## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ROADHOUSE HOLDING INC., *et al.*,[1]<br><br>           Debtors. | Chapter 11<br><br>Case No. 16 - 11819 (___)<br><br>(Joint Administration Requested) |

## DECLARATION OF KEITH A. MAIB IN SUPPORT OF
## CHAPTER 11 PETITIONS AND FIRST DAY RELIEF

I, Keith A. Maib, hereby declare under penalty of perjury:

1. I am the Chief Restructuring Officer ("**CRO**") of Finance of LRI Holdings, Inc. ("**LRI Holdings**"), a corporation organized under the laws of Delaware and an affiliate of each of the other above-captioned debtors and debtors in possession (each a "**Debtor**" and collectively, the "**Debtors**"). Mackinac Partners, LLC ("**Mackinac**"), of which I am a Senior Managing Director, was engaged by LRI Holdings on May 25, 2016, to provide the Debtors with advisory services with respect to their business operations and potential restructuring. At that time, I was appointed as CRO of Finance, and my colleague at Mackinac, Nishant Machado, was appointed as CRO of Operations. In my capacity as a co-CRO, I am familiar with the Debtors' day-to-day operations, businesses, financial affairs, and books and records

2. On the date hereof (the "**Petition Date**"), each Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**"). The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Roadhouse Holding Inc. (5939); Roadhouse Intermediate Inc. (6159); Roadhouse Midco Inc. (6337); Roadhouse Parent Inc. (5108); LRI Holdings, Inc. (4571); Logan's Roadhouse, Inc. (2074); Logan's Roadhouse of Texas, Inc. (2372); and Logan's Roadhouse of Kansas, Inc. (8716). The location of the Debtors' corporate headquarters is 3011 Armory Drive, Suite 300, Nashville, Tennessee 37204.

Code.  Concurrently herewith, the Debtors filed a motion seeking joint administration of these chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

3.      I submit this declaration (this "**First Day Declaration**"), pursuant to Rule 1007 of the Bankruptcy Rules, to provide an overview of the Debtors and these chapter 11 cases and to support the Debtors' chapter 11 petitions and applications and motions for "first day" relief (each, a "**First Day Motion**," and collectively, the "**First Day Motions**").  Except as otherwise indicated herein, all facts set forth in this First Day Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management and the Debtors' professional advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition.  I am authorized to submit this First Day Declaration on behalf of the Debtors and, if called upon to testify, I could and would testify competently to the facts set forth herein.

**Preliminary Statement**

4.      The Debtors commenced these cases to implement a balance sheet and operational restructuring that will allow the Debtors to become a market leading casual dining steakhouse operator.  The Debtors, in consultation with their professional advisors and after careful examination by the Debtors' management team, entered into a Restructuring Support Agreement (the "**RSA**," a copy of which is attached hereto as <u>Exhibit B</u>) under which their Revolving Facility Lenders (as defined herein) and holders of over 83.9% of the approximately $378.0 million in principal amount of Notes (as defined herein) have agreed to support a restructuring, including committed exit financing facilities, that will deleverage the company by over $300 million.  The Debtors are also engaged in an operational restructuring that, in

conjunction with the tools available to chapter 11 debtors, will allow them to eliminate costs and exit existing restaurant locations that are underperforming and incompatible with the Debtors' long-term business plan and will provide the platform to execute their long term strategy to grow sales and increase margins.

5.     Through these chapter 11 cases, the Debtors intend to pursue a swift and efficient chapter 11 plan confirmation process to preserve and maximize the value of their assets for the benefit of their stakeholders.  With a deleveraged balance sheet, a rationalized portfolio of restaurants, and the operational initiatives that the Debtors are implementing in conjunction with their financial restructuring, the Debtors believe that they will be poised to offer their customers best in class service and product within the casual dining steakhouse segment and will be positioned to increase annual revenue and profitability.

**I.     General Background**

    A.     Debtors' Businesses and Overview

6.     Debtor Logan's Roadhouse, Inc. ("**Logan's Roadhouse**"), a Tennessee corporation, operates full-service casual dining steakhouses.  Prior to the Petition Date, the Debtors' operations encompassed approximately 234 company-owned restaurants located in 23 states, with a workforce of approximately 18,964 employees, and an additional 26 franchised restaurants.  Approximately 1,002 of its employees are employed on a full-time, salaried basis, while the remainder of its workforce is employed on an hourly basis.

7.     The Debtors offer specially-seasoned aged steaks and southern inspired dishes in a roadhouse atmosphere that includes their "bottomless buckets" of roasted in-shell peanuts. All of the Debtors' company-owned and franchised restaurants operate under the name Logan's Roadhouse.  In calendar year 2015, the Debtors had net revenues of over $606.4 million and unaudited EBITDA of minus $112 million, which included impairment and closing charges of

over $120 million resulting in an adjusted EBITDA of approximately $8 million. For the first half of 2016, the Debtors had net revenues of over $302 million.

8.     The first Logan's Roadhouse restaurant opened in Lexington, Kentucky in 1991. Logan's Roadhouse was incorporated in 1995 in the state of Tennessee and operated as a public company from July 1995 through February 1999, when it was acquired by Cracker Barrel Old Country Store, Inc. ("**Cracker Barrel**"). From February 1999 to December 2006, Logan's Roadhouse was a wholly-owned subsidiary of Cracker Barrel. In December 2006, Logan's Roadhouse was acquired by certain investors through LRI Holdings, a Delaware corporation. On October 4, 2010, LRI Holdings was acquired by certain wholly owned subsidiaries of Roadhouse Holding Inc.

B.     The Debtors' Prepetition Capital Structure

9.     As of the Petition Date, the Debtors have outstanding debt obligations in the aggregate principal amount of about $416 million, consisting primarily of approximately (a) $23.9 million in secured loans under a first lien senior secured revolving credit facility, (b) $378.0 million in principal amount of second-priority senior secured notes, and (c) $14 million owed to vendors, landlords and other unsecured creditors. There are also approximately $5.1 million in letters of credit issued under the Credit Agreement (as defined herein) that are undrawn and have not been cash-collateralized.

(i)     The Prepetition Credit Agreement

10.     As of the Petition Date, Logan's Roadhouse was the borrower under that certain $30,000,000 Senior Secured Revolving Credit Facility (as amended from time to time, the "**Credit Agreement**"), dated as of October 4, 2010 with JPMorgan Chase Bank, N.A., as Administrative Agent and Collateral Agent (the "**Revolving Facility Agent**") and the lenders thereto (the "**Revolving Facility Lenders**"). The obligations under the Credit Agreement are

guaranteed by LRI Holdings and the subsidiaries of Logan's Roadhouse and are also secured by substantially all of the assets of Logan's Roadhouse, LRI Holdings, and all of Logan's Roadhouse's subsidiaries (the "**Revolving Facility Collateral**"). As of the Petition Date, approximately $23.9 million in principal amount of loans were outstanding under the Credit Agreement and approximately $5.1 million in unfunded letters of credit had been issued under the Credit Agreement.

(ii) <u>The Second Lien Notes</u>

11. On October 4, 2010, Logan's Roadhouse issued $355.0 million aggregate principal amount of senior secured notes in a private placement to qualified institutional buyers (the "**2010 Indenture**"). In July 2011, the Debtors completed an exchange offering, which allowed the holders of those notes to exchange them for notes identical in all material respects except they are registered with the SEC and are not subject to transfer restrictions (the "**2010 Notes**"). The 2010 Notes bear interest at a rate of 10.75% per annum, which is payable in cash on April 15 and October 15 each year, and will mature on October 15, 2017. The 2010 Notes are guaranteed by LRI Holdings and the subsidiaries of Logan's Roadhouse and are secured on a second-priority basis by the same collateral that secures the obligations under the Credit Agreement. Following the October 15, 2015 exchanges, which are discussed below, approximately $143.9 million of 2010 Notes remained outstanding (the "**Unexchanged Notes**").

12. In October 2015, the Debtors completed exchange offers with two substantial holders of 2010 Notes in order to preserve liquidity and reduce the Debtors' cash-pay interest obligations. Specifically, on October 15 and October 22, 2015, the Debtors completed an exchange with affiliates of Kelso & Company, L.P. ("**Kelso**"), as holders of approximately $106.8 million in aggregate principal amount of the 2010 Notes (the "**Kelso Noteholders**"), pursuant to which the Kelso Noteholders exchanged their 2010 Notes (and accrued and unpaid

interest thereon) for approximately $112.6 million in aggregate issue price of Logan's Roadhouse's Series 2015-1 Senior Secured Zero Coupon Notes due in 2017 (the "**Kelso Notes**"). Also on October 15, 2015, the Debtors completed an exchange with affiliates of GSO Capital Partners, LP ("**GSO**"), as holders of approximately $104.3 million in aggregate principal amount of 2010 Notes (the "**GSO Noteholders**", and together with the Kelso Noteholders and the holders of the Unexchanged Notes, the "**Noteholders**"), pursuant to which the GSO Noteholders exchanged their 2010 Notes (and accrued and unpaid interest thereon) for approximately $109.7 million in aggregate issue price of Logan's Roadhouse's Series 2015-2 Senior Secured Notes due in 2017 (the "**GSO Notes**," and together with the Kelso Notes, the "**2015 Notes**"). The 2015 Notes are guaranteed by LRI Holdings and the subsidiaries of Logan's Roadhouse and are secured on a second-priority basis by the Revolving Facility Collateral.

13.     The Kelso Notes were issued with original issue discount with an accretion rate of 10.75% per annum, compounded semi-annual, such that the Kelso Notes do not have any cash pay interest obligations and, instead, the accreted value of each Kelso Note increases on each interest payment date. The GSO Notes have a similar accretion feature, except that the accretion rate is 10.5% per annum and the accretion can be paid in cash at Logan's Roadhouse's election. The GSO Noteholders are also entitled to a 4% per annum cash coupon payment.

14.     As of the Petition Date, the outstanding principal balance of the Unexchanged Notes was $143.9 million, the outstanding principal balance of the Kelso Notes was approximately $118.6 million, and the outstanding principal balance of the GSO Notes was approximately $115.5 million.

(iii)    Equity Ownership

15.    Roadhouse Holding Inc. is the ultimate parent company of the Debtors and its stock is over 97% owned by affiliates of Kelso & Company.  The chart attached hereto as Exhibit A depicts the Debtors' organizational structure as of the Petition Date.

## II.    Events Leading to these Chapter 11 Cases.

16.    Over the course of the last few years, a series of factors has contributed to the Debtors' need to file these chapter 11 cases, as described below.  Critically, the Debtors' top line sales decreased while their margins also declined as a result of increases in commodities and labor costs.  These factors placed significant strain on the Debtors' business and liquidity needs.

17.    Prior to the commencement of these chapter 11 cases, the Debtors' operations and financial performance were adversely affected by the overall downturn in the economy, the highly competitive nature of the casual family dining sector, and poor sales results.  Despite recent trends of recovery in the overall economy, the Debtors' business has continued to underperform as a result of a competitive price environment.  The Debtors' customers continue to face pressure on discretionary income, directly correlating to depressed restaurant sales and reduced customer traffic.  The casual dining sector as a whole has continued to suffer, with the industry facing traffic declines of approximately 3% over the past year as consumer preferences shift towards cheaper, faster alternatives.  In the first half of 2016, the Debtors experienced an 8.77% drop in customer traffic and a 3.95% decrease in restaurant sales.

18.    As a result of these factors, the Debtors' revenues and EBITDA have been insufficient to support their debt service, working capital, and capital expenditure needs.  In realization of this fact, the Debtors engaged in the 2015 exchange with the GSO Noteholders and Kelso Noteholders in an effort to preserve liquidity, which resulted in the elimination of over $18.5 million in annual cash-pay interest obligations.  Importantly, the 2015 exchange allowed

the Debtors to avoid payment of over $9.2 million in cash interest payments that would have been due on October 15, 2015.

19.     However, those efforts were not enough; by April 2016, the Debtors determined that they could not make their cash coupon payments due on the Unexchanged Notes and the GSO Notes.  Thereafter, the Debtors began negotiating in earnest with the Revolving Facility Lenders and certain Noteholders regarding forbearance agreements and the terms of a more comprehensive restructuring of the Debtors and their balance sheets.  The Debtors entered into a forbearance agreement on May 13, 2016, which was subsequently amended to extend the forbearance period through August 15, 2016.  Extensive negotiations followed.

## III.     The Debtors' Restructuring and Turnaround Efforts

20.     In May 2015, the Debtors engaged Mackinac as their restructuring financial advisor and appointed the co-CROs.  Since that time, Mackinac has worked with the Debtors to review and analyze their financial results, operational data, and contractual and business arrangements and obligations.  Mackinac has also assisted and advised the Debtors with respect to the development of a plan to restructure the Debtors' debt obligations and prepare for these chapter 11 cases.

21.     Mackinac's engagement also included evaluating the Debtors' existing restaurant portfolio and operating performance to identify underperforming restaurants and to determine how such restaurants could improve their individual contributions to EBITDA.  As part of this exercise, Mackinac and the Debtors' management evaluated various cost saving opportunities on a store-by-store basis, including occupancy costs.  In connection with these efforts, the Debtors engaged Hilco Real Estate LLC ("**Hilco**") in April 2016 to review their real estate portfolio and advise the Debtors with respect to a strategic plan for restructuring, assigning/selling, or rejecting

the leases for underperforming locations. The Debtors have identified certain stores to close based on unsustainable performance levels, and the Debtors' review is continuing.

22. The Debtors also engaged Jefferies, LLC ("**Jefferies**") as their financial advisor to assist the Debtors in connection with their restructuring, including assisting and advising the Debtors in raising additional financing. In recent months, the Debtors have worked diligently, in consultation with Jefferies, Mackinac, and their counsel, to evaluate their options for addressing the Debtors' current financial difficulties and the long-term financial outlook for the Debtors. As part of this process, the Debtors engaged in discussions with certain Noteholders and the Revolving Facility Lenders. These discussions resulted in the negotiation of the RSA with the Supporting Noteholders,[2] Revolving Facility Agent, Supporting Lenders, and Supporting Interest Holders. Pursuant to the RSA, the parties thereto have agreed to support a restructuring transaction that will materially deleverage the Debtors' balance sheet and provide much needed liquidity to the Debtors' business.

23. Importantly, the RSA has backstop commitments from the Supporting Noteholders to backstop the funding of the "new money" portion of the debtor in possession financing facilities (the "**DIP Facilities**"), which will be junior to the obligations of the Credit Agreement, for the lenders under the DIP Facilities to roll-over that facility to an exit facility upon emergence from chapter 11, and for the Supporting Lenders to backstop an exit facility that will take-out the existing obligations under the Credit Agreement at closing. Prior to entering into the RSA, Jefferies was directed to contact parties to assess the level of interest in providing post-petition financing to the Debtors. Jefferies contacted the Revolving Facility Lenders, certain known Noteholders, and well established and experienced financial institutions and other

---

[2]  Capitalized terms used in this section but not otherwise defined will have the meanings ascribed to them by the RSA. Any description of the RSA herein is qualified in its entirety by the terms of the RSA, which shall control in the event of any conflict.

investors that may be interested in lending to debtors under these circumstances. No party expressed interest in providing financing to the Debtors on terms other than pursuant to a senior priming lien facility. The Debtors determined, in consultation with their advisors, that it was unlikely they could obtain consent to a senior priming lien facility provided by a third-party that was not already an existing lender and were, in fact, advised by the Revolving Facility Lenders that they were not willing to consent to having their liens primed by a debtor in possession financing facility. Further, the Debtors determined that seeking priming financing on a contested basis would thwart the Debtors' desire to promptly effect a restructuring because a priming financing dispute would likely disrupt the Debtors and their business and may also have unintended operational consequences.

24. With respect to the Plan contemplated under the RSA, the Noteholders will receive their pro-rata share of equity in the reorganized Debtors in exchange for their Notes, with the exception that holders of less than $50,000 in principal amount of Notes will receive either cash or a third-lien note rather than equity, depending on whether they vote in favor of the Plan. Additionally, the Revolving Facility Lenders will receive their pro rata share of an exit revolving facility in satisfaction of their claims under the Credit Agreement, unless the Debtors enter into an alternative first lien facility, in which case the Revolving Facility Lenders will be paid in full in cash and outstanding letters of credit issued under the Credit Agreement will be replaced or cash collateralized at 105% of their amount. The RSA also contemplates that holders of General Unsecured Claims will receive their pro rata share of a cash pool if, as a class, they vote in favor of the Plan.

25. Throughout the weeks leading up to the Petition Date, the Debtors and the Revolving Facility Agent, the Supporting Lenders, the Supporting Noteholders, and the trustee

for the 2010 Indenture engaged in extensive good faith and arms'-length negotiations with respect to the terms and conditions of the proposed postpetition financing and RSA. The DIP Facilities and RSA are the result of good faith and arms'-length negotiations.

## IV. Evidentiary Support for First Day Motions[3]

26.     Concurrently with the filing of their chapter 11 petitions, the Debtors have filed a number of First Day Motions seeking relief that the Debtors believe is necessary to enable them to operate with minimal disruption and loss of productivity. The Debtors request that the relief requested in each of the First Day Motions be granted as critical elements in ensuring a smooth transition into, and stabilizing and facilitating the Debtors' operations during the pendency of, these chapter 11 cases. I have reviewed each of the First Day Motions discussed below, and the facts set forth in each First Day Motion are true and correct to the best of my knowledge, information, and belief, and the below is included as a supplement to the specific facts set forth therein.

### A.     Debtors' Motion for Entry of an Order Directing the Joint Administration of the Debtors' Chapter 11 Cases (the "Joint Administration Motion")

27.     The Debtors request entry of an order directing joint administration of these chapter 11 cases for procedural purposes only, pursuant to Bankruptcy Rule 1015(b). Specifically, the Debtors request that the Court maintain one file and one docket for all of these chapter 11 cases under the case of Roadhouse Holding Inc., and also request that an entry be made on the docket of each of the Debtors' chapter 11 cases, other than Roadhouse Holding Inc., to reflect the joint administration of these chapter 11 cases.

28.     Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience without harming the

---

[3]  Capitalized terms used in this section and not otherwise defined shall have the meanings ascribed to them in the applicable motion.

substantive rights of any party in interest. Many of the motions, hearings, and orders that will arise in these chapter 11 cases will jointly affect Roadhouse Holding Inc. and each of its affiliates that also have contemporaneously filed chapter 11 cases. Among other things, the entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections, and will allow the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.

29. Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

B. Debtors' Application for an Order, Pursuant to 28 U.S.C. § 156(c), Authorizing the Retention and Appointment of Donlin, Recano & Company, Inc. as Claims and Noticing Agent for the Debtors, *Nunc Pro Tunc* to the Petition Date (the "DRC Retention Application")

30. The Debtors request entry of an order, pursuant to section 156(c) of title 28 of the United States Code, section 503(b) of the Bankruptcy Code, and Local Rule 2002-1(f), authorizing the retention and appointment of DRC as claims and noticing agent in connection with these chapter 11 cases, in accordance with the Engagement Letter. I believe that the relief requested in the DRC Retention Application is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will ease the administrative burden on the Clerk in connection with these chapter 11 cases. In addition, I have been advised by counsel that DRC's retention is required by the Local Rules in light of the anticipated number of creditors in these chapter 11 cases. Accordingly, on behalf of the Debtors, I respectfully submit that the DRC Retention Application should be approved.

C.  Debtors' Motion for Entry of Interim and Final Orders (I) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Services; (II) Deeming Utility Providers Adequately Assured of Payment; and (III) Establishing Procedures for Determining Additional Adequate Assurance of Payment (the "Utilities Motion")

31.     The Debtors request the entry of interim and final orders, among other things: (a) determining that the Utility Providers have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code; (b) approving the Debtors' proposed offer of adequate assurance and procedures governing any Utility Providers' requests for additional adequate assurance; and (c) prohibiting the Utility Providers from altering, refusing, or discontinuing services on account of prepetition amounts outstanding and on account of any perceived inadequacy of the Debtors' proposed adequate assurance pending entry of the Final Order.   In the ordinary course of business, the Debtors incur expenses for electricity, natural gas, water, sewer, telephone, internet, waste management and other similar utility services provided by several Utility Providers.   Additionally, the Debtors rely on the services of Ecova, Inc. to provide certain management and accounting services with respect to the majority of the Debtors' Utility Providers.   Uninterrupted Utility Services are essential to the Debtors' ongoing operations and, therefore, to the success of their chapter 11 efforts.   Indeed, any interruption of Utility Services, even for a brief period of time, would negatively affect the Debtors' operations, customer relationships, revenues, and profits, thereby seriously jeopardizing the Debtors' chapter 11 efforts and, ultimately, estate value and creditor recoveries.   It is, therefore, critical that Utility Services continue uninterrupted during these chapter 11 cases.

32.     As of the Petition Date, the Debtors believe they are generally current on their utility payments.   I believe and am advised that the Proposed Adequate Assurance and Additional Adequate Assurance Procedures are necessary in these chapter 11 cases because, if such procedures were not approved, the Debtors could be forced to address numerous requests

by the Utility Providers in a disorganized manner during the critical first weeks of these chapter 11 cases. Moreover, a Utility Provider could blindside the Debtors by unilaterally deciding—on or after the 30th day following the Petition Date—that it is not adequately assured of future performance and discontinuing service or making an exorbitant demand for payment to continue service. Discontinuation of Utility Service could shut down operations, and any significant disruption of operations could jeopardize the success of these chapter 11 cases.

33.     I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be approved.

D.     <u>Debtors' Motion for an Order Pursuant to Sections 105(a), 363(b), 507(a)(8) and 541 of the Bankruptcy Code (I) Authorizing Payment of Certain Prepetition Taxes and Fees, and (II) Authorizing and Directing Financial Institutions to Process and Cash Related Checks and Transfers (the "Taxes and Fees Motion").</u>

34.     The Debtors request authority to pay any Taxes and Fees that, in the ordinary course of business, accrued or arose before the Petition Date. In the ordinary course of business, the Debtors incur and/or collect certain Taxes and Fees and remit such Taxes and Fees to various Authorities. The Debtors must continue to pay the Taxes and Fees to continue operating in certain jurisdictions and to avoid costly distractions during these chapter 11 cases. Specifically, the Debtors' failure to pay the Taxes and Fees could adversely affect the Debtors' business operations because the Authorities could suspend the Debtors' operations, file liens, or seek to lift the automatic stay. In addition, certain of the Authorities may take precipitous action against the Debtors' directors and officers for unpaid Taxes and Fees, which undoubtedly would distract those individuals from their duties related to the Debtors' prosecution of these chapter 11 cases.

35.     I believe that the relief requested in the Taxes and Fees Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes and Fees Motion should be approved.

E.     <u>Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Pay Certain Prepetition Claims (A) Arising Under the Perishable Agricultural Commodities Act and (B) of Certain Critical Vendors, and (II) Granting Certain Related Relief (the "Trade Motion")</u>

36.     The Debtors request the authority to (a) pay prepetition claims arising under the Perishable Agricultural Commodities Act of 1930 (PACA) and (b) pay certain prepetition claims of critical vendors.

37.     The Debtors rely on a number of vendors that supply the Debtors with fruits and vegetables protected by PACA, and such PACA Claims have, as a general matter, priority ahead of all other secured and unsecured creditors in the Debtors' chapter 11 cases with respect to the Debtors' PACA inventory and its proceeds. Further, the Debtors have identified several Critical Vendors that supply goods and services critical to the uninterrupted operation of the Debtors' business. The Critical Vendors were determined following a close review of several factors, including the necessity of the goods and services to the Debtors' operations, the Debtors' ability to obtain the same or similar goods and services (either from the specific vendor or an alternate vendor) in the absence of payment of a pre-petition claim, the amount of the claim versus the financial and operational impact to the Debtors from a failure to obtain the goods and services underlying the claim, and the Debtors' ability to obtain or preserve favorable or necessary trade terms in exchange for payment of a Critical Vendor Claim. Finally, the Debtors have received from the PACA claimants and the Critical Vendors certain goods within the twenty-day period

prior to the Petition Date that may be entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code, which will need to be paid in full under the terms of the plan contemplated by the RSA.

38.     Without the relief granted in the Trade Motion, the Vendors may refuse to supply to the Debtors essential food, products, services, and supplies. Failure to receive these goods and services could cause serious disruptions to the continuous and timely flow of food, product, and supplies that are essential to the Debtors' business. Paying the prepetition obligations owed to these vendors in the ordinary course of business will thus benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption. Additionally, with respect to Critical Vendors, the Debtors intend only to make payments where the Debtors have determined that the payment is necessary and in the best interest of the Debtors and their estate. Further, the Debtors will seek to require the Critical Vendors to enter into Trade Agreements with the Debtors as a condition to receiving payment of their Critical Vendor Claim, thereby ensuring that the Debtors have a committed supply of the critical goods and services provide by Critical Vendors. I believe that the relief requested in the Trade Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will provide the Debtors' business operations a smooth transition into chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the Trade Motion should be approved.

F.     <u>Debtors' Motion for Order Authorizing (I) Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection With Liability, Property, and Other Insurance Programs, Including Payment of Policy Premiums and (II) Continuation of Insurance Premium Financing Programs (the "Insurance Motion")</u>

39.     The Debtors request authority to (i) continue and, to the extent necessary, renew liability, property, and other insurance programs and pay all policy premiums arising thereunder

or in connection therewith, including all such prepetition obligations arising in the ordinary course of business, and (ii) continue the Debtors' insurance premium financing programs.

40.     In connection with the operation of their businesses, the Debtors maintain workers' compensation, directors' and officers' liability, fiduciary, umbrella and excess liability, and various other liability, property, and automobile Insurance Programs.  All of the Insurance Programs are essential to the protection and continued functioning of the Debtors' business.  The continuation of the Insurance Programs on an uninterrupted basis is essential to the functioning of the Debtors' business.  If the Insurance Programs are permitted to lapse or are otherwise terminated, the Debtors could face significant postpetition liability for personal or property damage, which, in turn, could harm all parties in interest.  Moreover, in many cases, coverage provided by the Insurance Policies is required by the regulations, laws, and contracts governing the Debtors' commercial activities, including the requirements of the U.S. Trustee.  Accordingly, the Debtors must make payments with respect to the Insurance Programs and Premium Financing Obligations to preserve the value of the Debtors' estates for the benefit of all creditors.

41.     I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be approved.

G.     <u>Debtors' Motion Pursuant to Sections 105(a), 363(c), 503(b)(1), 1107(a) and 1108 of the Bankruptcy Code for Authorization to Honor Prepetition Obligations to Customers and Otherwise Continue Customer Programs in the Ordinary Course of Business (the "Customer Programs Motion")</u>

42.     The Debtors request the authority to maintain and administer their Customer Programs, and honor prepetition obligations related thereto, in the ordinary course of business and in a manner consistent with past practice.

43. To maintain the loyalty and goodwill of their customers, in the ordinary course of business, the Debtors implemented the Customer Programs to encourage new purchases, enhance customer satisfaction, sustain goodwill, and ensure that the Debtors remain competitive within the industry in which they operate. The Debtors' ability to honor their Customer Programs and related obligations in the ordinary course of business is necessary to retain their customer base and reputation for quality. The Debtors believe that the relief requested will pay dividends with respect to the success of these chapter 11 cases, especially at this critical time following the filing of the cases.

44. I believe that the relief requested in the Customer Programs Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Customer Programs Motion should be approved.

H. Debtors' Motion for an Order (A) Authorizing the (I) Continued Use of their Existing Cash Management System and (II) Use of Existing Bank Accounts and Business Forms; (B) Authorizing Payments of Prepetition Costs and Fees Associated with Customer Credit and Debit Card Transactions; (C) Waiving the Requirements of Section 345(b) of the Bankruptcy Code on an Interim Basis, and (D) Granting Certain Related Relief (the "Cash Management Motion")

45. The Debtors request the authority to: (a) continue to use, with the same account numbers, all of the Bank Accounts in their Cash Management System; (b) treat the Bank Accounts for all purposes as accounts of the Debtors as debtors in possession; (c) open new debtor-in-possession accounts, if needed; and (d) use, in their present form, all correspondence and business forms (including check stock, letterhead, purchase orders, and invoices) and other documents related to the Bank Accounts existing immediately before the Petition Date, without reference to the Debtors' status as debtors in possession.

46.     In addition, the Debtors further request that the Court authorize the Banks to: (a) continue to maintain, service, and administer the Bank Accounts and (b) debit the Bank Accounts in the ordinary course of business on account of (i) checks drawn on the Bank Accounts that are presented for payment at the Banks or exchanged for cashier's checks prior to the Petition Date; (ii) checks or other items deposited in the Bank Accounts prior to the Petition Date that have been dishonored or returned unpaid for any reason (including associated fees and costs), to the same extent the Debtors were responsible for such items prior to the Petition Date; and (iii) undisputed, outstanding service charges owed to the Banks as of the Petition Date on account of the maintenance of the Debtors' Cash Management System, if any.

47.     In the ordinary course of business, the Debtors utilize an integrated Cash Management System to collect, transfer, and disburse funds generated by their operations and maintain current and accurate accounting records of all daily cash transactions.  If the Debtors were required to comply with the U.S. Trustee Guidelines, the burden of opening new accounts, revising cash management procedures, instructing customers to redirect payments, and the immediate ordering of new checks with a "Debtor in Possession" legend, would disrupt the Debtors' business at this critical time.  The Debtors respectfully submit that parties in interest will not be harmed by their maintenance of the existing Cash Management System, including their Bank Accounts, because the Debtors have implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred prior to the Petition Date.

48.     The relief requested in the Cash Management Motion is vital to ensuring the Debtors' seamless transition into bankruptcy.  Authorizing the Debtors to maintain their Cash

Management System will avoid many of the possible disruptions and distractions that could divert their attention from more critical matters during the initial days of these chapter 11 cases.

49.     I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

I.     <u>Motion of the Debtors for Entry of an Order (A) Authorizing the Debtors to Pay and Honor Certain Prepetition Wages, Benefits and Other Compensation Obligations and (B) Authorizing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations (the "Wages and Benefits Motion")</u>

50.     The Debtors request the authority, in their discretion, to pay prepetition claims, honor obligations, and to continue programs, in the ordinary course of business and consistent with past practices, relating to the Employees and the Employee Programs.

51.     As of the Petition Date, the Debtors employ approximately 18,964 employees, of which approximately 1,002 are employed on a full-time, salaried basis, while the remainder are employed on an hourly basis. Although the Debtors have paid their wage, salary, and other obligations in accordance with their ordinary compensation schedule prior to the Petition Date, as of the date hereof, certain prepetition obligations for Employees may nevertheless be due and owing.

52.     The majority of the Debtors' Employees rely exclusively on their compensation, benefits, and reimbursement of expenses to satisfy their daily living expenses. Consequently, these Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid compensation, benefits, and reimbursable expenses. Moreover, if the Debtors are unable to satisfy such obligations, Employee morale and loyalty

will be jeopardized at a time when Employee support is critical to the Debtors. In the absence of such payments, the Debtors believe their Employees may seek alternative employment opportunities, perhaps with the Debtors' competitors, thereby hindering the Debtors' ability to meet their customer obligations and likely diminishing creditors' confidence in the Debtors. Moreover, the loss of valuable Employees and the recruiting efforts that would be required to replace such Employees would be a substantial and costly distraction at a time when the Debtors should be focusing on stabilizing their operations.

53. Included in the relief sought are approval of the Incentive Plans and authorization for the Debtors to issue Severance Pay to employees separated after the Petition Date in accordance with their prior practices. Under the Incentive Plans, people employed by the Debtors as Restaurant Managers, Directors of Operation, Divisional Vice Presidents, Director of Margin Improvement, and Managers of Margin Improvement earn monthly or quarterly performance-based bonuses. In addition, the Managers and Director of Margin Improvement are eligible for an annual kicker based on an established, predetermined incremental margin improvement goal. The Incentive Plans are considered as part of the overall salary and compensation package of the employees and failure to honor these obligations—which are tied to the achievement of certain performance metrics—would be viewed by the Employees in the same manner as failure to pay regular wages. With respect to Severance Pay, the Debtors anticipate that in connection with store closures, they may need to offer Severance Pay to key employees who may be leaving employment with the Debtors to ensure that those employees properly transition out of their positions with the Debtors and, in certain cases, to ensure that proper wind-down and exit procedures are implemented.

54.     Payments under the Monthly Performance Plan (one of the two sets of Incentive Plans) for the month of July will come due before the second day hearing in these cases and the Debtors anticipate that they will need to commit to make Severance Pay to employees prior to the second day hearing.  As a result, the Wages and Benefit Motion includes immediate approval of payments under the Monthly Performance Plan and interim approval of Severance Pay.  The Debtors also seek to schedule a non-emergency hearing regarding approval of continuation of their Quarterly Performance Plans and final relief on their Severance Pay practices.  In certain instances, the total amount authorized to be paid to employees for wages and salary, Incentive Plan payments and Severance Pay will exceed the $12,850 per individual statutory cap, but no payments to any individual employee will exceed that cap in the approximately 30 day period between the Petition Date and the second day hearing.

55.     I believe that the relief requested in the Wages and Benefits Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Wages and Benefits Motion should be approved.

J.      Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing the Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (III) Granting Adequate Protection to the Prepetition Secured
Parties Pursuant to Sections 361, 362, 363 and 364 of the Bankruptcy Code, (IV) Granting Liens and Superpriority Claims, (V) Modifying the Automatic Stay, and (VI) Scheduling a Final Hearing (the "DIP Motion").

56.     Among other things, the Debtors request the authority to (a) obtain postpetition financing on a senior-secured, super-priority basis, which will be subordinate to the obligations under the Credit Agreement and the adequate protection obligations of the Revolving Facility

Lenders, (b) grant super-priority liens and claims, (c) use Cash Collateral and provide adequate protection in connection therewith, and (d) roll-up certain prepetition secured notes with respect to the DIP Motion. The Debtors need financing to fund the administration of these chapter 11 cases and pursue the restructuring of their businesses.

57. As previously set forth in this First Day Declaration, I believe that after extensive efforts by the Debtors and their advisors, the DIP Facilities are the only feasible source of financing available to the Debtors given the facts and circumstances of these cases. This is unsurprising given, among other things, the substantial level of secured debt the Debtors already have and the competitive pressures the Debtors are facing in their industry. Without access to the DIP Facilities, the Debtors could experience a liquidity shortfall and would be deprived of the capital necessary to operate their businesses. The Debtors' management, board, and professionals have reviewed their restructuring alternatives in detail over the past several months, which included implementing the 2015 exchange with Kelso and GSO. They also explored alternative sources of capital and financing, including considering other out-of-court exchange transactions and seeking other financing transactions, none of which yielded a result that would allow the Debtors to continue to operate outside of chapter 11.

58. Once the importance of the DIP Facilities to the overall restructuring became apparent, the Debtors decided to concentrate their efforts on improving the terms of the DIP Facilities proposed by certain Noteholders. Extensive good faith negotiations between the Supporting Lenders, Supporting Noteholders, the Revolving Facility Agent, the trustee under the 2010 Indenture, and the Debtors occurred over the weeks leading up to the Petition Date, where the Debtors were successful in improving certain key terms of the DIP Facilities. After having engaged in extensive arms'-length negotiations regarding the DIP Facilities proposed as part of

the consensual restructuring under the RSA, and having improved several terms of the DIP Facilities as initially proposed, the Debtors have determined that the DIP Facilities are the best source of financing currently available to the Debtors.

59.     I believe that the DIP Facilities, along with the coupled consent to use Cash Collateral, will provide immediate access to capital on terms that, collectively, are the best and most favorable terms available to the Debtors.  The DIP Facilities will provide the funding necessary to allow the Debtors to, among other things, maintain their businesses in the ordinary course and successfully implement their restructuring under the plan contemplated by the RSA. The DIP Facilities also will enhance the Debtors' ability to minimize disruption to their businesses and instill confidence in their various creditor constituencies, including customers, employees, landlords, vendors, and service providers.

60.     I also believe that the financial terms of the DIP Facilities are consistent with market terms for such financing under the current economic environment and the Debtors' recent and projected financial performance.  And there is, in fact, no other financing proposal available to the Debtors, let alone a proposal with materially superior economic terms.  Moreover, the non-economic terms of the DIP Facilities—particularly, the ability to roll over the obligations under the DIP Facilities into exit-financing at emergence—make the DIP Facilities superior to any other facility with comparable terms.  After thorough analysis, I concluded that the terms of the DIP Facilities are reasonable and appropriate under the circumstances, as well as the only feasible option that the Debtors believe is available.  I submit that the satisfaction of certain of the Prepetition Note Obligations as provided for under the Roll Up Facility is appropriate in these cases.  The roll up is part of the overall package presented to the Debtors by the DIP Agent and the DIP Lenders.  Based on numerous conversations I have had with the DIP Lenders and

their respective advisors, and based on my experience in general, I do not believe that the DIP Lenders would have agreed to the DIP Facilities absent the treatment of their Prepetition Note Obligations provided for under the Roll Up Facility. In addition, I submit that the Debtors and their estates will not be prejudiced because the satisfaction of such amounts is subject to the "challenge" rights set forth in the DIP Orders.

61.     It is my understanding that all Prepetition Noteholders that are accredited investors or qualified institutional buyers are able to participate in the DIP Facilities. The Interim Order and DIP Credit Agreement require that such Prepetition Noteholders receive notice of the opportunity to participate in the DIP Facilities and provide mechanics for them to join in as lenders. As a result, every Prepetition Noteholder that is an accredited investor or qualified institutional buyer will be able to participate fully, which I believe is fair and reasonable.

62.     Additionally, I believe that the Prepetition Note Secured Parties are adequately protected against any diminution in value of the Prepetition Collateral by the protections set forth in the Interim Order, including the Adequate Protection Liens, the Adequate Protection Claims, and the additional funding provided by the DIP Lenders to maintain the Debtors' operation and preserve their going concern value. Importantly, the trustee under the 2010 Indenture has consented to the priming of the liens securing the 2010 Notes issued thereunder, and all holders of the GSO Notes and Kelso Notes are parties to the RSA and participating in the DIP Facilities and, therefore, are consenting to the priming of their liens. Further, I believe that the postpetition financing provided by the DIP Lenders not only protects against diminution in value—which would likely result from the Debtors' inability to continue to finance their operations—but also enhances the Debtors' ability to derive value (and the Prepetition Note Secured Parties' ability to

realize value) from the Prepetition Collateral by enabling the Debtors to purse a necessary deleveraging of their balance sheet, including through the transactions set forth in the RSA, and ensure that they continue as a financially sustainable going-concern. In contrast, absent such authority, I believe that the Debtors' ability to continue operations will be significantly impaired and the value of their assets and the Prepetition Collateral could be destroyed to the detriment of Prepetition Note Secured Parties and other creditors. With the DIP Facilities, the Debtors will be in a position to continue operations, thereby preserving the value of their assets for the benefit of all creditors, and will be provided an opportunity to pursue the transactions embodied in the RSA.

63.     Further, the DIP Facilities will be governed by a budget that has been developed by management and the Debtors' advisors, and I believe that this budget is sufficient to allow the Debtors to continue to operate in the ordinary course of business and execute on their business plan. As requested in the Interim Order, and set forth in the budget, the Debtors believe they need $10 million of new money liquidity in the first 35 days of these cases to, among other things, continue to fund their post-petition obligations and execute on their business plan. If the Debtors do not have access to this $10 million funding in the period prior to the final hearing on the DIP Motion, the Debtors face the threat of immediate and irreparable harm because they will be deprived of the necessary liquidity and capital to operate their businesses.

64.     Additionally, the DIP Facilities are fully integrated into the consensual framework for the Debtors' expedited emergence from chapter 11, which was negotiated among the Debtors, the Revolving Facility Agent, the Revolving Facility Lenders, and certain of the Noteholders, and embodied in the RSA and the exhibits thereto. Thus, the DIP Facilities are an integral component of a comprehensive restructuring strategy developed by the Debtors in

concert with their key stakeholders. In my view, the value of having agreed terms for a reorganization plan and stable and committed DIP financing and exit financing to reassure the Debtors' customer base, employees, landlords and other parties in interest that operations will continue as normal, cannot be overstated.

65. I believe the Debtors have satisfied the requirement to obtain postpetition financing on a superpriority, secured basis pursuant to section 364 of the Bankruptcy Code because the Prepetition Secured Parties have consented to the use of Cash Collateral, and the Prepetition Note Secured Parties have consented to the priming of their liens by the DIP Liens and are adequately protected against any diminution in value of the Prepetition Collateral. Moreover the DIP Facilities have terms, adequate protection, and fees that I believe are fair and within the range of reasonable terms for a secured post-petition financing facility in light of the facts and circumstances of these Debtors. In sum, approval of the DIP Facilities is necessary to avoid erosion of value and to accomplish a seamless transition into chapter 11 and, ultimately, to successfully emerge under the plan contemplated by the RSA. I believe the circumstances of the chapter 11 cases necessitate postpetition financing under section 364(c) and (d) of the Bankruptcy Code, and the DIP Facilities reflect the sound exercise of the Debtors' business judgment.

66. I believe that the relief requested in the DIP Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the DIP Motion should be approved.

*[remainder of page intentionally left blank]*

01:18929177.11

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: August ___, 2016
Wilmington, Delaware

Keith A. Maib
Chief Restructuring Officer of Finance

# EXHIBIT A

## Corporate Organizational Chart



# **EXHIBIT B**

## **Restructuring Support Agreement**

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.**

## RESTRUCTURING SUPPORT AGREEMENT

### August 8, 2016

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits and schedules attached hereto, and as may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms hereof, this "***Agreement***")[1] is entered into by and among the following parties:

(a) Roadhouse Holding Inc. ("***Roadhouse Holding***") and each of its direct and indirect subsidiaries that are party hereto (collectively, the "***Debtors***" and each such entity, a "***Debtor***");

(b) Kelso Investment Associates VIII, L.P. and KEP VI, LLC (together, the "***Supporting Interest Holders***") in their capacity as owners of Equity Interests in Roadhouse Holding;

(c) the undersigned holders or investment advisors or managers and discretionary accounts that hold claims[2] against certain of the Debtors under the Notes (collectively, the "***Supporting Noteholders***"), who have agreed to backstop debtor-in-possession financing under a debtor-in-possession financing agreement, in the form of DIP Credit Agreement attached as Exhibit D to the RSA Term Sheet, consisting of the New Money Facility (as defined in the DIP Credit Agreement) not to exceed $25 million and the Roll Up Facility (as defined in the DIP Credit Agreement, and together with the New Money Facility, the "***DIP Facilities***"). The backstop commitment amount for each initial Supporting Noteholder is set forth on **Schedule 2** hereto;

(d) JPMorgan Chase Bank, N.A., as administrative agent under the Credit Agreement (in such capacity, the "***Revolving Facility Agent***");

(e) the undersigned lenders holding 100% of the claims under the Credit Agreement (together, the "***Supporting Lenders***"). The Supporting Lenders and the Supporting Noteholders are together referred to herein as the "***Supporting Creditors***" and each such entity, as a "***Supporting Creditor***"; and

(f) each entity that becomes a Joining Party (as defined below) in accordance with Section 8 or Section 22 of this Agreement (each of the foregoing described in sub-clauses (a)

---

[1] Capitalized terms used but not otherwise defined in this Agreement shall have the meaning ascribed to such terms in the term sheet attached hereto as **Exhibit A** (the "***RSA Term Sheet***").

[2] As used herein the term "***claim***" has the meaning ascribed to such term as set forth in section 101(5) of the Bankruptcy Code.

through (f), a "***Party***" and, collectively, the "***Parties***"). Each of the Parties set forth in clauses (b) through (f) is a "***Supporting Party***" and they are collectively referred to herein as the "***Supporting Parties***."

## RECITALS

**WHEREAS**, the Parties have agreed to enter into certain restructuring and recapitalization transactions that will have the effect of modifying the Debtors' capital structure, including the Debtors' respective obligations and the Supporting Parties' respective claims and interests related to each of the following: (a) the Credit Agreement, (b) the Notes, and (c) the Equity Interests;

**WHEREAS**, as of the date hereof, the Supporting Lenders collectively hold 100% of the outstanding principal amount owed under the Credit Agreement;

**WHEREAS**, as of the date hereof, GSO and Kelso collectively hold 100% of the outstanding Notes issued under the 2015 Indenture;

**WHEREAS**, as of the date hereof, Carl Marks and Marblegate collectively hold over 57.5% of the outstanding Notes issued under the 2010 Indenture;

**WHEREAS**, the Debtors intend to commence voluntary reorganization cases (the "***Bankruptcy Cases***") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (such court, or another court of competent jurisdiction with respect to the subject matter, the "***Bankruptcy Court***") to effect the restructuring and recapitalization transactions through a pre-arranged chapter 11 plan of reorganization having the terms set forth in the RSA Term Sheet (as may be amended or supplemented from time to time in accordance with the terms of this Agreement, the "***Plan***"), all of which shall be on the terms and conditions described in this Agreement (such transactions, the "***Restructuring***");

**WHEREAS**, the Parties desire to express to one another their mutual support and commitment in respect of the matters discussed herein; and

**WHEREAS**, the Parties have engaged in arm's length, good faith discussions with the objective of reaching an agreement regarding the Restructuring.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

## AGREEMENT

**Section 1. Definitive Documentation.**

(a) The definitive documents and agreements governing the Restructuring (collectively, the "***Restructuring Documents***") shall consist of: (i) this Agreement and the RSA Term Sheet; (ii) the documentation in respect of the proposed DIP Facilities (including the motion pursuant to sections 363 and 364 of the Bankruptcy Code to authorize the Debtors to obtain post-petition

secured financing (the "***DIP Financing Motion***"), the Interim DIP Order in the form attached as Exhibit C to the RSA Term Sheet, the order approving the DIP Financing Motion on a final basis (in form and substance reasonably satisfactory to the DIP Agent, the Required DIP Lenders, the Required Supporting Noteholders, the Supporting Lenders and the Debtors, the "***Final DIP Order***" and together with the Interim DIP Order, the "***DIP Orders***") and the DIP Credit Agreement together with all related loan documents (the "***DIP Loan Documents***")); (iii) the Plan (and all exhibits thereto); (iv) a disclosure statement for the Plan (the "***Disclosure Statement***"), the other solicitation materials in respect of the Plan (such materials, collectively, the "***Solicitation Materials***"), the motion to approve the Disclosure Statement, and the order entered by the Bankruptcy Court approving the Disclosure Statement and Solicitation Materials as containing, among other things, "adequate information" as required by section 1125 of the Bankruptcy Code (the "***Disclosure Statement Order***"); (v) the order entered by the Bankruptcy Court confirming the Plan (the "***Confirmation Order***"); (vi) the documentation with respect to the Exit Second Lien Facility and the Exit Revolving Facility or the Alternative Exit Facility, as applicable (with the proceeds of any such Alternative Exit Facility being used to indefeasibly pay in cash, in full and final satisfaction, settlement, release and discharge of and in exchange for the Obligations (as defined in the Credit Agreement) outstanding under the Credit Agreement (the "***Credit Agreement Obligations***"), and any outstanding undrawn letters of credit that have not been replaced or released as of the closing of such facility shall be cash collateralized at 105% of the face amount thereof pursuant to arrangements satisfactory to the issuers thereof), and in the case of the Exit Revolving Facility, in form and substance reasonably satisfactory to the Supporting Lenders; and (viii) such other documents or agreements as may be reasonably necessary to implement the Restructuring contemplated by this Agreement and the RSA Term Sheet.

(b) Each of the Restructuring Documents remains subject to negotiation and completion and shall, upon completion, contain terms, conditions, representations, warranties, and covenants consistent with this Agreement and the RSA Term Sheet and shall otherwise be in form and substance reasonably satisfactory to the Debtors, Supporting Lenders, the Required Supporting Noteholders and the Supporting Interest Holders.

(c) The transaction documents in the foregoing forms, with the foregoing required approvals or as otherwise modified pursuant to the terms of this Agreement are collectively referred to herein as the "***Approved Transaction Documents***").

(d) Each of the exhibits attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include the exhibits. The terms of this Agreement and the exhibits shall whenever possible be read in a complementary manner; provided, that, to the extent there is a conflict between this Agreement and the exhibits, the conflicting term of this Agreement (excluding exhibits) shall control and govern; provided, further, that to the extent there is a conflict among the exhibits hereto, the conflicting term of the RSA Term Sheet shall control and govern.

### Section 2. Representations of the Supporting Parties and the Debtors.

Each of the Supporting Parties, severally and not jointly, hereby represents and warrants to the Debtors, and each of the Debtors hereby represents and warrants to the Supporting Parties

that, as of the Execution Date (as defined below), the following statements are true, correct, and complete:

(a) It has all requisite corporate, partnership, limited liability company or similar authority to execute this Agreement and carry out the transactions contemplated by, and perform its obligations contemplated under this Agreement; and the execution and delivery of this Agreement and the performance of such Party's obligations under this Agreement have been duly authorized by all necessary corporate, partnership, limited liability company or other similar action on its part.

(b) The execution, delivery, and performance by such Party of this Agreement does not violate (i) any provision of law, rule or regulation applicable to it or any of its subsidiaries or (ii) its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries.

(c) This Agreement is the legally valid and binding obligation of such Party, enforceable against such Party in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

(d) Except as expressly set forth herein and with respect to the Debtors' performance of this Agreement (and subject to necessary Bankruptcy Court approvals associated with the Restructuring), the execution, delivery, and performance by such Party of this Agreement does not and will not require any material registration or material filing with, material consent or material approval of, or material notice to, or other material action to, with or by, any federal, state or other governmental authority or regulatory body, other than those which have been obtained, taken or made.

(e) Although none of the Parties intends that this Agreement should constitute, and they each believe it does not constitute, a solicitation and acceptance of the Plan, regardless of whether its claims or Equity Interests constitute a "security" within the meaning of the Securities Act of 1933 (as amended, the "*Securities Act*"), such Supporting Party (A) is a sophisticated investor with respect to the transactions described herein with sufficient knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of owning and investing in any securities that may be issued in connection with the Restructuring, making an informed decision with respect thereto, and evaluating properly the terms and conditions of this Agreement, and it has made its own analysis and decision to enter in this Agreement, (B) is an "accredited investor" within the meaning of Rule 501 of Regulation D of the Securities Act, or is a "qualified institutional buyer" within the meaning of Rule 144A of the Securities Act, or is a non-"U.S. Person" as defined in Rule 902 of the Securities Act, who is located outside of the United States, of such similar sophistication; (C) is acquiring any securities that may be issued in connection with the Restructuring for its own account and not with a view to the distribution thereof; and (D) has made its own decision to execute this Agreement based upon its own independent assessment of documents and information available to it, as it deemed appropriate and sufficient.

(f) If such Party is a Supporting Creditor, such Supporting Creditor (i) either (A) is the sole legal and beneficial owner of the claims set forth below its name on the signature page hereof (or the Joinder (as defined below)), free and clear of all claims, liens and encumbrances, or (B) has sole investment and voting discretion with respect to the claims set forth below its name on the signature page hereof (or the Joinder (as defined below)) in respect of matters relating to the Restructuring contemplated by this Agreement and has the power and authority to bind the beneficial owner(s) of such claims to the terms of this Agreement (with respect to a Supporting Creditor, all claims under clauses (A) and (B) and any additional claims against the Debtors it owns or has such control over from time to time or acquires after the Execution Date, collectively, its "***Participating Claims***") and (ii) has full power and authority to act on behalf of, vote and consent to matters concerning such Participating Claims in respect of matters relating to the Restructuring contemplated by this Agreement and dispose of, exchange, assign and transfer such Participating Claims. Further, such Supporting Creditor has made no prior assignment, sale or other transfer of, and has not entered into any other agreement to assign, sell or otherwise transfer, in whole or in part, any portion of its right, title, or interests in such Participating Claims.

(g) If such Party is a Supporting Interest Holder, such Supporting Interest Holder is the sole legal and beneficial owner of the Equity Interests set forth next to its name below, free and clear of all claims, liens and encumbrances.

|  | Equity Interests |
|---|---|
| Kelso Investment Associates VIII, L.P. | 1,922,505 shares |
| KEP VI, LLC | 308,495 shares |

**Section 3. Agreements of the Supporting Parties and the Debtors.**

(a) During the period beginning on the Execution Date and ending on a Termination Event (such period, the "***Effective Period***"):

(i) each Supporting Party agrees that it shall, subject to the receipt by such Supporting Party of the Disclosure Statement and the Solicitation Materials, in each case, approved by the Bankruptcy Court as containing "adequate information" as such term is defined in section 1125 of the Bankruptcy Code:

1. timely vote all of its claims, including Participating Claims, and Equity Interests in voting classes now or hereafter beneficially owned by such Supporting Party or for which it now or hereafter serves as the nominee, investment manager or advisor for beneficial holders thereof, as applicable, to accept the Plan, by delivering its duly executed and completed ballots accepting the Plan on a timely basis following the commencement of the solicitation of the Plan, which ballots shall be in favor of and not indicate that the Supporting Party opts out of any releases and exculpation provided under the Plan; provided that such vote shall be immediately revoked and deemed *void ab initio* upon termination of this Agreement pursuant to the terms hereof (except any termination pursuant to Section 9(a) hereof); and

2.  not change or withdraw (or seek or cause to be changed or withdrawn) such vote.

(ii)  each Supporting Party agrees to not (A) object to, delay, impede or take any other action to interfere with acceptance or implementation of the Plan or the Restructuring, (B) directly or indirectly seek, solicit, encourage, propose, file, support, assist, participate, engage in the formulation, negotiations or discussions of or vote for, any restructuring, sale of assets, merger, workout or plan of reorganization for the Debtors other than the Plan (any such transaction, an "**_Alternative Transaction_**"), (C) object to or otherwise commence any proceeding, take any action opposing, or support any other person's efforts to oppose or object to, any of the terms of the DIP Facilities, the terms of the DIP Orders, the final relief sought in any "first day" and "second day" motions so long as they are consistent with the budget under the DIP Facilities and reasonably satisfactory to the DIP Lenders, and other motions consistent with this Agreement filed by any in furtherance of the Restructuring or (D) otherwise take any action that would in any material respect interfere with, delay or postpone the consummation of the Restructuring;

(iii)  each Supporting Party and each Debtor agrees to (A) support, and take all reasonable actions necessary to facilitate the implementation and consummation of, the Restructuring (including without limitation, approval of the Restructuring Documents and DIP Loan Documents, and other relief that may be set forth in the DIP Orders, as applicable, the confirmation of the Plan and the consummation of the Restructuring pursuant to the Plan) and (B) not take any action that is inconsistent with the implementation or consummation of the Restructuring;

(iv)  each Supporting Party and each Debtor (subject to Section 28 of this Agreement) agrees to not (A) support or encourage the termination or modification of the Debtors' exclusive period for the filing of a plan or the Debtors' exclusive period to solicit votes on a plan, (B) take any other action, including initiating any legal proceedings or enforcing rights as a holder of claims and Equity Interests, as applicable, that is inconsistent with this Agreement or the Restructuring Documents, or that would reasonably be expected to prevent, interfere with, delay or impede the implementation or consummation of the Restructuring (including the Bankruptcy Court's approval of the Restructuring Documents, the solicitation and confirmation of the Plan and the consummation of the Restructuring Transaction pursuant to the Plan), and (C) oppose or object to, or support any other person's efforts to oppose or object to, any motions filed by the Debtors that are not inconsistent with this Agreement; and

(v)  upon the commencement of the Bankruptcy Cases, and subject to <u>Section 9</u>, the automatic stay is invoked and each Supporting Party agrees that, except to the extent expressly contemplated under the Plan, the DIP Orders and this Agreement, it will not exercise any right or remedy for the enforcement, collection or recovery of any of the Participating Claims.

(b) Notwithstanding the forgoing, this Agreement will not limit any of the following Supporting Party rights, to the extent consistent with this Agreement:

(i) to appear and participate as a party in interest in any matter to be adjudicated in the Bankruptcy Cases, so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement and do not hinder, delay or prevent consummation of the Restructuring;

(ii) to enforce any rights under this Agreement;

(iii) to take or direct any action relating to maintenance, protection or preservation of any collateral; or

(iv) the ability of a Supporting Party or Debtor and its advisors to consult with other Supporting Parties or the Debtors and their respective advisors.

Notwithstanding anything to the contrary in this Agreement, Participating Claims or other claims of a Supporting Lender subject to this Agreement (including, without limitation, this Section 3 and Section 8) shall not include any Participating Claim or other claims held in a fiduciary capacity or held or acquired by any other division, business unit or trading desk of such Supporting Lender (other than the division, business unit or trading desk expressly identified on the signature pages hereto), unless and until such division, business unit or trading desk is or becomes a party to this Agreement.

**Section 4.  Agreements Related to DIP Facilities and Exit Financing.**

(a) In addition to their agreements as Supporting Parties and Debtors set forth in Section 3 above, during the Effective Period,

(i) each of the Supporting Lenders and the Revolving Facility Agent hereby commits to (A) consent to the use of cash collateral and adequate protection as provided in the DIP Credit Agreement, the DIP Orders and the DIP Loan Documents subject to the terms of the DIP Orders (without limiting any rights to seek further adequate protection or terminate cash collateral as provided therein), (B) backstop the Exit Revolving Facility on the terms attached to the RSA Term Sheet as Exhibit D, subject to Section 7(c) hereof, and (C) consent to waive the Pre-Petition Intercreditor Agreement (as defined in the DIP Credit Agreement), as necessary to permit the actions, terms and conditions in this Agreement, the RSA Term Sheet, the DIP Orders, the DIP Credit Agreement, and the DIP Loan Documents, and (D) not object to the terms of the DIP Facilities, in each instance subject to the definitive terms and conditions thereof, and on the terms and conditions of this Agreement,

(ii) each of the Supporting Noteholders hereby commits to backstop the commitments under the DIP Facilities (in the amounts set forth on **Schedule 2** hereto), subject to the definitive terms and conditions thereof, and on the terms and conditions of this Agreement, and to support and take all necessary steps to effectuate the Restructuring, and

(iii) each Supporting Noteholder and each Joining Party that participates in the DIP Facilities, in their capacity as DIP Lenders, agrees to roll-over the outstanding obligations under the DIP Facilities held by them as of the Effective Date to term loans under the Exit Second Lien Facility and to support and take all necessary steps to effectuate the Restructuring.

(b) No Supporting Party other than the Supporting Noteholders shall be obligated to fund or otherwise be committed to provide funding in connection with the Restructuring except pursuant to separate definitive documentation relating specifically to such funding, if any, (i) executed by such Supporting Party and (ii) approved by an order of the Bankruptcy Court, if necessary, along with the satisfaction of any conditions precedent to such funding under the definitive documentation relating thereto.

### Section 5. Continued Banking Practices.

Notwithstanding anything herein to the contrary, each Supporting Party and its affiliates may accept deposits from, lend money to, and generally engage in any kind of banking, investment banking, trust or other business with, or provide debt financing (including debtor in possession or exit financing), equity capital or other services (including financial advisory services) to any Debtor or any affiliate of any Debtor or any other person, including, but not limited to, any person proposing or entering into a transaction or financing related to or involving any Debtor or any affiliate thereof, and nothing in this Agreement shall limit or modify the rights of such Supporting Party or its affiliates under any documents, instruments or agreements governing such banking relationship.

### Section 6. Support for Mutual Releases by the Supporting Parties.

During the Effective Period, each of the Supporting Parties agrees that it shall not object to or opt out of any release included in the Solicitation Materials or the Plan, so long as such release is consistent with the RSA Term Sheet.

### Section 7. Agreements of the Debtors.

(a) The Debtors hereby agree that, as soon as reasonably practicable, but in no event later than August 15, 2016, the Debtors shall file with the Bankruptcy Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code and any and all other documents necessary to commence the Bankruptcy Cases of each Debtor.

(b) The Debtors hereby agree to file the Plan, the Disclosure Statement and motion seeking entry of the Disclosure Statement Order with the Bankruptcy Court no later than August 15, 2016.

(c) Within one business day of the Petition Date, the Debtors shall file the DIP Financing Motion seeking entry of the DIP Orders that shall authorize the Debtors' entry into the DIP Credit Agreement and DIP Facilities, which motion shall be in form and substance reasonable acceptable to the Debtors, the DIP Agent, the Required DIP Lenders, the Required Supporting Noteholders, and the Supporting Lenders.

(d) No later than August 11, 2016, the Debtors shall file one or more motions to reject certain unexpired leases as agreed to by the Required Supporting Noteholders and the Supporting Lenders.

(e) During the Effective Period, the Debtors shall: (i) support and take all steps necessary or desirable to obtain orders of the Bankruptcy Court in respect of the Restructuring, including obtaining entry of the RSA Assumption Order, the DIP Orders, Disclosure Statement Order and Confirmation Order; (ii) support and take all steps reasonably necessary or desirable to consummate the Restructuring in accordance with this Agreement, including the preparation and filing within the time-frame provided herein of the Approved Transaction Documents; (iii) execute and deliver any other required agreements to effectuate and consummate the Restructuring; (iv) obtain any and all required regulatory and/or third-party approvals for the Restructuring; (v) complete the Restructuring within the time-frame provided herein; (vi) comply with each of the deadlines provided in the Interim DIP Order and DIP Credit Agreement; (vii) comply with any other deadlines set forth herein and in the Restructuring Term Sheet; (viii) operate their business in the ordinary course, taking into account the Restructuring; and (ix) not object to, delay, impede, or take any other action that is materially inconsistent with, or is intended or is likely to interfere with acceptance or implementation of the Plan or the Restructuring.

(f) During the Effective Period, the Debtors shall timely file an objection to any motion filed with the Bankruptcy Court by any person seeking an order (i) directing the appointment in the Bankruptcy Cases of an examiner with expanded powers or a trustee, (ii) converting any of the Bankruptcy Cases to cases under chapter 7 of the Bankruptcy Code, (iii) dismissing any of the Bankruptcy Cases; (iv) granting any relief that is inconsistent with this Agreement in any material respect; or (v) modifying or terminating the Debtors' exclusive right to file and/or solicit acceptances of a plan of reorganization.

(g) During the Effective Period, the Debtors shall provide the Supporting Noteholders', Revolving Facility Agent's and Supporting Lenders' advisors, and direct their employees, officers, advisors and other representatives to provide the Supporting Noteholders', Revolving Facility Agent's and Supporting Lenders' advisors, with (i) reasonable access during normal business hours to the Debtors' books and records, (ii) reasonable access to the management and advisors of the Debtors for the purposes of evaluating the Debtors' assets, liabilities, operations, businesses, finances, strategies, prospects and affairs and (iii) timely and reasonable responses to all reasonable diligence requests.

(h) The Debtors shall promptly notify the Supporting Noteholders', Revolving Facility Agent's and Supporting Lenders' advisors in writing of any newly commenced material governmental, regulatory or third party litigations, investigations or hearings.

(i) Any Debtor that obtains actual knowledge of any breach by any Debtor in respect of any of the obligations, representations, warranties or covenants set forth in this Agreement shall notify the Supporting Noteholders', Revolving Facility Agent's and Supporting Lenders' advisors of such breach in writing within three (3) business days of obtaining such knowledge.

(j) The Debtors shall distribute any and all material pleadings to be filed with the Bankruptcy Court to the Supporting Noteholders', Revolving Facility Agent's and Supporting Lenders' advisors as promptly as practicable in advance of, and in no event less than two (2) days in advance of, any filing thereof, unless circumstances render such notice impracticable.

(k) The Debtors shall use commercially reasonable efforts to preserve their businesses and assets, maintain its operating assets in their present condition (ordinary wear and tear excepted), and maintain its existing insurance coverage.

(l) During the Effective Period, the Debtors shall pay in cash: (i) upon the execution of this Agreement by the Debtors, all accrued reasonable and documented fees and expenses of (A) each of the to the Revolving Facility Agent, the Supporting Lenders, the trustees for the 2010 Indenture and 2015 Indenture, the Unanimous Supporting Noteholders, the Supporting Interest Holders, and the DIP Agent, and (B) the following advisors to the parties identified in Clause (A), Debevoise & Plimpton LLP, Dechert LLP, King & Spalding LLP, Simpson Thacher & Bartlett LLP, one local counsel engaged for each such Party, CDG Group, LLC and Morris, Nichols, Arsht & Tunnell, LLP, as well as any replacement of any of the foregoing (collectively, the "***Transaction Fees and Expenses***"); (ii) all Transaction Fees and Expenses of each of the Supporting Parties prior to the filing of the Bankruptcy Cases and (iii) following the execution of this Agreement by the Debtors, all Transaction Fees and Expenses incurred after the filing of the Bankruptcy Cases within five (5) business days of delivery to the Debtors of any applicable invoice or receipt; <u>provided</u> that any Transaction Fees and Expenses which become payable under this Agreement after the Petition Date shall be paid on the Effective Date, unless another order of the Court (including, without limitation, the DIP Orders) authorizes a different payment date, and shall be subject to the same review procedures provided for fees and expenses that the Debtors are permitted to reimburse under the DIP Orders.

(m) From and after the Petition Date, the Debtors shall use reasonable efforts to solicit an Alternative Exit Revolving Facility from third parties on terms acceptable to the Unanimous Supporting Noteholders and the Supporting Interest Holders.

(n) *Negative Covenants*. Subject to Section 28 hereof, the Debtors, jointly and severally, agree that, for the duration of the Effective Period, the Company shall not, directly or indirectly, do any of the following:

(i) propose or support an Alternative Transaction;

(ii) (1) publicly announce that it intends to take or has taken any action, in each case, that is inconsistent in any material respect with this Agreement or the Approved Transaction Documents, (2) suspend or revoke the Restructuring or (3) execute, file or agree to file any motion, pleading or other Restructuring Document (including any modifications or amendments thereof) that is inconsistent in any material respect with this Agreement or the Approved Transaction Documents;

(iii) commence an avoidance action or other legal proceeding (or supporting any other Person seeking standing to commence any such avoidance action or other legal proceeding) that challenges the validity, enforceability or priority of the Credit

Agreement, the 2010 Indenture, or the 2015 Indenture, any lien or security interest granted in respect of any such documents or any Claim or Interest held by any Supporting Party; or

(iv) enter into any commitment or agreement with respect to debtor-in-possession financing, use of cash collateral, adequate protection, exit financing and/or any other financing arrangements other than the facilities contemplated by the DIP Credit Agreement, Exit Facility Term Sheets and DIP Orders.

**Section 8.    Transfers of Participating Claims and Equity Interests.**

(a) Each Supporting Creditor agrees that, during the Effective Period, it shall not sell, transfer, assign or otherwise dispose of (collectively, "*Transfer*") any of its Participating Claims, or any option thereon or any right or interest (voting or otherwise) in any of its Participating Claims (including, any participation therein), except to a party that (i) is a Supporting Creditor; provided that any such Participating Claims shall automatically be deemed to be subject to the terms of this Agreement, or (ii) executes and delivers a Joinder (as defined below) to the Debtors on or prior to the date of the relevant transfer, in which case such transferee shall be deemed to be a Supporting Creditor for purposes of this Agreement.    Subject to clause (c) below, the Debtors shall be deemed to have acknowledged such transfer.    Any transfer of Participating Claims by a Supporting Creditor that does not comply with the procedures set forth in this Agreement shall be deemed void without the need for further action.

(b) This Agreement shall in no way be construed to preclude any Supporting Party from acquiring additional claims; provided that any such additional claims shall automatically be deemed to be Participating Claims of such Supporting Party and shall be subject to all of the terms of this Agreement.    Each Supporting Party agrees to provide to counsel for the Debtors a notice of the acquisition of any additional claims within three (3) business days of the consummation of the acquisition transaction.

(c) Any person that receives or acquires a portion of the Participating Claims pursuant to a sale or other transfer by a Supporting Party hereby agrees to be bound by all of the terms of this Agreement (as the same may be hereafter modified from time to time) (a "*Joining Party*") by executing and delivering to counsel for the Debtors a joinder in the form of **Exhibit B** hereto (the "*Joinder*"), which Joinder may also be used by holders of claims that are not Participating Claims who wish to become a party to this Agreement as set forth in Section 22 of this Agreement.    The Joining Party shall thereafter be deemed to be a "Supporting Party" and a Party for all purposes under this Agreement.    Each Joining Party shall indicate, on the appropriate schedule of its Joinder, the number and amount of claims held by such Joining Party, which shall be deemed to be Participating Claims of such Joining Party and shall be subject to all of the terms of this Agreement.    Upon consummation of the transfer of such Participating Claims to the Joining Party, the Joining Party hereby makes the representations and warranties of the Supporting Creditors set forth in Section 2 of this Agreement to the other Parties and agrees to be bound by Section 3 of this Agreement.

(d) Each Supporting Interest Holder agrees that, during the Effective Period, it shall not sell, transfer, assign or otherwise dispose of any of its Equity Interests.

(e) Notwithstanding anything herein to the contrary, in the event that a Supporting Noteholder transfers any or all of its Participating Claims, such Supporting Noteholder shall remain obligated with respect to its commitments under <u>Section 4(a)</u> of this Agreement and may not assign, delegate, or transfer its commitment thereunder to a transferee, unless consented to in writing by (i) the Debtors, and (ii) all non-transferring Supporting Noteholders.

(f) Notwithstanding anything in this Agreement (including this <u>Section 8</u>) to the contrary, (i) a Supporting Party may Transfer any Participating Claim against or interest in any Debtor to an entity that is acting in its capacity as a Qualified Marketmaker without the requirement that such entity be or become a Supporting Party <u>provided</u> that the transferee of such Participating Claim from the Qualified Marketmaker shall comply in all respects with the terms of this Agreement and (ii) to the extent that a Supporting Party, acting in its capacity as a Qualified Marketmaker, acquires any Participating Claim against, or interest in, any Debtor from a holder of such Participating Claim or interest who is not a Supporting Party, it may Transfer (by purchase, sale, assignment, participation, or otherwise) such Participating Claim or interest without the requirement that the transferee be or become a Support Party in accordance with this <u>Section 8.</u> For purposes of this clause (f) of this <u>Section 8</u>, a *"Qualified Marketmaker"* means an entity that (x) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers claims or interest against any of the Debtor (including debt securities or other debt) or enter with customers into long and short positions in claims or interests against the Debtors (including debt securities or other debt), in its capacity as a dealer or market maker in such claims or interests against the Debtors, and (y) is in fact regularly in the business of making a market in claims or interests against issuers or borrowers (including debt securities or other debt).

**Section 9.  Termination of Obligations.**

This Agreement shall terminate and, except as set forth in <u>Section 19</u>, all obligations of the Parties shall immediately terminate and be of no further force and effect upon the occurrence of any of the following events (each, a *"Termination Event"*):

(a) the Effective Date of the Plan;

(b) mutual written consent of the Debtors and each of the Supporting Parties, <u>provided</u> that notice of such termination is provided within one (1) business day to the persons and entities listed on **Schedule 1** annexed hereto, in accordance with <u>Section 16</u> hereof;

(c) the breach in any material respect by any of the Debtors of any of its covenants, obligations, representations, or warranties contained in this Agreement, and such breach remains uncured for a period of five (5) business days from the date the Debtors receive a written notice of such breach from any Supporting Party (such notice, the "*Supporting Party Termination Notice*");

(d) the breach in any material respect by any Supporting Party of any of its covenants, obligations, representations, or warranties contained in this Agreement, and such breach remains uncured for a period of five (5) business days from the date the Supporting Parties receive a written notice of such breach from the Debtors;

(e) an Event of Default (as defined in the DIP Orders, DIP Credit Agreement, or DIP Loan Documents) occurs under the DIP Facilities, subject to all applicable notice, waiver, and cure provisions of the DIP Facilities;

(f) the issuance by any governmental authority or court of competent jurisdiction of any ruling, decision, judgment or order enjoining or otherwise preventing the consummation of a material portion of the Restructuring or requiring the Debtors to take actions inconsistent in any material respect with the Plan, unless such ruling, judgment or order has not been stayed, reversed or vacated within five (5) business days after the date of such issuance; *provided*, *however*, that if such issuance has been made at the request of any of the Supporting Parties, then this Agreement shall not terminate on account of such issuance;

(g) the Debtors file any motion or pleading with the Bankruptcy Court that is inconsistent in any material respect with this Agreement, the DIP Loan Documents and such motion or pleading has not been withdrawn prior to the earlier of (i) three (3) business days from the date the Debtors receive written notice from any Supporting Party of the same, and (ii) entry of an order of the Bankruptcy Court approving such motion or pleading;

(h) the Bankruptcy Court grants relief that is inconsistent with this Agreement in any material respect;

(i) the Debtors propose or support any Alternative Transaction;

(j) the Debtors (i) withdraw the Plan or publicly announce their intention to withdraw the Plan or to pursue an Alternative Transaction, (ii) file a Plan document in form and substance that is not acceptable to each of the DIP Agent, the Required DIP Lenders, the Supporting Lenders, the Required Supporting Noteholders, and the Supporting Interest Holders, (iii) move voluntarily to dismiss any of the Bankruptcy Cases, (iv) move for conversion of any of the Bankruptcy Cases to chapter 7 under the Bankruptcy Code, (v) move for the appointment of an examiner with expanded powers or a chapter 11 trustee in any of the Bankruptcy Cases, or (vi) support any other party seeking any of the foregoing relief;

(k) any party obtains relief from the automatic stay with respect to any of the Debtors' assets of a value in excess of $200,000;

(l) the waiver, amendment or modification of the Plan or any of the DIP Loan Documents, in a manner inconsistent with this Agreement, the RSA Term Sheet, or the relevant DIP Loan Document, without the consent of each of the DIP Agent, the Required DIP Lenders, the Supporting Lenders, the Required Supporting Noteholders (or each of the Unanimous Supporting Noteholders to the extent required by Annex B to the RSA Term Sheet), and the Supporting Interest Holders;

(m) the Debtors shall not have commenced the Bankruptcy Cases on or before August 15, 2016;

(n) the Plan, the Disclosure Statement and motion seeking entry of the order approving the Disclosure Statement are not filed with the Bankruptcy Court by August 15, 2016;

(o) an order approving the Disclosure Statement is not entered by September 26, 2016;

(p) the RSA Assumption Order is not entered within thirty-five (35) days of the Petition Date;

(q) the Interim DIP Order is not entered within three (3) business days of the Petition Date;

(r) the Final DIP Order is not entered within thirty-five (35) days of the Petition Date;

(s) on November 7, 2016, if the Confirmation Order confirming the Plan has not been entered;

(t) on September 26, 2016, if the Debtors have failed to seek an Alternative Exit Facility;

(u) on November 14, 2016, if the Effective Date has not occurred;

(v) failure to meet any milestone set forth in the RSA Term Sheet or DIP Credit Agreement;

(w) the Bankruptcy Court enters an order (A) directing the appointment of an examiner with expanded powers or a chapter 11 trustee in any of the Bankruptcy Cases, (B) converting any of the Bankruptcy Cases to cases under chapter 7 of the Bankruptcy Code or (C) dismissing any of the Bankruptcy Cases;

(x) the Debtors' authority to use cash collateral on a consensual basis on the terms set forth in the DIP Orders terminates; or

(y) the Debtors exercise their rights under Section 28 (whether or not the Debtors have formally terminated this Agreement in accordance with the terms of such Section).

Upon the occurrence of a Termination Event, unless waived under Section 12, this Agreement shall terminate, each Party shall be released from its commitments, undertakings and agreements under or related to this Agreement and any of the Approved Transaction Documents, and there shall be no liability or obligation on the part of any Party hereto; provided that in no event shall any such termination relieve a Party hereto from (a) liability for its breach or non-performance of its obligations under this Agreement before the date of such termination, (b) any liabilities or obligations under the DIP Loan Documents and (c) obligations under this Agreement which expressly survive any such termination pursuant to Section 19 hereunder. Upon the occurrence of a Termination Event, any and all consents or ballots tendered by the Parties subject to such termination before a Termination Event shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Agreement or otherwise.

The Debtors acknowledge and agree, and shall not dispute, that solely with respect to the giving of a Supporting Party Termination Notice by any of the Supporting Parties pursuant to this Agreement, such an action shall not be a violation of the automatic stay under section 362 of the Bankruptcy Code (and the Debtors hereby waive, to the greatest extent possible, the

applicability of the automatic stay to the giving of such notice), and no cure period contained in this Agreement shall be extended pursuant to sections 108 or 365 of the Bankruptcy Code.

### Section 10. Good Faith Cooperation; Further Assurances; Transaction Documents.

The Parties shall cooperate with each other in good faith and shall coordinate their activities (to the extent practicable) in respect of all matters concerning the implementation and consummation of the Restructuring. Furthermore, each of the Parties shall take such action (including executing and delivering any other agreements and making and filing any required regulatory filings) as may be reasonably necessary, or as may be required by order of the Bankruptcy Court, to carry out the purposes and intent of this Agreement. Each of the Debtors and the Supporting Parties, as applicable, hereby covenants and agrees (a) to negotiate in good faith the Restructuring Documents and Approved Transaction Documents, each of which shall, except as otherwise provided for herein, (i) contain the same economic terms as, and other terms consistent in all respects with, the terms set forth in the RSA Term Sheet and each of the other exhibits attached hereto (each as amended, supplemented or otherwise modified as provided herein), (ii) otherwise be in form and substance reasonably acceptable in all respects to the Parties (to the extent such Parties are specifically provided with consent rights over such documents pursuant to this Agreement), and (iii) be consistent with this Agreement in all respects, and (b) subject to the satisfaction of the terms and conditions set forth herein, to execute the Restructuring Documents and Approved Transaction Documents (in each case to the extent such Party is contemplated to be a party thereto).

### Section 11. Specific Performance.

It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach, including any order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply with any of its obligations hereunder; provided, however, that each Party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy.

### Section 12. Amendments and Waivers.

This Agreement, including the Exhibits hereto, may be amended only upon written approval of (a) each of the Debtors, (b) Required Supporting Noteholders (*provided* that any amendment of the type set forth on Annex B to the RSA Term Sheet shall require the consent of the Unanimous Supporting Noteholders), and (c) Supporting Lenders. In addition, any amendment that would materially and adversely affect any Supporting Interest Holder shall require the prior written consent of such Supporting Interest Holder. Any waiver of any condition, term or provision to this Agreement must be in writing signed by the Parties whose consent would be required to amend such condition, term or provision consistent with the impact of the waiver.

### Section 13. Representation by Counsel.

Each Party acknowledges that it has had the opportunity to be represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived. The provisions of this Agreement shall be interpreted in a reasonable manner to effect the intent of the Parties hereto. None of the Parties hereto shall have any term or provision construed against such Party solely by reason of such Party having drafted the same.

**Section 14. Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.**

This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflict of laws that would require the application of the law of any other jurisdiction. By its execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in either a state or federal court of competent jurisdiction in the State and County of New York (the "***Chosen Courts***"). By execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably accepts and submits itself to the exclusive jurisdiction of the Chosen Courts, generally and unconditionally, with respect to any such action, suit or proceeding; <u>provided</u>, <u>however</u>, that if the Debtors commence the Bankruptcy Cases, then the Bankruptcy Court (or court of proper appellate jurisdiction) shall be the exclusive Chosen Court. EACH PARTY HERETO UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING REFERRED TO ABOVE.

**Section 15. Execution Date.**

This Agreement shall become effective, and each Party hereto shall be bound to the terms of this Agreement, as of the date the Debtors and each of the Supporting Parties, which such Supporting Parties shall hold (a) 100% of the outstanding principal amount owed under the Credit Agreement, (b) at least 57.5 % in outstanding principal of the Unexchanged Notes, (c) 100% in outstanding principal of the Kelso Notes, and (d) 100% in outstanding principal of the GSO Notes, have executed and delivered a signature page to this Agreement (the "***Execution Date***"), <u>provided</u> that the Execution Date for any Joining Party shall be the date that such Joining Party executes the Joinder.

**Section 16. Notices.**

All demands, notices, requests, consents and other communications under this Agreement shall be in writing, sent contemporaneously to all of the Supporting Parties and the Debtors, and deemed given when delivered, if delivered by hand, or upon confirmation of transmission, if delivered by email or facsimile, at the addresses and facsimile numbers set forth on **<u>Schedule 1</u>** hereto.

**Section 17. Reservation of Rights.**

Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of each Party to protect and preserve its rights, remedies and interests, including its Participating Claims and any other claims against the Debtors or other parties. Without limiting the foregoing sentence in any way, after a Termination Event, the Parties hereto each fully reserve any and all of their respective rights, remedies, claims and interests, subject to <u>Section 9</u>, in the case of any claim for breach of this Agreement.

### Section 18. Rule of Interpretation.

This Agreement shall be interpreted in accordance with section 102 of the Bankruptcy Code. Notwithstanding anything contained herein to the contrary, it is the intent of the Parties that all references to votes or voting in this Agreement be interpreted to include all means of expressing agreement with, or rejection of, as the case may be, a Restructuring.

### Section 19. Survival.

Notwithstanding (a) any transfer of Participating Claims in accordance with <u>Section 8</u> or (b) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in <u>Section 2</u>, <u>Section 11</u>, <u>Section 13</u>, <u>Section 14</u>, <u>Section 16</u>, <u>Section 17</u>, <u>Section 18</u>, <u>Section 21</u>, <u>Section 23</u>, <u>Section 25</u>, <u>Section 26</u>, <u>Section 27</u>, and <u>Section 28</u> shall survive such sale and/or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof.

### Section 20. Successors and Assigns; Severability; Several Obligations.

This Agreement is intended to bind and inure to the benefit of the Parties and their respective permitted successors, assigns, heirs, executors, estates, administrators and representatives. The invalidity or unenforceability at any time of any provision hereof in any jurisdiction shall not affect or diminish in any way the continuing validity and enforceability of the remaining provisions hereof or the continuing validity and enforceability of such provision in any other jurisdiction; provided, however, that nothing in this Section 20 shall be deemed to amend, supplement or otherwise modify, or constitute a waiver of, any Termination Event. The agreements, representations and obligations of the Supporting Parties under this Agreement are, in all respects, several and not joint.

### Section 21. Third-Party Beneficiary.

This Agreement is intended for the benefit of the Parties hereto and no other person or entity shall be a third party beneficiary hereof or have any rights hereunder.

### Section 22. Counterparts; Additional Supporting Parties.

This Agreement may be executed in several identical counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Agreement may be delivered by facsimile, electronic mail or otherwise, each of which shall be deemed to be an original for the purposes of this paragraph. Any holder of claims that is not already an existing Supporting Party hereto may execute the

Joinder and, in doing so, shall become a Joining Party and shall thereafter be deemed to be a "Supporting Party" and a Party for all purposes under this Agreement.

**Section 23. Entire Agreement.**

This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements (oral and written) and all other prior negotiations but shall not supersede the Approved Transaction Documents; provided, however, that the Parties acknowledge and agree that any confidentiality agreements heretofore executed between the Debtors and any Supporting Party shall continue in full force and effect as provided therein.

**Section 24. Headings.**

The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement and shall not affect the interpretation of this Agreement.

**Section 25. Independent Due Diligence and Decision-Making.**

Each Party hereto hereby confirms that it has made its own decision to execute this Agreement based upon its own independent assessment of documents and information available to it, as it has deemed appropriate.

**Section 26. Settlement Discussions.**

This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the parties hereto. Regardless of whether or not the transactions contemplated herein are consummated, or whether or not a Termination Event has occurred, if applicable, nothing herein shall be construed herein as an admission of any kind or a waiver by any Party of any or all of such Party's rights or remedies. Pursuant to Federal Rule of Evidence 408, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than to prove the existence of this Agreement or in a proceeding to enforce the terms of this Agreement.

**Section 27. Publicity.**

(a) The Supporting Parties shall not (i) use the name of any of the Debtors in any press release or (ii) disseminate to any news media any press releases, public filings, public announcements or other communications relating to this Agreement or the transactions contemplated hereby and any amendments thereof without first (A) submitting such press releases, public filings, public announcements or other communications to counsel for the Debtors for review and potential suggestions and (B) receiving the prior written consent of the Debtors. Nothing contained herein shall be deemed to waive, amend or modify the terms of any confidentiality or non-disclosure agreement between the Debtors and any Supporting Party.

(b) The Debtors shall submit drafts to counsel of each Supporting Party of any press releases and public documents that (i) constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement at least two (2) business days prior to making any such disclosure, (ii) any other disclosure that includes descriptions of the Restructuring or any Supporting Party and shall negotiate any proposed changes thereto in good faith, or (iii) constitute disclosure of the amount or percentage of Claims held by any Supporting Party without prior written consent of such Supporting Party.

**Section 28.  The Debtors' Fiduciary Duties**.

Notwithstanding anything to the contrary herein, to the extent that any Debtors' boards of directors (or comparable governing body) determine in good faith after consulting with outside legal counsel that the Debtors' fiduciary obligations under applicable law require the Debtors to take any action or terminate this Agreement and the Debtors' obligations hereunder, the Debtors may terminate this Agreement without incurring any liability to any one or more of the Supporting Parties under this Agreement.  In the event that the Debtors determine to terminate this Agreement in accordance with this Section 28, the Debtors shall provide notice of such termination to each of the Supporting Parties and their advisors not more than one (1) business day after such determination.  Notwithstanding anything to the contrary herein, nothing in this Agreement shall create any additional fiduciary obligations on the part of the Debtors or any members, managers, or officers of the Debtors or their affiliated entities, in such capacity, that did not exist prior to the Execution Date.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

ROADHOUSE HOLDING INC.

By:

Name:   Keith A. Maib
Title:   Chief Restructuring Officer

ROADHOUSE INTERMEDIATE INC.

By:

Name:   Keith A. Maib
Title:   Chief Restructuring Officer

ROADHOUSE MIDCO INC.

By:

Name:   Keith A. Maib
Title:   Chief Restructuring Officer

ROADHOUSE PARENT INC.

By:

Name:   Keith A. Maib
Title:   Chief Restructuring Officer

LRI HOLDINGS, INC.

By:

Name:   Keith A. Maib
Title:   Chief Restructuring Officer

LOGAN'S ROADHOUSE, INC.

By:

Name: Keith A. Maib
Title: Chief Restructuring Officer

LOGAN'S ROADHOUSE OF TEXAS, INC.

By:

Name: Keith A. Maib
Title: Chief Restructuring Officer

LOGAN'S ROADHOUSE OF KANSAS, INC.

By:

Name: Keith A. Maib
Title: Chief Restructuring Officer

[SIGNATURE PAGES FOR SUPPORTING PARTIES
INTENTIONALLY OMITTED FROM FILING VERSION]

## SCHEDULE 1

### NOTICE ADDRESSES

---

**If to the Debtors:**

c/o Logan's Roadhouse, Inc.
3011 Armory Drive, Suite 300
Nashville, Tennessee 37204
Fax No.: (615) 884-9813
Attention:

with a copy to:

Young Conaway Stargatt & Taylor, LLP
1000 North King Street
Wilmington, DE 19801
Attention:  Robert S. Brady, Esq. and Edmon L. Morton, Esq.
rbrady@ycst.com
emorton@ycst.com

**If to a Supporting Party:**

To the Notice Party designated on each Supporting Party's Signature Page
with a copy to (which shall not constitute notice):

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
Attention: Elisha D. Graff, Esq. and Nicholas Baker, Esq.
egraff@stblaw.com
nbaker@stblaw.com

-and-

Dechert LLP
1095 Avenue of the Americas
New York, NY 10036
Attention:  Michael J. Sage and Brian E. Greer
michael.sage@dechert.com
brian.greer@dechert.com

-and-

King & Spalding LLP

1185 Avenue of the Americas
New York, NY 10036-4003
Attention:  Michael C. Rupe, Jeffrey D. Pawlitz and Christopher G. Boies
mrupe@kslaw.com
jpawlitz@kslaw.com
cboies@kslaw.com

-and-

Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
Attention: Natasha Labovitz and Craig Bruens
nlabovitz@debevoise.com
cabruens@debevoise.com

[SCHEDULE 2 INTENTIONALLY OMITTED FROM FILING VERSION]

**EXHIBIT A**

**RSA TERM SHEET**

LRI Holdings, Inc.

Principal Terms Of Proposed Restructuring Transaction

THIS TERM SHEET (THIS "***RSA TERM SHEET***") SUMMARIZES TERMS AND CONDITIONS OF A PROPOSED RESTRUCTURING OF THE DEBTORS (AS DEFINED BELOW).  THE TERMS SET FORTH IN THIS RSA TERM SHEET ARE BEING PROVIDED AS PART OF A COMPREHENSIVE COMPROMISE, EACH ELEMENT OF WHICH IS CONSIDERATION FOR THE OTHER ELEMENTS AND AN INTEGRAL ASPECT OF THE PROPOSED RESTRUCTURING OF THE DEBTORS.  THE PROPOSED RESTRUCTURING DESCRIBED HEREIN WOULD BE IMPLEMENTED BY MEANS OF A "PREARRANGED" PLAN OF REORGANIZATION, FOR THE DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE (AS DEFINED BELOW).  THIS RSA TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL BE MADE ONLY IN COMPLIANCE WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  THIS DOCUMENT IS BEING PROVIDED IN FURTHERANCE OF SETTLEMENT DISCUSSIONS AND IS ENTITLED TO PROTECTION PURSUANT TO FED. R. EVID. 408 AND ANY SIMILAR RULE OF EVIDENCE.  THE TRANSACTIONS DESCRIBED IN THIS RSA TERM SHEET ARE SUBJECT IN ALL RESPECTS TO, AMONG OTHER THINGS, THE RSA (AS DEFINED BELOW) AND DEFINITIVE DOCUMENTATION, INCLUDING THE PLAN, APPROPRIATE DISCLOSURE MATERIAL, AND RELATED DOCUMENTS.

**CERTAIN KEY TERMS**

**1) Parties**

| | |
|---|---|
| ***Debtors*** | Roadhouse Holding Inc., Roadhouse Intermediate Inc., Roadhouse Midco Inc., Roadhouse Parent Inc., LRI Holdings, Inc., Logan's Roadhouse, Inc., Logan's Roadhouse of Kansas, Inc., and Logan's Roadhouse of Texas, Inc. |
| ***Supporting Noteholders*** | Noteholders that are signatories to the RSA and remain bound by its terms, which shall include holders of 100% of the GSO Notes, holders of 100% of the Kelso Notes, and holders of no less than 57.8% of the Unexchanged Notes (each as defined below), including, as applicable, in each case in their capacity as DIP Lenders (as defined below) |
| ***Supporting Lenders*** | Revolving Facility Lenders (as defined below) that are signatories to the RSA and remain bound by its terms |
| ***Supporting Interest Holders*** | Means the holders of equity in LRI Holdings, Inc. that are signatories to the RSA and remain bound by its terms, which shall include the Sponsors |
| ***Supporting Parties*** | Means the Supporting Noteholders, the Supporting Lenders and the Supporting Interest Holders that are signatories to the RSA and remain bound by its terms |

## 2) Other Defined Terms

| Term | Definition |
|---|---|
| *2010 Indenture* | That certain Senior Secured Notes Indenture, dated as of October 4, 2010, among Roadhouse Financing, Inc., Roadhouse Merger, Inc. and BOKF, NA, as trustee and collateral agent, and all exhibits, amendments, and supplements thereto |
| *2015 Indenture* | That certain Indenture dated as of October 15, 2015, among Logan's Roadhouse, Inc., LRI Holdings, Inc. and Wells Fargo Bank, N.A., as trustee and collateral agent, and all exhibits, amendments, and supplements thereto |
| *Alternative Exit Facility* | A new first lien credit facility to be provided by parties other than the Revolving Facility Lenders, which would be in lieu of the Exit Revolving Facility, on terms reasonably acceptable to the Debtors and the Unanimous Supporting Noteholders |
| *Bankruptcy Cases* | The chapter 11 cases of the Debtors |
| *Bankruptcy Code* | Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 |
| *Bankruptcy Court* | The United States Bankruptcy Court for the District of Delaware |
| *Business Plan* | The business plan incorporated in the Disclosure Statement that accompanies the Plan |
| *Carl Marks* | Carl Marks Management Company, LLC |
| *Cash-Out Payment* | The pro rata share of the value of Plan Equity Value to be paid to each Noteholder in Subclass 4(b) in either (i) cash upon emergence if Subclass 4(b) votes to accept the Plan, or (ii) New Secured Notes if Subclass 4(b) votes to reject the Plan |
| *Credit Agreement* | That certain Credit Agreement dated as of October 4, 2010, Roadhouse Financing, Inc., Roadhouse Merger, Inc., JPMorgan Chase Bank, N.A., as Administrative Agent, and the other parties thereto, and all exhibits, amendments, and supplements thereto |
| *DIP Agent* | The administrative and collateral agent under the DIP Facilities |
| *DIP Credit Agreement* | The DIP Facilities shall be documented by a senior secured super-priority term loan credit agreement substantially in the form attached as *Exhibit D*, and otherwise reasonably acceptable to the Debtors, the Required Supporting Noteholders, the Supporting Lenders, the DIP Agent, and the DIP Lenders |

| | |
|---|---|
| *DIP Facilities* | Debtor-in-possession financing to be provided to the Debtors during the Bankruptcy Cases pursuant to the DIP Credit Agreement consisting of the New Money Facility (as defined in the DIP Credit Agreement) in an amount not less than $25 million and the Roll Up Facility (as defined in the DIP Credit Agreement) |
| *DIP Lenders* | The lenders under the DIP Facilities |
| *DIP Loan Documents* | The DIP Credit Agreement and all related documents, including guarantees and security agreements, the Interim DIP Order and the Final DIP Order |
| *Disclosure Statement* | The accompanying disclosure statement (including all attachments and exhibits) for the proposed Plan pursuant to the RSA |
| *Effective Date* | The date on which all conditions to the effectiveness of the Plan are either (a) satisfied or (b) waived by each of the Debtors, the Required Supporting Noteholders, and the Supporting Lenders, and on which the Plan is declared effective |
| *Equity Interests* | All issued and outstanding equity interests in the Debtors, including any vested or unvested and exercised or unexercised options or warrants to acquire such equity interests |
| *Exit First Lien Facility* | The Exit Revolving Facility or Alternative Exit Facility, as applicable |
| *Exit Revolving Facility* | A new first lien revolving credit facility to be provided by the Revolving Facility Lenders and entered into on the Effective Date, on terms materially consistent with the first lien exit financing term sheet attached hereto as ***Exhibit E***, and otherwise reasonably acceptable to the Debtors, the Required Supporting Noteholders, and the Supporting Lenders |
| *Exit Second Lien Facility* | A new second lien term loan facility to be entered into on the Effective Date, on terms materially consistent with the second lien exit financing term sheet attached hereto as ***Exhibit B***, and otherwise reasonably acceptable to the Debtors, the Required Supporting Noteholders, and the Supporting Lenders |
| *Final DIP Order* | An order of the Bankruptcy Court in form and substance acceptable to the DIP Agent, the Required DIP Lenders, the Debtors, the Supporting Lenders, the Required Supporting Noteholders, and the Supporting Interest Holders, approving the DIP Facilities and authorizing the use of cash collateral in accordance with the DIP Budget (as defined in the DIP Credit Agreement) |
| *General Unsecured Claim* | Any general unsecured claim that is not separately classified under the Plan, including, without limitation, any claims arising from existing or potential litigation against any of the Debtors and any Notes Deficiency Claims |
| *GSO* | GSO Capital Partners, LP |

| | |
|---|---|
| **GSO Notes** | The issued and outstanding Series 2015-2 Senior Secured Notes Due October 2017 issued under the 2015 Indenture |
| **Interim DIP Order** | An interim order of the Bankruptcy Court approving the DIP Facilities and authorizing the use of cash collateral in accordance with the DIP Budget (as defined in the DIP Credit Agreement) substantially in the form attached hereto as **_Exhibit C_**, and acceptable to the DIP Agent, the Required DIP Lenders, the Debtors, the Supporting Lenders, the Required Supporting Noteholders, and the Supporting Interest Holders, |
| **Kelso** | Kelso & Company, L.P. |
| **Kelso Notes** | The issued and outstanding Series 2015-1 Senior Secured Zero Coupon Notes Due October 2017 issued under the 2015 Indenture |
| **Management Incentive Plan** | A contemplated incentive plan for management to be implemented by the board of the Reorganized Debtors following the Effective Date that may include as consideration no more than 10% of the New Stock, the terms of which shall be acceptable to the Debtors and the Required Supporting Noteholders |
| **Marblegate** | Marblegate Asset Management, LLC |
| **New Secured Notes** | Third-lien secured notes having the same collateral as, but with a junior priority to, the Exit Second Lien Facility, and with a 12% interest rate, paid in kind semi-annually, with a maturity date seven (7) years from issuance and which shall be voluntarily prepayable without premium or penalty at the option of the Reorganized Debtors, and a customary AHYDO savings clause will be included at the election of the Debtors if the New Secured Notes would otherwise anticipate AHYDO |
| **New Stock** | The common stock in Reorganized Holdings to be issued on or after the Effective Date pursuant to the Plan |
| **Note** | Any Kelso Note, GSO Note or Unexchanged Note |
| **Noteholder** | Any holder of a Note |
| **Notes Deficiency Claim** | The portion of a claim on account of any Note that is not a secured claim under section 506(a) of the Bankruptcy Code |
| **Petition Date** | The date on which each Debtor files its chapter 11 petition |
| **Plan** | The Chapter 11 Plan of Reorganization for the Debtors that is consistent with the RSA and this RSA Term Sheet |
| **Plan Equity Value** | The value of the New Stock in Reorganized Holdings as of the Effective Date of the Plan, pursuant to the valuation set forth in the Disclosure Statement accompanying the Plan |
| **Reorganized Debtors** | The Debtors as reorganized pursuant to the Plan |

| | |
|---|---|
| *Reorganized Holdings* | Roadhouse Holdings, Inc., as reorganized under chapter 11 of the Bankruptcy Code |
| *Required DIP Lenders* | (1) A majority in interest by commitment amount of the DIP Lenders and (2) including funds or financing vehicles (or funds or accounts advised or sub-advised by such persons) that are DIP Lenders and are affiliated with at least three of the following entities: Carl Marks, Marblegate, GSO and Kelso; provided that if any DIP Lender described in this subclause (2) subsequently transfers or otherwise disposes of some or all of its commitments under the DIP Facilities prior to the Effective Date such that it holds less than 5% of all outstanding commitments in the aggregate, such DIP Lender shall be deemed removed from subclause (2), and subclause (2) shall be deemed revised to require consent from a majority of the remaining DIP Lenders described therein |
| *Required Supporting Noteholders* | (1) A majority of holders in amount of the outstanding principal amount of the Notes and (2) including funds or financing vehicles (or funds or accounts advised or sub-advised by such persons) that are Noteholders and are affiliated with at least three of the following entities: Carl Marks, Marblegate, GSO and Kelso; provided that if any Noteholder described in this subclause (2) subsequently transfers or otherwise disposes of some or all of its Notes prior to the Effective Date such that it holds less than 5% of all outstanding Notes in the aggregate, such Noteholder shall be deemed removed from subclause (2), and subclause (2) shall be deemed revised to require consent from a majority of the remaining Noteholders described therein |
| *Revolving Facility Agent* | JPMorgan Chase Bank, N.A., in its capacity as Administrative Agent and Collateral Agent under the Credit Agreement |
| *Revolving Facility Lenders* | The lenders party to the Credit Agreement |
| *RSA* | That certain Restructuring Support Agreement dated August 8, 2016, among the Debtors, the Supporting Noteholders, the Supporting Lenders, and Supporting Interest Holders, including all exhibits, attachments, amendments and supplements thereto |
| *RSA Assumption Order* | An order of the Bankruptcy Court, in form and substance acceptable to Debtors, the Required Supporting Noteholders, the Supporting Lenders, and the Supporting Interest Holders, approving assumption of the RSA |
| *Sponsors* | Kelso Investment Associates VIII, L.P. and KEP VI, LLC |

| | |
|---|---|
| **Unanimous Supporting Noteholders** | All funds or financing vehicles (or funds or accounts advised or sub-advised by such persons) that are Supporting Noteholders and are affiliated with the following entities: Carl Marks, Marblegate, GSO and Kelso; <u>provided</u> that if any Supporting Noteholder described in this definition subsequently transfers or otherwise disposes of some or all of its Notes prior to the Effective Date such that it holds less than 5% of all outstanding Notes in the aggregate, such Supporting Noteholder shall be deemed removed from this definition and this definition shall be deemed revised to require consent from each of the remaining Supporting Noteholders described herein |
| **Unexchanged Notes** | The issued and outstanding 10.75% Senior Secured Notes due 2017 issued under the 2010 Indenture |

## 3) Plan Terms

| <u>Term</u> | <u>Description</u> |
|---|---|
| **Proposed Filing Entities** | The Debtors |
| **Supporting Lender Agreements** | The Supporting Lenders, subject to the terms of the RSA: |

The Supporting Lenders, subject to the terms of the RSA:

   a. Consent to the use of cash collateral and adequate protection as provided in the Interim DIP Order attached hereto as **_Exhibit C_** and the Final DIP Order;

   b. Commit to backstop the Exit Revolving Facility on the terms attached hereto as **_Exhibit E_**;

   c. Agree to waive certain provisions of the Pre-Petition Intercreditor Agreement (as defined in the DIP Credit Agreement) as necessary to permit the actions, terms and conditions set forth herein and in the Interim DIP Order, the Final DIP Order and DIP Credit Agreement; and

   d. Not object to the terms of the DIP Facilities.

The Debtors shall solicit bids for the Alternative Exit Facility from third parties during the pendency of the Bankruptcy Cases, which financing, if obtained and acceptable to the Debtors, the Unanimous Supporting Noteholders and the Supporting Interest Holders, will be in lieu of the Exit Revolving Facility, and the proceeds of which shall be used to indefeasibly pay in cash, in full and final satisfaction, settlement, release, and discharge of and in exchange for the Obligations (as defined in the Credit Agreement) outstanding under the Credit Agreement, and any outstanding undrawn letters of credit

| Term | Description |
| --- | --- |
| | shall be cash collateralized at 105% of the face amount thereof pursuant to arrangements satisfactory to the issuers thereof. |
| **Funded Debt to be Restructured** | • All Obligations under and as defined in the Credit Agreement<br>• The GSO Notes, Kelso Notes and Unexchanged Notes |
| **Plan Summary** | On the Effective Date, among other things:<br><br>1. Holders of claims against and interests in the Debtors shall receive the treatment materially consistent with the treatment set forth in ***Exhibit A***.<br><br>2. Equity Interests and all claims against the Debtors (other than intercompany interests and intercompany claims, to the extent provided in the Plan), and all debt securities issued by the Debtors prior to the Petition Date shall be cancelled and discharged in accordance with the Plan.<br><br>3. Reorganized Holdings shall issue the New Stock to holders of claims in accordance with the terms of the Plan.<br><br>4. The Reorganized Debtors shall consummate the Exit Financing Transactions (see below).<br><br>The Plan pro forma sources and uses summary is attached hereto as ***Annex A***. |
| **Exit Financing** | On the Effective Date, the following financing transactions shall be consummated (collectively, the "***Exit Financing Transactions***"):<br><br>1) <u>Exit First Lien Facility</u>: The Debtors shall enter into either the Exit Revolving Facility or an Alternative Exit Facility; in each case, providing not less than $29 million of availability that shall be used to satisfy the claims under the Credit Agreement, including, in the case of the Exit Revolving Facility, through a cashless roll of the Obligations outstanding under the Credit Agreement.<br><br>2) <u>Exit Second Lien Facility</u>: The Debtors shall enter into the Exit Second Lien Facility, which shall be used to satisfy the claims under the DIP Facilities through a cashless roll of the obligations outstanding under the DIP Facilities. The Second Lien Facility shall substantially conform to the Exit First Lien Facility, subject to customary cushions and cutbacks satisfactory to the Supporting Lenders (if the Exit First Lien Facility is the Exit Revolving Facility). |
| **Releases** | To the maximum extent permitted by applicable law, the Plan shall provide for a full release from liability of the Debtors, the Supporting Noteholders, the trustees for the 2010 Indenture and 2015 Indenture, |

| Term | Description |
|---|---|
| | the DIP Lenders, the DIP Agent and other lender-parties under the DIP Facilities, the lenders, the agents and other lender-parties under the Exit Financing Transactions, the Supporting Lenders (as well as any issuing bank) and the Revolving Facility Agent under the Credit Agreement, the Sponsors and each of their affiliates, and all individuals serving, or who have served since the Petition Date, as a manager, director, managing member, officer, partner, principal, representative, shareholder, agent, or employee of any of the foregoing and the attorneys and other advisors to each of the foregoing (including the Debtors) by the Debtors, all of their creditors and all of their interest holders from any claims and causes of action, whether known or unknown, foreseen or unforeseen, arising from or related to any actions, transactions, events or omissions before the Effective Date relating to the Debtors, the Bankruptcy Cases or the obligations under the 2010 Indenture, the 2015 Indenture, the DIP Facilities and the Credit Agreement; provided, however, (i) the foregoing release shall not apply to obligations arising under the RSA, the Plan, the Exit First Lien Facility or the Exit Second Lien Facility; and (ii) the foregoing release shall not be construed to prohibit a party in interest from seeking to enforce the terms of the RSA or the Plan. |
| **Exculpation** | The Plan shall provide for customary exculpation for all estate fiduciaries, including with respect to any official committee appointed in the Bankruptcy Cases. |
| **Conditions to Effective Date of Plan** | The following conditions shall be satisfied or waived (with the consent of the Debtors, the Required Supporting Noteholders, the Supporting Lenders, and the Supporting Interest Holders):<br><br>• The Bankruptcy Court shall have entered a Confirmation Order in form and substance reasonably acceptable to the Debtors, the Required Supporting Noteholders, the Supporting Lenders, and the Supporting Interest Holders<br>• The Confirmation Order shall be final, shall not have been modified or stayed following its entry, and the period in which such order could be appealed shall have expired<br>• The Exit First Lien Facility shall be fully committed and funded (or scheduled for funding upon consummation of the Plan)<br>• The Reorganized Debtors shall be a private, non-SEC reporting company on the Effective Date<br>• The Debtors shall have paid all fees and reasonable and documented out-of-pocket expenses payable to the Revolving Facility Agent, the Supporting Lenders, the trustees for the 2010 Indenture and 2015 Indenture, the Unanimous Supporting Noteholders, and the Supporting Interest Holders, including all reasonable and documented out-of-pocket fees and expenses of |

| Term | Description |
|------|-------------|
| | counsel and other professionals of the Revolving Facility Agent, the Supporting Lenders, the trustees for the 2010 Indenture and 2015 Indenture, the Unanimous Supporting Noteholders, the Supporting Interest Holders, and the DIP Agent (including Simpson Thacher & Bartlett LLP, King & Spalding LLP, Debevoise & Plimpton LLP, Dechert LLP, local Delaware counsel, CDG Group, LLC, and Morris, Nichols, Arsht & Tunnell LLP) |
| **Milestones** | • The Debtors shall commence the respective Bankruptcy Cases in the Bankruptcy Court no later than August 15, 2016 <br>• Each Debtor shall file a Plan consistent with this RSA Term Sheet and the RSA, and otherwise reasonably acceptable in form and substance to the DIP Agent, the Required DIP Lenders, the Debtors, the Supporting Lenders, the Required Supporting Noteholders, and the Supporting Interest Holders, and the Disclosure Statement, which shall be reasonably acceptable in form and substance to the DIP Agent, the Required DIP Lenders, the Debtors, the Supporting Lenders, the Required Supporting Noteholders, and the Supporting Interest Holders, in the Bankruptcy Cases by no later than August 15, 2016 <br>• The Debtors shall file a motion seeking approval of the DIP Facilities within one business day of the Petition Date <br>• The Interim DIP Order shall be entered in the Debtors' Bankruptcy Cases by no later than three (3) business days after the Petition Date <br>• The Final DIP Order shall be entered in the Bankruptcy Cases by no later than thirty-five (35) calendar days after the Petition Date <br>• The RSA Assumption Order shall be entered in the Debtors' Bankruptcy Cases by no later than thirty-five (35) calendar days after the Petition Date <br>• On or before September 26, 2016, the Debtors must seek to obtain exit financing from other third parties on terms similar to or better than the terms set forth in the Exit First Lien Facility. <br>• An order approving the Disclosure Statement, which shall be reasonably acceptable in form and substance to the DIP Agent, the Required DIP Lenders, the Debtors, the Supporting Lenders, the Required Supporting Noteholders, and the Supporting Interest Holders, shall be entered in the Bankruptcy Cases by no later than September 26, 2016 <br>• An order confirming the Plan, which shall be reasonably acceptable in form and substance to the DIP Agent, the Required DIP Lenders, the Debtors, the Supporting Lenders, the Required Supporting Noteholders, and the Supporting Interest Holders, shall be entered in the applicable Bankruptcy Cases by no later than |

| Term | Description |
|---|---|
| | November 7, 2016<br>• The Plan shall each become effective by no later than November 14, 2016 |
| **Investor Rights and Governance** | Usual and customary investor rights acceptable in both form and substance to the Unanimous Supporting Noteholders, including as to status as a private company, board selection, rights under a shareholders agreement, minority protections and trading restrictions as set forth in the governance term sheet attached as ***Exhibit F***. |
| **Private Company Status** | The Reorganized Debtors shall be a private, non-SEC reporting company on the Effective Date |
| **Management Incentive Plan** | The Plan will permit the establishment of the Management Incentive Plan on terms consistent with this RSA Term Sheet. |
| **Decisions Requiring Unanimous Approval** | Notwithstanding anything to the contrary herein, certain decisions shall require unanimous approval by the Unanimous Supporting Noteholders. All decisions reserved to the unanimous approval of the Unanimous Supporting Noteholders are set forth on ***Annex B***. |
| **Indemnification** | The Plan shall provide that the Debtors' obligations to indemnify the trustees under the 2010 Indenture and 2015 Indenture and the Revolving Facility Agent under the Credit Agreement and the DIP Agent and DIP Lenders under the DIP Credit Agreement (the "Indemnified Parties") shall survive and shall continue in full force and effect for the benefit of the Indemnified Parties, notwithstanding confirmation of and effectiveness of the Plan, and such indemnification shall include, but not be limited to, all actions taken in connection with the RSA, the RSA Term Sheet, the filing of the Bankruptcy Cases, the DIP Facilities, the Interim DIP Order, the Final DIP Order and the DIP Credit Agreement. |

## 4) Other Matters

| Term | Description |
|---|---|
| **Support of DIP Facilities** | The Supporting Noteholders and the Supporting Lenders agree to consent to adequate protection and otherwise agree not to object to the terms of the DIP Facilities or cash collateral usage on terms that are materially consistent with the Interim DIP Order and the DIP Credit Agreement, and otherwise reasonably acceptable to the Debtors, the Required Supporting Noteholders, and the Supporting Lenders, subject to the terms of the Interim DIP Order and the Final DIP Order. |
| **Proposed Petition Date/Venue** | August 8, 2016 / Delaware |
| **Termination Events** | Termination Events shall include:<br><br>(i)      the breach in any material respect by any of the Debtors of any |

of its covenants, obligations, representations or warranties contained in the RSA, and such breach remains uncured for a period of five (5) business days from the date the Debtors receives a written notice from any of the Supporting Parties (such notice, the "Supporting Party Termination Notice");

(ii)     an Event of Default (as defined in the Interim DIP Order, Final DIP Order or DIP Credit Agreement) occurs under the DIP Facilities;

(iii)     the issuance by any governmental authority or court of competent jurisdiction of any ruling, decision, judgment or order enjoining or otherwise preventing the consummation of a material portion of the restructuring transaction contemplated by the RSA and this RSA Term Sheet (the "Restructuring Transaction") or requiring the Debtors to take actions inconsistent in any material respect with the Plan, unless such ruling, judgment or order has not been stayed, reversed or vacated within five (5) business days after the date of such issuance; provided, however, that if such issuance has been made at the request of any of the Supporting Parties, then the RSA shall not terminate on account of such issuance;

(iv)     the Debtors file any motion or pleading with the Bankruptcy Court that is inconsistent in any material respect with this Agreement, the DIP Loan Documents and such motion or pleading has not been withdrawn prior to the earlier of (i) three (3) business days after the Debtors receive written notice from the DIP Agent (acting at the direction of the Required DIP Lenders), the Required DIP Lenders, the Supporting Lenders, the Required Supporting Noteholders, or the Supporting Interest Holders that such motion or pleading is inconsistent with the RSA, and (ii) entry of an order of the Bankruptcy Court approving such motion or pleading;

(v)     the Bankruptcy Court grants relief that is inconsistent with the RSA in any material respect;

(vi)     the Debtors propose or support any alternative transaction;

(vii)     the Debtors (A) withdraw the Plan or publicly announce their intention to withdraw the Plan or to pursue an alternative transaction, (B) file a Plan document in form and substance that is not acceptable to each of the DIP Agent, the Required DIP Lenders, the Supporting Lenders, the Required Supporting Noteholders, and the Supporting Interest Holders, (C) move voluntarily to dismiss any of the Bankruptcy Cases, (D) move for conversion of any of the Bankruptcy Cases to chapter 7 under the Bankruptcy Code, or (E) move for the appointment of an examiner with expanded powers or a chapter 11 trustee in any of the Bankruptcy Cases; or (F) support any other party seeking any of the foregoing relief;

(viii)     any party obtains relief from the automatic stay with respect to

| | |
|---|---|
| | any of the Debtors' assets of a value in excess of $200,000; |
| | (ix)    the waiver, amendment or modification of the Plan or any of the DIP Loan Documents, in a manner inconsistent with this RSA Term Sheet, the RSA or the relevant DIP Loan Document, without the consent of each of the DIP Agent, the Required DIP Lenders, the Supporting Lenders, the Required Supporting Noteholders, and the Supporting Interest Holders; |
| | (x)    the Plan, the Disclosure Statement and motion seeking entry of the order approving the Disclosure Statement are not filed with the Bankruptcy Court by August 15, 2016; |
| | (xi)    an order approving the Disclosure Statement is not entered by September 26, 2016; |
| | (xii)    the RSA Assumption Order is not entered within thirty-five (35) days of the Petition Date; |
| | (xiii)    if the Interim DIP Order is not entered within three (3) business days of the Petition Date; |
| | (xiv)    if the Final DIP Order is not entered within thirty-five (35) days of the Petition Date; |
| | (xv)    on November 7, 2016, if the Confirmation Order confirming each Plan has not been entered; |
| | (xvi)    on November 14, 2016, if the Effective Date has not occurred; |
| | (xvii)    the Bankruptcy Court enters an order (A) directing the appointment of an examiner with expanded powers or a chapter 11 trustee in any of the Bankruptcy Cases, (B) converting any of the Bankruptcy Cases to cases under chapter 7 of the Bankruptcy Code or (C) dismissing any of the Bankruptcy Cases; |
| | (xviii) if forty-five (45) days after any official committee appointed in the Bankruptcy Cases or a party in interest obtains standing to assert a Challenge (as defined in the Interim DIP Order), such Challenge is not resolved; or |
| | (xix)  the Debtors exercise the Fiduciary Out (as defined below). |
| **Lease Analysis and Executory Contracts** | Lease and executory contract analysis to be completed no later than August 8, 2016. |
| | No later than August 11, 2016, the Debtors will file one or more motions to reject certain unexpired leases as agreed to by the Required Supporting Noteholders and the Supporting Lenders.  In addition, the Plan will provide for the Debtors to assume or reject, as the case may be, executory contracts and unexpired leases identified on a list in a Plan supplement, which list shall be acceptable in form and substance to the Required Supporting Noteholders and the Supporting Lenders. |

| Avoidance Actions | The Reorganized Debtors shall retain the exclusive right to commence, prosecute, or settle all causes of action, including avoidance actions, as appropriate in accordance with the best interests of the Reorganized Debtors, except as expressly provided for in the Interim DIP Order, the Final DIP Order and the DIP Credit Agreement. |
|---|---|
| Diligence | The Supporting Noteholders' obligations hereunder are expressly subject to the completion of due diligence in the sole discretion of the Supporting Noteholders. |
| Tax Structure | The Plan shall be structured in a tax efficient manner for the benefit of the Unanimous Supporting Noteholders. |
| Fiduciary Out | The RSA will be subject to a customary fiduciary out for the Debtors (the "Fiduciary Out") |
| PACA Claims | The Debtors shall file on the Petition Date a motion to pay all PACA claims in an amount not to exceed $1,100,000. |

\* \* \* \* \*

# Annex A

01:19116381.4

22459642.15

**Plan - Pro Forma Sources & Uses Summary** *($mm)*

| Sources | Amount ($) | | Uses | Amount ($) |
|---|---|---|---|---|
| Exit Revolving Facility[1] | $ 24.8 | | Refinance Prepetition Revolving Facility | $ 23.9 |
| Exit Second Lien Facility - DIP Refinancing[2] | 78.3 | | Exit Revolving Facility - Commitment Fee (PIK) | 0.9 |
| | | | Cash for Operations / Case Requirements[3] | - |
| | | | Refinance DIP Obligations | 76.8 |
| | | | Exit Second Lien - Commitment Fee (DIP Roll) | 1.5 |
| **Total Sources** | **$ 103.1** | | **Total Uses** | **$ 103.1** |

**Pro Forma Capitalization Summary** *($mm)*

| | Principal Amount | Interest Rate[4] | Maturity Date |
|---|---|---|---|
| Exit Revolving Facility | $ 24.8 | L+700 Cash / 100 PIK | 15-May-19 |
| Exit Second Lien Facility | 78.3 | L + 850 PIK | 15-Nov-20 |
| **Total Debt** | **$ 103.1** | | |
| Equity[5] | **TBD** | | |
| **Total Capitalization** | **TBD** | | |

Footnotes:

1. Total funded obligations at 6/30/16 plus PIK commitment fees of 3%. Assumes all outstanding LC's replaced under Exit Revolving Facility.

2. Includes $25 million new money DIP, $50 million roll-up DIP, 2% DIP commitment fee and 2% PIK Exit Second Lien Facility commitment fee and accrued interest on DIP.

3. Assumes balance sheet cash is sufficient to fund emergence (for operations, professional fees, and cash payments pursuant to the Plan).

4. Exit Second Lien Facility and Exit Revolving Facility subject to 1% LIBOR Floor. Exit Revolving Facility rate reflects initial rate; subject to step ups in years 2 and 3.

5. TBD based on Plan valuation

**Annex B**

The following matters, to the extent they occur before the Effective Date, shall be reserved for the unanimous approval of the Unanimous Supporting Noteholders:

1. Any modifications to the DIP Facilities that would (i) extend the maturity beyond December 14, 2016, (ii) change the aggregate principal amount of the New Money Facility, including increasing any commitments thereunder, (iii) decrease the rate of interest, or reduce any fee payable thereunder (or change the manner of computation of such rate of interest or fee that would result in such a decrease), (iv) change the lien and payment priority of the DIP Facilities or alter the pro rata sharing of payments required thereby, (v) alter the definition of Required DIP Lenders or Unanimous DIP Lenders, (vi) alter the adequate protection provided under the DIP Facilities, (vii) alter the amendment, consent, and waiver provisions of the DIP Facilities requiring unanimous consent of the Unanimous DIP Lenders, (viii) release all or substantially all of the DIP Collateral, (ix) release any Debtor from its obligations under the DIP Facilities, (x) impose any greater restrictions on the ability of a lender to assign its rights and obligations under the DIP Facilities, (xi) subordinate the obligations under the DIP Facilities or the liens granted to the DIP Agent to secure such obligations to any other indebtedness or liens, (xii) subject to clause (i) hereof, alter any event of default under the DIP Facilities in a manner adverse to the lenders thereunder, or (xiii) change any of the conditions precedent to the funding of a loan or a disbursement from the Segregated Pre-Funding Account (as such term is defined in the definitive documentation for the DIP Facilities).

2. Approval of the initial DIP Budget.

3. Any modifications to the Exit Second Lien Facility from the terms set forth on <u>Exhibit B</u> that would (i) change the maturity or postpone or waive any other date fixed for payment (other than usual customary mandatory prepayments such as asset sales, casualty events), (ii) decrease the rate of interest, or reduce any fee payable thereunder (or change the manner of computation of such rate of interest or fee that would result in such a decrease), (iii) change the lien and payment priority of the Exit Second Lien Facility or alter the pro rata sharing of payments required thereby, (iv) alter the amendment, consent, and waiver provisions of the Exit Second Lien Facility requiring unanimous consent of the lenders under the Exit Second Lien Facility who are Supporting Noteholders, (v) alter the definition of Required Lenders or comparable term, (vi) alter the scope of the collateral securing the Exit Second Lien Facility, including releasing all or substantially all of such collateral, (vii) impose any greater restrictions on the ability of a lender to assign its rights and obligations under the Exit Second Lien Facility, or (viii) subordinate the obligations under the Exit Second Lien Facility or the liens granted to the agent thereunder to secure such obligations to any other indebtedness or liens.

4. Any modifications to the Exit First Lien Facility from the terms set forth on <u>Exhibit E</u> that would (i) increase the commitment, shorten the maturity, increase the rate of interest by more than 150 basis points, or increase any fee payable thereunder, (ii) change the lien

and payment priority of the Exit First Lien Facility, or (iii) alter the scope of the collateral securing the Exit First Lien Facility.

5. Approval of entry into the Alternative Exit Facility, and all terms under the Alternative Exit Facility.

6. Any other change to the DIP Facilities, Exit First Lien Facility, or Exit Second Lien Facility that would materially adversely affect any of the rights or obligations of any Supporting Noteholder in a manner that is different or disproportionate in any respect from the effect on the rights or obligations (as applicable) of the Supporting Noteholders generally other than in proportion to the Supporting Noteholders' respective amounts of loans under the applicable debt facility.

7. Any modifications to the terms of the Plan set forth in the RSA Term Sheet and Exhibit A that would (a) materially change the proposed classification, impairment, and treatment of DIP Facilities Claims under the Plan, (b) materially change the proposed classification, impairment, and treatment of claims in Classes 2 through 4 under the Plan, (c) change the SEC-reporting status of the Reorganized Debtors, or (d) change the maximum percentage of New Stock that may be issued under the contemplated Management Incentive Plan.

8. Any other modifications to the Plan that would materially adversely affect any of the rights or obligations of any Supporting Noteholder in a manner that is different or disproportionate in any respect from the effect on the rights or obligations (as applicable) of the Supporting Noteholders generally other than in proportion to the Supporting Noteholders' respective claims.

9. Any material modifications to the post-Effective Date governance terms set forth in Exhibit F.

10. Any (a) extension of the RSA milestones relating to entry of the DIP Orders or (b) extension of the RSA milestones relating to the Plan effective date beyond December 14, 2016.

11. Any change to this Annex B.

# EXHIBIT A

## CLAIMS TREATMENT SUMMARY

Set forth below are the proposed classification, impairment and treatment of claims under the Plan:

| **Claims** | **Impairment** | **Treatment** |
|---|---|---|
| DIP Facilities Claims | N/A | To be satisfied by an in-kind exchange for obligations under the Exit Second Lien Facility |
| Administrative Expenses | N/A | Except to the extent a holder of an allowed administrative claim already has been paid during the Bankruptcy Cases or such holder, together with the Debtors and the Required Supporting Noteholders, agrees to less favorable treatment with respect to such holder's claim, each holder of an allowed administrative claim shall receive, in full satisfaction, settlement, release and discharge of, and in exchange for, its administrative claim, cash equal to the unpaid portion of its allowed administrative claim, to be paid on the latest of:  (a) the Effective Date, or as soon as reasonably practicable thereafter, if such administrative claim is allowed as of the Effective Date; (b) the date such administrative claim is allowed, or as soon as reasonably practicable thereafter; (c) the date such allowed administrative claim becomes due and payable, or as soon as reasonably practicable thereafter; *provided*, *however*, that allowed administrative claims that arise in the ordinary course of the Debtors' businesses shall be paid in the ordinary course of business, in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions; or (d) such other date as may be agreed upon between the holder of such allowed administrative claim and the Debtors (with the consent of the Required Supporting Noteholders) or the Reorganized Debtors, as the case may be. |

| Claims | Impairment | Treatment |
|---|---|---|
| Priority Tax Claims | N/A | Except to the extent a holder of an allowed priority tax claim, together with the Debtors and the Required Supporting Noteholders, agrees to a different treatment, in full and final satisfaction, settlement, release, and discharge or and in exchange for each allowed priority tax claim, each such holder shall be paid, at the option of the Debtors, with the approval of the Required Supporting Noteholders, to the extent such claims are allowed, (i) in the ordinary course of the Debtors' business, consistent with past practice; *provided, however,* that in the event the balance of any such claim becomes due during the pendency of the Bankruptcy Cases and remains unpaid as of the Effective Date, the holder of such claim shall be paid in full in cash on the Effective Date, or (ii) in installment payments over a period of time not to exceed five years after the Petition Date, pursuant to Section 1129(a)(9)(C) of the Bankruptcy Code. |
| Class 1<br><br>Other Priority Claims | Unimpaired | Except to the extent that a holder of an allowed other priority claim, together with the Debtors and the Required Supporting Noteholders, agree to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each allowed other priority claim, each such holder shall be paid, to the extent such claim has not already been paid during the Bankruptcy Cases, in full in cash in the ordinary course of business by the Debtors or the Reorganized Debtors, as applicable, on or as soon as reasonably practicable after (i) the Effective Date, (ii) the date on which such other priority claim against the Debtor becomes allowed, or (iii) such other date as may be ordered by the Bankruptcy Court.<br><br>Not entitled to vote; conclusively deemed to accept the Plan. |

| Claims | Impairment | Treatment |
|---|---|---|
| Class 2<br><br>Revolving Facility Lender Claims | Impaired | Revolving Facility Lender claims shall be allowed in full in the aggregate principal amount of not less than $23,899,525, plus all outstanding fees, interest, expenses and contingent reimbursement obligations, in each case, pursuant to and as provided in the Credit Agreement.<br><br>On the Effective Date, or as soon as thereafter as reasonably practicable, except to the extent that a holder of a Revolving Facility Lender claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for such claim, each holder of a Revolving Facility Lender claim shall receive a pro rata share of the Exit Revolving Facility, *provided, however,* that if the Debtors arrange for the Alternative Exit Facility, then each holder of a Revolving Facility Lender claim shall receive cash in the amount of its allowed claim in full and final satisfaction, settlement, release, and discharge of and in exchange for such claim and any outstanding undrawn letters of credit shall be cash collateralized at 105% of the face amount thereof, pursuant to arrangements satisfactory to the issuers thereof.<br><br>Entitled to vote, unless the Debtors enter into an Alternative Exit Facility. |

| Claims | Impairment | Treatment |
|--------|-----------|-----------|
| Class 3<br><br>Claims arising under the GSO Notes and Kelso Notes | Impaired | GSO Notes claims shall be allowed in the aggregate principal amount of not less than $119.299 million, plus all outstanding fees, interest, expenses and other amounts due in accordance with the terms of the 2015 Notes Indenture, and less the amount of such claims that are exchanged for notes under the Roll Up Facility (as defined in the Interim DIP Order), with the secured portion of such claims receiving treatment pursuant to this Class 3.<br><br>Kelso Notes claims shall be allowed in the aggregate principal amount of not less than $122.598 million, plus all outstanding fees, interest, expenses and other amounts due in accordance with the terms of the 2015 Notes Indenture, and less the amount of such claims that are exchanged for notes under the Roll Up Facility (as defined in the Interim DIP Order), with the secured portion of such claims receiving treatment pursuant to this Class 3.<br><br>On the Effective Date, or as soon as thereafter as reasonably practicable, except to the extent that a holder of a GSO Note claim or Kelso Note claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for such claim, each holder of a GSO Note claim and/or a Kelso Note claim shall receive a pro rata share of the New Stock, subject to dilution for the Management Incentive Plan.<br><br>Entitled to vote. |

| Claims | Impairment | Treatment |
|---|---|---|
| Class 4<br><br>Claims arising under the Unexchanged Notes | Impaired | Unexchanged Notes claims shall be allowed in the aggregate principal amount of not less than $143.936 million plus all outstanding fees, interest, expenses and other amounts due in accordance with the terms of the 2010 Notes Indenture, and less the amount of such claims that are exchanged for notes under the Roll Up Facility (as defined in the Interim DIP Order), with the secured portion of such claims receiving treatment pursuant to this Class 4.<br><br>On the Effective Date, or as soon as thereafter as reasonably practicable, except to the extent that a holder of an Unexchanged Note claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for such the secured portion of such claim, each holder of a Unexchanged Note claim shall receive:<br><br>A.<br><br>  1) Subclass 4(a).  Each holder of Unexchanged Notes that, in the aggregate, holds equal to or in excess of $50,000 in principal amount of Unexchanged Notes shall receive a pro rata share of the New Stock, subject to dilution for the Management Incentive Plan.<br><br>  2) Subclass 4(b).  Each holder of Unexchanged Notes that, in the aggregate, holds less than $50,000 in principal amount of Unexchanged Notes shall receive a Cash-Out Payment.<br><br>B.  If Subclass 4(b) votes to accept the Plan, then each holder of Unexchanged Notes in Subclass 4(b) shall receive its Cash-Out Payment in the form of cash.<br><br>C.  If Subclass 4(b) votes to reject the Plan, then each holder of Unexchanged Notes in Subclass 4(b) shall receive a Cash-Out Payment in the form of New Secured Notes.<br><br>Entitled to vote. |

01:19116381.4

| Claims | Impairment | Treatment |
|---|---|---|
| Class 5<br><br>General Unsecured Claims | Impaired | On the Effective Date, or as soon as thereafter as reasonably practicable, except to the extent that a holder of a General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for such claim, each holder of a General Unsecured Claim (including each holder of a Notes Deficiency Claim) shall receive:<br><br>   a) If Class 5 votes in favor of the Plan, its pro rata share of a $350,000 cash pool.<br><br>   b) If Class 5 rejects the Plan, holders of claims in Class 5 shall receive no distribution on account of their claims.<br><br>Entitled to Vote. |
| Class 6<br><br>Intercompany Claims | Unimpaired | Intercompany claims shall be reinstated, cancelled or compromised as determined by the Debtors with the consent of the Required Supporting Noteholders.<br><br>Not entitled to vote; deemed to accept the Plan |
| Class 7<br><br>Claims Subordinated Under Section 510(a) of the Bankruptcy Code | Impaired | No distribution under the Plan.<br><br>Not entitled to vote; deemed to reject the Plan. |
| Class 8<br><br>Equity Interests | Impaired | Equity Interests shall be canceled; the holders thereof will receive no distribution under the Plan.<br><br>Not entitled to vote; deemed to reject the Plan. |
| Class 9<br><br>Intercompany Interests | Unimpaired | Equity interests in a Debtor held by another Debtor shall be cancelled, or reinstated as determined by the Debtors with the consent of the Required Supporting Noteholders.<br><br>Not entitled to vote; deemed to accept the Plan. |

# EXHIBIT B

## EXIT SECOND LIEN FINANCING TERM SHEET

**Logan's Roadhouse –Exit Second Lien Term Loan**
**Summary of Principal Terms and Conditions**

This summary of terms and conditions (the "Term Sheet") describes the principal terms and conditions for the Exit Second Lien Facility (as defined below) contemplated to be entered into upon consummation of the Plan, subject to the terms and conditions herein and in the Restructuring Support Agreement, by and among Roadhouse Holding, Inc. and each of its direct and direct subsidiaries party thereto, Kelso Investment Associates VIII, L.P., KEP VI, LLC, the Supporting Noteholders (as defined therein), JPMorgan Chase Bank, N.A., the Supporting Lenders (as defined therein), and any Joining Party (as defined therein) from time to time party thereto (the "Restructuring Support Agreement") and the Plan. Capitalized terms used but not defined shall have the meanings set forth in the Restructuring Support Agreement to which this Term Sheet is attached.

| | |
|---|---|
| **Facility:** | Senior secured second lien term loans (the "Exit Second Lien Facility") in an aggregate principal amount equal to all obligations outstanding under the DIP Facilities on the Effective Date |
| **Borrower:** | Logan's Roadhouse, Inc., or such other persons as are borrowers under the Exit First Lien Facility |
| **Guarantors:** | LRI Holdings, Inc., Logan's Roadhouse of Kansas, Inc., and Logan's Roadhouse of Texas, Inc., or such other persons as are guarantors of the Exit First Lien Facility |
| **Maturity:** | [November 14, 2020] |
| **Collateral:** | Second priority liens on all collateral securing the Exit First Lien Facility |
| **Interest:** | LIBOR plus 850 bps, payable in cash or in kind at the option of Borrower; subject to a 1% LIBOR floor |
| **Default Interest:** | Non-default interest plus 200bps |
| **Fees:** | Commitment Fee equal to 2% of the initial aggregate principal amount of the Exit Second Lien Facility, which such fee shall be capitalized and added to the balance of the Exit Second Lien Facility |
| **Financial Covenants:** | No more restrictive than those in the Exit First Lien Facility, and otherwise to be mutually agreed upon by the Debtors and the Required Supporting Noteholders: |

LTM Minimum EBITDA (tested quarterly):

- Through Q1 2017: 60% cushion to Business Plan
- Q2 2017: 50% cushion to Business Plan
- Q3 2017-Q4 2017: 40% cushion to Business Plan
- Thereafter: 35% cushion to Business Plan

LTM Maximum CapEx (tested quarterly):

- Based on 20% cushion to Business Plan

| | |
|---|---|
| **Other Negative Covenants:** | No more restrictive than those in the Exit First Lien Facility, and otherwise to be mutually agreed upon by the Debtors and the Required Supporting Noteholders |
| **Change of Control** | To be mutually agreed upon by the Debtors and the Required Supporting Noteholders |
| **Optional Prepayment** | At any time without premium or penalty, on a pro-rata basis |

**Mandatory Prepayments:** To be mutually agreed upon by the Debtors and the Required Supporting Noteholders

**Unanimous Noteholder Approval** Notwithstanding anything to the contrary herein, certain decisions shall require approval by the Unanimous Supporting Noteholders. All decisions reserved to the unanimous approval of the Unanimous Supporting Noteholders are set forth on Annex B to the RSA Term Sheet.

**EXHIBIT C**

**INTERIM DIP ORDER**

| In re: | Chapter 11 |
|---|---|
| ROADHOUSE HOLDING INC., *et al.*,[1] | Case No. __-_____ (___) |
| Debtors. | (Jointly Administered) |
| | Ref. Docket No. __ |

**INTERIM ORDER (I) PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 507 AND 552
AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING,
(B) GRANT LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS,
(C) USE CASH COLLATERAL OF PREPETITION SECURED PARTIES, AND
(D) GRANT ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES;
(II) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY
RULES 4001(b) AND 4001(c); AND (III) GRANTING RELATED RELIEF**

Upon the motion dated August 8, 2016 (the "**Motion**")[2] of the above-captioned debtors

and debtors-in-possession (collectively, the "**Debtors**") in the above-referenced chapter 11 cases

(the "**Bankruptcy Cases**"), for entry of an interim order (this "**Interim Order**") and a final

order (the "**Final Order**"), under sections 105, 361, 362, 363, 364, 507 and 552 of title 11 of the

United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended, the "**Bankruptcy Code**"),

Rules 2002, 4001(b), 4001(c), 6003, 6004 and 9014 of the Federal Rules of Bankruptcy

Procedure (as amended, the "**Bankruptcy Rules**") and Rules 4001-2 and 9013-1(m) of the Local

Bankruptcy Rules for the United States Bankruptcy Court for the District of Delaware (the

"**Local Rules**"):

       (i)       authorizing the Debtors to (A) obtain postpetition financing pursuant to
the terms and conditions of that certain Debtor-in-Possession Credit

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Roadhouse Holding Inc. (5939); Roadhouse Intermediate Inc. (6159); Roadhouse Midco Inc. (6337); Roadhouse Parent Inc. (5108); LRI Holdings, Inc. (4571); Logan's Roadhouse, Inc. (2074); Logan's Roadhouse of Texas, Inc. (2372); and Logan's Roadhouse of Kansas, Inc. (8716). The location of the Debtors' corporate headquarters is 3011 Armory Drive, Suite 300, Nashville, Tennessee 37204.

[2]    Each capitalized term used but not otherwise defined herein shall have the meaning ascribed to it in the Motion or the DIP Credit Agreement (as defined below), as applicable.

Agreement entered into on or about the date hereof attached hereto as Exhibit 1 (as further amended, restated, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof, the "**DIP Credit Agreement**") among Logan's Roadhouse, Inc. (a debtor in possession), as borrower (the "**Borrower**"), Cortland Capital Market Services LLC, as administrative agent and collateral agent (the "**DIP Agent**"), the lenders party thereto from time to time (the "**DIP Lenders"**) and the Guarantors (as defined below), the obligations of the Borrower under which are guaranteed pursuant to the Guaranty Agreement executed in connection therewith by the guarantors party thereto (the "**Guarantors**" and, together with the Borrower, the "**Loan Parties**"), and (B) incur the Obligations under (and as defined in) the DIP Credit Agreement;

(ii)     authorizing the Debtors to execute and deliver the DIP Loan Documents (as defined in the DIP Credit Agreement as "Loan Documents") and to perform their respective obligations thereunder and such other and further acts as may be required in connection with the DIP Loan Documents, including, without limitation, the payment of all principal, interest, fees, expenses, and other amounts payable under the DIP Loan Documents as such amounts become due and payable;

(iii)     authorizing the Debtors to grant security interests, liens, and super-priority claims, including a super-priority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code and liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code (including priming liens pursuant to section 364(d)(1)) of the Bankruptcy Code to the DIP Agent, for the benefit of the DIP Lenders), in the DIP Collateral as set forth herein, including, without limitation, all property constituting "cash collateral," as defined in Bankruptcy Code section 363(a) (the "**Cash Collateral**"), to secure all obligations under the DIP Loan Documents, subordinated on a junior basis only to the Revolving Facility Liens, Revolving Facility Adequate Protection Liens, the Carve-Out and Permitted Liens (each as defined below);

(iv)     authorizing the Debtors' use of Cash Collateral of the Prepetition Secured Parties (as defined below) and the provision of adequate protection to the Prepetition Secured Parties for any diminution in value of their interests in the Prepetition Collateral, including Cash Collateral;

(v)     authorizing the Debtors to borrow under the New Money Facility up to an aggregate principal amount of $[25] million (the "**New Money Facility**"), $[10] million of which shall be available following entry of this Interim Order and the satisfaction of the other applicable conditions in the DIP Credit Agreement, with the remainder of the New Money Facility to be made available upon entry of the Final Order and the satisfaction of the

other applicable conditions in the DIP Credit Agreement and, in each case, to use the proceeds thereof in accordance with the DIP Budget (as defined herein);

(vi)    authorizing the Debtors to issue new notes (the "**Roll Up Facility**" and together with the New Money Facility, the "**DIP Facilities**"), upon entry of this Interim Order, in exchange for each DIP Lender's claim for notes issued under the Prepetition Indentures (as defined below) on a dollar-for-dollar basis for every dollar of borrowings actually disbursed under the New Money Facility, and upon entry of a Final Order granting such relief and the corresponding exchange of notes issued under the Prepetition Indentures, additional notes under the Roll Up Facility so that the total notes under the Roll Up Facility received by each DIP Lender that has a claim for notes issued under the Prepetition Indentures shall result in an exchange on a 2:1 basis for every dollar of borrowings actually disbursed under the New Money Facility;

(vii)   modifying the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and this Interim Order;

(viii)  scheduling a final hearing (the "**Final Hearing**") to consider entry of the Final Order granting the relief requested in the Motion on a final basis and approving the form of notice with respect to the Final Hearing; and

(ix)    granting related relief.

An interim hearing on the Motion having been held by this Court on August [__], 2016 (the "**Interim Hearing**"); and this Court having found that the relief requested in the Motion is in the best interest of the Debtors, their estates, their creditors and other parties-in-interest and necessary to avoid immediate and irreparable harm; and this Court having determined that the legal and factual bases set forth in the Motion and all pleadings related thereto, including the *Declaration of Keith A. Maib in Support of Chapter 11 Petitions and First Day Relief* filed contemporaneously with the Motion, and on the record made at the Interim Hearing, adequately establish just cause for the relief granted herein; and all objections, if any, to entry of this Interim Order having been withdrawn, resolved or overruled by this Court; and after due deliberation and consideration, and good and sufficient cause appearing therefor:

**THIS COURT HEREBY FINDS AND CONCLUDES AS FOLLOWS:**[3]

A.      On August [__], 2016 (the "**Petition Date**"), each Debtor filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are continuing to operate their respective businesses and manage their respective properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Each Debtor's bankruptcy case (collectively, the "**Bankruptcy Cases**") is being jointly administered for procedural purposes only under case number [16-_____ (___)].  No official committee of unsecured creditors (upon the appointment thereof, the "**Committee**"), as provided for under section 1102 of the Bankruptcy Code, has been appointed in these Bankruptcy Cases.

B.      This Court has jurisdiction over the Bankruptcy Cases, the Motion and the parties and property affected hereby, pursuant to 28 U.S.C. §§ 157(b) and 1334.  Consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  This Court may enter a final order consistent with Article III of the United States Constitution.  Venue of the Bankruptcy Cases is proper before this District pursuant to 28 U.S.C. §§ 1408 and 1409.

C.      On the Petition Date, the Debtors filed the Motion with this Court pursuant to Rules 2002, 4001 and 9014, and provided notice of the Motion and the Interim Hearing by facsimile, electronic mail or overnight mail to the following parties and/or their respective counsel as indicated below:  (i) the Office of the United States Trustee for Region 3, serving the District of Delaware (the "**U.S. Trustee**"); (ii) counsel to GSO Capital Partners LP ("**GSO**"); (iii) counsel to Kelso & Company, L.P. ("**Kelso**"); (iv) counsel to Carl Marks Management Company, LLC ("**Carl Marks**") and Marblegate Asset Management, LLC

---

[3]      The findings and conclusions set forth in this Interim Order constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

("**Marblegate**"); (v) counsel to JPMorgan Chase Bank, N.A., in its capacity as Administrative Agent and Collateral Agent (in such capacity, the "**Revolving Facility Agent**") under the Credit Agreement dated as of October 4, 2010, among Roadhouse Financing, Inc. (now known as Logan's Roadhouse, Inc.), Roadhouse Merger, Inc. (now known as LRI Holdings, Inc.), JPMorgan Chase Bank, N.A., as Administrative Agent and the lenders party thereto (the "**Revolving Facility Lenders**"), and all exhibits, amendments, and supplements thereto (the "**Credit Agreement**"), (vi) counsel to the trustee (the "**2015 Trustee**") under that certain Indenture dated as of October 15, 2015, among Logan's Roadhouse, Inc., LRI Holdings, Inc. and Wells Fargo Bank, N.A., as trustee and collateral agent, and all exhibits, amendments, and supplements thereto, including, without limitation, the Series 2015-1 Supplemental Indenture dated October 15, 2015, the Second Series 2015-1 Supplemental Indenture dated October 15, 2015 and the Series 2015-2 Supplemental Indenture dated October 15, 2015 (collectively, the "**2015 Indenture**"), (vii) counsel to the trustee (the "**2010 Trustee**," together with the 2015 Trustee, the "**Trustees,**" and the Trustees together with the Revolving Facility Agent, the "**Prepetition Agents**") under that certain Senior Secured Notes Indenture, dated as of October 4, 2010, among Roadhouse Financing, Inc., Roadhouse Merger, Inc. and BOKF, N.A., as trustee and collateral agent, and all exhibits, amendments, and supplements thereto (the "**2010 Indenture**," and together with the 2015 Indenture, the "**Prepetition Indentures**"); (viii) counsel to the DIP Agent; (ix) counsel to the DIP Lenders; (x) the creditors (excluding insiders) holding the 30 largest unsecured claims against the Debtors on a consolidated basis; (xi) the United States Attorney's Office for the District of Delaware; (xii) the United States Attorney General; (xiii) the Internal Revenue Service; (xiv) the Securities and Exchange Commission; (xv) all entities known or reasonably believed to have asserted a security interest or lien against property

of the Debtors; and (xvi) all parties entitled to notice pursuant to Local Rule 9013-1(m) (the parties set forth in the preceding clauses (i) through (xvi), collectively, the "**Notice Parties**"). Given the nature of the relief sought in the Motion and the exigent circumstances underlying the interim relief requested thereby, this Court concludes that no further notice is necessary for entry of this Interim Order.

D.     The Debtors and (i) the Revolving Facility Lenders, (ii) the Revolving Facility Agent,  and (iii) affiliates of, or funds managed, controlled or sub-advised by, (1) GSO, (2) Kelso, (3) Carl Marks and (4) Marblegate have entered into that certain Restructuring Support Agreement dated August 8, 2016 (as amended, supplemented, modified, extended, renewed, restated and/or replaced in accordance therewith, together with any schedules and exhibits thereto, (collectively, the "**RSA**")), pursuant to which the parties have, among other things, agreed to support a restructuring and recapitalization of the Debtors and the other transactions contemplated therein, including the relief requested in the Motion pursuant to the terms thereof.

E.     Subject to paragraph 27 below, the Debtors hereby, and, pursuant to the DIP Loan Documents, admit, stipulate and agree that:

(1)     <u>First Lien Revolving Credit Facility</u>:  Prior to the commencement of the Bankruptcy Cases, pursuant to the Credit Agreement, the Revolving Facility Lenders extended to Logan's Roadhouse, Inc. ("**Logan's Roadhouse**") a $30.0 million Senior Secured First Lien Revolving Facility (the "**Revolving Facility**").  The Revolving Facility is guaranteed by certain affiliates, including LRI Holdings, Inc. and certain subsidiaries, of Logan's Roadhouse (together with Logan's Roadhouse, the "**Existing Loan Parties**" and each an "**Existing Loan Party**") and secured by liens on substantially all of the assets of the Existing Loan Parties, with certain exceptions to the extent set forth in the Revolving Facility Loan Documents (as defined below).  All Obligations (as such term is defined in the Credit Agreement) of the Existing Loan Parties arising under the Credit Agreement and all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to, or in favor of the

Revolving Facility Lenders, including, without limitation, mortgages, security agreements, guaranties and UCC financing statements and all other related agreements, documents, notes, certificates, and instruments executed and/or delivered in connection therewith or related thereto (as amended, modified or supplemented and in effect, collectively the "**Revolving Facility Loan Documents**"), including, without limitation, all loans, advances, debts, liabilities, principal, accrued or hereafter accruing interest, fees, costs, charges, expenses (including any and all attorneys', accountants', appraisers' and financial advisors' fees and expenses that are chargeable, reimbursable or otherwise payable under the Revolving Facility Loan Documents), L/C Exposure (as defined in the Credit Agreement) indemnification obligations and obligations for the performance of covenants, tasks or duties, or for the payment of monetary amounts arising under the Revolving Facility Loan Documents to the Revolving Facility Agent or Revolving Facility Lenders by the Existing Loan Parties, of any kind or nature, whether or not evidenced by any note, agreement or other instrument, shall hereinafter be referred to as the "**Revolving Facility Obligations**."

(2)     2010 Indenture:  Prior to the commencement of the Bankruptcy Cases, pursuant to the 2010 Indenture, Logan's Roadhouse issued $355.0 million in principal of 10.75% senior secured notes due 2017 (the "**2010 Notes**"), of which $143.936 million of principal amount remain issued and outstanding. The 2010 Notes were guaranteed by the other Existing Loan Parties and secured by liens on substantially all of the assets of the Existing Loan Parties, with certain exceptions to the extent set forth in the 2010 Indenture Documents (as defined below).  All Obligations (as such term is defined in the 2010 Indenture) of the Existing Loan Parties arising under the 2010 Indenture and all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to, or in favor of the holders of the 2010 Notes (the "**2010 Noteholders**"), including, without limitation, mortgages, security agreements, guaranties and UCC financing statements and all other related agreements, documents, notes, certificates, and instruments executed and/or delivered in connection therewith or related thereto (as amended, modified or supplemented and in effect, collectively the "**2010 Indenture Documents**"), including, without limitation, all loans, advances, debts, liabilities, principal, accrued or hereafter accruing interest, fees, costs, charges, expenses (including any and all attorneys', accountants', appraisers' and financial advisors' fees and expenses that are chargeable, reimbursable or otherwise payable under the 2010 Indenture Documents) and obligations for the performance of covenants, tasks or duties, or for the payment of monetary amounts arising under the 2010 Indenture to the 2010 Trustee or 2010 Noteholders by the Existing Loan Parties, of any kind or nature, whether or not evidenced by any note, agreement or other instrument, shall hereinafter be referred to as the "**2010 Note Obligations**."

(3)     2015 Indenture:  Prior to the commencement of the Bankruptcy Cases, pursuant to the 2015 Indenture, Logan's Roadhouse refinanced certain of the 2010 Notes and issued $112.547 million in principal of Series 2015-1 senior secured notes due 2017 and $109.732 million in principal of Series 2015-2 senior secured notes due 2017 (collectively, the "**2015 Notes**," and the 2015 Notes and 2010 Notes are collectively referred to as the "**Prepetition Notes**"). The 2015 Notes were guaranteed by the Existing Loan Parties and secured by liens on substantially all of the assets of the Existing Loan Parties, with certain exceptions to the extent set forth in the 2015 Indenture Documents (as defined below).  All Obligations (as such term is defined in the 2015 Indenture) of the Existing Loan Parties arising under the 2015 Indenture and all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to, or in favor of the holders of the 2015 Notes (the "**2015 Noteholders**" and together with the 2010 Noteholders, the "**Prepetition Noteholders**"), including, without limitation, mortgages, security agreements, guaranties and UCC financing statements and all other related agreements, documents, notes, certificates, and instruments executed and/or delivered in connection therewith or related thereto (as amended, modified or supplemented and in effect, collectively the "**2015 Indenture Documents**" and together with the 2010 Indenture Documents, the "**Prepetition Indenture Documents**"), including, without limitation, all loans, advances, debts, liabilities, principal, accrued or hereafter accruing interest, fees, costs, charges, expenses (including any and all attorneys', accountants', appraisers' and financial advisors' fees and expenses that are chargeable, reimbursable or otherwise payable under the 2015 Indenture Documents) and obligations for the performance of covenants, tasks or duties, or for the payment of monetary amounts arising under the 2015 Indenture to the 2015 Trustee or 2015 Noteholders by the Existing Loan Parties, of any kind or nature, whether or not evidenced by any note, agreement or other instrument, shall hereinafter be referred to as the "**2015 Note Obligations**" and together with the 2010 Note Obligations, the "**Prepetition Note Obligations**," and the Prepetition Note Obligations together with the Revolving Facility Obligations, the "**Prepetition Secured Obligations**").

(4)     Revolving Facility Collateral:  Pursuant to certain Revolving Facility Loan Documents, including that certain First Lien Guarantee and Collateral Agreement dated as of October 4, 2010, and entered into by and among the Revolving Facility Agent, for the benefit of itself and the Revolving Facility Lenders, Logan's Roadhouse and each other party signatory thereto, each Existing Loan Party granted to the Revolving Facility Agent, for the benefit of itself and the Revolving Facility Lenders and the other holders of the Revolving Facility Obligations (the "**Revolving Facility Secured Parties**"), to secure such Revolving Facility Obligations, a

security interest in and continuing lien on substantially all of such Existing Loan Party's assets (subject to certain exceptions to the extent set forth in the Revolving Facility Loan Documents). All collateral granted or pledged by the Existing Loan Parties pursuant to the Revolving Facility Loan Documents shall collectively be referred to herein as the "**Revolving Facility Collateral**."

(5)     2010 Notes Collateral:  Pursuant to certain 2010 Indenture Documents, including that certain Security Agreement dated as of October 4, 2010, and entered into by and among the 2010 Trustee, for the benefit of itself and the 2010 Noteholders, Logan's Roadhouse and each other party signatory thereto, each Existing Loan Party granted to the 2010 Trustee, for the benefit of itself and the 2010 Noteholders (the "**2010 Note Secured Parties**"), to secure such 2010 Note Obligations, a security interest in and continuing lien on substantially all of such Existing Loan Party's assets (subject to certain exceptions to the extent set forth in the 2010 Indenture Documents). All collateral granted or pledged by the Existing Loan Parties pursuant to the 2010 Indenture Documents shall collectively be referred to herein as the "**2010 Note Collateral**."

(6)     2015 Notes Collateral:  Pursuant to certain 2015 Indenture Documents, including that certain Security Agreement dated as of October 15, 2015, and entered into by and among the 2015 Trustee, for the benefit of itself and the 2015 Noteholders, Logan's Roadhouse and each other party signatory thereto, each Existing Loan Party granted to the 2015 Trustee, for the benefit of itself and the 2015 Noteholders (the "**2015 Note Secured Parties**," and together with the 2010 Note Secured Parties, the "**Prepetition Note Secured Parties**," and the Prepetition Note Secured Parties together with the Revolving Facility Secured Parties, the "**Prepetition Secured Parties**"), to secure such 2015 Note Obligations, a security interest in and continuing lien on substantially all of such Existing Loan Party's assets (subject to certain exceptions to the extent set forth in the 2015 Indenture Documents). All collateral granted or pledged by the Existing Loan Parties pursuant to the 2015 Indenture Documents shall collectively be referred to herein as the "**2015 Note Collateral**," and together with the 2010 Note Collateral, the "**Prepetition Note Collateral**," and the Revolving Facility Collateral together with the Prepetition Note Collateral, the "**Prepetition Collateral**."

(7)     Intercreditor Agreement:  That certain Intercreditor Agreement, dated as of October 4, 2010 (as amended by Amendment No. 1 to Intercreditor Agreement, dated as of October 15, 2015), by and among the Revolving Facility Agent, the Trustees, the Borrower, LRI Holdings, Inc., Logan's Roadhouse of Texas, Inc. and Logan's Roadhouse of Kansas, Inc., as further amended by that certain Waiver to Intercreditor Agreement, dated as of August [___], 2016, by and among the Existing Loan Parties, the

Revolving Facility Agent, for the benefit of itself and the Revolving Facility Secured Parties, the 2010 Trustee, for the benefit of itself and the 2010 Note Secured Parties, and the 2015 Trustee, for the benefit of itself and the 2015 Note Secured Parties (the "**Prepetition Intercreditor Agreement Waiver**," attached hereto as <u>Exhibit 2</u>) (collectively, as further amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, and including the Prepetition Intercreditor Agreement Waiver, the "**Intercreditor Agreement**" and, together with the Revolving Facility Loan Documents and the Prepetition Indenture Documents, the "**Prepetition Credit Documents**"). The Intercreditor Agreement shall be enforceable among the parties thereto in determining the relative priorities and rights of the DIP Agent and DIP Lenders, the Revolving Facility Secured Parties and the Prepetition Note Secured Parties (including, without limitation, the relative priorities and rights of the Revolving Facility Secured Parties and the Prepetition Note Secured Parties with respect to the Adequate Protection Obligations (as defined below) granted hereunder), and such priorities and rights shall continue to be governed by the Prepetition Credit Documents, the Intercreditor Agreement, and all related agreements and documents.

(8)     <u>Validity of Prepetition Credit Documents:</u>    All Prepetition Credit Documents executed and delivered by the Debtors to the Prepetition Secured Parties are valid, binding and enforceable in accordance with their terms by the Prepetition Secured Parties against each of the applicable Debtors and not subject to avoidance, whether under the Bankruptcy Code or otherwise. The Prepetition Secured Parties duly and validly perfected their liens upon and security interests in the Prepetition Collateral (other than funds in the Excluded Accounts[4]) by, among other things, filing financing statements, entering into deposit account control agreements and, where necessary, possessing the relevant instruments, certificates, or other property. All of such financing statements were validly authorized by authorized representatives of the applicable Debtors. Pursuant to the Prepetition Credit Documents, the Prepetition Secured Parties have properly perfected and non-avoidable security interests in and liens on all of the Prepetition Collateral, including, without limitation, Cash Collateral (other than funds in the Excluded Accounts).

(9)     <u>Liens on Prepetition Collateral:</u>    The liens and security interests of the Prepetition Secured Parties in the Prepetition Collateral, including the Cash Collateral (other than funds in the Excluded Accounts), as security for the Prepetition Secured Obligations, constitute valid, binding, enforceable and properly perfected liens and security interests and are not subject to any challenge or defense including, without limitation,

---

[4]     The "Excluded Accounts" are those zero-balance accounts held at Wells Fargo Bank, N.A. with account numbers ending (5730), (5743), (0119), (8546) and (1449) and depository accounts at Fifth-Third Bank, N.A. with account numbers ending (6796) and (5998).

impairment, recoupment, attachment, disallowance, disgorgement, reduction, recharacterization, recovery, attack, offset, counterclaim, cross-claim, Claim,[5] avoidance, disallowance or subordination (whether equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law (except insofar as such liens are subordinated as set forth in the Prepetition Credit Documents and subordinated to the DIP Liens and the Carve-Out in accordance with the provisions of this Interim Order). The Debtors further admit, acknowledge and agree that (A) the Prepetition Secured Obligations constitute legal, valid and binding obligations of each of the Existing Loan Parties, (B) no offsets, defenses, reductions, impairments, grounds for avoidance, recoupments, subordinations (except as set forth in the Prepetition Credit Documents) or disallowance (whether under the Bankruptcy Code or otherwise), Claims, crossclaims or counterclaims with respect to the Prepetition Secured Obligations exist and (C) no portion of the Prepetition Secured Obligations is subject to any challenge or defense including, without limitation, impairment, recoupment, attachment, disallowance, disgorgement, reduction, recharacterization, recovery, attack, offset, counterclaim, cross-claim, Claim, avoidance, disallowance or subordination (whether equitable or otherwise, except as set forth in the Prepetition Credit Documents) pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

(10)     Cash Collateral: All cash proceeds of the Prepetition Collateral, including all such cash proceeds held in any of the Existing Loan Parties banking, checking or other deposit accounts with financial institutions (in each case, other than trust, escrow and custodial funds held as of the Petition Date in properly established trust, escrow and custodial accounts or funds held in the Excluded Accounts), wherever located, are Cash Collateral of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code. The Prepetition Secured Parties are entitled, pursuant to sections 105, 361, 362 and 363(e) of the Bankruptcy Code, to adequate protection of their interest in the Prepetition Collateral, including the Cash Collateral, for any diminution in the value thereof.

(11)     Priming of DIP Facilities: In entering into the DIP Loan Documents, and as consideration therefor, each of the Debtors hereby agrees that until such time as all outstanding obligations under the DIP Facilities (the "**DIP Obligations**") have been indefeasibly paid in full in cash (or other arrangements for payment of the DIP Obligations satisfactory to the DIP Lenders in their sole and exclusive discretion have been made) and the DIP Credit Agreement has been terminated in accordance with the terms thereof, the Debtors shall not in any way prime or seek to prime the

---

[5]     The term "Claim" as used in this Interim Order shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

claims, security interests and DIP Liens provided to the DIP Lenders under this Interim Order or the DIP Loan Documents by offering a subsequent lender or a party-in-interest a superior or *pari passu* lien or claim pursuant to section 364(c)(1) or section 364(d) of the Bankruptcy Code or otherwise, except as provided for in the DIP Loan Documents or in this Interim Order.

(12) <u>No Valid Claims</u>:  The Debtors have no valid Claims, counterclaims, cross-claims, recoupments, causes of action, defenses or setoff rights against the Prepetition Secured Parties, and their respective shareholders, affiliates, partners, members, officers, directors, employees, financial advisors, attorneys, agents and other representatives, with respect to the Revolving Facility Loan Documents, the 2010 Indenture Documents and the 2015 Indenture Documents, whether arising at law or at equity, including, without limitation, any recharacterization, subordination (whether equitable or otherwise), avoidance or other claims arising under or pursuant to sections 105, 510, 541 or 542 through 553, inclusive, of the Bankruptcy Code or any theory of "lender liability" under applicable state law or otherwise.

(13) <u>Amount of Prepetition Secured Obligations</u>:  As of the Petition Date, the aggregate principal balance of the Prepetition Secured Obligations for which the Debtors were truly and justly indebted to the Prepetition Secured Parties, without defense, counterclaim, cross-claim, Claim, challenge, recoupment or offset of any kind, are comprised of not less than approximately (A) an aggregate principal balance of $23,899,525 of Loans and $5,100,475 of L/C Exposure under the Revolving Facility, <u>plus</u> all other Revolving Facility Obligations, (B) an aggregate principal balance of no less than $143.936 million on account of the 2010 Notes, <u>plus</u> all other 2010 Note Obligations, and (C) an aggregate principal balance of no less than $234.089 million on account of the 2015 Notes, <u>plus</u> all other 2015 Note Obligations.

(14) <u>No Claims</u>.  Subject to paragraph 27 below, the admissions, stipulations and agreements set forth in paragraph E of this Interim Order are based upon and consistent with the Debtors' due diligence and analysis of the Prepetition Secured Parties' liens and claims and determination that subject to paragraph 14 below, the Debtors have no Claims, counterclaims, cross-claims, recoupments, causes of action, challenges, grounds for subordination (whether equitable, contractual or otherwise), defenses or setoff rights with respect to the Prepetition Secured Parties' liens and claims.

(15) <u>Release</u>.  Each Debtor and anyone who claims an interest by, through or under their estates forever and irrevocably release, discharge, and acquit each of the former, current, or future DIP Agents, DIP Lenders and

Secured Parties (as such term is defined in the DIP Credit Agreement), the Prepetition Secured Parties and each of their respective former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, successors, assigns, and predecessors in interest of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, arising out of, in connection with or relating to the DIP Facilities, the DIP Loan Documents, the Revolving Facility Loan Documents and/or the Prepetition Indenture Documents or the transactions contemplated hereunder or thereunder including, without limitation, (i) any avoidance, reduction, set off, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), so-called "lender liability" claims, counterclaims, cross-claims, recoupment, defenses, disallowance, impairment, or any other challenges under the Bankruptcy Code or any other applicable domestic or foreign law or regulation by any person or entity, (ii) any and all claims and causes of action arising under title 11 of the United States Code, and (iii) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the liens or claims of the DIP Agent, the DIP Lenders, and/or other Secured Parties (as such term is defined in the DIP Credit Agreement).

F.     Good cause has been shown for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) and Local Rule 4001-2. The Debtors have an immediate and critical need to obtain postpetition financing under the DIP Facilities and to use Cash Collateral to, among other things, finance the ordinary costs of their operations, maintain business relationships with vendors, independent contractors and customers, make payroll, make capital expenditures, satisfy other working capital and operational needs and fund the administration and prosecution of these Bankruptcy Cases. The Debtors' access to sufficient working capital and liquidity through the incurrence of postpetition financing under the DIP Facilities and the use of Cash Collateral under the terms of this Interim Order is vital to the

preservation and maintenance of the going concern value of the Debtors' estates, the orderly operation of the Debtors' businesses and, ultimately, the success of the Debtors' reorganization efforts. Consequently, without access to the DIP Facilities and the continued use of Cash Collateral, to the extent authorized pursuant to this Interim Order and the terms of the DIP Loan Documents, the Debtors and their estates would suffer immediate and irreparable harm.

G. The DIP Facilities are the best source of debtor in possession financing available to the Debtors. The Debtors are unable to obtain (i) adequate unsecured credit allowable either (a) under sections 364(b) and 503(b)(1) of the Bankruptcy Code or (b) under section 364(c)(1) of the Bankruptcy Code, (ii) adequate credit secured by (x) a senior lien on unencumbered assets of their estates under section 364(c)(2) of the Bankruptcy Code and (y) a junior lien on encumbered assets of their estates under section 364(c)(3) of the Bankruptcy Code, or (iii) secured credit under section 364(d)(1) of the Bankruptcy Code, except with respect to the Revolving Facility Obligations and the Revolving Facility Adequate Protection Obligations (as defined below), from sources other than the DIP Agent and the DIP Lenders on terms more favorable than the terms of the DIP Facilities. The best and only available source of secured credit available to the Debtors is the DIP Facilities. The Debtors are not able to operate and manage their business solely with the use of Cash Collateral. The Debtors require both additional financing under the DIP Facilities and the continued use of Cash Collateral under the terms of this Interim Order and the DIP Loan Documents in order to satisfy their postpetition liquidity needs.

H. The DIP Lenders have indicated a willingness to provide the DIP Facilities, but solely on the terms and conditions set forth in this Interim Order (and, subject to entry by this Court, the Final Order) and in the DIP Loan Documents. After considering all of

their alternatives, the Debtors have concluded, in an exercise of their sound business judgment consistent with their fiduciary duties, that the financing to be provided by the DIP Lenders pursuant to the terms of this Interim Order and the DIP Loan Documents represents the best financing presently available to the Debtors.

I.       Solely on the terms and conditions set forth in this Interim Order (and, subject to entry by this Court of the Final Order) and in the DIP Loan Documents, including without limitation, compliance with the DIP Budget, the Revolving Facility Secured Parties, the 2010 Trustee, Carl Marks and Marblegate as 2010 Noteholders who hold approximately 57.8% of the issued and outstanding 2010 Notes, [the 2015 Trustee,] and the 2015 Noteholders (collectively, the "**Prepetition Consenting Parties**" and each, a "**Prepetition Consenting Party**") are prepared to consent to: (i) the imposition of the DIP Liens (as defined below), which liens will prime the Primed Liens (as defined below) and (ii) the Debtors' use of the Prepetition Collateral (including the Cash Collateral); provided, in each case, that this Court authorizes the Debtors, pursuant to sections 361, 363 and 364(d) of the Bankruptcy Code, to grant to the Revolving Facility Agent, the 2010 Trustee and the 2015 Trustee, on a joint and several basis, for the benefit of themselves and the Revolving Facility Secured Parties, the 2010 Note Secured Parties and the 2015 Note Secured Parties, respectively, as and for adequate protection, which shall have the priorities set forth in paragraph 10 hereof and without in any way limiting the Prepetition Secured Parties' rights under section 552 of the Bankruptcy Code, but subject to the Revolving Facility Liens, the Permitted Liens and the Carve-Out, (1) a security interest in and lien and mortgage upon the DIP Collateral (as defined below) in favor of the Prepetition Secured Parties (the "**Adequate Protection Lien**"), (2) superpriority administrative expense claims under

section 507(b) of the Bankruptcy Code (the "**Adequate Protection Claims**"), and (3) the Adequate Protection Payments (as defined in paragraph 10 hereof).

J.       The security interests and liens granted pursuant to this Interim Order to the DIP Agent, for the benefit of itself and the DIP Lenders and other Secured Parties (as such term is defined in the DIP Credit Agreement), are appropriate under section 364(d) of the Bankruptcy Code because, among other things:  (i) such security interests and liens do not impair the interests of any holder of a valid, perfected, prepetition security interest or lien in the property of the Debtors' estates; (ii) the holders of such valid, perfected, prepetition security interests and liens have consented to the security interests and DIP Liens, including the Priming Liens, granted pursuant to this Interim Order and the DIP Loan Documents to the DIP Agent for the benefit of itself and the DIP Lenders; and (iii) the interests of any holder of a valid, perfected, prepetition security interest or lien are otherwise adequately protected.  In particular, the security interests and liens of the Prepetition Secured Parties are adequately protected by the Prepetition Secured Parties' Adequate Protection Liens and the Adequate Protection Claims.

K.       Good cause has been shown for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) and Local Rule 4001-2.  In particular, the authorization granted herein for the Debtors to execute, deliver, and perform their obligations under the DIP Loan Documents, to continue using Cash Collateral and to obtain interim financing, including on a priming lien basis, is necessary to avoid immediate and irreparable harm to the Debtors and their estates.  Entry of this Interim Order is in the best interest of the Debtors, their estates and their creditors.  The terms of the DIP Loan Documents (including the Debtors' continued use of Cash Collateral) are fair and reasonable under the circumstances,

reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and are supported by reasonably equivalent value and fair consideration.

L.     The Debtors, the DIP Agent, the DIP Lenders and the Prepetition Secured Parties, with the assistance and counsel of their respective advisors, have negotiated the terms and conditions of the DIP Loan Documents (including the Debtors' continued use of Cash Collateral) and this Interim Order, in good faith and at arm's-length, and any credit extended and loans made to the Debtors pursuant to this Interim Order and the DIP Loan Documents shall be, and hereby are, deemed to have been extended, issued or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code and the DIP Agent and the DIP Lenders shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that either this Interim Order or any provision thereof is vacated, reversed, amended or modified, whether on appeal or otherwise.

M.     As set forth in paragraph 16, the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties request a waiver of the surcharge provisions of sections 105 and 506(c) of the Bankruptcy Code and the "equities of the case" exception in section 552(b) of the Bankruptcy Code in connection with the DIP Facilities at the Final Hearing.

N.     Based on the foregoing findings, acknowledgements, and conclusions, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefor:

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.     *Approval of Motion.*  The Motion is granted on an interim basis on the terms and conditions set forth in this Interim Order and the DIP Loan Documents; provided however that, if there are any inconsistencies between the terms of this Interim Order and the

DIP Loan Documents, the terms of this Interim Order shall govern. Any objections or responses to the relief requested in the Motion that have not been previously resolved or withdrawn, waived or settled are hereby overruled on the merits and denied with prejudice or, to the extent applicable, deferred until the Final Hearing. The rights of all parties-in-interest to object to entry of a Final Order are reserved. This Interim Order shall become effective immediately upon its entry.

2. *Authority to Enter Into DIP Loan Documents, Authority Thereunder.* The Debtors are hereby authorized to enter into, execute, deliver and perform under the DIP Loan Documents, including the DIP Credit Agreement, the Intercreditor Agreement, and such additional documents, instruments and agreements as may be reasonably required by the DIP Agent to implement the terms or effectuate the purposes of this Interim Order. The Borrower is hereby authorized to borrow money under the DIP Credit Agreement, on an interim basis, up to an aggregate principal or face amount not to exceed $10 million under the New Money Facility and to issue in exchange for each DIP Lender's claim for notes issued under the Prepetition Indentures, on a dollar-for-dollar basis for every dollar of borrowing under the New Money Facility, a corresponding amount of new notes under the Roll Up Facility. The Guarantors are hereby authorized to guaranty such borrowings and the other outstanding DIP Obligations, all in accordance with the terms of this Interim Order, the DIP Credit Agreement and all other DIP Loan Documents.

3. *Use of Cash Collateral and DIP Loans.* Subject to the terms and conditions of this Interim Order, the Debtors are hereby authorized to use the Cash Collateral and proceeds of the New Money Facility to (a) fund the costs of the administration of the Bankruptcy Cases and (b) provide working capital to the Debtors, in each case, solely to the extent set forth

in, and in accordance with, the budget approved in accordance with the terms of the DIP Credit Agreement (the "**DIP Budget**"), including any variances to the DIP Budget (as the same may be amended, supplemented and/or updated in accordance with the DIP Credit Agreement and this Interim Order) that are permitted under the DIP Credit Agreement and this Interim Order unless otherwise ordered by the Court, which DIP Budget shall be in form and substance reasonably satisfactory to the Required Lenders (as defined in the DIP Credit Agreement) and the Revolving Facility Lenders; provided, however, that the initial DIP Budget shall be in form and substance reasonably satisfactory to the DIP Lenders and the Revolving Facility Lenders. Additionally, subject to the terms and conditions of this Interim Order, the Debtors are hereby authorized to use the Cash Collateral and proceeds of the New Money Facility to (x) fund interest, fees and other payments contemplated in respect of the DIP Facilities; (y) fund the payment of current interest owing to the Revolving Facility Agent at the default contract rate under the Revolving Facility Loan Documents; and (z) fund the payment of fees and reasonable and documented (in summary form) out-of-pocket expenses and indemnities payable to any Prepetition Consenting Party (including, without limitation, the prepetition and postpetition fees and disbursements of legal counsel and financial advisors advising any Prepetition Consenting Party, as permitted herein) as adequate protection. The initial DIP Budget is attached hereto as Exhibit 3.

4. *Payment of DIP Fees and Expenses.* Immediately upon the entry of this Interim Order, the Debtors are hereby authorized to pay or otherwise incur all fees, expenses and other amounts payable under the terms of the DIP Credit Agreement or any other DIP Loan Documents, including, without limitation, the fees in section 2.07 of the DIP Credit Agreement, which includes a commitment fee (the "**Commitment Fee**"), backstop fee (the "**Backstop Fee**") and Unused Commitment Fee (as defined in the DIP Credit Agreement), and all reasonable out-

of-pocket costs and expenses of the DIP Agent and the DIP Lenders in accordance with the terms of the DIP Credit Agreement and the Agent Fee Letter (as defined in the DIP Credit Agreement) (including, without limitation, the prepetition and postpetition fees and disbursements of legal counsel and financial advisors advising the DIP Agent and DIP Lenders who are Prepetition Consenting Parties) (collectively, the "**DIP Fees and Expenses**").  Subject to the same protocol regarding payment of the fees and expenses of the Prepetition Secured Parties provided for in paragraph 10(c) hereof, none of the DIP Fees and Expenses shall be subject to Court approval or U.S. Trustee guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court.  In addition, the Debtors are hereby authorized to indemnify the DIP Agent, the DIP Lenders and their respective affiliates and their respective affiliates' related parties, on the terms set forth in Section 11.04 of the DIP Credit Agreement.  All such unpaid fees, expenses and indemnities of the DIP Agent shall constitute DIP Obligations and the repayment thereof shall be secured by the DIP Collateral and afforded all of the priorities and protections afforded to the DIP Obligations under this Interim Order and the DIP Loan Documents.

5.        *Validity of DIP Loan Documents*.  Upon execution and delivery of the DIP Loan Documents and entry of this Interim Order, the DIP Loan Documents shall constitute legal, valid and binding obligations of the Debtors, enforceable against each Debtor party thereto in accordance with the terms thereof, including all terms and provisions pertaining to the New Money Facility and the Roll Up Facility.  Subject to paragraph 27, no obligation, payment, transfer or grant of security under the DIP Loan Documents as approved under this Interim Order shall be stayed, restrained, voided, voidable or recoverable under the Bankruptcy Code or under

any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment or counterclaim.

6. _DIP Loans._ All loans made to or for the benefit of the Debtors on or after the Petition Date under the DIP Loan Documents, including, without limitation, amounts owing under the New Money Facility and the Roll Up Facility (collectively, the "**DIP Loans**"): (a) shall be evidenced by the books and records of the DIP Agent; (b) shall bear interest payable at the rates set forth in the DIP Credit Agreement; (c) shall be secured in the manner specified in paragraph 8 below and in the DIP Loan Documents; (d) shall be payable in accordance with the terms of the DIP Loan Documents; and (e) shall otherwise be governed by the terms set forth herein and in the DIP Loan Documents. Upon entry of this Interim Order, all Prepetition Noteholders that are not DIP Lenders but are accredited investors or qualified institutional buyers (each, a "**Non-Backstop DIP Lender**") shall have an opportunity to fund their pro rata share of the DIP Facilities based upon the amount of Prepetition Notes, including principal and accrued interest to the Petition Date (but excluding any interest on interest required on overdue cash interest payments), held by such Prepetition Noteholders; provided, that (x) such commitment to fund is received no later than thirty (30) days following the entry of this Interim Order and such funding is received no later than forty (40) days following the entry of this Interim Order (the "**Funding Participation**") and (y) in connection with such Funding Participation, such Non-Backstop Lender executes a joinder to the RSA and becomes a Supporting Party (as defined in the RSA) thereunder. Within three (3) business days after entry of this Interim Order, the DIP Agent shall provide notice of the entry of this Interim Order (which notice shall include a copy of this Interim Order) and the Funding Participation to the 2010 Trustee. Within five (5) business days after entry of this Interim Order, the 2010 Trustee

shall provide notice of the Funding Participation through DTC in the form attached hereto as

Exhibit 4.    Consistent with the Debtors' fiduciary duties, the Funding Participation is

appropriate, fair and reasonable to the Debtors and all holders of 2010 Notes, and reflects the

Debtors' and the 2010 Trustee's exercise of prudent business judgment.    The terms of the

Funding Participation have been negotiated in good faith and at arms' length by and among the

Debtors, the DIP Agent, the DIP Lenders and the 2010 Trustee, with all parties being represented

by counsel.

       7.    *Continuation of Prepetition Liens and Prepetition Liens Securing DIP*

*Obligations.*  Until (a) all DIP Obligations have been indefeasibly paid in full in cash (or the DIP

Loans have been applied on a dollar-for-dollar basis to loans to be made under the Exit Second

Lien Facility (as defined in the RSA) upon consummation of the chapter 11 plan of

reorganization for the Debtors that is consistent with the RSA, as may be amended from time to

time (the "**Plan**")) and all Prepetition Secured Obligations shall have received the treatment

specified by  the terms and conditions of the Plan, (b) the DIP Lenders' commitments under the

DIP Facilities have terminated, (c) all objections and challenges to (i) the liens and security

interests of the Prepetition Secured Parties (including, without limitation, liens granted for

adequate protection purposes) and (ii) the Prepetition Secured Obligations have been waived,

denied or barred, and (d) all of the Debtors' stipulations contained in paragraph E hereof

(collectively, the "**Debtors' Stipulations**") have become binding upon their estates and parties-

in-interest in accordance with paragraph 27 below, all liens and security interests of the

Prepetition Secured Parties (including, without limitation, liens granted for adequate protection

purposes) shall remain valid and enforceable with the same continuing priority as described

herein, subject to the rights of a party in interest to bring a Challenge in accordance with

paragraph 27. Without limiting the foregoing, notwithstanding any payment of all or any portion of the Prepetition Secured Obligations, the liens on the Prepetition Collateral in favor of the Prepetition Secured Parties shall continue in full force and effect and shall be deemed to, secure the full and timely payment of the DIP Obligations (separate from and in addition to the DIP Liens granted to the DIP Agent and the DIP Lenders in paragraph 8 below) until (x) the payment in full in cash of all of the DIP Obligations (or the DIP Loans have been applied on a dollar for dollar basis to loans made under the Exit Second Lien Facility upon consummation of the Plan) and (y) the termination of the DIP Lenders' commitments under the DIP Facilities.

8. *DIP Liens and DIP Collateral.* To secure the DIP Obligations, effective immediately upon entry of this Interim Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent, for the benefit of itself and the DIP Lenders, is hereby granted the following continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on all prepetition and postpetition property of the Debtors, wherever located, whether existing on the Petition Date or thereafter acquired, including the Excluded Accounts (all property identified in clauses (a), (b), and (c) below being collectively referred to as the "**DIP Collateral**"), subject only to (w) the liens of the Revolving Facility Secured Parties on the Revolving Facility Collateral (the "**Revolving Facility Liens**"); (x) the Adequate Protection Liens granted to the Revolving Facility Secured Parties (the "**Revolving Facility Adequate Protection Liens**"); (y) the Carve-Out; and (z) the Permitted Liens (as defined below), as set forth in the DIP Loan Documents (all such liens and security interests granted to the DIP Agent, for the benefit of itself, and the DIP Lenders, pursuant to this Interim Order and the DIP Loan Documents, the

"**DIP Liens**") and notwithstanding any agreement that may purport to prevent, hinder, or attach obligations with respect to the incurrence of the DIP Liens:

(a)     First Lien on Unencumbered Property.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all DIP Collateral that, on or as of the Petition Date, is not subject to valid, perfected, and non-avoidable liens, including, without limitation, all real and personal property, inventory, plant, fixtures, machinery, equipment, cash, any investment of such cash, accounts receivable, other rights to payment whether arising before or after the Petition Date (including, without limitation, postpetition intercompany claims of the Debtors), deposit accounts, the Excluded Accounts, investment property, supporting obligations, causes of action (including those arising under section 549 of the Bankruptcy Code and any related action under section 550 of the Bankruptcy Code), chattel paper, contracts, general intangibles, documents, instruments, interests in leaseholds, letter of credit rights, patents, copyrights, trademarks, trade names, other intellectual property, capital stock and stock equivalents of subsidiaries, books and records pertaining to the foregoing, and to the extent not otherwise included, all proceeds, products, offspring, and profits of any and all of the foregoing (the "**Unencumbered Property**") subject to the Revolving Facility Adequate Protection Liens.  Notwithstanding the prior sentence, (I) Unencumbered Property shall in any event exclude the Debtors' claims and causes of action under chapter 5 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, "**Avoidance Actions**"), but upon entry of a Final Order granting such relief, shall include any proceeds or property recovered, unencumbered, or otherwise the subject of successful Avoidance Actions, whether by judgment, settlement, or otherwise, and (II) with respect to the Debtors' non-residential real property leases, no liens or encumbrances shall be

granted or extend to such leases themselves under this Interim Order except as permitted in the applicable lease or pursuant to applicable law but rather any liens granted shall extend only to the proceeds realized upon the sale, assignment, termination, or other disposition of such leases.

(b)     Liens Priming Liens of Prepetition Note Secured Parties.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all DIP Collateral that is subject to valid, perfected, and non-avoidable liens presently held for the benefit of the Prepetition Note Secured Parties (such priming liens granted to pursuant to this paragraph 8(b), the "**Priming Liens**" and such primed liens of the Prepetition Note Secured Parties, the "**Primed Liens**").  The priming security interests and liens granted pursuant to this paragraph 8(b) shall be senior in all respects to the interests in such property of any of the Prepetition Note Secured Parties (including, without limitation, any and all forms of adequate protection granted to the foregoing), but shall be junior to (i) the Revolving Facility Liens, (ii) the Revolving Facility Adequate Protection Liens, (iii) the Carve-Out, and (iv) any valid, perfected, and non-avoidable interests of other parties arising out of liens, if any, on such property existing immediately prior to the Petition Date, or to any valid, perfected, and non-avoidable interests in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code or otherwise arising by operation of law (the "**Permitted Liens**").

(c)     Liens Junior to Certain Other Liens.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected security interest in and lien upon all DIP Collateral (other than the property described in clause (a) or (b) of this paragraph 8, as to which the liens and security interests in favor of the DIP Agent will be as

described in such clauses), whether existing on the Petition Date or thereafter acquired, that is junior only to the Revolving Facility Liens, the Revolving Facility Adequate Protection Liens, the Carve-Out, and the Permitted Liens.

(d)     <u>Liens Senior to Certain Other Liens</u>.  The DIP Liens are legal, valid, binding, continuing, automatically perfected, non-avoidable, senior in priority, and superior to any security, mortgage, collateral interest, lien, or claim to any of the DIP Collateral, except that the DIP Liens shall be junior only to the Revolving Facility Liens, Revolving Facility Adequate Protection Liens, Permitted Liens and the Carve-Out.  Pursuant to section 364(d) of the Bankruptcy Code, the DIP Liens shall be senior to the liens of the Prepetition Note Secured Parties, and any and all forms of adequate protection granted to the Prepetition Note Secured Parties in the Bankruptcy Cases.  For purposes of this Interim Order, it shall be an Event of Default if, other than as set forth in this Interim Order, the DIP Liens shall be made junior to, or *pari passu* with, any lien or security interest heretofore or hereinafter granted in the Bankruptcy Cases or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Bankruptcy Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "**Successor Cases**"), upon the conversion of any of the Bankruptcy Cases to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of the Bankruptcy Cases or Successor Cases.  Subject to entry of  Final Order granting such relief, no lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens or the Revolving Facility Adequate Protection Liens.

9.     *DIP Lenders' Superpriority Claims*.  Upon entry of this Interim Order, the DIP Agent and the DIP Lenders are hereby granted, pursuant to section 364(c)(1) of the

Bankruptcy Code, allowed superpriority administrative expense claims in each of the Bankruptcy Cases and any Successor Cases against each of the Debtors and their estates on a joint and several basis (collectively, the "**DIP Superpriority Claims**") for all DIP Obligations:  (a) except as set forth in this Interim Order, with priority over any and all administrative expense claims, diminution claims, unsecured claims, and all other claims against the Debtors or their estates in any of the Bankruptcy Cases or any Successor Cases, existing on the Petition Date or thereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (upon entry of the Final Order granting such relief), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, which allowed claims shall be payable from, and have recourse to, all prepetition and postpetition property of the Debtors and all proceeds thereof, including without limitation, upon entry of a  Final Order granting such relief, the proceeds of Avoidance Actions; and (b) which shall at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative to the extent permitted by law.  Notwithstanding the foregoing, the DIP Superpriority Claims shall be subject only to the payment of the Adequate Protection Claims of the Revolving Facility Lenders, the Revolving Facility Obligations and the Carve-Out.

10.     _Adequate Protection for Prepetition Secured Parties_.  Without in any way limiting the Prepetition Secured Parties' respective rights under the Bankruptcy Code, the Prepetition Secured Parties are entitled, pursuant to sections 361, and 363(e) of the Bankruptcy

Code, to adequate protection of their interests in their Prepetition Collateral and are hereby granted the following:

(a)     Effective and perfected upon the date of entry of this Interim Order and without the necessity of the execution or filing of any mortgages, security agreements, pledge agreements, financing statements or other agreements, the Prepetition Secured Parties' Adequate Protection Liens and the Adequate Protection Claims against each of the Debtors and their estates on a joint and several basis, which shall secure the payment of an amount equal to the diminution in the value of the Prepetition Secured Parties' interests in the Prepetition Collateral from and after the Petition Date, including, without limitation, any such diminution resulting from: (1) the use by the Borrower of such collateral and cash and property constituting proceeds of such collateral, (2) the imposition of the Priming Liens granted to the DIP Lenders, (3) the Carve-Out and/or (4) the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code (the "**Adequate Protection Obligations**"; and the Adequate Protection Obligations in respect of the Credit Agreement, the "Revolving Facility Adequate Protection Obligations").

(b)     To give effect to the Prepetition Secured Parties' intent to recognize the priorities established in the Intercreditor Agreement, the priority of the Adequate Protection Liens shall be as follows: pursuant to section 364 of the Bankruptcy Code, and subject only to the Permitted Liens, and the Carve-Out, (1) the Revolving Facility Adequate Protection Liens granted to the Revolving Facility Agent and the Revolving Facility Lenders shall constitute senior first-priority perfected security interests in and liens upon DIP Collateral, and are senior to the DIP Liens and (2) the Adequate Protection Liens granted to the Prepetition Note Secured Parties shall constitute perfected security interests in and liens upon DIP

Collateral, subordinate to the Revolving Facility Adequate Protection Liens, Revolving Facility Liens, and the DIP Liens. For the avoidance of doubt: (i) the Adequate Protection Liens of the Prepetition Note Secured Parties shall be subject and junior in priority in all respects to the Revolving Facility Adequate Protection Liens, the Revolving Facility Liens and the DIP Liens; (ii) the Adequate Protection Claims of the Prepetition Note Secured Parties shall be subject and junior in priority in all respects to the Adequate Protection Claims of the Revolving Facility Secured Parties and the DIP Superpriority Claims; (iii) the Revolving Facility Adequate Protection Liens and Revolving Facility Liens shall be senior in priority in all respects to the DIP Liens; and (iv) the Adequate Protection Claims of the Revolving Facility Secured Parties shall be senior in priority in all respects to the DIP Superpriority Claims.

(c)     As additional adequate protection, the Debtors shall pay to the Prepetition Consenting Parties (i) immediately upon entry of this Interim Order, in the form of cash payments equal to all accrued and unpaid reasonable and documented (in summary form) fees and out-of-pocket expenses for the fees owed to the Revolving Facility Agent for its services as administrative agent and collateral agent, the Trustees for their services as indenture and collateral trustees, fees and disbursements of legal counsel (including Delaware local counsel) for each of the Prepetition Consenting Parties, and the financial advisor to the Revolving Facility Agent owing to such parties and incurred before the Petition Date; (ii) when due after the Petition Date, in the form of cash payments equal to all reasonable and documented (in summary form) fees and out-of-pocket expenses owing to such parties (including, but not limited to, the fees owed to the Revolving Facility Agent for its services as administrative agent and collateral agent, the Trustees for their services as indenture and collateral trustees, fees and disbursements of legal counsel (including Delaware local counsel) for each of the Prepetition

Consenting Parties, and the financial advisor to the Revolving Facility Agent); and (iii) upon entry of a Final Order granting such relief, on September 30, 2016, and on the last day of each subsequent calendar month, cash payment to the Revolving Facility Agent for prompt distribution to the Revolving Facility Lenders of all of the interest accruing on the Revolving Facility Obligations under the Revolving Facility Loan Documents from and after the Petition Date at the default contract rate(s) set forth therein (all such payments in (i) through (iii), the "**Adequate Protection Payments**").  None of the interest, fees and expenses payable pursuant to this paragraph 10 shall be subject to separate approval by this Court (but this Court shall resolve any dispute as to the reasonableness of any such fees and expenses) or the U.S. Trustee guidelines, and no recipient of any such payment shall be required to file any interim or final fee application with this Court with respect thereto.  The Prepetition Consenting Parties shall submit copies of their professional fee invoices in summary form (the "**Invoiced Fees**") (subject in all respects to applicable privilege or work product doctrines, it being expressly understood that provision of such invoices shall not constitute any waiver of the attorney-client privilege or any benefits of the attorney work product doctrine) to the Debtors, the U.S. Trustee and the Committee, if appointed; and the Debtors, U.S. Trustee and the Committee, if appointed, may preserve their right to dispute the payment of any portion of the Invoiced Fees (the "**Disputed Invoiced Fees**") if, within ten (10) days from receipt thereof (such ten (10) day period, the "**Review Period**") (i) the Debtors pay in full the Invoiced Fees, including the Disputed Invoiced Fees, and (ii) the Debtors, the U.S. Trustee or the Committee, if appointed, by written notice, dispute the reasonableness of such fees and expenses and such dispute cannot be resolved within ten (10) days following delivery of such written notice, file with the Court a motion or other pleading, on at least ten (10) days prior written notice of any hearing on such motion or other

pleading, setting forth the specific objections to the Disputed Invoiced Fees. Failure to object with specificity or to quantify the undisputed amount of the invoice subject to such objection will constitute a waiver of any objection to such invoice. Payment of Invoiced Fees shall not be delayed based on any objections thereto, and the relevant professional shall only be required to disgorge amounts objected to upon being "so ordered" pursuant to a final non-appealable order of this Court. The same protocol for payment of fees and expenses provided for in this paragraph 10(c) shall apply to the fees and expenses provided for in paragraph 4 hereof.

(d) The consent of the Prepetition Note Secured Parties that are Prepetition Consenting Parties (the "Consenting Note Secured Parties") to the priming of their liens by the DIP Liens is limited to the DIP Facilities presently before this Court and shall not extend to any other postpetition financing or to any modified version of the DIP Facilities (except for any amendment authorized in accordance with paragraph 26 of this Interim Order). Furthermore, the consent of the Consenting Note Secured Parties to the priming of their liens by the DIP Liens does not constitute, and shall not be construed as constituting, an acknowledgment or stipulation by the Consenting Note Secured Parties that their interests in the Prepetition Note Collateral are adequately protected pursuant to this Interim Order or otherwise, and, to the extent of any dispute regarding the payment or entitlement to adequate protection, including adequate protection granted pursuant to this Interim Order, the Debtors shall retain the burden of proof.

11. *Payment Priority*. Until the Revolving Facility Obligations and the Revolving Facility Adequate Protection Obligations are paid in full in cash (including all post-petition interest) and all issued and undrawn letters of credit under the Credit Agreement are either released or cash collateralized at 105% of the face amount thereof, pursuant to arrangements satisfactory to the issuer(s) thereof (collectively, the "**Discharge of Revolving**

**Facility Obligations**"), the DIP Agent and the DIP Lenders shall not receive or retain any payments, distributions, or other amounts on account of the DIP Loans, whether such payments, distributions, or amounts are from proceeds of the DIP Collateral or from any other source (including debt or equity issued or distributed in connection with a plan of reorganization or any proceeds of such debt or equity or from any refinancing of the DIP Loans) and whether such payments, distributions, or amounts are distributed or made in connection with or pursuant to a plan of reorganization or liquidation, sale pursuant to section 363 of the Bankruptcy Code, foreclosure or otherwise, other than (a) any funds, which funds are to be applied first to repay the Revolving Facility Obligations prior to the DIP Obligations other than specified exceptions set forth herein, in accordance with the terms of this Interim Order and the DIP Credit Agreement (including the payment priorities set forth in section 7.18 of the DIP Credit Agreement), (b) funds deposited in or otherwise credited to the Segregated Pre-Funding Account (as defined in the DIP Credit Agreement) at the time of such payment or other distribution to the DIP Agent or the DIP Lenders, (c) the Carve-Out, (d) the Commitment Fee, Backstop Fee, and the Unused Commitment Fee, (e) interest that is paid in kind, and (f) the fees and expenses required to be paid pursuant to the DIP Loan Documents (including, without, limitation any fees and expenses payable to the DIP Agent under the DIP Loan Documents). If the DIP Agent or any DIP Lender receives any payments, distributions or other amounts in violation of the payment priority schemes set forth herein or in any provision of the DIP Credit Agreement, then the DIP Agent or such DIP Lender, as applicable, shall hold such amounts in trust for the benefit of the Revolving Facility Agent and the Revolving Facility Lenders and shall promptly turn over such amounts to the Revolving Facility Agent.

12. _Automatic Effectiveness of Liens._ Except as expressly set forth herein (including, without limitation, with respect to the Carve-Out), the liens granted pursuant to this Interim Order shall not be (a) subject to entry of a Final Order granting such relief, subject to any lien that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or (b) subordinated to or made _pari passu_ with any other lien under sections 363 and 364 of the Bankruptcy Code other than as explicitly provided herein. The DIP Liens and the Adequate Protection Liens shall not be subject to challenge and shall attach and become legal, valid, properly perfected, enforceable, non-avoidable and effective by operation of law as of the Petition Date without any further action by the Debtors, the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties, and without the necessity of execution by the Debtors, or the filing or recordation, of any financing statements, guaranty agreements, security agreements, pledge agreements, federal or state notices, vehicle lien applications, mortgages, filings with the U.S. Patent and Trademark Office, or other documents or the taking of possession or control of any DIP Collateral or the taking of any other actions. All DIP Collateral shall be free and clear of other liens, claims and encumbrances, except the Prepetition Liens (as defined below), the Revolving Facility Adequate Protection Liens, the Carve-Out and the Permitted Liens. If the DIP Agent (acting at the direction of the Required Lenders (as defined in the DIP Credit Agreement)) hereafter requests that the Debtors execute and deliver to the DIP Agent (and/or authorize the filing of) financing statements, guaranty agreements, security agreements, collateral assignments, mortgages or other instruments and documents considered by the DIP Agent to be reasonably necessary or desirable to further evidence the perfection of the DIP Liens, the Debtors are hereby authorized to execute and deliver (and/or authorize the filing of) such financing statements, security agreements, mortgages, collateral assignments,

instruments and documents, and the DIP Agent is hereby authorized to file or record such documents in its discretion, in which event all such documents shall be deemed to have been filed or recorded at the time and on the date of entry of this Interim Order; provided, however, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens. Acting at the direction of the Required Lenders (as defined in the DIP Credit Agreement), the DIP Agent may file, record or present a certified copy of this Interim Order with any filing or recording office and, in such event, the subject filing or recording office is authorized to accept, file or record such certified copy of this Interim Order in accordance with applicable law; provided, however, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens.

13. *Carve-Out*. Notwithstanding anything to the contrary contained herein or in the DIP Credit Documents, the DIP Collateral, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Claims, and the Adequate Protection Liens shall be subject to the payment of the Carve-Out. For the avoidance of doubt, if at any time the Carve-Out is not adequately funded in accordance with the provisions of this Interim Order, upon a realization against the Carve-Out, the unpaid portion of the Carve-Out shall be funded out of the DIP Collateral having priority over the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Claims, and the Adequate Protection Liens. For purposes of this Interim Order, the "**Carve-Out**"[6] shall mean, collectively, the sum total of (i) all fees required to be paid to the clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code and 31 U.S.C. §3717 in an amount agreed upon by the U.S. Trustee or ordered by the Court, (ii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the

---

[6] For purposes of the Carve-Out, references to the DIP Budget for Professional Fees shall mean the accrual fee schedule with the header "Logan's Roadhouse, Inc., Professional Payments," which is annexed to the DIP Budget, as amended in accordance with the DIP Loan Documents.

Bankruptcy Code in an amount not to exceed $50,000 (iii) all fees, costs, disbursements, charges and expenses incurred at any time before the Carve-Out Trigger Date (as defined below) that are provided for in the DIP Budget, or any monthly or success or transaction fees payable to estate professionals that are provided for in the DIP Budget, in each case, by persons or firms retained by the Debtors or the Committee whose retention is approved by this Court pursuant to sections 327, 328, 363 or 1103 of the Bankruptcy Code (collectively, the "**Professionals**," and the fees, costs and expenses of Professionals, the "**Professional Fees**"), to the extent such Professional Fees are allowed by this Court at any time (whether before or after the Carve-Out Trigger Date) on a final basis; and (iv) all Professional Fees that are consistent with the DIP Budget and incurred on and after the Carve-Out Trigger Date by Professionals and allowed by this Court at any time, whether before or after the Carve-Out Trigger Date, whether by interim order, procedural order or otherwise; provided, that, the payment of any Professional Fees of the Professionals (but excluding fees and expenses of third party professionals employed by individual members of the Committee) incurred on or after the Carve-Out Trigger Date and allowed by the Court at any time, whether before or after the Carve-Out Trigger Date, on a final basis, shall not exceed $500,000 in the aggregate (the "**Professional Expense Cap**"); provided, further, that (A) any payments actually made in respect of Professional Fees incurred on or after the Carve-Out Trigger Date in accordance with the Budget and allowed by this Court at any time, whether before or after the Carve-Out Trigger Date, on a final basis, shall reduce the Professional Expense Cap on a dollar-for-dollar basis; (B) any success or transaction fees that may become due and payable to Professionals employed by the Debtors shall not be included in or subject the Professional Expense Cap and the payment of such fees shall not reduce the Professional Expense Cap pursuant to the prior clause (A); and (C) for the avoidance of doubt, so

long as a Carve-Out Trigger Date has not occurred, the payment of Professional Fees shall not reduce the Professional Expense Cap. For the avoidance of doubt, there shall be no success or transaction fee payable to Jefferies, LLC from the Carve-Out in the event of a liquidation of the Debtors that is not implemented through a chapter 11 plan or does not follow a going concern sale of assets pursuant to Section 363 of the Bankruptcy Code, including through a credit bid by secured lenders. For the purposes of the foregoing, "**Carve-Out Trigger Date**" means the first business day after delivery of written notice (which notice may be delivered to the Debtors by facsimile or other electronic means of communication or otherwise in accordance with the DIP Credit Agreement) of the occurrence of an Event of Default (as defined below) (such notice, a "**Carve-Out Trigger Notice**") by the DIP Agent to (1) the U.S. Trustee, (2) the Borrower and counsel to the Debtors, and (3) counsel for the Committee, if appointed. For the avoidance of doubt, the Carve-Out shall be senior to any claims arising under or relating to and liens securing the DIP Facilities and the Prepetition Secured Obligations, including, without limitation, any administrative or superpriority claims and all forms of adequate protection liens or security interests. In any event, the DIP Agent and the DIP Lenders reserve the right to review and object to any fee application or statement, interim application or monthly application issued or filed by estate professionals. Any funding or payment of the Carve-Out shall be added to, and made a part of, the DIP Obligations and adequate protection and shall be otherwise entitled to the protections granted under this Interim Order, the DIP Loan Documents, the Bankruptcy Code, and applicable law. Neither the Carve-Out nor any proceeds of the DIP Facilities, Cash Collateral or DIP Collateral proceeds shall be used in connection with preventing, hindering or delaying the DIP Lenders', DIP Agent's, Prepetition Agents', Revolving Facility Lenders' or Prepetition Noteholders' enforcement or realization upon the DIP Collateral once an Event of

Default has occurred and is continuing under the DIP Loan Documents, subject to the Remedies Notice Period (as defined below).

14.     _Investigation of Prepetition Liens._     The Debtors shall not assert or prosecute, and no portion of the DIP Facilities, the DIP Collateral, the Prepetition Collateral, the Cash Collateral, or the Carve-Out, and no disbursements set forth in the DIP Budget, shall be used for the payment of professional fees, disbursements, costs or expenses incurred in connection with (a) asserting or prosecuting any claims or causes of action against the Prepetition Secured Parties, the DIP Agent, or the DIP Lenders, or (b) challenging or raising any defenses to the Prepetition Secured Obligations or the DIP Obligations, the DIP Liens, the Adequate Protection Liens or the liens and security interests of the Prepetition Secured Parties with respect to the Prepetition Collateral (such liens and security interests, the "**Prepetition Liens**"). Notwithstanding the foregoing, the Debtors shall be permitted to contest the occurrence and/or continuance of an Event of Default in accordance with the terms and conditions of this Interim Order; provided, however, that nothing in the DIP Loan Documents or this Interim Order shall vest or confer on the Committee, or any representative of the estates, standing or authority to pursue any cause of action belonging to the Debtors or their estates.

15.     _Shared Control Between Prepetition Agents and DIP Agent; Access; Insurance._ Notwithstanding the Intercreditor Agreement, the DIP Agent shall immediately have dominion and control with respect to each depository account of the Debtors or other third party that was subject to a deposit account control agreement with the Prepetition Agents as of the Petition Date, and each of such deposit account control agreements shall hereafter be enforceable by the DIP Agent against, and binding upon, each depository institution party thereto until the DIP Obligations have been indefeasibly paid in full in cash and the DIP Credit Agreement shall

have been terminated, after which such deposit account control agreements shall again be solely enforceable by the Prepetition Agents but subject to the rights of the Prepetition Agent to exercise rights and remedies to the extent set forth in paragraph 23. Subject to the Intercreditor Agreement, upon entry of this Interim Order, the Prepetition Agents and the DIP Agent shall be, and shall be deemed to be, without any further action or notice of any kind, named as additional insureds and loss payees on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral.

16.     *Section 506(c) and 552(b) Waivers.*  Upon entry of Final Order granting such relief, the Debtors (on behalf of themselves and their estates) shall irrevocably waive, and shall be prohibited from asserting in the Bankruptcy Cases or any Successor Cases, (a) any surcharge claim under sections 105(a) and/or 506(c) of the Bankruptcy Code or otherwise for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties upon, the DIP Collateral or the Prepetition Collateral, and (b) the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral or DIP Collateral.

17.     *Restrictions on Granting Post-Petition Liens.*  Except for the Carve-Out, liens and claims otherwise permitted pursuant to Section 8.01 of the DIP Credit Agreement or as expressly set forth in this Interim Order, it shall constitute an Event of Default if any Debtor incurs or requests authority to incur a claim or grants a lien (or a claim or lien is allowed) having

a priority superior to or *pari passu* with those granted pursuant to this Interim Order and the DIP Loan Documents to the DIP Agent and the DIP Lenders, or the Prepetition Secured Parties, respectively, at any time during which any portion of the DIP Facilities (or any refinancing thereof), the DIP Obligations, the Adequate Protection Obligations or the Adequate Protection Payments owing to the Prepetition Secured Parties remains outstanding; provided, however, that the Debtors shall be entitled to incur such liens or request such authority in connection with obtaining postpetition financing, loans or financial accommodations (or a request therefor) that will indefeasibly repay in full all DIP Obligations in cash; provided, further, however, that in connection with the seeking or obtaining of such postpetition financing, loans, or financial accommodations, the Debtors may not rely on the consent of the Prepetition Secured Parties to the relief granted in this Interim Order and any and all such consent shall be deemed to have automatically terminated.

18. *Binding Nature of Order; Order Controls.* The provisions of this Interim Order shall be binding in any Successor Case and upon the Debtors and their respective successors and assigns (including, without limitation, any trustee or other fiduciary hereafter elected or appointed for or on behalf of any Debtor's estate or with respect to its property). In the event of any inconsistency between the provisions of this Interim Order and any of the DIP Loan Documents, the provisions of this Interim Order shall govern.

19. *No Marshaling*. In no event shall the DIP Agent, the DIP Lenders or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or Prepetition Collateral, as applicable.

20. *Survival of Order.* The provisions of this Interim Order and the DIP Loan Documents, and any actions taken pursuant hereto or thereto (a) shall survive the entry of any

order: (i) confirming any plan of reorganization in any of the Bankruptcy Cases or any Successor Cases; (ii) converting any of the Bankruptcy Cases or any Successor Cases to a case under chapter 7 of the Bankruptcy Code; (iii) dismissing any of the Bankruptcy Cases or any Successor Cases; or (iv) pursuant to which this Court abstains from hearing any Bankruptcy Case or any Successor Case; and (b) shall continue in full force and effect notwithstanding the entry of any such order, and the claims, liens, and security interests granted pursuant to this Interim Order shall maintain their priority as provided by this Interim Order and the DIP Loan Documents until all of the DIP Obligations are indefeasibly paid in full and discharged in accordance with the terms of the DIP Credit Agreement. The DIP Obligations shall not be discharged by the entry of any order confirming any plan of reorganization in any of the Bankruptcy Cases, and the Debtors shall, and shall be deemed to, waive any such discharge pursuant to section 1141(d)(4) of the Bankruptcy Code.

21. _Protection under Section 364(e) of the Bankruptcy Code_. If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect (i) the validity of any DIP Obligations or adequate protection obligations owing to the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties incurred prior to the actual receipt by the DIP Agent or the Prepetition Agents, as applicable, of written notice of the effective date of such reversal, modification, vacatur or stay, or (ii) the validity or enforceability of any claim, lien, security interest or priority authorized or created hereby or pursuant to the DIP Loan Documents with respect to any DIP Obligations or adequate protection rights of the Prepetition Secured Parties, including, without limitation, with respect to the use of Cash Collateral. Notwithstanding any such reversal, modification, vacatur or stay, any use of Cash Collateral or the incurrence of DIP Obligations or adequate protection

rights of the Prepetition Secured Parties prior to the actual receipt by the DIP Agent or the Prepetition Agents, as applicable, of written notice of the effective date of such reversal, modification, vacatur or stay, shall be governed in all respects by the provisions of this Interim Order and the DIP Loan Documents, and the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties shall be entitled to all of the rights, remedies, protections and benefits granted under section 364(e) of the Bankruptcy Code, this Interim Order and the DIP Loan Documents with respect to all uses of Cash Collateral and the incurrence of DIP Obligations and adequate protection obligations owing to the Prepetition Secured Parties.

22. *Events of Default.* Except as otherwise provided in this Interim Order or to the extent the DIP Agent (acting at the direction of the Required Lenders (as defined in the DIP Credit Agreement) or such other level of consent as required by the terms of the DIP Credit Agreement) may otherwise agree in writing, any occurrence of an "Event of Default" pursuant to the DIP Credit Agreement shall constitute an event of default hereunder, unless the DIP Agent (acting at the direction of the Required Lenders (as defined in the DIP Credit Agreement) or such other level of consent as required by the terms of the DIP Credit Agreement) has waived such default in accordance with the DIP Loan Documents (each, an "**Event of Default**").

23. *Modification of Stay.* The automatic stay provisions of section 362 of the Bankruptcy Code shall be and hereby are automatically vacated and modified to the extent necessary to permit the DIP Agent and the DIP Lenders to exercise in accordance with and subject to the Intercreditor Agreement, upon the occurrence and during the continuation of any Event of Default and, in each case, after the provision by the DIP Agent (acting at the direction of the Required Lenders (as defined in the DIP Credit Agreement)) to the Debtors of five (5) days' prior written notice of such Event of Default (such five (5) day period, the "**Remedies**

**Notice Period**"), which written notice shall be served by the DIP Agent via electronic mail or facsimile on the Debtors, counsel to the Debtors, counsel to the Revolving Facility Lenders, counsel to the Revolving Facility Agent, counsel to the GSO, Kelso, Carl Marks and Marblegate, counsel to the 2010 Trustee, counsel to the 2015 Trustee, counsel to the Committee (if appointed) and the U.S. Trustee, all rights and remedies provided for in the DIP Loan Documents, and to take any or all of the following actions without further order of or application to this Court following the conclusion of the Remedies Notice Period and in the absence of a determination by the Court that an Event of Default has not occurred and/or is not continuing: (a) immediately terminate the Debtors' use of Cash Collateral and cease making any DIP Loans to the Debtors; (b) immediately declare all DIP Obligations to be immediately due and payable; (c) immediately terminate the commitment to enter into the Exit Second Lien Facility; (d) immediately set off any and all amounts in accounts maintained by the Debtors with the DIP Agent or any of the DIP Lenders against the DIP Obligations, or otherwise enforce rights against the DIP Collateral in the possession of any of the DIP Agent or the DIP Lenders for application towards the Revolving Facility Obligations and the Revolving Facility Adequate Protection Obligations and after the Discharge of Revolving Facility Obligations, toward the DIP Obligations; and (e) take any other actions or exercise any other rights or remedies permitted under this Interim Order, the DIP Loan Documents or applicable law to effect the repayment of the DIP Obligations.  The automatic stay under section 362(a) of the Bankruptcy Code shall be automatically vacated and modified as provided above <u>unless</u> and until this Court has determined that an Event of Default has not occurred and/or is not continuing.  For the avoidance of doubt, neither the DIP Agent nor any of the DIP Lenders shall exercise any such rights and remedies on account of an Event of Default until after expiration of the Remedies Notice Period.  The

Debtors and any party-in-interest's sole recourse with respect to opposing such modification of the automatic stay under section 362(a) of the Bankruptcy Code shall be to contest the occurrence and/or continuance of an Event of Default. During the Remedies Notice Period, the Debtors shall be entitled to (x) contest the occurrence and/or continuance of the an Event of Default and (y) seek and obtain an emergency hearing before this Court, upon notice to the DIP Agent and the DIP Lenders, solely for the purpose of contesting whether an Event of Default has occurred and/or is continuing. The rights and remedies of the DIP Agent and the DIP Lenders specified herein are cumulative and not exclusive of any rights or remedies that the DIP Agent and the DIP Lenders may have under the DIP Loan Documents or otherwise. The Borrower shall cooperate fully with the DIP Agent and the DIP Lenders in their exercise of rights and remedies, whether against the DIP Collateral or otherwise. Notwithstanding anything contained herein to the contrary, the Revolving Facility Agent and Revolving Facility Lenders agree not to exercise remedies with respect to DIP Collateral after an Event of Default so long as Adequate Protection Payments are made, provided that after November 14, 2016 the standstill of the Revolving Facility Agent and the Revolving Facility Lenders shall terminate.

24. *No Waiver of Remedies*. The delay in or the failure of the Prepetition Secured Parties, the DIP Agent or the DIP Lenders to seek relief or otherwise exercise their rights and remedies shall not constitute a waiver of any of the Prepetition Secured Parties', the DIP Agent's or DIP Lenders' rights and remedies. Notwithstanding anything herein, but subject to the terms of the RSA as it relates to the Prepetition Secured Parties party thereto, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly or otherwise impair the rights and remedies of the Prepetition Secured Parties, the DIP Agent or the DIP Lenders under the Bankruptcy Code or under applicable non-bankruptcy law,

including without limitation, the rights of the Prepetition Secured Parties, the DIP Agent and the DIP Lenders to (a) request conversion of the Bankruptcy Cases to a case under chapter 7 of the Bankruptcy Code, dismissal of these Bankruptcy Cases, or the appointment of a trustee in these Bankruptcy Cases, (b) propose, subject to the provisions of section 1121 of the Bankruptcy Code, an alternative plan, or (c) exercise any of the rights, claims or privileges (whether legal, equitable or otherwise) the Prepetition Secured Parties, the DIP Agent and the DIP Lenders may have.

25. _Limitations on Borrowings_. It shall constitute an Event of Default if any of the Debtors obtains authorization from the Court for the Debtors or their estates to borrow money (other than in accordance with the DIP Credit Agreement or through credit terms in the ordinary course of business from any vendor, supplier, customer or the like) from any person other than the DIP Lenders; provided, however, that the Debtors may request and obtain such authorization in connection with postpetition financing, loans or financial accommodations that will indefeasibly repay in full all Revolving Facility Obligations, Revolving Facility Adequate Protection Obligations, and DIP Obligations; provided, further, however, that in connection with the seeking or obtaining of such postpetition financing, loans, or financial accommodations, the Debtors may not rely on the consent of the Prepetition Secured Parties to the relief granted in this Interim Order and any and all such consent shall be deemed to have automatically terminated.

26. _Modifications of DIP Loan Documents and Budgets_. The Debtors are hereby authorized, without further order of this Court, to enter into written agreements with the DIP Agent, with the consent of the Required Lenders (as defined in the DIP Credit Agreement), providing for (a) any non-material modifications to the DIP Loan Documents or of any other modifications to the DIP Loan Documents necessary to conform the DIP Loan Documents to this

Interim Order or (b) any other modification to the DIP Loan Documents; provided, however, that notice of any material modification or amendment to the DIP Loan Documents shall be provided by the Debtors to counsel to the Committee, the Revolving Facility Agent and the U.S. Trustee, each of whom shall have five (5) business days from the date of such notice within which to object in writing to such modification or amendment unless the Committee, the Revolving Facility Agent and the U.S. Trustee agree to a shorter period. If any of the Committee, the Revolving Facility Agent or the U.S. Trustee timely objects to any material modification or amendment to the DIP Financing Documents, such modification or amendment shall only be permitted pursuant to an order of this Court. Any modification or amendment to the DIP Budget shall require the consent of the Required Lenders (as defined in the DIP Credit Agreement) and the Revolving Facility Lenders, which consent shall not be unreasonably withheld or delayed. Any modification or amendment to the Permitted Variances (as defined in the DIP Credit Agreement) in respect of the DIP Budget shall require the consent of the Required Lenders (as defined in the DIP Credit Agreement) and the Revolving Facility Lenders, in each case in their sole and absolute discretion.

27. _Stipulations Regarding Prepetition Secured Obligations and Prepetition Liens Binding on Parties-in-Interest._

(a) The Debtors' Stipulations shall be binding on the Debtors' estates and all parties-in-interest, including, without limitation, the Committee, unless (a) the Committee, or another party-in-interest (other than any of the Debtors) has timely filed a motion (with a draft complaint attached) (a "**Standing Motion**") seeking standing to prosecute a contested matter or adversary proceeding (subject to the limitations set forth in paragraph 14 hereof) (a "**Challenge**") (i) challenging the liens or claims of any or all of the DIP Agent and/or

the DIP Lenders, or the initiation or prosecution of any claim or cause of action against any or all of the DIP Agent, the DIP Lenders, the Prepetition Agents, the Revolving Facility Lenders and the Prepetition Noteholders, including any claim under chapter 5 of the Bankruptcy Code, (ii) asserting any claims or causes of actions (including any claims or causes of action under chapter 5 of the Bankruptcy Code) against any or all of the Prepetition Agents, the Revolving Facility Lenders and the Prepetition Noteholders, their respective advisors, agents and sub-agents, including formal discovery proceedings in anticipation thereof and (iii) asserting any claims or challenges relating to the allocation of value as between encumbered and unencumbered assets (if any), no later than the date that is (A) seventy-five (75) days after the Petition Date for parties-in-interest other than the Committee or (B) for the Committee, sixty (60) days after its formation (the periods set forth in clauses (A) and (B), as applicable, the "**Challenge Period**"); provided, however, if a chapter 11 trustee or chapter 7 trustee is appointed during the Challenge Period, such trustee shall have the later of (X) the expiration of the Challenge Period or (Y) twenty (20) days after the appointment of such trustee, to file a Standing Motion and shall be substituted as a party-in-interest in the Challenge, and (b) this Court rules in favor of the plaintiff in any such timely and properly filed Standing Motion. If no Standing Motion is timely filed as of such dates, or the Court does not rule in favor of the plaintiff in any such proceeding, then, without further order of this Court, (x) subject to entry of a Final Order granting such relief, the claims, liens and security interests of the Prepetition Secured Parties shall be deemed to be finally allowed for all purposes in these Bankruptcy Cases and any Successor Cases, and (y) the Debtors and their estates shall be deemed to have released any and all claims or causes of action against Prepetition Secured Parties with respect to the Prepetition Credit Documents or any related transactions. Notwithstanding anything to the contrary herein, if a Standing Motion is not

timely filed, the Debtors' Stipulations shall be binding on the Debtors' estates, the Committee and all parties-in-interest. If a Standing Motion is timely filed, the Debtors' Stipulations shall be binding on the Debtors' estates and all parties-in-interest except to the extent such stipulations are specifically challenged in such Challenge as and when originally filed. To the extent a Standing Motion or Challenge is withdrawn, denied or overruled, the Debtors' Stipulations specifically challenged in such Standing Motion or Challenge also shall be binding on the Debtors' estates and all parties-in-interest. For the avoidance of doubt, the Court shall not be required to enter an order with respect to a Standing Motion or Challenge within the Challenge Period.

(b)     No portion of the Carve-Out, any proceeds of the DIP Facilities, Cash Collateral or other DIP Collateral or Prepetition Collateral (collectively, "**Collateral**") proceeds may be used for the payment of the fees and expenses of any Standing Motion or Challenge. Notwithstanding any provision in this Interim Order to the contrary (including paragraph 14), no more than $25,000 in the aggregate of the amounts set forth in the DIP Budget, the Carve-Out, or other Collateral proceeds may be used by the Committee, or any representative of the estates, to investigate, but not prosecute (or prepare for the prosecution of, including the preparation of a Standing Motion) any Challenge. Nothing in the DIP Loan Documents or this Interim Order shall vest or confer on the Committee, or any representative of the estates, standing or authority to pursue any cause of action belonging to the Debtors or their estates.

28.     *Termination of Commitments and Right to Use Cash Collateral.* All commitments of the DIP Lenders and any consent or right of the Debtors to use Cash Collateral shall terminate and all amounts owing under the DIP Facilities shall be due and payable, on the earliest to occur of the following events (collectively, the "**Cash Collateral Termination**

Events"): (a) in the event the Final Order has not been entered by the Court within thirty-five (35) days after the Petition Date, (b) the effective date of any plan of reorganization for the Debtors, (c) subject to the other terms and conditions of this Interim Order, the Borrower's receipt of a Carve-Out Trigger Notice, (d) the payment in full in cash of the Revolving Facility Obligations, Revolving Facility Adequate Protection Obligations, and DIP Obligations, (e) the date on which a sale of all or substantially all of the Debtors' assets under section 363 of title 11 of the Bankruptcy Code is consummated, (f) November 14, 2016, (g) the date that all loans and other DIP Obligations shall become due and payable in full under the DIP Loan Documents, (h) as otherwise provided in the DIP Credit Agreement and (i) the Debtors shall permit any Variance (as defined in the DIP Credit Agreement) to exist other than a Permitted Variance (unless waived by the Required Lenders and Revolving Facility Lenders); _provided_ that the Cash Collateral Termination Events set forth in the immediately preceding clauses (c), (g), (h), and (i) shall be subject to the Remedies Notice Period.

29.     _Indemnification._  The Debtors agree to jointly and severally indemnify and hold the DIP Agent, the DIP Lenders, any of their affiliates, and the respective shareholders, directors, members, principals, agents, advisors, officers, subsidiaries and affiliates of each solely in their respective capacities as such (each, an "**Indemnified Person**") harmless from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions or causes of action, and reasonable costs and expenses incurred, suffered, sustained or required to be paid by an Indemnified Person by reason of or resulting from the Bankruptcy Cases, the DIP Facilities, DIP Credit Agreement, the transactions contemplated thereby or hereby or by the DIP Facilities or any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any of such Indemnified Person is a party thereto and whether or not

brought by the Debtors or any other person, except to the extent resulting from the gross negligence or willful misconduct of such Indemnified Person as determined by a final non-appealable order of a court of competent jurisdiction. The indemnity includes indemnification for the DIP Agent exercising discretionary rights granted under the DIP Facilities. In all such litigation, or the preparation therefor, the DIP Agent and each DIP Lender shall be entitled to select its own counsel and, in addition to this foregoing indemnity, the Debtors agree to pay promptly the reasonable fees and expenses of such counsel. All indemnities of the Indemnified Persons shall be secured by the DIP Collateral and afforded all of the priorities and protections afforded to the DIP Obligations under this Interim Order and the DIP Loan Documents.

30. _Master Proof of Claim._ Notwithstanding any order entered by this Court in relation to the establishment of a bar date in any of the Bankruptcy Cases or any Successor Cases to the contrary, none of the Prepetition Secured Parties will be required to file proofs of claim or requests for payment of administrative expenses in any of the Bankruptcy Cases or any Successor Cases for any claims arising under the Prepetition Credit Documents or with respect to any Adequate Protection Obligations or Adequate Protection Payments, and the Debtors' Stipulations and the provisions of this Interim Order shall be deemed to constitute a timely filed proof of claim for the Prepetition Secured Parties with regard to all claims arising under the Prepetition Credit Documents and this Interim Order. Notwithstanding the foregoing, the Revolving Facility Agent, for the benefit of itself and the Revolving Facility Lenders, the 2010 Trustee for the benefit of itself and the 2010 Noteholders, and the 2015 Trustee, for the benefit of itself and the 2015 Noteholders, are authorized and entitled, in their sole discretion, but are not required, to file (and amend and/or supplement, as each sees fit) a proof of claim and/or proofs of claim and/or requests for payment of administrative expenses in each of the Bankruptcy Cases or

any Successor Cases for any claim or administrative expense described herein. The failure to file any such proof of claim or request for payment of an administrative expense shall not affect the validity or enforceability of any of the Prepetition Loan Documents, this Interim Order, the Prepetition Obligations or any other obligations hereunder, or prejudice or otherwise adversely affect the Prepetition Secured Parties' rights, remedies, powers, or privileges under the Prepetition Credit Documents or this Interim Order; provided further that, for the avoidance of doubt, the filing of any proof of claim or request for payment of an administrative expense by any of the Prepetition Secured Parties shall not in any way prejudice or otherwise adversely affect the Prepetition Secured Parties' rights, remedies, powers, or privileges under the Prepetition Credit Documents or this Interim Order. The DIP Agent and the DIP Lenders shall not be required to file proofs of claim in the Bankruptcy Cases or any Successor Cases in order to maintain their respective claims for payment of the DIP Obligations under the Interim Order or applicable DIP Loan Documents. The statements of claim in respect of the DIP Obligations set forth in this Interim Order, together with the evidence accompanying the Motion and presented at the Interim Hearing are deemed sufficient to and do constitute proofs of claim in respect of such obligations and secured status.

31.     *Access to Collateral.*  Subject to applicable state law, notwithstanding anything contained herein to the contrary and without limiting any other rights or remedies of the DIP Agent, for the benefit of the DIP Lenders, contained in this Interim Order or the DIP Loan Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Loan Documents and this Interim Order, upon written notice to the landlord of any leased premises that an Event of Default has occurred and is continuing under the DIP Loan Documents, the DIP Agent may, subject to any separate agreement by and between such landlord and the DIP Agent

(a "**Separate Agreement**"), enter upon any leased premises of the Debtors for the purpose of exercising any remedy with respect to DIP Collateral located thereon and, subject to any such Separate Agreement, shall be entitled to all of the Debtors' rights and privileges as lessee under such lease without interference from such landlord. Nothing herein shall require the DIP Agent to assume any lease as a condition to the rights afforded to the DIP Agent in this paragraph 31.

32.     _Enforceability_.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable _nunc pro tunc_ to the Petition Date immediately upon execution hereof. Notwithstanding Bankruptcy Rules 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedures, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

33.     _Binding Effect_.  The terms of this Interim Order shall be valid and binding upon the Debtors, all creditors of the Debtors and all other parties-in-interest from and after the entry of this Interim Order by this Court.  In the event the provisions of this Interim Order are reversed, stayed, modified or vacated following any further hearing, such reversals, modifications, stays or vacatur shall not affect the rights and priorities of the DIP Agent, the DIP Lenders and the Prepetition Secured Parties granted pursuant to this Interim Order.

34.     _No Third Party Rights_.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect or incidental beneficiary, other than the Debtors, the DIP Agent, the DIP Lenders and the Prepetition Secured Parties.

35.     _No Liability to Third Parties_.  Subject to entry of the Final Order, none of the Prepetition Agents or other Prepetition Secured Parties shall (i) be deemed to be in "control" of the operations of the Debtors or to be acting as a "controlling person," "responsible person," or "owner or operator" with respect to the operation or management of any of the Debtors (as such term, or any similar terms, are used in the Internal Revenue Code, the United States Comprehensive Environmental Response, Compensation and Liability Act (as amended), or any similar Federal or state statute), or (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates.

36.     _Sale, Conversion, Dismissal, Plan_.  It shall constitute an Event of Default if any order is entered by the Court providing for the sale of the ownership of the stock of any of the Debtors or their affiliates or the sale of all or substantially all of the assets of the Debtors under section 363 of the Bankruptcy Code and (i) such order does not provide that in connection and concurrently with any such event, the proceeds of such sale shall be used to satisfy, in cash, the Revolving Facility Obligations, Revolving Facility Adequate Protection Obligations, and DIP Obligations in accordance with the Revolving Facility Loan Documents, this Interim Order, and the DIP Loan Documents, respectively, and (ii) such sale is not expressly permitted by the DIP Loan Documents.  If an order dismissing or converting any of these Bankruptcy Cases under sections 305 or 1112 of the Bankruptcy Code or otherwise or an order appointing a chapter 11 trustee or an examiner with expanded powers is at any time proposed, and unless otherwise agreed to by the DIP Agent with the consent of the Required Lenders (as defined in the DIP Credit Agreement), any such order shall provide that (i) the DIP Liens, the Adequate Protection Liens, DIP Superpriority Claim, the Adequate Protection Claims and the Adequate Protection Payments granted hereunder and in the DIP Loan Documents shall continue in full force and

effect, remain binding on all parties-in-interest, and maintain their priorities as provided in this Interim Order until all DIP Obligations and Prepetition Secured Obligations, as applicable, are indefeasibly paid in full in cash and completely satisfied and all commitments under the DIP Loan Documents and the Prepetition Credit Documents are terminated in accordance with the DIP Loan Documents and the Prepetition Credit Documents, respectively, (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for purposes of enforcing the DIP Liens, the Adequate Protection Liens, the DIP Superpriority Claims, the Adequate Protection Claims and the Adequate Protection Payments and (iii) all postpetition indebtedness, obligations or liabilities incurred by any of the Debtors to the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties prior to the date of such order, including without limitation, the DIP Obligations, shall be governed in all respects by the original provisions of this Interim Order, and the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties shall be entitled to all the rights, remedies, privileges and benefits granted herein and in the DIP Loan Documents with respect to all such indebtedness, obligations or liabilities.

37.     *Headings*.  The headings of this Interim Order are for purposes of reference only and shall not limit or otherwise affect the meaning of this Interim Order.

38.     *Retention of Jurisdiction*.  This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and enforcement of this Interim Order.

39.     *Joint and Several Liability*.  Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable for the obligations hereunder and in accordance with the terms of the DIP Loan Documents.

40.  *Rights Under Sections 363(k) and 1129(b)*.  Absent a successful Challenge, the full amount of the DIP Obligations and the Prepetition Note Obligations may be used to "credit bid" for the assets and property of the Debtors as provided for in section 363(k) of the Bankruptcy Code by the DIP Agent (with respect to a credit bid of the DIP Obligations) (acting at the direction of the Required Lenders (as defined in the DIP Credit Agreement)) and the Trustees (with respect to a credit bid of their respective Prepetition Note Obligations), in accordance with the terms of the DIP Loan Documents, Revolving Facility Loan Documents and the Prepetition Credit Documents, without the need for further Court order authorizing the same and whether such sale is effectuated through section 363(k) and/or section 1129(b) of the Bankruptcy Code or otherwise; provided that any such credit bid provides for the payment in full and in cash of the Revolving Facility Obligations and the Revolving Facility Adequate Protection Obligations.

*[remainder of page intentionally left blank]*

41.     *Final Hearing.*  The Final Hearing is scheduled for September [__], 2016, at _____ __.m. (prevailing Eastern Time) before this Court.  Any objections by creditors or other parties-in-interest to any provisions of this Interim Order shall be deemed waived <u>unless</u> timely filed and served in accordance with this paragraph 41.  The Debtors shall promptly serve notice of entry of this Interim Order and the Final Hearing on the appropriate parties-in-interest in accordance with the Federal Rules of Bankruptcy Procedure and the Local Rules.  Without limiting the foregoing, the Debtors shall promptly serve a notice of entry of this Interim Order and the Final Hearing, together with a copy of this Interim Order, by first class mail, postage prepaid, facsimile, electronic mail or overnight mail upon the Notice Parties.  The notice of the entry of this Interim Order and the Final Hearing shall state that objections to the entry of a Final Order shall be filed with the United States Bankruptcy Court for the District of Delaware by **no later than 4:00 p.m. (prevailing Eastern Time) on August __, 2016** (the "**Objection Deadline**") and served via email.  The continued availability of the DIP Facilities shall be subject to the entry in these Bankruptcy Cases, not later than thirty-five (35) days after the Petition Date, of the Final Order, following proper notice and hearing thereon, which is in all respects reasonably satisfactory to the DIP Agent and the DIP Lenders.

Dated:  August ____, 2016

_____
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT 1

**DIP Credit Agreement**

# EXHIBIT 2

## Prepetition Intercreditor Agreement Waiver

# **EXHIBIT 3**

## **Initial DIP Budget**

# EXHIBIT 4

## Notice of Funding Participation

**ONLY RETURN THE FUNDING NOTICE IF YOU ARE (1) AN ACCREDITED INVESTOR OR QUALIFIED INSTITUTIONAL BUYER AND (2) INTERESTED IN BEING A DIP LENDER**

Re: Notice of Funding Participation

You are receiving this NOTICE OF FUNDING PARTICIPATION (the "**Funding Participation Notice**") as a holder (a "**Noteholder**") of 10.75% Senior Secured Notes due 2017 (the "**Notes**") under that certain Senior Secured Notes Indenture, dated as of October 4, 2010 (the "**Indenture**"), among Roadhouse Financing, Inc. (n/k/a Logan's Roadhouse, Inc. ("**Logan's**")), Roadhouse Merger, Inc. (n/k/a LRI Holdings, Inc.) and BOKF, N.A., as trustee and collateral agent. On August 8, 2016, (the "**Petition Date**"), Logan's and their affiliates (collectively, the "**Debtors**") commenced voluntary cases under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"). Additional information on the Bankruptcy Cases can be found at: www.donlinrecano.com/logans.

On August __, 2016, the Bankruptcy Court entered that certain *Interim Order (I) Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 507 and 552 Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Liens and Superpriority Administrative Expense Status, (C) Use Cash Collateral of Prepetition Secured Parties, and (D) Grant Adequate Protection to Prepetition Secured Parties; (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c); and (III) Granting Related Relief* (the "**Interim DIP Order**") [Docket No. __]. Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Interim DIP Order.

A copy of the Interim DIP Order can be found at: **[insert DRC specific link to Interim DIP]**.

Pursuant to the Interim Order, the Debtors are authorized to borrow up to an aggregate principal amount of $25 million (the "**New Money Facility**"), with $10 million available following entry of the Interim DIP Order. The remainder of the New Money Facility to be made available upon entry of the Final Order. Furthermore, the Debtors are authorized to issue new notes (the "**Roll Up Facility**" and together with the New Money Facility, the "**DIP Facilities**"), in exchange for each DIP Lender's claim for notes issued under the Prepetition Indentures[7] on a dollar-for-dollar basis for every dollar of borrowings under the New Money Facility, and upon entry of a Final Order, additional notes under the Roll Up Facility so that the total notes under the Roll Up Facility received by each DIP Lender that has a claim for notes issued under the Prepetition Indentures shall result in an exchange on a 2:1 basis for every dollar of borrowings under the New Money Facility.

The DIP Facilities are priming facilities, which are senior to the existing notes issued under the Prepetition Indentures, but are junior in priority to the Revolving Lender Facility.

Pursuant to paragraph 6 of the Interim DIP Order, as a Noteholder, if you are an accredited investor or qualified institutional buyer, you have the opportunity to be a DIP Lender and (i) fund a pro rata share of the New Money Facility based on the amount of Notes, including principal and accrued interest to the

---

[7] Prepetition Indentures includes the Indenture and that certain Indenture dated as of October 15, 2015, among Logan's Roadhouse, Inc., LRI Holdings, Inc. and Wells Fargo Bank, N.A., as trustee and collateral agent, and all exhibits, amendments, and supplements thereto, including, without limitation, the Series 2015-1 Supplemental Indenture dated October 15, 2015, the Second Series 2015-1 Supplemental Indenture dated October 15, 2015 and the Series 2015-2 Supplemental Indenture dated October 15, 2015 (collectively, the "**2015 Indenture**"). Thus, the DIP Lenders include holders of notes under the Indenture and the 2015 Indenture. Collectively, the prepetition principal amount owed under the Indenture and the 2015 Indenture is $378.025 million.

Petition Date (but excluding any interest on interest required on overdue cash interest payments), held by you as a Noteholder and (ii) as a result of participating in the New Money Facility, receiving new notes under the Roll Up Facility. For example, if you are an accredited investor or qualified institutional buyer and you hold $1,000,000 in Notes, your total accrued interest for purposes of this calculation will be $87,493.06, and your percentage of total prepetition Note claims for purposes of this calculation will be 0.270%.[8]  Accordingly, you can participate in the New Money Facility with your pro rata share being 0.270% of the New Money Facility.  Thus, your funding of the New Money Facility would be $67,618.22.[9]  Upon entry of the Final Order, you will receive $135,236.44 in notes under the Roll Up Facility in exchange for $135,236.44 of your Notes.

In order to participate as a DIP Lender, you must also execute a joinder to that certain Restructuring Support Agreement dated August 8, 2016, among the Debtors, certain Noteholders, GSO, Kelso, the Revolving Facility Agent and the Revolving Facility Lenders (the "**RSA**").  **In executing a joinder to the RSA, you will be bound to support the Plan as described in the term sheet attached as Exhibit A to the RSA (the "RSA Term Sheet"), which among other things, provides that the obligations under the DIP Facilities will repaid by an in-kind dollar-for-dollar exchange for obligations under the Exit Second Lien Facility, rather than payment in cash on the Effective Date**.

A copy of the RSA can be found at:  **[insert DRC specific link to RSA]**.  The RSA Term Sheet is attached as Exhibit A to the RSA.  The term sheet describing the Exit Second Lien Facility is attached as Exhibit B to the RSA Term Sheet.   THIS FUNDING PARTICIPATION NOTICE IS NOT A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH SOLICITATION WILL COMPLY WITH ALL PROVISIONS OF THE BANKRUPTCY CODE.

In order to participate as a DIP Lender, you must return this Funding Participation Notice, with all information complete, by first class mail, overnight courier, or hand delivery to Cortland Capital Market Services LLC, at:

> *By electronic mail at (preferred method):*
> [____]
>
> *By regular mail at:*
> [____]
>
> *By hand delivery or overnight mail at:*
> [____]

This Funding Participation Notice must be received by Cortland Capital Market Services LLC on or before September [__], 2016 (the "**Deadline**").  If a Funding Participation Notice is received after the Deadline, you will not be a DIP Lender.

---

[8] 1.087493 million / 402.071 million =  0.270%
[9] 0.270% * 25,000,000 = $67,618.22

The undersigned Noteholder certifies that:

1. The undersigned Noteholder is accredited investor or qualified institutional buyer.

2. The undersigned Noteholder holds $_____ in Notes.

3. The undersigned Noteholder elects to commit $_____ to fund the New Money Facility.

4. The undersigned agrees to be bound under the terms of the Interim DIP Order, the Final Order, the DIP Credit Agreement and RSA as a DIP Lender and will execute any and all necessary documents to effectuate such agreement to be bound.

_____
Name of Noteholder

_____
Signature

_____
Name of Institution

_____
Street Address

_____
City, State, Zip Code

_____
Taxpayer Identification Number

_____
Telephone Number

_____
Email Address

_____
Date Completed

If you are a beneficial holder, please provide DTC Participant information:

_____
DTC Participant Name

_____
DTC Participant Number

_____
DTC Contact Name

_____
DTC Contact Telephone Number

_____

_____
DTC Contact Email Address

**EXHIBIT D**

**DIP CREDIT AGREEMENT**

# **[DRAFT]**

DEBTOR-IN-POSSESSION CREDIT AGREEMENT

Dated as of August [___], 2016

among

LOGAN'S ROADHOUSE, INC.,

as Debtor and Debtor-In-Possession,

The Other Loan Parties Party Hereto,

CORTLAND CAPITAL MARKET SERVICES LLC,
as Administrative Agent and Collateral Agent,

and

The Other Lenders Party Hereto

# TABLE OF CONTENTS

## ARTICLE I.
## DEFINITIONS AND ACCOUNTING TERMS

Section 1.01  Defined Terms .................................................................................................1
Section 1.02  Other Interpretive Provisions.........................................................................31
Section 1.03  Accounting Terms...........................................................................................32
Section 1.04  Rounding.........................................................................................................32
Section 1.05  Times of Day...................................................................................................32
Section 1.06  Currency Equivalents Generally ....................................................................32

## ARTICLE II.
## THE COMMITMENTS AND CREDIT EXTENSIONS

Section 2.01  The Facilities...................................................................................................33
Section 2.02  Borrowings, Conversions and Continuations of Loans ..................................34
Section 2.03  Disbursements from Segregated Pre-Funding Account...................................36
Section 2.04  Prepayments....................................................................................................36
Section 2.05  Repayment of Loans .......................................................................................38
Section 2.06  Interest.............................................................................................................38
Section 2.07  Fees .................................................................................................................39
Section 2.08  Computation of Interest and Fees ...................................................................40
Section 2.09  Evidence of Debt.............................................................................................40
Section 2.10  Payments Generally; Administrative Agent's Clawback ................................40
Section 2.11  Sharing of Payments by Lenders ....................................................................42
Section 2.12  Defaulting Lenders..........................................................................................42

## ARTICLE III.
## TAXES, YIELD PROTECTION AND ILLEGALITY

Section 3.01  Taxes...............................................................................................................43
Section 3.02  Illegality ..........................................................................................................46
Section 3.03  Inability to Determine Rates ...........................................................................47
Section 3.04  Increased Costs; Reserves on Eurodollar Rate Loans.....................................47
Section 3.05  Compensation for Losses.................................................................................48
Section 3.06  Mitigation Obligations; Replacement of Lenders............................................49
Section 3.07  Survival ...........................................................................................................49

## ARTICLE IV.
## CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

Section 4.01  Conditions of Initial Credit Extension .............................................................50
Section 4.02  Conditions to Delayed Draw Borrowing .........................................................53
Section 4.03  Conditions to all Credit Extensions .................................................................54

## ARTICLE V.
## REPRESENTATIONS AND WARRANTIES

Section 5.01   Existence, Qualification and Power ........................................................................55
Section 5.02   Authorization; No Contravention ...........................................................................55
Section 5.03   Governmental Authorization; Other Consents.......................................................55
Section 5.04   Binding Effect .......................................................................................................56
Section 5.05   Financial Statements ..............................................................................................56
Section 5.06   Litigation................................................................................................................56
Section 5.07   No Material Adverse Effect ...................................................................................56
Section 5.08   Ownership of Property; Liens; Investments ..........................................................57
Section 5.09   Environmental Compliance ...................................................................................57
Section 5.10   Insurance ................................................................................................................58
Section 5.11   Taxes ......................................................................................................................58
Section 5.12   ERISA Compliance................................................................................................58
Section 5.13   Subsidiaries; Equity Interests; Loan Parties .........................................................59
Section 5.14   Margin Regulations; Investment Company Act .....................................................59
Section 5.15   Disclosure ..............................................................................................................59
Section 5.16   Compliance with Laws ...........................................................................................60
Section 5.17   Intellectual Property; Licenses, Etc. ......................................................................60
Section 5.18   Labor Matters.........................................................................................................60
Section 5.19   Foreign Assets Control Regulations; Anti-Money Laundering; Anti-Corruption Practices; Anti-Terrorism Laws .............................................................................60
Section 5.20   No Defaults..............................................................................................................61

## ARTICLE VI.
## REPORTING COVENANTS

Section 6.01   Financial Statements ..............................................................................................61
Section 6.02   Other Events...........................................................................................................65
Section 6.03   Copies of Notices and Reports...............................................................................65
Section 6.04   Taxes ......................................................................................................................65
Section 6.05   Labor Matters.........................................................................................................65
Section 6.06   Lender Calls ...........................................................................................................66

## ARTICLE VII.
## AFFIRMATIVE COVENANTS

Section 7.01   Certificates; Other Information..............................................................................66
Section 7.02   Notices ...................................................................................................................68
Section 7.03   Payment of Taxes...................................................................................................68
Section 7.04   Preservation of Existence, Etc. ..............................................................................69
Section 7.05   Maintenance of Properties .....................................................................................69
Section 7.06   Maintenance of Insurance ......................................................................................69
Section 7.07   Compliance with Laws ...........................................................................................69
Section 7.08   Books and Records .................................................................................................69
Section 7.09   Inspection Rights ...................................................................................................70

Section 7.10   Use of Proceeds.................................................................................70
Section 7.11   Information Regarding Collateral ..............................................................71
Section 7.12   Covenant to Guarantee Obligations and Give Security .....................................71
Section 7.13   Compliance with Environmental Laws.........................................................73
Section 7.14   Further Assurances..............................................................................73
Section 7.15   Post-Closing Covenant..........................................................................74
Section 7.16   Compliance with Milestones....................................................................74
Section 7.17   Opposition to Certain Motions.................................................................75
Section 7.18   Priority and Liens...............................................................................75

ARTICLE VIII.
NEGATIVE COVENANTS

Section 8.01   Liens..............................................................................................77
Section 8.02   Investments ......................................................................................77
Section 8.03   Indebtedness.....................................................................................77
Section 8.04   Fundamental Changes ..........................................................................78
Section 8.05   Dispositions......................................................................................78
Section 8.06   Restricted Payments.............................................................................79
Section 8.07   Change in Nature of Business..................................................................79
Section 8.08   Transactions with Affiliates ...................................................................79
Section 8.09   Burdensome Agreements .......................................................................80
Section 8.10   Use of Proceeds.................................................................................81
Section 8.11   Capital Expenditures............................................................................82
Section 8.12   Amendments of Organization Documents.....................................................82
Section 8.13   Accounting Changes ............................................................................82
Section 8.14   Prepayments, Etc. of Indebtedness ...........................................................82
Section 8.15   Holding Company ...............................................................................83
Section 8.16   Bankruptcy Provisions..........................................................................83
Section 8.17   Compliance with Budget Covenants...........................................................84
Section 8.18   Foreign Subsidiaries............................................................................84
Section 8.19   Real Property. ...................................................................................84

ARTICLE IX.
EVENTS OF DEFAULT AND REMEDIES

Section 9.01   Events of Default ...............................................................................84
Section 9.02   Remedies upon Event of Default ..............................................................87
Section 9.03   Application of Funds............................................................................88

ARTICLE X.
ADMINISTRATIVE AGENT

Section 10.01  Appointment and Authority ....................................................................90
Section 10.02  Rights as a Lender..............................................................................90
Section 10.03  Exculpatory Provisions ........................................................................90
Section 10.04  Reliance by Administrative Agent..............................................................91

Section 10.05 Delegation of Duties ...................................................................................92
Section 10.06 Resignation of Administrative Agent ...........................................................92
Section 10.07 Non-Reliance on Administrative Agent and Other Lenders...........................93
Section 10.08 No Other Duties, Etc. ....................................................................................93
Section 10.09 Administrative Agent May File Proofs of Claim...........................................93
Section 10.10 Collateral and Guaranty Matters....................................................................94
Section 10.11 Withholding Tax. ...........................................................................................94

ARTICLE XI.
MISCELLANEOUS

Section 11.01 Amendments, Etc. ..........................................................................................95
Section 11.02 Notices; Effectiveness; Electronic Communications.....................................97
Section 11.03 No Waiver; Cumulative Remedies; Enforcement...........................................99
Section 11.04 Expenses; Indemnity; Damage Waiver..........................................................99
Section 11.05 Payments Set Aside......................................................................................102
Section 11.06 Successors and Assigns.................................................................................102
Section 11.07 Treatment of Certain Information; Confidentiality.......................................104
Section 11.08 Right of Setoff..............................................................................................105
Section 11.09 Interest Rate Limitation ...............................................................................106
Section 11.10 Counterparts; Integration; Effectiveness.....................................................106
Section 11.11 Survival of Representations and Warranties.................................................106
Section 11.12 Severability ..................................................................................................106
Section 11.13 Replacement of Lenders ...............................................................................107
Section 11.14 Governing Law; Jurisdiction; Etc. ...............................................................107
Section 11.15 Waiver of Jury Trial.....................................................................................108
Section 11.16 No Advisory or Fiduciary Responsibility ....................................................109
Section 11.17 Electronic Execution of Assignments and Certain Other Documents ...........109
Section 11.18 USA PATRIOT Act.......................................................................................109
Section 11.19 Conflicts.......................................................................................................110
Section 11.20 Acknowledgement and Consent to Bail-In of EEA Financial Institutions. .........110

SCHEDULES

| 2.01 | Commitments |
| 5.03 | Certain Authorizations |
| 5.13 | Subsidiaries and Other Equity Investments; Loan Parties |
| 5.17 | Intellectual Property Matters |
| 7.12 | Guarantor Subsidiaries |
| 8.01(b) | Existing Liens |
| 8.02(a) | Existing Investments |
| 8.03(b) | Existing Indebtedness |
| 11.02 | Administrative Agent's Office, Certain Addresses for Notices |

EXHIBITS

*Form of*

| | |
|---|---|
| A-1 | Committed Loan Notice |
| A-2 | Notice of Request for Disbursement |
| B | Term Note |
| C | Compliance Certificate |
| D-1 | Assignment and Assumption |
| D-2 | Administrative Questionnaire |
| E | Guaranty |
| F | Security Agreement |
| G | U.S. Tax Compliance Certificate |
| H | Prepayment Notice |
| I | Budget |
| J | Interim Order |

CREDIT AGREEMENT

This CREDIT AGREEMENT ("Agreement") is entered into as of August [__], 2016, among Logan's Roadhouse, Inc., a Tennessee corporation (the "Borrower") and a Debtor and Debtor-In-Possession under the Bankruptcy Code (as defined below), each Guarantor (as defined below), each lender from time to time party hereto (collectively, the "Lenders" and individually, a "Lender"), and Cortland Capital Market Services LLC, as Administrative Agent.

PRELIMINARY STATEMENTS:

On August [__], 2016 (the "Petition Date"), the Borrower, and each Guarantor (as defined below) (each a "Debtor" and collectively, the "Debtors"), filed voluntary petitions with the Bankruptcy Court initiating their respective cases that are pending under chapter 11 of the Bankruptcy Code (each a "Case" and collectively, the "Cases");

From and after the Petition Date, the Debtors will continue to operate their respective businesses and to manage their respective properties as debtors and debtors-in-possession pursuant to Section 1107(a) and 1108 of the Bankruptcy Code;

In connection with the Cases, the Borrower has requested, and the Lenders have agreed to make available to the Borrower, a senior secured priming and superpriority debtor-in-possession term loan credit facility (junior only to the Pre-Petition First Lien Obligations) in an original principal amount of $25,000,000, consisting of $10,000,000 in Initial Commitments and $15,000,000 in Delayed Draw Commitments, the proceeds of which will be used in accordance with the Budget (as defined below), including the Permitted Variances (as defined below) thereto;

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

ARTICLE I.
DEFINITIONS AND ACCOUNTING TERMS

Section 1.01    Defined Terms.  As used in this Agreement, the following terms shall have the meanings set forth below:

"Adequate Protection Claims" has the meaning specified in the DIP Orders.

"Adequate Protection Consenting Parties" means (a) the Pre-Petition First Lien Agent, (b) the Pre-Petition First Lien Lenders, (c) the Pre-Petition Indenture Trustees and (d) each of Carl Marks, Marblegate, GSO, Kelso & Company, L.P. or one or more affiliated funds or financing vehicles (or funds or accounts advised or sub-advised by such Person) of any of them that are Pre-Petition Indenture Noteholders.

"Adequate Protection Liens" has the meaning specified in the DIP Orders.

"Adequate Protection Parties" means the Pre-Petition First Lien Agent, the Pre-Petition First Lien Lenders, the Pre-Petition Indenture Trustees and the Pre-Petition Indenture Noteholders.

"Adequate Protection Payments" means, collectively, the following payments to the Adequate Protection Parties:

(a)     all accrued and unpaid fees and disbursements owed to the Adequate Protection Consenting Parties under the Pre-Petition Debt Documents, including all reasonable and documented out-of-pocket fees and expenses of counsel and other professionals of the Adequate Protection Consenting Parties (including Simpson Thacher & Bartlett LLP, King & Spalding LLP, Debevoise & Plimpton LLP, Dechert LLP and Delaware local counsel retained by each of the Adequate Protection Consenting Parties (collectively, "Delaware Counsel")) incurred prior to the Petition Date in accordance with the Pre-Petition Debt Documents;

(b)     when due, current payment of all fees and reasonable and documented out-of-pocket expenses and indemnities payable to the Adequate Protection Consenting Parties under the Pre-Petition Debt Documents, including all reasonable and documented out-of-pocket fees and expenses of counsel and other professionals of the Adequate Protection Consenting Parties (including Simpson Thacher & Bartlett LLP, King & Spalding LLP, Debevoise & Plimpton LLP, Dechert LLP and Delaware Counsel);

(c)     to the extent of the diminution of value of the interest of the Pre-Petition First Lien Lenders and the Pre-Petition Indenture Noteholders in the prepetition Collateral, allowed, super-priority administrative expense claim status in the Case of each Loan Party pursuant to sections 503(b) and 507(b) of the Bankruptcy Code that (A) in the case of the Pre-Petition First Lien Lenders' super-priority claims, is senior to any other claims under section 507(b) of the Bankruptcy Code, including any such claims held by the Lenders and (B) in the case of the Pre-Petition Indenture Noteholders' super-priority claims, is junior in priority only to the Facility super-priority claims and the Pre-Petition First Lien Credit Agreement super-priority claims;

(d)     to the extent of the diminution of value of the interests of the Pre-Petition First Lien Lenders and the Pre-Petition Indenture Noteholders in prepetition Collateral, continuing, valid, binding, enforceable, non-avoidable and automatically perfected post-petition security interests in and liens on the Collateral pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code that are junior only to the Liens securing the Obligations and, in the case of the Pre-Petition Indentures, Liens securing the obligations under the Pre-Petition First Lien Credit Agreement; and

(e)     upon entry of the Final Order, cash payments of interest at the prescribed default contract rate pursuant to the terms of the Pre-Petition First Lien Credit Agreement to the Pre-Petition First Lien Agent and the Pre-Petition First Lien Lenders.

"Additional Roll Up Loans" has the meaning specified in Section 2.01(a).

"<u>Administrative Agent</u>" means Cortland Capital Market Services LLC in its capacity as administrative agent under any of the Loan Documents, or any successor administrative agent appointed in accordance with the terms hereof.

"<u>Administrative Agent's Office</u>" means the Administrative Agent's address and the account as set forth on <u>Schedule 11.02</u>, or such other address or account as the Administrative Agent may from time to time notify to the Borrower and the Lenders.

"<u>Administrative Questionnaire</u>" means an Administrative Questionnaire in substantially the form of <u>Exhibit D-2</u> or any other form approved by the Administrative Agent.

"<u>Affiliate</u>" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified. Notwithstanding anything herein to the contrary, neither the Administrative Agent nor any Lender (if not otherwise already an Affiliate of a Loan Party) shall be deemed an Affiliate of any Loan Party solely by virtue of the transactions contemplated by this Loan Agreement and the other Loan Documents.

"<u>Agent Fee Letter</u>" means that certain Credit Facility Agent Fee Letter, dated July 29, 2016, between Cortland Capital Market Services LLC and the Borrower, regarding fees payable in connection with the Facility.

"<u>Aggregate Commitments</u>" means the Commitments of all the Lenders.

"<u>Agreement</u>" means this Credit Agreement.

"<u>Anti-Corruption Laws</u>" has the meaning specified in <u>Section 5.19(c)</u>.

"<u>Anti-Money Laundering Law</u>" means any and all laws, judgments, orders, executive orders, decrees, ordinances, rules, regulations, statutes, case law or treaties applicable to a Loan Party, its Subsidiaries or Affiliates, related to terrorism financing or money laundering including any applicable provision of Title III of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (USA PATRIOT Act) of 2001 (Title III of Pub. L. 107-56) and The Currency and Foreign Transactions Reporting Act (also known as the "Bank Secrecy Act", 31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1820(b) and 1951-1959).

"<u>Applicable Rate</u>" means 7.5% per annum for Base Rate Loans and 8.5% per annum for Eurodollar Rate Loans.

"<u>Approved Fund</u>" means any Fund that is administered, managed, advised or sub-advised by (a) a GSO Entity, (b) a Carl Marks Entity, (c) a Marblegate Entity, (d) a Lender, (e) an Affiliate of a Lender or (f) an entity or an Affiliate of an entity that administers, manages or sub-advises a Lender.

"<u>Assignee Group</u>" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 11.06(b)), and accepted by the Administrative Agent, in substantially the form of Exhibit D-1 or any other form approved by the Administrative Agent.

"Attributable Indebtedness" means, on any date, in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP.

"Audited Financial Statements" means the audited consolidated balance sheet of Holdings and its Subsidiaries for fiscal year 2015, and the related consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal year of Holdings and its Subsidiaries, including the notes thereto.

"Avoidance Actions" means the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code and any other avoidance actions under the Bankruptcy Code and the proceeds thereof and property received thereby whether by judgment, settlement or otherwise.

"Backstop Lenders" means Carl Marks, Marblegate, GSO, Kelso & Company, L.P. or one or more affiliated funds or financing vehicles (or funds or accounts advised or sub-advised by such Person) of any of them that provide the Initial Loans or the Delayed Draw Loans in the event that the Pre-Petition First Lien Lenders are not signatories hereto and do not provide any Initial Loans or Delayed Draw Loans hereunder.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bankruptcy Code" means the Federal Bankruptcy Reform Act of 1978 (11 U.S.C. §101, et seq.).

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware or any other court having jurisdiction over the Cases from time to time.

"Base Rate" means for any day a fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate plus 1/2 of 1%, (b) the rate of interest quoted in the Wall Street Journal, Money Rates Section, as the "Prime Rate" in effect from time to time (or if such rate is at any time not available, the prime rate so quoted by any banking institution selected by the Administrative Agent, which rate is not intended to be the lowest rate charged by any such banking institutions) and (c) the one-month Eurodollar Rate plus 1.00%; provided that in no event will the Base Rate be lower than 2.00% at any time.

"<u>Base Rate Loan</u>" means a Loan that bears interest based on the Base Rate.

"<u>Borrower</u>" has the meaning specified in the introductory paragraph hereto.

"<u>Borrower Materials</u>" has the meaning specified in <u>Section 7.01(e)</u>.

"<u>Borrowing</u>" means a borrowing consisting of Loans made on the same day by the Lenders according to their respective Commitments as set forth by the Borrower on the Committed Loan Notice therefor.

"<u>Budget</u>" means a statement of the Debtors' projected receipts and disbursements on a weekly basis for the period of thirteen weeks commencing with the calendar week during which the Petition Date occurs, including the anticipated uses of the Loans for each week during such period, substantially in the form of <u>Exhibit I</u> hereto, and otherwise in form and substance satisfactory to the Required Lenders and the Unanimous DIP Lenders [and the Pre-Petition First Lien Lenders in their respective sole and absolute discretion (provided, that the Pre-Petition First Lien Lenders shall not unreasonably withhold, condition or delay any such approval).]  As used herein, "<u>Budget</u>" shall initially refer to <u>Exhibit I</u> (which, for the avoidance of doubt, shall be in form and substance satisfactory to the Unanimous DIP Lenders) and, thereafter, the most recent Budget delivered by the Borrower and approved by the Required Lenders in accordance with <u>Section 6.01(d)</u>.

"<u>Business Day</u>" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in New York, New York, and, if such day relates to any Eurodollar Rate Loan, means any such day on which dealings in Dollar deposits are conducted by and between banks in the London interbank eurodollar market.

"<u>Capital Expenditures</u>" means, with respect to any Person for any period, any expenditure in respect of the purchase or other acquisition of any fixed or capital asset (excluding assets acquired in normal replacements and maintenance which are properly charged to current operations) that, in conformity with GAAP are required to be included as additions during such period to property, plant or equipment reflected in the consolidated balance sheet of Holdings and its Subsidiaries.

"<u>Capitalized Leases</u>" means all leases that have been or should be, in accordance with GAAP, recorded as capitalized leases; provided that for all purposes hereunder the amount of obligations under any Capitalized Lease shall be the amount thereof accounted for as a liability in accordance with GAAP.

"<u>Carl Marks</u>" means Carl Marks Management Company, LLC and its Affiliates and Approved Funds.

"<u>Carl Marks Entity</u>" means Carl Marks or certain funds and accounts managed or subadvised by Carl Marks as the context may require.

"<u>Carve-Out</u>" has the meaning specified in the DIP Orders.

"Case" and "Cases" have the meanings specified in the recitals hereto.

"Cash Collateral Account" means a deposit account subject to a Control Agreement reasonably satisfactory to Administrative Agent and the Pre-Petition First Lien Agent.

"Cash Equivalents" means:

(a)     U.S. dollars or, in the case of a Foreign Subsidiary, any other foreign currency held by such Foreign Subsidiary in the ordinary course of business;

(b)     securities issued or directly and fully and unconditionally guaranteed or insured by the U.S. government or any agency or instrumentality thereof the securities of which are unconditionally guaranteed as a full faith and credit obligation of such government with maturities of 24 months or less from the date of acquisition;

(c)     certificates of deposit, time deposits and eurodollar time deposits with maturities of one year or less from the date of acquisition, bankers' acceptances with maturities not exceeding one year and overnight bank deposits, in each case with any commercial bank having capital and surplus of not less than $500.0 million in the case of U.S. banks and, in the case of any Foreign Subsidiary, $100.0 million (or the U.S. dollar equivalent as of the date of determination) in the case of non-U.S. banks, and in each case in a currency permitted under clause (a) above;

(d)     repurchase obligations for underlying securities of the types described in clauses (b), (c) and (h) entered into with any financial institution meeting the qualifications specified in clause (c) above, and in each case in a currency permitted under clause (a) above;

(e)     commercial paper rated at least P-2 by Moody's or at least A-2 by S&P and in each case maturing within 3 months after the date of creation thereof, and in each case in a currency permitted under clause (a) above;

(f)     marketable short-term money market and similar securities having a rating of at least P-2 or A-2 from either Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another Rating Agency) and in each case maturing within 3 months after the date of creation thereof and in a currency permitted under clause (a) above;

(g)     investment funds investing 95% of their assets in securities of the types described in clauses (a) through (f) above;

(h)     readily marketable direct obligations issued by any state, commonwealth or territory of the United States or any political subdivision or taxing authority thereof having a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P, or, in either case, an equivalent rating by any other Rating Agency with maturities of 3 months or less from the Closing Date;

(i)     Indebtedness or preferred stock issued by Persons with a rating of "A" or higher from S&P or "A2" or higher from Moody's with maturities of 3 months or less from the date of acquisition and in each case in a currency permitted under clause (a) above;

(j)     Investments with average maturities of 3 months or less from the date of acquisition in money market funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's and in each case in a currency permitted under clause (a) above; and

(k)     credit card receivables and debit card receivables so long as such are considered cash equivalents under GAAP and are so reflected on the Issuer's balance sheet.

Notwithstanding the foregoing, Cash Equivalents shall include amounts denominated in currencies other than those set forth in clause (a) above, provided that such amounts are converted into any currency listed in clause (a) as promptly as practicable and in any event within ten Business Days following the receipt of such amounts.

"Casualty Event" means any event that gives rise to the receipt by any Loan Party or any Subsidiary thereof of any insurance proceeds or condemnation award in respect of any equipment, fixed assets or real property (including improvements thereon) to replace, restore or repair such equipment, fixed assets or real property.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980.

"CERCLIS" means the Comprehensive Environmental Response, Compensation and Liability Information System, and its successor, the Superfund Enterprise Management System, maintained by the U.S. Environmental Protection Agency.

"CFC" means a Foreign Subsidiary of the Borrower that is a controlled foreign corporation under Section 957 of the Code, and any direct or indirect Subsidiary of such a Foreign Subsidiary.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following:  (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

"Change of Control" means an event or series of events by which:

(a)     Permitted Holders, collectively, shall cease to be the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Exchange Act as in effect on the Closing Date) (free and clear of all Liens except those created under the Collateral Documents and Permitted Liens), either directly or indirectly, of equity securities in Roadhouse Holding representing more than 50% of the combined voting power of all of equity securities entitled to vote for members of the board of directors or equivalent governing body of Roadhouse Holding on a fully-diluted basis (and taking into account all such securities that the Permitted Holders have the right to acquire, whether such right is exercisable immediately or only after the passage of time); or

(b)     At any time, a majority of the members of the board of directors or other equivalent governing body of Holdings, Roadhouse Holding or the Borrower cease to be composed of individuals (i) who were members of that board or equivalent governing body on the first day of such period, (ii) whose election or nomination to that board or equivalent governing body was approved by individuals referred to in clause (i) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body or (iii) whose election or nomination to that board or other equivalent governing body was approved by individuals referred to in clauses (i) and (ii) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body (excluding, in the case of both clause (ii) and clause (iii), any individual whose initial nomination for, or assumption of office as, a member of that board or equivalent governing body occurs as a result of an actual or threatened solicitation of proxies or consents for the election or removal of one or more directors by any person or group other than a solicitation for the election of one or more directors by or on behalf of the board of directors); or

(c)     Roadhouse Holding shall cease, directly or indirectly, to own and control legally and beneficially all of the Equity Interests in the Borrower; or

(d)     a "change of control" or any comparable term under, and as defined in, any indenture or agreement governing any Pre-Petition Debt shall have occurred.

"Closing Date" means the first date all the conditions precedent in Section 4.01 are satisfied or waived in accordance with Section 11.01.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collateral" has the meaning given to such term in the Security Agreement.

"Collateral Documents" means, collectively, the Security Agreement, each Intellectual Property Security Agreement, the Mortgages, the collateral assignments, Security Agreement Supplements, security agreements, pledge agreements or other similar agreements delivered to the Administrative Agent pursuant to Sections 7.11 and 7.12 and each of the other agreements, instruments or documents that creates or purports to create a Lien in favor of the Administrative Agent for the benefit of the Secured Parties, each as the Administrative Agent may request.

"Committee" means the official committee of unsecured creditors retained in any Case whose retention is approved by the Bankruptcy Court pursuant to sections 327, 328 or 1103 of the Bankruptcy Code.

"Commitments" means, collectively, the Initial Commitments and the Delayed Draw Commitments. The aggregate principal amount of all Commitments on the Closing Date is $25,000,000.

"Committed Loan Notice" means a written notice of (a) a Borrowing, (b) a conversion of Loans from one Type to the other, or (c) a continuation of Eurodollar Rate Loans, pursuant to Section 2.02(a), which shall be substantially in the form of Exhibit A-1.

"Company IP Rights" means rights in Intellectual Property owned or purported to be owned by a Loan Party or its Subsidiaries.

"Compliance Certificate" means a certificate substantially in the form of Exhibit C.

"Consolidated" means, with respect to any Person, the accounts of such Person and its Subsidiaries consolidated in accordance with GAAP.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Control Agreement" means, with respect to any deposit account, any securities account, commodity account, securities entitlement or commodity contract, an agreement, in form and substance satisfactory to the Administrative Agent and the Required Lenders in their sole discretion, effective to grant "control" (as defined under the applicable UCC) over such account to the Administrative Agent for the benefit of the Secured Parties or otherwise to perfect the security interest of the Administrative Agent for the benefit of the Secured Parties in such account and to permit the exercise of collateral remedies with respect thereto.

"Corporate Chart" means a document in form reasonably acceptable to the Administrative Agent and setting forth, as of a date set forth therein, for each Person that is a Loan Party, that is subject to Section 7.09 or that is a Subsidiary or joint venture of any of them, (a) the full legal name of such Person, (b) the jurisdiction of organization and any organizational number and tax identification number of such Person, (c) the location of such Person's chief executive office (or, if applicable, sole place of business) and (d) the number of shares of each class of Stock of such Person authorized, the number outstanding and the number and percentage of such outstanding shares for each such class owned, directly or indirectly, by any Loan Party or any Subsidiary of any of them.

"Credit Extension" means a Borrowing.

"Debtor Relief Laws" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rear-

rangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default; provided that any Default that results solely from the taking of an action that would have been permitted but for the continuation of a previous Default will be deemed to be cured if such previous Default is cured prior to becoming an Event of Default.

"Default Rate" means (a) when used with respect to Obligations consisting of principal, an interest rate equal to (i) the Base Rate with respect to any Base Rate Loan, or Eurodollar Rate with respect to any Eurodollar Loan plus (ii) the Applicable Rate for such loan, plus (iii) 3% per annum, (b) when used with respect to Obligations other than principal, an interest rate equal to (i) the Base Rate, plus (ii) the Applicable Rate applicable to Base Rate Loans under the Facility, plus (iii) 3% per annum.

"Defaulting Lender" means any Lender that (a) has failed to fund any portion of the Loans required to be funded by it hereunder within two Business Days of the date required to be funded by it hereunder, (b) has otherwise failed to pay over to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within two Business Days of the date when due, unless the subject of a good faith dispute, (c) has notified the Borrower or the Administrative Agent or any Lender that it does not intend to comply with its funding obligations or has made a public statement to that effect with respect to its funding obligations, (d) has failed within three Business Days after request by the Administrative Agent, to confirm in a manner satisfactory to the Administrative Agent that it will comply with its funding obligations, or (e) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, (ii) had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or a custodian appointed for it, (iii) taken any action in furtherance of, or indicated its consent to, approval of, or acquiescence in any such proceeding or appointment, or (iv) become the subject of a Bail-In Action; provided that, for the avoidance of doubt, a Lender shall not be a defaulting lender solely by virtue of (i) the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority or (ii) in the case of a solvent Person, the precautionary appointment of an administrator, guardian, custodian or other similar official by a Governmental Authority under or based on the law of the country where such Person is subject to home jurisdiction supervision if applicable law requires that such appointment not be publicly disclosed so long as, in any such case, where such action does not result in or provide such Person with immunity from the jurisdiction of courts within the United States of America or from the enforcement of judgments or writs of attachment on its assets or permit such Person (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any of one or more clauses (a) through (e) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender upon delivery of written notice of such determination from the Administrative Agent to the Borrower and each Lender.

"Delayed Draw Commitment" means, with respect to each Lender, the several (and not joint or joint and several) commitment of such Lender to make Delayed Draw Loans hereunder as set forth in the "Delayed Draw Commitments" column on Schedule 2.01, or in the Assignment and Acceptance pursuant to which such Lender assumed its Delayed Draw Commitment, as applicable, as the same may be (a) reduced from time to time pursuant to Section 2.04 and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to Section 11.06. The aggregate principal amount of all Delayed Draw Commitments on the Closing Date is $15,000,000.

"Delayed Draw Loan" has the meaning specified in Section 2.01(b).

"Delayed Draw Loan Funding Date" means the later of (a) the Final Order Entry Date and (b) the date that is forty (40) days after the Interim Order Entry Date.

"DIP Maturity Date" means the earliest of (a) the Effective Date, (b) the date on which a sale of all or substantially all of the Debtors' assets under section 363 of the Bankruptcy Code is consummated, (c) the date of termination in whole of the Commitments or acceleration of the Loans pursuant to Section 9.02 and (d) November 14, 2016.

"DIP Orders" means the Interim Order and the Final Order.

"Disbursement Date" has the meaning specified in Section 2.03(a).

"Disclosure Statement" has the meaning specified in Section 7.16(e).

"Disqualified Lenders" means any competitor of the Borrower or its Subsidiaries, which Person has been identified in writing to the Administrative Agent prior to the Closing Date as being a "Disqualified Lender," the identities of which will be made available to Lenders upon request.

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction) of any property by any Person (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"Disqualified Equity Interests" means any Equity Interest which, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable and the termination of the Commitments) (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise, (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part, (c) provides for the scheduled payments of dividends in cash, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests,

in each case, prior to the date that is ninety-one (91) days after the latest then existing DIP Maturity Date.

"Dollar" and "$" mean lawful money of the United States.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition and is subject to the supervision of an EEA Resolution Authority, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision of an EEA Resolution Authority with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Date" means the effective date of the Reorganization Plan.

"Eligible Assignee" means any Person that meets the requirements to be an assignee under Sections 11.06(b)(iii), (v) and (vi) (subject to such consents, if any, as may be required under Section 11.06(b)(iii)), and in no event shall include any Disqualified Lender or any Affiliate of any Loan Party (other than the Equity Investors).

"Environmental Laws" means any and all applicable Federal, state, local, international and foreign treaties, statutes, laws (including common law), codes, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions relating to pollution, the protection of the environment, the protection of natural resources (including threatened or endangered species), the Release of any Hazardous Materials into the environment, or the exposure of any person to Hazardous Materials, including those related to air emissions of Hazardous Materials, management and disposal of solid waste, and discharges of wastewater to public systems.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Borrower, any other Loan Party or any of their respective Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Environmental Permit" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"Equity Investors" means Kelso & Company, L.P. and any successor in interest thereto and any of its Affiliates other than any portfolio companies or any Loan Party.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with the Borrower within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by the Borrower or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by the Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in endangered or critical status under Section 305 of ERISA; (d) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Section 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (f) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrower or any ERISA Affiliate; (g) a prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan; or (h) any Loan Party, any Subsidiary thereof or any ERISA Affiliate engages in a transaction that could be subject to Section 4069 or 4212(c) of ERISA.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"Eurodollar Rate" means, for any Interest Period with respect to any Eurodollar Rate Loan:

(a)     the rate of interest per annum, expressed on the basis of a year of 360 days, determined by the Administrative Agent,  which is equal to the ICE Benchmark Administration Limited LIBOR Rate published by Bloomberg (or any successor thereto as may be selected by the Administrative Agent) with a term equivalent to such Interest Period, determined as of ap-

proximately 11:00 a.m. (London time) two (2) Business Days prior to the first day of such Interest Period, or

(b)      if the rates referenced in the preceding subsection (a) are not available, the Administrative Agent shall request the principal London office of any three major reference banks in the London interbank market selected by the Administrative Agent to provide such bank's offered quotation (expressed as a percentage per annum) to prime banks in the London interbank market for deposits in U.S. dollars for a term equivalent to such Interest Period as of 11:00 am London time, on such date for the amounts for a comparable loan at the time of such calculation, and LIBOR shall be the arithmetic mean of such quotation.  In no event will the Eurodollar Rate be lower than 1.00% at any time.

"Eurodollar Rate Loan" means a Loan that bears interest at a rate based on the Eurodollar Rate.

"Event of Default" has the meaning specified in Section 9.01.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Excluded Subsidiary" means each (i) CFC and (ii) Transparent Subsidiary.

"Excluded Taxes" means, with respect to the Administrative Agent, any Lender, or any other recipient of any payment to be made by or on account of any obligation of any Loan Party under any Loan Document, (a) Taxes imposed on or measured by its overall net income (however denominated), franchise Taxes imposed on it (in lieu of net income Taxes) and branch profits Taxes, in each case, imposed by the jurisdiction (or any political subdivision thereof) under the Laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable Lending Office is located, or as the result of any other connection between such recipient and such jurisdiction (other than any such connection arising solely from the execution or delivery of, receipt of payments under, receipt or perfection of a security interest under, enforcement of, becoming a party to, performing its obligations under or otherwise participating in the transactions contemplated in, or otherwise with respect to, the Loan Documents), (b) in the case of any Lender (other than an assignee pursuant to a request by the Borrower under Section 11.13), any U.S. federal withholding Tax that (i) is required to be imposed on amounts payable to such Lender pursuant to the Laws in force at the time such Lender becomes a party hereto (or designates a new Lending Office), except to the extent that such Lender (or its assignor, if any) was entitled, at the time of designation of a new Lending Office (or assignment), to receive additional amounts from the Borrower with respect to such withholding Tax pursuant to Section 3.01(a) or (ii) is attributable to such Lender's failure to comply with Section 3.01(e), and (c) any U.S. federal withholding Taxes imposed pursuant to FATCA.

"Exit Facilities" means, collectively, the Exit First Lien Facility and the Exit Second Lien Facility.

"Exit First Lien Facility" has the meaning specified in the RSA Term Sheet.

"Exit Second Lien Facility" means a second lien term loan facility to be entered into on the Effective Date, on terms materially consistent with the second lien exit financing term sheet attached to the RSA Term Sheet, and otherwise reasonably acceptable to the Debtors, the Required Supporting Noteholders and the Supporting Lenders.

"Facility" means the New Money Facility and the Roll Up Facility.

"FATCA" means Sections 1471 through 1474 of the Code as of the date of this Agreement, and any amended or successor version that is substantively comparable and not materially more onerous to comply with, and any current or future Treasury regulations or other official administrative guidance or interpretations thereof (including any Revenue Ruling, Revenue Procedure, Notice or similar guidance issued by the Internal Revenue Service) promulgated thereunder.

"FCPA" has the meaning specified in Section 5.19(c).

"Federal Funds Rate" means, for any day, the rate calculated by the New York Fed based on such day's federal funds transactions by depository institutions as determined in such manner as the New York Fed shall set forth on its public website from time to time and published on the next succeeding Business Day by the New York Fed as the federal funds effective rate; provided that if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day.

"Final Order" means a final order entered by the Bankruptcy Court in the Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures approved by the Bankruptcy Court, which order shall authorize the transactions contemplated by this Agreement and the use of cash collateral in accordance with the Budget, and shall otherwise be in form and substance satisfactory to the Administrative Agent, the Required Lenders, the Debtors, the Supporting Lenders, the Required Supporting Noteholders, and the Supporting Interest Holders in their respective sole discretion.

"Final Order Entry Date" means the date on which the Final Order is entered by the Bankruptcy Court.

"Flood Insurance Laws" means, collectively, (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statute thereto, (iii) the National Flood Insurance Reform Act of 1994 as now or hereafter in effect or any successor statute thereto and (iv) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto.

"Foreign Lender" means any Lender that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"Foreign Subsidiary" means each Subsidiary of the Borrower that is not organized under the Laws of the United States, any state thereof, or the District of Columbia.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"Funding Date" has the meaning specified in Section 2.02(b).

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Group Members" means, collectively, the Loan Parties and their respective other Subsidiaries, if any (each such entity individually being a "Group Member").

"Group Members' Accountants" means Grant Thornton LLP, Deloitte & Touche LLP or other nationally-recognized independent registered certified public accountants reasonably acceptable to the Administrative Agent.

"GSO" means GSO Capital Partners LP and its Affiliates and Approved Funds, including GSO / Blackstone Debt Funds Management LLC.

"GSO Entity" means GSO or certain funds and accounts managed or sub-advised by GSO as the context may require.

"Guarantee" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness payable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of

the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien); provided that the term "Guarantee" shall not include endorsements for collection or deposit, in either case in the ordinary course of business, or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or disposition or assets permitted under this Agreement (other than such obligations with respect to Indebtedness).  Except as provided in the definition of Indebtedness, the amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith.  The term "Guarantee" as a verb has a corresponding meaning.

"Guarantor Subsidiaries" means the Subsidiaries of the Borrower listed on Schedule 7.12 and each other Subsidiary of the Borrower that shall be required to execute and deliver a guaranty or guaranty supplement pursuant to Section 7.12; provided that in no event shall any CFC or Transparent Subsidiary be considered a Guarantor Subsidiary.

"Guarantors" means, collectively, Roadhouse Holding, Roadhouse Intermediate, Roadhouse Midco, Roadhouse Parent, Holdings and the Guarantor Subsidiaries.

"Guaranty" means, the Guaranty, dated as of the date hereof, made by the Guarantors in favor of the Secured Parties, substantially in the form of Exhibit E, together with each other guaranty and guaranty supplement delivered pursuant to Section 7.12.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, infectious or medical wastes and all other hazardous or toxic substances or wastes of any nature regulated pursuant to any Environmental Law.

"Holdings" means LRI Holdings, Inc., a Delaware corporation.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)      all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)      the maximum amount of all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c)      net obligations of such Person under any swap contract;

(d)      all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business and not past due for more than 90 days);

(e)      indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)      all Attributable Indebtedness in respect of Capitalized Leases of such Person;

(g)      all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interest in such Person or any other Person or any warrant, right or option to acquire such Equity Interest, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends;

(h)      all obligations in respect of Disqualified Equity Interests; and

(i)      all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person. The amount of Indebtedness of any Person for the purposes of clause (e) (or any secured Guarantee thereof) shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the fair market value of the property encumbered thereby as determined by such Person in good faith.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Indemnitees" has the meaning specified in Section 11.04(b).

"Information" has the meaning specified in Section 11.07.

"Initial Commitment" means, with respect to each Lender, the several (and not joint or joint and several) commitment of such Lender to make Initial Loans hereunder as set forth in the "Initial Commitments" column on Schedule 2.01, or in the Assignment and Acceptance pursuant to which such Lender assumed its Commitment, as applicable, as the same may be (a) reduced from time to time pursuant to Section 2.04 and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to Section 11.06. The aggregate principal amount of all Initial Commitments on the Closing Date is $10,000,000.

"Initial Loan" has the meaning specified in Section 2.01(b).

"Initial Roll Up Loans" has the meaning specified in Section 2.01(a).

"Intellectual Property" has the meaning specified in the Collateral Documents.

"Intellectual Property Security Agreements" means, collectively, the Copyright Security Agreement, the Trademark Security Agreement and the Patent Security Agreement (as each such term is defined in the Security Agreement).

"Interest Payment Date" means, (a) as to any Eurodollar Rate Loan, the last day of each Interest Period applicable to such Loan and the DIP Maturity Date; and (b) as to any Base Rate Loan, the last Business Day of each March, June, September and December and the DIP Maturity Date.

"Interest Period" means, as to each Eurodollar Rate Loan, the period commencing on the date such Eurodollar Rate Loan is disbursed or converted to or continued as a Eurodollar Rate Loan and ending on the date one month thereafter; provided that:

(a)     any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

(b)     any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(c)     no Interest Period shall extend beyond the DIP Maturity Date.

"Interim Order" means an interim order entered by the Bankruptcy Court (as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms hereof) in the form set forth as Exhibit J (as modified in a manner satisfactory to the Debtors, the Administrative Agent, the Required Lenders, the Supporting Lenders, the Required Supporting Noteholders and the Supporting Interest Holders in their respective sole discretion).

"Interim Order Entry Date" means the date on which the Interim Order is entered by the Bankruptcy Court.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or interest in, another Person, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person that constitute a business unit or all or a substantial part of the business of, such Person. For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"IRS" means the United States Internal Revenue Service.

"Laws" means, collectively, all applicable international, foreign, Federal, state and local statutes, treaties, rules, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case having the force of law.

"Lender" has the meaning specified in the introductory paragraph hereto.

"Lending Office" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify in writing to the Borrower and the Administrative Agent.

"Lien" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing).

"Loans" means the loans made by the Lenders to the Borrower pursuant to Section 2.01 (including, for the avoidance of doubt, the Initial Loans, the Delayed Draw Loans and the Roll Up Loans), in each case, plus any PIK Interest capitalized and added to the principal amount thereof.

"Loan Documents" means, collectively, (a) this Agreement, (b) the Notes, if any, (c) the Guaranty, (d) the Collateral Documents, (e) the Agent Fee Letter and (f) any other document executed by or on behalf of any of the Loan Parties that is delivered to the Administrative Agent or any of the other Secured Parties in connection with the foregoing.

"Loan Parties" means, collectively, the Borrower and each Guarantor.

"Logan's Kansas" means Logan's Roadhouse of Kansas, Inc., a Kansas corporation.

"Logan's Texas" means Logan's Roadhouse of Texas, Inc., a Texas corporation.

"Marblegate" means Marblegate Asset Management, LLC and its Affiliates and Approved Funds.

"Marblegate Entity" means Marblegate or certain funds and accounts managed or subadvised by Marblegate as the context may require.

"Material Adverse Effect" means a material adverse change in, or a material adverse effect upon, (a) the operations, business, assets or condition (financial or otherwise) of the Loan Parties and their Subsidiaries, taken as a whole, other than as customarily occurs as a result of events leading up to and following the commencement of a proceeding under chapter 11 of the

Bankruptcy Code and the commencement of the Cases, (b) the validity or enforceability of this Agreement or any other Loan Document or the rights or remedies of the Administrative Agent or any of the Lenders hereunder or thereunder or the ability of the Loan Parties to perform their respective material obligations hereunder or thereunder, (c) the Collateral or the attachment, perfection or priority of any Liens granted pursuant to any Loan Document in the Collateral, or (d) the Transactions.

"Monthly Operating Reports" has the meaning specified in <u>Section 6.03</u>.

"<u>Moody's</u>" means Moody's Investors Service, Inc. and any successor thereto.

"<u>Mortgages</u>" means deeds of trust, trust deeds, deeds to secure debt and mortgages, each in a form satisfactory to the Administrative Agent.

"<u>Multiemployer Plan</u>" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which the Borrower or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"<u>Net Cash Proceeds</u>" means:

(a)     with respect to any Disposition by any Loan Party or any of its Subsidiaries, or any Casualty Event, the excess, if any, of (i) the sum of cash and Cash Equivalents received by any Loan Party or Subsidiary thereof in connection with such transaction (including any cash or Cash Equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) over (ii) the sum of (A) the principal amount of any Indebtedness that is secured by the applicable asset and that is required to be repaid in connection with such transaction (other than Indebtedness under the Loan Documents), (B) the reasonable out-of-pocket cash fees and expenses (including attorney's fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, other customary expenses and brokerage, consulting and other customary fees) incurred by such Loan Party or such Subsidiary in connection with such transaction, (C) any Taxes paid or reasonably estimated by the Borrower to be payable with respect to such Disposition; <u>provided</u> that, if the amount of any estimated Taxes pursuant to subclause (C) exceeds the amount of Taxes actually required to be paid in cash in respect of such Disposition, the aggregate amount of such excess shall constitute Net Cash Proceeds and (D) any reserve for adjustment in respect of (x) the sale price of such asset or assets established in accordance with GAAP and (y) any liabilities associated with such asset or assets and retained by the Borrower or any Subsidiary after such sale or other disposition thereof, including pension and other post-employment benefit liabilities and liabilities related to environmental matters or with respect to any indemnification obligations associated with such transaction, it being understood that "Net Cash Proceeds" shall include (i) any cash or Cash Equivalents received upon the Disposition of any non-cash consideration by the Borrower or any Subsidiary in any such Disposition and (ii) upon the reversal (without the satisfaction of any applicable liabilities in cash in a corresponding amount) of any reserve described in subclause (D) above or if such liabilities have not been satisfied in cash and such reserve is not reversed within 365 days after such Disposition or Casualty Event, the amount of such reserve;

(b)     with respect to the incurrence or issuance of any Equity Interest or Indebtedness by the Borrower or any of its Subsidiaries, the excess of (i) the sum of the cash and Cash Equivalents received in connection with such transaction over (ii) the investment banking fees, underwriting discounts and commissions, costs and other reasonable and customary out-of-pocket fees and expenses, incurred by the Borrower or such Subsidiary in connection therewith.

"New Money Facility" has the meaning specified in Section 2.01(b).

"Note" means a promissory note of the Borrower, in substantially the form of Exhibit B, payable to the order of a Lender, evidencing the Indebtedness of the Borrower to such Lender resulting from the Loans made to the Borrower by such Lender or its predecessor(s) and "Notes" means all such notes.

"Notice of Request for Disbursement" means a written notice of request for disbursement of proceeds of the Initial Loans and Delayed Draw Loans on deposit in the Segregated Pre-Funding Account, pursuant to Section 2.03, substantially in the form of Exhibit A-2 or such other form as may be acceptable to the Administrative Agent and the Required Lenders.

"NPL" means the National Priorities List under CERCLA.

"Obligations" means all Loans, advances to, and debts, liabilities, obligations, covenants and duties of (including, without limitation, interest (including any PIK Interest), fees, expenses, indemnities and any prepayment premiums), any Loan Party arising under any Loan Document or otherwise with respect to any Loan, absolute or contingent, due or to become due, now existing or hereafter arising and including interest (including, without limitation, any PIK Interest) and fees that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding.

"OFAC" has the meaning specified in Section 5.19(a).

"Organization Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Other Taxes" means all present or future stamp or documentary Taxes or any other excise, property, intangible, mortgage recording or similar Taxes arising from any payment made hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document, except any such Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 11.13) that are imposed as a result of a present or former connection between the assignor or as-

signee and the jurisdiction imposing such Tax (other than connections arising from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, sold or assigned an interest in any Loan or Loan Document).

"Outstanding Amount" means the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Loans as the case may be, occurring on such date.

"PBGC" means the Pension Benefit Guaranty Corporation.

"Perfection Certificate" means that certain Perfection Certificate, dated on or after the date hereof, delivered by each Loan Party to the Administrative Agent pursuant to Section 4.01.

"Pension Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by the Borrower or any ERISA Affiliate or to which the Borrower or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer plan or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five plan years.

"Permitted Holder" means the Equity Investors, members of management of the Borrower or any direct or indirect parent of the Borrower, any other shareholders who are holders of Equity Interests of the Borrower (or any of its direct or indirect parent companies) on the Closing Date, and any group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act or any successor provision) of which any of the foregoing constitute the majority; provided that the voting power of the voting stock owned by the Equity Investors shall be greater than the voting power of the voting stock owned by such groups and/or members of management.

"Permitted Liens" has the meaning specified in Section 8.01, except where otherwise indicated.

"Permitted Refinancing" means, with respect to any Person, any modification (other than a release of such Person), refinancing, refunding, renewal or extension of any Indebtedness of such Person; provided that (a) the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, refunded, renewed or extended except by an amount equal to unpaid accrued interest and premium thereon plus other reasonable amounts paid, and fees and expenses reasonably incurred, in connection with such modification, refinancing, refunding, renewal or extension and by an amount equal to any existing commitments unutilized thereunder, (b) other than with respect to a Permitted Refinancing in respect of Indebtedness permitted pursuant to Section 8.03, such modification, refinancing, refunding, renewal or extension has a final maturity date equal to or later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being modified, refinanced, refunded, renewed or extended and (c) at the time thereof, no Event of Default shall have occurred and be continuing.

"Permitted Tax Distributions" means, for so long as any Group Member is a member of a combined, consolidated or unitary tax group of which it is not the parent, payments, dividends or distributions by such Group Member to its direct or indirect parent, as applicable, to the extent necessary to allow the payment by such direct or indirect parent of any consolidated, combined or unitary federal, state or local Taxes not payable directly by such Group Member and its Subsidiaries; provided that the aggregate amount of such payments, dividends or distributions shall not be greater than the aggregate amount of Taxes that would have been due and owing by such Group Member had the Group Member and its Subsidiaries filed a combined, consolidated, unitary or similar type return (without including any other persons other than such Group Member and its Subsidiaries).

"Permitted Variance" means (a) any positive Variance or (b) any negative Variance that, on a cumulative basis, does not exceed the greater of (i) solely for the first three Variance Reports, $4.5 million and (ii) the dollar amount resulting from multiplying the total operating receipts in the applicable Budget by six percent (6%) for the applicable week.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Petition Date" has the meaning specified in the recitals hereto.

"PIK Interest" has the meaning specified in Section 2.06(c).

"Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established by the Borrower or, with respect to any such plan that is subject to Section 412 of the Code or Section 302 or Title IV of ERISA, any ERISA Affiliate.

"Plan Milestones" has the meaning specified in Section 7.16.

"Platform" has the meaning specified in Section 7.01.

"Pledged Securities" has the meaning specified in the Security Agreement.

"Pre-Petition 2010 Indenture" means that certain Indenture, dated as of October 4, 2010, as amended or supplemented from time to time, by and among the Borrower, the Guarantors party thereto, the indenture trustee thereunder (the "Pre-Petition 2010 Indenture Trustee") and the collateral agent thereunder (the "Pre-Petition 2010 Collateral Agent").

"Pre-Petition 2010 Indenture Noteholders" means the holders of the notes under the 2010 Indenture.

"Pre-Petition 2015 Indenture" means that certain Indenture, dated as of October 15, 2015, as amended or supplemented from time to time, by and among the Borrower, the Guarantors party thereto, the indenture trustee thereunder (the "Pre-Petition 2015 Indenture Trustee") and the collateral agent thereunder (the "Pre-Petition 2015 Collateral Agent").

"Pre-Petition 2015 Indenture Noteholders" means the holders of the notes under the 2015 Indenture.

"Pre-Petition Debt" means, collectively, the Indebtedness of each Debtor outstanding and unpaid under the Pre-Petition First Lien Loan Documents and the Pre-Petition Indenture Documents.

"Pre-Petition Debt Documents" means, collectively, the Pre-Petition First Lien Loan Documents and the Pre-Petition Indenture Documents.

"Pre-Petition First Lien Agent" means JPMorgan Chase Bank, N.A., as administrative agent under the Pre-Petition First Lien Credit Agreement, and any successor in interest thereto.

"Pre-Petition First Lien Credit Agreement" means that certain Credit Agreement, dated as of October 4, 2010 (as amended by Amendment No. 1, dated as of September 4, 2012, as further amended by Amendment No. 2, dated as of April 26, 2013, as further amended by Amendment No. 3, dated as of January 24, 2014, as further amended by Amendment No. 4, dated as of December 19, 2014, as further amended by Amendment No. 5, dated as of May 28, 2015, Amendment No. 6, dated as of October 15, 2015, as further amended by Amendment No. 7, dated as of March 28, 2016, as further amended by Amendment No. 8 and Forbearance Agreement, dated as of June 30, 2016), by and among the Borrower, Holdings, the lenders from time to time party thereto and the Pre-Petition First Lien Agent.

"Pre-Petition First Lien Lenders" means the "Lenders" under (and as defined in) the Pre-Petition First Lien Credit Agreement.

"Pre-Petition First Lien Loan Documents" means the "Loan Documents" as defined in the Pre-Petition First Lien Credit Agreement.

"Pre-Petition First Lien Obligations" means the "Obligations" as defined in the Pre-Petition First Lien Credit Agreement.

"Pre-Petition First Lien Secured Parties" means, collectively, the Pre-Petition First Lien Agent and the Pre-Petition First Lien Lenders.

"Pre-Petition Indenture Documents" means, collectively, the Pre-Petition 2010 Indenture, the Pre-Petition 2015 Indenture, the related notes, and other guarantee, security or other relevant documentation executed in connection therewith.

"Pre-Petition Indenture Noteholders" means, collectively, the Pre-Petition 2010 Indenture Noteholders and the Pre-Petition 2015 Indenture Noteholders.

"Pre-Petition Indenture Notes" means, collectively, the notes issued under the Pre-Petition Indentures, which are the (a) 10.75% Senior Secured Notes due 2017 issued under the Pre-Petition 2010 Indenture and (b) the Series 2015-1 Senior Secured Zero Coupon Notes due October 2017 and the Series 2015-2 Senior Secured Notes Due October 2017, each issued under the Pre-Petition 2015 Indenture.

"Pre-Petition Indenture Secured Parties" means, collectively, the Pre-Petition Indenture Noteholders and the Pre-Petition Indenture Trustees.

"**Pre-Petition Indenture Trustees**" means, collectively, the Pre-Petition 2010 Trustee and the Pre-Petition 2015 Indenture Trustee.

"**Pre-Petition Indentures**" means, collectively, the Pre-Petition 2010 Indenture and the Pre-Petition 2015 Indenture.

"**Pre-Petition Intercreditor Agreement**" means that certain Intercreditor Agreement, dated as of October 4, 2010 (as amended by Amendment No. 1 to Intercreditor Agreement, dated as of October 15, 2015), by and among the Pre-Petition First Lien Agent, the Pre-Petition Indenture Trustees, the Borrower, Holdings, Logan's Texas and Logan's Kansas.

"**Pre-Petition Intercreditor Agreement Waiver**" means that certain Waiver to Intercreditor Agreement, dated as of August [__], 2016, by and among the Borrower, Holdings, Logan's Kansas, Logan's Texas, the Pre-Petition First Lien Agent, and each of the Pre-Petition Indenture Trustees.

"**Pre-Petition Payment**" means a payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any (i) Pre-Petition Debt, (ii) "critical vendor payments", (iii) trade payables (including, without limitation, in respect of reclamation claims) or (iv) other pre-petition claims against any Debtor.

"**Primed Liens**" has the meaning specified in Section 7.18(a)(iv).

"**Priming Liens**" has the meaning specified in Section 7.18(a)(iv).

"**Pro Rata Share**" means, with respect to each Lender at any time a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount of the Commitments (or Loans, as applicable) of such Lender under the Facility at such time and the denominator of which is the amount of the Aggregate Commitments (or aggregate Loans, as applicable) under the Facility at such time.

"**Public Lender**" has the meaning specified in Section 7.01(e).

"**Qualified Equity Interests**" means any Equity Interests that are not Disqualified Equity Interests.

"**Register**" has the meaning specified in Section 11.06(c).

"**Related Parties**" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, members, principals, employees, agents, trustees, advisors and sub-advisors of such person and of such person's Affiliates, and with respect to a (a) GSO Entity, also includes current and prospective investors or funding sources of a GSO Entity, (b) Carl Marks Entity, also includes current and prospective investors or funding sources of a Carl Marks Entity and (c) Marblegate Entity, also includes current and prospective investors or funding sources of a Marblegate Entity.

"**Release**" means, with respect to any Hazardous Material, any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, depositing,

disposing, dispersing, or migrating into or through the environment or within any building, structure, facility or fixture (including the abandonment or discarding of any barrels, containers or other closed receptacles containing any Hazardous Material).

"<u>Reorganization Plan</u>" means a plan of reorganization in the Cases implementing the terms of the Restructuring in accordance with the Restructuring Support Agreement and otherwise in form and substance reasonably acceptable to the Administrative Agent, the Required Lenders, the Debtors, the Supporting Lenders, the Required Supporting Noteholders and the Supporting Interest Holders or that otherwise satisfies the Obligations in full in cash.

"<u>Reportable Event</u>" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30 day notice period has been waived.

"<u>Request for Credit Extension</u>" means with respect to a Borrowing, conversion or continuation of a Loan, a Committed Loan Notice.

"<u>Required Lenders</u>" means Lenders having at such time in excess of 50% of the sum of the aggregate Commitments then outstanding as of such date plus the Total Outstandings as of such date, which, in the event that the Backstop Lenders are Lenders under the Facility, shall include (a) a majority in interest by commitment amount of the Lenders and (b) the funds or financing vehicles (or funds or accounts advised or sub-advised by such Person) who are Backstop Lenders and are affiliated with at least three of the following: (i) Carl Marks, (ii) Marblegate, (iii) GSO and (iv) Kelso & Company, L.P.; provided, that if any Lender described in the foregoing clause (b) subsequently transfers or otherwise disposes of some or all of its Loans prior to the Effective Date such that it holds less than [5]% of all outstanding Loans in the aggregate, such Lender shall be deemed removed from clause (b), and clause (b) shall be deemed revised to require consent from a majority in interest of the remaining Lenders described therein.

"<u>Required Supporting Noteholders</u>" means (1) a majority of holders in amount of the outstanding principal amount of the notes issued pursuant to the Pre-Petition Indentures and (2) including funds or financing vehicles (or funds or accounts advised or sub-advised by such Persons) that are Pre-Petition Indenture Noteholders and are affiliated with at least three of the following entities: Carl Marks, Marblegate, GSO and Kelso & Company, L.P.; <u>provided</u>, that if any Person described in this clause (2) subsequently transfers or otherwise disposes of some or all of its notes prior to the Effective Date such that it holds less than [5]% of all outstanding Pre-Petition Indenture Notes in the aggregate, such Person shall be deemed removed from clause (2) and clause (2) shall be deemed revised to require consent from a majority of the remaining Pre-Petition Indenture Noteholders described therein.

"<u>Responsible Officer</u>" means the chief executive officer, president, vice president, chief financial officer, treasurer, assistant treasurer, secretary, assistant secretary or controller of a Loan Party. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other Equity Interest of any Person or any of its Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such capital stock or other Equity Interest, or on account of any return of capital to any Person's stockholders, partners or members (or the equivalent of any thereof), or any option, warrant or other right to acquire any such dividend or other distribution or payment.

"Restructuring" has the meaning specified in the Restructuring Support Agreement.

"Restructuring Support Agreement" means that certain Restructuring Support Agreement, dated as of August [__], 2016, by and among the Debtors, the Pre-Petition First Lien Lenders, the Pre-Petition First Lien Agent, GSO or certain affiliates thereof party thereto, Kelso & Company, L.P. or certain affiliates thereof party thereto, Carl Marks or certain affiliates thereof party thereto, and Marblegate or certain affiliates thereof party thereto, in form and substance satisfactory to the Administrative Agent, the Required Lenders and the Unanimous DIP Lenders, as amended, supplemented, modified, extended, renewed, restated and/or replaced in accordance therewith, together with any schedules and exhibits thereto.

"Roadhouse Holding" means Roadhouse Holding Inc., a Delaware corporation.

"Roadhouse Intermediate" means Roadhouse Intermediate Inc., a Delaware corporation.

"Roadhouse Midco" means Roadhouse Midco Inc., a Delaware corporation.

"Roadhouse Parent" means Roadhouse Parent Inc., a Delaware corporation.

"Roadhouse Parent Entities" means Roadhouse Holding, Roadhouse Intermediate, Roadhouse Midco and Roadhouse Parent.

"Roll Up Facility" has the meaning specified in Section 2.01(a).

"Roll Up Loans" has the meaning specified in Section 2.01(a).

"RSA Term Sheet" means the term sheet attached as Exhibit A to the Restructuring Support Agreement.

"Sanctions" has the meaning specified in Section 5.19(a).

"Sanctioned Country" has the meaning specified in Section 5.19(a).

"SDN List" has the meaning specified in Section 5.19(a).

"S&P" means Standard & Poor's Financial Services LLC, a subsidiary of The McGraw-Hill Companies, Inc., and any successor thereto.

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Secured Parties" means, collectively, the Administrative Agent, each Lender, each other Indemnitee and each other holder of any Obligation of any Loan Party.

"Security Agreement" means that certain Debtor-In-Possession Security Agreement, dated as of the date hereof, by and among the Loan Parties and the Administrative Agent, substantially in the form of Exhibit F (together with each security agreement supplement delivered pursuant to Section 7.12, in each case as amended).

"Security Agreement Supplement" has the meaning specified in the Security Agreement.

"Segregated Pre-Funding Account" means a segregated deposit account maintained by the Administrative Agent for the benefit of the Lenders into which the proceeds of the Loans under the New Money Facility shall be deposited; provided, that, as of the Closing Date and until a new account maintained by the Administrative Agent for the benefit of the Lenders is established, "Segregated Pre-Funding Account" shall mean the omnibus account at the Administrative Agent into which the proceeds of the Loans under the New Money Facility shall be deposited temporarily until such time as the new account can be established.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of Holdings.

"Supporting Interest Holders" means the holders of Equity Interests, directly or indirectly, in Holdings that are signatories to the Restructuring Support Agreement and remain bound by its terms.

"Supporting Lenders" means the Pre-Petition First Lien Lenders that are signatories to the Restructuring Support Agreement and remain bound by its terms.

"Tax Affiliate" means, (a) the Roadhouse Parent Entities, Holdings, Borrower and each of their Subsidiaries and (b) any Affiliate of the Roadhouse Parent Entities, Holdings or the Borrower with which the Roadhouse Parent Entities, Holdings, Borrower or any of their Subsidiaries files or is eligible to file consolidated, combined or unitary tax returns, but only if and to the extent that the Roadhouse Parent Entities, Holdings, Borrower or any of their Subsidiaries may be liable for the tax in question of such Affiliate pursuant to Treasury Regulation Section 1.1502-6 (or similar provision of state or local law).

"<u>Taxes</u>" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"<u>Total Outstandings</u>" means the aggregate Outstanding Amount of all Loans.

"<u>Transactions</u>" means, collectively, (a) the execution, delivery and performance by the Loan Parties of the Loan Documents to which they are a party and the making of the Borrowings hereunder, (b) the entry into the Restructuring Support Agreement, (c) the restructuring transactions contemplated under the Reorganization Plan, (d) the entry of the DIP Orders and (e) the payment of the fees and expenses related to the foregoing.

"<u>Transparent Subsidiary</u>" means a Subsidiary of the Borrower that is treated as a disregarded entity or partnership for U.S. federal income Tax purposes and that has no material assets other than Equity Interests (held directly or indirectly through other Transparent Subsidiaries) in one or more CFCs.

"<u>Type</u>" means, with respect to a Loan, its character as a Base Rate Loan or a Eurodollar Rate Loan.

"<u>UCC</u>" means the Uniform Commercial Code as in effect in the State of New York; <u>provided</u> that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "<u>UCC</u>" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"<u>Unanimous DIP Lenders</u>" means, collectively, (a) any Carl Marks Entity or Lender hereunder that is affiliated with a Carl Marks Entity for so long as such Carl Marks Entity or Affiliate remains a Lender hereunder, (b) any Marblegate Entity or Lender hereunder that is affiliated with a Marblegate Entity for so long as such Marblegate Entity or Affiliate remains a Lender hereunder, (c) any GSO Entity or Lender hereunder that is affiliated with a GSO Entity for so long as such GSO Entity or Affiliate remains a Lender hereunder and (d) Kelso & Company, L.P. for so long as it remains a Lender hereunder and all Lenders hereunder who are affiliated with Kelso & Company, L.P.; <u>provided</u>, that if any Backstop Lender described in this definition subsequently transfers or otherwise disposes of some or all of its Loans prior to the Effective Date such that it holds less than [5]% of all outstanding Loans in the aggregate, such Backstop Lender shall be deemed removed from this definition, and this definition shall be deemed revised to require consent from each of the remaining Backstop Lenders described therein.

"<u>Unfunded Pension Liability</u>" means the excess of a Pension Plan's "benefit liabilities" (as defined in Section 4001(a)(16) of ERISA), over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to Section 412 of the Code for the applicable plan year.

"<u>United States</u>" and "<u>U.S.</u>" mean the United States of America.

"Variance" has the meaning assigned to such term in the definition of "Variance Report".

"Variance Report" means a report certified by a Responsible Officer of the Borrower, in form reasonably satisfactory the Lenders, delivered in accordance with Section 6.01(d), showing (a) the actual cumulative receipts and disbursements as of the end of the week immediately preceding the week during which such Variance Report is delivered and (b) commencing with the second Thursday following the Petition Date, the variance, expressed as both a percentage and as a dollar amount, of such amounts for all applicable weeks since the Closing Date, on a rolling basis (and without giving effect to the making of any Loans or prepayments of any Loans), from the corresponding anticipated amount therefor set forth in the most recent Budget (each a "Variance").

"Weighted Average Life to Maturity" means, when applied to any Indebtedness at any date, the number of years obtained by dividing: (i) the sum of the products obtained by multiplying (a) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (b) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment by (ii) the then outstanding principal amount of such Indebtedness.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.02   Other Interpretive Provisions.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)      The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Preliminary Statements, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Preliminary Statements, Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to

refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)  In the computation of periods of time from a specified date to a later specified date, the word "<u>from</u>" means "<u>from and including</u>"; the words "<u>to</u>" and "<u>until</u>" each mean "<u>to but excluding</u>"; and the word "<u>through</u>" means "<u>to and including</u>."

(c)  Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

Section 1.03  <u>Accounting Terms</u>.

(a)  <u>Generally</u>.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, applied in a manner consistent with that used in preparing the Audited Financial Statements, <u>except</u> as otherwise specifically prescribed herein.

(b)  <u>Changes in GAAP</u>.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrower or the Required Lenders shall so request, the Administrative Agent, the Lenders and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); <u>provided</u> that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrower shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder together with a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP; <u>provided</u> <u>further</u> that such reconciliation shall be required to be provided only for the four fiscal quarters following such change or such longer period as may be reasonably requested by the Administrative Agent.

Section 1.04  <u>Rounding</u>.  Any financial ratios required to be maintained by the Borrower pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

Section 1.05  <u>Times of Day</u>.  Unless otherwise specified, all references herein to times of day shall be references to Eastern Time (daylight or standard, as applicable).

Section 1.06  <u>Currency Equivalents Generally</u>.  Any amount specified in this Agreement (other than in <u>Articles II</u>, <u>IX</u> and <u>X</u>) or any of the other Loan Documents to be in Dollars shall also include the equivalent of such amount in any currency other than Dollars, such equivalent amount thereof in the applicable currency to be determined by the Administrative Agent at such

time on the basis of the Spot Rate (as defined below) for the purchase of such currency with Dollars. For purposes of this Section 1.06, the "Spot Rate" for a currency means the rate determined by the Administrative Agent to be the rate quoted by the Person acting in such capacity as the spot rate for the purchase by such Person of such currency with another currency through its principal foreign exchange trading office at approximately 11:00 a.m. on the date two Business Days prior to the date of such determination; provided that the Administrative Agent may obtain such spot rate from another financial institution designated by the Administrative Agent if the Person acting in such capacity does not have as of the date of determination a spot buying rate for any such currency. Notwithstanding the foregoing, for purposes of determining compliance with Sections 8.01, 8.02 and 8.03 with respect to any amount of Indebtedness or Investment in a currency other than Dollars, no Default shall be deemed to have occurred solely as a result of changes in rates of exchange occurring after the time such Indebtedness or Investment is incurred; provided that, for the avoidance of doubt, the foregoing provisions of this Section 1.06 shall otherwise apply to such Sections, including with respect to determining whether any Indebtedness or Investment may be incurred at any time under such Sections.

ARTICLE II.
THE COMMITMENTS AND CREDIT EXTENSIONS

Section 2.01    The Facilities.

(a)    Roll Up Facility.

(i)    Upon entry of the Interim Order, each Lender who is a Pre-Petition Indenture Noteholder shall be deemed to have exchanged its Pre-Petition Indenture Notes in an aggregate principal amount equal to the sum of such Lender's Initial Commitment which has been actually disbursed to the Borrower pursuant to Section 2.03, for loans hereunder on a dollar for dollar basis (each such loan deemed made in exchange for such Pre-Petition Indenture Notes, an "Initial Roll Up Loan", and collectively, the "Initial Roll Up Loans"). Each Lender that is a Pre-Petition Indenture Noteholder as of the entry of the Interim Order shall be identified in a schedule delivered to the Administrative Agent on such date.

(ii)    So long as permitted by the Final Order, upon entry of the Final Order, each Lender who is a Pre-Petition Indenture Noteholder shall be deemed to have exchanged additional Pre-Petition Indenture Notes held by it in an aggregate principal amount equal to the amount of Initial Loans plus Delayed Draw Loans of such Lender hereunder which have been actually disbursed to the Borrower pursuant to Section 2.03, for loans hereunder so that the aggregate total of such loans received by such Lender under this Section 2.01(a)(i) and (ii) in exchange for such Lender's Pre-Petition Indenture Notes plus accrued and unpaid interest thereon result in an exchange on a 2:1 basis for every dollar of the New Money Facility under Section 2.01(b) actually disbursed to the Borrower pursuant to Section 2.03 (each such loan deemed made in exchange for such additional Pre-Petition Indenture Notes, an "Additional Roll Up Loan", and collectively, the "Additional Roll Up Loans", and the Additional Roll Up Loans together with the Initial Roll Up Loans, the "Roll Up Loans"). Notwithstanding anything herein or in any other Loan Document to the contrary, if the terms of the DIP Orders do not permit such ad-

ditional exchange, no additional Pre-Petition Indenture Notes shall be exchanged pursuant to this clause (ii) and no Additional Roll Up Loans shall be deemed to be outstanding hereunder.

(iii)    All such Pre-Petition Indenture Notes so exchanged shall be deemed repaid in full and no longer outstanding. The facility described in this Section 2.01(a) is referred to herein as the "Roll Up Facility".

(b)    New Money Facility.

(i)    Subject to the terms and conditions herein and in the DIP Orders and relying upon the representations and warranties herein set forth, each Lender agrees, severally and not jointly, to make (i) a single loan to the Borrower on the Interim Order Entry Date in an aggregate principal amount not to exceed its Initial Commitment (such loans, each an "Initial Loan" and collectively, the "Initial Loans") and (ii) a single loan on the Delayed Draw Loan Funding Date in an aggregate principal amount not to exceed its Delayed Draw Commitment (such loans, each a "Delayed Draw Loan" and collectively, the "Delayed Draw Loans"). Following the making of the Initial Loans, the Initial Commitment of such Lender shall terminate, and following the making of the Delayed Draw Loans, the Delayed Draw Commitment of such Lender shall terminate. Any remaining Initial Commitments or Delayed Draw Commitments shall automatically terminate on (1) the [second Business Day] following the entry of the Interim Order in the case of the Initial Loans and (2) the [second Business Day] following the Delayed Draw Loan Funding Date in the case of the Delayed Draw Loans. Once funded, each Initial Loan and Delayed Draw Loan shall be a "Loan" for all purposes under this Agreement and the other Loan Documents. Amounts paid or prepaid in respect of Loans may not be reborrowed. The facility provided for in this Section 2.01(b) shall be referred to herein as the "New Money Facility".

(ii)    All proceeds from the New Money Facility shall be deposited into the Segregated Pre-Funding Account and shall be disbursed to the Borrower in accordance with, subject to and to the extent provided in, Section 2.03. For the avoidance of doubt, it is understood and agreed that (A) the funds on deposit in the Segregated Pre-Funding Account shall not be assets of any of the Loan Parties, (B) the Loan Parties shall have no right, title or interest in amounts on deposit in the Segregated Pre-Funding Account other than to request a disbursement hereunder in accordance with the terms of this Agreement.

Section 2.02    Borrowings, Conversions and Continuations of Loans.

(a)    Each Borrowing or each conversion of Loans from one Type to the other, and each continuation of Eurodollar Rate Loans shall be made upon the Borrower's irrevocable written notice to the Administrative Agent. Each such notice must be received by the Administrative Agent not later than 11:00 a.m. (i) three Business Days prior to the requested date of any Borrowing of, conversion to or continuation of Eurodollar Rate Loans or of any conversion of Eurodollar Rate Loans to Base Rate Loans, and (ii) one Business Day prior to the requested date of any Borrowing of Base Rate Loans. Not later than 11:00 a.m., one Business Day before the requested date of such Borrowing, conversion or continuation, the Administrative Agent shall noti-

fy the Borrower in writing whether or not the requested Interest Period has been consented to by all the Lenders. Each written notice contemplated by this Section 2.02(a) shall be made pursuant to a written Committed Loan Notice, appropriately completed and signed by a duly authorized officer of the Borrower. Each Borrowing of, conversion to or continuation of Eurodollar Rate Loans shall be in a principal amount of $[100,000] or a whole multiple of $[50,000] in excess thereof. Each Borrowing of or conversion to Base Rate Loans shall be in a principal amount of $[100,000] or a whole multiple of $[50,000] in excess thereof. Each Committed Loan Notice shall specify (i) whether the Borrower is requesting a Borrowing or a conversion of Loans from one Type to the other, or a continuation of Eurodollar Rate Loans, (ii) the requested date of the Borrowing, conversion or continuation, as the case may be (which shall be a Business Day), (iii) the principal amount of Loans to be borrowed, converted or continued, (iv) the Type of Loans to be borrowed or to which existing Loans are to be converted, and (v) if applicable, the duration of the Interest Period with respect thereto. If the Borrower fails to specify a Type of Loan in a Committed Loan Notice or if the Borrower fails to give a timely notice requesting a conversion or continuation, then the applicable Loans shall be made as, or converted to, Base Rate Loans. If the Borrower requests a Borrowing of or continuation of Eurodollar Rate Loans but fails to specify an Interest Period, it will be deemed to have specified an Interest Period of one month. Any such automatic conversion to Base Rate Loans shall be effective as of the last day of the Interest Period then in effect with respect to the applicable Eurodollar Rate Loans.

(b)     Following receipt of a Committed Loan Notice, the Administrative Agent shall promptly notify each Lender of the amount of its Pro Rata Share under the applicable Loans, and if no timely notice of a conversion or continuation is provided by the Borrower, the Administrative Agent shall notify each Lender of the details of any automatic conversion to Base Rate Loans described in Section 2.02(a). Each Lender shall make the amount of its Loan available to the Administrative Agent in immediately available funds at the Administrative Agent's Office not later than [2:00 p.m.] on the Business Day specified in the applicable Committed Loan Notice (each such date, a "Funding Date"). Upon satisfaction of the applicable conditions set forth in Section 4.02 (and, if such Borrowing is the initial Credit Extension, Section 4.01) and receipt of each Lender's Pro Rata Share of such Loans (other than the portion to be funded by a Defaulting Lender), the Administrative Agent shall make all funds so received available to the Borrower, subject to the DIP Orders and the Budget (including Permitted Variances), in like funds as received by the Administrative Agent, provided that such funds be deposited into the Segregated Pre-Funding Account and only disbursed in accordance with the terms of Section 2.03.

(c)     Except as otherwise provided herein, a Eurodollar Rate Loan may be continued or converted only on the last day of an Interest Period for such Eurodollar Rate Loan. During the existence of a Default, no Loans may be requested as, converted to or continued as Eurodollar Rate Loans without the consent of the Required Lenders.

(d)     The Administrative Agent shall promptly notify the Borrower and the Lenders of the interest rate applicable to any Interest Period for Eurodollar Rate Loans upon determination of such interest rate. At any time that Base Rate Loans are outstanding, the Administrative Agent shall notify the Borrower and the Lenders of any change in the prime rate used in determining the Base Rate promptly following such change.

(e)     After giving effect to all Borrowings, all conversions of Loans from one Type to the other, and all continuations of Loans as the same Type, there shall not be more than [two] Interest Periods in effect in respect of the Facility.

Section 2.03     Disbursements from Segregated Pre-Funding Account.

(a)     From and after the funding of the Initial Loans or the Delayed Draw Loans, the Borrower may request proceeds from such Loans on deposit in the Segregated Pre-Funding Account be disbursed from such account to the Borrower on a weekly basis in accordance with the Budget until the DIP Maturity Date (or more frequently as determined by the Required Lenders in their sole discretion). To request such disbursement, the Borrower shall deliver to the Administrative Agent and the Lenders a Notice of Request for Disbursement, which notice must be received by the Administrative Agent no later than 11:00 a.m. at least one Business Day prior to the date of the requested disbursement. Such Notice of Request for Disbursement shall specify:

(i)     the amount of the disbursement to be made, which shall be an amount not to exceed the least of (1) an amount, such that after making such disbursement, the cumulative amount of disbursements so made since the date of the first disbursement would not exceed the amount set forth in the Budget for such period, (2) the amount permitted in the DIP Orders and (3) the amount available in the Segregated Pre-Funding Account as of the date of the proposed disbursement (such date, the "Disbursement Date"); and

(ii)     the Disbursement Date, which shall be a Business Day.

(b)     Upon receipt of a Notice of Request for Disbursement, the Administrative Agent shall promptly notify each Lender of the amount of its Pro Rata Share of the Loans to be disbursed on such Disbursement Date.

(c)     Such disbursements shall be made available to the Borrower by wire transfer of such amount to the account as specified by the Borrower in the Notice of Request for Disbursement to the Administrative Agent, which such account shall be subject to a Control Agreement. The Borrower shall promptly direct and apply such amounts for the purposes set forth in the Budget (subject to Permitted Variances).

(d)     Notwithstanding anything herein to the contrary, (i) there shall not be more than one (1) disbursement in any calendar week unless otherwise agreed to by the Required Lenders in their sole discretion, (ii) no disbursement shall be issued during any week when the Budget does not provide for such a disbursement, unless otherwise consented to by the Required Lenders and (iii) all conditions precedent set forth in Section 4.03 shall have been fulfilled or waived by the Required Lenders and the Unanimous DIP Lenders before any such disbursement may be made.

Section 2.04     Prepayments.

(a)     Optional.  The Borrower may, upon three (3) Business Days prior written notice for a Eurodollar Rate Loan and upon one Business Day prior written notice for a Base Rate Loan, prepay the outstanding principal amount of any Loan in whole or in part at any time (to-

gether with any breakage costs that may be owing pursuant to Section 3.05 after giving effect to such prepayment); provided, however, that each partial prepayment that is not of the entire outstanding amount under the Facility shall be in a minimum amount of $[100,000] and increments of $[50,000] in excess thereof. Amounts so prepaid under this Section 2.04(a) may not be reborrowed.

(b)     Mandatory.

(i)     (A) if (x) any Loan Party or any Subsidiary thereof Disposes or proposes to Dispose of any property or assets (other than Net Cash Proceeds of sales or other dispositions of inventory in the ordinary course of business as permitted by Section 8.05(a), Section 8.05(b) and Section 8.05(c) (to the extent constituting a Disposition to a Loan Party)), (y) any Casualty Event occurs or (z) the Borrower or any Guarantor issues or proposes to issue any Equity Interest, the Borrower shall (1) promptly notify the Administrative Agent in writing of such proposed Disposition, Casualty Event or issuance of Equity Interest (in each case, including a description of such property or assets (if applicable) and the estimated amount of Net Cash Proceeds to be received by a Loan Party or any Subsidiary thereof in respect thereof and the expected date of prepayment) and (2) make a prepayment, in accordance with Section 2.04(b)(ii), of an aggregate principal amount of Loans equal to 100% of all such Net Cash Proceeds realized or received.

(ii)     On each occasion that the Borrower must make a prepayment of the Loans pursuant to Section 2.04(b)(i), the Borrower shall, within [five (5) Business Days] after the date of realization or receipt of such Net Cash Proceeds, make a prepayment, in accordance with Section 2.04(b)(v) below, of the principal amount of Loans in an amount equal to 100% of such Net Cash Proceeds realized or received.

(iii)     If any Loan Party or Subsidiary thereof incurs or issues any Indebtedness not expressly permitted to be incurred or issued pursuant to Section 8.03, the Borrower shall cause to be prepaid an aggregate principal amount of Loans equal to 100% of all Net Cash Proceeds received therefrom on the first Business Day following the date of receipt of such Net Cash Proceeds.

(iv)     Each prepayment of Loans pursuant to this Section 2.04(b) shall be applied in accordance with the provisions set forth in Section 9.03.

(v)     The Borrower shall notify the Administrative Agent in writing substantially in the form of Exhibit H of any mandatory prepayment of Loans required to be made pursuant to clauses (ii) and (iii) of this Section 2.04(b) at least one (1) Business Day prior to 1:00 p.m. on the date of such prepayment.  Each such notice shall specify the date of such prepayment and provide a reasonably detailed calculation of the amount of such prepayment.  The Administrative Agent will promptly notify each Lender of the contents of the Borrower's prepayment notice and of such Lender's Pro Rata Share of the prepayment.

(c)     Interest, Funding Losses, Etc.  All prepayments under this Section 2.04 shall be accompanied by all accrued and unpaid interest thereon, together with, in the case of any such

prepayment of a Eurodollar Rate Loan on a date other than the last day of an Interest Period therefor, any amounts owing in respect of such Eurodollar Rate Loan pursuant to Section 3.05.

Notwithstanding any of the other provisions of this Section 2.04, so long as no Default or Event of Default shall have occurred and be continuing, if any prepayment of Eurodollar Rate Loans is required to be made under this Section 2.04, prior to the last day of the Interest Period therefor, in lieu of making any payment pursuant to this Section 2.04 in respect of any such Eurodollar Rate Loan prior to the last day of the Interest Period therefor, the Borrower may, in its sole discretion, deposit with the Administrative Agent the amount of any such prepayment otherwise required to be made hereunder until the last day of such Interest Period, at which time the Administrative Agent shall be authorized (without any further action by or notice to or from the Borrower or any other Loan Party) to apply such amount to the prepayment of such Loans in accordance with this Section 2.04. Such deposit shall constitute cash collateral for the Eurodollar Rate Loans to be so prepaid, provided that the Borrower may at any time direct that such deposit be applied to make the applicable payment required pursuant to this Section 2.04.

Section 2.05   Repayment of Loans. On the DIP Maturity Date, (i) if the Reorganization Plan is not confirmed or if the Restructuring Support Agreement is terminated or otherwise not in full force and effect, then the Borrower shall repay the Loans, together with all other Obligations hereunder and under the other Loan Documents (other than contingent indemnification and expense reimbursement obligations for which no claim has been made), in full in cash and (ii) if both the Reorganization Plan is confirmed and the Restructuring Support Agreement remains in full force and effect, all outstanding principal, accrued and unpaid interest and all other Obligations hereunder (other than contingent indemnification and expense reimbursement obligations for which no claim has been made) shall be exchanged for an equivalent amount of principal of loans under the Exit Second Lien Facility and upon such full and complete exchange pursuant to this clause (ii), the Borrower's Obligations hereunder and under the other Loan Documents (other than contingent indemnification and expense reimbursement obligations for which no claim has been made) shall be deemed to have been satisfied in full; provided, that the Borrower shall repay any Obligations owing to the Administrative Agent (other than contingent indemnification and expense reimbursement obligations for which no claim has been made) in full in cash on the DIP Maturity Date regardless of whether the Restructuring Support Agreement is terminated or remains in full force and effect or the Reorganization Plan has been confirmed or not confirmed.

Section 2.06   Interest.

(a)      Subject to the provisions of Section 2.06(b), (i) each Eurodollar Rate Loan under the Facility shall bear interest (from the time of disbursement pursuant to Section 2.03) on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the Eurodollar Rate for such Interest Period plus the Applicable Rate for the Facility; and (ii) each Base Rate Loan under the Facility shall bear interest (from the time of disbursement pursuant to Section 2.03) on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Rate for the Facility.

(b)      (i) If the Borrower shall default in the payment of any principal of or interest on any Loan or any other amount due hereunder or under any other Loan Document, by acceleration or otherwise, or any Event of Default shall occur and be continuing, then, until such defaulted

amount shall have been paid in full or such Event of Default shall no longer exist, all Obligations shall bear interest (after as well as before judgment), payable on demand, at a fluctuating interest rate per annum at all times equal to the Default Rate.

(ii)     Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c)     Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law. Any interest payable hereunder shall automatically and without further action on the applicable Interest Payment Date be capitalized, compounded and added to the then unpaid principal amount of the Loans (the "PIK Interest") and shall thereafter be deemed to be a part of the principal amount of the Loans. All PIK Interest that has accrued shall be payable in cash on the DIP Maturity Date.  The Borrower shall not issue any additional promissory notes to represent the PIK Interest, and, in lieu thereof, the Administrative Agent shall keep a ledger of the amount of PIK Interest that has accrued, which ledger shall be presumed to be correct absent manifest error.

Section 2.07    Fees.

(a)     Unused Commitment Fee.  The Borrower agrees to pay to each Lender (other than a Defaulting Lender) a commitment fee on the actual daily amount by which (i) the Initial Commitments of such Lender exceeds its Pro Rata Share of the aggregate outstanding principal amount of the Initial Loans from the Closing Date to the Final Order Entry Date at a rate per annum equal to 0.5% per annum and (ii) the Commitments of such Lender exceeds its Pro Rata Share of the aggregate outstanding principal amount of the Initial Loans and the Delayed Draw Loans from and including the Final Order Entry Date through the DIP Maturity Date at a rate per annum equal to 0.5% per annum, in each case of this clause (i) and (ii), payable in arrears and in cash (x) on the last Business Day of each month, and (y) on the DIP Maturity Date.

(b)     Commitment Fee.  The Borrower shall pay on the Closing Date to each Lender party to this Agreement as a Lender on the Closing Date, as fee compensation for agreeing to fund such Lender's Commitments, a commitment fee in an amount equal to 2.0% of the stated principal amount of such Lender's Commitments. Such fee shall be in all respects fully earned, due and payable on the Closing Date and non-refundable and non-creditable thereafter and shall automatically and without further action be added to the outstanding amount of the Loans as of the Closing Date.

(c)     Backstop Commitment Fee.  The Borrower agrees to pay on each Funding Date to each Backstop Lender party to this Agreement as a Lender on such Funding Date, as fee compensation for the funding of the Commitments held by such Backstop Lender on the Closing Date, a fee in an amount equal to 3.0% of the stated principal amount of such Commitments funded on such date (in each case regardless of whether such Commitments are funded by such Backstop Lender, any assignee of such Backstop Lender, any Affiliate or Approved Fund of such Backstop Lender or assignee or any combination of the foregoing), payable in cash to such

Backstop Lender.  Such fee shall be in all respects fully earned, due and payable on such funding date and non-refundable and non-creditable thereafter.

(d)    _Administrative Agent Fees_.  The Borrower shall pay to the Administrative Agent such fees as have been agreed upon in writing as set forth in the Agent Fee Letter.

(e)    _Other Fees._  The Borrower shall pay to the Lenders such fees as shall have been separately agreed upon in writing in the amounts and at the times so specified.  Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

Section 2.08    _Computation of Interest and Fees_.  All computations of interest for Base Rate Loans when the Base Rate is determined by the "prime rate" shall be made on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed.  All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a 365-day year).  Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid, provided that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.10(a), bear interest for one day.  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.[1]

Section 2.09    _Evidence of Debt_.  The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and by the Administrative Agent in the ordinary course of business.  The accounts or records maintained by the Administrative Agent and each Lender shall be conclusive absent manifest error of the amount of the Credit Extensions made by the Lenders to the Borrower and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.  Upon the request of any Lender made through the Administrative Agent, the Borrower shall execute and deliver to such Lender (through the Administrative Agent) a Note, which shall evidence such Lender's Loans in addition to such accounts or records.  Each Lender may attach schedules to its Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto.

Section 2.10    _Payments Generally; Administrative Agent's Clawback_.

(a)    _General_.  All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the Administrative Agent's Office in Dollars and in immediately available funds not later than 2:00

---

[1] NTD: TBD interest accrual.

p.m. on the date specified herein. The Administrative Agent will promptly distribute to each Lender its Pro Rata Share in respect of the Facility (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office. All payments received by the Administrative Agent after 2:00 p.m. may be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue. If any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected on computing interest or fees, as the case may be.

(b)    (i)   <u>Reserved</u>.

      (ii)   <u>Payments by Borrower; Presumptions by Administrative Agent</u>. Unless the Administrative Agent shall have received written notice from the Borrower prior to the time at which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders, as the case may be, the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders, as the case may be, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

A notice of the Administrative Agent to any Lender or the Borrower with respect to any amount owing under this subsection (b) shall be conclusive, absent manifest error.

(c)   <u>Failure to Satisfy Conditions Precedent</u>. If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this <u>Article II</u>, and such funds are not made available to the Borrower by the Administrative Agent because the conditions to the applicable Credit Extension set forth in <u>Article IV</u> are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest from the Borrower or any other Person.

(d)   <u>Obligations of Lenders Several</u>. The obligations of the Lenders hereunder to make Loans and to make payments pursuant to <u>Section 11.04(c)</u> are several and not joint. The failure of any Lender to make any Loan or to make any payment under <u>Section 11.04(c)</u> on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan or to make its payment under <u>Section 11.04(c)</u>.

(e)   <u>Funding Source</u>. Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

(f)     Insufficient Funds.  If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (i) first, toward payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, toward payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

Section 2.11   Sharing of Payments by Lenders.  If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of (a) Obligations in respect of the Facilities due and payable to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations due and payable to such Lender at such time to (ii) the aggregate amount of the Obligations in respect of the Facilities due and payable to all Lenders hereunder and under the other Loan Documents at such time) of payments on account of the Obligations in respect of the Facilities due and payable to all Lenders hereunder and under the other Loan Documents at such time obtained by all the Lenders at such time or (b) Obligations in respect of any of the Facilities owing (but not due and payable) to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations owing (but not due and payable) to such Lender at such time to (ii) the aggregate amount of the Obligations in respect of the Facilities owing (but not due and payable) to all Lenders hereunder and under the other Loan Documents at such time) of payment on account of the Obligations in respect of the Facilities owing (but not due and payable) to all Lenders hereunder and under the other Loan Documents at such time obtained by all of the Lenders at such time then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact, and (b) make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of Obligations in respect of the Facilities then due and payable to the Lenders or owing (but not due and payable) to the Lenders, as the case may be, provided that: the provisions of this Section 2.11 shall not be construed to apply to (A) any payment made by the Borrower or Holdings pursuant to and in accordance with the express terms of this Agreement or (B) any payment obtained by a Lender as consideration for the assignment of any of its Loans to any assignee.

Each Loan Party consents to the foregoing.

Section 2.12   Defaulting Lenders.  Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the Commitments and Outstanding Amount of Loans of such Defaulting Lender shall not be included in determining whether all Lenders or the Required Lenders or the Unanimous DIP Lenders have taken or may take any action hereunder (including any consent to any amendment, waiver or other modification pursuant to Section 11.01); provided that any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender which affects such Defaulting Lender disproportionately when compared to the other affected Lenders, or increases or extends the Commitment of such Defaulting Lender, or extends the DIP Maturity Date beyond December 14, 2016 or reduces the

principal of the Loans of such Defaulting Lender, shall require the consent of such Defaulting Lender.

ARTICLE III.<br>TAXES, YIELD PROTECTION AND ILLEGALITY

Section 3.01    <u>Taxes</u>.

(a)    <u>Payments Free of Taxes; Obligation to Withhold; Payments on Account of Taxes</u>. (i)  Any and all payments by or on account of any obligation of any Loan Party hereunder or under any other Loan Document shall to the extent permitted by applicable Laws be made free and clear of and without reduction or withholding for any Taxes.

(ii)    If any applicable withholding agent shall be required by applicable Laws to withhold or deduct any Taxes from any payment, then (A) the applicable withholding agent shall withhold or make such deductions as are determined by the applicable withholding agent to be required, (B) the applicable withholding agent shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with applicable Laws, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the applicable Loan Party shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this <u>Section 3.01</u>) the Administrative Agent or Lender, as the case may be, receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(b)    <u>Payment of Other Taxes by the Borrower</u>.  Without limiting or duplicating the provisions of subsection (a) above, the Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable Laws.

(c)    <u>Tax Indemnifications</u>.  Without limiting or duplicating the provisions of subsection (a) or (b) above, the Borrower shall indemnify the Administrative Agent and each Lender, and shall make payment in respect thereof within 10 days after receipt of written demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this <u>Section 3.01</u>) paid or payable by the Administrative Agent or such Lender, as the case may be, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of any such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)    <u>Evidence of Payments</u>.  As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority as provided in this <u>Section 3.01</u>, such Loan Party shall deliver to the Administrative Agent, the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return required by applicable

Laws to report such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e) <u>Status of Lenders; Tax Documentation</u>.  (i)  Each Lender shall deliver to the Borrower and to the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable Laws and such other reasonably requested information as will permit the Borrower or the Administrative Agent, as the case may be, to determine (A) whether or not payments made hereunder or under any other Loan Document are subject to withholding or deduction of any Taxes, (B) if applicable, the required rate of withholding or deduction, and (C) such Lender's entitlement to any available exemption from, or reduction of, applicable Taxes in respect of all payments to be made to such Lender by a Loan Party pursuant to this Agreement or otherwise to establish such Lender's status for withholding Tax purposes in the applicable jurisdiction.  Notwithstanding anything to the contrary in the preceding sentence, the completion, execution and submission of such documentation shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii) Without limiting the generality of the foregoing:

(A) any Lender that is a "United States person" within the meaning of Section 7701(a)(30) of the Code shall deliver to the Borrower and the Administrative Agent, on or before the date on which it becomes a Lender under this Agreement (and from time to time thereafter upon the request of the Borrower or the Administrative Agent), two properly completed and duly executed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding; and

(B) each Foreign Lender that is entitled under the Code or any applicable treaty to an exemption from or reduction of withholding Tax with respect to payments hereunder or under any other Loan Document shall deliver to the Borrower and the Administrative Agent, on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1) two properly completed and duly executed originals of IRS Form W-8BEN (or IRS Form W-8BEN-E, as applicable) claiming eligibility for the applicable benefits of an income tax treaty to which the United States is a party,

(2) two properly completed and duly executed originals of IRS Form W-8ECI,

(3) in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate, substantially in the form of <u>Exhibit G</u>**,** to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the

Code, or (C) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (any such certificate, a "<u>U.S. Tax Compliance Certificate</u>") and (y) two properly completed and duly executed originals of IRS Form W-8BEN (or IRS Form W-8BEN-E, as applicable),

(4)    to the extent a Foreign Lender is not the beneficial owner, two properly completed and duly executed originals of IRS Form W-8IMY of the Foreign Lender, accompanied by IRS Form W-8ECI, IRS Form W-8BEN (or IRS Form W-8BEN-E, as applicable), a U.S. Tax Compliance Certificate, IRS Form W-9, and/or other certification documents from each beneficial owner that would be required under this Section <u>3.01(e)</u> if such beneficial owner were a Lender, as applicable; provided that if the Foreign Lender is a partnership for U.S. federal income tax purposes and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of <u>Exhibit G</u> on behalf of each such direct and indirect partner, or

(5)    properly completed, duly executed originals of any other form prescribed by applicable Laws as a basis for claiming exemption from or a reduction in United States Federal withholding Tax together with such supplementary documentation as may be prescribed by applicable Laws to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made.

(C)  if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable Laws (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (C), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so. Notwithstanding any other provision of this clause (e), a Lender shall not be required to deliver any form that such Lender is not legally eligible to deliver.

(f)    <u>Treatment of Certain Refunds</u>.  Unless required by applicable Laws, at no time shall the Administrative Agent have any obligation to file for or otherwise pursue on behalf of a Lender, or have any obligation to pay to any Lender, any refund of Taxes withheld or deducted

from funds paid for the account of such Lender.  If the Administrative Agent or any Lender receives a refund of any Indemnified Taxes as to which it has been indemnified by the Borrower or any other Loan Party, or with respect to which the Borrower or any other Loan Party has paid additional amounts pursuant to this Section 3.01, it shall pay to the Borrower an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 3.01 with respect to the Indemnified Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) incurred by the Administrative Agent or such Lender, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that the Borrower, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this subsection (f), in no event will the Administrative Agent or any Lender be required to pay any amount to the Borrower pursuant to this subsection (f) the payment of which would place the Administrative Agent or such Lender in a less favorable net after-Tax position than the Administrative Lender or such Lender would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This subsection (f) shall not be construed to require the Administrative Agent or any Lender to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to any Loan Party or any other Person.

(g)     Each party's obligations under this Section 3.01 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

Section 3.02   Illegality.  If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to make, maintain or fund Eurodollar Rate Loans, or to determine or charge interest rates based upon the Eurodollar Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, then, on notice thereof by such Lender to the Borrower through the Administrative Agent, any obligation of such Lender to make or continue Eurodollar Rate Loans or to convert Base Rate Loans to Eurodollar Rate Loans shall be suspended until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, the Borrower shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all Eurodollar Rate Loans of such Lender to Base Rate Loans, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Eurodollar Rate Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such Eurodollar Rate Loans.  Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted.

Section 3.03   Inability to Determine Rates.  If the Required Lenders determine that for any reason in connection with any request for a Eurodollar Rate Loan or a conversion to or continuation thereof that (a) Dollar deposits are not being offered to banks in the London interbank eurodollar market for the applicable amount and Interest Period of such Eurodollar Rate Loan, (b) adequate and reasonable means do not exist for determining the Eurodollar Rate for any requested Interest Period with respect to a proposed Eurodollar Rate Loan, or (c) the Eurodollar Rate for any requested Interest Period with respect to a proposed Eurodollar Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, the Administrative Agent will promptly so notify the Borrower and each Lender.  Thereafter, the obligation of the Lenders to make or maintain Eurodollar Rate Loans shall be suspended until the Administrative Agent (upon the instruction of the Required Lenders) revokes such notice.  Upon receipt of such notice, the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of Eurodollar Rate Loans or, failing that, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans in the amount specified therein.

Section 3.04   Increased Costs; Reserves on Eurodollar Rate Loans.

(a)      Increased Costs Generally.  If any Change in Law shall:

(i)      impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any reserve requirement contemplated by Section 3.04(e));

(ii)      subject any Lender to any Tax of any kind whatsoever with respect to this Agreement or any Eurodollar Rate Loan made by it (except for Indemnified Taxes covered by Section 3.01, or any Excluded Tax); or

(iii)      impose on any Lender or the London interbank market any other condition, cost or expense affecting this Agreement or Eurodollar Rate Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurodollar Rate Loan (or of maintaining its obligation to make any such Loan), or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount) then, within 15 days after Borrower's receipt of a written request from such Lender, including a reasonably detailed calculation of such increased costs or reduction, the Borrower will pay to such Lender, as the case may be, such additional amount or amounts as will compensate such Lender, as the case may be, for such additional costs incurred or reduction suffered.

(b)      Capital Requirements.  If any Lender determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital requirements or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender, to a level below that which such Lender or such Lender's holding

company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender, as the case may be, such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)     Certificates for Reimbursement.     A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, and a reasonably detailed calculation of such amounts, as specified in subsection (a) or (b) of this Section and delivered to the Borrower shall be conclusive absent manifest error.  The Borrower shall pay such Lender, as the case may be, the amount shown as due on any such certificate within 15 days after receipt thereof.

(d)     Delay in Requests.     Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of such Lender's right to demand such compensation, provided that the Borrower shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender, as the case may be, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

(e)     Reserves on Eurodollar Rate Loans.     The Borrower shall pay to each Lender, as long as such Lender shall be required to maintain reserves with respect to liabilities or assets consisting of or including Eurodollar funds or deposits (currently known as "Eurodollar liabilities"), additional interest on the unpaid principal amount of each Eurodollar Rate Loan equal to the actual costs of such reserves allocated to such Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive), which shall be due and payable on each date on which interest is payable on such Loan, provided the Borrower shall have received at least 10 days' prior notice (with a copy to the Administrative Agent) of such additional interest from such Lender.  If a Lender fails to give notice 10 days prior to the relevant Interest Payment Date, such additional interest shall be due and payable 10 days from receipt of such notice.

Section 3.05     Compensation for Losses.     Upon demand of any Lender (with a copy to the Administrative Agent) from time to time, the Borrower shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense incurred by it as a result of:

(a)     any continuation, conversion, payment or prepayment of any Loan other than a Base Rate Loan on a day other than the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(b)     any failure by the Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Loan other than a Base Rate Loan on the date or in the amount notified by the Borrower; or

(c)     any assignment of a Eurodollar Rate Loan on a day other than the last day of the Interest Period therefor as a result of a request by the Borrower pursuant to Section 11.13;

including any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained.  The Borrower shall also pay any customary administrative fees charged by such Lender in connection with the foregoing.

For purposes of calculating amounts payable by the Borrower to the Lenders under this Section 3.05, each Lender shall be deemed to have funded each Eurodollar Rate Loan made by it at the Eurodollar Rate for such Loan by a matching deposit or other borrowing in the London interbank eurodollar market for a comparable amount and for a comparable period, whether or not such Eurodollar Rate Loan was in fact so funded.

Section 3.06    Mitigation Obligations; Replacement of Lenders.

(a)     Designation of a Different Lending Office.  If any Lender requests compensation under Section 3.04, or the Borrower is required to pay Indemnified Taxes or any additional amount with respect to Indemnified Taxes to any Lender, or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender gives a notice pursuant to Section 3.02, then such Lender shall, as applicable, use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.04, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 3.02, as applicable, and (ii) in each case, would not subject such Lender, as the case may be, to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender, as the case may be.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)     Replacement of Lenders.  If any Lender requests compensation under Section 3.04, or if the Borrower is required to pay any Indemnified Taxes or pay any additional amount with respect to any Indemnified Taxes to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, the Borrower may replace such Lender in accordance with Section 11.13 and/or convert to a Base Rate Loan.

Section 3.07    Survival.  All of the Borrower's obligations under this Article III shall survive termination of the Aggregate Commitments, repayment of all other Obligations hereunder, and resignation of the Administrative Agent.

ARTICLE IV.
CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

Section 4.01    <u>Conditions of Initial Credit Extension</u>.  The effectiveness of this Agreement and the obligation of each Lender to make its Initial Loans on the Closing Date hereunder is subject to satisfaction (or waiver in accordance with <u>Section 11.01</u>) of the following conditions precedent:

(a)    The Administrative Agent's receipt of the following, each properly executed by a duly authorized officer of the signing Loan Party (if applicable) and each other party thereto, each dated the Closing Date (unless otherwise provided herein or, in the case of searches and certificates of governmental officials, a recent date before the Closing Date) and each in form and substance satisfactory to the Administrative Agent and the Required Lenders in their sole discretion:

(i)    this Agreement, the Guaranty, the Agent Fee Letter and each other Loan Document to be executed on the Closing Date, each duly executed by the appropriate parties;

(ii)    executed counterparts of the Pre-Petition Intercreditor Agreement Waiver and the Restructuring Support Agreement (including executed counterparts from the Pre-Petition First Lien Lenders);

(iii)    executed counterparts of the Security Agreement, together with:

(A)    except as permitted by <u>Section 7.15</u>, certificates, if any, representing the Pledged Securities referred to therein accompanied by undated stock powers executed in blank, or other arrangements (including the DIP Orders) sufficient to perfect the security interest of the Administrative Agent for the benefit of the Secured Parties in the securities evidenced by such certificates and to permit the exercise of collateral remedies with respect thereto, subject to the right of the Pre-Petition First Lien Secured Parties to exercise remedies after November 14, 2016 to the extent set forth in paragraph 23 of the Interim DIP Order,

(B)    Reserved,

(C)    except as permitted by <u>Section 7.15</u>, UCC, United States Patent and Trademark Office and United States Copyright Office, tax and judgment lien searches or equivalent reports or searches, each of a recent date listing all effective financing statements, lien notices or comparable documents that name any Loan Party as debtor and that are filed in those state and county jurisdictions in which any Loan Party is organized or maintains its principal place of business and such other searches that are required by the Perfection Certificate,

(D)    evidence of the completion of all other actions, recordings and filings of or with respect to the Security Agreement that the Administrative Agent may

deem necessary or desirable in order to perfect the Liens created thereby, except as permitted by <u>Section 7.15 hereof,</u> and

(E)     except as permitted by <u>Section 7.15</u> hereof, each Control Agreement required by the Security Agreement to perfect security interests in the Cash Collateral Account, Deposit Accounts, Securities Accounts, or Commodities Accounts, duly executed by the appropriate parties;

(iv)     except as permitted by <u>Section 7.15</u> hereof, the Intellectual Property Security Agreements, duly executed by each Loan Party, together with evidence that all action that the Administrative Agent may reasonably deem necessary or desirable in order to perfect the Liens created under each Intellectual Property Security Agreements has been taken;

(v)     (1) copies of the Organization Documents of each Loan Party certified as of a recent date by the appropriate governmental official, (2) signature and incumbency certificates of the officers of such Person executing the Loan Documents to which it is a party, (3) resolutions of the board of directors or similar governing body of each Loan Party approving and authorizing the execution, delivery and performance of this Agreement and the other Loan Documents to which it is a party or by which it or its assets may be bound, certified by its secretary or an assistant secretary or other comparable officer as being in full force and effect without modification or amendment, (4) a good standing certificate from the applicable Governmental Authority of each Loan Party's (A) jurisdiction of incorporation, organization or formation and (B) except as permitted by <u>Section 7.15</u>, jurisdiction in which it is qualified as a foreign corporation or other entity to do business where the failure to be in good standing could result in a Material Adverse Effect, in each case dated a recent date prior to the Closing Date, and (5) such other documents and certificates as the Administrative Agent or its counsel may reasonably request relating to the organization, existence and good standing of the Loan Parties, and the authorization of the Transactions;

(vi)     Reserved;

(vii)     evidence that all insurance required to be maintained pursuant to the Loan Documents has been obtained and is in effect, together with, subject to <u>Section 7.15</u> the certificates of insurance and endorsements, naming the Administrative Agent, on behalf of the Lenders, as an additional insured or lender's loss payee, as the case may be, under all insurance policies maintained with respect to the assets and properties of the Loan Parties that constitutes Collateral;

(viii)     a certificate of a Responsible Officer of the Borrower as to the satisfaction of the conditions set forth in this <u>Section 4.01</u> and in <u>Section 4.03</u>, except to the extent satisfaction of such conditions is subject to <u>Section 7.15</u>; and

(ix)     except as permitted by <u>Section 7.15</u> hereof, a Perfection Certificate by, and in respect of, each Loan Party.

(b)　　(i) All fees and other amounts required to be paid to the Administrative Agent and the Lenders on or prior to the Closing Date to the extent permitted by the terms of the DIP Orders shall have been paid, including reimbursement or payment of all reasonable and documented out-of-pocket costs, fees and expenses (including the reasonable and documented out-of-pocket costs, fees and expenses of outside counsel and financial advisors) incurred in connection with the Transactions and (ii) all fees and other amounts required to be paid to the Pre-Petition Indenture Trustees and the Pre-Petition Indenture Noteholders on or prior to the Closing Date to the extent permitted by the terms of the DIP Orders shall have been paid, including reimbursement or payment of all reasonable and documented out-of-pocket costs, fees and expenses (including the reasonable and documented out-of-pocket costs, fees and expenses of outside counsel and financial advisors) incurred in connection with the Transactions.

(c)　　The Administrative Agent shall have received, prior to the Closing Date, all documentation and other information about the Borrower and the Guarantors that it reasonably determines is required by regulatory authorities under applicable "know your customer" and Anti-Money Laundering Laws, including without limitation the USA PATRIOT Act, including but not limited to the Borrower's form W-9.

(d)　　The Administrative Agent and the Lenders shall have received on or prior to the Closing Date each of the following:

(i)　　the Consolidated unaudited balance sheet of Holdings and its Subsidiaries as of the close of the last fiscal year and, to the extent such statements have been filed publically, each subsequent fiscal quarter and (y) the related Consolidated income statement for such fiscal year and, to the extent such statements have been filed publically, fiscal quarter, in each case setting forth in comparative form the figures for the corresponding periods in the prior fiscal year or fiscal quarter and in each case certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the Consolidated and consolidating financial position, results of operations and cash flow of Holdings and its Subsidiaries as at the dates indicated and for the periods indicated in accordance with GAAP (subject to the absence of footnote disclosure and normal year-end audit adjustments) and in each case otherwise reasonably satisfactory to the Administrative Agent and the Required Lenders; and

(ii)　　such other material documents and material information as any Lender through the Administrative Agent may reasonably request.

(e)　　Reserved.

(f)　　The Petition Date shall have occurred, and the Administrative Agent and the Required Lenders shall be reasonably satisfied with the form and substance of the material pleadings and "first day orders" sought by the Borrower, which in any event shall not conflict with the terms of this Agreement and the Facility hereunder, the other Loan Documents and the Restructuring Support Agreement. Such first day orders shall have been entered on or prior to the Closing Date.

(g)     The Interim Order Entry Date shall have occurred not later than three (3) Business Days after the Petition Date.

(h)     The Administrative Agent and the Lenders shall have received, and the Administrative Agent, the Required Lenders and the Unanimous DIP Lenders shall be satisfied with, the Budget for the period of thirteen weeks commencing with the week during which the Petition Date occurred.

(i)     No trustee under chapter 7 or chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in any of the Cases.

(j)     The amount of the Loans made on the Closing Date shall not exceed the amount authorized by the Interim Order.

(k)     Each of the Interim Order and the Restructuring Support Agreement shall be in full force and effect, and the Interim Order shall not have been vacated or reversed, shall not be subject to a stay and shall not have been modified or amended in any respect without the prior written consent of the Required Lenders; *provided* that if the Interim Order is the subject of a pending appeal in any respect, neither the making of the Loans nor the performance by any Loan Party of any of its respective obligations under any of the Loan Documents shall be the subject of a presently effective stay pending appeal.

(l)     Upon entry of the Interim Order, the Administrative Agent shall have, for the benefit of the Lenders, valid and perfected first priority Liens on the Collateral, junior only to the liens of the Pre-Petition First Lien Secured Parties securing the Pre-Petition First Lien Obligations, the Adequate Protection Liens of the Pre-Petition First Lien Secured Parties, the Carve-Out and Permitted Liens (as defined in the Interim Order), and all filing and recording fees and taxes with respect to such Liens and security interests that are then due and payable shall have been duly paid.

(m)     The proposed Exit Facilities, on the terms included in the exit financing term sheets attached to the RSA Term Sheet, shall have backstop commitments and be satisfactory in all respects to the Administrative Agent, the Required Lenders and the Unanimous DIP Lenders.

Without limiting the generality of the provisions of the last paragraph of Section 10.03, for purposes of determining compliance with the conditions specified in this Section 4.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

Section 4.02   Conditions to Delayed Draw Borrowing.  The obligation of each Lender to make its Delayed Draw Loan is subject to the satisfaction or waiver in accordance with Section 11.01 of the following conditions precedent:

(a)     The Final Order and the Restructuring Support Agreement shall be in full force and effect, and the Final Order shall not have been vacated or reversed, shall not be subject to a stay, and shall not have been modified or amended in any material respect without the written consent of the Required Lenders; *provided* that if the Final Order is the subject of a pending appeal in any respect, neither the making of the Loans nor the performance by any Loan Party of any of its respective obligations under any of the Loan Documents shall be the subject of a presently effective stay pending appeal.

(b)     (i) All material "second day orders" and all related pleadings intended to be entered on or prior to the date of entry of the Final Order, including a final cash management order and any order authorizing adequate protection or establishing procedures for the administration of the Cases, shall have been entered by the Bankruptcy Court and (ii) all pleadings related to procedures for approval of significant transactions, including, without limitation, asset sale procedures, regardless of when filed or entered, shall be reasonably satisfactory in form and substance to the Administrative Agent and the Required Lenders.

(c)     The Borrower shall have paid all fees and reasonable and documented out-of-pocket expenses of the Lenders (including the reasonable and documented fees and expenses of outside counsel and financial advisors) accrued and payable on or prior to the date of such Borrowing.

(d)     The aggregate amount of the Loans made on or prior to such date shall not exceed the aggregate amount authorized by the Final Order.

(e)     The Final Order shall have been entered by the Bankruptcy Court in the Cases no later than thirty-five (35) calendar days after the Petition Date.

(f)     The Administrative Agent shall have received a certificate of a Responsible Officer as to the satisfaction of the conditions set forth in this Section 4.02 and in Section 4.03, except to the extent satisfaction of such conditions is subject to Section 7.15.

Section 4.03     Conditions to all Credit Extensions and Disbursements.  The obligation of each Lender to honor any Request for Credit Extension (other than a Committed Loan Notice requesting only a conversion of Loans to the other Type, or a continuation of Eurodollar Rate Loans) or Notice of Request for Disbursement is subject to the following conditions precedent:

(a)     The representations and warranties contained in Article V or any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects on and as of the date of such Credit Extension or such Disbursement Date, as applicable, and, in each case, after giving effect thereto, except (i) to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct as of such earlier date, (ii) to the extent that such representations are qualified as to materiality, in which case they shall be true and correct in all respects and (iii) that for purposes of this Section 4.03, the representations and warranties contained in Sections 5.05(a) and (b) shall be deemed to refer to the most recent statements furnished pursuant to Sections 6.01(b) and (a), respectively.

(b)     No Default or Event of Default shall exist, or would result from such proposed Credit Extension or disbursement, as applicable, or from the application of the proceeds thereof.

(c)     The Administrative Agent shall have received a Request for Credit Extension or a Notice of Request for Disbursement, as applicable, in accordance with the requirements hereof and within the time periods specified herein (or such shorter period of time as may be agreed to by the Administrative Agent in its sole discretion).

Each Borrowing shall be deemed to constitute a representation and warranty by the Borrower on the date of such Borrowing as to the matters specified in paragraphs (a) through (b) of this Section 4.03.

ARTICLE V.
REPRESENTATIONS AND WARRANTIES

Each of the Loan Parties, jointly and severally, represents and warrants to the Administrative Agent and the Lenders that:

Section 5.01    Existence, Qualification and Power.   Each Loan Party and each of its Subsidiaries (a) is duly organized or formed, validly existing and, as applicable, in good standing under the Laws of the jurisdiction of its incorporation or organization, (b) has all requisite power and authority to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party, (c) has all requisite governmental licenses, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and (ii) subject to the entry of the DIP Orders, execute, deliver and perform its obligations under the Loan Documents to which it is a party, and (d) is duly qualified and is licensed and, as applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except, in each case referred to in clause (c)(i) or (d), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

Section 5.02    Authorization; No Contravention.   The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is or is to be a party have been duly authorized by all necessary corporate or other organizational action, and do not and will not (a) contravene the terms of any of such Person's Organization Documents; (b) conflict with or result in any breach or contravention of, or the creation of any Lien under, or require any payment to be made under (i) any material Contractual Obligation to which such Person is a party or affecting such Person (other than, with respect to such conflicts, the Pre-Petition Debt Documents) or the properties of such Person or any of its Subsidiaries or (ii) any material order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or (c) violate any Law in any material respect.

Section 5.03    Governmental Authorization; Other Consents.   No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with (a) the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, (b) the grant by any Loan Party of the Liens granted by it pursuant to the Collateral

Documents, (c) subject to the entry of the DIP Orders, the perfection or maintenance of the Liens created under the Collateral Documents (including the priority thereof) or (d) the exercise by the Administrative Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents, except for (i) the authorizations, approvals, actions, notices and filings listed on Schedule 5.03, all of which have been duly obtained, taken, given or made and are in full force and effect (other than any consents necessary pursuant to the Pre-Petition Debt Documents) and (ii) those authorizations, approvals, actions, notices or filings, the failure of which to obtain or make could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.04    Binding Effect.    This Agreement has been, and each other Loan Document, when delivered hereunder, will have been, duly executed and delivered by each Loan Party that is party thereto.  Subject to the entry of the DIP Orders, this Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms, except as such enforceability may be limited by Debtor Relief Laws and by general principals of equity.

Section 5.05    Financial Statements.

(a)    The Audited Financial Statements (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; (ii) fairly present in all material respects the financial condition of Holdings and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; and (iii) show all material indebtedness and other liabilities, direct or contingent, of the Holdings and its Subsidiaries as of the date thereof, including liabilities for taxes, material commitments and Indebtedness to the extent required by GAAP.

(b)    The unaudited consolidated balance sheet of the Holdings and its Subsidiaries and the related consolidated statements of income or operations, shareholders' equity and cash flows for the most recent fiscal quarter delivered pursuant to Section 6.01(a) (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and (ii) fairly present in all material respects the financial condition of Holdings and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby, subject, in the case of clauses (i) and (ii), to the absence of footnotes and to normal year-end audit adjustments.

Section 5.06    Litigation.    Other than the Cases, there are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of any Loan Party, threatened, at law, in equity, in arbitration or before any Governmental Authority, by or against any Loan Party or any of its Subsidiaries or against any of their properties or revenues that (a) purport to affect or pertain to this Agreement, any other Loan Document, or (b) either individually or in the aggregate could reasonably be expected to have a Material Adverse Effect.

Section 5.07    No Material Adverse Effect.    Since December 31, 2015, there has been no Material Adverse Effect and there has been no circumstance, event or occurrence, and no fact is

known to any of the Loan Parties, in each case, that could reasonably be expected to result in a Material Adverse Effect.

Section 5.08  <u>Ownership of Property; Liens; Investments</u>.  Each Loan Party and each of its Subsidiaries has good record and marketable defensible title in fee simple to, or valid lease-hold interests in (except to the extent of an existing event of default under such leases as set forth on <u>Schedule 5.08</u>), or easements or other limited property interests in, all property necessary in the ordinary conduct of its business, free and clear of all Liens except for minor defects in title that do not individually or in the aggregate materially interfere with its ability to conduct its business or to utilize such assets for their intended purposes and Liens permitted under the Loan Documents (including the Permitted Liens) and except where the failure to have such title or other interest could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  The property of each Loan Party and each of its Subsidiaries, taken as a whole, (i) is in good operating order, condition and repair (ordinary wear and tear excepted) and (ii) constitutes all the property which is required for the business and operations of each Loan Party and each of its Subsidiaries as presently conducted. None of the Loan Parties nor any Subsidiary thereof owns any real property.

Section 5.09  <u>Environmental Compliance</u>.

Except for any matters that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect:

(a)  Each Loan Party and its Subsidiaries are and have been in compliance with all Environmental Laws, including possessing and complying with all Environmental Permits.

(b)  None of the real property currently owned, if any, leased or operated by any Loan Party or any of its Subsidiaries is listed or, to the knowledge of any Loan Party, proposed for listing on the NPL or on the CERCLIS or any analogous foreign, state or local list; to the knowledge of the Loan Parties, there are no and never have been any underground or above-ground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed on any property currently owned, leased or operated by any Loan Party or any of its Subsidiaries or, to the knowledge of any Loan Party, on any property formerly owned, leased or operated by any Loan Party or any of its Subsidiaries, in each case which could reasonably be expected to result in any Loan Party incurring an Environmental Liability; to the knowledge of the Loan Parties, there is no asbestos or asbestos-containing material on any property currently owned, leased or operated by any Loan Party or any of its Subsidiaries that could reasonably be expected to result in any Loan Party incurring an Environmental Liability; and there has been no Release of Hazardous Materials by any Loan Party or any of its Subsidiaries or, to the knowledge of any Loan Party, by any other Person at, on, under or migrating to or from any property currently or formerly owned, leased or operated by any Loan Party or any of its Subsidiaries in violation of Environmental Law or which could reasonably be expected to result in any Loan Party incurring an Environmental Liability.

(c)  Neither any Loan Party nor any of its Subsidiaries is undertaking, and has not completed, either individually or together with other potentially responsible parties, any investi-

gation or assessment or remedial or response action relating to any actual or threatened Release of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any Governmental Authority or the requirements of any Environmental Law; and all Hazardous Materials generated, used, treated, handled or stored by any Loan Party or any of its Subsidiaries at, or transported to or from, any property currently or formerly owned, leased or operated by any Loan Party or any of its Subsidiaries have been disposed of in a manner not reasonably expected to result in any Loan Party or any of its Subsidiaries incurring an Environmental Liability.

(d)     No Loan Party nor any of its Subsidiaries: (i) has received notice (written or otherwise) of any Environmental Liability that is pending or unresolved; or (ii) has assumed by Contractual Obligation (including indemnity) or operation of Law any Environmental Liability of any other Person.

Section 5.10     Insurance.  The properties of the Loan Parties and their respective Subsidiaries are insured with financially sound and reputable insurance companies not Affiliates of the Borrower, in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the applicable Person operates.

Section 5.11     Taxes.  Each Loan Party and each Subsidiary thereof has timely filed all federal income Tax returns and reports and all other material Tax returns and reports required to be filed, and has paid all material Taxes (including any Taxes payable in the capacity of a withholding agent) levied or imposed upon it or its income, profits, properties or assets otherwise due and payable, except those which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP. There is no proposed Tax audit, Tax assessment, deficiency or other claim against any Loan Party or any Subsidiary thereof that, if made, individually or in the aggregate could reasonably be expected to have a Material Adverse Effect.  The charges, accruals and reserves on the books of the Loan Parties in respect of any Taxes are adequate.  Neither any Loan Party nor any Subsidiary thereof is party to any tax sharing agreement.

Section 5.12     ERISA Compliance.

(a)     Each Plan is in compliance in all respects with its terms and with the applicable provisions of ERISA, the Code and other Federal or state Laws, except to the extent that could not reasonably be expected to have a Material Adverse Effect.  Each Plan that is intended to qualify under Section 401(a) of the Code has received a favorable determination or opinion letter from the IRS or an application for such a letter is currently being processed by the IRS with respect thereto (or such Plan or the prototype sponsor in respect of such Plan has remaining a period of time under the Code or pronouncements of the Internal Revenue Service in which to apply for such a determination and make any amendments necessary to obtain a favorable determination or opinion, as applicable, as to the qualified status of such Plan) and, to the knowledge of the Borrower, nothing has occurred which would prevent, or cause the loss of, such qualification. The Borrower and each ERISA Affiliate have made all required contributions to each Plan subject to Section 412 of the Code or Section 302 of ERISA, and no application for a funding waiv-

er or an extension of any amortization period pursuant to Section 412 of the Code or Section 302 of ERISA has been made with respect to any Plan.

(b)     There are no pending or, to the knowledge of the Loan Parties, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that could reasonably be expected to have a Material Adverse Effect.

(c)     (i) No ERISA Event has occurred or is reasonably expected to occur; (ii) no Pension Plan has any Unfunded Pension Liability; (iii) neither the Loan Parties nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due and not delinquent under Section 4007 of ERISA); and (iv) neither the Loan Parties nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Section 4201 of ERISA with respect to a Multiemployer Plan, except, in each case, that could not reasonably be expected to have a Material Adverse Effect.

Section 5.13     Subsidiaries; Equity Interests; Loan Parties.  As of the Closing Date, no Loan Party has any Subsidiaries other than those specifically disclosed in Part (a) of Schedule 5.13 (none of which are Foreign Subsidiaries), and all of the outstanding Equity Interests in such Subsidiaries have been validly issued, are fully paid and non-assessable and are owned by a Loan Party in the amounts specified on Part (a) of Schedule 5.13 free and clear of all Liens except those created under the Collateral Documents and Permitted Liens.  No Loan Party has any equity investments in any other corporation or entity other than those specifically disclosed in Part (b) of Schedule 5.13.  Set forth on Part (c) of Schedule 5.13 is a complete and accurate list of all Loan Parties, showing as of the Closing Date (as to each Loan Party) the jurisdiction of its incorporation, the address of its principal place of business and its U.S. taxpayer identification number, if any, or in the case of any Guarantor Subsidiary that does not have a U.S. taxpayer identification number, any unique identification number issued to it by the jurisdiction of its incorporation.  The copy of the charter of each Loan Party and each amendment thereto provided pursuant to Section 4.01(a)(v) is a true and correct copy of each such document, each of which is valid and in full force and effect.

Section 5.14     Margin Regulations; Investment Company Act.

(a)     No Loan Party is engaged nor will engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock and no proceeds of any Borrowings will be used for any purpose that violates Regulation U or Regulation X of the FRB.

(b)     None of the Loan Parties, any Person Controlling any Loan Party, or any Subsidiary is or is required to be registered as an "investment company" under the Investment Company Act of 1940, as amended.

Section 5.15     Disclosure.  No report, financial statement, certificate or other written information furnished by or on behalf of any Loan Party or any Subsidiary thereof to the Adminis-

trative Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (in each case as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading; provided that, with respect to projected financial information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time; it being understood that such projections may vary from actual results and that such variances may be material.

Section 5.16    Compliance with Laws.  Except to the extent excused by the Bankruptcy Code, each Loan Party and each Subsidiary thereof is in compliance in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (b) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

Section 5.17    Intellectual Property; Licenses, Etc.  Each Loan Party and each of its Subsidiaries own, or possess the valid title to all of the Intellectual Property owned or purported to be owned by such Loan Party or Subsidiary, free and clear of all Liens (other than licenses granted in the ordinary course of business) except for Liens permitted under the Loan Documents (including Permitted Liens).  All Intellectual Property which any Loan Party or any Subsidiary thereof uses under license from third parties and which is material to its business operations is subject to license agreements that are valid and in full force and effect.  As of the Closing Date, Schedule 5.17 sets forth a true, complete and accurate list of all Company IP Rights, which are registered or pending application for registration with applicable intellectual property registries worldwide.  The operation of the businesses of each Loan Party and each of its Subsidiaries, including technology, slogan or other advertising device, product, process, method, substance, part or other material now employed in connection therewith, or now contemplated to be employed, by any Loan Party or any of its Subsidiaries, does not infringe or otherwise violate any proprietary rights held by any other Person.  No claim or litigation alleging any of the foregoing, or disputing the ownership, validity or enforceability of any Company IP Rights, is pending or, threatened in writing.

Section 5.18    Labor Matters.  There are no collective bargaining agreements or Multiemployer Plans covering the employees of any Loan Party or any of its Subsidiaries as of the Closing Date and neither any Loan Party nor any Subsidiary thereof has suffered any strikes, walkouts, work stoppages or other material labor difficulty within the last five years.

Section 5.19    Foreign Assets Control Regulations; Anti-Money Laundering; Anti-Corruption Practices; Anti-Terrorism Laws.

(a)    Each Loan Party and each Subsidiary of each Loan Party is in compliance in all material respects with all U.S. economic sanctions laws, Executive Orders and implementing regulations ("Sanctions") as administered by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") and the U.S. State Department.  No Loan Party and no Subsidiary of a

Loan Party (i) is a Person on the list of the Specially Designated Nationals and Blocked Persons (the "SDN List"), (ii) is a Person who is otherwise the target of U.S. economic sanctions laws such that a U.S. Person cannot deal or otherwise engage in business transactions with such person, (iii) is a Person organized or resident in a country or territory subject to comprehensive Sanctions (a "Sanctioned Country") or (iv) is owned or controlled by (including by virtue of such Person being a director or owning voting shares or interests), or acts, directly or indirectly, for or on behalf of, any Person on the SDN List or a government of a Sanctioned Country such that the entry into, or performance under, this Agreement or any other Loan Document would be prohibited by U.S. law.

(b)  Each Loan Party and each Subsidiary of each Loan Party is in compliance with all laws related to terrorism or money laundering including: (i) all applicable requirements of the Currency and Foreign Transactions Reporting Act of 1970 (31 U.S.C. 5311 et. seq., (the Bank Secrecy Act)), as amended by Title III of the USA Patriot Act, (ii) the Trading with the Enemy Act, (iii) Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 (66 Fed. Reg. 49079), any other enabling legislation, executive order or regulations issued pursuant or relating thereto and (iv) other applicable federal or state laws relating to "know your customer" or anti-money laundering rules and regulations. No action, suit or proceeding by or before any court or Governmental Authority with respect to compliance with such anti-money laundering laws is pending or threatened to the knowledge of each Loan Party and each Subsidiary of each Loan Party.

(c)  Each Loan Party and each Subsidiary of each Loan Party is in compliance in all material respects with all applicable anti-corruption laws, including the U.S. Foreign Corrupt Practices Act of 1977 ("FCPA") and the U.K. Bribery Act 2010 ("Anti-Corruption Laws"). None of the Loan Parties or any Subsidiary thereof, nor to the knowledge of the Loan Parties, any director, officer, agent, employee, or other person acting on behalf of such Loan Party or any Subsidiary thereof, has taken any action, directly or indirectly, that would result in a violation of applicable Anti-Corruption Laws. Each Loan Party and each Subsidiary has instituted and will continue to maintain policies and procedures designed to promote compliance with applicable Anti-Corruption Laws.

Section 5.20  No Defaults. No Default or Event of Default has occurred and is continuing or would result from the consummation of the Transactions.

ARTICLE VI.
REPORTING COVENANTS

Each of the Loan Parties agrees with the Lenders and the Administrative Agent to each of the following, as long as any Obligation (other than contingent indemnification claims not then due and payable) or any Commitment remains outstanding:

Section 6.01  Financial Statements. The Borrower shall deliver to the (x) Administrative Agent, for delivery to each Lender, and (y) Pre-Petition First Lien Agent, for delivery to each Pre-Petition First Lien Lender, each of the following:

(a)    Quarterly Reports.  As soon as available, and in any event within 45 days after the end of each of the first three fiscal quarters of each fiscal year  (or such later date that the Required Lenders may agree in their sole discretion), the Consolidated and consolidating unaudited balance sheet of Holdings and its Subsidiaries as of the close of such fiscal quarter and related Consolidated and consolidating statements of operations and cash flow for such fiscal quarter and that portion of the fiscal year ending as of the close of such fiscal quarter, setting forth in comparative form the figures for the corresponding period in the prior fiscal year, certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the Consolidated and consolidating financial position, results of operations and cash flow of Holdings and its Subsidiaries as at the dates indicated and for the periods indicated in accordance with GAAP (subject to the absence of footnote disclosure and normal year-end audit adjustments).

(b)    Annual Reports.  As soon as available, and in any event within 120 days after the end of each fiscal year (or such later date that the Required Lenders may agree in their sole discretion), the Consolidated and consolidating balance sheet of Holdings and its Subsidiaries as of the end of such year and related Consolidated and consolidating statements of operations, unitholders' equity and cash flow for such fiscal year, each prepared in accordance with GAAP, together with a certification (with respect to such Consolidated financial statements) by the Group Members' Accountants that (i) such Consolidated financial statements fairly present in all material respects the Consolidated financial position, results of operations and cash flow of Holdings and its Subsidiaries as at the dates indicated and for the periods indicated therein in accordance with GAAP without qualification as to the scope of the audit and (ii) in the course of the regular audit of the businesses of the Group Members, which audit was conducted in accordance with the standards of the United States' Public Company Accounting Oversight Board (or any successor entity), such Group Members' Accountants have obtained no knowledge that a Default in respect of any financial covenant contained in this Agreement is continuing or, if in the opinion of the Group Members' Accountants such a Default is continuing, a statement as to the nature thereof (which certification may be limited to the extent required by customary applicable auditing rules or guidelines acceptable to the Administrative Agent).

(c)    Monthly Reports.  As soon as available, and in any event within 30 days after the end of each fiscal month (other than the third fiscal month of each fiscal quarter), (i) the Consolidated and consolidating unaudited balance sheet of Holdings and its Subsidiaries as of the close of such fiscal month (and that portion of the fiscal year ending as of the close of such fiscal month) and (ii) the related Consolidated and consolidating income statement for such fiscal month (and that portion of the fiscal year ending as of the close of such fiscal month), in each case setting forth in comparative form the figures for the corresponding periods in the prior fiscal year and in each case certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the Consolidated and consolidating financial position and results of operations of Holdings and its Subsidiaries as at the dates indicated and for the periods indicated in accordance with GAAP (subject to the absence of footnote disclosure and normal year-end audit adjustments). Together with such monthly reports delivered pursuant to this clause, the Borrower shall deliver a certificate, in form and substance satisfactory to the Administrative Agent, by a Responsible Officer of the Borrower that (i) the Corporate Chart attached thereto (or the last Corporate Chart delivered pursuant to this clause (c)) is correct and complete as of the date of such monthly report, (ii) the Loan Parties have delivered all documents (including updated

schedules as to locations of Collateral and acquisition of Intellectual Property or real property) they are required to deliver pursuant to any Loan Document on or prior to the date of delivery of such monthly report and (iii) complete and correct copies of all documents modifying any term of any Organization Document of any Group Member or any Subsidiary or joint venture thereof on or prior to the date of delivery of such monthly report have been delivered to the Administrative Agent or are attached to such certificate.

(d) <u>Variance Report</u>.

(i) Commencing on the second Thursday after the Petition Date and no later than Thursday of each succeeding calendar week, and on any other date on which the Borrower may deliver the same to the Bankruptcy Court, a Variance Report as of the end of the immediately preceding calendar week, and

(ii) commencing on the date of this Agreement and no later than Thursday of each week thereafter, and on any other date on which the Borrower may deliver the same to the Bankruptcy Court, a Budget setting forth on a weekly basis for the next thirteen weeks (commencing with the immediately succeeding calendar week) an updated budget for such period; *provided* that the Required Lenders, in their sole and absolute discretion, shall have the right to dispute any updates or amendments contained in any budget delivered pursuant to this clause (ii) by providing the Borrower specific notice thereof within five (5) Business Days after the delivery by the Borrower of such updates or amendments; *provided*, *further*, that, (x) to the extent the Required Lenders do not provide such dispute notice within such period of five (5) Business Days, the updates to or amendments of the Budget shall be deemed approved and consented to by the Required Lenders and shall be deemed to constitute the Budget upon the expiration of such period of five (5) Business Days, and (y) to the extent the Required Lenders do provide such dispute notice within such period of five (5) Business Days, then the Budget, without giving effect to such updates or amendments, shall continue to constitute the Budget until otherwise agreed to among the Loan Parties and the Required Lenders.

(e) <u>Management Discussion and Analysis</u>. Together with each delivery of the financial statements for each fiscal quarter or fiscal month required by clauses (a) or (c) above, a customary written management discussion and analysis (MD&A) of the financial condition and results of operations of the Group Members for the portion of the fiscal year then elapsed and discussing the reasons for any significant variations from (i) the previous fiscal quarter or fiscal month, as applicable for such period, (ii) the figures for the corresponding period in the previous fiscal year and (iii) to the extent forecasts and projections have been delivered pursuant to Section 6.01(g), the figures for the corresponding period in such forecasts and projections, including written qualitative discussion and analysis, in each case with detail satisfactory to the Administrative Agent.

(f) <u>Corporate Chart and Other Collateral Updates</u>. A certificate by a Responsible Officer of the Borrower that (i) the Corporate Chart attached thereto (or the last Corporate Chart delivered pursuant to this <u>clause (f)</u>) is correct and complete as of the date of the Variance Report most recently required to be delivered pursuant to <u>Section 6.01(d)</u>, (ii) the Loan Parties have delivered all documents (including updated schedules as to locations of Collateral and acquisition

of Intellectual Property or real property) they are required to deliver pursuant to any Loan Document on or prior to the date of the Variance Report most recently required to be delivered pursuant to Section 6.01(d) and (iii) complete and correct copies of all documents modifying any term of any Organization Document of any Group Member or any Subsidiary or joint venture thereof on or prior to the date of the Variance Report most recently required to be delivered pursuant to Section 6.01(d).

(g)     Additional Projections.  As soon as available and in any event not later than 45 days after the end of the [fiscal quarter ended September 30, 2016], (i) a revised annual business plan of the Group Members for the [2017 fiscal year] in form and substance acceptable to the Administrative Agent and the Required Lenders in their reasonable discretion and (ii) forecasts prepared by management of the Borrower for each fiscal quarter in such next succeeding fiscal year, including in such forecasts, (x) a projected year-end Consolidated and consolidating balance sheet, income statement and statement of cash flows, (y) a statement of all of the material assumptions on which such forecasts are based and (z) substantially the same type of financial information as that contained in financial projections provided by or on behalf of the Borrower to the Administrative Agent or the Pre-Petition First Lien Agent (in such capacities) prior to the Closing Date.

(h)     Bankruptcy Court Filings.  As soon as practicable in advance of filing with the Bankruptcy Court, (i) all proposed orders and pleadings related to the Facility, which orders and pleadings shall be in form and substance satisfactory to the Administrative Agent and the Required Lenders, (ii) any plan of reorganization or liquidation, and/or any disclosure statement related to such plan (which plan shall be a Reorganization Plan and with the disclosure statement shall comply with the requirements set forth herein), (iii) any motion and proposed form of order seeking to extend or otherwise modify the Debtors' exclusive periods set forth in section 1121 of the Bankruptcy Code, (iv) any motion seeking approval of any sale of the Debtors' assets in form and substance reasonably acceptable to the Administrative Agent and the Required Lenders and any proposed form of a bidding procedures order and sale order (each of which must be in form and substance satisfactory to the Administrative Agent and the Required Lenders) and (v) any motion and proposed form of order filed with the Bankruptcy Court relating to any management equity plan, incentive plan or severance plan, the assumption, rejection, modification or amendment of any employment agreement, or the assumption, rejection, modification or amendment of any material contract (each of which must be in form and substance satisfactory to the Administrative Agent and the Required Lenders).

(i)     Insurance.  Together with each delivery of any financial statement for any fiscal month pursuant to clause (c) above, each in form and substance satisfactory to the Administrative Agent and certified as complete and correct by a Responsible Officer of the Borrower, a summary of all material insurance coverage maintained as of the date thereof by any Group Member, together with such other related documents and information as the Administrative Agent may reasonably require; provided, that in lieu of such summary, a Responsible Officer of the Borrower may certify that there have been no changes since the Closing Date or the end of the previous fiscal month, as applicable.

(j)     Additional Reports. Such additional reports reasonably requested by the Administrative Agent or the Lenders, including with respect to litigation and contingent liabilities.

Section 6.02    Other Events.  The Loan Parties shall give the (x) Administrative Agent, for delivery to each Lender, and (y) Pre-Petition First Lien Agent, for delivery to each Pre-Petition First Lien Lender, notice of each of the following (which may be made by telephone if promptly confirmed in writing) promptly after any Responsible Officer of any Group Member knows: (a) any event (other than any event involving loss or damage to property) reasonably expected to result in a mandatory payment of the Obligations pursuant to Section 2.04, stating the material terms and conditions of such transaction and estimating the Net Cash Proceeds thereof, (b) the commencement of, or any material developments in, any action, investigation, suit, proceeding, audit, claim, demand, order or dispute with, by or before any Governmental Authority affecting any Group Member or any property of any Group Member that seeks injunctive or similar relief, (c) the acquisition of any material real property or the entering into of any material lease and (d) any event, occurrence or circumstance in which a material portion of the Collateral is damaged, destroyed or otherwise impaired or adversely affected.

Section 6.03    Copies of Notices and Reports.  The Loan Parties shall promptly deliver to the (x) Administrative Agent, for delivery to each Lender, and (y) Pre-Petition First Lien Agent, for delivery to each Pre-Petition First Lien Lender, copies of each of the following:  (a) all reports that any Loan Party transmits to its security holders generally, and (b) all documents that any Group Member files with, or otherwise provides to, the Securities and Exchange Commission, any securities exchange or any Governmental Authority exercising similar functions, any Governmental Authority exercising regulatory authority over the restaurant industry, the Bankruptcy Court (including, without limitation, any "Monthly Operating Reports") or any Committee.

Section 6.04    Taxes.  The Loan Parties shall give the (x) Administrative Agent, for delivery to each Lender, and (y) Pre-Petition First Lien Agent, for delivery to each Pre-Petition First Lien Lender, notice of each of the following (which may be made by telephone if promptly confirmed in writing) promptly after any Responsible Officer of any Group Member knows of it: (a) the creation, or filing with the IRS or any other Governmental Authority, of any Contractual Obligation or other document extending, or having the effect of extending, the period for assessment or collection of any Taxes with respect to any Tax Affiliate and (b) the creation of any Contractual Obligation of any Tax Affiliate, or the receipt of any request directed to any Tax Affiliate, to make any adjustment under Section 481(a) of the Code, by reason of a change in accounting method or otherwise, which, in either case, could reasonably be expected to have a Material Adverse Effect.

Section 6.05    Labor Matters.  The Loan Parties shall give the (x) Administrative Agent, for delivery to each Lender, and (y) Pre-Petition First Lien Agent, for delivery to each Pre-Petition First Lien Lender, notice of each of the following (which may be made by telephone if promptly confirmed in writing), promptly after, and in any event within 30 days after any Responsible Officer of any Group Member knows or has reason to know of it:  (a) the commencement of any material labor dispute to which any Group Member is or may become a party, including any class action litigation, strikes, lockouts or other disputes relating to any of such Person's restaurants, plants or other facilities and (b) the incurrence by any Group Member of any Worker Adjustment and Retraining Notification Act or related or similar liability incurred with respect to the closing of any plant or other facility of any such Person (other than, in the case of

this underline{clause (b)}, those that could not, in the aggregate, reasonably be expected to have a Material Adverse Effect).

Section 6.06    Lender Calls.  The Borrower, Holdings and their respective officers (including, the chief financial officer of the Borrower) and advisors (including any investment banker or financial advisor retained by any Debtor) shall make themselves available for conference calls to be held on a weekly basis with the Administrative Agent and/or the other Secured Parties or their representatives or advisors to discuss the Budget (and all updates and Variance Reports related thereto), or any other issues as may be reasonably requested by the Administrative Agent and/or the other Secured Parties, and such conference calls may be held without the participation of the Loan Parties or any other representative or advisor of the Loan Parties.

ARTICLE VII.
AFFIRMATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder (other than contingent indemnification obligations for which no claim has been made) shall remain unpaid or unsatisfied or shall remain outstanding, each Loan Party shall, and shall cause each of its Subsidiaries to:

Section 7.01    Certificates; Other Information.  Deliver to the Administrative Agent for delivery to each Lender:

(a)    concurrently with the delivery of the financial statements referred to in Section 6.01(a), (b) and (c) (commencing with the delivery of the financial statements for the fiscal quarter ended September 30, 2016), a duly completed Compliance Certificate signed by the chief executive officer, chief financial officer, treasurer or controller of the Borrower;

(b)    promptly, and in any event within five Business Days after receipt thereof by any Loan Party or any Subsidiary thereof, copies of each material notice or other material correspondence received from the SEC (or comparable agency in any applicable non-U.S. jurisdiction) concerning any investigation or possible investigation or other inquiry by such agency regarding financial or other operational results of any Loan Party or any Subsidiary thereof;

(c)    promptly after receipt thereof by any Loan Party or any Subsidiary thereof, copies of all notices, requests and other documents (including amendments, waivers and other modifications) so received under or pursuant to any instrument, indenture, loan or credit or similar agreement regarding or related to any breach or default by any party thereto, or any other event, in each case, that could reasonably be expected to materially impair the value of the interests or the rights of any Loan Party or otherwise reasonably be expected to have a Material Adverse Effect;

(d)    promptly after the assertion or occurrence thereof, notice of any action or proceeding against or of any noncompliance by any Loan Party or any of its Subsidiaries with any Environmental Law or Environmental Permit that could (i) reasonably be expected to have a Material Adverse Effect or (ii) cause any property owned or leased by any Loan Party to be subject

to any material restrictions on ownership, occupancy, use or transferability under any Environmental Law;

(e)     promptly, such additional information regarding the business, financial, legal or corporate affairs of any Loan Party or any Subsidiary thereof, or compliance with the terms of the Loan Documents, as the Administrative Agent or any Lender through the Administrative Agent may from time to time reasonably request.

Documents required to be delivered pursuant to Section 6.01(a) or (b) (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower posts such documents, or provides a link thereto on the Borrower's website on the Internet at the website address listed on Schedule 11.02; or (ii) on which such documents are posted on the Borrower's behalf on an Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); provided that:  (i) the Borrower shall deliver paper copies of such documents to the Administrative Agent or any Lender that requests the Borrower to deliver such paper copies until a written request to cease delivering paper copies is given by the Administrative Agent or such Lender and (ii) the Borrower shall notify the Administrative Agent and each Lender (by telecopier or electronic mail) of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents.  Notwithstanding anything contained herein, in every instance the Borrower shall be required to provide paper copies of the Compliance Certificates required by Section 7.01(a) to the Administrative Agent.  Except for such Compliance Certificates, the Administrative Agent shall have no obligation to request the delivery or to maintain copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Borrower with any such request for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

The Borrower hereby acknowledges that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on SmartRoom or another similar electronic system (the "Platform") and (b) certain of the Lenders (each, a "Public Lender") may have personnel who do not wish to receive material non-public information with respect to the Borrower or its Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities.  The Borrower hereby agrees that it will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (w) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any material non-public information (although it may be sensitive and proprietary), with respect to the Borrower or its securities for purposes of United States Federal and state securities laws (provided, however, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 11.07); (y) all Borrower Materials

marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information"; and (z) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information." For purposes of this Agreement, public information shall not be deemed to include any information and documentation that is of a type that would be required under applicable securities laws to have been made publicly available if the Borrower were a public reporting company.

Section 7.02    Notices.  In addition to any other notice otherwise required under this Agreement or any of the other Loan Documents, promptly notify the Administrative Agent and each Lender in writing:

(a)    of the occurrence of any Default or Event of Default;

(b)    of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect, including the following to the extent they have resulted or could reasonably be expected to result in a Material Adverse Effect: (i) except as excused by the Bankruptcy Code, breach or non-performance of, or any default under, a Contractual Obligation of any Loan Party or any Subsidiary thereof; (ii) any dispute, litigation, investigation, proceeding or suspension between any Loan Party or any Subsidiary thereof and any Governmental Authority; or (iii) the commencement of, or any material development in, any litigation or proceeding affecting any Loan Party or any Subsidiary thereof, including pursuant to any applicable Environmental Laws; and

(c)    (i) of the occurrence of any ERISA Event; (ii) of the filing by any Loan Party of Schedule B (or such other schedule as contains actuarial information) to IRS Form 5500 in respect of a Plan with Unfunded Pension Liabilities (and shall provide a copy of such IRS Form 5500, including the Schedule B); or (iii) of (w) a material increase in Unfunded Pension Liabilities (taking into account only Plans with positive Unfunded Pension Liabilities) since the date the representations hereunder are deemed given, (x) the existence of potential withdrawal liability under Section 4201 of ERISA if any Loan Party or any Subsidiary thereof were to withdraw completely from any and all Multiemployer Plans, (y) the adoption of, or the commencement of contributions to, any Plan subject to Section 412 of the Code by any Loan Party, any Subsidiary thereof or any ERISA Affiliate, or (z) the adoption of any amendment to a Plan subject to Section 412 of the Code that results in a material increase in contribution obligations of any Loan Party, any Subsidiary thereof or any ERISA Affiliate.

Each notice pursuant to Section 7.02 shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth details of the occurrence referred to therein and stating what action the Loan Parties have taken and propose to take with respect thereto, to the extent such details and other information are known to the Loan Parties.  Each notice pursuant to Section 7.02(a) shall describe with particularity any and all provisions of this Agreement and any other Loan Document that have been breached.

Section 7.03    Payment of Taxes.  Pay and discharge all post-petition Taxes imposed upon it or upon its income or profits, or upon any properties or assets belonging to it, in each case on a timely basis, and all lawful claims which, if unpaid, may reasonably be expected to become

a Lien upon any properties or assets of any Loan Party or any Subsidiary thereof not otherwise permitted under this Agreement; provided that none of the Loan Parties or any of their respective Subsidiaries shall be required to pay any such Tax that is being contested in good faith by proper proceedings diligently conducted if it has maintained adequate reserves with respect thereto in accordance with GAAP or which could not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect.

Section 7.04   Preservation of Existence, Etc.   (a) Preserve, renew and maintain in full force and effect its legal existence and good standing under the Laws of the jurisdiction of its organization (except pursuant to a transaction expressly permitted by Section 8.04 or Section 8.05) and (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

Section 7.05   Maintenance of Properties.   (a) Maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted and (b) make all necessary repairs thereto and renewals and replacements thereof, except in each case where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

Section 7.06   Maintenance of Insurance.   Maintain with financially sound and reputable insurance companies not Affiliates of the Borrower, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts as are customarily carried under similar circumstances by such other Persons.   All such insurance shall name the Administrative Agent as an additional insured or lender's loss payee, as applicable.   If any portion of any Mortgaged Property is at any time located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a special flood hazard area with respect to which flood insurance has been made available under the National Flood Insurance Act of 1968 (as now or hereafter in effect or successor act thereto), then, to the extent required by the Flood Insurance Laws, the Borrower shall, or shall cause each Loan Party to, (i) maintain, or cause to be maintained, with a financially sound and reputable insurer, flood insurance in an amount reasonably satisfactory to the Administrative Agent and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (ii) deliver to the Administrative Agent evidence of such compliance in form and substance reasonably acceptable to the Administrative Agent.

Section 7.07   Compliance with Laws.   Except as excused by the Bankruptcy Code, comply in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted; or (b) the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

Section 7.08   Books and Records.   (a) Maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of such Loan Party or

such Subsidiary, as the case may be; and (b) maintain such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over such Loan Party or such Subsidiary, as the case may be. In addition, each Group Member shall provide full and direct access during normal business hours and upon reasonable prior notice to information (including historical information) and personnel as the Administrative Agent may reasonably request from time to time, including regularly scheduled meetings among senior management, company advisors, and the Administrative Agent and such other consultants to the Administrative Agent and/or the Lenders as may be identified to the Borrower, shall be provided with reasonable access during normal business hours and upon reasonable prior notice to all information it shall reasonably request and to other internal meetings regarding strategic planning, cash and liquidity management, operation and restructuring activities, progress with respect to the Reorganization Plan and any other aspect of the Cases; provided, however, that the foregoing shall not require the Borrower to permit any access, disclose any privileged information or trade secret or violate any of its obligations with respect to confidentiality or violate applicable laws. All access rights of the Administrative Agent or any other Lender under this Section 7.08 shall extend to any of their respective representatives, agents, counsel, advisors, accountants, appraisers, consultants, independent contractors or other designees.

Section 7.09   Inspection Rights.  Permit representatives and independent contractors of the Administrative Agent and each Lender to visit and inspect any of its properties and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants, all at the reasonable expense of the Borrower and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower; provided that, excluding any such visits and inspections during the continuation of an Event of Default, only the Administrative Agent on behalf of the Lenders may exercise rights of the Administrative Agent and the Lenders under this Section 7.09, and the Administrative Agent shall not exercise such rights more often than three (3) times during any calendar year absent the existence of an Event of Default, and only three (3) such visits shall be at the Borrower's expense; provided further that when an Event of Default exists, the Administrative Agent or any Lender (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice. The Administrative Agent and the Lenders shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants. Notwithstanding anything to the contrary in this Section 7.09, the Borrower shall not be required to disclose or permit the inspection or discussion of, any document, information or other matter (i) that constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by Law or any binding agreement or (iii) that is subject to attorney client or similar privilege or constitutes attorney work product.

Section 7.10   Use of Proceeds.  Use the proceeds of the Loans in accordance with the Budget (including, subject to Section 8.17, by reason of a Permitted Variance) to: (i) provide working capital to the Loan Parties that are Debtors in the Cases; (ii) fund interest, fees and other payments contemplated hereunder, including, without limitation, the Adequate Protection Payments; and (iii) fund costs of the administration of the Cases and the consummation of the Restructuring (including professional fees).

Section 7.11    Information Regarding Collateral.

(a)    Not effect any change (i) in any Loan Party's legal name, (ii) in the location of any Loan Party's chief executive office, (iii) in any Loan Party's identity or organizational structure, (iv) in any Loan Party's Federal Taxpayer Identification Number or organizational identification number, if any, or (v) in any Loan Party's jurisdiction of organization (in each case, including by merging with or into any other entity, reorganizing, dissolving, liquidating, reorganizing or organizing in any other jurisdiction), until (A) it shall have given the Administrative Agent not less than 30 days' prior written notice (in the form of an Officers' Certificate), or such lesser notice period agreed to by the Administrative Agent, of its intention so to do, clearly describing such change and providing such other information in connection therewith as the Administrative Agent may reasonably request and (B) it shall have taken all action reasonably satisfactory to the Administrative Agent to maintain the perfection and priority of the security interest of the Administrative Agent for the benefit of the Secured Parties in the Collateral, if applicable.  Each Loan Party agrees to promptly provide the Administrative Agent with certified Organizational Documents reflecting any of the changes described in the preceding sentence.  Each Loan Party also agrees to promptly notify the Administrative Agent of any change in the location of any office in which it maintains books or records relating to Collateral owned by it or any office or facility at which Collateral is located (including the establishment of any such new office or facility), other than changes in location to a Mortgaged Property or a leased property subject to a Landlord Access Agreement (as defined in the Security Agreement).

Section 7.12    Covenant to Guarantee Obligations and Give Security.

(a)    Upon the formation or acquisition of any new direct or indirect Subsidiary (other than an Excluded Subsidiary) by any Loan Party, then the Loan Parties shall, at the expense of the Loan Parties:

(i)    within 15 days after such formation or acquisition, cause such Subsidiary, to duly execute and deliver to the Administrative Agent a guaranty or guaranty supplement, in form and substance satisfactory to the Administrative Agent, guaranteeing the other Loan Parties' obligations under the Loan Documents,

(ii)    within 15 days after such formation or acquisition, furnish to the Administrative Agent a description of the real and personal properties of such Subsidiary, in detail reasonably satisfactory to the Administrative Agent,

(iii)    within 30 days after such formation or acquisition, cause such Subsidiary to duly execute and deliver to the Administrative Agent any Mortgages, Security Agreement Supplements, IP Security Agreements, each item required pursuant to the Mortgaged Property Requirement and other security and pledge agreements required by the Security Agreement, as specified by and in form and substance reasonably satisfactory to the Administrative Agent (including delivery of all Pledged Securities in and of such Subsidiary, and other instruments of the type specified in Section 4.01(a)(iii)), to grant a security interest in the assets of such Subsidiary constituting Collateral;

(iv)    within 30 days after such formation or acquisition, cause such Subsidiary to take whatever action (including the recording of Mortgages, the filing of Uniform Commercial Code financing statements, the giving of notices and the endorsement of notices on title documents) required hereunder or in the Security Agreement to vest in the Administrative Agent (or in any representative of the Administrative Agent designated by it), for the benefit of the Secured Parties, valid and subsisting Liens on the assets of such Subsidiary constituting Collateral, and

(v)    concurrently with the actions taken under clauses (iii) and (iv) above, deliver to the Administrative Agent, upon the request of the Administrative Agent or the Required Lenders in their sole discretion, a signed copy of a favorable opinion, addressed to the Administrative Agent and the other Secured Parties, of counsel for the Loan Parties acceptable to the Administrative Agent as to the matters contained in clauses (i), (iii) and (iv) above, and as to such other matters as the Administrative Agent may reasonably request.

(b)    Upon the acquisition of (i) any property with a value in excess of $[100,000] by any Loan Party, if such property, in the judgment of the Administrative Agent, shall not already be subject to a perfected first priority Lien and security interest in favor of the Administrative Agent for the benefit of the Secured Parties, then the Loan Parties shall, at the Loan Parties' expense:

(i)    within 5 days after such acquisition, furnish to the Administrative Agent a description of the property so acquired in detail satisfactory to the Administrative Agent,

(ii)    within 5 days after such acquisition, cause the applicable Loan Party to duly execute and deliver to the Administrative Agent, Security Agreement Supplements, IP Security Agreements and other security and pledge agreements required by the Security Agreement, as specified by and in form and substance reasonably satisfactory to the Administrative Agent, to grant a security interest in the assets of the applicable Loan Party constituting Collateral,

(iii)    within 10 days after such acquisition, cause the applicable Loan Party to take whatever action (including the filing of Uniform Commercial Code financing statements, the giving of notices and the endorsement of notices on title documents) required hereunder or in the Security Agreement to vest in the Administrative Agent (or in any representative of the Administrative Agent designated by it) for the benefit of the Secured Parties valid and subsisting Liens on the assets of such Loan Party constituting Collateral,

(iv)    concurrently with the actions taken under clauses (ii) and (iii) above, deliver to the Administrative Agent, upon the request of the Administrative Agent or the Required Lenders in their sole discretion, a signed copy of a favorable opinion, addressed to the Administrative Agent and the other Secured Parties, of counsel for the Loan Parties acceptable to the Administrative Agent as to the matters contained in clauses (ii) and (iii) above and as to such other matters as the Administrative Agent may reasonably request,

(c)    Reserved, and

(d)     At any time upon request of the Administrative Agent, promptly execute and deliver any and all further instruments and documents and take all such other action as the Administrative Agent may reasonably deem necessary or desirable in obtaining the full benefits of, or (as applicable) in perfecting and preserving the Liens of, such guaranties, deeds of trust, trust deeds, deeds to secure debt, mortgages, Security Agreement Supplements and other security and pledge agreements and supplements thereto.

(e)     Notwithstanding anything to the contrary herein, in no case shall a Loan Party be required to grant a security interest in any Equity Interests in a CFC or a Transparent Subsidiary, other than (i) 100% of the non-voting Equity Interests (if any) in a CFC or Transparent Subsidiary, as applicable, that is a first-tier Subsidiary of such Loan Party, and (ii) 65% of the voting Equity Interests in a CFC or Transparent Subsidiary, as applicable, that is a first-tier Subsidiary of such Loan Party, in each case to secure Obligations of such Loan Party.

(f)     Notwithstanding anything to the contrary herein, the Required Lenders may agree in their sole discretion to extend any of the time periods set forth in this Section 7.12.

Section 7.13   Compliance with Environmental Laws.  Except as required by the Bankruptcy Code or orders of the Bankruptcy Court, comply, and cause all its lessees and other Persons operating or occupying its properties to comply, with all applicable Environmental Laws and Environmental Permits, except where the failure to comply could not reasonably be expected to result in a Material Adverse Effect; obtain and renew all Environmental Permits necessary for its operations and properties, except whether the failure to obtain or renew could not reasonably be expected to result in a Material Adverse Effect; and conduct any investigation, study, sampling and testing, and undertake any cleanup, removal, remedial or other action necessary to remove and clean up Hazardous Materials from any of its properties, to the extent required of it by and in material compliance with Environmental Laws; provided, however, that neither the Borrower nor any of its Subsidiaries shall be required to undertake any such investigation, study, sampling, testing, cleanup, removal, remedial or other action to the extent that its obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained with respect to such circumstances in accordance with GAAP.

Section 7.14   Further Assurances.  Promptly upon request by the Administrative Agent, or any Lender through the Administrative Agent, (a) correct any material defect or error that may be discovered in any Loan Document or in the execution, acknowledgment, filing or recordation thereof, and (b) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Administrative Agent, or any Lender through the Administrative Agent, may reasonably require from time to time in order to (i) carry out more effectively the purposes of the Loan Documents, (ii) subject to any Loan Party's or any of its Subsidiaries' properties, assets, rights or interests to the Liens now or hereafter intended to be covered by any of the Collateral Documents, (iii) perfect and maintain the validity, effectiveness and priority of any Collateral Documents and any of the Liens intended to be created thereunder and (iv) assure, convey, grant, assign, transfer, preserve, protect and confirm more effectively unto the Secured Parties the rights granted or now or hereafter intended to be granted to the Secured Parties under any Loan Documents or under any other instrument executed in connection with any Loan Document to which any Loan Party or any of its Subsidiaries is or is to be a party, and cause each of its Subsidiaries to do so.

Section 7.15 <u>Post-Closing Covenant</u>. To the extent any actions to create or perfect a security interest in Collateral to be provided hereunder or any other matters herein that are specifically subject to this Section 7.15 are not completed on or prior to the Closing Date notwithstanding the Borrower's use of best efforts to do so, the Borrower will complete each of such actions as soon as commercially reasonable but in no event later than Final Order Entry Date unless a later date is agreed to by the Required Lenders or the Administrative Agent at the direction of the Required Lenders; <u>provided</u>, that the Loan Parties shall deliver the Perfection Certificate to the Administrative Agent on or before the date that is within ten (10) days of the Closing Date.

Section 7.16 <u>Compliance with Milestones</u>. Comply with the following relating to the Cases in accordance with the applicable timing referred to below (or such later dates as approved by the Required Lenders or the Administrative Agent by consent of the Required Lenders, other than any Plan Milestones set forth in clauses (g), (i) or (l) (and with respect to clause (l), only to the extent that the Effective Date were to be extended beyond December 14, 2016) below, which shall be subject to the approval of the Unanimous DIP Lenders as well), as well as certain other agreed milestones as may relate to the Cases (collectively, the "<u>Plan Milestones</u>" and each individually, a "<u>Plan Milestone</u>"):

(a) Reserved;

(b) on or before September 26, 2016, the Debtors must seek to obtain exit financing from third parties on terms similar to or better than the terms set forth in the Exit First Lien Facility;

(c) Reserved;

(d) the Debtors shall have commenced the respective Cases in the Bankruptcy Court no later than August 15, 2016;

(e) each Debtor shall file the Reorganization Plan, and an accompanying disclosure statement (the "<u>Disclosure Statement</u>"), which shall be reasonably acceptable in form and substance to the Administrative Agent, the Required Lenders, the Debtors, the Supporting Lenders, the Required Supporting Noteholders, and the Supporting Interest Holders, in the Cases by no later than August 15, 2016;

(f) the Debtors shall file a motion seeking approval of the Facility within one Business Day of the Petition Date;

(g) the Interim Order shall be entered by the Bankruptcy Court in the Cases no later than three (3) Business Days after the Petition Date;

(h) an order in form and substance acceptable to the Debtors, the Supporting Lenders, the Required Supporting Noteholders, and the Supporting Interest Holders, approving the assumption of the Restructuring Support Agreement shall be entered by the Bankruptcy Court in the Cases no later than thirty-five (35) calendar days after the Petition Date;

(i) the Final Order shall be entered by the Bankruptcy Court in the Cases no later than thirty-five (35) calendar days after the Petition Date;

(j) an order approving the Disclosure Statement, which shall be reasonably acceptable in form and substance to the Administrative Agent, the Required Lenders, the Debtors, the Supporting Lenders, the Required Supporting Noteholders, and the Supporting Interest Holders, shall be entered by the Bankruptcy Court in the Cases by no later than September 26, 2016;

(k) an order confirming the Reorganization Plan, which shall be reasonably acceptable in form and substance to the Administrative Agent, the Required Lenders, the Debtors, the Supporting Lenders, the Required Supporting Noteholders, and the Supporting Interest Holders, shall be entered by the Bankruptcy Court in the applicable Cases by no later than November 7, 2016; and

(l) the Effective Date shall occur by no later than November 14, 2016.

Section 7.17   <u>Opposition to Certain Motions</u>. Each Loan Party shall promptly and diligently oppose all motions filed by Persons in the Bankruptcy Court to lift the stay on any Collateral (other than motions filed by the Administrative Agent, the Pre-Petition Indenture Trustees, the Lenders, the Pre-Petition 2010 Indenture Noteholders and/or the Pre-Petition 2015 Indenture Noteholders relating to the Facility), all motions filed by Persons in the Bankruptcy Court to terminate the exclusive ability of the Debtors to file a plan of reorganization, and all other motions filed by Persons in the Bankruptcy Court that, if granted, could reasonably be expected to have a material adverse effect on the Administrative Agent or any Collateral.

Section 7.18   Priority and Liens.  At all times during the term hereof, ensure each of the following:

(a) Upon entry of each DIP Order, the Borrower's and each other Debtor's Obligations hereunder and under each of the other Loan Documents shall, at all times:

(i) pursuant to section 364(c)(1) of the Bankruptcy Code, constitute an allowed superpriority claim on a joint and several basis in the Case of such Loan Party;

(ii) subject to the Carve-Out, pursuant to section 364(c)(2) of the Bankruptcy Code, be secured by first priority, valid, binding, continuing, enforceable and fully-perfected security interests in, and Liens upon, all Collateral that, on or as of the Petition Date, is not subject to valid, perfected and non-avoidable liens (excluding any Avoidance Actions (but including, following the entry of the Final Order, the proceeds therefrom));

(iii) pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by valid, binding, continuing, enforceable and fully-perfected security interests in, and Liens upon, the Collateral (other than the property described in clause (ii) or (iv) of this <u>Section 7.18(a)</u>, as to which the liens and security interests in favor of the Administrative Agent will be as described in such clauses), whether existing on the Petition Date or thereafter acquired, that is subject to the liens of the Pre-Petition First Lien Secured Parties securing the Pre-Petition First Lien Obligations, the Adequate Protection Liens of the Pre-Petition

Secured Parties, the Carve-Out, or any Permitted Lien (as defined in the Interim Order) which security interests and liens in favor of the Administrative Agent, are junior to such valid, perfected, and non-avoidable liens; and

(iv) pursuant to section 364(d)(1) of the Bankruptcy Code, be secured by valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interests in and Liens upon all Collateral that is subject to valid, perfected, and non-avoidable liens presently held for the benefit of the Pre-Petition Indenture Secured Parties (such priming liens, the "Priming Liens" and such primed liens of the Pre-Petition Indenture Noteholders, the "Primed Liens"). The Priming Liens shall be senior in all respects to the interests in such property of any of the Pre-Petition Indenture Secured Parties (including, without limitation, any and all forms of adequate protection granted to the foregoing), but shall be junior to the liens of the Pre-Petition First Lien Secured Parties securing the Pre-Petition First Lien Obligations, the Adequate Protection Liens of the Pre-Petition First Lien Secured Parties, the Carve-Out and the Permitted Liens (as defined in the Interim Order). The Primed Liens shall be primed by and made subject and subordinate to the Priming Liens, but the Priming Liens shall not prime liens, if any, to which the Primed Liens are subordinate at the time of the commencement of the Cases.

(b) The Secured Parties' Liens and superpriority claims as described in Section 7.18(a) shall have priority over any claims arising, upon entry of the Final Order, under sections 105 and 506(c) of the Bankruptcy Code, and shall be subject only to the liens of the Pre-Petition First Lien Lenders securing the Pre-Petition First Lien Obligations, the Adequate Protection Liens of the Pre-Petition First Lien Lenders, the Carve-Out, any other Permitted Liens (as defined in the Interim Order) and the payment of the Adequate Protection Claims of the Pre-Petition First Lien Lenders. Except as set forth herein, no other claim having a priority superior to or pari passu with that granted to Secured Parties by the Interim Order and Final Order, whichever is then in effect, shall be granted or approved while any Obligations under this Agreement remain outstanding.

(c) Except for the Carve-Out, no costs or expenses of administration shall be imposed against the Administrative Agent, the Lenders, any other Secured Party or any of the Collateral or, subject to entry of the Final Order, under sections 105 or 506(c) of the Bankruptcy Code, or otherwise, and each of the Loan Parties hereby waives for itself and on behalf of its estate in bankruptcy, any and all rights under sections 105 or, upon entry of the Final Order, 506(c) of the Bankruptcy Code, or otherwise, to assert or impose or seek to assert or impose, any such costs or expenses of administration against Administrative Agent, the Lenders or any other Secured Party.

(d) Except for the Carve-Out, the respective superpriority claims of the Secured Parties, the Pre-Petition First Lien Agent, the Pre-Petition First Lien Lenders, the Pre-Petition Indenture Trustees and the Pre-Petition Indenture Noteholders shall at all times be senior to the rights of such Loan Party, any chapter 11 trustee and, subject to section 726 of the Bankruptcy Code, any chapter 7 trustee, or any other creditor (including, without limitation, post-petition counterparties and other post-petition creditors) in the Cases or any subsequent proceedings under the Bankruptcy Code, including, without limitation, any chapter 7 cases (if any of such Loan Party's cases are converted to cases under chapter 7 of the Bankruptcy Code). Notwithstanding the fore-

going, the superpriority claims of the Secured Parties shall be junior to the Adequate Protection Claims of the Pre-Petition First Lien Lenders.

ARTICLE VIII.
NEGATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder (other than contingent indemnification obligations for which no claims has been made) shall remain unpaid or unsatisfied or shall remain outstanding, each Loan Party shall not, nor shall it permit any of its Subsidiaries to, directly or indirectly:

Section 8.01    Liens.   Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following (the "Permitted Liens"):

(a)     Liens securing the Obligations;

(b)     Liens which are Permitted Liens (as defined in the Interim DIP Order);

(c)     Adequate Protection Liens and Liens securing Indebtedness of the Loan Parties outstanding under the Pre-Petition First Lien Loan Documents or the Pre-Petition Indenture Documents as of the Closing Date or as otherwise provided under the DIP Orders; and

(d)     Liens for Taxes that are not overdue for a period of more than 30 days or that are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP.

Section 8.02    Investments.   Make any Investments, except:

(a)     Investments existing on the Petition Date and listed on Schedule 8.02(a);

(b)     Investments as provided in the Budget (including Permitted Variances) or the DIP Orders.

Section 8.03    Indebtedness.   Create, incur, assume or suffer to exist any Indebtedness, except

(a)     Indebtedness in respect of the (i) Obligations, (ii) Pre-Petition First Lien Obligations and (iii) obligations under the Pre-Petition Indenture Documents;

(b)     Indebtedness existing on the date hereof and listed on Schedule 8.03(b) and any permitted refinancing thereof allowed pursuant to Section 8.14;

(c)     Indebtedness in respect of swap contracts designed to hedge against interest rates, foreign exchange rates or commodities pricing risks incurred in the ordinary course of business and not for speculative purposes; and

(d)     Indebtedness as provided in the Budget (including Permitted Variances) or the DIP Orders.

The accrual of interest, the accretion of accreted value and the payment of interest in the form of additional Indebtedness shall not be deemed to be an incurrence of Indebtedness for purposes of this Section 8.03.

Section 8.04   Fundamental Changes.  Merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, except that, so long as no Default exists or would result therefrom:

(a)     any Subsidiary may merge with (i) the Borrower; provided that the Borrower shall be the continuing or surviving Person, or (ii) any one or more other Subsidiaries; provided that when any Subsidiary that is a Loan Party is merging with another Subsidiary, a Loan Party shall be the continuing or surviving Person;

(b)     the Borrower may change its legal form if it determines in good faith that such action is in the best interests of the Borrower and its Subsidiaries, and the Administrative Agent reasonably determines it is not disadvantageous to the Lenders or in conflict with the Restructuring Support Agreement; and

(c)     any Loan Party may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to the Borrower or to another Loan Party (other than Holdings or any Roadhouse Parent Entity).

Section 8.05   Dispositions.  Make any Disposition or enter into any agreement to make any Disposition, except:

(a)     Dispositions of obsolete, worn out or surplus property, whether now owned or hereafter acquired, in the ordinary course of business and Dispositions of property no longer used or useful in the conduct of the business of the Borrower and its Subsidiaries;

(b)     Dispositions of inventory, equipment and immaterial assets in the ordinary course of business;

(c)     Dispositions of property by any Subsidiary to the Borrower or to a wholly-owned Subsidiary; provided that if the transferor of such property is a Guarantor, the transferee thereof must either be the Borrower or a Guarantor;

(d)     Dispositions permitted by Section 8.02, Section 8.04 and Section 8.06 and Liens permitted by Section 8.01;

(e)     Dispositions in the ordinary course of business of Cash Equivalents;

(f)     leases, subleases, licenses or sublicenses, in each case in the ordinary course of business and which do not materially interfere with the business of the Borrower and its Subsidiaries, taken as a whole;

(g)     transfers of property subject to Casualty Events upon receipt of the Net Cash Proceeds of such Casualty Event;

(h)     Dispositions of Investments in joint ventures to the extent required by, or made pursuant to customary buy/sell arrangements between, the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

(i)     Dispositions of accounts receivable in the ordinary course of business in connection with the collection or compromise thereof;

(j)     The unwinding of any swap contract pursuant to its terms;

(k)     Dispositions in the ordinary course of business consisting of the abandonment of Company IP Rights which, in the reasonable good faith determination of the Borrower or any Subsidiary, are uneconomical, negligible, obsolete or otherwise not material in the conduct of its business; and

(l)     any surrender or waiver of contractual rights or the settlement, release or surrender of contractual rights or other litigation claims in the ordinary course of business.

To the extent any Collateral is disposed of as expressly permitted by this Section 8.05 to any Person other than to a Loan Party, such Collateral shall be sold free and clear of the Liens created by the Loan Documents and, if requested by the Administrative Agent, upon the certification by the Borrower that such Disposition is permitted by this Agreement, the Administrative Agent shall be authorized to take and shall take any actions deemed appropriate in order to effect the foregoing.

Section 8.06    Restricted Payments.  Declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except that:

(a)     each Subsidiary may make Restricted Payments to the Borrower, any Subsidiaries of the Borrower that are Guarantors and any other Person that owns a direct Equity Interest in such Subsidiary, ratably according to their respective holdings of the type of Equity Interest in respect of which such Restricted Payment is being made;

(b)     Permitted Tax Distributions may be made by any Group Member; and

(c)     to the extent constituting Restricted Payments, the Borrower and its Subsidiaries may enter into and consummate transactions expressly permitted by any provision of Section 8.02 or Section 8.04.

Section 8.07    Change in Nature of Business.  Engage in any material line of business different in any material respect from those lines of business conducted by the Borrower and its Subsidiaries on the date hereof or any business substantially related or incidental thereto.

Section 8.08    Transactions with Affiliates.  Except with the prior written consent of the Administrative Agent and Required Lenders, enter into any transaction of any kind with any Affiliate of the Borrower, whether or not in the ordinary course of business, other than:

(a)     transactions between or among the Borrower or any Subsidiary that is a Guarantor or any entity that becomes a Subsidiary that becomes a Guarantor as a result of such transaction;

(b)     loans and other transactions by and among the Borrower and/or one or more Subsidiaries to the extent otherwise permitted under this Article VIII;

(c)     employment and severance arrangements between the Borrower or any of its Subsidiaries and their respective officers and employees in the ordinary course of business and transactions pursuant to stock option plans and employee benefit plans and arrangements; provided that such arrangements are limited to incentive plans approved by the Bankruptcy Court in accordance with the Restructuring Support Agreement;

(d)     the payment of customary fees and reasonable out-of-pocket costs to, and indemnities provided on behalf of, directors, officers, employees and consultants of the Borrower and its Subsidiaries or any direct or indirect parent of the Borrower in the ordinary course of business to the extent attributable to the ownership or operation of the Borrower and its Subsidiaries; and

(e)     transactions pursuant to the Restructuring Support Agreement or the Reorganization Plan.

Section 8.09   Burdensome Agreements.  Enter into or permit to exist any Contractual Obligation (other than this Agreement or any other Loan Document or as required under the Bankruptcy Code) that limits the ability (i) of any Subsidiary (other than an Excluded Subsidiary) to make Restricted Payments to the Borrower or any Guarantor or to otherwise transfer property to invest in the Borrower or any Guarantor, (ii) of any Loan Party (other than the Borrower or an Excluded Subsidiary) to Guarantee the Indebtedness of the Borrower or (iii) of the Borrower, any other Loan Party or any Subsidiary thereof (other than an Excluded Subsidiary) to create, incur, assume or suffer to exist Liens on property of such Person for the benefit of the Secured Parties with respect to the Obligations; provided, however, that the foregoing shall not apply to:

(a)     restrictions and conditions imposed by law or any Loan Document;

(b)     restrictions and conditions existing on the Closing Date (including, without limitation, any restrictions or conditions pursuant to existing Indebtedness permitted under Section 8.03(a)) or to any extension, renewal, amendment, modification or replacement thereof, except to the extent any such amendment, modification or replacement expands the scope of any such restriction or condition;

(c)     customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary or any assets pending such sale, provided that such restrictions and conditions apply only to the Subsidiary or assets that is or are to be sold and such sale is permitted hereunder;

(d)     customary provisions in leases, licenses and other contracts restricting the assignment thereof;

(e)     restrictions imposed by any agreement relating to secured Indebtedness permitted by this Agreement to the extent such restriction applies only to the property securing such Indebtedness;

(f)     restrictions or conditions set forth in any agreement in effect at any time a Person becomes a Subsidiary (but not any modification or amendment expanding the scope of any such restriction or condition), provided that such agreement was not entered into in contemplation of such Person becoming a Subsidiary and the restriction or condition set forth in such agreement does not apply to the Borrower, any other Loan Party or any other Subsidiary;

(g)     restrictions or conditions in any Indebtedness permitted pursuant to Section 8.03 to the extent such restrictions or conditions are no more restrictive than the restrictions and conditions in the Loan Documents or, in the case of subordinated debt, are market terms at the time of issuance or, in the case of Indebtedness of any non-Guarantor, are imposed solely on such non-Guarantor and its Subsidiaries;

(h)     restrictions on cash or other deposits imposed by agreements entered into in the ordinary course of business;

(i)     encumbrances and restrictions under the Organization Documents of any joint ventures existing on the Closing Date; and

(j)     negative pledges incurred or provided in favor of any holder of Indebtedness permitted under Section 8.03 solely to the extent any such negative pledge relates to the property financed by or the subject of such Indebtedness.

Section 8.10     Use of Proceeds.

(a)     Use the proceeds of any Credit Extension, whether directly or indirectly, and whether immediately, incidentally or ultimately, to purchase or carry margin stock (within the meaning of Regulation U of the FRB) or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund indebtedness originally incurred for such purpose.

(b)     Use any portion of the Carve-Out, any proceeds of any Credit Extension, cash collateral or other Collateral or prepetition collateral proceeds, for the payment of the fees and expenses of any Person incurred in challenging, or in relation to (i) the challenge of the Liens or claims of any or all of the Administrative Agent or the Lenders, or the initiation or prosecution of any claim or cause of action against any or all of the Administrative Agent, the Lenders, the Pre-Petition First Lien Agent, any Pre-Petition Indenture Trustee, the Pre-Petition First Lien Lenders, and the Pre-Petition Indenture Noteholders, including any claim under chapter 5 of the Bankruptcy Code, (ii) the assertion of any claims or causes of actions (including any claims or causes of action under chapter 5 of the Bankruptcy Code) against any or all of the Pre-Petition First Lien Agent, the Pre-Petition Indenture Trustees, the Pre-Petition First Lien Lenders, and the Pre-Petition Indenture Noteholders, their respective advisors, agents and sub-agents, including formal discovery proceedings in anticipation thereof and (iii) the assertion of any claims or challenges relating to the allocation of value as between encumbered and unencumbered assets (if any). The foregoing notwithstanding, no more than $25,000 in the aggregate of the amounts set

forth in the Budget, the Carve-Out, any cash collateral, or proceeds of any Credit Extension, Collateral or prepetition collateral may be used by the Committee, or any representative of the estates, to investigate, but not prosecute (or prepare for the prosecution of) any challenge or motion seeking standing to prosecute a challenge, to, the claims and/or Liens of the Pre-Petition First Lien Agent, the Pre-Petition Indenture Trustees, the Pre-Petition First Lien Lenders and the Pre-Petition Indenture Noteholders; provided, however, that nothing in this Agreement, any other Loan Document or the DIP Orders shall vest or confer on the Committee, or any representative of the estates, standing or authority to pursue any cause of action belonging to the Debtors or their estates. In addition, neither the Carve-Out nor any proceeds of any Credit Extension, cash collateral, Collateral or prepetition collateral shall be used in connection with preventing, hindering or delaying the Lenders', the Administrative Agent's, the Pre-Petition First Lien Agent's, the Pre-Petition Indenture Trustees', the Pre-Petition First Lien Lenders' or the Pre-Petition Indenture Noteholders' enforcement or realization upon the Collateral once an Event of Default has occurred and is continuing under the Loan Documents, subject to the notice provisions in <u>Section 9.02</u> (and a comparable notice provision to be included in the Final Order with respect to the Pre-Petition First Lien Agent, the Pre-Petition Indenture Trustees, the Pre-Petition First Lien Lenders and the Pre-Petition Indenture Noteholders).

Section 8.11   <u>Capital Expenditures</u>.   Make or become legally obligated to make any Capital Expenditure, other than as set forth in the Budget (including Permitted Variances thereto).

Section 8.12   <u>Amendments of Organization Documents</u>.   Amend, supplement, waive or otherwise modify, or permit any amendment, supplement, waiver or other modification to, any of its Organization Documents in a manner adverse to the interests of the Lenders.

Section 8.13   <u>Accounting Changes</u>.   Make any change in (a) accounting policies or reporting practices, except as required by GAAP, or (b) fiscal year; <u>provided</u>, <u>however</u>, that the Borrower may, upon written notice to the Administrative Agent change its (x) accounting policies and/or reporting practices and/or (y) fiscal year, in each case as may be reasonably acceptable to the Administrative Agent and the Required Lenders, in which case the Borrower and the Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such change in fiscal year and/or accounting policies or reporting practices.

Section 8.14   <u>Prepayments, Etc. of Indebtedness</u>.   (i) Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner any Indebtedness (it being understood that payments of regularly scheduled interest and mandatory prepayments under Indebtedness expressly permitted to be incurred hereunder shall be permitted, subject in each case to the DIP Orders) except (a) the conversion of any such Indebtedness to Qualified Equity Interests of Holdings (or any direct or indirect parent thereof), and (b) refinancings and refundings of such Indebtedness in compliance with the Budget, or (ii) amend, modify or change in any manner any term or condition of any Indebtedness set forth in <u>Schedule 8.03(b)</u> in a manner materially adverse to the Administrative Agent or the Lenders without the consent of the Required Lenders, except for any refinancing, refunding, renewal or extension thereof contemplated by the Budget and permitted hereunder.

Section 8.15   <u>Holding Company</u>.  In the case of Holdings and any Roadhouse Parent Entity, engage in any business or activity other than (a) (i) in the case of Holdings, the ownership of all outstanding Equity Interests in the Borrower, (ii) in the case of Roadhouse Parent, the ownership of all outstanding Equity Interests in Holdings, (iii) in the case of Roadhouse Midco, the ownership of all outstanding Equity Interests in Roadhouse Parent, (iv) in the case of Roadhouse Intermediate, the ownership of all outstanding Equity Interests in Roadhouse Midco, and (v) in the case of Roadhouse Holding, the ownership of all outstanding Equity Interests in Roadhouse Intermediate, (b) maintaining its corporate existence, including general and corporate overhead, <u>provided</u> that Holdings or such Roadhouse Parent Entity may change its form of organization, so long as (A) it is organized under the laws of the United States of America, any State thereof or the District of Columbia and (B) its Guarantee of the Obligations and the Lien on or security interest in any Collateral held by it under the Loan Documents shall remain in effect to the same extent as immediately prior to such change, (c) activities required to comply with applicable laws, (d) participating in tax, accounting and other administrative activities as the parent of the consolidated group of companies, including the Loan Parties, (e) the receipt of Restricted Payments to the extent permitted by <u>Section 8.06</u> and the making of Restricted Payments to the extent permitted by <u>Section 8.06</u> (including, in each case, for the avoidance of doubt, Permitted Tax Distributions), (f) to the extent not otherwise covered by the other clauses of this <u>Section 8.15</u>, any of the activities of Holdings or such Roadhouse Parent Entity referred to in <u>Section 8.06</u>, (g) concurrently with any issuance of Qualified Equity Interests, the redemption, purchase or retirement of any Equity Interest of Roadhouse Holding using the proceeds of, or conversion or exchange of any equity Interests of Roadhouse Holding for, such Qualified Equity Interests, (h) compliance with its obligation under the Loan Documents, the execution and delivery of the Loan Documents to which it is a party and the performance of its obligations thereunder, (i) incurring guarantees of Indebtedness permitted to be incurred by the Borrower or any Guarantor Subsidiary hereunder, provided such guarantee shall be subordinated to the Obligations to the same extent as such other Indebtedness, and (j) activities incidental to the businesses or activities described in clauses (a) through (i) of this <u>Section 8.15</u>.

Section 8.16   <u>Bankruptcy Provisions</u>.  No Group Member shall: (a) seek or consummate a sale of assets under a plan of reorganization, Section 363(b) of the Bankruptcy Code or otherwise (other than the Reorganization Plan) without the consent of the Required Lenders and the Supporting Interest Holders; (b) except for the Carve-Out (subject to the applicable caps and the other limitations set forth herein and in the DIP Orders), incur administrative expense claims pari passu with or senior to the Obligations; (c) seek or consent to any modification, stay, vacation or amendment with respect to (i) "first day orders" entered by the Bankruptcy Court, (ii) the Final Order or (iii) the Loan Documents, except in each case as agreed to by the Administrative Agent and the Required Lenders in their sole discretion; (d) except as otherwise expressly permitted herein or in the DIP Orders, create any Lien that ranks senior to, or *pari passu* with, the Liens securing the Obligations; (e) make cash expenditures on account of claims incurred (i) by critical vendors prior to the Petition Date, (ii) by protected vendors under the Perishable Agricultural Commodities Act of 1930, as amended, prior to the Petition Date or (iii) pursuant to Section 503(b)(9) of the Bankruptcy Code, or pursuant to any "first day" orders entered by the Bankruptcy Court,  in each case except as agreed to by the Pre-Petition First Lien Agent, the Pre-Petition Indenture Trustees and the Required Lenders or as permitted by the Budget (including Permitted Variances thereto), (f) seek or consent to any order seeking authority to take any action prohibit-

ed by the Final Order or the other Loan Documents without the consent of the Required Lenders, the Pre-Petition First Lien Agent or the Pre-Petition Indenture Trustees or otherwise required by any Requirement of Law or (g) except as expressly consented to by the Required Lenders, seek, or consent to any order seeking, to settle any litigation related to employee or labor matters, including without limitation, wage and hour collective or class action litigation involving one or more Loan Parties.

Section 8.17   Compliance with Budget Covenants.  Permit any Variance to exist other than a Permitted Variance.

Section 8.18   Foreign Subsidiaries.  Form or otherwise acquire any Foreign Subsidiaries.

Section 8.19   Real Property. Own or acquire, or enter into any agreement to acquire, any real property unless appropriate collateral documents, in form and substance acceptable to the Required Lenders in all respects, are executed and delivered to the Administrative Agent to create a valid, continuing and perfected security interest in such real property in favor of the Administrative Agent for the benefit of the Secured Parties.

ARTICLE IX.
EVENTS OF DEFAULT AND REMEDIES

Section 9.01   Events of Default.  Any of the following shall constitute an Event of Default:

(a)   Non-Payment.  The Borrower or any other Loan Party fails to pay (i) any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or by acceleration thereof or otherwise, or (ii) pay any interest on any Loan or any fee or other amount (other than an amount referred to in the foregoing clause (i)) payable under this Agreement or under any other Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of five (5) or more Business Days; or

(b)   Specific Covenants.  Any Loan Party fails to perform or observe any term, covenant or agreement contained in any of Sections 7.02(a), 7.04(a) (solely with respect to the Borrower), 7.10, 7.12, 7.15, 7.16, 7.17, 7.18 or Article VIII; or

(c)   Other Defaults.  Any Loan Party fails to perform or observe any other term, covenant or agreement (not specified in Section 9.01(a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for 10 days; provided that an Event of Default under Article VI (other than under Sections 6.01(d) and Section 6.06) is subject to a grace period of 5 Business Days and an Event of Default under Sections 6.01(d) or 6.06 is subject to a grace period of 2 Business Days; or

(d)   Representations and Warranties.  Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Borrower or any other Loan Party herein, in any other Loan Document, or in any document delivered in connection herewith or

therewith shall be incorrect or misleading in any material respect when made or deemed made; or

(e)    <u>Judgments</u>.  There is entered against any Loan Party or any Subsidiary thereof a final judgment or order for the payment of money in an aggregate amount exceeding $[250,000] (to the extent not covered by independent third-party insurance as to which the insurer is rated at least "A" by A.M. Best Company, has been notified of the potential claim and does not dispute coverage), or any one or more non-monetary final judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and there is a period of 30 consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, is not in effect, or enforcement of such judgment is not subject to the automatic stay provided in the Bankruptcy Code; or

(f)    <u>ERISA</u>.  (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of any of the Loan Parties under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount in excess of $[250,000], (ii) any Loan Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount in excess of $[250,000], (iii) there is or arises an Unfunded Pension Liability (taking into account only Plans with positive Unfunded Pension Liability) of $[250,000] or more, or (iv) there is or arises any potential withdrawal liability under Section 4201 of ERISA, if any Loan Party, any Subsidiary thereof or any ERISA Affiliate were to withdraw completely from any and all Multiemployer Plan of $[250,000] or more; or

(g)    <u>Invalidity of Loan Documents and Collateral Documents</u>.  (i) Any Loan Document shall cease to be in full force and effect (other than pursuant to the terms hereof or thereof), or any Loan Party shall deny or disaffirm in writing the validity of any Loan Document or that it has any further liability under any such Loan Document (other than, in the case of a Guarantor Subsidiary, as a result of the discharge of a Guarantor Subsidiary in accordance with the terms of the Loan Documents) or otherwise attempt to invalidate or otherwise impair the Loans or of the validity or perfection of the liens granted thereunder or (ii) any material provision of any Collateral Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or as a result of acts or omissions by the Administrative Agent or any Lender or satisfaction in full of all the Obligations, ceases to be in full force and effect or ceases to create a valid and perfected first priority Lien (subject to Liens permitted by <u>Section 8.01</u>) on the Collateral to be covered thereby; or any Loan Party or any other Person contests in any manner the validity or enforceability of any material provision of any Collateral Document or of the validity or perfection of the liens granted thereunder; or any Loan Party denies that it has any or further liability or obligation under any provision of any Collateral Document, or purports to revoke, terminate or rescind any Collateral Document; or

(h)    <u>Change of Control</u>.  There occurs any Change of Control; or

(i)    <u>Bankruptcy Matters</u>.  The Bankruptcy Court shall enter an order authorizing, approving or granting (or the Debtors shall file a motion seeking such authorization, approval or grant of) (i) additional post-Petition Date financing not otherwise permitted herein, (ii) any liens

on the Collateral not otherwise permitted herein, (iii) dismissal of the Cases or conversion of any Case to one under Chapter 7 of the Bankruptcy Code, (iv) appointment of a Chapter 11 trustee in any of the Cases, (v) any other superpriority claim senior to or pari passu with superpriority claims of the Administrative Agent, the other Secured Parties, the Pre-Petition First Lien Agent, the Pre-Petition First Lien Lenders, the Pre-Petition Indenture Trustees or the Pre-Petition Indenture Noteholders, (vi) modification of the Facility (other than pursuant to Section 11.01) or the Final Order, (vii) any action materially adverse to the Administrative Agent, the other Secured Parties, the Pre-Petition First Lien Agent, the Pre-Petition First Lien Lenders, the Pre-Petition Indenture Trustees or the Pre-Petition Indenture Noteholders, or their rights and remedies with respect to or interest in the Collateral, (viii) appointment of an examiner having powers beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code in any of the Cases, (ix) relief from the automatic stay for the benefit of any creditor with a security interest in the Collateral without the consent of the Administrative Agent and the Required Lenders, or (x) termination of the use of cash collateral by the Loan Parties; or

(j)    Prepetition Debts.  Any Debtor shall make any Pre-Petition Payment or otherwise pay any claim accrued prior to the Petition Date without the prior written consent of the Administrative Agent and the Required Lenders in their sole discretion or other than as permitted by the Budget (and any Permitted Variances thereto); or

(k)    Actions against Administrative Agent.  Any Debtor shall commence any action against the Administrative Agent, any other Secured Parties, the Pre-Petition First Lien Agent, the Pre-Petition First Lien Lenders, the Pre-Petition Indenture Trustees or the Pre-Petition Indenture Noteholders, on behalf of itself or any of its affiliates, officers or employees; or

(l)    Material Adverse Effect. Any Material Adverse Effect shall have occurred; or

(m)    Restructuring Support Agreement.  The Restructuring Support Agreement (i) shall be terminated pursuant to its terms or shall otherwise cease to be in full force and effect (other than a Termination Event (as defined in the RSA) as a result of the occurrence of the Effective Date of the Reorganization Plan), or (ii) shall have been amended, supplemented or otherwise modified in any material manner that adversely affects the interests, rights or remedies of any of the Administrative Agent or the Lenders; or

(n)    Plan Milestones.  The failure of the Debtors to comply with any of the Plan Milestones, regardless of whether the Debtors used commercially reasonable efforts to comply with any such Plan Milestone; or

(o)    506(c) Claims.  A claim under Section 506(c) of the Bankruptcy Code or otherwise shall have been allowed against any of all of the Administrative Agent, the other Secured Parties or the Collateral, or against the Pre-Petition First Lien Agent, the Pre-Petition First Lien Lenders, the Pre-Petition Indenture Trustees or the Pre-Petition Indenture Noteholders or the collateral securing any Pre-Petition Debt; or

(p)    Competing Plans.  The filing by any Group Member of any plan of reorganization or related disclosure statement or any direct or indirect amendment, modification, waiver or other change to the Reorganization Plan or related disclosure statement, or the entry of an order con-

firming any such plan of reorganization or approving any such disclosure statement or approving any such amendment, modification, waiver or other change in each case to the extent that such filing is not the Reorganization Plan or treats the claims of the Administrative Agent, any of the Lenders, any of the Pre-Petition Indenture Trustees or any of the Pre-Petition Indenture Noteholders in any manner to which they do not consent in their respective sole discretion; or

(q)      Exclusivity.  The Bankruptcy Court shall enter an order that results in any termination or modification of the exclusivity periods set forth in Section 1121 of the Bankruptcy Code except as provided in the Final Order or any such exclusivity periods shall have expired; or

(r)      Bankruptcy Orders Not In Full Force and Effect.  The Interim Order (prior to entry of the Final Order) or the Final Order shall cease to be in full force and effect or shall have been reversed, modified, amended, stayed, vacated or subject to stay pending appeal, in the case of any modification or amendment, without the prior written consent of the Required Lenders; or

(s)      Compliance with DIP Orders.  The failure of any Loan Party to comply in any material respect with the Interim Order (prior to entry of the Final Order) or the Final Order; or

(t)      Asset Sales.  Any sale or other disposition of all or a material portion of the Collateral pursuant to sections 363 or 1129 of the Bankruptcy Code other than as permitted by the DIP Orders (or pursuant to a transaction expressly permitted herein); or

(u)      Administrative Expense or Priority Claims.  A claim against any Debtor arising prior to the Effective Date of a kind specified under or entitled to priority or superpriority pursuant to sections 364(c)(1), 503(b), 507(a), 507(b) or 1114(e)(2) of the Bankruptcy Code or otherwise shall have been allowed in excess of $50,000 against such Debtor as a result of litigation with employees or former employees of any Debtor (including, without limitation, wage and hour collective or class action litigation involving one or more Debtors); or

(v)      Schedule of Assumption/Rejection of Executory Contracts and Unexpired Leases.  The filing of any schedule of assumption, assumption and assignment, or rejection of executory contracts and unexpired leases in any of the Cases that materially adversely affects the interests, rights or remedies of the Administrative Agent or any Lender that is not reasonably satisfactory to the Administrative Agent and the Required Lenders; or

(w)      Challenge Under Interim Order.  If forty-five (45) days after the Committee or a party in interest obtains standing to assert a Challenge (as defined in the Interim Order) and such Challenge (as defined in the Interim Order) is not resolved.

Section 9.02    Remedies upon Event of Default.  During the continuance of an Event of Default:

(a)      (other than an event described in Section 9.01(i)(iii) above), subject to the DIP Orders, the Administrative Agent may (with the consent of the Required Lenders), and shall (at the request of the Required Lenders), by notice to the Borrower, take any or all of the following actions, at the same or different times, (i) terminate forthwith the Commitments and (ii) declare the Loans then outstanding to be forthwith due and payable in whole or in part, whereupon the

principal of the Loans so declared to be due and payable, together with accrued interest thereon and any unpaid accrued fees and all other Obligations of the Loan Parties accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Loan Parties, anything contained herein or in any other Loan Document to the contrary notwithstanding; and in any event described in Section 9.01(i)(iii) above, the Commitments shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon and any unpaid accrued fees and all other Obligations of the Loan Parties accrued hereunder and under any other Loan Document, shall automatically become due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Loan Parties, anything contained herein or in any other Loan Document to the contrary notwithstanding; and

(b)    after the Administrative Agent or the Required Lenders have given at least five (5) days' prior written notice (the "Notice Period") to the Loan Parties (during which period the Event of Default is not cured) as set forth below, the Required Lenders may direct the Administrative Agent, who shall be permitted without seeking relief from the automatic stay, to foreclose on all or any portion of the Collateral, collect accounts receivable and apply the proceeds thereof to the Obligations or otherwise exercise remedies against the Collateral as permitted by applicable Laws.  During the Notice Period, the Loan Parties shall be entitled to (i) contest the occurrence and/or continuance of any Event of Default and (ii) seek and obtain an emergency hearing before the Bankruptcy Court, with proper notice to the Administrative Agent, solely for the purpose of contesting whether an Event of Default has occurred and/or is continuing. In addition to the other remedies set forth in this Section 9.02, the Administrative Agent, at the direction of the Required Lenders, shall have the authority to credit bid all or a portion of the Obligations, whether pursuant to a sale under section 363 of the Bankruptcy Code, a plan pursuant to section 1129(b) of the Bankruptcy Code or otherwise; provided, that that such credit bid provides for the assumption of or payment in full in cash of the Pre-Petition First Lien Obligations.

Section 9.03    Application of Funds.  After the exercise of remedies provided for in Section 9.02 (or after the Loans have automatically become immediately due and payable), any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order, subject to the Carve-Out:

First, to the payment of interest, expense reimbursement and other obligations owed to the Pre-Petition First Lien Agent and the Pre-Petition First Lien Lenders in accordance with the DIP Orders;

Second, to the payment of the remaining Pre-Petition First Lien Obligations in accordance with the terms of the Pre-Petition First Lien Credit Agreement;

Third,  to the payment of all costs and expenses incurred by the Administrative Agent (in its capacity as such hereunder or under any other Loan Document) in connection with any collection, sale, foreclosure or realization or otherwise in connection with this Agreement, any other Loan Document or any of the Obligations, including all court costs and the fees and expenses of its agents and legal counsel, the repayment of all advances made by the Administrative Agent hereunder or under any other Loan Document on behalf of

any Loan Party, any other costs or expenses incurred in connection with the exercise of any right or remedy hereunder or under any other Loan Document, any amounts for which the Administrative Agent is entitled to indemnification, fees, or reimbursement of costs or expenses under the terms of any Loan Document, and any other Obligations owed to the Administrative Agent, in their respective capacities as such hereunder or under any other Loan Document;

Fourth, to the payment in full of all Obligations consisting of interest (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) on the Loans, (the amounts so applied to be distributed among the Lenders pro rata in accordance with the amounts of the Loans owed to them on the date of any such distribution);

Fifth, to the payment in full of all Obligations (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) consisting of unpaid principal amount of the Loans and any premium thereon or breakage or termination fees, costs or expenses related thereto (the amounts so applied to be distributed among the Lenders pro rata in accordance with the amounts of the Obligations owed to them on the date of any such distribution);

Sixth, to the payment in full of all other Obligations (the amounts so applied to be distributed among the Secured Parties pro rata in accordance with the amounts of the Obligations owed to them on the date of any such distribution);

Seventh, to the payment of any remaining obligations owed to the Pre-Petition Indenture Trustees and the Pre-Petition Indenture Noteholders under the Pre-Petition Indentures; and

Eighth, to the Borrower, its successors or assigns, or as a court of competent jurisdiction may otherwise direct.

The Administrative Agent shall have absolute discretion as to the time of application of any such proceeds, moneys, balances or amounts in accordance with this Agreement and the other Loan Documents. Upon any sale of Collateral by the Administrative Agent (including pursuant to a power of sale granted by statute or under a judicial proceeding), the receipt of the Administrative Agent or of the officer making the sale shall be a sufficient discharge to the purchaser or purchasers of the Collateral so sold and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to the Administrative Agent or such officer or be answerable in any way for the misapplication thereof.

# ARTICLE X.
## ADMINISTRATIVE AGENT

Section 10.01  <u>Appointment and Authority</u>.

(a)     Each of the Lenders hereby irrevocably appoints Cortland Capital Market Services LLC to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  The provisions of this Article are solely for the benefit of the Administrative Agent, the Lenders, and neither the Borrower nor any other Loan Party shall have rights as a third party beneficiary of any of such provisions.

(b)     The Administrative Agent shall also act as the "<u>collateral agent</u>" under the Loan Documents, and each of the Lenders hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto.  In this connection, the Administrative Agent, as "collateral agent" and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to <u>Section 10.05</u> for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent), shall be entitled to the benefits of all provisions of this <u>Article X</u> and <u>Article XI</u> (including <u>Section 11.04(c)</u>, as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto.

Section 10.02  <u>Rights as a Lender</u>.  The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

Section 10.03  <u>Exculpatory Provisions</u>.  The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents. Without limiting the generality of the foregoing, the Administrative Agent:

(a)     shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)     shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the

other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), <u>provided</u> that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable law; and

(c)      shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity.

The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in <u>Sections 11.01</u> and <u>9.02</u>) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final, non-appealable judgment.  The Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice describing such Default is given to the Administrative Agent by the Borrower or a Lender.

The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Collateral Documents, (v) the value or the sufficiency of any Collateral, or (v) the satisfaction of any condition set forth in <u>Article IV</u> or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

Section 10.04  <u>Reliance by Administrative Agent</u>.  The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan, that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan.  The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Section 10.05  <u>Delegation of Duties</u>.  The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent.  The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent. The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final, non-appealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

Section 10.06  <u>Resignation of Administrative Agent</u>.  The Administrative Agent may at any time give written notice of its resignation to the Lenders and the Borrower.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right, upon the consent of the Borrower, to appoint a successor, not to be unreasonably withheld (and not required during the continuance of an Event of Default) which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may on behalf of the Lenders, appoint a successor Administrative Agent meeting the qualifications set forth above; <u>provided</u> that if the Administrative Agent shall notify the Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (a) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders under any of the Loan Documents, the retiring Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (b) except for any indemnity payments owed to the retiring or resigning Administrative Agent, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Administrative Agent as provided for above in this <u>Section 10.06</u>.  Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent, and the retiring Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this <u>Section 10.06</u>).  The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the retiring Administrative Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article and <u>Section 11.04</u> shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent.

Section 10.07  <u>Non-Reliance on Administrative Agent and Other Lenders</u>.  Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

Section 10.08  <u>No Other Duties, Etc.</u>  Except as expressly set forth in this Agreement or any other Loan Document, the Administrative Agent shall not have any duties or responsibilities hereunder in its capacity as such.

Section 10.09  <u>Administrative Agent May File Proofs of Claim</u>.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise

(a)      to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under <u>Sections 2.07</u> and <u>11.04</u>) allowed in such judicial proceeding; and

(b)      to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, if the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under <u>Sections 2.07</u> and <u>11.04</u>.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender to authorize the Administrative Agent to vote in respect of the claim of any Lender or in any such proceeding.

Section 10.10  <u>Collateral and Guaranty Matters</u>.  Each of the Lenders irrevocably authorize the Administrative Agent, at its option and in its discretion,

(a)    to release any Lien on any property granted to or held by the Administrative Agent under any Loan Document (i) upon termination of the Aggregate Commitments and payment in full in cash of all Obligations (other than contingent indemnification obligations for which no claim has been made), (ii) that is sold or to be sold as part of or in connection with any sale permitted hereunder or under any other Loan Document to a Person that is not a Loan Party, or (iii) if approved, authorized or ratified in writing in accordance with <u>Section 11.01</u>;

(b)    to release any Guarantor from its obligations under the Guaranty if such Person ceases to be a Subsidiary as a result of a transaction permitted hereunder; and

(c)    to subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted by <u>Section 8.01</u>.

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty pursuant to this <u>Section 10.10</u>.  In each case as specified in this <u>Section 10.10</u>, the Administrative Agent will, at the Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Collateral Documents or to subordinate its interest in such item, or to release such Guarantor from its obligations under the Guaranty, in each case in accordance with the terms of the Loan Documents and this <u>Section 10.10</u>.

Section 10.11  <u>Withholding Tax</u>.  To the extent required by any applicable Laws, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax.  Without limiting or expanding the provisions of <u>Section 3.01</u>, each Lender shall, and does hereby severally, indemnify the Administrative Agent against, and shall make payable in respect thereof within 10 days after demand therefor, (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so) and (ii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Administrative Agent under this <u>Section 10.11</u>.  The agreements in this <u>Section 10.11</u> shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender and the repayment, satisfaction or discharge of all other Obligations.

ARTICLE XI.
MISCELLANEOUS

Section 11.01 <u>Amendments, Etc.</u>  No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Borrower or any other Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders and the Borrower or the applicable Loan Party, as the case may be, and acknowledged by the Administrative Agent, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; <u>provided</u>, <u>however</u>, that no such amendment, waiver or consent shall:

(a)      waive any condition set forth in <u>Section 4.01</u> without the written consent of each Lender;

(b)      without limiting the generality of clause (a) above, waive any condition set forth in <u>Section 4.03</u> as to any Credit Extension or Notice of Request for Disbursement without the written consent of each Unanimous DIP Lender;

(c)      increase the Commitment of any Lender (or reinstate any Commitment terminated pursuant to <u>Section 9.02</u>) without the written consent of each affected Lender and the Unanimous DIP Lenders;

(d)      postpone any date fixed by this Agreement or any other Loan Document for any payment of principal, interest, fees or other amounts due to the Lenders (or any of them) hereunder or under such other Loan Documents or extend the DIP Maturity Date beyond December 14, 2016, in each case without the written consent of the Unanimous DIP Lenders;

(e)      reduce the principal of, or the rate of interest specified herein on, any Loan or any fees or other amounts payable hereunder or under any other Loan Document, or change the manner of computation of such rate of interest or fee that would result in a reduction of any interest rate on any Loan or any fee payable hereunder without the written consent of each affected Lender entitled to such amount and the Unanimous DIP Lenders; <u>provided</u>, <u>however</u>, that only the consent of the Required Lenders and the Unanimous DIP Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Borrower to pay interest at the Default Rate;

(f)      change (i) <u>Section 2.11</u> or <u>Section 9.03</u> in a manner that would alter the pro rata sharing of payments required thereby without the written consent of each Lender or (ii) the order of application of any reduction in the Commitments or any prepayment of Loans from the application thereof set forth in the applicable provisions of <u>Section 2.04(b)</u> without the consent of each affected Lender or (iii) any provision of <u>Section 7.18</u> in a manner that would alter the Lien priority of the Facility without the written consent of the Unanimous DIP Lenders;

(g)      change any provision of this <u>Section 11.01</u> or the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder without the written consent of each Lender, other than any such change that

would only affect the Unanimous DIP Lenders in which case the written consent of the Unanimous DIP Lenders shall be required to make such change;

(h)    change the definition of "Unanimous DIP Lenders" without the written consent of each Unanimous DIP Lender;

(i)    release all or substantially all of the Collateral in any transaction or series of related transactions, without the written consent of each Lender;

(j)    release all or substantially all of the value of the Guaranty, without the written consent of each Lender, except to the extent the release of any Subsidiary from the Guaranty is permitted pursuant to Section 9.10 (in which case such release may be made by the Administrative Agent acting alone);

(k)    impose any greater restriction on the ability of any Lender under the Facility to assign any of its rights or obligations hereunder without the written consent of each affected Lender;

(l)    subordinate the Obligations or the Liens securing the Obligations without the written consent of the Unanimous DIP Lenders;

(m)    alter the adequate protection provided under the Facility without the written consent of the Unanimous DIP Lenders;

(n)    subject to clause (d) of this Section 11.01, alter any Event of Default in a manner adverse to the Lenders without the written consent of the Unanimous DIP Lenders; or

(o)    change the terms of the Facility in a manner that would materially adversely affect any of the rights or obligations of any Unanimous DIP Lender in a manner that is different or disproportionate in any respect from the effect on the rights or obligations (as applicable) of the Unanimous DIP Lenders generally, other than in proportion to the Unanimous DIP Lenders' respective amounts of the Loans, without the written consent of the Unanimous DIP Lenders;

provided, further, that no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, affect the rights or duties of the Administrative Agent under this Agreement or any other Loan Document.

Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder, except that the Commitment of such Lender may not be increased or extended without the consent of such Lender.

If any Lender does not consent to a proposed amendment, waiver, consent or release with respect to any Loan Document that requires the consent of each Lender or each adversely affected Lender and that has been approved by the Required Lenders or the majority of the Lenders whose consent is required therefor, the Borrower may replace such non-consenting Lender in accordance with Section 11.13; provided that such amendment, waiver, consent or release can be

effected as a result of the assignment contemplated by such Section (together with all other such assignments required by the Borrower to be made pursuant to this paragraph).

Section 11.02  Notices; Effectiveness; Electronic Communications.

(a)  Notices Generally.  Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier or electronic mail as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)  if to Holdings, the Borrower, or the other Loan Parties, to the address, telecopier number, electronic mail address or telephone number specified for such Person on Schedule 11.02;

(ii)  if to the Administrative Agent, to the address, telecopier number, electronic mail address or telephone number specified for such Person on Schedule 11.02; and

(iii)  if to any Lender, to the address, telecopier number, electronic mail address or telephone number specified on Schedule 11.02 or in the Assignment and Acceptance pursuant to which such Lender shall have become a party hereto or in its Administrative Questionnaire.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient).  Notices and other communications delivered through electronic communications to the extent provided in subsection (b) below shall be effective as provided in such subsection (b).

(b)  Electronic Communications.  Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, provided that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender, as applicable, has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.  The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice

or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)     The Platform.  THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE."  THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.  In no event shall the Administrative Agent or any of its Related Parties (collectively, the "Agent Parties") have any liability to Holdings, the Borrower, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's or the Administrative Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party; provided, however, that in no event shall any Agent Party have any liability to Holdings, the Borrower, any Lender, or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(d)     Change of Address, Etc.  Each of the Loan Parties and the Administrative Agent may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto.  Each Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the Borrower and the Administrative Agent.  In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.  Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States Federal and state securities Laws, to make reference to Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Borrower or its securities for purposes of United States Federal or state securities laws.

(e)     Reliance by Administrative Agent and Lenders.  The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices (including telephonic Committed Loan Notices) purportedly given by or on behalf of the Borrower even if (i) such notices were

not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Loan Parties shall indemnify the Administrative Agent, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of a Loan Party. All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

Section 11.03 <u>No Waiver; Cumulative Remedies; Enforcement</u>. No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with <u>Section 9.02</u> for the benefit of all the Lenders; <u>provided</u>, <u>however</u>, that the foregoing shall not prohibit (a) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent) hereunder and under the other Loan Documents, (b) any Lender from exercising setoff rights in accordance with <u>Section 11.08</u> (subject to the terms of <u>Section 2.11</u>), or (c) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law; and <u>provided</u>, <u>further</u>, that if at any time there is no Person acting as Administrative Agent hereunder and under the other Loan Documents, then (i) the Required Lenders shall have the rights otherwise ascribed to the Administrative Agent pursuant to <u>Section 9.02</u> and (ii) in addition to the matters set forth in clauses (b) and (c) of the preceding proviso and subject to <u>Section 2.11</u>, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

Section 11.04 <u>Expenses; Indemnity; Damage Waiver</u>.

(a) <u>Costs and Expenses</u>. The Loan Parties shall, subject to the terms of the DIP Orders, pay (i) all reasonable and documented out-of-pocket costs and expenses incurred by the Administrative Agent (including the reasonable fees, charges and disbursements of counsel for the Administrative Agent) and the Required Lenders and the Unanimous DIP Lenders (including the reasonable fees, charges and disbursements of counsel for the Required Lenders and the Unanimous DIP Lenders (including King & Spalding LLP, Debevoise & Plimpton LLP, Dechert LLP and Delaware Counsel for each)), in connection with the syndication of the credit facilities provided for herein, the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the

provisions hereof or thereof (whether or not the transactions contemplated thereby shall be consummated), (ii) all reasonable and documented out-of-pocket costs and expenses incurred by the Administrative Agent (including reasonable fees, charges and disbursements of counsel for the Administrative Agent) and any Required Lender and any Unanimous DIP Lender (including the fees, charges and disbursements of only one lead law firm, one local-counsel firm and any necessary specialists, one accounting firm, one financial advisory firm and one consultant retained for or on behalf of the Administrative Agent and the Lenders) in connection with the enforcement of its rights and interests under this Agreement and the other Loan Documents, including in connection with any workout, restructuring or waiver or similar matters in respect of such Obligations and Loan Documents and (iii) all reasonable and documented out-of-pocket costs and expenses incurred by the Administrative Agent (including reasonable fees, charges and disbursements of counsel for the Administrative Agent) and any Required Lender and any Unanimous DIP Lender (including the fees, charges and disbursements of only one lead law firm, one local-counsel firm and any necessary specialists, one accounting firm, one financial advisory firm and one consultant retained for or on behalf of the Administrative Agent and the Lenders).

(b)     Indemnification by the Borrower.  The Loan Parties shall indemnify the Administrative Agent (and any sub-agent thereof), each Lender, and each Related Party and Approved Fund of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities, obligations, settlement payments, actions, or causes of action and related costs and expenses (including the reasonable, documented and invoiced fees, charges and disbursements of one counsel for the Indemnitees taken as a whole and, if necessary, one firm of local counsel in each appropriate jurisdiction to the Indemnitees taken as a whole, and, in the case of a conflict of interest, one additional counsel to the affected Indemnitee taken as a whole; provided, that the foregoing shall not apply to the Administrative Agent and the Lenders, who shall each be entitled to select their respective counsel, and the Loan Parties agree to pay promptly the reasonable fees and expenses of such counsel), and shall indemnify and hold harmless each Indemnitee from all reasonable, documented and invoiced fees and time charges and disbursements for attorneys who may be employees of any Indemnitee, incurred by any Indemnitee or asserted against any Indemnitee by any third party or by the Borrower or any other Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, or, in the case of the Administrative Agent (and any sub-agent thereof) and its Related Parties only, the administration of this Agreement and the other Loan Documents, (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or Release of Hazardous Materials on or from any property owned or operated by the Borrower or any of its Subsidiaries, or any Environmental Liability related in any way to the Borrower or any of its Subsidiaries, (iv) the Cases or (v) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower or any other Loan Party or any of the Borrower's or such Loan Party's directors, shareholders or creditors, and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (1) (x) are determined by a court of competent jurisdiction by final and nonap-

pealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or any of its officers or directors or (y) result from a claim brought by the Borrower or any other Loan Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if the Borrower or such Loan Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction or (2) relate to any proceeding solely between or among Indemnitees other than (A) claims against the Administrative Agent, Lenders or their Affiliates, in each case in their capacity or in fulfilling their role as the agent or arranger or any other similar role under the Loan Documents (including their role as a Lender), and (B) claims arising out of any act or omission on the part of the Equity Investors (in their capacities as holders of Equity Interests in Roadhouse Holding), the Borrower or their respective Subsidiaries.

(c)     <u>Reimbursement by Lenders</u>.  To the extent that the Borrower for any reason fails to indefeasibly pay any amount required under subsection (a) or (b) of this <u>Section 11.04</u> to be paid by it to the Administrative Agent (or any sub-agent thereof), or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent), or such Related Party, as the case may be, such Lender's Pro Rata Share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, <u>provided</u> that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent) in its capacity as such, or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent) in connection with such capacity.  The obligations of the Lenders under this subsection (c) are subject to the provisions of <u>Section 2.10(d)</u>.

(d)     <u>Waiver of Consequential Damages, Etc</u>.  To the fullest extent permitted by applicable law, no Loan Party shall assert, and each Loan Party hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.  No Indemnitee referred to in subsection (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnitee as determined by a final and nonappealable judgment of a court of competent jurisdiction.

(e)     <u>Payments</u>.  All amounts due under this <u>Section 11.04</u> shall be payable not later than ten Business Days after presentation of a reasonably detailed invoice therefor.

(f)     <u>Survival</u>.  The agreements in this <u>Section 11.04</u> shall survive the resignation of the Administrative Agent, the replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations.

Section 11.05  <u>Payments Set Aside</u>.  To the extent that any payment by or on behalf of any Loan Party is made to the Administrative Agent or any Lender, or the Administrative Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent, <u>plus</u> interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect.  The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

Section 11.06  <u>Successors and Assigns</u>.

(a)    <u>Successors and Assigns Generally</u>.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that neither the Borrower nor any other Loan Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of <u>Section 11.06(b)</u> or (ii) by way of pledge or assignment of a security interest subject to the restrictions of <u>Section 11.06(d)</u> (and any other attempted assignment or transfer by any party hereto shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    <u>Assignments by Lenders</u>.  Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment(s) and the Loans at the time owing to it); <u>provided</u> that any such assignment shall be subject to the following conditions:

(i)    <u>Minimum Amounts</u>.

(A)    in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment under the Facility and the Loans at the time owing to it under the Facility or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)    in any case not described in subsection (b)(i)(A) of this <u>Section 11.06</u>, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the Commitment is not then in effect, the principal out-

standing balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent, shall not be less than $[1,000,000]; provided, however, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met;

(ii)     Proportionate Amounts.  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Commitment assigned, except that this clause (ii) shall not prohibit any Lender from assigning all or a portion of its rights and obligations among separate Facilities on a non-pro rata basis;

(iii)     Required Consents.  No consent shall be required for any assignment except to the extent required by subsection (b)(i)(B) of this Section 11.06 and, in addition:

(A)     the consent of the Borrower (such consent not to be unreasonably withheld, conditioned or delayed) shall be required unless (1) an Event of Default has occurred and is continuing at the time of such assignment or (2) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund; provided that the Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within ten (10) Business Days after having received notice thereof;

(B)     the consent of the Administrative Agent (such consent not to be unreasonably withheld, conditioned or delayed) shall be required for assignments in respect of (1) any Commitment (other than Commitments assigned to an Affiliate or an Approved Fund of such Lender) to a Person that is not a Lender with a Commitment in respect of the Facility, an Affiliate of any such Lender or an Approved Fund with respect to any such Lender or (2) any Loan to a Person that is not a Lender, an Affiliate of a Lender or an Approved Fund;

(iv)     Assignment and Assumption.  The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee in the amount of $[3,500]; provided, however, that (A) such processing and recordation fee shall not be payable in connection with any assignment by a Lender that was a Lender on the Closing Date or an Affiliate of any such Lender or a GSO Entity, Carl Marks Entity or Marblegate Entity and (B) the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment.  The assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire, including but not limited to all documentation and other information with respect to the assignee that is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act.

(v)     No Assignment to Borrower.  No such assignment shall be made to any Loan Party or Subsidiary thereof.

(vi)     No Assignment to Natural Persons.  No such assignment shall be made to a natural person.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to subsection (c) of this Section 11.06, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05 and 11.04 with respect to facts and circumstances occurring prior to the effective date of such assignment.  Upon request, the Borrower (at its expense) shall execute and deliver a Note to the assignee Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be null and void.

(c)     Register.  The Administrative Agent, acting solely for this purpose as an agent of the Borrower, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower and any Lender (solely to the extent of the provisions related to such Lender), at any reasonable time and from time to time upon reasonable prior notice.

(d)     Certain Pledges.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under any Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, the European Central Bank or any other central bank or similar monetary authority in the organizational jurisdiction of such Lender; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

Section 11.07 Treatment of Certain Information; Confidentiality.  Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective Related Parties (if such person is (i) a GSO Entity, then it may make disclosures to any other GSO Entity and its Related Parties or its Approved Funds, (ii) a Carl Marks Entity, then it may make disclosures to any other Carl Marks Entity and its Related Parties or its Approved Funds and (iii) a Marblegate Entity, then it may make disclosures to any other Mar-

blegate Entity and its Related Parties or its Approved Funds) (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential, and it being further understood that the disclosing party shall be liable for any breaches of such confidentiality obligations by such disclosing party's current and prospective investors and funding sources to whom such disclosing party discloses Information), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it or any of its Affiliates (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section 11.07, to (i) any assignee or any prospective assignee of any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower and its obligations, (g) with the consent of the Borrower or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section 11.07 or (ii) becomes available to the Administrative Agent and any Lender, or any of their respective Affiliates on a nonconfidential basis from a source other than the Borrower.

For purposes of this Section 11.07, "Information" means all information received from any Loan Party or any Subsidiary thereof relating to any Loan Party or any Subsidiary thereof or their respective businesses, other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by any Loan Party or any Subsidiary thereof, provided that, in the case of information received from a Loan Party or any such Subsidiary after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section 11.07 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Administrative Agent and the Lenders acknowledges that (a) the Information may include material non-public information concerning the Borrower or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Law, including United States Federal and state securities Laws.

Section 11.08 Right of Setoff. If an Event of Default shall have occurred and be continuing each Lender and each of their respective Affiliates and Approved Funds is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of the Borrower or any other Loan Party against any and all of the obligations of the Borrower or such Loan Party now or hereafter existing under this Agreement or any other Loan Document to such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or any

other Loan Document and although such obligations of the Borrower or such Loan Party may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness. The rights of each Lender and their respective Affiliates under this Section 11.08 are in addition to other rights and remedies (including other rights of setoff) that such Lender or their respective Affiliates may have. Each Lender agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

Section 11.09 Interest Rate Limitation. Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "Maximum Rate"). If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower. In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

Section 11.10 Counterparts; Integration; Effectiveness. This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a signature page of this Agreement by telecopy or other electronic imaging means shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 11.11 Survival of Representations and Warranties. All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by the Administrative Agent and each Lender, regardless of any investigation made by the Administrative Agent or any Lender or on their behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

Section 11.12 Severability. If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected

or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 11.13  <u>Replacement of Lenders</u>.  If any Lender requests compensation under <u>Section 3.04</u>, or if the Borrower is required to pay any Indemnified Taxes or is required to pay any additional amount with respect to Indemnified Taxes to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 3.01</u>, if any Lender is a Defaulting Lender or if any other circumstance exists hereunder that gives the Borrower the right to replace a Lender as a party hereto, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, <u>Section 11.06</u>), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), <u>provided</u> that:

(a)     the Borrower shall have paid to the Administrative Agent the assignment fee specified in <u>Section 11.06(b)</u>;

(b)     such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under <u>Section 3.05</u>) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

(c)     in the case of any such assignment resulting from a claim for compensation under <u>Section 3.04</u> or payments required to be made pursuant to <u>Section 3.01</u>, such assignment will result in a reduction in such compensation or payments thereafter; and

(d)     such assignment does not conflict with applicable Laws.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

Section 11.14  <u>Governing Law; Jurisdiction; Etc.</u>

(a)     <u>GOVERNING LAW</u>.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK AND THE BANKRUPTCY CODE.

(b)     <u>SUBMISSION TO JURISDICTION</u>.  THE BORROWER AND EACH OTHER LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT, OR IF THE BANKRUPTCY COURT DOES NOT HAVE OR DOES NOT EXER-

CISE JURISDICTION, THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH COURTS OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE ADMINISTRATIVE AGENT OR ANY LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST THE BORROWER OR ANY OTHER LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)     WAIVER OF VENUE.  THE BORROWER AND EACH OTHER LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURTS REFERRED TO IN PARAGRAPH (B) OF THIS SECTION 11.14. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURTS.

(d)     SERVICE OF PROCESS.  EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 11.02.  NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW

Section 11.15  Waiver of Jury Trial.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT

AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 11.15</u>.

Section 11.16 <u>No Advisory or Fiduciary Responsibility</u>.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each Loan Party acknowledges and agrees, and acknowledges its Affiliates' understanding, that:  (i) (A) the arranging and other services regarding this Agreement provided by the Administrative Agent are arm's-length commercial transactions between the Borrower, Holdings and their respective Affiliates, on the one hand, and the Administrative Agent, on the other hand, (B) each Loan Party has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) each Loan Party is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) the Administrative Agent and each Lender is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for any Loan Party or any of its Affiliates, or any other Person and (B) none of the Administrative Agent or the Lenders has any obligation to the Loan Parties or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Administrative Agent and the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Loan Parties and their respective Affiliates, and none of the Administrative Agent or the Lenders has any obligation to disclose any of such interests to the Loan Parties or any of their respective Affiliates.  To the fullest extent permitted by law, each of the Loan Parties hereby waives and releases any claims that it may have against the Administrative Agent the Lenders with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 11.17 <u>Electronic Execution of Assignments and Certain Other Documents</u>.  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption or in any amendment or other modification hereof (including waivers and consents) shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 11.18 <u>USA PATRIOT Act</u>.  Each Lender that is subject to the Act (as hereinafter defined) and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "<u>Act</u>"), it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify each Loan Party in accordance with the Act.  The Borrower

shall, promptly following a request by the Administrative Agent or any Lender, provide all documentation and other information that the Administrative Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" an anti-money laundering rules and regulations, including the Act.

Section 11.19  <u>Conflicts</u>.  In the event of any conflict between the terms and conditions of the Loan Documents and of the DIP Orders, the provisions of the DIP Orders shall govern and control.

Section 11.20  Acknowledgement and Consent to Bail-In of EEA Financial Institutions. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers and agrees and consents to, and acknowledges and agrees to be bound by:

(a)  the application of any Write-Down and Conversion Powers to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)  the effects of any Bail-In Action on any such liability, including, if applicable:

(i)  a reduction in full or in part or cancellation of any such liability;

(ii)  a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)  the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers.

*IN WITNESS WHEREOF,* the parties hereto have caused this Agreement to be duly executed as of the date first above written.

LOGAN'S ROADHOUSE, INC.

By: _____
     Name:
     Title:

LRI HOLDINGS, INC.

By: _____
     Name:
     Title:

LOGAN'S ROADHOUSE OF KANSAS, INC.

By: _____
     Name:
     Title:

LOGAN'S ROADHOUSE OF TEXAS, INC.

By: _____
     Name:
     Title:

ROADHOUSE PARENT INC.

By: _____
     Name:
     Title:

ROADHOUSE MIDCO INC.

By: _____
     Name:
     Title:

ROADHOUSE INTERMEDIATE INC.

By: _____
     Name:
     Title:

ROADHOUSE HOLDING INC.


By: _____
     Name:
     Title:

CORTLAND CAPITAL MARKET SERVICES LLC,
as Administrative Agent

By: _____
   Name:
   Title:

MARBLEGATE SPECIAL OPPORTUNITIES
MASTER FUND, L.P., as a Lender

# EXHIBIT E

## EXIT FIRST LIEN FINANCING TERM SHEET

Logan's Roadhouse, Inc.
$29 million
First Lien Exit Revolving Facility
Summary of Terms and Conditions

This summary of terms and conditions (the "Term Sheet") and all annexes hereto describes the principal terms and conditions for the Exit Revolving Facility (as defined below) contemplated to be entered into upon consummation of the Plan, subject to the terms and conditions herein and in the Restructuring Support Agreement, by and among Roadhouse Holding, Inc., Kelso Investment Associates VIII, L.P., KEP VI, LLC, the Supporting Noteholders (as defined therein), JPMorgan Chase Bank, N.A., the Supporting Lenders (as defined therein), and any Joining Party (as defined therein) from time to time party thereto (the "Restructuring Support Agreement") and the Plan. Capitalized terms used but not defined shall have the meanings set forth in the Restructuring Support Agreement.

## 1. PARTIES

| | |
|---|---|
| Borrower: | Logan's Roadhouse, Inc., a Tennessee corporation, as reorganized pursuant to the Plan (the "Borrower"). |
| Guarantors: | LRI Holdings, Inc., a Delaware corporation ("Holdings"), as reorganized pursuant to the Plan, and each of the Borrower's direct and indirect, existing and future, domestic subsidiaries (the "Guarantors", in each case, as reorganized pursuant to the Plan; together with the Borrower, the "Loan Parties"). |
| Lead Arrangers and Bookrunners: | JPMorgan Chase Bank, N.A. ("JPMorgan") and Credit Suisse Securities (USA) LLC ("CS Securities"; together with JPMorgan in such capacity, the "Senior Lead Arrangers"). |
| Administrative Agent: | JPMorgan (in such capacity, the "Administrative Agent"). |
| Lenders: | The lenders under the Existing Facility (as defined below) (the "Lenders"). |
| | "Existing Facility" means that certain Credit Agreement dated as of October 4, 2010, between LRI Holdings, Inc. (as successor by merger to Roadhouse Merger, Inc.), Logan's Roadhouse, Inc. (as successor by merger to Roadhouse Financing, Inc.), JPMorgan, as Administrative Agent, and the other agents and lenders party thereto from time to time, and all exhibits, amendments, and supplements thereto. |

## 2. TYPE AND AMOUNT OF EXIT REVOLVING FACILITY

| | |
|---|---|
| Type and Amount: | A thirty month first lien exit revolving facility (the "Exit Revolving Facility"; the commitments thereunder, the "Revolving Commitments") in the amount of $29,000,000 (the loans thereunder, the "Revolving Loans"). |
| Availability and | |

| | |
|---|---|
| Maturity: | The Exit Revolving Facility shall be available on a revolving basis during the period commencing on the Closing Date and ending on the date that is thirty months after the Closing Date (the "<u>Revolving Termination Date</u>"), provided that Revolving Loans shall not exceed $23,899,525 (plus an additional amount that shall include commitment fees and PIK interest, which shall be set forth in a separate tranche which, for the avoidance of doubt, may not be reborrowed) at any time outstanding. The Revolving Commitments and the Revolving Loans will mature on the Revolving Termination Date. |
| Letters of Credit: | A portion of the Exit Revolving Facility not in excess of $12,000,000 shall be available for the issuance of letters of credit (the "<u>Letters of Credit</u>") by the Administrative Agent or other Lenders reasonably satisfactory to the Borrower (in such capacity, the "<u>Issuing Lender</u>"). No Letter of Credit shall have an expiration date after the earlier of (a) one year after the date of issuance unless consented to by the Issuing Lender and (b) five business days prior to the Revolving Termination Date, <u>provided</u> that any Letter of Credit with a one-year tenor may provide for the renewal thereof for additional one-year periods (which shall in no event extend beyond the date referred to in clause (b) above). Letters of Credit issued under the Existing Facility and outstanding on the Closing Date will be rolled over into the Exit Revolving Facility and shall be deemed to have been issued under the Exit Revolving Facility. |
| | Drawings under any Letter of Credit shall be reimbursed by the Borrower (whether with its own funds or with the proceeds of Revolving Loans) within one business day. To the extent that the Borrower does not so reimburse the Issuing Lender, the Lenders under the Exit Revolving Facility shall be irrevocably and unconditionally obligated to fund participations in the reimbursement obligations on a pro rata basis. |
| Use of Proceeds: | The proceeds of the Revolving Loans shall be used to repay (or deemed to repay) the outstanding principal amount under the Existing Facility, as contemplated by the Plan, and to finance the working capital needs and general corporate purposes of the Borrower and its subsidiaries. |

## 3. CERTAIN PAYMENT PROVISIONS

| | |
|---|---|
| Fees and Interest Rates: | As set forth on Annex I. |
| Optional Prepayments and Commitment Reductions: | Revolving Loans may be prepaid and Revolving Commitments may be reduced, in whole or in part without premium or penalty, at the option of the Borrower, in multiples of $1,000,000, or a whole multiple of $500,000 in excess thereof, upon not less than three-business days' prior notice to the Administrative Agent, |

509265-1544-15068-Active.20036354.11

subject to reimbursement of the Lenders' redeployment costs in the case of a prepayment of Eurodollar Loans (as defined in Annex I) prior to the last day of the relevant interest period. Any reduction shall reduce permanently the Revolving Commitments then in effect.

Mandatory Commitment Reductions/Prepayments:

The Revolving Commitments shall be permanently reduced upon the receipt by the Borrower or any of its subsidiaries of the net cash proceeds of any asset sale (including any casualty or condemnation event) in an amount equal to 75% of the net cash proceeds from any such asset sale in excess of $2,000,000 in the aggregate since the effective date of the Plan. In addition, all of such net cash proceeds shall be used to prepay outstanding Revolving Loans and, to the extent that, after giving effect to the prepayment of all outstanding Revolving Loans, the outstanding extensions of credit under the Exit Revolving Facility exceed the Revolving Commitments (as so reduced), the Borrower shall cash collateralize any outstanding Letters of Credit in any amount equal to such excess.

The Revolving Loans shall be prepaid and the Letters of Credit shall be cash collateralized or replaced (i) to the extent, for any other reason, such extensions of credit exceed the Revolving Commitments and (ii) with any amounts in excess of the Maximum Liquidity Amount.

## 4. COLLATERAL

Collateral:

Subject to exclusions and limitations substantially the same as those applicable to the Existing Facility, the obligations of the Borrower and each Guarantor in respect of the Exit Revolving Facility and any swap agreements and cash management arrangements provided by any Lender (or any affiliate of a Lender) (collectively, the "Exit Revolving Facility Obligations") shall be secured by a perfected first priority security interest in all of its tangible and intangible assets (collectively, the "Collateral") (including, without limitation, U.S. intellectual property, real property, material leasehold interests and all of the capital stock of the Borrower and each of its direct and indirect subsidiaries (limited, in the case of foreign subsidiaries, to 66-⅔% of the capital stock of first tier foreign subsidiaries)), except for those assets as to which the Administrative Agent shall determine in its sole discretion that the cost of obtaining a security interest therein are excessive in relation to the value of the security to be afforded thereby.

All the above-described pledges, security interests and mortgages shall be created on reasonably satisfactory terms, pursuant to documentation substantially the same as that applicable to the Existing Facility, and none of the Collateral

shall be subject to any other pledges, security interests or mortgages, other than liens to secure the obligations under the Exit Second Lien Facility including exceptions consistent with those applicable to the Existing Facility.

| | |
|---|---|
| Intercreditor Arrangements: | An intercreditor agreement (the "<u>Second Lien Intercreditor Agreement</u>") shall document the second lien status of the collateral package for the Exit Second Lien Facility which shall provide, among other things, that (i) the Lenders under the Exit Revolving Facility and any other holders of a first lien on the Collateral (the "<u>Senior Lienholders</u>") will have a standstill on the ability of Lenders under the Exit Second Lien Facility (the "<u>Second Lienholders</u>") to exercise lien-related remedies, (ii) the Second Lienholders will not dispute the validity of the Senior Lienholders' claims or the Exit Revolving Facility Obligations, (iii) the Second Lienholders will not object to a "debtor-in-possession" financing, (iv) the Second Lienholders will not object to the Senior Lienholders' adequate protection, (v) the Second Lienholders will not engage in any credit bidding with regard to the Exit Second Lien Facility unless the Exit Revolving Facility is paid in full and in cash with the proceeds of such credit bid, (vi) the Second Lienholders may not support any plan that is inconsistent with the terms of the Second Lien Intercreditor Agreement, (vii) the Second Lienholders may not make any proposal regarding "debtor-in-possession" financing without the prior consent of the Senior Lienholders, <u>provided</u>, <u>further</u>, that any such "debtor-in-possession" financing proposed by the Second Lienholders must be subordinated to the Senior Lienholders and (viii) certain other customary bankruptcy-related protections satisfactory to the Lenders. |

## 5. CERTAIN CONDITIONS

| | |
|---|---|
| Initial Conditions: | The availability of the Exit Revolving Facility and each extension of credit under the Exit Revolving Facility on the Closing Date (if any) will be subject to usual and customary conditions precedent for facilities and transactions of this type including, but not limited to, the following: |

    (a) Each party thereto shall have executed and delivered the Revolving Credit Documentation (as defined below) and the Second Lien Intercreditor Agreement on terms consistent with, and containing only such representations, warranties, covenants and events of default expressly set forth in, this Term Sheet, and otherwise reasonably satisfactory to both the Loan Parties and the Lenders, and the Lenders shall have received:

        i.    customary closing certificates and legal opinions for similar financings; and

ii. a certificate from the chief financial officer of Holdings, in the form attached hereto as Annex II, certifying that Holdings and its subsidiaries, on a consolidated basis after giving effect to the transactions contemplated hereby, are solvent.

(b) A final non-appealable order of the Bankruptcy Court in form and substance satisfactory to the Administrative Agent confirming the Plan, which shall not have been stayed, reversed, vacated, amended, supplemented or otherwise modified in any manner that could reasonably be expected to adversely affect the interests of the Administrative Agent, the Arranger or the Lenders (the "Confirmation Order") and authorizing Loan Parties and their subsidiaries to execute, deliver and perform under all documents contemplated hereunder and thereunder shall have been entered and shall have become a final order of the Bankruptcy Court. The Plan and all transactions contemplated therein or in the Confirmation Order to occur on the effective date of the Plan shall have been (or concurrently with the Closing Date, shall be) substantially consummated in accordance with the terms thereof and in compliance with applicable law and Bankruptcy Court and regulatory approvals.

(c) The Borrower shall have received debtor-in-possession financing under a debtor-in-possession financing agreement, in the form of the DIP Credit Agreement attached as Exhibit D to the RSA Term Sheet, consisting of the New Money Facility (as defined in the DIP Credit Agreement) not less than $25,000,000 and the Roll Up Facility (as defined in the DIP Credit Agreement), and the proceeds of the New Money Facility shall have been contributed to the Borrower following any such approval of the DIP Financing by the Bankruptcy Court in an amount not less than $25,000,000. In addition, claims under the DIP Financing shall have been (or concurrently with the Closing Date, shall be) converted to claims under the Exit Second Lien Facility, as set forth in the Plan.

(d) The Administrative Agent shall have received evidence reasonably satisfactory to it that the Loan Parties shall have aggregate Liquidity (as defined below) as of the Closing Date in an amount not less than $5,000,000 and there shall be no debt of the Borrower or any its Subsidiaries outstanding as of the Closing Date other than the Exit Revolving Facility, the Exit Second Lien Facility and as otherwise contemplated by the Plan, in each case, as certified to in writing by an authorized officer of each Loan Party and evidenced in a form and

509265-1544-15068-Active.20036354.11

substance reasonably satisfactory to the Administrative Agent.

(e) The Restructuring Support Agreement shall be in full force and effect and no termination event shall have occurred thereunder.

(f) The Lenders shall have received (a) audited consolidated balance sheets and related statements of income, stockholders' equity and cash flows of Holdings and its subsidiaries, for fiscal years ended 2013, 2014 and 2015 and (b) unaudited consolidated balance sheets and related statements of income, stockholders' equity and cash flows of Holdings and its subsidiaries, for each subsequent fiscal quarter ended at least 45 days before the Closing Date.

(g) The Lenders shall have received a pro forma consolidated balance sheet and related pro forma consolidated statements of income, stockholders' equity and cash flows of the Loan Parties as of and for the twelve-month period ending on the Closing Date, prepared after giving effect to the consummation of the Plan and any other transactions contemplated thereby as if and other transactions had occurred as of such date (in the case of such balance sheet) or at the beginning of such period (in the case of such statements of income and cash flows).

(h) The Administrative Agent shall have received, at least 5 days prior to the Closing Date, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act.

(i) All fees and invoiced expenses due to the Senior Lead Arrangers and the Lenders shall have been paid.

(j) All documents, certificates and instruments necessary to establish that the Administrative Agent under the Exit Revolving Facility will have a perfected first priority security interest (subject to liens permitted under the Revolving Credit Documentation) in the Collateral shall have been executed and delivered.

(k) A Chief Restructuring Officer acceptable to the Lenders shall have been appointed.

(l) All governmental and third party approvals necessary in connection with the consummation of the Plan, including

509265-1544-15068-Active.20036354.11

the Exit Revolving Facility and the continuing operations of the Loan Parties (including shareholder approvals, if any) shall have been obtained on satisfactory terms and shall be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose adverse conditions on the consummation of the Plan, including the entry into the Exit Revolving Facility.

(m) The absence of any action, suit, investigation or proceeding pending or threatened in any court or before any arbitrator or governmental authority that purports to materially and adversely affect the consummation of the Plan and any other transaction contemplated hereby, or that could have a material adverse effect on Loan Parties, taken as a whole, the consummation of the Plan and any other transaction contemplated hereby or on the ability of any Loan Party to perform its obligations under the Loan Documents.

(n) The Closing date shall have occurred on or prior to November 14, 2016.

On-Going Conditions: After the Closing Date the making of each Revolving Loan or the issuance of a Letter of Credit shall be conditioned upon (a) the accuracy in all material respects (and in all respects if qualified by materiality) of all representations and warranties in the definitive documentation for the Exit Revolving Facility and (b) there being no default or event of default in existence at the time of, or after giving effect to the making of, such extension of credit (including, without limitation, under the financial covenants set forth below).

6. DOCUMENTATION

Revolving Credit Documentation: The definitive documentation for the Exit Revolving Facility (the "Revolving Credit Documentation") shall contain those terms and conditions set forth herein and otherwise customary for facilities and transactions of this type as may be mutually agreed by the Senior Lead Arrangers and the Borrower.

Financial Covenants: Limited to:

(a) A minimum EBITDA measured on a trailing twelve month basis at the end of each fiscal month, at levels to be agreed and based on (i) for the period beginning on the Closing Date and ending on March 31, 2017, a 50% variance in EBITDA below the EBITDA levels set forth

7

in the Plan, (ii) for the period beginning on April 1, 2017 and ending on June 30, 2017, a 40% variance in EBITDA below the EBITDA levels set forth in the Plan, (iii) for the period beginning on September 1, 2017 and ending on December 31, 2017, a 30% variance in EBITDA below the EBITDA levels set forth in the Plan and (iv) thereafter, a 25% variance in EBITDA below the EBITDA levels set forth in the Plan. For the avoidance of doubt, this covenant shall be based on a consolidated EBITDA definition (which shall include certain adjustments) to be mutually agreed upon by the Loan Parties and the Lenders pursuant to definitive documentation.

(b)     Maximum capital expenditures, measured on a trailing 12-month basis at the end of each fiscal month, at levels to be agreed and with a 15% variance in capital expenditures above the capital expenditure levels set forth in the Plan.

(c)     Maximum liquidity (which shall include the undrawn available Revolving Commitments), measured on a trailing monthly basis at the end of each fiscal month (beginning with January 2018), shall be equal to or less than $23,000,000 (the "Maximum Liquidity Amount").

(d)     Liquidity shall equal or be greater than, at the end of each fiscal month (i) for the period beginning on the Closing Date and ending on March 31, 2017, $5,000,000, (ii) for the period beginning on April 1, 2017 and ending on December 31, 2017, $6,000,000 and (iii) thereafter, $7,500,000.

Representations and Warranties:     Customary for facilities and transactions of this type, and limited to the following: Financial condition (including pro forma financial statements); no material adverse change; corporate existence; compliance with law; corporate power and authority; enforceability of Revolving Credit Documentation; no conflict with law or contractual obligations; no material litigation; no default; ownership of property; liens; possession under leases; insurance; location of real property and leased premises; intellectual property; taxes; Federal Reserve regulations; labor matters; ERISA; Investment Company Act; subsidiaries; use of proceeds; environmental matters; accuracy of disclosure; creation and perfection of security interests; solvency; and status of Exit Revolving Facility as senior debt.

Affirmative Covenants:     Customary for facilities and transactions of this type, and limited to the following: Delivery of financial statements, reports, accountants' letters, projections, officers' certificates and other information requested by the Lenders or provided to the Second

8

Lienholders (including, without limitation, weekly flash performance reports); payment of taxes and other obligations; continuation of business and maintenance of existence and material rights and privileges; compliance with laws and material contractual obligations; maintenance of property and insurance; maintenance of books and records; right of the Lenders to inspect property and books and records (including, without limitation, the availability of the Loan Parties for update calls at the Lenders' request); notices of defaults, litigation and other material events; compliance with environmental laws; ERISA; further assurances (including, without limitation, with respect to security interests in after-acquired property); use of commercially reasonable efforts to maintain public corporate family/corporate credit ratings; sanctions and anti-corruption laws; and maintenance of a Chief Restructuring Officer acceptable to the Lenders.

|  |  |
|---|---|
| Negative Covenants: | Customary for facilities and transactions of this type, and limited to the following:  Limitations on: indebtedness (including guarantee obligations); liens; mergers, consolidations, liquidations, dissolutions and other fundamental changes; changes in nature of business; sales of assets; dividends and other payments in respect of capital stock; capital expenditures; acquisitions, investments, loans and advances; payments and modifications of the obligations under the Exit Second Lien Facility, subordinated debt and other material debt instruments; transactions with affiliates; sale-leasebacks; changes in fiscal year; hedging arrangements; negative pledge clauses and clauses restricting subsidiary distributions; use of proceeds not violating sanctions and anti-corruption laws; and changes in lines of business. |
| Events of Default: | Customary for facilities and transactions of this type, and limited to the following:  Nonpayment of principal when due; nonpayment of interest, fees or other amounts after a grace period to be agreed upon; material inaccuracy of a representation or warranty when made; violation of a covenant (subject, in the case of certain affirmative covenants, to a grace period to be agreed upon); cross-default to material indebtedness; bankruptcy events; certain ERISA events; material judgments; actual or asserted invalidity of any guarantee, security document or subordination provisions or non-perfection of security interest; changes in the passive holding company status of Holdings; and a change of control. |
| Voting: | Amendments and waivers with respect to the Exit Revolving Facility Documentation shall require the approval of Lenders holding more than 50% of the aggregate amount of the Revolving Commitments (the "Required Lenders"), except that (a) the consent of each Lender directly affected thereby shall be required with respect to (i) reductions in the amount or |

extensions of the final maturity of any Revolving Loan, (ii) reductions in the rate of interest or any fee or extensions of any due date thereof and (iii) increases in the amount or extensions of the expiry date of any Lender's Revolving Commitment and (b) the consent of 100% of the Lenders shall be required with respect to (i) reductions of any of the voting percentages, (ii) releases of all or substantially all the collateral and (iii) releases of all or substantially all of the Guarantors. The Exit Revolving Facility Documentation shall contain customary provisions for replacing non-consenting Lenders in connection with amendments and waivers requiring the consent of all Lenders or of all Lenders directly affected thereby so long as the Required Lenders shall have consented thereto.

The Exit Revolving Facility Documentation shall contain customary provisions relating to "defaulting" Lenders (including provisions relating to providing cash collateral to support letters of credit, the suspension of voting rights, rights to receive certain fees, and termination or assignment of commitments or Revolving Loans of such Lenders).

**Assignments and Participations:**

The Lenders shall be permitted to assign all or a portion of their Revolving Loans and Revolving Commitments with the consent, not to be unreasonably withheld, conditioned or delayed of (a) the Borrower, unless (i) the assignee is a Lender, an affiliate of a Lender or an approved fund; provided that the Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within ten (10) business days after having received written notice thereof; or (ii) an event of default has occurred and is continuing and (b) the Administrative Agent.  In the case of partial assignments (other than to another Lender, an affiliate of a Lender or an approved fund), the minimum assignment amount shall be $1,000,000, unless otherwise agreed by the Borrower and the Administrative Agent.  The Administrative Agent shall receive a processing and recordation fee of $3,500 in connection with all assignments.  The Lenders shall also be permitted to sell participations in their Revolving Loans.  Participants shall have the same benefits as the selling Lenders, in an amount not to exceed that available to the selling Lenders, with respect to yield protection and increased cost provisions subject to customary limitations.  Voting rights of participants shall be limited to those matters set forth in clause (a) under "Voting" with respect to which the affirmative vote of the Lender from which it purchased its participation would be required.  Pledges of Revolving Loans in accordance with applicable law shall be permitted without restriction.

**Yield Protection:**

The Revolving Credit Documentation shall contain customary provisions (a) protecting the Lenders against increased costs or loss of yield resulting from changes in reserve, tax, capital

adequacy and other requirements of law and from the imposition of or changes in withholding or other taxes and (b) indemnifying the Lenders for "breakage costs" incurred in connection with, among other things, any prepayment of a Eurodollar Loan (as defined in Annex I) on a day other than the last day of an interest period with respect thereto.

Expenses and Indemnification:

The Borrower shall pay (a) all reasonable and documented out-of-pocket expenses of the Administrative Agent and the Lead Arrangers associated with the syndication of the Exit Revolving Facility and the preparation, execution, delivery and administration of the Revolving Credit Documentation and any amendment or waiver with respect thereto (including the reasonable fees, disbursements and other charges of counsel); (b) all documented out-of-pocket expenses of the Administrative Agent and the Lenders (including the fees, disbursements and other charges of counsel) in connection with the enforcement of the Revolving Credit Documentation; and (c) all reasonable and documented out-of-pocket expenses of the Lenders' outside counsel, local counsel and financial advisor, if necessary, in the discretion of the Lenders.

The Administrative Agent, the Lead Arrangers and the Lenders and their affiliates and their respective officers, directors, employees, advisors and agents (each, an "indemnified person" and such affiliates, directors, officers, employees, advisors, agents and other representatives of any such indemnified person are referred to herein as its "related parties") will have no liability for, and will be indemnified and held harmless against, any losses, claims, damages, liabilities or expenses (including the reasonable fees, disbursements and other charges of counsel) incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof, except to the extent they are found by a final, nonappealable judgment of a court of competent jurisdiction to arise from the bad faith, gross negligence, willful misconduct or material breach of the obligations of the relevant indemnified person (or its related parties) under the Revolving Credit Documentation.

Governing Law and Forum:

New York.

Bail-In Provisions:

The Exit Revolving Facility will contain customary EU bail-in provisions.

Counsel to the Administrative Agent and the Lenders:

Simpson Thacher & Bartlett LLP.

11

# INTEREST AND CERTAIN FEES

Interest Rate Options:

The Borrower may elect that the Revolving Loans comprising each borrowing bear interest at a rate per annum equal to (a) the ABR plus the Applicable Margin or (b) the Eurodollar Rate plus the Applicable Margin.

As used herein:

"ABR" means the highest of (i) the rate of interest publicly announced by JPMorgan Chase Bank, N.A. as its prime rate in effect at its principal office in New York City (the "Prime Rate"), (ii) the federal funds effective or overnight rate from time to time plus 0.50% and (iii) the Eurodollar Rate applicable for an interest period of one month plus 1.00%

"ABR Loans" means Revolving Loans bearing interest based upon the ABR.

"Applicable Margin" means, (a) in the case of Eurodollar Loans, (i) during the period commencing on the Closing Date and ending on the date that is twelve months after the Closing Date: 8.00%; (ii) during the period commencing on the date that is thirteen months after the Closing Date and ending on the date that is eighteen months after the Closing Date: 11.00% and (iii) during the period commencing on the date that is nineteen months after the Closing Date and ending on the date that is thirty months after the Closing Date: 13.00%, and, (b) in the case of ABR Loans, (i) during the period commencing on the Closing Date and ending on the date that is twelve months after the Closing Date: 7.00%; (ii) during the period commencing on the date that is thirteen months after the Closing Date and ending on the date that is eighteen months after the Closing Date: 10.00% and (iii) during the period commencing on the date that is nineteen months after the Closing Date and ending on the date that is thirty months after the Closing Date: 12.00%, provided that, at the option of the Borrower, the Borrower may elect to pay a portion of such Applicable Margin in-kind by adding such portion to the principal amount of the Revolving Loans, which portion shall not exceed (i) 1.00% during the period commencing on the Closing Date and ending on the date that is twelve months after the Closing Date, (ii) 3.00% during the period commencing on the date that is thirteen months after the Closing Date and ending on the date that is eighteen months after the Closing Date and (iii) 2.00% thereafter.

"Eurodollar Rate" means the rate (adjusted for statutory reserve requirements for eurocurrency liabilities) for eurodollar deposits for a period equal to one, two, three or six months (as selected by

the Borrower) appearing on LIBOR01 Page published by Reuters (or an interpolated rate if the screen rate is not available), provided, however, that in no event shall the Eurodollar Rate be less than 1%.

"<u>Eurodollar Loans</u>" means Revolving Loans bearing interest based upon the Eurodollar Rate.

| | |
|---|---|
| Interest Payment Dates: | In the case of ABR Loans, quarterly in arrears. |

In the case of Eurodollar Loans, on the last day of each relevant interest period and, in the case of any interest period longer than three months, on each successive date three months after the first day of such interest period.

**Upfront Commitment Fee:**

The Borrower shall pay an upfront commitment fee equal to 3.00% of the total amount of the Exit Revolving Facility (the "<u>Upfront Commitment Fee</u>"), which shall be capitalized on the Closing Date and added to the outstanding balance of Revolving Loans as of the Closing Date.

**Undrawn Commitment Fee:**

The Borrower shall pay a commitment fee calculated at a rate per annum equal to 0.75% on the average daily unused portion of the Exit Revolving Facility.

**Letter of Credit Fees:**

The Borrower shall pay a fee on all outstanding Letters of Credit at a per annum rate equal to the Applicable Margin then in effect with respect to Eurodollar Loans under the Exit Revolving Facility on the face amount of each such Letter of Credit. Such fee shall be shared ratably among the Lenders participating in the Exit Revolving Facility and shall be payable quarterly in arrears.

A fronting fee equal to 0.25% of the face amount of each Letter of Credit shall be payable quarterly in arrears to the Issuing Lender for its own account. In addition, customary administrative, issuance, amendment, payment and negotiation charges shall be payable to the Issuing Lender for its own account.

**Default Rate:**

At any time when the Borrower is in default in the payment of any amount under the Exit Revolving Facility, after giving effect to any applicable grace period, such overdue amounts shall bear interest at 2.00% per annum above the interest rate which would be payable at such time on an ABR Loan.

**Rate and Fee Basis:**

All per annum rates shall be calculated on the basis of a year of 360 days (or 365/366 days, in the case of ABR Loans, the interest rate payable on which is then based on the Prime Rate) for actual days elapsed.

# FORM OF SOLVENCY CERTIFICATE

[_____], 2016

This Solvency Certificate is being executed and delivered pursuant to Section [___] of that certain [_____][1] (as amended, restated, amended and restated, extended, supplemented or otherwise modified in writing from time to time, the "Exit Revolving Facility"; the terms defined therein being used herein as therein defined).

I, [              ], the Chief Financial Officer of Holdings, in such capacity and not in an individual capacity, hereby certify that I am the Chief Financial Officer of Holdings and that I am generally familiar with the businesses and assets of Holdings and its Subsidiaries (taken as a whole) and am duly authorized to execute this Solvency Certificate on behalf of Holdings pursuant to the Exit Revolving Facility.

I further certify, in my capacity as Chief Financial Officer of Holdings, and not in my individual capacity, as of the date hereof and after giving effect to the Plan and the incurrence of the indebtedness and obligations being incurred in connection with the Exit Revolving Facility and the Plan, that, (i) the sum of the debt (including contingent liabilities) of Holdings, the Borrower and its subsidiaries, taken as a whole, does not exceed the present fair saleable value of the present assets of Holdings, the Borrower and its subsidiaries, taken as a whole; (ii) the capital of Holdings, the Borrower and its subsidiaries, taken as a whole, is not unreasonably small in relation to the business of Holdings, the Borrower or its subsidiaries, taken as a whole, contemplated as of the date hereof; and (iii) Holdings, Borrower and its subsidiaries, taken as a whole, do not intend to incur, or believe that they will incur, debts including current obligations beyond their ability to pay such debt as they mature in the ordinary course of business. For the purposes hereof, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standard No. 5).

*[Remainder of page intentionally left blank]*

---

[1]     Describe Exit Revolving Facility

IN WITNESS WHEREOF, I have executed this Solvency Certificate on the date first written above.

By:_____
    Name: [_____]
    Title: Chief Financial Officer

**EXHIBIT F**

**GOVERNANCE TERM SHEET**

**Logan's Roadhouse, Inc.**

**Corporate Governance Term Sheet**

**August 8, 2016**

**THE FOLLOWING TERM SHEET PRESENTS CERTAIN OF THE MATERIAL TERMS IN RESPECT OF THE CORPORATE GOVERNANCE OF ROADHOUSE HOLDINGS, INC. (OR SUCH OTHER ENTITY AS IS ESTABLISHED TO BE THE ULTIMATE HOLDING COMPANY FOR THE LOGAN'S ROADHOUSE BUSINESS) ("ULTIMATE PARENT").  THIS TERM SHEET IS BEING PROVIDED IN CONTEMPLATION OF A RELATED "PRINCIPAL TERMS OF PROPOSED RESTRUCTURING TRANSACTION" TO BE ATTACHED TO A RESTRUCTURING SUPPORT AGREEMENT (THE "RSA").  THE PROPOSED TERMS SET FORTH IN THIS TERM SHEET ARE INTENDED TO FACILITATE THE PREPARATION OF THE DEFINITIVE CONSTITUTIVE DOCUMENTATION OF ULTIMATE PARENT.  THIS TERM SHEET IS HIGHLY CONFIDENTIAL AND SHALL NOT BE DISCLOSED BY ANY RECIPIENT HEREOF TO ANY THIRD PARTY.**

The constitutive documents (e.g., Amended and Restated Certificate of Incorporation, By-laws and Stockholders' Agreement) of Ultimate Parent (the "Organizational Documents") would include the provisions set forth below.

| | |
|---|---|
| ***Board of Directors*** | Following the effective date of the Plan contemplated by the RSA (such date, the "Effective Date"), the day-to-day operations of Ultimate Parent shall be overseen by the Board of Directors of Ultimate Parent (the "Board"), including the authority to appoint the officers of Ultimate Parent, which shall initially be comprised of seven or more directors collectively holding up to twelve votes as follows:<br><br>(i) two independent directors nominated by the Board and elected by a majority of the holders of Ultimate Parent's equity securities entitled to vote generally for the election of directors ("New Voting Securities");<br><br>(ii) the then-serving Chief Executive Officer of Ultimate Parent;<br><br>(iii) for so long as Kelso & Company or its respective controlled investment affiliates (collectively, "Kelso") hold at least the Designating Threshold (as defined below) of the New Voting Securities issued to Kelso on the Effective Date, one director appointed by Kelso (the "Kelso Director"); |

(iv) for so long as GSO Capital Partners, LP or its controlled investment affiliates (collectively, "GSO" and together with Kelso, the "Lead Holders") hold at least the Designating Threshold of the New Voting Securities issued to GSO on the Effective Date, one director appointed by GSO (the "GSO Director" and together with the Kelso Director, the "Lead Directors");

(v) for so long as Marblegate Asset Management, LLC or its controlled investment affiliates (collectively, "MG") hold at least the Designating Threshold of the New Voting Securities issued to MG on the Effective Date, one director appointed by MG (the "MG Director");

(vi) for so long as Carl Marks Management Company, LLC or its controlled investment affiliates (collectively, "CM" and collectively with Kelso, GSO and MG for so long as they retain the right to designate a Designated Director, the "Designating Holders") hold at least the Designating Threshold of the New Voting Securities issued to CM on the Effective Date, one director appointed by CM (the "CM Director" and collectively with the Kelso Director, the GSO Director and the MG Director, the "Designated Directors"); and

(vii) any Alternative Director (as defined below).

The "Designating Threshold" means an amount of New Voting Securities equal to 25% of the lesser of (a) the New Voting Securities to be issued to Kelso on the Effective Date and (b) the New Voting Securities to be issued to GSO on the Effective Date.

Each director shall be entitled to cast one vote on any matter before the Board, except that (a) (i) each Lead Director shall be entitled to cast three votes on any matter before the Board for so long as the Lead Holder that appointed such Lead Director holds an amount of New Voting Securities equal to at least the Three-Vote Threshold (as defined below) of the New Voting Securities issued to such Designating Holder on the Effective Date, (ii) each Lead Director shall be entitled to cast two votes on any matter before the Board for so long as the Lead Holder that appointed such Lead Director holds at least the Two-Vote Threshold (as defined below) but less than Three-Vote Threshold of the New Voting Securities issued to such Designating Holder on the Effective Date, and (iii) thereafter each Lead Director shall have the right to cast one vote on any matter before the Board, (b) the CM Director shall be entitled to cast two votes on any matter before the Board for so long as CM holds at least the Two-Vote Threshold of the New Voting Securities issued to CM on the Effective Date and thereafter the CM Director shall have

the right to cast one vote on any matter before the Board and (c) any Alternative Director shall be entitled to cast a number of votes as described below. Furthermore, anytime a Designating Holder transfers to one of the other Designating Holders (in one or more transactions) (x) an aggregate amount of New Voting Securities equal to or greater than the Designating Threshold, which causes a reduction in the number of votes entitled to be cast by the transferring Designating Holder's Designated Director from three votes to two votes, (y) an aggregate amount of New Voting Securities equal to or greater than (i) the Three-Vote Threshold minus the Two-Vote Threshold, in the case of the Lead Directors, and (ii) 100% of the New Voting Securities issued to CM on the Effective Date minus the Two-Vote Threshold, in the case of CM, which causes a reduction in the number of votes entitled to be cast by the transferring Designating Holder's Designated Director from two votes to one vote, or (z) an aggregate amount of New Voting Securities equal to or greater than the Designating Threshold, which causes the loss of the transferring Designating Holder's right to designate a director, the number of votes entitled to be cast on any matter before the Board by the Designated Director of the transferee Designating Holder will increase by one vote for each applicable transfer concurrently with the corresponding loss of a vote by the transferring Designating Holder's Designated Director. Such Designated Director of the transferee Designating Holder will continue to be entitled to cast any such additional vote or votes so long as the transferee Designating Holder holds such transferred New Voting Securities and is otherwise entitled to designate a director in accordance herewith.

The "<u>Two-Vote Threshold</u>" means an amount of New Voting Securities equal to 75% of the New Voting Securities to be issued to CM on the Effective Date. The "<u>Three-Vote Threshold</u>" means an amount of New Voting Securities equal to 75% of the lesser of (a) the New Voting Securities to be issued to Kelso on the Effective Date and (b) the New Voting Securities to be issued to GSO on the Effective Date.

Notwithstanding the foregoing, any time the GSO Director would otherwise be entitled to cast more than 25% of the total number of votes entitled to be cast on any matter before the Board, one or more (as determined by GSO) additional independent directors shall be appointed to the Board by the then-serving Chief Executive Officer of Ultimate Parent (each, an "<u>Alternative Director</u>"), which appointment(s) shall be subject in all respects to GSO's consent, and such Alternative Director(s) shall be entitled to collectively cast (in lieu of the GSO Director) the number of votes that reduces the

| | number of votes the GSO Director is entitled to cast to 25% or less of the total number of votes entitled to be cast. For the avoidance of doubt, any vote entitled to be cast by an Alternative Director will reduce the number of votes entitled to be cast by the GSO Director. |
| --- | --- |
| | For each Designating Holder that loses its right to designate a director, the number of directors elected pursuant to clause (i) shall be increased by one; provided, that, to the extent another Designated Director receives the right to cast an additional vote in connection with such loss (as described above), the number of directors elected pursuant to clause (i) shall not be increased until such time as the applicable Designated Director is no longer entitled to cast such additional vote. |
| | The Chairperson of the Board shall be appointed from among the members of the Board by a majority vote of the Designated Directors (together with any Alternative Directors). The Chairperson of the Board shall have the rights and duties customary for non-executive chairperson positions. |
| | A quorum for meetings of the Board will require the attendance (telephonically or in person) of directors holding a majority of the votes of all the directors on the Board. Action to be taken by the Board shall require approval by a majority vote of the directors of the whole Board at a meeting at which quorum is present. Any two directors acting collectively (irrespective of voting power) shall have the right to call a special meeting of the Board. The Board shall hold regular meetings no less than quarterly. |
| | Each Designating Holder may remove and replace its Designated Director with or without cause by written notice to the Board. A Designated Director may not otherwise be removed from the Board except for cause or as required by applicable law and, in such cases, the applicable Designating Holder may fill the vacancy created by such removal. |
| | No Designating Holder may transfer its right to appoint a Designated Director to any third party (whether or not in connection with a sale or transfer of its New Voting Securities as contemplated below). |
| ***Observer Rights*** | Each Designating Holder shall be entitled to designate one person to observe the Board's actions and meetings (including the actions and meetings of committees of the Board), subject to exceptions for the preservation of attorney-client privilege and conflicts of interest, for so long as such Designating Holder retains its right to designate a |

| | |
|---|---|
| | director to the Board. Such observer may be required to execute a confidentiality agreement reasonably acceptable to Ultimate Parent prior to attending such meetings or receiving any written materials to be discussed at such meetings. Such observer shall not have any voting rights. |
| **_Voting_** | Each holder of New Voting Securities (such holder, an "Equity Holder") shall be entitled to one vote per share of New Voting Securities.<br><br>A quorum for all Equity Holder meetings shall require the attendance (telephonically, in person or by proxy) of Equity Holders holding a majority of the New Voting Securities issued and outstanding. Action to be taken by Equity Holders at a meeting shall require approval by a majority or such other percentage of the New Voting Securities entitled to vote, as provided herein. Any holder or group of holders of the New Voting Securities holding at least 25% of the New Voting Securities shall be entitled to call a special meeting of the Equity Holders. |
| **_Consent Rights/Protections_** | The following actions shall require the affirmative vote of the Equity Holders holding more than 67 of the New Voting Securities:<br><br>(i)    any change in the size or classification of the Board;<br><br>(ii)    any winding up, liquidation or dissolution of the business and operations of Ultimate Parent or any of its subsidiaries;<br><br>(iii)    any recapitalization, reclassification or similar action with respect to the equity securities of Ultimate Parent or any of its subsidiaries (or securities exercisable for, convertible into or exchangeable for equity securities);<br><br>(iv)    any issuance of any equity securities (or securities exercisable for, convertible into or exchangeable for equity securities) at less than fair market value as determined by the Board in good faith, other than Excluded Issuances (as defined below);<br><br>(v)    any redemption of any equity securities;<br><br>(vi)    transactions between Ultimate Parent or any of its subsidiaries, on the one hand, and, on the other hand, (A) any Equity Holder or affiliate of an Equity |

| | |
|---|---|
| | Holder (other than (1) pursuant to the definitive documentation that provides for a loan to Ultimate Parent or any of its subsidiaries and (2) transactions among any of Ultimate Parent and any of its subsidiaries); or (B) any director or officer of Ultimate Parent or any of its subsidiaries or any of their respective affiliates (other than ordinary course employment and indemnification arrangements and the management incentive plan); |
| | (vii) engagement of Ultimate Parent or any of its subsidiaries in any unrelated line of business; |
| | (viii) any sale or other disposition of assets of Ultimate Parent or any of its subsidiaries with a value in excess of $40 million in one or a series of related transactions; |
| | (ix) any transaction that results in a change in control of Ultimate Parent other than a sale pursuant to Drag-Along Rights described below; |
| | (x) the establishment or entrance into any joint ventures, partnerships, alliances or similar arrangements in which Ultimate Parent and/or any of its subsidiaries invests (or commits to invest), or becomes liable for, an aggregate amount in excess of $10 million; and |
| | (xi) any initial public offering or any action to cause Ultimate Parent to become a public reporting company under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and the related rules and regulations thereunder. |
| ***Tag-Along Rights*** | If one or more Designating Holders (collectively, the "Transferring Equity Holders" and each a "Transferring Equity Holder") propose to sell or otherwise transfer in one or a series of related transactions shares of New Voting Securities representing more than 50% of the issued and outstanding New Voting Securities held by it to any purchaser (other than to any affiliate of a Transferring Equity Holder or any other Designating Holder), then the Transferring Equity Holders shall give written notice to Ultimate Parent and all of the other Designating Holders at least 15 business days prior to the closing of such sale or transfer, and each other Designating Holder (the "Tagging Equity Holders") shall have the right (but not the obligation) to include in such sale or transfer its pro rata portion |

| | |
|---|---|
| | of the New Voting Securities to be sold or transferred to the proposed purchaser on the same terms and conditions as the Transferring Equity Holder, including, without limitation, in exchange for a pro rata share of all consideration received by the Transferring Equity Holders in exchange for such New Voting Securities, except that such other Designating Holders shall not be required to make any representation, warranty or agreement in any documentation relating to such sale transfer that is less favorable than the representations, warranties or agreements agreed to by the Transferring Equity Holder. |
| ***Drag-Along Rights*** | If one or more Equity Holders (collectively, the "<u>Selling Equity Holders</u>" and each a "<u>Selling Equity Holder</u>") propose to sell or otherwise transfer in one or a series of related transactions shares of New Voting Securities representing more than 67% of all of the issued and outstanding New Voting Securities (including through a merger structure) or all or substantially all of the assets of Ultimate Parent to any purchaser (other than to an affiliate of a Selling Equity Holder) that proposes to purchase all (but not less than all) of the issued and outstanding New Voting Securities or all or substantially all of the assets of Ultimate Parent, the Selling Equity Holders may require the other Equity Holders (the "<u>Dragged-Along Equity Holders</u>") to include all of their shares of New Voting Securities in, if applicable, and otherwise cooperate and raise no objection to, such sale or transfer and on the same terms and conditions applicable to the Selling Equity Holders, except that the only representations to be made by the Dragged-Along Equity Holders in any documentation relating to such sale shall be those as are customarily made by selling security holders in a compelled sale, and any liability of a Dragged-Along Equity Holder shall be several and limited to an escrow. |
| ***Pre-emptive Rights*** | Until an initial public offering (if any) by Ultimate Parent occurs (an "<u>Initial Public Offering</u>"), if Ultimate Parent offers any equity securities (or securities exercisable for, convertible into or exchangeable for equity securities), except for any securities issued in connection with any Excluded Issuances, each Equity Holder who is an accredited investor and owns not less than 5% of New Voting Securities shall have a right of first refusal to purchase its *pro rata* portion of such interests on the most favorable price and the most favorable economic terms as such interests are offered to be sold. "<u>Excluded Issuances</u>" shall mean the issuance of equity securities (i) pursuant to or issued upon the exercise of incentive interests granted under any management incentive plan approved by the Board, (ii) in consideration for an acquisition transaction or other strategic investment, (iii) pursuant to conversion or exchange rights included |

| | |
|---|---|
| | in equity interests previously issued, (iv) in connection with an equity interests split, division or dividend and (v) in connection with a bona fide debt financing. |
| *Registration Rights* | *Demand Registration.*  At any time after an Initial Public Offering, Ultimate Parent shall register all Registrable Securities under the Securities Act of 1933, as amended (the "<u>Securities Act</u>") requested in writing to be registered by any holder of at least 7% of Registrable Securities (a "<u>Qualified Equity Holder</u>").  Kelso, GSO and any other Qualified Equity Holder will each be entitled to an aggregate of 2 demand registrations.  Exercise of demand rights will otherwise be subject to usual and customary limitations (e.g., blackout periods). |
| | "<u>Registrable Securities</u>" means all New Voting Securities held by Equity Holders, including any equity securities issued (a) in respect of the New Voting Securities (by way of conversion, exchange, split, dividend or otherwise) or (b) by a corporation formed for the purpose of effecting a public offering; provided that such securities shall cease to be Registrable Securities after (i) they have been sold to the public pursuant to a registration statement or (ii) may be sold to the public without registration or being subject to limitations pursuant to Rule 144. |
| | *Piggyback Registration.*  Each Equity Holder that owns at least 2% of the Registrable Securities shall have the right to include its Registrable Securities each time Ultimate Parent proposes for any reason to register any of its Registrable Shares under the Securities Act.  The rights to piggyback registration may be exercised an unlimited number of occasions.  The rights to piggyback registration will be subject to usual and customary exceptions and limitations (including, without limitation, as to exceptions, employee plan S-8 filings and acquisition transactions and, as to limitations, selection of underwriters, priority and cutbacks). |
| | *S-3 Registration.*  Following an Initial Public Offering, any Qualified Equity Holder may request that Ultimate Parent file a registration statement under the Securities Act on Form S-3 (or similar or successor form) covering Registrable Securities held by such Qualified Equity Holder if Ultimate Parent is a registrant qualified to use Form S-3 to register the Registrable Securities. Demands to register the Registrable Securities on Form S-3 will not be deemed to be demand requests (as described above) and any Qualified Equity Holder shall have the right to request an unlimited number of registrations on Form S-3. |

| | |
|---|---|
| | *Registration Procedures.* Ultimate Parent and its Equity Holders will enter into a registration rights agreement that will contain usual and customary provisions relating to the registration procedures to be followed by Ultimate Parent, termination of registration rights, as well as indemnification obligations. |
| ***Right of First Refusal*** | If a Designating Holder negotiates to sell or otherwise transfer (i) to any purchaser (other than any affiliate of such Designating Holder or any other Designating Holder), in one or a series of related transactions, shares of New Voting Securities (the "Offered Securities") representing more than 5% of the issued and outstanding New Voting Securities held by it or (ii) to another Designating Holder, a number of shares of New Voting Securities that will result in the Designated Director of the transferee Designating Holder being entitled to cast a majority or more of the votes of the Board (each of (i) and (ii) referred to as an "Offer"), then such Designating Holder shall give written notice (the "Offer Notice") of the Offer to Ultimate Parent and all of the other Designating Holders, and each other Designating Holder (the "Offerees") shall have the right (but not the obligation) to elect to purchase (within 5 business days after the Offer Notice) on a pro rata basis with any other participating Offeree, the offered New Voting Securities at the same price and on the terms as the Offer. If any Offerees elect to exercise such right to purchase the Offered Securities, the parties shall use commercially reasonable efforts to consummate such transaction within 20 business days after the Offer Notice. |
| ***Information Rights*** | Ultimate Parent (for as long as it is not a public filer) will provide or cause to be provided the following information to each of (a) the Equity Holders holding 2% or more of the issued and outstanding New Voting Securities and (b) upon written request therefor, the Equity Holders holding less than 2% of the issued and outstanding New Voting Securities: |
| | (i)      As soon as available but in any event within 120 days after the end of each fiscal year of LRI Holdings, Inc., Logan's Roadhouse, Inc. and their respective subsidiaries and affiliates (collectively, the "Company"), audited consolidated financial statements (including an income statement, balance sheet and statement of cash flows), setting forth in each case in comparative form the corresponding figures for the corresponding periods of the previous fiscal year, all in reasonable detail, together with a copy of the audit report of the Company's |

<table>
<tr><td></td><td>independent public accountants, and</td></tr>
<tr><td></td><td>

(ii)      As soon as available but in any event within 45 days after the end of each fiscal quarter of the Company, unaudited consolidated financial statements (including an income statement, balance sheet and statement of cash flows), all in reasonable detail.

Ultimate Parent will also provide or cause to be provided, upon request therefor, the following information to each Designating Holder:

(i)      Copy of the annual budget and Board adopted updates to such budget;

(ii)      Copies of all material notices from accountants, landlords, insurers and counterparties to material agreements;

(iii)      Copies of any filings or notices of any material actions, suits or proceedings by or before any arbitrator or governmental authority against or affecting the Company; and

(iv)      Such other information as such Equity Holder may reasonably request.

</td></tr>
<tr><td>

***Amendments***

</td><td>

None of the Organizational Documents may be amended without written consent of the Equity Holders holding at least 67% of the New Voting Securities issued and outstanding; provided, however, that no amendment to any of the Organizational Documents shall be effected that would eliminate or materially alter the right of the Designating Holders to appoint, remove or replace the Designated Directors without the written consent of the Designating Holders.

</td></tr>
</table>

# EXHIBIT B

## JOINDER

The undersigned ("***Transferee***") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of August 8, 2016 (the "***Agreement***"), by and among Roadhouse Holding Inc. and each of its direct and indirect subsidiaries that are party thereto (collectively, the "***Debtors***") and certain holders of claims against the Debtors signatory thereto, and agrees to be bound by the terms and conditions thereof, and shall be deemed a "***Joining Party***" under the terms of the Agreement. The Transferee hereby makes the representations and warranties of the Supporting Parties (as defined in the Agreement) set forth in Section 2 of the Agreement to the other Parties thereto. This joinder shall be governed by, and construed in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflict of laws that would require the application of the law of any other jurisdiction.

Date Executed: _____

**TRANSFEREE**

Name: _____

By: _____

Name: _____

Title: _____

Notice Party: _____

Address: _____

_____

Telephone: _____

Facsimile: _____

Email: _____

**CLAIMS**

$
_____