## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ROADHOUSE HOLDING INC., *et al.*,[1] | Case No. 16 -11819 (___) |
| Debtors. | (Joint Administration Requested) |

### DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO PAY CERTAIN PREPETITION CLAIMS (A) ARISING UNDER THE PERISHABLE AGRICULTURAL COMMODITIES ACT AND SIMILAR TRUST FUND STATUTES AND (B) OF CERTAIN CRITICAL VENDORS AND (II) GRANTING CERTAIN RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**") hereby file this motion (this "**Motion**") for the entry of an order (the "**Proposed Order**"), substantially in the form attached hereto as Exhibit A, (i) authorizing, but not directing, the Debtors, in their discretion, to pay, in the ordinary course of business as such claims come due: (a) all prepetition claims arising under the Perishable Agricultural Commodities Act of 1930 (as amended, modified, or supplemented from time to time, "**PACA**") of protected vendors (collectively, the "**PACA Vendors**," whose claims shall be identified herein collectively as the "**PACA Claims**") and (b) certain prepetition claims of critical vendors (collectively, the "**Critical Vendors**," whose claims shall be identified herein as the "**Critical Vendor Claims**") that are essential to the Debtors' business operations; and (ii) authorizing the Debtors' banks and financial institutions (collectively, the "**Banks**") to receive, process, honor, and pay all checks

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Roadhouse Holding Inc. (5939); Roadhouse Intermediate Inc. (6159); Roadhouse Midco Inc. (6337); Roadhouse Parent Inc. (5108); LRI Holdings, Inc. (4571); Logan's Roadhouse, Inc. (2074); Logan's Roadhouse of Texas, Inc. (2372); and Logan's Roadhouse of Kansas, Inc. (8716). The location of the Debtors' corporate headquarters is 3011 Armory Drive, Suite 300, Nashville, Tennessee 37204.

and electronic payment requests relating to the foregoing. In support of this Motion, the Debtors respectfully state as follows.

**Jurisdiction and Venue**

1.　　　The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b), and the Debtors consent pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.　　　Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.　　　The bases for relief requested herein are sections 105(a), 363, 503(b)(9), 507(a)(2), 541, 1107(a), and 1108 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**"), and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

Background

4.　　　On the date hereof (the "**Petition Date**"), each of the Debtors commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  Each Debtor is authorized to continue to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date hereof, no trustee, examiner, or statutory committee has been appointed in these chapter 11 cases.

5.      Additional information regarding the Debtors, including their business operations, corporate and capital structure, and the events leading to the Petition Date, is more fully set forth in the *Declaration of Keith A. Maib in Support of Chapter 11 Petitions and First Day Relief* the "**First Day Declaration**"), filed substantially contemporaneous herewith.

**Relief Requested**

6.      By this Motion, the Debtors seek entry of the Proposed Order authorizing, but not directing, the Debtors, in their discretion, to pay the PACA Claims and Critical Vendor Claims (each, a "**Claim**," and collectively, the "**Claims**"), subject to the terms, conditions, and limitations set forth herein.   In sum, pursuant to this Motion, the Debtors are requesting authority, but not direction, from the Court to pay the Claims, subject to the following caps PACA Claims up to an aggregate amount of $1,100,000 and Critical Vendor Claims up to an aggregate amount of $950,000.

**The Claims**

7.      As described in detail below, it is critical to the Debtors' business operations that the Debtors continue to receive goods and services, as applicable, from the PACA Vendors and the Critical Vendors (each a "**Vendor**," and collectively, the "**Vendors**").   The Debtors believe that without the relief requested herein, many of the Vendors may cease delivering goods and providing services to the Debtors, which could have devastating consequences for the Debtors' business operations and their efforts to reorganize in these chapter 11 cases.

**A.      PACA Claims**

8.      To ensure that the Debtors continue to receive a constant supply of fresh fruits and vegetables postpetition, the Debtors seek authority, but not direction, in their discretion, to continue to pay, in the ordinary course of business and consistent with their historical practices, prepetition claims that are subject to protection under PACA, as determined by the Debtors in

3

their discretion.  Importantly, under the Restructuring Support Agreement, the supporting parties thereunder have required the Debtors to file a motion seeking immediate payment of the PACA Claims, up to $1,100,000.

9.      Congress enacted PACA to regulate the sale of "perishable agricultural commodities."  7 U.S.C. § 499a; *see Endico Potatoes, Inc. v. CIT Group/Factoring*, 67 F.3d 1063, 1067 (2d Cir. 1995).   Under PACA, the term "perishable agricultural commodity" is generally defined as "fruits and fresh vegetables of every kind and character" "whether or not frozen or packed in ice."  7 U.S.C. § 499a(b)(4).  PACA provides various protections to fresh fruit and vegetable sellers, including the establishment of a statutory constructive trust (a "**PACA Trust**"), consisting of a purchaser's entire inventory of food or other derivatives of perishable agricultural commodities, the products derived therefrom and the proceeds related to any sale of the commodities or products (collectively, the "**PACA Trust Assets**").   *See* 7 U.S.C. § 499e(c)(2).   Assets subject to a PACA Trust are preserved as a non-segregated floating trust and may be commingled with non-trust assets.  However, courts in this district and other districts have consistently held that PACA Trust Assets are not property of a debtor's estate.  *See In re CFP Liquidating Estate*, 405 B.R. 694 (Bankr. D. Del. May 21, 2009); *In re Long John Silver's Restaurants, Inc.*, 230 B.R. 29, 32 (Bankr. D. Del. 1999); *Morris Okun, Inc. v. Harry Zimmerman, Inc.*, 814 F. Supp. 346, 348 (S.D.N.Y. 1993).

