# EXHIBIT 1

**DIP Credit Agreement**

*Dechert Draft 8/9/16*

DEBTOR-IN-POSSESSION CREDIT AGREEMENT

Dated as of August [__], 2016

among

LOGAN'S ROADHOUSE, INC.,

as Debtor and Debtor-In-Possession,

The Other Loan Parties Party Hereto,

CORTLAND CAPITAL MARKET SERVICES LLC,
as Administrative Agent and Collateral Agent,

and

The Other Lenders Party Hereto

# TABLE OF CONTENTS

## ARTICLE I.
### DEFINITIONS AND ACCOUNTING TERMS

Section 1.01    Defined Terms ...............................................................................................1
Section 1.02    Other Interpretive Provisions...................................................................31
Section 1.03    Accounting Terms.....................................................................................32
Section 1.04    Rounding....................................................................................................32
Section 1.05    Times of Day..............................................................................................32
Section 1.06    Currency Equivalents Generally ............................................................32

## ARTICLE II.
### THE COMMITMENTS AND CREDIT EXTENSIONS

Section 2.01    The Facilities.............................................................................................33
Section 2.02    Borrowings, Conversions and Continuations of Loans ......................35
Section 2.03    Disbursements from Segregated Pre-Funding Account.......................36
Section 2.04    Prepayments..............................................................................................37
Section 2.05    Repayment of Loans .................................................................................39
Section 2.06    Interest........................................................................................................39
Section 2.07    Fees .............................................................................................................40
Section 2.08    Computation of Interest and Fees ..........................................................40
Section 2.09    Evidence of Debt.......................................................................................41
Section 2.10    Payments Generally; Administrative Agent's Clawback ....................41
Section 2.11    Sharing of Payments by Lenders ............................................................42
Section 2.12    Defaulting Lenders...................................................................................43

## ARTICLE III.
### TAXES, YIELD PROTECTION AND ILLEGALITY

Section 3.01    Taxes...........................................................................................................43
Section 3.02    Illegality ....................................................................................................47
Section 3.03    Inability to Determine Rates ...................................................................47
Section 3.04    Increased Costs; Reserves on Eurodollar Rate Loans.........................48
Section 3.05    Compensation for Losses .........................................................................49
Section 3.06    Mitigation Obligations; Replacement of Lenders................................50
Section 3.07    Survival ......................................................................................................50

## ARTICLE IV.
### CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

Section 4.01    Conditions of Initial Credit Extension ..................................................50
Section 4.02    Conditions to Delayed Draw Borrowing ...............................................54
Section 4.03    Conditions to all Credit Extensions .......................................................55

## ARTICLE V.
## REPRESENTATIONS AND WARRANTIES

Section 5.01    Existence, Qualification and Power ........................................................ 55
Section 5.02    Authorization; No Contravention ........................................................ 56
Section 5.03    Governmental Authorization; Other Consents ........................................ 56
Section 5.04    Binding Effect ........................................................................... 56
Section 5.05    Financial Statements .................................................................... 56
Section 5.06    Litigation ............................................................................... 57
Section 5.07    No Material Adverse Effect .............................................................. 57
Section 5.08    Ownership of Property; Liens; Investments .............................................. 57
Section 5.09    Environmental Compliance ............................................................... 57
Section 5.10    Insurance ............................................................................... 58
Section 5.11    Taxes ................................................................................... 58
Section 5.12    ERISA Compliance ....................................................................... 59
Section 5.13    Subsidiaries; Equity Interests; Loan Parties ........................................... 59
Section 5.14    Margin Regulations; Investment Company Act ............................................. 60
Section 5.15    Disclosure .............................................................................. 60
Section 5.16    Compliance with Laws ................................................................... 60
Section 5.17    Intellectual Property; Licenses, Etc. .................................................. 60
Section 5.18    Labor Matters ........................................................................... 61
Section 5.19    Foreign Assets Control Regulations; Anti-Money Laundering; Anti-Corruption
                Practices; Anti-Terrorism Laws ......................................................... 61
Section 5.20    No Defaults.. ........................................................................... 62

## ARTICLE VI.
## REPORTING COVENANTS

Section 6.01    Financial Statements .................................................................... 62
Section 6.02    Other Events ............................................................................ 65
Section 6.03    Copies of Notices and Reports ........................................................... 65
Section 6.04    Taxes ................................................................................... 66
Section 6.05    Labor Matters ........................................................................... 66
Section 6.06    Lender Calls ............................................................................ 66

## ARTICLE VII.
## AFFIRMATIVE COVENANTS

Section 7.01    Certificates; Other Information ......................................................... 66
Section 7.02    Notices ................................................................................. 68
Section 7.03    Payment of Taxes ........................................................................ 69
Section 7.04    Preservation of Existence, Etc. ......................................................... 69
Section 7.05    Maintenance of Properties ............................................................... 69
Section 7.06    Maintenance of Insurance ................................................................ 69
Section 7.07    Compliance with Laws .................................................................... 70
Section 7.08    Books and Records ....................................................................... 70
Section 7.09    Inspection Rights ....................................................................... 70

Section 7.10 Use of Proceeds.................................................................................71
Section 7.11 Information Regarding Collateral ........................................................71
Section 7.12 Covenant to Guarantee Obligations and Give Security .....................72
Section 7.13 Compliance with Environmental Laws................................................73
Section 7.14 Further Assurances..............................................................................74
Section 7.15 Post-Closing Covenant........................................................................74
Section 7.16 Compliance with Milestones................................................................74
Section 7.17 Opposition to Certain Motions ...........................................................75
Section 7.18 Priority and Liens................................................................................76

## ARTICLE VIII.
## NEGATIVE COVENANTS

Section 8.01 Liens....................................................................................................77
Section 8.02 Investments .........................................................................................78
Section 8.03 Indebtedness........................................................................................78
Section 8.04 Fundamental Changes.........................................................................78
Section 8.05 Dispositions.........................................................................................79
Section 8.06 Restricted Payments............................................................................80
Section 8.07 Change in Nature of Business .............................................................80
Section 8.08 Transactions with Affiliates ................................................................80
Section 8.09 Burdensome Agreements .....................................................................81
Section 8.10 Use of Proceeds...................................................................................82
Section 8.11 Capital Expenditures...........................................................................83
Section 8.12 Amendments of Organization Documents...........................................83
Section 8.13 Accounting Changes ............................................................................83
Section 8.14 Prepayments, Etc. of Indebtedness .....................................................83
Section 8.15 Holding Company ................................................................................83
Section 8.16 Bankruptcy Provisions.........................................................................84
Section 8.17 Compliance with Budget Covenants....................................................84
Section 8.18 Foreign Subsidiaries............................................................................84
Section 8.19 Real Property. ......................................................................................85

## ARTICLE IX.
## EVENTS OF DEFAULT AND REMEDIES

Section 9.01 Events of Default .................................................................................85
Section 9.02 Remedies upon Event of Default .........................................................88
Section 9.03 Application of Funds............................................................................89

## ARTICLE X.
## ADMINISTRATIVE AGENT

Section 10.01 Appointment and Authority ................................................................90
Section 10.02 Rights as a Lender..............................................................................91
Section 10.03 Exculpatory Provisions ......................................................................91
Section 10.04 Reliance by Administrative Agent.......................................................92

Section 10.05  Delegation of Duties ....................................................................................92
Section 10.06  Resignation of Administrative Agent ...........................................................92
Section 10.07  Non-Reliance on Administrative Agent and Other Lenders...........................93
Section 10.08  No Other Duties, Etc. ..................................................................................93
Section 10.09  Administrative Agent May File Proofs of Claim...........................................93
Section 10.10  Collateral and Guaranty Matters..................................................................94
Section 10.11  Withholding Tax. .......................................................................................95

ARTICLE XI.
MISCELLANEOUS

Section 11.01  Amendments, Etc.........................................................................................95
Section 11.02  Notices; Effectiveness; Electronic Communications.....................................97
Section 11.03  No Waiver; Cumulative Remedies; Enforcement..........................................99
Section 11.04  Expenses; Indemnity; Damage Waiver.......................................................100
Section 11.05  Payments Set Aside....................................................................................102
Section 11.06  Successors and Assigns...............................................................................102
Section 11.07  Treatment of Certain Information; Confidentiality.......................................105
Section 11.08  Right of Setoff............................................................................................106
Section 11.09  Interest Rate Limitation .............................................................................106
Section 11.10  Counterparts; Integration; Effectiveness.....................................................107
Section 11.11  Survival of Representations and Warranties.................................................107
Section 11.12  Severability ...............................................................................................107
Section 11.13  Replacement of Lenders .............................................................................107
Section 11.14  Governing Law; Jurisdiction; Etc. .............................................................108
Section 11.15  Waiver of Jury Trial...................................................................................109
Section 11.16  No Advisory or Fiduciary Responsibility ...................................................109
Section 11.17  Electronic Execution of Assignments and Certain Other Documents.................110
Section 11.18  USA PATRIOT Act....................................................................................110
Section 11.19  Conflicts....................................................................................................110
Section 11.20  Acknowledgement and Consent to Bail-In of EEA Financial Institutions..........110

SCHEDULES

| | |
|---|---|
| 2.01 | Commitments |
| 5.03 | Certain Authorizations |
| 5.13 | Subsidiaries and Other Equity Investments; Loan Parties |
| 5.17 | Intellectual Property Matters |
| 7.12 | Guarantor Subsidiaries |
| 8.01(b) | Existing Liens |
| 8.02(a) | Existing Investments |
| 8.03(b) | Existing Indebtedness |
| 11.02 | Administrative Agent's Office, Certain Addresses for Notices |

EXHIBITS

*Form of*

| | |
|---|---|
| A-1 | Committed Loan Notice |
| A-2 | Notice of Request for Disbursement |
| B | Term Note |
| C | Compliance Certificate |
| D-1 | Assignment and Assumption |
| D-2 | Administrative Questionnaire |
| E | Guaranty |
| F | Security Agreement |
| G | U.S. Tax Compliance Certificate |
| H | Prepayment Notice |
| I | Budget |
| J | Interim Order |

## CREDIT AGREEMENT

This CREDIT AGREEMENT ("Agreement") is entered into as of August [ ], 2016, among Logan's Roadhouse, Inc., a Tennessee corporation (the "Borrower") and a Debtor and Debtor-In-Possession under the Bankruptcy Code (as defined below), each Guarantor (as defined below), each lender from time to time party hereto (collectively, the "Lenders" and individually, a "Lender"), and Cortland Capital Market Services LLC, as Administrative Agent.

### PRELIMINARY STATEMENTS:

On August 8, 2016 (the "Petition Date"), the Borrower, and each Guarantor (as defined below) (each a "Debtor" and collectively, the "Debtors"), filed voluntary petitions with the Bankruptcy Court initiating their respective cases that are pending under chapter 11 of the Bankruptcy Code (each a "Case" and collectively, the "Cases");

From and after the Petition Date, the Debtors will continue to operate their respective businesses and to manage their respective properties as debtors and debtors-in-possession pursuant to Section 1107(a) and 1108 of the Bankruptcy Code;

In connection with the Cases, the Borrower has requested, and the Lenders have agreed to make available to the Borrower, a senior secured priming and superpriority debtor-in-possession term loan credit facility (junior only to the Pre-Petition First Lien Obligations) in an original principal amount of $25,000,000, consisting of $10,000,000 in Initial Commitments and $15,000,000 in Delayed Draw Commitments, the proceeds of which will be used in accordance with the Budget (as defined below), including the Permitted Variances (as defined below) thereto;

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

### ARTICLE I.
### DEFINITIONS AND ACCOUNTING TERMS

Section 1.01    Defined Terms.  As used in this Agreement, the following terms shall have the meanings set forth below:

"Adequate Protection Claims" has the meaning specified in the DIP Orders.

"Adequate Protection Consenting Parties" means (a) the Pre-Petition First Lien Agent, (b) the Pre-Petition First Lien Lenders, (c) the Pre-Petition Indenture Trustees and (d) each of Carl Marks, Marblegate, GSO, Kelso & Company, L.P. or one or more affiliated funds or financing vehicles (or funds or accounts advised or sub-advised by such Person) of any of them that are Pre-Petition Indenture Noteholders.

"Adequate Protection Liens" has the meaning specified in the DIP Orders.

"Adequate Protection Parties" means the Pre-Petition First Lien Agent, the Pre-Petition First Lien Lenders, the Pre-Petition Indenture Trustees and the Pre-Petition Indenture Noteholders.

"Adequate Protection Payments" means, collectively, the following payments to the Adequate Protection Parties:

(a)   all accrued and unpaid fees and disbursements owed to the Adequate Protection Consenting Parties under the Pre-Petition Debt Documents, including all reasonable and documented out-of-pocket fees and expenses of counsel and other professionals of the Adequate Protection Consenting Parties (including Simpson Thacher & Bartlett LLP, King & Spalding LLP, Debevoise & Plimpton LLP, Dechert LLP and Delaware local counsel retained by each of the Adequate Protection Consenting Parties (collectively, "Delaware Counsel")) incurred prior to the Petition Date in accordance with the Pre-Petition Debt Documents;

(b)   when due, current payment of all fees and reasonable and documented out-of-pocket expenses and indemnities payable to the Adequate Protection Consenting Parties under the Pre-Petition Debt Documents, including all reasonable and documented out-of-pocket fees and expenses of counsel and other professionals of the Adequate Protection Consenting Parties (including Simpson Thacher & Bartlett LLP, King & Spalding LLP, Debevoise & Plimpton LLP, Dechert LLP and Delaware Counsel);

(c)   to the extent of the diminution of value of the interest of the Pre-Petition First Lien Lenders and the Pre-Petition Indenture Noteholders in the prepetition Collateral, allowed, super-priority administrative expense claim status in the Case of each Loan Party pursuant to sections 503(b) and 507(b) of the Bankruptcy Code that (A) in the case of the Pre-Petition First Lien Lenders' super-priority claims, is senior to any other claims under section 507(b) of the Bankruptcy Code, including any such claims held by the Lenders and (B) in the case of the Pre-Petition Indenture Noteholders' super-priority claims, is junior in priority only to the Facility super-priority claims and the Pre-Petition First Lien Credit Agreement super-priority claims;

(d)   to the extent of the diminution of value of the interests of the Pre-Petition First Lien Lenders and the Pre-Petition Indenture Noteholders in prepetition Collateral, continuing, valid, binding, enforceable, non-avoidable and automatically perfected post-petition security interests in and liens on the Collateral pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code that are junior only to the Liens securing the Obligations and, in the case of the Pre-Petition Indentures, Liens securing the obligations under the Pre-Petition First Lien Credit Agreement; and

(e)   upon entry of the Final Order, cash payments of interest at the prescribed default contract rate pursuant to the terms of the Pre-Petition First Lien Credit Agreement to the Pre-Petition First Lien Agent and the Pre-Petition First Lien Lenders.

"Additional Roll Up Loans" has the meaning specified in Section 2.01(a).

"Administrative Agent" means Cortland Capital Market Services LLC in its capacity as administrative agent under any of the Loan Documents, or any successor administrative agent appointed in accordance with the terms hereof.

"Administrative Agent's Office" means the Administrative Agent's address and the account as set forth on Schedule 11.02, or such other address or account as the Administrative Agent may from time to time notify to the Borrower and the Lenders.

"Administrative Questionnaire" means an Administrative Questionnaire in substantially the form of Exhibit D-2 or any other form approved by the Administrative Agent.

"Affiliate" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified. Notwithstanding anything herein to the contrary, neither the Administrative Agent nor any Lender (if not otherwise already an Affiliate of a Loan Party) shall be deemed an Affiliate of any Loan Party solely by virtue of the transactions contemplated by this Loan Agreement and the other Loan Documents.

"Agent Fee Letter" means that certain Credit Facility Agent Fee Letter, dated July 29, 2016, between Cortland Capital Market Services LLC and the Borrower, regarding fees payable in connection with the Facility.

"Aggregate Commitments" means the Commitments of all the Lenders.

"Agreement" means this Credit Agreement.

"Anti-Corruption Laws" has the meaning specified in Section 5.19(c).

"Anti-Money Laundering Law" means any and all laws, judgments, orders, executive orders, decrees, ordinances, rules, regulations, statutes, case law or treaties applicable to a Loan Party, its Subsidiaries or Affiliates, related to terrorism financing or money laundering including any applicable provision of Title III of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (USA PATRIOT Act) of 2001 (Title III of Pub. L. 107-56) and The Currency and Foreign Transactions Reporting Act (also known as the "Bank Secrecy Act", 31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1820(b) and 1951-1959).

"Applicable Rate" means 7.5% per annum for Base Rate Loans and 8.5% per annum for Eurodollar Rate Loans.

"Approved Fund" means any Fund that is administered, managed, advised or sub-advised by (a) a GSO Entity, (b) a Carl Marks Entity, (c) a Marblegate Entity, (d) a Lender, (e) an Affiliate of a Lender or (f) an entity or an Affiliate of an entity that administers, manages or sub-advises a Lender.

"Assignee Group" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 11.06(b)), and accepted by the Administrative Agent, in substantially the form of Exhibit D-1 or any other form approved by the Administrative Agent.

"Attributable Indebtedness" means, on any date, in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP.

"Audited Financial Statements" means the audited consolidated balance sheet of Holdings and its Subsidiaries for fiscal year 2015, and the related consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal year of Holdings and its Subsidiaries, including the notes thereto.

"Avoidance Actions" means the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code and any other avoidance actions under the Bankruptcy Code and the proceeds thereof and property received thereby whether by judgment, settlement or otherwise.

"Backstop Lenders" means Carl Marks, Marblegate, GSO, Kelso & Company, L.P. or one or more affiliated funds or financing vehicles (or funds or accounts advised or sub-advised by such Person) of any of them that provide the Initial Loans or the Delayed Draw Loans in the event that the Pre-Petition First Lien Lenders are not signatories hereto and do not provide any Initial Loans or Delayed Draw Loans hereunder.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bankruptcy Code" means the Federal Bankruptcy Reform Act of 1978 (11 U.S.C. §101, et seq.).

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware or any other court having jurisdiction over the Cases from time to time.

"Base Rate" means for any day a fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate plus 1/2 of 1%, (b) the rate of interest quoted in the Wall Street Journal, Money Rates Section, as the "Prime Rate" in effect from time to time (or if such rate is at any time not available, the prime rate so quoted by any banking institution selected by the Administrative Agent, which rate is not intended to be the lowest rate charged by any such banking institutions) and (c) the one-month Eurodollar Rate plus 1.00%; provided that in no event will the Base Rate be lower than 2.00% at any time.

"Base Rate Loan" means a Loan that bears interest based on the Base Rate.

"Borrower" has the meaning specified in the introductory paragraph hereto.

"Borrower Materials" has the meaning specified in Section 7.01(e).

"Borrowing" means a borrowing consisting of Loans made on the same day by the Lenders according to their respective Commitments as set forth by the Borrower on the Committed Loan Notice therefor.

"Budget" means a statement of the Debtors' projected receipts and disbursements on a weekly basis for the period of thirteen weeks commencing with the calendar week during which the Petition Date occurs, including the anticipated uses of the Loans for each week during such period, substantially in the form of Exhibit I hereto, and otherwise in form and substance reasonably satisfactory to the Required Lenders and the Pre-Petition First Lien Lenders. As used herein, "Budget" shall initially refer to Exhibit I (which, for the avoidance of doubt, shall be in form and substance satisfactory to the Unanimous DIP Lenders and the Pre-Petition First Lien Lenders) and, thereafter, the most recent Budget delivered by the Borrower and approved by the Required Lenders in accordance with Section 6.01(d).

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in New York, New York, and, if such day relates to any Eurodollar Rate Loan, means any such day on which dealings in Dollar deposits are conducted by and between banks in the London interbank eurodollar market.

"Capital Expenditures" means, with respect to any Person for any period, any expenditure in respect of the purchase or other acquisition of any fixed or capital asset (excluding assets acquired in normal replacements and maintenance which are properly charged to current operations) that, in conformity with GAAP are required to be included as additions during such period to property, plant or equipment reflected in the consolidated balance sheet of Holdings and its Subsidiaries.

"Capitalized Leases" means all leases that have been or should be, in accordance with GAAP, recorded as capitalized leases; provided that for all purposes hereunder the amount of obligations under any Capitalized Lease shall be the amount thereof accounted for as a liability in accordance with GAAP.

"Carl Marks" means Carl Marks Management Company, LLC and its Affiliates and Approved Funds.

"Carl Marks Entity" means Carl Marks or certain funds and accounts managed or subadvised by Carl Marks as the context may require.

"Carve-Out" has the meaning specified in the DIP Orders.

"Case" and "Cases" have the meanings specified in the recitals hereto.

"Cash Collateral Account" means a deposit account subject to a Control Agreement reasonably satisfactory to Administrative Agent and the Pre-Petition First Lien Agent.

"Cash Equivalents" means:

(a)      U.S. dollars or, in the case of a Foreign Subsidiary, any other foreign currency held by such Foreign Subsidiary in the ordinary course of business;

(b)      securities issued or directly and fully and unconditionally guaranteed or insured by the U.S. government or any agency or instrumentality thereof the securities of which are unconditionally guaranteed as a full faith and credit obligation of such government with maturities of 24 months or less from the date of acquisition;

(c)      certificates of deposit, time deposits and eurodollar time deposits with maturities of one year or less from the date of acquisition, bankers' acceptances with maturities not exceeding one year and overnight bank deposits, in each case with any commercial bank having capital and surplus of not less than $500.0 million in the case of U.S. banks and, in the case of any Foreign Subsidiary, $100.0 million (or the U.S. dollar equivalent as of the date of determination) in the case of non-U.S. banks, and in each case in a currency permitted under clause (a) above;

(d)      repurchase obligations for underlying securities of the types described in clauses (b), (c) and (h) entered into with any financial institution meeting the qualifications specified in clause (c) above, and in each case in a currency permitted under clause (a) above;

(e)      commercial paper rated at least P-2 by Moody's or at least A-2 by S&P and in each case maturing within 3 months after the date of creation thereof, and in each case in a currency permitted under clause (a) above;

(f)      marketable short-term money market and similar securities having a rating of at least P-2 or A-2 from either Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another Rating Agency) and in each case maturing within 3 months after the date of creation thereof and in a currency permitted under clause (a) above;

(g)      investment funds investing 95% of their assets in securities of the types described in clauses (a) through (f) above;

(h)      readily marketable direct obligations issued by any state, commonwealth or territory of the United States or any political subdivision or taxing authority thereof having a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P, or, in either case, an equivalent rating by any other Rating Agency with maturities of 3 months or less from the Closing Date;

(i)      Indebtedness or preferred stock issued by Persons with a rating of "A" or higher from S&P or "A2" or higher from Moody's with maturities of 3 months or less from the date of acquisition and in each case in a currency permitted under clause (a) above;

(j)     Investments with average maturities of 3 months or less from the date of acquisition in money market funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's and in each case in a currency permitted under clause (a) above; and

(k)     credit card receivables and debit card receivables so long as such are considered cash equivalents under GAAP and are so reflected on the Issuer's balance sheet.

Notwithstanding the foregoing, Cash Equivalents shall include amounts denominated in currencies other than those set forth in clause (a) above, provided that such amounts are converted into any currency listed in clause (a) as promptly as practicable and in any event within ten Business Days following the receipt of such amounts.

"Casualty Event" means any event that gives rise to the receipt by any Loan Party or any Subsidiary thereof of any insurance proceeds or condemnation award in respect of any equipment, fixed assets or real property (including improvements thereon) to replace, restore or repair such equipment, fixed assets or real property.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980.

"CERCLIS" means the Comprehensive Environmental Response, Compensation and Liability Information System, and its successor, the Superfund Enterprise Management System, maintained by the U.S. Environmental Protection Agency.

"CFC" means a Foreign Subsidiary of the Borrower that is a controlled foreign corporation under Section 957 of the Code, and any direct or indirect Subsidiary of such a Foreign Subsidiary.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following:  (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

"Change of Control" means an event or series of events by which:

(a)     Permitted Holders, collectively, shall cease to be the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Exchange Act as in effect on the Closing Date) (free and clear of all Liens except those created under the Collateral Documents and Permitted Liens),

either directly or indirectly, of equity securities in Roadhouse Holding representing more than 50% of the combined *voting power of all of equity securities* entitled to vote for members of the board of directors or equivalent governing body of Roadhouse Holding on a fully-diluted basis (and taking into account all such securities that the Permitted Holders have the right to acquire, whether such right is exercisable immediately or only after the passage of time); or

(b)    At any time, a majority of the members of the board of directors or other equivalent governing body of Holdings, Roadhouse Holding or the Borrower cease to be composed of individuals (i) who were members of that board or equivalent governing body on the first day of such period, (ii) whose election or nomination to that board or equivalent governing body was approved by individuals referred to in clause (i) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body or (iii) whose election or nomination to that board or other equivalent governing body was approved by individuals referred to in clauses (i) and (ii) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body (excluding, in the case of both clause (ii) and clause (iii), any individual whose initial nomination for, or assumption of office as, a member of that board or equivalent governing body occurs as a result of an actual or threatened solicitation of proxies or consents for the election or removal of one or more directors by any person or group other than a solicitation for the election of one or more directors by or on behalf of the board of directors); or

(c)    Roadhouse Holding shall cease, directly or indirectly, to own and control legally and beneficially all of the Equity Interests in the Borrower; or

(d)    a "change of control" or any comparable term under, and as defined in, any indenture or agreement governing any Pre-Petition Debt shall have occurred.

"Closing Date" means the first date all the conditions precedent in Section 4.01 are satisfied or waived in accordance with Section 11.01.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collateral" has the meaning given to such term in the Security Agreement.

"Collateral Documents" means, collectively, the Security Agreement, each Intellectual Property Security Agreement, *the Mortgages, the collateral assignments,* Security Agreement Supplements, security agreements, pledge agreements or other similar agreements delivered to the Administrative Agent pursuant to Sections 7.11 and 7.12 and each of the other agreements, instruments or documents that creates or purports to create a Lien in favor of the Administrative Agent for the benefit of the Secured Parties, each as the Administrative Agent may request.

"Committee" means the official committee of unsecured creditors retained in any Case whose retention is approved by the Bankruptcy Court pursuant to sections 327, 328 or 1103 of the Bankruptcy Code.

"Commitments" means, collectively, the Initial Commitments and the Delayed Draw Commitments. The aggregate principal amount of all Commitments on the Closing Date is $25,000,000.

"Committed Loan Notice" means a written notice of (a) a Borrowing, (b) a conversion of Loans from one Type to the other, or (c) a continuation of Eurodollar Rate Loans, pursuant to Section 2.02(a), which shall be substantially in the form of Exhibit A-1.

"Company IP Rights" means rights in Intellectual Property owned or purported to be owned by a Loan Party or its Subsidiaries.

"Compliance Certificate" means a certificate substantially in the form of Exhibit C.

"Consolidated" means, with respect to any Person, the accounts of such Person and its Subsidiaries consolidated in accordance with GAAP.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Control Agreement" means, with respect to any deposit account, any securities account, commodity account, securities entitlement or commodity contract, an agreement, in form and substance satisfactory to the Administrative Agent and the Required Lenders in their sole discretion, effective to grant "control" (as defined under the applicable UCC) over such account to the Administrative Agent for the benefit of the Secured Parties or otherwise to perfect the security interest of the Administrative Agent for the benefit of the Secured Parties in such account and to permit the exercise of collateral remedies with respect thereto.

"Corporate Chart" means a document in form reasonably acceptable to the Administrative Agent and setting forth, as of a date set forth therein, for each Person that is a Loan Party, that is subject to Section 7.09 or that is a Subsidiary or joint venture of any of them, (a) the full legal name of such Person, (b) the jurisdiction of organization and any organizational number and tax identification number of such Person, (c) the location of such Person's chief executive office (or, if applicable, sole place of business) and (d) the number of shares of each class of Stock of such Person authorized, the number outstanding and the number and percentage of such outstanding shares for each such class owned, directly or indirectly, by any Loan Party or any Subsidiary of any of them.

"Credit Extension" means a Borrowing.

"Debtor Relief Laws" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rear-

rangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default; provided that any Default that results solely from the taking of an action that would have been permitted but for the continuation of a previous Default will be deemed to be cured if such previous Default is cured prior to becoming an Event of Default.

"Default Rate" means (a) when used with respect to Obligations consisting of principal, an interest rate equal to (i) the Base Rate with respect to any Base Rate Loan, or Eurodollar Rate with respect to any Eurodollar Loan plus (ii) the Applicable Rate for such loan, plus (iii) 3% per annum, (b) when used with respect to Obligations other than principal, an interest rate equal to (i) the Base Rate, plus (ii) the Applicable Rate applicable to Base Rate Loans under the Facility, plus (iii) 3% per annum.