10.      PACA requires that certain procedural steps be taken by a seller of perishable agricultural commodities in order to preserve its rights as a trust beneficiary.  Specifically, a PACA Vendor must provide written notice (a "**PACA Notice**") to the purchaser of such goods and its intent to preserve the benefits of the PACA Trust.  *See In re HR. Hindle & Co.*, 149 B.R. 775, 785 (Bankr. E.D. Pa. 1993); *In re Richmond Produce Co.*, 112 B.R. 364 (Bankr. N.D. Cal.

1990). Written notice under PACA may be accomplished by either (a) including the statutorily-mandated language on the face of the vendor's invoices or (b) providing written notice to the purchaser of the PACA goods within 30 days after the time payment is due. Beneficiaries of a PACA Trust that adhere to the statutory notice requirements are entitled to prompt payment from the PACA Trust Assets ahead of secured and unsecured creditors of a debtor's estate. *See "R" Best Prod., Inc. v. 646 Corp.*, No. 00-CV-8536, 2002 WL 31453909, at *1 (S.D.N.Y. Oct. 31, 2002). However, a PACA Vendor's failure to comply with the notice requirements renders its claim a general unsecured claim in a debtor's chapter 11 case. *See In re HR. Hindle*, 149 B.R. at 786.

11. PACA's application is limited to sales to commission merchants, brokers, and dealers. 7 U.S.C. § 499e(c). "Dealer," as such term is defined in PACA, is "any person engaged in the business of buying or selling in wholesale or jobbing quantities, as defined by the Secretary, any perishable agricultural commodity in interstate or foreign commerce." 7 U.S.C. § 499a(b).

12. The Debtors believe that a certain portion of the goods purchased from vendors may qualify as "perishable agricultural commodities" under PACA. As a result, insofar as those vendors abide by the notice requirements of PACA, such vendors will be eligible to assert PACA Claims granting them priority ahead of all other secured and unsecured creditors in the Debtors' chapter 11 cases. Accordingly, payment of PACA Claims at this time will not prejudice or affect the amount available for distributions to other creditors of the Debtors. To ensure that the supply of fresh produce continues unimpeded, it is imperative that the Debtors be authorized to pay all prepetition and postpetition PACA Claims in the ordinary of business and consistent with their historical practices.

13.     As of the Petition Date, the Debtors estimate that PACA Vendors may hold PACA Claims in an amount up to $1,100,000 in the aggregate (the "**PACA Cap**") for PACA goods delivered prior to the Petition Date.  The Debtors seek authority, but not direction, in their discretion, to pay PACA Claims in the ordinary course of business.  As PACA requires that payment terms be not more than 25 days, the Debtors believe that all PACA Claims will come due in the first 30 days of these chapter 11 cases, and accordingly, are seeking immediate authority to pay all PACA Claims that are the subject of this Motion, in an amount not to exceed the PACA Cap, unless otherwise ordered by the Court.

14.     Any PACA Vendor who accepts payment from the Debtors in satisfaction of its valid PACA Claim will be deemed to have waived any and all claims of whatever type, kind, or priority, against the Debtors, their property, their estates, and any PACA Trust Assets, but only to the extent that payment has been received by such PACA Vendor on account of its PACA Claim.

**B.      Critical Vendor Claims**

15.     The Critical Vendors supply food, alcohol, goods related to the preparation and service thereof, and critical services to the Debtors' restaurants.  For the most part, the Critical Vendors provide goods and services across the Debtors' restaurant portfolio.  These goods and services are absolutely critical to the Debtors' ability to operate their restaurants on a day-to-day basis.  The Debtors believe the failure to pay the Critical Vendor Claims would, in the Debtors' business judgment, result in the Critical Vendors refusing to provide goods and/or services to the Debtors post-petition which could have an immediately devastating effect on the Debtors' ability to operate their restaurants.  Moreover, the delay attendant to the Debtors changing from a Critical Vendor to another vendor of similar products or services (assuming one could be

located) would very likely delay the Debtors' ability to operate its business which would be extremely detrimental to the Debtors' operations.

16.     The Debtors and their advisors have critically examined whether the payment of Critical Vendor Claims is necessary, will ameliorate immediate and irreparable harm to the Debtors' business operations, and will ensure the Debtors have access to adequate trade credit post-petition.  Specifically, the Debtors have undertaken a thorough review of their accounts payable and their list of prepetition vendors to identify those vendors who are essential to the Debtors' operations.  The Debtors then considered the following aspects of the relationship with their vendors to determine which vendors should constitute Critical Vendors under this Motion: (a) whether the vendor is likely to continue providing goods and/or services to the Debtors absent payment of prepetition amounts owed, (b) whether the vendor could be easily replaced with an alternative source for the goods and/or services provided, and (c) the length of time that would be required to find a replacement vendor.  Further, certain Critical Vendors provide liquor and alcoholic beverages, and in some states, failure to pay for such goods when acquired for commercial purposes can result in the buyer's inability to further purchase those products. Finally, the Debtors believe that some vendors may be in possession of their goods and may be able to withhold delivery under various state laws that allow them to retain possession of the goods to secure payment.  In those instances, the Debtors will need to determine, on a case by case basis, the criticality of the retained goods vis a vis the amount necessary to obtain release.