"Defaulting Lender" means any Lender that (a) has failed to fund any portion of the Loans required to be funded by it hereunder within two Business Days of the date required to be funded by it hereunder, (b) has otherwise failed to pay over to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within two Business Days of the date when due, unless the subject of a good faith dispute, (c) has notified the Borrower or the Administrative Agent or any Lender that it does not intend to comply with its funding obligations or has made a public statement to that effect with respect to its funding obligations, (d) has failed within three Business Days after request by the Administrative Agent, to confirm in a manner satisfactory to the Administrative Agent that it will comply with its funding obligations, or (e) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, (ii) had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or a custodian appointed for it, (iii) taken any action in furtherance of, or indicated its consent to, approval of, or acquiescence in any such proceeding or appointment, or (iv) become the subject of a Bail-In Action; provided that, for the avoidance of doubt, a Lender shall not be a defaulting lender solely by virtue of (i) the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority or (ii) in the case of a solvent Person, the precautionary appointment of an administrator, guardian, custodian or other similar official by a Governmental Authority under or based on the law of the country where such Person is subject to home jurisdiction supervision if applicable law requires that such appointment not be publicly disclosed so long as, in any such case, where such action does not result in or provide such Person with immunity from the jurisdiction of courts within the United States of America or from the enforcement of judgments or writs of attachment on its assets or permit such Person (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any of one or more clauses (a) through (e) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender upon delivery of written notice of such determination from the Administrative Agent to the Borrower and each Lender.

"Delayed Draw Commitment" means, with respect to each Lender, the several (and not joint or joint and several) commitment of such Lender to make Delayed Draw Loans hereunder as set forth in the "Delayed Draw Commitments" column on Schedule 2.01, or in the Assignment and Acceptance pursuant to which such Lender assumed its Delayed Draw Commitment, as applicable, as the same may be (a) reduced from time to time pursuant to Section 2.04 and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to Section 11.06. The aggregate principal amount of all Delayed Draw Commitments on the Closing Date is $15,000,000.

"Delayed Draw Loan" has the meaning specified in Section 2.01(b).

"Delayed Draw Loan Funding Date" means the later of (a) the Final Order Entry Date and (b) the date that is forty (40) days after the Interim Order Entry Date.

"DIP Maturity Date" means the earliest of (a) the Effective Date, (b) the date on which a sale of all or substantially all of the Debtors' assets under section 363 of the Bankruptcy Code is consummated, (c) the date of termination in whole of the Commitments or acceleration of the Loans pursuant to Section 9.02 and (d) November 14, 2016.

"DIP Orders" means the Interim Order and the Final Order.

"Disbursement Date" has the meaning specified in Section 2.03(a).

"Disclosure Statement" has the meaning specified in Section 7.16(e).

"Disqualified Lenders" means any competitor of the Borrower or its Subsidiaries, which Person has been identified in writing to the Administrative Agent prior to the Closing Date as being a "Disqualified Lender," the identities of which will be made available to Lenders upon request.

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction) of any property by any Person (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"Disqualified Equity Interests" means any Equity Interest which, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable and the termination of the Commitments) (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise, (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part, (c) provides for the scheduled payments of dividends in cash, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests,

in each case, prior to the date that is ninety-one (91) days after the latest then existing DIP Maturity Date.

"Dollar" and "$" mean lawful money of the United States.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition and is subject to the supervision of an EEA Resolution Authority, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision of an EEA Resolution Authority with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Date" means the effective date of the Reorganization Plan.

"Eligible Assignee" means any Person that meets the requirements to be an assignee under Sections 11.06(b)(iii), (v) and (vi) (subject to such consents, if any, as may be required under Section 11.06(b)(iii)), and in no event shall include any Disqualified Lender or any Affiliate of any Loan Party (other than the Equity Investors).

"Environmental Laws" means any and all applicable Federal, state, local, international and foreign treaties, statutes, laws (including common law), codes, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions relating to pollution, the protection of the environment, the protection of natural resources (including threatened or endangered species), the Release of any Hazardous Materials into the environment, or the exposure of any person to Hazardous Materials, including those related to air emissions of Hazardous Materials, management and disposal of solid waste, and discharges of wastewater to public systems.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Borrower, any other Loan Party or any of their respective Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Environmental Permit" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"Equity Investors" means Kelso & Company, L.P. and any successor in interest thereto and any of its Affiliates other than any portfolio companies or any Loan Party.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with the Borrower within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by the Borrower or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by the Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in endangered or critical status under Section 305 of ERISA; (d) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Section 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (f) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrower or any ERISA Affiliate; (g) a prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan; or (h) any Loan Party, any Subsidiary thereof or any ERISA Affiliate engages in a transaction that could be subject to Section 4069 or 4212(c) of ERISA.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"Eurodollar Rate" means, for any Interest Period with respect to any Eurodollar Rate Loan:

(a)     the rate of interest per annum, expressed on the basis of a year of 360 days, determined by the Administrative Agent,  which is equal to the ICE Benchmark Administration Limited LIBOR Rate published by Bloomberg (or any successor thereto as may be selected by the Administrative Agent) with a term equivalent to such Interest Period, determined as of ap-

proximately 11:00 a.m. (London time) two (2) Business Days prior to the first day of such Interest Period, or

(b)    if the rates referenced in the preceding subsection (a) are not available, the Administrative Agent shall request the principal London office of any three major reference banks in the London interbank market selected by the Administrative Agent to provide such bank's offered quotation (expressed as a percentage per annum) to prime banks in the London interbank market for deposits in U.S. dollars for a term equivalent to such Interest Period as of 11:00 am London time, on such date for the amounts for a comparable loan at the time of such calculation, and LIBOR shall be the arithmetic mean of such quotation. In no event will the Eurodollar Rate be lower than 1.00% at any time.

"Eurodollar Rate Loan" means a Loan that bears interest at a rate based on the Eurodollar Rate.

"Event of Default" has the meaning specified in Section 9.01.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Excluded Subsidiary" means each (i) CFC and (ii) Transparent Subsidiary.

"Excluded Taxes" means, with respect to the Administrative Agent, any Lender, or any other recipient of any payment to be made by or on account of any obligation of any Loan Party under any Loan Document, (a) Taxes imposed on or measured by its overall net income (however denominated), franchise Taxes imposed on it (in lieu of net income Taxes) and branch profits Taxes, in each case, imposed by the jurisdiction (or any political subdivision thereof) under the Laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable Lending Office is located, or as the result of any other connection between such recipient and such jurisdiction (other than any such connection arising solely from the execution or delivery of, receipt of payments under, receipt or perfection of a security interest under, enforcement of, becoming a party to, performing its obligations under or otherwise participating in the transactions contemplated in, or otherwise with respect to, the Loan Documents), (b) in the case of any Lender (other than an assignee pursuant to a request by the Borrower under Section 11.13), any U.S. federal withholding Tax that (i) is required to be imposed on amounts payable to such Lender pursuant to the Laws in force at the time such Lender becomes a party hereto (or designates a new Lending Office), except to the extent that such Lender (or its assignor, if any) was entitled, at the time of designation of a new Lending Office (or assignment), to receive additional amounts from the Borrower with respect to such withholding Tax pursuant to Section 3.01(a) or (ii) is attributable to such Lender's failure to comply with Section 3.01(e), and (c) any U.S. federal withholding Taxes imposed pursuant to FATCA.

"Exit Facilities" means, collectively, the Exit First Lien Facility and the Exit Second Lien Facility.

"Exit First Lien Facility" has the meaning specified in the RSA Term Sheet.

"Exit Second Lien Facility" means a second lien term loan facility to be entered into on the Effective Date, on terms materially consistent with the second lien exit financing term sheet attached to the RSA Term Sheet, and otherwise reasonably acceptable to the Debtors, the Required Supporting Noteholders and the Supporting Lenders.

"Facility" means the New Money Facility and the Roll Up Facility.

"FATCA" means Sections 1471 through 1474 of the Code as of the date of this Agreement, and any amended or successor version that is substantively comparable and not materially more onerous to comply with, and any current or future Treasury regulations or other official administrative guidance or interpretations thereof (including any Revenue Ruling, Revenue Procedure, Notice or similar guidance issued by the Internal Revenue Service) promulgated thereunder.

"FCPA" has the meaning specified in Section 5.19(c).

"Federal Funds Rate" means, for any day, the rate calculated by the New York Fed based on such day's federal funds transactions by depository institutions as determined in such manner as the New York Fed shall set forth on its public website from time to time and published on the next succeeding Business Day by the New York Fed as the federal funds effective rate; provided that if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day.

"Final Order" means a final order entered by the Bankruptcy Court in the Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures approved by the Bankruptcy Court, which order shall authorize the transactions contemplated by this Agreement and the use of cash collateral in accordance with the Budget, and shall otherwise be in form and substance satisfactory to the Administrative Agent, the Required Lenders, the Debtors, the Supporting Lenders, the Required Supporting Noteholders, and the Supporting Interest Holders in their respective sole discretion.

"Final Order Entry Date" means the date on which the Final Order is entered by the Bankruptcy Court.

"Flood Insurance Laws" means, collectively, (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statute thereto, (iii) the National Flood Insurance Reform Act of 1994 as now or hereafter in effect or any successor statute thereto and (iv) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto.

"Foreign Lender" means any Lender that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"Foreign Subsidiary" means each Subsidiary of the Borrower that is not organized under the Laws of the United States, any state thereof, or the District of Columbia.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"Funding Date" has the meaning specified in Section 2.02(b).

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Group Members" means, collectively, the Loan Parties and their respective other Subsidiaries, if any (each such entity individually being a "Group Member").

"Group Members' Accountants" means Grant Thornton LLP, Deloitte & Touche LLP or other nationally-recognized independent registered certified public accountants reasonably acceptable to the Administrative Agent.

"GSO" means GSO Capital Partners LP and its Affiliates and Approved Funds, including GSO / Blackstone Debt Funds Management LLC.

"GSO Entity" means GSO or certain funds and accounts managed or sub-advised by GSO as the context may require.

"Guarantee" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness payable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of

the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien); provided that the term "Guarantee" shall not include endorsements for collection or deposit, in either case in the ordinary course of business, or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or disposition or assets permitted under this Agreement (other than such obligations with respect to Indebtedness). Except as provided in the definition of Indebtedness, the amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"Guarantor Subsidiaries" means the Subsidiaries of the Borrower listed on Schedule 7.12 and each other Subsidiary of the Borrower that shall be required to execute and deliver a guaranty or guaranty supplement pursuant to Section 7.12; provided that in no event shall any CFC or Transparent Subsidiary be considered a Guarantor Subsidiary.

"Guarantors" means, collectively, Roadhouse Holding, Roadhouse Intermediate, Roadhouse Midco, Roadhouse Parent, Holdings and the Guarantor Subsidiaries.

"Guaranty" means, the Guaranty, dated as of the date hereof, made by the Guarantors in favor of the Secured Parties, substantially in the form of Exhibit E, together with each other guaranty and guaranty supplement delivered pursuant to Section 7.12.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, infectious or medical wastes and all other hazardous or toxic substances or wastes of any nature regulated pursuant to any Environmental Law.

"Holdings" means LRI Holdings, Inc., a Delaware corporation.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)    all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)    the maximum amount of all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c)    net obligations of such Person under any swap contract;

(d)    all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business and not past due for more than 90 days);

(e)    indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)    all Attributable Indebtedness in respect of Capitalized Leases of such Person;

(g)    all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interest in such Person or any other Person or any warrant, right or option to acquire such Equity Interest, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends;

(h)    all obligations in respect of Disqualified Equity Interests; and

(i)    all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person. The amount of Indebtedness of any Person for the purposes of clause (e) (or any secured Guarantee thereof) shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the fair market value of the property encumbered thereby as determined by such Person in good faith.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Indemnitees" has the meaning specified in Section 11.04(b).

"Information" has the meaning specified in Section 11.07.

"Initial Commitment" means, with respect to each Lender, the several (and not joint or joint and several) commitment of such Lender to make Initial Loans hereunder as set forth in the "Initial Commitments" column on Schedule 2.01, or in the Assignment and Acceptance pursuant to which such Lender assumed its Commitment, as applicable, as the same may be (a) reduced from time to time pursuant to Section 2.04 and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to Section 11.06. The aggregate principal amount of all Initial Commitments on the Closing Date is $10,000,000.

"Initial Loan" has the meaning specified in Section 2.01(b).

"Initial Roll Up Loans" has the meaning specified in Section 2.01(a).

"Intellectual Property" has the meaning specified in the Collateral Documents.

"Intellectual Property Security Agreements" means, collectively, the Copyright Security Agreement, the Trademark Security Agreement and the Patent Security Agreement (as each such term is defined in the Security Agreement).

"Interest Payment Date" means, (a) as to any Eurodollar Rate Loan, the last day of each Interest Period applicable to such Loan and the DIP Maturity Date; and (b) as to any Base Rate Loan, the last Business Day of each March, June, September and December and the DIP Maturity Date.

"Interest Period" means, as to each Eurodollar Rate Loan, the period commencing on the date such Eurodollar Rate Loan is disbursed or converted to or continued as a Eurodollar Rate Loan and ending on the date one month thereafter; provided that:

(a)     any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

(b)     any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(c)     no Interest Period shall extend beyond the DIP Maturity Date.

"Interim Order" means an interim order entered by the Bankruptcy Court (as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms hereof) in the form set forth as Exhibit J (as modified in a manner satisfactory to the Debtors, the Administrative Agent, the Required Lenders, the Supporting Lenders, the Required Supporting Noteholders and the Supporting Interest Holders in their respective sole discretion).

"Interim Order Entry Date" means the date on which the Interim Order is entered by the Bankruptcy Court.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or interest in, another Person, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person that constitute a business unit or all or a substantial part of the business of, such Person. For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"IRS" means the United States Internal Revenue Service.

"Laws" means, collectively, all applicable international, foreign, Federal, state and local statutes, treaties, rules, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case having the force of law.

"Lender" has the meaning specified in the introductory paragraph hereto.

"Lending Office" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify in writing to the Borrower and the Administrative Agent.

"Lien" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing).

"Loans" means the loans made by the Lenders to the Borrower pursuant to Section 2.01 (including, for the avoidance of doubt, the Initial Loans, the Delayed Draw Loans and the Roll Up Loans), in each case, plus any PIK Interest capitalized and added to the principal amount thereof.

"Loan Documents" means, collectively, (a) this Agreement, (b) the Notes, if any, (c) the Guaranty, (d) the Collateral Documents, (e) the Agent Fee Letter and (f) any other document executed by or on behalf of any of the Loan Parties that is delivered to the Administrative Agent or any of the other Secured Parties in connection with the foregoing.

"Loan Parties" means, collectively, the Borrower and each Guarantor.

"Logan's Kansas" means Logan's Roadhouse of Kansas, Inc., a Kansas corporation.

"Logan's Texas" means Logan's Roadhouse of Texas, Inc., a Texas corporation.

"Marblegate" means Marblegate Asset Management, LLC and its Affiliates and Approved Funds.

"Marblegate Entity" means Marblegate or certain funds and accounts managed or sub-advised by Marblegate as the context may require.

"Material Adverse Effect" means a material adverse change in, or a material adverse effect upon, (a) the operations, business, assets or condition (financial or otherwise) of the Loan Parties and their Subsidiaries, taken as a whole, other than as customarily occurs as a result of events leading up to and following the commencement of a proceeding under chapter 11 of the

Bankruptcy Code and the commencement of the Cases, (b) the validity or enforceability of this Agreement or any other Loan Document or the rights or remedies of the Administrative Agent or any of the Lenders hereunder or thereunder or the ability of the Loan Parties to perform their respective material obligations hereunder or thereunder, (c) the Collateral or the attachment, perfection or priority of any Liens granted pursuant to any Loan Document in the Collateral, or (d) the Transactions.

"Monthly Operating Reports" has the meaning specified in <u>Section 6.03</u>.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Mortgages" means deeds of trust, trust deeds, deeds to secure debt and mortgages, each in a form satisfactory to the Administrative Agent.

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which the Borrower or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"Net Cash Proceeds" means:

(a)     with respect to any Disposition by any Loan Party or any of its Subsidiaries, or any Casualty Event, the excess, if any, of (i) the sum of cash and Cash Equivalents received by any Loan Party or Subsidiary thereof in connection with such transaction (including any cash or Cash Equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) over (ii) the sum of (A) the principal amount of any Indebtedness that is secured by the applicable asset and that is required to be repaid in connection with such transaction (other than Indebtedness under the Loan Documents), (B) the reasonable out-of-pocket cash fees and expenses (including attorney's fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, other customary expenses and brokerage, consulting and other customary fees) incurred by such Loan Party or such Subsidiary in connection with such transaction, (C) any Taxes paid or reasonably estimated by the Borrower to be payable with respect to such Disposition; <u>provided</u> that, if the amount of any estimated Taxes pursuant to subclause (C) exceeds the amount of Taxes actually required to be paid in cash in respect of such Disposition, the aggregate amount of such excess shall constitute Net Cash Proceeds and (D) any reserve for adjustment in respect of (x) the sale price of such asset or assets established in accordance with GAAP and (y) any liabilities associated with such asset or assets and retained by the Borrower or any Subsidiary after such sale or other disposition thereof, including pension and other post-employment benefit liabilities and liabilities related to environmental matters or with respect to any indemnification obligations associated with such transaction, it being understood that "Net Cash Proceeds" shall include (i) any cash or Cash Equivalents received upon the Disposition of any non-cash consideration by the Borrower or any Subsidiary in any such Disposition and (ii) upon the reversal (without the satisfaction of any applicable liabilities in cash in a corresponding amount) of any reserve described in subclause (D) above or if such liabilities have not been satisfied in cash and such reserve is not reversed within 365 days after such Disposition or Casualty Event, the amount of such reserve;

(b)    with respect to the incurrence or issuance of any Equity Interest or Indebtedness by the Borrower or any of its Subsidiaries, the excess of (i) the sum of the cash and Cash Equivalents received in connection with such transaction over (ii) the investment banking fees, underwriting discounts and commissions, costs and other reasonable and customary out-of-pocket fees and expenses, incurred by the Borrower or such Subsidiary in connection therewith.

"New Money Facility" has the meaning specified in Section 2.01(b).

"Note" means a promissory note of the Borrower, in substantially the form of Exhibit B, payable to the order of a Lender, evidencing the Indebtedness of the Borrower to such Lender resulting from the Loans made to the Borrower by such Lender or its predecessor(s) and "Notes" means all such notes.

"Notice of Request for Disbursement" means a written notice of request for disbursement of proceeds of the Initial Loans and Delayed Draw Loans on deposit in the Segregated Pre-Funding Account, pursuant to Section 2.03, substantially in the form of Exhibit A-2 or such other form as may be acceptable to the Administrative Agent and the Required Lenders.

"NPL" means the National Priorities List under CERCLA.

"Obligations" means all Loans, advances to, and debts, liabilities, obligations, covenants and duties of (including, without limitation, interest (including any PIK Interest), fees, expenses, indemnities and any prepayment premiums), any Loan Party arising under any Loan Document or otherwise with respect to any Loan, absolute or contingent, due or to become due, now existing or hereafter arising and including interest (including, without limitation, any PIK Interest) and fees that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding.

"OFAC" has the meaning specified in Section 5.19(a).

"Organization Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Other Taxes" means all present or future stamp or documentary Taxes or any other excise, property, intangible, mortgage recording or similar Taxes arising from any payment made hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document, except any such Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 11.13) that are imposed as a result of a present or former connection between the assignor or as-

signee and the jurisdiction imposing such Tax (other than connections arising from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, sold or assigned an interest in any Loan or Loan Document).

"Outstanding Amount" means the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Loans as the case may be, occurring on such date.

"PBGC" means the Pension Benefit Guaranty Corporation.

"Perfection Certificate" means that certain Perfection Certificate, dated on or after the date hereof, delivered by each Loan Party to the Administrative Agent pursuant to Section 4.01.

"Pension Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by the Borrower or any ERISA Affiliate or to which the Borrower or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer plan or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five plan years.

"Permitted Holder" means the Equity Investors, members of management of the Borrower or any direct or indirect parent of the Borrower, any other shareholders who are holders of Equity Interests of the Borrower (or any of its direct or indirect parent companies) on the Closing Date, and any group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act or any successor provision) of which any of the foregoing constitute the majority; provided that the voting power of the voting stock owned by the Equity Investors shall be greater than the voting power of the voting stock owned by such groups and/or members of management.

"Permitted Liens" has the meaning specified in Section 8.01, except where otherwise indicated.

"Permitted Refinancing" means, with respect to any Person, any modification (other than a release of such Person), refinancing, refunding, renewal or extension of any Indebtedness of such Person; provided that (a) the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, refunded, renewed or extended except by an amount equal to unpaid accrued interest and premium thereon plus other reasonable amounts paid, and fees and expenses reasonably incurred, in connection with such modification, refinancing, refunding, renewal or extension and by an amount equal to any existing commitments unutilized thereunder, (b) other than with respect to a Permitted Refinancing in respect of Indebtedness permitted pursuant to Section 8.03, such modification, refinancing, refunding, renewal or extension has a final maturity date equal to or later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being modified, refinanced, refunded, renewed or extended and (c) at the time thereof, no Event of Default shall have occurred and be continuing.

"Permitted Tax Distributions" means, for so long as any Group Member is a member of a combined, consolidated or unitary tax group of which it is not the parent, payments, dividends or distributions by such Group Member to its direct or indirect parent, as applicable, to the extent necessary to allow the payment by such direct or indirect parent of any consolidated, combined or unitary federal, state or local Taxes not payable directly by such Group Member and its Subsidiaries; provided that the aggregate amount of such payments, dividends or distributions shall not be greater than the aggregate amount of Taxes that would have been due and owing by such Group Member had the Group Member and its Subsidiaries filed a combined, consolidated, unitary or similar type return (without including any other persons other than such Group Member and its Subsidiaries).

"Permitted Variance" means (a) any positive Variance or (b) any negative Variance that, on a cumulative basis, does not exceed the greater of (i) solely for the first three Variance Reports, $4.5 million and (ii) the dollar amount resulting from multiplying the total operating receipts in the applicable Budget by six percent (6%) for the applicable week; provided, that any modification or amendment to the foregoing definition shall require the consent of the Required Lenders and the Pre-Petition First Lien Lenders in each of their respective sole and absolute discretion.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Petition Date" has the meaning specified in the recitals hereto.

"PIK Interest" has the meaning specified in Section 2.06(c).

"Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established by the Borrower or, with respect to any such plan that is subject to Section 412 of the Code or Section 302 or Title IV of ERISA, any ERISA Affiliate.

"Plan Milestones" has the meaning specified in Section 7.16.

"Platform" has the meaning specified in Section 7.01.

"Pledged Securities" has the meaning specified in the Security Agreement.

"Pre-Petition 2010 Indenture" means that certain Indenture, dated as of October 4, 2010, as amended or supplemented from time to time, by and among the Borrower, the Guarantors party thereto, the indenture trustee thereunder (the "Pre-Petition 2010 Indenture Trustee") and the collateral agent thereunder (the "Pre-Petition 2010 Collateral Agent").

"Pre-Petition 2010 Indenture Noteholders" means the holders of the notes under the 2010 Indenture.

"Pre-Petition 2015 Indenture" means that certain Indenture, dated as of October 15, 2015, as amended or supplemented from time to time, by and among the Borrower, the Guarantors par-

ty thereto, the indenture trustee thereunder (the "Pre-Petition 2015 Indenture Trustee") and the collateral agent thereunder (the "Pre-Petition 2015 Collateral Agent").

"Pre-Petition 2015 Indenture Noteholders" means the holders of the notes under the 2015 Indenture.

"Pre-Petition Debt" means, collectively, the Indebtedness of each Debtor outstanding and unpaid under the Pre-Petition First Lien Loan Documents and the Pre-Petition Indenture Documents.

"Pre-Petition Debt Documents" means, collectively, the Pre-Petition First Lien Loan Documents and the Pre-Petition Indenture Documents.

"Pre-Petition First Lien Agent" means JPMorgan Chase Bank, N.A., as administrative agent under the Pre-Petition First Lien Credit Agreement, and any successor in interest thereto.

"Pre-Petition First Lien Credit Agreement" means that certain Credit Agreement, dated as of October 4, 2010 (as amended by Amendment No. 1, dated as of September 4, 2012, as further amended by Amendment No. 2, dated as of April 26, 2013, as further amended by Amendment No. 3, dated as of January 24, 2014, as further amended by Amendment No. 4, dated as of December 19, 2014, as further amended by Amendment No. 5, dated as of May 28, 2015, Amendment No. 6, dated as of October 15, 2015, as further amended by Amendment No. 7, dated as of March 28, 2016, as further amended by Amendment No. 8 and Forbearance Agreement, dated as of June 30, 2016), by and among the Borrower, Holdings, the lenders from time to time party thereto and the Pre-Petition First Lien Agent.

"Pre-Petition First Lien Lenders" means the "Lenders" under (and as defined in) the Pre-Petition First Lien Credit Agreement.

"Pre-Petition First Lien Loan Documents" means the "Loan Documents" as defined in the Pre-Petition First Lien Credit Agreement.

"Pre-Petition First Lien Obligations" means the "Obligations" as defined in the Pre-Petition First Lien Credit Agreement.

"Pre-Petition First Lien Secured Parties" means, collectively, the Pre-Petition First Lien Agent and the Pre-Petition First Lien Lenders.

"Pre-Petition Indenture Documents" means, collectively, the Pre-Petition 2010 Indenture, the Pre-Petition 2015 Indenture, the related notes, and other guarantee, security or other relevant documentation executed in connection therewith.

"Pre-Petition Indenture Noteholders" means, collectively, the Pre-Petition 2010 Indenture Noteholders and the Pre-Petition 2015 Indenture Noteholders.

"Pre-Petition Indenture Notes" means, collectively, the notes issued under the Pre-Petition Indentures, which are the (a) 10.75% Senior Secured Notes due 2017 issued under the Pre-Petition 2010 Indenture and (b) the Series 2015-1 Senior Secured Zero Coupon Notes due

October 2017 and the Series 2015-2 Senior Secured Notes Due October 2017, each issued under the Pre-Petition 2015 Indenture.

"Pre-Petition Indenture Secured Parties" means, collectively, the Pre-Petition Indenture Noteholders and the Pre-Petition Indenture Trustees.

"Pre-Petition Indenture Trustees" means, collectively, the Pre-Petition 2010 Trustee and the Pre-Petition 2015 Indenture Trustee.

"Pre-Petition Indentures" means, collectively, the Pre-Petition 2010 Indenture and the Pre-Petition 2015 Indenture.

"Pre-Petition Intercreditor Agreement" means that certain Intercreditor Agreement, dated as of October 4, 2010 (as amended by Amendment No. 1 to Intercreditor Agreement, dated as of October 15, 2015), by and among the Pre-Petition First Lien Agent, the Pre-Petition Indenture Trustees, the Borrower, Holdings, Logan's Texas and Logan's Kansas.

"Pre-Petition Intercreditor Agreement Waiver" means that certain Waiver to Intercreditor Agreement, dated as of the date hereof, by and among the Borrower, Holdings, Logan's Kansas, Logan's Texas, the Pre-Petition First Lien Agent, and each of the Pre-Petition Indenture Trustees.

"Pre-Petition Payment" means a payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any (i) Pre-Petition Debt, (ii) "critical vendor payments", (iii) trade payables (including, without limitation, in respect of reclamation claims) or (iv) other pre-petition claims against any Debtor.

"Primed Liens" has the meaning specified in Section 7.18(a)(iv).

"Priming Liens" has the meaning specified in Section 7.18(a)(iv).

"Pro Rata Share" means, with respect to each Lender at any time a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount of the Commitments (or Loans, as applicable) of such Lender under the Facility at such time and the denominator of which is the amount of the Aggregate Commitments (or aggregate Loans, as applicable) under the Facility at such time.

"Public Lender" has the meaning specified in Section 7.01(e).

"Qualified Equity Interests" means any Equity Interests that are not Disqualified Equity Interests.

"Register" has the meaning specified in Section 11.06(c).

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, members, principals, employees, agents, trustees, advisors and sub-advisors of such person and of such person's Affiliates, and with respect to a (a) GSO Entity, also includes current and prospective investors or funding sources of a GSO Entity, (b) Carl

Marks Entity, also includes current and prospective investors or funding sources of a Carl Marks Entity and (c) Marblegate Entity, also includes current and prospective investors or funding sources of a Marblegate Entity.