17.     After evaluating the foregoing criteria, the Debtors estimated the total payments that would be necessary to ensure the continued supply of critical goods and services to the Debtors and, further, considered the Debtors' urgent need to continue to receive goods and services uninterrupted, their ability to find alternate sources and the likelihood that a vendor

would extend trade terms post-petition despite the Debtors' failure to pay such vendors' pre-petition outstanding trade debt.  Based on the foregoing considerations, the Debtors were able to identify the Critical Vendors whose cessation of deliveries or services could cripple a large number of the Debtors' restaurants and, therefore, result in immediate and irreparable harm. Finally, the Debtors' prepetition payment terms with the Critical Vendors do not extent beyond 30 days, and many of the Critical Vendors have payment terms of 20 days or less.

18.    The Debtors believe that the Critical Vendors may hold claims up to $950,000 in amount on account of prepetition Critical Vendor Claims, and they believe that approximately $262,000 of these amounts relate to transactions involving the delivery of goods to the Debtors in the twenty-day period prior to the Petition Date.  The Debtors are seeking authority to pay up to $950,000 in Critical Vendor Claims.  Given that all of the Critical Vendor Claims will be payable under normal trade terms within the first thirty (30) days of these cases, the Debtors are seeking final relief with respect to the payment of Critical Vendor Claims.

19.    The Debtors have further developed certain procedures (for which they seek this Court's approval) that, when implemented, will ensure the Debtors derive value for payments to Critical Vendors such that vendors receiving payment of Critical Vendor Claims will continue to supply trade credit necessary to the Debtors' operations on a post-petition basis.

20.    The Debtors will condition payment of Critical Vendor Claims upon each Critical Vendor's agreement to continue supplying services and goods pursuant to the terms of an agreement, substantially in the form attached hereto as <u>Exhibit B</u> (the "**Vendor Agreement**"). The Debtors request that the Court approve the form of the Vendor Agreement, pursuant to which the Critical Vendor agrees to provide goods and/or services to the Debtors on a

postpetition basis in accordance with "Customary Trade Terms"[2] and such other or modified terms that the Debtors determine, in the exercise of their business judgment, are necessary to avoid irreparable harm to the Debtors and their estates and are otherwise in the best interest of the Debtors and their estates.

## C.    Breach of a Vendor Agreement

21.    In the event that any Vendor has entered into a Vendor Agreement and received payment of a prepetition claim as consideration therefore, but subsequently refuses to continue to provide goods and services on the terms set forth in the applicable Vendor Agreement, the Debtors propose that, without further order of the Court and in their discretion, they be authorized to deem the payments made to any such Vendor to have been in payment of any then-outstanding postpetition claims of such Vendor and deem any applicable Vendor Agreement to be terminated, or to pursue specific performance where warranted.  If this situation arises and the Debtors terminate a Vendor Agreement, the previously paid Claims of the Vendor shall be reinstated as Claims in the amount deemed by the Debtors to have been in payment of any then-outstanding postpetition claims of such Vendor.  To the extent that the payments made to the Vendor on account of the previously paid Claims exceed the post-petition amounts then owed to such Vendor, the Debtors and their estates reserve all rights to recover such payments.

---

[2]    As used herein, "**Customary Trade Terms**" are defined as the normal and customary trade terms, practices and programs (including credit limits, pricing, cash discounts, timing of payments, allowances, rebates, normal product mix and availability, and other applicable terms and programs) that were most favorable to the Debtors and in effect between the applicable vendor and the Debtors on a historical basis for the period within 180 days of the Petition Date, or such other trade terms, practices, and programs that are at least as favorable to the Debtors as those that were in effect during such time.

## Basis for Relief

**A.     Payment of the PACA Claims and Critical Vendor Claims Is Warranted Under the Doctrine of Necessity**

22.     Courts generally acknowledge that, under appropriate circumstances, they may authorize a debtor to pay (or provide special treatment for) certain prepetition obligations.  *See*, *e.g.*, *In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (Bankr. D. Del. 1999) (noting that, in the Third Circuit, debtors may pay prepetition claims that are essential to the continued operation of the debtor's business); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (granting the debtor the authority to pay prepetition wages); *Armstrong World Indus., Inc. v. James A. Phillips, Inc.*, (*In re James A. Phillips, Inc.*), 29 B.R. 391, 398 (Bankr. S.D.N.Y. 1983) (granting the debtor the authority to pay prepetition claims of suppliers who were potential lien claimants).  When authorizing payments of certain prepetition obligations, courts have relied upon several legal theories rooted in sections 363(b) and 105(a) of the Bankruptcy Code.

23.     Consistent with a debtor's fiduciary duties, where there is a sound business purpose for the payment of prepetition obligations, and where the debtor is able to "articulate some business justification, other than the mere appeasement of major creditors," courts have authorized debtors to make such payments under section 363(b) of the Bankruptcy Code.  *See*, *e.g.*, *Ionosphere Clubs*, 98 B.R. at 175 (finding that a sound business justification existed to pay prepetition wages); *James A. Phillips, Inc.*, 29 B.R. at 397 (relying upon section 363 as a basis to allow a contractor to pay the prepetition claims of suppliers who were potential lien claimants).