"Release" means, with respect to any Hazardous Material, any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, depositing, disposing, dispersing, or migrating  into or through the environment or within any building, structure, facility or fixture (including the abandonment or discarding of any barrels, containers or other closed receptacles containing any Hazardous Material).

"Reorganization Plan" means a plan of reorganization in the Cases implementing the terms of the Restructuring in accordance with the Restructuring Support Agreement and otherwise in form and substance reasonably acceptable to the Administrative Agent, the Required Lenders, the Debtors, the Supporting Lenders, the Required Supporting Noteholders and the Supporting Interest Holders or that otherwise satisfies the Obligations in full in cash.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30 day notice period has been waived.

"Request for Credit Extension" means with respect to a Borrowing, conversion or continuation of a Loan, a Committed Loan Notice.

"Required Lenders" means Lenders having at such time in excess of 50% of the sum of the aggregate Commitments then outstanding as of such date plus the Total Outstandings as of such date, which, in the event that the Backstop Lenders are Lenders under the Facility, shall include (a) a majority in interest by commitment amount of the Lenders and (b) the funds or financing vehicles (or funds or accounts advised or sub-advised by such Person) who are Backstop Lenders and are affiliated with at least three of the following: (i) Carl Marks, (ii) Marblegate, (iii) GSO and (iv) Kelso & Company, L.P.; provided, that if any Lender described in the foregoing clause (b) subsequently transfers or otherwise disposes of some or all of its Loans prior to the Effective Date such that it holds less than 5% of all outstanding Loans in the aggregate, such Lender shall be deemed removed from clause (b), and clause (b) shall be deemed revised to require consent from a majority in interest of the remaining Lenders described therein.

"Required Supporting Noteholders" means (1) a majority of holders in amount of the outstanding principal amount of the notes issued pursuant to the Pre-Petition Indentures and (2) including funds or financing vehicles (or funds or accounts advised or sub-advised by such Persons) that are Pre-Petition Indenture Noteholders and are affiliated with at least three of the following entities: Carl Marks, Marblegate, GSO and Kelso & Company, L.P.; provided, that if any Person described in this clause (2) subsequently transfers or otherwise disposes of some or all of its notes prior to the Effective Date such that it holds less than 5% of all outstanding Pre-Petition Indenture Notes in the aggregate, such Person shall be deemed removed from clause (2) and clause (2) shall be deemed revised to require consent from a majority of the remaining Pre-Petition Indenture Noteholders described therein.

"Responsible Officer" means the chief executive officer, president, vice president, chief financial officer, treasurer, assistant treasurer, secretary, assistant secretary or controller of a

Loan Party. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other Equity Interest of any Person or any of its Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such capital stock or other Equity Interest, or on account of any return of capital to any Person's stockholders, partners or members (or the equivalent of any thereof), or any option, warrant or other right to acquire any such dividend or other distribution or payment.

"Restructuring" has the meaning specified in the Restructuring Support Agreement.

"Restructuring Support Agreement" means that certain Restructuring Support Agreement, dated as of August 8, 2016, by and among the Debtors, the Pre-Petition First Lien Lenders, the Pre-Petition First Lien Agent, GSO or certain affiliates thereof party thereto, Kelso & Company, L.P. or certain affiliates thereof party thereto, Carl Marks or certain affiliates thereof party thereto, and Marblegate or certain affiliates thereof party thereto, in form and substance satisfactory to the Administrative Agent, the Required Lenders and the Unanimous DIP Lenders, as amended, supplemented, modified, extended, renewed, restated and/or replaced in accordance therewith, together with any schedules and exhibits thereto.

"Roadhouse Holding" means Roadhouse Holding Inc., a Delaware corporation.

"Roadhouse Intermediate" means Roadhouse Intermediate Inc., a Delaware corporation.

"Roadhouse Midco" means Roadhouse Midco Inc., a Delaware corporation.

"Roadhouse Parent" means Roadhouse Parent Inc., a Delaware corporation.

"Roadhouse Parent Entities" means Roadhouse Holding, Roadhouse Intermediate, Roadhouse Midco and Roadhouse Parent.

"Roll Up Affiliate" has the meaning specified in Section 2.01(a).

"Roll Up Facility" has the meaning specified in Section 2.01(a).

"Roll Up Loans" has the meaning specified in Section 2.01(a).

"RSA Term Sheet" means the term sheet attached as Exhibit A to the Restructuring Support Agreement.

"Sanctions" has the meaning specified in Section 5.19(a).

"Sanctioned Country" has the meaning specified in Section 5.19(a).

"SDN List" has the meaning specified in Section 5.19(a).

"S&P" means Standard & Poor's Financial Services LLC, a subsidiary of The McGraw-Hill Companies, Inc., and any successor thereto.

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Secured Parties" means, collectively, the Administrative Agent, each Lender, each other Indemnitee and each other holder of any Obligation of any Loan Party.

"Security Agreement" means that certain Debtor-In-Possession Security Agreement, dated as of the date hereof, by and among the Loan Parties and the Administrative Agent, substantially in the form of Exhibit F (together with each security agreement supplement delivered pursuant to Section 7.12, in each case as amended).

"Security Agreement Supplement" has the meaning specified in the Security Agreement.

"Segregated Pre-Funding Account" means a segregated deposit account maintained by the Administrative Agent for the benefit of the Lenders into which the proceeds of the Loans under the New Money Facility shall be deposited; provided, that, as of the Closing Date and until a new account maintained by the Administrative Agent for the benefit of the Lenders is established, "Segregated Pre-Funding Account" shall mean the omnibus account at the Administrative Agent into which the proceeds of the Loans under the New Money Facility shall be deposited temporarily until such time as the new account can be established.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person.  Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of Holdings.

"Supporting Interest Holders" means the holders of Equity Interests, directly or indirectly, in Holdings that are signatories to the Restructuring Support Agreement and remain bound by its terms.

"Supporting Lenders" means the Pre-Petition First Lien Lenders that are signatories to the Restructuring Support Agreement and remain bound by its terms.

"Tax Affiliate" means, (a) the Roadhouse Parent Entities, Holdings, Borrower and each of their Subsidiaries and (b) any Affiliate of the Roadhouse Parent Entities, Holdings or the Borrower with which the Roadhouse Parent Entities, Holdings, Borrower or any of their Subsidiaries files or is eligible to file consolidated, combined or unitary tax returns, but only if and to the extent that the Roadhouse Parent Entities, Holdings, Borrower or any of their Subsidiaries may be

liable for the tax in question of such Affiliate pursuant to Treasury Regulation Section 1.1502-6 (or similar provision of state or local law).

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Total Outstandings" means the aggregate Outstanding Amount of all Loans.

"Transactions" means, collectively, (a) the execution, delivery and performance by the Loan Parties of the Loan Documents to which they are a party and the making of the Borrowings hereunder, (b) the entry into the Restructuring Support Agreement, (c) the restructuring transactions contemplated under the Reorganization Plan, (d) the entry of the DIP Orders and (e) the payment of the fees and expenses related to the foregoing.

"Transparent Subsidiary" means a Subsidiary of the Borrower that is treated as a disregarded entity or partnership for U.S. federal income Tax purposes and that has no material assets other than Equity Interests (held directly or indirectly through other Transparent Subsidiaries) in one or more CFCs.

"Type" means, with respect to a Loan, its character as a Base Rate Loan or a Eurodollar Rate Loan.

"UCC" means the Uniform Commercial Code as in effect in the State of New York; provided that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"Unanimous DIP Lenders" means, collectively, (a) any Carl Marks Entity or Lender hereunder that is affiliated with a Carl Marks Entity for so long as such Carl Marks Entity or Affiliate remains a Lender hereunder, (b) any Marblegate Entity or Lender hereunder that is affiliated with a Marblegate Entity or Lender hereunder that is affiliated with a Marblegate Entity for so long as such Marblegate Entity or Affiliate remains a Lender hereunder, (c) any GSO Entity or Lender hereunder that is affiliated with a GSO Entity for so long as such GSO Entity or Affiliate remains a Lender hereunder and (d) Kelso & Company, L.P. for so long as it remains a Lender hereunder and all Lenders hereunder who are affiliated with Kelso & Company, L.P.; provided, that if any Backstop Lender described in this definition subsequently transfers or otherwise disposes of some or all of its Loans prior to the Effective Date such that it holds less than 5% of all outstanding Loans in the aggregate, such Backstop Lender shall be deemed removed from this definition, and this definition shall be deemed revised to require consent from each of the remaining Backstop Lenders described therein.

"Unfunded Pension Liability" means the excess of a Pension Plan's "benefit liabilities" (as defined in Section 4001(a)(16) of ERISA), over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to Section 412 of the Code for the applicable plan year.

"United States" and "U.S." mean the United States of America.

"Variance" has the meaning assigned to such term in the definition of "Variance Report".

"Variance Report" means a report certified by a Responsible Officer of the Borrower, in form reasonably satisfactory the Lenders, delivered in accordance with Section 6.01(d), showing (a) the actual cumulative receipts and disbursements as of the end of the week immediately preceding the week during which such Variance Report is delivered and (b) commencing with the second Thursday following the Petition Date, the variance, expressed as both a percentage and as a dollar amount, of such amounts for all applicable weeks since the Closing Date, on a rolling basis (and without giving effect to the making of any Loans or prepayments of any Loans), from the corresponding anticipated amount therefor set forth in the most recent Budget (each a "Variance").

"Weighted Average Life to Maturity" means, when applied to any Indebtedness at any date, the number of years obtained by dividing: (i) the sum of the products obtained by multiplying (a) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (b) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment by (ii) the then outstanding principal amount of such Indebtedness.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.02    Other Interpretive Provisions. With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Preliminary Statements, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Preliminary Statements, Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, re-

fer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)     In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including."

(c)     Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

Section 1.03   Accounting Terms.

(a)     Generally.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, applied in a manner consistent with that used in preparing the Audited Financial Statements, except as otherwise specifically prescribed herein.

(b)     Changes in GAAP.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrower or the Required Lenders shall so request, the Administrative Agent, the Lenders and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrower shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder together with a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP; provided further that such reconciliation shall be required to be provided only for the four fiscal quarters following such change or such longer period as may be reasonably requested by the Administrative Agent.

Section 1.04   Rounding.  Any financial ratios required to be maintained by the Borrower pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

Section 1.05   Times of Day.  Unless otherwise specified, all references herein to times of day shall be references to Eastern Time (daylight or standard, as applicable).

Section 1.06   Currency Equivalents Generally.  Any amount specified in this Agreement (other than in Articles II, IX and X) or any of the other Loan Documents to be in Dollars shall

also include the equivalent of such amount in any currency other than Dollars, such equivalent amount thereof in the applicable currency to be determined by the Administrative Agent at such time on the basis of the Spot Rate (as defined below) for the purchase of such currency with Dollars. For purposes of this Section 1.06, the "Spot Rate" for a currency means the rate determined by the Administrative Agent to be the rate quoted by the Person acting in such capacity as the spot rate for the purchase by such Person of such currency with another currency through its principal foreign exchange trading office at approximately 11:00 a.m. on the date two Business Days prior to the date of such determination; provided that the Administrative Agent may obtain such spot rate from another financial institution designated by the Administrative Agent if the Person acting in such capacity does not have as of the date of determination a spot buying rate for any such currency. Notwithstanding the foregoing, for purposes of determining compliance with Sections 8.01, 8.02 and 8.03 with respect to any amount of Indebtedness or Investment in a currency other than Dollars, no Default shall be deemed to have occurred solely as a result of changes in rates of exchange occurring after the time such Indebtedness or Investment is incurred; provided that, for the avoidance of doubt, the foregoing provisions of this Section 1.06 shall otherwise apply to such Sections, including with respect to determining whether any Indebtedness or Investment may be incurred at any time under such Sections.

<div align="center">

ARTICLE II.
THE COMMITMENTS AND CREDIT EXTENSIONS
</div>

Section 2.01   The Facilities.

(a)   Roll Up Facility.

(i)   Upon entry of the Interim Order, each Lender who is a Pre-Petition Indenture Noteholder, or in the case of each Lender who designates in the "Roll Up Affiliate" column on Schedule 2.01 a Pre-Petition Indenture Noteholder that is an Affiliate or Approved Fund of such Lender or a fund or account managed or sub-advised by such Lender or such Affiliate or Approved Fund (each, a "Roll Up Affiliate"), such Roll Up Affiliate shall be deemed to have exchanged its Pre-Petition Indenture Notes in an aggregate principal amount equal to the amount of such Lender's Initial Commitment which has been actually disbursed to the Borrower pursuant to Section 2.03, for loans hereunder on a dollar for dollar basis (each such loan deemed made in exchange for such Pre-Petition Indenture Notes, an "Initial Roll Up Loan", and collectively, the "Initial Roll Up Loans"). Each Lender that is a Pre-Petition Indenture Noteholder and each Roll Up Affiliate as of the entry of the Interim Order shall be identified in a schedule delivered to the Administrative Agent on such date.

(ii)   So long as permitted by the Final Order, upon entry of the Final Order, each Lender who is a Pre-Petition Indenture Noteholder, or in the case of each Lender who designates a Roll Up Affiliate, such Roll Up Affiliate, shall be deemed to have exchanged additional Pre-Petition Indenture Notes held by it in an aggregate principal amount equal to the amount of Initial Loans plus Delayed Draw Loans of such Lender or such Roll Up Affiliate, as applicable, hereunder which have been actually disbursed to the Borrower pursuant to Section 2.03, for loans hereunder so that the aggregate total of such loans received by such Lender or such Roll Up Affiliate under this Section

2.01(a)(i) and (ii) in exchange for the applicable Lender's Pre-Petition Indenture Notes plus accrued and unpaid interest thereon result in an exchange on a 2:1 basis for every dollar of the New Money Facility under Section 2.01(b) actually disbursed to the Borrower pursuant to Section 2.03 (each such loan deemed made in exchange for such additional Pre-Petition Indenture Notes, an "Additional Roll Up Loan", and collectively, the "Additional Roll Up Loans", and the Additional Roll Up Loans together with the Initial Roll Up Loans, the "Roll Up Loans"). Notwithstanding anything herein or in any other Loan Document to the contrary, if the terms of the DIP Orders do not permit such additional exchange, (A) no additional Pre-Petition Indenture Notes shall be exchanged pursuant to this clause (ii) and (B) no Additional Roll Up Loans shall be deemed to be outstanding hereunder.

(iii)    All such Pre-Petition Indenture Notes so exchanged shall be deemed repaid in full and no longer outstanding. The facility described in this Section 2.01(a) is referred to herein as the "Roll Up Facility".

(b)    New Money Facility.

(i)    Subject to the terms and conditions herein and in the DIP Orders and relying upon the representations and warranties herein set forth, each Lender agrees, severally and not jointly, to make (i) a single loan to the Borrower on the Interim Order Entry Date in an aggregate principal amount not to exceed its Initial Commitment (such loans, each an "Initial Loan" and collectively, the "Initial Loans") and (ii) a single loan on the Delayed Draw Loan Funding Date in an aggregate principal amount not to exceed its Delayed Draw Commitment (such loans, each a "Delayed Draw Loan" and collectively, the "Delayed Draw Loans"). Following the making of the Initial Loans, the Initial Commitment of such Lender shall terminate, and following the making of the Delayed Draw Loans, the Delayed Draw Commitment of such Lender shall terminate. Any remaining Initial Commitments or Delayed Draw Commitments shall automatically terminate on (1) the [second Business Day] following the entry of the Interim Order in the case of the Initial Loans and (2) the [second Business Day] following the Delayed Draw Loan Funding Date in the case of the Delayed Draw Loans. Once funded, each Initial Loan and Delayed Draw Loan shall be a "Loan" for all purposes under this Agreement and the other Loan Documents. Amounts paid or prepaid in respect of Loans may not be reborrowed. The facility provided for in this Section 2.01(b) shall be referred to herein as the "New Money Facility".

(ii)    All proceeds from the New Money Facility shall be deposited into the Segregated Pre-Funding Account and shall be disbursed to the Borrower in accordance with, subject to and to the extent provided in, Section 2.03. For the avoidance of doubt, it is understood and agreed that (A) the funds on deposit in the Segregated Pre-Funding Account shall not be assets of any of the Loan Parties, (B) the Loan Parties shall have no right, title or interest in amounts on deposit in the Segregated Pre-Funding Account other than to request a disbursement hereunder in accordance with the terms of this Agreement.

Section 2.02    Borrowings, Conversions and Continuations of Loans.

(a)    Each Borrowing or each conversion of Loans from one Type to the other, and each continuation of Eurodollar Rate Loans shall be made upon the Borrower's irrevocable written notice to the Administrative Agent. Each such notice must be received by the Administrative Agent not later than 11:00 a.m. (i) three Business Days prior to the requested date of any Borrowing of, conversion to or continuation of Eurodollar Rate Loans or of any conversion of Eurodollar Rate Loans to Base Rate Loans, and (ii) one Business Day prior to the requested date of any Borrowing of Base Rate Loans. Not later than 11:00 a.m., one Business Day before the requested date of such Borrowing, conversion or continuation, the Administrative Agent shall notify the Borrower in writing whether or not the requested Interest Period has been consented to by all the Lenders. Each written notice contemplated by this Section 2.02(a) shall be made pursuant to a written Committed Loan Notice, appropriately completed and signed by a duly authorized officer of the Borrower. Each Borrowing of, conversion to or continuation of Eurodollar Rate Loans shall be in a principal amount of $100,000 or a whole multiple of $50,000 in excess thereof (or as otherwise agreed to by the Administrative Agent). Each Borrowing of or conversion to Base Rate Loans shall be in a principal amount of $100,000 or a whole multiple of $50,000 in excess thereof (or as otherwise agreed to by the Administrative Agent). Each Committed Loan Notice shall specify (i) whether the Borrower is requesting a Borrowing or a conversion of Loans from one Type to the other, or a continuation of Eurodollar Rate Loans, (ii) the requested date of the Borrowing, conversion or continuation, as the case may be (which shall be a Business Day), (iii) the principal amount of Loans to be borrowed, converted or continued, (iv) the Type of Loans to be borrowed or to which existing Loans are to be converted, and (v) if applicable, the duration of the Interest Period with respect thereto. If the Borrower fails to specify a Type of Loan in a Committed Loan Notice or if the Borrower fails to give a timely notice requesting a conversion or continuation, then the applicable Loans shall be made as, or converted to, Base Rate Loans. If the Borrower requests a Borrowing of or continuation of Eurodollar Rate Loans but fails to specify an Interest Period, it will be deemed to have specified an Interest Period of one month. Any such automatic conversion to Base Rate Loans shall be effective as of the last day of the Interest Period then in effect with respect to the applicable Eurodollar Rate Loans.

(b)    Following receipt of a Committed Loan Notice, the Administrative Agent shall promptly notify each Lender of the amount of its Pro Rata Share under the applicable Loans, and if no timely notice of a conversion or continuation is provided by the Borrower, the Administrative Agent shall notify each Lender of the details of any automatic conversion to Base Rate Loans described in Section 2.02(a). Each Lender shall make the amount of its Loan available to the Administrative Agent in immediately available funds at the Administrative Agent's Office not later than [2:00 p.m.] on the Business Day specified in the applicable Committed Loan Notice (each such date, a "Funding Date"). Upon satisfaction of the applicable conditions set forth in Section 4.02 (and, if such Borrowing is the initial Credit Extension, Section 4.01) and receipt of each Lender's Pro Rata Share of such Loans (other than the portion to be funded by a Defaulting Lender), the Administrative Agent shall make all funds so received available to the Borrower, subject to the DIP Orders and the Budget (including Permitted Variances), in like funds as received by the Administrative Agent, provided that such funds be deposited into the Segregated Pre-Funding Account and only disbursed in accordance with the terms of Section 2.03.

(c)    Except as otherwise provided herein, a Eurodollar Rate Loan may be continued or converted only on the last day of an Interest Period for such Eurodollar Rate Loan. During the existence of a Default, no Loans may be requested as, converted to or continued as Eurodollar Rate Loans without the consent of the Required Lenders.

(d)    The Administrative Agent shall promptly notify the Borrower and the Lenders of the interest rate applicable to any Interest Period for Eurodollar Rate Loans upon determination of such interest rate. At any time that Base Rate Loans are outstanding, the Administrative Agent shall notify the Borrower and the Lenders of any change in the prime rate used in determining the Base Rate promptly following such change.

(e)    After giving effect to all Borrowings, all conversions of Loans from one Type to the other, and all continuations of Loans as the same Type, there shall not be more than seven Interest Periods in effect in respect of the Facility, or such greater number of Interest Periods as may be agreed to by the Administrative Agent.

Section 2.03    Disbursements from Segregated Pre-Funding Account.

(a)    From and after the funding of the Initial Loans or the Delayed Draw Loans, the Borrower may request proceeds from such Loans on deposit in the Segregated Pre-Funding Account be disbursed from such account to the Borrower on a weekly basis in accordance with the Budget until the DIP Maturity Date (or more frequently as determined by the Required Lenders in their sole discretion). To request such disbursement, the Borrower shall deliver to the Administrative Agent and the Lenders a Notice of Request for Disbursement, which notice must be received by the Administrative Agent no later than 11:00 a.m. at least one Business Day prior to the date of the requested disbursement. Such Notice of Request for Disbursement shall specify:

(i)    the amount of the disbursement to be made, which shall be an amount not to exceed the least of (1) an amount, such that after making such disbursement, the cumulative amount of disbursements so made since the date of the first disbursement would not exceed the amount set forth in the Budget for such period, (2) the amount permitted in the DIP Orders and (3) the amount available in the Segregated Pre-Funding Account as of the date of the proposed disbursement (such date, the "Disbursement Date"); and

(ii)    the Disbursement Date, which shall be a Business Day.

(b)    Upon receipt of a Notice of Request for Disbursement, the Administrative Agent shall promptly notify each Lender of the amount of its Pro Rata Share of the Loans to be disbursed on such Disbursement Date.

(c)    Such disbursements shall be made available to the Borrower by wire transfer of such amount to the account as specified by the Borrower in the Notice of Request for Disbursement to the Administrative Agent, which such account shall be subject to a Control Agreement. The Borrower shall promptly direct and apply such amounts for the purposes set forth in the Budget (subject to Permitted Variances).

(d)     Notwithstanding anything herein to the contrary, (i) there shall not be more than one (1) disbursement in any calendar week unless otherwise agreed to by the Required Lenders in their sole discretion, (ii) no disbursement shall be issued during any week when the Budget does not provide for such a disbursement, unless otherwise consented to by the Required Lenders and (iii) all conditions precedent set forth in Section 4.03 shall have been fulfilled or waived by the Required Lenders and the Unanimous DIP Lenders before any such disbursement may be made.

Section 2.04   Prepayments.

(a)     Optional.  The Borrower may, upon three (3) Business Days prior written notice for a Eurodollar Rate Loan and upon one Business Day prior written notice for a Base Rate Loan, prepay the outstanding principal amount of any Loan in whole or in part at any time (together with any breakage costs that may be owing pursuant to Section 3.05 after giving effect to such prepayment); provided, however, that each partial prepayment that is not of the entire outstanding amount under the Facility shall be in a minimum amount of $[100,000] and increments of $[50,000] in excess thereof. Amounts so prepaid under this Section 2.04(a) may not be reborrowed.

(b)     Mandatory.

(i)     (A) if (x) any Loan Party or any Subsidiary thereof Disposes or proposes to Dispose of any property or assets (other than Net Cash Proceeds of sales or other dispositions of inventory in the ordinary course of business as permitted by Section 8.05(a), Section 8.05(b) and Section 8.05(c) (to the extent constituting a Disposition to a Loan Party)), (y) any Casualty Event occurs or (z) the Borrower or any Guarantor issues or proposes to issue any Equity Interest, the Borrower shall (1) promptly notify the Administrative Agent in writing of such proposed Disposition, Casualty Event or issuance of Equity Interest (in each case, including a description of such property or assets (if applicable) and the estimated amount of Net Cash Proceeds to be received by a Loan Party or any Subsidiary thereof in respect thereof and the expected date of prepayment) and (2) make a prepayment, in accordance with Section 2.04(b)(ii), of an aggregate principal amount of Loans equal to 100% of all such Net Cash Proceeds realized or received.

(ii)     On each occasion that the Borrower must make a prepayment of the Loans pursuant to Section 2.04(b)(i), the Borrower shall, within [five (5) Business Days] after the date of realization or receipt of such Net Cash Proceeds, make a prepayment, in accordance with Section 2.04(b)(v) below, of the principal amount of Loans in an amount equal to 100% of such Net Cash Proceeds realized or received.

(iii)     If any Loan Party or Subsidiary thereof incurs or issues any Indebtedness not expressly permitted to be incurred or issued pursuant to Section 8.03, the Borrower shall cause to be prepaid an aggregate principal amount of Loans equal to 100% of all Net Cash Proceeds received therefrom on the first Business Day following the date of receipt of such Net Cash Proceeds.

(iv)    Each prepayment of Loans pursuant to this Section 2.04(b) shall be applied in accordance with the provisions set forth in Section 9.03.

(v)    The Borrower shall notify the Administrative Agent in writing substantially in the form of Exhibit H of any mandatory prepayment of Loans required to be made pursuant to clauses (ii) and (iii) of this Section 2.04(b) at least one (1) Business Day prior to 1:00 p.m. on the date of such prepayment. Each such notice shall specify the date of such prepayment and provide a reasonably detailed calculation of the amount of such prepayment. The Administrative Agent will promptly notify each Lender of the contents of the Borrower's prepayment notice and of such Lender's Pro Rata Share of the prepayment.

(c)    Interest, Funding Losses, Etc.  All prepayments under this Section 2.04 shall be accompanied by all accrued and unpaid interest thereon, together with, in the case of any such prepayment of a Eurodollar Rate Loan on a date other than the last day of an Interest Period therefor, any amounts owing in respect of such Eurodollar Rate Loan pursuant to Section 3.05.

Notwithstanding any of the other provisions of this Section 2.04, so long as no Default or Event of Default shall have occurred and be continuing, if any prepayment of Eurodollar Rate Loans is required to be made under this Section 2.04, prior to the last day of the Interest Period therefor, in lieu of making any payment pursuant to this Section 2.04 in respect of any such Eurodollar Rate Loan prior to the last day of the Interest Period therefor, the Borrower may, in its sole discretion, deposit with the Administrative Agent the amount of any such prepayment otherwise required to be made hereunder until the last day of such Interest Period, at which time the Administrative Agent shall be authorized (without any further action by or notice to or from the Borrower or any other Loan Party) to apply such amount to the prepayment of such Loans in accordance with this Section 2.04. Such deposit shall constitute cash collateral for the Eurodollar Rate Loans to be so prepaid, provided that the Borrower may at any time direct that such deposit be applied to make the applicable payment required pursuant to this Section 2.04.

Section 2.05    Repayment of Loans.  On the DIP Maturity Date, (i) if the Reorganization Plan is not confirmed or if the Restructuring Support Agreement is terminated or otherwise not in full force and effect, then the Borrower shall repay the Loans, together with all other Obligations hereunder and under the other Loan Documents (other than contingent indemnification and expense reimbursement obligations for which no claim has been made), in full in cash and (ii) if both the Reorganization Plan is confirmed and the Restructuring Support Agreement remains in full force and effect, all outstanding principal, accrued and unpaid interest and all other Obligations hereunder (other than contingent indemnification and expense reimbursement obligations for which no claim has been made) shall be exchanged for an equivalent amount of principal of loans under the Exit Second Lien Facility and upon such full and complete exchange pursuant to this clause (ii), the Borrower's Obligations hereunder and under the other Loan Documents (other than contingent indemnification and expense reimbursement obligations for which no claim has been made) shall be deemed to have been satisfied in full; provided, that the Borrower shall repay any Obligations owing to the Administrative Agent (other than contingent indemnification and expense reimbursement obligations for which no claim has been made) in full in cash on the DIP Maturity Date regardless of whether the Restructuring Support Agreement is terminated or remains in full force and effect or the Reorganization Plan has been confirmed or not confirmed.

Section 2.06    Interest.

(a)    Subject to the provisions of Section 2.06(b), (i) each Eurodollar Rate Loan under the Facility shall bear interest (from the time of disbursement pursuant to Section 2.03) on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the Eurodollar Rate for such Interest Period plus the Applicable Rate for the Facility; and (ii) each Base Rate Loan under the Facility shall bear interest (from the time of disbursement pursuant to Section 2.03) on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Rate for the Facility.