24.     Courts have also authorized payment of prepetition claims in appropriate circumstances pursuant to section 105(a) of the Bankruptcy Code.  Section 105(a) of the Bankruptcy Code, which codifies the inherent equitable powers of the bankruptcy court, empowers the bankruptcy court to "issue any order, process, or judgment that is necessary or

appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Under section 105(a), courts may permit pre-plan payments of prepetition obligations when such payments are essential to the continued operation of the debtor's business and, in particular, where nonpayment of a prepetition obligation would trigger a withholding of goods or services essential to the debtors' business reorganization plan. *See In re UNR Indus.*, 143 B.R. 506, 520 (Bankr. N.D. Ill. 1992) (permitting the debtor to pay prepetition claims of suppliers or employees whose continued cooperation is essential to the debtors' successful reorganization); *Ionosphere Clubs*, 98 B.R. at 177 (finding that section 105 empowers bankruptcy courts to authorize payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor).

25.     In addition to the authority granted a debtor in possession under sections 363(b) and 105(a) of the Bankruptcy Code, courts have developed the "doctrine of necessity" or the "necessity of payment" rule, which originated in the landmark case of *Miltenberger v. Logansport, C. & S. W.R. Co.*, 106 U.S. 286 (1882). Since *Miltenberger*, courts have expanded their application of the doctrine of necessity to cover instances of a debtor's reorganization, *see Dudley v. Mealey*, 147 F.2d 268, 271 (2d Cir. 1945) (holding, in a hotel reorganization matter, that the court was not "helpless" to apply the rule to supply creditors where the alternative was the cessation of operations), including the United States Court of Appeals for the Third Circuit, which recognized the doctrine in *In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981).

26.     In *In re Lehigh*, the Third Circuit held that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor. *Id.* (stating that a court may authorize payment of prepetition claims when there "is the possibility

that the creditor will employ an immediate economic sanction, failing such payment"); *see also In re Penn. Cent. Transp. Co.*, 467 F.2d 100, 102 n.1 (3d Cir. 1972) (holding that the necessity of payment doctrine permits "immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims have been paid"); *Just for Feet*, 242 B.R. at 824–25 (noting that debtors may pay prepetition claims that are essential to continued operation of business); *In re Colum. Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (same).

27.     The necessity of payment doctrine is designed to foster the rehabilitation of a debtor in reorganization cases, which courts have recognized is "the paramount policy and goal of Chapter 11." *Ionosphere Clubs*, 98 B.R. at 176; *Just for Feet*, 242 B.R. at 826 (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization."); *see also In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code", but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of tool makers as "necessary to avert a serious threat to the Chapter 11 process"); *Burchinal v. Cent. Wash. Bank* (*In re Adams Apple, Inc.*), 829 F.2d 1484, 1490 (9th Cir. 1987) (finding that it is appropriate to provide for the "unequal treatment of pre-petition debts when [such treatment is] necessary for rehabilitation . . . ."); 2 COLLIER ON BANKRUPTCY ¶ 105.02(4)(a) (16th 2015) (discussing cases in which courts have relied upon the "doctrine of necessity" or the "necessity of payment" rule to

pay prepetition claims immediately). The Debtors submit that the relief requested represents a sound exercise of the Debtors' business judgment, and will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption.

28.     The authority, but not direction, to satisfy the PACA Claims and Critical Vendor Claims in the initial days of these chapter 11 cases without disrupting their business operations will send a clear signal to the marketplace, including key suppliers and customers, that the Debtors are willing and, importantly, able to conduct business as usual during their chapter 11 cases.

29.     The Debtors' operations also require the seamless coordination of many unrelated third-parties at every stage in the supply chain.  Collectively, the Debtors' supply chain ensures that the Debtors receive all of the food, products, and supplies necessary to operate their businesses and provide their customers with the high-quality food expected under their brands. Any significant disruption in the Debtors' supply chain, such as a vendor halting delivery of certain necessary goods and/or services, could result in the Debtors' not having sufficient food, products, and supplies to operate their businesses.  Given the highly-competitive local and regional casual restaurant markets, such a result could cause a devastating impact on the Debtors' businesses and significantly impair their restructuring efforts.

30.     Moreover, certain Critical Vendors may be entitled under applicable non-bankruptcy law to assert certain possessory or other liens on the Debtors' goods, merchandise, or finished products (notwithstanding the automatic stay under section 362 of the Bankruptcy Code) in an attempt to secure payment of their prepetition claim.  As described above, under section 362(b)(3) of the Bankruptcy Code, the act of perfecting such liens, to the extent consistent with section 546(b) of the Bankruptcy Code, is expressly excluded from the automatic stay.  As a

result, it is possible that certain Critical Vendors may assert and/or perfect liens, simply refuse to turn over goods in their possession, or stop performing their ongoing obligations.