(b)    (i)    If the Borrower shall default in the payment of any principal of or interest on any Loan or any other amount due hereunder or under any other Loan Document, by acceleration or otherwise, or any Event of Default shall occur and be continuing, then, until such defaulted amount shall have been paid in full or such Event of Default shall no longer exist, all Obligations shall bear interest (after as well as before judgment), payable on demand, at a fluctuating interest rate per annum at all times equal to the Default Rate.

(ii)    Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c)    Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law. Any interest payable hereunder shall automatically and without further action on the applicable Interest Payment Date be capitalized, compounded and added to the then unpaid principal amount of the Loans (the "PIK Interest") and shall thereafter be deemed to be a part of the principal amount of the Loans. All PIK Interest that has accrued shall be payable in cash on the DIP Maturity Date.  The Borrower shall not issue any additional promissory notes to represent the PIK Inter-

est, and, in lieu thereof, the Administrative Agent shall keep a ledger of the amount of PIK Interest that has accrued, which ledger shall be presumed to be correct absent manifest error.

Section 2.07    Fees.

(a)    Unused Commitment Fee. The Borrower agrees to pay to each Lender (other than a Defaulting Lender) a commitment fee on the actual daily amount by which (i) the Initial Commitments of such Lender exceeds its Pro Rata Share of the aggregate outstanding principal amount of the Initial Loans from the Closing Date to the Final Order Entry Date at a rate per annum equal to 0.5% per annum and (ii) the Commitments of such Lender exceeds its Pro Rata Share of the aggregate outstanding principal amount of the Initial Loans and the Delayed Draw Loans from and including the Final Order Entry Date through the DIP Maturity Date at a rate per annum equal to 0.5% per annum, in each case of this clause (i) and (ii), payable in arrears and in cash (x) on the last Business Day of each month, and (y) on the DIP Maturity Date.

(b)    Commitment Fee. The Borrower shall pay on the Closing Date to each Lender party to this Agreement as a Lender on the Closing Date, as fee compensation for agreeing to fund such Lender's Commitments, a commitment fee in an amount equal to 2.0% of the stated principal amount of such Lender's Commitments. Such fee shall be in all respects fully earned, due and payable on the Closing Date and non-refundable and non-creditable thereafter and shall automatically and without further action be added to the outstanding amount of the Loans as of the Closing Date.

(c)    Backstop Commitment Fee. The Borrower agrees to pay on each Funding Date to each Backstop Lender party to this Agreement as a Lender on such Funding Date, as fee compensation for the funding of the Commitments held by such Backstop Lender on the Closing Date, a fee in an amount equal to 3.0% of the stated principal amount of such Commitments funded on such date (in each case regardless of whether such Commitments are funded by such Backstop Lender, any assignee of such Backstop Lender, any Affiliate or Approved Fund of such Backstop Lender or assignee or any combination of the foregoing), payable in cash to such Backstop Lender. Such fee shall be in all respects fully earned, due and payable on such funding date and non-refundable and non-creditable thereafter.

(d)    Administrative Agent Fees. The Borrower shall pay to the Administrative Agent such fees as have been agreed upon in writing as set forth in the Agent Fee Letter.

(e)    Other Fees. The Borrower shall pay to the Lenders such fees as shall have been separately agreed upon in writing in the amounts and at the times so specified. Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

Section 2.08    Computation of Interest and Fees. All computations of interest for Base Rate Loans when the Base Rate is determined by the "prime rate" shall be made on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed. All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a 365-day year). Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid,

provided that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.10(a), bear interest for one day. Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.[1]

Section 2.09   Evidence of Debt. The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and by the Administrative Agent in the ordinary course of business. The accounts or records maintained by the Administrative Agent and each Lender shall be conclusive absent manifest error of the amount of the Credit Extensions made by the Lenders to the Borrower and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations. In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error. Upon the request of any Lender made through the Administrative Agent, the Borrower shall execute and deliver to such Lender (through the Administrative Agent) a Note, which shall evidence such Lender's Loans in addition to such accounts or records. Each Lender may attach schedules to its Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto.

Section 2.10   Payments Generally; Administrative Agent's Clawback.

(a)      General. All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the Administrative Agent's Office in Dollars and in immediately available funds not later than 2:00 p.m. on the date specified herein. The Administrative Agent will promptly distribute to each Lender its Pro Rata Share in respect of the Facility (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office. All payments received by the Administrative Agent after 2:00 p.m. may be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue. If any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected on computing interest or fees, as the case may be.

(b)      (i)   Reserved.

(ii)   Payments by Borrower; Presumptions by Administrative Agent. Unless the Administrative Agent shall have received written notice from the Borrower prior to the time at which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders, as the

---

[1] NTD: TBD interest accrual.

case may be, the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders, as the case may be, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

A notice of the Administrative Agent to any Lender or the Borrower with respect to any amount owing under this subsection (b) shall be conclusive, absent manifest error.

(c)     Failure to Satisfy Conditions Precedent. If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the Borrower by the Administrative Agent because the conditions to the applicable Credit Extension set forth in Article IV are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest from the Borrower or any other Person.

(d)     Obligations of Lenders Several. The obligations of the Lenders hereunder to make Loans and to make payments pursuant to Section 11.04(c) are several and not joint. The failure of any Lender to make any Loan or to make any payment under Section 11.04(c) on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan or to make its payment under Section 11.04(c).

(e)     Funding Source. Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

(f)     Insufficient Funds. If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (i) first, toward payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, toward payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

Section 2.11   Sharing of Payments by Lenders. If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of (a) Obligations in respect of the Facilities due and payable to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations due and payable to such Lender at such time to (ii) the aggregate amount of the Obligations in respect of the Facilities due and payable to all Lenders hereunder and under the other Loan Documents at such time) of payments on account of the Obligations in respect of the Facilities due and payable to all Lenders hereunder and under the other Loan Documents at

such time obtained by all the Lenders at such time or (b) Obligations in respect of any of the Facilities owing (but not due and payable) to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations owing (but not due and payable) to such Lender at such time to (ii) the aggregate amount of the Obligations in respect of the Facilities owing (but not due and payable) to all Lenders hereunder and under the other Loan Documents at such time) of payment on account of the Obligations in respect of the Facilities owing (but not due and payable) to all Lenders hereunder and under the other Loan Documents at such time obtained by all of the Lenders at such time then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact, and (b) make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of Obligations in respect of the Facilities then due and payable to the Lenders or owing (but not due and payable) to the Lenders, as the case may be, provided that: the provisions of this Section 2.11 shall not be construed to apply to (A) any payment made by the Borrower or Holdings pursuant to and in accordance with the express terms of this Agreement or (B) any payment obtained by a Lender as consideration for the assignment of any of its Loans to any assignee.

Each Loan Party consents to the foregoing.

Section 2.12   Defaulting Lenders.  Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the Commitments and Outstanding Amount of Loans of such Defaulting Lender shall not be included in determining whether all Lenders or the Required Lenders or the Unanimous DIP Lenders have taken or may take any action hereunder (including any consent to any amendment, waiver or other modification pursuant to Section 11.01); provided that any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender which affects such Defaulting Lender disproportionately when compared to the other affected Lenders, or increases or extends the Commitment of such Defaulting Lender, or extends the DIP Maturity Date beyond December 14, 2016 or reduces the principal of the Loans of such Defaulting Lender, shall require the consent of such Defaulting Lender.

## ARTICLE III.
## TAXES, YIELD PROTECTION AND ILLEGALITY

Section 3.01   Taxes.

(a)   Payments Free of Taxes; Obligation to Withhold; Payments on Account of Taxes. (i) Any and all payments by or on account of any obligation of any Loan Party hereunder or under any other Loan Document shall to the extent permitted by applicable Laws be made free and clear of and without reduction or withholding for any Taxes.

(ii)   If any applicable withholding agent shall be required by applicable Laws to withhold or deduct any Taxes from any payment, then (A) the applicable withholding agent shall withhold or make such deductions as are determined by the applicable withholding agent to be required, (B) the applicable withholding agent shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance

with applicable Laws, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the applicable Loan Party shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this Section 3.01) the Administrative Agent or Lender, as the case may be, receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(b)     Payment of Other Taxes by the Borrower.  Without limiting or duplicating the provisions of subsection (a) above, the Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable Laws.

(c)     Tax Indemnifications.  Without limiting or duplicating the provisions of subsection (a) or (b) above, the Borrower shall indemnify the Administrative Agent and each Lender, and shall make payment in respect thereof within 10 days after receipt of written demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 3.01) paid or payable by the Administrative Agent or such Lender, as the case may be, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of any such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)     Evidence of Payments.  As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority as provided in this Section 3.01, such Loan Party shall deliver to the Administrative Agent, the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return required by applicable Laws to report such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)     Status of Lenders; Tax Documentation.  (i) Each Lender shall deliver to the Borrower and to the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable Laws and such other reasonably requested information as will permit the Borrower or the Administrative Agent, as the case may be, to determine (A) whether or not payments made hereunder or under any other Loan Document are subject to withholding or deduction of any Taxes, (B) if applicable, the required rate of withholding or deduction, and (C) such Lender's entitlement to any available exemption from, or reduction of, applicable Taxes in respect of all payments to be made to such Lender by a Loan Party pursuant to this Agreement or otherwise to establish such Lender's status for withholding Tax purposes in the applicable jurisdiction. Notwithstanding anything to the contrary in the preceding sentence, the completion, execution and submission of such documentation shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)    Without limiting the generality of the foregoing:

(A)    any Lender that is a "United States person" within the meaning of Section 7701(a)(30) of the Code shall deliver to the Borrower and the Administrative Agent, on or before the date on which it becomes a Lender under this Agreement (and from time to time thereafter upon the request of the Borrower or the Administrative Agent), two properly completed and duly executed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding; and

(B)    each Foreign Lender that is entitled under the Code or any applicable treaty to an exemption from or reduction of withholding Tax with respect to payments hereunder or under any other Loan Document shall deliver to the Borrower and the Administrative Agent, on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)    two properly completed and duly executed originals of IRS Form W-8BEN (or IRS Form W-8BEN-E, as applicable) claiming eligibility for the applicable benefits of an income tax treaty to which the United States is a party,

(2)    two properly completed and duly executed originals of IRS Form W-8ECI,

(3)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate, substantially in the form of Exhibit G, to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (any such certificate, a "U.S. Tax Compliance Certificate") and (y) two properly completed and duly executed originals of IRS Form W-8BEN (or IRS Form W-8BEN-E, as applicable),

(4)    to the extent a Foreign Lender is not the beneficial owner, two properly completed and duly executed originals of IRS Form W-8IMY of the Foreign Lender, accompanied by IRS Form W-8ECI, IRS Form W-8BEN (or IRS Form W-8BEN-E, as applicable), a U.S. Tax Compliance Certificate, IRS Form W-9, and/or other certification documents from each beneficial owner that would be required under this Section 3.01(e) if such beneficial owner were a Lender, as applicable; provided that if the Foreign Lender is a partnership for U.S. federal income tax purposes and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit G on behalf of each such direct and indirect partner, or

(5)    properly completed, duly executed originals of any other form prescribed by applicable Laws as a basis for claiming exemption from or a reduction

in United States Federal withholding Tax together with such supplementary documentation as may be prescribed by applicable Laws to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made.

(C) if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable Laws (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (C), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so. Notwithstanding any other provision of this clause (e), a Lender shall not be required to deliver any form that such Lender is not legally eligible to deliver.

(f)     _Treatment of Certain Refunds._  Unless required by applicable Laws, at no time shall the Administrative Agent have any obligation to file for or otherwise pursue on behalf of a Lender, or have any obligation to pay to any Lender, any refund of Taxes withheld or deducted from funds paid for the account of such Lender.  If the Administrative Agent or any Lender receives a refund of any Indemnified Taxes as to which it has been indemnified by the Borrower or any other Loan Party, or with respect to which the Borrower or any other Loan Party has paid additional amounts pursuant to this Section 3.01, it shall pay to the Borrower an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 3.01 with respect to the Indemnified Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) incurred by the Administrative Agent or such Lender, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that the Borrower, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this subsection (f), in no event will the Administrative Agent or any Lender be required to pay any amount to the Borrower pursuant to this subsection (f) the payment of which would place the Administrative Agent or such Lender in a less favorable net after-Tax position than the Administrative Lender or such Lender would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, with-

held or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This subsection (f) shall not be construed to require the Administrative Agent or any Lender to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to any Loan Party or any other Person.

(g)    Each party's obligations under this Section 3.01 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

Section 3.02    Illegality.  If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to make, maintain or fund Eurodollar Rate Loans, or to determine or charge interest rates based upon the Eurodollar Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, then, on notice thereof by such Lender to the Borrower through the Administrative Agent, any obligation of such Lender to make or continue Eurodollar Rate Loans or to convert Base Rate Loans to Eurodollar Rate Loans shall be suspended until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, the Borrower shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all Eurodollar Rate Loans of such Lender to Base Rate Loans, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Eurodollar Rate Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such Eurodollar Rate Loans. Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted.

Section 3.03    Inability to Determine Rates.  If the Required Lenders determine that for any reason in connection with any request for a Eurodollar Rate Loan or a conversion to or continuation thereof that (a) Dollar deposits are not being offered to banks in the London interbank eurodollar market for the applicable amount and Interest Period of such Eurodollar Rate Loan, (b) adequate and reasonable means do not exist for determining the Eurodollar Rate for any requested Interest Period with respect to a proposed Eurodollar Rate Loan, or (c) the Eurodollar Rate for any requested Interest Period with respect to a proposed Eurodollar Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, the Administrative Agent will promptly so notify the Borrower and each Lender. Thereafter, the obligation of the Lenders to make or maintain Eurodollar Rate Loans shall be suspended until the Administrative Agent (upon the instruction of the Required Lenders) revokes such notice. Upon receipt of such notice, the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of Eurodollar Rate Loans or, failing that, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans in the amount specified therein.

Section 3.04    Increased Costs; Reserves on Eurodollar Rate Loans.

(a)    Increased Costs Generally.  If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any reserve requirement contemplated by Section 3.04(e));

(ii)    subject any Lender to any Tax of any kind whatsoever with respect to this Agreement or any Eurodollar Rate Loan made by it (except for Indemnified Taxes covered by Section 3.01, or any Excluded Tax); or

(iii)    impose on any Lender or the London interbank market any other condition, cost or expense affecting this Agreement or Eurodollar Rate Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurodollar Rate Loan (or of maintaining its obligation to make any such Loan), or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount) then, within 15 days after Borrower's receipt of a written request from such Lender, including a reasonably detailed calculation of such increased costs or reduction, the Borrower will pay to such Lender, as the case may be, such additional amount or amounts as will compensate such Lender, as the case may be, for such additional costs incurred or reduction suffered.

(b)    Capital Requirements.  If any Lender determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital requirements or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender, as the case may be, such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)    Certificates for Reimbursement.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, and a reasonably detailed calculation of such amounts, as specified in subsection (a) or (b) of this Section and delivered to the Borrower shall be conclusive absent manifest error. The Borrower shall pay such Lender, as the case may be, the amount shown as due on any such certificate within 15 days after receipt thereof.

(d)    Delay in Requests.  Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of such

Lender's right to demand such compensation, provided that the Borrower shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender, as the case may be, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

(e)      Reserves on Eurodollar Rate Loans. The Borrower shall pay to each Lender, as long as such Lender shall be required to maintain reserves with respect to liabilities or assets consisting of or including Eurodollar funds or deposits (currently known as "Eurodollar liabilities"), additional interest on the unpaid principal amount of each Eurodollar Rate Loan equal to the actual costs of such reserves allocated to such Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive), which shall be due and payable on each date on which interest is payable on such Loan, provided the Borrower shall have received at least 10 days' prior notice (with a copy to the Administrative Agent) of such additional interest from such Lender. If a Lender fails to give notice 10 days prior to the relevant Interest Payment Date, such additional interest shall be due and payable 10 days from receipt of such notice.

Section 3.05    Compensation for Losses. Upon demand of any Lender (with a copy to the Administrative Agent) from time to time, the Borrower shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense incurred by it as a result of:

(a)      any continuation, conversion, payment or prepayment of any Loan other than a Base Rate Loan on a day other than the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(b)      any failure by the Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Loan other than a Base Rate Loan on the date or in the amount notified by the Borrower; or

(c)      any assignment of a Eurodollar Rate Loan on a day other than the last day of the Interest Period therefor as a result of a request by the Borrower pursuant to Section 11.13;

including any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained. The Borrower shall also pay any customary administrative fees charged by such Lender in connection with the foregoing.

For purposes of calculating amounts payable by the Borrower to the Lenders under this Section 3.05, each Lender shall be deemed to have funded each Eurodollar Rate Loan made by it at the Eurodollar Rate for such Loan by a matching deposit or other borrowing in the London interbank eurodollar market for a comparable amount and for a comparable period, whether or not such Eurodollar Rate Loan was in fact so funded.

Section 3.06    Mitigation Obligations; Replacement of Lenders.

(a)    Designation of a Different Lending Office. If any Lender requests compensation under Section 3.04, or the Borrower is required to pay Indemnified Taxes or any additional amount with respect to Indemnified Taxes to any Lender, or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender gives a notice pursuant to Section 3.02, then such Lender shall, as applicable, use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.04, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 3.02, as applicable, and (ii) in each case, would not subject such Lender, as the case may be, to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender, as the case may be. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)    Replacement of Lenders. If any Lender requests compensation under Section 3.04, or if the Borrower is required to pay any Indemnified Taxes or pay any additional amount with respect to any Indemnified Taxes to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, the Borrower may replace such Lender in accordance with Section 11.13 and/or convert to a Base Rate Loan.

Section 3.07    Survival. All of the Borrower's obligations under this Article III shall survive termination of the Aggregate Commitments, repayment of all other Obligations hereunder, and resignation of the Administrative Agent.

ARTICLE IV.
CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

Section 4.01    Conditions of Initial Credit Extension. The effectiveness of this Agreement and the obligation of each Lender to make its Initial Loans on the Closing Date hereunder is subject to satisfaction (or waiver in accordance with Section 11.01) of the following conditions precedent:

(a)    The Administrative Agent's receipt of the following, each properly executed by a duly authorized officer of the signing Loan Party (if applicable) and each other party thereto, each dated the Closing Date (unless otherwise provided herein or, in the case of searches and certificates of governmental officials, a recent date before the Closing Date) and each in form and substance satisfactory to the Administrative Agent and the Required Lenders in their sole discretion:

(i)    this Agreement, the Guaranty, the Agent Fee Letter and each other Loan Document to be executed on the Closing Date, each duly executed by the appropriate parties;

(ii)     executed counterparts of the Pre-Petition Intercreditor Agreement Waiver and the Restructuring Support Agreement (including executed counterparts from the Pre-Petition First Lien Lenders);

(iii)    executed counterparts of the Security Agreement, together with:

(A)     except as permitted by Section 7.15, certificates, if any, representing the Pledged Securities referred to therein accompanied by undated stock powers executed in blank, or other arrangements (including the DIP Orders) sufficient to perfect the security interest of the Administrative Agent for the benefit of the Secured Parties in the securities evidenced by such certificates and to permit the exercise of collateral remedies with respect thereto, subject to the right of the Pre-Petition First Lien Secured Parties to exercise remedies after November 14, 2016 to the extent set forth in paragraph 23 of the Interim DIP Order,

(B)     Reserved,

(C)     except as permitted by Section 7.15, UCC, United States Patent and Trademark Office and United States Copyright Office, tax and judgment lien searches or equivalent reports or searches, each of a recent date listing all effective financing statements, lien notices or comparable documents that name any Loan Party as debtor and that are filed in those state and county jurisdictions in which any Loan Party is organized or maintains its principal place of business and such other searches that are required by the Perfection Certificate,

(D)     evidence of the completion of all other actions, recordings and filings of or with respect to the Security Agreement that the Administrative Agent may deem necessary or desirable in order to perfect the Liens created thereby, except as permitted by Section 7.15 hereof, and

(E)     except as permitted by Section 7.15 hereof, each Control Agreement required by the Security Agreement to perfect security interests in the Cash Collateral Account, Deposit Accounts, Securities Accounts, or Commodities Accounts, duly executed by the appropriate parties;

(iv)    except as permitted by Section 7.15 hereof, the Intellectual Property Security Agreements, duly executed by each Loan Party, together with evidence that all action that the Administrative Agent may reasonably deem necessary or desirable in order to perfect the Liens created under each Intellectual Property Security Agreements has been taken;

(v)     (1) copies of the Organization Documents of each Loan Party certified as of a recent date by the appropriate governmental official, (2) signature and incumbency certificates of the officers of such Person executing the Loan Documents to which it is a party, (3) resolutions of the board of directors or similar governing body of each Loan Party approving and authorizing the execution, delivery and performance of this Agreement and the other Loan Documents to which it is a party or by which it or its assets may

be bound, certified by its secretary or an assistant secretary or other comparable officer as being in full force and effect without modification or amendment, (4) a good standing certificate from the applicable Governmental Authority of each Loan Party's (A) jurisdiction of incorporation, organization or formation and (B) except as permitted by <u>Section 7.15</u>, jurisdiction in which it is qualified as a foreign corporation or other entity to do business where the failure to be in good standing could result in a Material Adverse Effect, in each case dated a recent date prior to the Closing Date, and (5) such other documents and certificates as the Administrative Agent or its counsel may reasonably request relating to the organization, existence and good standing of the Loan Parties, and the authorization of the Transactions;

(vi)    Reserved;

(vii)    evidence that all insurance required to be maintained pursuant to the Loan Documents has been obtained and is in effect, together with, subject to <u>Section 7.15</u> the certificates of insurance and endorsements, naming the Administrative Agent, on behalf of the Lenders, as an additional insured or lender's loss payee, as the case may be, under all insurance policies maintained with respect to the assets and properties of the Loan Parties that constitutes Collateral;

(viii)    a certificate of a Responsible Officer of the Borrower as to the satisfaction of the conditions set forth in this <u>Section 4.01</u> and in <u>Section 4.03</u>, except to the extent satisfaction of such conditions is subject to <u>Section 7.15</u>; and

(ix)    except as permitted by <u>Section 7.15</u> hereof, a Perfection Certificate by, and in respect of, each Loan Party.

(b)    (i) All fees and other amounts required to be paid to the Administrative Agent and the Lenders on or prior to the Closing Date to the extent permitted by the terms of the DIP Orders shall have been paid, including reimbursement or payment of all reasonable and documented out-of-pocket costs, fees and expenses (including the reasonable and documented out-of-pocket costs, fees and expenses of outside counsel and financial advisors) incurred in connection with the Transactions and (ii) all fees and other amounts required to be paid to the Pre-Petition Indenture Trustees and the Pre-Petition Indenture Noteholders on or prior to the Closing Date to the extent permitted by the terms of the DIP Orders shall have been paid, including reimbursement or payment of all reasonable and documented out-of-pocket costs, fees and expenses (including the reasonable and documented out-of-pocket costs, fees and expenses of outside counsel and financial advisors) incurred in connection with the Transactions.

(c)    The Administrative Agent shall have received, prior to the Closing Date, all documentation and other information about the Borrower and the Guarantors that it reasonably determines is required by regulatory authorities under applicable "know your customer" and Anti-Money Laundering Laws, including without limitation the USA PATRIOT Act, including but not limited to the Borrower's form W-9.

(d)    The Administrative Agent and the Lenders shall have received on or prior to the Closing Date each of the following:

(i)      the Consolidated unaudited balance sheet of Holdings and its Subsidiaries as of the close of the last fiscal year and, to the extent such statements have been filed publically, each subsequent fiscal quarter and (y) the related Consolidated income statement for such fiscal year and, to the extent such statements have been filed publically, fiscal quarter, in each case setting forth in comparative form the figures for the corresponding periods in the prior fiscal year or fiscal quarter and in each case certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the Consolidated and consolidating financial position, results of operations and cash flow of Holdings and its Subsidiaries as at the dates indicated and for the periods indicated in accordance with GAAP (subject to the absence of footnote disclosure and normal year-end audit adjustments) and in each case otherwise reasonably satisfactory to the Administrative Agent and the Required Lenders; and

(ii)      such other material documents and material information as any Lender through the Administrative Agent may reasonably request.

(e)      Reserved.

(f)      The Petition Date shall have occurred, and the Administrative Agent and the Required Lenders shall be reasonably satisfied with the form and substance of the material pleadings and "first day orders" sought by the Borrower, which in any event shall not conflict with the terms of this Agreement and the Facility hereunder, the other Loan Documents and the Restructuring Support Agreement. Such first day orders shall have been entered on or prior to the Closing Date.

(g)      The Interim Order Entry Date shall have occurred not later than three (3) Business Days after the Petition Date.

(h)      The Administrative Agent and the Lenders shall have received, and the Administrative Agent, the Required Lenders and the Unanimous DIP Lenders shall be satisfied with, the Budget for the period of thirteen weeks commencing with the week during which the Petition Date occurred.

(i)      No trustee under chapter 7 or chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in any of the Cases.

(j)      The amount of the Loans made on the Closing Date shall not exceed the amount authorized by the Interim Order.

(k)      Each of the Interim Order and the Restructuring Support Agreement shall be in full force and effect, and the Interim Order shall not have been vacated or reversed, shall not be subject to a stay and shall not have been modified or amended in any respect without the prior written consent of the Required Lenders; *provided* that if the Interim Order is the subject of a pending appeal in any respect, neither the making of the Loans nor the performance by any Loan Party of any of its respective obligations under any of the Loan Documents shall be the subject of a presently effective stay pending appeal.

(l)    Upon entry of the Interim Order, the Administrative Agent shall have, for the benefit of the Lenders, valid and perfected first priority Liens on the Collateral, junior only to the liens of the Pre-Petition First Lien Secured Parties securing the Pre-Petition First Lien Obligations, the Adequate Protection Liens of the Pre-Petition First Lien Secured Parties, the Carve-Out and Permitted Liens (as defined in the Interim Order), and all filing and recording fees and taxes with respect to such Liens and security interests that are then due and payable shall have been duly paid.

(m)    The proposed Exit Facilities, on the terms included in the exit financing term sheets attached to the RSA Term Sheet, shall have backstop commitments and be satisfactory in all respects to the Administrative Agent, the Required Lenders and the Unanimous DIP Lenders.

Without limiting the generality of the provisions of the last paragraph of Section 10.03, for purposes of determining compliance with the conditions specified in this Section 4.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

Section 4.02    Conditions to Delayed Draw Borrowing. The obligation of each Lender to make its Delayed Draw Loan is subject to the satisfaction or waiver in accordance with Section 11.01 of the following conditions precedent:

(a)    The Final Order and the Restructuring Support Agreement shall be in full force and effect, and the Final Order shall not have been vacated or reversed, shall not be subject to a stay, and shall not have been modified or amended in any material respect without the written consent of the Required Lenders; *provided* that if the Final Order is the subject of a pending appeal in any respect, neither the making of the Loans nor the performance by any Loan Party of any of its respective obligations under any of the Loan Documents shall be the subject of a presently effective stay pending appeal.

(b)    (i) All material "second day orders" and all related pleadings intended to be entered on or prior to the date of entry of the Final Order, including a final cash management order and any order authorizing adequate protection or establishing procedures for the administration of the Cases, shall have been entered by the Bankruptcy Court and (ii) all pleadings related to procedures for approval of significant transactions, including, without limitation, asset sale procedures, regardless of when filed or entered, shall be reasonably satisfactory in form and substance to the Administrative Agent and the Required Lenders.

(c)    The Borrower shall have paid all fees and reasonable and documented out-of-pocket expenses of the Lenders (including the reasonable and documented fees and expenses of outside counsel and financial advisors) accrued and payable on or prior to the date of such Borrowing.

(d)    The aggregate amount of the Loans made on or prior to such date shall not exceed the aggregate amount authorized by the Final Order.

(e)     The Final Order shall have been entered by the Bankruptcy Court in the Cases no later than thirty-five (35) calendar days after the Petition Date.

(f)     The Administrative Agent shall have received a certificate of a Responsible Officer as to the satisfaction of the conditions set forth in this <u>Section 4.02</u> and in <u>Section 4.03</u>, except to the extent satisfaction of such conditions is subject to <u>Section 7.15</u>.