**B.    Payment of Allowed PACA Claims In the Ordinary Course of Business Is Warranted**

31.    The prompt and full payment of PACA Claims should be authorized by this Court.  As described above, assets governed by PACA do not constitute property of the Debtors' estates.  *See In re Kornblum & Co.*, 81 F.3d 280, 284 (2d Cir. 1995); *Morris Okun, Inc. v. Harry Zimmerman, Inc.*, 814 F. Supp. 346, 348 (S.D.N.Y. 1993).  As a result, the distribution of assets to the holders of PACA Claims falls outside the priority scheme set forth in the Bankruptcy Code, and such holders are entitled to payment from the PACA Trust ahead of the Debtors' other creditors.  *See, e.g.*, *In re Magic Rests., Inc.*, 205 F.3d 108, 110 (3d Cir. 2000); *Consumers Produce Co. v. Volante Wholesale Produce, Inc.*, 16 F.3d 1374, 1377–78 (3d Cir. 1994).  Moreover, the disposition of PACA Trust Assets is subject to the jurisdiction of the bankruptcy court.  *See Monterey Mushrooms, Inc. v. Carolina Produce Distribs., Inc.*, 110 B.R. 207, 209 (W.D.N.C. 1990); *Allied Growers Co-Op, Inc. v. United Fruit & Produce Co.*, 86 B.R. 14, 16 (Bankr. D. Conn. 1988).  Accordingly, the relief requested herein does not prejudice the Debtors' creditors or any party in interest in the chapter 11 cases.

32.    Furthermore, payment of allowed PACA Claims will inure to the benefit of the Debtors' estates by preserving goodwill between the Debtors and the PACA Vendors.  Any delays in satisfying amounts owed to PACA Vendors could adversely affect the Debtors' ability to obtain fresh produce, thereby undercutting the Debtors' efforts in connection with these chapter 11 cases.  Failing to pay allowed PACA Claims in the ordinary course of business could subject the Debtors to numerous claims and adversary proceedings, including motions by PACA Vendors for relief from the automatic stay and/or injunctive relief, which would result in the

unnecessary expenditure of time, effort, and money by the Debtors, their management team, and their professional advisors.

33.     Lastly, in certain circumstances, officers or directors of a corporate entity who are in a position to control trust assets but breach the fiduciary duty to preserve those assets may be held personally liable under PACA.  *See Sunkist Growers, Inc. v. Fisher*, 104 F.3d 280, 283 (9th Cir. 1997); *see also Golman-Hayden Co., Inc. v. Fresh Source Produce, Inc.*, 217 F.3d 348, 350 (5th Cir. 2000) (court will inquire (a) whether the individual's involvement with the corporation was sufficient to establish legal responsibility and (b) whether the individual, in failing to exercise any appreciable oversight of the corporation's management, breached a fiduciary duty owed to the PACA creditors, to determine personal liability).  Thus, to the extent that any valid obligations arising under PACA remain unsatisfied by the Debtors, the Debtors' officers and directors may be subject to lawsuits during the pendency of these chapter 11 cases.  Any such lawsuit (and the ensuing potential liability) would distract the Debtors and their officers and directors in their attempt to implement a successful reorganization strategy and, moreover, could lead to the assertion of substantial indemnification claims under the Debtors' governing documents, employment agreements, and applicable laws, to the detriment of all of the Debtors' stakeholders.

**C.     Paying the PACA Claims and Certain Critical Vendor Claims Now Will Not Significantly Affect Creditor Recoveries**

34.     Much of the relief requested herein will not affect the recovery of creditors in these chapter 11 cases.  As stated above, assets governed by PACA do not constitute property of the Debtors' estates.  Holders of PACA Claims are entitled to payment from the PACA Trust ahead of the Debtors' other creditors.

35.     Further, as discussed above, the Debtors estimate that over 25% by dollar amount of the Critical Vendor Claims relate to transactions where goods were received by the Debtors in the twenty-day period prior to the Petition Date, and holders of those claims who delivered goods to the Debtors in the ordinary course of the Debtors' business are entitled to an administrative expense claim for the value of those goods under section 503(b)(9) of the Bankruptcy Code.  In such instances, payment now only provides such parties with what they would be entitled to receive under a plan of reorganization, only without any interest costs that might otherwise accrue during these chapter 11 cases.

36.     Thus, payment of PACA Claims and much of the Critical Vendor Claims affects the timing, but not the amount, of such payment.  As a result, the Debtors respectfully submit that they should have the authority (but not the direction) to pay such claims, in the ordinary course of business, during the pendency of the chapter 11 cases, to the extent necessary to preserve the going-concern value of the chapter 11 estates.

37.     As explained above, it is critical to the Debtors' chapter 11 efforts that they continue to receive goods and services, as applicable, from the Vendors on an uninterrupted basis throughout the chapter 11 process.  The Debtors believe that without the relief requested herein, many Vendors may cease delivering goods and providing services to the Debtors, which could have devastating consequences for the Debtors and their estates.

38.     Accordingly, for all of the foregoing reasons, the Debtors submit that cause exists for granting the relief requested herein.

**D.     The Court Should Authorize the Debtors' Banks to Honor Payments in respect of the Claims**

39.     The Debtors also request that the Court authorize the Debtors' Banks, when requested by the Debtors in their discretion, to receive, process, honor, and pay any and all

checks or electronic fund transfers drawn on the Debtors' bank accounts to pay all prepetition obligations described herein, whether such checks or other requests were submitted prior to or after the Petition Date.  The Debtors further request that the Banks be authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved pursuant to any order of the Court granting the relief requested in this Motion.