Section 4.03   <u>Conditions to all Credit Extensions and Disbursements</u>.  The obligation of each Lender to honor any Request for Credit Extension (other than a Committed Loan Notice requesting only a conversion of Loans to the other Type, or a continuation of Eurodollar Rate Loans) or Notice of Request for Disbursement is subject to the following conditions precedent:

(a)     The representations and warranties contained in <u>Article V</u> or any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects on and as of the date of such Credit Extension or such Disbursement Date, as applicable, and, in each case, after giving effect thereto, except (i) to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct as of such earlier date, (ii) to the extent that such representations are qualified as to materiality, in which case they shall be true and correct in all respects and (iii) that for purposes of this <u>Section 4.03</u>, the representations and warranties contained in <u>Sections 5.05(a)</u> and <u>(b)</u> shall be deemed to refer to the most recent statements furnished pursuant to <u>Sections 6.01(b)</u> and <u>(a)</u>, respectively.

(b)     No Default or Event of Default shall exist, or would result from such proposed Credit Extension or disbursement, as applicable, or from the application of the proceeds thereof.

(c)     The Administrative Agent shall have received a Request for Credit Extension or a Notice of Request for Disbursement, as applicable, in accordance with the requirements hereof and within the time periods specified herein (or such shorter period of time as may be agreed to by the Administrative Agent in its sole discretion).

Each Borrowing shall be deemed to constitute a representation and warranty by the Borrower on the date of such Borrowing as to the matters specified in paragraphs (a) through (b) of this <u>Section 4.03</u>.

## ARTICLE V.
## REPRESENTATIONS AND WARRANTIES

Each of the Loan Parties, jointly and severally, represents and warrants to the Administrative Agent and the Lenders that:

Section 5.01   <u>Existence, Qualification and Power</u>.  Each Loan Party and each of its Subsidiaries (a) is duly organized or formed, validly existing and, as applicable, in good standing under the Laws of the jurisdiction of its incorporation or organization, (b) has all requisite power and authority to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party, (c) has all requisite governmental licenses, authorizations, consents and approvals to (i) own or lease its assets and carry

on its business and (ii) subject to the entry of the DIP Orders, execute, deliver and perform its obligations under the Loan Documents to which it is a party, and (d) is duly qualified and is licensed and, as applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except, in each case referred to in clause (c)(i) or (d), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

Section 5.02  <u>Authorization; No Contravention</u>.  The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is or is to be a party have been duly authorized by all necessary corporate or other organizational action, and do not and will not (a) contravene the terms of any of such Person's Organization Documents; (b) conflict with or result in any breach or contravention of, or the creation of any Lien under, or require any payment to be made under (i) any material Contractual Obligation to which such Person is a party or affecting such Person (other than, with respect to such conflicts, the Pre-Petition Debt Documents) or the properties of such Person or any of its Subsidiaries or (ii) any material order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or (c) violate any Law in any material respect.

Section 5.03  <u>Governmental Authorization; Other Consents</u>.  No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with (a) the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, (b) the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents, (c) subject to the entry of the DIP Orders, the perfection or maintenance of the Liens created under the Collateral Documents (including the priority thereof) or (d) the exercise by the Administrative Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents, except for (i) the authorizations, approvals, actions, notices and filings listed on <u>Schedule 5.03</u>, all of which have been duly obtained, taken, given or made and are in full force and effect (other than any consents necessary pursuant to the Pre-Petition Debt Documents) and (ii) those authorizations, approvals, actions, notices or filings, the failure of which to obtain or make could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.04  <u>Binding Effect</u>.  This Agreement has been, and each other Loan Document, when delivered hereunder, will have been, duly executed and delivered by each Loan Party that is party thereto. Subject to the entry of the DIP Orders, this Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms, except as such enforceability may be limited by Debtor Relief Laws and by general principals of equity.

Section 5.05  <u>Financial Statements</u>.

(a)    The Audited Financial Statements (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; (ii) fairly present in all material respects the financial condition of Holdings and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby in

accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; and (iii) show all material indebtedness and other liabilities, direct or contingent, of the Holdings and its Subsidiaries as of the date thereof, including liabilities for taxes, material commitments and Indebtedness to the extent required by GAAP.

(b)     The unaudited consolidated balance sheet of the Holdings and its Subsidiaries and the related consolidated statements of income or operations, shareholders' equity and cash flows for the most recent fiscal quarter delivered pursuant to Section 6.01(a) (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and (ii) fairly present in all material respects the financial condition of Holdings and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby, subject, in the case of clauses (i) and (ii), to the absence of footnotes and to normal year-end audit adjustments.

Section 5.06     Litigation.  Other than the Cases, there are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of any Loan Party, threatened, at law, in equity, in arbitration or before any Governmental Authority, by or against any Loan Party or any of its Subsidiaries or against any of their properties or revenues that (a) purport to affect or pertain to this Agreement, any other Loan Document, or (b) either individually or in the aggregate could reasonably be expected to have a Material Adverse Effect.

Section 5.07     No Material Adverse Effect.  Since December 31, 2015, there has been no Material Adverse Effect and there has been no circumstance, event or occurrence, and no fact is known to any of the Loan Parties, in each case, that could reasonably be expected to result in a Material Adverse Effect.

Section 5.08     Ownership of Property; Liens; Investments.  Each Loan Party and each of its Subsidiaries has good record and marketable defensible title in fee simple to, or valid leasehold interests in (except to the extent of an existing event of default under such leases as set forth on Schedule 5.08), or easements or other limited property interests in, all property necessary in the ordinary conduct of its business, free and clear of all Liens except for minor defects in title that do not individually or in the aggregate materially interfere with its ability to conduct its business or to utilize such assets for their intended purposes and Liens permitted under the Loan Documents (including the Permitted Liens) and except where the failure to have such title or other interest could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  The property of each Loan Party and each of its Subsidiaries, taken as a whole, (i) is in good operating order, condition and repair (ordinary wear and tear excepted) and (ii) constitutes all the property which is required for the business and operations of each Loan Party and each of its Subsidiaries as presently conducted. None of the Loan Parties nor any Subsidiary thereof owns any real property.

Section 5.09     Environmental Compliance.

Except for any matters that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect:

(a)    Each Loan Party and its Subsidiaries are and have been in compliance with all Environmental Laws, including possessing and complying with all Environmental Permits.

(b)    None of the real property currently owned, if any, leased or operated by any Loan Party or any of its Subsidiaries is listed or, to the knowledge of any Loan Party, proposed for listing on the NPL or on the CERCLIS or any analogous foreign, state or local list; to the knowledge of the Loan Parties, there are no and never have been any underground or above-ground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed on any property currently owned, leased or operated by any Loan Party or any of its Subsidiaries or, to the knowledge of any Loan Party, on any property formerly owned, leased or operated by any Loan Party or any of its Subsidiaries, in each case which could reasonably be expected to result in any Loan Party incurring an Environmental Liability; to the knowledge of the Loan Parties, there is no asbestos or asbestos-containing material on any property currently owned, leased or operated by any Loan Party or any of its Subsidiaries that could reasonably be expected to result in any Loan Party incurring an Environmental Liability; and there has been no Release of Hazardous Materials by any Loan Party or any of its Subsidiaries or, to the knowledge of any Loan Party, by any other Person at, on, under or migrating to or from any property currently or formerly owned, leased or operated by any Loan Party or any of its Subsidiaries in violation of Environmental Law or which could reasonably be expected to result in any Loan Party incurring an Environmental Liability.

(c)    Neither any Loan Party nor any of its Subsidiaries is undertaking, and has not completed, either individually or together with other potentially responsible parties, any investigation or assessment or remedial or response action relating to any actual or threatened Release of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any Governmental Authority or the requirements of any Environmental Law; and all Hazardous Materials generated, used, treated, handled or stored by any Loan Party or any of its Subsidiaries at, or transported to or from, any property currently or formerly owned, leased or operated by any Loan Party or any of its Subsidiaries have been disposed of in a manner not reasonably expected to result in any Loan Party or any of its Subsidiaries incurring an Environmental Liability.

(d)    No Loan Party nor any of its Subsidiaries: (i) has received notice (written or otherwise) of any Environmental Liability that is pending or unresolved; or (ii) has assumed by Contractual Obligation (including indemnity) or operation of Law any Environmental Liability of any other Person.

Section 5.10    Insurance. The properties of the Loan Parties and their respective Subsidiaries are insured with financially sound and reputable insurance companies not Affiliates of the Borrower, in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the applicable Person operates.

Section 5.11    Taxes. Each Loan Party and each Subsidiary thereof has timely filed all federal income Tax returns and reports and all other material Tax returns and reports required to be filed, and has paid all material Taxes (including any Taxes payable in the capacity of a with-

holding agent) levied or imposed upon it or its income, profits, properties or assets otherwise due and payable, except those which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP. There is no proposed Tax audit, Tax assessment, deficiency or other claim against any Loan Party or any Subsidiary thereof that, if made, individually or in the aggregate could reasonably be expected to have a Material Adverse Effect. The charges, accruals and reserves on the books of the Loan Parties in respect of any Taxes are adequate. Neither any Loan Party nor any Subsidiary thereof is party to any tax sharing agreement.

Section 5.12    ERISA Compliance.

(a)    Each Plan is in compliance in all respects with its terms and with the applicable provisions of ERISA, the Code and other Federal or state Laws, except to the extent that could not reasonably be expected to have a Material Adverse Effect. Each Plan that is intended to qualify under Section 401(a) of the Code has received a favorable determination or opinion letter from the IRS or an application for such a letter is currently being processed by the IRS with respect thereto (or such Plan or the prototype sponsor in respect of such Plan has remaining a period of time under the Code or pronouncements of the Internal Revenue Service in which to apply for such a determination and make any amendments necessary to obtain a favorable determination or opinion, as applicable, as to the qualified status of such Plan) and, to the knowledge of the Borrower, nothing has occurred which would prevent, or cause the loss of, such qualification. The Borrower and each ERISA Affiliate have made all required contributions to each Plan subject to Section 412 of the Code or Section 302 of ERISA, and no application for a funding waiver or an extension of any amortization period pursuant to Section 412 of the Code or Section 302 of ERISA has been made with respect to any Plan.

(b)    There are no pending or, to the knowledge of the Loan Parties, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that could reasonably be expected to have a Material Adverse Effect.

(c)    (i) No ERISA Event has occurred or is reasonably expected to occur; (ii) no Pension Plan has any Unfunded Pension Liability; (iii) neither the Loan Parties nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due and not delinquent under Section 4007 of ERISA); and (iv) neither the Loan Parties nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Section 4201 of ERISA with respect to a Multiemployer Plan, except, in each case, that could not reasonably be expected to have a Material Adverse Effect.

Section 5.13    Subsidiaries; Equity Interests; Loan Parties. As of the Closing Date, no Loan Party has any Subsidiaries other than those specifically disclosed in Part (a) of Schedule 5.13 (none of which are Foreign Subsidiaries), and all of the outstanding Equity Interests in such Subsidiaries have been validly issued, are fully paid and non-assessable and are owned by a Loan Party in the amounts specified on Part (a) of Schedule 5.13 free and clear of all Liens except those created under the Collateral Documents and Permitted Liens. No Loan Party has any equity investments in any other corporation or entity other than those specifically disclosed in Part

(b) of <u>Schedule 5.13</u>. Set forth on Part (c) of <u>Schedule 5.13</u> is a complete and accurate list of all Loan Parties, showing as of the Closing Date (as to each Loan Party) the jurisdiction of its incorporation, the address of its principal place of business and its U.S. taxpayer identification number, if any, or in the case of any Guarantor Subsidiary that does not have a U.S. taxpayer identification number, any unique identification number issued to it by the jurisdiction of its incorporation. The copy of the charter of each Loan Party and each amendment thereto provided pursuant to <u>Section 4.01(a)(v)</u> is a true and correct copy of each such document, each of which is valid and in full force and effect.

Section 5.14    <u>Margin Regulations; Investment Company Act</u>.

(a)    No Loan Party is engaged nor will engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock and no proceeds of any Borrowings will be used for any purpose that violates Regulation U or Regulation X of the FRB.

(b)    None of the Loan Parties, any Person Controlling any Loan Party, or any Subsidiary is or is required to be registered as an "investment company" under the Investment Company Act of 1940, as amended.

Section 5.15    <u>Disclosure</u>. No report, financial statement, certificate or other written information furnished by or on behalf of any Loan Party or any Subsidiary thereof to the Administrative Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (in each case as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading; <u>provided</u> that, with respect to projected financial information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time; it being understood that such projections may vary from actual results and that such variances may be material.

Section 5.16    <u>Compliance with Laws</u>. Except to the extent excused by the Bankruptcy Code, each Loan Party and each Subsidiary thereof is in compliance in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (b) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

Section 5.17    <u>Intellectual Property; Licenses, Etc</u>. Each Loan Party and each of its Subsidiaries own, or possess the valid title to all of the Intellectual Property owned or purported to be owned by such Loan Party or Subsidiary, free and clear of all Liens (other than licenses granted in the ordinary course of business) except for Liens permitted under the Loan Documents (including Permitted Liens). All Intellectual Property which any Loan Party or any Subsidiary thereof uses under license from third parties and which is material to its business operations is

subject to license agreements that are valid and in full force and effect. As of the Closing Date, Schedule 5.17 sets forth a true, complete and accurate list of all Company IP Rights, which are registered or pending application for registration with applicable intellectual property registries worldwide. The operation of the businesses of each Loan Party and each of its Subsidiaries, including technology, slogan or other advertising device, product, process, method, substance, part or other material now employed in connection therewith, or now contemplated to be employed, by any Loan Party or any of its Subsidiaries, does not infringe or otherwise violate any proprietary rights held by any other Person. No claim or litigation alleging any of the foregoing, or disputing the ownership, validity or enforceability of any Company IP Rights, is pending or, threatened in writing.

Section 5.18    Labor Matters.    There are no collective bargaining agreements or Multiemployer Plans covering the employees of any Loan Party or any of its Subsidiaries as of the Closing Date and neither any Loan Party nor any Subsidiary thereof has suffered any strikes, walkouts, work stoppages or other material labor difficulty within the last five years.

Section 5.19    Foreign Assets Control Regulations; Anti-Money Laundering; Anti-Corruption Practices; Anti-Terrorism Laws.

(a)    Each Loan Party and each Subsidiary of each Loan Party is in compliance in all material respects with all U.S. economic sanctions laws, Executive Orders and implementing regulations ("Sanctions") as administered by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") and the U.S. State Department. No Loan Party and no Subsidiary of a Loan Party (i) is a Person on the list of the Specially Designated Nationals and Blocked Persons (the "SDN List"), (ii) is a Person who is otherwise the target of U.S. economic sanctions laws such that a U.S. Person cannot deal or otherwise engage in business transactions with such person, (iii) is a Person organized or resident in a country or territory subject to comprehensive Sanctions (a "Sanctioned Country") or (iv) is owned or controlled by (including by virtue of such Person being a director or owning voting shares or interests), or acts, directly or indirectly, for or on behalf of, any Person on the SDN List or a government of a Sanctioned Country such that the entry into, or performance under, this Agreement or any other Loan Document would be prohibited by U.S. law.

(b)    Each Loan Party and each Subsidiary of each Loan Party is in compliance with all laws related to terrorism or money laundering including: (i) all applicable requirements of the Currency and Foreign Transactions Reporting Act of 1970 (31 U.S.C. 5311 et. seq., (the Bank Secrecy Act)), as amended by Title III of the USA Patriot Act, (ii) the Trading with the Enemy Act, (iii) Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 (66 Fed. Reg. 49079), any other enabling legislation, executive order or regulations issued pursuant or relating thereto and (iv) other applicable federal or state laws relating to "know your customer" or anti-money laundering rules and regulations. No action, suit or proceeding by or before any court or Governmental Authority with respect to compliance with such anti-money laundering laws is pending or threatened to the knowledge of each Loan Party and each Subsidiary of each Loan Party.

(c)    Each Loan Party and each Subsidiary of each Loan Party is in compliance in all material respects with all applicable anti-corruption laws, including the U.S. Foreign Corrupt

Practices Act of 1977 ("FCPA") and the U.K. Bribery Act 2010 ("Anti-Corruption Laws"). None of the Loan Parties or any Subsidiary thereof, nor to the knowledge of the Loan Parties, any director, officer, agent, employee, or other person acting on behalf of such Loan Party or any Subsidiary thereof, has taken any action, directly or indirectly, that would result in a violation of applicable Anti-Corruption Laws. Each Loan Party and each Subsidiary has instituted and will continue to maintain policies and procedures designed to promote compliance with applicable Anti-Corruption Laws.

Section 5.20    No Defaults. No Default or Event of Default has occurred and is continuing or would result from the consummation of the Transactions.

<div align="center">

ARTICLE VI.
REPORTING COVENANTS

</div>

Each of the Loan Parties agrees with the Lenders and the Administrative Agent to each of the following, as long as any Obligation (other than contingent indemnification claims not then due and payable) or any Commitment remains outstanding:

Section 6.01    Financial Statements. The Borrower shall deliver to the (x) Administrative Agent, for delivery to each Lender, and (y) Pre-Petition First Lien Agent, for delivery to each Pre-Petition First Lien Lender, each of the following:

(a)    Quarterly Reports. As soon as available, and in any event within 45 days after the end of each of the first three fiscal quarters of each fiscal year  (or such later date that the Required Lenders may agree in their sole discretion), the Consolidated and consolidating unaudited balance sheet of Holdings and its Subsidiaries as of the close of such fiscal quarter and related Consolidated and consolidating statements of operations and cash flow for such fiscal quarter and that portion of the fiscal year ending as of the close of such fiscal quarter, setting forth in comparative form the figures for the corresponding period in the prior fiscal year, certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the Consolidated and consolidating financial position, results of operations and cash flow of Holdings and its Subsidiaries as at the dates indicated and for the periods indicated in accordance with GAAP (subject to the absence of footnote disclosure and normal year-end audit adjustments).

(b)    Annual Reports. As soon as available, and in any event within 120 days after the end of each fiscal year (or such later date that the Required Lenders may agree in their sole discretion), the Consolidated and consolidating balance sheet of Holdings and its Subsidiaries as of the end of such year and related Consolidated and consolidating statements of operations, unitholders' equity and cash flow for such fiscal year, each prepared in accordance with GAAP, together with a certification (with respect to such Consolidated financial statements) by the Group Members' Accountants that (i) such Consolidated financial statements fairly present in all material respects the Consolidated financial position, results of operations and cash flow of Holdings and its Subsidiaries as at the dates indicated and for the periods indicated therein in accordance with GAAP without qualification as to the scope of the audit and (ii) in the course of the regular audit of the businesses of the Group Members, which audit was conducted in accordance with the standards of the United States' Public Company Accounting Oversight Board (or any successor entity), such Group Members' Accountants have obtained no knowledge that a Default in

respect of any financial covenant contained in this Agreement is continuing or, if in the opinion of the Group Members' Accountants such a Default is continuing, a statement as to the nature thereof (which certification may be limited to the extent required by customary applicable auditing rules or guidelines acceptable to the Administrative Agent).

(c)     Monthly Reports.  As soon as available, and in any event within 30 days after the end of each fiscal month (other than the third fiscal month of each fiscal quarter), (i) the Consolidated and consolidating unaudited balance sheet of Holdings and its Subsidiaries as of the close of such fiscal month (and that portion of the fiscal year ending as of the close of such fiscal month) and (ii) the related Consolidated and consolidating income statement for such fiscal month (and that portion of the fiscal year ending as of the close of such fiscal month), in each case setting forth in comparative form the figures for the corresponding periods in the prior fiscal year and in each case certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the Consolidated and consolidating financial position and results of operations of Holdings and its Subsidiaries as at the dates indicated and for the periods indicated in accordance with GAAP (subject to the absence of footnote disclosure and normal year-end audit adjustments). Together with such monthly reports delivered pursuant to this clause, the Borrower shall deliver a certificate, in form and substance satisfactory to the Administrative Agent, by a Responsible Officer of the Borrower that (i) the Corporate Chart attached thereto (or the last Corporate Chart delivered pursuant to this clause (c)) is correct and complete as of the date of such monthly report, (ii) the Loan Parties have delivered all documents (including updated schedules as to locations of Collateral and acquisition of Intellectual Property or real property) they are required to deliver pursuant to any Loan Document on or prior to the date of delivery of such monthly report and (iii) complete and correct copies of all documents modifying any term of any Organization Document of any Group Member or any Subsidiary or joint venture thereof on or prior to the date of delivery of such monthly report have been delivered to the Administrative Agent or are attached to such certificate.

(d)     Variance Report.

(i)     Commencing on the second Thursday after the Petition Date and no later than Thursday of each succeeding calendar week, and on any other date on which the Borrower may deliver the same to the Bankruptcy Court, a Variance Report as of the end of the immediately preceding calendar week, and

(ii)    commencing on the date of this Agreement and no later than Thursday of each week thereafter, and on any other date on which the Borrower may deliver the same to the Bankruptcy Court, a Budget setting forth on a weekly basis for the next thirteen weeks (commencing with the immediately succeeding calendar week) an updated budget for such period; *provided* that the Required Lenders, in their sole and absolute discretion, shall have the right to dispute any updates or amendments contained in any budget delivered pursuant to this clause (ii) by providing the Borrower specific notice thereof within five (5) Business Days after the delivery by the Borrower of such updates or amendments; *provided, further*, that, (x) to the extent the Required Lenders do not provide such dispute notice within such period of five (5) Business Days, the updates to or amendments of the Budget shall be deemed approved and consented to by the Required Lenders and shall be deemed to constitute the Budget upon the expiration of such period of five

(5) Business Days, and (y) to the extent the Required Lenders do provide such dispute notice within such period of five (5) Business Days, then the Budget, without giving effect to such updates or amendments, shall continue to constitute the Budget until otherwise agreed to among the Loan Parties and the Required Lenders.

(e)    <u>Management Discussion and Analysis</u>.  Together with each delivery of the financial statements for each fiscal quarter or fiscal month required by clauses (a) or (c) above, a customary written management discussion and analysis (MD&A) of the financial condition and results of operations of the Group Members for the portion of the fiscal year then elapsed and discussing the reasons for any significant variations from (i) the previous fiscal quarter or fiscal month, as applicable for such period, (ii) the figures for the corresponding period in the previous fiscal year and (iii) to the extent forecasts and projections have been delivered pursuant to Section 6.01(g), the figures for the corresponding period in such forecasts and projections, including written qualitative discussion and analysis, in each case with detail satisfactory to the Administrative Agent.

(f)    <u>Corporate Chart and Other Collateral Updates</u>.  A certificate by a Responsible Officer of the Borrower that (i) the Corporate Chart attached thereto (or the last Corporate Chart delivered pursuant to this <u>clause (f)</u>) is correct and complete as of the date of the Variance Report most recently required to be delivered pursuant to <u>Section 6.01(d)</u>, (ii) the Loan Parties have delivered all documents (including updated schedules as to locations of Collateral and acquisition of Intellectual Property or real property) they are required to deliver pursuant to any Loan Document on or prior to the date of the Variance Report most recently required to be delivered pursuant to <u>Section 6.01(d)</u> and (iii) complete and correct copies of all documents modifying any term of any Organization Document of any Group Member or any Subsidiary or joint venture thereof on or prior to the date of the Variance Report most recently required to be delivered pursuant to <u>Section 6.01(d)</u>.

(g)    <u>Additional Projections</u>.  As soon as available and in any event not later than 45 days after the end of the [fiscal quarter ended September 28, 2016], (i) a revised annual business plan of the Group Members for the [2017 fiscal year] in form and substance acceptable to the Administrative Agent and the Required Lenders in their reasonable discretion and (ii) forecasts prepared by management of the Borrower for each fiscal quarter in such next succeeding fiscal year, including in such forecasts, (x) a projected year-end Consolidated and consolidating balance sheet, income statement and statement of cash flows, (y) a statement of all of the material assumptions on which such forecasts are based and (z) substantially the same type of financial information as that contained in financial projections provided by or on behalf of the Borrower to the Administrative Agent or the Pre-Petition First Lien Agent (in such capacities) prior to the Closing Date.

(h)    <u>Bankruptcy Court Filings</u>.  As soon as practicable in advance of filing with the Bankruptcy Court, (i) all proposed orders and pleadings related to the Facility, which orders and pleadings shall be in form and substance satisfactory to the Administrative Agent and the Required Lenders, (ii) any plan of reorganization or liquidation, and/or any disclosure statement related to such plan (which plan shall be a Reorganization Plan and with the disclosure statement shall comply with the requirements set forth herein), (iii) any motion and proposed form of order seeking to extend or otherwise modify the Debtors' exclusive periods set forth in section 1121 of

the Bankruptcy Code, (iv) any motion seeking approval of any sale of the Debtors' assets in form and substance reasonably acceptable to the Administrative Agent and the Required Lenders and any proposed form of a bidding procedures order and sale order (each of which must be in form and substance satisfactory to the Administrative Agent and the Required Lenders) and (v) any motion and proposed form of order filed with the Bankruptcy Court relating to any management equity plan, incentive plan or severance plan, the assumption, rejection, modification or amendment of any employment agreement, or the assumption, rejection, modification or amendment of any material contract (each of which must be in form and substance satisfactory to the Administrative Agent and the Required Lenders).

(i)     Insurance.  Together with each delivery of any financial statement for any fiscal month pursuant to clause (c) above, each in form and substance satisfactory to the Administrative Agent and certified as complete and correct by a Responsible Officer of the Borrower, a summary of all material insurance coverage maintained as of the date thereof by any Group Member, together with such other related documents and information as the Administrative Agent may reasonably require; provided, that in lieu of such summary, a Responsible Officer of the Borrower may certify that there have been no changes since the Closing Date or the end of the previous fiscal month, as applicable.

(j)     Additional Reports.  Such additional reports reasonably requested by the Administrative Agent or the Lenders, including with respect to litigation and contingent liabilities.

Section 6.02     Other Events.  The Loan Parties shall give the (x) Administrative Agent, for delivery to each Lender, and (y) Pre-Petition First Lien Agent, for delivery to each Pre-Petition First Lien Lender, notice of each of the following (which may be made by telephone if promptly confirmed in writing) promptly after any Responsible Officer of any Group Member knows: (a) any event (other than any event involving loss or damage to property) reasonably expected to result in a mandatory payment of the Obligations pursuant to Section 2.04, stating the material terms and conditions of such transaction and estimating the Net Cash Proceeds thereof, (b) the commencement of, or any material developments in, any action, investigation, suit, proceeding, audit, claim, demand, order or dispute with, by or before any Governmental Authority affecting any Group Member or any property of any Group Member that seeks injunctive or similar relief, (c) the acquisition of any material real property or the entering into of any material lease and (d) any event, occurrence or circumstance in which a material portion of the Collateral is damaged, destroyed or otherwise impaired or adversely affected.

Section 6.03     Copies of Notices and Reports.  The Loan Parties shall promptly deliver to the (x) Administrative Agent, for delivery to each Lender, and (y) Pre-Petition First Lien Agent, for delivery to each Pre-Petition First Lien Lender, copies of each of the following: (a) all reports that any Loan Party transmits to its security holders generally, and (b) all documents that any Group Member files with, or otherwise provides to, the Securities and Exchange Commission, any securities exchange or any Governmental Authority exercising similar functions, any Governmental Authority exercising regulatory authority over the restaurant industry, the Bankruptcy Court (including, without limitation, any "Monthly Operating Reports") or any Committee.

Section 6.04   Taxes. The Loan Parties shall give the (x) Administrative Agent, for delivery to each Lender, and (y) Pre-Petition First Lien Agent, for delivery to each Pre-Petition First Lien Lender, notice of each of the following (which may be made by telephone if promptly confirmed in writing) promptly after any Responsible Officer of any Group Member knows of it: (a) the creation, or filing with the IRS or any other Governmental Authority, of any Contractual Obligation or other document extending, or having the effect of extending, the period for assessment or collection of any Taxes with respect to any Tax Affiliate and (b) the creation of any Contractual Obligation of any Tax Affiliate, or the receipt of any request directed to any Tax Affiliate, to make any adjustment under Section 481(a) of the Code, by reason of a change in accounting method or otherwise, which, in either case, could reasonably be expected to have a Material Adverse Effect.

Section 6.05   Labor Matters. The Loan Parties shall give the (x) Administrative Agent, for delivery to each Lender, and (y) Pre-Petition First Lien Agent, for delivery to each Pre-Petition First Lien Lender, notice of each of the following (which may be made by telephone if promptly confirmed in writing), promptly after, and in any event within 30 days after any Responsible Officer of any Group Member knows or has reason to know of it: (a) the commencement of any material labor dispute to which any Group Member is or may become a party, including any class action litigation, strikes, lockouts or other disputes relating to any of such Person's restaurants, plants or other facilities and (b) the incurrence by any Group Member of any Worker Adjustment and Retraining Notification Act or related or similar liability incurred with respect to the closing of any plant or other facility of any such Person (other than, in the case of this clause (b), those that could not, in the aggregate, reasonably be expected to have a Material Adverse Effect).