### The Requirements of Bankruptcy Rule 6003 Are Satisfied

40.     Under Bankruptcy Rule 6003, the Court may authorize the Debtors to satisfy the Claims because such relief is necessary to avoid immediate and irreparable harm.  Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern.  *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001(c)(2)).

41.     As described above, and in the First Day Declaration, the continuity and viability of the Debtors' business operations relies heavily on the uninterrupted delivery of essential food, products, and supplies.  The failure of any Vendor to deliver essential food, products, or supplies or to render services to the Debtors would have immediate and detrimental consequences to the Debtors' businesses and would decrease value to the detriment and prejudice of all of the Debtors' stakeholders.  The Debtors cannot risk even the perception that their restaurants will offer anything but the highest level of food and beverage quality and quantity for the duration of these chapter 11 cases.  Moreover, it is the Debtors' business judgment that continuation of their positive relationship with the Vendors is critical to their continued operations and greatly increases the likelihood of successfully prosecuting these chapter 11 cases.

42.     Accordingly, the Debtors respectfully submit that the relief requested herein is necessary to avoid immediate and irreparable harm and, therefore, Bankruptcy Rule 6003 is satisfied.

### Waiver of Bankruptcy Rule 6004(h)

43.     In addition, by this Motion, the Debtors seek a waiver of any stay of the effectiveness of the Proposed Order (when and if entered).   Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  For the reasons set forth above, the Debtors submit that ample cause exists to justify a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), as any delay in satisfying the Claims would jeopardize the Debtors' business operations and their efforts in connection with these chapter 11 cases, to the detriment of their estates and creditors.

### Reservation of Rights

44.     Nothing herein or in the Proposed Order (when and if entered), nor as a result of any payment made pursuant to the Proposed Order (when and if entered), shall be deemed or construed as (a) an admission as to the validity, priority, or amount of any claim against the Debtors or their estates or an approval or assumption of any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, or (b) a waiver of any of the rights of the Debtors and their estates, or shall impair the ability of the Debtors and their estates, to contest the validity, priority, and amount of any claim or any payment made pursuant to the Proposed Order (when and if entered).

### Notice

45.     Notice of this motion has been provided to the following parties:  (i) the Office of the United States Trustee for the District of Delaware; (ii) the United States Securities and

Exchange Commission; (iii) the Office of the United States Attorney General for the District of Delaware; (iv) the Internal Revenue Service; (v) counsel to JPMorgan Chase Bank, N.A., as Administrative Agent under the Credit Agreement, dated as of October 4, 2010; (vi) counsel to BOKF, N.A., as Trustee under that certain Senior Secured Notes Indenture, dated October 4, 2010; (vii) counsel to Wells Fargo Bank, N.A., as Trustee under the Series 2015-1 Supplemental Indenture and Series 2015-2 Supplemental Indenture, each dated as of October 15, 2015, and the Second Series 2015-1 Supplemental Indenture, dated as of October 22, 2015; (viii) each of the counsel to the noteholders who are party to the Restructuring Support Agreement, dated as of August 8, 2016, and who are proposed debtor in possession lenders; (ix) the Debtors' cash management banks; and (x) those creditors holding the thirty (30) largest unsecured claims against the Debtors' estates (on a consolidated basis).  Notice of this motion and any order entered on this motion will be served as required by Local Rule 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Order,

granting the relief requested herein and such other and further relief as is just and proper.

| | | |
|---|---|---|
| Dated: | Wilmington, Delaware<br>August 8, 2016 | */s/ Ryan M. Bartley* |

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Robert S. Brady (No. 2847)
Edmon L. Morton (No. 3856)
Ryan M. Bartley (No. 4985)
Elizabeth S. Justison (No. 5911)
Norah M. Roth-Moore (No. 6125)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Tel:    (302) 571-6600
Fax:    (302) 571-1253
Email: rbrady@ycst.com
        emorton@ycst.com
        rbartley@ycst.com
        ejustison@ycst.com
        nroth-moore@ycst.com

*Proposed Counsel for the Debtors and Debtors in Possession*

## EXHIBIT A

**Proposed Order**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ROADHOUSE HOLDING INC., *et al.*,[1] | Case No. 16-11819 (___) |
| Debtors. | Jointly Administered |
| | **Ref. Docket Nos. __** |

## ORDER (I) AUTHORIZING THE DEBTORS TO PAY CERTAIN PREPETITION CLAIMS (A) ARISING UNDER THE PERISHABLE AGRICULTURAL COMMODITIES ACT AND SIMILAR TRUST FUND STATUTES AND (B) OF CERTAIN CRITICAL VENDORS AND (II) GRANTING CERTAIN RELATED RELIEF

Upon the motion (the "**Motion**")[2] of the Debtors for entry of an order (this "**Order**") (i) authorizing, but not directing, the Debtors, in their discretion, to pay certain (a) PACA Claims and (b) Critical Vendor Claims in the ordinary course of business as such claims come due, and (ii) authorizing the Banks, when requested by the Debtors in their discretion, to receive, process, honor, and pay all checks and electronic payment requests related to the Claims, all as set forth more fully in the Motion; and upon consideration of the First Day Declaration and this Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and adequate notice of the Motion and opportunity for objection having been given under the circumstances;