Section 6.06   Lender Calls. The Borrower, Holdings and their respective officers (including, the chief financial officer of the Borrower) and advisors (including any investment banker or financial advisor retained by any Debtor) shall make themselves available for conference calls to be held on a weekly basis with the Administrative Agent and/or the other Secured Parties or their representatives or advisors to discuss the Budget (and all updates and Variance Reports related thereto), or any other issues as may be reasonably requested by the Administrative Agent and/or the other Secured Parties, and such conference calls may be held without the participation of the Loan Parties or any other representative or advisor of the Loan Parties.

ARTICLE VII.
AFFIRMATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder (other than contingent indemnification obligations for which no claim has been made) shall remain unpaid or unsatisfied or shall remain outstanding, each Loan Party shall, and shall cause each of its Subsidiaries to:

Section 7.01   Certificates; Other Information. Deliver to the Administrative Agent for delivery to each Lender:

(a)      concurrently with the delivery of the financial statements referred to in Section 6.01(a), (b) and (c) (commencing with the delivery of the financial statements for the fiscal

quarter ended September [28], 2016), a duly completed Compliance Certificate signed by the chief executive officer, chief financial officer, treasurer or controller of the Borrower;

(b)    promptly, and in any event within five Business Days after receipt thereof by any Loan Party or any Subsidiary thereof, copies of each material notice or other material correspondence received from the SEC (or comparable agency in any applicable non-U.S. jurisdiction) concerning any investigation or possible investigation or other inquiry by such agency regarding financial or other operational results of any Loan Party or any Subsidiary thereof;

(c)    promptly after receipt thereof by any Loan Party or any Subsidiary thereof, copies of all notices, requests and other documents (including amendments, waivers and other modifications) so received under or pursuant to any instrument, indenture, loan or credit or similar agreement regarding or related to any breach or default by any party thereto, or any other event, in each case, that could reasonably be expected to materially impair the value of the interests or the rights of any Loan Party or otherwise reasonably be expected to have a Material Adverse Effect;

(d)    promptly after the assertion or occurrence thereof, notice of any action or proceeding against or of any noncompliance by any Loan Party or any of its Subsidiaries with any Environmental Law or Environmental Permit that could (i) reasonably be expected to have a Material Adverse Effect or (ii) cause any property owned or leased by any Loan Party to be subject to any material restrictions on ownership, occupancy, use or transferability under any Environmental Law;

(e)    promptly, such additional information regarding the business, financial, legal or corporate affairs of any Loan Party or any Subsidiary thereof, or compliance with the terms of the Loan Documents, as the Administrative Agent or any Lender through the Administrative Agent may from time to time reasonably request.

Documents required to be delivered pursuant to Section 6.01(a) or (b) (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower posts such documents, or provides a link thereto on the Borrower's website on the Internet at the website address listed on Schedule 11.02; or (ii) on which such documents are posted on the Borrower's behalf on an Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); provided that: (i) the Borrower shall deliver paper copies of such documents to the Administrative Agent or any Lender that requests the Borrower to deliver such paper copies until a written request to cease delivering paper copies is given by the Administrative Agent or such Lender and (ii) the Borrower shall notify the Administrative Agent and each Lender (by telecopier or electronic mail) of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents. Notwithstanding anything contained herein, in every instance the Borrower shall be required to provide paper copies of the Compliance Certificates required by Section 7.01(a) to the Administrative Agent. Except for such Compliance Certificates, the Administrative Agent shall have no obligation to request the delivery or to maintain copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Borrower with

any such request for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

The Borrower hereby acknowledges that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on SmartRoom or another similar electronic system (the "Platform") and (b) certain of the Lenders (each, a "Public Lender") may have personnel who do not wish to receive material non-public information with respect to the Borrower or its Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities. The Borrower hereby agrees that it will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (w) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any material non-public information (although it may be sensitive and proprietary), with respect to the Borrower or its securities for purposes of United States Federal and state securities laws (provided, however, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 11.07); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information"; and (z) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information." For purposes of this Agreement, public information shall not be deemed to include any information and documentation that is of a type that would be required under applicable securities laws to have been made publicly available if the Borrower were a public reporting company.

Section 7.02  Notices.  In addition to any other notice otherwise required under this Agreement or any of the other Loan Documents, promptly notify the Administrative Agent and each Lender in writing:

(a)     of the occurrence of any Default or Event of Default;

(b)     of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect, including the following to the extent they have resulted or could reasonably be expected to result in a Material Adverse Effect: (i) except as excused by the Bankruptcy Code, breach or non-performance of, or any default under, a Contractual Obligation of any Loan Party or any Subsidiary thereof; (ii) any dispute, litigation, investigation, proceeding or suspension between any Loan Party or any Subsidiary thereof and any Governmental Authority; or (iii) the commencement of, or any material development in, any litigation or proceeding affecting any Loan Party or any Subsidiary thereof, including pursuant to any applicable Environmental Laws; and

(c)     (i) of the occurrence of any ERISA Event; (ii) of the filing by any Loan Party of Schedule B (or such other schedule as contains actuarial information) to IRS Form 5500 in respect of a Plan with Unfunded Pension Liabilities (and shall provide a copy of such IRS Form

5500, including the Schedule B); or (iii) of (w) a material increase in Unfunded Pension Liabilities (taking into account only Plans with positive Unfunded Pension Liabilities) since the date the representations hereunder are deemed given, (x) the existence of potential withdrawal liability under Section 4201 of ERISA if any Loan Party or any Subsidiary thereof were to withdraw completely from any and all Multiemployer Plans, (y) the adoption of, or the commencement of contributions to, any Plan subject to Section 412 of the Code by any Loan Party, any Subsidiary thereof or any ERISA Affiliate, or (z) the adoption of any amendment to a Plan subject to Section 412 of the Code that results in a material increase in contribution obligations of any Loan Party, any Subsidiary thereof or any ERISA Affiliate.

Each notice pursuant to Section 7.02 shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth details of the occurrence referred to therein and stating what action the Loan Parties have taken and propose to take with respect thereto, to the extent such details and other information are known to the Loan Parties. Each notice pursuant to Section 7.02(a) shall describe with particularity any and all provisions of this Agreement and any other Loan Document that have been breached.

Section 7.03   Payment of Taxes.  Pay and discharge all post-petition Taxes imposed upon it or upon its income or profits, or upon any properties or assets belonging to it, in each case on a timely basis, and all lawful claims which, if unpaid, may reasonably be expected to become a Lien upon any properties or assets of any Loan Party or any Subsidiary thereof not otherwise permitted under this Agreement; provided that none of the Loan Parties or any of their respective Subsidiaries shall be required to pay any such Tax that is being contested in good faith by proper proceedings diligently conducted if it has maintained adequate reserves with respect thereto in accordance with GAAP or which could not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect.

Section 7.04   Preservation of Existence, Etc.  (a) Preserve, renew and maintain in full force and effect its legal existence and good standing under the Laws of the jurisdiction of its organization (except pursuant to a transaction expressly permitted by Section 8.04 or Section 8.05) and (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

Section 7.05   Maintenance of Properties.  (a) Maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted and (b) make all necessary repairs thereto and renewals and replacements thereof, except in each case where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

Section 7.06   Maintenance of Insurance.  Maintain with financially sound and reputable insurance companies not Affiliates of the Borrower, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts as are customarily carried under similar circumstances by such other Persons. All such insurance shall name the Administrative Agent as an additional insured or lender's loss payee, as applicable. If any portion of any Mortgaged Property is at any time located in an area identified by the Federal Emergency Manage-

ment Agency (or any successor agency) as a special flood hazard area with respect to which flood insurance has been made available under the National Flood Insurance Act of 1968 (as now or hereafter in effect or successor act thereto), then, to the extent required by the Flood Insurance Laws, the Borrower shall, or shall cause each Loan Party to, (i) maintain, or cause to be maintained, with a financially sound and reputable insurer, flood insurance in an amount reasonably satisfactory to the Administrative Agent and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (ii) deliver to the Administrative Agent evidence of such compliance in form and substance reasonably acceptable to the Administrative Agent.

Section 7.07  <u>Compliance with Laws</u>.  Except as excused by the Bankruptcy Code, comply in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted; or (b) the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

Section 7.08  <u>Books and Records</u>.  (a) Maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of such Loan Party or such Subsidiary, as the case may be; and (b) maintain such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over such Loan Party or such Subsidiary, as the case may be.  In addition, each Group Member shall provide full and direct access during normal business hours and upon reasonable prior notice to information (including historical information) and personnel as the Administrative Agent may reasonably request from time to time, including regularly scheduled meetings among senior management, company advisors, and the Administrative Agent and such other consultants to the Administrative Agent and/or the Lenders as may be identified to the Borrower, shall be provided with reasonable access during normal business hours and upon reasonable prior notice to all information it shall reasonably request and to other internal meetings regarding strategic planning, cash and liquidity management, operation and restructuring activities, progress with respect to the Reorganization Plan and any other aspect of the Cases; <u>provided</u>, <u>however</u>, that the foregoing shall not require the Borrower to permit any access, disclose any privileged information or trade secret or violate any of its obligations with respect to confidentiality or violate applicable laws.  All access rights of the Administrative Agent or any other Lender under this <u>Section 7.08</u> shall extend to any of their respective representatives, agents, counsel, advisors, accountants, appraisers, consultants, independent contractors or other designees.

Section 7.09  <u>Inspection Rights</u>.  Permit representatives and independent contractors of the Administrative Agent and each Lender to visit and inspect any of its properties and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants, all at the reasonable expense of the Borrower and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower; <u>provided</u> that, excluding any such visits and inspections during the continuation of an Event of Default, only the Administrative Agent on behalf of the Lenders may exercise rights of the Administrative Agent and the Lenders under this <u>Section 7.09</u>, and the Administrative Agent

shall not exercise such rights more often than three (3) times during any calendar year absent the existence of an Event of Default, and only three (3) such visits shall be at the Borrower's expense; provided further that when an Event of Default exists, the Administrative Agent or any Lender (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice. The Administrative Agent and the Lenders shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants. Notwithstanding anything to the contrary in this Section 7.09, the Borrower shall not be required to disclose or permit the inspection or discussion of, any document, information or other matter (i) that constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by Law or any binding agreement or (iii) that is subject to attorney client or similar privilege or constitutes attorney work product.

Section 7.10   Use of Proceeds. Use the proceeds of the Loans in accordance with the Budget (including, subject to Section 8.17, by reason of a Permitted Variance) to: (i) provide working capital to the Loan Parties that are Debtors in the Cases; (ii) fund interest, fees and other payments contemplated hereunder, including, without limitation, the Adequate Protection Payments; and (iii) fund costs of the administration of the Cases and the consummation of the Restructuring (including professional fees).

Section 7.11   Information Regarding Collateral.

(a)   Not effect any change (i) in any Loan Party's legal name, (ii) in the location of any Loan Party's chief executive office, (iii) in any Loan Party's identity or organizational structure, (iv) in any Loan Party's Federal Taxpayer Identification Number or organizational identification number, if any, or (v) in any Loan Party's jurisdiction of organization (in each case, including by merging with or into any other entity, reorganizing, dissolving, liquidating, reorganizing or organizing in any other jurisdiction), until (A) it shall have given the Administrative Agent not less than 30 days' prior written notice (in the form of an Officers' Certificate), or such lesser notice period agreed to by the Administrative Agent, of its intention so to do, clearly describing such change and providing such other information in connection therewith as the Administrative Agent may reasonably request and (B) it shall have taken all action reasonably satisfactory to the Administrative Agent to maintain the perfection and priority of the security interest of the Administrative Agent for the benefit of the Secured Parties in the Collateral, if applicable. Each Loan Party agrees to promptly provide the Administrative Agent with certified Organizational Documents reflecting any of the changes described in the preceding sentence. Each Loan Party also agrees to promptly notify the Administrative Agent of any change in the location of any office in which it maintains books or records relating to Collateral owned by it or any office or facility at which Collateral is located (including the establishment of any such new office or facility), other than changes in location to a Mortgaged Property or a leased property subject to a Landlord Access Agreement (as defined in the Security Agreement).

Section 7.12    Covenant to Guarantee Obligations and Give Security.

(a)    Upon the formation or acquisition of any new direct or indirect Subsidiary (other than an Excluded Subsidiary) by any Loan Party, then the Loan Parties shall, at the expense of the Loan Parties:

(i)    within 15 days after such formation or acquisition, cause such Subsidiary, to duly execute and deliver to the Administrative Agent a guaranty or guaranty supplement, in form and substance satisfactory to the Administrative Agent, guaranteeing the other Loan Parties' obligations under the Loan Documents,

(ii)    within 15 days after such formation or acquisition, furnish to the Administrative Agent a description of the real and personal properties of such Subsidiary, in detail reasonably satisfactory to the Administrative Agent,

(iii)    within 30 days after such formation or acquisition, cause such Subsidiary to duly execute and deliver to the Administrative Agent any Mortgages, Security Agreement Supplements, IP Security Agreements, each item required pursuant to the Mortgaged Property Requirement and other security and pledge agreements required by the Security Agreement, as specified by and in form and substance reasonably satisfactory to the Administrative Agent (including delivery of all Pledged Securities in and of such Subsidiary, and other instruments of the type specified in Section 4.01(a)(iii)), to grant a security interest in the assets of such Subsidiary constituting Collateral;

(iv)    within 30 days after such formation or acquisition, cause such Subsidiary to take whatever action (including the recording of Mortgages, the filing of Uniform Commercial Code financing statements, the giving of notices and the endorsement of notices on title documents) required hereunder or in the Security Agreement to vest in the Administrative Agent (or in any representative of the Administrative Agent designated by it), for the benefit of the Secured Parties, valid and subsisting Liens on the assets of such Subsidiary constituting Collateral, and

(v)    concurrently with the actions taken under clauses (iii) and (iv) above, deliver to the Administrative Agent, upon the request of the Administrative Agent or the Required Lenders in their sole discretion, a signed copy of a favorable opinion, addressed to the Administrative Agent and the other Secured Parties, of counsel for the Loan Parties acceptable to the Administrative Agent as to the matters contained in clauses (i), (iii) and (iv) above, and as to such other matters as the Administrative Agent may reasonably request.

(b)    Upon the acquisition of (i) any property with a value in excess of $[100,000] by any Loan Party, if such property, in the judgment of the Administrative Agent, shall not already be subject to a perfected first priority Lien and security interest in favor of the Administrative Agent for the benefit of the Secured Parties, then the Loan Parties shall, at the Loan Parties' expense:

(i)     within 5 days after such acquisition, furnish to the Administrative Agent a description of the property so acquired in detail satisfactory to the Administrative Agent,

(ii)     within 5 days after such acquisition, cause the applicable Loan Party to duly execute and deliver to the Administrative Agent, Security Agreement Supplements, IP Security Agreements and other security and pledge agreements required by the Security Agreement, as specified by and in form and substance reasonably satisfactory to the Administrative Agent, to grant a security interest in the assets of the applicable Loan Party constituting Collateral,

(iii)     within 10 days after such acquisition, cause the applicable Loan Party to take whatever action (including the filing of Uniform Commercial Code financing statements, the giving of notices and the endorsement of notices on title documents) required hereunder or in the Security Agreement to vest in the Administrative Agent (or in any representative of the Administrative Agent designated by it) for the benefit of the Secured Parties valid and subsisting Liens on the assets of such Loan Party constituting Collateral,

(iv)     concurrently with the actions taken under clauses (ii) and (iii) above, deliver to the Administrative Agent, upon the request of the Administrative Agent or the Required Lenders in their sole discretion, a signed copy of a favorable opinion, addressed to the Administrative Agent and the other Secured Parties, of counsel for the Loan Parties acceptable to the Administrative Agent as to the matters contained in clauses (ii) and (iii) above and as to such other matters as the Administrative Agent may reasonably request,

(c)     Reserved, and

(d)     At any time upon request of the Administrative Agent, promptly execute and deliver any and all further instruments and documents and take all such other action as the Administrative Agent may reasonably deem necessary or desirable in obtaining the full benefits of, or (as applicable) in perfecting and preserving the Liens of, such guaranties, deeds of trust, trust deeds, deeds to secure debt, mortgages, Security Agreement Supplements and other security and pledge agreements thereto.

(e)     Notwithstanding anything to the contrary herein, in no case shall a Loan Party be required to grant a security interest in any Equity Interests in a CFC or a Transparent Subsidiary, other than (i) 100% of the non-voting Equity Interests (if any) in a CFC or Transparent Subsidiary, as applicable, that is a first-tier Subsidiary of such Loan Party, and (ii) 65% of the voting Equity Interests in a CFC or Transparent Subsidiary, as applicable, that is a first-tier Subsidiary of such Loan Party, in each case to secure Obligations of such Loan Party.

(f)     Notwithstanding anything to the contrary herein, the Required Lenders may agree in their sole discretion to extend any of the time periods set forth in this Section 7.12.

Section 7.13   Compliance with Environmental Laws.  Except as required by the Bankruptcy Code or orders of the Bankruptcy Court, comply, and cause all its lessees and other Persons operating or occupying its properties to comply, with all applicable Environmental Laws and Environmental Permits, except where the failure to comply could not reasonably be expected

to result in a Material Adverse Effect; obtain and renew all Environmental Permits necessary for its operations and properties, except whether the failure to obtain or renew could not reasonably be expected to result in a Material Adverse Effect; and conduct any investigation, study, sampling and testing, and undertake any cleanup, removal, remedial or other action necessary to remove and clean up Hazardous Materials from any of its properties, to the extent required of it by and in material compliance with Environmental Laws; provided, however, that neither the Borrower nor any of its Subsidiaries shall be required to undertake any such investigation, study, sampling, testing, cleanup, removal, remedial or other action to the extent that its obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained with respect to such circumstances in accordance with GAAP.

Section 7.14  Further Assurances.  Promptly upon request by the Administrative Agent, or any Lender through the Administrative Agent, (a) correct any material defect or error that may be discovered in any Loan Document or in the execution, acknowledgment, filing or recordation thereof, and (b) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Administrative Agent, or any Lender through the Administrative Agent, may reasonably require from time to time in order to (i) carry out more effectively the purposes of the Loan Documents, (ii) subject to any Loan Party's or any of its Subsidiaries' properties, assets, rights or interests to the Liens now or hereafter intended to be covered by any of the Collateral Documents, (iii) perfect and maintain the validity, effectiveness and priority of any Collateral Documents and any of the Liens intended to be created thereunder and (iv) assure, convey, grant, assign, transfer, preserve, protect and confirm more effectively unto the Secured Parties the rights granted or now or hereafter intended to be granted to the Secured Parties under any Loan Documents or under any other instrument executed in connection with any Loan Document to which any Loan Party or any of its Subsidiaries is or is to be a party, and cause each of its Subsidiaries to do so.

Section 7.15  Post-Closing Covenant.  To the extent any actions to create or perfect a security interest in Collateral to be provided hereunder or any other matters herein that are specifically subject to this Section 7.15 are not completed on or prior to the Closing Date notwithstanding the Borrower's use of best efforts to do so, the Borrower will complete each of such actions as soon as commercially reasonable but in no event later than Final Order Entry Date unless a later date is agreed to by the Required Lenders or the Administrative Agent at the direction of the Required Lenders; provided, that the Loan Parties shall deliver the Perfection Certificate to the Administrative Agent on or before the date that is within ten (10) days of the Closing Date.

Section 7.16  Compliance with Milestones.  Comply with the following relating to the Cases in accordance with the applicable timing referred to below (or such later dates as approved by the Required Lenders or the Administrative Agent by consent of the Required Lenders, other than any Plan Milestones set forth in clauses (g), (i) or (l) (and with respect to clause (l), only to the extent that the Effective Date were to be extended beyond December 14, 2016) below, which shall be subject to the approval of the Unanimous DIP Lenders as well), as well as certain other agreed milestones as may relate to the Cases (collectively, the "Plan Milestones" and each individually, a "Plan Milestone"):

(a)  Reserved;

(b)     on or before September 26, 2016, the Debtors must seek to obtain exit financing from third parties on terms similar to or better than the terms set forth in the Exit First Lien Facility;

(c)     Reserved;

(d)     the Debtors shall have commenced the respective Cases in the Bankruptcy Court no later than August 15, 2016;

(e)     each Debtor shall file the Reorganization Plan, and an accompanying disclosure statement (the "Disclosure Statement"), which shall be reasonably acceptable in form and substance to the Administrative Agent, the Required Lenders, the Debtors, the Supporting Lenders, the Required Supporting Noteholders, and the Supporting Interest Holders, in the Cases by no later than August 15, 2016;

(f)     the Debtors shall file a motion seeking approval of the Facility within one Business Day of the Petition Date;

(g)     the Interim Order shall be entered by the Bankruptcy Court in the Cases no later than three (3) Business Days after the Petition Date;

(h)     an order in form and substance acceptable to the Debtors, the Supporting Lenders, the Required Supporting Noteholders, and the Supporting Interest Holders, approving the assumption of the Restructuring Support Agreement shall be entered by the Bankruptcy Court in the Cases no later than thirty-five (35) calendar days after the Petition Date;

(i)     the Final Order shall be entered by the Bankruptcy Court in the Cases no later than thirty-five (35) calendar days after the Petition Date;

(j)     an order approving the Disclosure Statement, which shall be reasonably acceptable in form and substance to the Administrative Agent, the Required Lenders, the Debtors, the Supporting Lenders, the Required Supporting Noteholders, and the Supporting Interest Holders, shall be entered by the Bankruptcy Court in the Cases by no later than September 26, 2016;

(k)     an order confirming the Reorganization Plan, which shall be reasonably acceptable in form and substance to the Administrative Agent, the Required Lenders, the Debtors, the Supporting Lenders, the Required Supporting Noteholders, and the Supporting Interest Holders, shall be entered by the Bankruptcy Court in the applicable Cases by no later than November 7, 2016; and

(l)     the Effective Date shall occur by no later than November 14, 2016.

Section 7.17   Opposition to Certain Motions. Each Loan Party shall promptly and diligently oppose all motions filed by Persons in the Bankruptcy Court to lift the stay on any Collateral (other than motions filed by the Administrative Agent, the Pre-Petition Indenture Trustees, the Lenders, the Pre-Petition 2010 Indenture Noteholders and/or the Pre-Petition 2015 Indenture Noteholders relating to the Facility), all motions filed by Persons in the Bankruptcy Court to

terminate the exclusive ability of the Debtors to file a plan of reorganization, and all other motions filed by Persons in the Bankruptcy Court that, if granted, could reasonably be expected to have a material adverse effect on the Administrative Agent or any Collateral.

Section 7.18   Priority and Liens.   At all times during the term hereof, ensure each of the following:

(a)   Upon entry of each DIP Order, the Borrower's and each other Debtor's Obligations hereunder and under each of the other Loan Documents shall, at all times:

(i)   pursuant to section 364(c)(1) of the Bankruptcy Code, constitute an allowed superpriority claim on a joint and several basis in the Case of such Loan Party;

(ii)   subject to the Carve-Out, pursuant to section 364(c)(2) of the Bankruptcy Code, be secured by first priority, valid, binding, continuing, enforceable and fully-perfected security interests in, and Liens upon, all Collateral that, on or as of the Petition Date, is not subject to valid, perfected and non-avoidable liens (excluding any Avoidance Actions (but including, following the entry of the Final Order, the proceeds therefrom));

(iii)   pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by valid, binding, continuing, enforceable and fully-perfected security interests in, and Liens upon, the Collateral (other than the property described in clause (ii) or (iv) of this Section 7.18(a), as to which the liens and security interests in favor of the Administrative Agent will be as described in such clauses), whether existing on the Petition Date or thereafter acquired, that is subject to the liens of the Pre-Petition First Lien Secured Parties securing the Pre-Petition First Lien Obligations, the Adequate Protection Liens of the Pre-Petition Secured Parties, the Carve-Out, or any Permitted Lien (as defined in the Interim Order) which security interests and liens in favor of the Administrative Agent, are junior to such valid, perfected, and non-avoidable liens; and

(iv)   pursuant to section 364(d)(1) of the Bankruptcy Code, be secured by valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interests in and Liens upon all Collateral that is subject to valid, perfected, and non-avoidable liens presently held for the benefit of the Pre-Petition Indenture Secured Parties (such priming liens, the "Priming Liens" and such primed liens of the Pre-Petition Indenture Noteholders, the "Primed Liens"). The Priming Liens shall be senior in all respects to the interests in such property of any of the Pre-Petition Indenture Secured Parties (including, without limitation, any and all forms of adequate protection granted to the foregoing), but shall be junior to the liens of the Pre-Petition First Lien Secured Parties securing the Pre-Petition First Lien Obligations, the Adequate Protection Liens of the Pre-Petition First Lien Secured Parties, the Carve-Out and the Permitted Liens (as defined in the Interim Order). The Primed Liens shall be primed by and made subject and subordinate to the Priming Liens, but the Priming Liens shall not prime liens, if any, to which the Primed Liens are subordinate at the time of the commencement of the Cases.

(b)   The Secured Parties' Liens and superpriority claims as described in Section 7.18(a) shall have priority over any claims arising, upon entry of the Final Order, under sections

105 and 506(c) of the Bankruptcy Code, and shall be subject only to the liens of the Pre-Petition First Lien Lenders securing the Pre-Petition First Lien Obligations, the Adequate Protection Liens of the Pre-Petition First Lien Lenders, the Carve-Out, any other Permitted Liens (as defined in the Interim Order) and the payment of the Adequate Protection Claims of the Pre-Petition First Lien Lenders. Except as set forth herein, no other claim having a priority superior to or pari passu with that granted to Secured Parties by the Interim Order and Final Order, whichever is then in effect, shall be granted or approved while any Obligations under this Agreement remain outstanding.

(c)     Except for the Carve-Out, no costs or expenses of administration shall be imposed against the Administrative Agent, the Lenders, any other Secured Party or any of the Collateral or, subject to entry of the Final Order, under sections 105 or 506(c) of the Bankruptcy Code, or otherwise, and each of the Loan Parties hereby waives for itself and on behalf of its estate in bankruptcy, any and all rights under sections 105 or, upon entry of the Final Order, 506(c) of the Bankruptcy Code, or otherwise, to assert or impose or seek to assert or impose, any such costs or expenses of administration against Administrative Agent, the Lenders or any other Secured Party.

(d)     Except for the Carve-Out, the respective superpriority claims of the Secured Parties, the Pre-Petition First Lien Agent, the Pre-Petition First Lien Lenders, the Pre-Petition Indenture Trustees and the Pre-Petition Indenture Noteholders shall at all times be senior to the rights of such Loan Party, any chapter 11 trustee and, subject to section 726 of the Bankruptcy Code, any chapter 7 trustee, or any other creditor (including, without limitation, post-petition counterparties and other post-petition creditors) in the Cases or any subsequent proceedings under the Bankruptcy Code, including, without limitation, any chapter 7 cases (if any of such Loan Party's cases are converted to cases under chapter 7 of the Bankruptcy Code). Notwithstanding the foregoing, the superpriority claims of the Secured Parties shall be junior to the Adequate Protection Claims of the Pre-Petition First Lien Lenders.

ARTICLE VIII.
NEGATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder (other than contingent indemnification obligations for which no claims has been made) shall remain unpaid or unsatisfied or shall remain outstanding, each Loan Party shall not, nor shall it permit any of its Subsidiaries to, directly or indirectly:

Section 8.01   Liens.   Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following (the "Permitted Liens"):

(a)     Liens securing the Obligations;

(b)     Liens which are Permitted Liens (as defined in the Interim DIP Order);

(c)       Adequate Protection Liens and Liens securing Indebtedness of the Loan Parties outstanding under the Pre-Petition First Lien Loan Documents or the Pre-Petition Indenture Documents as of the Closing Date or as otherwise provided under the DIP Orders; and

(d)       Liens for Taxes that are not overdue for a period of more than 30 days or that are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP.

Section 8.02    Investments.  Make any Investments, except:

(a)       Investments existing on the Petition Date and listed on Schedule 8.02(a);

(b)       Investments as provided in the Budget (including Permitted Variances) or the DIP Orders.