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:  Roadhouse Holding Inc. (5939); Roadhouse Intermediate Inc. (6159); Roadhouse Midco Inc. (6337); Roadhouse Parent Inc. (5108); LRI Holdings, Inc. (4571); Logan's Roadhouse, Inc. (2074); Logan's Roadhouse of Texas, Inc. (2372); and Logan's Roadhouse of Kansas, Inc. (8716).  The location of the Debtors' corporate headquarters is 3011 Armory Drive, Suite 300, Nashville, Tennessee 37204.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein and that such relief is in the best interests of the Debtors, their estates, their creditors, and all parties in interest and is necessary to avoid immediate and irreparable harm to the Debtors and their estates; and any objections to the Motion having been withdrawn or overruled on the merits; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED that:

1.      The Motion is granted as set forth herein.

2.      The Debtors are authorized, but not directed, in their discretion, to pay or otherwise satisfy valid PACA Claims, as determined by the Debtors in their discretion, in the ordinary course of business in an aggregate amount not to exceed $1,100,000.

3.      Any PACA Vendor who accepts payment from the Debtors in satisfaction of its valid PACA Claim will be deemed to have waived any and all claims of whatever type, kind, or priority against the Debtors, their property, their estates, and any PACA Trust Assets, but only to the extent that payment has been received by such PACA Vendor on account of its PACA Claim.

4.      The Debtors are authorized, but not directed, in their discretion, to pay or otherwise satisfy all valid Critical Vendor Claims, in the ordinary course of business in an aggregate amount not to exceed $950,000.

5.      Critical Vendors shall enter into a Vendor Agreement with the Debtors substantially similar to that attached as <u>Exhibit B</u> to the Motion as a condition to payment of their Critical Vendor Claims; provided, however, that the Debtors may modify any of the terms of the Vendor Agreement set forth in <u>Exhibit B</u> to the Motion (with such modified terms becoming part of the Vendor Agreement), including the Customary Trade Terms, if the

2

Debtors determine, in the exercise of their business judgment, that such modifications are necessary to avoid irreparable harm to the Debtors and their estates and are otherwise in the best interest of the Debtors and their estates.

6.      In the event that any Vendor that has entered into a Vendor Agreement and refuses to continue to provide goods and services, as applicable, on an uninterrupted basis, to the Debtors in accordance with the terms of the applicable Vendor Agreement, without further order of this Court and in their discretion, the Debtors shall be authorized to deem the payments made to any such Vendor to have been in payment of any then-outstanding postpetition claims of such Vendor and deem any applicable Vendor Agreement to be terminated.  If this situation arises, the previously paid Claims of the Vendor shall be reinstated as Claims in the amount deemed by the Debtors to have been in payment of any then-outstanding postpetition claims of such Vendor.  To the extent that the payments made to the Vendor on account of the previously paid Claims exceed the post-petition amounts then owed to such Vendor, all rights of the Debtors and their estates to recover such payments shall be reserved.

7.      The Debtors' Banks shall be, and hereby are, authorized, when requested by the Debtors in their discretion, to receive, process, honor, and pay any and all checks or electronic fund transfers drawn on the Debtors' bank accounts to pay all Claims, whether those checks were presented prior to or after the Petition Date, provided that sufficient funds are available in the applicable accounts to make the payments.

8.      The Debtors' Banks may rely on the representations of the Debtors with respect to whether any check or other transfer drawn or issued by the Debtors prior to the Petition Date should be honored pursuant to this Order, and any such Bank shall not have

any liability to any party for relying on such representations by the Debtors as provided for in this Order.

9.    Nothing in the Motion or this Order, nor as a result of any payment made pursuant to this Order, shall be deemed or construed as (a) an admission as to the validity, priority or amount of any claim or lien against the Debtors or their estates or an approval or assumption of any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, or (b) a waiver of the rights of the Debtors and their estates, or shall impair the ability of the Debtors and their estates, to contest the validity, priority, and amount of any claims or any payment made pursuant to this Order.

10.    Notwithstanding anything to the contrary in this Order, any payment made or to be made under this Order, and any authorization contained in this Order, shall be subject to the requirement imposed on the Debtors under the Orders of this Court approving the Debtors' debtor-in-possession financing facilities and use of cash collateral and budget in connection therewith.

11.    Notwithstanding any applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

12.    The requirements of Bankruptcy Rule 6004(a) are waived.

13.    This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation and/or interpretation of this Order.

Dated: _____, 2016
      Wilmington, Delaware

                                 _____
                                 UNITED STATES BANKRUPTCY JUDGE

## **EXHIBIT B**

**Form of Vendor Agreement**

**[LOGAN'S ROADHOUSE, INC.]**

[                ], 2016

TO:     **[Vendor]**
**[Name/Title]**
**[Address]**

Dear Valued Vendor/Service Provider:

On [DATE] (the "**Petition Date**"), Logan's Roadhouse, Inc. and certain of its affiliates (collectively, "**Logan's**," or the "**Debtors**") filed voluntary petitions under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Cases**" and the "**Bankruptcy Court**," respectively).