Section 8.03    Indebtedness.  Create, incur, assume or suffer to exist any Indebtedness, except

(a)       Indebtedness in respect of the (i) Obligations, (ii) Pre-Petition First Lien Obligations and (iii) obligations under the Pre-Petition Indenture Documents;

(b)       Indebtedness existing on the date hereof and listed on Schedule 8.03(b) and any permitted refinancing thereof allowed pursuant to Section 8.14;

(c)       Indebtedness in respect of swap contracts designed to hedge against interest rates, foreign exchange rates or commodities pricing risks incurred in the ordinary course of business and not for speculative purposes; and

(d)       Indebtedness as provided in the Budget (including Permitted Variances) or the DIP Orders.

The accrual of interest, the accretion of accreted value and the payment of interest in the form of additional Indebtedness shall not be deemed to be an incurrence of Indebtedness for purposes of this Section 8.03.

Section 8.04    Fundamental Changes.  Merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, except that, so long as no Default exists or would result therefrom:

(a)       any Subsidiary may merge with (i) the Borrower; provided that the Borrower shall be the continuing or surviving Person, or (ii) any one or more other Subsidiaries; provided that when any Subsidiary that is a Loan Party is merging with another Subsidiary, a Loan Party shall be the continuing or surviving Person;

(b)       the Borrower may change its legal form if it determines in good faith that such action is in the best interests of the Borrower and its Subsidiaries, and the Administrative Agent

reasonably determines it is not disadvantageous to the Lenders or in conflict with the Restructuring Support Agreement; and

(c)    any Loan Party may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to the Borrower or to another Loan Party (other than Holdings or any Roadhouse Parent Entity).

Section 8.05    Dispositions.  Make any Disposition or enter into any agreement to make any Disposition, except:

(a)    Dispositions of obsolete, worn out or surplus property, whether now owned or hereafter acquired, in the ordinary course of business and Dispositions of property no longer used or useful in the conduct of the business of the Borrower and its Subsidiaries;

(b)    Dispositions of inventory, equipment and immaterial assets in the ordinary course of business;

(c)    Dispositions of property by any Subsidiary to the Borrower or to a wholly-owned Subsidiary; provided that if the transferor of such property is a Guarantor, the transferee thereof must either be the Borrower or a Guarantor;

(d)    Dispositions permitted by Section 8.02, Section 8.04 and Section 8.06 and Liens permitted by Section 8.01;

(e)    Dispositions in the ordinary course of business of Cash Equivalents;

(f)    leases, subleases, licenses or sublicenses, in each case in the ordinary course of business and which do not materially interfere with the business of the Borrower and its Subsidiaries, taken as a whole;

(g)    transfers of property subject to Casualty Events upon receipt of the Net Cash Proceeds of such Casualty Event;

(h)    Dispositions of Investments in joint ventures to the extent required by, or made pursuant to customary buy/sell arrangements between, the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

(i)    Dispositions of accounts receivable in the ordinary course of business in connection with the collection or compromise thereof;

(j)    The unwinding of any swap contract pursuant to its terms;

(k)    Dispositions in the ordinary course of business consisting of the abandonment of Company IP Rights which, in the reasonable good faith determination of the Borrower or any Subsidiary, are uneconomical, negligible, obsolete or otherwise not material in the conduct of its business; and

(l)     any surrender or waiver of contractual rights or the settlement, release or surrender of contractual rights or other litigation claims in the ordinary course of business.

To the extent any Collateral is disposed of as expressly permitted by this Section 8.05 to any Person other than to a Loan Party, such Collateral shall be sold free and clear of the Liens created by the Loan Documents and, if requested by the Administrative Agent, upon the certification by the Borrower that such Disposition is permitted by this Agreement, the Administrative Agent shall be authorized to take and shall take any actions deemed appropriate in order to effect the foregoing.

Section 8.06   Restricted Payments.   Declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except that:

(a)     each Subsidiary may make Restricted Payments to the Borrower, any Subsidiaries of the Borrower that are Guarantors and any other Person that owns a direct Equity Interest in such Subsidiary, ratably according to their respective holdings of the type of Equity Interest in respect of which such Restricted Payment is being made;

(b)     Permitted Tax Distributions may be made by any Group Member; and

(c)     to the extent constituting Restricted Payments, the Borrower and its Subsidiaries may enter into and consummate transactions expressly permitted by any provision of Section 8.02 or Section 8.04.

Section 8.07   Change in Nature of Business.   Engage in any material line of business different in any material respect from those lines of business conducted by the Borrower and its Subsidiaries on the date hereof or any business substantially related or incidental thereto.

Section 8.08   Transactions with Affiliates.   Except with the prior written consent of the Administrative Agent and Required Lenders, enter into any transaction of any kind with any Affiliate of the Borrower, whether or not in the ordinary course of business, other than:

(a)     transactions between or among the Borrower or any Subsidiary that is a Guarantor or any entity that becomes a Subsidiary that becomes a Guarantor as a result of such transaction;

(b)     loans and other transactions by and among the Borrower and/or one or more Subsidiaries to the extent otherwise permitted under this Article VIII;

(c)     employment and severance arrangements between the Borrower or any of its Subsidiaries and their respective officers and employees in the ordinary course of business and transactions pursuant to stock option plans and employee benefit plans and arrangements; provided that such arrangements are limited to incentive plans approved by the Bankruptcy Court in accordance with the Restructuring Support Agreement;

(d)     the payment of customary fees and reasonable out-of-pocket costs to, and indemnities provided on behalf of, directors, officers, employees and consultants of the Borrower and

its Subsidiaries or any direct or indirect parent of the Borrower in the ordinary course of business to the extent attributable to the ownership or operation of the Borrower and its Subsidiaries; and

(e)      transactions pursuant to the Restructuring Support Agreement or the Reorganization Plan.

Section 8.09    Burdensome Agreements.  Enter into or permit to exist any Contractual Obligation (other than this Agreement or any other Loan Document or as required under the Bankruptcy Code) that limits the ability (i) of any Subsidiary (other than an Excluded Subsidiary) to make Restricted Payments to the Borrower or any Guarantor or to otherwise transfer property to invest in the Borrower or any Guarantor, (ii) of any Loan Party (other than the Borrower or an Excluded Subsidiary) to Guarantee the Indebtedness of the Borrower or (iii) of the Borrower, any other Loan Party or any Subsidiary thereof (other than an Excluded Subsidiary) to create, incur, assume or suffer to exist Liens on property of such Person for the benefit of the Secured Parties with respect to the Obligations; provided, however, that the foregoing shall not apply to:

(a)      restrictions and conditions imposed by law or any Loan Document;

(b)      restrictions and conditions existing on the Closing Date (including, without limitation, any restrictions or conditions pursuant to existing Indebtedness permitted under Section 8.03(a)) or to any extension, renewal, amendment, modification or replacement thereof, except to the extent any such amendment, modification or replacement expands the scope of any such restriction or condition;

(c)      customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary or any assets pending such sale, provided that such restrictions and conditions apply only to the Subsidiary or assets that is or are to be sold and such sale is permitted hereunder;

(d)      customary provisions in leases, licenses and other contracts restricting the assignment thereof;

(e)      restrictions imposed by any agreement relating to secured Indebtedness permitted by this Agreement to the extent such restriction applies only to the property securing such Indebtedness;

(f)      restrictions or conditions set forth in any agreement in effect at any time a Person becomes a Subsidiary (but not any modification or amendment expanding the scope of any such restriction or condition), provided that such agreement was not entered into in contemplation of such Person becoming a Subsidiary and the restriction or condition set forth in such agreement does not apply to the Borrower, any other Loan Party or any other Subsidiary;

(g)      restrictions or conditions in any Indebtedness permitted pursuant to Section 8.03 to the extent such restrictions or conditions are no more restrictive than the restrictions and conditions in the Loan Documents or, in the case of subordinated debt, are market terms at the time

of issuance or, in the case of Indebtedness of any non-Guarantor, are imposed solely on such non-Guarantor and its Subsidiaries;

(h)    restrictions on cash or other deposits imposed by agreements entered into in the ordinary course of business;

(i)    encumbrances and restrictions under the Organization Documents of any joint ventures existing on the Closing Date; and

(j)    negative pledges incurred or provided in favor of any holder of Indebtedness permitted under Section 8.03 solely to the extent any such negative pledge relates to the property financed by or the subject of such Indebtedness.

Section 8.10    Use of Proceeds.

(a)    Use the proceeds of any Credit Extension, whether directly or indirectly, and whether immediately, incidentally or ultimately, to purchase or carry margin stock (within the meaning of Regulation U of the FRB) or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund indebtedness originally incurred for such purpose.

(b)    Use any portion of the Carve-Out, any proceeds of any Credit Extension, cash collateral or other Collateral or prepetition collateral proceeds, for the payment of the fees and expenses of any Person incurred in challenging, or in relation to (i) the challenge of the Liens or claims of any or all of the Administrative Agent or the Lenders, or the initiation or prosecution of any claim or cause of action against any or all of the Administrative Agent, the Lenders, the Pre-Petition First Lien Agent, any Pre-Petition Indenture Trustee, the Pre-Petition First Lien Lenders, and the Pre-Petition Indenture Noteholders, including any claim under chapter 5 of the Bankruptcy Code, (ii) the assertion of any claims or causes of actions (including any claims or causes of action under chapter 5 of the Bankruptcy Code) against any or all of the Pre-Petition First Lien Agent, the Pre-Petition Indenture Trustees, the Pre-Petition First Lien Lenders, and the Pre-Petition Indenture Noteholders, their respective advisors, agents and sub-agents, including formal discovery proceedings in anticipation thereof and (iii) the assertion of any claims or challenges relating to the allocation of value as between encumbered and unencumbered assets (if any). The foregoing notwithstanding, no more than $25,000 in the aggregate of the amounts set forth in the Budget, the Carve-Out, any cash collateral, or proceeds of any Credit Extension, Collateral or prepetition collateral may be used by the Committee, or any representative of the estates, to investigate, but not prosecute (or prepare for the prosecution of) any challenge or motion seeking standing to prosecute a challenge, to, the claims and/or Liens of the Pre-Petition First Lien Agent, the Pre-Petition Indenture Trustees, the Pre-Petition First Lien Lenders and the Pre-Petition Indenture Noteholders; provided, however, that nothing in this Agreement, any other Loan Document or the DIP Orders shall vest or confer on the Committee, or any representative of the estates, standing or authority to pursue any cause of action belonging to the Debtors or their estates. In addition, neither the Carve-Out nor any proceeds of any Credit Extension, cash collateral, Collateral or prepetition collateral shall be used in connection with preventing, hindering or delaying the Lenders', the Administrative Agent's, the Pre-Petition First Lien Agent's, the Pre-Petition Indenture Trustees', the Pre-Petition First Lien Lenders' or the Pre-Petition Indenture Noteholders' enforcement or realization upon the Collateral once an Event of Default has

occurred and is continuing under the Loan Documents, subject to the notice provisions in <u>Section 9.02</u> (and a comparable notice provision to be included in the Final Order with respect to the Pre-Petition First Lien Agent, the Pre-Petition Indenture Trustees, the Pre-Petition First Lien Lenders and the Pre-Petition Indenture Noteholders).

Section 8.11    <u>Capital Expenditures</u>.   Make or become legally obligated to make any Capital Expenditure, other than as set forth in the Budget (including Permitted Variances thereto).

Section 8.12    <u>Amendments of Organization Documents</u>.   Amend, supplement, waive or otherwise modify, or permit any amendment, supplement, waiver or other modification to, any of its Organization Documents in a manner adverse to the interests of the Lenders.

Section 8.13    <u>Accounting Changes</u>.   Make any change in (a) accounting policies or reporting practices, except as required by GAAP, or (b) fiscal year; <u>provided, however</u>, that the Borrower may, upon written notice to the Administrative Agent change its (x) accounting policies and/or reporting practices and/or (y) fiscal year, in each case as may be reasonably acceptable to the Administrative Agent and the Required Lenders, in which case the Borrower and the Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such change in fiscal year and/or accounting policies or reporting practices.

Section 8.14    <u>Prepayments, Etc. of Indebtedness</u>.   (i) Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner any Indebtedness (it being understood that payments of regularly scheduled interest and mandatory prepayments under Indebtedness expressly permitted to be incurred hereunder shall be permitted, subject in each case to the DIP Orders) except (a) the conversion of any such Indebtedness to Qualified Equity Interests of Holdings (or any direct or indirect parent thereof), and (b) refinancings and refundings of such Indebtedness in compliance with the Budget, or (ii) amend, modify or change in any manner any term or condition of any Indebtedness set forth in <u>Schedule 8.03(b)</u> in a manner materially adverse to the Administrative Agent or the Lenders without the consent of the Required Lenders, except for any refinancing, refunding, renewal or extension thereof contemplated by the Budget and permitted hereunder.

Section 8.15    <u>Holding Company</u>.   In the case of Holdings and any Roadhouse Parent Entity, engage in any business or activity other than (a) (i) in the case of Holdings, the ownership of all outstanding Equity Interests in the Borrower, (ii) in the case of Roadhouse Parent, the ownership of all outstanding Equity Interests in Holdings, (iii) in the case of Roadhouse Midco, the ownership of all outstanding Equity Interests in Roadhouse Parent, (iv) in the case of Roadhouse Intermediate, the ownership of all outstanding Equity Interests in Roadhouse Midco, and (v) in the case of Roadhouse Holding, the ownership of all outstanding Equity Interests in Roadhouse Intermediate, (b) maintaining its corporate existence, including general and corporate overhead, <u>provided</u> that Holdings or such Roadhouse Parent Entity may change its form of organization, so long as (A) it is organized under the laws of the United States of America, any State thereof or the District of Columbia and (B) its Guarantee of the Obligations and the Lien on or security interest in any Collateral held by it under the Loan Documents shall remain in effect to the same extent as immediately prior to such change, (c) activities required to comply with

applicable laws, (d) participating in tax, accounting and other administrative activities as the parent of the consolidated group of companies, including the Loan Parties, (e) the receipt of Restricted Payments to the extent permitted by Section 8.06 and the making of Restricted Payments to the extent permitted by Section 8.06 (including, in each case, for the avoidance of doubt, Permitted Tax Distributions), (f) to the extent not otherwise covered by the other clauses of this Section 8.15, any of the activities of Holdings or such Roadhouse Parent Entity referred to in Section 8.06, (g) concurrently with any issuance of Qualified Equity Interests, the redemption, purchase or retirement of any Equity Interest of Roadhouse Holding using the proceeds of, or conversion or exchange of any equity Interests of Roadhouse Holding for, such Qualified Equity Interests, (h) compliance with its obligation under the Loan Documents, the execution and delivery of the Loan Documents to which it is a party and the performance of its obligations thereunder, (i) incurring guarantees of Indebtedness permitted to be incurred by the Borrower or any Guarantor Subsidiary hereunder, provided such guarantee shall be subordinated to the Obligations to the same extent as such other Indebtedness, and (j) activities incidental to the businesses or activities described in clauses (a) through (i) of this Section 8.15.

Section 8.16    Bankruptcy Provisions.  No Group Member shall: (a) seek or consummate a sale of assets under a plan of reorganization, Section 363(b) of the Bankruptcy Code or otherwise (other than the Reorganization Plan) without the consent of the Required Lenders and the Supporting Interest Holders; (b) except for the Carve-Out (subject to the applicable caps and the other limitations set forth herein and in the DIP Orders), incur administrative expense claims pari passu with or senior to the Obligations; (c) seek or consent to any modification, stay, vacation or amendment with respect to (i) "first day orders" entered by the Bankruptcy Court, (ii) the Final Order or (iii) the Loan Documents, except in each case as agreed to by the Administrative Agent and the Required Lenders in their sole discretion; (d) except as otherwise expressly permitted herein or in the DIP Orders, create any Lien that ranks senior to, or *pari passu* with, the Liens securing the Obligations; (e) make cash expenditures on account of claims incurred (i) by critical vendors prior to the Petition Date, (ii) by protected vendors under the Perishable Agricultural Commodities Act of 1930, as amended, prior to the Petition Date or (iii) pursuant to Section 503(b)(9) of the Bankruptcy Code, or pursuant to any "first day" orders entered by the Bankruptcy Court,  in each case except as agreed to by the Pre-Petition First Lien Agent, the Pre-Petition Indenture Trustees and the Required Lenders or as permitted by the Budget (including Permitted Variances thereto), (f) seek or consent to any order seeking authority to take any action prohibited by the Final Order or the other Loan Documents without the consent of the Required Lenders, the Pre-Petition First Lien Agent or the Pre-Petition Indenture Trustees or otherwise required by any Requirement of Law or (g) except as expressly consented to by the Required Lenders, seek, or consent to any order seeking, to settle any litigation related to employee or labor matters, including without limitation, wage and hour collective or class action litigation involving one or more Loan Parties.

Section 8.17    Compliance with Budget Covenants.  Permit any Variance to exist other than a Permitted Variance.

Section 8.18    Foreign Subsidiaries.  Form or otherwise acquire any Foreign Subsidiaries.

Section 8.19    Real Property. Own or acquire, or enter into any agreement to acquire, any real property unless appropriate collateral documents, in form and substance acceptable to the Required Lenders in all respects, are executed and delivered to the Administrative Agent to create a valid, continuing and perfected security interest in such real property in favor of the Administrative Agent for the benefit of the Secured Parties.

ARTICLE IX.
EVENTS OF DEFAULT AND REMEDIES

Section 9.01    Events of Default. Any of the following shall constitute an Event of Default:

(a)    Non-Payment. The Borrower or any other Loan Party fails to pay (i) any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or by acceleration thereof or otherwise, or (ii) pay any interest on any Loan or any fee or other amount (other than an amount referred to in the foregoing clause (i)) payable under this Agreement or under any other Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of five (5) or more Business Days; or

(b)    Specific Covenants. Any Loan Party fails to perform or observe any term, covenant or agreement contained in any of Sections 7.02(a), 7.04(a) (solely with respect to the Borrower), 7.10, 7.12, 7.15, 7.16, 7.17, 7.18 or Article VIII; or

(c)    Other Defaults. Any Loan Party fails to perform or observe any other term, covenant or agreement (not specified in Section 9.01(a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for 10 days; provided that an Event of Default under Article VI (other than under Sections 6.01(d) and Section 6.06) is subject to a grace period of 5 Business Days and an Event of Default under Sections 6.01(d) or 6.06 is subject to a grace period of 2 Business Days; or

(d)    Representations and Warranties. Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Borrower or any other Loan Party herein, in any other Loan Document, or in any document delivered in connection herewith or therewith shall be incorrect or misleading in any material respect when made or deemed made; or

(e)    Judgments. There is entered against any Loan Party or any Subsidiary thereof a final judgment or order for the payment of money in an aggregate amount exceeding $[250,000] (to the extent not covered by independent third-party insurance as to which the insurer is rated at least "A" by A.M. Best Company, has been notified of the potential claim and does not dispute coverage), or any one or more non-monetary final judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and there is a period of 30 consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, is not in effect, or enforcement of such judgment is not subject to the automatic stay provided in the Bankruptcy Code; or

(f)     ERISA.  (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of any of the Loan Parties under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount in excess of $[250,000], (ii) any Loan Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount in excess of $[250,000], (iii) there is or arises an Unfunded Pension Liability (taking into account only Plans with positive Unfunded Pension Liability) of $[250,000] or more, or (iv) there is or arises any potential withdrawal liability under Section 4201 of ERISA, if any Loan Party, any Subsidiary thereof or any ERISA Affiliate were to withdraw completely from any and all Multiemployer Plan of $[250,000] or more; or

(g)     Invalidity of Loan Documents and Collateral Documents.  (i) Any Loan Document shall cease to be in full force and effect (other than pursuant to the terms hereof or thereof), or any Loan Party shall deny or disaffirm in writing the validity of any Loan Document or that it has any further liability under any such Loan Document (other than, in the case of a Guarantor Subsidiary, as a result of the discharge of a Guarantor Subsidiary in accordance with the terms of the Loan Documents) or otherwise attempt to invalidate or otherwise impair the Loans or of the validity or perfection of the liens granted thereunder or (ii) any material provision of any Collateral Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or as a result of acts or omissions by the Administrative Agent or any Lender or satisfaction in full of all the Obligations, ceases to be in full force and effect or ceases to create a valid and perfected first priority Lien (subject to Liens permitted by Section 8.01) on the Collateral to be covered thereby; or any Loan Party or any other Person contests in any manner the validity or enforceability of any material provision of any Collateral Document or of the validity or perfection of the liens granted thereunder; or any Loan Party denies that it has any or further liability or obligation under any provision of any Collateral Document, or purports to revoke, terminate or rescind any Collateral Document; or

(h)     Change of Control.  There occurs any Change of Control; or

(i)     Bankruptcy Matters.  The Bankruptcy Court shall enter an order authorizing, approving or granting (or the Debtors shall file a motion seeking such authorization, approval or grant of) (i) additional post-Petition Date financing not otherwise permitted herein, (ii) any liens on the Collateral not otherwise permitted herein, (iii) dismissal of the Cases or conversion of any Case to one under Chapter 7 of the Bankruptcy Code, (iv) appointment of a Chapter 11 trustee in any of the Cases, (v) any other superpriority claim senior to or pari passu with superpriority claims of the Administrative Agent, the other Secured Parties, the Pre-Petition First Lien Agent, the Pre-Petition First Lien Lenders, the Pre-Petition Indenture Trustees or the Pre-Petition Indenture Noteholders, (vi) modification of the Facility (other than pursuant to Section 11.01) or the Final Order, (vii) any action materially adverse to the Administrative Agent, the other Secured Parties, the Pre-Petition First Lien Agent, the Pre-Petition First Lien Lenders, the Pre-Petition Indenture Trustees or the Pre-Petition Indenture Noteholders, or their rights and remedies with respect to or interest in the Collateral, (viii) appointment of an examiner having powers beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code in any of the Cases, (ix) relief from the automatic stay for the benefit of any creditor with a security interest in the

Collateral without the consent of the Administrative Agent and the Required Lenders, or (x) termination of the use of cash collateral by the Loan Parties; or

(j)     <u>Prepetition Debts</u>.  Any Debtor shall make any Pre-Petition Payment or otherwise pay any claim accrued prior to the Petition Date without the prior written consent of the Administrative Agent and the Required Lenders in their sole discretion or other than as permitted by the Budget (and any Permitted Variances thereto); or

(k)     <u>Actions against Administrative Agent</u>.  Any Debtor shall commence any action against the Administrative Agent, any other Secured Parties, the Pre-Petition First Lien Agent, the Pre-Petition First Lien Lenders, the Pre-Petition Indenture Trustees or the Pre-Petition Indenture Noteholders, on behalf of itself or any of its affiliates, officers or employees; or

(l)     <u>Material Adverse Effect</u>.  Any Material Adverse Effect shall have occurred; or

(m)     <u>Restructuring Support Agreement</u>.  The Restructuring Support Agreement (i) shall be terminated pursuant to its terms or shall otherwise cease to be in full force and effect (other than a Termination Event (as defined in the RSA) as a result of the occurrence of the Effective Date of the Reorganization Plan), or (ii) shall have been amended, supplemented or otherwise modified in any material manner that adversely affects the interests, rights or remedies of any of the Administrative Agent or the Lenders; or

(n)     <u>Plan Milestones</u>.  The failure of the Debtors to comply with any of the Plan Milestones, regardless of whether the Debtors used commercially reasonable efforts to comply with any such Plan Milestone; or

(o)     <u>506(c) Claims</u>.  A claim under Section 506(c) of the Bankruptcy Code or otherwise shall have been allowed against any of all of the Administrative Agent, the other Secured Parties or the Collateral, or against the Pre-Petition First Lien Agent, the Pre-Petition First Lien Lenders, the Pre-Petition Indenture Trustees or the Pre-Petition Indenture Noteholders or the collateral securing any Pre-Petition Debt; or

(p)     <u>Competing Plans</u>.  The filing by any Group Member of any plan of reorganization or related disclosure statement or any direct or indirect amendment, modification, waiver or other change to the Reorganization Plan or related disclosure statement, or the entry of an order confirming any such plan of reorganization or approving any such disclosure statement or approving any such amendment, modification, waiver or other change in each case to the extent that such filing is not the Reorganization Plan or treats the claims of the Administrative Agent, any of the Lenders, any of the Pre-Petition Indenture Trustees or any of the Pre-Petition Indenture Noteholders in any manner to which they do not consent in their respective sole discretion; or

(q)     <u>Exclusivity</u>.  The Bankruptcy Court shall enter an order that results in any termination or modification of the exclusivity periods set forth in Section 1121 of the Bankruptcy Code except as provided in the Final Order or any such exclusivity periods shall have expired; or

(r)     <u>Bankruptcy Orders Not In Full Force and Effect</u>.  The Interim Order (prior to entry of the Final Order) or the Final Order shall cease to be in full force and effect or shall have

been reversed, modified, amended, stayed, vacated or subject to stay pending appeal, in the case of any modification or amendment, without the prior written consent of the Required Lenders; or

(s)    <u>Compliance with DIP Orders</u>. The failure of any Loan Party to comply in any material respect with the Interim Order (prior to entry of the Final Order) or the Final Order; or

(t)    <u>Asset Sales</u>. Any sale or other disposition of all or a material portion of the Collateral pursuant to sections 363 or 1129 of the Bankruptcy Code other than as permitted by the DIP Orders (or pursuant to a transaction expressly permitted herein); or

(u)    <u>Administrative Expense or Priority Claims</u>. A claim against any Debtor arising prior to the Effective Date of a kind specified under or entitled to priority or superpriority pursuant to sections 364(c)(1), 503(b), 507(a), 507(b) or 1114(e)(2) of the Bankruptcy Code or otherwise shall have been allowed in excess of $50,000 against such Debtor as a result of litigation with employees or former employees of any Debtor (including, without limitation, wage and hour collective or class action litigation involving one or more Debtors); or

(v)    <u>Schedule of Assumption/Rejection of Executory Contracts and Unexpired Leases</u>. The filing of any schedule of assumption, assumption and assignment, or rejection of executory contracts and unexpired leases in any of the Cases that materially adversely affects the interests, rights or remedies of the Administrative Agent or any Lender that is not reasonably satisfactory to the Administrative Agent and the Required Lenders; or

(w)    <u>Challenge Under Interim Order</u>. If forty-five (45) days after the Committee or a party in interest obtains standing to assert a Challenge (as defined in the Interim Order) and such Challenge (as defined in the Interim Order) is not resolved.

Section 9.02    <u>Remedies upon Event of Default</u>. During the continuance of an Event of Default:

(a)    (other than an event described in <u>Section 9.01(i)(iii)</u> above), subject to the DIP Orders, the Administrative Agent may (with the consent of the Required Lenders), and shall (at the request of the Required Lenders), by notice to the Borrower, take any or all of the following actions, at the same or different times, (i) terminate forthwith the Commitments and (ii) declare the Loans then outstanding to be forthwith due and payable in whole or in part, whereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and any unpaid accrued fees and all other Obligations of the Loan Parties accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Loan Parties, anything contained herein or in any other Loan Document to the contrary notwithstanding; and in any event described in <u>Section 9.01(i)(iii)</u> above, the Commitments shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon and any unpaid accrued fees and all other Obligations of the Loan Parties accrued hereunder and under any other Loan Document, shall automatically become due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Loan Parties, anything contained herein or in any other Loan Document to the contrary notwithstanding; and

(b)    after the Administrative Agent or the Required Lenders have given at least five (5) days' prior written notice (the "Notice Period") to the Loan Parties (during which period the Event of Default is not cured) as set forth below, the Required Lenders may direct the Administrative Agent, who shall be permitted without seeking relief from the automatic stay, to foreclose on all or any portion of the Collateral, collect accounts receivable and apply the proceeds thereof to the Obligations or otherwise exercise remedies against the Collateral as permitted by applicable Laws. During the Notice Period, the Loan Parties shall be entitled to (i) contest the occurrence and/or continuance of any Event of Default and (ii) seek and obtain an emergency hearing before the Bankruptcy Court, with proper notice to the Administrative Agent, solely for the purpose of contesting whether an Event of Default has occurred and/or is continuing. In addition to the other remedies set forth in this Section 9.02, the Administrative Agent, at the direction of the Required Lenders, shall have the authority to credit bid all or a portion of the Obligations, whether pursuant to a sale under section 363 of the Bankruptcy Code, a plan pursuant to section 1129(b) of the Bankruptcy Code or otherwise; provided, that that such credit bid provides for the assumption of or payment in full in cash of the Pre-Petition First Lien Obligations.