On the Petition Date, the Debtors also requested authority from the Bankruptcy Court to pay certain critical suppliers or service providers in recognition of the importance of our relationship with such suppliers and service providers.  On [        ], 2016, the Bankruptcy Court entered an order (the "**Order**") authorizing this relief, a copy of which is enclosed.

In accordance with the Order, Logan's is prepared to enter into this letter agreement (the "**Vendor Agreement**") in accordance with the following terms:

1.      The estimated balance of your prepetition claim (net of any setoff, credits or discounts) (the "**Claim**") is $[_____].  **Your Claim does not constitute a claim allowed by the Bankruptcy Court in the Bankruptcy Cases.  Furthermore, signing this Vendor Agreement does not excuse you from any requirement of filing a proof of claim in the Bankruptcy Cases on account of prepetition amounts that may remain unpaid.**

2.      The Debtors will provisionally pay you $[_____] (the "**Claim Payment**") of your Claim, subject to the terms and conditions of this Vendor Agreement, and this payment will be applied, and shall be deemed for all purposes to apply, to your most recent invoices, in reverse chronological order.  It is understood by you and the Debtors that the remaining amount of your Claim is $[____].

The Claim Payment will be disbursed on the following schedule:  [_____].

3.      In consideration for the Claim Payment, you agree not to file or otherwise assert, directly or indirectly, against any or all of the Debtors, their estates, or any of their respective assets or property (real or personal), any lien (a "**Lien**"), a claim for reclamation (a "**Reclamation Claim**"), or a claim under Section 503(b)(9) of the Bankruptcy Code (a "**503(b)(9) Claim**"), regardless of the statute or other legal authority

upon which such Lien, Reclamation Claim, or 503(b)(9) Claim may be asserted, related in any way to any remaining prepetition amounts allegedly owed to you by the Debtors arising from agreements or other arrangements entered into prior to the Petition Date. The Debtors may apply the Claim Payment to any 503(b)(9) amounts owed. Furthermore, if you have taken steps to file or otherwise assert such a Lien, Reclamation Claim, or 503(b)(9) Claim prior to entering into this Vendor Agreement, you agree to take the necessary steps to remove such Lien, Reclamation Claim, or 503(b)(9) Claim as soon as possible.

4.      In consideration of the Claim Payment, you agree to continue providing and/or supplying goods/or services to the Debtors based on Customary Trade Terms (as defined in the Order), which shall be no less favorable than the most favorable terms that you provided to the Debtors for the period within 180 days of the Petition Date.  For purposes of this Vendor Agreement, Customary Trade Terms consist of the following terms and conditions (if more space is required, attach continuation pages):

_____
_____
_____
_____

5.      Payment of your Claim in the manner set forth in this Vendor Agreement may only occur upon the execution of this Vendor Agreement by a duly authorized representative of your company and the return of this Vendor Agreement to the Debtors. Your execution of this letter agreement and return of the same to the Debtors constitutes an agreement by you and the Debtors:

   a)      to the Customary Trade Terms and, subject to the reservations contained in the Order, to the amount of the Claim set forth above;

   b)      that, for a period of 180 days after the entry into this Agreement (or such longer period that the parties have previously committed to such trade terms), you will continue to supply the Debtors with goods or services pursuant to the Customary Trade Terms and that the Debtors will pay for such goods or services in accordance with the Customary Trade Terms;

   c)      that you have reviewed the terms and provisions of the Order and that you consent to be bound by such terms and provisions;

   d)      that you will not separately seek payment for reclamation and similar claims outside of the terms of the Order and this Vendor Agreement;

   e)      you agree and acknowledge that irreparable damage would occur in the event that you fail to satisfy your obligations hereunder (a "Vendor

Breach") and in the event of a Vendor Breach, remedies at law would not be adequate to compensate the Debtors. Accordingly, you agree that the Debtors shall have the right, in addition to any other rights and remedies existing in its favor, to an injunction or injunctions to prevent breaches of the provisions of this Vendor Agreement and to enforce their rights and obligations hereunder not only by an action or actions for damages but also by an action or actions for specific performance, injunctive relief, and other equitable relief. The right to equitable relief, including specific performance or injunctive relief, shall exist notwithstanding, and shall not be limited by, any other provision of this Vendor Agreement. You hereby waive any defense that a remedy at law is adequate and any requirement to post bond or other security in connection with actions instituted for injunctive relief, specific performance, or other equitable remedies. This provision shall not be enforceable by the Debtors during any period in which the Debtors are in breach of this Vendor Agreement.

6.      The Debtors and you also hereby agree that any dispute with respect to this Vendor Agreement or the Order shall be determined by the Bankruptcy Court, and you expressly waive any right to trial by jury and withdrawal of the reference for decision by a district court.

7.      All terms of this Vendor Agreement (including the existence of this Vendor Agreement) are confidential between you and the Debtors; *provided, however*, that the Debtors may disclose this Vendor Agreement in accordance with the terms of the Order, and both you and the Debtors may disclose this Vendor Agreement as required by any federal or state securities laws or any other court order.

If you have any questions about this agreement or our financial restructuring, do not hesitate to call _____ at _____.

Sincerely,

Logan's Roadhouse, Inc.

By:     _____
Title:  _____
Date:   _____, 2016

Agreed and Accepted by:

[NAME OF VENDOR]


By: _____
Title:_____
Dated:  _____, 2016