Section 9.03    Application of Funds. After the exercise of remedies provided for in Section 9.02 (or after the Loans have automatically become immediately due and payable), any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order, subject to the Carve-Out:

First, to the payment of interest, expense reimbursement and other obligations owed to the Pre-Petition First Lien Agent and the Pre-Petition First Lien Lenders in accordance with the DIP Orders;

Second, to the payment of the remaining Pre-Petition First Lien Obligations in accordance with the terms of the Pre-Petition First Lien Credit Agreement;

Third,  to the payment of all costs and expenses incurred by the Administrative Agent (in its capacity as such hereunder or under any other Loan Document) in connection with any collection, sale, foreclosure or realization or otherwise in connection with this Agreement, any other Loan Document or any of the Obligations, including all court costs and the fees and expenses of its agents and legal counsel, the repayment of all advances made by the Administrative Agent hereunder or under any other Loan Document on behalf of any Loan Party, any other costs or expenses incurred in connection with the exercise of any right or remedy hereunder or under any other Loan Document, any amounts for which the Administrative Agent is entitled to indemnification, fees, or reimbursement of costs or expenses under the terms of any Loan Document, and any other Obligations owed to the Administrative Agent, in their respective capacities as such hereunder or under any other Loan Document;

Fourth, to the payment in full of all Obligations consisting of interest (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) on the Loans, (the amounts so applied to be distributed among the Lenders pro rata in accordance with the amounts of the Loans owed to them on the date of any such distribution);

<u>Fifth</u>, to the payment in full of all Obligations (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) consisting of unpaid principal amount of the Loans and any premium thereon or breakage or termination fees, costs or expenses related thereto (the amounts so applied to be distributed among the Lenders pro rata in accordance with the amounts of the Obligations owed to them on the date of any such distribution);

<u>Sixth</u>, to the payment in full of all other Obligations (the amounts so applied to be distributed among the Secured Parties pro rata in accordance with the amounts of the Obligations owed to them on the date of any such distribution);

<u>Seventh</u>, to the payment of any remaining obligations owed to the Pre-Petition Indenture Trustees and the Pre-Petition Indenture Noteholders under the Pre-Petition Indentures; and

<u>Eighth</u>, to the Borrower, its successors or assigns, or as a court of competent jurisdiction may otherwise direct.

The Administrative Agent shall have absolute discretion as to the time of application of any such proceeds, moneys, balances or amounts in accordance with this Agreement and the other Loan Documents. Upon any sale of Collateral by the Administrative Agent (including pursuant to a power of sale granted by statute or under a judicial proceeding), the receipt of the Administrative Agent or of the officer making the sale shall be a sufficient discharge to the purchaser or purchasers of the Collateral so sold and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to the Administrative Agent or such officer or be answerable in any way for the misapplication thereof.

<div align="center">

ARTICLE X.
ADMINISTRATIVE AGENT

</div>

Section 10.01 <u>Appointment and Authority</u>.

(a)    Each of the Lenders hereby irrevocably appoints Cortland Capital Market Services LLC to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article are solely for the benefit of the Administrative Agent, the Lenders, and neither the Borrower nor any other Loan Party shall have rights as a third party beneficiary of any of such provisions.

(b)    The Administrative Agent shall also act as the "<u>collateral agent</u>" under the Loan Documents, and each of the Lenders hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto. In this con-

nection, the Administrative Agent, as "collateral agent" and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to Section 10.05 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent), shall be entitled to the benefits of all provisions of this Article X and Article XI (including Section 11.04(c), as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto.

Section 10.02 Rights as a Lender. The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

Section 10.03 Exculpatory Provisions. The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents. Without limiting the generality of the foregoing, the Administrative Agent:

(a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), provided that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable law; and

(c)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity.

The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 11.01 and 9.02) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final, non-appealable judgment. The Administrative Agent shall be deemed not

to have knowledge of any Default unless and until written notice describing such Default is given to the Administrative Agent by the Borrower or a Lender.

The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Collateral Documents, (v) the value or the sufficiency of any Collateral, or (v) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

Section 10.04  Reliance by Administrative Agent.  The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan, that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan.  The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Section 10.05  Delegation of Duties.  The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent.  The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.  The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final, non-appealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

Section 10.06  Resignation of Administrative Agent.  The Administrative Agent may at any time give written notice of its resignation to the Lenders and the Borrower.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right, upon the consent of the Borrower, to appoint a successor, not to be unreasonably withheld (and not required during the

continuance of an Event of Default) which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may on behalf of the Lenders, appoint a successor Administrative Agent meeting the qualifications set forth above; provided that if the Administrative Agent shall notify the Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (a) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders under any of the Loan Documents, the retiring Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (b) except for any indemnity payments owed to the retiring or resigning Administrative Agent, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Administrative Agent as provided for above in this Section 10.06. Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent, and the retiring Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section 10.06). The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring Administrative Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article and Section 11.04 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent.

Section 10.07 Non-Reliance on Administrative Agent and Other Lenders. Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

Section 10.08 No Other Duties, Etc. Except as expressly set forth in this Agreement or any other Loan Document, the Administrative Agent shall not have any duties or responsibilities hereunder in its capacity as such.

Section 10.09 Administrative Agent May File Proofs of Claim. In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall

then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Sections 2.07 and 11.04) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, if the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Sections 2.07 and 11.04.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender to authorize the Administrative Agent to vote in respect of the claim of any Lender or in any such proceeding.

Section 10.10 Collateral and Guaranty Matters. Each of the Lenders irrevocably authorize the Administrative Agent, at its option and in its discretion,

(a)    to release any Lien on any property granted to or held by the Administrative Agent under any Loan Document (i) upon termination of the Aggregate Commitments and payment in full in cash of all Obligations (other than contingent indemnification obligations for which no claim has been made), (ii) that is sold or to be sold as part of or in connection with any sale permitted hereunder or under any other Loan Document to a Person that is not a Loan Party, or (iii) if approved, authorized or ratified in writing in accordance with Section 11.01;

(b)    to release any Guarantor from its obligations under the Guaranty if such Person ceases to be a Subsidiary as a result of a transaction permitted hereunder; and

(c)    to subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 8.01.

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty pursuant to this Section 10.10. In each case as specified in this Section 10.10, the Administrative Agent will, at the Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Collateral Documents or to subordinate its interest in such item, or to release such Guarantor from its obligations under the Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 10.10.

Section 10.11    Withholding Tax.    To the extent required by any applicable Laws, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax. Without limiting or expanding the provisions of Section 3.01, each Lender shall, and does hereby severally, indemnify the Administrative Agent against, and shall make payable in respect thereof within 10 days after demand therefor, (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so) and (ii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Administrative Agent under this Section 10.11. The agreements in this Section 10.11 shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender and the repayment, satisfaction or discharge of all other Obligations.

ARTICLE XI.
MISCELLANEOUS

Section 11.01    Amendments, Etc.    No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Borrower or any other Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders and the Borrower or the applicable Loan Party, as the case may be, and acknowledged by the Administrative Agent, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no such amendment, waiver or consent shall:

(a)    waive any condition set forth in Section 4.01 without the written consent of each Lender;

(b)    without limiting the generality of clause (a) above, waive any condition set forth in Section 4.03 as to any Credit Extension or Notice of Request for Disbursement without the written consent of each Unanimous DIP Lender;

(c)    increase the Commitment of any Lender (or reinstate any Commitment terminated pursuant to Section 9.02) without the written consent of each affected Lender and the Unanimous DIP Lenders;

(d)    postpone any date fixed by this Agreement or any other Loan Document for any payment of principal, interest, fees or other amounts due to the Lenders (or any of them) hereunder or under such other Loan Documents or extend the DIP Loan Maturity Date beyond December 14, 2016, in each case without the written consent of the Unanimous DIP Lenders;

(e)    reduce the principal of, or the rate of interest specified herein on, any Loan or any fees or other amounts payable hereunder or under any other Loan Document, or change the manner of computation of such rate of interest or fee that would result in a reduction of any interest rate on any Loan or any fee payable hereunder without the written consent of each affected Lender entitled to such amount and the Unanimous DIP Lenders; provided, however, that only the consent of the Required Lenders and the Unanimous DIP Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Borrower to pay interest at the Default Rate;

(f)    change (i) Section 2.11 or Section 9.03 in a manner that would alter the pro rata sharing of payments required thereby without the written consent of each Lender or (ii) the order of application of any reduction in the Commitments or any prepayment of Loans from the application thereof set forth in the applicable provisions of Section 2.04(b) without the consent of each affected Lender or (iii) any provision of Section 7.18 in a manner that would alter the Lien priority of the Facility without the written consent of the Unanimous DIP Lenders;

(g)    change any provision of this Section 11.01 or the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder without the written consent of each Lender, other than any such change that would only affect the Unanimous DIP Lenders in which case the written consent of the Unanimous DIP Lenders shall be required to make such change;

(h)    change the definition of "Unanimous DIP Lenders" without the written consent of each Unanimous DIP Lender;

(i)    release all or substantially all of the Collateral in any transaction or series of related transactions, without the written consent of each Lender;

(j)    release all or substantially all of the value of the Guaranty, without the written consent of each Lender, except to the extent the release of any Subsidiary from the Guaranty is permitted pursuant to Section 9.10 (in which case such release may be made by the Administrative Agent acting alone);

(k)    impose any greater restriction on the ability of any Lender under the Facility to assign any of its rights or obligations hereunder without the written consent of each affected Lender;

(l)  subordinate the Obligations or the Liens securing the Obligations without the written consent of the Unanimous DIP Lenders;

(m)  alter the adequate protection provided under the Facility without the written consent of the Unanimous DIP Lenders;

(n)  subject to clause (d) of this Section 11.01, alter any Event of Default in a manner adverse to the Lenders without the written consent of the Unanimous DIP Lenders; or

(o)  change the terms of the Facility in a manner that would materially adversely affect any of the rights or obligations of any Unanimous DIP Lender in a manner that is different or disproportionate in any respect from the effect on the rights or obligations (as applicable) of the Unanimous DIP Lenders generally, other than in proportion to the Unanimous DIP Lenders' respective amounts of the Loans, without the written consent of the Unanimous DIP Lenders;

provided, further, that no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, affect the rights or duties of the Administrative Agent under this Agreement or any other Loan Document.

Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder, except that the Commitment of such Lender may not be increased or extended without the consent of such Lender.

If any Lender does not consent to a proposed amendment, waiver, consent or release with respect to any Loan Document that requires the consent of each Lender or each adversely affected Lender and that has been approved by the Required Lenders or the majority of the Lenders whose consent is required therefor, the Borrower may replace such non-consenting Lender in accordance with Section 11.13; provided that such amendment, waiver, consent or release can be effected as a result of the assignment contemplated by such Section (together with all other such assignments required by the Borrower to be made pursuant to this paragraph).

Section 11.02 Notices; Effectiveness; Electronic Communications.

(a)  Notices Generally.  Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier or electronic mail as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)  if to Holdings, the Borrower, or the other Loan Parties, to the address, telecopier number, electronic mail address or telephone number specified for such Person on Schedule 11.02;

(ii)  if to the Administrative Agent, to the address, telecopier number, electronic mail address or telephone number specified for such Person on Schedule 11.02; and

      (iii)    if to any Lender, to the address, telecopier number, electronic mail address or telephone number specified on <u>Schedule 11.02</u> or in the Assignment and Acceptance pursuant to which such Lender shall have become a party hereto or in its Administrative Questionnaire.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient). Notices and other communications delivered through electronic communications to the extent provided in subsection (b) below shall be effective as provided in such subsection (b).

      (b)    <u>Electronic Communications</u>. Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, <u>provided</u> that the foregoing shall not apply to notices to any Lender pursuant to <u>Article II</u> if such Lender, as applicable, has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, <u>provided</u> that approval of such procedures may be limited to particular notices or communications.

      Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), <u>provided</u> that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

      (c)    <u>The Platform</u>. THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM. In no event shall the Administrative Agent or any of its Related Parties (collectively, the "<u>Agent Parties</u>") have any liability to Holdings, the Borrower, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's or the Administrative

Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party; provided, however, that in no event shall any Agent Party have any liability to Holdings, the Borrower, any Lender, or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(d)    Change of Address, Etc. Each of the Loan Parties and the Administrative Agent may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto. Each Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the Borrower and the Administrative Agent. In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender. Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States Federal and state securities Laws, to make reference to Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Borrower or its securities for purposes of United States Federal or state securities laws.

(e)    Reliance by Administrative Agent and Lenders. The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices (including telephonic Committed Loan Notices) purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Loan Parties shall indemnify the Administrative Agent, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of a Loan Party. All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

Section 11.03 No Waiver; Cumulative Remedies; Enforcement. No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against

the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with Section 9.02 for the benefit of all the Lenders; provided, however, that the foregoing shall not prohibit (a) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent) hereunder and under the other Loan Documents, (b) any Lender from exercising setoff rights in accordance with Section 11.08 (subject to the terms of Section 2.11), or (c) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law; and provided, further, that if at any time there is no Person acting as Administrative Agent hereunder and under the other Loan Documents, then (i) the Required Lenders shall have the rights otherwise ascribed to the Administrative Agent pursuant to Section 9.02 and (ii) in addition to the matters set forth in clauses (b) and (c) of the preceding proviso and subject to Section 2.11, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

Section 11.04 Expenses; Indemnity; Damage Waiver.

(a)    Costs and Expenses. The Loan Parties shall, subject to the terms of the DIP Orders, pay (i) all reasonable and documented out-of-pocket costs and expenses incurred by the Administrative Agent (including the reasonable fees, charges and disbursements of counsel for the Administrative Agent) and the Required Lenders and the Unanimous DIP Lenders (including the reasonable fees, charges and disbursements of counsel for the Required Lenders and the Unanimous DIP Lenders (including King & Spalding LLP, Debevoise & Plimpton LLP, Dechert LLP and Delaware Counsel for each)), in connection with the syndication of the credit facilities provided for herein, the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated thereby shall be consummated), (ii) all reasonable and documented out-of-pocket costs and expenses incurred by the Administrative Agent (including reasonable fees, charges and disbursements of counsel for the Administrative Agent) and any Required Lender and any Unanimous DIP Lender (including the fees, charges and disbursements of only one lead law firm, one local-counsel firm and any necessary specialists, one accounting firm, one financial advisory firm and one consultant retained for or on behalf of the Administrative Agent and the Lenders) in connection with the enforcement of its rights and interests under this Agreement and the other Loan Documents, including in connection with any workout, restructuring or waiver or similar matters in respect of such Obligations and Loan Documents and (iii) all reasonable and documented out-of-pocket costs and expenses incurred by the Administrative Agent (including reasonable fees, charges and disbursements of counsel for the Administrative Agent) and any Required Lender and any Unanimous DIP Lender (including the fees, charges and disbursements of only one lead law firm, one local-counsel firm and any necessary specialists, one accounting firm, one financial advisory firm and one consultant retained for or on behalf of the Administrative Agent and the Lenders).

(b)    Indemnification by the Borrower. The Loan Parties shall indemnify the Administrative Agent (and any sub-agent thereof), each Lender, and each Related Party and Approved Fund of any of the foregoing Persons (each such Person being called an "Indemnitee") against,

and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities, obligations, settlement payments, actions, or causes of action and related costs and expenses (including the reasonable, documented and invoiced fees, charges and disbursements of one counsel for the Indemnitees taken as a whole and, if necessary, one firm of local counsel in each appropriate jurisdiction to the Indemnitees taken as a whole, and, in the case of a conflict of interest, one additional counsel to the affected Indemnitee taken as a whole; provided, that the foregoing shall not apply to the Administrative Agent and the Lenders, who shall each be entitled to select their respective counsel, and the Loan Parties agree to pay promptly the reasonable fees and expenses of such counsel), and shall indemnify and hold harmless each Indemnitee from all reasonable, documented and invoiced fees and time charges and disbursements for attorneys who may be employees of any Indemnitee, incurred by any Indemnitee or asserted against any Indemnitee by any third party or by the Borrower or any other Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, or, in the case of the Administrative Agent (and any sub-agent thereof) and its Related Parties only, the administration of this Agreement and the other Loan Documents, (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or Release of Hazardous Materials on or from any property owned or operated by the Borrower or any of its Subsidiaries, or any Environmental Liability related in any way to the Borrower or any of its Subsidiaries, (iv) the Cases or (v) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower or any other Loan Party or any of the Borrower's or such Loan Party's directors, shareholders or creditors, and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (1) (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or any of its officers or directors or (y) result from a claim brought by the Borrower or any other Loan Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if the Borrower or such Loan Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction or (2) relate to any proceeding solely between or among Indemnitees other than (A) claims against the Administrative Agent, Lenders or their Affiliates, in each case in their capacity or in fulfilling their role as the agent or arranger or any other similar role under the Loan Documents (including their role as a Lender), and (B) claims arising out of any act or omission on the part of the Equity Investors (in their capacities as holders of Equity Interests in Roadhouse Holding), the Borrower or their respective Subsidiaries.

(c)    <u>Reimbursement by Lenders</u>.  To the extent that the Borrower for any reason fails to indefeasibly pay any amount required under subsection (a) or (b) of this <u>Section 11.04</u> to be paid by it to the Administrative Agent (or any sub-agent thereof), or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent), or such Related Party, as the case may be, such Lender's Pro Rata Share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, provided that the unreimbursed expense or indemnified loss, claim, damage, lia-

bility or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent) in its capacity as such, or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent) in connection with such capacity. The obligations of the Lenders under this subsection (c) are subject to the provisions of Section 2.10(d).

(d)    Waiver of Consequential Damages, Etc.  To the fullest extent permitted by applicable law, no Loan Party shall assert, and each Loan Party hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof. No Indemnitee referred to in subsection (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnitee as determined by a final and nonappealable judgment of a court of competent jurisdiction.

(e)    Payments.  All amounts due under this Section 11.04 shall be payable not later than ten Business Days after presentation of a reasonably detailed invoice therefor.

(f)    Survival.  The agreements in this Section 11.04 shall survive the resignation of the Administrative Agent, the replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations.

Section 11.05 Payments Set Aside.  To the extent that any payment by or on behalf of any Loan Party is made to the Administrative Agent or any Lender, or the Administrative Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect. The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

Section 11.06 Successors and Assigns.

(a)    Successors and Assigns Generally.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and

assigns permitted hereby, except that neither the Borrower nor any other Loan Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of Section 11.06(b) or (ii) by way of pledge or assignment of a security interest subject to the restrictions of Section 11.06(d) (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     Assignments by Lenders. Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment(s) and the Loans at the time owing to it); provided that any such assignment shall be subject to the following conditions:

(i)     Minimum Amounts.

(A)     in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment under the Facility and the Loans at the time owing to it under the Facility or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)     in any case not described in subsection (b)(i)(A) of this Section 11.06, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent, shall not be less than $[1,000,000]; provided, however, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met;

(ii)     Proportionate Amounts. Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Commitment assigned, except that this clause (ii) shall not prohibit any Lender from assigning all or a portion of its rights and obligations among separate Facilities on a non-pro rata basis;

(iii)     Required Consents. No consent shall be required for any assignment except to the extent required by subsection (b)(i)(B) of this Section 11.06 and, in addition:

(A)     the consent of the Borrower (such consent not to be unreasonably withheld, conditioned or delayed) shall be required unless (1) an Event of Default has oc-

curred and is continuing at the time of such assignment or (2) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund; provided that the Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within ten (10) Business Days after having received notice thereof;

        (B)    the consent of the Administrative Agent (such consent not to be unreasonably withheld, conditioned or delayed) shall be required for assignments in respect of (1) any Commitment (other than Commitments assigned to an Affiliate or an Approved Fund of such Lender) to a Person that is not a Lender with a Commitment in respect of the Facility, an Affiliate of any such Lender or an Approved Fund with respect to any such Lender or (2) any Loan to a Person that is not a Lender, an Affiliate of a Lender or an Approved Fund;

        (iv)    <u>Assignment and Assumption</u>. The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee in the amount of $[3,500]; provided, however, that (A) such processing and recordation fee shall not be payable in connection with any assignment by a Lender that was a Lender on the Closing Date or an Affiliate of any such Lender or a GSO Entity, Carl Marks Entity or Marblegate Entity and (B) the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment. The assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire, including but not limited to all documentation and other information with respect to the assignee that is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act.

        (v)    <u>No Assignment to Borrower</u>. No such assignment shall be made to any Loan Party or Subsidiary thereof.

        (vi)    <u>No Assignment to Natural Persons</u>. No such assignment shall be made to a natural person.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to subsection (c) of this <u>Section 11.06</u>, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of <u>Sections 3.01</u>, <u>3.04</u>, <u>3.05</u> and <u>11.04</u> with respect to facts and circumstances occurring prior to the effective date of such assignment. Upon request, the Borrower (at its expense) shall execute and deliver a Note to the assignee Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be null and void.

(c)    Register.  The Administrative Agent, acting solely for this purpose as an agent of the Borrower, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower and any Lender (solely to the extent of the provisions related to such Lender), at any reasonable time and from time to time upon reasonable prior notice.

(d)    Certain Pledges.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under any Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, the European Central Bank or any other central bank or similar monetary authority in the organizational jurisdiction of such Lender; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

Section 11.07 Treatment of Certain Information; Confidentiality.  Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective Related Parties (if such person is (i) a GSO Entity, then it may make disclosures to any other GSO Entity and its Related Parties or its Approved Funds, (ii) a Carl Marks Entity, then it may make disclosures to any other Carl Marks Entity and its Related Parties or its Approved Funds and (iii) a Marblegate Entity, then it may make disclosures to any other Marblegate Entity and its Related Parties or its Approved Funds) (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential, and it being further understood that the disclosing party shall be liable for any breaches of such confidentiality obligations by such disclosing party's current and prospective investors and funding sources to whom such disclosing party discloses Information), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it or any of its Affiliates (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section 11.07, to (i) any assignee or any prospective assignee of any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower and its obligations, (g) with the consent of the Borrower or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section 11.07 or (ii) becomes available to the Administrative Agent and any Lender, or any of their respective Affiliates on a nonconfidential basis from a source other than the Borrower.

For purposes of this Section 11.07, "Information" means all information received from any Loan Party or any Subsidiary thereof relating to any Loan Party or any Subsidiary thereof or their respective businesses, other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by any Loan Party or any Subsidiary thereof, provided that, in the case of information received from a Loan Party or any such Subsidiary after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section 11.07 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Administrative Agent and the Lenders acknowledges that (a) the Information may include material non-public information concerning the Borrower or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Law, including United States Federal and state securities Laws.

Section 11.08 Right of Setoff. If an Event of Default shall have occurred and be continuing each Lender and each of their respective Affiliates and Approved Funds is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of the Borrower or any other Loan Party against any and all of the obligations of the Borrower or such Loan Party now or hereafter existing under this Agreement or any other Loan Document to such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Borrower or such Loan Party may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness. The rights of each Lender and their respective Affiliates under this Section 11.08 are in addition to other rights and remedies (including other rights of setoff) that such Lender or their respective Affiliates may have. Each Lender agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

Section 11.09 Interest Rate Limitation. Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "Maximum Rate"). If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower. In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate,

and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

Section 11.10  Counterparts; Integration; Effectiveness.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy or other electronic imaging means shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 11.11  Survival of Representations and Warranties.  All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by the Administrative Agent and each Lender, regardless of any investigation made by the Administrative Agent or any Lender or on their behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

Section 11.12  Severability.  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 11.13  Replacement of Lenders.  If any Lender requests compensation under Section 3.04, or if the Borrower is required to pay any Indemnified Taxes or is required to pay any additional amount with respect to Indemnified Taxes to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, if any Lender is a Defaulting Lender or if any other circumstance exists hereunder that gives the Borrower the right to replace a Lender as a party hereto, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 11.06), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), provided that:

(a)     the Borrower shall have paid to the Administrative Agent the assignment fee specified in <u>Section 11.06(b)</u>;

(b)     such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under <u>Section 3.05</u>) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

(c)     in the case of any such assignment resulting from a claim for compensation under <u>Section 3.04</u> or payments required to be made pursuant to <u>Section 3.01</u>, such assignment will result in a reduction in such compensation or payments thereafter; and

(d)     such assignment does not conflict with applicable Laws.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

Section 11.14  <u>Governing Law; Jurisdiction; Etc.</u>

(a)     <u>GOVERNING LAW</u>. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK AND THE BANKRUPTCY CODE.

(b)     <u>SUBMISSION TO JURISDICTION</u>. THE BORROWER AND EACH OTHER LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT, OR IF THE BANKRUPTCY COURT DOES NOT HAVE OR DOES NOT EXERCISE JURISDICTION, THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH COURTS OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE ADMINISTRATIVE AGENT OR ANY LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST THE BORROWER OR ANY OTHER LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)    WAIVER OF VENUE. THE BORROWER AND EACH OTHER LOAN PAR-TY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HERE-AFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARIS-ING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCU-MENT IN ANY COURTS REFERRED TO IN PARAGRAPH (B) OF THIS SECTION 11.14. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULL-EST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVEN-IENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURTS.

(d)    SERVICE OF PROCESS. EACH PARTY HERETO IRREVOCABLY CON-SENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 11.02. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY AP-PLICABLE LAW

Section 11.15 Waiver of Jury Trial. EACH PARTY HERETO HEREBY IRREVOCA-BLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECT-LY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR AT-TORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHER-WISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 11.15.

Section 11.16 No Advisory or Fiduciary Responsibility. In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each Loan Party acknowledges and agrees, and acknowledges its Affiliates' understanding, that: (i) (A) the arranging and other services regarding this Agreement provided by the Administrative Agent are arm's-length com-mercial transactions between the Borrower, Holdings and their respective Affiliates, on the one hand, and the Administrative Agent, on the other hand, (B) each Loan Party has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) each Loan Party is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and (ii) (A) the Administrative Agent and each Lender is and has been acting solely as a principal and, ex-cept as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for any Loan Party or any of its Affiliates, or any other Person and (B) none of the Administrative Agent or the Lenders has any obligation to the Loan Parties or any of their respective Affiliates with respect to the transactions contemplated hereby

except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Administrative Agent and the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Loan Parties and their respective Affiliates, and none of the Administrative Agent or the Lenders has any obligation to disclose any of such interests to the Loan Parties or any of their respective Affiliates. To the fullest extent permitted by law, each of the Loan Parties hereby waives and releases any claims that it may have against the Administrative Agent the Lenders with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 11.17 <u>Electronic Execution of Assignments and Certain Other Documents</u>. The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption or in any amendment or other modification hereof (including waivers and consents) shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 11.18 <u>USA PATRIOT Act</u>. Each Lender that is subject to the Act (as hereinafter defined) and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act"), it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify each Loan Party in accordance with the Act. The Borrower shall, promptly following a request by the Administrative Agent or any Lender, provide all documentation and other information that the Administrative Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" an anti-money laundering rules and regulations, including the Act.

Section 11.19 <u>Conflicts</u>. In the event of any conflict between the terms and conditions of the Loan Documents and of the DIP Orders, the provisions of the DIP Orders shall govern and control.

Section 11.20 Acknowledgement and Consent to Bail-In of EEA Financial Institutions. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)      the effects of any Bail-In Action on any such liability, including, if applicable:

   (i)      a reduction in full or in part or cancellation of any such liability;

   (ii)      a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

   (iii)      the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers.

*IN WITNESS WHEREOF,* the parties hereto have caused this Agreement to be duly executed as of the date first above written.

<div style="margin-left:auto; max-width:60%;">

LOGAN'S ROADHOUSE, INC.

By: _____
      Name:
      Title:

LRI HOLDINGS, INC.

By: _____
      Name:
      Title:

LOGAN'S ROADHOUSE OF KANSAS, INC.

By: _____
      Name:
      Title:

LOGAN'S ROADHOUSE OF TEXAS, INC.

By: _____
      Name:
      Title:

ROADHOUSE PARENT INC.

By: _____
      Name:
      Title:

ROADHOUSE MIDCO INC.

By: _____
      Name:
      Title:

</div>

**[SIGNATURE PAGE TO DEBTOR-IN-POSSESSION CREDIT AGREEMENT]**

ROADHOUSE INTERMEDIATE INC.

By: _____

     Name:
     Title:

ROADHOUSE HOLDING INC.


By: _____

     Name:
     Title:

**[SIGNATURE PAGE TO DEBTOR-IN-POSSESSION CREDIT AGREEMENT]**

CORTLAND CAPITAL MARKET SERVICES LLC,
as Administrative Agent

By: _____

     Name:
     Title:

**[SIGNATURE PAGE TO DEBTOR-IN-POSSESSION CREDIT AGREEMENT]**

CH\1787007.23
22505703.11.BUSINESS