**THIS PROPOSED DISCLOSURE STATEMENT IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION DESCRIBED HEREIN.   ACCEPTANCES AND REJECTIONS OF THAT PLAN MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.   THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL, BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.**

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ROADHOUSE HOLDING INC., *et al.*,[1] | Case No. 16-11819 (BLS) |
| Debtors. | (Jointly Administered) |

## DISCLOSURE STATEMENT FOR DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Robert S. Brady (No. 2847)
Edmon L. Morton (No. 3856)
Ryan M. Bartley (No. 4985)
Elizabeth S. Justison (No. 5911)
Norah M. Roth-Moore (No. 6125)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Tel:    (302) 571-6600
Fax:    (302) 571-1253

Counsel for the Debtors and Debtors-in-Possession

Dated:    September 28, 2016
        Wilmington, Delaware

---

[1]   The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:  Roadhouse Holding Inc. (5939); Roadhouse Intermediate Inc. (6159); Roadhouse Midco Inc. (6337); Roadhouse Parent Inc. (5108); LRI Holdings, Inc. (4571); Logan's Roadhouse, Inc. (2074); Logan's Roadhouse of Texas, Inc. (2372); and Logan's Roadhouse of Kansas, Inc. (8716).  The location of the Debtors' corporate headquarters is 3011 Armory Drive, Suite 300, Nashville, Tennessee 37204.

# TABLE OF CONTENTS

**Page**

**ARTICLE I.   INTRODUCTION**.................................................................................. **1**
   A.  General Background ........................................................................ 1
   B.  Holders Entitled to Vote ............................................................... 6
   C.  Voting Procedures......................................................................... 8
   D.  Recommendation ......................................................................... 10

**ARTICLE II.  OVERVIEW OF THE PLAN**............................................................. **10**

**ARTICLE III. OVERVIEW OF CHAPTER 11** ....................................................... **13**

**ARTICLE IV.  COMPANY BACKGROUND**........................................................... **14**
   A.  History of the Debtors................................................................. 14

**ARTICLE V.  EVENTS LEADING UP TO THE COMMENCEMENT OF THE
CHAPTER 11 CASES** ............................................................................... **16**

**ARTICLE VI.  THE CHAPTER 11 CASES** ........................................................... **18**
   A.  Significant "First Day" Motions ................................................ 18
   B.  Retention of Professionals ......................................................... 19
   C.  Official Committee of Unsecured Creditors ............................... 20
   D.  DIP Facilities ............................................................................. 20
   E.  Assumption/Rejection of Leases and Executory Contracts ........ 21
   F.  Employment-Related Compensation ......................................... 21
   G.  The Restructuring Support Agreement ...................................... 22
   H.  Claims Process .......................................................................... 22
   I.  Global Settlement of Creditors' Committee's Objections .......... 23

**ARTICLE VII. SUMMARY OF THE PLAN** ......................................................... **23**
   A.  Introduction............................................................................... 23
   B.  General Rules of Classification ................................................. 24
   C.  Treatment of Certain Unclassified Claims................................. 25
   D.  Classification and Treatment of Claims and Equity Interests...... 27
   E.  Provisions Regarding Corporate Governance of the Reorganized Debtors.................. 32
   F.  Substantive Consolidation of the Debtors.................................. 33
   G.  Provisions Regarding Means of Implementation, Voting, Distributions, and
Resolution of Disputed Claims ................................................. 36
   H.  Executory Contracts and Unexpired Leases .............................. 46
   I.  Effect of Confirmation of the Plan............................................ 50
   J.  Effectiveness of the Plan........................................................... 55
   K.  Retention of Jurisdiction ........................................................... 58

# TABLE OF CONTENTS
(continued)

Page

L.   Miscellaneous Provisions.................................................................... 59

**ARTICLE VIII.   FINANCIAL PROJECTIONS AND VALUATION ANALYSIS ............ 65**

A.   Financial Projections..................................................................... 65

B.   Valuation Analysis ......................................................................... 66

**ARTICLE IX.   CERTAIN RISK FACTORS TO BE CONSIDERED.................................. 66**

A.   Certain Risks Relating to the New Stock......................................... 66

B.   Projected Financial Information ...................................................... 68

C.   Risks Related to the Debtors' Business and Operations.................... 68

D.   Financial Risks ............................................................................... 77

E.   Certain Bankruptcy Law Considerations......................................... 78

**ARTICLE X.   CONFIRMATION PROCEDURE .................................................. 83**

A.   Solicitation of Votes ...................................................................... 83

B.   The Confirmation Hearing.............................................................. 84

C.   Confirmation .................................................................................. 85

**ARTICLE XI.   ALTERNATIVES TO CONFIRMATION AND
CONSUMMATION OF THE PLAN .................................................................. 88**

A.   Alternative Plan of Reorganization Under Chapter 11 .................... 88

B.   Liquidation Under Chapter 7 or Chapter 11 ................................... 89

**ARTICLE XII.   SECURITIES LAWS MATTERS .............................................. 90**

**ARTICLE XIII.   TAX MATTERS ................................................................... 91**

A.   Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of
Claims ............................................................................................ 93

B.   Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors............... 98

C.   Alternative Minimum Tax ............................................................. 102

**ARTICLE XIV.   CONCLUSION .................................................................. 102**

## Exhibits

A.  Debtors' First Amended Joint Plan of Reorganization
B.  Disclosure Statement Order, excluding certain exhibits
C.  Restructuring Support Agreement
D.  Financial Projections
E.  Valuation Discussion
F.  Liquidation Analysis

THIS DISCLOSURE STATEMENT (THIS "**DISCLOSURE STATEMENT**") HAS BEEN PREPARED FOR THE PURPOSE OF PROVIDING CERTAIN APPLICABLE INFORMATION TO CREDITORS OF THE DEBTORS WHO, AS DESCRIBED HEREIN, ARE ENTITLED TO VOTE WHETHER TO ACCEPT OR REJECT THE DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION (THE "**PLAN**").  A COPY OF THE PLAN IS ATTACHED AS **EXHIBIT A** HERETO.  THIS DISCLOSURE STATEMENT INCLUDES, AMONG OTHER THINGS, A SUMMARY OF THE PLAN, AS WELL AS SUMMARIES OF CERTAIN OTHER MATERIALS REFERENCED IN THIS DISCLOSURE STATEMENT INCLUDING (AMONG OTHER THINGS) CERTAIN OTHER DOCUMENTS ATTACHED AS EXHIBITS TO THIS DISCLOSURE STATEMENT OR ATTACHED AS EXHIBITS TO THE *PLAN SUPPLEMENT*[2] REFERENCED IN THIS DISCLOSURE STATEMENT.  THE SUMMARIES AND OTHER INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THOSE OTHER EXHIBITS TO THIS DISCLOSURE STATEMENT, AND THE EXHIBITS TO THE PLAN SUPPLEMENT.

PERSONS ENTITLED TO VOTE WHETHER TO ACCEPT OR REJECT THE PLAN ARE ADVISED AND ENCOURAGED TO READ, IN THEIR ENTIRETY, THIS DISCLOSURE STATEMENT, THE PLAN ATTACHED AS AN EXHIBIT HERETO, AND THE OTHER EXHIBITS HERETO OR THERETO, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**ALL PERSONS ENTITLED TO VOTE SHOULD READ CAREFULLY THE SECTION OF THIS DISCLOSURE STATEMENT DESCRIBING CERTAIN APPLICABLE RISK FACTORS SET FORTH IN ARTICLE IX, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF (UNLESS OTHERWISE SPECIFIED), AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH APPLICABLE DATE.  THE DEBTORS DO NOT WARRANT THAT THE STATEMENTS OR INFORMATION CONTAINED HEREIN ARE WITHOUT ANY INACCURACY OR OMISSION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE, AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE LAW.  THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "**SEC**"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.  PERSONS TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTORS

---

[2]    Terms that are defined in the Plan or in the Disclosure Statement (other than defined terms commonly used herein) will appear in italics when presented in all-capitalized typeface herein.

SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSES FOR WHICH THEY WERE PREPARED.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF THE DETERMINATION BY HOLDERS OF CLAIMS AGAINST THE DEBTORS WHO ARE ENTITLED TO VOTE ON ACCEPTANCE OR REJECTION OF THE PLAN AS TO WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY OTHER PERSON OR FOR ANY OTHER PURPOSE. AS DESCRIBED IN GREATER DETAIL BELOW, NOT ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS ARE ENTITLED TO VOTE ON WHETHER TO ACCEPT OR REJECT THE PLAN. ALSO AS DESCRIBED IN GREATER DETAIL BELOW, HOLDERS OF EQUITY INTERESTS IN THE DEBTORS ARE NOT ENTITLED TO VOTE ON ACCEPTANCE OR REJECTION OF THE PLAN, EXCEPT INSOFAR AS ANY SUCH HOLDER ALSO HOLDS CLAIMS THAT GIVE RISE TO ANY SUCH VOTING RIGHT.

IN THE EVENT OF ANY INCONSISTENCY OR AMBIGUITY BETWEEN THE TERMS OF THE PLAN ITSELF AND THE SUMMARY OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN SHALL GOVERN. ALL EXHIBITS TO THIS DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

AS TO CONTESTED MATTERS, EXISTING LITIGATION INVOLVING, OR POSSIBLE ADDITIONAL LITIGATION TO BE BROUGHT BY, OR AGAINST, THE DEBTORS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION, OR A WAIVER, BUT RATHER AS A STATEMENT MADE WITHOUT PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH FULL RESERVATION OF RIGHTS, AND IS NOT TO BE USED FOR ANY LITIGATION PURPOSE WHATSOEVER BY ANY PARTY IN INTEREST OR OTHER PERSON. ACCORDINGLY, THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NONBANKRUPTCY PROCEEDING INVOLVING ANY DEBTOR OR ANY OTHER PARTY IN INTEREST, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, FINANCIAL OR OTHER EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST THE DEBTORS OR HOLDERS OF EQUITY INTERESTS IN THE DEBTORS.

# ARTICLE I.

# INTRODUCTION

## A.    General Background

On August 8, 2016, (the "**Petition Date**"), Roadhouse Holding Inc., a Delaware corporation ("**Holding**"),[3] along with seven (7) direct and indirect subsidiary corporations of Holding (collectively, referred to herein and in the Plan as the "**Debtors**"), filed voluntary petitions (the "**Petitions**") for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**") with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**").[4] Upon the filing of the Petitions, the Debtors' respective reorganization cases under the Bankruptcy Code (the "**Chapter 11 Cases**") commenced.  As described in greater detail below, on August 9, 2016, the Bankruptcy Court ordered that the Chapter 11 Cases be consolidated for administrative purposes only.

In addition to Holding, the Debtors include the following seven (7) direct and indirect Holding subsidiaries:

--    Roadhouse Intermediate Inc. a Delaware corporation ("**Intermediate**");

--    Roadhouse Midco Inc., a Delaware corporation ("**Midco**");

--    Roadhouse Parent Inc., a Delaware corporation ("**Parent**");

--    LRI Holding, Inc., a Delaware Corporation ("**LRI Holdings**");

--    Logan's Roadhouse, Inc., a Tennessee corporation ("**Logan's Roadhouse**");

--    Logan's Roadhouse of Texas, Inc., a Texas corporation ("**Logan's Texas**");

--    Logan's Roadhouse of Kansas, Inc., a Kansas corporation ("**Logan's Kansas**");

Contemporaneously herewith, the Debtors filed with the Bankruptcy Court the "Debtors' First Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code," dated September 29, 2016 (the "**Plan**").  All capitalized terms used in this Disclosure Statement but not defined herein have the respective meanings ascribed to such terms in the Plan.  A complete copy of the Plan is attached as **Exhibit A** to this Disclosure Statement.

This Disclosure Statement is being submitted pursuant to section 1125 of the Bankruptcy Code for use by those entitled to vote on whether to accept or reject the Plan in connection with

---

[3]    References in this Disclosure Statement to Holding or to any other Debtor include such Person, as in existence prior to the commencement of the Chapter 11 Cases and as a debtor and a debtor-in-possession during the pendency of the Chapter 11 Cases.  Where applicable, however, this Disclosure Statement instead makes reference to such entity as a reorganized entity (*e.g.*, "**Reorganized Holding**") when necessary or appropriate to reference such entity as constituted following its emergence from its respective Chapter 11 Case.

[4]    References in this Disclosure Statement to the "Docket" are to the Docket maintained in the Chapter 11 Cases.  The Docket can be accessed at www.donlinrecano.com/logans, a website maintained by the Debtors' claims and noticing agent.  Alternatively, the Docket can be inspected in the office of the Clerk of the Bankruptcy Court (or on a website maintained by the Bankruptcy Court).

(a) the solicitation by the Debtors of acceptances of the Plan and (b) the hearing by the Bankruptcy Court to consider confirmation of the Plan (the "**Confirmation Hearing**").

The Plan sets forth the manner in which Claims against the Debtors and Equity Interests in the Debtors are proposed to be treated in connection with the reorganization of the Debtors in connection with the Chapter 11 Cases.  This Disclosure Statement describes certain aspects of the Plan, and also provides a general description of the Debtors' business as well as information regarding various other matters relevant to the purpose for which this Disclosure Statement has been prepared.  This Disclosure Statement is intended to provide sufficient information to enable those who are entitled to vote on the acceptance or rejection of the Plan, as explained below, to make an informed decision in connection with that vote.  Among other things, this Disclosure Statement describes:

- in summary form how the Plan treats holders of Claims against, and Equity Interests in, the Debtors (Article II);

- how Chapter 11 works (Article III);

- the Debtors' business and prepetition capital structure (Article IV);

- the events leading up to the  commencement of the Chapter 11 Cases (Article V);

- significant events in the Chapter 11 Cases (Article VI);

- the matters dealt with under the Plan (Article VII);

- certain projections and valuations (Article VIII);

- certain risk factors to be considered before voting on the Plan (Article IX);

- the procedures for confirming the Plan (Article X);

- alternatives to confirmation and consummation of the Plan (Article XI);

- certain securities laws matters regarding the Plan (Article XII); and

- certain U.S. federal income tax consequences of the Plan (Article XIII).

This Disclosure Statement has been carefully prepared in order to, among other things, describe the material aspects of the Plan, but it is not intended to override the Plan or any aspect of it.  Accordingly, in the event there are any inconsistencies or ambiguities between the Plan itself and the descriptions of the Plan contained in this Disclosure Statement, the terms of the Plan will govern.  The Plan and this Disclosure Statement, along with the other exhibits attached to this Disclosure Statement, and the exhibits attached to the Plan, are the only materials that those who are entitled to vote on acceptance or rejection of the Plan should use in determining how to vote.

The Plan is the product of extensive negotiations among the Debtors and certain of their major creditor constituencies. As described in more detail in Article V below, effective as of August 8, 2016, the Debtors entered into the Restructuring Support Agreement with the Supporting Parties. Those Supporting Parties are (w) the Debtors' prepetition Revolving Facility Agent, (x) the Debtors' prepetition Revolving Facility Lenders, (y) more than 83.9% of the aggregate outstanding principal amount of Notes, and (z) holders of more than 97% of the outstanding Equity Interests in the Debtors. Pursuant to the Restructuring Support Agreement, the Supporting Parties agreed to support a financial restructuring of the Debtors' outstanding indebtedness, obligations, and capital structure on the terms set forth in the Plan and described in this Disclosure Statement.

**AS DISCUSSED IN ARTICLE VI.I., THE PLAN REFLECTS A GLOBAL SETTLEMENT REACHED BY THE DEBTORS, THE CREDITORS' COMMITTEE AND THE PARTIES TO THE RESTRUCTURING SUPPORT AGREEMENT THAT PROVIDES, AMONG OTHER THINGS, FOR INCREASED RECOVERIES TO HOLDERS OF GENERAL UNSECURED CLAIMS THAN WHAT WAS PROVIDED UNDER THE CHAPTER 11 PLAN FILED WITH THE BANKRUPTCY COURT ON AUGUST 16, 2016, WAIVER OF ANY NOTES DEFICIENCY CLAIM AND GENERAL UNSECURED CLAIMS OF THE SUPPORTING PARTIES, PROVIDES FOR IMPROVEMENTS TO THE REORGANIZED DEBTORS' FINANCIAL POSITION POST-EMERGENCE, AND THE RELEASE AND WAIVER BY THE DEBTORS OF AVOIDANCE ACTIONS. AS A RESULT OF THOSE IMPROVEMENTS, THE CREDITORS' COMMITTEE SUPPORTS THE PLAN, INCLUDING THE SETTLEMENTS AND RELEASES EMBODIED THEREIN, AND RECOMMENDS THAT HOLDERS OF GENERAL UNSECURED CLAIMS VOTE TO ACCEPT THE PLAN.**

As discussed in more detail in Article VII below, the Plan contemplates that the voting on and confirmation of the Plan, as well as Distributions to holders of Claims in the Chapter 11 Cases, would be effected under the Plan as though the Estates of the Debtors were consolidated for such purposes.

After careful consideration of the Debtors' business and assets, and their prospects for reorganization, as well as the alternatives to reorganization, the Debtors have determined that the recoveries to creditors will be maximized by utilizing the treatment established under the Plan. The Debtors further have determined it is not possible to afford any recovery at all to holders of Equity Interests in the Debtors (apart from the pre-existing direct and indirect intercompany ownership interests, which are preserved under the Plan), whether under the reorganization proposed in the Plan or in any liquidation alternative.

The following additional materials are attached as Exhibits to this Disclosure Statement:

1. as "**Exhibit A**," a copy of the Plan, including the exhibits thereto (excluding the Plan Supplement);

2. as "**Exhibit B**," a copy of the Disclosure Statement Order (excluding the exhibits thereto), dated [_____], 2016, that, among other things, approves

this Disclosure Statement, establishes procedures for the solicitation and tabulation of votes to accept or reject the Plan, and schedules the hearing on confirmation of the Plan;

3. as "**Exhibit C**," a copy of the Restructuring Support Agreement, including the "**Exit Second Lien Financing Term Sheet**" as Exhibit B thereto, the "**Exit First Lien Financing Term Sheet**," as Exhibit E thereto, and the "**Governance Term Sheet**," as Exhibit F thereto;

4. as "**Exhibit D**," the "**Financial Projections**" prepared by the Debtors' management for the Reorganized Debtors through 2019;

5. as "**Exhibit E**," the "**Valuation Discussion**" prepared by Jefferies, LLC ("**Jefferies**");

6. as "**Exhibit F**," the "**Liquidation Analysis**" prepared by the Debtors; and

7. as "**Exhibit G**," a copy of the "Confirmation Hearing Notice."

To the extent this Disclosure Statement is being submitted to a holder of a Claim that is entitled to vote to accept or reject the Plan, this Disclosure Statement also is accompanied by a Ballot to be used by such holder in connection with that vote. As further described below, holders of certain categories of Claims against, and Equity Interests in, the Debtors automatically are deemed to have accepted the Plan or to have rejected it, depending on the particular category of Claims or Equity Interests. Holders of Claims and Equity Interests that are deemed to have accepted or rejected the Plan are not entitled to vote to accept or reject the Plan.

In addition to the exhibits attached to this Disclosure Statement and the exhibits attached to the Plan, the Debtors anticipate there will be certain additional materials that are necessary or appropriate to the implementation and/or confirmation of the Plan. Those additional materials are summarized in this Disclosure Statement, to the extent now known or reasonably determinable; and copies of those materials (in final or substantially final form), or summaries thereof, will be contained in the Plan Supplement. The Plan Supplement will be filed by the Debtors with the Clerk of the Bankruptcy Court no later than seven (7) days before the deadline to objection to confirmation of the Plan, or such later date as may be approved by the Court. Once so filed, the Plan Supplement will be available free of charge on the website for these chapter 11 cases maintained by the Debtor' claims agent (http://www.donlinrecano.com/logans), for inspection at the Office of the Clerk of the Court, 3rd Floor, 824 N. Market Street, Wilmington, Delaware 19801, or on the internet for a fee at the Court's website (http://www.deb.uscourts.gov/) by following directions for accessing the Court's electronic filing system on such website.

This Disclosure Statement also contains information about the Debtors and their business, including certain financial information. Prior to the commencement of the Chapter 11 Cases, LRI Holdings had been filing certain information, including financial information, with the SEC on its Edgar database, at the following address: https://www.sec.gov/cgi-bin/browse-edgar?action=getcompany&CIK=0001383875&owner=exclude&count=40. However, LRI Holdings failed to file certain information, including but not limited to its Annual Report on

Form 10-K for the transition period ended December 30, 2015 (which was required to contain, among other things, annual audited financial statements for such fiscal year), in the months leading up to the filing of the Petitions. No further filings have been made with the SEC since the commencement of the Chapter 11 Cases. Accordingly, the information contained in the SEC's Edgar database may be useful for historical information but should not be regarded as containing current information (financial or otherwise) about the Debtors or their business. CAUTION SHOULD BE USED IN RELYING UPON THE INFORMATION, INCLUDING THE FINANCIAL INFORMATION THAT IS AVAILABLE ABOUT THE DEBTORS ON THE SEC'S EDGAR DATABASE.

On [_____], 2016, after notice and a hearing, the Bankruptcy Court entered the Disclosure Statement Order, determining that this Disclosure Statement contains "adequate information" (as that term is defined in section 1125 of the Bankruptcy Code). Section 1125(a)(1) of the Bankruptcy Code defines "adequate information" as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and the history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material U.S. federal income tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information . . . ." 11 U.S.C. §1125(a)(1). NO STATEMENTS OR INFORMATION CONCERNING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY HAVE BEEN AUTHORIZED, OTHER THAN THE STATEMENTS AND INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT <u>AND</u> THE INFORMATION ACCOMPANYING OR SUPPLEMENTING THIS DISCLOSURE STATEMENT (INCLUDING THE PLAN AND THE PLAN SUPPLEMENT). ALL OTHER STATEMENTS REGARDING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY, WHETHER WRITTEN OR ORAL, ARE UNAUTHORIZED AND SHOULD NOT BE RELIED UPON.

APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S ENDORSEMENT OF THE PLAN. THE BANKRUPTCY COURT MAKES NO DETERMINATION AS TO THE FAIRNESS OR MERITS OF THE PLAN.

The Disclosure Statement Order sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, the record dates for voting purposes, and the applicable standards for tabulating Ballots. In the event of any discrepancy between the provisions of the Disclosure Statement Order and the summary thereof contained in this Disclosure Statement, the provisions of the Disclosure Statement Order will govern. In addition, detailed voting instructions will accompany each Ballot. Each person entitled to vote on acceptance or rejection of the Plan should read in their entirety this Disclosure Statement (including the exhibits hereto), the Plan (including the exhibits thereto) and Plan Supplement, the Disclosure Statement Order, and the instructions

accompanying the Ballot(s) received by such person before voting on whether to accept or reject the Plan. These documents contain, among other things, important information concerning the classification of Claims and Equity Interests for voting purposes and the tabulation of votes. No solicitation of votes to accept or reject the Plan may be made except pursuant to section 1125 of the Bankruptcy Code.

### B.    Holders Entitled to Vote

Not all holders of claims against a debtor and holders of equity interests in that debtor are entitled to vote to accept or reject a proposed reorganization plan. Rather, the Bankruptcy Code limits the right to vote to holders of claims against that debtor, or holders of equity interests in that debtor, that are regarded as being "allowed" (within the meaning of section 502 of the Bankruptcy Code), and only where those allowed claims or equity interests have been classified in classes of claims or equity interests that are regarded as being "impaired" (within the meaning of section 1124 of the Bankruptcy Code) by the treatment proposed under that reorganization plan, with certain exceptions described below. Where an allowed claim or equity interest is classified in a class that is regarded as unimpaired under the proposed reorganization plan, the holder of that claim or equity interest is not entitled to vote to accept or reject the plan and instead automatically is conclusively presumed to have accepted the plan. Correspondingly, where an allowed claim or equity interest is classified in a class that is regarded as impaired under the proposed reorganization plan <u>and</u> the plan provides that the holders of allowed claims or equity interests in that class will not be entitled to receive or retain any property on account of such claims or equity interests (sometimes known as being "wiped out"), the holder of such claim or equity interest is not entitled to vote to accept or reject the plan and instead automatically is deemed to have rejected the plan. In addition, the Bankruptcy Code provides that certain specific categories of allowed claims against a debtor need not be classified for purposes of a plan of reorganization; and, where those categories of unclassified allowed claims are unimpaired under the reorganization plan, the holders of such claims do not actually vote on acceptance or rejection and instead automatically are conclusively presumed to have accepted the plan.

In the Chapter 11 Cases, the Plan establishes four (4) categories of unclassified Claims against the Debtors, eight (8) classes of Claims against the Debtors, and two (2) classes of Equity Interests in the Debtors. Of those 14 categories of Claims and Equity Interests, only holders of Claims in four (4) categories are entitled to vote to accept or reject the Plan. The other eleven (11) categories are conclusively presumed to have accepted the Plan or are deemed to have rejected it. As more fully summarized in Article II below (and described in detail in Article VII below):

• Administrative Claims, Professional Fee Claims, Priority Tax Claims, and DIP Facilities Claims are unclassified and Unimpaired under the Plan. Accordingly, holders of Allowed Claims in those categories are not entitled to vote to accept or reject the Plan and instead are conclusively presumed to have accepted the Plan.

• Class 1 (Other Priority Claims), Class 2 (Other Secured Claims), Class 7 (Intercompany Claims), and Class 10 (Intercompany Interests) are Unimpaired under the Plan. Accordingly, holders of Allowed Claims and Allowed Equity Interests in those Classes are not

entitled to vote to accept or reject the Plan and instead are conclusively presumed to have accepted the Plan.

• Class 8 (Subordinated Claims) and Class 9 (Existing Equity Interests) are Impaired under the Plan, and the holders of Claims in Class 8 and Existing Equity Interests in Class 9 will not be entitled to receive or retain any property on account of such Claims and Equity Interests. Accordingly, holders of Claims in Class 8 and Existing Equity Interests in Class 9 are not entitled to vote to accept or reject the Plan and instead are deemed to have rejected the Plan; and

• Class 3 (Revolving Facility Lender Claims),[5] Class 4 (GSO Notes Claims and Kelso Notes Claims), Class 5 (Unexchanged Notes Claims), and Class 6 (General Unsecured Claims) are Impaired under the Plan. Accordingly, to the extent Claims in those Classes are not the subject of an objection or request for estimation which remains pending, holders of Allowed Claims in each of those Classes are entitled to vote to accept or reject the Plan.

A BALLOT TO BE USED IN VOTING TO ACCEPT OR REJECT THE PLAN WILL BE PROVIDED ONLY TO HOLDERS OF CLAIMS IN THE CLASSES THAT ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN, AS FOLLOWS:

• Class 3 (Revolving Facility Lender Claims);[6]

• Class 4 (GSO Notes Claims and Kelso Notes Claims);

• Class 5 (Unexchanged Notes Claims); and

• Class 6 (General Unsecured Claims).

The Bankruptcy Code defines "acceptance" of a reorganization plan by a class of allowed claims as acceptance by creditors in that class that hold at least two-thirds in aggregate dollar amount of claims in such class and represent more than one-half in number of the allowed claims in such class that cast ballots for acceptance or rejection of that reorganization plan. For a more detailed description of the requirements for confirmation of the Plan, see Article X below.

Two Classes, Class 8 (Subordinated Claims) and Class 9 (Existing Equity Interests), automatically are deemed to have rejected the Plan. Accordingly, the Debtors intend to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code. Section 1129(b) permits the Bankruptcy Court to confirm a plan of reorganization notwithstanding the nonacceptance of that plan by one or more impaired classes of claims or equity interests. Under section 1129(b), a plan may be confirmed as long as such plan does not "discriminate unfairly"

---

[5]    Class 3 is only Impaired if the Debtors do not obtain an Alternative Exit Facility.

[6]    Class 3 is only entitled to vote to accept or reject the Plan to the extent that the Debtors do not obtain an Alternative Exit Facility. If the Debtors do obtain an Alternative Exit Facility, Class 3 will be Unimpaired and will not be entitled to vote to accept or reject the Plan and instead will be conclusively presumed to have accepted the Plan.

and is "fair and equitable" with respect to each non-accepting class. The requirements for confirmation of a nonconsensual plan are described more fully in Article X below.

### C.    Voting Procedures

On [_____], 2016, the Bankruptcy Court entered the Disclosure Statement Order, among other things, approving this Disclosure Statement, setting voting procedures and scheduling the Confirmation Hearing. A copy of the Disclosure Statement Order is attached as **Exhibit B** to this Disclosure Statement and a copy of the Confirmation Hearing Notice is attached as **Exhibit G** to this Disclosure Statement. The Confirmation Hearing Notice sets forth in detail, among other things, the voting deadlines and objection deadlines with respect to the Plan. The Confirmation Hearing Notice and the instructions attached to the Ballot should be read in conjunction with this section of the Disclosure Statement.

If you are a holder of an Allowed Claim that is entitled to vote to accept or reject the Plan, a Ballot is enclosed with this Disclosure Statement for the purpose of casting your vote. If you hold an Allowed Claim in more than one Class that is entitled to vote to accept or reject the Plan, you will receive a separate Ballot for each Class in which you hold an Allowed Claim. In order for your Ballot to be counted, you must use the particular Ballot pertaining to the particular Class of Allowed Claims. The Debtors urge you to vote and return your Ballot(s) by no later than 5:00 p.m., prevailing Eastern Time, on November 2, 2016 (the "**Voting Deadline**"), in accordance with the instructions accompanying your Ballot(s) and described in this section.

With the approval of the Bankruptcy Court [Docket Nos. 48, 195], the Debtors have retained Donlin, Recano & Company, Inc. ("**DRC**") as their claims, balloting, and noticing agent for purposes of the Chapter 11 Cases. If you received a Ballot(s) from the Debtors (or from DRC on behalf of the Debtors), please vote and return your Ballot(s) directly to DRC at the following addresses:

> **If by regular mail, to**:
> Donlin, Recano & Company, Inc.
> Re: Roadhouse Holding Inc.
> Attention: Voting Department
> P.O. Box 192016
> Blythebourne Station, New York, NY 11219;

> **If by hand delivery or overnight mail, to**:
> Donlin, Recano & Company, Inc.
> Re: Roadhouse Holding Inc.
> Attention: Voting Department
> 6201 15th Avenue
> Brooklyn, New York 11219.

If you did not receive your Ballot(s) directly from the Debtors (or from DRC on behalf of the Debtors), and instead received such Ballot(s) from a broker, bank, dealer, or other agent or nominee (each, a "**Voting Nominee**"), please <u>do not</u> return those completed original Ballot(s) directly to DRC. Instead, you must return your original Ballot(s) to your Voting Nominee. Your

Ballot(s) must be returned promptly, so that your Voting Nominee can forward your Ballot(s) to DRC for receipt by DRC by the Voting Deadline. Notwithstanding the foregoing, if you received a "prevalidated" Ballot from your Voting Nominee, such ballot should be returned directly to DRC if you are instructed by your Voting Nominee to do so.

PLEASE RETURN YOUR *BALLOT*(S) ONLY. DO NOT ALSO RETURN ANY PROMISSORY NOTE OR OTHER INSTRUMENTS OR AGREEMENTS THAT YOU MAY HAVE RELATING TO YOUR CLAIM.

TO BE COUNTED, YOUR DULY COMPLETED *BALLOT*(S)—INDICATING ACCEPTANCE OR REJECTION OF THE PLAN—MUST BE ACTUALLY RECEIVED BY *DRC* NO LATER THAN THE *VOTING DEADLINE*. *BALLOTS* NOT ACTUALLY RECEIVED BY *DRC* BY THE *VOTING DEADLINE* WILL NOT BE COUNTED, EVEN IN THE CASE OF *BALLOTS* THAT FIRST MUST BE RETURNED TO AN APPLICABLE *VOTING NOMINEE*. IN THE CASE OF *BALLOTS* WHICH FIRST MUST BE RETURNED TO AN APPLICABLE *VOTING NOMINEE*, CARE MUST BE TAKEN TO RETURN ANY SUCH *BALLOT*(S) TO SUCH *VOTING NOMINEE* IN SUFFICIENT TIME SO SUCH *BALLOT*(S) THEN CAN BE DELIVERED BY SUCH *VOTING NOMINEE* TO *DRC* BY THE *VOTING DEADLINE*. Any Ballot not received by DRC by the Voting Deadline (including, without limitation, where a Voting Nominee timely received a duly completed Ballot from the beneficial owner of the Claim being voted but failed to return it to DRC by the Voting Deadline) shall not be counted unless the Debtors in their discretion (with the consent of the Required Supporting Noteholders and the Supporting Lenders) determine to extend the deadline to submit votes on the Plan, and except insofar as the Bankruptcy Court may order otherwise.

Any Claim in Class 6 (General Unsecured Claims) to which an objection or request for estimation is filed on or prior to October 21, 2016 shall not be entitled to vote (unless the holder of such Claim has obtained an order of the Bankruptcy Court temporarily allowing such Claim for the purpose of voting on the Plan). In addition, the Debtors propose that Ballots cast by alleged creditors who have timely filed proofs of claim in wholly contingent or unliquidated amounts (as may be reasonably determined by the Debtors or DRC) that are not the subject of an objection filed by the Debtors, will have their Ballots counted towards satisfying the numerosity requirement, but not also toward satisfying the aggregate claim amount requirement (and shall only have their claim tabulated in the amount of $1.00), of section 1126(c) of the Bankruptcy Code. The numerosity and aggregate claim amount requirements of section 1126(c) are further described in Article X below.

In the Disclosure Statement Order, the Bankruptcy Court set September 28, 2016 at 5:00 p.m. (prevailing Eastern Time) as the record date for holders of Notes (the "**Notes Voting Record Date**"), and September 28, 2016 at 5:00 p.m. (prevailing Eastern Time) as the record date for holders of General Unsecured Claims (the "**GUC Voting Record Date**," and together with the Notes Voting Record Date, the "**Voting Record Dates**"), for purposes of voting on the Plan. Accordingly, only holders of record, as of the Voting Record Dates, of Allowed Claims otherwise entitled to vote to accept or reject the Plan will receive a Ballot and be entitled vote on the Plan. If, as of the applicable Voting Record Date, you were a holder of an Allowed Claim entitled to vote on the Plan and did not receive a Ballot(s), received a damaged Ballot(s) or lost your Ballot(s), or if you have any questions concerning the procedures for voting on the Plan,

please contact DRC, at (212) 771-1128 from 9:00 a.m. to 5:00 p.m., prevailing Eastern Time, excluding weekends and holidays, sufficiently in advance of the deadline referenced above for receipt back of duly completed Ballots.

### D.    Recommendation

THE DEBTORS BELIEVE THAT THE PLAN WILL ENABLE THEM TO REORGANIZE SUCCESSFULLY AND TO ACCOMPLISH THE OBJECTIVES OF CHAPTER 11, AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CREDITORS.  THE DEBTORS RECOMMEND THAT CREDITORS VOTE TO ACCEPT THE PLAN.

AS A RESULT OF THE GLOBAL SETTLEMENT EMBODIED IN THE FINAL DIP ORDER AND PLAN, AND DESCRIBED IN ARTICLE VI.I. OF THIS DISCLOSURE STATEMENT, THE CREDITORS' COMMITTEE RECOMMENDS THAT HOLDERS OF GENERAL UNSECURED CLAIMS VOTE TO ACCEPT THE PLAN.

## ARTICLE II.

## OVERVIEW OF THE PLAN

The following table briefly summarizes how the Plan classifies and treats Allowed Claims and Equity Interests, and also provides the estimated Distributions to be received by the holders of Allowed Claims and Equity Interests in accordance with the Plan:

| Class | Designation | Impaired | Treatment of Allowed Claims and Interests | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|---|
| -- | Administrative Claims, including Professional Fee Claims | No | Except to the extent a holder of an Allowed Administrative Claim already has been paid during the Chapter 11 Cases or such holder, together with the Debtors and the Required Supporting Noteholders, agrees to less favorable treatment with respect to such holder's Claim, each holder of an Allowed Administrative Claim shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, its Administrative Claim, Cash equal to the unpaid portion of its Allowed Administrative Claim (but not to exceed the Creditors' Committee Claims Cap in the case of Professional Fee Claims held by the Professionals retained by the Creditors' Committee), to be paid on the latest of:  (a) the Effective Date, or as soon as reasonably practicable thereafter, if such Administrative Claim is Allowed as of the Effective Date; (b) the date such Administrative Claim is Allowed, or as soon as reasonably practicable thereafter; (c) the date such Allowed Administrative Claim becomes due and payable, or as soon as reasonably practicable thereafter; and (d) such other date as may be agreed upon between the holder of such Allowed Administrative Claim and the Debtors (with the consent of the Required Supporting Noteholders) or the Reorganized Debtors, as the case may be. | No (conclusively presumed to accept) | 100% |
| -- | Priority Tax Claims | No | Except to the extent a holder of an Allowed Priority Tax Claim, together with the Debtors and the Required Supporting Noteholders, agrees to a different treatment, in full and final | No (conclusively presumed to |

| Class | Designation | Impaired | Treatment of Allowed Claims and Interests | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|---|
|  |  |  | satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each such holder shall be paid, at the option of the Debtors, with the approval of the Required Supporting Noteholders, (i) in the ordinary course of the Debtors' business, consistent with past practice; provided, however, that in the event the balance of any such Claim becomes due during the pendency of the Bankruptcy Cases and remains unpaid as of the Effective Date, the holder of such Claim shall be paid in full in Cash on the Effective Date, or (ii) in installment payments over a period of time not to exceed five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code. | accept) |  |
| -- | DIP Facilities Claims | No | Subject to the delivery and surrender requirements under Articles VII.B.1 and VII.B.3 of the Plan, upon the Effective Date, the DIP Facilities Claims shall be deemed to be Allowed Claims and indefeasibly satisfied by an in-kind exchange on a dollar-for-dollar basis for obligations of the Reorganized Debtors under the Exit Second Lien Facility; provided, however, that any fees and expenses set forth in Article XII.A of the Plan shall be deemed to be Allowed Claims and paid in Cash as set forth in Article XII.A of the Plan. | No (conclusively presumed to accept) | 100% |
| 1 | Other Priority Claims | No | Except to the extent that a holder of an Allowed Other Priority Claim, together with the Debtors and the Required Supporting Noteholders, agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each such holder shall be paid, to the extent such Claim has not already been paid during the Chapter 11 Cases, in full in Cash in the ordinary course of business by the Debtors or the Reorganized Debtors, as applicable, on or as soon as reasonably practicable after the latest of (i) the Effective Date, (ii) the date on which such Other Priority Claim against the Debtor becomes Allowed, or (iii) such other date as may be ordered by the Court. | No (conclusively presumed to accept) | 100% |
| 2 | Other Secured Claims | No | Except to the extent that a holder of an Allowed Other Secured Claim, together with the Debtors and the Required Supporting Noteholders, agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, each such holder shall be Reinstated, or, at the option of the Debtors or the Reorganized Debtors with the consent of the Required Supporting Noteholders, each holder of an Allowed Other Secured Claim shall receive, either (i) Cash in the full amount of such Allowed Other Secured Claim, including any postpetition interest Allowed pursuant to section 506(b) of the Bankruptcy Code, (ii) the net proceeds of the sale or disposition of the collateral securing such Allowed Other Secured Claim to the extent of the value of the holder's secured interest in such collateral, (iii) the collateral securing such Allowed Other Secured Claim, or (iv) such other Distribution as necessary to satisfy the requirements of section 1129 of the Bankruptcy Code on account of such Allowed Other Secured Claim. | No (conclusively presumed to accept) | 100% |
| 3 | Revolving Facility Lender | Yes (Unless the Debtors | On the Effective Date, except to the extent that a holder of a Revolving Facility Lender Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and | Yes (unless the Debtors enter into an | 100% |

| Class | Designation | Impaired | Treatment of Allowed Claims and Interests | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|---|
| | Claims | enter into an Alternative Exit Facility) | discharge of and in exchange for such Claim, each holder of a Revolving Facility Lender Claim shall receive a Pro Rata share of the Exit Revolving Facility (by having any Revolving Facility Lender Claims for outstanding principal deemed outstanding under the Exit Revolving Facility on a dollar-for-dollar basis and all letters of credit issued under the Credit Agreement deemed outstanding under the Exit Revolving Facility), *provided, however*, that all Revolving Facility Lender Claims for interest and outstanding expenses shall be paid on the Effective Date in Cash to the extent not previously paid pursuant to the Interim DIP Order or Final DIP Order; and *provided further however* that if the Debtors arrange for the Alternative Exit Facility, then each holder of a Revolving Facility Lender Claim shall receive Cash in the amount of its Allowed Claim in full and final satisfaction, settlement, release, and discharge of and in exchange for such Claim and any outstanding undrawn letters of credit issued under the Credit Agreement shall be cash collateralized at 105% of the face amount thereof, pursuant to arrangements satisfactory to the issuers thereof. | Alternative Exit Facility) | |
| 4 | GSO Notes Claims and Kelso Notes Claims | Yes | On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a holder of a GSO Notes Claim or Kelso Notes Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for the secured portion of such Claim, each holder of a GSO Notes Claim and/or a Kelso Notes Claim shall receive a Pro Rata share of the New Stock, subject to dilution for the Management Incentive Plan (to the extent the board of directors of Reorganized Holding approves awards of New Stock thereunder). For the avoidance of doubt, on the Effective Date, each holder of a GSO Notes Claim and Kelso Notes Claim shall be deemed to have waived its Notes Deficiency Claim. | Yes | 11.6% |
| 5 | Unexchanged Notes Claims | Yes | On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a holder of an Unexchanged Notes Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for the secured portion of such Claim, each holder of an Unexchanged Note Claim shall receive:<br>a.       Subclass 5(a). Each holder of Unexchanged Notes that, in the aggregate, holds equal to or in excess of $9,000 in principal amount of Unexchanged Notes shall receive a Pro Rata share of the New Stock, subject to dilution for the Management Incentive Plan (to the extent the board of directors of Reorganized Holding approves awards of New Stock thereunder).<br>b.       Subclass 5(b). Each holder of Unexchanged Notes that, in the aggregate, holds less than $9,000 in principal amount of Unexchanged Notes shall receive a Cash-Out Payment, which shall be paid (i) in the form of Cash, if Class 5 votes to accept the Plan and (ii) in the form of New Secured Notes, if Class 5 votes to reject the Plan.<br>For the avoidance of doubt, on the Effective Date, each holder of Unexchanged Notes shall be deemed to have waived its Notes Deficiency Claim. | Yes | 11.6% |

| Class | Designation | Impaired | Treatment of Allowed Claims and Interests | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|---|
| 6 | General Unsecured Claims | Yes | On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for such Claim, each holder of an Allowed General Unsecured Claim shall receive  its Pro Rata share of the General Unsecured Claim Cash Pool. | Yes | 2.5%-3.5% |
| 7 | Intercompany Claims | No | Intercompany Claims shall be reinstated, cancelled or compromised as determined by the Debtors with the consent of the Required Supporting Noteholders. | No (conclusively presumed to accept) | 100% |
| 8 | Subordinated Claims | Yes | The holders of Subordinated Claims shall neither receive Distributions nor retain any property under the Plan for or on account of such Subordinated Claims. | No (deemed to reject) | 0% |
| 9 | Existing Equity Interests | Yes | Existing Equity Interests shall be discharged, cancelled, released, and extinguished as of the Effective Date and holders of Existing Equity Interests shall neither receive any Distributions nor retain any property under the Plan for or on account of such Equity Interests. | No (deemed to reject) | 0% |
| 10 | Intercompany Interests | No | Intercompany Interests shall be cancelled or reinstated, as determined by the Debtors with the consent of the Required Supporting Noteholders. | No (conclusively presumed to accept) | 100% |

## ARTICLE III.

## OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, the company or other entity to which the particular bankruptcy case relates, called the "debtor", is authorized to reorganize its business for its own benefit as well as the benefit of its creditors and equity interest holders.  In addition to permitting rehabilitation of a debtor, chapter 11 is intended to promote equality of treatment for similarly situated creditors and equity interest holders, including with respect to the distribution of that debtor's assets.

The debtor commences its chapter 11 case by filing a voluntary bankruptcy petition with an appropriate United States Bankruptcy Court.  The commencement of that case immediately creates an "estate" that is comprised of all of the legal and equitable interests of the debtor, including interests in its assets, as of the date of filing of its bankruptcy petition.  In addition, in the case of bankruptcy petitions filed under chapter 11, the Bankruptcy Code generally provides that the debtor may continue to operate its business and remain in possession of its property as a so-called "debtor in possession", rather than have control of its business and possession of its property instead transferred to an independent bankruptcy trustee.

The principal objective of a chapter 11 reorganization case is to confirm and then consummate a plan of reorganization.  A plan of reorganization sets forth the means for satisfying claims against the debtor and equity interests in the debtor.  Confirmation of a plan of reorganization by the bankruptcy court makes the plan binding upon the debtor as well as upon various other interested constituencies, including any issuer of securities under the plan, any

person acquiring property under the plan, and any holder of claims against, or equity interests in, the debtor.  Subject to certain limited exceptions, the bankruptcy court's confirmation order discharges a debtor from any debt that arose prior to the date of confirmation of the plan (including, among other things, debts that arose prior to the filing of the debtor's original bankruptcy petition) and substitutes therefor the obligations specified under the confirmed plan.

Once a plan of reorganization meeting the requirements of the Bankruptcy Code has been filed with the Bankruptcy Court, then, with certain exceptions, the holders of claims against, or equity interests in, the debtor generally are entitled to vote whether to accept or reject that plan. Before the debtor may solicit acceptances of the proposed plan, however, section 1125 of the Bankruptcy Code requires the debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about whether to accept or reject the plan.

In connection with the Chapter 11 Cases, and to satisfy the requirements of section 1125 of the Bankruptcy Code, the Debtors have prepared this Disclosure Statement and are submitting it to holders of Allowed Claims against the Debtors who, under the Plan, are entitled to vote on whether to accept or reject the Plan.

## ARTICLE IV.

## COMPANY BACKGROUND

### A.      History of the Debtors

#### 1.      Overview

Holding, a Delaware Corporation, owns, directly or indirectly, 100% of each of the other Debtors.  The first Logan's Roadhouse restaurant opened in Lexington, Kentucky in 1991. Logan's Roadhouse was incorporated in 1995 in the state of Tennessee and operated as a public company from July 1995 through February 1999, when it was acquired by Cracker Barrel Old Country Store, Inc. ("**Cracker Barrel**").  From February 1999 to December 2006, Logan's Roadhouse was a wholly-owned subsidiary of Cracker Barrel.  In December 2006, Logan's Roadhouse was acquired by certain investors through LRI Holdings.  On October 4, 2010, LRI Holdings was acquired by certain wholly owned subsidiaries of Holding.

Debtor Logan's Roadhouse operates full-service casual dining steakhouses.  The Debtors offer specially-seasoned aged steaks and southern inspired dishes in a roadhouse atmosphere that includes their "bottomless buckets" of roasted in-shell peanuts.  All of the Debtors' company-owned and franchised restaurants operate under the name Logan's Roadhouse.  In calendar year 2015, the Debtors had net revenues of over $606.4 million and unaudited EBITDA of minus $112 million, which included impairment and closing charges of over $120 million resulting in an adjusted EBITDA of approximately $8 million.  For the first half of 2016, the Debtors had net revenues of over $302 million.

#### 2.      Employees

As of August 8, 2016, the Debtors employed approximately 18,964 people, mostly at their restaurant locations. Of those restaurant employees, approximately 13,326 were employed on a part-time basis. None of the Debtors employees were represented by a union.

### 3.    Pre-Petition Capital Structure of the Debtors

Holding is the ultimate parent company of each of the other Debtors. Holding's stock is over 97% owned by affiliates of Kelso & Company, L.P.

As of the Petition Date, the Debtors had outstanding debt obligations in the aggregate principal amount of about $416 million, consisting primarily of approximately (a) $23.9 million in secured loans under a first lien senior secured revolving credit facility, (b) $378.0 million in principal amount of second-priority senior secured notes, and (c) $14 million owed to vendors, landlords and other unsecured creditors. There are also approximately $5.1 million in letters of credit issued under the Credit Agreement (as defined herein) that are undrawn and have not been cash-collateralized.

On October 4, 2010, Logan's Roadhouse entered, as the borrower, into that certain $30,000,000 Senior Secured Revolving Credit Facility (as amended from time to time, the "**Credit Agreement**"), with JPMorgan Chase Bank, N.A., as Administrative Agent and Collateral Agent (the "**Revolving Facility Agent**") and the lenders thereto (the "**Revolving Facility Lenders**"). The obligations under the Credit Agreement are guaranteed by LRI Holdings and the subsidiaries of Logan's Roadhouse and are also secured by substantially all of the assets of Logan's Roadhouse, LRI Holdings, and all of Logan's Roadhouse's subsidiaries (the "**Revolving Facility Collateral**"). As of the Petition Date, approximately $23.9 million in principal amount of loans were outstanding under the Credit Agreement and approximately $5.1 million in unfunded letters of credit had been issued under the Credit Agreement.

Also on October 4, 2010, Logan's Roadhouse issued $355.0 million aggregate principal amount of senior secured notes in a private placement to qualified institutional buyers (the "**2010 Indenture**"). In July 2011, the Debtors completed an exchange offering, which allowed the holders of those notes to exchange them for notes identical in all material respects except they are registered with the SEC and are not subject to transfer restrictions (the "**2010 Notes**"). The 2010 Notes bear interest at a rate of 10.75% per annum, which is payable in cash on April 15 and October 15 each year, and will mature on October 15, 2017. The 2010 Notes are guaranteed by LRI Holdings and the subsidiaries of Logan's Roadhouse and are secured on a second-priority basis by the same collateral that secures the obligations under the Credit Agreement. Following the October 15, 2015 exchanges, which are discussed below, approximately $143.9 million of 2010 Notes remained outstanding (the "**Unexchanged Notes**").

In October 2015, the Debtors completed exchange offers with two substantial holders of 2010 Notes in order to preserve liquidity and reduce the Debtors' cash-pay interest obligations. Specifically, on October 15 and October 22, 2015, the Debtors completed an exchange with affiliates of Kelso & Company, L.P., as holders of approximately $106.8 million in aggregate principal amount of the 2010 Notes (the "**Kelso Noteholders**"), pursuant to which the Kelso Noteholders exchanged their 2010 Notes (and accrued and unpaid interest thereon) for approximately $112.6 million in aggregate issue price of Logan's Roadhouse's Series 2015-1

Senior Secured Zero Coupon Notes due in 2017 (the "**Kelso Notes**").  Also on October 15, 2015, the Debtors completed an exchange with affiliates of GSO Capital Partners, LP, as holders of approximately $104.3 million in aggregate principal amount of 2010 Notes (the "**GSO Noteholders**", and together with the Kelso Noteholders and the holders of the Unexchanged Notes, the "**Noteholders**"), pursuant to which the GSO Noteholders exchanged their 2010 Notes (and accrued and unpaid interest thereon) for approximately $109.7 million in aggregate issue price of Logan's Roadhouse's Series 2015-2 Senior Secured Notes due in 2017 (the "**GSO Notes**," and together with the Kelso Notes, the "**2015 Notes**").  The 2015 Notes are guaranteed by LRI Holdings and the subsidiaries of Logan's Roadhouse and are secured on a second-priority basis by the Revolving Facility Collateral.

The Kelso Notes were issued with original issue discount with an accretion rate of 10.75% per annum, compounded semi-annual, such that the Kelso Notes do not have any cash pay interest obligations and, instead, the accreted value of each Kelso Note increases on each interest payment date.  The GSO Notes have a similar accretion feature, except that the accretion rate is 10.5% per annum and the accretion can be paid in cash at Logan's Roadhouse's election.  The GSO Noteholders are also entitled to a 4% per annum cash coupon payment.

As of August 8, 2016, the outstanding principal balance of the Unexchanged Notes was $143.9 million, the outstanding principal balance of the Kelso Notes was approximately $118.6 million, and the outstanding principal balance of the GSO Notes was approximately $115.5 million.

### 4.      Historical Financial Information

In the past, the Debtors had been filing financial and other information with the SEC on the EDGAR database the SEC maintains.  That information is available through the SEC's EDGAR website, which can be accessed at:  https://www.sec.gov/cgi-bin/browse-edgar?action=getcompany&CIK=0001383875&owner=exclude&count=40.

However, the Debtors failed to file certain information, including but not limited to their Annual Report on Form 10-K for the transition period ended December 30, 2015 (which was required to contain, among other things, annual audited financial statements for such fiscal year), in the months leading up to the filing of the Petitions.  The Debtors' filings on the SEC's EDGAR database have not been kept current and should not be regarded as providing current accurate information (financial or otherwise) about the Debtors.  Certain limited more recent financial information relating to the Debtors has been filed with the Bankruptcy Court.

### ARTICLE V.

### EVENTS LEADING UP TO THE COMMENCEMENT OF THE CHAPTER 11 CASES

Over the course of the last few years, a series of factors contributed to the Debtors' need to file the Chapter 11 Cases, as described below.  Critically, the Debtors' top line sales decreased while their margins also declined as a result of increases in commodities and labor costs.  These factors placed significant strain on the Debtors' business and liquidity needs.

Prior to the commencement of the Chapter 11 Cases, the Debtors' operations and financial performance were adversely affected by the overall downturn in the economy, the highly competitive nature of the casual family dining sector, and poor sales results. Despite recent trends of recovery in the overall economy, the Debtors' business continued to underperform as a result of a competitive price environment. The Debtors' customers continue to face pressure on discretionary income, directly correlating to depressed restaurant sales and reduced customer traffic. The casual dining sector as a whole has suffered, with the industry facing traffic declines of approximately 3% over the past year as consumer preferences shift towards cheaper, faster alternatives. In the first half of 2016, the Debtors experienced an 8.77% drop in customer traffic and a 3.95% decrease in restaurant sales.

As a result of these factors, the Debtors' revenues and EBITDA were insufficient to support their debt service, working capital, and capital expenditure needs. In realization of this fact, in October of 2015, the Debtors engaged in an exchange with the GSO Noteholders and Kelso Noteholders in an effort to preserve liquidity, whereby the GSO Noteholders and Kelso Noteholders exchanged 2010 Notes for their respective 2015 Notes, which were issued at a principal amount equal to the amount of notes and unpaid interest owed for the 2010 Notes being exchanged. The principal distinction between the 2010 Notes and the 2015 Notes was the fact that a substantial portion of the interest accruing on the 2015 Notes was payable in kind and on a non-cash basis (in fact, entirely on a non-cash basis for the Kelso Notes), and this exchange resulted in the elimination of approximately $18.5 million in annual cash-pay interest obligations. Importantly, the 2015 exchange provided the Debtors with an immediate benefit by allowing them to avoid payment of over $9.2 million in cash interest payments that would have been due on October 15, 2015.

However, those efforts were not enough; by April 2016, the Debtors determined that they could not make their cash coupon payments due on the Unexchanged Notes and the GSO Notes. Thereafter, the Debtors began negotiating in earnest with the Revolving Facility Lenders and certain Noteholders regarding forbearance agreements and the terms of a more comprehensive restructuring of the Debtors and their balance sheets. The Debtors entered into forbearance agreements on May 13, 2016, which were subsequently amended to extend the forbearance period through August 15, 2016. Extensive negotiations followed.

In May 2016, the Debtors engaged Mackinac Partners, LLC as their restructuring financial advisor and appointed Keith A. Maib and Nishant Machado as co-Chief Restructuring Officers (each a "**CRO**" and together the "**Co-CROs**"). Additionally, they engaged Young Conaway Stargatt & Taylor, LLP ("**YCST**") as restructuring counsel. Since that time, YCST has worked with the Co-CROs and the Debtors' management to review and analyze the Debtors' financial results, operational data, and contractual and business arrangements and obligations. Mackinac's engagement also included evaluating the Debtors' existing restaurant portfolio and operating performance to identify underperforming restaurants and to determine how such restaurants could improve their individual contributions to EBITDA. As part of this exercise, Mackinac and the Debtors' management evaluated various cost saving opportunities on a store-by-store basis, including occupancy costs, as well as initiatives to improve operating performance and customer engagement, experience and retention.

In connection with these efforts, the Debtors engaged Hilco Real Estate LLC ("**Hilco**") in April 2016 to review their real estate portfolio and advise the Debtors with respect to a strategic plan for restructuring, assigning/selling, or rejecting leases for underperforming locations. The Debtors identified certain stores to close based on unsustainable performance levels.

The Debtors also engaged Jefferies as their financial advisor to assist the Debtors in connection with their restructuring, including assisting and advising the Debtors in raising additional financing.

The Debtors worked diligently, in consultation with Jefferies, Mackinac, and their counsel, to evaluate options for addressing their financial difficulties and long-term financial outlook. As part of this process, the Debtors engaged in discussions with certain Noteholders and the Revolving Facility Lenders. These discussions resulted in the negotiation of the Restructuring Support Agreement. Pursuant to the Restructuring Support Agreement, the parties thereto agreed to support the restructuring transaction reflected by the Plan, which will materially deleverage the Debtors' balance sheet and provide much needed liquidity to the Debtors' business.

The Debtors believe that a prompt exit from chapter 11 is critical to the Debtors turn-around as it will free them from the liquidity constraints imposed by a prolonged restructuring (and its attendant costs) and will allow the Debtors' management to focus on critical operational initiatives that will stabilize the Debtors' business, position them to offer their customers best in class service and product within the casual dining steakhouse segment, and provide a platform to increase annual revenue and profitability. Importantly, the Supporting Lenders and Supporting Noteholders under the Restructuring Support Agreement have made certain financial commitments to the Debtors (which are subject to the terms of the Restructuring Support Agreement ) that will pave the way to this prompt exit, including the commitment by the Supporting Lenders to backstop the Exit First Lien Facility and the commitment by the Supporting Noteholders to roll-over the loans under the DIP Facilities to loans under the Exit Second Lien Facility.

## ARTICLE VI.

## THE CHAPTER 11 CASES

### A.    Significant "First Day" Motions

Upon the commencement of a case under chapter 11 of the Bankruptcy Code, the Bankruptcy Code imposes an automatic stay on creditors and others in dealing with the debtor, and also imposes strict limitations on actions that may be taken by the debtor absent authorization by the bankruptcy court. For that reason, a debtor typically files a number of so-called "first day" motions, either on the actual petition date itself or within the first few business days thereafter, seeking bankruptcy court approval to continue to operate its business and to facilitate its bankruptcy reorganization.

To facilitate a smooth and efficient administration of the Chapter 11 Cases and minimize the impact to daily business operations, the Bankruptcy Court entered certain procedural orders

by which it (a) approved the joint administration of the Chapter 11 Cases [Docket No. 47]; (b) authorized the appointment of DRC as claims and noticing agent [Docket No. 48]; and (c) prohibited utilities from altering, refusing or discontinuing service on an interim basis [Docket No. 49].

Recognizing that any interruption to the Debtors' business, even for a brief period of time, would negatively impact their operations, customer relationships, revenue, and profits while seeking to facilitate the stabilization of their business and effectuate a smooth transition into operating as debtors in possession, the Debtors sought and obtained orders authorizing them to:

- Maintain customer programs and honor their prepetition obligations arising under or in relation to those programs [Docket No. 52];

- Pay prepetition wages, salaries and other compensation, reimbursable employee expenses, and employee benefits and other obligations, as discussed in more detail below [Docket No. 56, 187 ];

- Pay claims under PACA (the Perishable Agricultural Commodities Act) and certain critical vendors [Docket No. 54];

- Pay certain prepetition taxes and fees [Docket No. 53];

- Continue prepetition insurance programs and pay all obligations in respect of those programs [Docket No. 51, 183]; and

- Maintain their existing cash management systems [Docket No. 57].

### B.    Retention of Professionals

The Debtors also filed several applications seeking orders authorizing the retention of certain professionals needed by the Debtors in connection with the Chapter 11 Cases, including the retention of: (i) YCST, as restructuring counsel [Docket No. 97]; (ii) Mackinac, as restructuring financial advisor and to provide the Co-CROs [Docket No. 88]; (iii) Hilco, as real estate advisor [Docket No. 98]; (iv) Jefferies, as financial advisor [Docket No. 104] and (v) DRC, as administrative advisor [Docket No. 103].   The Bankruptcy Court entered orders authorizing the Debtors' retention of those firms on August 31, 2016.  *See* [Docket Nos. 191, 189, 192, 197 and 195, respectively].

In addition, the Debtors filed a motion with the Bankruptcy Court seeking authority to employ and compensate certain professionals utilized by the Debtors in the ordinary course of their business (nunc pro tunc to the Petition Date) [Docket No. 101]. This motion was also approved on August 31, 2016. *See* [Docket No. 194].

C.    **Official Committee of Unsecured Creditors**

On August 19, 2016, the United States Trustee for the District of Delaware appointed an official committee of unsecured creditors in the Chapter 11 Cases (as such committee may be reconstituted from time to time, the "**Creditors' Committee**"). The Creditors' Committee is currently comprised of the following members: National Retail Properties, Inc.; Cintas Corporation No. 2; The Coca-Cola Company; Performance Food Group, Inc. ("**PFG**"); and W. Cody Bolen as a named Plaintiff on behalf of the collective in the Bradford Action (as defined herein).  PFG currently serves as Chair of the Creditors' Committee.

The Creditors' Committee has selected Kelley Drye & Warren LLP as its primary counsel, Pachulski Stang Ziehl & Jones LLP as its Delaware counsel, and FTI Consulting, Inc. as its financial advisor.

D.    **DIP Facilities**

As one of their "first day" motions the Debtors filed a motion seeking entry by the Bankruptcy Court of interim (the "**Interim Dip Order**") and final (the "**Final DIP Order**") orders authorizing the Debtors to obtain postpetition financing and grant liens and super-priority administrative expense status to the Debtors' postpetition lenders (the "**DIP Motion**") [Docket No. 12].[7]

The DIP Facilities are established pursuant to a certain Debtor-in-Possession Credit Facility, dated as of August 10, 2016 (as in effect from time to time, the "**DIP Credit Agreement**"),[8] entered into among Logan's Roadhouse, as borrower, the lenders from time to time party thereto (the "**DIP Lenders**"), and Cortland Capital Market Services LLC as Administrative Agent and Collateral Agent thereunder (the "**DIP Agent**").  Each of the other Debtors, have guaranteed all of Logan's Roadhouse's obligations under the DIP Facilities.

The DIP Facilities consist of senior secured superpriority debtor-in-possession DIP Facilities[9] in the aggregate principal amount of up to $75 million (the "**DIP Loans**"), consisting of (i) a $25 million New Money Facility, of which $10 million was committed for borrowing following entry of the Interim DIP Order (the "**Initial Commitment**") and an additional $15 million committed for borrowing upon entry of the Final DIP Order and (ii) a Roll Up Facility pursuant to which each DIP Lender, following entry of (A) the Interim Order, received new loans in exchange for each DIP Lender's claim for notes issued under the Prepetition Indentures on a dollar-for-dollar basis for every dollar of such DIP Lender's Initial Commitment which was actually disbursed under the New Money Facility by such DIP Lender, and (B) the Final Order, will receive additional loans so that the total loans received by each DIP Lender will result in an

---

[7]    The DIP Motion also sought adequate protection for the Prepetition Secured Parties, in the form of, among other things, replacement liens and super-priority administrative expense status.  That adequate protection was sought because the liens and claims of those secured prepetition creditors were being primed by the DIP Facilities, and for the use by the Debtors of those Prepetition Secured Creditors' cash collateral.

[8]    A copy of the DIP Credit Agreement is attached as an exhibit to the Interim DIP Order [Docket No. 60].

[9]    The DIP Facilities are subordinate only to Revolving Facility Liens, Revolving Facility Adequate Protection Liens, the Carve-Out, and Permitted Liens, each as defined in the DIP Motion.

exchange on a 2:1 basis for every dollar of borrowings actually disbursed under the New Money Facility by each DIP Lender.

On August 9, 2016, the Bankruptcy Court approved the DIP Facilities, on an interim basis, upon the terms and subject to the conditions set forth in the Interim DIP Order [Docket No. 60]. The Final DIP Order was entered on September [__], 2016.

### E.    Assumption/Rejection of Leases and Executory Contracts

Under the Bankruptcy Code, the Debtors have 120 days after the Petition Date to assume or reject unexpired leases of nonresidential real property. The Bankruptcy Court may extend such period for 90 days for cause; and may further extend such period only upon prior written consent of the affected lessor. Also under the Bankruptcy Code, the Debtors have until confirmation of the Plan to assume or reject executory contracts. The deadline for assuming or rejecting the Debtors' unexpired leases of nonresidential real property in the Chapter 11 Cases is December 6, 2016. The Debtors reserve the right to seek extensions of that current deadline if necessary.

Since the commencement of their Chapter 11 Cases, the Debtors have continued their process, begun in the months preceding the filing of the Petitions, of analyzing their portfolio of leases of nonresidential real property, in order to determine whether it would be in the best interests of the Debtors and their creditors to assume or reject those leases. Among the factors considered in this analysis were: (a) the operating performance (both historical and projected) of the location; (b) competition; (c) rent and other material terms under the applicable lease; (d) remaining term of the applicable lease; and (e) a variety of other considerations (*e.g.*, local market demographics, trade vendor relations, etc.).

Based on the Debtors' analysis, the Debtors filed a motion to reject, *nunc pro tunc* to August 12, 2016, twenty-one (21) leases for restaurant locations [Docket No. 87] (the "**First Lease Rejection Motion**"). The Bankruptcy Court entered an order approving the First Lease Rejection Motion on August 31, 2016. *See* [Docket No. 188]. On September 2, 2016, the Debtors filed a motion to reject, *nunc pro tunc* to September 2, 2016, a prime lease and sub-lease for a non-operated restaurant located in Knoxville, Tennessee (the "**Second Lease Rejection Motion**") [Docket No. 232]. The Bankruptcy Court entered an order approving the Second Lease Rejection Motion on September 21, 2016. *See* [Docket No. 296].

The Debtors are continuing to review their real estate leases and executory contracts in order to determine if additional leases and contracts should be rejected to best position the Debtors for long-term success and growth. As discussed above, the Debtors have retained Hilco to assist with this process, and Hilco is actively negotiating with the Debtors' landlords regarding favorable amendments to the terms of the Debtors' real property leases. As more fully described in Article VII of this Disclosure Statement, the Plan sets forth a mechanism for dealing with the assumption or rejection by the Debtors of their leases and executory contracts.

### F.    Employment-Related Compensation

As one of their "first day" motions filed with the Bankruptcy Court, the Debtors sought authority to pay: certain prepetition employee salary, wages, benefits, bonuses, and other

compensation; withholding taxes to federal, state and local authorities related to those payments; certain amounts withheld from some employees for insurance programs, savings plans, child support, and garnishments; outstanding claims for reimbursement of business expenses incurred by employees prepetition; and other employee related obligations (the "**Employee Motion**") [Docket No. 10]. The Employee Motion also sought the right to continue certain employee incentive programs and severance programs, and to pay prepetition amounts with respect to such programs. On August 9, 2016, the Bankruptcy Court entered an order (the "**Employee Order**") [Docket No. 56] granting the Employee Motion. The Employee Order provided, however, that final approval of the relief requested with respect to the Debtors' workers' compensation insurance policies and programs, final authorization with respect to severance payments, and authorization of payment of certain unpaid incentive compensation would not occur until the entry of a supplemental order (the "**Supplemental Employee Order**"). The Bankruptcy Court entered the Supplemental Employee Order on August 31, 2016. *See* [Docket No. 187].

In addition, on September 9, 2016, the Debtors filed a motion to approve a Key Employee Incentive and Key Employee Retention Program (the "**KEIP/KERP Motion**") [Docket No. 251]. [The KEIP/KERP Motion will be considered by the Bankruptcy Court at the hearing currently scheduled for October 11, 2016. OR The Bankruptcy Court entered an order approving the KEIP/KERP Motion on September [__], 2016. *See* [Docket No. 296].]

### G.    The Restructuring Support Agreement

Prior to commencing these cases, the Debtors' boards approved entry into the Restructuring Support Agreement. As discussed above, the Restructuring Support Agreement provides a framework for the Debtors' prompt and successful exit from chapter 11, including overwhelming support (by dollar amount) of their secured creditors and commitments with respect to exit financing which will provide the Debtors with the working capital needed to make payments required under the Plan, as well as to continue to fund the Debtors' operational turnaround plan. On August 11, 2016, the Debtors filed a motion to assume the Restructuring Support Agreement [Docket No. 89], and a hearing to consider assumption of the Restructuring Support Agreement is scheduled for November 9, 2016.

### H.    Claims Process

On August 12, 2016, the Debtors filed a motion (the "**Bar Date Motion**") [Docket No. 102] requesting that the court establish deadlines for the filing of proofs of claim against the Debtors in the Chapter 11 Cases (the "**Bar Dates**"). The Bankruptcy Court entered an order (the "**Bar Date Order**") [Docket No. 219] approving the Bar Date Motion on September 1, 2016. Any person or entity (with certain exceptions, as further set forth in the Bar Date Motion) that fails to timely file a Proof of Claim by the applicable Bar Date will not be permitted to vote to accept or reject the Plan, or any other plan filed in the Chapter 11 Cases, or to receive any distribution in the Chapter 11 cases on account of such claim.

On September 1, 2016, each Debtor filed its Schedules of Assets and Liabilities and its Statement of Financial Affairs. As a result of filing the Schedules and Statements, the Debtors were authorized to establish the Bar Dates and, pursuant to the Bar Date Order, the "General Bar Date" has been established as October 7, 2016.

The Plan provides that, with certain exceptions, the Reorganized Debtors have until the later of (i) one hundred and eighty (180) days after the Effective Date, and (ii) such later date as may be fixed by the Court upon a motion by the Reorganized Debtors without notice to any party or a hearing, to file objections to Claims. Under the Plan, no objection is required with respect to a Proof of Claim filed after the applicable Bar Date, and any and all such Claims are deemed disallowed unless otherwise ordered by the Court after notice and a hearing.

## I.    Global Settlement of Creditors' Committee's Objections

On September 20, 2016, the Debtors, Creditors' Committee and the parties to the Restructuring Support Agreement agreed to the Creditors' Committee Settlement to resolve in principle the objections that the Creditors' Committee raised regarding the DIP Facilities, the Restructuring Support Agreement, and the Plan and Disclosure Statement. That resolution is now reflected in the Final DIP Order and Plan.

Pursuant to the Creditors' Committee Settlement, the treatment of holders of General Unsecured Claims is improved by (i) an increase in the amount of cash in the General Unsecured Claims Pool from $350,000 to a total of $1 million, (ii) a waiver of deficiency claims on account of the Notes and all other unsecured claims held by the Unanimous Supporting Noteholders, (iii) the waiver and release of all Avoidance Actions by the Debtors and Reorganized Debtors, and (iv) the appointment of an Ombudsman with consultation rights regarding the allowance of general unsecured claims, subject to certain thresholds. The Creditors' Committee Settlement will also provide an estimated $5 million of increased liquidity for the benefit of the Reorganized Debtors through a combination of adding an additional $3.5 million of "new money" loans under the Exit Second Lien Facility and an estimated $1.5 million reduction in the Cash-Out Payment as a result of lowering the threshold to determine which holders of Unexchanged Notes Claims will receive a Cash-Out Payment. Further, the Professionals for the Creditors Committee have agreed to an overall limit on the amount to be paid on account of their Allowed Professional Fee Claims. Finally, as a result of the benefits of the global settlement to General Unsecured Creditors—in the form of increased recoveries and strengthening the Reorganized Debtors' financial position at emergence—the Creditors' Committee agreed to support confirmation of the Plan, including the settlements and releases embodied in the Plan.

## ARTICLE VII.

## SUMMARY OF THE PLAN

### A.    Introduction

The Debtors have proposed the Plan, consistent with the requirements described in Subsection B below, and in consultation with the Supporting Parties. The Debtors believe, and at the Confirmation Hearing will demonstrate to the Bankruptcy Court,[10] that the Debtors'

---

[10]    The Plan makes reference to "Court" rather than to the "Bankruptcy Court", in order to address also those instances where there is no reference pursuant to section 157 of title 28 of the United States Code, or where some other court has jurisdiction over the Chapter 11 Cases or any proceedings arising therefrom. For ease of reference, this Disclosure Statement refers simply to the "Bankruptcy Court" (with such reference also to reference the more broadly defined term "Court" as and to the extent applicable under the Plan).

creditors will receive at least as much, and likely more, in value under the Plan than they would receive were there instead to be a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

**THE FOLLOWING IS A SUMMARY OF SOME OF THE SIGNIFICANT ELEMENTS OF THE PLAN.  THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN ITSELF.  CREDITORS ARE URGED TO READ THE PLAN IN ITS ENTIRETY.**

### B.  General Rules of Classification

In general, the Bankruptcy Code only permits distributions to be made, under a debtor's chapter 11 reorganization plan, on account of "allowed" expenses relating to the administration of the debtor's bankruptcy estate, as well as "allowed" prepetition claims against the debtor and "allowed" prepetition equity interests in the debtor.  "Allowance" simply means that the debtor has agreed (or, in the event of a dispute, that the Bankruptcy Court has determined) the particular administrative expense, claim or equity interest, including the amount thereof, in fact is a valid obligation of (or Equity Interest in) that debtor.  Bankruptcy Code section 502(a) provides that a timely filed administrative expense, claim or equity Interest is "allowed" automatically unless the debtor (or another party in interest) objects to its allowance.  Bankruptcy Code section 502(b), however, specifies certain types of claims (including, among other things, claims for unmatured interest on unsecured or undersecured obligations, and nonresidential real property lease and employment contract rejection damage claims above specified thresholds) that cannot be "allowed" in the bankruptcy case even where a valid proof of claim has been timely filed in the debtor's bankruptcy case.

The Bankruptcy Code requires that, for purposes of treatment and voting, and subject to certain exceptions, a chapter 11 reorganization plan must divide the different "allowed" claims against, and equity interest in, the debtor into separate "classes" based upon the nature of such claims and equity interests.  Generally, claims of a substantially similar legal nature would be classified together.  The same is true for equity interests having a substantially similar legal nature.  This classification process focuses on the legal nature of the particular claims and equity interests, rather than on the holders of those claims and equity interests, making it common for holders of multiple claims and/or equity interests to find themselves as members of multiple classes for purposes of treatment and voting with respect to a debtor's chapter 11 reorganization plan.

The Bankruptcy Code further requires, in this classification process, that classes of claims and equity interests must be designated either as "impaired" (if altered by the reorganization plan in some way) or "unimpaired" (if not).  The Bankruptcy Code then provides the holders of impaired claims and impaired equity interests with certain additional rights (such as the right to vote to accept or reject the plan), and the right to receive not less than the value the holder would have received were the debtor instead to liquidate under chapter 7 of the Bankruptcy Code), with certain limited exceptions.  The Bankruptcy Code establishes the criteria for determining whether or not a class of claims or equity interests is "impaired" or "unimpaired" for purposes of treatment and voting under the plan.

The classification, treatment, question of impairment, and entitlement to vote of the Allowed Claims against the Debtors and Allowed Equity Interests in the Debtors, were summarized briefly in Article II of this Disclosure Statement, and are described in greater detail below. As provided in the Plan, a Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim or Interest is also placed in a particular Class for the purpose of receiving Distributions only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date.

## C.    Treatment of Certain Unclassified Claims

Under section 1123(a)(1) of the Bankruptcy Code, certain categories of claims that must be addressed in the proposed reorganization plan need not be classified (that is, put into one of the specific classes established in that plan) for purposes of such plan. In connection with the Chapter 11 Cases, the Debtors have identified four (4) applicable categories of unclassified Claims.

### 1.    Unclassified – Administrative Claims

Administrative Claims consist of any Claim for costs and expenses of administration of the Estates pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving and operating the Estates; (b) any indebtedness or obligations incurred or assumed by the Debtors in connection with the conduct of their businesses after the Petition Date, including for wages, salaries, or commissions for services, and payments for goods and other services and leased premises to the extent such indebtedness or obligations provided a benefit to the Debtors' estates; and (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

The Plan provides that, except to the extent a holder of an Allowed Administrative Claim already has been paid during the Chapter 11 Cases or such holder, together with the Debtors and the Required Supporting Noteholders, agrees to less favorable treatment with respect to such holder's Claim, each holder of an Allowed Administrative Claim shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, its Administrative Claim, Cash equal to the unpaid portion of its Allowed Administrative Claim (but not to exceed the Creditors' Committee Claims Cap in the case of Professional Fee Claims held by the Professionals retained by the Creditors' Committee), to be paid on the latest of: (a) the Effective Date, or as soon as reasonably practicable thereafter, if such Administrative Claim is Allowed as of the Effective Date; (b) the date such Administrative Claim is Allowed, or as soon as reasonably practicable thereafter; (c) the date such Allowed Administrative Claim becomes due and payable, or as soon as reasonably practicable thereafter; and (d) such other date as may be agreed upon between the holder of such Allowed Administrative Claim and the Debtors (with the consent of the Required Supporting Noteholders) or the Reorganized Debtors, as the case may be.

The Plan provides that, unless a prior date has been established pursuant to the Bankruptcy Code, the Bankruptcy Rules or a prior order of the Court, the Confirmation Order will establish a bar date for filing notices, requests, Proofs of Claim, applications or motions for allowance of Administrative Claims (other than Professional Fee Claims, DIP Facilities Claims, Claims by any other trade creditor or customer of the Debtors whose Claim is on account of ordinary course of business goods or services provided to the Debtors during the course of these Chapter 11 Cases, and the post-Petition Date fees and expenses of the Supporting Lenders, the Unanimous Supporting Noteholders, the Supporting Interest Holders, the Revolving Facility Agent, the Indenture Trustees and their respective advisors), which date shall be the Administrative Claims Bar Date. Holders of Administrative Claims not paid prior to the Confirmation Date shall file with the Court and serve upon the Debtors or Reorganized Debtors, as applicable, a motion requesting payment of such Administrative Claim on or before the Administrative Claims Bar Date or forever be barred from doing so. The notice of entry of the Confirmation Order to be delivered pursuant to Bankruptcy Rules 3020(c) and 2002(f) will set forth the Administrative Claims Bar Date and constitute good and sufficient notice of the Administrative Claims Bar Date.

### (a)    Professional Fee Claims

Professional Fee Claims consist of Administrative Claims Allowed under section 328, 330(a), 331 or 503 of the Bankruptcy Code for reasonable compensation of a Professional or other Person for services rendered or expenses incurred in the Chapter 11 Cases on or prior to the Effective Date (including the reasonable, actual and necessary expenses of the members of the Creditors' Committee incurred as members of the Creditors' Committee in discharge of their duties as such), but specifically excluding the fees and expenses of professionals of (a) the Revolving Facility Agent, (b) the Supporting Lenders, (c) the Unanimous Supporting Lenders, (d) the Indenture Trustees, (e) the Supporting Interest Holders, (f) the DIP Agent, and (g) the DIP Lenders.

The Plan provides that all requests for compensation or reimbursement of Professional Fee Claims pursuant to sections 327, 328, 330, 331, 363, 503 or 1103 of the Bankruptcy Code for services rendered prior to the Effective Date shall be filed and served on the Reorganized Debtors, counsel to the Reorganized Debtors, the United States Trustee, counsel to each of the Supporting Parties, counsel to the Creditors' Committee, and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Court, no later than forty-five (45) days after the Effective Date. Holders of Professional Fee Claims that are required to file and serve applications for final allowance of their Professional Fee Claims and that do not file and serve such applications by the required deadline shall be forever barred from asserting such Claims against the Debtors, the Reorganized Debtors or their respective properties, and such Professional Fee Claims shall be deemed discharged as of the Effective Date. Objections to any Professional Fee Claims must be filed and served no later than sixty-five (65) days following the Effective Date. Objections must be served on the Reorganized Debtors, counsel for the Reorganized Debtors, counsel to each of the Supporting Parties, counsel to the Creditors' Committee and the holders of Professional Fee Claims requesting payment. The Professional Fee Claims held by the Professionals retained by the Creditors' Committee shall not exceed the Creditors' Committee Claims Cap.

### 2.    Unclassified – Priority Tax Claims

Priority Tax Claims include any unsecured Claim that is entitled to a priority in right of payment under section 507(a)(8) of the Bankruptcy Code.

The Plan provides that, except to the extent a holder of an Allowed Priority Tax Claim, together with the Debtors and the Required Supporting Noteholders, agrees to a different treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each such holder shall be paid, at the option of the Debtors, with the approval of the Required Supporting Noteholders, (i) in the ordinary course of the Debtors' business, consistent with past practice; provided, however, that in the event the balance of any such Claim becomes due during the pendency of the Bankruptcy Cases and remains unpaid as of the Effective Date, the holder of such Claim shall be paid in full in Cash on the Effective Date, or (ii) in installment payments over a period of time not to exceed five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.

### 3.    Unclassified – DIP Facilities Claims

DIP Facilities Claims include all Claims arising under or relating to the DIP Facilities, whether pursuant to the DIP Credit Agreement, any other DIP Loan Document, the Interim DIP Order, the Final DIP Order, or otherwise.  DIP Facilities Claims would include, among other things, Claims originally arising under the 2010 Indenture or 2015 Indenture that have been rolled up into the DIP Facilities in accordance with the terms of the DIP Facilities and with the approval of the Bankruptcy Court pursuant to the Interim DIP Order and Final DIP Order.

The Plan provides that, subject to the delivery and surrender requirements under Articles VII.B.1 and VII.B.3 of the Plan with respect to obligations under the Roll Up Facility, upon the Effective Date, the DIP Facilities Claims shall be deemed to be Allowed Claims and indefeasibly satisfied by an in-kind exchange for obligations of the Reorganized Debtors under the Exit Second Lien Facility; provided, however, that any fees and expenses set from in Article XII.A of the Plan shall be deemed to be Allowed Claims and paid in Cash as set forth in Article XII.A of the Plan.

### D.    Classification and Treatment of Claims and Equity Interests

### 1.    Class 1 – Other Priority Claims

Other Priority Claims include any Claim against any of the Debtors (other than an Administrative Claim, a Professional Fee Claim, a Priority Tax Claim or a DIP Financing Claim) that is entitled to priority in payment as specified in section 507(a)(3), (4), (5), (6), (7), or (9) of Bankruptcy Code.

The Plan provides that, except to the extent that a holder of an Allowed Other Priority Claim, together with the Debtors and the Required Supporting Noteholders, agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each such holder shall be paid, to the extent such Claim has not already been paid during the Chapter 11 Cases, in full in Cash in the ordinary

course of business by the Debtors or the Reorganized Debtors, as applicable, on or as soon as reasonably practicable after the latest of (i) the Effective Date, (ii) the date on which such Other Priority Claim against the Debtor becomes Allowed, or (iii) such other date as may be ordered by the Court.

Because the Bankruptcy Court entered an order authorizing the Debtors to pay, among other things, unpaid prepetition employee compensation and benefits, the Debtors estimate that the Allowed Claims in Class 1 that are due and payable pursuant to the Plan on or before the Effective Date will be nominal.

Class 1 is Unimpaired under the Plan. Holders of Allowed Other Priority Claims in Class 1 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

### 2.    Class 2 – Other Secured Claims

Other Secured Claims include any Claim (other than the DIP Facilities Claims, Revolving Facility Lender Claims, GSO Notes Claims, Kelso Notes Claims, and Unexchanged Notes Claims) to the extent reflected in the Schedules or a Proof of Claim filed as a secured Claim, which is (i) secured by a Lien on Collateral (to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code), or (ii) in the event that such Claim is subject to a right of setoff under section 553 of the Bankruptcy Code, to the extent of such right of setoff.

The Plan provides that, except to the extent that a holder of an Allowed Other Secured Claim, together with the Debtors and the Required Supporting Noteholders, agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, each such holder shall be Reinstated, or, at the option of the Debtors or the Reorganized Debtors with the consent of the Required Supporting Noteholders, each holder of an Allowed Other Secured Claim shall receive, either (i) Cash in the full amount of such Allowed Other Secured Claim, including any postpetition interest Allowed pursuant to section 506(b) of the Bankruptcy Code, (ii) the net proceeds of the sale or disposition of the collateral securing such Allowed Other Secured Claim to the extent of the value of the holder's secured interest in such collateral, (iii) the collateral securing such Allowed Other Secured Claim, or (iv) such other Distribution as necessary to satisfy the requirements of section 1129 of the Bankruptcy Code on account of such Allowed Other Secured Claim.

Class 2 is Unimpaired under the Plan. Holders of Other Secured Claims in Class 2 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

### 3.    Class 3 – Revolving Facility Lender Claims

Revolving Facility Lender Claims consist of all claims arising under or relating to the Credit Agreement held by the Revolving Facility Lenders.

The Plan Provides that Revolving Facility Lender Claims shall be Allowed in full without set-off, defense, or counterclaim, in the aggregate principal amount of not less than $24,399,525

plus $4,600,475 for unreimbursed obligations on account of issued letters of credit plus all outstanding fees, accrued and unpaid pre- and post-petition interest, expenses and contingent reimbursement obligations, in each case, pursuant to and as provided in the Credit Agreement

The Plan provides that, on the Effective Date, except to the extent that a holder of a Revolving Facility Lender Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for such Claim, each holder of a Revolving Facility Lender Claim shall receive a Pro Rata share of the Exit Revolving Facility (by having any Revolving Facility Lender Claims for outstanding principal deemed outstanding under the Exit Revolving Facility on a dollar-for-dollar basis and all letters of credit issued under the Credit Agreement deemed outstanding under the Exit Revolving Facility), *provided, however,* that all Revolving Facility Lender Claims for interest and outstanding fees and expenses shall be paid on the Effective Date in Cash to the extent not previously paid pursuant to the Interim DIP Order or Final DIP Order; and *provided further however,* that if the Debtors arrange for the Alternative Exit Facility, then each holder of a Revolving Facility Lender Claim shall receive Cash in the amount of its Allowed Claim in full and final satisfaction, settlement, release, and discharge of and in exchange for such Claim and any outstanding undrawn letters of credit issued under the Credit Agreement shall be cash collateralized at 105% of the face amount thereof, pursuant to arrangements satisfactory to the issuers thereof.

If the Debtors do not arrange for the Alternative Exit Facility, Class 3 will be Impaired and Holders of Revolving Facility Lender Claims in Class 3 will be entitled to vote to accept or reject the Plan. If the Debtors arrange for the Alternative Exit Facility, Class 3 will be Unimpaired. Holders of Revolving Facility Lender Claims in Class 3 will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, will not be entitled to vote to accept or reject the Plan.

### 4.  Class 4 – GSO Notes Claims and Kelso Notes Claims

GSO Notes Claims and Kelso Notes Claims in Class 4 include all Claims arising under or relating to the GSO Notes and Kelso Notes held by the GSO Noteholders and Kelso Noteholders.

The Plan provides that GSO Notes Claims shall be Allowed in full without set-off, defense, or counterclaim in the aggregate principal amount of not less than $115,492,000, plus all outstanding fees, interest, expenses and other amounts due in accordance with the terms of the 2015 Indenture, and less the amount of such Claims that are exchanged for loans under the Roll Up Facility, with the secured portion of such Claims receiving treatment pursuant to Class 4.

The Plan also provides that Kelso Notes Claims shall be Allowed in full without set-off, defense, or counterclaim in the aggregate principal amount of not less than $118,596,000, plus all outstanding fees, interest, expenses and other amounts due in accordance with the terms of the 2015 Indenture, and less the amount of such Claims that are exchanged for loans under the Roll Up Facility, with the secured portion of such Claims receiving treatment pursuant to Class 4.

The Plan provides that, on the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a holder of a GSO Notes Claim or Kelso Notes Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and

in exchange for such Claim, each holder of a GSO Notes Claim and/or a Kelso Notes Claim shall receive a Pro Rata share of the New Stock, subject to dilution for the Management Incentive Plan (to the extent the board of directors of Reorganized Holding approves awards of New Stock thereunder).  The Plan further provides that, for the avoidance of doubt, on the Effective Date, each holder of a GSO Notes Claim and Kelso Notes Claim shall be deemed to have waived its Notes Deficiency Claim.

Class 4 is Impaired under the Plan.  Holders of Allowed GSO Notes Claims and Allowed Kelso Notes Claims in Class 4 are entitled to vote to accept or reject the Plan.

### 5.    Class 5 – Unexchanged Notes Claims

Unexchanged Notes Claims in Class 5 include all Claims arising under or relating to the Unexchanged Notes held by the Unexchanged Noteholders.

The Plan provides that the Unexchanged Notes Claims shall be Allowed in full without set-off, defense, or counterclaim in the aggregate principal amount of not less than $143,936,000, plus all outstanding fees, interest, expenses and other amounts due in accordance with the terms of the 2010 Indenture, and less the amount of such Claims that are exchanged for loans under the Roll Up Facility, with the secured portion of such Claims receiving treatment pursuant to Class 5.

The Plan provides that, on the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a holder of an Unexchanged Notes Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for such Claim, each holder of an Unexchanged Note Claim shall receive:

a.    Subclass 5(a).  Each holder of Unexchanged Notes that, in the aggregate, holds equal to or in excess of $9,000 in principal amount of Unexchanged Notes shall receive a Pro Rata share of the New Stock, subject to dilution for Management Incentive Plan (to the extent the board of directors of Reorganized Holding approves awards of New Stock thereunder).

b.    Subclass 5(b).  Each holder of Unexchanged Notes that, in the aggregate, holds less than $9,000 in principal amount of Unexchanged Notes shall receive a Cash-Out Payment, which shall be paid (i) in the form of Cash, if Class 5 votes to accept the Plan and (ii) in the form of New Secured Notes, if Class 5 votes to reject the Plan.

The Plan further provides that, for the avoidance of doubt, on the Effective Date, each holder of Unexchanged Notes shall be deemed to have waived its Notes Deficiency Claim.

Class 5 is Impaired under the Plan.  Holders of Allowed Unexchanged Notes Claims in Class 5 are entitled to vote to accept or reject the Plan.

### 6.      Class 6 – General Unsecured Claims

A General Unsecured Claim consists of any Claim against any of the Debtors that is not a DIP Facilities Claim, Administrative Claim, Priority Tax Claim, Other Priority Claim, Revolving Facility Lender Claim, GSO Notes Claim, Kelso Notes Claim, Unexchanged Notes Claim, Other Secured Claim, Intercompany Claim, or Subordinated Claim, and shall include, without limitation, any Claims arising from existing or potential litigation against any of the Debtors. For the avoidance of doubt, General Unsecured Claims shall not include and any Notes Deficiency Claim or any General Unsecured Claim of the Unanimous Supporting Noteholders, which are all deemed waived and released under the Plan.

The Plan provides that, on the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for such Claim, each holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the General Unsecured Claim Cash Pool.

Class 6 is Impaired under the Plan.  Holders of Allowed General Unsecured Claims in Class 6 are entitled to vote to accept or reject the Plan.

### 7.      Class 7 – Intercompany Claims

Intercompany Claims include any Claim held by one of the Debtors against any other Debtor, including (a) any account reflecting intercompany book entries by a Debtor with respect to any other Debtor, (b) any Claim not reflected in book entries that is held by such Debtor against any other Debtor or Debtors, and (c) any derivative Claim asserted or assertable by or on behalf of a Debtor against any other Debtor or Debtors.

The Plan provides that Intercompany Claims shall be reinstated, cancelled or compromised as determined by the Debtors with the consent of the Required Supporting Noteholders.

Class 7 is Unimpaired under the Plan.  Holders of Allowed Intercompany Claims in Class 7 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

### 8.      Class 8 – Subordinated Claims

A Subordinated Claim includes any Claim that is subordinated by Final Order of the Court pursuant to section 510(b) or 510(c) of the Bankruptcy Code.

The Plan provides that the holders of Subordinated Claims shall neither receive Distributions nor retain any property under the Plan for or on account of such Subordinated Claims.

Class 8 is Impaired under the Plan.  Holders of Subordinated Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

### 9.    Class 9 – Existing Equity Interests

The Plan defines an Equity Interest as meaning all issued and outstanding Equity Interests in Holding, including any vested or unvested and exercised or unexercised options or warrants to acquire such Equity Interests.

The Plan provides that Existing Equity Interests shall be discharged, cancelled, released, and extinguished as of the Effective Date and holders of Existing Equity Interests shall neither receive any Distributions nor retain any property under the Plan for or on account of such Equity Interests.

Class 9 is Impaired under the Plan. Holders of Existing Equity Interests in Class 9 are presumed and deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

### 10.    Class 10 – Intercompany Interests

Class 10 Consists of Intercompany Interests.

The Plan provides that Intercompany Interests shall be cancelled or reinstated, as determined by the Debtors with the consent of the Required Supporting Noteholders.

Class 10 is Unimpaired under the Plan. Holders of Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

### E.    Provisions Regarding Corporate Governance of the Reorganized Debtors

### 1.    Cancellation of Existing Equity Interests

On the Effective Date, all Existing Equity Interests shall be cancelled.

### 2.    Directors and Officers of the Reorganized Debtors

On the Effective Date, the term of each member of the current boards of directors of the Debtors shall expire, and the board of each of the Reorganized Debtors, as well as the officers of each of the Reorganized Debtors, shall consist of those individuals that will be identified in the Plan Supplement. Following the Effective Date, the appointment and removal of the members of the board of each of the Reorganized Debtors shall be governed by the terms of each Reorganized Debtor's respective corporate governance documents.

### 3.    Powers of Officers

The Plan provides that the officers of the Debtors (with the consent of the Required Supporting Noteholders, the Supporting Lenders, the Supporting Interest Holders, the DIP Agent, and the Required Lenders) or the Reorganized Debtors, as applicable, shall have the power to (i) enter into, execute or deliver any documents or agreements that may be necessary

and appropriate to implement and effectuate the terms of the Plan, and (ii) take any and all other actions that may be necessary and appropriate to effectuate the terms of the Plan, including the making of appropriate filings, applications or recordings, <u>provided</u> that such documents and agreements are in form and substance acceptable to the Required Supporting Noteholders, the Supporting Lenders, the Supporting Interest Holders, the DIP Agent, and the Required Lenders.

### 4.    Management Incentive Plan

The Plan provides that, following the Effective Date, the board of directors of Reorganized Holding may adopt and implement a Management Incentive Plan, which may provide for the issuance of Cash or New Stock.  Specific awards shall be as determined by the board of directors of Reorganized Holding (or, if applicable, a compensation committee established by such board) from time to time.

### F.    Substantive Consolidation of the Debtors

Early into the Chapter 11 Cases, upon the motion of the Debtors, the Bankruptcy Court ordered that the Chapter 11 Cases be administered on a joint rather than individual basis.  Joint administration of the bankruptcy reorganization cases of affiliated debtors commonly occurs, as it greatly simplifies that administration, for the bankruptcy court, the debtors, and the debtors' claimants.  Joint administration of the bankruptcy cases of affiliated debtors does not, in and of itself, displace or otherwise impact the substantive rights of any party in interest; nor does it necessarily presage the substantive consolidation of those affiliated debtors for any purpose.

Unlike joint administration, substantive consolidation does affect substantive rights, and is permissible only under certain narrowly prescribed circumstances.  "Substantive consolidation, a construct of federal common law, emanates from equity. It 'treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities (save for inter-entity liabilities, which are erased). The result is that claims of creditors against separate debtors morph to claims against the consolidated survivor.' Consolidation restructures (and thus revalues) rights of creditors and for certain creditors this may result in significantly less recovery."  *In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005), as amended (internal citation omitted).

The United States Supreme Court has not established any set framework, binding nationwide, for determining when substantive consolidation may be appropriate.  In the absence of any such nationwide framework, a patchwork of frameworks has developed, largely based on the decisions of those federal circuit courts of appeal that have weighed in on the matter (and decisions of the lower courts in those particular federal circuits in reliance on that appellate guidance), as well as the lower court decisions in the federal circuits lacking definitive direction from their respective court of appeals.  Further complicating the legal landscape, it is unclear whether the analysis of certain earlier-decided cases of certain of those federal courts of appeal still would be regarded as good law, were those appellate courts to revisit the question with the benefit of the more-refined analysis gained from certain of the later-decided appellate cases.  In the case of the Chapter 11 Cases, the governing analysis is contained in the *Owens Corning* case referenced above.  *Owens Corning* was decided by the United States Court of Appeals for the Third Circuit, which circuit includes bankruptcy courts located in the State of Delaware and

which decision also constitutes perhaps the most recent full substantive consolidation analysis of any federal circuit court.

In *Owens Corning*, the Third Circuit confirmed that substantive consolidation exists as a remedy available to a bankruptcy court for use in appropriate circumstances over the objections of creditors. *Owens Corning*, at 210.    In reversing the district court's consolidation of a parent company and a number of its subsidiary guarantors, the Third Circuit did not endorse any specific set of "factors" a court should consider in ordering substantive consolidation.    Instead, the Third Circuit articulated the following five (5) "principles" to guide the court in its analysis: (i) absent compelling circumstances calling equity (and even then only possibly substantive consolidation) into play, courts must respect entity separateness; (ii) substantive consolidation nearly always addresses harms caused by debtors disregarding separateness (with other tools being available to address harms caused by creditors); (iii) mere benefit of administration of the case is "hardly a harm calling substantive consolidation into play"; (iv) substantive consolidation rarely should be used, and only as a last resort after alternative remedies have been considered and rejected; and (v) substantive consolidation may be used defensively, to remedy identified harms caused by entangled affairs, but may not be used as a "sword." *Owens Corning*, at 211.

Applying those five (5) principles, the Third Circuit established two alternate rationales to be used by a bankruptcy court in this jurisdiction in order to order substantive consolidation, absent the consent of the parties.    The bankruptcy court must find that "(i) prepetition [the applicable debtors] disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors." *Id*. (footnotes omitted).

The Plan provides that, solely for purposes of voting on, confirmation of, and Distributions to be made to holders of Allowed Claims under the Plan, the Plan is predicated upon, and it is a condition precedent to confirmation of the Plan, that the Court provide in the Confirmation Order for the limited consolidation of the Estates of the Debtors into a single Estate for purposes of the Plan, the confirmation thereof and Distributions thereunder.

As provided in the Plan, pursuant to the Confirmation Order: (i) all assets and liabilities of the consolidated Debtors will be deemed to be merged solely for purposes of Distributions to be made thereunder, (ii) the obligations of each Debtor will be deemed to be the obligation of the consolidated Debtors solely for purposes of Distributions thereunder, (iii) any Claims filed or to be filed in connection with any such obligations will be deemed Claims against the consolidated Debtors, (iv) each Claim filed in the Chapter 11 Case of any Debtor will be deemed filed against the Debtors in the consolidated Chapter 11 Cases in accordance with the limited consolidation of the assets and liabilities of the Debtors, (v) all transfers, disbursements and Distributions made by any Debtor thereunder will be deemed to be made by the consolidated Debtors, and (vi) all guarantees of the Debtors of the obligations of any other Debtors shall be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the consolidated Debtors. Holders of Allowed Claims in each Class shall be entitled to their share of assets available for Distribution to such Class without regard to which

Debtor was originally liable for such Claim. Intercompany Claims shall be treated as provided in Class 7 of the Plan and Intercompany Interests shall be treated as provided in Class 10 of the Plan.

The Plan provides that, notwithstanding the limited consolidation provided for in the Plan and described above, such limited consolidation shall not affect (a) the legal and corporate structure of the Reorganized Debtors, (b) any obligations under any contracts or leases that were entered into during the Chapter 11 Cases or executory contracts or unexpired leases that have been or will be assumed pursuant to the Plan, (c) distributions from any insurance policies or proceeds of such policies, (d) the revesting of assets in the separate Reorganized Debtors pursuant to Article IX.B of the Plan, or (e) guarantees that are required to be maintained post-Effective Date (i) in connection with executory contracts or unexpired leases that were entered into during the Chapter 11 Cases or that have been, or will thereunder be, assumed, (ii) pursuant to the express terms of the Plan, or (iii) in connection with the Exit Financing Facilities. The limited consolidation proposed in the Plan shall not affect each Debtor's obligation to file the necessary operating reports and pay any required fees pursuant to 28 U.S.C. § 1930(a)(6), which obligations shall continue until a Final Order is entered closing, dismissing or converting each such Debtor's Chapter 11 Case.

Unless the Bankruptcy Court has approved the substantive consolidation of the Estates by a prior order, the Plan shall serve as, and shall be deemed to be, a motion for entry of an order consolidating the Estates in the manner and for the limited purposes set forth in the Plan. If no objection to such consolidation is timely filed and served, then the holders of Claims will be deemed to have consented to such consolidation in the manner and for the limited purposes of the Plan only, and the Bankruptcy Court may approve such consolidation of the Estates in the Confirmation Order. If an objection to the limited consolidation described above is timely filed and served, a hearing with respect to such consolidation and the objections thereto shall be scheduled by the Bankruptcy Court, which hearing may coincide with the Confirmation Hearing. **The Debtors reserve the right to proceed with confirmation of the Plan on a non-substantively consolidated basis.**

The Debtors believe that substantive consolidation, in the manner and for the limited purposes set forth in the Plan, is warranted in the Chapter 11 Cases for several reasons. The Debtors believe that customers and creditors identified the Debtors and dealt with them as one aggregation, by their trade name, rather than on the basis of separate corporate identities, particularly in light of the fact that all company-owned locations operated under the Logan's Roadhouse name. The Debtors also believe that their general unsecured creditors viewed the Debtors as one single entity when extending trade credit and other credit terms, and the Debtors capitalized upon the scale and operations of the entirety of the Debtors' business operations to negotiate such agreements and maximize value. Further, all accounts payable functions were performed from one centralized location (Nashville, Tennessee), by the same administrative staff working on behalf of all Debtors, and all debts were centralized and paid by one Debtor entity.

In addition, each of Holding, Midco, Intermediate, Parent and LRI Holdings are simply holding companies for their subsidiary debtors and have no business activity. The Debtors maintain consolidated financial statements for the activity at LRI Holdings and

Logan's Roadhouse and do not keep separate books and records for the other Debtors, given their lack of financial activity. For purposes of the Debtors' negotiation of secured financing, both prepetition and postpetition, the parties to such financing arrangements treated the Debtors' operations as unitary. For example, each of the Debtors is fully obligated, as borrower or guarantor, on the Debtors' post-petition secured financings, and the Credit Agreement, the 2010 Indenture, and 2015 Indenture are secured by substantially all of the assets of LRI Holdings and its subsidiaries. The latter financings collectively constitute the vast majority of the Debtors' prepetition liabilities, and all of them encumber substantially all of the Debtors' collective prepetition assets.

Given the nominal amount of assets held by the Debtors other than Logan's Roadhouse, the small number of creditors of each of the Debtors other than Logan's Roadhouse, the fact that many of the Debtors are obligors under each of the prepetition secured financings and the obligations thereunder represent the vast majority of Claims in the Chapter 11 cases, and the expense of generating separate plans of reorganization for each of the Debtors, the Debtors believe that the overall effect of substantive consolidation will be more beneficial than harmful to creditors and will allow for greater efficiencies and simplification in processing Claims and making distributions to holders of Allowed Claims. Accordingly, the Debtors believe that substantive consolidation of the Debtors' estates, under the terms of the Plan, will not adversely impact the treatment of any of the Debtors' creditors, but rather will reduce administrative expenses by automatically eliminating any duplicative claims asserted against more than one of the Debtors, decreasing the administrative difficulties and costs related to the administration of eight (8) separate Debtor's estates separately, as well as eliminating the need to determine professional fees on a case-by-case basis and streamlining the process of making Distributions.

For the above reasons, the Debtors believe that substantive consolidation is justified in the Chapter 11 Cases. Absent a timely objection to the Debtors' proposed substantive consolidation, substantive consolidation may be ordered by the Bankruptcy Court. If an objection is timely filed and served, a hearing with respect to the substantive consolidation of the Estates in the manner provided for under the Plan may be requested by the Debtors, at which time the Debtors will seek to establish the requisites for substantive consolidation.

### G.   Provisions Regarding Means of Implementation, Voting, Distributions, and Resolution of Disputed Claims

### 1.   General Settlement of Claims

The Plan provides that, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests and controversies resolved pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, in consideration for the classification, distributions, releases and other benefits provided under the Plan. Distributions made under the Plan to holders of Allowed Claims in any Class are intended to be final.

Under Bankruptcy Rule 9019, a bankruptcy court can approve a compromise or settlement if it is in the best interests of the debtor's estate. *See Law Debenture Trust Co. of New*

*York v. Kaiser Aluminum Corp. (In re Kaiser Aluminum Corp.)*, 339 B.R. 91, 95–96 (D. Del. 2006) ("Pursuant to Bankruptcy Rule 9019, the Bankruptcy Court must determine whether a proposed settlement is in the best interest of the debtor's estate before such a settlement is approved."). In evaluating a settlement, the bankruptcy court must exercise its discretion and make an independent determination that the settlement is fair and reasonable. *See In re Marvel Entm't Grp., Inc.*, 222 B.R. 243, 249 (D. Del. 1998) ("This court has described the ultimate inquiry to be whether 'the compromise is fair, reasonable, and in the interest of the estate.'" (quoting *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997)). In addition, a court must: "'assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal' in light of four factors: (1) the probability of success in the litigation, (2) the likely difficulties in collection, (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it, and (4) the paramount interests of the creditors." *In re Kaiser Aluminum Corp.*, 339 B.R. at 96 (*quoting In re Martin*, 91 F.3d 389, 392 (3d Cir. 1996)).

As discussed in Article VI.I. of this Disclosure Statement, the treatment of creditors and distribution of assets under the Plan contemplates a comprehensive agreement under which the Debtors, the other parties to the Restructuring Support Agreement, and the Creditors' Committee have consensually resolved or agreed not to pursue claims, objections, litigation, or other disputes that otherwise likely would arise and be required to be resolved in these Chapter 11 Cases, including, among other things and solely by way of example, potential disputes related to the valuation of the Debtors and their assets, feasibility of the Plan, and the scope of releases under the Plan.

### 2.    Exit Financing

The Exit Financing is to consist of the Exit First Lien Facility (or Alternative Exit Facility) and the Exit Second Lien Facility, each of which the Debtor shall enter into on the Effective Date.

#### a.    Exit First Lien Facility

The Plan provides that, on the Effective Date, the Reorganized Debtors shall enter into either the Exit Revolving Facility (subject to the terms of the Exit Revolving Credit Agreement), or an Alternative Exit Facility; in each case, providing not less than $29 million of availability that shall be used to satisfy the Revolving Facility Lender Claims (including, in the case of the Exit Revolving Facility, by deeming all Revolving Lender Claims for principal as principal outstanding under the Exit Revolving Facility on a dollar-for-dollar basis and deeming all outstanding letters of credit issued under the Credit Agreement as issued under the Exit Revolving Credit Agreement, and, in each case, subject to the terms of the Exit Revolving Facility). The terms and conditions of the Exit First Lien Facility shall be substantially in the form set forth in the Plan Supplement subject to any amendments, modifications or waivers consented to by the Supporting Lenders and the Required Supporting Noteholders.

b.    Exit Second Lien Facility

The Plan provides that, on the Effective Date, the Reorganized Debtors shall enter into the Exit Second Lien Facility, which shall be used to satisfy the DIP Facility Claims through a cashless exchange of all obligations outstanding under the DIP Facilities for obligations of the Reorganized Debtors under the Exit Second Lien Facility on a dollar-for-dollar basis and shall include an additional $3.5 million of "new money" loans.  The terms and conditions of the Exit Second Lien Facility shall be substantially in the form set forth in the Plan Supplement, subject to any amendments, modifications or waivers consented to by (x) the Required Supporting Noteholders or the Unanimous Supporting Noteholders as provided for in the Restructuring Support Agreement Term Sheet, and (y) to the extent that the Exit First Lien Facility is the Exit Revolving Facility, the Supporting Lenders, and in each case with the consent of the Creditors' Committee if such amendment, modification, or waiver is materially inconsistent with the terms of the Creditors' Committee Settlement.  The Exit First Lien Facility, the Exit Second Lien Facility and, if applicable, the New Secured Notes shall be subject to the Exit Financing Intercreditor Agreement.

The Plan further provides that, in order to participate in the Exit Second Lien Facility with respect to the exchange of obligations under the Roll Up Facility, each DIP Lender must surrender, either physically or electronically, to the applicable Indenture Trustee the Notes that were deemed exchanged for obligations under the Roll Up Facility, in accordance with Article VII.I.3 of the Plan, by the Effective Date, or such other date as determined by the Indenture Trustees and the Debtors.  If any DIP Lender fails to surrender to the applicable Indenture Trustee by the Effective Date, or such other date as determined by the Indenture Trustees and the Debtors, the Notes that were deemed to have been exchanged for obligations under the Roll Up Facility, those obligations under the Roll Up Facility shall be deemed null and void and such DIP Lender will not participate in the Exit Second Lien Facility on account of the obligations under the Roll Up Facility that otherwise would have been issued with respect to such Notes.  The Debtors and the Indenture Trustees, may modify the participation procedures contained in the Plan as may be necessary or appropriate to effect surrender of the Notes.

Confirmation of the Plan shall be deemed to constitute approval of the Exit Financing Facilities, and the Exit Financing Facility Documents, and, subject to the occurrence of the Effective Date, authorization for the Reorganized Debtors to enter into and perform their obligations in connection with the Exit Financing Facilities.

On the Effective Date, the Exit Financing Facility Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms.  The financial accommodations to be extended pursuant to the Exit Financing Facility Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law.  On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Financing Facility Documents (1) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit

Financing Facility Documents, (2) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Exit Financing Facility Documents, (3) shall be subject to the Exit Financing Intercreditor Agreement, and (4) except as expressly permitted in the Exit Financing Facility Documents, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

### 3. Issuance of New Stock

The Plan provides that the issuance of New Stock by Reorganized Holding, is authorized without the need for any further corporate action or without any further action by a holder of Claims or Interests. On the Effective Date (or as soon as reasonably practicable thereafter), the New Stock shall be issued, through any intermediate holding companies, subject to the provisions of the Plan, to Logan's Roadhouse, Inc., which shall then issue the New Stock to (i) the holders of Allowed GSO Notes Claims who are receiving New Stock pursuant to the Plan, (ii) the holders of Allowed Kelso Notes Claims who are receiving New Stock pursuant to the Plan and (iii) the holders of Allowed Unexchanged Notes Claims who are receiving New Stock pursuant to the Plan. The amount of the New Stock to be issued pursuant to the Plan shall be disclosed in the Plan Supplement.

The Plan provides that all of the New Stock issued pursuant to the Plan shall be duly authorized and validly issued. Each Distribution and issuance referred to in Article VII of the Plan shall be governed by the terms and conditions set forth therein applicable to such Distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such Distribution or issuance, including the Reorganized Holding Certificate of Incorporation and Reorganized Holding Shareholder Agreement, which terms and conditions shall bind each Person receiving such Distribution or issuance. Upon the Effective Date, the Reorganized Holding Certificate of Incorporation and Reorganized Holding Shareholder Agreement shall be deemed to become valid, binding and enforceable in accordance with their terms, and each holder of New Stock shall be bound thereby, in each case, without need for execution by any party thereto other than Reorganized Holding; *provided* that any party that receives New Stock under the Plan is directed to furnish the Reorganized Debtors with such information and documents as are necessary to evidence their ownership of New Stock and their becoming a party to the Reorganized Holding Shareholder Agreement.

### 4. Avoidance Actions

Pursuant to the Plan, from and after the Effective Date, the Reorganized Debtors covenant and agree not to bring any Avoidance Actions, which Avoidance Actions shall be deemed released and waived on the Effective Date.

### 5. Waiver of Notes Deficiency Claims and Certain General Unsecured Claims

Pursuant to the Plan, on the Effective Date, all Notes Deficiency Claims shall be deemed waived and the Unanimous Supporting Noteholders shall be deemed to have waived any General Unsecured Claims against the Debtors.

### 6. Restructuring Transactions

Pursuant to the Plan, on the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may modify their corporate structure by eliminating certain entities and may take all actions as may be necessary or appropriate to effect such transactions, including any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties may agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion (including related formation) or dissolution pursuant to applicable state law; and (iv) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law. The Plan provides that, prior to the Effective Date, the Debtors shall have obtained the consent of the Supporting Lenders and the Required Supporting Noteholders or the Unanimous Supporting Noteholders as provided for in the Restructuring Support Agreement Term Sheet, regarding their intentions with respect to the restructuring transactions.

### 7. Corporate Action

Under the Plan, upon the Effective Date, all corporate actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (i) the transactions contemplated by Article VII.D of the Plan, (ii) the adoption and filing of appropriate certificates of incorporation and memoranda and articles of association and amendments thereto, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable law, (iii) the initial selection of managers, directors and officers for the Reorganized Debtors, (iv) the Distributions pursuant to the Plan, (v) the execution and entry into the Exit Financing Facilities, and (vi) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date), in each case unless otherwise provided in the Plan. All matters provided for under the Plan involving the corporate structure of the Debtors and Reorganized Debtors or

corporate action to be taken by or required of a Debtor or a Reorganized Debtor will be deemed to occur and be effective as of the Effective Date, if no such other date is specified in such documents, and shall be authorized, approved, adopted and, to the extent taken prior to the Effective Date, ratified and confirmed in all respects and for all purposes without any requirement of further action by holders of Claims or Interests, directors of the Debtors or the Reorganized Debtors, as applicable, or any other Person, except to effect the filing of any new corporate governance documents respecting the Debtors, as necessary.

### 8.    Effectuating Documents; Further Transactions

In accordance with the Plan, the Reorganized Debtors and the officers and directors of the board of directors thereof, are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan and applicable non-bankruptcy law.

### 9.    Reorganized Holding Certificate of Incorporation and By-Laws

The Plan provides that, on or promptly after the Effective Date, Reorganized Holding will file the Reorganized Holding Certificate of Incorporation with the Secretary of State and/or other applicable authorities in its state of incorporation in accordance with the corporate laws of that state.  Pursuant to section 1123(a)(6) of the Bankruptcy Code, the Reorganized Holding Certificate of Incorporation will prohibit the issuance of non-voting equity securities.  After the Effective Date, Reorganized Holding may amend and restate the Reorganized Holding Certificate of Incorporation and Reorganized By-Laws as permitted by the laws of its state of incorporation, and the Reorganized Holding Constituent Documents.  The Reorganized Holding Constituent Documents shall be substantially in the form set forth in the Plan Supplement

### 10.    Cancellation of Securities and Agreements

a.    Cancellations. Pursuant to the Plan, on the Effective Date, except as otherwise specifically provided for in the Plan, including as provided for in Article IX.L of the Plan with respect to certain Indemnification Obligations surviving: (1) the obligations of the Debtors under the Credit Agreement, the 2010 Indenture, and the 2015 Indenture and any other certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Equity Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically reinstated pursuant to the Plan), shall be cancelled solely as to the Debtors, and the Reorganized Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the membership interests, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any

indebtedness or obligation of the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically reinstated pursuant to the Plan) shall be released and discharged; provided, however, notwithstanding confirmation of the Plan or the occurrence of the Effective Date, any agreement that governs the rights of the holder of a Claim shall continue in effect solely for purposes of allowing holders to receive Distributions under the Plan as provided therein; provided, further, notwithstanding confirmation of the Plan or the occurrence of the Effective Date, the Credit Agreement, the 2010 Indenture and the 2015 Indenture shall continue in effect solely for the purposes of allowing the Revolving Facility Lender Claims, GSO Notes Claims, Kelso Notes Claims, and Unexchanged Notes Claims under the Plan; provided, further, however, that the preceding proviso shall not affect the discharge of Claims or Equity Interests pursuant to the Bankruptcy Code, the Confirmation Order or the Plan, or result in any expense or liability to the Reorganized Debtors.

　　　　　b.　　　Letter of Transmittal to Holders of Notes Claims.　The Plan provides that, as soon as practicable after the Effective Date, the Reorganized Debtors, with the cooperation of the Indenture Trustees shall send a letter of transmittal to each Noteholder who has not surrendered, either physically or electronically, its Note(s) as of the Effective Date, advising such Noteholder of the effectiveness of the Plan and providing instructions to such Noteholder to deliver to the applicable Indenture Trustee such Noteholder's Note(s) in exchange for the Distributions to be made pursuant to the Plan.　Under the Plan, delivery of any Note will be effected, and risk of loss and title thereto shall pass, only upon delivery of such Note to the appropriate Indenture Trustee in accordance with the terms and conditions of such letter of transmittal, such letter of transmittal to be in such form and have such other provisions as the Reorganized Debtors, the Indenture Trustees or their representatives may reasonably request.

　　　　　c.　　　Delivery and Surrender.　The Plan provides that each Noteholder, including each DIP Lender with respect to the Roll Up Facility, shall surrender, either physically or electronically, its Note(s) to the appropriate Indenture Trustee as a condition to receiving a Distribution under the Plan and, with respect to the Exit Second Lien Facility, participating in the Exit Second Lien Facility with respect to the exchange of obligations under the Roll Up Facility. No Distribution under the Plan shall be made to or on behalf of any Noteholder or any DIP Lender, with respect to the obligations under the Roll Up Facility, unless and until such Note(s) are received by the appropriate Indenture Trustee, or the ownership and loss, theft or destruction of such Note(s) are established to the satisfaction of the applicable Indenture Trustee, including requiring such Noteholder to (i) submit a lost instrument affidavit and an indemnity bond, and (ii) hold the Debtors, the Reorganized Debtor, the DIP Lenders, the DIP Agent, and the Indenture Trustee harmless in respect of such Note and any Distributions made in respect thereof.　The Plan further provides that no Distribution thereunder shall be made on account of any Unexchanged Notes Claim unless and until the holder of such Unexchanged Notes Claims certifies that such Noteholder holds, in the aggregate, either (a) equal to or in excess of $9,000 in principal amount of Unexchanged Notes or (b) less than $9,000 in principal amount of Unexchanged Notes.　Upon compliance with Article VII.I.3 of the Plan by a Noteholder, the Plan provides that such Noteholder shall, for all purposes under the Plan, be deemed to have surrendered such Note(s).　Pursuant to the Plan, any such Noteholder that fails to surrender such Note(s) or satisfactorily explain its non-availability to the applicable Indenture Trustee within one hundred and twenty (120) days of the Effective Date shall be deemed to have no further Claim against the Debtors, the Reorganized Debtor or their property, the DIP Lenders, the DIP

Agent, or the applicable Indenture Trustee in respect of such Claim and shall not participate in any Distribution under the Plan. If any Distributions under the Plan are unclaimed or cannot be made because a Noteholder has failed to comply with the provisions of Article VII.I.3 of the Plan, such New Stock, cash or notes that would have been distributed to the applicable holder shall be retained by the applicable Reorganized Debtor.

### 11.    Distributions in Respect of Allowed Claims

Article VII.K of the Plan sets forth the procedure for making distributions under the Plan, which include provisions for the timing and manner of delivering distributions of claims, the treatment of  unclaimed distributions, the treatment of interest on claims, the rights of the Debtors or Reorganized Debtors to effectuate setoffs against distribution and the certain tax and withholding information.

### 12.    Resolution of Disputed Claims

a.    <u>Objections to Claims</u>.  The Plan provides that, from and after the Effective Date, the Reorganized Debtors shall have the right to object to any and all Claims that have not been previously Allowed.  Any objections to Claims shall be filed and served on or before the later of (i) one hundred and eighty (180) days after the Effective Date, and (ii) such later date as may be fixed by the Court upon a motion by the Reorganized Debtors without notice to any party or a hearing, which later date may be fixed before or after the date specified in clause (i) above.  No objection shall be required with respect to a Proof of Claim filed after the applicable Bar Date, and any and all such Claims shall be deemed disallowed unless otherwise ordered by the Court after notice and a hearing.  The Plan also provides procedures regarding the filing and service of objections to Professional Fee Claims.

b.    <u>Settlement of Claims</u>.  Pursuant to the Plan, and notwithstanding the requirements that may be imposed pursuant to Bankruptcy Rule 9019, from and after the Effective Date, the Reorganized Debtors shall have the authority to settle or compromise any claim or objections or proceedings relating to the allowance of Claims as and to the extent deemed prudent and reasonable without further review or approval of the Court and without the need to file a formal objection, subject to the consultations rights of the Ombudsman provided for in the Plan.  The Plan also provides that nothing in the Plan's provisions dealing with the resolution of Disputed Claim shall be deemed to effect or modify the applicable Bar Dates previously established in the Chapter 11 Cases.

c.    <u>Participation of Ombudsman</u>.    The Plan provides that the Reorganized Debtors consult with the Ombudsman prior to (a) taking an action or failing to take any action (i) to object or to otherwise challenge a General Unsecured Claim that is asserted in an amount (or in the case of an unliquidated General Unsecured Claim, that the Debtors reasonably believe may be asserted in an amount) equal to or in excess of $250,000 or (ii) that would result in the allowance of a General Unsecured Claim in an amount equal to or in excess of $250,000, or (b) making any amendment to the Schedules that would result in an Allowed General Unsecured Claim in an amount equal to or in excess of $250,000.  The Plan further provides that the Reorganized Debtors shall pay the reasonable documented fees and expenses of the Ombudsman in an amount not to exceed $50,000.

d.    No Distributions Pending Allowance.    The Plan provides that, notwithstanding any other provision of the Plan, if any portion of a Claim is a Disputed Claim, no payment or Distribution provided thereunder shall be made on account of the disputed portion of such Claim until the disputed portion of such Claim becomes an Allowed Claim.

e.    General Unsecured Claim Cash Pool.    In accordance with the Plan, on the Effective Date or as soon as practicable thereafter, the Reorganized Debtors shall establish the General Unsecured Claim Cash Pool.  Cash held in the General Unsecured Claim Cash Pool shall be held by the Reorganized Debtors in trust in a segregated account for the benefit of holders of Allowed General Unsecured Claims.  Cash held in the General Unsecured Claim Cash Pool shall not constitute property of the Reorganized Debtors.  Each holder of a Disputed General Unsecured Claim that becomes an Allowed General Unsecured Claim shall have recourse only to the undistributed Cash in the General Unsecured Cash Pool for satisfaction of such Allowed General Unsecured Claim and not to any Reorganized Debtor.

f.    Distributions after Allowance.    The Plan provides that, in the event that a Disputed Claim becomes an Allowed Claim, the Disbursing Agent shall distribute to the holder of such Claim such holder's Pro Rata portion of the property distributable with respect to the Class in which such Claim is classified therein.  To the extent that all or a portion of a Disputed Claim is disallowed, the holder of such Claim shall not receive any Distributions on account of the portion of such Claim that is disallowed and any property withheld pending the resolution of such Claim shall be reallocated Pro Rata to the holders of Allowed Claims in the same Class. The Plan also provides that nothing set forth therein is intended to, nor shall it, prohibit the Reorganized Debtors, in their sole discretion, from making a Distribution on account of any Claim at any time after such Claim becomes an Allowed Claim.  The Plan provides that, notwithstanding anything to the contrary therein, no distributions shall be made from the General Unsecured Claim Cash Pool until all Disputed General Unsecured Claims are resolved and either become Allowed or disallowed by Final Order or estimated by Final Order for purposes of distribution.

g.    Interest on Disputed Claims.    Unless otherwise specifically provided for in the Plan or as otherwise required by sections 506(b), 511 or 1129(a)(9)(C)-(D) of the Bankruptcy Code, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final Distribution is made when and if such Disputed Claim becomes and Allowed Claim.

h.    Estimation of Claims.    The Plan provides that the Debtors or the Reorganized Debtors may at any time request that the Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code or other applicable law regardless of whether the Debtors or the Reorganized Debtors have previously objected to such Claim or whether the Court has ruled on any such objection.  The Court will retain jurisdiction to estimate any Claim at any time during the pendency of litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  In the event that the Court estimates any Disputed Claim, such estimated amount shall constitute either (a) the Allowed amount of such Claim, (b) the amount on which a reserve is to be calculated for purposes of any reserve requirement to the Plan or (c) a maximum limitation on such Claim, as determined by the Court.  If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or

the Reorganized Debtors, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Court.

### 13.    Issuance of New Secured Notes.

The Plan provides that, subject to the terms thereof, on the Effective Date, to the extent applicable, the Reorganized Debtors shall execute and deliver the New Secured Notes on the terms set forth herein and otherwise in form and substance satisfactory to the Supporting Lenders and the Required Supporting Noteholders. If applicable, confirmation of the Plan shall be deemed to constitute approval of the New Secured Notes, and, subject to the occurrence of the Effective Date, authorization for the Reorganized Debtors to enter into and perform their obligations in connection with the New Secured Notes. All parties receiving the New Secured Notes under the Plan, upon receipt thereof, will be deemed bound to the terms of the New Secured Notes and subject to the terms of the Exit Financing Intercreditor Agreement.

The Plan provides that, on the Effective Date, to the extent that they are executed and delivered by the Reorganized Debtors, the New Secured Notes shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms. Under the Plan, the financial accommodations to be extended pursuant to the New Secured Notes are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law. Under the Plan, on the Effective Date, all of the Liens and security interests to be granted in accordance with the New Secured Notes (1) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New Secured Notes, (2) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the New Secured Notes, and (3) except as expressly permitted in the New Secured Notes, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law. The Plan provides that the Reorganized Debtors and the entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

### H.    Executory Contracts and Unexpired Leases

#### 1.    Assumption and Rejection of Executory Contracts and Unexpired Leases

Except as otherwise provided in the Plan or in any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, the Plan provides that, as of the Effective Date, all executory contracts and unexpired leases governed by section 365 of the Bankruptcy Code to which any of the Debtors are parties are thereby rejected except for any executory contract or unexpired lease that (i) previously has been assumed or rejected by the Debtors in the Chapter 11 Cases, (ii) previously expired or terminated pursuant to its own terms; (iii) is specifically identified on the Schedule of Assumed Contracts and Leases, or (iv) is the subject of a separate motion to assume or reject such executory contract or unexpired lease filed by the Debtors under section 365 of the Bankruptcy Code prior to the Effective Date. Under the Plan, the Debtors reserve the right to amend the Schedule of Assumed Contracts and Leases at any time prior to the Effective Date, subject to the consent of the Required Supporting Noteholders, the Supporting Lenders, and the Supporting Interest Holders.

#### 2.    Cure

Under the Plan, except to the extent that different treatment has been agreed to by the non-Debtor party or parties to any executory contract or unexpired lease to be assumed pursuant to the Plan, not less than fifteen (15) Business Days prior to the Confirmation Hearing, the Debtors shall, pursuant to the provisions of sections 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code, and consistent with the requirements of section 365 of the Bankruptcy Code, file and serve a notice with the Court listing the cure amounts of all executory contracts or unexpired leases to be assumed. The parties to such executory contracts or unexpired leases to be assumed by the Debtors shall have ten (10) Business Days from service of such pleading to object to the cure amounts listed by the Debtors. If there are any objections filed with respect thereto, the Court shall conduct a hearing to consider such cure amounts and any objections thereto. Under the Plan, the Debtors shall retain their right to reject any of their executory contracts or unexpired leases that are the subject of an objection to assumption, including any executory contracts or unexpired leases that are subject to a dispute concerning amounts necessary to cure any defaults, and any such executory contract or unexpired lease shall neither be assumed nor rejected until such time as the objection is resolved, either by agreement of the parties or following entry of a Final Order.

The Plan provides that all undisputed cure amounts shall be paid on the Effective Date or as soon as reasonably practicable thereafter. The Plan further provides that any cure amount that remains disputed as of the Effective Date shall be paid as soon as practicable after the resolution of the dispute with respect to the cure amount, either by agreement of the parties or following entry of a Final Order.

#### 3.    Rejection Damage Claims

The Plan provides that any and all Claims for damages arising from the rejection of an executory contract or unexpired lease must be filed with the Court in accordance with the terms

of the Final Order authorizing such rejection, but in no event later than thirty (30) days after the Effective Date to the extent an earlier time has not been established by the Court. Any Claims for damages arising from the rejection of an executory contract or unexpired lease that is not filed within such time period will be forever barred from assertion against the Debtors, their respective Estates and the Reorganized Debtors. Under the Plan, all Allowed Claims arising from the rejection of executory contracts or unexpired leases shall be treated as General Unsecured Claims.

### 4.   Restrictions on Assignment Void

The Plan provides that any executory contract or unexpired lease assumed or assumed and assigned shall remain in full force and effect to the benefit of the transferee or assignee in accordance with its terms, notwithstanding any provision in such executory contract or unexpired lease (including those of the type described in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer or assignment, including based on any change of control provision. Under the Plan, any provision that prohibits, restricts, or conditions the assignment or transfer of any such executory contract or unexpired lease, terminates or modifies such executory contract or unexpired lease or allows the counterparty to such executory contract or unexpired lease to terminate, modify, recapture, impose any penalty, condition renewal or extension, or modify any term or condition thereof (including on account of any change of control provision) on any such transfer or assignment, constitutes an unenforceable anti-assignment provision and is void and of no force or effect, but only in connection with the assumption or assumption and assignment of executory contracts and unexpired leases under the Plan.

The Plan provides that no sections or provisions of any executory contract or unexpired lease that purport to provide for additional payments, penalties, charges, rent acceleration, or other financial accommodations in favor of the non-debtor third party thereto shall have any force and effect with respect to the transactions contemplated under the Plan, and such provisions constitute unenforceable anti-assignment provisions under section 365(f) of the Bankruptcy Code and are otherwise unenforceable under section 365(e) of the Bankruptcy Code, but only in connection with the assumption or assumption and assignment of executory contracts and unexpired leases under the Plan.

### 5.   Benefit Plans

As of and subject to the Effective Date, the Plan provides that all employment and severance agreements and policies, and all employee compensation and benefit plans, policies, and programs of the Debtors applicable generally to their employees, including agreements and programs subject to section 1114 of the Bankruptcy Code, as in effect on the Effective Date, including all savings plans, retirement plans, health care plans, disability plans, severance benefit plans, incentive plans, and life, accidental death, and dismemberment insurance plans, and senior executive retirement plans, but expressly excluding any nonqualified deferred compensation plans that are treated as unfunded for tax purposes and Title 1 of ERISA, shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed under the Plan, and the Debtors' obligations under all such agreements and programs shall survive the Effective Date of the Plan, without prejudice to the Reorganized Debtors' rights under applicable

nonbankruptcy law to modify, amend, or terminate the foregoing arrangements in accordance with the terms and provisions thereof, except for (i) such executory contracts or plans specifically rejected pursuant to the Plan (to the extent such rejection does not violate section 1114 of the Bankruptcy Code), and (ii) such executory contracts or plans as have previously been terminated, or rejected, pursuant to a Final Order, or specifically waived by the beneficiaries of such plans, benefits, contracts, or programs.

### 6.     Workers' Compensation Obligations and ACE/Chubb Insurance Contracts

The Plan provides that, subject to Article VIII.F.1 of the Plan, (i) all applicable workers' compensation laws in states in which the Reorganized Debtors operate and (ii) all of the Debtors' obligations to employees under workers' compensation programs and laws are treated as executory contracts under this Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, with a cure amount of zero dollars.

a.     <u>Treatment of Ace/Chubb Insurance Contracts</u>.  The Plan provides that, notwithstanding anything to the contrary in this Disclosure Statement, the Plan, the Plan Supplement, the Exit Financing Facility Documents, the Confirmation Order, any other document related to any of the foregoing or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening (including, but not limited to, Article VIII.E of the Plan), grants an injunction, release, confers Bankruptcy Court jurisdiction or requires a party to opt out of any releases):  (a) on the Effective Date, the Reorganized Debtors jointly and severally shall assume the ACE/Chubb Insurance Contracts in their entirety pursuant to sections 105 and 365 of the Bankruptcy Code; (b) all ACE/Chubb Insurance Contracts (and any and all letters of credit and other collateral and security provided pursuant or in relation thereto) and all debts, obligations, and liabilities of Debtors (and, after the Effective Date, of the Reorganized Debtors) thereunder, whether arising before or after the Effective Date, shall survive and shall not be amended, modified, waived, released, discharged or impaired in any respect as a result of the confirmation of the Plan and occurrence of the Effective Date and the Reorganized Debtors will continue to be bound by the ACE/Chubb Insurance Contracts in accordance with their terms as if the Chapter 11 Cases had not occurred; (c) nothing in the Disclosure Statement, the Plan, the Plan Supplement, or the Confirmation Order shall affect, impair or prejudice the rights and defenses of the ACE/Chubb Insurers or the Reorganized Debtors under the ACE/Chubb Insurance Contracts in any manner (including, but not limited to, (i) any agreement to arbitrate disputes, (ii) any provisions regarding the provision, maintenance, use, nature and priority of collateral/security, and (iii) any provisions regarding the payment of amounts within any deductible by the ACE/Chubb Insurers and the obligation of the Debtors to pay or reimburse the applicable ACE/Chubb Insurer therefor), and such ACE/Chubb Insurers and the Reorganized Debtors shall retain all rights and defenses under the ACE/Chubb Insurance Contracts, and the ACE/Chubb Insurance Contracts shall apply to, and be enforceable by and against, the Reorganized Debtors and the applicable insurer(s) as if the Chapter 11 Cases had not occurred; (d) nothing in the Disclosure Statement, the Plan, the Plan Supplement, the Confirmation Order, any prepetition or administrative claim bar date order (or notice) or any other pleading, order or notice alters or modifies the duty, if any, that the ACE/Chubb Insurers have to pay claims covered by the ACE/Chubb Insurance Contracts and their right to seek payment or reimbursement from the Debtors (or after the Effective Date, the Reorganized

Debtors) or draw on any collateral or security therefor, subject to any and all legal, equitable or contractual rights, remedies, claims, counterclaims, defenses or Causes of Action of the Debtors (or after the Effective Date, the Reorganized Debtors); (e) nothing in the Disclosure Statement, the Plan, or the Confirmation Order (including any other provision that purports to be preemptory or supervening), shall in any way operate to, or have the effect of, impairing any party's legal, equitable or contractual rights and/or obligations under any ACE/Chubb Insurance Contract, if any, in any respect; any such rights and obligations shall be determined under the ACE/Chubb Insurance Contracts and applicable non-bankruptcy law; (f) the claims of the ACE/Chubb Insurers arising (whether before or after the Effective Date) under the ACE/Chubb Insurance Contracts (I) shall be paid in full by the Debtors or Reorganized Debtors, as applicable, in the ordinary course of businesses, whether as an Allowed Administrative Claim under section 503(b)(1)(A) of the Bankruptcy Code or otherwise, regardless of when such amounts are or shall become liquidated, due or paid, and (II) shall not be discharged or released by the Plan or the Confirmation Order or any other order of the Bankruptcy Court; (g) the ACE/Chubb Insurers shall not need to or be required to file or serve any objection to a proposed cure amount or a request, application, claim, proof or motion for payment or allowance of any Administrative Claim and shall not be subject to the Administrative Claims Bar Date, any other bar date or similar deadline governing cure amounts or Administrative Claims; and (h) the automatic stay of section 362(a) of the Bankruptcy Code and the injunctions set forth in Article IX of the Plan, if and to the extent applicable, shall be deemed lifted without further order of this Court, solely to permit: (I) claimants with valid workers' compensation claims or direct action claims to proceed with their claims against the Debtors (or the Reorganized Debtors) or the applicable insurers; (II) the insurers of the Debtors' workers' compensation programs to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Bankruptcy Court, (A) all valid workers' compensation claims arising under the workers' compensation policies issued by any insurer, (B) all claims where a claimant asserts a direct claim against any insurer under applicable non-bankruptcy law, or an order has been entered by this Court granting a claimant relief from the automatic stay to proceed with its claim, and (C) all costs in relation to each of the foregoing; (III) the ACE/Chubb Insurers to draw against any or all of the collateral or security provided by or on behalf of the Debtors (or the Reorganized Debtors, as applicable) at any time, subject to the terms and conditions of the applicable ACE/Chubb Insurance Contracts, and to hold the proceeds thereof as security for the obligations of the Debtors (and the Reorganized Debtors, as applicable) and/or apply such proceeds to the obligations of the Debtors (and the Reorganized Debtors, as applicable) under the applicable ACE/Chubb Insurance Contracts, in such order as the applicable Insurer may determine to the extent not inconsistent with the terms of the applicable insurance contract; and (IV) the ACE/Chubb Insurers to cancel any ACE/Chubb Insurance Contracts, and take other actions relating thereto, to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the ACE/Chubb Insurance Contracts; provided that the foregoing shall not modify or nullify any covenants or obligations of the Reorganized Debtors under the Exit Financing Facility Documents; provided, further, that for purposes of clarity, nothing in the Exit Financing Facility Documents shall modify or nullify any of the rights and/or obligations of the Reorganized Debtors and the ACE/Chubb Insurers under any ACE/Chubb Insurance Contract, including, without limitation, (A) the Exit Financing Facility Documents shall not grant Liens on, or security interests in, any and all collateral/security and the proceeds thereof (other than those granted in favor of the ACE/Chubb Insurers) provided by or on behalf of the

Debtors as security for the obligations of the Debtors (and the Reorganized Debtors, as applicable) under the ACE/Chubb Insurance Contracts and (B) the ACE/Chubb Insurers' Liens and security interests in such collateral/security shall be considered permitted Liens and security interests under the Exit Financing Facility Documents.

## I.      Effect of Confirmation of the Plan

### 1.      Continued Corporate Existence

Pursuant to the Plan, except as otherwise provided therein, including as provided with respect to Reorganized Holding in Article V.B of the Plan, or as may be provided in the Confirmation Order, each Debtor will, as a Reorganized Debtor, continue to exist after the Effective Date as a separate corporate entity, or limited liability company, as the case may be, with all the powers thereof, pursuant to the applicable law in the jurisdiction in which each applicable Reorganized Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificates of incorporation and by-laws (or other formation documents) are amended by the Plan and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval..

### 2.      Vesting of Assets

The Plan provides that, except as otherwise set forth therein or any agreement, instrument, or other document incorporated therein, on the Effective Date all property in each Estate, all Causes of Action, and any other property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens granted to secure the Exit Financing Facilities and any Liens applicable to any capitalized leases existing on the Effective Date).  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and conduct its affairs, and may use, acquire, or dispose of its property and assets and compromise or settle any Claims, Interests, or Causes of Action (excluding Avoidance Actions) without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

### 3.      Preservation of Causes of Action

Subject to the releases and exculpations set forth in the Plan, the Interim DIP Order, the Final DIP Order, and the DIP Credit Agreement, in accordance with section 1123(b)(3) of the Bankruptcy Code, under the Plan, the Debtors and the Reorganized Debtors shall retain all Litigation Rights (excluding Avoidance Actions), and nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any such Litigation Rights (excluding Avoidance Actions).  The Debtors may (but are not required to) enforce all Litigation Rights (excluding Avoidance Actions) and all other similar claims arising under applicable state laws, including fraudulent transfer claims, if any, and all other Causes of Action (excluding Avoidance Actions) of a trustee and debtor-in-possession under the Bankruptcy Code. Except as otherwise set forth in the Plan, the Reorganized Debtors, as applicable, in their sole

and absolute discretion, shall determine whether to bring, settle, release, compromise, or enforce any such Litigation Rights (or decline to do any of the foregoing), and shall not be required to seek further approval of the Court for such action.  Except as otherwise set forth in the Plan, the Debtors, the Reorganized Debtors, or any successors thereof may pursue such Litigation Rights (excluding Avoidance Actions) in accordance with the best interests of the Reorganized Debtors or any successors holding such rights of action.

### 4.    Discharge of the Debtors

The Plan provides that pursuant to section 1141(d) of the Bankruptcy Code, except as otherwise specifically provided in the Plan or in the Confirmation Order, the Distributions and rights that are provided in the Plan shall be in complete satisfaction, discharge and release, effective as of the Effective Date, of any and all Claims and Causes of Action (whether known or unknown) against, liabilities of, Liens on, obligations of, rights against, and Equity Interests in, the Debtors or any of their assets or properties, regardless of whether any property or assets shall have been distributed or retained pursuant to the Plan on account of such Claims, rights, and Equity Interests, including Claims and Equity Interests that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims relate to services performed by employees of the Debtors prior to the Petition Date and that arise from a termination of employment or a termination of any employee or retiree benefit program which occurred prior to the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (a) a Proof of Claim or Equity Interest based upon such Claim, debt, right, or Equity Interest was filed, is filed, or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim or Equity Interests based upon such Claim, debt, right, or Equity Interest is Allowed under section 502 of the Bankruptcy Code, or (c) the holder of such a Claim, right, or Equity Interest accepted the Plan.  As provided in the Plan, the Confirmation Order shall be a judicial determination of the discharge of all Claims against and Equity Interests in the Debtors, subject to the terms thereof and the occurrence of the Effective Date.

### 5.    Releases by the Debtors of Certain Parties

**TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, PURSUANT TO SECTION 1123(B)(3) OF THE BANKRUPTCY CODE, FOR GOOD AND VALUABLE CONSIDERATION, INCLUDING THE ACTIONS OF THE *RELEASED PARTIES*[11] TO FACILITATE THE REORGANIZATION OF THE DEBTORS AND THE IMPLEMENTATION OF THE RESTRUCTURING CONTEMPLATED BY THE PLAN, EFFECTIVE AS OF THE *EFFECTIVE DATE*,**

---

[11]   The "Released Parties" are defined by the Plan to mean " (a) each Debtor, (b) the Supporting Noteholders, (c) the Indenture Trustees, (d) the DIP Lenders, DIP Agent and other lender-parties under the DIP Facilities, (e) the lenders, agents, issuing banks, arrangers and other lender-parties under the Exit Financing Facilities, (f) the Supporting Lenders (as well as any issuing bank) and the Revolving Facility Agent, (g) the Sponsors, and (h) with respect to each of the foregoing entities identified in subsections (a) through (g), such Person's current and former equity holders, including shareholders, partnership interest holders, and limited liability company unit holders, affiliates, partners, subsidiaries, members, officers, directors, managers serving on a board of managers, principals, employees, agents, managed funds, advisors, attorneys, accountants, investment banks, consultants, representatives, and other professionals, together with their respective predecessors, successors, and assigns."

**EACH DEBTOR, IN ITS INDIVIDUAL CAPACITY AND AS A DEBTOR IN POSSESSION FOR ITSELF AND ON BEHALF OF ITS *ESTATE*, AND ANY PERSON CLAIMING THROUGH, ON BEHALF OF, OR FOR THE BENEFIT OF EACH DEBTOR AND ITS *ESTATE* SHALL RELEASE AND DISCHARGE AND BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED ALL *RELEASED PARTIES* FOR AND FROM ANY AND ALL *CLAIMS* OR *CAUSES OF ACTION* EXISTING AS OF THE *EFFECTIVE DATE* OR THEREAFTER WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, ARISING FROM OR RELATED TO ANY ACTIONS, TRANSACTIONS, EVENTS OR OMISSIONS OCCURRING ON OR BEFORE THE *EFFECTIVE DATE* RELATING TO THE DEBTORS, THE *CHAPTER 11 CASES* OR THE OBLIGATIONS UNDER THE *2010 INDENTURE*, THE *2015 INDENTURE*, THE *DIP FACILITIES*, AND THE *CREDIT AGREEMENT*; <u>PROVIDED, HOWEVER</u>, THE FOREGOING RELEASE SHALL NOT APPLY TO THE POST-*EFFECTIVE DATE* OBLIGATIONS ARISING UNDER THE PLAN OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE *PLAN SUPPLEMENT* AND THE *EXIT FINANCING FACILITIES*) EXECUTED TO IMPLEMENT THE PLAN.  THE REORGANIZED DEBTORS SHALL BE BOUND, TO THE SAME EXTENT THAT THE DEBTORS ARE BOUND, BY THE RELEASES AND DISCHARGES SET FORTH ABOVE**.

6.    **Releases by Non-Debtors**

**TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, FOR GOOD AND VALUABLE CONSIDERATION, INCLUDING THE ACTIONS OF THE *RELEASED PARTIES* TO FACILITATE THE REORGANIZATION OF THE DEBTORS AND THE IMPLEMENTATION OF THE RESTRUCTURING CONTEMPLATED BY THE PLAN, ON THE *EFFECTIVE DATE*, EACH PERSON WHO DIRECTLY OR INDIRECTLY, HAS HELD, HOLDS, OR MAY HOLD ANY *CLAIM* AGAINST THE DEBTORS OR INTEREST IN THE DEBTORS SHALL RELEASE AND DISCHARGE AND BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED ALL *RELEASED PARTIES* FOR AND FROM ANY AND ALL *CLAIMS* OR *CAUSES OF ACTION* EXISTING AS OF THE *EFFECTIVE DATE* OR THEREAFTER WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, ARISING FROM OR RELATED TO ANY ACTIONS, TRANSACTIONS, EVENTS OR OMISSIONS OCCURRING ON OR BEFORE THE *EFFECTIVE DATE* RELATING TO THE DEBTORS, THE *CHAPTER 11 CASES* OR THE OBLIGATIONS UNDER THE *2010 INDENTURE*, THE *2015 INDENTURE*, THE *DIP FACILITIES*, AND THE *CREDIT AGREEMENT*; <u>PROVIDED, HOWEVER</u>, THE FOREGOING RELEASE SHALL NOT APPLY TO POST-*EFFECTIVE DATE* OBLIGATIONS ARISING UNDER THE PLAN OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE *PLAN SUPPLEMENT* AND THE *EXIT FINANCING FACILITIES*) EXECUTED TO IMPLEMENT THE PLAN; <u>PROVIDED, FURTHER, HOWEVER</u>, THAT NOTWITHSTANDING ANY LANGUAGE TO THE CONTRARY CONTAINED IN THE DISCLOSURE STATEMENT, THE**

PLAN, AND/OR CONFIRMATION ORDER, NO PROVISION OF THE DISCLOSURE STATEMENT, THE PLAN, OR CONFIRMATION ORDER SHALL (A) PRECLUDE THE SECURITIES AND EXCHANGE COMMISSION FROM ENFORCING ITS POLICE OR REGULATORY POWERS OR (B) RELEASE ANY NON-DEBTOR FROM LIABILITY IN CONNECTION WITH ANY LEGAL OR EQUITABLE ACTION OR *CLAIM* BROUGHT BY THE SECURITIES AND EXCHANGE COMMISSION.

### 7.    Exculpation

UNDER THE PLAN, EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED THEREIN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS, NO *EXCULPATED PARTY*[12] SHALL HAVE OR INCUR ANY LIABILITY TO ANY ENTITY FOR ANY PREPETITION OR POSTPETITION ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH, OR RELATED TO, OR ARISING OUT OF THE *CHAPTER 11 CASES*, THE FILING OF THE *CHAPTER 11 CASES*, THE FORMULATION, PREPARATION, NEGOTIATION, DISSEMINATION, FILING, IMPLANTATION, ADMINISTRATION, CONFIRMATION OR CONSUMMATION OF THE PLAN, THE DISCLOSURE STATEMENT, THE EXHIBITS TO THE PLAN AND THE DISCLOSURE STATEMENT, THE *PLAN SUPPLEMENT* DOCUMENTS, ANY EMPLOYEE BENEFIT PLAN, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT CREATED, MODIFIED, AMENDED OR ENTERED INTO IN CONNECTION WITH THE PLAN, EXCEPT FOR THEIR WILLFUL MISCONDUCT OR GROSS NEGLIGENCE AS DETERMINED BY A FINAL ORDER AND EXCEPT WITH RESPECT TO OBLIGATIONS ARISING UNDER CONFIDENTIALITY AGREEMENTS, JOINT INTEREST AGREEMENTS, OR PROTECTIVE ORDERS, IF ANY, ENTERED DURING THE *CHAPTER 11 CASES*; PROVIDED, HOWEVER, THAT EACH *EXCULPATED PARTY* SHALL BE ENTITLED TO ASSERT APPLICABLE AFFIRMATIVE DEFENSES, IF ANY.

### 8.    Injunction

UNDER THE PLAN, THE SATISFACTION, RELEASE, AND DISCHARGE PURSUANT TO ARTICLE IX OF THE PLAN SHALL ACT AS A PERMANENT INJUNCTION AGAINST ANY ENTITY COMMENCING OR CONTINUING ANY ACTION, EMPLOYMENT OF PROCESS, OR ACT TO COLLECT, OFFSET OR RECOVER ANY *CLAIM*, *INTEREST*, OR *CAUSE OF ACTION* SATISFIED, RELEASED, OR DISCHARGED UNDER THE PLAN TO THE FULLEST EXTENT AUTHORIZED OR PROVIDED BY THE BANKRUPTCY CODE, INCLUDING TO THE EXTENT PROVIDED FOR OR AUTHORIZED BY SECTIONS 524 OR 1141 OF THE BANKRUPTCY CODE.

WITHOUT LIMITING THE FOREGOING, FROM AND AFTER THE *EFFECTIVE DATE*, ALL ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD

---

[12]    "Exculpated Party" is defined by the Plan to mean "each of: (a) the Debtors; (b) the Debtors' current and former officers and directors; (c) the Creditors' Committee; (d) each member of the Creditors' Committee in its capacity as such; and (e) the Professionals retained by the Debtors and the Creditors' Committee."

*CLAIMS* AND *INTERESTS* THAT HAVE BEEN RELEASED OR DISCHARGED PURSUANT TO ARTICLE IX OF THE PLAN, OR ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE IX OF THE PLAN, SHALL BE PERMANENTLY ENJOINED FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTORS, THE REORGANIZED DEBTORS, THE *RELEASED PARTIES* OR THE *EXCULPATED PARTIES*: (A) COMMENCING OR CONTINUING IN ANY MANNER ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY SUCH *CLAIMS* OR *INTERESTS*; (B) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH *CLAIMS* OR *INTERESTS*; (C) CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR *ESTATES* OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH *CLAIMS* OR *INTERESTS*; AND (D) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH *CLAIMS* OR *INTERESTS* RELEASED, EXCULPATED, OR SETTLED PURSUANT TO THE PLAN.

### 9. Term of Bankruptcy Injunction or Stays

Pursuant to the Plan, all injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

### 10. Setoff

Notwithstanding anything herein, in no event shall any holder of a Claim be entitled to setoff any Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, unless such holder preserves its right to setoff by filing a motion for authority to effect such setoff on or before the Confirmation Date (regardless of whether such motion is heard prior to or after the Confirmation Date), and notwithstanding any indication in any proof of claim or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

### 11. Preservation of Insurance

Under the Plan, subject to Article VIII.F.1 of the Plan, and except as otherwise provided therein, the Debtors' discharge and release from all Claims as provided therein, except as necessary to be consistent with the Plan, shall not diminish or impair the enforceability of any insurance policy (including any ACE/Chubb Insurance Contracts) that may cover Claims against the Debtors or the Reorganized Debtors, including their officers and current and former directors, or any other Person.

### 12.     Indemnification Obligations

Under the Plan, the Debtors' obligations to indemnify the Indemnified Parties shall survive and shall continue in full force and effect for the benefit of the Indemnified Parties, notwithstanding confirmation of and effectiveness of the Plan, and such indemnification shall include, but not be limited to, all actions taken in connection with the Restructuring Support Agreement, the Restructuring Support Agreement Term Sheet, the filing of the Chapter 11 Cases, the DIP Facilities, the Interim DIP Order, the Final DIP Order and the DIP Credit Agreement.

### J.     Effectiveness of the Plan

### 1.     Conditions Precedent to Confirmation

It is a condition to confirmation of the Plan that the following conditions shall have been satisfied or waived in accordance with the Plan: (a) the Confirmation Order, in form and substance reasonably acceptable to the Debtors, the Required Supporting Noteholders, the Supporting Lenders, the Supporting Interest Holders, the DIP Agent, and the Required Lenders shall have been entered and shall be in full force and effect and there shall not be a stay or injunction in effect with respect thereto, *provided* that the Confirmation Order shall be in form and substance reasonably acceptable to the Creditors' Committee with respect to any provision that is materially inconsistent with the terms of the Creditors' Committee Settlement; and (b) the Plan, the Plan Supplement, and all of the schedules, documents, and exhibits contained therein shall have been filed in form and substance reasonably acceptable to the Debtors the Required Supporting Noteholders, the Supporting Lenders, the Supporting Interest Holders, the DIP Agent, and the Required Lenders.

### 2.     Conditions Precedent to the Effective Date

It is a condition to the Effective Date of the Plan that the following provisions, terms and conditions are approved or waived in accordance with the Plan:

a.     the Confirmation Order, in form and substance reasonably acceptable to the Debtors the Required Supporting Noteholders, the Supporting Lenders, the Supporting Interest Holders, the DIP Agent, and the Required Lenders shall have been entered by the Court, *provided* that the Confirmation Order shall be in form and substance reasonably acceptable to the Creditors' Committee with respect to any provision that is materially inconsistent with the terms of the Creditors' Committee Settlement;

b.     the Confirmation Order shall have become a Final Order;

c.     the Confirmation Order shall have approved the limited substantive consolidation of the Debtors provided under Article VI of the Plan;

d.      the Exit First Lien Facility shall be executed, all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof, the closing shall have occurred, and the loans thereunder shall be funded or scheduled for funding upon consummation of the Plan (or, with respect to the Exit Revolving Facility, deemed funded as contemplated by Article IV.B.3 of the Plan);

e.      the Exit Second Lien Facility shall be executed, all conditions precedent to the consummation thereof shall been waived or satisfied in accordance with the terms thereof, the closing shall have occurred and the loans thereunder shall be deemed funded as contemplated by Article III.E of the Plan;

f.      the Reorganized Debtors shall be private, non-SEC reporting companies on the Effective Date;

g.      the Debtors shall have paid all fees and reasonable and documented out-of-pocket expenses payable to the Unanimous Supporting Noteholders, the Supporting Lenders, the Supporting Interest Holders, the Revolving Facility Agent, the DIP Agent, and the Indenture Trustees, including all reasonable and documented out-of-pocket fees and expenses of counsel and other professionals of the Unanimous Supporting Noteholders, the Supporting Lenders, the Supporting Interest Holders, the Revolving Facility Agent, the DIP Agent, and the Indenture Trustees;

h.      all authorizations, consents and regulatory approvals required (if any) for the Plan's effectiveness shall have been obtained; and

i.      the formation and governance documents for each of the Reorganized Debtors shall be consistent with the Plan and reasonably acceptable to the Required Supporting Parties.

### 3.      Waiver of Conditions

The Plan provides that the conditions to confirmation of the Plan, and to the Effective Date, set forth in Article X.A and X.B of the Plan may be waived by the Debtors (with the consent of the Required Supporting Parties, the DIP Agent, and the Required Lenders, and, solely as to Articles X.A.1 and X.B.1, the consent of the Creditors' Committee, if applicable) without notice, leave or order of the Court or any formal action other than proceeding to confirm or consummate the Plan.

Any order of the Court approving this Disclosure Statement (and any procedures therein for the solicitation of votes to accept or reject the Plan) should provide that, upon termination of the Restructuring Support Agreement (except any termination pursuant to Section 9(a) of the Restructuring Support Agreement), any Ballot submitted by a Supporting Party shall be

immediately revoked and deemed *void ab initio*, and unless such Supporting Party provides notice otherwise, shall be deemed a vote to reject the Plan.

### 4.     Notice of Confirmation and Effective Date

Pursuant to the Plan, on or before five (5) Business Days after the occurrence of the Effective Date, the Reorganized Debtors shall mail or cause to be mailed to all holders of Claims and Equity Interests a notice that informs such holders of (i) the entry of the Confirmation Order, (ii) the occurrence of the Effective Date, (iii) the occurrence of the Administrative Claims Bar Date and deadline for submission of Professional Fee Claims, and (iv) such other matters as the Debtors deem appropriate.

### 5.     Effect of Failure of Conditions

In the event that the Effective Date does not occur, the Plan provides that: (a) the Confirmation Order shall be vacated; (b) no Distributions under the Plan shall be made; (c) the Debtors and all holders of Claims and Equity Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred; and (d) the Debtors' obligations with respect to Claims and Equity Interests shall remain unchanged and nothing contained in the Plan shall (i) constitute or be deemed a waiver or release of any Claims against or any Equity Interests in  the Debtors or any other Person, (ii) prejudice in any manner any right, remedy or claim of the Debtors or any Person in any further proceedings involving the Debtors or otherwise, or (iii) be deemed an admission against interest by the Debtors or any other Person.

### 6.     Vacatur of Confirmation Order

If a Final Order denying confirmation of the Plan is entered, or if the Confirmation Order is vacated, then the Plan provides it shall be null and void in all respects, and nothing contained in the Plan shall (a) constitute a waiver or release of any Claims against or Equity Interests in the Debtors, (b) prejudice in any manner the rights of the holder of any Claim against, or Equity Interest in, the Debtors, (c) prejudice in any manner any right, remedy or claim of the Debtors, or (d) be deemed an admission against interest by the Debtors.

### 7.     Revocation, Withdrawal, Modification or Non-Consummation

The Debtors reserve the right to revoke, withdraw, amend or modify the Plan at any time prior to the Confirmation Date (in each case subject to the consent of the Required Supporting Parties, except as otherwise provided in Article XII.C of the Plan).  If the Debtors revoke or withdraw the Plan, the Confirmation Order is not entered, or the Effective Date does not occur, then, under the Plan, (i) the Plan shall be null and void in all respects, (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting the amount of any Claim or Class of Claims), assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void, and (iii) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (a) constitute or be deemed a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors or any other Person, (b) prejudice in any manner any right,

remedy or claim of the Debtors or any other Person in any further proceeding involving the Debtors or otherwise, or (c) constitute an admission against interest by the Debtors or any other Person.

### K.    Retention of Jurisdiction

Pursuant to the Plan, the Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, section 105(a) and section 1142 of the Bankruptcy Code and for, among other things, the following purposes:

1.    to hear and determine motions for the assumption or rejection of executory contracts or unexpired leases pending on the Confirmation Date, and the allowance of Claims resulting therefrom;

2.    to determine any other applications, adversary proceedings, and contested matters pending on the Effective Date;

3.    to ensure that Distributions to holders of Allowed Claims are accomplished as provided by the Plan;

4.    to resolve disputes as to the ownership of any Claim or Equity Interest;

5.    to hear and determine timely objections to Claims;

6.    to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

7.    to issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

8.    to consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Court, including the Confirmation Order;

9.    to hear and determine all applications for compensation and reimbursement of expenses of Professionals under sections 328, 330, 331, 363 and 503(b) of the Bankruptcy Code;

10.    to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan;

11.    to hear and determine any issue for which the Plan requires a Final Order of the Court;

12.    to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

13.     to hear and determine disputes arising in connection with compensation and reimbursement of expenses of professionals for the Supporting Lenders, the Unanimous Supporting Noteholders, the Supporting Interest Holders, the Revolving Facility Agent, the DIP Agent, and the Indenture Trustees for services rendered and expenses incurred during the period commencing on the Petition Date through and including the Effective Date;

14.     to hear and determine any Causes of Action (excluding Avoidance Actions) preserved under the Plan under Bankruptcy Code sections 544, 547, 548, 549, 550, 551, 553, and 1123(b)(3);

15.     to hear and determine any matter regarding the existence, nature and scope of the Debtors' discharge;

16.     to hear and determine any matter regarding the existence, nature, and scope of the releases and exculpation provided in Article IX of the Plan; and

17.     to enter a final decree closing the Chapter 11 Cases.

Under the Plan, notwithstanding anything to the contrary in Article XI therein, the Exit Revolving Facility, the Exit Revolving Credit Agreement and the Exit Second Lien Facility (and all related loan documents) shall be governed by the jurisdictional provisions therein and the Court shall not retain jurisdiction for matters under those agreements.

The Plan provides that, if the Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, then Article XI of the Plan shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## L.     Miscellaneous Provisions

### 1.     Payment of Fees and Expenses of Lenders, Unanimous Supporting Noteholders, Supporting Interest Holders, Revolving Facility Agent, and Indenture Trustees

Under the Plan, the Debtors or the Reorganized Debtors shall promptly pay in Cash in full (following receipt of an appropriate invoice in reasonable detail) all reasonable and documented fees and expenses incurred by the Supporting Lenders, the Unanimous Supporting Noteholders, the Supporting Interest Holders, the Revolving Facility Agent, the DIP Agent, and the Indenture Trustees and their advisors in connection with the restructuring described in the Plan that have not previously been paid.  All amounts distributed and paid to the foregoing parties pursuant to the Plan shall not be subject to setoff, recoupment, reduction or allocation of any kind and shall not require the filing or approval of any fee application; *provided* that such amounts shall be subject to the fee review provisions in Paragraph 10(c) of the Interim DIP Order prior to payment.

### 2.    Modification of the Plan

Under the Plan, subject to the limitations contained therein: (1) the Debtors (with the consent of the Required Supporting Parties, the DIP Agent, and the Required Lenders, and the consent of the Creditors' Committee to the extent any amendment or modification is materially inconsistent with the terms of the Creditors' Committee Settlement) reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend, modify, revoke or withdraw the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; and (2) after the entry of the Confirmation Order, the Debtors (with the consent of the Required Supporting Parties, the DIP Agent, and the Required Lenders, and the consent of the Creditors' Committee to the extent any amendment or modification is materially inconsistent with the terms of the Creditors' Committee Settlement) or the Reorganized Debtors, as the case may be, may, upon order of the Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code.

The Plan provides that entry of a Confirmation Order shall result in all modifications or amendments to the Plan occurring after the solicitation of the Plan being approved pursuant to section 1127(a) of the Bankruptcy Code.

The Plan provides that, notwithstanding anything to the contrary therein, the Debtors may revoke or withdraw the Plan upon the occurrence of an unwaived "Termination Event" under (and as defined in) the Restructuring Support Agreement (other than a Termination Event caused by a breach by the Debtors); provided, however, that the Debtors reserve the right to fully or conditionally waive, on a prospective or retroactive basis, the effects of this paragraph in respect of any such Termination Event, with any such waiver effective only if in writing and signed by the Debtors.

### 3.    Dissolution of Creditors' Committee

Under the Plan, the Creditors' Committee shall continue in existence until the Effective Date to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code.  On the Effective Date, the Creditors' Committee shall be dissolved and its members shall be deemed released of all their duties, responsibilities and obligations in connection with the Chapter 11 Cases or the Plan and its implementation, and the retention or employment of the Creditors' Committee's attorneys, financial advisors, and other agents shall terminate as of the Effective Date; provided, however, that following the Effective Date, the Creditors' Committee shall continue in existence and have standing and a right to be heard for the following limited purposes: filing and prosecuting applications for (x) allowances of compensation for professional services rendered and reimbursement of expenses incurred; or (y) reimbursement of expenses of members of the Creditors' Committee.

### 4.    Votes Solicited in Good Faith

The Plan stipulates that the Debtors have, and upon confirmation of the Plan shall be deemed to have, solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code. The Plan also provides that the Debtors (and each of their respective affiliates, agents, directors, managers, officers, members, employees, advisors,

and attorneys) have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of the securities offered and sold under the Plan and, therefore, are not, and on account of such offer and issuance will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer or issuance of the securities offered and distributed under the Plan.

### 5.    Obligations Incurred After the Effective Date

Under the Plan (and except as otherwise specifically provided for in the Plan), from and after the Effective Date, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Court, pay in Cash all obligations, including the reasonable legal, professional, or other fees and expenses related to the implementation of the Plan, incurred by the Reorganized Debtors.  The Plan provides that, upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation of services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order or approval of the Court.

### 6.    Request for Expedited Determination of Taxes

The Reorganized Debtors shall have the right, under the Plan, to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns (other than U.S. federal tax returns) filed by any of them, or to be filed by any of them, for any and all taxable periods ending after the Petition Date through the Effective Date.

### 7.    Determination of Tax Filings and Taxes

The Plan provides that: (a) for all taxable periods ending on or prior to, or including, the Effective Date, the Reorganized Debtors shall prepare and file (or cause to be prepared and filed) on behalf of the Debtors, all combined, consolidated or unitary tax returns, reports, certificates, forms or similar statements or documents for any group of entities that include the Debtors (collectively, "Group Tax Returns") required to be filed or that the Reorganized Debtors otherwise deem appropriate, including the filing of amended Group Tax Returns or requests for refunds; and  (b) the Reorganized Debtors shall be entitled to the entire amount of any refunds and credits (including interest thereon) with respect to or otherwise relating to any taxes of the Debtors, including for any taxable period ending on or prior to, or including, the Effective Date.

### 8.    Governing Law

The Plan provides that, unless a rule of law or procedure is supplied by Federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of Delaware shall govern the construction and implementation of the Plan, any agreements, documents, and instruments executed in connection with the Plan (except as otherwise set forth in those agreements or instruments, in which case the governing law of such agreements shall control).

Corporate governance matters shall be governed by the laws of the state of incorporation or formation of the applicable Debtor.

### 9.        Filing or Execution of Additional Documents

On or before the Effective Date, the Debtors (with the consent of the Required Supporting Noteholders, the Supporting Lenders, the Supporting Interest Holders, the DIP Agent, and the Required Lenders) or the Reorganized Debtors, shall file with the Bankruptcy Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### 10.        Exemption From Transfer Taxes

As provided in the Plan, and pursuant to section 1146(c) of the Bankruptcy Code, a) the issuance, transfer or exchange under the Plan of the New Stock, (b) the making or assignment of any lease or sublease, or (c) the making or delivery of any other instrument whatsoever, in furtherance of or in connection with the Plan shall not be subject to any stamp, real estate transfer, mortgage, recording sales or use or other similar tax.

### 11.        Exemption for Issuance of New Stock and New Secured Notes

The Plan provides that the issuance of the New Stock and Distribution thereof to holders of Allowed GSO Notes Claims, Allowed Kelso Notes Claims, and Allowed Unexchanged Notes Claims, to the extent that they are deemed Securities (as defined in the Securities Act of 1933, as amended), shall be authorized and exempt from registration under the securities laws solely to the extent permitted under section 1145 of the Bankruptcy Code, as of the Effective Date, without further act or action by any person, unless required by provision of the relevant governance documents or applicable law, regulation, order, or rule; and all documents evidencing the same shall be executed and delivered as provided for in the Plan or the Plan Supplement.

The Plan provides that the issuance of the New Secured Notes, if any, and Distributions thereof of holders of Allowed Unexchanged Notes Claims under the Plan, to the extent that they are deemed Securities (as defined in the Securities Act of 1933, as amended), shall be authorized and exempt from registration under the securities laws solely to the extent permitted under section 1145 of the Bankruptcy Code, as of the Effective Date without further act or action by any person, unless required by provision of the relevant governance documents or applicable law, regulation, order or rule; and all documents evidencing the same shall be executed and delivered as provided for in the Plan or the Plan Supplement.

### 12.        Waiver of Federal Rule of Civil Procedure 62(a)

Under the Plan, the Debtors may request that the Confirmation Order include (a) a finding that Fed. R. Civ. P. 62(a) shall not apply to the Confirmation Order, and (b) authorization for the Debtors to consummate the Plan immediately after entry of the Confirmation Order.

### 13.    Exhibits/Schedules

The Plan provides that all Exhibits and schedules to the Plan and the Plan Supplement are incorporated into and constitute a part of the Plan as if set forth therein.

### 14.    Notices

In accordance with the Plan, all notices, requests, and demands under the Plan, to be effective, shall be in writing and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

To the Debtors:
c/o Logan's Roadhouse, Inc.
3011 Armory Drive, Suite 300
Nashville, Tennessee 37204
Fax No.: (615) 884-9813
Attention:  Keith Maib, Chief Restructuring Officer of Finance

with a copy to:

Young Conaway Stargatt & Taylor, LLP
1000 North King Street
Wilmington, DE 19801
Attention:  Robert S. Brady, Esq. and Edmon L. Morton, Esq.
rbrady@ycst.com
emorton@ycst.com

### 15.    Plan Supplement

The Plan provides that the Plan Supplement will be filed with the Clerk of the Bankruptcy Court no later than seven (7) calendar days before the deadline to object to confirmation of the Plan, unless such date is further extended by order of the Bankruptcy Court on notice to parties in interest. The Plan Supplement may be inspected in the office of the Clerk of the Court during normal court hours and shall be available online at https://ecf.deb.uscourts.gov. Holders of Claims or Equity Interests may obtain a copy of the Plan Supplement upon written request to counsel to the Debtors at their address set forth above, or by accessing the website maintained by DRC (the Debtors' claims and noticing agent) at www.donlinrecano.com/logans.

### 16.    Further Actions; Implementations

As provided in the Plan, the Debtors shall be authorized to execute, deliver, file or record such documents, contracts, instruments, releases and other agreements and take such other or further actions as may be necessary to effectuate or further evidence the terms and conditions of the Plan.  From and after the Confirmation Date, the Debtors shall be authorized to take any and all steps and execute all documents necessary to effectuate the provisions contained in the Plan.

### 17.    Severability

As provided in the Plan, if, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors (with the consent of the Required Supporting Parties, the DIP Agent, and the Required Lenders), shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the Plan provides that the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Plan stipulates that the Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 18.    Entire Agreement

The Plan states that, except as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

### 19.    Binding Effect

The Plan, by its terms, shall be binding on and inure to the benefit of the Debtors, the holders of Claims against and Equity Interests in the Debtors, and each of their respective successors and assigns, including each of the Reorganized Debtors, and all other parties in interest in the Chapter 11 Cases.

Under the Plan, subject to Article X of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors and any and all holders of Claims or Interests (regardless of whether such Claims or Interests are deemed to have accepted or rejected the Plan), all entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, and any and all non-Debtor parties to the executory contracts and unexpired leases with the Debtors.  Under the Plan, all Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any holder of a Claim or debt has voted on the Plan.

### 20.    No Change in Ownership or Control

The Plan provides that consummation of the Plan is not intended to and shall not constitute a change in ownership or change in control, as defined in any employment or other agreement or plan in effect on the Effective Date to which a Debtor is a party.

### 21.    Substantial Consummation

Under the Plan, on the Effective Date the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.  However, the Plan further provides nothing in the Plan shall prevent the Debtors or any other party in interest from arguing that substantial consummation of the Plan has occurred prior to the Effective Date.

### 22.    Conflict

The terms of the Plan shall govern in the event of any inconsistency with the summary of the Plan set forth in this Disclosure Statement. The Plan also provides that, in the event of any inconsistency or ambiguity between and among the terms of the Plan, this Disclosure Statement, and the Confirmation Order, the terms of the Confirmation Order shall govern and control.

## ARTICLE VIII.

## FINANCIAL PROJECTIONS AND VALUATION ANALYSIS

### A.    Financial Projections

In connection with the planning and development of the Plan and the implementation of their restructuring and turn-around initiatives, the Debtors prepared projections for the fiscal years 2016 through 2019 to present the anticipated impact of the Debtors' restructuring, which are attached hereto as **Exhibit D** and were originally filed with the Bankruptcy Court  on September 12, 2016 and have not been updated since that date. The projections assume that the Plan will be implemented in accordance with its stated terms.  The Debtors are unaware of any circumstances as of the date of this Disclosure Statement that would require the re-forecasting of the projections due to a material change in the Debtors' prospects. The projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors, changes in the competitive environment, regulatory changes, and/or a variety of other factors, including the factors listed in this Disclosure Statement and in the projections.

The Financial Projections are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Factors that could cause actual results to differ materially include, but are not limited to: the ability of the Reorganized Debtors to operate their business consistent with their projections generally, including the ability to maintain or increase revenue and cash flow to satisfy their liquidity needs, service their indebtedness and finance the ongoing obligations of their business, and to manage their future operating expenses and make necessary capital expenditures; the ability of the Reorganized Debtors to comply with the covenants and conditions under their credit facilities and their ability to borrow thereunder; increases in costs including, without limitation, wages, insurance, provisions, changes in rules and regulations applicable to the industry; actions by the courts, the U.S. Department of Justice or other governmental or regulatory authorities, and the results of the legal proceedings to which the Reorganized Debtors or any of their affiliates may be subject; changes in the condition of the Debtors' assets; the Reorganized Debtors' ability to attract and maintain key executives, managers and employees; and changes in customer preferences and other key macroeconomic trends affecting the Reorganized Debtors' business.

B.     **Valuation Analysis**

The Plan provides for the distribution of New Stock upon consummation of the Plan to holders of Allowed Kelso Note Claims and Allowed GSO Note Claims in Class 4 and holders that hold at least $9,000 in amount of Unexchanged Notes Claims who are in subclass 5(a). Accordingly, Jefferies, at the request of the Debtors, performed an analysis, which is attached hereto as **Exhibit E**, of the estimated implied value of the Reorganized Debtors on a going-concern basis as of a projected Effective Date of November 14, 2016 (the "**Valuation Analysis**"). The Valuation Analysis, including the procedures followed, assumptions made, qualifications, and limitations on review undertaken described therein, should be read in conjunction with Article IX of the Disclosure Statement, entitled "Certain Risk Factors to be Considered." The Valuation Analysis is prepared as of September 9, 2016, and is based on data and information as of that date. Jefferies makes no representations as to changes to such data and information that may have occurred since the date of the Valuation Analysis.

## ARTICLE IX.

## CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST THE DEBTORS THAT ARE ENTITLED TO VOTE ON WHETHER TO ACCEPT OR REJECT THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW, ALONG WITH THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED HEREIN BY REFERENCE), PRIOR TO VOTING WHETHER TO ACCEPT OR REJECT THE PLAN.   THESE RISK FACTORS ARE NOT NECESSARILY THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

A.     **Certain Risks Relating to the New Stock**

The receipt and ownership of the New Stock entails substantial risk.  Only some of that risk relates to the value of the Reorganized Debtors.  The Debtors have identified certain significant risks, as described below:

1.     **The Debtors May Not Be Able To Achieve Their Projected Financial Results**

The Debtors may not be able to meet their projected financial results or achieve the revenue or cash flow that the Debtors have assumed in projecting their future business prospects. If the Debtors do not achieve these projected revenue or cash flow levels, the Debtors may lack sufficient liquidity to continue operating as planned after emergence and may not be able to satisfy claims of creditors that arise after the Effective Date.  The financial projections represent management's view based on currently known facts and hypothetical assumptions about their future operations.  They do not, however, guarantee the Debtors' future financial performance.

2.       **The Plan Exchanges Senior Securities for Junior Securities**

If the Plan is confirmed and consummated, certain holders of Claims will receive shares of the New Stock and, if Class 5(b) rejects the Plan, the New Secured Notes. Thus, in agreeing to the Plan, certain of such holders will be consenting to the exchange of their interests in senior debt, which has, among other things, a stated interest rate, a maturity date, and a liquidation preference over equity securities, for shares of the New Stock and the New Secured Notes, which will be contractually subordinated to the Exit First Lien Facility and the Exit Second Lien Facility and, in the case of the New Stock, will also be structurally subordinated to all claims against Reorganized Holding, including the New Secured Notes.

3.       **A Liquid Trading Market for the New Stock May Not Develop**

The Debtors make no assurance that a liquid trading market for the New Stock will develop. The liquidity of any market for the New Stock will depend, among other things, upon the number of holders of New Stock, the Reorganized Debtors' financial performance, and the market for similar securities, none of which can be determined or predicted. Therefore, the Debtors cannot assure that an active trading market will develop or, if a market develops, what the liquidity or pricing characteristics of that market will be.

4.       **Significant Holders**

As of the Petition Date, the Supporting Parties held, in the aggregate, one hundred percent (100%) of the debt then outstanding under the Credit Agreement and in excess of eighty percent (83%) in principal amount of Notes then outstanding. Were they and their affiliates to continue to hold that debt and those Notes as of the Effective Date, then they would be significant creditors of the Reorganized Debtors (by virtue of the Exit Financing Facilities, as contemplated by the Plan) and also would constitute the controlling equity holders of the Reorganized Debtors (by virtue of their receipt of a supermajority of the New Stock on account of their GSO Notes Claims, Kelso Notes Claims, and Unexchanged Notes Claims). The Supporting Parties and their affiliates would hold substantially all of the New Stock to be outstanding on the Effective Date (prior to any issuances under the Management Incentive Plan, to the extent the board of directors of Reorganized Holding approves awards of New Stock thereunder), and therefore would be able to, among other things, elect all of the members of the board of directors of Reorganized Holding. The interests of the Supporting Parties, as the controlling equity holders of Reorganized Holding, may conflict with the interests of other holders of New Stock. The Supporting Parties are in the business of making investments in companies and may, from time to time, hold or acquire interests in businesses that compete directly or indirectly with the business of the Reorganized Debtors.

5.       **Lack of Publicly Available Information About the Reorganized Debtors**

Prior to the Petition Date, the Debtors were required to have filed certain financial and other information with the SEC. The Debtors failed to file certain of that financial information, including the Debtors' audited financial statements for the 2015 transition period. It is not anticipated that the Reorganized Debtors will resume filings with the SEC. Accordingly, there

now is, and after the Effective Date will continue to be, limited public information available about the Reorganized Debtors, particularly financial information.

### B.      Projected Financial Information

The Financial Projections attached to this Disclosure Statement, and the estimated valuations contained herein that are based in part on the Financial Projections, are dependent upon the successful implementation of the Reorganized Debtors' business plan and the validity of the assumptions contained therein.   Those projections reflect numerous assumptions, including, without limitation, confirmation and consummation of the Plan in accordance with its terms, the Reorganized Debtors' anticipated future performance, the future performance of the restaurant industry, certain assumptions with respect to the Reorganized Debtors' competitors, general business and economic conditions, and other matters.   Many or most of those matters are beyond the control of the Reorganized Debtors.   In addition, unanticipated events and circumstances occurring subsequent to the preparation of the Financial Projections may affect the Reorganized Debtors' actual financial results.   Although the Reorganized Debtors believe that the Financial Projections are reasonably attainable, variations between the actual financial results and those projected may occur and, if they do occur, they may be material and adverse.

### C.      Risks Related to the Debtors' Business and Operations

### 1.      Operational Restructuring Efforts

The Debtors are in the process of implementing a number of measures to revitalize the Logan's Roadhouse brand and reduce operating costs.   There can be no assurance that these measures will be successful.   The Debtors intend to improve customer experience around consistency of execution of exceptional food and service.   The Debtors' also expect to implement certain changes in their marketing approach in order to attract new customers and increase frequency of customer visits.   However, these measures may not increase customer traffic or improve the performance of their restaurants.   Accordingly, it is possible that the trend of declining comparable restaurant sales will continue.   In addition, this transformation may result in unexpected expenses and losses.   If the Debtors are unable to improve the performance of their restaurants, the financial position and operating results of the Debtors may be adversely impacted.   Even if the Debtors' efforts are successful, it may take a significant period of time to realize increased revenues or comparable store sales growth.

### 2.      Competition

The Debtors' restaurants operate in an intensely competitive industry.   The Debtors compete with other well-established restaurant companies on the basis of type and quality of menu offerings, pricing, customer service, atmosphere, location and overall customer experience. They also compete with other restaurant chains and retail businesses for quality site locations and management and hourly employees.   The Debtors' competitors include a large and diverse group from independent local operators to well-capitalized national restaurant companies.   In addition, the Debtors face growing competition from the supermarket industry, with the improvement of their "convenience meals" in the form of improved entrees and side dishes from the deli section. Many of the Debtors' competitors are larger and have significantly greater financial resources, a

greater number of restaurants, have been in business longer, have greater brand recognition, and are better established in the markets where the Debtors' restaurants are located or are planned to be located. As a result, the Debtors' competitors may be able to invest greater resources than the Debtors in attracting customers and succeed in attracting customers. If the Debtors are unable to continue to compete effectively, competition could have a material adverse effect on the Debtors' operations or earnings.

### 3.    Vendors; Raw Material Costs

The Debtors are dependent on timely deliveries of ingredients, including fresh produce, dairy products and meat.  The cost, availability and quality of the ingredients used to prepare food are subject to a range of factors, many of which are beyond the Debtors' control.  For example, fluctuations in weather, supply and demand, as well as economic and political conditions, could adversely affect the cost, availability and quality of ingredients.  Significant menu items that could be subject to price fluctuations include beef, pork, poultry, coffee, eggs, dairy products, wheat products, and corn products.  The Debtors may not be able to recover increased costs through menu price increases because competition may limit the ability to implement those increases or may preclude them entirely.  In many cases, the Debtors have only one supplier for a product or supply, including their beef and chicken supply. The Debtors' dependence on single source suppliers subjects them to the possible risks of shortages, interruptions and price fluctuations. In addition, the Debtors rely on a contract with one primary distributor to deliver products to their restaurants. If any of these vendors, suppliers, or primary distributor is unable to fulfill their obligations, or if the Debtors are unable to find replacement providers in the event of a supply or service disruption, the Debtors may experience supply shortages and incur higher costs, which would materially harm their business.

The Debtors' profitability depends in part on their ability to anticipate and react to changes in food and supply costs.  Commodity pricing is volatile and can change unpredictably and over short periods. The impact of changes in commodity prices is also affected by the term and duration of the Debtors' supply contracts, which are typically one-year contracts.  These contracts are negotiated at each renewal, and the Debtors cannot guarantee that such contracts will be available in the future on favorable terms or at all.  Any increase in food prices, particularly for beef, chicken, produce, and seafood, could adversely affect the Debtors' operating results. If beef prices rise to high levels, the Debtors' restaurant operating margins will be negatively impacted.  In addition, the Debtors are susceptible to increases in food costs as a result of factors beyond their control, such as weather conditions, food safety concerns, costs of distribution, production problems, delivery difficulties, product recalls, and government regulations.  The Debtors cannot predict whether they will be able to anticipate and react to changing food costs by adjusting purchasing practices, menu items, and prices. In addition, because the Debtors' menu items are moderately priced, they may not seek to or be able to pass along price increases to customers. If the Debtors do adjust pricing there is no assurance that they will realize the benefit of any adjustment due to changes in customers' menu item selections and customer traffic.

### 4.        Seasonality and Macroeconomic Conditions

As is the case with all restaurant companies, weather conditions can have a strong influence on the Debtors' business, and result in seasonal fluctuations in net sales.  Severe weather may also affect seasonal sales volumes in certain markets.  Many operating costs are fixed or semi-fixed, which means that the loss of sales during these periods of lower sales could adversely impact profitability.

Additionally, general economic conditions may adversely affect the Debtors' results of operations. Recessionary economic cycles, a protracted economic slowdown, a worsening economy, increased unemployment, increased energy prices, rising interest rates, or other industry-wide cost pressures could affect consumer behavior and spending for restaurant dining and lead to a decline in sales and earnings. Job losses, foreclosures, bankruptcies, and falling home prices could cause customers to make fewer discretionary purchases, and any significant decrease in their customer traffic or average profit per transaction will negatively impact the Debtors' financial performance. If gasoline, natural gas, electricity, and other energy costs increase, and credit card, home mortgage, and other borrowing costs increase with rising interest rates, customers may have lower disposable income and reduce the frequency with which they dine out, spend less on each dining out occasion, or choose more inexpensive restaurants.

Furthermore, the effects that actual or threatened armed conflicts, terrorist attacks, efforts to combat terrorism, heightened security requirements, or failures to protect information systems for critical infrastructure, such as the electrical grid and telecommunications systems, could have on the Debtors' operations, the economy, or consumer confidence generally, are unpredictable.  Any of these events could affect consumer spending patterns or result in increased costs for the Debtors.

Finally, a majority of the Debtors' restaurants are located in the Southeast to Southwest United States, and as a result, are particularly susceptible to adverse trends and economic conditions in those regions, including their labor markets.  Given this geographic concentration, negative publicity in these regions could have a material adverse effect on the Debtors' business and operations, as could other occurrences in these regions such as local strikes, energy shortages or increases in energy prices, droughts, hurricanes, fires, floods or other natural disasters.

Unfavorable changes in the above factors or in other business and economic conditions could increase costs, reduce restaurant traffic, or impose practical limits on pricing, any of which could lower the Debtors' profit margins and have a material adverse effect on their financial condition and results of operations.

### 5.        Health Concerns, Customer Preferences, and Government Regulation

The restaurant industry is affected by consumer preferences and perceptions.  If consumers seek out other dining alternatives rather than visit the Debtors' restaurants, whether due to shifts in dietary trends, nutrition, health emphasis or otherwise, the Debtors' business could be materially impacted.  Changes in the dining concept and/or menu by the Debtors in response to changes in economic conditions and consumer tastes or dining patterns could result in the loss, rather than gain, of customers.  In addition, negative publicity about the Debtors'

products or dining experience could materially harm their business, results of operations and financial condition.

Peanuts contribute to the atmosphere of the Debtors' restaurants, which are known for their "bottomless" buckets of peanuts. As a result of the severe nature of some peanut allergies, the United States Food and Drug Administration has identified peanuts as significant allergens, and federal and state regulatory bodies have contemplated extending peanut labeling regulations to the restaurant business. The introduction of such regulations may cause the Debtors to reduce their use of peanuts, which could adversely impact their business and brand differentiation.

## 6.    Information Technology and Data Breach

The Debtors will rely heavily on information systems, including point-of-sale processing in restaurants, management of supply chain, payment of obligations, collection of cash, credit, and debit card transactions, and other processes and procedures, some of which are licensed from third parties. The Debtors' ability to efficiently and effectively manage their business will depend significantly on the reliability and capacity of these systems. The failure of these systems to operate effectively, problems with transitioning to upgraded or replacement systems, or a breach in security of these systems could cause delays in customer service and reduce efficiency in operations, and significant capital investments could be required to remediate the problem.

The majority of restaurant sales are by credit or debit cards. Other retailers have experienced security breaches in which credit and debit card information has been stolen. Despite mechanisms in place to protect information transmitted by credit or debit card, there is no guarantee that such mechanisms will be effective to prevent such information from being compromised by unscrupulous third parties. The techniques used to obtain unauthorized access, disable or degrade service, or sabotage systems change frequently and are often difficult to detect for long periods of time, which may cause a breach to go undetected for an extensive period of time. Advances in computer and software capabilities and encryption technology, new tools, and other developments may increase the risk of such a breach. Further, the systems used for transmission and approval of electronic payment transactions, and the technology utilized in electronic payment themselves, all of which can put electronic payment at risk, are determined and controlled by the payment card industry. In addition, franchisees, contractors, or third parties with whom the Debtors do business or to whom they outsource business operations may attempt to circumvent security measures in order to misappropriate such information, and may purposefully or inadvertently cause a breach involving such information. The Debtors may become subject to claims for purportedly fraudulent transactions arising out of the actual or alleged theft of credit or debit card information, and may also be subject to lawsuits or other proceedings relating to these types of incidents. Any such claim or proceeding could result in significant unplanned expenses, which could have an adverse impact on the Debtors' financial condition and results of operations. Further, adverse publicity resulting from these allegations may have a material adverse effect on the Debtors and their restaurants.

## 7.    Franchisees

As of the Petition Date, the Debtors had two franchisees that operated a total of 26 restaurants. The franchisees are contractually obligated to operate their restaurants in accordance

with the Debtors' standards and all applicable laws. Franchisees are independent third parties, and the franchisees own, operate, and oversee the daily operations of their restaurants. As a result, the ultimate success and quality of any franchised restaurant rests with the franchisee. If franchisees do not successfully operate restaurants in a manner consistent with the Debtors' standards, the Debtors' image and reputation could be harmed, which in turn could adversely affect the Debtors business and operating results. Further, the failure of either of the franchisees or any of their restaurants to remain financially viable could result in their failure to pay royalties.

Finally, regardless of the actual validity of such a claim, the Debtors may be named as a party in an action relating to, and/or be held liable for, the conduct of their franchisees if it is shown that they exercise a sufficient level of control over a particular franchisee's operation. One of the legal foundations fundamental to the franchise relationship has been that, absent special circumstances, a franchiser is generally not responsible for the acts, omissions or liabilities of its franchisees. Recently, established law has been challenged and questioned by the plaintiffs' bar and certain regulators, and the outcome of these challenges and new regulatory positions remains unknown. If these challenges and/or new positions are successful in altering currently settled law, it could significantly change the relationship between the Debtors and its franchisees. For example, a determination that the Debtors are a "joint employer" with their franchisees or that their franchisees are part of their system with joint and several liability under the National Labor Relations Act, statutes administered by the Equal Employment Opportunity Commission, Occupational Safety and Health Administration, or OSHA, regulations and other areas of labor and employment law, could subject the Debtors to liability for the unfair labor practices, wage-and-hour law violations, employment discrimination law violations, OSHA regulation violations, and other employment-related liabilities of one of their franchisees. In addition, if these changes were to be expanded outside of the employment context, the Debtors could be held liable for other claims against their franchisees such as personal injury claims by customers at franchised restaurants. Therefore, any regulatory action or court decisions expanding the vicarious liability of franchisers could have a material adverse effect on the Debtors' results of operations.

### 8.    Government Regulations

The restaurant industry is subject to extensive federal, state and local laws and regulations, including those relating to minimum wage and other labor issues, health care, building and zoning requirements and those relating to the preparation and sale of food. The development and operation of restaurants depend to a significant extent on the selection and acquisition of suitable sites, which are subject to zoning, land use, environmental, traffic and other regulations and requirements. The Debtors will also be subject to licensing and regulation by state and local authorities relating to health, sanitation, safety and fire standards, and liquor licenses, federal and state laws governing the Debtors' relationships with employees (including the Fair Labor Standards Act of 1938, the Immigration Reform and Control Act of 1986 and applicable requirements concerning the minimum wage, overtime, family leave, tip credits, working conditions, safety standards, immigration status, unemployment tax rates, workers' compensation rates and state and local payroll taxes), federal and state laws which prohibit discrimination and other laws regulating the design and operation of facilities, such as the Americans With Disabilities Act of 1990, or the ADA.

The Debtors are subject to the Patient Protection and Affordable Care Act of 2010 ("**PPACA**"). There are no assurances that a combination of cost management and price increases can accommodate all of the costs associated with compliance with PPACA. PPACA also requires certain restaurant companies to disclose calorie information on their menus.  The Debtors do not expect to incur any material costs from compliance with this provision, but cannot anticipate any changes in customer behavior resulting from the implementation of this portion of the law, which could have an adverse effect on the Debtors' sales or results of operations.

The Debtors are subject to a variety of federal, state and local laws and regulations relating to the use, storage, discharge, emission, and disposal of hazardous materials.  There also has been increasing focus by U.S. and overseas governmental authorities on other environmental matters, such as climate change, the reduction of greenhouse gases and water consumption.  This increased focus may lead to new initiatives directed at regulating an as yet unspecified array of environmental matters, such as the emission of greenhouse gases, where "cap and trade" initiatives could effectively impose a tax on carbon emissions.  Legislative, regulatory or other efforts to combat climate change or other environmental concerns could result in future increases in the cost of raw materials, taxes, transportation, and utilities, which could decrease the Debtors' operating profits and necessitate future investments in facilities and equipment.  Compliance with these laws and regulations can be costly, and any failure or perceived failure to comply with those laws could harm the Debtors' reputation or lead to litigation, which could adversely affect the Debtors' financial condition.

The Debtors are subject to various state laws that govern the offer and sale of franchises, as well as the rules and regulations of the Federal Trade Commission. Additionally, many state laws regulate various aspects of the franchise relationship, including the nature, timing and sufficiency of disclosures to franchisees upon the initiation of the franchisor-potential franchisee relationship, conduct during the franchisor-franchisee relationship, and renewals and terminations of franchises. Any failures by the Debtors to comply with these laws and regulations in any jurisdiction or to obtain required government approvals could result in franchisee-initiated lawsuits, a ban or temporary suspension on future franchise sales, civil and administrative penalties or other fines, or require the Debtors to make offers of rescission, disgorgement, or restitution, any of which could adversely affect the their business and operating results. The Debtors could also face lawsuits by their franchisees based upon alleged violations of these laws. In the case of willful violations, criminal sanctions could be brought against the Debtors.

The impact of current laws and regulations, the effect of future changes in laws or regulations that impose additional requirements, and the consequences of litigation relating to current or future laws and regulations, or an insufficient or ineffective response to significant regulatory or public policy issues, could increase the Debtors' cost structure, decrease operational efficiencies and talent availability, and therefore have an adverse effect on the Debtors' operations and profitability.

Failure to comply with the laws and regulatory requirements of federal, state and local authorities could result in, among other things, revocation of required licenses, administrative enforcement actions, fines, and civil and criminal liability. Compliance with these laws and

regulations can be costly and could increase the Debtors' exposure to litigation or governmental investigations or proceedings.

### 9.      Intellectual Property

The Debtors own certain common law trademark rights and federal trademark and service registrations, including for the "Logan's Roadhouse" trade name and logo, as well as proprietary rights related to methods of operation and certain core menu offerings.  The Debtors also currently own the exclusive rights to various domain names containing or related to their brand.  These intellectual property rights are important to the Debtors' success and their competitive position.  If the Debtors are required to commence litigation to enforce their intellectual property rights, such proceedings could be burdensome and costly and would carry the risk that the Debtors may not prevail.

The Debtors cannot ensure that their intellectual property does not and will not infringe on the intellectual property rights of others, or that third parties will not claim infringement in the future.  Any such claim, whether or not it has merit, could be time consuming and distracting for the Debtors' management, result in costly litigation, and potentially cause changes to the Debtors' menu items or result in a requirement to enter into royalty or licensing agreements.  As a result, any intellectual property claim against the Debtors could have a material adverse impact on their business, financial conditions, and operations.

### 10.      Labor and Employment

The loss of services of certain executives or other employees could adversely impact the Debtors' business if they are unable to quickly find suitable replacements.  Future growth also depends on the Debtors' ability to recruit and retain high-quality employees to work in and manage their restaurants.  A loss of key employees or shortage of restaurant workers could harm the Debtors' business.

Federal and state laws govern such matters as minimum wages, working conditions, overtime, and tip credits. As federal and state minimum wage rates increase, the Debtors may need to increase their employees' wages.  Labor shortages and health care mandates could also increase labor costs.  In addition, if restaurant management and staff turnover trends increase, the Debtors could suffer higher direct costs associated with recruiting, training, and retaining replacement personnel. Moreover, the Debtors could suffer from significant indirect costs, including restaurant disruptions due to management changeover, potential delays in new restaurant openings, or adverse customer reactions to inadequate customer service levels due to staff shortages.  Competition for qualified employees exerts upward pressure on wages paid to attract such personnel, resulting in higher labor costs, together with greater recruitment and training expense.  The Debtors may not be able to completely offset increased labor costs with increased menu pricing.  Increased labor costs could result in adverse impacts to the Debtors' business and declines in profitability.

### 11.      Risk of Food-Borne Illness Incidents

Claims of illness or injury relating to food quality or food handling are common in the food service industry, and a number of these claims may exist at any given time.  It cannot be

guaranteed that the Debtors' efforts to ensure that customers enjoy safe, quality food products will be fully effective. Furthermore, reliance on third-party food suppliers and distributors increases the risk that food-borne illness incidents could be caused by factors outside of the Debtors control and would affect multiple locations rather than single restaurants.

Food-borne illnesses spread at restaurants have generated significant negative publicity at other restaurant chains in the past, which has had a negative impact on their results of operations. Any report or publicity linking the Debtors' restaurants to instances of food-borne illness or other food safety issues, including food tampering or contamination, could adversely affect the Debtors' brand and reputation as well as their revenue and profits. Even instances of food-borne illness, food tampering, or food contamination occurring solely at other restaurant brands could result in negative publicity about the food service industry generally and adversely impact the Debtors' restaurants, operations, and business.

If any of the Debtors' customers become ill from food-borne illnesses, the Debtors may be forced to temporarily close some restaurants. Furthermore, any instances of food contamination, whether or not at the Debtors' restaurants, could subject the Debtors' restaurants or suppliers to a food recall pursuant to the Food and Drug Administration Food Safety Modernization Act. Even the prospect of a food safety issue could change consumer perceptions of the safety of the Debtors' food, disrupt their supply chain, and impact their ability to supply certain menu items or adequately staff restaurants. To the extent that a virus is food-borne, future outbreaks may adversely affect the price and availability of certain food products and cause customers to eat less of a product that is critical (or a critical component) in the Debtors' menu or avoid eating in the Debtors' restaurants.

Furthermore, the United States and other countries have experienced, and may experience in the future, outbreaks of viruses, such as avian influenza, SARS, H1N1, various other forms of influenza, enterovirus, and Ebola. To the extent that a virus is transmitted by human-to-human contact, the Debtors' customers or employees could become infected or could choose, or be advised, to avoid gathering in public places and avoid eating in restaurant establishments, which could adversely affect the Debtors' business. In addition, certain jurisdictions may impose mandatory closures, seek voluntary closures, or impose restrictions on operations. Any of these events or any related negative publicity would adversely affect the Debtors' business.

## 12.    Complaints or Litigation

From time to time, the Debtors may be subject to employee claims alleging injuries, wage and hour violations, discrimination, harassment or wrongful termination, as well as customer and third party claims. In recent years, a number of restaurant companies have been subject to lawsuits, including class and collective action lawsuits, alleging violations of federal and state law regarding workplace, employment, and similar matters. The outcome of litigation, particularly class action lawsuits and regulatory actions, is difficult to assess or quantify. Plaintiffs in these types of lawsuits may seek recovery of very large or indeterminate amounts, and the magnitude of the potential loss relating to such lawsuits may remain unknown for substantial periods of time. The cost to defend litigation may be significant. There may also be adverse publicity associated with litigation that could decrease customer acceptance of the Debtors' brand, regardless of the validity of the claims or the ultimate determination of liability.

Regardless of whether any claims against the Debtors are valid or whether they are ultimately determined to be liable, claims may be expensive to defend and may divert time and money away from the Debtors' operations and hurt the Debtors' financial performance. A significant judgment for any claim could materially adversely affect the Debtors' financial condition or results of operations.

The Debtors may also be subject to state and local "dram shop" statutes, which may subject them to uninsured liabilities. These statutes generally allow a person injured by an intoxicated person to recover damages from an establishment that wrongfully served alcoholic beverages to the intoxicated person. Because a plaintiff may seek punitive damages, which may not be fully covered by insurance, this type of action could have an adverse impact on the Debtors' financial condition and results of operations.

### 13.   <u>Insurance</u>

The Debtors may incur certain types of losses that cannot be insured against or that they believe are not economically reasonable to insure. In addition, the Debtors may not be able to obtain adequate insurance in the future and premiums for insurance may increase over time and such increases may be significant. Uninsured losses could have a material adverse effect on the Debtors' business and results of operations. Unanticipated changes in the actuarial assumptions and management estimates underlying the Debtors' reserves for losses under self-insured workers' compensation, general liability, employee health, and property insurance programs could result in materially different amounts of expense under these programs, which could have a material adverse effect on the Debtors' business, financial condition and results of operations.

### 14.   <u>Goodwill and Intangible Assets</u>

The Debtors are required to evaluate goodwill and other intangibles for impairment whenever changes in circumstances indicate that the carrying amount may not be recoverable from estimated future cash flows or at least annually. This evaluation requires the use of projections of future cash flows from the reporting segment. These projections are based on growth rates, anticipated future economic conditions, the appropriate discount rates relative to risk and estimates of residual values. If changes in growth rates, future economic conditions, discount rates or estimates of residual values were to occur, goodwill and other intangibles may become impaired. This could result in material charges that could be adverse to the Debtors' operating results and financial position.

### 15.   <u>Risk of Termination of Surety Bonds</u>

The Debtors are currently required to provide certain governmental entities and utility providers with surety bonds to secure the Debtors' payment obligations to those entities that are incurred in the course of operating certain of their restaurants. The provider of the Debtors' surety bonds filed a motion on September 13, 2016 for authority to proceed with termination of the surety bonds; the motion will be heard on October 11, 2016. If the Debtors' existing surety bonds issued to governmental entities are ultimately cancelled and the Debtors do not timely obtain replacement surety bonds or make alternative arrangements, the applicable governmental

entities may prohibit the Debtors from operating the impacted restaurants until they receive replacement surety bonds or the Debtors make other acceptable arrangements.

**D.    Financial Risks**

The Reorganized Debtors' working capital needs are anticipated to be funded by the Exit First Lien Facility and Exit Second Lien Facility.  The credit agreement establishing the Exit First Lien Facility will be on the terms described in the Exit First Lien Financing Term Sheet and will be in substantially the form included as an exhibit to the Plan Supplement.  It is likely that credit agreement will include, among other things, restrictions on the Reorganized Debtors' ability to incur additional indebtedness, consummate certain asset sales, create liens on assets, make investments, loans or advances, consolidate or merge with or into any other Person, or convey, transfer, or lease all or substantially all of their assets, or change the business to be conducted by them.  The Exit First Lien Facility also will contain specific financial covenants, as well as customary events of default. A breach of any of those covenants could result in a default under the Exit First Lien Facility; and, in certain cases, such default could result in a cross-default under the credit agreement for the Exit Second Lien Facility discussed below.  It also is anticipated that substantially all of the assets of the Reorganized Debtors will be pledged as security under the Exit First Lien Facility.

In addition, upon the Effective Date the Reorganized Debtors will enter into the Exit Second Lien Facility.  The credit agreement establishing the Exit Second Lien Facility will be will be on the terms described in the Exit Second Lien Financing Term Sheet and will be in substantially the form included as an exhibit to the Plan Supplement.  It is likely that credit agreement will include, among other things, restrictions on the Reorganized Debtors' ability to incur additional indebtedness, consummate certain asset sales, create liens on assets, make investments, loans or advances, consolidate or merge with or into any other Person, or convey, transfer, or lease all or substantially all of their assets, or change the business to be conducted by them.  The Exit Second Lien Facility also will contain specific financial covenants, as well as customary events of default. A breach of any of those covenants could result in a default under the Exit Second Lien Facility; and, in certain cases, such default could result in a cross-default under the credit agreement for the Exit First Lien Facility discussed above.  It also is anticipated that substantially all of the assets of the Reorganized Debtors will be pledged as security under the Exit Second Lien Facility.

Based on the Reorganized Debtors' level of secured funded indebtedness, the treatment accorded general unsecured creditors under the Plan, and other factors affecting the Reorganized Debtors or their business, one or more suppliers, including suppliers material to the business of the Reorganized Debtors, could decline to continue shipping products to the Reorganized Debtors or, as a condition to such shipments, could require more restrictive payment terms than had existed previously.  The occurrence of the foregoing could affect the Reorganized Debtors in a material and adverse manner.

There can be no assurance that the Reorganized Debtors will be able to generate sufficient cash flow from operations to enable them, along with the availability under the First Lien Exit Facility and Second Lien Exit Facility, to maintain operations at a sufficient level, or to repay their indebtedness as such indebtedness becomes due and payable and may not be able to

satisfy claims of creditors that arise after the Effective Date; and the Reorganized Debtors may not be able to extend the maturity of or refinance such indebtedness on commercially reasonable terms or at all.

### E.    Certain Bankruptcy Law Considerations

#### 1.    <u>Risk of Non-Confirmation of the Plan</u>

Although the Debtors believe that the Plan satisfies all of the requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation, or that any such modifications would not necessitate the resolicitation of votes to accept the modified Plan.

The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created ten (10) Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class.  However, a Claim or Interest holder could challenge the Debtors' classification.  In such an event, the cost of the Chapter 11 Cases and the time needed to confirm the Plan may increase, and there can be no assurance that the Bankruptcy Court will agree with the Debtors' classification.   If the Bankruptcy Court concludes that the classifications of Claims and Interests under the Plan do not comply with the requirements of the Bankruptcy Code, the Debtors may need to modify the Plan.  The Plan may not be confirmed if the Bankruptcy Court determines that the Debtors' classification of Claims and Interests is not appropriate.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors may seek, as promptly as practicable thereafter, Confirmation.  If the Plan does not receive the required support from the Voting Classes, the Debtors may elect to amend the Plan (with the consent of the Required Supporting Parties), seek to sell their assets pursuant to section 363 of the Bankruptcy Code, or proceed with liquidation.

The Debtors cannot assure you that the Plan will be confirmed by the Bankruptcy Court.  Section 1129 of the Bankruptcy Code, which sets forth the requirements for confirmation of a plan of reorganization, requires, among other things, a finding by the Bankruptcy Court that the plan of reorganization is "feasible," that all claims and interests have been classified in compliance with the provisions of section 1122 of the Bankruptcy Code, and that, under the plan of reorganization, each holder of a claim or interest within each impaired class either accepts the plan of reorganization or receives or retains cash or property of a value, as of the date the plan of reorganization becomes effective, that is not less than the value such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.  There can be no assurance that the Bankruptcy Court will conclude that the feasibility test and other requirements of section 1129 of the Bankruptcy Code have been met with respect to the Plan.  There can be no assurance that modifications to the Plan would not be required for Confirmation.

If the Plan is not confirmed, the Chapter 11 Cases may be converted into cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to

liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Interests and the Liquidation Analysis are set forth in the Liquidation Analysis. The Debtors believe that liquidation under chapter 7 of the Bankruptcy Code would result in, among other things, smaller distributions being made to holders of Claims and Interests than those provided for in the Plan because of:

- the absence of a market for the Debtors' assets on a going concern basis;

- additional administrative expenses involved in the appointment of a trustee; and

- additional expenses and Claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other Executory Contracts in connection with a cessation of the Debtors' operations.

## 2. **Risk of Objection to Claim or Interest**

Except as otherwise provided in the Plan, the Debtors and other parties in interest reserve the right to object to the amount or classification of any Claim or Interest under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any holder of a Claim or Interest where such Claim or Interest is subject to an objection. Any holder of a Claim or Interest that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement

## 3. **Risk of Non-Occurrence of the Effective Date**

Although the Debtors believe that the Effective Date will occur prior to the close of the Debtors' fiscal year ending December 2016, there can be no assurance as to such timing or that the conditions to the Effective Date, as contained in the Plan, will occur on a timely basis or at all. Moreover, both the Restructuring Support Agreement and the DIP Facilities contain milestones relating to, among other things, the timely occurrence of the Effective Date; and there can be no assurance that the timely occurrence of the Effective Date will occur within the respective time frames set forth in the Restructuring Support Agreement and the DIP Facilities, if at all. Failure to meet the milestones with respect to the occurrence of the Effective Date constitutes an event of default under both the Restructuring Support Agreement and the DIP Facilities.

## 4. **Contingencies May Affect Distributions**

The distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies could affect distributions under the Plan to holders of Claims.

5.      <u>**Risk of Amendment, Waiver, Modification, or Withdrawal of Plan**</u>

The Debtors, or the Reorganized Debtors, as applicable, reserve the right, in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Restructuring Support Agreement, and consistent with the terms of the Plan, to amend the terms of the Plan or waive any conditions thereto if and to the extent that such amendments or waivers are consistent with the terms of the Restructuring Support Agreement and necessary or desirable to consummate the Plan, subject to the requisite consent of the Supporting Parties and the consent of the Creditors Committee to the extent any amendment or modification is materially inconsistent with the terms of the Creditors' Committee Settlement. The potential impact of any such amendment or waiver on the holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes. All holders of Claims and Interests will receive notice of such amendments or waivers required by applicable law and the Bankruptcy Court. If, after receiving sufficient acceptances, but prior to Confirmation of the Plan, the Debtors seek to modify the Plan, the previously solicited acceptances will be valid only if (1) all adversely affected Classes accept the modification in writing, or (2) the Bankruptcy Court determines, after notice to designated parties, that such modification was *de minimis* or purely technical or otherwise did not adversely change the treatment of holders of accepting Claims and Interests or is otherwise permitted by the Bankruptcy Code.

6.      <u>**Risk of Material Adverse Effects on the Debtors' Operations**</u>

The commencement of the Chapter 11 Cases could adversely affect the relationships between the Debtors and their customers, employees, partners, and other parties. Such adverse effects could materially impair the Debtors' operations, including their ability to serve their customers.

7.      <u>**Risk of Lengthy Bankruptcy Proceedings**</u>

The Debtors estimate that the process of obtaining Confirmation of the Plan by the Bankruptcy Court will last approximately 90-120 days from the Petition Date, but it could last considerably longer if, for example, Confirmation is contested or the conditions to Confirmation or consummation are not satisfied or waived.

Although the Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy, and the Debtors cannot be certain that the Plan will be confirmed. Even if confirmed on a timely basis, the Chapter 11 Cases could themselves have an adverse effect on the Debtors' business. There is a risk, due to uncertainty about the Debtors' futures that, among other things:

- customers could frequent the Debtors' competitors instead of the Debtors;

- employees could be distracted from performance of their duties or more easily attracted to other employment opportunities; and

- suppliers, vendors, or other business partners could terminate their relationship with the Debtors or demand financial assurances or enhanced performance, any of which could impair the Debtors' prospects.

A lengthy bankruptcy proceeding also would involve additional expenses and divert the attention of management from the operation of the Debtors' business, which could also result in the potential loss of new business opportunities for the Debtors.

The disruption that the bankruptcy process could have on the Debtors' business may increase with the length of time it takes to complete the Chapter 11 Cases. If the Debtors are unable to obtain Confirmation of the Plan on a timely basis, because of a challenge to the Plan or otherwise, the Debtors may be forced to operate in bankruptcy for an extended period of time while they try to develop a different plan of reorganization that can be confirmed. A protracted bankruptcy case could increase both the probability and the magnitude of the adverse effects described above.

### 8.    Risk of Other Plan Proposals

Other parties in interest could seek authority from the Bankruptcy Court to propose an alternative plan of reorganization to the Plan. Under the Bankruptcy Code, a debtor in possession initially has the exclusive right to propose and solicit acceptances of a plan of reorganization for a period of 120 days from the Petition Date. However, such exclusivity period can be reduced or terminated upon order of the Bankruptcy Court. If such an order were to be entered, other parties in interest would then have the opportunity to propose alternative plans of reorganization.

If another party in interest were to propose an alternative plan of reorganization following expiration or termination of the Debtors' exclusivity period, such a plan may be less favorable to existing holders of Claims and Interests, including the holders of Claims in the Voting Classes. If there were competing plans of reorganization, the Chapter 11 Cases likely would become longer, more complicated, and much more expensive. If this were to occur, or if the Debtors' employees or other constituencies important to the Debtors' business were to react adversely to an alternative plan of reorganization, the adverse consequences discussed in the preceding section may also occur.

### 9.    Contract and Lease Assumption Risks

An executory contract is a contract on which performance remains due to some extent by both parties to the contract. If the Debtors elect to assume an Executory Contract or Unexpired Lease, with respect to some limited classes of Executory Contracts, including licenses with respect to patents or trademarks, the Debtors may need to obtain the consent of the counterparty to maintain the benefit of the contract. There is no guarantee that such consent either would be forthcoming or that conditions would not be attached to any such consent that makes assuming the contracts unattractive. The Debtors then would be required to either forego the benefits offered by such contracts or to find alternative arrangements to replace them.

### 10.   Fraudulent Conveyances and Preferential Transfers

Certain payments received by stakeholders prior to the Petition Date could be challenged under applicable debtor/creditor or bankruptcy laws as either a "fraudulent conveyance" or a "preferential transfer." A fraudulent conveyance occurs when a transfer of a debtor's assets is made with the intent to defraud creditors or in exchange for consideration that does not represent reasonably equivalent value to the property transferred. A preferential transfer occurs upon a transfer of property of the debtor while the debtor is insolvent for the benefit of a creditor on account of an antecedent debt owed by the debtor that was made on or within 90 days before the petition date or one year before the petition date, if the creditor, at the time of such transfer, was an insider. If any transfer were challenged in the Bankruptcy Court and found to have occurred with regard to any of the Debtors' material transactions, the Bankruptcy Court could order the recovery of all amounts received by the recipient of the transfer. Notwithstanding the foregoing, pursuant to the Plan, the Debtors shall covenant and agree not to pursue Avoidance Actions, which Avoidance Actions shall be deemed released and waived on the Effective Date.

### 11.   Final Approval and Availability of the DIP Facilities

Upon commencing the Chapter 11 Cases, the Debtors asked the Bankruptcy Court to authorize the Debtors to enter into the DIP Credit Agreement and use cash collateral to fund the Chapter 11 Cases and to provide customary adequate protection to the DIP Lenders under the DIP Credit Agreement, which requests were granted on [an interim] basis. Such access to postpetition financing and cash collateral will provide liquidity during the pendency of the Chapter 11 Cases. [There can be no assurance that the Bankruptcy Court will approve on a final basis the DIP Facilities and/or such use of cash collateral on the terms requested. Moreover,] if the Chapter 11 Cases take longer than expected to conclude, the Debtors may exhaust their available financing or their obligations under the DIP Facilities may mature. There is no assurance that the Debtors will be able to obtain an extension of the right to obtain further postpetition financing or use cash collateral, in which case, the liquidity necessary for the orderly functioning of the Debtors' business may be impaired materially.

### 12.   The Debtors' Estimates and Assumptions Regarding's Secured, Administrative, and Priority Claims May Be Incorrect

In preparing their business plan and the Financial Projections, the Debtors have made certain estimates and assumptions regarding obligations that will need to be paid in full, in cash as of the Effective Date of the Plan. Among the obligations that will be paid in full, in cash as of the Effective Date of the Plan are Administrative Claims, Priority Tax Claims, Other Priority Claims, and, at the Debtor's election, Other Secured Claims, and the cash requirements of the Reorganized Debtors as of the Effective Date are derived form, among other things, the Debtors' estimates and assumptions about the cash required to pay these Claims. For instance, Other Priority Claims include claims entitled to priority under Section 507(a)(4) of the Bankruptcy Code relating to wages, salaries, or commissions earned within 180 days before the Petition Date. Certain Debtors are defendants in a prepetition collective action brought under the Fair Labor Standards Act ("**FLSA**") styled as *Bradford and Bolen v. Logan's Roadhouse, Inc., et al.*, 3:14-w-02184 (M.D. Tenn.) (the "**Bradford Action**"), alleging violations of the FLSA with respect to certain tipped employees employed by Logan's Roadhouse, Inc. The action was

conditionally class certified in 2015 and approximately 4,750 current and former employees opted-in as plaintiffs. Certain Debtors are defendants in a putative collective action brought under the FLSA styled as *Elchert and Crochet v. LRI Holdings, Inc. and Logan's Roadhouse, Inc.*, Case No. 3:16-cv-00564 (M.D. Tenn.) (the "**Elchert Action**," and with the Bradford Action, the "**FLSA Actions**"), alleging violations of the FLSA with respect to certain assistant managers employed by Logan's Roadhouse, Inc. The Elchert Action has not been class certified and only three plaintiffs have opted to participate to date, but it purports to be on behalf of all assistant managers at Logan's restaurants. The Debtors anticipate that the plaintiffs in the FLSA Actions may allege that some portion of their claims are entitled to priority under Section 507(a)(4) of the Bankruptcy Code. The Debtors dispute the allegations in the FLSA Actions, have vigorously defended against them and intend to continue to do so.

The Debtors have included the occurrence of certain contingencies in their estimate of secured, administrative and priority claims that will need to be paid in full at or following the Effective Date. However, the Debtors' estimates and assumptions may differ materially from the actual Allowed amount of claims that need to be paid in full, in cash, as of the Effective Date, including Other Priority Claims related to the FLSA Actions.

### 13. Risk of Termination of the Restructuring Support Agreement

Pursuant to the Restructuring Support Agreement, the Supporting Parties are obligated to support the restructuring transaction discussed above and the Plan. Nevertheless, the Restructuring Support Agreement is subject to termination upon the occurrence of a Termination Event (as such term is defined in the Restructuring Support Agreement). Accordingly, the Restructuring Support Agreement may be terminated after the date of this Disclosure Statement, and such a termination would present a material risk to Confirmation of the Plan because the Plan may no longer have the support of the Supporting Parties.

## ARTICLE X.

## CONFIRMATION PROCEDURE

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

### A. Solicitation of Votes

In accordance with sections 1126 and 1129 of the Bankruptcy Code, the Claims and Equity Interests in six (6) of the Classes of the Plan are Impaired. Those Classes are Class 3 (Revolving Facility Lender Claims), Class 4 (GSO Notes Claims and Kelso Notes Claims), Class 5 (Unexchanged Notes Claims), Class 6 (General Unsecured Claims), Class 8 (Subordinated Claims), and Class 9 (Existing Equity Interests). However, only the holders of Allowed Claims in four of those Classes (Classes 3, 4, 5, and 6) are entitled to vote to accept or reject the Plan. Holders of Claims and Equity Interests in Classes 8 and 9 are Impaired and are deemed to have rejected the Plan; and, therefore, are not entitled to vote to accept or reject the Plan. Further, the Claims in Class 1 (Other Priority Claims), Class 2 (Other Secured Claims), Class 7 (Intercompany Claims), and Class 10 (Intercompany Interests) are Unimpaired and are

conclusively presumed to have accepted the Plan; and, therefore, they are not entitled to vote to accept or reject the Plan.

As to Classes of Claims entitled to vote on the Plan, section 1126(c) of the Bankruptcy Code defines "acceptance" of a reorganization plan by a class of creditors as acceptance by holders of at least two-thirds in dollar amount (commonly referred to as the "aggregate claim amount" requirement) and more than one-half in number (commonly referred to as the "numerosity" requirement) of the Claims of that class that have timely voted to accept or reject a plan.

A vote on acceptance or rejection of a reorganization plan may be disregarded if the bankruptcy court determines, after notice and a hearing, that acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

Any Claim to which an objection or request for estimation is pending, or which is on the Schedules is reflected as unliquidated, disputed or contingent and for which no proof of claim has been filed, is not entitled to vote on whether to accept or reject the Plan unless the holder of such Claim has obtained an order of the Bankruptcy Court temporarily allowing such Claim for the purpose of voting on the Plan.  In addition, the Debtors propose that Ballots cast by alleged creditors of the Debtors whose Claims (x) are not listed on the Schedules  or (y) are listed on the Schedules as disputed, contingent and/or unliquidated, but who in either case have timely filed proofs of claim in unliquidated or unknown amounts that are not the subject of an objection filed by the Debtors, will have their Ballots counted towards satisfying the numerosity requirement of section 1126(c) of the Bankruptcy Code, but will not have their Ballots counted toward satisfying the aggregate claim amount requirements of that section.

## B.    The Confirmation Hearing

The Bankruptcy Code requires that a bankruptcy court, after notice, hold a confirmation hearing prior to determining whether to confirm the proposed plan of reorganization.    The Confirmation Hearing is scheduled for 10:30 a.m., prevailing Eastern Time, on November 9, 2016, but may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or filed on the Docket.  The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing.  Subject to section 1127 of the Bankruptcy Code and the Restructuring Support Agreement, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation.  The Bankruptcy Court has established November 2, 2016 at 4:00 p.m., prevailing Eastern Time, as the deadline for parties in interest to file Plan objections (the "**Objection Deadline**").  All objections to the Plan must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest so that they are received on or before the Objection Deadline.

### C.    Confirmation

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.  Among those requirements are that the Plan is (i) accepted by all Impaired Classes of Claims and Equity Interests (or, if rejected by an Impaired class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such Class), (ii) feasible, and (iii) in the "best interests" of creditors and equity interest holders that are Impaired under the Plan.  These three concepts are described below.

### 1.    Acceptance

Under the Bankruptcy Code, certain classes are not entitled to vote to accept or reject a proposed plan because those classes are conclusively presumed to have voted to accept that plan or are deemed to have rejected that plan.  In the case of Class 1 (Other Priority Claims), Class 2 (Other Secured Claims), Class 7 (Intercompany Claims), and Class 10 (Intercompany Interests), those Classes are Unimpaired under the Plan and, therefore, are conclusively presumed to have accepted the Plan.  In the case of Class 8 (Subordinated Claims) and Class 9 (Existing Equity Interests), those Classes are deemed to reject the Plan because, under the Plan, those Classes are Impaired and the members of those Classes will not receive any Distribution or be entitled to retain any property on account of those Claims or Equity Interests.  Consequently, only holders of Allowed Claims in Class 3 (Revolving Facility Lender Claims), Class 4 (GSO Notes Claims and Kelso Notes Claims), Class 5 (Unexchanged Notes Claims), and Class 6 (General Unsecured Claims) are entitled to vote to accept or reject the Plan.

Because Classes 8 and 9 are Impaired and also are deemed to reject the Plan, the Debtors will seek nonconsensual confirmation of the Plan under section 1129(b) of the Bankruptcy Code, with respect to such Classes; provided that the Debtors will only seek the nonconsensual confirmation of the Plan under section 1129(b) of the Bankruptcy Code, if at least one (1) Class of Claims Impaired under the Plan has accepted the Plan (and which Class's acceptance is determined without inclusion of Claims of Insiders).

### 2.    Confirmation Without Acceptance of All Impaired Classes

Section 1129(b) of the Bankruptcy Code establishes a procedure to obtain the nonconsensual confirmation of a proposed plan.  This procedure is known as a "cram down".  To obtain nonconsensual confirmation, it must be demonstrated to the bankruptcy court that the proposed plan (x) "does not discriminate unfairly" and (y) is "fair and equitable" with respect to each nonaccepting class that is impaired under the proposed plan.  The Debtors believe that the Plan does not discriminate unfairly, and they also believe it is fair and equitable.

### a.    No Unfair Discrimination

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent, but that such treatment be fair.  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character).  Bankruptcy courts will take into account a number of

factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

b.    <u>Fair and Equitable Test</u>

This test applies to classes of different priority and status (e.g., secured vs. unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class.  As to the dissenting class, the test sets different standards depending on the type of claims or equity interests in such class, which are as follows:

(1)    <u>Secured Creditors</u>.  In the case of a class of secured creditors, either: (i) each impaired creditor retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim; or (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim; or (iii) the property securing the claim is sold free and clear of Liens (with such Liens instead attaching to the proceeds of the sale and the treatment of such Liens on proceeds satisfying clause (i) or (ii) above.  The Plan establishes three Classes of Impaired secured Claims: Class 3 (Revolving Facility Lender Claims), Class 4 (GSO Notes Claims and Kelso Notes Claims), and Class 5 (Unexchanged Notes Claims).  The majority in amount of the Claims in each of those Classes are held by the Supporting Parties, who will vote in favor of the Plan in accordance with the Restructuring Support Agreement.  With respect to Class 3, the Revolving Facility Lender Claims will either receive their pro rata share of the Exit Revolving Facility, as agreed to in the Restructuring Support Agreement,  or such claims will be paid in full in cash or otherwise satisfied.  With respect to Class 4 and 5, who hold liens on substantially all of the Debtors' assets that are *pari passu* between the classes and junior to the liens securing the Revolving Facility Lender Claims in Class 3, the holders will receive the equity of the Reorganized Debtors (or the Cash-Out Payment), which the Debtors believe provides the indubitable equivalent of the value of such holders' residual interest in the Debtors' assets.

(2)    <u>Unsecured Creditors.</u>  In the case of a class of unsecured creditors, either: (i) each impaired unsecured creditor receives or retains under the proposed plan property of a value equal to the amount of its allowed claim; or (ii) the holders of claims and equity interests that are junior to the claims or equity interests of the particular nonaccepting class will not receive any property under the plan.  The Plan establishes one Class of Impaired unsecured Claims: Class 6 (General Unsecured Claims); no holders of Claims or Interests junior to holders of Claims in Class 6 are receiving anything on account of their Claims or Interests; *provided* that for administrative convenience, Intercompany Claims may be reinstated, cancelled or compromised and Intercompany Interests will remain in place.

(3)    <u>Equity Interests.</u>  In the case of a class of equity holders, either: (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of its interest (whichever is highest); or (ii) the holder of an equity interest that is junior to the particular nonaccepting class will not receive or retain any property under the Plan.  Here, with respect to holders of Equity Interests there are no junior

classes receiving any recovery under the Plan; *provided* that Intercompany Interests will remain in place for administrative convenience.

### 3.       Feasibility

For a reorganization plan to be confirmed, section 1129(a)(11) of the Bankruptcy Code requires that confirmation of that plan is not likely to be followed by the liquidation of the debtor, or by the need for further financial reorganization of that debtor.  The Debtors believe the Plan satisfies this confirmation requirement.  The Debtors have analyzed their ability to meet their obligations under the Plan and, based upon the Financial Projections attached as **Exhibit D** to this Disclosure Statement and the assumptions set forth therein, including (among other things) the anticipated liquidity to be provided under the Exit First Lien Facility and Exit Second Lien Facility, the Debtors believe they will be able to make all Distributions required by the Plan and also will be able to fund their corporate and working capital needs going forward.

### 4.       Best Interests Test

For a reorganization plan to be confirmed, section 1129(a)(7) of the Bankruptcy Code requires, in general, with respect to each Impaired class of claims and equity interests, that each holder of an allowed claim or equity interest either (i) accept the plan or (ii) receive or retain under the plan, on account of such claim or equity interest, property of a value, as of the plan's effective date, that is not less than the value such holder would so receive or retain if the debtors instead were liquidated under chapter 7 of the Bankruptcy Code.

To determine what each holder of an Allowed Claim or Equity Interest would receive if the Debtors were to be liquidated under chapter 7, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtors' assets in the context of a chapter 7 liquidation case.  The Cash amount that would be available for satisfaction of Claims and Equity Interests would consist of the proceeds resulting from the disposition of the unencumbered assets of the Debtors (if any), plus the unencumbered Cash (if any) held by the Debtors at the time of the commencement of the liquidation case and litigation recoveries not available under the Plan.  That aggregate amount then would be reduced by the amount of the costs and expenses of liquidation, plus any additional administrative and priority Claims that might result from the termination of the Debtors' business and the use of chapter 7 for the purposes of liquidation.

The costs and expenses of any liquidation under chapter 7 would include, among other things, the fees payable to a chapter 7 trustee, as well as the fees and expenses that might be payable to attorneys and other professionals that such a chapter 7 trustee might engage.  In addition, Claims would arise by reason of the breach or rejection of obligations incurred and leases and executory contracts assumed or entered into by the Debtors during the pendency of the Chapter 11 Cases.  All of these Claims, as well as other Claims that might arise in a liquidation case or result from the Chapter 11 Cases, including any unpaid expenses incurred by the Debtors and the Creditors' Committee during the Chapter 11 Cases (such as compensation for legal and financial advisors and accountants), would need to be paid in full from the

liquidation proceeds before the balance of those proceeds would be made available to pay prepetition Allowed General Unsecured Claims.

The value of those net distribution proceeds from the Debtors' unencumbered assets are then compared to the value of the property offered to such Classes of Claims and Equity Interests under the Plan, to determine if the Plan is in the best interests of each such Impaired Class.

The Debtors have considered the impact that a chapter 7 liquidation would have on the ultimate proceeds available for Distribution to holders of Claims and Equity Interests in the Chapter 11 Cases, as detailed in the Liquidation Analysis being prepared by the Debtors (with the assistance of their financial advisor). A copy of that Liquidation Analysis is attached as **Exhibit F** to this Disclosure Statement. As a result of the Liquidation Analysis, the Debtors believe that confirmation of the Plan will provide each holder of an Allowed Claim with a recovery that is not less than such holder would receive were the Debtors instead to be liquidated under chapter 7.

It is important to emphasize that a liquidation analysis, like any other type of financial projection, must be based on a series of estimates and assumptions that, although developed and considered reasonable at the time that analysis is undertaken, are inherently subject to significant economic and competitive uncertainties and contingencies, mostly beyond the control of the Debtors. Moreover, liquidation involves a sequence of steps, with each step involving potentially multiple alternate decisions. The sequence of steps, and decision made at each applicable step, as assumed for purposes of the analysis may or may not be the sequence and decisions that ultimately would have been taken and made, or even available, had an actual liquidation been undertaken. For these reasons, there can be no assurance that an aggregate value at least equal to the valuation reflected in the Liquidation Analysis in fact would be achieved in any such actual liquidation.

## ARTICLE XI.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors would have two principal alternatives if the Plan is not to be confirmed and consummated. First, the Debtors could seek the confirmation and consummation of an alternative plan of reorganization under chapter 11 of the Bankruptcy Code. Second, the Debtors could seek liquidation under chapter 7 or chapter 11 of the Bankruptcy Code. These two alternatives are discussed below.

### A.    Alternative Plan of Reorganization Under Chapter 11

If the Plan is not confirmed, the Debtors (or, after the expiration of the Debtors' exclusive period in which to propose and solicit a plan of reorganization, any other party in interest in the Chapter 11 Cases) could propose a different plan or plans of reorganization under chapter 11 of the Bankruptcy Code. Such plans might involve a reorganization and continuation of the Debtors' business, an orderly liquidation of the Debtors' assets, a transaction, or a combination of such alternatives. As of the date of this Disclosure Statement, there is no feasible alternative

plan of reorganization that has been developed by the Debtors.  Moreover, the Debtors believe that the Plan, as described in this Disclosure Statement, enables creditors to realize the highest and best value available under the circumstances, and that any liquidation of the Debtors' assets, or alternative form of chapter 11 plan, would result in substantially more delay, risk and uncertainty to the Debtors and their creditors.

Additionally, any alternative plan of reorganization would need to provide for payment of DIP Facilities Claims in Cash, because the agreement to roll those Claims into the Exit Second Lien Facility is contingent upon confirmation of the Plan.  Moreover, the proposal of any alternative plan is a Termination Event (as defined by the Restructuring Support Agreement) under the Restructuring Support Agreement, and would relieve the Supporting Parties from their obligations thereunder.  Additionally, termination of the Restructuring Support Agreement is an Event of Default under the DIP Credit Agreement.

### B.    Liquidation Under Chapter 7 or Chapter 11

If no plan of reorganization is confirmed, the Chapter 11 Cases may be converted to a case under chapter 7 of the Bankruptcy Code.  In a chapter 7 case, a trustee or trustees would be appointed to liquidate the assets of the Debtors.  It is impossible to predict precisely how the proceeds of the liquidation, if any, would be distributed to the respective holders of Claims against the Debtors.

The Debtors believe, however, that creditors would lose the substantially higher going concern value if the Debtors were forced to liquidate.  In addition, the Debtors believe that in a liquidation under chapter 7, before creditors would receive any distribution, additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants, and other professionals to assist such trustees would cause a substantial diminution in the value of the Estates.  The assets available for distribution to creditors would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, which would arise by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of operations and the failure to realize the greater going concern value of the Debtors' assets.

The Debtors may also be liquidated pursuant to a liquidation plan under chapter 11 of the Bankruptcy Code.  In a liquidation under chapter 11, the Debtors' assets could be sold in an orderly fashion, a process that may be conducted over a more extended period of time than a liquidation under chapter 7.  Thus, a chapter 11 liquidation might result in larger recoveries than a chapter 7 liquidation, but still would be subject to the potential delay in distributions that could result in lower present values received and higher administrative costs.  Because a trustee is not required in a chapter 11 case, expenses for professional fees could be lower than in a chapter 7 case, in which a trustee must be appointed.  Any distribution to holders of Claims or Equity Interests under a chapter 11 liquidation plan may be delayed substantially.

The Liquidation Analysis is premised upon a hypothetical liquidation in a chapter 7 case.  As described in Article X above, the Debtors believe that a liquidation under chapter 7 is a substantially less attractive alternative to the Debtors and their creditors.

# ARTICLE XII.

## SECURITIES LAWS MATTERS

The Plan provides that New Stock will be issued to holders of Allowed Claims in Class 4 (GSO Notes Claims and Kelso Notes Claims) and Class 5 (Unexchanged Notes Claims).[13]  The Plan further provides that New Secured Notes will be issued to holders of Claims in Subclass 5(b) if that subclass does not vote to accept the Plan.

The New Stock and New Secured Notes (if any) issued under the Plan may be "securities" within the meaning of the Securities Act of 1933, as amended (the "**Securities Act**").  The Debtors do not intend to file a registration statement under the Securities Act, or any corresponding state securities laws, in connection with the offer and Distribution of the New Stock or New Secured Notes (if any) under the Plan.  The Debtors believe that the provisions of section 1145(a)(1) of the Bankruptcy Code exempt the Debtors' offer and Distribution of the New Stock or New Secured Notes (if any) from federal and state securities registration requirements (including, but not limited to, Section 5 of the Securities Act or any corresponding state law requiring the registration for offer or sale of a security).

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from the registration requirements the Securities Act and corresponding state laws if certain criteria are satisfied, principally that: (i) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan; (ii) the recipients of the securities must each hold a prepetition claim against (or equity interest in), or a claim for administrative expense in the reorganization case concerning, the debtor or such affiliate; and (iii) the securities must be issued entirely in exchange for the recipient's claim against or equity interest in the debtor or such affiliate, or principally in such exchange and partly for cash or property.  As indicated above, the Debtors believe that the offer and sale of the New Stock and New Secured Notes (if any) under the Plan satisfies the requirements of section 1145(a)(1) and thus is entitled to the exemption from registration afforded by that section.  However, section 1145(a)(1), by its terms, would not be available to any entity deemed a statutory underwriter under section 1145.[14]  You should confer with your own legal advisors to help determine whether or not you are an "underwriter."

Section 1145 stipulates that the offer and sale of securities in accordance with section 1145(a)(1) is deemed to be a public offering.  To the extent a creditor of the Debtors receives any

---

[13]    Except for holders of Allowed Claims in Class 5(b) who are to receive a Cash-Out Payment under the Plan.

[14]    Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any entity who "(A) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such a claim or interest; (B) offers to sell securities offered or sold under the plan for the holders of such securities; (C) offers to buy securities offered or sold under the plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities; and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (D) is an issuer, as used in such section 2(a)(11) [of the Securities Act], with respect to such securities."

New Stock or the New Secured Notes in accordance with section 1145, the subsequent transfer of such New Stock or the New Secured Notes typically would be exempt from registration under the Securities Act, pursuant to section 4(1) of the Securities Act, unless such holder was deemed to be an "issuer", "underwriter," or "dealer" with respect to such securities.

In light of the complexities of the foregoing provisions, the Debtors are unable to offer any assurance concerning the right of any Person to trade in the New Stock or New Secured Notes (if any); nor will the Debtors seek any no-action advice from the SEC or any applicable state securities commissioner. Creditors are urged to consult with their own counsel regarding the securities laws implications of obtaining, holding, and trading in New Stock or New Secured Notes (if any).

## ARTICLE XIII.

## TAX MATTERS

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY FEDERAL, STATE, LOCAL, OR FOREIGN TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

This discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors and to U.S. holders (as defined below) of Claims that are entitled to vote to accept or reject the Plan.  This discussion is provided for information purposes only, and is based on provisions of the Internal Revenue Code of 1986, as amended (the "**IRC**"), Treasury Regulations promulgated thereunder, judicial authorities, and current published administrative rulings and practice of the United States Internal Revenue Service (the "**IRS**") and other applicable authorities, all as in effect on the date hereof. Legislative, judicial, or administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the United States federal income tax consequences of the Plan.  Any such changes or interpretations may be retroactive and could significantly, and adversely, affect the United States federal income tax consequences of the Plan.

The following summary is limited to holders of Claims that are U.S. holders (as defined herein).  For purposes of the following discussion, a "**U.S. holder**" is any of the following:

- An individual who is a citizen or resident of the United States;

- A corporation (or other entity classified as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia;

- An estate, the income of which is subject to federal income taxation regardless of its source; or

- A trust that (a) is subject to the primary supervision of a United States court and which has one or more United States fiduciaries who have the authority to control all substantial decisions of the trust, or (b) has a valid election in effect under applicable Treasury Regulations to be treated as a United States person.

This discussion does not address all aspects of U.S. federal income taxation that may be relevant to the Debtors or a particular U.S. holder in light of its particular facts and circumstances, or to certain types of U.S. holders subject to special treatment under the IRC or other applicable tax rules or regulations, and does not address any tax consequences related to the holding or disposition of interests in Reorganized Holding. Examples of U.S. holders subject to special treatment under the IRC are governmental entities and entities exercising governmental authority, banks and certain other financial institutions, broker-dealers, insurance companies, tax-exempt organizations, real estate investment trusts, small business investment companies, regulated investment companies, U.S. holders that are or hold their Claims through a partnership or other pass-through entity (including a subchapter S corporation), persons using a mark-to-market method of accounting, persons who are related to the Debtors within the meaning of the IRC, U.S. holders of claims who are themselves in bankruptcy, dealers in securities or foreign currency, persons that have a functional currency other than the U.S. dollar, and persons holding or that will hold Claims or interests in Reorganized Holding as part of a hedge, straddle, constructive sale, conversion transaction or other integrated transaction. This discussion does not address state, local or foreign tax consequences of the Plan, and does not discuss federal tax consequences other than income tax, for example estate, gift, or the 3.8% Medicare contribution tax, of the Plan. Except as stated otherwise, this summary also assumes that the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form. Furthermore, this summary only applies to U.S. holders that hold their Claims as capital assets for U.S. federal income tax purposes (generally, property held for investment).

The tax treatment of holders of Claims and the character, amount and timing of income, gain or loss recognized as a consequence of the Plan and the Distributions provided for by the Plan may vary, depending upon the following factors, among others: (i) whether the Claim or portion thereof constitutes a Claim for principal or interest; (ii) the type of consideration, if any, received by the holder in exchange for the Claim, and whether the holder receives Distributions under the Plan in more than one taxable year; (iii) whether the holder is a United States person for tax purposes, or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (iv) the manner in which the holder acquired the Claim; (v) the length of time that the Claim has been held; (vi) whether the Claim was acquired at a discount; (vii) whether the holder has taken a bad debt deduction or a worthless securities deduction with respect to the Claim or any portion thereof in the current or prior taxable years; (viii) whether the holder has previously included in gross income accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the holder; (x) whether the Claim is an installment obligation for U.S. federal income tax purposes; (xi) whether the Claim is considered a "security" for U.S. federal income tax purposes; and (xii) whether the "market discount" rules apply to the holder. In addition, if a partnership (including any entity or arrangement treated as a

partnership for U.S. federal income tax purposes) is a beneficial owner of a Claim, the treatment of a partner in the partnership will generally depend upon the status of the partner and the activities of the partnership. Partnerships and their partners should consult their tax advisors about the U.S. federal income tax consequences of participating in the Plan. Therefore, each holder should consult such holder's own tax advisor for tax advice with respect to that holder's particular situation and circumstances, and the particular tax consequences to such holder of the transactions contemplated by the Plan.

A significant amount of time may elapse between the date of the Disclosure Statement and the receipt of Distributions under the Plan. Events occurring after the date of the Disclosure Statement, such as new or additional tax legislation, court decisions, or administrative changes, could affect the U.S. federal income tax consequences of the Plan and the transactions contemplated thereunder. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No ruling has been or will be sought from the IRS with respect to any of the tax consequences of the Plan, and no opinion of counsel has been or will be obtained by the Debtors with respect thereto. No representations are being made regarding the particular tax consequences of the confirmation or implementation of the Plan as to any U.S. holder of a Claim. This discussion is not binding upon the IRS or other taxing authorities or the Bankruptcy Court. No assurance can be given that the IRS or another authority would not assert, or that a court would not sustain, a different position from any discussed herein.

**THE FOLLOWING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FOLLOWING DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A U.S. HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, EACH U.S. HOLDER IS STRONGLY URGED TO CONSULT SUCH U.S. HOLDER'S TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME TAX CONSEQUENCES OF THE PLAN.**

    **A.**    **Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Claims**

        **1.**    **Receipt of Debt in Exchange for an Allowed Revolving Facility Lender Claim, DIP Facilities Claim, or Note Claim**

Whether a U.S. holder of an Allowed Revolving Facility Lenders Claim, DIP Facilities Claim, or Note Claim recognizes gain or loss as a result of the exchange of its Claim for newly issued debt (including the Exit First Lien Facility, the Exit Second Lien Facility or the New Secured Notes, if any), depends, in part, on whether the exchange qualifies as a tax-free recapitalization, which in turn depends on whether the debt underlying the Allowed Claim surrendered, and the consideration received in the exchange, are each treated as a "security" for purposes of the reorganization provisions of the IRC (as described below). If the debt underlying

the Allowed Claim surrendered and the consideration received are each treated as a "security," the exchange should be treated as a recapitalization and therefore as a reorganization under the IRC. If any such Claim is not a "security" for this purpose, or the consideration received is not a "security" for this purpose, a U.S. holder could be treated as exchanging its Claim in a fully taxable exchange.

Whether indebtedness or an obligation constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances and therefore depends upon the nature of the indebtedness or obligation. Most authorities have held that important factors to be considered include, among other things, the length of time to maturity and the purpose of the borrowing. These authorities have indicated that, generally, corporate debt instruments that mature less than five (5) years from issuance are not considered "securities" and corporate debt instruments that mature ten years or more from the time of issuance are considered "securities." Whether a debt instrument with a term of five or more, but less than ten, years is a security is unclear. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable or contingent, and whether such payments are made on a current basis or accrued. Allowed Claims for accrued interest generally are not considered "securities." However, U.S. holders of Claims that are due to receive debt in accordance with the provisions of the Plan should consult their own tax advisors regarding whether such Claims constitute "securities" for these purposes.

As described above, if an Allowed Revolving Facility Lender Claim, DIP Facilities Claim, or Note Claim is treated as a "security" for U.S. federal income tax purposes, the exchange of such Allowed Claim by a U.S. holder for new debt (including, the Exit First Lien Facility, the Exit Second Lien Facility or the New Secured Notes, if any) should be treated as a recapitalization, and therefore a reorganization under the IRC, if the new debt is a "security" for U.S. federal Income tax purposes. In that case, a U.S. holder of such an Allowed Claim generally should not recognize gain on the exchange of its Claim for new debt, except (a) to the extent that any cash is received and (b) to the extent that any new debt or cash is treated as attributable to accrued but untaxed interest on its Claim, as discussed further below. A U.S. holder, however, that realizes loss on such an exchange would likely not be permitted to recognize the loss.

Alternatively, if any of the debt underlying the Allowed Revolving Facility Lenders Claims, DIP Facilities Claims, or Note Claims, or the new debt (including, the Exit First Lien Facility, the Exit Second Lien Facility, or the New Secured Notes, if any) are not treated as a "security" for U.S. federal income tax purposes, the exchange of the Claim for new debt could be a fully taxable transaction. If the exchange is fully taxable, a U.S. holder of a Claim will generally recognize gain or loss equal to the difference between the "amount realized" by such U.S. holder in exchange for its Claim and such U.S. holder's adjusted tax basis in the Claim. Any such gain or loss should be capital in nature (subject to the "market discount" rules described below) and should be a long term capital gain (or loss) if the surrendered Claims were held for more than one year by the U.S. holder. However, any such gain would be treated as ordinary income to the extent attributable to any market discount such U.S. holder had accrued

with respect to its surrendered Claim, unless the U.S. holder has elected to include market discount in income currently as it accrues.

**The tax consequences of the Plan and to the U.S. holders of Allowed Revolving Facility Lender Claims, DIP Facilities Claims and Notes Claims are uncertain and depend on the application of complex rules to facts that are not clearly addressed by such rules. Such U.S. holders should consult their tax advisors regarding, among other things, whether such Claims and the consideration received therefor would be treated as "securities" for U.S. federal income tax purposes.**

### 2.    Receipt of New Stock for a Note Claim

For purposes of this discussion, it is assumed that the transfer of New Stock in exchange for a Note Claim pursuant to the Plan will be treated for U.S. federal income tax purposes as an issuance of such New Stock by Reorganized Holding to Logan's Roadhouse (through any intermediate holding companies), followed immediately thereafter by a transfer of such New Stock by Logan's Roadhouse in exchange for such Note Claim.  Under this characterization, a U.S. holder's receipt of New Stock in exchange for a Note Claim would be a fully taxable transaction.  In that case, a U.S. holder of a Note Claim will generally recognize gain or loss equal to the difference between the "amount realized" by such U.S. holder in exchange for its Note Claim (which generally should equal the fair market value of the New Stock received) and such U.S. holder's adjusted tax basis in the Note Claim.  Any such gain or loss should be capital gain or loss (subject to the "market discount" rules described below) and should be a long term capital gain (or loss) if the surrendered Note Claims were held for more than one year by the U.S. holder.  However, any such gain would be treated as ordinary income to the extent attributable to any market discount such U.S. holder had accrued with respect to its surrendered Note Claim, unless the U.S. holder has elected to include market discount in income currently as it accrues.

Alternative characterizations of the transfer of New Stock in exchange for Note Claims are possible, which could result in U.S. federal income tax consequences different from those described above.  Holders of Note Claims should consult their own tax advisors regarding possible alternative characterizations as well as the consequences to them of such alternative characterizations, including possibly limiting the ability of holders of Note Claims to take a loss on such exchange.

### 3.    Receipt of Cash in Satisfaction of a Claim

Except to the extent attributable to accrued and unpaid interest (as discussed below), a U.S. holder who receives cash in exchange for its Allowed Claim will generally recognize income, gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (i) the amount of cash received in exchange for its Allowed Claim, and (ii) the U.S. holder's adjusted tax basis in its Allowed Claim that is treated as exchanged for cash.  The character of such income, gain or loss as ordinary income or loss or as capital gain or loss will be determined by a number of factors, including the tax status of the U.S. holder, the nature of the Allowed Claim in such U.S. holder's hands, whether the Allowed Claim constitutes a capital

asset in the hands of the U.S. holder, whether the Allowed Claim was purchased at a discount, and whether and to what extent the U.S. holder has previously claimed a bad debt deduction with respect to its Allowed Claim.

**The tax consequences of the Plan and to the U.S. holders receiving cash in consideration of their Claims are uncertain and depend on the application of complex rules to facts that are not clearly addressed by such rules. Such U.S. holders should consult their tax advisors.**

### 4.      Receipt of Other Consideration

If a U.S. holder of a Claim receives consideration other than cash, New Stock or new debt in satisfaction of its Claim, the federal income tax consequences of the exchange will depend on many factors, including the type and mix of such consideration and the tax characterization of the Claim in the hands of the U.S. holder. Because the specifics of any such transaction are unknowable at this time, this summary does not address the tax consequences of such transactions. Accordingly, any such U.S. holder should explore such tax consequences with its tax advisor.

### 5.      Accrued but Unpaid Interest

In general, to the extent a U.S. holder of a debt instrument receives cash or property in satisfaction of interest accrued but unpaid during the holding period of such instrument, the amount of such cash or the value of such property will be taxable to the U.S. holder as ordinary interest income (if not previously included in the U.S. holder's gross income). Conversely, such U.S. holder may recognize a deductible loss to the extent that any accrued interest was previously included in its gross income and is not paid. The extent to which cash or property received by a U.S. holder of a debt instrument will be attributable to accrued but unpaid interest is unclear. Pursuant to the Plan, all distributions in respect of any Allowed Claim will be allocated first to the principal amount of such Allowed Claim (as determined for U.S. federal income tax purposes), and thereafter, to the extent permitted under the Bankruptcy Code, to accrued but unpaid interest, if any. However, the provisions of the Plan are not binding on the IRS nor a Bankruptcy Court with respect to the appropriate tax treatment for creditors. Certain legislative history indicates that an allocation of consideration between principal and interest provided in a chapter 11 plan of reorganization generally is binding for U.S. federal income tax purposes. However, regulations issued by the IRS require, in general, that payments made on a debt instrument first be allocated to accrued but untaxed interest. Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear.

Each U.S. holder of an Allowed Claim is urged to consult its tax advisor regarding the inclusion in income of amounts received in satisfaction of accrued but unpaid interest, the allocation of consideration between principal and interest, and the deductibility of previously included unpaid interest for tax purposes.

### 6.      Market Discount

Under the "market discount" provisions of Sections 1276 through 1278 of the IRC, some or all of any gain realized by a U.S. holder exchanging the debt instruments constituting its

Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of accrued "market discount" on the debt constituting the surrendered Allowed Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its U.S. holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or, (b) in the case of a debt instrument issued with "original issue discount," its adjusted issue price, by at least a *de minimis* amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. holder on the taxable disposition (determined as described above) of debts that it acquired with market discount will generally be treated as ordinary income to the extent of any market discount that accrued thereon while such debts were considered to be held by the U.S. holder (unless the U.S. holder elected to include market discount in income as it accrued).  If a U.S. holder did not elect to include market discount in income as it accrued and, thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry the obligations constituting its Allowed Claim, such deferred amounts would become deductible at the time of such taxable disposition.  To the extent that the surrendered debts that had been acquired with market discount are exchanged in a tax-free or other reorganization transaction for other property, any additional accrued but unrecognized market discount may be required to be carried over to the property received therefor.  Any gain recognized by such U.S. holder on a subsequent sale, exchange, redemption or other disposition of such property received under the Plan may be treated as ordinary income to the extent of such accrued but unrecognized market discount with respect to the exchanged debt instrument.

### 7.    Backup Withholding Tax and Information Reporting Requirements

The applicable withholding agent will withhold all amounts required by law to be withheld from payments of interest.  The applicable withholding will comply with all applicable information reporting requirements of the IRC. Payments and other distributions in respect of Allowed Claims under the Plan may be subject to applicable information reporting and backup withholding.  Unless the payee otherwise establishes an exemption, backup withholding of taxes will generally apply to payments in respect of an Allowed Claim under the Plan if the U.S. holder of such Allowed Claim fails to provide an accurate taxpayer identification number or otherwise fails to comply with the applicable requirements of the backup withholding rules.

Backup withholding is not an additional tax.  Amounts withheld under the backup withholding rules may be credited against a U.S. holder's U.S. federal income tax liability, and a U.S. holder may obtain a refund of any excess amounts withheld under the backup withholding rules by timely filing an appropriate claim for refund with the IRS.

In addition, from an information reporting perspective, U.S. Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions,

certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. U.S. holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the U.S. holders' tax returns.

### B.    Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors

#### 1.    Cancellation of Debt and Reduction of Tax Attributes

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("**COD Income**") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (x) the amount of cash paid, (y) the issue price of any new debt instrument issued by the debtor and (z) the fair market value of any other consideration (including New Stock) given in satisfaction of such indebtedness at the time of the exchange.  The issue price of any such new debt instrument is determined under either Section 1273 or 1274 of the IRC.  Generally, these provisions treat the fair market value of a debt instrument treated as publicly traded for U.S. federal income tax purposes as its issue price and the stated principal amount of any other debt instrument as its issue price if its terms provide for interest not less than the applicable federal rate.

A debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a Bankruptcy Court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding.  Instead, as a consequence of such exclusion, a debtor must generally reduce its tax attributes by the amount of COD Income that it excluded from gross income.  In general, tax attributes will be reduced in the following order:   (a) net operating losses ("**NOLs**"); (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); and (e) foreign tax credits.  A debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to Section 108(b)(5) of the IRC.  In the context of a consolidated group of corporations, the tax rules provide for a complex ordering mechanism in determining how the tax attributes of one member can be reduced by the COD Income of another member.

Because the Plan provides that holders of certain Claims will receive New Stock, the amount of COD Income, and accordingly the amount of tax attributes required to be reduced, will depend in part on the fair market value of the New Stock.  This value cannot be known with certainty until after the Effective Date.  In addition, it has not been determined whether the Debtors will make the election under Section 108(b)(5) of the IRC.

#### 2.    Accrued Interest

To the extent that there exists accrued but unpaid interest on indebtedness owing to holders of Allowed Claims and to the extent that such accrued but unpaid interest has not been deducted previously by the Debtors, portions of payments made in consideration for the

indebtedness underlying such Allowed Claims that are allocable to such accrued but unpaid interest should be deductible by the Debtors.  Any such interest that is not paid will not be deductible by the Debtors and will not give rise to COD Income.

To the extent that any of the Debtors have previously taken a deduction for accrued but unpaid interest, any amounts so deducted that are paid will not give rise to any tax consequences to such Debtors.  If such amounts are not paid, they will give rise to COD Income that would be excluded from gross income pursuant to the bankruptcy exclusion discussed above.  As a result, the Debtors would be required to reduce their tax attributes to the extent of such interest previously deducted and not paid.

### 3.    Utilization of Net Operating Loss Carryforwards

#### (a)    Limitation on NOLs and Other Tax Attributes

The amount of tax attributes that will be available to the Reorganized Debtors at emergence is based on a number of factors and is impossible to calculate at this time.  Some of the factors that will impact the amount of available tax attributes include:  (a) the amount of tax losses incurred by the Debtors in applicable prior tax years; (b) the fair market value of the New Stock; and (c) the amount of COD Income realized by the Debtors in connection with consummation of the Plan.  Following consummation of the Plan, any remaining NOLs (if any) could be subject to limitation under Section 382 of the IRC by reason of the transactions pursuant to the Plan.  At this time, but subject to further consideration, Reorganized Debtors are not anticipating significant NOLs or other tax attributes following emergence.

Under Section 382 of the IRC, whenever a corporation (or a consolidated group) undergoes an "ownership change," the ability of the corporation to utilize its NOL carryovers and certain subsequently recognized built-in losses and deductions (collectively, "**Pre-Change Losses**") to offset future taxable income may be subject to an annual limitation.  As discussed in greater detail herein, the issuance of the New Stock pursuant to the Plan could result in an "ownership change" of the Reorganized Debtors for these purposes, and that the Debtors' use of their Pre-Change Losses could be subject to limitation unless an exception to the general rules of Section 382 of the IRC applies.  This limitation is independent of, and in addition to, the reduction of tax attributes described in the preceding section resulting from the exclusion of COD Income which may result in the use of all of Debtors NOLs.

#### (b)    General Section 382 Annual Limitation

This discussion refers to the limitation determined under Section 382 of the IRC in the case of an "ownership change" as the "**Section 382 Limitation**."  In general, the annual Section 382 Limitation on the use of Pre-Change Losses in any "post-change year" is equal to the product of (i) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (ii) the "long term tax exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the "ownership change" occurs) in effect for the month in which the "ownership change" occurs.  The Section 382 Limitation may be increased to the extent that the Debtors recognize certain built-in gains in their assets

during the five-year period following the "ownership change," or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65. Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. However, if a corporation that has undergone an "ownership change" does not continue its historic business or use a significant portion of its assets in a new business for two (2) years after the "ownership change", the annual limitation resulting from the "ownership change" is reduced to zero (0), thereby precluding any utilization of the corporation's Pre-Change Losses, absent any increases due to recognized built-in gains discussed above. Furthermore, if the corporation (or the consolidated group) undergoes a second "ownership change," the second "ownership change" may result in a lesser Section 382 Limitation with respect to any losses that existed at the time of the first "ownership change." Generally, NOL carryforwards expire after twenty (20) years. As discussed below, however, special rules may apply in the case of a corporation which experiences an "ownership change" as the result of a bankruptcy proceeding.

#### (c)    Built-In Gains and Losses

Under certain circumstances, Section 382 of the IRC also limits the deductibility of certain built-in losses that are recognized during the five-year period following the date of an "ownership change." In particular, subject to a de minimis exception, if a loss corporation (or loss consolidated group or subgroup) has a net unrealized built-in loss at the time of an "ownership change" (taking into account its assets and items of "built-in" income and deduction), then any built-in losses recognized during the following five (5) years (up to the amount of the original net unrealized built-in loss) generally will be treated as a pre-change loss and will be subject to the Section 382 Limitation.

Conversely, if the loss corporation (or loss consolidated group or subgroup) has a net unrealized built-in gain during the five year period following the "ownership change," any built-in gains recognized during such period (up to the amount of the original net unrealized built-in gain) generally will increase the Section 382 Limitation in the year recognized, such that the loss corporation (or loss consolidated group or subgroup) would be permitted to use its pre-change NOLs against such built-in gain income in addition to its regular Section 382 Limitation.

Although the rules applicable to net unrealized built-in losses generally apply to consolidated groups on a consolidated basis, certain corporations that join the consolidated group within five (5) years prior to the "ownership change" may not be taken into account in the group computation of net unrealized built-in loss. Nevertheless, such corporations would be taken into account in determining whether the consolidated group has a net unrealized built-in gain.

The issuance under the Plan of the New Stock, along with the cancellation of existing equity, may cause an "ownership change" with respect to the Debtors.  As a result, unless the exception discussed below applies, the Debtors' Pre-Change Losses may be subject to the Section 382 Limitation (as described above). The Section 382 Limitation may be increased to the extent that the Reorganized Debtors recognize certain built-in gains in their assets during the five-year period following the "ownership change."  If, in any year, the amount of Pre-Change Losses used by the Reorganized Debtors to offset income is less than the Section 382 Limitation, any unused limitation may be carried forward, thereby increasing the Section 382 Limitation (the

amount of Pre-Change Losses which may offset income) in the subsequent taxable year of the Reorganized Debtors.

### (d)    Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when shareholders and/or "qualified creditors" of a debtor company in chapter 11 receive, in respect of their equity interests in the debtor or "qualified indebtedness" (as defined in Treasury Regulations Section 1.382-9(d)(2)), at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "**382(l)(5) Exception**").   Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis but, instead, the debtor's NOLs are required to be reduced by the amount of any interest deductions claimed during any taxable year ending during the three-year period preceding the taxable year that includes the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization.  If the 382(l)(5) Exception applies and the debtor undergoes another "ownership change" within two (2) years after consummation, then the debtor's Pre-Change Losses effectively are eliminated in their entirety.  It is not clear whether the Debtors will satisfy the requirements for the 382(l)(5) Exception or, if they do, if they will avail themselves of its provisions.

When the 382(l)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply to a debtor in chapter 11 (the "**382(l)(6) Exception**").  When the 382(l)(6) Exception applies, a debtor corporation that undergoes an "ownership change" generally is permitted to determine the fair market value of its stock after taking into account the increase in value resulting from any surrender or cancellation of creditors' claims in the bankruptcy.  This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change.  The 382(l)(6) Exception differs from the 382(l)(5) Exception in that the debtor corporation is not required to reduce its NOLs by interest deductions in the manner described above, and the debtor may undergo a change of ownership within two (2) years without triggering the elimination of its Pre-Change Losses.

It is possible that the Debtors will not qualify for the 382(l)(5) Exception. Alternatively, the Reorganized Debtors may decide to elect out of the 382(l)(5) Exception.  Regardless of whether the Reorganized Debtors take advantage of the 382(l)(6) Exception or the 382(l)(5) Exception, the Reorganized Debtors' use of their Pre Change Losses after the Effective Date may be adversely affected if an "ownership change" within the meaning of Section 382 of the IRC were to occur after the Effective Date. In order to prevent such a subsequent "ownership change," the new organizational documents of Reorganized Debtors may contain restrictions on trading of New Stock that are intended to prevent such a change.  The need for, or the specific terms of, such restrictions (if any) have not yet been determined.

### C.    Alternative Minimum Tax

In general, an alternative minimum tax ("**AMT**") is imposed on a corporation's alternative minimum taxable income ("**AMTI**") at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the year.  AMTI is generally equal to regular taxable income with certain adjustments.  For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated.  For example, as a general rule, only 90% of a corporation's AMTI may be offset by available alternative tax NOL carryforwards.

Additionally, under Section 56(g)(4)(G) of the IRC, an "ownership change" (as discussed above) that occurs with respect to a corporation having a net unrealized built in loss in its assets will cause, for AMT purposes, the adjusted basis of each asset of the corporation immediately after the "ownership change" to be equal to its proportionate share (determined on the basis of respective fair market values) of the fair market value of the assets of the corporation, as determined under Section 382(h) of the IRC, immediately before the "ownership change." A corporation that pays AMT generally is later allowed a nonrefundable credit (equal to a portion of its prior year AMT liability) against its regular federal income tax liability in future taxable years when it is no longer subject to the AMT.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR U.S. HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.    ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY FEDERAL, STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

### ARTICLE XIV.

### CONCLUSION

The Debtors believe the Plan is in the best interest of all holders of Claims against the Debtors, and all holders of Equity Interests in the Debtors, and, accordingly, urge those who are entitled to vote on whether to accept or reject the Plan to vote to accept the Plan.

(Remainder of Page Intentionally Left Blank)
(Signature Pages Follow)

IN WITNESS WHEREOF, each Debtor has executed this Disclosure Statement this 28th day of September, 2016.

ROADHOUSE HOLDING INC.

By: */s/ Nishant Machado*
Name: Nishant Machado
Title: Chief Restructuring Officer of Operations

ROADHOUSE INTERMEDIATE INC.

By: */s/ Nishant Machado*
Name: Nishant Machado
Title: Chief Restructuring Officer of Operations

ROADHOUSE MIDCO INC.

By: */s/ Nishant Machado*
Name: Nishant Machado
Title: Chief Restructuring Officer of Operations

ROADHOUSE PARENT INC.

By: */s/ Nishant Machado*
Name: Nishant Machado
Title: Chief Restructuring Officer of Operations

LRI HOLDINGS, INC.

By: */s/ Nishant Machado*
Name: Nishant Machado
Title: Chief Restructuring Officer of Operations

LOGAN'S ROADHOUSE, INC.

By: */s/ Nishant Machado*
Name: Nishant Machado
Title: Chief Restructuring Officer of Operations

LOGAN'S ROADHOUSE OF KANSAS, INC.

By: */s/ Nishant Machado*
Name: Nishant Machado
Title: Chief Restructuring Officer of Operations

LOGAN'S ROADHOUSE OF TEXAS, INC.

By: */s/ Nishant Machado*
Name: Nishant Machado
Title: Chief Restructuring Officer of Operations

# **EXHIBIT A**

**Debtors' Joint Plan of Reorganization**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| ROADHOUSE HOLDING INC., *et al.*,[1] | Case No. 16-11819 (BLS) |
| Debtors. | (Jointly Administered) |

## DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

---

**THIS DRAFT CHAPTER 11 PLAN IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL BE MADE ONLY IN COMPLIANCE WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.**

---

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Robert S. Brady (No. 2847)
Edmon L. Morton (No. 3856)
Ryan M. Bartley (No. 4985)
Elizabeth S. Justison (No. 5911)
Norah M. Roth-Moore (No. 6125)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Tel:    (302) 571-6600
Fax:    (302) 571-1253

Dated: September 28, 2016
        Wilmington, Delaware

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:  Roadhouse Holding Inc. (5939); Roadhouse Intermediate Inc. (6159); Roadhouse Midco Inc. (6337); Roadhouse Parent Inc. (5108); LRI Holdings, Inc. (4571); Logan's Roadhouse, Inc. (2074); Logan's Roadhouse of Texas, Inc. (2372); and Logan's Roadhouse of Kansas, Inc. (8716).  The location of the Debtors' corporate headquarters is 3011 Armory Drive, Suite 300, Nashville, Tennessee 37204.

# TABLE OF CONTENTS

**Page**

**I. DEFINITIONS AND CONSTRUCTION OF TERMS** .......................................................... 2

    A.    Definitions .................................................................................. 2
    B.    Interpretation, Application of Definitions, and Rules of Construction ................ 14
    C.    Reference to Monetary Figures ................................................................ 14
    D.    Consent Rights of Supporting Parties ...................................................... 14

**II. CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS** ..................................... 14

    A.    General Rules of Classification. ............................................................. 14
    B.    Classification of Claims and Interests .................................................... 15

**III. TREATMENT OF ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE CLAIMS, PRIORITY TAX CLAIMS, DIP FACILITIES CLAIMS AND STATUTORY FEES** ................................................................................................... 16

    A.    Administrative Claims. ......................................................................... 16
    B.    Administrative Claims Bar Date. ........................................................... 16
    C.    Professional Fee Claims. ...................................................................... 16
    D.    Priority Tax Claims. ............................................................................ 17
    E.    DIP Facilities Claims. .......................................................................... 17
    F.    Payment of Statutory Fees. ................................................................... 17

**IV. TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS** .................... 18

    A.    Class 1 – Other Priority Claims. ............................................................ 18
    B.    Class 2 - Other Secured Claims. ............................................................ 18
    C.    Class 3 – Revolving Facility Lender Claims. ............................................. 19
    D.    Class 4 – GSO Notes Claims and Kelso Notes Claims. ................................ 19
    E.    Class 5  – Unexchanged Notes Claims. .................................................... 20
    F.    Class 6 – General Unsecured Claims. ...................................................... 21
    G.    Class 7 – Intercompany Claims. ............................................................. 21
    H.    Class 8 – Subordinated Claims. ............................................................. 21
    I.    Class 9 – Existing Equity Interests. ........................................................ 21
    J.    Class 10 – Intercompany Interests. ........................................................ 22
    K.    Special Provision Governing Claims. ...................................................... 22
    L.    Elimination of Vacant Classes. .............................................................. 22
    M.    Acceptance or Rejection of this Plan. ...................................................... 22
    N.    Nonconsensual Confirmation. ................................................................ 23
    O.    Subordinated Claims. ........................................................................... 23

**V. PROVISIONS REGARDING CORPORATE GOVERNANCE OF THE REORGANIZED DEBTORS** ............................................................................... 23

    A.    Cancellation of Existing Equity Interests. ................................................ 23
    B.    Directors and Officers of the Reorganized Debtors. .................................... 23
    C.    Powers of Officers. ............................................................................. 23
    D.    Management Incentive Plan. .................................................................. 24

**TABLE OF CONTENTS**
(continued)

**Page**

**VI. SUBSTANTIVE CONSOLIDATION OF THE DEBTORS** ........................................... 24

**VII. PROVISIONS REGARDING MEANS OF IMPLEMENTATION, DISTRIBUTIONS, AND RESOLUTION OF DISPUTED CLAIMS**...................... 25

A.    General Settlement of Claims. ........................................................................ 25
B.    Exit Financing. ............................................................................................... 25
C.    Issuance of New Stock................................................................................... 27
D.    Avoidance Actions. ........................................................................................ 27
E.    Waiver of Notes Deficiency Claims and Certain General Unsecured Claims. ........................................................................................................... 28
F.    Restructuring Transactions. ........................................................................... 28
G.    Corporate Action............................................................................................ 28
H.    Effectuating Documents; Further Transactions. ............................................ 29
I.    Reorganized Holding Certificate of Incorporation and By-Laws.................. 29
J.    Cancellation of Securities and Agreements. ................................................. 29
K.    Distributions in Respect of Allowed Claims. ............................................... 31
L.    Resolution of Disputed Claims. ..................................................................... 34

**VIII. EXECUTORY CONTRACTS AND UNEXPIRED LEASES**....................................... 36

A.    Assumption and Rejection of Executory Contracts and Unexpired Leases. ....... 36
B.    Cure................................................................................................................. 37
C.    Rejection Damage Claims............................................................................... 37
D.    Restrictions on Assignment Void. ................................................................. 37
E.    Benefit Plans. ................................................................................................. 38
F.    Workers' Compensation Obligations and ACE/Chubb Insurance Contracts. ....................................................................................................... 38

**IX. EFFECT OF CONFIRMATION OF THIS PLAN** ........................................................ 40

A.    Continued Corporate Existence. .................................................................... 40
B.    Vesting of Assets. .......................................................................................... 41
C.    Preservation of Causes of Action................................................................... 41
D.    Discharge of the Debtors. ............................................................................... 41
E.    Releases by the Debtors of Certain Parties.................................................... 42
F.    Releases by Non-Debtors............................................................................... 42
G.    Exculpation. ................................................................................................... 43
H.    Injunction. ...................................................................................................... 44
I.    Term of Bankruptcy Injunction or Stays. ..................................................... 44
J.    Setoff.............................................................................................................. 44
K.    Preservation of Insurance............................................................................... 45
L.    Indemnification Obligations. ......................................................................... 45

**X. EFFECTIVENESS OF THIS PLAN**............................................................................... 45

A.    Conditions Precedent to Confirmation........................................................... 45
B.    Conditions Precedent to the Effective Date.................................................... 46

TABLE OF CONTENTS
(continued)

C.      Waiver of Conditions. ......................................................... 47
D.      Notice of Confirmation and Effective Date. ....................... 47
E.      Effect of Failure of Conditions. .......................................... 47
F.      Vacatur of Confirmation Order. .......................................... 47
G.      Revocation, Withdrawal, Modification or Non-Consummation ....................... 47

**XI. RETENTION OF JURISDICTION** ................................................................. **48**

**XII. MISCELLANEOUS PROVISIONS** .................................................................. **49**

A.      Payment of Fees and Expenses of Supporting Lenders, Unanimous
        Supporting Noteholders, Supporting Interest Holders, Revolving Facility
        Agent, DIP Agent, and Indenture Trustees. ....................... 49
B.      Modification of this Plan. .................................................... 50
C.      Dissolution of Creditors' Committee. ................................. 50
D.      Votes Solicited in Good Faith. ............................................ 50
E.      Obligations Incurred After the Effective Date. ................... 51
F.      Request for Expedited Determination of Taxes. ................. 51
G.      Determination of Tax Filings and Taxes. ............................ 51
H.      Governing Law. ................................................................... 51
I.      Filing or Execution of Additional Documents. ................... 52
J.      Exemption From Transfer Taxes. ........................................ 52
K.      Exemption for Issuance of New Stock and New Secured Notes. ...................... 52
L.      Waiver of Federal Rule of Civil Procedure 62(a). .............. 52
M.      Exhibits/Schedules. ............................................................. 53
N.      Notices. ................................................................................ 53
O.      Plan Supplement. ................................................................. 53
P.      Further Actions; Implementations. ...................................... 53
Q.      Severability. ......................................................................... 54
R.      Entire Agreement. ............................................................... 54
S.      Binding Effect. ..................................................................... 54
T.      No Change in Ownership or Control. .................................. 54
U.      Substantial Consummation. ................................................. 55
V.      Conflict. ............................................................................... 55

**Plan Supplement**

A.  Litigation Rights
B.  Exit First Lien Facility
C.  Exit Second Lien Facility
D.  Exit Financing Intercreditor Agreement
E.  Terms of New Stock
F.  Reorganized Holding Certificate of Incorporation
G.  Reorganized Holding By-Laws
H.  Reorganized Holding Shareholder Agreement

# TABLE OF CONTENTS
(continued)

**Page**

I.  Schedule of Assumed Contracts and Leases

J.  Schedule of Assigned Contracts and Leases (if applicable)

K.  Schedule of Rejected Contracts and Leases (if applicable)

## <u>INTRODUCTION</u>

Roadhouse Holding Inc., Roadhouse Intermediate Inc., Roadhouse Midco Inc., Roadhouse Parent Inc., LRI Holdings, Inc., Logan's Roadhouse, Inc., Logan's Roadhouse of Texas, Inc., and Logan's Roadhouse of Kansas, Inc., the above- captioned debtors and debtors in possession, propose the following joint plan of reorganization under section 1121(a) of the Bankruptcy Code.[2]

The Chapter 11 Cases are being jointly administered pursuant to an order of the Court, and this Plan is being presented as a joint plan of reorganization of the Debtors.  Claims against, and Interests in, the Debtors (other than DIP Facilities Claims, Administrative Claims, Professional Fee Claims, and Priority Tax Claims) are classified in Article II hereof and treated in Article IV hereof.

Reference is made to the Disclosure Statement accompanying this Plan, including the exhibits thereto, for a discussion of the Debtors' history, business, properties, financial projections of future operations, and risk factors, together with a summary and analysis of this Plan.  All Claim and Interest holders entitled to vote on this Plan are encouraged to review the Disclosure Statement and to read this Plan carefully before voting to accept or reject this Plan.

NO SOLICITATION MATERIALS, OTHER THAN THE DISCLOSURE STATEMENT AND RELATED MATERIALS TRANSMITTED THEREWITH AND APPROVED BY THE COURT, HAVE BEEN AUTHORIZED BY THE COURT FOR USE IN SOLICITING ACCEPTANCES OR REJECTIONS OF THIS PLAN.

Subject to certain restrictions and requirements set forth herein and section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtors reserve the right to alter, amend, modify, revoke or withdraw this Plan prior to its substantial consummation (as such term is defined in section 1101 of the Bankruptcy Code).

---

[2]    Capitalized terms used in this Introduction shall have the meanings ascribed to them below.

# I.

## DEFINITIONS AND CONSTRUCTION OF TERMS

### A.   Definitions.

Unless otherwise defined herein, or the context otherwise requires, the following terms shall have the respective meanings set forth below:

1.      *"2010 Indenture"* means that certain Senior Secured Notes Indenture, dated as of October 4, 2010, among Logan's Roadhouse, Inc. (as successor by merger to Roadhouse Financing, Inc.), LRI Holdings, Inc. (as successor by merger to Roadhouse Merger, Inc.) and BOKF, NA, as trustee and collateral agent, and all exhibits, amendments, and supplements thereto.

2.      *"2015 Indenture"* means that certain Indenture, dated as of October 15, 2015, among Logan's Roadhouse, Inc., LRI Holdings, Inc., the subsidiary guarantors from time to time party thereto and Wells Fargo Bank, National Association, as trustee and collateral agent, and all exhibits, amendments, and supplements thereto.

3.      *"ACE/Chubb Companies"* means ACE American Insurance Company and its affiliates.

4.      *"ACE/Chubb Insurance Contracts"* means all insurance policies that provide insurance coverage for periods commencing on or after August 1, 2006 by ACE/Chubb Companies to any of the Debtors and all agreements, documents or instruments relating thereto.

5.      *"ACE/Chubb Insurers"* means, collectively, the ACE/Chubb Companies, any entity in its capacity as a third party administrator for the ACE/Chubb Insurance Contracts, and any respective predecessors, successors and/or affiliates thereof.

6.      *"Administrative Claim"* means a Claim for costs and expenses of administration of the Estates pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving and operating the Estates; (b) any indebtedness or obligations incurred or assumed by the Debtors in connection with the conduct of their businesses after the Petition Date, including for wages, salaries, or commissions for services, and payments for goods and other services and leased premises to the extent such indebtedness or obligations provided a benefit to the Debtors' estates; and (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

7.      *"Administrative Claims Bar Date"* means the first Business Day that is thirty (30) days after the Effective Date.

8.      *"Allowed"* means, with reference to a Claim, (i) a Claim against a Debtor that has been listed by such Debtor in the Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not Disputed or contingent and for which no contrary Proof of Claim has been timely filed, (ii) a

Claim with respect to which a Proof of Claim that has been timely filed by the applicable Bar Date (or for which Claim under this Plan, the Bankruptcy Code or Final Order of the Court a Proof of Claim is or shall not be required to be filed), which Proof of Claim has not been withdrawn and as to which Proof of Claim no objection to allowance, request for estimation, or motion or other effort to subordinate or reclassify has been interposed prior to the expiration of the time for filing any such objection, or (iii) any Claim expressly Allowed by a Final Order or Allowed under this Plan, <u>provided</u> that any Claim that is Allowed for the limited purpose of voting to accept or reject this Plan pursuant to an order of the Court shall not be considered "Allowed" for the purpose of Distributions hereunder.

9.       ***"Alternative Exit Facility"*** means a new first lien credit facility to be provided by parties other than the Revolving Facility Lenders in lieu of the Exit Revolving Facility, the proceeds of which shall be used to, among other things repay the Revolving Facility Lenders Claims in accordance with this Plan, on terms reasonably acceptable to the Debtors, the Unanimous Supporting Noteholders, and the Supporting Interest Holders.

10.       ***"Avoidance Actions"*** means any Causes of Action pursuant to chapter 5 of the Bankruptcy Code.

11.       "***Ballots"*** means each of the ballot forms distributed with the Disclosure Statement to each holder of an Impaired Claim (other than to holders not entitled to vote on this Plan) for, among other things, voting on the acceptance or rejection of this Plan.

12.       "***Bankruptcy Code***" means chapter 11 of title 11 of the United States Code.

13.       "***Bankruptcy Rules***" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local and chambers rules of the Court.

14.       "***Bar Date"*** means the applicable date on which a Proof of Claim must be filed as may be specifically fixed by an order of the Court.

15.       ***"Budget"*** has the meaning set forth in the DIP Credit Agreement.

16.       "***Business Day***" means any day, other than a Saturday, Sunday or Legal Holiday (as defined in Bankruptcy Rule 9006(a)(6)).

17.       ***"Business Plan"*** means the business plan incorporated in the Disclosure Statement.

18.       "***Cash***" means the legal tender of the United States of America.

19.       ***"Cash-Out Payment"*** means the Pro Rata share of the value of Plan Equity Value to be paid to each Noteholder in Subclass 5(b) in either (i) Cash upon emergence if Subclass 5(b) votes to accept this Plan, or (ii) New Secured Notes if Subclass 5(b) votes to reject this Plan.

20.       ***"Causes of Action"*** means any and all actions, proceedings, causes of action, suits, accounts, demands, controversies, agreements, promises, rights to legal remedies, rights to

equitable remedies, rights to payment, and claims, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, non-contingent, matured, unmatured, now-owned, hereafter acquired, disputed, undisputed, secured, or unsecured, and whether asserted or assertable directly or derivatively in law, equity, or otherwise, including Avoidance Actions or any other cause of action arising under the Bankruptcy Code, unless otherwise waived or released by the Debtor(s), with the consent of the Required Supporting Noteholders, the Supporting Lenders, and the Supporting Interest Holders, or by the Reorganized Debtor(s) to the extent such Cause of Action is a Cause of Action held by one or more Debtors or Reorganized Debtors; *provided*, *however*, that on the Effective Date, the Debtors shall be deemed to have released and waived all Avoidance Actions.

21.      "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Court.

22.      "*Claim*" means any claim, as such term is defined in section 101(5) of the Bankruptcy Code, against a Debtor or, as applicable in Article IX, against any of the Released Parties.

23.      "*Claims Agent*" means Donlin, Recano & Company, Inc. or any successor thereto.

24.      "*Class*" means a class of Claims or Equity Interests as classified under this Plan.

25.      "*Collateral*" means any property or interest in property of the Estates subject to a Lien to secure the payment or performance of a Claim, which Lien has not been avoided or is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state law.

26.      "*Confirmation Date*" means the date upon which the Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

27.      "*Confirmation Hearing*" means the confirmation hearing held by the Court pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

28.      "*Confirmation Order*" means the order of the Court in form and substance satisfactory to the Required Supporting Parties, the DIP Agent, and the Required Lenders confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

29.      "*Court*" means, (a) the United States Bankruptcy Court for the District of Delaware, having jurisdiction over the Chapter 11 Cases; (b) to the extent there is no reference pursuant to section 157 of title 28 of the United States Code, the United States District Court for the District of Delaware; and (c) any other court having jurisdiction over the Chapter 11 Cases or proceedings arising therein.

30.     *"Credit Agreement"* means that certain Credit Agreement, dated as of October 4, 2010, by and among Logan's Roadhouse, Inc. (as successor by merger to Roadhouse Financing, Inc.), LRI Holdings, Inc. (as successor by merger to Roadhouse Merger, Inc.), the Revolving Facility Agent, and the other parties thereto, and all exhibits, amendments, and supplements thereto.

31.     *"Creditors' Committee"* means the Official Committee of Unsecured Creditors appointed by the United States Trustee in the Chapter 11 Cases, as constituted from time to time.

32.     *"Creditors' Committee Claims Cap"* means a cap on payment of Professional Fee Claims incurred by Professionals retained by the Creditors' Committee such that the amount paid shall not exceed $950,000 in the aggregate; with a sub-cap of $100,000 applicable to payment on account of Professional Fee Claims that are subject to Paragraph 27(b) of the Interim DIP Order (and the corresponding provision included in the Final DIP Order).

33.     *"Creditors' Committee Settlement"* means the terms of the global settlement reached by the Debtors, the Creditors' Committee and the parties to the Restructuring Support Agreement.

34.     *"Debtors"* means Roadhouse Holding, Inc., Roadhouse Intermediate, Inc., Roadhouse Midco, Inc., Roadhouse Parent, Inc., LRI Holdings, Inc., Logan's Roadhouse, Inc., Logan's Roadhouse of Kansas, Inc., and Logan's Roadhouse of Texas, Inc.

35.     *"DIP Agent"* means Cortland Capital Market Services LLC, in its capacity as Administrative Agent and Collateral Agent under the under the DIP Credit Agreement.

36.     *"DIP Credit Agreement"* means that certain Debtor-in-Possession Credit Agreement, dated as of August 10, 2016, by and among Logan's Roadhouse, Inc. the guarantors from time to time party thereto, the DIP Lenders and the DIP Agent, and all exhibits, amendments, and supplements thereto.

37.     *"DIP Facilities"* means the debtor-in-possession financing provided to the Debtors during the Chapter 11 Cases pursuant to the DIP Credit Agreement consisting of the New Money Facility (as defined in the DIP Credit Agreement) in an amount not less than $25 million and the Roll Up Facility.

38.     *"DIP Facilities Claims"* means all Claims arising under or relating to the DIP Facilities, whether pursuant to the DIP Credit Agreement, any other DIP Loan Document, any notes, the Final DIP Order, or otherwise.

39.     *"DIP Lenders"* means the lenders under the DIP Facilities.

40.     *"DIP Loan Documents"* means the DIP Credit Agreement and all related documents, including guarantees, security agreements, and the Agent Fee Letter (as defined in the DIP Credit Agreement), the Interim DIP Order, and the Final DIP Order.

41.     *"Disbursing Agent"* means the Debtors or the Reorganized Debtors, or any Person designated by the Debtors (with the consent of the Required Supporting Noteholders, the

Supporting Lenders, and the Supporting Interest Holders) or the Reorganized Debtors to serve as a disbursing agent, or to assist the Debtors or the Reorganized Debtors in the making of Distributions, under this Plan.

42.     ***"Disclosure Statement"*** means the written disclosure statement that relates to this Plan in form and substance reasonably satisfactory to the Required Supporting Parties, the DIP Agent, and the Required Lenders, as approved by the Court pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017, as such disclosure statement may be amended, modified or supplemented from time to time subject to the prior written consent of the Required Supporting Parties, the DIP Agent, and the Required Lenders.

43.     ***"Disputed"*** means, with reference to any Claim, any Claim that has not been Allowed.

44.     ***"Distributions"*** means the distribution in accordance with this Plan of (a) Cash, (b) New Stock, (c) New Secured Notes, (d) rights and obligations with respect to the Exit Revolving Facility, (e) rights and obligations with respect to the Exit Second Lien Facility or (f) other forms of consideration, as the case may be

45.     ***"Effective Date"*** means the date on which all conditions to the effectiveness of this Plan are either (a) satisfied or (b) waived by each of the Debtors, the Required Supporting Parties, the DIP Agent and the Required Lenders, and on which this Plan is declared effective.

46.     ***"Equity Interest"*** or ***"Interest"*** means any equity security within the meaning of section 101(16) of the Bankruptcy Code or any other instrument evidencing an ownership interest in any of the Debtors (or Reorganized Debtors, as applicable), whether or not transferable, any option, warrant, or right, contractual or otherwise, to acquire, sell or subscribe for any such interest, and any and all Claims that are otherwise determined by the Court to be an equity interest, including any Claim or debt that is recharacterized as an equity interest.

47.     ***"Estates"*** means the chapter 11 estates of the Debtors, individually or collectively, as is appropriate in the context created by the commencement of and in the Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code.

48.     ***"Exculpated Party"*** means each of:  (a) the Debtors; (b) the Debtors' current and former officers and directors; (c) the Creditors' Committee; (d) each member of the Creditors' Committee in its capacity as such; and (e) the Professionals retained by the Debtors and the Creditors' Committee.

49.     ***"Existing Equity Interests"*** means all issued and outstanding Equity Interests in Roadhouse Holding, including any vested or unvested and exercised or unexercised options or warrants to acquire such Equity Interests.

50.     ***"Exit Financing Facility Documents"*** means the definitive documentation governing the Exit Financing Facilities and all related documents, including guarantees and security agreements, which shall include those terms and conditions set forth in the Exit Second Lien Financing Term Sheet and the Exit First Lien Financing Term Sheet (to the extent the Exit

First Lien Facility is the Exit Revolving Facility) annexed to the Restructuring Support Agreement Term Sheet as Exhibits B and E, respectively.

51.    "***Exit Financing Facilities***" means the Exit First Lien Facility and the Exit Second Lien Facility.

52.    "***Exit First Lien Facility***" means the Exit Revolving Facility or Alternative Exit Facility, as applicable.

53.    "***Exit Financing Intercreditor Agreement***" means an intercreditor agreement consistent with the term sheet governing the Exit Revolving Facility attached as Exhibit E to the Restructuring Support Agreement and otherwise in form and substance reasonably satisfactory to the Revolving Facility Lenders (to the extent the Exit First Lien Facility is the Exit Revolving Facility, and if not, the lenders under the Alternative Exit Facility) and the Required Supporting Noteholders.

54.    "*Exit Revolving Credit Agreement*" means a credit agreement governing the Exit Revolving Facility in form and substance reasonably satisfactory to the Required Supporting Parties.

55.    "***Exit Revolving Facility***" means a new first lien revolving credit facility to be provided by the Revolving Facility Lenders pursuant to the Exit Revolving Credit Agreement entered into on the Effective Date and having the terms and conditions set forth on the term sheet attached as Exhibit E to the Restructuring Support Agreement and otherwise in form and substance reasonably satisfactory to the Required Supporting Parties.

56.    "***Exit Second Lien Facility***" means a new second lien term loan facility to be entered into on the Effective Date and having the terms and conditions set forth on the term sheet attached as Exhibit B to the Restructuring Support Agreement, and including an additional $3.5 million of "new money" loans in addition to the exchange of obligations under the DIP Facilities, and otherwise in form and substance reasonably satisfactory to the Required Supporting Parties.

57.    "***Final DIP Order***" means the Final Order entered by the Court in the Chapter 11 Cases approving, on a final basis, the DIP Facilities and authorizing the use of cash collateral in accordance with the Budget, in form and substance consistent with the Interim DIP Order and otherwise reasonably satisfactory to the Required Supporting Parties, the DIP Agent, and the Required Lenders.

58.    "***Final Order***" means an order or judgment of the Court, or other court of competent jurisdiction, as entered on the docket of such court, the operation or effect of which has not been stayed, reversed, vacated, modified or amended, and as to which order or judgment (or any revision, modification, or amendment thereof) the time to appeal, petition for certiorari, or seek review or rehearing has expired and as to which no appeal, petition for certiorari, or petition for review or rehearing was filed or, if filed, remains pending or subject to any right of further appeal, petition for certiorari or petition for review or rehearing.

59.    "***General Unsecured Claim***" means a Claim against any of the Debtors that is not a DIP Facilities Claim, Administrative Claim, Priority Tax Claim, Other Priority Claim,

Revolving Facility Lender Claim, Other Secured Claim, Notes Claim, Intercompany Claim, or Subordinated Claim, and shall include any Claims arising from existing or potential litigation against any of the Debtors but shall expressly exclude (i) any Notes Claims, including any Notes Deficiency Claim, and (ii) any General Unsecured Claims asserted by the Unanimous Supporting Noteholders.

60.    *"General Unsecured Claim Cash Pool"* means the $1,000,000 Cash pool to be distributed to holders of Allowed General Unsecured Claims.

61.    *"GSO Notes"* means the issued and outstanding Series 2015-2 Senior Secured Notes Due October 2017 issued under the 2015 Indenture.

62.    *"Impaired"* means, when used with reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

63.    *"Indemnification Obligation"* means any obligation of any of the Debtors to indemnify, reimburse, or provide contribution pursuant to charter, by-laws, contract, or otherwise.

64.    *"Indemnified Parties"* means the Indenture Trustees, the Revolving Facility Agent, the Revolving Facility Lenders, the DIP Agent and DIP Lenders under the DIP Credit Agreement, and those individuals serving, immediately prior to the Effective Date, as members of the boards of directors (or comparable governing body) or officers of the Debtors.

65.    *"Indenture Trustees"* means the current and former trustees for the 2010 Indenture and the 2015 Indenture, in their capacities as both indenture trustee and collateral agent under the 2010 Indenture, 2015 Indenture and related documents.

66.    *"Intercompany Claims"* means any Claim held by one of the Debtors against any other Debtor, including (a) any account reflecting intercompany book entries by a Debtor with respect to any other Debtor, (b) any Claim not reflected in book entries that is held by such Debtor against any other Debtor or Debtors, and (c) any derivative Claim asserted or assertable by or on behalf of a Debtor against any other Debtor or Debtors.

67.    *"Intercompany Interests"* means any Interest held by one of the Debtors in any other Debtor.

68.    *"Interim DIP Order"* means the order entered by the Court in the Chapter 11 Cases approving, on an interim basis, the DIP Facilities and authorizing the use of cash collateral in accordance with the Budget entered on the docket of the Court on August 9, 2016 [Docket No. 60].

69.    *"Kelso Notes"* means the issued and outstanding Series 2015-1 Senior Secured Zero Coupon Notes Due October 2017 issued under the 2015 Indenture.

70.    *"Lien"* has the meaning set forth in section 101(37) of the Bankruptcy Code.

01:19300671.7

71.    *"Litigation Rights"* means the Causes of Action, claims, suits, or proceedings, whether in law or in equity, whether known or unknown, that the Debtors or their Estates may hold against any Person (except to the extent such claims are expressly released under this Plan), which are to be retained by the Reorganized Debtors and identified in the Plan Supplement (which document shall be in form and substance acceptable to the Required Supporting Noteholders, the Supporting Lenders and the Supporting Interest Holders).

72.    *"Management Incentive Plan"* means an incentive plan for management to be implemented by the board of Reorganized Holding following the Effective Date.

73.    *"New Secured Notes"* means the new third-lien secured notes having the same collateral as, but with a junior priority to, the Exit First Lien Facility and the Exit Second Lien Facility, and with a 12% interest rate, paid in kind semi-annually, with a maturity date seven (7) years from issuance and which shall be voluntarily prepayable without premium or penalty at the option of the Reorganized Debtors.

74.    *"New Stock"* means the common stock in Reorganized Holding to be issued on or after the Effective Date.

75.    *"Note"* means any Kelso Note, GSO Note or Unexchanged Note.

76.    *"Note Claims"* means all Claims arising under or relating to the GSO Notes, Kelso Notes and Unexchanged Notes held by the Noteholders.

77.    *"Noteholder"* means any holder of a Note.

78.    "*Notes Deficiency Claim*" means the portion of the Note Claim that is not a secured claim under section 506(a) of the Bankruptcy Code.

79.    "*Ombudsman*" means a person appointed by the members of the Creditors' Committee to oversee the resolution of General Unsecured Claims after the Effective Date as set forth herein.

80.    *"Other Priority Claim"* means any Claim against any of the Debtors other than an Administrative Claim, a Professional Fee Claim, a Priority Tax Claim or a DIP Facilities Claim that is entitled to priority in payment as specified in section 507(a)(3), (4), (5), (6), (7), or (9) of the Bankruptcy Code.

81.    *"Other Secured Claims"* means any Claim (other than the DIP Facilities Claims, the Revolving Facility Lenders Claims, and the Note Claims) to the extent reflected in the Schedules or a Proof of Claim filed as a secured Claim, which is (i) secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code, or, (ii) in the event that such Claim is subject to setoff under section 553 of the Bankruptcy Code, to the extent of such setoff.

82.    *"Person"* means any individual, corporation, partnership, limited liability company, association, indenture trustee, organization, joint stock company, joint venture, estate,

trust, Governmental Unit (as defined in the Bankruptcy Code) or any political subdivision thereof, or any other entity.

83.     *"Petition Date"* means August 8, 2016.

84.     *"Plan"* means this "Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code", as it may be amended or modified from time to time in accordance with the terms hereof, together with all addenda, exhibits, schedules or other attachments, if any.

85.     *"Plan Equity Value"* means the value of the New Stock in Reorganized Holding as of the Effective Date, determined pursuant to the mid-point implied equity valuation set forth in Exhibit E to the Disclosure Statement accompanying this Plan.

86.     *"Plan Supplement"* means any compilation of documents and forms of documents, agreements, schedules, and exhibits to this Plan, which shall be filed by the Debtors no later than seven (7) calendar days before the deadline to object to confirmation of the Plan or such later date as may be consented to by the Required Supporting Parties, and the Creditors' Committee and approved by the Court  on notice to parties in interest, and additional documents filed with the Court prior to the Effective Date as amendments to the Plan Supplement, each of which shall be consistent in all respects with, and shall otherwise contain, the terms and conditions set forth on the exhibits attached hereto, where applicable, and, without limiting the foregoing, shall be satisfactory in form and substance to the Required Supporting Parties, the DIP Agent, the Required Lenders, and the Debtors, except to the extent otherwise expressly provided herein; *provided* that any provision of a document included in the Plan Supplement that is materially inconsistent with the Creditors' Committee Settlement must be acceptable to the Creditors' Committee. The Plan Supplement shall include the following documents, among others: Litigation Rights, Schedule of Assumed Contracts and Leases, Schedule of Rejected Contracts and Leases (if applicable), Exit First Lien Facility, Exit Second Lien Facility, Exit Financing Intercreditor Agreement, Terms of New Stock, Reorganized Holding Certificate of Incorporation, Reorganized Holding By-Laws, and Reorganized Holding Shareholder Agreement.

87.     *"Priority Tax Claim"* means any unsecured Claim that is entitled to a priority in right of payment under section 507(a)(8) of the Bankruptcy Code.

88.     *"Professional"* means any professional employed in the Chapter 11 Cases pursuant to sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered and expenses incurred during the Chapter 11 Cases pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code.

89.     *"Professional Fee Claim"* means an Administrative Claim Allowed for reasonable compensation of a Professional or other Person for services rendered or expenses incurred in the Chapter 11 Cases on or prior to the Effective Date (including the reasonable, actual and necessary expenses of the members of the Creditors' Committee incurred as members of the Creditors' Committee in discharge of their duties as such).

90.     *"Pro Rata"* means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that an Allowed

Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class and in any other Class entitled to share in the same recovery as such Allowed Claim under this Plan. For the purpose of determining Pro Rata Distributions for the holders of Claims in Class 5(b), Pro Rata means the proportion that an Allowed Claim in Class 5(b) bears to the aggregate amount of Allowed Claims in Class 4, Class 5(a) and Class 5(b).

91.      *"Proof of Claim"* means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

92.      *"Record Date*" means, for purposes of making distributions under this Plan on account of Allowed Claims, the Confirmation Date or such other date as established by the Bankruptcy Court with respect to publicly traded securities.

93.      *"Released Parties"* means:  (a) each Debtor, (b) the Supporting Noteholders, (c) the Indenture Trustees, (d) the DIP Lenders, DIP Agent and other lender-parties under the DIP Facilities, (e) the lenders, agents, issuing banks, arrangers and other lender-parties under the Exit Financing Facilities, (f) the Supporting Lenders (as well as any issuing bank) and the Revolving Facility Agent, (g) the Sponsors, and (h) with respect to each of the foregoing entities identified in subsections (a) through (g), such Person's current and former equity holders, including shareholders, partnership interest holders, and limited liability company unit holders, affiliates, partners, subsidiaries, members, officers, directors, managers serving on a board of managers, principals, employees, agents, managed funds, advisors, attorneys, accountants, investment banks, consultants, representatives, and other professionals, together with their respective predecessors, successors, and assigns.

94.      *"Reorganized Debtor"* means each of the Debtors, or any successors thereto by merger, consolidation, or otherwise, on and after the Effective Date.

95.      "*Reorganized Holding By-Laws*" means the by-laws of Reorganized Holding.

96.      *"Reorganized Holding Certificate of Incorporation"* means the certificate of incorporation of Reorganized Holding.

97.      *"Reorganized Holding Constituent Documents"* means the Reorganized Holding Certificate of Incorporation and the Reorganized Holding By-Laws.

98.      *"Reorganized Holding Shareholder Agreement"* means a shareholders agreement to be deemed entered into by all holders of New Stock issued on the Effective Date, which shall include those terms and conditions set forth in the Governance Term Sheet annexed to the Restructuring Support Agreement Term Sheet as Exhibit F.

99.      *"Reorganized Holding"* means Roadhouse Holding, as reorganized under chapter 11 of the Bankruptcy Code.

100.      *"Required Lenders"* has the meaning set forth in the DIP Credit Agreement.

101.      *"Required Supporting Noteholders"* has the meaning set forth in the Restructuring Support Agreement Term Sheet.

102. "***Required Supporting Parties***" means as of any date of determination the Required Supporting Noteholders or the Unanimous Supporting Noteholders as provided for in the Restructuring Support Agreement Term Sheet, the Supporting Lenders, and the Supporting Interest Holders that are signatories to the Restructuring Support Agreement and remain bound by its terms as of such date.

103. "***Restructuring Support Agreement***" means that certain Restructuring Support Agreement dated as of August 8, 2016, between the Debtors and the Supporting Parties, as amended by the terms of the Creditors' Committee Settlement, and as the same may be amended or otherwise modified in accordance with its terms (and with the consent of the Creditors' Committee if such amendment or modification is materially inconsistent with the terms of the Creditors' Committee Settlement), and the Term Sheets attached as exhibits thereto, attached as Exhibit C to the Disclosure Statement.

104. "***Restructuring Support Agreement Term Sheet***" means the term sheet attached as Exhibit A to the Restructuring Support Agreement that summarizes the terms and conditions of this Plan, as amended, supplement or otherwise modified in accordance with the terms of the Restructuring Support Agreement and the Creditors' Committee Settlement, if applicable.

105. "***Revolving Facility Agent***" means JPMorgan Chase Bank, N.A., in its capacity as Administrative Agent and Collateral Agent under the Credit Agreement.

106. "***Revolving Facility Lenders***" means the lenders and issuing banks party to the Credit Agreement and each other "Secured Party" (as defined in the Credit Agreement).

107. "***Revolving Facility Lenders Claims***" means all Claims arising under or relating to the Revolving Facility Loan Documents held by the Revolving Facility Lenders or the Revolving Facility Agent.

108. "***Revolving Facility Loan Documents***" means the Credit Agreement, all letters of credit issued thereunder and all other loan and security documents executed in connection with the Credit Agreement.

109. "***Roadhouse Holding***" means Roadhouse Holding, Inc.

110. "***Roll Up Facility***" has the meaning set forth in the DIP Credit Agreement.

111. "***Schedule of Assumed Contracts and Leases***" means the schedule of executory contracts and unexpired leases to be assumed pursuant to this Plan to be filed in connection with the Plan Supplement, which schedule shall be acceptable in form and substance to the Required Supporting Noteholders and the Supporting Lenders.

112. "***Schedule of Assigned Contracts and Leases***" means the schedule of executory contracts and unexpired leases to be assumed and assigned pursuant to this Plan to be filed with the Plan Supplement, which schedule shall be acceptable in form and substance to the Required Supporting Noteholders and the Supporting Lenders. The Schedule of Assigned Contracts and Leases shall include as an exhibit the adequate assurance information provided by all proposed assignees (which shall include without limitation the precise legal name of the entity to which

the executory contract or unexpired lease will be assigned and any applicable parent or affiliate entities providing any security or guaranties, the proposed use of the leased premises and trade name under which the proposed assignee will operate (for a lease), and contact information for the proposed assignees and their counsel, so that counterparties to those executory contracts and unexpired leases may contact the proposed assignees and their counsel for any additional information such counterparties may request).

113.    ***"Schedule of Rejected Contracts and Leases"*** means a non-exclusive schedule of executory contracts and unexpired leases to be rejected pursuant to this Plan that may be filed, at the Debtors' election, in connection with the Plan Supplement, which schedule shall be acceptable in form and substance to the Required Supporting Noteholders and the Supporting Lenders.

114.    ***"Schedules"*** means the schedules of assets and liabilities, statements of financial affairs, lists of holders of Claims and Equity Interests and related exhibits filed with the Court by each of the Debtors, including any amendments or supplements thereto.

115.    ***"Sponsors"*** means Kelso Investment Associates VIII, L.P. and KEP VI, LLC.

116.    ***"Subordinated Claims"*** means any Claim that is subordinated by Final Order of the Court pursuant to section 510(b) or 510(c) of the Bankruptcy Code.

117.    ***"Supporting Interest Holders"*** means the holders of Equity Interests in Roadhouse Holding that are signatories to the Restructuring Support Agreement and remain bound by its terms.

118.    ***"Supporting Lenders"*** means the Revolving Facility Lenders that are signatories to the Restructuring Support Agreement and remain bound by its terms.

119.    ***"Supporting Noteholders"*** means the Noteholders that are signatories to the Restructuring Support Agreement and remain bound by its terms.

120.    ***"Supporting Parties"*** means the Supporting Noteholders, the Supporting Lenders and the Supporting Interest Holders that are signatories to the Restructuring Support Agreement and remain bound by its terms.

121.    ***"Unanimous Supporting Noteholders"*** means all funds or financing vehicles (or funds or accounts advised or sub-advised by such persons) that are Supporting Noteholders and are affiliated with the following entities: Carl Marks Management Company, LLC, Marblegate Asset Management, LLC, GSO Capital Partners, LP. and Kelso & Company, L.P.; provided that if any Supporting Noteholder described in this definition subsequently transfers or otherwise disposes of some or all of its Notes prior to the Effective Date such that it holds less than 5% of all outstanding Notes in the aggregate, such Supporting Noteholder shall be deemed removed from this definition and this definition shall be deemed revised to require consent from each of the remaining Supporting Noteholders described herein.

122.    ***"Unexchanged Notes"*** means the issued and outstanding 10.75% Senior Secured Notes due 2017 issued under the 2010 Indenture.

123.    *"Unimpaired"* means, when used with reference to a Claim or Interest, a Claim or Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

### B.    Interpretation, Application of Definitions, and Rules of Construction.

Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine, and neuter, such meanings to be applicable to both the singular and plural forms of the terms defined.  Capitalized terms in this Plan that are not defined herein shall have the same meanings assigned to such terms by the Bankruptcy Code or Bankruptcy Rules, as the case may be.  The words "herein," "hereof," and "hereunder" and other words of similar import refer to this Plan as a whole and not to any particular section or subsection in this Plan unless expressly provided otherwise.  The words "includes" and "including" are not limiting and mean that the things specifically identified are set forth for purposes of illustration, clarity or specificity and do not in any respect qualify, characterize or limit the generality of the class within which such things are included, and the words "includes" or "including" are deemed immediately followed by the phrase "without limitation".  Captions and headings to Articles, Sections, and exhibits to this Plan are inserted for convenience of reference only, are not a part of this Plan, and shall not be used to interpret this Plan.  The rules of construction set forth in section 102 of the Bankruptcy Code shall apply to this Plan.  In computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

### C.    Reference to Monetary Figures

All references in this Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

### D.    Consent Rights of Supporting Parties

Notwithstanding anything herein to the contrary, any and all consent rights of the respective parties to the Restructuring Support Agreement set forth in the Restructuring Support Agreement with respect to the form and substance of this Plan and the documents and instruments contained in the Plan Supplement, including any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers or other deviations under or from such documents, shall be incorporated herein by this reference and fully enforceable as if stated in full herein.

## II.

## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

### A.    General Rules of Classification.

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of the Classes of Claims and Interests.  In accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Facilities Claims, Administrative Claims, Professional Fee Claims, and Priority Tax Claims, as described below, have not been classified.  These Claims will be Unimpaired and,

therefore, will not be entitled to vote to accept or reject this Plan.  A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.  A Claim or Interest is also placed in a particular Class for the purpose of receiving Distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date.

As discussed in greater detail in Article VI hereof, this Plan is premised upon the consolidation of the Debtors for purposes of this Plan only and shall not affect the legal and corporate structures of the Debtors, subject to the rights of the Debtors to effectuate the restructuring transactions contemplated herein.  Accordingly, for purposes of this Plan, the assets and liabilities of each of the Debtors are deemed assets and liabilities of a single, consolidated entity.  This consolidation treatment is designed to consensually pool the assets and liabilities of the Debtors solely to implement the settlements and compromises reached by the primary constituencies in the Chapter 11 Cases.

## B.    Classification of Claims and Interests.

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which of those Classes are (i) Impaired or Unimpaired under this Plan, (ii) entitled to vote to accept or reject this Plan, and (iii) deemed to either accept or reject this Plan.  A Claim or Interest is designated in a particular Class only to the extent it falls within the description of that Class, and is classified in any other Class to the extent (if any) that a portion of such Claim or Interest falls within the description of such other Class.

| Class | Designation | Status | Entitled to Vote |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) |
| 2 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| 3 | Revolving Facility Lender Claims | Impaired unless the Debtors enter into an Alternative Exit Facility and the Revolving Facility Lender Claims are repaid in full in cash | Yes |
| 4 | GSO Notes Claims and Kelso Notes Claims | Impaired | Yes |
| 5 | Unexchanged Notes Claims | Impaired | Yes |
| 6 | General Unsecured Claims | Impaired | Yes |
| 7 | Intercompany Claims | Unimpaired | No (deemed to accept) |
| 8 | Subordinated Claims | Impaired | No (deemed to reject) |
| 9 | Existing Equity Interests | Impaired | No (deemed to reject) |
| 10 | Intercompany Interests | Unimpaired | No (deemed to accept) |

## III.

## TREATMENT OF ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE CLAIMS, PRIORITY TAX CLAIMS, DIP FACILITIES CLAIMS AND STATUTORY FEES

### A.    Administrative Claims.

Except to the extent a holder of an Allowed Administrative Claim already has been paid during the Chapter 11 Cases or such holder, together with the Debtors and the Required Supporting Noteholders, agrees to less favorable treatment with respect to such holder's Claim, each holder of an Allowed Administrative Claim shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, its Administrative Claim, Cash equal to the unpaid portion of its Allowed Administrative Claim (but not to exceed the Creditors' Committee Claims Cap in the case of Professional Fee Claims held by the Professionals retained by the Creditors' Committee), to be paid on the latest of:  (a) the Effective Date, or as soon as reasonably practicable thereafter, if such Administrative Claim is Allowed as of the Effective Date; (b) the date such Administrative Claim is Allowed, or as soon as reasonably practicable thereafter; (c) the date such Allowed Administrative Claim becomes due and payable, or as soon as reasonably practicable thereafter; and (d) such other date as may be agreed upon between the holder of such Allowed Administrative Claim and the Debtors (with the consent of the Required Supporting Noteholders) or the Reorganized Debtors, as the case may be.

### B.    Administrative Claims Bar Date.

Unless a prior date has been established pursuant to the Bankruptcy Code, the Bankruptcy Rules or a prior order of the Court, the Confirmation Order will establish a bar date for filing notices, requests, Proofs of Claim, applications or motions for allowance of Administrative Claims (other than Professional Fee Claims, DIP Facilities Claims, Claims by any other trade creditor or customer of the Debtors whose Claim is on account of ordinary course of business goods or services provided to the Debtors during the course of these Chapter 11 Cases, and the post-Petition Date fees and expenses of the Unanimous Supporting Noteholders, the Supporting Lenders, the Supporting Interest Holders, the Revolving Facility Agent, the Indenture Trustees, the DIP Agent, the DIP Lenders, and their respective advisors), which date shall be the Administrative Claims Bar Date.  Holders of Administrative Claims not paid prior to the Confirmation Date shall file with the Court and serve upon the Debtors or Reorganized Debtors, as applicable, a motion requesting payment of such Administrative Claim on or before the Administrative Claims Bar Date or forever be barred from doing so.  The notice of entry of the Confirmation Order to be delivered pursuant to Bankruptcy Rules 3020(c) and 2002(f) will set forth the Administrative Claims Bar Date and constitute good and sufficient notice of the Administrative Claims Bar Date.

### C.    Professional Fee Claims.

All requests for compensation or reimbursement of Professional Fee Claims pursuant to sections 327, 328, 330, 331, 363, 503 or 1103 of the Bankruptcy Code for services rendered prior to the Effective Date shall be filed and served on the Reorganized Debtors,

counsel to the Reorganized Debtors, the United States Trustee, counsel to each of the Supporting Parties, counsel to the Creditors' Committee, and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Court, no later than forty-five (45) days after the Effective Date.  Holders of Professional Fee Claims that are required to file and serve applications for final allowance of their Professional Fee Claims and that do not file and serve such applications by the required deadline shall be forever barred from asserting such Claims against the Debtors, the Reorganized Debtors or their respective properties, and such Professional Fee Claims shall be deemed discharged as of the Effective Date.  Objections to any Professional Fee Claims must be filed and served no later than sixty-five (65) days following the Effective Date.  Objections must be served on the Reorganized Debtors, counsel for the Reorganized Debtors, counsel to each of the Supporting Parties, counsel to the Creditors' Committee and the holders of Professional Fee Claims requesting payment.  The Professional Fee Claims held by the Professionals retained by the Creditors' Committee shall not exceed the Creditors' Committee Claims Cap.

### D.    **Priority Tax Claims.**

Except to the extent a holder of an Allowed Priority Tax Claim, together with the Debtors and the Required Supporting Noteholders, agrees to a different treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each such holder shall be paid, at the option of the Debtors, with the approval of the Required Supporting Noteholders, (i) in the ordinary course of the Debtors' business, consistent with past practice; *provided*, *however*, that in the event the balance of any such Claim becomes due during the pendency of the Bankruptcy Cases and remains unpaid as of the Effective Date, the holder of such Claim shall be paid in full in Cash on the Effective Date, or (ii) in installment payments over a period of time not to exceed five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.

### E.    **DIP Facilities Claims.**

Subject to the delivery and surrender requirements under Articles VII.B.1. and VII.I.3. with respect to the obligations under the Roll Up Facility, upon the Effective Date, the DIP Facilities Claims shall be deemed to be Allowed Claims and indefeasibly satisfied by an in-kind exchange on a dollar-for-dollar basis for obligations of the Reorganized Debtors under the Exit Second Lien Facility; *provided*, *however*, that any fees and expenses set forth in Article XII.A hereof shall be deemed to be Allowed Claims and paid in Cash as set forth in Article XII.A.

### F.    **Payment of Statutory Fees.**

All fees payable on or before the Effective Date pursuant to section 1930 of title 28 of the United States Code shall be paid by the Debtors on or before the Effective Date and all such fees payable after the Effective Date shall be paid by the applicable Reorganized Debtor.

# IV.

## TREATMENT OF CLASSIFIED CLAIMS AND
## EQUITY INTERESTS

A.    **Class 1 – Other Priority Claims.**

    1.    **Classification.** Class 1 consists of all Other Priority Claims.

    2.    **Treatment.** Except to the extent that a holder of an Allowed Other Priority Claim, together with the Debtors and the Required Supporting Noteholders, agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each such holder shall be paid, to the extent such Claim has not already been paid during the Chapter 11 Cases, in full in Cash in the ordinary course of business by the Debtors or the Reorganized Debtors, as applicable, on or as soon as reasonably practicable after the latest of (i) the Effective Date, (ii) the date on which such Other Priority Claim against the Debtor becomes Allowed, or (iii) such other date as may be ordered by the Court.

    3.    **Impairment and Voting.** Class 1 is Unimpaired under this Plan. Holders of Other Priority Claims in Class 1 are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject this Plan.

B.    **Class 2 - Other Secured Claims.**

    1.    **Classification.** Class 2 consists of all Other Secured Claims.

    2.    **Treatment.** Except to the extent that a holder of an Allowed Other Secured Claim, together with the Debtors and the Required Supporting Noteholders, agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, each such holder shall be Reinstated, or, at the option of the Debtors or the Reorganized Debtors with the consent of the Required Supporting Noteholders, each holder of an Allowed Other Secured Claim shall receive, either (i) Cash in the full amount of such Allowed Other Secured Claim, including any postpetition interest Allowed pursuant to section 506(b) of the Bankruptcy Code, (ii) the net proceeds of the sale or disposition of the collateral securing such Allowed Other Secured Claim to the extent of the value of the holder's secured interest in such collateral, (iii) the collateral securing such Allowed Other Secured Claim, or (iv) such other Distribution as necessary to satisfy the requirements of section 1129 of the Bankruptcy Code on account of such Allowed Other Secured Claim.

    3.    **Impairment and Voting.** Class 2 is Unimpaired under this Plan. Holders of Other Secured Claims in Class 2 are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject this Plan.

C.      **Class 3 – Revolving Facility Lender Claims.**

1.      **Classification.**  Class 3 consists of all Revolving Facility Lender Claims.

2.      **Allowance.**  Revolving Facility Lender Claims shall be Allowed in full without set-off, defense or counterclaim in the aggregate principal amount of not less than $24,399,525 plus $4,600,475 for unreimbursed obligations on account of issued letters of credit plus all outstanding fees, accrued and unpaid pre- and post-petition interest, expenses and contingent reimbursement obligations, in each case, pursuant to and as provided in the Credit Agreement.

3.      **Treatment.**  On the Effective Date except to the extent that a holder of a Revolving Facility Lender Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for such Claim, each holder of a Revolving Facility Lender Claim shall receive a Pro Rata share of the Exit Revolving Facility (by having any Revolving Facility Lender Claims for outstanding principal deemed outstanding under the Exit Revolving Facility on a dollar-for-dollar basis and all letters of credit issued under the Credit Agreement deemed outstanding under the Exit Revolving Facility), *provided*, *however*, that all Revolving Facility Lender Claims for interest and outstanding fees and expenses shall be paid on the Effective Date in Cash to the extent not previously paid pursuant to the Interim DIP Order or Final DIP Order; and *provided further however* that if the Debtors arrange for the Alternative Exit Facility, then each holder of a Revolving Facility Lender Claim shall receive Cash in the amount of its Allowed Claim in full and final satisfaction, settlement, release, and discharge of and in exchange for such Claim and any outstanding undrawn letters of credit issued under the Credit Agreement shall be cash collateralized at 105% of the face amount thereof, pursuant to arrangements satisfactory to the issuers thereof.

4.      **Impairment and Voting.**

(a)      If the Debtors do not arrange for the Alternative Exit Facility, Class 3 will be Impaired.  Holders of Revolving Facility Lender Claims in Class 3 will be entitled to vote to accept or reject this Plan.

(b)      If the Debtors arrange for the Alternative Exit Facility, Class 3 will be Unimpaired.  Holders of Revolving Facility Lenders Claims in Class 3 will be conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, will not be entitled to vote to accept or reject this Plan.

D.      **Class 4 – GSO Notes Claims and Kelso Notes Claims.**

1.      **Classification.**  Class 4 consists of all GSO Notes Claims and Kelso Notes Claims.

2.      **Allowance.**

(a)      GSO Notes Claims shall be Allowed in full without set-off, defense or counterclaim in the aggregate principal amount of not less than $115,492,000, plus all outstanding fees, interest, expenses and other amounts due in accordance with the terms of the

2015 Indenture, and less the amount of such Claims that are exchanged for loans under the Roll Up Facility, with the secured portion of such Claims receiving treatment pursuant to this Class 4.

(b)    Kelso Notes Claims shall be Allowed in full without set-off, defense or counterclaim in the aggregate principal amount of not less than $118,596,000, plus all outstanding fees, interest, expenses and other amounts due in accordance with the terms of the 2015 Indenture, and less the amount of such Claims that are exchanged for loans under the Roll Up Facility, with the secured portion of such Claims receiving treatment pursuant to this Class 4.

3.    **Treatment.**  On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a holder of a GSO Notes Claim or Kelso Notes Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for such Claim, each holder of a GSO Notes Claim and/or a Kelso Notes Claim shall receive a Pro Rata share of the New Stock, subject to dilution for the Management Incentive Plan (to the extent the board of directors of Reorganized Holding approves awards of New Stock thereunder).  For the avoidance of doubt, on the Effective Date, each holder of a GSO Notes Claim and Kelso Notes Claim shall be deemed to have waived its Notes Deficiency Claim.

4.    **Impairment and Voting.**  Class 4 is Impaired under this Plan.  Holders of GSO Notes Claims and Kelso Notes Claims in Class 4 are entitled to vote to accept or reject this Plan.

E.    <u>**Class 5 – Unexchanged Notes Claims.**</u>

1.    **Classification.**  Class 5 consists of all Unexchanged Notes Claims.

2.    **Allowance**.  Unexchanged Notes Claims shall be Allowed in full without set-off, defense or counterclaim in the aggregate principal amount of not less than $143,936,000, plus all outstanding fees, interest, expenses and other amounts due in accordance with the terms of the 2010 Indenture, and less the amount of such Claims that are exchanged for loans under the Roll Up Facility, with the secured portion of such Claims receiving treatment pursuant to this Class 5.

3.    **Treatment.**  On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a holder of an Unexchanged Notes Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for such Claim, each holder of an Unexchanged Note Claim shall receive:

(a)    Subclass 5(a).  Each holder of Unexchanged Notes that, in the aggregate, holds equal to or in excess of $9,000 in principal amount of Unexchanged Notes shall receive a Pro Rata share of the New Stock, subject to dilution for the Management Incentive Plan (to the extent the board of directors of Reorganized Holding approves awards of New Stock thereunder).

(b)    Subclass 5(b).  Each holder of Unexchanged Notes that, in the aggregate, holds less than $9,000 in principal amount of Unexchanged Notes shall receive a Cash-Out Payment, which shall be paid (i) in the form of Cash, if Class 5 votes to accept the Plan and (ii) in the form of New Secured Notes, if Class 5 votes to reject the Plan.

For the avoidance of doubt, on the Effective Date, each holder of Unexchanged Notes shall be deemed to have waived their Notes Deficiency Claim.

        4.     **Impairment and Voting.**  Class 5 is Impaired under this Plan.  Holders of Unexchanged Notes Claims in Class 5 are entitled to vote to accept or reject this Plan.

    F.     **Class 6 – General Unsecured Claims.**

        1.     **Classification.**  Class 6 consists of all General Unsecured Claims.

        2.     **Treatment.**  On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for such Claim, each holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the General Unsecured Claim Cash Pool.

        3.     **Impairment and Voting.**  Class 6 is Impaired under this Plan.  Holders of General Unsecured Claims in Class 6 are entitled to vote to accept or reject this Plan.

    G.     **Class 7 – Intercompany Claims.**

        1.     **Classification.**  Class 7 consists of all Intercompany Claims.

        2.     **Treatment.**  Intercompany Claims shall be reinstated, cancelled or compromised as determined by the Debtors with the consent of the Required Supporting Noteholders.

        3.     **Impairment and Voting.**  Class 7 Claims are Unimpaired under this Plan. Holders of Intercompany Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject this Plan.

    H.     **Class 8 – Subordinated Claims.**

        1.     **Classification.**  Class 8 consists of all Subordinated Claims.

        2.     **Treatment.**  The holders of Subordinated Claims shall neither receive Distributions nor retain any property under this Plan for or on account of such Subordinated Claims.

        3.     **Impairment and Voting.**  Class 8 is Impaired under this Plan.  Holders of Subordinated Claims are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject this Plan.

    I.     **Class 9 – Existing Equity Interests.**

        1.     **Classification.**  Class 9 consists of all Existing Equity Interests.

2.    **Treatment.**  Existing Equity Interests shall be discharged, cancelled, released, and extinguished as of the Effective Date and holders of Existing Equity Interests shall neither receive any Distributions nor retain any property under this Plan for or on account of such Equity Interests.

3.    **Impairment and Voting.**  Class 9 is Impaired under this Plan.  Holders of Existing Equity Interests are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject this Plan.

J.    **Class 10 – Intercompany Interests.**

1.    **Classification.**  Class 10 consists of all Intercompany Interests.

2.    **Treatment.**  Intercompany Interests shall be cancelled or reinstated, as determined by the Debtors with the consent of the Required Supporting Noteholders.

3.    **Impairment and Voting.**  Class 10 is Unimpaired under this Plan. Holders of Intercompany Interests are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject this Plan.

K.    **Special Provision Governing Claims.**

Except as otherwise provided in this Plan, nothing under this Plan shall affect the Debtors' or the Reorganized Debtors' rights in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Claims.

L.    **Elimination of Vacant Classes.**

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or Claim or Interest temporarily Allowed by the Court as of the date of the Confirmation Hearing shall be deemed eliminated from this Plan for purposes of voting to accept or reject this Plan and for purposes of determining acceptance or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

M.    **Acceptance or Rejection of this Plan.**

1.    **Presumed Acceptance.**  Claims in Classes 1, 2, and 7, and Interests in Class 10 are Unimpaired under the Plan.  The holders of such Claims and Interests are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject this Plan.

2.    **Voting Classes.**  Claims in Classes 3, 4, 5, and 6 are Impaired under this Plan and the holders of such Claims are entitled to vote to accept or reject this Plan.  If holders of Claims in a particular Impaired Class of Claims are given the opportunity to vote to accept or reject the Plan, but no holders of Claims in such Impaired Class of Claims vote to accept or reject this Plan, then such Class of Claims shall be deemed to have accepted this Plan.

3.      **Deemed Rejection of Plan.**  Subordinated Claims in Class 8 and Equity Interests in Class 9 are Impaired, and holders of such Claims and Equity Interests shall receive no Distributions.  The holders in such Classes are deemed to have rejected this Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject this Plan.

**N.      Nonconsensual Confirmation.**

If less than all Impaired Classes accept this Plan, but at least one (1) Class of Claims Impaired under this Plan has accepted this Plan (and which Class's acceptance is determined without inclusion of Claims of Insiders (as defined in the Bankruptcy Code)), the Debtors may seek to have the Court confirm this Plan under section 1129(b) of the Bankruptcy Code.

**O.      Subordinated Claims.**

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective Distributions and treatments under this Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 510(a) or 510(b) of the Bankruptcy Code or otherwise.

## V.

### PROVISIONS REGARDING CORPORATE GOVERNANCE OF THE REORGANIZED DEBTORS

**A.      Cancellation of Existing Equity Interests.**

On the Effective Date, all Existing Equity Interests shall be cancelled in accordance with this Plan.

**B.      Directors and Officers of the Reorganized Debtors.**

On the Effective Date, the term of each member of the current boards of directors of the Debtors shall expire, and the board of each of the Reorganized Debtors, as well as the officers of each of the Reorganized Debtors, shall consist of those individuals that will be identified in the Plan Supplement.  Following the Effective Date, the appointment and removal of the members of the board of each of the Reorganized Debtors shall be governed by the terms of each Reorganized Debtor's respective corporate governance documents.

**C.      Powers of Officers.**

The officers of the Debtors (with the consent of the Required Supporting Noteholders, the Supporting Lenders, the Supporting Interest Holders, the DIP Agent, and the Required Lenders) or the Reorganized Debtors, as applicable, shall have the power to (i) enter into, execute or deliver any documents or agreements that may be necessary and appropriate to implement and effectuate the terms of this Plan, and (ii) take any and all other actions that may

be necessary and appropriate to effectuate the terms of this Plan, including the making of appropriate filings, applications or recordings, provided that such documents and agreements are in form and substance acceptable to the Required Supporting Noteholders, the Supporting Lenders, the Supporting Interest Holders, the DIP Agent, and the Required Lenders.

### D.    **Management Incentive Plan**.

Following the Effective Date, the board of directors of Reorganized Holding may adopt and implement a Management Incentive Plan, which may provide for the issuance of Cash or New Stock.  Specific awards shall be as determined by the board of directors of Reorganized Holding (or, if applicable, a compensation committee established by such board) from time to time.

## VI.

## SUBSTANTIVE CONSOLIDATION OF THE DEBTORS

Solely for purposes of voting on, confirmation of, and Distributions to be made to holders of Allowed Claims under this Plan, this Plan is predicated upon, and it is a condition precedent to confirmation of this Plan, that the Court provide in the Confirmation Order for the limited consolidation of the Estates of the Debtors into a single Estate for purposes of this Plan, the confirmation hereof and Distributions hereunder.

Pursuant to the Confirmation Order (i) all assets and liabilities of the consolidated Debtors will be deemed to be merged solely for purposes of Distributions to be made hereunder, (ii) the obligations of each Debtor will be deemed to be the obligation of the consolidated Debtors solely for purposes of Distributions hereunder, (iii) any Claims filed or to be filed in connection with any such obligations will be deemed Claims against the consolidated Debtors, (iv) each Claim filed in the Chapter 11 Case of any Debtor will be deemed filed against the Debtors in the consolidated Chapter 11 Cases in accordance with the limited consolidation of the assets and liabilities of the Debtors, (v) all transfers, disbursements and Distributions made by any Debtor hereunder will be deemed to be made by the consolidated Debtors, and (vi) all guarantees of the Debtors of the obligations of any other Debtors shall be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the consolidated Debtors. Holders of Allowed Claims in each Class shall be entitled to their share of assets available for Distribution to such Class without regard to which Debtor was originally liable for such Claim. Intercompany Claims shall be treated as provided in Class 7 of this Plan and Intercompany Interests shall be treated as provided in Class 10 of this Plan.

Notwithstanding the foregoing, such limited consolidation shall not affect (a) the legal and corporate structure of the Reorganized Debtors, (b) any obligations under any contracts or leases that were entered into during the Chapter 11 Cases or executory contracts or unexpired leases that have been or will be assumed pursuant to this Plan, (c) distributions from any insurance policies or proceeds of such policies, (d) the revesting of assets in the separate Reorganized Debtors pursuant to Article IX.B of this Plan, or (e) guarantees that are required to be maintained post-Effective Date (i) in connection with executory contracts or unexpired leases

that were entered into during the Chapter 11 Cases or that have been, or will hereunder be, assumed, (ii) pursuant to the express terms of this Plan, or (iii) in connection with the Exit Financing Facilities. The limited consolidation proposed herein shall not affect each Debtor's obligation to file the necessary operating reports and pay any required fees pursuant to 28 U.S.C. § 1930(a)(6), which obligation shall continue until a Final Order is entered closing, dismissing or converting each such Debtor's Chapter 11 Case.

VII.

## PROVISIONS REGARDING MEANS OF IMPLEMENTATION, DISTRIBUTIONS, AND RESOLUTION OF DISPUTED CLAIMS

A.    **General Settlement of Claims.**

As discussed further in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under this Plan, upon the Effective Date, the provisions of this Plan shall constitute a good faith compromise and settlement of all Claims, Interests and controversies resolved pursuant to this Plan. Distributions made to holders of Allowed Claims in any Class are intended to be final.

B.    **Exit Financing.**

On the Effective Date, the Debtors shall enter into the following Exit Financing Facilities:

1.    **Exit First Lien Facility.**  On the Effective Date, the Reorganized Debtors shall enter into either the Exit Revolving Facility (subject to the terms of the Exit Revolving Credit Agreement), or an Alternative Exit Facility; in each case, providing not less than $29 million of availability that shall be used to satisfy the Revolving Facility Lenders Claims (including, in the case of the Exit Revolving Facility, by deeming all Revolving Lender Claims for principal as principal outstanding under the Exit Revolving Facility on a dollar-for-dollar basis and deeming all outstanding letters of credit issued under the Credit Agreement as issued under the Exit Revolving Credit Agreement, and, in each case, subject to the terms of the Exit Revolving Facility).  The terms and conditions of the Exit First Lien Facility shall be substantially in the form set forth in the Plan Supplement subject to any amendments, modifications or waivers consented to by the Supporting Lenders and the Required Supporting Noteholders.

2.    **Exit Second Lien Facility.**   On the Effective Date, the Reorganized Debtors shall enter into the Exit Second Lien Facility, which shall be used to satisfy the DIP Facility Claims through a cashless exchange of all obligations outstanding under the DIP Facilities for obligations of the Reorganized Debtors under the Exit Second Lien Facility on a dollar-for-dollar basis and shall include an additional $3.5 million of "new money" loans.  The terms and conditions of the Exit Second Lien Facility shall be substantially in the form set forth in the Plan Supplement, subject to any amendments, modifications or waivers consented to by (x) the Required Supporting

Noteholders or the Unanimous Supporting Noteholders as provided for in the Restructuring Support Agreement Term Sheet, and (y) to the extent that the Exit First Lien Facility is the Exit Revolving Facility, the Supporting Lenders, and in each case with the consent of the Creditors' Committee if such amendment, modification or waiver is materially inconsistent with the terms of the Creditors' Committee Settlement. The Exit First Lien Facility, the Exit Second Lien Facility and, if applicable, the New Secured Notes shall be subject to the Exit Financing Intercreditor Agreement.

In order to participate in the Exit Second Lien Facility with respect to the exchange of obligations under the Roll Up Facility, each DIP Lender must surrender, either physically or electronically, to the applicable Indenture Trustee the Notes that were deemed exchanged for obligations under the Roll Up Facility, in accordance with Article VII.I.3 hereof, by the Effective Date, or such other date as determined by the Indenture Trustees and the Debtors. If any DIP Lender fails to surrender to the applicable Indenture Trustee by the Effective Date, or such other date as determined by the Indenture Trustees and the Debtors, the Notes that were deemed to have been exchanged for obligations under the Roll Up Facility, those obligations under the Roll Up Facility shall be deemed null and void and such DIP Lender will not participate in the Exit Second Lien Facility on account of the obligations under the Roll Up Facility that otherwise would have been issued with respect to such Notes. The Debtors and the Indenture Trustees, may modify the participation procedures contained in this paragraph as may be necessary or appropriate to effect surrender of the Notes.

Confirmation of this Plan shall be deemed to constitute approval of the Exit Financing Facilities, and the Exit Financing Facility Documents, and, subject to the occurrence of the Effective Date, authorization for the Reorganized Debtors to enter into and perform their obligations in connection with the Exit Financing Facilities.

On the Effective Date, the Exit Financing Facility Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms. The financial accommodations to be extended pursuant to the Exit Financing Facility Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law. On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Financing Facility Documents (1) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Financing Facility Documents, (2) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Exit Financing Facility Documents, (3) shall be subject to the Exit Financing Intercreditor Agreement and (4) except as expressly permitted in the Exit Financing Facility Documents, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the entities granted such Liens and security interests are

authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of this Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

### C.    Issuance of New Stock.

The issuance of New Stock by Reorganized Holding is authorized without the need for any further corporate action or without any further action by a holder of Claims or Interests.  On the Effective Date (or as soon as reasonably practicable thereafter), the New Stock shall be issued, through any intermediate holding companies subject to the provisions of this Plan, to Logan's Roadhouse, Inc., which shall then issue the New Stock to (i) the holders of Allowed GSO Notes Claims who are receiving New Stock pursuant to this Plan, (ii) the holders of Allowed Kelso Notes Claims who are receiving New Stock pursuant to this Plan and (iii) the holders of Allowed Unexchanged Notes Claims who are receiving New Stock pursuant to this Plan.  The amount of the New Stock to be issued pursuant to this Plan shall be disclosed in the Plan Supplement.

All of the New Stock issued pursuant to this Plan shall be duly authorized and validly issued.  Each Distribution and issuance referred to in this Article VII shall be governed by the terms and conditions set forth herein applicable to such Distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such Distribution or issuance, including the Reorganized Holding Certificate of Incorporation and the Reorganized Holding Shareholder Agreement, which terms and conditions shall bind each Person receiving such Distribution or issuance.  Upon the Effective Date, the Reorganized Holding Certificate of Incorporation and Reorganized Holding Shareholder Agreement shall be deemed to become valid, binding and enforceable in accordance with their terms, and each holder of New Stock shall be bound thereby, in each case, without need for execution by any party thereto other than Reorganized Holding; *provided* that any party that receives New Stock under this Plan is directed to furnish the Reorganized Debtor with such information and documents as are necessary to evidence their ownership of New Stock and their becoming a party to the Reorganized Holding Shareholder Agreement.

### D.    Avoidance Actions.

From and after the Effective Date, the Reorganized Debtors covenant and agree not to bring any Avoidance Actions, which Avoidance Actions shall be deemed released and waived on the Effective Date.

01:19300671.7

E.      **Waiver of Notes Deficiency Claims and Certain General Unsecured Claims.**

On the Effective Date, all Notes Deficiency Claims shall be deemed waived and the Unanimous Supporting Noteholders shall be deemed to have waived any General Unsecured Claims against the Debtors.

F.      **Restructuring Transactions.**

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may modify their corporate structure by eliminating certain entities and may take all actions as may be necessary or appropriate to effect such transactions, including any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan, including: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of this Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of this Plan and having other terms to which the applicable parties may agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion (including related formation) or dissolution pursuant to applicable state law; and (iv) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.  Prior to the Effective Date, the Debtors shall have obtained the consent of the Supporting Lenders and the Required Supporting Noteholders or the Unanimous Supporting Noteholders as provided for in the Restructuring Support Agreement Term Sheet, regarding their intentions with respect to the restructuring transactions.

G.      **Corporate Action.**

Upon the Effective Date, all corporate actions contemplated by this Plan shall be deemed authorized and approved in all respects, including (i) the transactions contemplated by Article VII.D hereof, (ii) the adoption and filing of appropriate certificates of incorporation and memoranda and articles of association and amendments thereto, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable law, (iii) the initial selection of managers, directors and officers for the Reorganized Debtors, (iv) the Distributions pursuant to this Plan, (v) the execution and entry into the Exit Financing Facilities, and (vi) all other actions contemplated by this Plan (whether to occur before, on, or after the Effective Date), in each case unless otherwise provided in this Plan.  All matters provided for under this Plan involving the corporate structure of the Debtors and Reorganized Debtors or corporate action to be taken by or required of a Debtor or a Reorganized Debtor will be deemed to occur and be effective as of the Effective Date, if no such other date is specified in such documents, and shall be authorized, approved, adopted and, to the extent taken prior to the Effective Date, ratified and confirmed in all respects and for all purposes without any requirement of further action by holders of Claims or Interests, directors of the Debtors or the Reorganized Debtors, as applicable, or any other Person, except to effect the filing of any new corporate governance documents respecting the Debtors, as necessary.

01:19300671.7

**H.**    **Effectuating Documents; Further Transactions.**

On and after the Effective Date, the Reorganized Debtors and the officers and directors of the boards of directors thereof, are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of this Plan and the securities issued pursuant to this Plan in the name of and on behalf of the Reorganized Debtors, without need for any approvals, authorization, or consents except for those expressly required pursuant to this Plan and applicable non-bankruptcy law.

**I.**    **Reorganized Holding Certificate of Incorporation and By-Laws.**

On or promptly after the Effective Date, Reorganized Holding will file the Reorganized Holding Certificate of Incorporation with the Secretary of State and/or other applicable authorities in its state of incorporation in accordance with the corporate laws of that state.    Pursuant to section 1123(a)(6) of the Bankruptcy Code, the Reorganized Holding Certificate of Incorporation will prohibit the issuance of non-voting equity securities.    After the Effective Date, Reorganized Holding may amend and restate the Reorganized Holding Certificate of Incorporation and Reorganized By-Laws as permitted by the laws of its state of incorporation, and the Reorganized Holding Constituent Documents.    The Reorganized Holding Constituent Documents shall be substantially in the form set forth in the Plan Supplement.

**J.**    **Cancellation of Securities and Agreements.**

1.    **Cancellations.**    On the Effective Date, except as otherwise specifically provided for in this Plan, including as provided for in Article IX.L hereof: (1) the obligations of the Debtors under the Credit Agreement, the 2010 Indenture, and the 2015 Indenture and any other certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Equity Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically reinstated pursuant to this Plan), shall be cancelled solely as to the Debtors, and the Reorganized Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the membership interests, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically reinstated pursuant to this Plan) shall be released and discharged; provided, however, notwithstanding confirmation of this Plan or the occurrence of the Effective Date, any agreement that governs the rights of the holder of a Claim shall continue in effect solely for purposes of allowing holders to receive Distributions under this Plan as provided herein; provided, further, notwithstanding confirmation of this Plan or the occurrence of the Effective Date, the Credit Agreement, the 2010 Indenture and the 2015 Indenture shall continue in effect solely for the purposes of allowing the

Revolving Facility Lenders Claims, GSO Notes Claims, Kelso Notes Claims, and Unexchanged Notes Claims under this Plan; provided, further, however, that the preceding proviso shall not affect the discharge of Claims or Equity Interests pursuant to the Bankruptcy Code, the Confirmation Order or this Plan, or result in any expense or liability to the Reorganized Debtors.

2.      **Letter of Transmittal to Holders of Notes Claims.**    As soon as practicable after the Effective Date, the Reorganized Debtors, with the cooperation of the Indenture Trustees shall send a letter of transmittal to each Noteholder who has not surrendered, either physically or electronically, its Note(s) as of the Effective Date, advising such Noteholder of the effectiveness of this Plan and providing instructions to such Noteholder to deliver to the applicable Indenture Trustee such Noteholder's Note(s) in exchange for the Distributions to be made pursuant to this Plan.    Delivery of any Note will be effected, and risk of loss and title thereto shall pass, only upon delivery of such Note to the appropriate Indenture Trustee in accordance with the terms and conditions of such letter of transmittal, such letter of transmittal to be in such form and have such other provisions as the Reorganized Debtors, the Indenture Trustees or their representatives may reasonably request.

3.      **Delivery and Surrender.**    Each Noteholder, including each DIP Lender with respect to the Roll Up Facility, shall surrender, either physically or electronically, its Note(s) to the appropriate Indenture Trustee as a condition to receiving a Distribution under this Plan and, with respect to the Exit Second Lien Facility, participating in the Exit Second Lien Facility with respect to the exchange of obligations under the Roll Up Facility.    No Distribution hereunder shall be made to or on behalf of any Noteholder or any DIP Lender, with respect to the obligations under the Roll Up Facility, unless and until such Note(s) are received by the appropriate Indenture Trustee, or the ownership and loss, theft or destruction of such Note(s) are established to the satisfaction of the applicable Indenture Trustee, including requiring such Noteholder to (i) submit a lost instrument affidavit and an indemnity bond, and (ii) hold the Debtors, the Reorganized Debtor, the DIP Lenders, DIP Agent, and the Indenture Trustee harmless in respect of such Note and any Distributions made in respect thereof.    Additionally, no Distribution hereunder shall be made on account of any Unexchanged Notes Claim unless and until the holder of such Unexchanged Notes Claims certifies that such Noteholder holds, in the aggregate, either (a) equal to or in excess of $9,000 in principal amount of Unexchanged Notes or (b) less than $9,000 in principal amount of Unexchanged Notes.    Upon compliance with this Article VII.I.3 by a Noteholder, such Noteholder shall, for all purposes under this Plan, be deemed to have surrendered such Note(s).    Any such Noteholder that fails to surrender such Note(s) or satisfactorily explain its non-availability to the applicable Indenture Trustee within one hundred and twenty (120) days of the Effective Date shall be deemed to have no further Claim against the Debtors, the Reorganized Debtor or their property, the DIP Lenders, the DIP Agent, or the applicable Indenture Trustee in respect of such Claim and shall not participate in any Distribution hereunder. If any Distributions are unclaimed or cannot be made because a Noteholder has failed to comply with the provisions of this Article VII.I.3., such New Stock, cash or notes that would have been distributed to the applicable holder shall be retained by the applicable Reorganized Debtor.

### K.    **Distributions in Respect of Allowed Claims.**

1.    **Record Date for Distributions.**  As of the close of business on the Record Date, the various transfer registers for each of the Classes of Claims or Equity Interests as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes made to reflect any new record holders of any Claims or Equity Interests occurring on or after the Record Date.  The Debtors and the Reorganized Debtors shall have no obligation to recognize any transfer of any Claims or Equity Interests occurring after the Record Date.

2.    **Date of Distributions.**  Except as otherwise provided herein, Distributions and deliveries under this Plan with respect to Allowed Claims shall be made before the close of business on or as soon as reasonably practicable after the Effective Date.  Distributions on account of Unexchanged Notes Claims will be made to each holder of Unexchanged Notes as soon as reasonably practicable after the date on which such holder surrenders its Unexchanged Note(s) in accordance with Article VII.I.3 hereof.  In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

3.    **Disbursing Agent.**  Except as otherwise provided herein, all Distributions under this Plan shall be made by the Reorganized Debtors as Disbursing Agent or such other Entity (as defined in section 101(15) of the Bankruptcy Code) designated by the Reorganized Debtors to assist the Disbursing Agent on the Effective Date.  If the Disbursing Agent is an independent third party designated by the Reorganized Debtors to serve in such capacity, such Disbursing Agent shall receive, without further Court approval, reasonable compensation for distribution services rendered pursuant to this Plan and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services from the Reorganized Debtors on terms acceptable to the Reorganized Debtors.  No Disbursing Agent shall be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Court.  If otherwise so ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

4.    **Powers of Disbursing Agent.**  The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder, (ii) make all Distributions contemplated hereby, and (iii) exercise such other powers as may be vested in the Disbursing Agent by Final Order of the Court or pursuant to this Plan.

5.    **Delivery of Distributions.**  Except as otherwise provided herein, the Disbursing Agent shall make Distributions to holders of Allowed Claims at the address for each holder indicated on the Debtors' records as of the date of any such Distribution unless such addresses are superseded by Proofs of Claim or transfers of Claim filed pursuant to Bankruptcy Rule 3001 by the Record Date.  If any Distribution to a holder of a Claim is returned as undeliverable, no further Distributions shall be made unless and until the Disbursing Agent is notified of the then-current address of such holder of the Claim, at which time all missed

distributions shall be made to such holder of the Claim without interest.  Amounts in respect of undeliverable distributions shall be returned to the Reorganized Debtors until such Distributions are claimed.  The Reorganized Debtors shall make reasonable efforts to locate holders of undeliverable Distributions.

Except as otherwise provided herein, all Distributions to holders of DIP Facilities Claims shall be governed by the DIP Credit Agreement.

Except as otherwise provided herein, all Distributions to holders of GSO Notes Claims, Kelso Notes Claims, and Unexchanged Notes Claims shall be governed by the 2015 Indenture and the 2010 Indenture, as applicable, and shall be deemed completed when made to their respective Indenture Trustees unless otherwise agreed to, in each case, by the Indenture Trustees, who shall in turn make Distributions in accordance with the 2010 Indenture and the 2015 Indenture, as applicable, for further distribution to holders of GSO Claims, Kelso Notes Claims, and Unexchanged Notes Claims; *provided* that the Debtors reserve the right to include in the Confirmation Order a protocol under which holders of Notes are required to submit information necessary to validate their Notes holdings and to receive their New Stock.

6.      **Distribution of Cash.**  Any payment of Cash by the Reorganized Debtors pursuant to this Plan shall be made at the option and in the sole discretion of the Reorganized Debtors by (i) a check drawn on, or (ii) wire transfer from, a U.S. domestic bank selected by the Reorganized Debtors; *provided that,* any Cash paid to the Revolving Facility Lenders or Revolving Facility Agent shall be made by wire transfer.

7.      **Unclaimed Distributions.**  Any Distribution under this Plan, other than a distribution of New Stock to holders of Notes, which shall be subject to a Court approved distribution protocol, that is unclaimed six (6) months after the Disbursing Agent has delivered (or has attempted to deliver) such Distribution shall become the property of the Reorganized Debtor against which such Claim was Allowed notwithstanding any federal or state escheat, abandoned or unclaimed property laws to the contrary, and the entitlement by the holder of such unclaimed Allowed Claim to such Distribution or any subsequent Distribution on account of such Allowed Claim shall be discharged and forever barred; *provided*, *however*, that in the event such Distribution relates to a General Unsecured Claim, the Disbursing Agent shall redistribute such Distribution to the remaining holders of Allowed General Unsecured Claims on a Pro Rata basis.  In the case of any unclaimed Distributions of New Stock that remain unclaimed for six (6) months after the Disbursing Agent has delivered (or attempted to deliver) such Distribution, such unclaimed New Stock shall be forfeited, and the holder of the Allowed Claim otherwise entitled to receive such New Stock shall have forever forfeited its right to receive any recovery or Distribution under this Plan on account of its Allowed Claim.

8.      **Fractional New Stock and De Minimis Distributions.**  Notwithstanding any other provision in this Plan to the contrary, no fractional units of New Stock shall be issued or distributed pursuant to this Plan.  Whenever any payment of a fraction of a unit of New Stock would otherwise be required under this Plan, the actual Distribution made shall reflect a rounding of such fraction to the nearest whole share (up or down), with half Interests or less being rounded down and fractions in excess of a half of an Interest being rounded up.  Any holder whose Claim has been so rounded down shall not be entitled to receive any compensation

whatsoever on account of such reduction.  If two or more holders are entitled to equal fractional entitlements and the number of holders so entitled exceeds the number of whole Interests, as the case may be, which remain to be allocated, the Reorganized Debtors shall allocate the remaining whole units to such holders by random lot or such other impartial method as the Reorganized Debtors deem fair, in their sole discretion. Upon the allocation of all of the whole New Stock authorized under this Plan, all remaining fractional portions of the entitlements shall be canceled and shall be of no further force and effect.

The Debtors or the Reorganized Debtors, as the case may be, shall not be required to, but may in their discretion, make distributions to any holder of a Claim of Cash in an amount less than twenty-five dollars ($25).  In addition, the Debtors and the Reorganized Debtors shall not be required to, but may in their discretion, make any payment on account of any Claim in the event that the costs of making such payment exceeds the amount of such payment.

9.     **Interest on Claims.**  Except as expressly provided for in this Plan, the Confirmation Order or any contract, instrument, release, settlement or other agreement entered into in connection with this Plan, or as required by applicable bankruptcy law, including sections 511 and 1129(a)(9)(C)-(D) of the Bankruptcy Code, post-Petition Date interest shall not be treated as accruing in respect of any Claim for purposes of determining the allowance of, and Distribution for or on account of, such Claim.

10.     **Withholding and Reporting Requirements.**  In connection with this Plan and all instruments issued in connection therewith, the Disbursing Agent shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all Distributions under this Plan shall be subject to any such withholding or reporting requirements.

11.     **Setoffs.**  Except as otherwise expressly provided in this Plan, the Debtors and the Reorganized Debtors, as applicable, may, but shall not be required to, set off against any Claim (for purposes of determining the Allowed amount of such Claim on which Distribution shall be made), any claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claim the Debtors or the Reorganized Debtors may have against the holder of such Claim. Nothing in this Plan shall be deemed to expand rights to setoff under applicable non-bankruptcy law.

12.     **Allocation of Consideration.**  To the extent that any Allowed Claim entitled to a Distribution under this Plan is comprised of indebtedness and, accrued but unpaid interest thereon, the consideration distributed to the holder of such Allowed Claim shall be treated as first satisfying the principal amount of such Claim (as determined for federal income tax purposes), and any remaining consideration shall be treated as satisfying accrued but unpaid interest.

L.    **Resolution of Disputed Claims.**

1.    **Objections to Claims.**    From and after the Effective Date, the Reorganized Debtors shall have the right to object to any and all Claims that have not been previously Allowed.  Any objections to Claims shall be filed and served on or before the later of (i) one hundred and eighty (180) days after the Effective Date, and (ii) such later date as may be fixed by the Court upon a motion by the Reorganized Debtors without notice to any party or a hearing, which later date may be fixed before or after the date specified in clause (i) above.  No objection shall be required with respect to a Proof of Claim filed after the applicable Bar Date, and any and all such Claims shall be deemed disallowed unless otherwise ordered by the Court after notice and a hearing.  Objections to Professional Fee Claims shall be filed and served in accordance with Article III.B.

2.    **Settlement of Claims.**    Notwithstanding the requirements that may be imposed pursuant to Bankruptcy Rule 9019, from and after the Effective Date, the Reorganized Debtors shall have the authority to settle or compromise any claim or objections or proceedings relating to the allowance of Claims as and to the extent deemed prudent and reasonable without further review or approval of the Court and without the need to file a formal objection, subject to the consultation rights of the Ombudsman provided for herein.  Nothing in this Article VII.K shall be deemed to affect or modify the applicable Bar Dates previously established in the Chapter 11 Cases.

3.    **Participation of Ombudsman.**    The Reorganized Debtors shall consult with the Ombudsman prior to (a) taking any action or failing to take any action (i) to object or to otherwise challenge a General Unsecured Claim that is asserted in an amount (or, in the case of an unliquidated General Unsecured Claim, that the Debtors reasonably believe may be asserted in an amount) equal to or in excess of $250,000 or (ii) that would result in the allowance of a General Unsecured Claim in an amount equal to or in excess of $250,000, or (b) making any amendment to the Schedules that would result in an Allowed General Unsecured Claim in an amount equal to or in excess of $250,000.  The Reorganized Debtors shall pay the reasonable documented fees and expenses of the Ombudsman in an amount not to exceed $50,000.

4.    **No Distributions Pending Allowance.**    Notwithstanding any other provision hereof, if any portion of a Claim is a Disputed Claim, no payment or Distribution provided hereunder shall be made on account of the disputed portion of such Claim until the disputed portion of such Claim becomes an Allowed Claim.

5.    **General Unsecured Claim Cash Pool.**    On the Effective Date or as soon as practicable thereafter, the Reorganized Debtors shall establish the General Unsecured Claim Cash Pool.  Cash held in the General Unsecured Claim Cash Pool shall be held by the Reorganized Debtors in trust in a segregated account for the benefit of holders of Allowed General Unsecured Claims.  Cash held in the General Unsecured Claim Cash Pool shall not constitute property of the Reorganized Debtors.  Each holder of a Disputed General Unsecured Claim that becomes an Allowed General Unsecured Claim shall have recourse only to the undistributed Cash in the General Unsecured Claim Cash Pool for satisfaction of such Allowed General Unsecured Claim and not to any Reorganized Debtor.

6.      **Distributions after Allowance.**  In the event that a Disputed Claim becomes an Allowed Claim, the Disbursing Agent shall distribute to the holder of such Claim such holder's Pro Rata portion of the property distributable with respect to the Class in which such Claim is classified herein.  To the extent that all or a portion of a Disputed Claim is disallowed, the holder of such Claim shall not receive any Distributions on account of the portion of such Claim that is disallowed and any property withheld pending the resolution of such Claim shall be reallocated Pro Rata to the holders of Allowed Claims in the same Class. Nothing set forth herein is intended to, nor shall it, prohibit the Reorganized Debtors, in their sole discretion, from making a Distribution on account of any Claim at any time after such Claim becomes an Allowed Claim.  Notwithstanding anything to the contrary in this Plan, no distributions shall be made from the General Unsecured Claim Cash Pool until all Disputed General Unsecured Claims are resolved and either become Allowed or disallowed by Final Order or estimated by Final Order for purposes of distribution.

7.      **Interest on Disputed Claims.**  Unless otherwise specifically provided for in this Plan or as otherwise required by sections 506(b), 511 or 1129(a)(9)(C)-(D) of the Bankruptcy Code, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final Distribution is made when and if such Disputed Claim becomes and Allowed Claim.

8.      **Estimation of Claims.**  The Debtors or the Reorganized Debtors may at any time request that the Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code or other applicable law regardless of whether the Debtors or the Reorganized Debtors have previously objected to such Claim or whether the Court has ruled on any such objection.  The Court will retain jurisdiction to estimate any Claim at any time during the pendency of litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  In the event that the Court estimates any Disputed Claim, such estimated amount shall constitute either (a) the Allowed amount of such Claim, (b) the amount on which a reserve is to be calculated for purposes of any reserve requirement to this Plan or (c) a maximum limitation on such Claim, as determined by the Court.  If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the Reorganized Debtors, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Court.

**M.      Issuance of New Secured Notes.**

Subject to the terms hereof, on the Effective Date, to the extent applicable, the Reorganized Debtors shall execute and deliver the New Secured Notes on the terms set forth herein and otherwise in form and substance satisfactory to the Supporting Lenders and the Required Supporting Noteholders.  If applicable, confirmation of this Plan shall be deemed to constitute approval of the New Secured Notes, and, subject to the occurrence of the Effective Date, authorization for the Reorganized Debtors to enter into and perform their obligations in connection with the New Secured Notes.  All parties receiving the New Secured Notes under the Plan, upon receipt thereof, are deemed bound to the terms of the New Secured Notes and subject to the terms of the Exit Financing Intercreditor Agreement.

On the Effective Date, to the extent that they are executed and delivered by the Reorganized Debtors, the New Secured Notes shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms. The financial accommodations to be extended pursuant to the New Secured Notes are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law.  On the Effective Date, all of the Liens and security interests to be granted in accordance with the New Secured Notes (1) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New Secured Notes, (2) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the New Secured Notes, and (3) except as expressly permitted in the New Secured Notes, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.  The Reorganized Debtors and the entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of this Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

## VIII.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.    Assumption and Rejection of Executory Contracts and Unexpired Leases.

Except as otherwise provided herein or in any contract, instrument, release, indenture or other agreement or document entered into in connection with this Plan, as of the Effective Date, all executory contracts and unexpired leases governed by section 365 of the Bankruptcy Code to which any of the Debtors are parties are hereby rejected except for any executory contract or unexpired lease that (i) previously has been assumed or rejected by the Debtors in the Chapter 11 Cases, (ii) previously expired or terminated pursuant to its own terms; (iii) is specifically identified on the Schedule of Assumed Contracts and Leases, or (iv) is the subject of a separate motion to assume or reject such executory contract or unexpired lease filed by the Debtors under section 365 of the Bankruptcy Code prior to the Effective Date.  The Debtors reserve the right to amend the Schedule of Assumed Contracts and Leases at any time prior to the Effective Date, subject to the consent of the Required Supporting Noteholders, the Supporting Lenders, and the Supporting Interest Holders.

B.      <u>Cure</u>.

Except to the extent that different treatment has been agreed to by the non-Debtor party or parties to any executory contract or unexpired lease to be assumed pursuant to Article VIII.A hereof, not less than fifteen (15) Business Days prior to the Confirmation Hearing, the Debtors shall, pursuant to the provisions of sections 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code, and consistent with the requirements of section 365 of the Bankruptcy Code, file and serve a notice with the Court listing the cure amounts of all executory contracts or unexpired leases to be assumed.  The parties to such executory contracts or unexpired leases to be assumed by the Debtors shall have ten (10) Business Days from service of such pleading to object to the cure amounts listed by the Debtors.  If there are any objections filed with respect thereto, the Court shall conduct a hearing to consider such cure amounts and any objections thereto.  The Debtors shall retain their right to reject any of their executory contracts or unexpired leases that are the subject of an objection to assumption, including any executory contracts or unexpired leases that are subject to a dispute concerning amounts necessary to cure any defaults, and any such executory contract or unexpired lease shall neither be assumed nor rejected until such time as the objection is resolved, either by agreement of the parties or following entry of a Final Order.

All undisputed cure amounts shall be paid on the Effective Date or as soon as reasonably practicable thereafter.  Any cure amount that remains disputed as of the Effective Date shall be paid as soon as practicable after the resolution of the dispute with respect to the cure amount, either by agreement of the parties or following entry of a Final Order.

C.      <u>Rejection Damage Claims</u>.

Any and all Claims for damages arising from the rejection of an executory contract or unexpired lease must be filed with the Court in accordance with the terms of the Final Order authorizing such rejection, but in no event later than thirty (30) days after the Effective Date to the extent an earlier time has not been established by the Court.  Any Claims for damages arising from the rejection of an executory contract or unexpired lease that is not filed within such time period will be forever barred from assertion against the Debtors, their respective Estates and the Reorganized Debtors.  All Allowed Claims arising from the rejection of executory contracts or unexpired leases shall be treated as General Unsecured Claims.

D.      <u>Restrictions on Assignment Void</u>.

Any executory contract or unexpired lease assumed or assumed and assigned shall remain in full force and effect to the benefit of the transferee or assignee in accordance with its terms, notwithstanding any provision in such executory contract or unexpired lease (including those of the type described in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer or assignment, including based on any change of control provision.  Any provision that prohibits, restricts, or conditions the assignment or transfer of any such executory contract or unexpired lease, terminates or modifies such executory contract or unexpired lease or allows the counterparty to such executory contract or unexpired lease to terminate, modify, recapture, impose any penalty, condition renewal or extension, or modify any term or condition thereof (including on account of any change of control provision) on any such

transfer or assignment, constitutes an unenforceable anti-assignment provision and is void and of no force or effect, but only in connection with the assumption or assumption and assignment of executory contracts and unexpired leases under this Plan.

No sections or provisions of any executory contract or unexpired lease that purport to provide for additional payments, penalties, charges, rent acceleration, or other financial accommodations in favor of the non-debtor third party thereto shall have any force and effect with respect to the transactions contemplated hereunder, and such provisions constitute unenforceable anti-assignment provisions under section 365(f) of the Bankruptcy Code and are otherwise unenforceable under section 365(e) of the Bankruptcy Code, but only in connection with the assumption or assumption and assignment of executory contracts and unexpired leases under this Plan.

E.    **Benefit Plans.**

As of and subject to the Effective Date, all employment and severance agreements and policies, and all employee compensation and benefit plans, policies, and programs of the Debtors applicable generally to their employees, including agreements and programs subject to section 1114 of the Bankruptcy Code, as in effect on the Effective Date, including all savings plans, retirement plans, health care plans, disability plans, severance benefit plans, incentive plans, and life, accidental death, and dismemberment insurance plans, and senior executive retirement plans, but expressly excluding any nonqualified deferred compensation plans that are treated as unfunded plan for tax purposes and Title I of ERISA, shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed under this Plan, and the Debtors' obligations under all such agreements and programs shall survive the Effective Date of this Plan, without prejudice to the Reorganized Debtors' rights under applicable nonbankruptcy law to modify, amend, or terminate the foregoing arrangements in accordance with the terms and provisions thereof, except for (i) such executory contracts or plans specifically rejected pursuant to this Plan (to the extent such rejection does not violate section 1114 of the Bankruptcy Code), and (ii) such executory contracts or plans as have previously been terminated, or rejected, pursuant to a Final Order, or specifically waived by the beneficiaries of such plans, benefits, contracts, or programs.

F.    **Workers' Compensation Obligations and ACE/Chubb Insurance Contracts.**

Subject to Article VIII.F.1. of the Plan, (i) all applicable workers' compensation laws in states in which the Reorganized Debtors operate and (ii) all of the Debtors' obligations to employees under workers' compensation programs and laws are treated as executory contracts under this Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, with a cure amount of zero dollars.

1.    **Treatment of ACE/Chubb Insurance Contracts.**    Notwithstanding anything to the contrary in the Disclosure Statement, the Plan, the Plan Supplement, the Exit Financing Facility Documents, the Confirmation Order, any other document related to any of the foregoing or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening (including, but not limited to, Article VIII.E of the Plan), grants an injunction, release, confers Bankruptcy Court jurisdiction or

requires a party to opt out of any releases): (a) on the Effective Date, the Reorganized Debtors jointly and severally shall assume the ACE/Chubb Insurance Contracts in their entirety pursuant to sections 105 and 365 of the Bankruptcy Code; (b) all ACE/Chubb Insurance Contracts (and any and all letters of credit and other collateral and security provided pursuant or in relation thereto) and all debts, obligations, and liabilities of Debtors (and, after the Effective Date, of the Reorganized Debtors) thereunder, whether arising before or after the Effective Date, shall survive and shall not be amended, modified, waived, released, discharged or impaired in any respect as a result of the confirmation of the Plan and occurrence of the Effective Date and the Reorganized Debtors will continue to be bound by the ACE/Chubb Insurance Contracts in accordance with their terms as if the Chapter 11 Cases had not occurred; (c) nothing in the Disclosure Statement, the Plan, the Plan Supplement, or the Confirmation Order shall affect, impair or prejudice the rights and defenses of the ACE/Chubb Insurers or the Reorganized Debtors under the ACE/Chubb Insurance Contracts in any manner (including, but not limited to, (i) any agreement to arbitrate disputes, (ii) any provisions regarding the provision, maintenance, use, nature and priority of collateral/security, and (iii) any provisions regarding the payment of amounts within any deductible by the ACE/Chubb Insurers and the obligation of the Debtors to pay or reimburse the applicable ACE/Chubb Insurer therefor), and such ACE/Chubb Insurers and the Reorganized Debtors shall retain all rights and defenses under the ACE/Chubb Insurance Contracts, and the ACE/Chubb Insurance Contracts shall apply to, and be enforceable by and against, the Reorganized Debtors and the applicable insurer(s) as if the Chapter 11 Cases had not occurred; (d) nothing in the Disclosure Statement, the Plan, the Plan Supplement, the Confirmation Order, any prepetition or administrative claim bar date order (or notice) or any other pleading, order or notice alters or modifies the duty, if any, that the ACE/Chubb Insurers have to pay claims covered by the ACE/Chubb Insurance Contracts and their right to seek payment or reimbursement from the Debtors (or after the Effective Date, the Reorganized Debtors) or draw on any collateral or security therefor, subject to any and all legal, equitable or contractual rights, remedies, claims, counterclaims, defenses or Causes of Action of the Debtors (or after the Effective Date, the Reorganized Debtors); (e) nothing in the Disclosure Statement, the Plan, or the Confirmation Order (including any other provision that purports to be preemptory or supervening), shall in any way operate to, or have the effect of, impairing any party's legal, equitable or contractual rights and/or obligations under any ACE/Chubb Insurance Contract, if any, in any respect; any such rights and obligations shall be determined under the ACE/Chubb Insurance Contracts and applicable non-bankruptcy law; (f) the claims of the ACE/Chubb Insurers arising (whether before or after the Effective Date) under the ACE/Chubb Insurance Contracts (I) shall be paid in full by the Debtors or Reorganized Debtors, as applicable, in the ordinary course of businesses, whether as an Allowed Administrative Claim under section 503(b)(1)(A) of the Bankruptcy Code or otherwise, regardless of when such amounts are or shall become liquidated, due or paid, and (II) shall not be discharged or released by the Plan or the Confirmation Order or any other order of the Bankruptcy Court; (g) the ACE/Chubb Insurers shall not need to or be required to file or serve any objection to a proposed cure amount or a request, application, claim, proof or motion for payment or allowance of any Administrative Claim and shall not be subject to the Administrative Claims Bar Date, any other bar date or similar deadline governing cure amounts or Administrative Claims; and (h) the automatic stay of section 362(a) of the Bankruptcy Code and the injunctions set forth in Article IX of the Plan, if and to the extent applicable, shall be deemed lifted without further order of this Court, solely to permit: (I) claimants with valid workers' compensation claims or direct action

claims to proceed with their claims against the Debtors (or the Reorganized Debtors) or the applicable insurers; (II) the insurers of the Debtors' workers' compensation programs to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Bankruptcy Court, (A) all valid workers' compensation claims arising under the workers' compensation policies issued by any insurer, (B) all claims where a claimant asserts a direct claim against any insurer under applicable non-bankruptcy law, or an order has been entered by this Court granting a claimant relief from the automatic stay to proceed with its claim, and (C) all costs in relation to each of the foregoing; (III) the ACE/Chubb Insurers to draw against any or all of the collateral or security provided by or on behalf of the Debtors (or the Reorganized Debtors, as applicable) at any time, subject to the terms and conditions of the applicable ACE/Chubb Insurance Contracts, and to hold the proceeds thereof as security for the obligations of the Debtors (and the Reorganized Debtors, as applicable) and/or apply such proceeds to the obligations of the Debtors (and the Reorganized Debtors, as applicable) under the applicable ACE/Chubb Insurance Contracts, in such order as the applicable Insurer may determine to the extent not inconsistent with the terms of the applicable insurance contract; and (IV) the ACE/Chubb Insurers to cancel any ACE/Chubb Insurance Contracts, and take other actions relating thereto, to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the ACE/Chubb Insurance Contracts; *provided* that the foregoing shall not modify or nullify any covenants or obligations of the Reorganized Debtors under the Exit Financing Facility Documents; *provided*, *further*, that for purposes of clarity, nothing in the Exit Financing Facility Documents shall modify or nullify any of the rights and/or obligations of the Reorganized Debtors and the ACE/Chubb Insurers under any ACE/Chubb Insurance Contract, including, without limitation, (A) the Exit Financing Facility Documents shall not grant Liens on, or security interests in, any and all collateral/security and the proceeds thereof (other than those granted in favor of the ACE/Chubb Insurers) provided by or on behalf of the Debtors as security for the obligations of the Debtors (and the Reorganized Debtors, as applicable) under the ACE/Chubb Insurance Contracts and (B) the ACE/Chubb Insurers' Liens and security interests in such collateral/security shall be considered permitted Liens and security interests under the Exit Financing Facility Documents.

## IX.

## EFFECT OF CONFIRMATION OF THIS PLAN

### A.    <u>Continued Corporate Existence</u>.

Except as otherwise provided herein, including as provided with respect to Reorganized Holding in Article V.B hereof, or as may be provided in the Confirmation Order, each Debtor will, as a Reorganized Debtor, continue to exist after the Effective Date as a separate corporate entity, or limited liability company, as the case may be, with all the powers thereof, pursuant to the applicable law in the jurisdiction in which each applicable Reorganized Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificates of incorporation and by-laws (or other formation documents) are amended by the Plan and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval.

B.    **Vesting of Assets.**

Except as otherwise provided in this Plan or any agreement, instrument, or other document incorporated herein, on the Effective Date all property in each Estate, all Causes of Action, and any other property acquired by any of the Debtors pursuant to this Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens granted to secure the Exit Financing Facilities and any Liens applicable to any capitalized leases existing on the Effective Date). On and after the Effective Date, except as otherwise provided in this Plan, each Reorganized Debtor may operate its business and conduct its affairs, and may use, acquire, or dispose of its property and assets and compromise or settle any Claims, Interests, or Causes of Action (excluding Avoidance Actions) without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

C.    **Preservation of Causes of Action.**

Subject to the releases and exculpations set forth in the Plan, the Interim DIP Order, the Final DIP Order, and the DIP Credit Agreement, in accordance with section 1123(b)(3) of the Bankruptcy Code, the Debtors and the Reorganized Debtors shall retain all Litigation Rights (excluding Avoidance Actions), and nothing contained in this Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any such Litigation Rights (excluding Avoidance Actions). The Debtors may (but are not required to) enforce all Litigation Rights (excluding Avoidance Actions) and all other similar claims arising under applicable state laws, including fraudulent transfer claims, if any, and all other Causes of Action (excluding Avoidance Actions) of a trustee and debtor-in-possession under the Bankruptcy Code. Except as otherwise set forth in this Plan, the Reorganized Debtors, as applicable, in their sole and absolute discretion, shall determine whether to bring, settle, release, compromise, or enforce any such Litigation Rights (or decline to do any of the foregoing), and shall not be required to seek further approval of the Court for such action. Except as otherwise set forth in this Plan, the Debtors, the Reorganized Debtors, or any successors thereof may pursue such Litigation Rights (excluding Avoidance Actions) in accordance with the best interests of the Reorganized Debtors or any successors holding such rights of action.

D.    **Discharge of the Debtors.**

Pursuant to section 1141(d) of the Bankruptcy Code, except as otherwise specifically provided in this Plan or in the Confirmation Order, the Distributions and rights that are provided in this Plan shall be in complete satisfaction, discharge and release, effective as of the Effective Date, of any and all Claims and Causes of Action (whether known or unknown) against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property or assets shall have been distributed or retained pursuant to this Plan on account of such Claims, rights, and Interests, including Claims and Interests that arose before the Effective Date, any liability (including withdrawal liability to the extent such Claims relate to services performed by employees of the Debtors prior to the Petition Date and that arise from a termination of employment or a termination of any employee or retiree benefit program which occurred prior to the Effective Date), and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy

Code, in each case whether or not (a) a Proof of Claim or Interest based upon such Claim, debt, right, or Interest was filed, is filed, or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim or Interests based upon such Claim, debt, right, or Interest is Allowed under section 502 of the Bankruptcy Code, or (c) the holder of such a Claim, right, or Interest accepted this Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims against and Interests in the Debtors, subject to the terms thereof and the occurrence of the Effective Date.

       E.       <u>**Releases by the Debtors of Certain Parties**</u>.

**TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, PURSUANT TO SECTION 1123(B)(3) OF THE BANKRUPTCY CODE, FOR GOOD AND VALUABLE CONSIDERATION, INCLUDING THE ACTIONS OF THE *RELEASED PARTIES* TO FACILITATE THE REORGANIZATION OF THE DEBTORS AND THE IMPLEMENTATION OF THE RESTRUCTURING CONTEMPLATED BY THE PLAN, EFFECTIVE AS OF THE *EFFECTIVE DATE*, EACH DEBTOR, IN ITS INDIVIDUAL CAPACITY AND AS A DEBTOR IN POSSESSION FOR ITSELF AND ON BEHALF OF ITS *ESTATE*, AND ANY *PERSON* CLAIMING THROUGH, ON BEHALF OF, OR FOR THE BENEFIT OF EACH DEBTOR AND ITS *ESTATE*, SHALL RELEASE AND DISCHARGE AND BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED ALL *RELEASED PARTIES* FOR AND FROM ANY AND ALL *CLAIMS* OR *CAUSES OF ACTION* EXISTING AS OF THE *EFFECTIVE DATE* OR THEREAFTER WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, ARISING FROM OR RELATED TO ANY ACTIONS, TRANSACTIONS, EVENTS OR OMISSIONS OCCURRING ON OR BEFORE THE *EFFECTIVE DATE* RELATING TO THE DEBTORS, THE *CHAPTER 11 CASES* OR THE OBLIGATIONS UNDER THE *2010 INDENTURE*, THE *2015 INDENTURE*, THE *DIP FACILITIES*, AND THE *CREDIT AGREEMENT*; <u>PROVIDED</u>, <u>HOWEVER</u>, THE FOREGOING RELEASE SHALL NOT APPLY TO POST-*EFFECTIVE DATE* OBLIGATIONS ARISING UNDER THE PLAN OR ANY DOCUMENT, INSTRUMENT OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE *PLAN SUPPLEMENT* AND THE *EXIT FINANCING FACILITIES*) EXECUTED TO IMPLEMENT THE PLAN. THE REORGANIZED DEBTORS SHALL BE BOUND, TO THE SAME EXTENT THAT THE DEBTORS ARE BOUND, BY THE RELEASES AND DISCHARGES SET FORTH ABOVE.**

       F.       <u>**Releases by Non-Debtors**</u>.

**TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, FOR GOOD AND VALUABLE CONSIDERATION, INCLUDING THE ACTIONS OF THE *RELEASED PARTIES* TO FACILITATE THE REORGANIZATION OF THE DEBTORS AND THE IMPLEMENTATION OF THE RESTRUCTURING CONTEMPLATED BY THE PLAN, ON THE *EFFECTIVE DATE*, EACH *PERSON* WHO DIRECTLY OR INDIRECTLY, HAS HELD, HOLDS, OR MAY HOLD ANY *CLAIM* AGAINST THE DEBTORS OR *INTEREST* IN THE DEBTORS SHALL RELEASE AND DISCHARGE AND BE DEEMED TO HAVE CONCLUSIVELY,**

ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED ALL *RELEASED PARTIES* FOR AND FROM ANY AND ALL *CLAIMS* OR *CAUSES OF ACTION* EXISTING AS OF THE *EFFECTIVE DATE* OR THEREAFTER WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, ARISING FROM OR RELATED TO ANY ACTIONS, TRANSACTIONS, EVENTS OR OMISSIONS OCCURRING ON OR BEFORE THE *EFFECTIVE DATE* RELATING TO THE DEBTORS, THE *CHAPTER 11 CASES* OR THE OBLIGATIONS UNDER THE *2010 INDENTURE*, THE *2015 INDENTURE*, THE *DIP FACILITIES*, AND THE *CREDIT AGREEMENT*; <u>PROVIDED</u>, <u>HOWEVER</u>, THE FOREGOING RELEASE SHALL NOT APPLY TO POST-*EFFECTIVE DATE* OBLIGATIONS ARISING UNDER THE PLAN OR ANY DOCUMENT, INSTRUMENT OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE *PLAN SUPPLEMENT* AND THE *EXIT FINANCING FACILITIES*) EXECUTED TO IMPLEMENT THE PLAN; <u>PROVIDED</u>, <u>FURTHER</u>, <u>HOWEVER</u>, THAT NOTWITHSTANDING ANY LANGUAGE TO THE CONTRARY CONTAINED IN THE PLAN AND/OR CONFIRMATION ORDER, NO PROVISION OF THE PLAN OR CONFIRMATION ORDER SHALL (A) PRECLUDE THE SECURITIES AND EXCHANGE COMMISSION FROM ENFORCING ITS POLICE OR REGULATORY POWERS OR (B) RELEASE ANY NON-DEBTOR FROM LIABILITY IN CONNECTION WITH ANY LEGAL OR EQUITABLE ACTION OR CLAIM BROUGHT BY THE SECURITIES AND EXCHANGE COMMISSION.

G.    <u>Exculpation</u>.

EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THIS PLAN, THE *PLAN SUPPLEMENT* OR RELATED DOCUMENTS, NO *EXCULPATED PARTY* SHALL HAVE OR INCUR ANY LIABILITY TO ANY ENTITY FOR ANY PREPETITION OR POSTPETITION ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH, OR RELATED TO, OR ARISING OUT OF THE *CHAPTER 11 CASES*, THE FILING OF THE *CHAPTER 11 CASES*, THE FORMULATION, PREPARATION, NEGOTIATION, DISSEMINATION, FILING, IMPLANTATION, ADMINISTRATION, CONFIRMATION OR CONSUMMATION OF THIS PLAN, THE DISCLOSURE STATEMENT, THE EXHIBITS TO THIS PLAN AND THE DISCLOSURE STATEMENT, THE *PLAN SUPPLEMENT* DOCUMENTS, ANY EMPLOYEE BENEFIT PLAN, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT CREATED, MODIFIED, AMENDED OR ENTERED INTO IN CONNECTION WITH THIS PLAN, EXCEPT FOR THEIR WILLFUL MISCONDUCT OR GROSS NEGLIGENCE AS DETERMINED BY A *FINAL ORDER* AND EXCEPT WITH RESPECT TO OBLIGATIONS ARISING UNDER CONFIDENTIALITY AGREEMENTS, JOINT INTEREST AGREEMENTS, OR PROTECTIVE ORDERS, IF ANY, ENTERED DURING THE *CHAPTER 11 CASES*; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT EACH *EXCULPATED PARTY* SHALL BE ENTITLED TO ASSERT APPLICABLE AFFIRMATIVE DEFENSES, IF ANY.

H.    __Injunction.__

THE SATISFACTION, RELEASE, AND DISCHARGE PURSUANT TO THIS ARTICLE IX SHALL ACT AS A PERMANENT INJUNCTION AGAINST ANY ENTITY COMMENCING OR CONTINUING ANY ACTION, EMPLOYMENT OF PROCESS, OR ACT TO COLLECT, OFFSET OR RECOVER ANY *CLAIM*, *INTEREST*, OR *CAUSE OF ACTION* SATISFIED, RELEASED, OR DISCHARGED UNDER THIS PLAN TO THE FULLEST EXTENT AUTHORIZED OR PROVIDED BY THE BANKRUPTCY CODE, INCLUDING TO THE EXTENT PROVIDED FOR OR AUTHORIZED BY SECTIONS 524 OR 1141 OF THE BANKRUPTCY CODE.

WITHOUT LIMITING THE FOREGOING, FROM AND AFTER THE *EFFECTIVE DATE*, ALL ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD *CLAIMS* AND *INTERESTS* THAT HAVE BEEN RELEASED OR DISCHARGED PURSUANT TO THIS ARTICLE IX, OR ARE SUBJECT TO *EXCULPATION* PURSUANT TO THIS ARTICLE IX, SHALL BE PERMANENTLY ENJOINED FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTORS, THE REORGANIZED DEBTORS, THE *RELEASED PARTIES* OR THE *EXCULPATED PARTIES*: (A) COMMENCING OR CONTINUING IN ANY MANNER ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY SUCH *CLAIMS* OR *INTERESTS*; (B) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH *CLAIMS* OR *INTERESTS*; (C) CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH *CLAIMS* OR *INTERESTS*; AND (D) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH *CLAIMS* OR *INTERESTS* RELEASED, EXCULPATED, OR SETTLED PURSUANT TO THE PLAN.

I.    __Term of Bankruptcy Injunction or Stays.__

All injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in this Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

J.    __Setoff.__

Notwithstanding anything herein, in no event shall any holder of a Claim be entitled to setoff any Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, unless such holder preserves its right to setoff by filing a motion  for authority to effect such setoff on or before the Confirmation Date (regardless of whether such

motion is heard prior to or after the Confirmation Date), and notwithstanding any indication in any proof of claim or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

### K.    Preservation of Insurance.

Subject to Article VIII.F.1. of the Plan, except as otherwise provided herein, the Debtors' discharge and release from all Claims as provided herein, except as necessary to be consistent with this Plan, shall not diminish or impair the enforceability of any insurance policy (including any ACE/Chubb Insurance Contracts) that may cover Claims against the Debtors or the Reorganized Debtors, including their officers and current and former directors, or any other person or entity.

### L.    Indemnification Obligations.

The Debtors' obligations to indemnify the Indemnified Parties shall survive and shall continue in full force and effect for the benefit of the Indemnified Parties, notwithstanding confirmation of and effectiveness of the Plan, and such indemnification shall include, but not be limited to, all actions taken in connection with the Restructuring Support Agreement, the Restructuring Support Agreement Term Sheet, the filing of the Chapter 11 Cases, the DIP Facilities, the Interim DIP Order, the Final DIP Order and the DIP Credit Agreement.

## X.

## EFFECTIVENESS OF THIS PLAN

### A.    Conditions Precedent to Confirmation.

It shall be a condition to confirmation of this Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article X.C hereof:

1.    the Confirmation Order, in form and substance reasonably acceptable to the Debtors, the Required Supporting Noteholders, the Supporting Lenders, the Supporting Interest Holders, the DIP Agent, and the Required Lenders shall have been entered and shall be in full force and effect and there shall not be a stay or injunction in effect with respect thereto; *provided* that the Confirmation Order shall be in form and substance reasonably acceptable to the Creditors' Committee with respect to any provision that is materially inconsistent with the terms of the Creditors' Committee Settlement; and

2.    this Plan, the Plan Supplement, and all of the schedules, documents, and exhibits contained therein shall have been filed in form and substance reasonably acceptable to the Debtors, the Required Supporting Noteholders, the Supporting Lenders, the Supporting Interest Holders, the DIP Agent, and the Required Lenders.

01:19300671.7

**B.    Conditions Precedent to the Effective Date.**

It shall be a condition to the Effective Date of this Plan that the following provisions, terms and conditions are approved or waived pursuant to the provisions of Article X.C hereof:

1.     the Confirmation Order, in form and substance reasonably acceptable to the Debtors, the Required Supporting Noteholders, the Supporting Lenders, the Supporting Interest Holders, the DIP Agent, and the Required Lenders shall have been entered by the Court ; *provided* that the Confirmation Order shall be in form and substance reasonably acceptable to the Creditors' Committee with respect to any provision that is materially inconsistent with the terms of the Creditors' Committee Settlement;

2.     the Confirmation Order shall have become a Final Order;

3.     the Confirmation Order shall have approved the limited substantive consolidation of the Debtors provided under Article VI of this Plan;

4.     the Exit First Lien Facility shall be executed, all conditions precedent to the consummation thereof shall been waived or satisfied in accordance with the terms thereof, the closing shall have occurred and the loans thereunder shall be funded or scheduled for funding upon consummation of this Plan (or, with respect to the Exit Revolving Facility, deemed funded as contemplated by Article IV.B.3 of this Plan);

5.     the Exit Second Lien Facility shall be executed, all conditions precedent to the consummation thereof shall been waived or satisfied in accordance with the terms thereof, the closing shall have occurred and the loans thereunder shall be deemed funded as contemplated by Article III.E of this Plan;

6.     the Reorganized Debtors shall be private, non-SEC reporting companies on the Effective Date;

7.     the Debtors shall have paid all fees and reasonable and documented out-of-pocket expenses payable to the Unanimous Supporting Noteholders, the Supporting Lenders, the Supporting Interest Holders, the Revolving Facility Agent, the DIP Agent, and the Indenture Trustees, including all reasonable and documented out-of-pocket fees and expenses of counsel and other professionals of the Unanimous Supporting Noteholders, the Supporting Lenders, the Supporting Interest Holders, the Revolving Facility Agent, the DIP Agent, and the Indenture Trustees;

8.     all authorizations, consents and regulatory approvals required (if any) for this Plan's effectiveness shall have been obtained; and

9.     the formation and governance documents for each of the Reorganized Debtors shall be consistent with this Plan and the Restructuring Support Agreement Term Sheet, and shall be reasonably acceptable to the Required Supporting Parties.

C.    **Waiver of Conditions.**

The conditions to confirmation of this Plan and to the Effective Date set forth in Article X.A and X.B hereof may be waived by the Debtors (with the consent of the Required Supporting Parties, the DIP Agent, and the Required Lenders, and solely as to Articles X.A.1. and X.B.1., the consent of the Creditors' Committee, if applicable) without notice, leave or order of the Court or any formal action other than proceeding to confirm or consummate this Plan.

D.    **Notice of Confirmation and Effective Date.**

On or before five (5) Business Days after the occurrence of the Effective Date, the Reorganized Debtors shall mail or cause to be mailed to all holders of Claims and Interests a notice that informs such holders of (i) the entry of the Confirmation Order, (ii) the occurrence of the Effective Date, (iii) the occurrence of the Administrative Claims Bar Date and deadline for submission of Professional Fee Claims, and (iv) such other matters as the Debtors deem appropriate.

E.    **Effect of Failure of Conditions.**

In the event that the Effective Date does not occur:  (a) the Confirmation Order shall be vacated; (b) no Distributions under this Plan shall be made; (c) the Debtors and all holders of Claims and Equity Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred; and (d) the Debtors' obligations with respect to Claims and Equity Interests shall remain unchanged and nothing contained in this Plan shall (i) constitute or be deemed a waiver or release of any Claims against or any Equity Interests in  the Debtors or any other Person, (ii) prejudice in any manner any right, remedy or claim of the Debtors or any Person in any further proceedings involving the Debtors or otherwise, or (iii) be deemed an admission against interest by the Debtors or any other Person.

F.    **Vacatur of Confirmation Order.**

If a Final Order denying confirmation of this Plan is entered, or if the Confirmation Order is vacated, then this Plan shall be null and void in all respects, and nothing contained in this Plan shall (a) constitute a waiver or release of any Claims against or Equity Interests in the Debtors, (b) prejudice in any manner the rights of the holder of any Claim against, or Equity Interest in, the Debtors, (c) prejudice in any manner any right, remedy or claim of the Debtors, or (d) be deemed an admission against interest by the Debtors.

G.    **Revocation, Withdrawal, Modification or Non-Consummation.**

The Debtors reserve the right to revoke, withdraw, amend or modify this Plan at any time prior to the Confirmation Date (in each case subject to the consent of the Required Supporting Parties, the DIP Agent, and the Required Lenders, except as otherwise provided in Article XII.C of this Plan).  If the Debtors revoke or withdraw this Plan, the Confirmation Order is not entered, or the Effective Date does not occur, (i) this Plan shall be null and void in all respects, (ii) any settlement or compromise embodied in this Plan (including the fixing or limiting the amount of any Claim or Class of Claims), assumption or rejection of executory

contracts or leases effected by this Plan, and any document or agreement executed pursuant to this Plan shall be deemed null and void, and (iii) nothing contained in this Plan, and no acts taken in preparation for consummation of this Plan, shall (a) constitute or be deemed a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors or any other Person, (b) prejudice in any manner any right, remedy or claim of the Debtors or any other Person in any further proceeding involving the Debtors or otherwise, or (c) constitute an admission against interest by the Debtors or any other Person.

## XI.

## RETENTION OF JURISDICTION

The Court shall have exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and this Plan pursuant to, and for the purposes of, section 105(a) and section 1142 of the Bankruptcy Code and for, among other things, the following purposes:

1.     to hear and determine motions for the assumption or rejection of executory contracts or unexpired leases pending on the Confirmation Date, and the allowance of Claims resulting therefrom;

2.     to determine any other applications, adversary proceedings, and contested matters pending on the Effective Date;

3.     to ensure that Distributions to holders of Allowed Claims are accomplished as provided herein;

4.     to resolve disputes as to the ownership of any Claim or Equity Interest;

5.     to hear and determine timely objections to Claims;

6.     to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

7.     to issue such orders in aid of execution of this Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

8.     to consider any modifications of this Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Court, including the Confirmation Order;

9.     to hear and determine all applications for compensation and reimbursement of expenses of Professionals under sections 328, 330, 331 and 503(b) of the Bankruptcy Code;

10.     to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan;

11.     to hear and determine any issue for which this Plan requires a Final Order of the Court;

12.     to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

13.     to hear and determine disputes arising in connection with compensation and reimbursement of expenses of professionals for the Supporting Lenders, the Unanimous Supporting Noteholders, the Supporting Interest Holders, the Revolving Facility Agent, the DIP Agent, and the Indenture Trustees for services rendered and expenses incurred during the period commencing on the Petition Date through and including the Effective Date;

14.     to hear and determine any Causes of Action (excluding Avoidance Actions) preserved under this Plan under Bankruptcy Code sections 544, 547, 548, 549, 550, 551, 553, and 1123(b)(3);

15.     to hear and determine any matter regarding the existence, nature and scope of the Debtors' discharge;

16.     to hear and determine any matter regarding the existence, nature, and scope of the releases and exculpation provided in Article IX of this Plan; and

17.     to enter a final decree closing the Chapter 11 Cases.

Notwithstanding anything to the contrary in this Article XI, the Exit Revolving Facility, the Exit Revolving Credit Agreement and the Exit Second Lien Facility (and all related loan documents) shall be governed by the jurisdictional provisions therein and the Court shall not retain jurisdiction for matters under those agreements.

If the Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, then Article XI of this Plan shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## XII.

## MISCELLANEOUS PROVISIONS

**A.     Payment of Fees and Expenses of Supporting Lenders, Unanimous Supporting Noteholders, Supporting Interest Holders, Revolving Facility Agent, DIP Agent, and Indenture Trustees.**

On the Effective Date and from time to time thereafter, the Debtors or the Reorganized Debtors shall promptly pay in Cash in full (following receipt of an appropriate invoice in reasonable detail) all reasonable and documented fees and expenses incurred by the Supporting Lenders, the Unanimous Supporting Noteholders, the Supporting Interest Holders, the Revolving Facility Agent, the DIP Agent, and the Indenture Trustees and their advisors in connection with the restructuring described herein that have not previously been paid.  All amounts distributed and paid to the foregoing parties pursuant to this Plan shall not be subject to setoff, recoupment, reduction or allocation of any kind and shall not require the filing or

approval of any fee application; *provided* that such amounts shall be subject to the fee review provisions in Paragraph 10(c) of the Interim DIP Order prior to payment.

### B.    Modification of this Plan.

Subject to the limitations contained in this Plan: (1) the Debtors (with the consent of the Required Supporting Parties, the DIP Agent, and the Required Lenders, and the consent of the Creditors' Committee to the extent any amendment or modification is materially inconsistent with the terms of the Creditors' Committee Settlement) reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend, modify, revoke or withdraw this Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; and (2) after the entry of the Confirmation Order, the Debtors (with the consent of the Required Supporting Parties, the DIP Agent, and the Required Lenders, and the consent of the Creditors' Committee to the extent any amendment or modification is materially inconsistent with the terms of the Creditors' Committee Settlement) or the Reorganized Debtors, as the case may be, may, upon order of the Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code.

Entry of a Confirmation Order shall result in all modifications or amendments to this Plan occurring after the solicitation thereof being approved pursuant to section 1127(a) of the Bankruptcy Code.

Notwithstanding anything to the contrary herein, the Debtors may revoke or withdraw this Plan upon the occurrence of an unwaived "Termination Event" under (and as defined in) the Restructuring Support Agreement (other than a Termination Event caused by a breach by the Debtors); provided, however, that the Debtors reserve the right to fully or conditionally waive, on a prospective or retroactive basis, the effects of this paragraph in respect of any such Termination Event, with any such waiver effective only if in writing and signed by the Debtors.

### C.    Dissolution of Creditors' Committee.

The Creditors' Committee shall continue in existence until the Effective Date to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code.  On the Effective Date, the Creditors' Committee shall be dissolved and its members shall be deemed released of all their duties, responsibilities and obligations in connection with the Chapter 11 Cases or this Plan and its implementation, and the retention or employment of the Creditors' Committee's attorneys, financial advisors, and other agents shall terminate as of the Effective Date; *provided*, *however*, that following the Effective Date, the Creditors' Committee shall continue in existence and have standing and a right to be heard for the following limited purposes: filing and prosecuting applications for (x) allowances of compensation for professional services rendered and reimbursement of expenses incurred; or (y) reimbursement of expenses of members of the Creditors' Committee.

### D.    Votes Solicited in Good Faith.

The Debtors have, and upon confirmation of this Plan shall be deemed to have, solicited acceptances of this Plan in good faith and in compliance with the applicable provisions

of the Bankruptcy Code. The Debtors (and each of their respective affiliates, agents, directors, managers, officers, members, employees, advisors, and attorneys) have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of the securities offered and sold under this Plan and, therefore, are not, and on account of such offer and issuance will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or the offer or issuance of the securities offered and distributed under this Plan.

### E.      **Obligations Incurred After the Effective Date.**

Except as otherwise specifically provided for in this Plan, from and after the Effective Date, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Court, pay in Cash all obligations including the reasonable legal, professional, or other fees and expenses related to the implementation of this Plan incurred by the Reorganized Debtors. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation of services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order or approval of the Court.

### F.      **Request for Expedited Determination of Taxes.**

The Reorganized Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns (other than federal tax returns) filed by any of them, or to be filed by any of them, for any and all taxable periods ending after the Petition Date through the Effective Date.

### G.      **Determination of Tax Filings and Taxes.**

(a) For all taxable periods ending on or prior to, or including, the Effective Date, the Reorganized Debtors shall prepare and file (or cause to be prepared and filed) on behalf of the Debtors, all combined, consolidated or unitary tax returns, reports, certificates, forms or similar statements or documents for any group of entities that include the Debtors (collectively, "*Group Tax Returns*") required to be filed or that the Reorganized Debtors otherwise deem appropriate, including the filing of amended Group Tax Returns or requests for refunds.

(b) The Reorganized Debtors shall be entitled to the entire amount of any refunds and credits (including interest thereon) with respect to or otherwise relating to any taxes of the Debtors, including for any taxable period ending on or prior to, or including, the Effective Date.

### H.      **Governing Law.**

Unless a rule of law or procedure is supplied by Federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of Delaware shall govern the construction and implementation of this Plan, any agreements, documents, and instruments executed in connection with this Plan (except as otherwise set forth in those agreements or instruments, in which case the governing law of such agreements shall control). Corporate

governance matters shall be governed by the laws of the state of incorporation or formation of the applicable Debtor.

### I.        Filing or Execution of Additional Documents.

On or before the Effective Date, the Debtors (with the consent of the Required Supporting Noteholders, the Supporting Lenders, the Supporting Interest Holders, the DIP Agent, and the Required Lenders) or the Reorganized Debtors, shall file with the Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

### J.        Exemption From Transfer Taxes.

Pursuant to section 1146(c) of the Bankruptcy Code, (a) the issuance, transfer or exchange under this Plan of the New Stock, (b) the making or assignment of any lease or sublease, or (c) the making or delivery of any other instrument whatsoever, in furtherance of or in connection with this Plan shall not be subject to any stamp, real estate transfer, mortgage, recording sales or use or other similar tax.

### K.        Exemption for Issuance of New Stock and New Secured Notes.

The issuance of the New Stock and Distribution thereof to holders of Allowed GSO Notes Claims, Allowed Kelso Notes Claims, and Allowed Unexchanged Notes Claims to the extent that they are deemed Securities (as defined in the Securities Act of 1933, as amended), shall be authorized and exempt from registration under the securities laws solely to the extent permitted under section 1145 of the Bankruptcy Code, as of the Effective Date without further act or action by any person, unless required by provision of the relevant governance documents or applicable law, regulation, order or rule; and all documents evidencing the same shall be executed and delivered as provided for in this Plan or the Plan Supplement.

The issuance of the New Secured Notes, if any, and Distribution thereof to holders of Allowed Unexchanged Notes Claims under this Plan, to the extent that they are deemed Securities (as defined in the Securities Act of 1933, as amended), shall be authorized and exempt from registration under the securities laws solely to the extent permitted under section 1145 of the Bankruptcy Code, as of the Effective Date without further act or action by any person, unless required by provision of the relevant governance documents or applicable law, regulation, order or rule; and all documents evidencing the same shall be executed and delivered as provided for in this Plan or the Plan Supplement.

### L.        Waiver of Federal Rule of Civil Procedure 62(a).

The Debtors may request that the Confirmation Order include (a) a finding that Fed. R. Civ. P. 62(a) shall not apply to the Confirmation Order, and (b) authorization for the Debtors to consummate this Plan immediately after entry of the Confirmation Order.

**M.**    **Exhibits/Schedules.**

All Exhibits and schedules to this Plan and the Plan Supplement are incorporated into and constitute a part of this Plan as if set forth herein.

**N.**    **Notices.**

All notices, requests, and demands hereunder to be effective shall be in writing and unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

To the Debtors:
c/o Logan's Roadhouse, Inc.
3011 Armory Drive, Suite 300
Nashville, Tennessee 37204
Fax No.: (615) 884-9813
Attention: Keith Maib, Chief Restructuring Officer of Finance

with a copy to:

Young Conaway Stargatt & Taylor, LLP
1000 North King Street
Wilmington, DE 19801
Attention:  Robert S. Brady, Esq. and Edmon L. Morton, Esq.
rbrady@ycst.com
emorton@ycst.com

**O.**    **Plan Supplement.**

The Plan Supplement will be filed with the Clerk of the Court no later than seven (7) calendar days before the deadline to object to confirmation of the Plan, unless such date is further extended by order of the Court on notice to parties in interest.  The Plan Supplement may be inspected in the office of the Clerk of the Court during normal court hours and shall be available online at https://ecf.deb.uscourts.gov.  Holders of Claims or Existing Equity Interests may obtain a copy of the Plan Supplement upon written request to counsel to the Debtors in accordance with Article XII.N of this Plan or by accessing the website maintained by the Debtors' claims and noticing agent at https://www.donlinrecano.com/Clients/lr/Index.

**P.**    **Further Actions; Implementations.**

The Debtors shall be authorized to execute, deliver, file or record such documents, contracts, instruments, releases and other agreements and take such other or further actions as may be necessary to effectuate or further evidence the terms and conditions of this Plan.  From and after the Confirmation Date, the Debtors shall be authorized to take any and all steps and execute all documents necessary to effectuate the provisions contained in this Plan.

01:19300671.7

Q.     **Severability**.

If, prior to the entry of the Confirmation Order, any term or provision of this Plan is held by the Court to be invalid, void, or unenforceable, the Court, at the request of the Debtors (with the consent of the Required Supporting Parties, the DIP Agent, and the Required Lenders), shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

R.     **Entire Agreement**.

Except as otherwise indicated, this Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

S.     **Binding Effect**.

This Plan shall be binding on and inure to the benefit of the Debtors, the holders of Claims against and Equity Interests in the Debtors, and each of their respective successors and assigns, including each of the Reorganized Debtors, and all other parties in interest in the Chapter 11 Cases.

Subject to Article X of this Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of this Plan, the Plan Supplement and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors and any and all holders of Claims or Interests (regardless of whether such Claims or Interests are deemed to have accepted or rejected this Plan), all entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in this Plan, and any and all non-Debtor parties to the executory contracts and unexpired leases with the Debtors. All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to this Plan regardless of whether any holder of a Claim or debt has voted on this Plan.

T.     **No Change in Ownership or Control**.

Consummation of this Plan is not intended to and shall not constitute a change in ownership or change in control, as defined in any employment or other agreement or plan in effect on the Effective Date to which a Debtor is a party.

U.    **Substantial Consummation.**

On the Effective Date, this Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code; provided, however, that nothing herein shall prevent the Debtors or any other party in interest from arguing that substantial consummation of this Plan has occurred prior to the Effective Date.

V.    **Conflict.**

The terms of this Plan shall govern in the event of any inconsistency with the summaries of this Plan set forth in the Disclosure Statement. In the event of any inconsistency or ambiguity between and among the terms of this Plan, the Disclosure Statement, and the Confirmation Order, the terms of the Confirmation Order shall govern and control.

01:19300671.7

IN WITNESS WHEREOF, each Debtor has executed this Plan this 28th day of September, 2016.

ROADHOUSE HOLDING INC.

By: */s/ Nishant Machado*
Name: Nishant Machado
Title: Chief Restructuring Officer of Operations

ROADHOUSE INTERMEDIATE INC.

By: */s/ Nishant Machado*
Name: Nishant Machado
Title: Chief Restructuring Officer of Operations

ROADHOUSE MIDCO INC.

By: */s/ Nishant Machado*
Name: Nishant Machado
Title: Chief Restructuring Officer of Operations

ROADHOUSE PARENT INC.

By: */s/ Nishant Machado*
Name: Nishant Machado
Title: Chief Restructuring Officer of Operations

LRI HOLDINGS, INC.

By: */s/ Nishant Machado*
Name: Nishant Machado
Title: Chief Restructuring Officer of Operations

LOGAN'S ROADHOUSE, INC.

By: */s/ Nishant Machado*
Name: Nishant Machado
Title: Chief Restructuring Officer of Operations

LOGAN'S ROADHOUSE OF KANSAS, INC.

By: */s/ Nishant Machado*
Name: Nishant Machado
Title: Chief Restructuring Officer of Operations

LOGAN'S ROADHOUSE OF TEXAS, INC.

By: */s/ Nishant Machado*
Name: Nishant Machado
Title: Chief Restructuring Officer of Operations

# EXHIBIT B

**Disclosure Statement Order**

(TO BE PROVIDED ONCE ENTERED)

## EXHIBIT C

**Restructuring Support Agreement**

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.**

## RESTRUCTURING SUPPORT AGREEMENT

### August 8, 2016

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits and schedules attached hereto, and as may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms hereof, this "***Agreement***")[1] is entered into by and among the following parties:

(a) Roadhouse Holding Inc. ("***Roadhouse Holding***") and each of its direct and indirect subsidiaries that are party hereto (collectively, the "***Debtors***" and each such entity, a "***Debtor***");

(b) Kelso Investment Associates VIII, L.P. and KEP VI, LLC (together, the "***Supporting Interest Holders***") in their capacity as owners of Equity Interests in Roadhouse Holding;

(c) the undersigned holders or investment advisors or managers and discretionary accounts that hold claims[2] against certain of the Debtors under the Notes (collectively, the "***Supporting Noteholders***"), who have agreed to backstop debtor-in-possession financing under a debtor-in-possession financing agreement, in the form of DIP Credit Agreement attached as Exhibit D to the RSA Term Sheet, consisting of the New Money Facility (as defined in the DIP Credit Agreement) not to exceed $25 million and the Roll Up Facility (as defined in the DIP Credit Agreement, and together with the New Money Facility, the "***DIP Facilities***").  The backstop commitment amount for each initial Supporting Noteholder is set forth on **Schedule 2** hereto;

(d) JPMorgan Chase Bank, N.A., as administrative agent under the Credit Agreement (in such capacity, the "***Revolving Facility Agent***");

(e) the undersigned lenders holding 100% of the claims under the Credit Agreement (together, the "***Supporting Lenders***").  The Supporting Lenders and the Supporting Noteholders are together referred to herein as the "***Supporting Creditors***" and each such entity, as a "***Supporting Creditor***"; and

(f) each entity that becomes a Joining Party (as defined below) in accordance with Section 8 or Section 22 of this Agreement (each of the foregoing described in sub-clauses (a)

---

[1] Capitalized terms used but not otherwise defined in this Agreement shall have the meaning ascribed to such terms in the term sheet attached hereto as **Exhibit A** (the "***RSA Term Sheet***").

[2] As used herein the term "***claim***" has the meaning ascribed to such term as set forth in section 101(5) of the Bankruptcy Code.

through (f), a "***Party***" and, collectively, the "***Parties***").  Each of the Parties set forth in clauses (b) through (f) is a "***Supporting Party***" and they are collectively referred to herein as the "***Supporting Parties***."

## RECITALS

**WHEREAS**, the Parties have agreed to enter into certain restructuring and recapitalization transactions that will have the effect of modifying the Debtors' capital structure, including the Debtors' respective obligations and the Supporting Parties' respective claims and interests related to each of the following: (a) the Credit Agreement, (b) the Notes, and (c) the Equity Interests;

**WHEREAS**, as of the date hereof, the Supporting Lenders collectively hold 100% of the outstanding principal amount owed under the Credit Agreement;

**WHEREAS**, as of the date hereof, GSO and Kelso collectively hold 100% of the outstanding Notes issued under the 2015 Indenture;

**WHEREAS**, as of the date hereof, Carl Marks and Marblegate collectively hold over 57.5% of the outstanding Notes issued under the 2010 Indenture;

**WHEREAS**, the Debtors intend to commence voluntary reorganization cases (the "***Bankruptcy Cases***") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (such court, or another court of competent jurisdiction with respect to the subject matter, the "***Bankruptcy Court***") to effect the restructuring and recapitalization transactions through a pre-arranged chapter 11 plan of reorganization having the terms set forth in the RSA Term Sheet (as may be amended or supplemented from time to time in accordance with the terms of this Agreement, the "***Plan***"), all of which shall be on the terms and conditions described in this Agreement (such transactions, the "***Restructuring***");

**WHEREAS**, the Parties desire to express to one another their mutual support and commitment in respect of the matters discussed herein; and

**WHEREAS**, the Parties have engaged in arm's length, good faith discussions with the objective of reaching an agreement regarding the Restructuring.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

## AGREEMENT

**Section 1.  Definitive Documentation.**

(a) The definitive documents and agreements governing the Restructuring (collectively, the "***Restructuring Documents***") shall consist of: (i) this Agreement and the RSA Term Sheet; (ii) the documentation in respect of the proposed DIP Facilities (including the motion pursuant to sections 363 and 364 of the Bankruptcy Code to authorize the Debtors to obtain post-petition

secured financing (the "*DIP Financing Motion*"), the Interim DIP Order in the form attached as Exhibit C to the RSA Term Sheet, the order approving the DIP Financing Motion on a final basis (in form and substance reasonably satisfactory to the DIP Agent, the Required DIP Lenders, the Required Supporting Noteholders, the Supporting Lenders and the Debtors, the "*Final DIP Order*" and together with the Interim DIP Order, the "*DIP Orders*") and the DIP Credit Agreement together with all related loan documents (the "*DIP Loan Documents*")); (iii) the Plan (and all exhibits thereto); (iv) a disclosure statement for the Plan (the "*Disclosure Statement*"), the other solicitation materials in respect of the Plan (such materials, collectively, the "*Solicitation Materials*"), the motion to approve the Disclosure Statement, and the order entered by the Bankruptcy Court approving the Disclosure Statement and Solicitation Materials as containing, among other things, "adequate information" as required by section 1125 of the Bankruptcy Code (the "*Disclosure Statement Order*"); (v) the order entered by the Bankruptcy Court confirming the Plan (the "*Confirmation Order*"); (vi) the documentation with respect to the Exit Second Lien Facility and the Exit Revolving Facility or the Alternative Exit Facility, as applicable (with the proceeds of any such Alternative Exit Facility being used to indefeasibly pay in cash, in full and final satisfaction, settlement, release and discharge of and in exchange for the Obligations (as defined in the Credit Agreement) outstanding under the Credit Agreement (the "*Credit Agreement Obligations*"), and any outstanding undrawn letters of credit that have not been replaced or released as of the closing of such facility shall be cash collateralized at 105% of the face amount thereof pursuant to arrangements satisfactory to the issuers thereof), and in the case of the Exit Revolving Facility, in form and substance reasonably satisfactory to the Supporting Lenders; and (viii) such other documents or agreements as may be reasonably necessary to implement the Restructuring contemplated by this Agreement and the RSA Term Sheet.

(b) Each of the Restructuring Documents remains subject to negotiation and completion and shall, upon completion, contain terms, conditions, representations, warranties, and covenants consistent with this Agreement and the RSA Term Sheet and shall otherwise be in form and substance reasonably satisfactory to the Debtors, Supporting Lenders, the Required Supporting Noteholders and the Supporting Interest Holders.

(c) The transaction documents in the foregoing forms, with the foregoing required approvals or as otherwise modified pursuant to the terms of this Agreement are collectively referred to herein as the "*Approved Transaction Documents*").

(d) Each of the exhibits attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include the exhibits.  The terms of this Agreement and the exhibits shall whenever possible be read in a complementary manner; provided, that, to the extent there is a conflict between this Agreement and the exhibits, the conflicting term of this Agreement (excluding exhibits) shall control and govern; provided, further, that to the extent there is a conflict among the exhibits hereto, the conflicting term of the RSA Term Sheet shall control and govern.

**Section 2.  Representations of the Supporting Parties and the Debtors.**

Each of the Supporting Parties, severally and not jointly, hereby represents and warrants to the Debtors, and each of the Debtors hereby represents and warrants to the Supporting Parties

that, as of the Execution Date (as defined below), the following statements are true, correct, and complete:

(a) It has all requisite corporate, partnership, limited liability company or similar authority to execute this Agreement and carry out the transactions contemplated by, and perform its obligations contemplated under this Agreement; and the execution and delivery of this Agreement and the performance of such Party's obligations under this Agreement have been duly authorized by all necessary corporate, partnership, limited liability company or other similar action on its part.

(b) The execution, delivery, and performance by such Party of this Agreement does not violate (i) any provision of law, rule or regulation applicable to it or any of its subsidiaries or (ii) its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries.

(c) This Agreement is the legally valid and binding obligation of such Party, enforceable against such Party in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

(d) Except as expressly set forth herein and with respect to the Debtors' performance of this Agreement (and subject to necessary Bankruptcy Court approvals associated with the Restructuring), the execution, delivery, and performance by such Party of this Agreement does not and will not require any material registration or material filing with, material consent or material approval of, or material notice to, or other material action to, with or by, any federal, state or other governmental authority or regulatory body, other than those which have been obtained, taken or made.

(e) Although none of the Parties intends that this Agreement should constitute, and they each believe it does not constitute, a solicitation and acceptance of the Plan, regardless of whether its claims or Equity Interests constitute a "security" within the meaning of the Securities Act of 1933 (as amended, the "*Securities Act*"), such Supporting Party (A) is a sophisticated investor with respect to the transactions described herein with sufficient knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of owning and investing in any securities that may be issued in connection with the Restructuring, making an informed decision with respect thereto, and evaluating properly the terms and conditions of this Agreement, and it has made its own analysis and decision to enter in this Agreement, (B) is an "accredited investor" within the meaning of Rule 501 of Regulation D of the Securities Act, or is a "qualified institutional buyer" within the meaning of Rule 144A of the Securities Act, or is a non-"U.S. Person" as defined in Rule 902 of the Securities Act, who is located outside of the United States, of such similar sophistication; (C) is acquiring any securities that may be issued in connection with the Restructuring for its own account and not with a view to the distribution thereof; and (D) has made its own decision to execute this Agreement based upon its own independent assessment of documents and information available to it, as it deemed appropriate and sufficient.

(f) If such Party is a Supporting Creditor, such Supporting Creditor (i) either (A) is the sole legal and beneficial owner of the claims set forth below its name on the signature page hereof (or the Joinder (as defined below)), free and clear of all claims, liens and encumbrances, or (B) has sole investment and voting discretion with respect to the claims set forth below its name on the signature page hereof (or the Joinder (as defined below)) in respect of matters relating to the Restructuring contemplated by this Agreement and has the power and authority to bind the beneficial owner(s) of such claims to the terms of this Agreement (with respect to a Supporting Creditor, all claims under clauses (A) and (B) and any additional claims against the Debtors it owns or has such control over from time to time or acquires after the Execution Date, collectively, its "***Participating Claims***") and (ii) has full power and authority to act on behalf of, vote and consent to matters concerning such Participating Claims in respect of matters relating to the Restructuring contemplated by this Agreement and dispose of, exchange, assign and transfer such Participating Claims.  Further, such Supporting Creditor has made no prior assignment, sale or other transfer of, and has not entered into any other agreement to assign, sell or otherwise transfer, in whole or in part, any portion of its right, title, or interests in such Participating Claims.

(g) If such Party is a Supporting Interest Holder, such Supporting Interest Holder is the sole legal and beneficial owner of the Equity Interests set forth next to its name below, free and clear of all claims, liens and encumbrances.

|                                          | Equity Interests   |
| ---------------------------------------- | ------------------ |
| Kelso Investment Associates VIII, L.P.   | 1,922,505 shares   |
| KEP VI, LLC                              | 308,495 shares     |

**Section 3.  Agreements of the Supporting Parties and the Debtors.**

(a) During the period beginning on the Execution Date and ending on a Termination Event (such period, the "***Effective Period***"):

(i) each Supporting Party agrees that it shall, subject to the receipt by such Supporting Party of the Disclosure Statement and the Solicitation Materials, in each case, approved by the Bankruptcy Court as containing "adequate information" as such term is defined in section 1125 of the Bankruptcy Code:

1. timely vote all of its claims, including Participating Claims, and Equity Interests in voting classes now or hereafter beneficially owned by such Supporting Party or for which it now or hereafter serves as the nominee, investment manager or advisor for beneficial holders thereof, as applicable, to accept the Plan, by delivering its duly executed and completed ballots accepting the Plan on a timely basis following the commencement of the solicitation of the Plan, which ballots shall be in favor of and not indicate that the Supporting Party opts out of any releases and exculpation provided under the Plan; provided that such vote shall be immediately revoked and deemed *void ab initio* upon termination of this Agreement pursuant to the terms hereof (except any termination pursuant to Section 9(a) hereof); and

2.  not change or withdraw (or seek or cause to be changed or withdrawn) such vote.

(ii)  each Supporting Party agrees to not (A) object to, delay, impede or take any other action to interfere with acceptance or implementation of the Plan or the Restructuring, (B) directly or indirectly seek, solicit, encourage, propose, file, support, assist, participate, engage in the formulation, negotiations or discussions of or vote for, any restructuring, sale of assets, merger, workout or plan of reorganization for the Debtors other than the Plan (any such transaction, an "*Alternative Transaction*"), (C) object to or otherwise commence any proceeding, take any action opposing, or support any other person's efforts to oppose or object to, any of the terms of the DIP Facilities, the terms of the DIP Orders, the final relief sought in any "first day" and "second day" motions so long as they are consistent with the budget under the DIP Facilities and reasonably satisfactory to the DIP Lenders, and other motions consistent with this Agreement filed by any in furtherance of the Restructuring or (D) otherwise take any action that would in any material respect interfere with, delay or postpone the consummation of the Restructuring;

(iii)  each Supporting Party and each Debtor agrees to (A) support, and take all reasonable actions necessary to facilitate the implementation and consummation of, the Restructuring (including without limitation, approval of the Restructuring Documents and DIP Loan Documents, and other relief that may be set forth in the DIP Orders, as applicable, the confirmation of the Plan and the consummation of the Restructuring pursuant to the Plan) and (B) not take any action that is inconsistent with the implementation or consummation of the Restructuring;

(iv)  each Supporting Party and each Debtor (subject to Section 28 of this Agreement) agrees to not (A) support or encourage the termination or modification of the Debtors' exclusive period for the filing of a plan or the Debtors' exclusive period to solicit votes on a plan, (B) take any other action, including initiating any legal proceedings or enforcing rights as a holder of claims and Equity Interests, as applicable, that is inconsistent with this Agreement or the Restructuring Documents, or that would reasonably be expected to prevent, interfere with, delay or impede the implementation or consummation of the Restructuring (including the Bankruptcy Court's approval of the Restructuring Documents, the solicitation and confirmation of the Plan and the consummation of the Restructuring Transaction pursuant to the Plan), and (C) oppose or object to, or support any other person's efforts to oppose or object to, any motions filed by the Debtors that are not inconsistent with this Agreement; and

(v)  upon the commencement of the Bankruptcy Cases, and subject to Section 9, the automatic stay is invoked and each Supporting Party agrees that, except to the extent expressly contemplated under the Plan, the DIP Orders and this Agreement, it will not exercise any right or remedy for the enforcement, collection or recovery of any of the Participating Claims.

(b) Notwithstanding the forgoing, this Agreement will not limit any of the following Supporting Party rights, to the extent consistent with this Agreement:

(i) to appear and participate as a party in interest in any matter to be adjudicated in the Bankruptcy Cases, so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement and do not hinder, delay or prevent consummation of the Restructuring;

(ii) to enforce any rights under this Agreement;

(iii) to take or direct any action relating to maintenance, protection or preservation of any collateral; or

(iv) the ability of a Supporting Party or Debtor and its advisors to consult with other Supporting Parties or the Debtors and their respective advisors.

Notwithstanding anything to the contrary in this Agreement, Participating Claims or other claims of a Supporting Lender subject to this Agreement (including, without limitation, this Section 3 and Section 8) shall not include any Participating Claim or other claims held in a fiduciary capacity or held or acquired by any other division, business unit or trading desk of such Supporting Lender (other than the division, business unit or trading desk expressly identified on the signature pages hereto), unless and until such division, business unit or trading desk is or becomes a party to this Agreement.

**Section 4.  Agreements Related to DIP Facilities and Exit Financing.**

(a) In addition to their agreements as Supporting Parties and Debtors set forth in Section 3 above, during the Effective Period,

(i) each of the Supporting Lenders and the Revolving Facility Agent hereby commits to (A) consent to the use of cash collateral and adequate protection as provided in the DIP Credit Agreement, the DIP Orders and the DIP Loan Documents subject to the terms of the DIP Orders (without limiting any rights to seek further adequate protection or terminate cash collateral as provided therein), (B) backstop the Exit Revolving Facility on the terms attached to the RSA Term Sheet as Exhibit D, subject to Section 7(c) hereof, and (C) consent to waive the Pre-Petition Intercreditor Agreement (as defined in the DIP Credit Agreement), as necessary to permit the actions, terms and conditions in this Agreement, the RSA Term Sheet, the DIP Orders, the DIP Credit Agreement, and the DIP Loan Documents, and (D) not object to the terms of the DIP Facilities, in each instance subject to the definitive terms and conditions thereof, and on the terms and conditions of this Agreement,

(ii) each of the Supporting Noteholders hereby commits to backstop the commitments under the DIP Facilities (in the amounts set forth on **Schedule 2** hereto), subject to the definitive terms and conditions thereof, and on the terms and conditions of this Agreement, and to support and take all necessary steps to effectuate the Restructuring, and

(iii) each Supporting Noteholder and each Joining Party that participates in the DIP Facilities, in their capacity as DIP Lenders, agrees to roll-over the outstanding obligations under the DIP Facilities held by them as of the Effective Date to term loans under the Exit Second Lien Facility and to support and take all necessary steps to effectuate the Restructuring.

(b) No Supporting Party other than the Supporting Noteholders shall be obligated to fund or otherwise be committed to provide funding in connection with the Restructuring except pursuant to separate definitive documentation relating specifically to such funding, if any, (i) executed by such Supporting Party and (ii) approved by an order of the Bankruptcy Court, if necessary, along with the satisfaction of any conditions precedent to such funding under the definitive documentation relating thereto.

**Section 5.  Continued Banking Practices.**

Notwithstanding anything herein to the contrary, each Supporting Party and its affiliates may accept deposits from, lend money to, and generally engage in any kind of banking, investment banking, trust or other business with, or provide debt financing (including debtor in possession or exit financing), equity capital or other services (including financial advisory services) to any Debtor or any affiliate of any Debtor or any other person, including, but not limited to, any person proposing or entering into a transaction or financing related to or involving any Debtor or any affiliate thereof, and nothing in this Agreement shall limit or modify the rights of such Supporting Party or its affiliates under any documents, instruments or agreements governing such banking relationship.

**Section 6.  Support for Mutual Releases by the Supporting Parties.**

During the Effective Period, each of the Supporting Parties agrees that it shall not object to or opt out of any release included in the Solicitation Materials or the Plan, so long as such release is consistent with the RSA Term Sheet.

**Section 7.  Agreements of the Debtors.**

(a) The Debtors hereby agree that, as soon as reasonably practicable, but in no event later than August 15, 2016, the Debtors shall file with the Bankruptcy Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code and any and all other documents necessary to commence the Bankruptcy Cases of each Debtor.

(b) The Debtors hereby agree to file the Plan, the Disclosure Statement and motion seeking entry of the Disclosure Statement Order with the Bankruptcy Court no later than August 15, 2016.

(c) Within one business day of the Petition Date, the Debtors shall file the DIP Financing Motion seeking entry of the DIP Orders that shall authorize the Debtors' entry into the DIP Credit Agreement and DIP Facilities, which motion shall be in form and substance reasonable acceptable to the Debtors, the DIP Agent, the Required DIP Lenders, the Required Supporting Noteholders, and the Supporting Lenders.

(d) No later than August 11, 2016, the Debtors shall file one or more motions to reject certain unexpired leases as agreed to by the Required Supporting Noteholders and the Supporting Lenders.

(e) During the Effective Period, the Debtors shall: (i) support and take all steps necessary or desirable to obtain orders of the Bankruptcy Court in respect of the Restructuring, including obtaining entry of the RSA Assumption Order, the DIP Orders, Disclosure Statement Order and Confirmation Order; (ii) support and take all steps reasonably necessary or desirable to consummate the Restructuring in accordance with this Agreement, including the preparation and filing within the time-frame provided herein of the Approved Transaction Documents; (iii) execute and deliver any other required agreements to effectuate and consummate the Restructuring; (iv) obtain any and all required regulatory and/or third-party approvals for the Restructuring; (v) complete the Restructuring within the time-frame provided herein; (vi) comply with each of the deadlines provided in the Interim DIP Order and DIP Credit Agreement; (vii) comply with any other deadlines set forth herein and in the Restructuring Term Sheet; (viii) operate their business in the ordinary course, taking into account the Restructuring; and (ix) not object to, delay, impede, or take any other action that is materially inconsistent with, or is intended or is likely to interfere with acceptance or implementation of the Plan or the Restructuring.

(f) During the Effective Period, the Debtors shall timely file an objection to any motion filed with the Bankruptcy Court by any person seeking an order (i) directing the appointment in the Bankruptcy Cases of an examiner with expanded powers or a trustee, (ii) converting any of the Bankruptcy Cases to cases under chapter 7 of the Bankruptcy Code, (iii) dismissing any of the Bankruptcy Cases; (iv) granting any relief that is inconsistent with this Agreement in any material respect; or (v) modifying or terminating the Debtors' exclusive right to file and/or solicit acceptances of a plan of reorganization.

(g) During the Effective Period, the Debtors shall provide the Supporting Noteholders', Revolving Facility Agent's and Supporting Lenders' advisors, and direct their employees, officers, advisors and other representatives to provide the Supporting Noteholders', Revolving Facility Agent's and Supporting Lenders' advisors, with (i) reasonable access during normal business hours to the Debtors' books and records, (ii) reasonable access to the management and advisors of the Debtors for the purposes of evaluating the Debtors' assets, liabilities, operations, businesses, finances, strategies, prospects and affairs and (iii) timely and reasonable responses to all reasonable diligence requests.

(h) The Debtors shall promptly notify the Supporting Noteholders', Revolving Facility Agent's and Supporting Lenders' advisors in writing of any newly commenced material governmental, regulatory or third party litigations, investigations or hearings.

(i) Any Debtor that obtains actual knowledge of any breach by any Debtor in respect of any of the obligations, representations, warranties or covenants set forth in this Agreement shall notify the Supporting Noteholders', Revolving Facility Agent's and Supporting Lenders' advisors of such breach in writing within three (3) business days of obtaining such knowledge.

(j) The Debtors shall distribute any and all material pleadings to be filed with the Bankruptcy Court to the Supporting Noteholders', Revolving Facility Agent's and Supporting Lenders' advisors as promptly as practicable in advance of, and in no event less than two (2) days in advance of, any filing thereof, unless circumstances render such notice impracticable.

(k) The Debtors shall use commercially reasonable efforts to preserve their businesses and assets, maintain its operating assets in their present condition (ordinary wear and tear excepted), and maintain its existing insurance coverage.

(l) During the Effective Period, the Debtors shall pay in cash: (i) upon the execution of this Agreement by the Debtors, all accrued reasonable and documented fees and expenses of (A) each of the to the Revolving Facility Agent, the Supporting Lenders, the trustees for the 2010 Indenture and 2015 Indenture, the Unanimous Supporting Noteholders, the Supporting Interest Holders, and the DIP Agent, and (B) the following advisors to the parties identified in Clause (A), Debevoise & Plimpton LLP, Dechert LLP, King & Spalding LLP, Simpson Thacher & Bartlett LLP, one local counsel engaged for each such Party, CDG Group, LLC and Morris, Nichols, Arsht & Tunnell, LLP, as well as any replacement of any of the foregoing (collectively, the "***Transaction Fees and Expenses***"); (ii) all Transaction Fees and Expenses of each of the Supporting Parties prior to the filing of the Bankruptcy Cases and (iii) following the execution of this Agreement by the Debtors, all Transaction Fees and Expenses incurred after the filing of the Bankruptcy Cases within five (5) business days of delivery to the Debtors of any applicable invoice or receipt; <u>provided</u> that any Transaction Fees and Expenses which become payable under this Agreement after the Petition Date shall be paid on the Effective Date, unless another order of the Court (including, without limitation, the DIP Orders) authorizes a different payment date, and shall be subject to the same review procedures provided for fees and expenses that the Debtors are permitted to reimburse under the DIP Orders.

(m) From and after the Petition Date, the Debtors shall use reasonable efforts to solicit an Alternative Exit Revolving Facility from third parties on terms acceptable to the Unanimous Supporting Noteholders and the Supporting Interest Holders.

(n) *Negative Covenants.* Subject to Section 28 hereof, the Debtors, jointly and severally, agree that, for the duration of the Effective Period, the Company shall not, directly or indirectly, do any of the following:

(i)  propose or support an Alternative Transaction;

(ii) (1) publicly announce that it intends to take or has taken any action, in each case, that is inconsistent in any material respect with this Agreement or the Approved Transaction Documents, (2) suspend or revoke the Restructuring or (3) execute, file or agree to file any motion, pleading or other Restructuring Document (including any modifications or amendments thereof) that is inconsistent in any material respect with this Agreement or the Approved Transaction Documents;

(iii) commence an avoidance action or other legal proceeding (or supporting any other Person seeking standing to commence any such avoidance action or other legal proceeding) that challenges the validity, enforceability or priority of the Credit

Agreement, the 2010 Indenture, or the 2015 Indenture, any lien or security interest granted in respect of any such documents or any Claim or Interest held by any Supporting Party; or

(iv) enter into any commitment or agreement with respect to debtor-in-possession financing, use of cash collateral, adequate protection, exit financing and/or any other financing arrangements other than the facilities contemplated by the DIP Credit Agreement, Exit Facility Term Sheets and DIP Orders.

### Section 8.    Transfers of Participating Claims and Equity Interests.

(a) Each Supporting Creditor agrees that, during the Effective Period, it shall not sell, transfer, assign or otherwise dispose of (collectively, "*Transfer*") any of its Participating Claims, or any option thereon or any right or interest (voting or otherwise) in any of its Participating Claims (including, any participation therein), except to a party that (i) is a Supporting Creditor; provided that any such Participating Claims shall automatically be deemed to be subject to the terms of this Agreement, or (ii) executes and delivers a Joinder (as defined below) to the Debtors on or prior to the date of the relevant transfer, in which case such transferee shall be deemed to be a Supporting Creditor for purposes of this Agreement.   Subject to clause (c) below, the Debtors shall be deemed to have acknowledged such transfer.   Any transfer of Participating Claims by a Supporting Creditor that does not comply with the procedures set forth in this Agreement shall be deemed void without the need for further action.

(b) This Agreement shall in no way be construed to preclude any Supporting Party from acquiring additional claims; provided that any such additional claims shall automatically be deemed to be Participating Claims of such Supporting Party and shall be subject to all of the terms of this Agreement.   Each Supporting Party agrees to provide to counsel for the Debtors a notice of the acquisition of any additional claims within three (3) business days of the consummation of the acquisition transaction.

(c) Any person that receives or acquires a portion of the Participating Claims pursuant to a sale or other transfer by a Supporting Party hereby agrees to be bound by all of the terms of this Agreement (as the same may be hereafter modified from time to time) (a "*Joining Party*") by executing and delivering to counsel for the Debtors a joinder in the form of **Exhibit B** hereto (the "*Joinder*"), which Joinder may also be used by holders of claims that are not Participating Claims who wish to become a party to this Agreement as set forth in Section 22 of this Agreement.   The Joining Party shall thereafter be deemed to be a "Supporting Party" and a Party for all purposes under this Agreement.   Each Joining Party shall indicate, on the appropriate schedule of its Joinder, the number and amount of claims held by such Joining Party, which shall be deemed to be Participating Claims of such Joining Party and shall be subject to all of the terms of this Agreement.   Upon consummation of the transfer of such Participating Claims to the Joining Party, the Joining Party hereby makes the representations and warranties of the Supporting Creditors set forth in Section 2 of this Agreement to the other Parties and agrees to be bound by Section 3 of this Agreement.

(d) Each Supporting Interest Holder agrees that, during the Effective Period, it shall not sell, transfer, assign or otherwise dispose of any of its Equity Interests.

(e) Notwithstanding anything herein to the contrary, in the event that a Supporting Noteholder transfers any or all of its Participating Claims, such Supporting Noteholder shall remain obligated with respect to its commitments under <u>Section 4(a)</u> of this Agreement and may not assign, delegate, or transfer its commitment thereunder to a transferee, unless consented to in writing by (i) the Debtors, and (ii) all non-transferring Supporting Noteholders.

(f) Notwithstanding anything in this Agreement (including this <u>Section 8</u>) to the contrary, (i) a Supporting Party may Transfer any Participating Claim against or interest in any Debtor to an entity that is acting in its capacity as a Qualified Marketmaker without the requirement that such entity be or become a Supporting Party <u>provided</u> that the transferee of such Participating Claim from the Qualified Marketmaker shall comply in all respects with the terms of this Agreement and (ii) to the extent that a Supporting Party, acting in its capacity as a Qualified Marketmaker, acquires any Participating Claim against, or interest in, any Debtor from a holder of such Participating Claim or interest who is not a Supporting Party, it may Transfer (by purchase, sale, assignment, participation, or otherwise) such Participating Claim or interest without the requirement that the transferee be or become a Support Party in accordance with this <u>Section 8.</u> For purposes of this clause (f) of this <u>Section 8</u>, a *"Qualified Marketmaker"* means an entity that (x) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers claims or interest against any of the Debtor (including debt securities or other debt) or enter with customers into long and short positions in claims or interests against the Debtors (including debt securities or other debt), in its capacity as a dealer or market maker in such claims or interests against the Debtors, and (y) is in fact regularly in the business of making a market in claims or interests against issuers or borrowers (including debt securities or other debt).

### Section 9.  Termination of Obligations.

This Agreement shall terminate and, except as set forth in <u>Section 19</u>, all obligations of the Parties shall immediately terminate and be of no further force and effect upon the occurrence of any of the following events (each, a *"Termination Event"*):

(a) the Effective Date of the Plan;

(b) mutual written consent of the Debtors and each of the Supporting Parties, <u>provided</u> that notice of such termination is provided within one (1) business day to the persons and entities listed on **Schedule 1** annexed hereto, in accordance with <u>Section 16</u> hereof;

(c) the breach in any material respect by any of the Debtors of any of its covenants, obligations, representations, or warranties contained in this Agreement, and such breach remains uncured for a period of five (5) business days from the date the Debtors receive a written notice of such breach from any Supporting Party (such notice, the "*Supporting Party Termination Notice*");

(d) the breach in any material respect by any Supporting Party of any of its covenants, obligations, representations, or warranties contained in this Agreement, and such breach remains uncured for a period of five (5) business days from the date the Supporting Parties receive a written notice of such breach from the Debtors;

(e) an Event of Default (as defined in the DIP Orders, DIP Credit Agreement, or DIP Loan Documents) occurs under the DIP Facilities, subject to all applicable notice, waiver, and cure provisions of the DIP Facilities;

(f) the issuance by any governmental authority or court of competent jurisdiction of any ruling, decision, judgment or order enjoining or otherwise preventing the consummation of a material portion of the Restructuring or requiring the Debtors to take actions inconsistent in any material respect with the Plan, unless such ruling, judgment or order has not been stayed, reversed or vacated within five (5) business days after the date of such issuance; *provided*, *however*, that if such issuance has been made at the request of any of the Supporting Parties, then this Agreement shall not terminate on account of such issuance;

(g) the Debtors file any motion or pleading with the Bankruptcy Court that is inconsistent in any material respect with this Agreement, the DIP Loan Documents and such motion or pleading has not been withdrawn prior to the earlier of (i) three (3) business days from the date the Debtors receive written notice from any Supporting Party of the same, and (ii) entry of an order of the Bankruptcy Court approving such motion or pleading;

(h) the Bankruptcy Court grants relief that is inconsistent with this Agreement in any material respect;

(i) the Debtors propose or support any Alternative Transaction;

(j) the Debtors (i) withdraw the Plan or publicly announce their intention to withdraw the Plan or to pursue an Alternative Transaction, (ii) file a Plan document in form and substance that is not acceptable to each of the DIP Agent, the Required DIP Lenders, the Supporting Lenders, the Required Supporting Noteholders, and the Supporting Interest Holders, (iii) move voluntarily to dismiss any of the Bankruptcy Cases, (iv) move for conversion of any of the Bankruptcy Cases to chapter 7 under the Bankruptcy Code, (v) move for the appointment of an examiner with expanded powers or a chapter 11 trustee in any of the Bankruptcy Cases, or (vi) support any other party seeking any of the foregoing relief;

(k) any party obtains relief from the automatic stay with respect to any of the Debtors' assets of a value in excess of $200,000;

(l) the waiver, amendment or modification of the Plan or any of the DIP Loan Documents, in a manner inconsistent with this Agreement, the RSA Term Sheet, or the relevant DIP Loan Document, without the consent of each of the DIP Agent, the Required DIP Lenders, the Supporting Lenders, the Required Supporting Noteholders (or each of the Unanimous Supporting Noteholders to the extent required by Annex B to the RSA Term Sheet), and the Supporting Interest Holders;

(m) the Debtors shall not have commenced the Bankruptcy Cases on or before August 15, 2016;

(n) the Plan, the Disclosure Statement and motion seeking entry of the order approving the Disclosure Statement are not filed with the Bankruptcy Court by August 15, 2016;

(o)  an order approving the Disclosure Statement is not entered by September 26, 2016;

(p)  the RSA Assumption Order is not entered within thirty-five (35) days of the Petition Date;

(q)  the Interim DIP Order is not entered within three (3) business days of the Petition Date;

(r)  the Final DIP Order is not entered within thirty-five (35) days of the Petition Date;

(s)  on November 7, 2016, if the Confirmation Order confirming the Plan has not been entered;

(t)  on September 26, 2016, if the Debtors have failed to seek an Alternative Exit Facility;

(u)  on November 14, 2016, if the Effective Date has not occurred;

(v)  failure to meet any milestone set forth in the RSA Term Sheet or DIP Credit Agreement;

(w)  the Bankruptcy Court enters an order (A) directing the appointment of an examiner with expanded powers or a chapter 11 trustee in any of the Bankruptcy Cases, (B) converting any of the Bankruptcy Cases to cases under chapter 7 of the Bankruptcy Code or (C) dismissing any of the Bankruptcy Cases;

(x)  the Debtors' authority to use cash collateral on a consensual basis on the terms set forth in the DIP Orders terminates; or

(y)  the Debtors exercise their rights under Section 28 (whether or not the Debtors have formally terminated this Agreement in accordance with the terms of such Section).

Upon the occurrence of a Termination Event, unless waived under Section 12, this Agreement shall terminate, each Party shall be released from its commitments, undertakings and agreements under or related to this Agreement and any of the Approved Transaction Documents, and there shall be no liability or obligation on the part of any Party hereto; provided that in no event shall any such termination relieve a Party hereto from (a) liability for its breach or non-performance of its obligations under this Agreement before the date of such termination, (b) any liabilities or obligations under the DIP Loan Documents and (c) obligations under this Agreement which expressly survive any such termination pursuant to Section 19 hereunder. Upon the occurrence of a Termination Event, any and all consents or ballots tendered by the Parties subject to such termination before a Termination Event shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Agreement or otherwise.

The Debtors acknowledge and agree, and shall not dispute, that solely with respect to the giving of a Supporting Party Termination Notice by any of the Supporting Parties pursuant to this Agreement, such an action shall not be a violation of the automatic stay under section 362 of the Bankruptcy Code (and the Debtors hereby waive, to the greatest extent possible, the

applicability of the automatic stay to the giving of such notice), and no cure period contained in this Agreement shall be extended pursuant to sections 108 or 365 of the Bankruptcy Code.

### Section 10.  Good Faith Cooperation; Further Assurances; Transaction Documents.

The Parties shall cooperate with each other in good faith and shall coordinate their activities (to the extent practicable) in respect of all matters concerning the implementation and consummation of the Restructuring.  Furthermore, each of the Parties shall take such action (including executing and delivering any other agreements and making and filing any required regulatory filings) as may be reasonably necessary, or as may be required by order of the Bankruptcy Court, to carry out the purposes and intent of this Agreement.  Each of the Debtors and the Supporting Parties, as applicable, hereby covenants and agrees (a) to negotiate in good faith the Restructuring Documents and Approved Transaction Documents, each of which shall, except as otherwise provided for herein, (i) contain the same economic terms as, and other terms consistent in all respects with, the terms set forth in the RSA Term Sheet and each of the other exhibits attached hereto (each as amended, supplemented or otherwise modified as provided herein), (ii) otherwise be in form and substance reasonably acceptable in all respects to the Parties (to the extent such Parties are specifically provided with consent rights over such documents pursuant to this Agreement), and (iii) be consistent with this Agreement in all respects, and (b) subject to the satisfaction of the terms and conditions set forth herein, to execute the Restructuring Documents and Approved Transaction Documents (in each case to the extent such Party is contemplated to be a party thereto).

### Section 11.  Specific Performance.

It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach, including any order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply with any of its obligations hereunder; provided, however, that each Party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy.

### Section 12.  Amendments and Waivers.

This Agreement, including the Exhibits hereto, may be amended only upon written approval of (a) each of the Debtors, (b) Required Supporting Noteholders (*provided* that any amendment of the type set forth on Annex B to the RSA Term Sheet shall require the consent of the Unanimous Supporting Noteholders), and (c) Supporting Lenders.  In addition, any amendment that would materially and adversely affect any Supporting Interest Holder shall require the prior written consent of such Supporting Interest Holder.  Any waiver of any condition, term or provision to this Agreement must be in writing signed by the Parties whose consent would be required to amend such condition, term or provision consistent with the impact of the waiver.

### Section 13.  Representation by Counsel.

Each Party acknowledges that it has had the opportunity to be represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived. The provisions of this Agreement shall be interpreted in a reasonable manner to effect the intent of the Parties hereto. None of the Parties hereto shall have any term or provision construed against such Party solely by reason of such Party having drafted the same.

**Section 14.  Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.**

This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflict of laws that would require the application of the law of any other jurisdiction. By its execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in either a state or federal court of competent jurisdiction in the State and County of New York  (the "***Chosen Courts***"). By execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably accepts and submits itself to the exclusive jurisdiction of the Chosen Courts, generally and unconditionally, with respect to any such action, suit or proceeding; provided, however, that if the Debtors commence the Bankruptcy Cases, then the Bankruptcy Court (or court of proper appellate jurisdiction) shall be the exclusive Chosen Court. EACH PARTY HERETO UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING REFERRED TO ABOVE.

**Section 15.  Execution Date.**

This Agreement shall become effective, and each Party hereto shall be bound to the terms of this Agreement, as of the date the Debtors and each of the Supporting Parties, which such Supporting Parties shall hold (a) 100% of the outstanding principal amount owed under the Credit Agreement, (b) at least 57.5 % in outstanding principal of the Unexchanged Notes, (c) 100% in outstanding principal of the Kelso Notes, and (d) 100% in outstanding principal of the GSO Notes, have executed and delivered a signature page to this Agreement (the "***Execution Date***"), provided that the Execution Date for any Joining Party shall be the date that such Joining Party executes the Joinder.

**Section 16.  Notices.**

All demands, notices, requests, consents and other communications under this Agreement shall be in writing, sent contemporaneously to all of the Supporting Parties and the Debtors, and deemed given when delivered, if delivered by hand, or upon confirmation of transmission, if delivered by email or facsimile, at the addresses and facsimile numbers set forth on **Schedule 1** hereto.

**Section 17.  Reservation of Rights.**

Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of each Party to protect and preserve its rights, remedies and interests, including its Participating Claims and any other claims against the Debtors or other parties.   Without limiting the foregoing sentence in any way, after a Termination Event, the Parties hereto each fully reserve any and all of their respective rights, remedies, claims and interests, subject to <u>Section 9</u>, in the case of any claim for breach of this Agreement.

### Section 18.  Rule of Interpretation.

This Agreement shall be interpreted in accordance with section 102 of the Bankruptcy Code.  Notwithstanding anything contained herein to the contrary, it is the intent of the Parties that all references to votes or voting in this Agreement be interpreted to include all means of expressing agreement with, or rejection of, as the case may be, a Restructuring.

### Section 19.  Survival.

Notwithstanding (a) any transfer of Participating Claims in accordance with <u>Section 8</u> or (b) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in <u>Section 2</u>, <u>Section 11</u>, <u>Section 13</u>, <u>Section 14</u>, <u>Section 16</u>, <u>Section 17</u>, <u>Section 18</u>, <u>Section 21</u>, <u>Section 23</u>, <u>Section 25</u>, <u>Section 26</u>, <u>Section 27</u>, and <u>Section 28</u> shall survive such sale and/or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof.

### Section 20.  Successors and Assigns; Severability; Several Obligations.

This Agreement is intended to bind and inure to the benefit of the Parties and their respective permitted successors, assigns, heirs, executors, estates, administrators and representatives.  The invalidity or unenforceability at any time of any provision hereof in any jurisdiction shall not affect or diminish in any way the continuing validity and enforceability of the remaining provisions hereof or the continuing validity and enforceability of such provision in any other jurisdiction; provided, however, that nothing in this Section 20 shall be deemed to amend, supplement or otherwise modify, or constitute a waiver of, any Termination Event.  The agreements, representations and obligations of the Supporting Parties under this Agreement are, in all respects, several and not joint.

### Section 21.  Third-Party Beneficiary.

This Agreement is intended for the benefit of the Parties hereto and no other person or entity shall be a third party beneficiary hereof or have any rights hereunder.

### Section 22.  Counterparts; Additional Supporting Parties.

This Agreement may be executed in several identical counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement.  Execution copies of this Agreement may be delivered by facsimile, electronic mail or otherwise, each of which shall be deemed to be an original for the purposes of this paragraph. Any holder of claims that is not already an existing Supporting Party hereto may execute the

Joinder and, in doing so, shall become a Joining Party and shall thereafter be deemed to be a "Supporting Party" and a Party for all purposes under this Agreement.

### Section 23.  Entire Agreement.

This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements (oral and written) and all other prior negotiations but shall not supersede the Approved Transaction Documents; provided, however, that the Parties acknowledge and agree that any confidentiality agreements heretofore executed between the Debtors and any Supporting Party shall continue in full force and effect as provided therein.

### Section 24.  Headings.

The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement and shall not affect the interpretation of this Agreement.

### Section 25.  Independent Due Diligence and Decision-Making.

Each Party hereto hereby confirms that it has made its own decision to execute this Agreement based upon its own independent assessment of documents and information available to it, as it has deemed appropriate.

### Section 26.  Settlement Discussions.

This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the parties hereto.  Regardless of whether or not the transactions contemplated herein are consummated, or whether or not a Termination Event has occurred, if applicable, nothing herein shall be construed herein as an admission of any kind or a waiver by any Party of any or all of such Party's rights or remedies.  Pursuant to Federal Rule of Evidence 408, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than to prove the existence of this Agreement or in a proceeding to enforce the terms of this Agreement.

### Section 27.  Publicity.

(a)  The Supporting Parties shall not (i) use the name of any of the Debtors in any press release or (ii) disseminate to any news media any press releases, public filings, public announcements or other communications relating to this Agreement or the transactions contemplated hereby and any amendments thereof without first (A) submitting such press releases, public filings, public announcements or other communications to counsel for the Debtors for review and potential suggestions and (B) receiving the prior written consent of the Debtors.  Nothing contained herein shall be deemed to waive, amend or modify the terms of any confidentiality or non-disclosure agreement between the Debtors and any Supporting Party.

(b) The Debtors shall submit drafts to counsel of each Supporting Party of any press releases and public documents that (i) constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement at least two (2) business days prior to making any such disclosure, (ii) any other disclosure that includes descriptions of the Restructuring or any Supporting Party and shall negotiate any proposed changes thereto in good faith, or (iii) constitute disclosure of the amount or percentage of Claims held by any Supporting Party without prior written consent of such Supporting Party.

**Section 28.  The Debtors' Fiduciary Duties**.

Notwithstanding anything to the contrary herein, to the extent that any Debtors' boards of directors (or comparable governing body) determine in good faith after consulting with outside legal counsel that the Debtors' fiduciary obligations under applicable law require the Debtors to take any action or terminate this Agreement and the Debtors' obligations hereunder, the Debtors may terminate this Agreement without incurring any liability to any one or more of the Supporting Parties under this Agreement.  In the event that the Debtors determine to terminate this Agreement in accordance with this Section 28, the Debtors shall provide notice of such termination to each of the Supporting Parties and their advisors not more than one (1) business day after such determination.  Notwithstanding anything to the contrary herein, nothing in this Agreement shall create any additional fiduciary obligations on the part of the Debtors or any members, managers, or officers of the Debtors or their affiliated entities, in such capacity, that did not exist prior to the Execution Date.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

ROADHOUSE HOLDING INC.

By:

Name:   Keith A. Maib
Title:    Chief Restructuring Officer

ROADHOUSE INTERMEDIATE INC.

By:

Name:   Keith A. Maib
Title:    Chief Restructuring Officer

ROADHOUSE MIDCO INC.

By:

Name:   Keith A. Maib
Title:    Chief Restructuring Officer

ROADHOUSE PARENT INC.

By:

Name:   Keith A. Maib
Title:    Chief Restructuring Officer

LRI HOLDINGS, INC.

By:

Name:   Keith A. Maib
Title:    Chief Restructuring Officer

LOGAN'S ROADHOUSE, INC.

By:

Name:  Keith A. Maib
Title:  Chief Restructuring Officer

LOGAN'S ROADHOUSE OF TEXAS, INC.

By:

Name:  Keith A. Maib
Title:  Chief Restructuring Officer

LOGAN'S ROADHOUSE OF KANSAS, INC.

By:

Name:  Keith A. Maib
Title:  Chief Restructuring Officer

*[Signature Page to Restructuring Support Agreement]*

[SIGNATURE PAGES FOR SUPPORTING PARTIES
INTENTIONALLY OMITTED FROM FILING VERSION]

## SCHEDULE 1

### NOTICE ADDRESSES

---

**If to the Debtors:**

c/o Logan's Roadhouse, Inc.
3011 Armory Drive, Suite 300
Nashville, Tennessee 37204
Fax No.: (615) 884-9813
Attention:

with a copy to:

Young Conaway Stargatt & Taylor, LLP
1000 North King Street
Wilmington, DE 19801
Attention:  Robert S. Brady, Esq. and Edmon L. Morton, Esq.
rbrady@ycst.com
emorton@ycst.com

**If to a Supporting Party:**

To the Notice Party designated on each Supporting Party's Signature Page
with a copy to (which shall not constitute notice):

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
Attention: Elisha D. Graff, Esq. and Nicholas Baker, Esq.
egraff@stblaw.com
nbaker@stblaw.com

-and-

Dechert LLP
1095 Avenue of the Americas
New York, NY 10036
Attention:  Michael J. Sage and Brian E. Greer
michael.sage@dechert.com
brian.greer@dechert.com

-and-

King & Spalding LLP

1185 Avenue of the Americas
New York, NY 10036-4003
Attention:  Michael C. Rupe, Jeffrey D. Pawlitz and Christopher G. Boies
mrupe@kslaw.com
jpawlitz@kslaw.com
cboies@kslaw.com

-and-

Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
Attention: Natasha Labovitz and Craig Bruens
nlabovitz@debevoise.com
cabruens@debevoise.com

[SCHEDULE 2 INTENTIONALLY OMITTED FROM FILING VERSION]

**EXHIBIT A**

**RSA TERM SHEET**

LRI Holdings, Inc.

Principal Terms Of Proposed Restructuring Transaction

THIS TERM SHEET (THIS "***RSA TERM SHEET***") SUMMARIZES TERMS AND CONDITIONS OF A PROPOSED RESTRUCTURING OF THE DEBTORS (AS DEFINED BELOW).  THE TERMS SET FORTH IN THIS RSA TERM SHEET ARE BEING PROVIDED AS PART OF A COMPREHENSIVE COMPROMISE, EACH ELEMENT OF WHICH IS CONSIDERATION FOR THE OTHER ELEMENTS AND AN INTEGRAL ASPECT OF THE PROPOSED RESTRUCTURING OF THE DEBTORS.  THE PROPOSED RESTRUCTURING DESCRIBED HEREIN WOULD BE IMPLEMENTED BY MEANS OF A "PREARRANGED" PLAN OF REORGANIZATION, FOR THE DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE (AS DEFINED BELOW).  THIS RSA TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL BE MADE ONLY IN COMPLIANCE WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  THIS DOCUMENT IS BEING PROVIDED IN FURTHERANCE OF SETTLEMENT DISCUSSIONS AND IS ENTITLED TO PROTECTION PURSUANT TO FED. R. EVID. 408 AND ANY SIMILAR RULE OF EVIDENCE.  THE TRANSACTIONS DESCRIBED IN THIS RSA TERM SHEET ARE SUBJECT IN ALL RESPECTS TO, AMONG OTHER THINGS, THE RSA (AS DEFINED BELOW) AND DEFINITIVE DOCUMENTATION, INCLUDING THE PLAN, APPROPRIATE DISCLOSURE MATERIAL, AND RELATED DOCUMENTS.

## CERTAIN KEY TERMS

### 1) Parties

| | |
|---|---|
| ***Debtors*** | Roadhouse Holding Inc., Roadhouse Intermediate Inc., Roadhouse Midco Inc., Roadhouse Parent Inc., LRI Holdings, Inc., Logan's Roadhouse, Inc., Logan's Roadhouse of Kansas, Inc., and Logan's Roadhouse of Texas, Inc. |
| ***Supporting Noteholders*** | Noteholders that are signatories to the RSA and remain bound by its terms, which shall include holders of 100% of the GSO Notes, holders of 100% of the Kelso Notes, and holders of no less than 57.8% of the Unexchanged Notes (each as defined below), including, as applicable, in each case in their capacity as DIP Lenders (as defined below) |
| ***Supporting Lenders*** | Revolving Facility Lenders (as defined below) that are signatories to the RSA and remain bound by its terms |
| ***Supporting Interest Holders*** | Means the holders of equity in LRI Holdings, Inc. that are signatories to the RSA and remain bound by its terms, which shall include the Sponsors |
| ***Supporting Parties*** | Means the Supporting Noteholders, the Supporting Lenders and the Supporting Interest Holders that are signatories to the RSA and remain bound by its terms |

## 2) Other Defined Terms

| Term | Definition |
|------|-----------|
| *2010 Indenture* | That certain Senior Secured Notes Indenture, dated as of October 4, 2010, among Roadhouse Financing, Inc., Roadhouse Merger, Inc. and BOKF, NA, as trustee and collateral agent, and all exhibits, amendments, and supplements thereto |
| *2015 Indenture* | That certain Indenture dated as of October 15, 2015, among Logan's Roadhouse, Inc., LRI Holdings, Inc. and Wells Fargo Bank, N.A., as trustee and collateral agent, and all exhibits, amendments, and supplements thereto |
| *Alternative Exit Facility* | A new first lien credit facility to be provided by parties other than the Revolving Facility Lenders, which would be in lieu of the Exit Revolving Facility, on terms reasonably acceptable to the Debtors and the Unanimous Supporting Noteholders |
| *Bankruptcy Cases* | The chapter 11 cases of the Debtors |
| *Bankruptcy Code* | Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 |
| *Bankruptcy Court* | The United States Bankruptcy Court for the District of Delaware |
| *Business Plan* | The business plan incorporated in the Disclosure Statement that accompanies the Plan |
| *Carl Marks* | Carl Marks Management Company, LLC |
| *Cash-Out Payment* | The pro rata share of the value of Plan Equity Value to be paid to each Noteholder in Subclass 4(b) in either (i) cash upon emergence if Subclass 4(b) votes to accept the Plan, or (ii) New Secured Notes if Subclass 4(b) votes to reject the Plan |
| *Credit Agreement* | That certain Credit Agreement dated as of October 4, 2010, Roadhouse Financing, Inc., Roadhouse Merger, Inc., JPMorgan Chase Bank, N.A., as Administrative Agent, and the other parties thereto, and all exhibits, amendments, and supplements thereto |
| *DIP Agent* | The administrative and collateral agent under the DIP Facilities |
| *DIP Credit Agreement* | The DIP Facilities shall be documented by a senior secured super-priority term loan credit agreement substantially in the form attached as *Exhibit D*, and otherwise reasonably acceptable to the Debtors, the Required Supporting Noteholders, the Supporting Lenders, the DIP Agent, and the DIP Lenders |

| | |
|---|---|
| ***DIP Facilities*** | Debtor-in-possession financing to be provided to the Debtors during the Bankruptcy Cases pursuant to the DIP Credit Agreement consisting of the New Money Facility (as defined in the DIP Credit Agreement) in an amount not less than $25 million and the Roll Up Facility (as defined in the DIP Credit Agreement) |
| ***DIP Lenders*** | The lenders under the DIP Facilities |
| ***DIP Loan Documents*** | The DIP Credit Agreement and all related documents, including guarantees and security agreements, the Interim DIP Order and the Final DIP Order |
| ***Disclosure Statement*** | The accompanying disclosure statement (including all attachments and exhibits) for the proposed Plan pursuant to the RSA |
| ***Effective Date*** | The date on which all conditions to the effectiveness of the Plan are either (a) satisfied or (b) waived by each of the Debtors, the Required Supporting Noteholders, and the Supporting Lenders, and on which the Plan is declared effective |
| ***Equity Interests*** | All issued and outstanding equity interests in the Debtors, including any vested or unvested and exercised or unexercised options or warrants to acquire such equity interests |
| ***Exit First Lien Facility*** | The Exit Revolving Facility or Alternative Exit Facility, as applicable |
| ***Exit Revolving Facility*** | A new first lien revolving credit facility to be provided by the Revolving Facility Lenders and entered into on the Effective Date, on terms materially consistent with the first lien exit financing term sheet attached hereto as ***Exhibit E***, and otherwise reasonably acceptable to the Debtors, the Required Supporting Noteholders, and the Supporting Lenders |
| ***Exit Second Lien Facility*** | A new second lien term loan facility to be entered into on the Effective Date, on terms materially consistent with the second lien exit financing term sheet attached hereto as ***Exhibit B***, and otherwise reasonably acceptable to the Debtors, the Required Supporting Noteholders, and the Supporting Lenders |
| ***Final DIP Order*** | An order of the Bankruptcy Court in form and substance acceptable to the DIP Agent, the Required DIP Lenders, the Debtors, the Supporting Lenders, the Required Supporting Noteholders, and the Supporting Interest Holders, approving the DIP Facilities and authorizing the use of cash collateral in accordance with the DIP Budget (as defined in the DIP Credit Agreement) |
| ***General Unsecured Claim*** | Any general unsecured claim that is not separately classified under the Plan, including, without limitation, any claims arising from existing or potential litigation against any of the Debtors and any Notes Deficiency Claims |
| ***GSO*** | GSO Capital Partners, LP |

| | |
|---|---|
| *GSO Notes* | The issued and outstanding Series 2015-2 Senior Secured Notes Due October 2017 issued under the 2015 Indenture |
| *Interim DIP Order* | An interim order of the Bankruptcy Court approving the DIP Facilities and authorizing the use of cash collateral in accordance with the DIP Budget (as defined in the DIP Credit Agreement) substantially in the form attached hereto as ***Exhibit C***, and acceptable to the DIP Agent, the Required DIP Lenders, the Debtors, the Supporting Lenders, the Required Supporting Noteholders, and the Supporting Interest Holders, |
| *Kelso* | Kelso & Company, L.P. |
| *Kelso Notes* | The issued and outstanding Series 2015-1 Senior Secured Zero Coupon Notes Due October 2017 issued under the 2015 Indenture |
| *Management Incentive Plan* | A contemplated incentive plan for management to be implemented by the board of the Reorganized Debtors following the Effective Date that may include as consideration no more than 10% of the New Stock, the terms of which shall be acceptable to the Debtors and the Required Supporting Noteholders |
| *Marblegate* | Marblegate Asset Management, LLC |
| *New Secured Notes* | Third-lien secured notes having the same collateral as, but with a junior priority to, the Exit Second Lien Facility, and with a 12% interest rate, paid in kind semi-annually, with a maturity date seven (7) years from issuance and which shall be voluntarily prepayable without premium or penalty at the option of the Reorganized Debtors, and a customary AHYDO savings clause will be included at the election of the Debtors if the New Secured Notes would otherwise anticipate AHYDO |
| *New Stock* | The common stock in Reorganized Holdings to be issued on or after the Effective Date pursuant to the Plan |
| *Note* | Any Kelso Note, GSO Note or Unexchanged Note |
| *Noteholder* | Any holder of a Note |
| *Notes Deficiency Claim* | The portion of a claim on account of any Note that is not a secured claim under section 506(a) of the Bankruptcy Code |
| *Petition Date* | The date on which each Debtor files its chapter 11 petition |
| *Plan* | The Chapter 11 Plan of Reorganization for the Debtors that is consistent with the RSA and this RSA Term Sheet |
| *Plan Equity Value* | The value of the New Stock in Reorganized Holdings as of the Effective Date of the Plan, pursuant to the valuation set forth in the Disclosure Statement accompanying the Plan |
| *Reorganized Debtors* | The Debtors as reorganized pursuant to the Plan |

| | |
|---|---|
| *Reorganized Holdings* | Roadhouse Holdings, Inc., as reorganized under chapter 11 of the Bankruptcy Code |
| *Required DIP Lenders* | (1) A majority in interest by commitment amount of the DIP Lenders and (2) including funds or financing vehicles (or funds or accounts advised or sub-advised by such persons) that are DIP Lenders and are affiliated with at least three of the following entities: Carl Marks, Marblegate, GSO and Kelso; provided that if any DIP Lender described in this subclause (2) subsequently transfers or otherwise disposes of some or all of its commitments under the DIP Facilities prior to the Effective Date such that it holds less than 5% of all outstanding commitments in the aggregate, such DIP Lender shall be deemed removed from subclause (2), and subclause (2) shall be deemed revised to require consent from a majority of the remaining DIP Lenders described therein |
| *Required Supporting Noteholders* | (1) A majority of holders in amount of the outstanding principal amount of the Notes and (2) including funds or financing vehicles (or funds or accounts advised or sub-advised by such persons) that are Noteholders and are affiliated with at least three of the following entities: Carl Marks, Marblegate, GSO and Kelso; provided that if any Noteholder described in this subclause (2) subsequently transfers or otherwise disposes of some or all of its Notes prior to the Effective Date such that it holds less than 5% of all outstanding Notes in the aggregate, such Noteholder shall be deemed removed from subclause (2), and subclause (2) shall be deemed revised to require consent from a majority of the remaining Noteholders described therein |
| *Revolving Facility Agent* | JPMorgan Chase Bank, N.A., in its capacity as Administrative Agent and Collateral Agent under the Credit Agreement |
| *Revolving Facility Lenders* | The lenders party to the Credit Agreement |
| *RSA* | That certain Restructuring Support Agreement dated August 8, 2016, among the Debtors, the Supporting Noteholders, the Supporting Lenders, and Supporting Interest Holders, including all exhibits, attachments, amendments and supplements thereto |
| *RSA Assumption Order* | An order of the Bankruptcy Court, in form and substance acceptable to Debtors, the Required Supporting Noteholders, the Supporting Lenders, and the Supporting Interest Holders, approving assumption of the RSA |
| *Sponsors* | Kelso Investment Associates VIII, L.P. and KEP VI, LLC |

| | |
|---|---|
| ***Unanimous Supporting Noteholders*** | All funds or financing vehicles (or funds or accounts advised or sub-advised by such persons) that are Supporting Noteholders and are affiliated with the following entities: Carl Marks, Marblegate, GSO and Kelso; <u>provided</u> that if any Supporting Noteholder described in this definition subsequently transfers or otherwise disposes of some or all of its Notes prior to the Effective Date such that it holds less than 5% of all outstanding Notes in the aggregate, such Supporting Noteholder shall be deemed removed from this definition and this definition shall be deemed revised to require consent from each of the remaining Supporting Noteholders described herein |
| ***Unexchanged Notes*** | The issued and outstanding 10.75% Senior Secured Notes due 2017 issued under the 2010 Indenture |

**3) Plan Terms**

| <u>Term</u> | <u>Description</u> |
|---|---|
| **Proposed Filing Entities** | The Debtors |
| **Supporting Lender Agreements** | The Supporting Lenders, subject to the terms of the RSA:<br><br>   a. Consent to the use of cash collateral and adequate protection as provided in the Interim DIP Order attached hereto as ***<u>Exhibit C</u>*** and the Final DIP Order;<br><br>   b. Commit to backstop the Exit Revolving Facility on the terms attached hereto as ***<u>Exhibit E</u>***;<br><br>   c. Agree to waive certain provisions of the Pre-Petition Intercreditor Agreement (as defined in the DIP Credit Agreement) as necessary to permit the actions, terms and conditions set forth herein and in the Interim DIP Order, the Final DIP Order and DIP Credit Agreement; and<br><br>   d. Not object to the terms of the DIP Facilities.<br><br>The Debtors shall solicit bids for the Alternative Exit Facility from third parties during the pendency of the Bankruptcy Cases, which financing, if obtained and acceptable to the Debtors, the Unanimous Supporting Noteholders and the Supporting Interest Holders, will be in lieu of the Exit Revolving Facility, and the proceeds of which shall be used to indefeasibly pay in cash, in full and final satisfaction, settlement, release, and discharge of and in exchange for the Obligations (as defined in the Credit Agreement) outstanding under the Credit Agreement, and any outstanding undrawn letters of credit |

| <u>Term</u> | <u>Description</u> |
|---|---|
| | shall be cash collateralized at 105% of the face amount thereof pursuant to arrangements satisfactory to the issuers thereof. |
| **Funded Debt to be Restructured** | • All Obligations under and as defined in the Credit Agreement<br>• The GSO Notes, Kelso Notes and Unexchanged Notes |
| **Plan Summary** | On the Effective Date, among other things:<br><br>1. Holders of claims against and interests in the Debtors shall receive the treatment materially consistent with the treatment set forth in ***<u>Exhibit A</u>***.<br><br>2. Equity Interests and all claims against the Debtors (other than intercompany interests and intercompany claims, to the extent provided in the Plan), and all debt securities issued by the Debtors prior to the Petition Date shall be cancelled and discharged in accordance with the Plan.<br><br>3. Reorganized Holdings shall issue the New Stock to holders of claims in accordance with the terms of the Plan.<br><br>4. The Reorganized Debtors shall consummate the Exit Financing Transactions (see below).<br><br>The Plan pro forma sources and uses summary is attached hereto as ***<u>Annex A</u>***. |
| **Exit Financing** | On the Effective Date, the following financing transactions shall be consummated (collectively, the "***Exit Financing Transactions***"):<br><br>1) <u>Exit First Lien Facility</u>: The Debtors shall enter into either the Exit Revolving Facility or an Alternative Exit Facility; in each case, providing not less than $29 million of availability that shall be used to satisfy the claims under the Credit Agreement, including, in the case of the Exit Revolving Facility, through a cashless roll of the Obligations outstanding under the Credit Agreement.<br><br>2) <u>Exit Second Lien Facility</u>: The Debtors shall enter into the Exit Second Lien Facility, which shall be used to satisfy the claims under the DIP Facilities through a cashless roll of the obligations outstanding under the DIP Facilities. The Second Lien Facility shall substantially conform to the Exit First Lien Facility, subject to customary cushions and cutbacks satisfactory to the Supporting Lenders (if the Exit First Lien Facility is the Exit Revolving Facility). |
| **Releases** | To the maximum extent permitted by applicable law, the Plan shall provide for a full release from liability of the Debtors, the Supporting Noteholders, the trustees for the 2010 Indenture and 2015 Indenture, |

| Term | Description |
|---|---|
| | the DIP Lenders, the DIP Agent and other lender-parties under the DIP Facilities, the lenders, the agents and other lender-parties under the Exit Financing Transactions, the Supporting Lenders (as well as any issuing bank) and the Revolving Facility Agent under the Credit Agreement, the Sponsors and each of their affiliates, and all individuals serving, or who have served since the Petition Date, as a manager, director, managing member, officer, partner, principal, representative, shareholder, agent, or employee of any of the foregoing and the attorneys and other advisors to each of the foregoing (including the Debtors) by the Debtors, all of their creditors and all of their interest holders from any claims and causes of action, whether known or unknown, foreseen or unforeseen, arising from or related to any actions, transactions, events or omissions before the Effective Date relating to the Debtors, the Bankruptcy Cases or the obligations under the 2010 Indenture, the 2015 Indenture, the DIP Facilities and the Credit Agreement; provided, however, (i) the foregoing release shall not apply to obligations arising under the RSA, the Plan, the Exit First Lien Facility or the Exit Second Lien Facility; and (ii) the foregoing release shall not be construed to prohibit a party in interest from seeking to enforce the terms of the RSA or the Plan. |
| **Exculpation** | The Plan shall provide for customary exculpation for all estate fiduciaries, including with respect to any official committee appointed in the Bankruptcy Cases. |
| **Conditions to Effective Date of Plan** | The following conditions shall be satisfied or waived (with the consent of the Debtors, the Required Supporting Noteholders, the Supporting Lenders, and the Supporting Interest Holders):<br><br>• The Bankruptcy Court shall have entered a Confirmation Order in form and substance reasonably acceptable to the Debtors, the Required Supporting Noteholders, the Supporting Lenders, and the Supporting Interest Holders<br>• The Confirmation Order shall be final, shall not have been modified or stayed following its entry, and the period in which such order could be appealed shall have expired<br>• The Exit First Lien Facility shall be fully committed and funded (or scheduled for funding upon consummation of the Plan)<br>• The Reorganized Debtors shall be a private, non-SEC reporting company on the Effective Date<br>• The Debtors shall have paid all fees and reasonable and documented out-of-pocket expenses payable to the Revolving Facility Agent, the Supporting Lenders, the trustees for the 2010 Indenture and 2015 Indenture, the Unanimous Supporting Noteholders, and the Supporting Interest Holders, including all reasonable and documented out-of-pocket fees and expenses of |

| **Term** | **Description** |
|---|---|
| | counsel and other professionals of the Revolving Facility Agent, the Supporting Lenders, the trustees for the 2010 Indenture and 2015 Indenture, the Unanimous Supporting Noteholders, the Supporting Interest Holders, and the DIP Agent (including Simpson Thacher & Bartlett LLP, King & Spalding LLP, Debevoise & Plimpton LLP, Dechert LLP, local Delaware counsel, CDG Group, LLC, and Morris, Nichols, Arsht & Tunnell LLP) |
| **Milestones** | • The Debtors shall commence the respective Bankruptcy Cases in the Bankruptcy Court no later than August 15, 2016 <br> • Each Debtor shall file a Plan consistent with this RSA Term Sheet and the RSA, and otherwise reasonably acceptable in form and substance to the DIP Agent, the Required DIP Lenders, the Debtors, the Supporting Lenders, the Required Supporting Noteholders, and the Supporting Interest Holders, and the Disclosure Statement, which shall be reasonably acceptable in form and substance to the DIP Agent, the Required DIP Lenders, the Debtors, the Supporting Lenders, the Required Supporting Noteholders, and the Supporting Interest Holders, in the Bankruptcy Cases by no later than August 15, 2016 <br> • The Debtors shall file a motion seeking approval of the DIP Facilities within one business day of the Petition Date <br> • The Interim DIP Order shall be entered in the Debtors' Bankruptcy Cases by no later than three (3) business days after the Petition Date <br> • The Final DIP Order shall be entered in the Bankruptcy Cases by no later than thirty-five (35) calendar days after the Petition Date <br> • The RSA Assumption Order shall be entered in the Debtors' Bankruptcy Cases by no later than thirty-five (35) calendar days after the Petition Date <br> • On or before September 26, 2016, the Debtors must seek to obtain exit financing from other third parties on terms similar to or better than the terms set forth in the Exit First Lien Facility. <br> • An order approving the Disclosure Statement, which shall be reasonably acceptable in form and substance to the DIP Agent, the Required DIP Lenders, the Debtors, the Supporting Lenders, the Required Supporting Noteholders, and the Supporting Interest Holders, shall be entered in the Bankruptcy Cases by no later than September 26, 2016 <br> • An order confirming the Plan, which shall be reasonably acceptable in form and substance to the DIP Agent, the Required DIP Lenders, the Debtors, the Supporting Lenders, the Required Supporting Noteholders, and the Supporting Interest Holders, shall be entered in the applicable Bankruptcy Cases by no later than |

| Term | Description |
|---|---|
| | November 7, 2016<br>• The Plan shall each become effective by no later than November 14, 2016 |
| **Investor Rights and Governance** | Usual and customary investor rights acceptable in both form and substance to the Unanimous Supporting Noteholders, including as to status as a private company, board selection, rights under a shareholders agreement, minority protections and trading restrictions as set forth in the governance term sheet attached as ***Exhibit F***. |
| **Private Company Status** | The Reorganized Debtors shall be a private, non-SEC reporting company on the Effective Date |
| **Management Incentive Plan** | The Plan will permit the establishment of the Management Incentive Plan on terms consistent with this RSA Term Sheet. |
| **Decisions Requiring Unanimous Approval** | Notwithstanding anything to the contrary herein, certain decisions shall require unanimous approval by the Unanimous Supporting Noteholders.  All decisions reserved to the unanimous approval of the Unanimous Supporting Noteholders are set forth on ***Annex B***. |
| **Indemnification** | The Plan shall provide that the Debtors' obligations to indemnify the trustees under the 2010 Indenture and 2015 Indenture and the Revolving Facility Agent under the Credit Agreement and the DIP Agent and DIP Lenders under the DIP Credit Agreement (the "Indemnified Parties") shall survive and shall continue in full force and effect for the benefit of the Indemnified Parties, notwithstanding confirmation of and effectiveness of the Plan, and such indemnification shall include, but not be limited to, all actions taken in connection with the RSA, the RSA Term Sheet, the filing of the Bankruptcy Cases, the DIP Facilities, the Interim DIP Order, the Final DIP Order and the DIP Credit Agreement. |

## 4) Other Matters

| Term | Description |
|---|---|
| **Support of DIP Facilities** | The Supporting Noteholders and the Supporting Lenders agree to consent to adequate protection and otherwise agree not to object to the terms of the DIP Facilities or cash collateral usage on terms that are materially consistent with the Interim DIP Order and the DIP Credit Agreement, and otherwise reasonably acceptable to the Debtors, the Required Supporting Noteholders, and the Supporting Lenders, subject to the terms of the Interim DIP Order and the Final DIP Order. |
| **Proposed Petition Date/Venue** | August 8, 2016 / Delaware |
| **Termination Events** | Termination Events shall include:<br><br>(i)      the breach in any material respect by any of the Debtors of any |

01:19116381.4

of its covenants, obligations, representations or warranties contained in the RSA, and such breach remains uncured for a period of five (5) business days from the date the Debtors receives a written notice from any of the Supporting Parties (such notice, the "Supporting Party Termination Notice");

(ii)     an Event of Default (as defined in the Interim DIP Order, Final DIP Order or DIP Credit Agreement) occurs under the DIP Facilities;

(iii)     the issuance by any governmental authority or court of competent jurisdiction of any ruling, decision, judgment or order enjoining or otherwise preventing the consummation of a material portion of the restructuring transaction contemplated by the RSA and this RSA Term Sheet (the "Restructuring Transaction") or requiring the Debtors to take actions inconsistent in any material respect with the Plan, unless such ruling, judgment or order has not been stayed, reversed or vacated within five (5) business days after the date of such issuance; provided, however, that if such issuance has been made at the request of any of the Supporting Parties, then the RSA shall not terminate on account of such issuance;

(iv)     the Debtors file any motion or pleading with the Bankruptcy Court that is inconsistent in any material respect with this Agreement, the DIP Loan Documents and such motion or pleading has not been withdrawn prior to the earlier of (i) three (3) business days after the Debtors receive written notice from the DIP Agent (acting at the direction of the Required DIP Lenders), the Required DIP Lenders, the Supporting Lenders, the Required Supporting Noteholders, or the Supporting Interest Holders that such motion or pleading is inconsistent with the RSA, and (ii) entry of an order of the Bankruptcy Court approving such motion or pleading;

(v)     the Bankruptcy Court grants relief that is inconsistent with the RSA in any material respect;

(vi)     the Debtors propose or support any alternative transaction;

(vii)     the Debtors (A) withdraw the Plan or publicly announce their intention to withdraw the Plan or to pursue an alternative transaction, (B) file a Plan document in form and substance that is not acceptable to each of the DIP Agent, the Required DIP Lenders, the Supporting Lenders, the Required Supporting Noteholders, and the Supporting Interest Holders, (C) move voluntarily to dismiss any of the Bankruptcy Cases, (D) move for conversion of any of the Bankruptcy Cases to chapter 7 under the Bankruptcy Code, or (E) move for the appointment of an examiner with expanded powers or a chapter 11 trustee in any of the Bankruptcy Cases; or (F) support any other party seeking any of the foregoing relief;

(viii)     any party obtains relief from the automatic stay with respect to

|  | any of the Debtors' assets of a value in excess of $200,000; |
|---|---|
|  | (ix)    the waiver, amendment or modification of the Plan or any of the DIP Loan Documents, in a manner inconsistent with this RSA Term Sheet, the RSA or the relevant DIP Loan Document, without the consent of each of the DIP Agent, the Required DIP Lenders, the Supporting Lenders, the Required Supporting Noteholders, and the Supporting Interest Holders; |
|  | (x)    the Plan, the Disclosure Statement and motion seeking entry of the order approving the Disclosure Statement are not filed with the Bankruptcy Court by August 15, 2016; |
|  | (xi)    an order approving the Disclosure Statement is not entered by September 26, 2016; |
|  | (xii)    the RSA Assumption Order is not entered within thirty-five (35) days of the Petition Date; |
|  | (xiii)    if the Interim DIP Order is not entered within three (3) business days of the Petition Date; |
|  | (xiv)    if the Final DIP Order is not entered within thirty-five (35) days of the Petition Date; |
|  | (xv)    on November 7, 2016, if the Confirmation Order confirming each Plan has not been entered; |
|  | (xvi)    on November 14, 2016, if the Effective Date has not occurred; |
|  | (xvii)    the Bankruptcy Court enters an order (A) directing the appointment of an examiner with expanded powers or a chapter 11 trustee in any of the Bankruptcy Cases, (B) converting any of the Bankruptcy Cases to cases under chapter 7 of the Bankruptcy Code or (C) dismissing any of the Bankruptcy Cases; |
|  | (xviii) if forty-five (45) days after any official committee appointed in the Bankruptcy Cases or a party in interest obtains standing to assert a Challenge (as defined in the Interim DIP Order), such Challenge is not resolved; or |
|  | (xix)  the Debtors exercise the Fiduciary Out (as defined below). |
| **Lease Analysis and Executory Contracts** | Lease and executory contract analysis to be completed no later than August 8, 2016. |
|  | No later than August 11, 2016, the Debtors will file one or more motions to reject certain unexpired leases as agreed to by the Required Supporting Noteholders and the Supporting Lenders.  In addition, the Plan will provide for the Debtors to assume or reject, as the case may be, executory contracts and unexpired leases identified on a list in a Plan supplement, which list shall be acceptable in form and substance to the Required Supporting Noteholders and the Supporting Lenders. |

| **Avoidance Actions** | The Reorganized Debtors shall retain the exclusive right to commence, prosecute, or settle all causes of action, including avoidance actions, as appropriate in accordance with the best interests of the Reorganized Debtors, except as expressly provided for in the Interim DIP Order, the Final DIP Order and the DIP Credit Agreement. |
|---|---|
| **Diligence** | The Supporting Noteholders' obligations hereunder are expressly subject to the completion of due diligence in the sole discretion of the Supporting Noteholders. |
| **Tax Structure** | The Plan shall be structured in a tax efficient manner for the benefit of the Unanimous Supporting Noteholders. |
| **Fiduciary Out** | The RSA will be subject to a customary fiduciary out for the Debtors (the "Fiduciary Out") |
| **PACA Claims** | The Debtors shall file on the Petition Date a motion to pay all PACA claims in an amount not to exceed $1,100,000. |

* * * * *

**Annex A**

01:19116381.4

22459642.15

**Plan - Pro Forma Sources & Uses Summary** *($mm)*

| Sources | Amount ($) |
|---|---|
| Exit Revolving Facility[1] | $    24.8 |
| Exit Second Lien Facility - DIP Refinancing[2] | 78.3 |
| **Total Sources** | **$    103.1** |

| Uses | Amount ($) |
|---|---|
| Refinance Prepetition Revolving Facility | $    23.9 |
| Exit Revolving Facility - Commitment Fee (PIK) | 0.9 |
| Cash for Operations / Case Requirements[3] | - |
| Refinance DIP Obligations | 76.8 |
| Exit Second Lien - Commitment Fee (DIP Roll) | 1.5 |
| **Total Uses** | **$    103.1** |

**Pro Forma Capitalization Summary** *($mm)*

| | Principal Amount | Interest Rate[4] | Maturity Date |
|---|---|---|---|
| Exit Revolving Facility | $    24.8 | L+700 Cash / 100 PIK | 15-May-19 |
| Exit Second Lien Facility | 78.3 | L + 850 PIK | 15-Nov-20 |
| **Total Debt** | **$    103.1** | | |
| Equity[5] | **TBD** | | |
| **Total Capitalization** | **TBD** | | |

Footnotes:

1. Total funded obligations at 6/30/16 plus PIK commitment fees of 3%. Assumes all outstanding LC's replaced under Exit Revolving Facility.

2. Includes $25 million new money DIP, $50 million roll-up DIP, 2% DIP commitment fee and 2% PIK Exit Second Lien Facility commitment fee and accrued interest on DIP.

3. Assumes balance sheet cash is sufficient to fund emergence (for operations, professional fees, and cash payments pursuant to the Plan).

4. Exit Second Lien Facility and Exit Revolving Facility subject to 1% LIBOR Floor. Exit Revolving Facility rate reflects initial rate; subject to step ups in years 2 and 3.

5. TBD based on Plan valuation

**Annex B**

The following matters, to the extent they occur before the Effective Date, shall be reserved for the unanimous approval of the Unanimous Supporting Noteholders:

1. Any modifications to the DIP Facilities that would (i) extend the maturity beyond December 14, 2016, (ii) change the aggregate principal amount of the New Money Facility, including increasing any commitments thereunder, (iii) decrease the rate of interest, or reduce any fee payable thereunder (or change the manner of computation of such rate of interest or fee that would result in such a decrease), (iv) change the lien and payment priority of the DIP Facilities or alter the pro rata sharing of payments required thereby, (v) alter the definition of Required DIP Lenders or Unanimous DIP Lenders, (vi) alter the adequate protection provided under the DIP Facilities, (vii) alter the amendment, consent, and waiver provisions of the DIP Facilities requiring unanimous consent of the Unanimous DIP Lenders, (viii) release all or substantially all of the DIP Collateral, (ix) release any Debtor from its obligations under the DIP Facilities, (x) impose any greater restrictions on the ability of a lender to assign its rights and obligations under the DIP Facilities, (xi) subordinate the obligations under the DIP Facilities or the liens granted to the DIP Agent to secure such obligations to any other indebtedness or liens, (xii) subject to clause (i) hereof, alter any event of default under the DIP Facilities in a manner adverse to the lenders thereunder, or (xiii) change any of the conditions precedent to the funding of a loan or a disbursement from the Segregated Pre-Funding Account (as such term is defined in the definitive documentation for the DIP Facilities).

2. Approval of the initial DIP Budget.

3. Any modifications to the Exit Second Lien Facility from the terms set forth on <u>Exhibit B</u> that would (i) change the maturity or postpone or waive any other date fixed for payment (other than usual customary mandatory prepayments such as asset sales, casualty events), (ii) decrease the rate of interest, or reduce any fee payable thereunder (or change the manner of computation of such rate of interest or fee that would result in such a decrease), (iii) change the lien and payment priority of the Exit Second Lien Facility or alter the pro rata sharing of payments required thereby, (iv) alter the amendment, consent, and waiver provisions of the Exit Second Lien Facility requiring unanimous consent of the lenders under the Exit Second Lien Facility who are Supporting Noteholders, (v) alter the definition of Required Lenders or comparable term, (vi) alter the scope of the collateral securing the Exit Second Lien Facility, including releasing all or substantially all of such collateral, (vii) impose any greater restrictions on the ability of a lender to assign its rights and obligations under the Exit Second Lien Facility, or (viii) subordinate the obligations under the Exit Second Lien Facility or the liens granted to the agent thereunder to secure such obligations to any other indebtedness or liens.

4. Any modifications to the Exit First Lien Facility from the terms set forth on <u>Exhibit E</u> that would (i) increase the commitment, shorten the maturity, increase the rate of interest by more than 150 basis points, or increase any fee payable thereunder, (ii) change the lien

and payment priority of the Exit First Lien Facility, or (iii) alter the scope of the collateral securing the Exit First Lien Facility.

5. Approval of entry into the Alternative Exit Facility, and all terms under the Alternative Exit Facility.

6. Any other change to the DIP Facilities, Exit First Lien Facility, or Exit Second Lien Facility that would materially adversely affect any of the rights or obligations of any Supporting Noteholder in a manner that is different or disproportionate in any respect from the effect on the rights or obligations (as applicable) of the Supporting Noteholders generally other than in proportion to the Supporting Noteholders' respective amounts of loans under the applicable debt facility.

7. Any modifications to the terms of the Plan set forth in the RSA Term Sheet and Exhibit A that would (a) materially change the proposed classification, impairment, and treatment of DIP Facilities Claims under the Plan, (b) materially change the proposed classification, impairment, and treatment of claims in Classes 2 through 4 under the Plan, (c) change the SEC-reporting status of the Reorganized Debtors, or (d) change the maximum percentage of New Stock that may be issued under the contemplated Management Incentive Plan.

8. Any other modifications to the Plan that would materially adversely affect any of the rights or obligations of any Supporting Noteholder in a manner that is different or disproportionate in any respect from the effect on the rights or obligations (as applicable) of the Supporting Noteholders generally other than in proportion to the Supporting Noteholders' respective claims.

9. Any material modifications to the post-Effective Date governance terms set forth in Exhibit F.

10. Any (a) extension of the RSA milestones relating to entry of the DIP Orders or (b) extension of the RSA milestones relating to the Plan effective date beyond December 14, 2016.

11. Any change to this Annex B.

## EXHIBIT A

## CLAIMS TREATMENT SUMMARY

Set forth below are the proposed classification, impairment and treatment of claims under the Plan:

| **Claims** | **Impairment** | **Treatment** |
|---|---|---|
| DIP Facilities Claims | N/A | To be satisfied by an in-kind exchange for obligations under the Exit Second Lien Facility |
| Administrative Expenses | N/A | Except to the extent a holder of an allowed administrative claim already has been paid during the Bankruptcy Cases or such holder, together with the Debtors and the Required Supporting Noteholders, agrees to less favorable treatment with respect to such holder's claim, each holder of an allowed administrative claim shall receive, in full satisfaction, settlement, release and discharge of, and in exchange for, its administrative claim, cash equal to the unpaid portion of its allowed administrative claim, to be paid on the latest of:  (a) the Effective Date, or as soon as reasonably practicable thereafter, if such administrative claim is allowed as of the Effective Date; (b) the date such administrative claim is allowed, or as soon as reasonably practicable thereafter; (c) the date such allowed administrative claim becomes due and payable, or as soon as reasonably practicable thereafter; *provided*, *however*, that allowed administrative claims that arise in the ordinary course of the Debtors' businesses shall be paid in the ordinary course of business, in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions; or (d) such other date as may be agreed upon between the holder of such allowed administrative claim and the Debtors (with the consent of the Required Supporting Noteholders) or the Reorganized Debtors, as the case may be. |

| Claims | Impairment | Treatment |
|--------|-----------|-----------|
| Priority Tax Claims | N/A | Except to the extent a holder of an allowed priority tax claim, together with the Debtors and the Required Supporting Noteholders, agrees to a different treatment, in full and final satisfaction, settlement, release, and discharge or and in exchange for each allowed priority tax claim, each such holder shall be paid, at the option of the Debtors, with the approval of the Required Supporting Noteholders, to the extent such claims are allowed, (i) in the ordinary course of the Debtors' business, consistent with past practice; *provided, however*, that in the event the balance of any such claim becomes due during the pendency of the Bankruptcy Cases and remains unpaid as of the Effective Date, the holder of such claim shall be paid in full in cash on the Effective Date, or (ii) in installment payments over a period of time not to exceed five years after the Petition Date, pursuant to Section 1129(a)(9)(C) of the Bankruptcy Code. |
| Class 1 Other Priority Claims | Unimpaired | Except to the extent that a holder of an allowed other priority claim, together with the Debtors and the Required Supporting Noteholders, agree to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each allowed other priority claim, each such holder shall be paid, to the extent such claim has not already been paid during the Bankruptcy Cases, in full in cash in the ordinary course of business by the Debtors or the Reorganized Debtors, as applicable, on or as soon as reasonably practicable after (i) the Effective Date, (ii) the date on which such other priority claim against the Debtor becomes allowed, or (iii) such other date as may be ordered by the Bankruptcy Court. Not entitled to vote; conclusively deemed to accept the Plan. |

| Claims | Impairment | Treatment |
|---|---|---|
| Class 2<br><br>Revolving Facility Lender Claims | Impaired | Revolving Facility Lender claims shall be allowed in full in the aggregate principal amount of not less than $23,899,525, plus all outstanding fees, interest, expenses and contingent reimbursement obligations, in each case, pursuant to and as provided in the Credit Agreement.<br><br>On the Effective Date, or as soon as thereafter as reasonably practicable, except to the extent that a holder of a Revolving Facility Lender claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for such claim, each holder of a Revolving Facility Lender claim shall receive a pro rata share of the Exit Revolving Facility, *provided*, *however*, that if the Debtors arrange for the Alternative Exit Facility, then each holder of a Revolving Facility Lender claim shall receive cash in the amount of its allowed claim in full and final satisfaction, settlement, release, and discharge of and in exchange for such claim and any outstanding undrawn letters of credit shall be cash collateralized at 105% of the face amount thereof, pursuant to arrangements satisfactory to the issuers thereof.<br><br>Entitled to vote, unless the Debtors enter into an Alternative Exit Facility. |

| **Claims** | **Impairment** | **Treatment** |
|---|---|---|
| Class 3<br><br>Claims arising under the GSO Notes and Kelso Notes | Impaired | GSO Notes claims shall be allowed in the aggregate principal amount of not less than $119.299 million, plus all outstanding fees, interest, expenses and other amounts due in accordance with the terms of the 2015 Notes Indenture, and less the amount of such claims that are exchanged for notes under the Roll Up Facility (as defined in the Interim DIP Order), with the secured portion of such claims receiving treatment pursuant to this Class 3.<br><br>Kelso Notes claims shall be allowed in the aggregate principal amount of not less than $122.598 million, plus all outstanding fees, interest, expenses and other amounts due in accordance with the terms of the 2015 Notes Indenture, and less the amount of such claims that are exchanged for notes under the Roll Up Facility (as defined in the Interim DIP Order), with the secured portion of such claims receiving treatment pursuant to this Class 3.<br><br>On the Effective Date, or as soon as thereafter as reasonably practicable, except to the extent that a holder of a GSO Note claim or Kelso Note claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for such claim, each holder of a GSO Note claim and/or a Kelso Note claim shall receive a pro rata share of the New Stock, subject to dilution for the Management Incentive Plan.<br><br>Entitled to vote. |

| Claims | Impairment | Treatment |
|---|---|---|
| Class 4<br><br>Claims arising under the Unexchanged Notes | Impaired | Unexchanged Notes claims shall be allowed in the aggregate principal amount of not less than $143.936 million plus all outstanding fees, interest, expenses and other amounts due in accordance with the terms of the 2010 Notes Indenture, and less the amount of such claims that are exchanged for notes under the Roll Up Facility (as defined in the Interim DIP Order), with the secured portion of such claims receiving treatment pursuant to this Class 4.<br><br>On the Effective Date, or as soon as thereafter as reasonably practicable, except to the extent that a holder of an Unexchanged Note claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for such the secured portion of such claim, each holder of a Unexchanged Note claim shall receive:<br><br>A.<br><br>   1) Subclass 4(a).  Each holder of Unexchanged Notes that, in the aggregate, holds equal to or in excess of $50,000 in principal amount of Unexchanged Notes shall receive a pro rata share of the New Stock, subject to dilution for the Management Incentive Plan.<br><br>   2) Subclass 4(b).  Each holder of Unexchanged Notes that, in the aggregate, holds less than $50,000 in principal amount of Unexchanged Notes shall receive a Cash-Out Payment.<br><br>B.  If Subclass 4(b) votes to accept the Plan, then each holder of Unexchanged Notes in Subclass 4(b) shall receive its Cash-Out Payment in the form of cash.<br><br>C.  If Subclass 4(b) votes to reject the Plan, then each holder of Unexchanged Notes in Subclass 4(b) shall receive a Cash-Out Payment in the form of New Secured Notes.<br><br>Entitled to vote. |

| Claims | Impairment | Treatment |
|---|---|---|
| Class 5<br><br>General Unsecured Claims | Impaired | On the Effective Date, or as soon as thereafter as reasonably practicable, except to the extent that a holder of a General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for such claim, each holder of a General Unsecured Claim (including each holder of a Notes Deficiency Claim) shall receive:<br><br>  a) If Class 5 votes in favor of the Plan, its pro rata share of a $350,000 cash pool.<br><br>  b) If Class 5 rejects the Plan, holders of claims in Class 5 shall receive no distribution on account of their claims.<br><br>Entitled to Vote. |
| Class 6<br><br>Intercompany Claims | Unimpaired | Intercompany claims shall be reinstated, cancelled or compromised as determined by the Debtors with the consent of the Required Supporting Noteholders.<br><br>Not entitled to vote; deemed to accept the Plan |
| Class 7<br><br>Claims Subordinated Under Section 510(a) of the Bankruptcy Code | Impaired | No distribution under the Plan.<br><br>Not entitled to vote; deemed to reject the Plan. |
| Class 8<br><br>Equity Interests | Impaired | Equity Interests shall be canceled; the holders thereof will receive no distribution under the Plan.<br><br>Not entitled to vote; deemed to reject the Plan. |
| Class 9<br><br>Intercompany Interests | Unimpaired | Equity interests in a Debtor held by another Debtor shall be cancelled, or reinstated as determined by the Debtors with the consent of the Required Supporting Noteholders.<br><br>Not entitled to vote; deemed to accept the Plan. |

**EXHIBIT B**

**EXIT SECOND LIEN FINANCING TERM SHEET**

01:19116381.4

**Logan's Roadhouse –Exit Second Lien Term Loan**
**Summary of Principal Terms and Conditions**

This summary of terms and conditions (the "Term Sheet") describes the principal terms and conditions for the Exit Second Lien Facility (as defined below) contemplated to be entered into upon consummation of the Plan, subject to the terms and conditions herein and in the Restructuring Support Agreement, by and among Roadhouse Holding, Inc. and each of its direct and direct subsidiaries party thereto, Kelso Investment Associates VIII, L.P., KEP VI, LLC, the Supporting Noteholders (as defined therein), JPMorgan Chase Bank, N.A., the Supporting Lenders (as defined therein), and any Joining Party (as defined therein) from time to time party thereto (the "Restructuring Support Agreement") and the Plan. Capitalized terms used but not defined shall have the meanings set forth in the Restructuring Support Agreement to which this Term Sheet is attached.

| | |
|---|---|
| **Facility:** | Senior secured second lien term loans (the "Exit Second Lien Facility") in an aggregate principal amount equal to all obligations outstanding under the DIP Facilities on the Effective Date |
| **Borrower:** | Logan's Roadhouse, Inc., or such other persons as are borrowers under the Exit First Lien Facility |
| **Guarantors:** | LRI Holdings, Inc., Logan's Roadhouse of Kansas, Inc., and Logan's Roadhouse of Texas, Inc., or such other persons as are guarantors of the Exit First Lien Facility |
| **Maturity:** | [November 14, 2020] |
| **Collateral:** | Second priority liens on all collateral securing the Exit First Lien Facility |
| **Interest:** | LIBOR plus 850 bps, payable in cash or in kind at the option of Borrower; subject to a 1% LIBOR floor |
| **Default Interest:** | Non-default interest plus 200bps |
| **Fees:** | Commitment Fee equal to 2% of the initial aggregate principal amount of the Exit Second Lien Facility, which such fee shall be capitalized and added to the balance of the Exit Second Lien Facility |
| **Financial Covenants:** | No more restrictive than those in the Exit First Lien Facility, and otherwise to be mutually agreed upon by the Debtors and the Required Supporting Noteholders: |

LTM Minimum EBITDA (tested quarterly):

- Through Q1 2017: 60% cushion to Business Plan
- Q2 2017: 50% cushion to Business Plan
- Q3 2017-Q4 2017: 40% cushion to Business Plan
- Thereafter: 35% cushion to Business Plan

LTM Maximum CapEx (tested quarterly):

- Based on 20% cushion to Business Plan

| | |
|---|---|
| **Other Negative Covenants:** | No more restrictive than those in the Exit First Lien Facility, and otherwise to be mutually agreed upon by the Debtors and the Required Supporting Noteholders |
| **Change of Control** | To be mutually agreed upon by the Debtors and the Required Supporting Noteholders |
| **Optional Prepayment** | At any time without premium or penalty, on a pro-rata basis |

1002244695v3

**Mandatory Prepayments:**      To be mutually agreed upon by the Debtors and the Required Supporting Noteholders

**Unanimous Noteholder Approval**      Notwithstanding anything to the contrary herein, certain decisions shall require approval by the Unanimous Supporting Noteholders.  All decisions reserved to the unanimous approval of the Unanimous Supporting Noteholders are set forth on Annex B to the RSA Term Sheet.

**EXHIBIT C**

**INTERIM DIP ORDER**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ROADHOUSE HOLDING INC., *et al.*,[1] | Case No. __-_____ (___) |
| Debtors. | (Jointly Administered) |
| | Ref. Docket No. __ |

**INTERIM ORDER (I) PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 507 AND 552 AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING, (B) GRANT LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (C) USE CASH COLLATERAL OF PREPETITION SECURED PARTIES, AND (D) GRANT ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (II) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND 4001(c); AND (III) GRANTING RELATED RELIEF**

Upon the motion dated August 8, 2016 (the "**Motion**")[2] of the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**") in the above-referenced chapter 11 cases (the "**Bankruptcy Cases**"), for entry of an interim order (this "**Interim Order**") and a final order (the "**Final Order**"), under sections 105, 361, 362, 363, 364, 507 and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended, the "**Bankruptcy Code**"), Rules 2002, 4001(b), 4001(c), 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "**Bankruptcy Rules**") and Rules 4001-2 and 9013-1(m) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"):

        (i)         authorizing the Debtors to (A) obtain postpetition financing pursuant to the terms and conditions of that certain Debtor-in-Possession Credit

---

[1]   The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Roadhouse Holding Inc. (5939); Roadhouse Intermediate Inc. (6159); Roadhouse Midco Inc. (6337); Roadhouse Parent Inc. (5108); LRI Holdings, Inc. (4571); Logan's Roadhouse, Inc. (2074); Logan's Roadhouse of Texas, Inc. (2372); and Logan's Roadhouse of Kansas, Inc. (8716). The location of the Debtors' corporate headquarters is 3011 Armory Drive, Suite 300, Nashville, Tennessee 37204.

[2]   Each capitalized term used but not otherwise defined herein shall have the meaning ascribed to it in the Motion or the DIP Credit Agreement (as defined below), as applicable.

Agreement entered into on or about the date hereof attached hereto as Exhibit 1 (as further amended, restated, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof, the "**DIP Credit Agreement**") among Logan's Roadhouse, Inc. (a debtor in possession), as borrower (the "**Borrower**"), Cortland Capital Market Services LLC, as administrative agent and collateral agent (the "**DIP Agent**"), the lenders party thereto from time to time (the "**DIP Lenders**") and the Guarantors (as defined below), the obligations of the Borrower under which are guaranteed pursuant to the Guaranty Agreement executed in connection therewith by the guarantors party thereto (the "**Guarantors**" and, together with the Borrower, the "**Loan Parties**"), and (B) incur the Obligations under (and as defined in) the DIP Credit Agreement;

(ii) authorizing the Debtors to execute and deliver the DIP Loan Documents (as defined in the DIP Credit Agreement as "Loan Documents") and to perform their respective obligations thereunder and such other and further acts as may be required in connection with the DIP Loan Documents, including, without limitation, the payment of all principal, interest, fees, expenses, and other amounts payable under the DIP Loan Documents as such amounts become due and payable;

(iii) authorizing the Debtors to grant security interests, liens, and super-priority claims, including a super-priority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code and liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code (including priming liens pursuant to section 364(d)(1)) of the Bankruptcy Code to the DIP Agent, for the benefit of the DIP Lenders), in the DIP Collateral as set forth herein, including, without limitation, all property constituting "cash collateral," as defined in Bankruptcy Code section 363(a) (the "**Cash Collateral**"), to secure all obligations under the DIP Loan Documents, subordinated on a junior basis only to the Revolving Facility Liens, Revolving Facility Adequate Protection Liens, the Carve-Out and Permitted Liens (each as defined below);

(iv) authorizing the Debtors' use of Cash Collateral of the Prepetition Secured Parties (as defined below) and the provision of adequate protection to the Prepetition Secured Parties for any diminution in value of their interests in the Prepetition Collateral, including Cash Collateral;

(v) authorizing the Debtors to borrow under the New Money Facility up to an aggregate principal amount of $[25] million (the "**New Money Facility**"), $[10] million of which shall be available following entry of this Interim Order and the satisfaction of the other applicable conditions in the DIP Credit Agreement, with the remainder of the New Money Facility to be made available upon entry of the Final Order and the satisfaction of the

2

other applicable conditions in the DIP Credit Agreement and, in each case, to use the proceeds thereof in accordance with the DIP Budget (as defined herein);

(vi)    authorizing the Debtors to issue new notes (the "**Roll Up Facility**" and together with the New Money Facility, the "**DIP Facilities**"), upon entry of this Interim Order, in exchange for each DIP Lender's claim for notes issued under the Prepetition Indentures (as defined below) on a dollar-for-dollar basis for every dollar of borrowings actually disbursed under the New Money Facility, and upon entry of a Final Order granting such relief and the corresponding exchange of notes issued under the Prepetition Indentures, additional notes under the Roll Up Facility so that the total notes under the Roll Up Facility received by each DIP Lender that has a claim for notes issued under the Prepetition Indentures shall result in an exchange on a 2:1 basis for every dollar of borrowings actually disbursed under the New Money Facility;

(vii)    modifying the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and this Interim Order;

(viii)    scheduling a final hearing (the "**Final Hearing**") to consider entry of the Final Order granting the relief requested in the Motion on a final basis and approving the form of notice with respect to the Final Hearing; and

(ix)    granting related relief.

An interim hearing on the Motion having been held by this Court on August [__], 2016 (the "**Interim Hearing**"); and this Court having found that the relief requested in the Motion is in the best interest of the Debtors, their estates, their creditors and other parties-in-interest and necessary to avoid immediate and irreparable harm; and this Court having determined that the legal and factual bases set forth in the Motion and all pleadings related thereto, including the *Declaration of Keith A. Maib in Support of Chapter 11 Petitions and First Day Relief* filed contemporaneously with the Motion, and on the record made at the Interim Hearing, adequately establish just cause for the relief granted herein; and all objections, if any, to entry of this Interim Order having been withdrawn, resolved or overruled by this Court; and after due deliberation and consideration, and good and sufficient cause appearing therefor:

## THIS COURT HEREBY FINDS AND CONCLUDES AS FOLLOWS:[3]

A.    On August [__], 2016 (the "**Petition Date**"), each Debtor filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are continuing to operate their respective businesses and manage their respective properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Each Debtor's bankruptcy case (collectively, the "**Bankruptcy Cases**") is being jointly administered for procedural purposes only under case number [16-_____ (___)].  No official committee of unsecured creditors (upon the appointment thereof, the "**Committee**"), as provided for under section 1102 of the Bankruptcy Code, has been appointed in these Bankruptcy Cases.

B.    This Court has jurisdiction over the Bankruptcy Cases, the Motion and the parties and property affected hereby, pursuant to 28 U.S.C. §§ 157(b) and 1334.  Consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  This Court may enter a final order consistent with Article III of the United States Constitution.  Venue of the Bankruptcy Cases is proper before this District pursuant to 28 U.S.C. §§ 1408 and 1409.

C.    On the Petition Date, the Debtors filed the Motion with this Court pursuant to Rules 2002, 4001 and 9014, and provided notice of the Motion and the Interim Hearing by facsimile, electronic mail or overnight mail to the following parties and/or their respective counsel as indicated below:  (i) the Office of the United States Trustee for Region 3, serving the District of Delaware (the "**U.S. Trustee**"); (ii) counsel to GSO Capital Partners LP ("**GSO**"); (iii) counsel to Kelso & Company, L.P. ("**Kelso**"); (iv) counsel to Carl Marks Management Company, LLC ("**Carl Marks**") and Marblegate Asset Management, LLC

---

[3]    The findings and conclusions set forth in this Interim Order constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

("**Marblegate**"); (v) counsel to JPMorgan Chase Bank, N.A., in its capacity as Administrative Agent and Collateral Agent (in such capacity, the "**Revolving Facility Agent**") under the Credit Agreement dated as of October 4, 2010, among Roadhouse Financing, Inc. (now known as Logan's Roadhouse, Inc.), Roadhouse Merger, Inc. (now known as LRI Holdings, Inc.), JPMorgan Chase Bank, N.A., as Administrative Agent and the lenders party thereto (the "**Revolving Facility Lenders**"), and all exhibits, amendments, and supplements thereto (the "**Credit Agreement**"), (vi) counsel to the trustee (the "**2015 Trustee**") under that certain Indenture dated as of October 15, 2015, among Logan's Roadhouse, Inc., LRI Holdings, Inc. and Wells Fargo Bank, N.A., as trustee and collateral agent, and all exhibits, amendments, and supplements thereto, including, without limitation, the Series 2015-1 Supplemental Indenture dated October 15, 2015, the Second Series 2015-1 Supplemental Indenture dated October 15, 2015 and the Series 2015-2 Supplemental Indenture dated October 15, 2015 (collectively, the "**2015 Indenture**"), (vii) counsel to the trustee (the "**2010 Trustee**," together with the 2015 Trustee, the "**Trustees,**" and the Trustees together with the Revolving Facility Agent, the "**Prepetition Agents**") under that certain Senior Secured Notes Indenture, dated as of October 4, 2010, among Roadhouse Financing, Inc., Roadhouse Merger, Inc. and BOKF, N.A., as trustee and collateral agent, and all exhibits, amendments, and supplements thereto (the "**2010 Indenture**," and together with the 2015 Indenture, the "**Prepetition Indentures**"); (viii) counsel to the DIP Agent; (ix) counsel to the DIP Lenders; (x) the creditors (excluding insiders) holding the 30 largest unsecured claims against the Debtors on a consolidated basis; (xi) the United States Attorney's Office for the District of Delaware; (xii) the United States Attorney General; (xiii) the Internal Revenue Service; (xiv) the Securities and Exchange Commission; (xv) all entities known or reasonably believed to have asserted a security interest or lien against property

of the Debtors; and (xvi) all parties entitled to notice pursuant to Local Rule 9013-1(m) (the parties set forth in the preceding clauses (i) through (xvi), collectively, the "**Notice Parties**"). Given the nature of the relief sought in the Motion and the exigent circumstances underlying the interim relief requested thereby, this Court concludes that no further notice is necessary for entry of this Interim Order.

        D.      The Debtors and (i) the Revolving Facility Lenders, (ii) the Revolving Facility Agent,  and (iii) affiliates of, or funds managed, controlled or sub-advised by, (1) GSO, (2) Kelso, (3) Carl Marks and (4) Marblegate have entered into that certain Restructuring Support Agreement dated August 8, 2016 (as amended, supplemented, modified, extended, renewed, restated and/or replaced in accordance therewith, together with any schedules and exhibits thereto, (collectively, the "**RSA**")), pursuant to which the parties have, among other things, agreed to support a restructuring and recapitalization of the Debtors and the other transactions contemplated therein, including the relief requested in the Motion pursuant to the terms thereof.

        E.      Subject to paragraph 27 below, the Debtors hereby, and, pursuant to the DIP Loan Documents, admit, stipulate and agree that:

        (1)    <u>First Lien Revolving Credit Facility</u>:  Prior to the commencement of the Bankruptcy Cases, pursuant to the Credit Agreement, the Revolving Facility Lenders extended to Logan's Roadhouse, Inc. ("**Logan's Roadhouse**") a $30.0 million Senior Secured First Lien Revolving Facility (the "**Revolving Facility**").  The Revolving Facility is guaranteed by certain affiliates, including LRI Holdings, Inc. and certain subsidiaries, of Logan's Roadhouse (together with Logan's Roadhouse, the "**Existing Loan Parties**" and each an "**Existing Loan Party**") and secured by liens on substantially all of the assets of the Existing Loan Parties, with certain exceptions to the extent set forth in the Revolving Facility Loan Documents (as defined below).  All Obligations (as such term is defined in the Credit Agreement) of the Existing Loan Parties arising under the Credit Agreement and all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to, or in favor of the

Revolving Facility Lenders, including, without limitation, mortgages, security agreements, guaranties and UCC financing statements and all other related agreements, documents, notes, certificates, and instruments executed and/or delivered in connection therewith or related thereto (as amended, modified or supplemented and in effect, collectively the "**Revolving Facility Loan Documents**"), including, without limitation, all loans, advances, debts, liabilities, principal, accrued or hereafter accruing interest, fees, costs, charges, expenses (including any and all attorneys', accountants', appraisers' and financial advisors' fees and expenses that are chargeable, reimbursable or otherwise payable under the Revolving Facility Loan Documents), L/C Exposure (as defined in the Credit Agreement) indemnification obligations and obligations for the performance of covenants, tasks or duties, or for the payment of monetary amounts arising under the Revolving Facility Loan Documents to the Revolving Facility Agent or Revolving Facility Lenders by the Existing Loan Parties, of any kind or nature, whether or not evidenced by any note, agreement or other instrument, shall hereinafter be referred to as the "**Revolving Facility Obligations**."

(2)    <u>2010 Indenture</u>:   Prior to the commencement of the Bankruptcy Cases, pursuant to the 2010 Indenture, Logan's Roadhouse issued $355.0 million in principal of 10.75% senior secured notes due 2017 (the "**2010 Notes**"), of which $143.936 million of principal amount remain issued and outstanding. The 2010 Notes were guaranteed by the other Existing Loan Parties and secured by liens on substantially all of the assets of the Existing Loan Parties, with certain exceptions to the extent set forth in the 2010 Indenture Documents (as defined below).   All Obligations (as such term is defined in the 2010 Indenture) of the Existing Loan Parties arising under the 2010 Indenture and all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to, or in favor of the holders of the 2010 Notes (the "**2010 Noteholders**"), including, without limitation, mortgages, security agreements, guaranties and UCC financing statements and all other related agreements, documents, notes, certificates, and instruments executed and/or delivered in connection therewith or related thereto (as amended, modified or supplemented and in effect, collectively the "**2010 Indenture Documents**"), including, without limitation, all loans, advances, debts, liabilities, principal, accrued or hereafter accruing interest, fees, costs, charges, expenses (including any and all attorneys', accountants', appraisers' and financial advisors' fees and expenses that are chargeable, reimbursable or otherwise payable under the 2010 Indenture Documents) and obligations for the performance of covenants, tasks or duties, or for the payment of monetary amounts arising under the 2010 Indenture to the 2010 Trustee or 2010 Noteholders by the Existing Loan Parties, of any kind or nature, whether or not evidenced by any note, agreement or other instrument, shall hereinafter be referred to as the "**2010 Note Obligations**."

(3)    <u>2015 Indenture</u>:  Prior to the commencement of the Bankruptcy Cases, pursuant to the 2015 Indenture, Logan's Roadhouse refinanced certain of the 2010 Notes and issued $112.547 million in principal of Series 2015-1 senior secured notes due 2017 and $109.732 million in principal of Series 2015-2 senior secured notes due 2017 (collectively, the "**2015 Notes**," and the 2015 Notes and 2010 Notes are collectively referred to as the "**Prepetition Notes**"). The 2015 Notes were guaranteed by the Existing Loan Parties and secured by liens on substantially all of the assets of the Existing Loan Parties, with certain exceptions to the extent set forth in the 2015 Indenture Documents (as defined below).  All Obligations (as such term is defined in the 2015 Indenture) of the Existing Loan Parties arising under the 2015 Indenture and all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to, or in favor of the holders of the 2015 Notes (the "**2015 Noteholders**" and together with the 2010 Noteholders, the "**Prepetition Noteholders**"), including, without limitation, mortgages, security agreements, guaranties and UCC financing statements and all other related agreements, documents, notes, certificates, and instruments executed and/or delivered in connection therewith or related thereto (as amended, modified or supplemented and in effect, collectively the "**2015 Indenture Documents**" and together with the 2010 Indenture Documents, the "**Prepetition Indenture Documents**"), including, without limitation, all loans, advances, debts, liabilities, principal, accrued or hereafter accruing interest, fees, costs, charges, expenses (including any and all attorneys', accountants', appraisers' and financial advisors' fees and expenses that are chargeable, reimbursable or otherwise payable under the 2015 Indenture Documents) and obligations for the performance of covenants, tasks or duties, or for the payment of monetary amounts arising under the 2015 Indenture to the 2015 Trustee or 2015 Noteholders by the Existing Loan Parties, of any kind or nature, whether or not evidenced by any note, agreement or other instrument, shall hereinafter be referred to as the "**2015 Note Obligations**" and together with the 2010 Note Obligations, the "**Prepetition Note Obligations**," and the Prepetition Note Obligations together with the Revolving Facility Obligations, the "**Prepetition Secured Obligations**").

(4)    <u>Revolving Facility Collateral</u>:  Pursuant to certain Revolving Facility Loan Documents, including that certain First Lien Guarantee and Collateral Agreement dated as of October 4, 2010, and entered into by and among the Revolving Facility Agent, for the benefit of itself and the Revolving Facility Lenders, Logan's Roadhouse and each other party signatory thereto, each Existing Loan Party granted to the Revolving Facility Agent, for the benefit of itself and the Revolving Facility Lenders and the other holders of the Revolving Facility Obligations (the "**Revolving Facility Secured Parties**"), to secure such Revolving Facility Obligations, a

security interest in and continuing lien on substantially all of such Existing Loan Party's assets (subject to certain exceptions to the extent set forth in the Revolving Facility Loan Documents). All collateral granted or pledged by the Existing Loan Parties pursuant to the Revolving Facility Loan Documents shall collectively be referred to herein as the "**Revolving Facility Collateral**."

(5)     2010 Notes Collateral:  Pursuant to certain 2010 Indenture Documents, including that certain Security Agreement dated as of October 4, 2010, and entered into by and among the 2010 Trustee, for the benefit of itself and the 2010 Noteholders, Logan's Roadhouse and each other party signatory thereto, each Existing Loan Party granted to the 2010 Trustee, for the benefit of itself and the 2010 Noteholders (the "**2010 Note Secured Parties**"), to secure such 2010 Note Obligations, a security interest in and continuing lien on substantially all of such Existing Loan Party's assets (subject to certain exceptions to the extent set forth in the 2010 Indenture Documents). All collateral granted or pledged by the Existing Loan Parties pursuant to the 2010 Indenture Documents shall collectively be referred to herein as the "**2010 Note Collateral**."

(6)     2015 Notes Collateral:  Pursuant to certain 2015 Indenture Documents, including that certain Security Agreement dated as of October 15, 2015, and entered into by and among the 2015 Trustee, for the benefit of itself and the 2015 Noteholders, Logan's Roadhouse and each other party signatory thereto, each Existing Loan Party granted to the 2015 Trustee, for the benefit of itself and the 2015 Noteholders (the "**2015 Note Secured Parties**," and together with the 2010 Note Secured Parties, the "**Prepetition Note Secured Parties**," and the Prepetition Note Secured Parties together with the Revolving Facility Secured Parties, the "**Prepetition Secured Parties**"), to secure such 2015 Note Obligations, a security interest in and continuing lien on substantially all of such Existing Loan Party's assets (subject to certain exceptions to the extent set forth in the 2015 Indenture Documents). All collateral granted or pledged by the Existing Loan Parties pursuant to the 2015 Indenture Documents shall collectively be referred to herein as the "**2015 Note Collateral**," and together with the 2010 Note Collateral, the "**Prepetition Note Collateral**," and the Revolving Facility Collateral together with the Prepetition Note Collateral, the "**Prepetition Collateral**."

(7)     Intercreditor Agreement:  That certain Intercreditor Agreement, dated as of October 4, 2010 (as amended by Amendment No. 1 to Intercreditor Agreement, dated as of October 15, 2015), by and among the Revolving Facility Agent, the Trustees, the Borrower, LRI Holdings, Inc., Logan's Roadhouse of Texas, Inc. and Logan's Roadhouse of Kansas, Inc., as further amended by that certain Waiver to Intercreditor Agreement, dated as of August [__], 2016, by and among the Existing Loan Parties, the

Revolving Facility Agent, for the benefit of itself and the Revolving Facility Secured Parties, the 2010 Trustee, for the benefit of itself and the 2010 Note Secured Parties, and the 2015 Trustee, for the benefit of itself and the 2015 Note Secured Parties (the "**Prepetition Intercreditor Agreement Waiver**," attached hereto as <u>Exhibit 2</u>) (collectively, as further amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, and including the Prepetition Intercreditor Agreement Waiver, the "**Intercreditor Agreement**" and, together with the Revolving Facility Loan Documents and the Prepetition Indenture Documents, the "**Prepetition Credit Documents**"). The Intercreditor Agreement shall be enforceable among the parties thereto in determining the relative priorities and rights of the DIP Agent and DIP Lenders, the Revolving Facility Secured Parties and the Prepetition Note Secured Parties (including, without limitation, the relative priorities and rights of the Revolving Facility Secured Parties and the Prepetition Note Secured Parties with respect to the Adequate Protection Obligations (as defined below) granted hereunder), and such priorities and rights shall continue to be governed by the Prepetition Credit Documents, the Intercreditor Agreement, and all related agreements and documents.

(8)     <u>Validity of Prepetition Credit Documents</u>:     All Prepetition Credit Documents executed and delivered by the Debtors to the Prepetition Secured Parties are valid, binding and enforceable in accordance with their terms by the Prepetition Secured Parties against each of the applicable Debtors and not subject to avoidance, whether under the Bankruptcy Code or otherwise. The Prepetition Secured Parties duly and validly perfected their liens upon and security interests in the Prepetition Collateral (other than funds in the Excluded Accounts[4]) by, among other things, filing financing statements, entering into deposit account control agreements and, where necessary, possessing the relevant instruments, certificates, or other property. All of such financing statements were validly authorized by authorized representatives of the applicable Debtors. Pursuant to the Prepetition Credit Documents, the Prepetition Secured Parties have properly perfected and non-avoidable security interests in and liens on all of the Prepetition Collateral, including, without limitation, Cash Collateral (other than funds in the Excluded Accounts).

(9)     <u>Liens on Prepetition Collateral</u>:     The liens and security interests of the Prepetition Secured Parties in the Prepetition Collateral, including the Cash Collateral (other than funds in the Excluded Accounts), as security for the Prepetition Secured Obligations, constitute valid, binding, enforceable and properly perfected liens and security interests and are not subject to any challenge or defense including, without limitation,

---

[4]     The "Excluded Accounts" are those zero-balance accounts held at Wells Fargo Bank, N.A. with account numbers ending (5730), (5743), (0119), (8546) and (1449) and depository accounts at Fifth-Third Bank, N.A. with account numbers ending (6796) and (5998).

impairment, recoupment, attachment, disallowance, disgorgement, reduction, recharacterization, recovery, attack, offset, counterclaim, cross-claim, Claim,[5] avoidance, disallowance or subordination (whether equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law (except insofar as such liens are subordinated as set forth in the Prepetition Credit Documents and subordinated to the DIP Liens and the Carve-Out in accordance with the provisions of this Interim Order).  The Debtors further admit, acknowledge and agree that (A) the Prepetition Secured Obligations constitute legal, valid and binding obligations of each of the Existing Loan Parties, (B) no offsets, defenses, reductions, impairments, grounds for avoidance, recoupments, subordinations (except as set forth in the Prepetition Credit Documents) or disallowance (whether under the Bankruptcy Code or otherwise), Claims, crossclaims or counterclaims with respect to the Prepetition Secured Obligations exist and (C) no portion of the Prepetition Secured Obligations is subject to any challenge or defense including, without limitation, impairment, recoupment, attachment, disallowance, disgorgement, reduction, recharacterization, recovery, attack, offset, counterclaim, cross-claim, Claim, avoidance, disallowance or subordination (whether equitable or otherwise, except as set forth in the Prepetition Credit Documents) pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

(10)    Cash Collateral:  All cash proceeds of the Prepetition Collateral, including all such cash proceeds held in any of the Existing Loan Parties banking, checking or other deposit accounts with financial institutions (in each case, other than trust, escrow and custodial funds held as of the Petition Date in properly established trust, escrow and custodial accounts or funds held in the Excluded Accounts), wherever located, are Cash Collateral of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code.  The Prepetition Secured Parties are entitled, pursuant to sections 105, 361, 362 and 363(e) of the Bankruptcy Code, to adequate protection of their interest in the Prepetition Collateral, including the Cash Collateral, for any diminution in the value thereof.

(11)    Priming of DIP Facilities:  In entering into the DIP Loan Documents, and as consideration therefor, each of the Debtors hereby agrees that until such time as all outstanding obligations under the DIP Facilities (the "**DIP Obligations**") have been indefeasibly paid in full in cash (or other arrangements for payment of the DIP Obligations satisfactory to the DIP Lenders in their sole and exclusive discretion have been made) and the DIP Credit Agreement has been terminated in accordance with the terms thereof, the Debtors shall not in any way prime or seek to prime the

---

[5]    The term "Claim" as used in this Interim Order shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

claims, security interests and DIP Liens provided to the DIP Lenders under this Interim Order or the DIP Loan Documents by offering a subsequent lender or a party-in-interest a superior or *pari passu* lien or claim pursuant to section 364(c)(1) or section 364(d) of the Bankruptcy Code or otherwise, except as provided for in the DIP Loan Documents or in this Interim Order.

(12)     <u>No Valid Claims</u>:   The Debtors have no valid Claims, counterclaims, cross-claims, recoupments, causes of action, defenses or setoff rights against the Prepetition Secured Parties, and their respective shareholders, affiliates, partners, members, officers, directors, employees, financial advisors, attorneys, agents and other representatives, with respect to the Revolving Facility Loan Documents, the 2010 Indenture Documents and the 2015 Indenture Documents, whether arising at law or at equity, including, without limitation, any recharacterization, subordination (whether equitable or otherwise), avoidance or other claims arising under or pursuant to sections 105, 510, 541 or 542 through 553, inclusive, of the Bankruptcy Code or any theory of "lender liability" under applicable state law or otherwise.

(13)     <u>Amount of Prepetition Secured Obligations</u>:   As of the Petition Date, the aggregate principal balance of the Prepetition Secured Obligations for which the Debtors were truly and justly indebted to the Prepetition Secured Parties, without defense, counterclaim, cross-claim, Claim, challenge, recoupment or offset of any kind, are comprised of not less than approximately (A) an aggregate principal balance of $23,899,525 of Loans and $5,100,475 of L/C Exposure under the Revolving Facility, <u>plus</u> all other Revolving Facility Obligations, (B) an aggregate principal balance of no less than $143.936 million on account of the 2010 Notes, <u>plus</u> all other 2010 Note Obligations, and (C) an aggregate principal balance of no less than $234.089 million on account of the 2015 Notes, <u>plus</u> all other 2015 Note Obligations.

(14)     <u>No Claims</u>.   Subject to paragraph 27 below, the admissions, stipulations and agreements set forth in paragraph E of this Interim Order are based upon and consistent with the Debtors' due diligence and analysis of the Prepetition Secured Parties' liens and claims and determination that subject to paragraph 14 below, the Debtors have no Claims, counterclaims, cross-claims, recoupments, causes of action, challenges, grounds for subordination (whether equitable, contractual or otherwise), defenses or setoff rights with respect to the Prepetition Secured Parties' liens and claims.

(15)     <u>Release</u>.   Each Debtor and anyone who claims an interest by, through or under their estates forever and irrevocably release, discharge, and acquit each of the former, current, or future DIP Agents, DIP Lenders and

Secured Parties (as such term is defined in the DIP Credit Agreement), the Prepetition Secured Parties and each of their respective former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, successors, assigns, and predecessors in interest of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, arising out of, in connection with or relating to the DIP Facilities, the DIP Loan Documents, the Revolving Facility Loan Documents and/or the Prepetition Indenture Documents or the transactions contemplated hereunder or thereunder including, without limitation, (i) any avoidance, reduction, set off, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), so-called "lender liability" claims, counterclaims, cross-claims, recoupment, defenses, disallowance, impairment, or any other challenges under the Bankruptcy Code or any other applicable domestic or foreign law or regulation by any person or entity, (ii) any and all claims and causes of action arising under title 11 of the United States Code, and (iii) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the liens or claims of the DIP Agent, the DIP Lenders, and/or other Secured Parties (as such term is defined in the DIP Credit Agreement).

F.      Good cause has been shown for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) and Local Rule 4001-2. The Debtors have an immediate and critical need to obtain postpetition financing under the DIP Facilities and to use Cash Collateral to, among other things, finance the ordinary costs of their operations, maintain business relationships with vendors, independent contractors and customers, make payroll, make capital expenditures, satisfy other working capital and operational needs and fund the administration and prosecution of these Bankruptcy Cases. The Debtors' access to sufficient working capital and liquidity through the incurrence of postpetition financing under the DIP Facilities and the use of Cash Collateral under the terms of this Interim Order is vital to the

preservation and maintenance of the going concern value of the Debtors' estates, the orderly operation of the Debtors' businesses and, ultimately, the success of the Debtors' reorganization efforts.   Consequently, without access to the DIP Facilities and the continued use of Cash Collateral, to the extent authorized pursuant to this Interim Order and the terms of the DIP Loan Documents, the Debtors and their estates would suffer immediate and irreparable harm.

G.     The DIP Facilities are the best source of debtor in possession financing available to the Debtors.   The Debtors are unable to obtain (i) adequate unsecured credit allowable either (a) under sections 364(b) and 503(b)(1) of the Bankruptcy Code or (b) under section 364(c)(1) of the Bankruptcy Code, (ii) adequate credit secured by (x) a senior lien on unencumbered assets of their estates under section 364(c)(2) of the Bankruptcy Code and (y) a junior lien on encumbered assets of their estates under section 364(c)(3) of the Bankruptcy Code, or (iii) secured credit under section 364(d)(1) of the Bankruptcy Code, except with respect to the Revolving Facility Obligations and the Revolving Facility Adequate Protection Obligations (as defined below), from sources other than the DIP Agent and the DIP Lenders on terms more favorable than the terms of the DIP Facilities.   The best and only available source of secured credit available to the Debtors is the DIP Facilities.   The Debtors are not able to operate and manage their business solely with the use of Cash Collateral.   The Debtors require both additional financing under the DIP Facilities and the continued use of Cash Collateral under the terms of this Interim Order and the DIP Loan Documents in order to satisfy their postpetition liquidity needs.

H.     The DIP Lenders have indicated a willingness to provide the DIP Facilities, but solely on the terms and conditions set forth in this Interim Order (and, subject to entry by this Court, the Final Order) and in the DIP Loan Documents.   After considering all of

14

their alternatives, the Debtors have concluded, in an exercise of their sound business judgment consistent with their fiduciary duties, that the financing to be provided by the DIP Lenders pursuant to the terms of this Interim Order and the DIP Loan Documents represents the best financing presently available to the Debtors.

I.      Solely on the terms and conditions set forth in this Interim Order (and, subject to entry by this Court of the Final Order) and in the DIP Loan Documents, including without limitation, compliance with the DIP Budget, the Revolving Facility Secured Parties, the 2010 Trustee, Carl Marks and Marblegate as 2010 Noteholders who hold approximately 57.8% of the issued and outstanding 2010 Notes, [the 2015 Trustee,] and the 2015 Noteholders (collectively, the "**Prepetition Consenting Parties**" and each, a "**Prepetition Consenting Party**") are prepared to consent to: (i) the imposition of the DIP Liens (as defined below), which liens will prime the Primed Liens (as defined below) and (ii) the Debtors' use of the Prepetition Collateral (including the Cash Collateral); provided, in each case, that this Court authorizes the Debtors, pursuant to sections 361, 363 and 364(d) of the Bankruptcy Code, to grant to the Revolving Facility Agent, the 2010 Trustee and the 2015 Trustee, on a joint and several basis, for the benefit of themselves and the Revolving Facility Secured Parties, the 2010 Note Secured Parties and the 2015 Note Secured Parties, respectively, as and for adequate protection, which shall have the priorities set forth in paragraph 10 hereof and without in any way limiting the Prepetition Secured Parties' rights under section 552 of the Bankruptcy Code, but subject to the Revolving Facility Liens, the Permitted Liens and the Carve-Out, (1) a security interest in and lien and mortgage upon the DIP Collateral (as defined below) in favor of the Prepetition Secured Parties (the "**Adequate Protection Lien**"), (2) superpriority administrative expense claims under

section 507(b) of the Bankruptcy Code (the "**Adequate Protection Claims**"), and (3) the Adequate Protection Payments (as defined in paragraph 10 hereof).

J.    The security interests and liens granted pursuant to this Interim Order to the DIP Agent, for the benefit of itself and the DIP Lenders and other Secured Parties (as such term is defined in the DIP Credit Agreement), are appropriate under section 364(d) of the Bankruptcy Code because, among other things: (i) such security interests and liens do not impair the interests of any holder of a valid, perfected, prepetition security interest or lien in the property of the Debtors' estates; (ii) the holders of such valid, perfected, prepetition security interests and liens have consented to the security interests and DIP Liens, including the Priming Liens, granted pursuant to this Interim Order and the DIP Loan Documents to the DIP Agent for the benefit of itself and the DIP Lenders; and (iii) the interests of any holder of a valid, perfected, prepetition security interest or lien are otherwise adequately protected. In particular, the security interests and liens of the Prepetition Secured Parties are adequately protected by the Prepetition Secured Parties' Adequate Protection Liens and the Adequate Protection Claims.

K.    Good cause has been shown for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) and Local Rule 4001-2. In particular, the authorization granted herein for the Debtors to execute, deliver, and perform their obligations under the DIP Loan Documents, to continue using Cash Collateral and to obtain interim financing, including on a priming lien basis, is necessary to avoid immediate and irreparable harm to the Debtors and their estates. Entry of this Interim Order is in the best interest of the Debtors, their estates and their creditors. The terms of the DIP Loan Documents (including the Debtors' continued use of Cash Collateral) are fair and reasonable under the circumstances,

reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and are supported by reasonably equivalent value and fair consideration.

L.     The Debtors, the DIP Agent, the DIP Lenders and the Prepetition Secured Parties, with the assistance and counsel of their respective advisors, have negotiated the terms and conditions of the DIP Loan Documents (including the Debtors' continued use of Cash Collateral) and this Interim Order, in good faith and at arm's-length, and any credit extended and loans made to the Debtors pursuant to this Interim Order and the DIP Loan Documents shall be, and hereby are, deemed to have been extended, issued or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code and the DIP Agent and the DIP Lenders shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that either this Interim Order or any provision thereof is vacated, reversed, amended or modified, whether on appeal or otherwise.

M.     As set forth in paragraph 16, the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties request a waiver of the surcharge provisions of sections 105 and 506(c) of the Bankruptcy Code and the "equities of the case" exception in section 552(b) of the Bankruptcy Code in connection with the DIP Facilities at the Final Hearing.

N.     Based on the foregoing findings, acknowledgements, and conclusions, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefor:

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.     *Approval of Motion.*  The Motion is granted on an interim basis on the terms and conditions set forth in this Interim Order and the DIP Loan Documents; provided however that, if there are any inconsistencies between the terms of this Interim Order and the

DIP Loan Documents, the terms of this Interim Order shall govern. Any objections or responses to the relief requested in the Motion that have not been previously resolved or withdrawn, waived or settled are hereby overruled on the merits and denied with prejudice or, to the extent applicable, deferred until the Final Hearing. The rights of all parties-in-interest to object to entry of a Final Order are reserved. This Interim Order shall become effective immediately upon its entry.

2.      _Authority to Enter Into DIP Loan Documents, Authority Thereunder._ The Debtors are hereby authorized to enter into, execute, deliver and perform under the DIP Loan Documents, including the DIP Credit Agreement, the Intercreditor Agreement, and such additional documents, instruments and agreements as may be reasonably required by the DIP Agent to implement the terms or effectuate the purposes of this Interim Order. The Borrower is hereby authorized to borrow money under the DIP Credit Agreement, on an interim basis, up to an aggregate principal or face amount not to exceed $10 million under the New Money Facility and to issue in exchange for each DIP Lender's claim for notes issued under the Prepetition Indentures, on a dollar-for-dollar basis for every dollar of borrowing under the New Money Facility, a corresponding amount of new notes under the Roll Up Facility. The Guarantors are hereby authorized to guaranty such borrowings and the other outstanding DIP Obligations, all in accordance with the terms of this Interim Order, the DIP Credit Agreement and all other DIP Loan Documents.

3.      _Use of Cash Collateral and DIP Loans._ Subject to the terms and conditions of this Interim Order, the Debtors are hereby authorized to use the Cash Collateral and proceeds of the New Money Facility to (a) fund the costs of the administration of the Bankruptcy Cases and (b) provide working capital to the Debtors, in each case, solely to the extent set forth

in, and in accordance with, the budget approved in accordance with the terms of the DIP Credit

Agreement (the "**DIP Budget**"), including any variances to the DIP Budget (as the same may be

amended, supplemented and/or updated in accordance with the DIP Credit Agreement and this

Interim Order) that are permitted under the DIP Credit Agreement and this Interim Order unless

otherwise ordered by the Court, which DIP Budget shall be in form and substance reasonably

satisfactory to the Required Lenders (as defined in the DIP Credit Agreement) and the Revolving

Facility Lenders; provided, however, that the initial DIP Budget shall be in form and substance

reasonably satisfactory to the DIP Lenders and the Revolving Facility Lenders.  Additionally,

subject to the terms and conditions of this Interim Order, the Debtors are hereby authorized to

use the Cash Collateral and proceeds of the New Money Facility to (x) fund interest, fees and

other payments contemplated in respect of the DIP Facilities; (y) fund the payment of current

interest owing to the Revolving Facility Agent at the default contract rate under the Revolving

Facility Loan Documents; and (z) fund the payment of fees and reasonable and documented (in

summary form) out-of-pocket expenses and indemnities payable to any Prepetition Consenting

Party (including, without limitation, the prepetition and postpetition fees and disbursements of

legal counsel and financial advisors advising any Prepetition Consenting Party, as permitted

herein) as adequate protection.  The initial DIP Budget is attached hereto as Exhibit 3.

       4.     *Payment of DIP Fees and Expenses.*  Immediately upon the entry of this

Interim Order, the Debtors are hereby authorized to pay or otherwise incur all fees, expenses and

other amounts payable under the terms of the DIP Credit Agreement or any other DIP Loan

Documents, including, without limitation, the fees in section 2.07 of the DIP Credit Agreement,

which includes a commitment fee (the "**Commitment Fee**"), backstop fee (the "**Backstop Fee**")

and Unused Commitment Fee (as defined in the DIP Credit Agreement), and all reasonable out-

of-pocket costs and expenses of the DIP Agent and the DIP Lenders in accordance with the terms

of the DIP Credit Agreement and the Agent Fee Letter (as defined in the DIP Credit Agreement)

(including, without limitation, the prepetition and postpetition fees and disbursements of legal

counsel and financial advisors advising the DIP Agent and DIP Lenders who are Prepetition

Consenting Parties) (collectively, the "**DIP Fees and Expenses**").  Subject to the same protocol

regarding payment of the fees and expenses of the Prepetition Secured Parties provided for in

paragraph 10(c) hereof, none of the DIP Fees and Expenses shall be subject to Court approval or

U.S. Trustee guidelines, and no recipient of any such payment shall be required to file with

respect thereto any interim or final fee application with this Court.  In addition, the Debtors are

hereby authorized to indemnify the DIP Agent, the DIP Lenders and their respective affiliates

and their respective affiliates' related parties, on the terms set forth in Section 11.04 of the DIP

Credit Agreement.  All such unpaid fees, expenses and indemnities of the DIP Agent shall

constitute DIP Obligations and the repayment thereof shall be secured by the DIP Collateral and

afforded all of the priorities and protections afforded to the DIP Obligations under this Interim

Order and the DIP Loan Documents.

   5. *Validity of DIP Loan Documents*.  Upon execution and delivery of the DIP

Loan Documents and entry of this Interim Order, the DIP Loan Documents shall constitute legal,

valid and binding obligations of the Debtors, enforceable against each Debtor party thereto in

accordance with the terms thereof, including all terms and provisions pertaining to the New

Money Facility and the Roll Up Facility.  Subject to paragraph 27, no obligation, payment,

transfer or grant of security under the DIP Loan Documents as approved under this Interim Order

shall be stayed, restrained, voided, voidable or recoverable under the Bankruptcy Code or under

any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment or counterclaim.

6.     *DIP Loans.*  All loans made to or for the benefit of the Debtors on or after the Petition Date under the DIP Loan Documents, including, without limitation, amounts owing under the New Money Facility and the Roll Up Facility (collectively, the "**DIP Loans**"): (a) shall be evidenced by the books and records of the DIP Agent; (b) shall bear interest payable at the rates set forth in the DIP Credit Agreement; (c) shall be secured in the manner specified in paragraph 8 below and in the DIP Loan Documents; (d) shall be payable in accordance with the terms of the DIP Loan Documents; and (e) shall otherwise be governed by the terms set forth herein and in the DIP Loan Documents.  Upon entry of this Interim Order, all Prepetition Noteholders that are not DIP Lenders but are accredited investors or qualified institutional buyers (each, a "**Non-Backstop DIP Lender**") shall have an opportunity to fund their pro rata share of the DIP Facilities based upon the amount of Prepetition Notes, including principal and accrued interest to the Petition Date (but excluding any interest on interest required on overdue cash interest payments), held by such Prepetition Noteholders; provided, that (x) such commitment to fund is received no later than thirty (30) days following the entry of this Interim Order and such funding is received no later than forty (40) days following the entry of this Interim Order (the "**Funding Participation**") and (y) in connection with such Funding Participation, such Non-Backstop Lender executes a joinder to the RSA and becomes a Supporting Party (as defined in the RSA) thereunder.  Within three (3) business days after entry of this Interim Order, the DIP Agent shall provide notice of the entry of this Interim Order (which notice shall include a copy of this Interim Order) and the Funding Participation to the 2010 Trustee.  Within five (5) business days after entry of this Interim Order, the 2010 Trustee

shall provide notice of the Funding Participation through DTC in the form attached hereto as Exhibit 4. Consistent with the Debtors' fiduciary duties, the Funding Participation is appropriate, fair and reasonable to the Debtors and all holders of 2010 Notes, and reflects the Debtors' and the 2010 Trustee's exercise of prudent business judgment. The terms of the Funding Participation have been negotiated in good faith and at arms' length by and among the Debtors, the DIP Agent, the DIP Lenders and the 2010 Trustee, with all parties being represented by counsel.

7. *Continuation of Prepetition Liens and Prepetition Liens Securing DIP Obligations.* Until (a) all DIP Obligations have been indefeasibly paid in full in cash (or the DIP Loans have been applied on a dollar-for-dollar basis to loans to be made under the Exit Second Lien Facility (as defined in the RSA) upon consummation of the chapter 11 plan of reorganization for the Debtors that is consistent with the RSA, as may be amended from time to time (the "**Plan**")) and all Prepetition Secured Obligations shall have received the treatment specified by the terms and conditions of the Plan, (b) the DIP Lenders' commitments under the DIP Facilities have terminated, (c) all objections and challenges to (i) the liens and security interests of the Prepetition Secured Parties (including, without limitation, liens granted for adequate protection purposes) and (ii) the Prepetition Secured Obligations have been waived, denied or barred, and (d) all of the Debtors' stipulations contained in paragraph E hereof (collectively, the "**Debtors' Stipulations**") have become binding upon their estates and parties-in-interest in accordance with paragraph 27 below, all liens and security interests of the Prepetition Secured Parties (including, without limitation, liens granted for adequate protection purposes) shall remain valid and enforceable with the same continuing priority as described herein, subject to the rights of a party in interest to bring a Challenge in accordance with

paragraph 27.  Without limiting the foregoing, notwithstanding any payment of all or any portion of the Prepetition Secured Obligations, the liens on the Prepetition Collateral in favor of the Prepetition Secured Parties shall continue in full force and effect and shall be deemed to, secure the full and timely payment of the DIP Obligations (separate from and in addition to the DIP Liens granted to the DIP Agent and the DIP Lenders in paragraph 8 below) until (x) the payment in full in cash of all of the DIP Obligations (or the DIP Loans have been applied on a dollar for dollar basis to loans made under the Exit Second Lien Facility upon consummation of the Plan) and (y) the termination of the DIP Lenders' commitments under the DIP Facilities.

8.     *DIP Liens and DIP Collateral.*  To secure the DIP Obligations, effective immediately upon entry of this Interim Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent, for the benefit of itself and the DIP Lenders, is hereby granted the following continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on all prepetition and postpetition property of the Debtors, wherever located, whether existing on the Petition Date or thereafter acquired, including the Excluded Accounts (all property identified in clauses (a), (b), and (c) below being collectively referred to as the "**DIP Collateral**"), subject only to (w) the liens of the Revolving Facility Secured Parties on the Revolving Facility Collateral (the "**Revolving Facility Liens**"); (x) the Adequate Protection Liens granted to the Revolving Facility Secured Parties (the "**Revolving Facility Adequate Protection Liens**"); (y) the Carve-Out; and (z) the Permitted Liens (as defined below), as set forth in the DIP Loan Documents (all such liens and security interests granted to the DIP Agent, for the benefit of itself, and the DIP Lenders, pursuant to this Interim Order and the DIP Loan Documents, the

"**DIP Liens**") and notwithstanding any agreement that may purport to prevent, hinder, or attach obligations with respect to the incurrence of the DIP Liens:

        (a)    <u>First Lien on Unencumbered Property</u>. Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all DIP Collateral that, on or as of the Petition Date, is not subject to valid, perfected, and non-avoidable liens, including, without limitation, all real and personal property, inventory, plant, fixtures, machinery, equipment, cash, any investment of such cash, accounts receivable, other rights to payment whether arising before or after the Petition Date (including, without limitation, postpetition intercompany claims of the Debtors), deposit accounts, the Excluded Accounts, investment property, supporting obligations, causes of action (including those arising under section 549 of the Bankruptcy Code and any related action under section 550 of the Bankruptcy Code), chattel paper, contracts, general intangibles, documents, instruments, interests in leaseholds, letter of credit rights, patents, copyrights, trademarks, trade names, other intellectual property, capital stock and stock equivalents of subsidiaries, books and records pertaining to the foregoing, and to the extent not otherwise included, all proceeds, products, offspring, and profits of any and all of the foregoing (the "**Unencumbered Property**") subject to the Revolving Facility Adequate Protection Liens. Notwithstanding the prior sentence, (I) Unencumbered Property shall in any event exclude the Debtors' claims and causes of action under chapter 5 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, "**Avoidance Actions**"), but upon entry of a Final Order granting such relief, shall include any proceeds or property recovered, unencumbered, or otherwise the subject of successful Avoidance Actions, whether by judgment, settlement, or otherwise, and (II) with respect to the Debtors' non-residential real property leases, no liens or encumbrances shall be

granted or extend to such leases themselves under this Interim Order except as permitted in the applicable lease or pursuant to applicable law but rather any liens granted shall extend only to the proceeds realized upon the sale, assignment, termination, or other disposition of such leases.

(b)    <u>Liens Priming Liens of Prepetition Note Secured Parties</u>.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all DIP Collateral that is subject to valid, perfected, and non-avoidable liens presently held for the benefit of the Prepetition Note Secured Parties (such priming liens granted to pursuant to this paragraph 8(b), the "**Priming Liens**" and such primed liens of the Prepetition Note Secured Parties, the "**Primed Liens**").  The priming security interests and liens granted pursuant to this paragraph 8(b) shall be senior in all respects to the interests in such property of any of the Prepetition Note Secured Parties (including, without limitation, any and all forms of adequate protection granted to the foregoing), but shall be junior to (i) the Revolving Facility Liens, (ii) the Revolving Facility Adequate Protection Liens, (iii) the Carve-Out, and (iv) any valid, perfected, and non-avoidable interests of other parties arising out of liens, if any, on such property existing immediately prior to the Petition Date, or to any valid, perfected, and non-avoidable interests in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code or otherwise arising by operation of law (the "**Permitted Liens**").

(c)    <u>Liens Junior to Certain Other Liens</u>.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected security interest in and lien upon all DIP Collateral (other than the property described in clause (a) or (b) of this paragraph 8, as to which the liens and security interests in favor of the DIP Agent will be as

described in such clauses), whether existing on the Petition Date or thereafter acquired, that is junior only to the Revolving Facility Liens, the Revolving Facility Adequate Protection Liens, the Carve-Out, and the Permitted Liens.

(d)    _Liens Senior to Certain Other Liens_.  The DIP Liens are legal, valid, binding, continuing, automatically perfected, non-avoidable, senior in priority, and superior to any security, mortgage, collateral interest, lien, or claim to any of the DIP Collateral, except that the DIP Liens shall be junior only to the Revolving Facility Liens, Revolving Facility Adequate Protection Liens, Permitted Liens and the Carve-Out.  Pursuant to section 364(d) of the Bankruptcy Code, the DIP Liens shall be senior to the liens of the Prepetition Note Secured Parties, and any and all forms of adequate protection granted to the Prepetition Note Secured Parties in the Bankruptcy Cases.  For purposes of this Interim Order, it shall be an Event of Default if, other than as set forth in this Interim Order, the DIP Liens shall be made junior to, or _pari passu_ with, any lien or security interest heretofore or hereinafter granted in the Bankruptcy Cases or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Bankruptcy Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "**Successor Cases**"), upon the conversion of any of the Bankruptcy Cases to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of the Bankruptcy Cases or Successor Cases.  Subject to entry of  Final Order granting such relief, no lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be _pari passu_ with or senior to the DIP Liens or the Revolving Facility Adequate Protection Liens.

9.    _DIP Lenders' Superpriority Claims_.  Upon entry of this Interim Order, the DIP Agent and the DIP Lenders are hereby granted, pursuant to section 364(c)(1) of the

Bankruptcy Code, allowed superpriority administrative expense claims in each of the Bankruptcy Cases and any Successor Cases against each of the Debtors and their estates on a joint and several basis (collectively, the "**DIP Superpriority Claims**") for all DIP Obligations:  (a) except as set forth in this Interim Order, with priority over any and all administrative expense claims, diminution claims, unsecured claims, and all other claims against the Debtors or their estates in any of the Bankruptcy Cases or any Successor Cases, existing on the Petition Date or thereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (upon entry of the Final Order granting such relief), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, which allowed claims shall be payable from, and have recourse to, all prepetition and postpetition property of the Debtors and all proceeds thereof, including without limitation, upon entry of a  Final Order granting such relief, the proceeds of Avoidance Actions; and (b) which shall at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative to the extent permitted by law.  Notwithstanding the foregoing, the DIP Superpriority Claims shall be subject only to the payment of the Adequate Protection Claims of the Revolving Facility Lenders, the Revolving Facility Obligations and the Carve-Out.

   10. _Adequate Protection for Prepetition Secured Parties_.  Without in any way limiting the Prepetition Secured Parties' respective rights under the Bankruptcy Code, the Prepetition Secured Parties are entitled, pursuant to sections 361, and 363(e) of the Bankruptcy

Code, to adequate protection of their interests in their Prepetition Collateral and are hereby granted the following:

(a)    Effective and perfected upon the date of entry of this Interim Order and without the necessity of the execution or filing of any mortgages, security agreements, pledge agreements, financing statements or other agreements, the Prepetition Secured Parties' Adequate Protection Liens and the Adequate Protection Claims against each of the Debtors and their estates on a joint and several basis, which shall secure the payment of an amount equal to the diminution in the value of the Prepetition Secured Parties' interests in the Prepetition Collateral from and after the Petition Date, including, without limitation, any such diminution resulting from:  (1) the use by the Borrower of such collateral and cash and property constituting proceeds of such collateral, (2) the imposition of the Priming Liens granted to the DIP Lenders, (3) the Carve-Out and/or (4) the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code (the "**Adequate Protection Obligations**"; and the Adequate Protection Obligations in respect of the Credit Agreement, the "Revolving Facility Adequate Protection Obligations").

(b)    To give effect to the Prepetition Secured Parties' intent to recognize the priorities established in the Intercreditor Agreement, the priority of the Adequate Protection Liens shall be as follows:  pursuant to section 364 of the Bankruptcy Code, and subject only to the Permitted Liens, and the Carve-Out, (1) the Revolving Facility Adequate Protection Liens granted to the Revolving Facility Agent and the Revolving Facility Lenders shall constitute senior first-priority perfected security interests in and liens upon DIP Collateral, and are senior to the DIP Liens and (2) the Adequate Protection Liens granted to the Prepetition Note Secured Parties shall constitute perfected security interests in and liens upon DIP

Collateral, subordinate to the Revolving Facility Adequate Protection Liens, Revolving Facility Liens, and the DIP Liens.  For the avoidance of doubt: (i) the Adequate Protection Liens of the Prepetition Note Secured Parties shall be subject and junior in priority in all respects to the Revolving Facility Adequate Protection Liens, the Revolving Facility Liens and the DIP Liens; (ii) the Adequate Protection Claims of the Prepetition Note Secured Parties shall be subject and junior in priority in all respects to the Adequate Protection Claims of the Revolving Facility Secured Parties and the DIP Superpriority Claims; (iii) the Revolving Facility Adequate Protection Liens and Revolving Facility Liens shall be senior in priority in all respects to the DIP Liens; and (iv) the Adequate Protection Claims of the Revolving Facility Secured Parties shall be senior in priority in all respects to the DIP Superpriority Claims.

(c)    As additional adequate protection, the Debtors shall pay to the Prepetition Consenting Parties (i) immediately upon entry of this Interim Order, in the form of cash payments equal to all accrued and unpaid reasonable and documented (in summary form) fees and out-of-pocket expenses for the fees owed to the Revolving Facility Agent for its services as administrative agent and collateral agent, the Trustees for their services as indenture and collateral trustees, fees and disbursements of legal counsel (including Delaware local counsel) for each of the Prepetition Consenting Parties, and the financial advisor to the Revolving Facility Agent owing to such parties and incurred before the Petition Date; (ii) when due after the Petition Date, in the form of cash payments equal to all reasonable and documented (in summary form) fees and out-of-pocket expenses owing to such parties (including, but not limited to, the fees owed to the Revolving Facility Agent for its services as administrative agent and collateral agent, the Trustees for their services as indenture and collateral trustees, fees and disbursements of legal counsel (including Delaware local counsel) for each of the Prepetition

Consenting Parties, and the financial advisor to the Revolving Facility Agent); and (iii) upon entry of a Final Order granting such relief, on September 30, 2016, and on the last day of each subsequent calendar month, cash payment to the Revolving Facility Agent for prompt distribution to the Revolving Facility Lenders of all of the interest accruing on the Revolving Facility Obligations under the Revolving Facility Loan Documents from and after the Petition Date at the default contract rate(s) set forth therein (all such payments in (i) through (iii), the "**Adequate Protection Payments**").  None of the interest, fees and expenses payable pursuant to this paragraph 10 shall be subject to separate approval by this Court (but this Court shall resolve any dispute as to the reasonableness of any such fees and expenses) or the U.S. Trustee guidelines, and no recipient of any such payment shall be required to file any interim or final fee application with this Court with respect thereto.  The Prepetition Consenting Parties shall submit copies of their professional fee invoices in summary form (the "**Invoiced Fees**") (subject in all respects to applicable privilege or work product doctrines, it being expressly understood that provision of such invoices shall not constitute any waiver of the attorney-client privilege or any benefits of the attorney work product doctrine) to the Debtors, the U.S. Trustee and the Committee, if appointed; and the Debtors, U.S. Trustee and the Committee, if appointed, may preserve their right to dispute the payment of any portion of the Invoiced Fees (the "**Disputed Invoiced Fees**") if, within ten (10) days from receipt thereof (such ten (10) day period, the "**Review Period**") (i) the Debtors pay in full the Invoiced Fees, including the Disputed Invoiced Fees, and (ii) the Debtors, the U.S. Trustee or the Committee, if appointed, by written notice, dispute the reasonableness of such fees and expenses and such dispute cannot be resolved within ten (10) days following delivery of such written notice, file with the Court a motion or other pleading, on at least ten (10) days prior written notice of any hearing on such motion or other

pleading, setting forth the specific objections to the Disputed Invoiced Fees. Failure to object with specificity or to quantify the undisputed amount of the invoice subject to such objection will constitute a waiver of any objection to such invoice. Payment of Invoiced Fees shall not be delayed based on any objections thereto, and the relevant professional shall only be required to disgorge amounts objected to upon being "so ordered" pursuant to a final non-appealable order of this Court. The same protocol for payment of fees and expenses provided for in this paragraph 10(c) shall apply to the fees and expenses provided for in paragraph 4 hereof.

(d)      The consent of the Prepetition Note Secured Parties that are Prepetition Consenting Parties (the "Consenting Note Secured Parties") to the priming of their liens by the DIP Liens is limited to the DIP Facilities presently before this Court and shall not extend to any other postpetition financing or to any modified version of the DIP Facilities (except for any amendment authorized in accordance with paragraph 26 of this Interim Order). Furthermore, the consent of the Consenting Note Secured Parties to the priming of their liens by the DIP Liens does not constitute, and shall not be construed as constituting, an acknowledgment or stipulation by the Consenting Note Secured Parties that their interests in the Prepetition Note Collateral are adequately protected pursuant to this Interim Order or otherwise, and, to the extent of any dispute regarding the payment or entitlement to adequate protection, including adequate protection granted pursuant to this Interim Order, the Debtors shall retain the burden of proof.

11.    _Payment Priority_.   Until the Revolving Facility Obligations and the Revolving Facility Adequate Protection Obligations are paid in full in cash (including all post-petition interest) and all issued and undrawn letters of credit under the Credit Agreement are either released or cash collateralized at 105% of the face amount thereof, pursuant to arrangements satisfactory to the issuer(s) thereof (collectively, the "**Discharge of Revolving**

**Facility Obligations**"), the DIP Agent and the DIP Lenders shall not receive or retain any payments, distributions, or other amounts on account of the DIP Loans, whether such payments, distributions, or amounts are from proceeds of the DIP Collateral or from any other source (including debt or equity issued or distributed in connection with a plan of reorganization or any proceeds of such debt or equity or from any refinancing of the DIP Loans) and whether such payments, distributions, or amounts are distributed or made in connection with or pursuant to a plan of reorganization or liquidation, sale pursuant to section 363 of the Bankruptcy Code, foreclosure or otherwise, other than (a) any funds, which funds are to be applied first to repay the Revolving Facility Obligations prior to the DIP Obligations other than specified exceptions set forth herein, in accordance with the terms of this Interim Order and the DIP Credit Agreement (including the payment priorities set forth in section 7.18 of the DIP Credit Agreement), (b) funds deposited in or otherwise credited to the Segregated Pre-Funding Account (as defined in the DIP Credit Agreement) at the time of such payment or other distribution to the DIP Agent or the DIP Lenders, (c) the Carve-Out, (d) the Commitment Fee, Backstop Fee, and the Unused Commitment Fee, (e) interest that is paid in kind, and (f) the fees and expenses required to be paid pursuant to the DIP Loan Documents (including, without, limitation any fees and expenses payable to the DIP Agent under the DIP Loan Documents).  If the DIP Agent or any DIP Lender receives any payments, distributions or other amounts in violation of the payment priority schemes set forth herein or in any provision of the DIP Credit Agreement, then the DIP Agent or such DIP Lender, as applicable, shall hold such amounts in trust for the benefit of the Revolving Facility Agent and the Revolving Facility Lenders and shall promptly turn over such amounts to the Revolving Facility Agent.

12.    _Automatic Effectiveness of Liens._    Except as expressly set forth herein (including, without limitation, with respect to the Carve-Out), the liens granted pursuant to this Interim Order shall not be (a) subject to entry of a Final Order granting such relief, subject to any lien that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or (b) subordinated to or made _pari passu_ with any other lien under sections 363 and 364 of the Bankruptcy Code other than as explicitly provided herein.  The DIP Liens and the Adequate Protection Liens shall not be subject to challenge and shall attach and become legal, valid, properly perfected, enforceable, non-avoidable and effective by operation of law as of the Petition Date without any further action by the Debtors, the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties, and without the necessity of execution by the Debtors, or the filing or recordation, of any financing statements, guaranty agreements, security agreements, pledge agreements, federal or state notices, vehicle lien applications, mortgages, filings with the U.S. Patent and Trademark Office, or other documents or the taking of possession or control of any DIP Collateral or the taking of any other actions.  All DIP Collateral shall be free and clear of other liens, claims and encumbrances, except the Prepetition Liens (as defined below), the Revolving Facility Adequate Protection Liens, the Carve-Out and the Permitted Liens.  If the DIP Agent  (acting at the direction of the Required Lenders (as defined in the DIP Credit Agreement)) hereafter requests that the Debtors execute and deliver to the DIP Agent (and/or authorize the filing of) financing statements, guaranty agreements, security agreements, collateral assignments, mortgages or other instruments and documents considered by the DIP Agent to be reasonably necessary or desirable to further evidence the perfection of the DIP Liens, the Debtors are hereby authorized to execute and deliver (and/or authorize the filing of) such financing statements, security agreements, mortgages, collateral assignments,

instruments and documents, and the DIP Agent is hereby authorized to file or record such documents in its discretion, in which event all such documents shall be deemed to have been filed or recorded at the time and on the date of entry of this Interim Order; provided, however, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens. Acting at the direction of the Required Lenders (as defined in the DIP Credit Agreement), the DIP Agent may file, record or present a certified copy of this Interim Order with any filing or recording office and, in such event, the subject filing or recording office is authorized to accept, file or record such certified copy of this Interim Order in accordance with applicable law; provided, however, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens.

13. *Carve-Out*. Notwithstanding anything to the contrary contained herein or in the DIP Credit Documents, the DIP Collateral, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Claims, and the Adequate Protection Liens shall be subject to the payment of the Carve-Out. For the avoidance of doubt, if at any time the Carve-Out is not adequately funded in accordance with the provisions of this Interim Order, upon a realization against the Carve-Out, the unpaid portion of the Carve-Out shall be funded out of the DIP Collateral having priority over the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Claims, and the Adequate Protection Liens. For purposes of this Interim Order, the "**Carve-Out**"[6] shall mean, collectively, the sum total of (i) all fees required to be paid to the clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code and 31 U.S.C. §3717 in an amount agreed upon by the U.S. Trustee or ordered by the Court, (ii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the

---

[6]   For purposes of the Carve-Out, references to the DIP Budget for Professional Fees shall mean the accrual fee schedule with the header "Logan's Roadhouse, Inc., Professional Payments," which is annexed to the DIP Budget, as amended in accordance with the DIP Loan Documents.

Bankruptcy Code in an amount not to exceed $50,000 (iii) all fees, costs, disbursements, charges and expenses incurred at any time before the Carve-Out Trigger Date (as defined below) that are provided for in the DIP Budget, or any monthly or success or transaction fees payable to estate professionals that are provided for in the DIP Budget, in each case, by persons or firms retained by the Debtors or the Committee whose retention is approved by this Court pursuant to sections 327, 328, 363 or 1103 of the Bankruptcy Code (collectively, the "**Professionals**," and the fees, costs and expenses of Professionals, the "**Professional Fees**"), to the extent such Professional Fees are allowed by this Court at any time (whether before or after the Carve-Out Trigger Date) on a final basis; and (iv) all Professional Fees that are consistent with the DIP Budget and incurred on and after the Carve-Out Trigger Date by Professionals and allowed by this Court at any time, whether before or after the Carve-Out Trigger Date, whether by interim order, procedural order or otherwise; provided, that, the payment of any Professional Fees of the Professionals (but excluding fees and expenses of third party professionals employed by individual members of the Committee) incurred on or after the Carve-Out Trigger Date and allowed by the Court at any time, whether before or after the Carve-Out Trigger Date, on a final basis, shall not exceed $500,000 in the aggregate (the "**Professional Expense Cap**"); provided, further, that (A) any payments actually made in respect of Professional Fees incurred on or after the Carve-Out Trigger Date in accordance with the Budget and allowed by this Court at any time, whether before or after the Carve-Out Trigger Date, on a final basis, shall reduce the Professional Expense Cap on a dollar-for-dollar basis; (B) any success or transaction fees that may become due and payable to Professionals employed by the Debtors shall not be included in or subject the Professional Expense Cap and the payment of such fees shall not reduce the Professional Expense Cap pursuant to the prior clause (A); and (C) for the avoidance of doubt, so

long as a Carve-Out Trigger Date has not occurred, the payment of Professional Fees shall not reduce the Professional Expense Cap.  For the avoidance of doubt, there shall be no success or transaction fee payable to Jefferies, LLC from the Carve-Out in the event of a liquidation of the Debtors that is not implemented through a chapter 11 plan or does not follow a going concern sale of assets pursuant to Section 363 of the Bankruptcy Code, including through a credit bid by secured lenders.  For the purposes of the foregoing, "**Carve-Out Trigger Date**" means the first business day after delivery of written notice (which notice may be delivered to the Debtors by facsimile or other electronic means of communication or otherwise in accordance with the DIP Credit Agreement) of the occurrence of an Event of Default (as defined below) (such notice, a "**Carve-Out Trigger Notice**") by the DIP Agent to (1) the U.S. Trustee, (2) the Borrower and counsel to the Debtors, and (3) counsel for the Committee, if appointed.  For the avoidance of doubt, the Carve-Out shall be senior to any claims arising under or relating to and liens securing the DIP Facilities and the Prepetition Secured Obligations, including, without limitation, any administrative or superpriority claims and all forms of adequate protection liens or security interests.  In any event, the DIP Agent and the DIP Lenders reserve the right to review and object to any fee application or statement, interim application or monthly application issued or filed by estate professionals.  Any funding or payment of the Carve-Out shall be added to, and made a part of, the DIP Obligations and adequate protection and shall be otherwise entitled to the protections granted under this Interim Order, the DIP Loan Documents, the Bankruptcy Code, and applicable law.  Neither the Carve-Out nor any proceeds of the DIP Facilities, Cash Collateral or DIP Collateral proceeds shall be used in connection with preventing, hindering or delaying the DIP Lenders', DIP Agent's, Prepetition Agents', Revolving Facility Lenders' or Prepetition Noteholders' enforcement or realization upon the DIP Collateral once an Event of

Default has occurred and is continuing under the DIP Loan Documents, subject to the Remedies Notice Period (as defined below).

14.     *Investigation of Prepetition Liens.*    The Debtors shall not assert or prosecute, and no portion of the DIP Facilities, the DIP Collateral, the Prepetition Collateral, the Cash Collateral, or the Carve-Out, and no disbursements set forth in the DIP Budget, shall be used for the payment of professional fees, disbursements, costs or expenses incurred in connection with (a) asserting or prosecuting any claims or causes of action against the Prepetition Secured Parties, the DIP Agent, or the DIP Lenders, or (b) challenging or raising any defenses to the Prepetition Secured Obligations or the DIP Obligations, the DIP Liens, the Adequate Protection Liens or the liens and security interests of the Prepetition Secured Parties with respect to the Prepetition Collateral (such liens and security interests, the "**Prepetition Liens**").  Notwithstanding the foregoing, the Debtors shall be permitted to contest the occurrence and/or continuance of an Event of Default in accordance with the terms and conditions of this Interim Order; provided, however, that nothing in the DIP Loan Documents or this Interim Order shall vest or confer on the Committee, or any representative of the estates, standing or authority to pursue any cause of action belonging to the Debtors or their estates.

15.     *Shared Control Between Prepetition Agents and DIP Agent; Access; Insurance.*  Notwithstanding the Intercreditor Agreement, the DIP Agent shall immediately have dominion and control with respect to each depository account of the Debtors or other third party that was subject to a deposit account control agreement with the Prepetition Agents as of the Petition Date, and each of such deposit account control agreements shall hereafter be enforceable by the DIP Agent against, and binding upon, each depository institution party thereto until the DIP Obligations have been indefeasibly paid in full in cash and the DIP Credit Agreement shall

have been terminated, after which such deposit account control agreements shall again be solely enforceable by the Prepetition Agents but subject to the rights of the Prepetition Agent to exercise rights and remedies to the extent set forth in paragraph 23. Subject to the Intercreditor Agreement, upon entry of this Interim Order, the Prepetition Agents and the DIP Agent shall be, and shall be deemed to be, without any further action or notice of any kind, named as additional insureds and loss payees on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral.

16.     *Section 506(c) and 552(b) Waivers.* Upon entry of Final Order granting such relief, the Debtors (on behalf of themselves and their estates) shall irrevocably waive, and shall be prohibited from asserting in the Bankruptcy Cases or any Successor Cases, (a) any surcharge claim under sections 105(a) and/or 506(c) of the Bankruptcy Code or otherwise for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties upon, the DIP Collateral or the Prepetition Collateral, and (b) the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral or DIP Collateral.

17.     *Restrictions on Granting Post-Petition Liens.* Except for the Carve-Out, liens and claims otherwise permitted pursuant to Section 8.01 of the DIP Credit Agreement or as expressly set forth in this Interim Order, it shall constitute an Event of Default if any Debtor incurs or requests authority to incur a claim or grants a lien (or a claim or lien is allowed) having

a priority superior to or *pari passu* with those granted pursuant to this Interim Order and the DIP Loan Documents to the DIP Agent and the DIP Lenders, or the Prepetition Secured Parties, respectively, at any time during which any portion of the DIP Facilities (or any refinancing thereof), the DIP Obligations, the Adequate Protection Obligations or the Adequate Protection Payments owing to the Prepetition Secured Parties remains outstanding; provided, however, that the Debtors shall be entitled to incur such liens or request such authority in connection with obtaining postpetition financing, loans or financial accommodations (or a request therefor) that will indefeasibly repay in full all DIP Obligations in cash; provided, further, however, that in connection with the seeking or obtaining of such postpetition financing, loans, or financial accommodations, the Debtors may not rely on the consent of the Prepetition Secured Parties to the relief granted in this Interim Order and any and all such consent shall be deemed to have automatically terminated.

18. *Binding Nature of Order; Order Controls.* The provisions of this Interim Order shall be binding in any Successor Case and upon the Debtors and their respective successors and assigns (including, without limitation, any trustee or other fiduciary hereafter elected or appointed for or on behalf of any Debtor's estate or with respect to its property). In the event of any inconsistency between the provisions of this Interim Order and any of the DIP Loan Documents, the provisions of this Interim Order shall govern.

19. *No Marshaling*. In no event shall the DIP Agent, the DIP Lenders or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or Prepetition Collateral, as applicable.

20. *Survival of Order.* The provisions of this Interim Order and the DIP Loan Documents, and any actions taken pursuant hereto or thereto (a) shall survive the entry of any

order:   (i) confirming any plan of reorganization in any of the Bankruptcy Cases or any Successor Cases; (ii) converting any of the Bankruptcy Cases or any Successor Cases to a case under chapter 7 of the Bankruptcy Code; (iii) dismissing any of the Bankruptcy Cases or any Successor Cases; or (iv) pursuant to which this Court abstains from hearing any Bankruptcy Case or any Successor Case; and (b) shall continue in full force and effect notwithstanding the entry of any such order, and the claims, liens, and security interests granted pursuant to this Interim Order shall maintain their priority as provided by this Interim Order and the DIP Loan Documents until all of the DIP Obligations are indefeasibly paid in full and discharged in accordance with the terms of the DIP Credit Agreement.  The DIP Obligations shall not be discharged by the entry of any order confirming any plan of reorganization in any of the Bankruptcy Cases, and the Debtors shall, and shall be deemed to, waive any such discharge pursuant to section 1141(d)(4) of the Bankruptcy Code.

21.    *Protection under Section 364(e) of the Bankruptcy Code.*  If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect (i) the validity of any DIP Obligations or adequate protection obligations owing to the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties incurred prior to the actual receipt by the DIP Agent or the Prepetition Agents, as applicable, of written notice of the effective date of such reversal, modification, vacatur or stay, or (ii) the validity or enforceability of any claim, lien, security interest or priority authorized or created hereby or pursuant to the DIP Loan Documents with respect to any DIP Obligations or adequate protection rights of the Prepetition Secured Parties, including, without limitation, with respect to the use of Cash Collateral.  Notwithstanding any such reversal, modification, vacatur or stay, any use of Cash Collateral or the incurrence of DIP Obligations or adequate protection

rights of the Prepetition Secured Parties prior to the actual receipt by the DIP Agent or the Prepetition Agents, as applicable, of written notice of the effective date of such reversal, modification, vacatur or stay, shall be governed in all respects by the provisions of this Interim Order and the DIP Loan Documents, and the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties shall be entitled to all of the rights, remedies, protections and benefits granted under section 364(e) of the Bankruptcy Code, this Interim Order and the DIP Loan Documents with respect to all uses of Cash Collateral and the incurrence of DIP Obligations and adequate protection obligations owing to the Prepetition Secured Parties.

22.     *Events of Default.*    Except as otherwise provided in this Interim Order or to the extent the DIP Agent (acting at the direction of the Required Lenders (as defined in the DIP Credit Agreement) or such other level of consent as required by the terms of the DIP Credit Agreement) may otherwise agree in writing, any occurrence of an "Event of Default" pursuant to the DIP Credit Agreement shall constitute an event of default hereunder, unless the DIP Agent (acting at the direction of the Required Lenders (as defined in the DIP Credit Agreement) or such other level of consent as required by the terms of the DIP Credit Agreement) has waived such default in accordance with the DIP Loan Documents (each, an "**Event of Default**").

23.     *Modification of Stay.*    The automatic stay provisions of section 362 of the Bankruptcy Code shall be and hereby are automatically vacated and modified to the extent necessary to permit the DIP Agent and the DIP Lenders to exercise in accordance with and subject to the Intercreditor Agreement, upon the occurrence and during the continuation of any Event of Default and, in each case, after the provision by the DIP Agent (acting at the direction of the Required Lenders (as defined in the DIP Credit Agreement)) to the Debtors of five (5) days' prior written notice of such Event of Default (such five (5) day period, the "**Remedies**

**Notice Period**"), which written notice shall be served by the DIP Agent via electronic mail or facsimile on the Debtors, counsel to the Debtors, counsel to the Revolving Facility Lenders, counsel to the Revolving Facility Agent, counsel to the GSO, Kelso, Carl Marks and Marblegate, counsel to the 2010 Trustee, counsel to the 2015 Trustee, counsel to the Committee (if appointed) and the U.S. Trustee, all rights and remedies provided for in the DIP Loan Documents, and to take any or all of the following actions without further order of or application to this Court following the conclusion of the Remedies Notice Period and in the absence of a determination by the Court that an Event of Default has not occurred and/or is not continuing: (a) immediately terminate the Debtors' use of Cash Collateral and cease making any DIP Loans to the Debtors; (b) immediately declare all DIP Obligations to be immediately due and payable; (c) immediately terminate the commitment to enter into the Exit Second Lien Facility; (d) immediately set off any and all amounts in accounts maintained by the Debtors with the DIP Agent or any of the DIP Lenders against the DIP Obligations, or otherwise enforce rights against the DIP Collateral in the possession of any of the DIP Agent or the DIP Lenders for application towards the Revolving Facility Obligations and the Revolving Facility Adequate Protection Obligations and after the Discharge of Revolving Facility Obligations, toward the DIP Obligations; and (e) take any other actions or exercise any other rights or remedies permitted under this Interim Order, the DIP Loan Documents or applicable law to effect the repayment of the DIP Obligations.  The automatic stay under section 362(a) of the Bankruptcy Code shall be automatically vacated and modified as provided above <u>unless</u> and until this Court has determined that an Event of Default has not occurred and/or is not continuing.  For the avoidance of doubt, neither the DIP Agent nor any of the DIP Lenders shall exercise any such rights and remedies on account of an Event of Default until after expiration of the Remedies Notice Period.  The

Debtors and any party-in-interest's sole recourse with respect to opposing such modification of the automatic stay under section 362(a) of the Bankruptcy Code shall be to contest the occurrence and/or continuance of an Event of Default. During the Remedies Notice Period, the Debtors shall be entitled to (x) contest the occurrence and/or continuance of the an Event of Default and (y) seek and obtain an emergency hearing before this Court, upon notice to the DIP Agent and the DIP Lenders, solely for the purpose of contesting whether an Event of Default has occurred and/or is continuing.  The rights and remedies of the DIP Agent and the DIP Lenders specified herein are cumulative and not exclusive of any rights or remedies that the DIP Agent and the DIP Lenders may have under the DIP Loan Documents or otherwise.  The Borrower shall cooperate fully with the DIP Agent and the DIP Lenders in their exercise of rights and remedies, whether against the DIP Collateral or otherwise.  Notwithstanding anything contained herein to the contrary, the Revolving Facility Agent and Revolving Facility Lenders agree not to exercise remedies with respect to DIP Collateral after an Event of Default so long as Adequate Protection Payments are made, provided that after November 14, 2016 the standstill of the Revolving Facility Agent and the Revolving Facility Lenders shall terminate.

24.     *No Waiver of Remedies*.  The delay in or the failure of the Prepetition Secured Parties, the DIP Agent or the DIP Lenders to seek relief or otherwise exercise their rights and remedies shall not constitute a waiver of any of the Prepetition Secured Parties', the DIP Agent's or DIP Lenders' rights and remedies.  Notwithstanding anything herein, but subject to the terms of the RSA as it relates to the Prepetition Secured Parties party thereto, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly or otherwise impair the rights and remedies of the Prepetition Secured Parties, the DIP Agent or the DIP Lenders under the Bankruptcy Code or under applicable non-bankruptcy law,

including without limitation, the rights of the Prepetition Secured Parties, the DIP Agent and the DIP Lenders to (a) request conversion of the Bankruptcy Cases to a case under chapter 7 of the Bankruptcy Code, dismissal of these Bankruptcy Cases, or the appointment of a trustee in these Bankruptcy Cases, (b) propose, subject to the provisions of section 1121 of the Bankruptcy Code, an alternative plan, or (c) exercise any of the rights, claims or privileges (whether legal, equitable or otherwise) the Prepetition Secured Parties, the DIP Agent and the DIP Lenders may have.

25.     *Limitations on Borrowings.*   It shall constitute an Event of Default if any of the Debtors obtains authorization from the Court for the Debtors or their estates to borrow money (other than in accordance with the DIP Credit Agreement or through credit terms in the ordinary course of business from any vendor, supplier, customer or the like) from any person other than the DIP Lenders; provided, however, that the Debtors may request and obtain such authorization in connection with postpetition financing, loans or financial accommodations that will indefeasibly repay in full all Revolving Facility Obligations, Revolving Facility Adequate Protection Obligations, and DIP Obligations; provided, further, however, that in connection with the seeking or obtaining of such postpetition financing, loans, or financial accommodations, the Debtors may not rely on the consent of the Prepetition Secured Parties to the relief granted in this Interim Order and any and all such consent shall be deemed to have automatically terminated.

26.     *Modifications of DIP Loan Documents and Budgets.*   The Debtors are hereby authorized, without further order of this Court, to enter into written agreements with the DIP Agent, with the consent of the Required Lenders (as defined in the DIP Credit Agreement), providing for (a) any non-material modifications to the DIP Loan Documents or of any other modifications to the DIP Loan Documents necessary to conform the DIP Loan Documents to this

Interim Order or (b) any other modification to the DIP Loan Documents; provided, however, that notice of any material modification or amendment to the DIP Loan Documents shall be provided by the Debtors to counsel to the Committee, the Revolving Facility Agent and the U.S. Trustee, each of whom shall have five (5) business days from the date of such notice within which to object in writing to such modification or amendment unless the Committee, the Revolving Facility Agent and the U.S. Trustee agree to a shorter period.  If any of the Committee, the Revolving Facility Agent or the U.S. Trustee timely objects to any material modification or amendment to the DIP Financing Documents, such modification or amendment shall only be permitted pursuant to an order of this Court.  Any modification or amendment to the DIP Budget shall require the consent of the Required Lenders (as defined in the DIP Credit Agreement) and the Revolving Facility Lenders, which consent shall not be unreasonably withheld or delayed. Any modification or amendment to the Permitted Variances (as defined in the DIP Credit Agreement) in respect of the DIP Budget shall require the consent of the Required Lenders (as defined in the DIP Credit Agreement) and the Revolving Facility Lenders, in each case in their sole and absolute discretion.

27.    _Stipulations Regarding Prepetition Secured Obligations and Prepetition Liens Binding on Parties-in-Interest._

(a)    The Debtors' Stipulations shall be binding on the Debtors' estates and all parties-in-interest, including, without limitation, the Committee, unless (a) the Committee, or another party-in-interest (other than any of the Debtors) has timely filed a motion (with a draft complaint attached) (a "**Standing Motion**") seeking standing to prosecute a contested matter or adversary proceeding (subject to the limitations set forth in paragraph 14 hereof) (a "**Challenge**") (i) challenging the liens or claims of any or all of the DIP Agent and/or

the DIP Lenders, or the initiation or prosecution of any claim or cause of action against any or all of the DIP Agent, the DIP Lenders, the Prepetition Agents, the Revolving Facility Lenders and the Prepetition Noteholders, including any claim under chapter 5 of the Bankruptcy Code, (ii) asserting any claims or causes of actions (including any claims or causes of action under chapter 5 of the Bankruptcy Code) against any or all of the Prepetition Agents, the Revolving Facility Lenders and the Prepetition Noteholders, their respective advisors, agents and sub-agents, including formal discovery proceedings in anticipation thereof and (iii) asserting any claims or challenges relating to the allocation of value as between encumbered and unencumbered assets (if any), no later than the date that is (A) seventy-five (75) days after the Petition Date for parties-in-interest other than the Committee or (B) for the Committee, sixty (60) days after its formation (the periods set forth in clauses (A) and (B), as applicable, the "**Challenge Period**"); provided, however, if a chapter 11 trustee or chapter 7 trustee is appointed during the Challenge Period, such trustee shall have the later of (X) the expiration of the Challenge Period or (Y) twenty (20) days after the appointment of such trustee, to file a Standing Motion and shall be substituted as a party-in-interest in the Challenge, and (b) this Court rules in favor of the plaintiff in any such timely and properly filed Standing Motion.  If no Standing Motion is timely filed as of such dates, or the Court does not rule in favor of the plaintiff in any such proceeding, then, without further order of this Court, (x) subject to entry of a Final Order granting such relief, the claims, liens and security interests of the Prepetition Secured Parties shall be deemed to be finally allowed for all purposes in these Bankruptcy Cases and any Successor Cases, and (y) the Debtors and their estates shall be deemed to have released any and all claims or causes of action against Prepetition Secured Parties with respect to the Prepetition Credit Documents or any related transactions.  Notwithstanding anything to the contrary herein, if a Standing Motion is not

46

timely filed, the Debtors' Stipulations shall be binding on the Debtors' estates, the Committee and all parties-in-interest.  If a Standing Motion is timely filed, the Debtors' Stipulations shall be binding on the Debtors' estates and all parties-in-interest except to the extent such stipulations are specifically challenged in such Challenge as and when originally filed.  To the extent a Standing Motion or Challenge is withdrawn, denied or overruled, the Debtors' Stipulations specifically challenged in such Standing Motion or Challenge also shall be binding on the Debtors' estates and all parties-in-interest.  For the avoidance of doubt, the Court shall not be required to enter an order with respect to a Standing Motion or Challenge within the Challenge Period.

(b)     No portion of the Carve-Out, any proceeds of the DIP Facilities, Cash Collateral or other DIP Collateral or Prepetition Collateral (collectively, "**Collateral**") proceeds may be used for the payment of the fees and expenses of any Standing Motion or Challenge.   Notwithstanding any provision in this Interim Order to the contrary (including paragraph 14), no more than $25,000 in the aggregate of the amounts set forth in the DIP Budget, the Carve-Out, or other Collateral proceeds may be used by the Committee, or any representative of the estates, to investigate, but not prosecute (or prepare for the prosecution of, including the preparation of a Standing Motion) any Challenge.  Nothing in the DIP Loan Documents or this Interim Order shall vest or confer on the Committee, or any representative of the estates, standing or authority to pursue any cause of action belonging to the Debtors or their estates.

28.     *Termination of Commitments and Right to Use Cash Collateral.*   All commitments of the DIP Lenders and any consent or right of the Debtors to use Cash Collateral shall terminate and all amounts owing under the DIP Facilities shall be due and payable, on the earliest to occur of the following events (collectively, the "**Cash Collateral Termination**

Events"): (a) in the event the Final Order has not been entered by the Court within thirty-five (35) days after the Petition Date, (b) the effective date of any plan of reorganization for the Debtors, (c) subject to the other terms and conditions of this Interim Order, the Borrower's receipt of a Carve-Out Trigger Notice, (d) the payment in full in cash of the Revolving Facility Obligations, Revolving Facility Adequate Protection Obligations, and DIP Obligations, (e) the date on which a sale of all or substantially all of the Debtors' assets under section 363 of title 11 of the Bankruptcy Code is consummated, (f) November 14, 2016, (g) the date that all loans and other DIP Obligations shall become due and payable in full under the DIP Loan Documents, (h) as otherwise provided in the DIP Credit Agreement and (i) the Debtors shall permit any Variance (as defined in the DIP Credit Agreement) to exist other than a Permitted Variance (unless waived by the Required Lenders and Revolving Facility Lenders); provided that the Cash Collateral Termination Events set forth in the immediately preceding clauses (c), (g), (h), and (i) shall be subject to the Remedies Notice Period.

29.    *Indemnification.*  The Debtors agree to jointly and severally indemnify and hold the DIP Agent, the DIP Lenders, any of their affiliates, and the respective shareholders, directors, members, principals, agents, advisors, officers, subsidiaries and affiliates of each solely in their respective capacities as such (each, an "**Indemnified Person**") harmless from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions or causes of action, and reasonable costs and expenses incurred, suffered, sustained or required to be paid by an Indemnified Person by reason of or resulting from the Bankruptcy Cases, the DIP Facilities, DIP Credit Agreement, the transactions contemplated thereby or hereby or by the DIP Facilities or any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any of such Indemnified Person is a party thereto and whether or not

brought by the Debtors or any other person, except to the extent resulting from the gross negligence or willful misconduct of such Indemnified Person as determined by a final non-appealable order of a court of competent jurisdiction.  The indemnity includes indemnification for the DIP Agent exercising discretionary rights granted under the DIP Facilities. In all such litigation, or the preparation therefor, the DIP Agent and each DIP Lender shall be entitled to select its own counsel and, in addition to this foregoing indemnity, the Debtors agree to pay promptly the reasonable fees and expenses of such counsel.  All indemnities of the Indemnified Persons shall be secured by the DIP Collateral and afforded all of the priorities and protections afforded to the DIP Obligations under this Interim Order and the DIP Loan Documents.

30.     *Master Proof of Claim.*  Notwithstanding any order entered by this Court in relation to the establishment of a bar date in any of the Bankruptcy Cases or any Successor Cases to the contrary, none of the Prepetition Secured Parties will be required to file proofs of claim or requests for payment of administrative expenses in any of the Bankruptcy Cases or any Successor Cases for any claims arising under the Prepetition Credit Documents or with respect to any Adequate Protection Obligations or Adequate Protection Payments, and the Debtors' Stipulations and the provisions of this Interim Order shall be deemed to constitute a timely filed proof of claim for the Prepetition Secured Parties with regard to all claims arising under the Prepetition Credit Documents and this Interim Order.   Notwithstanding the foregoing, the Revolving Facility Agent, for the benefit of itself and the Revolving Facility Lenders, the 2010 Trustee for the benefit of itself and the 2010 Noteholders, and the 2015 Trustee, for the benefit of itself and the 2015 Noteholders, are authorized and entitled, in their sole discretion, but are not required, to file (and amend and/or supplement, as each sees fit) a proof of claim and/or proofs of claim and/or requests for payment of administrative expenses in each of the Bankruptcy Cases or

any Successor Cases for any claim or administrative expense described herein.  The failure to file any such proof of claim or request for payment of an administrative expense shall not affect the validity or enforceability of any of the Prepetition Loan Documents, this Interim Order, the Prepetition Obligations or any other obligations hereunder, or prejudice or otherwise adversely affect the Prepetition Secured Parties' rights, remedies, powers, or privileges under the Prepetition Credit Documents or this Interim Order; provided further that, for the avoidance of doubt, the filing of any proof of claim or request for payment of an administrative expense by any of the Prepetition Secured Parties shall not in any way prejudice or otherwise adversely affect the Prepetition Secured Parties' rights, remedies, powers, or privileges under the Prepetition Credit Documents or this Interim Order.  The DIP Agent and the DIP Lenders shall not be required to file proofs of claim in the Bankruptcy Cases or any Successor Cases in order to maintain their respective claims for payment of the DIP Obligations under the Interim Order or applicable DIP Loan Documents.  The statements of claim in respect of the DIP Obligations set forth in this Interim Order, together with the evidence accompanying the Motion and presented at the Interim Hearing are deemed sufficient to and do constitute proofs of claim in respect of such obligations and secured status.

        31.    *Access to Collateral.*  Subject to applicable state law, notwithstanding anything contained herein to the contrary and without limiting any other rights or remedies of the DIP Agent, for the benefit of the DIP Lenders, contained in this Interim Order or the DIP Loan Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Loan Documents and this Interim Order, upon written notice to the landlord of any leased premises that an Event of Default has occurred and is continuing under the DIP Loan Documents, the DIP Agent may, subject to any separate agreement by and between such landlord and the DIP Agent

(a "**Separate Agreement**"), enter upon any leased premises of the Debtors for the purpose of exercising any remedy with respect to DIP Collateral located thereon and, subject to any such Separate Agreement, shall be entitled to all of the Debtors' rights and privileges as lessee under such lease without interference from such landlord.  Nothing herein shall require the DIP Agent to assume any lease as a condition to the rights afforded to the DIP Agent in this paragraph 31.

32.     *Enforceability*.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof. Notwithstanding Bankruptcy Rules 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedures, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

33.     *Binding Effect*.  The terms of this Interim Order shall be valid and binding upon the Debtors, all creditors of the Debtors and all other parties-in-interest from and after the entry of this Interim Order by this Court.  In the event the provisions of this Interim Order are reversed, stayed, modified or vacated following any further hearing, such reversals, modifications, stays or vacatur shall not affect the rights and priorities of the DIP Agent, the DIP Lenders and the Prepetition Secured Parties granted pursuant to this Interim Order.

34.     *No Third Party Rights*.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect or incidental beneficiary, other than the Debtors, the DIP Agent, the DIP Lenders and the Prepetition Secured Parties.

35.     _No Liability to Third Parties_.  Subject to entry of the Final Order, none of the Prepetition Agents or other Prepetition Secured Parties shall (i) be deemed to be in "control" of the operations of the Debtors or to be acting as a "controlling person," "responsible person," or "owner or operator" with respect to the operation or management of any of the Debtors (as such term, or any similar terms, are used in the Internal Revenue Code, the United States Comprehensive Environmental Response, Compensation and Liability Act (as amended), or any similar Federal or state statute), or (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates.

36.     _Sale, Conversion, Dismissal, Plan_.  It shall constitute an Event of Default if any order is entered by the Court providing for the sale of the ownership of the stock of any of the Debtors or their affiliates or the sale of all or substantially all of the assets of the Debtors under section 363 of the Bankruptcy Code and (i) such order does not provide that in connection and concurrently with any such event, the proceeds of such sale shall be used to satisfy, in cash, the Revolving Facility Obligations, Revolving Facility Adequate Protection Obligations, and DIP Obligations in accordance with the Revolving Facility Loan Documents, this Interim Order, and the DIP Loan Documents, respectively, and (ii) such sale is not expressly permitted by the DIP Loan Documents.  If an order dismissing or converting any of these Bankruptcy Cases under sections 305 or 1112 of the Bankruptcy Code or otherwise or an order appointing a chapter 11 trustee or an examiner with expanded powers is at any time proposed, and unless otherwise agreed to by the DIP Agent with the consent of the Required Lenders (as defined in the DIP Credit Agreement), any such order shall provide that (i) the DIP Liens, the Adequate Protection Liens, DIP Superpriority Claim, the Adequate Protection Claims and the Adequate Protection Payments granted hereunder and in the DIP Loan Documents shall continue in full force and

effect, remain binding on all parties-in-interest, and maintain their priorities as provided in this Interim Order until all DIP Obligations and Prepetition Secured Obligations, as applicable, are indefeasibly paid in full in cash and completely satisfied and all commitments under the DIP Loan Documents and the Prepetition Credit Documents are terminated in accordance with the DIP Loan Documents and the Prepetition Credit Documents, respectively, (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for purposes of enforcing the DIP Liens, the Adequate Protection Liens, the DIP Superpriority Claims, the Adequate Protection Claims and the Adequate Protection Payments and (iii) all postpetition indebtedness, obligations or liabilities incurred by any of the Debtors to the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties prior to the date of such order, including without limitation, the DIP Obligations, shall be governed in all respects by the original provisions of this Interim Order, and the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties shall be entitled to all the rights, remedies, privileges and benefits granted herein and in the DIP Loan Documents with respect to all such indebtedness, obligations or liabilities.

37.    _Headings_.    The headings of this Interim Order are for purposes of reference only and shall not limit or otherwise affect the meaning of this Interim Order.

38.    _Retention of Jurisdiction_.    This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and enforcement of this Interim Order.

39.    _Joint and Several Liability_.    Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable for the obligations hereunder and in accordance with the terms of the DIP Loan Documents.

40.    *Rights Under Sections 363(k) and 1129(b)*.    Absent a successful Challenge, the full amount of the DIP Obligations and the Prepetition Note Obligations may be used to "credit bid" for the assets and property of the Debtors as provided for in section 363(k) of the Bankruptcy Code by the DIP Agent (with respect to a credit bid of the DIP Obligations) (acting at the direction of the Required Lenders (as defined in the DIP Credit Agreement)) and the Trustees (with respect to a credit bid of their respective Prepetition Note Obligations), in accordance with the terms of the DIP Loan Documents, Revolving Facility Loan Documents and the Prepetition Credit Documents, without the need for further Court order authorizing the same and whether such sale is effectuated through section 363(k) and/or section 1129(b) of the Bankruptcy Code or otherwise; provided that any such credit bid provides for the payment in full and in cash of the Revolving Facility Obligations and the Revolving Facility Adequate Protection Obligations.

*[remainder of page intentionally left blank]*

41.    *Final Hearing*.  The Final Hearing is scheduled for September [__], 2016, at _____ __.m. (prevailing Eastern Time) before this Court.  Any objections by creditors or other parties-in-interest to any provisions of this Interim Order shall be deemed waived <u>unless</u> timely filed and served in accordance with this paragraph 41.  The Debtors shall promptly serve notice of entry of this Interim Order and the Final Hearing on the appropriate parties-in-interest in accordance with the Federal Rules of Bankruptcy Procedure and the Local Rules.  Without limiting the foregoing, the Debtors shall promptly serve a notice of entry of this Interim Order and the Final Hearing, together with a copy of this Interim Order, by first class mail, postage prepaid, facsimile, electronic mail or overnight mail upon the Notice Parties.  The notice of the entry of this Interim Order and the Final Hearing shall state that objections to the entry of a Final Order shall be filed with the United States Bankruptcy Court for the District of Delaware by **no later than 4:00 p.m. (prevailing Eastern Time) on August __, 2016** (the "**Objection Deadline**") and served via email.  The continued availability of the DIP Facilities shall be subject to the entry in these Bankruptcy Cases, not later than thirty-five (35) days after the Petition Date, of the Final Order, following proper notice and hearing thereon, which is in all respects reasonably satisfactory to the DIP Agent and the DIP Lenders.

Dated:  August _____, 2016

_____

UNITED STATES BANKRUPTCY JUDGE

# **EXHIBIT 1**

## **DIP Credit Agreement**

## **EXHIBIT 2**

**Prepetition Intercreditor Agreement Waiver**

**<u>EXHIBIT 3</u>**

**Initial DIP Budget**

## **EXHIBIT 4**

**Notice of Funding Participation**

**ONLY RETURN THE FUNDING NOTICE IF YOU ARE (1) AN ACCREDITED INVESTOR OR QUALIFIED INSTITUTIONAL BUYER AND (2) INTERESTED IN BEING A DIP LENDER**

Re:  Notice of Funding Participation

You are receiving this NOTICE OF FUNDING PARTICIPATION (the "**Funding Participation Notice**") as a holder (a "**Noteholder**") of 10.75% Senior Secured Notes due 2017 (the "**Notes**") under that certain Senior Secured Notes Indenture, dated as of October 4, 2010 (the "**Indenture**"), among Roadhouse Financing, Inc. (n/k/a Logan's Roadhouse, Inc. ("**Logan's**")), Roadhouse Merger, Inc. (n/k/a LRI Holdings, Inc.) and BOKF, N.A., as trustee and collateral agent.  On August 8, 2016, (the "**Petition Date**"), Logan's and their affiliates (collectively, the "**Debtors**") commenced voluntary cases under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**").  Additional information on the Bankruptcy Cases can be found at: www.donlinrecano.com/logans.

On August __, 2016, the Bankruptcy Court entered that certain *Interim Order (I) Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 507 and 552 Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Liens and Superpriority Administrative Expense Status, (C) Use Cash Collateral of Prepetition Secured Parties, and (D) Grant Adequate Protection to Prepetition Secured Parties; (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c); and (III) Granting Related Relief* (the "**Interim DIP Order**") [Docket No. __].  Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Interim DIP Order.

A copy of the Interim DIP Order can be found at:  **[insert DRC specific link to Interim DIP]**.

Pursuant to the Interim Order, the Debtors are authorized to borrow up to an aggregate principal amount of $25 million (the "**New Money Facility**"), with $10 million available following entry of the Interim DIP Order.  The remainder of the New Money Facility to be made available upon entry of the Final Order.  Furthermore, the Debtors are authorized to issue new notes (the "**Roll Up Facility**" and together with the New Money Facility, the "**DIP Facilities**"), in exchange for each DIP Lender's claim for notes issued under the Prepetition Indentures[7] on a dollar-for-dollar basis for every dollar of borrowings under the New Money Facility, and upon entry of a Final Order, additional notes under the Roll Up Facility so that the total notes under the Roll Up Facility received by each DIP Lender that has a claim for notes issued under the Prepetition Indentures shall result in an exchange on a 2:1 basis for every dollar of borrowings under the New Money Facility.

The DIP Facilities are priming facilities, which are senior to the existing notes issued under the Prepetition Indentures, but are junior in priority to the Revolving Lender Facility.

Pursuant to paragraph 6 of the Interim DIP Order, as a Noteholder, if you are an accredited investor or qualified institutional buyer, you have the opportunity to be a DIP Lender and (i) fund a pro rata share of the New Money Facility based on the amount of Notes, including principal and accrued interest to the

---

[7] Prepetition Indentures includes the Indenture and that certain Indenture dated as of October 15, 2015, among Logan's Roadhouse, Inc., LRI Holdings, Inc. and Wells Fargo Bank, N.A., as trustee and collateral agent, and all exhibits, amendments, and supplements thereto, including, without limitation, the Series 2015-1 Supplemental Indenture dated October 15, 2015, the Second Series 2015-1 Supplemental Indenture dated October 15, 2015 and the Series 2015-2 Supplemental Indenture dated October 15, 2015 (collectively, the "**2015 Indenture**").  Thus, the DIP Lenders include holders of notes under the Indenture and the 2015 Indenture.  Collectively, the prepetition principal amount owed under the Indenture and the 2015 Indenture is $378.025 million.

Petition Date (but excluding any interest on interest required on overdue cash interest payments), held by you as a Noteholder and (ii) as a result of participating in the New Money Facility, receiving new notes under the Roll Up Facility. For example, if you are an accredited investor or qualified institutional buyer and you hold $1,000,000 in Notes, your total accrued interest for purposes of this calculation will be $87,493.06, and your percentage of total prepetition Note claims for purposes of this calculation will be 0.270%.[8]  Accordingly, you can participate in the New Money Facility with your pro rata share being 0.270% of the New Money Facility.  Thus, your funding of the New Money Facility would be $67,618.22.[9]  Upon entry of the Final Order, you will receive $135,236.44 in notes under the Roll Up Facility in exchange for $135,236.44 of your Notes.

In order to participate as a DIP Lender, you must also execute a joinder to that certain Restructuring Support Agreement dated August 8, 2016, among the Debtors, certain Noteholders, GSO, Kelso, the Revolving Facility Agent and the Revolving Facility Lenders (the "**RSA**").  **In executing a joinder to the RSA, you will be bound to support the Plan as described in the term sheet attached as Exhibit A to the RSA (the "RSA Term Sheet"), which among other things, provides that the obligations under the DIP Facilities will repaid by an in-kind dollar-for-dollar exchange for obligations under the Exit Second Lien Facility, rather than payment in cash on the Effective Date**.

A copy of the RSA can be found at:  **[insert DRC specific link to RSA]**.  The RSA Term Sheet is attached as Exhibit A to the RSA.  The term sheet describing the Exit Second Lien Facility is attached as Exhibit B to the RSA Term Sheet.   THIS FUNDING PARTICIPATION NOTICE IS NOT A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH SOLICITATION WILL COMPLY WITH ALL PROVISIONS OF THE BANKRUPTCY CODE.

In order to participate as a DIP Lender, you must return this Funding Participation Notice, with all information complete, by first class mail, overnight courier, or hand delivery to Cortland Capital Market Services LLC, at:

> *By electronic mail at (preferred method):*
> [_____]
>
> *By regular mail at:*
> [_____]
>
> *By hand delivery or overnight mail at:*
> [_____]

This Funding Participation Notice must be received by Cortland Capital Market Services LLC on or before September [___], 2016 (the "**Deadline**").  If a Funding Participation Notice is received after the Deadline, you will not be a DIP Lender.

---

[8] 1.087493 million / 402.071 million =  0.270%
[9] 0.270% * 25,000,000 = $67,618.22

The undersigned Noteholder certifies that:

1. The undersigned Noteholder is accredited investor or qualified institutional buyer.

2. The undersigned Noteholder holds $_____ in Notes.

3. The undersigned Noteholder elects to commit $_____ to fund the New Money Facility.

4. The undersigned agrees to be bound under the terms of the Interim DIP Order, the Final Order, the DIP Credit Agreement and RSA as a DIP Lender and will execute any and all necessary documents to effectuate such agreement to be bound.

_____
Name of Noteholder

_____
Signature

_____
Name of Institution

_____
Street Address

_____
City, State, Zip Code

_____
Taxpayer Identification Number

_____
Telephone Number

_____
Email Address

_____
Date Completed

If you are a beneficial holder, please provide DTC Participant information:

_____
DTC Participant Name

_____
DTC Participant Number

_____
DTC Contact Name

_____
DTC Contact Telephone Number

_____

_____
DTC Contact Email Address

**EXHIBIT D**

**DIP CREDIT AGREEMENT**

# [DRAFT]

DEBTOR-IN-POSSESSION CREDIT AGREEMENT

Dated as of August [___], 2016

among

LOGAN'S ROADHOUSE, INC.,

as Debtor and Debtor-In-Possession,

The Other Loan Parties Party Hereto,

CORTLAND CAPITAL MARKET SERVICES LLC,
as Administrative Agent and Collateral Agent,

and

The Other Lenders Party Hereto

# TABLE OF CONTENTS

## ARTICLE I.
## DEFINITIONS AND ACCOUNTING TERMS

Section 1.01    Defined Terms .................................................................................................1
Section 1.02    Other Interpretive Provisions...................................................................31
Section 1.03    Accounting Terms.....................................................................................32
Section 1.04    Rounding....................................................................................................32
Section 1.05    Times of Day..............................................................................................32
Section 1.06    Currency Equivalents Generally ..............................................................32

## ARTICLE II.
## THE COMMITMENTS AND CREDIT EXTENSIONS

Section 2.01    The Facilities.............................................................................................33
Section 2.02    Borrowings, Conversions and Continuations of Loans ........................34
Section 2.03    Disbursements from Segregated Pre-Funding Account.......................36
Section 2.04    Prepayments..............................................................................................36
Section 2.05    Repayment of Loans .................................................................................38
Section 2.06    Interest.......................................................................................................38
Section 2.07    Fees ............................................................................................................39
Section 2.08    Computation of Interest and Fees ...........................................................40
Section 2.09    Evidence of Debt........................................................................................40
Section 2.10    Payments Generally; Administrative Agent's Clawback .....................40
Section 2.11    Sharing of Payments by Lenders .............................................................42
Section 2.12    Defaulting Lenders....................................................................................42

## ARTICLE III.
## TAXES, YIELD PROTECTION AND ILLEGALITY

Section 3.01    Taxes..........................................................................................................43
Section 3.02    Illegality ....................................................................................................46
Section 3.03    Inability to Determine Rates ....................................................................47
Section 3.04    Increased Costs; Reserves on Eurodollar Rate Loans..........................47
Section 3.05    Compensation for Losses..........................................................................48
Section 3.06    Mitigation Obligations; Replacement of Lenders..................................49
Section 3.07    Survival......................................................................................................49

## ARTICLE IV.
## CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

Section 4.01    Conditions of Initial Credit Extension ....................................................50
Section 4.02    Conditions to Delayed Draw Borrowing .................................................53
Section 4.03    Conditions to all Credit Extensions ........................................................54

## ARTICLE V.
## REPRESENTATIONS AND WARRANTIES

Section 5.01    Existence, Qualification and Power ................................................................55
Section 5.02    Authorization; No Contravention ..................................................................55
Section 5.03    Governmental Authorization; Other Consents ..............................................55
Section 5.04    Binding Effect ..............................................................................................56
Section 5.05    Financial Statements .....................................................................................56
Section 5.06    Litigation .......................................................................................................56
Section 5.07    No Material Adverse Effect ..........................................................................56
Section 5.08    Ownership of Property; Liens; Investments ..................................................57
Section 5.09    Environmental Compliance ...........................................................................57
Section 5.10    Insurance .......................................................................................................58
Section 5.11    Taxes .............................................................................................................58
Section 5.12    ERISA Compliance .......................................................................................58
Section 5.13    Subsidiaries; Equity Interests; Loan Parties ................................................59
Section 5.14    Margin Regulations; Investment Company Act ............................................59
Section 5.15    Disclosure .....................................................................................................59
Section 5.16    Compliance with Laws ..................................................................................60
Section 5.17    Intellectual Property; Licenses, Etc. ............................................................60
Section 5.18    Labor Matters ...............................................................................................60
Section 5.19    Foreign Assets Control Regulations; Anti-Money Laundering; Anti-Corruption
                Practices; Anti-Terrorism Laws ....................................................................60
Section 5.20    No Defaults.. .................................................................................................61

## ARTICLE VI.
## REPORTING COVENANTS

Section 6.01    Financial Statements .....................................................................................61
Section 6.02    Other Events .................................................................................................65
Section 6.03    Copies of Notices and Reports ......................................................................65
Section 6.04    Taxes .............................................................................................................65
Section 6.05    Labor Matters ...............................................................................................65
Section 6.06    Lender Calls ..................................................................................................66

## ARTICLE VII.
## AFFIRMATIVE COVENANTS

Section 7.01    Certificates; Other Information .....................................................................66
Section 7.02    Notices ..........................................................................................................68
Section 7.03    Payment of Taxes ..........................................................................................68
Section 7.04    Preservation of Existence, Etc. .....................................................................69
Section 7.05    Maintenance of Properties .............................................................................69
Section 7.06    Maintenance of Insurance .............................................................................69
Section 7.07    Compliance with Laws ..................................................................................69
Section 7.08    Books and Records ........................................................................................69
Section 7.09    Inspection Rights ..........................................................................................70

Section 7.10    Use of Proceeds..................................................................................70
Section 7.11    Information Regarding Collateral......................................................71
Section 7.12    Covenant to Guarantee Obligations and Give Security ....................71
Section 7.13    Compliance with Environmental Laws..............................................73
Section 7.14    Further Assurances............................................................................73
Section 7.15    Post-Closing Covenant......................................................................74
Section 7.16    Compliance with Milestones.............................................................74
Section 7.17    Opposition to Certain Motions..........................................................75
Section 7.18    Priority and Liens..............................................................................75

## ARTICLE VIII.
## NEGATIVE COVENANTS

Section 8.01    Liens...................................................................................................77
Section 8.02    Investments ........................................................................................77
Section 8.03    Indebtedness.......................................................................................77
Section 8.04    Fundamental Changes........................................................................78
Section 8.05    Dispositions........................................................................................78
Section 8.06    Restricted Payments...........................................................................79
Section 8.07    Change in Nature of Business............................................................79
Section 8.08    Transactions with Affiliates...............................................................79
Section 8.09    Burdensome Agreements ...................................................................80
Section 8.10    Use of Proceeds..................................................................................81
Section 8.11    Capital Expenditures..........................................................................82
Section 8.12    Amendments of Organization Documents..........................................82
Section 8.13    Accounting Changes ..........................................................................82
Section 8.14    Prepayments, Etc. of Indebtedness ...................................................82
Section 8.15    Holding Company...............................................................................83
Section 8.16    Bankruptcy Provisions.......................................................................83
Section 8.17    Compliance with Budget Covenants...................................................84
Section 8.18    Foreign Subsidiaries...........................................................................84
Section 8.19    Real Property. .....................................................................................84

## ARTICLE IX.
## EVENTS OF DEFAULT AND REMEDIES

Section 9.01    Events of Default ...............................................................................84
Section 9.02    Remedies upon Event of Default .......................................................87
Section 9.03    Application of Funds...........................................................................88

## ARTICLE X.
## ADMINISTRATIVE AGENT

Section 10.01   Appointment and Authority ................................................................90
Section 10.02   Rights as a Lender..............................................................................90
Section 10.03   Exculpatory Provisions ......................................................................90
Section 10.04   Reliance by Administrative Agent......................................................91

Section 10.05  Delegation of Duties ...................................................................92
Section 10.06  Resignation of Administrative Agent ..........................................92
Section 10.07  Non-Reliance on Administrative Agent and Other Lenders.................93
Section 10.08  No Other Duties, Etc. ................................................................93
Section 10.09  Administrative Agent May File Proofs of Claim..............................93
Section 10.10  Collateral and Guaranty Matters ................................................94
Section 10.11  Withholding Tax. ......................................................................94

ARTICLE XI.
MISCELLANEOUS

Section 11.01  Amendments, Etc. ....................................................................95
Section 11.02  Notices; Effectiveness; Electronic Communications.......................97
Section 11.03  No Waiver; Cumulative Remedies; Enforcement............................99
Section 11.04  Expenses; Indemnity; Damage Waiver .......................................99
Section 11.05  Payments Set Aside..................................................................102
Section 11.06  Successors and Assigns............................................................102
Section 11.07  Treatment of Certain Information; Confidentiality.........................104
Section 11.08  Right of Setoff. ........................................................................105
Section 11.09  Interest Rate Limitation ...........................................................106
Section 11.10  Counterparts; Integration; Effectiveness.....................................106
Section 11.11  Survival of Representations and Warranties.................................106
Section 11.12  Severability .............................................................................106
Section 11.13  Replacement of Lenders ...........................................................107
Section 11.14  Governing Law; Jurisdiction; Etc. .............................................107
Section 11.15  Waiver of Jury Trial..................................................................108
Section 11.16  No Advisory or Fiduciary Responsibility .....................................109
Section 11.17  Electronic Execution of Assignments and Certain Other Documents.................109
Section 11.18  USA PATRIOT Act..................................................................109
Section 11.19  Conflicts..................................................................................110
Section 11.20  Acknowledgement and Consent to Bail-In of EEA Financial Institutions. .........110

SCHEDULES

2.01        Commitments
5.03        Certain Authorizations
5.13        Subsidiaries and Other Equity Investments; Loan Parties
5.17        Intellectual Property Matters
7.12        Guarantor Subsidiaries
8.01(b)     Existing Liens
8.02(a)     Existing Investments
8.03(b)     Existing Indebtedness
11.02       Administrative Agent's Office, Certain Addresses for Notices

EXHIBITS

*Form of*

| | |
|---|---|
| A-1 | Committed Loan Notice |
| A-2 | Notice of Request for Disbursement |
| B | Term Note |
| C | Compliance Certificate |
| D-1 | Assignment and Assumption |
| D-2 | Administrative Questionnaire |
| E | Guaranty |
| F | Security Agreement |
| G | U.S. Tax Compliance Certificate |
| H | Prepayment Notice |
| I | Budget |
| J | Interim Order |

CREDIT AGREEMENT

This CREDIT AGREEMENT ("<u>Agreement</u>") is entered into as of August [__], 2016, among Logan's Roadhouse, Inc., a Tennessee corporation (the "<u>Borrower</u>") and a Debtor and Debtor-In-Possession under the Bankruptcy Code (as defined below), each Guarantor (as defined below), each lender from time to time party hereto (collectively, the "<u>Lenders</u>" and individually, a "<u>Lender</u>"), and Cortland Capital Market Services LLC, as Administrative Agent.

<u>PRELIMINARY STATEMENTS:</u>

On August [__], 2016 (the "<u>Petition Date</u>"), the Borrower, and each Guarantor (as defined below) (each a "<u>Debtor</u>" and collectively, the "<u>Debtors</u>"), filed voluntary petitions with the Bankruptcy Court initiating their respective cases that are pending under chapter 11 of the Bankruptcy Code (each a "<u>Case</u>" and collectively, the "<u>Cases</u>");

From and after the Petition Date, the Debtors will continue to operate their respective businesses and to manage their respective properties as debtors and debtors-in-possession pursuant to Section 1107(a) and 1108 of the Bankruptcy Code;

In connection with the Cases, the Borrower has requested, and the Lenders have agreed to make available to the Borrower, a senior secured priming and superpriority debtor-in-possession term loan credit facility (junior only to the Pre-Petition First Lien Obligations) in an original principal amount of $25,000,000, consisting of $10,000,000 in Initial Commitments and $15,000,000 in Delayed Draw Commitments, the proceeds of which will be used in accordance with the Budget (as defined below), including the Permitted Variances (as defined below) thereto;

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

ARTICLE I.
DEFINITIONS AND ACCOUNTING TERMS

Section 1.01   <u>Defined Terms</u>.  As used in this Agreement, the following terms shall have the meanings set forth below:

"<u>Adequate Protection Claims</u>" has the meaning specified in the DIP Orders.

"<u>Adequate Protection Consenting Parties</u>" means (a) the Pre-Petition First Lien Agent, (b) the Pre-Petition First Lien Lenders, (c) the Pre-Petition Indenture Trustees and (d) each of Carl Marks, Marblegate, GSO, Kelso & Company, L.P. or one or more affiliated funds or financing vehicles (or funds or accounts advised or sub-advised by such Person) of any of them that are Pre-Petition Indenture Noteholders.

"<u>Adequate Protection Liens</u>" has the meaning specified in the DIP Orders.

"<u>Adequate Protection Parties</u>" means the Pre-Petition First Lien Agent, the Pre-Petition First Lien Lenders, the Pre-Petition Indenture Trustees and the Pre-Petition Indenture Noteholders.

"<u>Adequate Protection Payments</u>" means, collectively, the following payments to the Adequate Protection Parties:

(a)    all accrued and unpaid fees and disbursements owed to the Adequate Protection Consenting Parties under the Pre-Petition Debt Documents, including all reasonable and documented out-of-pocket fees and expenses of counsel and other professionals of the Adequate Protection Consenting Parties (including Simpson Thacher & Bartlett LLP, King & Spalding LLP, Debevoise & Plimpton LLP, Dechert LLP and Delaware local counsel retained by each of the Adequate Protection Consenting Parties (collectively, "<u>Delaware Counsel</u>")) incurred prior to the Petition Date in accordance with the Pre-Petition Debt Documents;

(b)    when due, current payment of all fees and reasonable and documented out-of-pocket expenses and indemnities payable to the Adequate Protection Consenting Parties under the Pre-Petition Debt Documents, including all reasonable and documented out-of-pocket fees and expenses of counsel and other professionals of the Adequate Protection Consenting Parties (including Simpson Thacher & Bartlett LLP, King & Spalding LLP, Debevoise & Plimpton LLP, Dechert LLP and Delaware Counsel);

(c)    to the extent of the diminution of value of the interest of the Pre-Petition First Lien Lenders and the Pre-Petition Indenture Noteholders in the prepetition Collateral, allowed, super-priority administrative expense claim status in the Case of each Loan Party pursuant to sections 503(b) and 507(b) of the Bankruptcy Code that (A) in the case of the Pre-Petition First Lien Lenders' super-priority claims, is senior to any other claims under section 507(b) of the Bankruptcy Code, including any such claims held by the Lenders and (B) in the case of the Pre-Petition Indenture Noteholders' super-priority claims, is junior in priority only to the Facility super-priority claims and the Pre-Petition First Lien Credit Agreement super-priority claims;

(d)    to the extent of the diminution of value of the interests of the Pre-Petition First Lien Lenders and the Pre-Petition Indenture Noteholders in prepetition Collateral, continuing, valid, binding, enforceable, non-avoidable and automatically perfected post-petition security interests in and liens on the Collateral pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code that are junior only to the Liens securing the Obligations and, in the case of the Pre-Petition Indentures, Liens securing the obligations under the Pre-Petition First Lien Credit Agreement; and

(e)    upon entry of the Final Order, cash payments of interest at the prescribed default contract rate pursuant to the terms of the Pre-Petition First Lien Credit Agreement to the Pre-Petition First Lien Agent and the Pre-Petition First Lien Lenders.

"<u>Additional Roll Up Loans</u>" has the meaning specified in <u>Section 2.01(a)</u>.

"Administrative Agent" means Cortland Capital Market Services LLC in its capacity as administrative agent under any of the Loan Documents, or any successor administrative agent appointed in accordance with the terms hereof.

"Administrative Agent's Office" means the Administrative Agent's address and the account as set forth on Schedule 11.02, or such other address or account as the Administrative Agent may from time to time notify to the Borrower and the Lenders.

"Administrative Questionnaire" means an Administrative Questionnaire in substantially the form of Exhibit D-2 or any other form approved by the Administrative Agent.

"Affiliate" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified. Notwithstanding anything herein to the contrary, neither the Administrative Agent nor any Lender (if not otherwise already an Affiliate of a Loan Party) shall be deemed an Affiliate of any Loan Party solely by virtue of the transactions contemplated by this Loan Agreement and the other Loan Documents.

"Agent Fee Letter" means that certain Credit Facility Agent Fee Letter, dated July 29, 2016, between Cortland Capital Market Services LLC and the Borrower, regarding fees payable in connection with the Facility.

"Aggregate Commitments" means the Commitments of all the Lenders.

"Agreement" means this Credit Agreement.

"Anti-Corruption Laws" has the meaning specified in Section 5.19(c).

"Anti-Money Laundering Law" means any and all laws, judgments, orders, executive orders, decrees, ordinances, rules, regulations, statutes, case law or treaties applicable to a Loan Party, its Subsidiaries or Affiliates, related to terrorism financing or money laundering including any applicable provision of Title III of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (USA PATRIOT Act) of 2001 (Title III of Pub. L. 107-56) and The Currency and Foreign Transactions Reporting Act (also known as the "Bank Secrecy Act", 31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1820(b) and 1951-1959).

"Applicable Rate" means 7.5% per annum for Base Rate Loans and 8.5% per annum for Eurodollar Rate Loans.

"Approved Fund" means any Fund that is administered, managed, advised or sub-advised by (a) a GSO Entity, (b) a Carl Marks Entity, (c) a Marblegate Entity, (d) a Lender, (e) an Affiliate of a Lender or (f) an entity or an Affiliate of an entity that administers, manages or sub-advises a Lender.

"Assignee Group" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 11.06(b)), and accepted by the Administrative Agent, in substantially the form of Exhibit D-1 or any other form approved by the Administrative Agent.

"Attributable Indebtedness" means, on any date, in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP.

"Audited Financial Statements" means the audited consolidated balance sheet of Holdings and its Subsidiaries for fiscal year 2015, and the related consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal year of Holdings and its Subsidiaries, including the notes thereto.

"Avoidance Actions" means the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code and any other avoidance actions under the Bankruptcy Code and the proceeds thereof and property received thereby whether by judgment, settlement or otherwise.

"Backstop Lenders" means Carl Marks, Marblegate, GSO, Kelso & Company, L.P. or one or more affiliated funds or financing vehicles (or funds or accounts advised or sub-advised by such Person) of any of them that provide the Initial Loans or the Delayed Draw Loans in the event that the Pre-Petition First Lien Lenders are not signatories hereto and do not provide any Initial Loans or Delayed Draw Loans hereunder.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bankruptcy Code" means the Federal Bankruptcy Reform Act of 1978 (11 U.S.C. §101, et seq.).

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware or any other court having jurisdiction over the Cases from time to time.

"Base Rate" means for any day a fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate plus 1/2 of 1%, (b) the rate of interest quoted in the Wall Street Journal, Money Rates Section, as the "Prime Rate" in effect from time to time (or if such rate is at any time not available, the prime rate so quoted by any banking institution selected by the Administrative Agent, which rate is not intended to be the lowest rate charged by any such banking institutions) and (c) the one-month Eurodollar Rate plus 1.00%; provided that in no event will the Base Rate be lower than 2.00% at any time.

"<u>Base Rate Loan</u>" means a Loan that bears interest based on the Base Rate.

"<u>Borrower</u>" has the meaning specified in the introductory paragraph hereto.

"<u>Borrower Materials</u>" has the meaning specified in <u>Section 7.01(e)</u>.

"<u>Borrowing</u>" means a borrowing consisting of Loans made on the same day by the Lenders according to their respective Commitments as set forth by the Borrower on the Committed Loan Notice therefor.

"<u>Budget</u>" means a statement of the Debtors' projected receipts and disbursements on a weekly basis for the period of thirteen weeks commencing with the calendar week during which the Petition Date occurs, including the anticipated uses of the Loans for each week during such period, substantially in the form of <u>Exhibit I</u> hereto, and otherwise in form and substance satisfactory to the Required Lenders and the Unanimous DIP Lenders [and the Pre-Petition First Lien Lenders in their respective sole and absolute discretion (provided, that the Pre-Petition First Lien Lenders shall not unreasonably withhold, condition or delay any such approval).]  As used herein, "<u>Budget</u>" shall initially refer to <u>Exhibit I</u> (which, for the avoidance of doubt, shall be in form and substance satisfactory to the Unanimous DIP Lenders) and, thereafter, the most recent Budget delivered by the Borrower and approved by the Required Lenders in accordance with <u>Section 6.01(d)</u>.

"<u>Business Day</u>" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in New York, New York, and, if such day relates to any Eurodollar Rate Loan, means any such day on which dealings in Dollar deposits are conducted by and between banks in the London interbank eurodollar market.

"<u>Capital Expenditures</u>" means, with respect to any Person for any period, any expenditure in respect of the purchase or other acquisition of any fixed or capital asset (excluding assets acquired in normal replacements and maintenance which are properly charged to current operations) that, in conformity with GAAP are required to be included as additions during such period to property, plant or equipment reflected in the consolidated balance sheet of Holdings and its Subsidiaries.

"<u>Capitalized Leases</u>" means all leases that have been or should be, in accordance with GAAP, recorded as capitalized leases; provided that for all purposes hereunder the amount of obligations under any Capitalized Lease shall be the amount thereof accounted for as a liability in accordance with GAAP.

"<u>Carl Marks</u>" means Carl Marks Management Company, LLC and its Affiliates and Approved Funds.

"<u>Carl Marks Entity</u>" means Carl Marks or certain funds and accounts managed or sub-advised by Carl Marks as the context may require.

"<u>Carve-Out</u>" has the meaning specified in the DIP Orders.

"Case" and "Cases" have the meanings specified in the recitals hereto.

"Cash Collateral Account" means a deposit account subject to a Control Agreement reasonably satisfactory to Administrative Agent and the Pre-Petition First Lien Agent.

"Cash Equivalents" means:

(a)    U.S. dollars or, in the case of a Foreign Subsidiary, any other foreign currency held by such Foreign Subsidiary in the ordinary course of business;

(b)    securities issued or directly and fully and unconditionally guaranteed or insured by the U.S. government or any agency or instrumentality thereof the securities of which are unconditionally guaranteed as a full faith and credit obligation of such government with maturities of 24 months or less from the date of acquisition;

(c)    certificates of deposit, time deposits and eurodollar time deposits with maturities of one year or less from the date of acquisition, bankers' acceptances with maturities not exceeding one year and overnight bank deposits, in each case with any commercial bank having capital and surplus of not less than $500.0 million in the case of U.S. banks and, in the case of any Foreign Subsidiary, $100.0 million (or the U.S. dollar equivalent as of the date of determination) in the case of non-U.S. banks, and in each case in a currency permitted under clause (a) above;

(d)    repurchase obligations for underlying securities of the types described in clauses (b), (c) and (h) entered into with any financial institution meeting the qualifications specified in clause (c) above, and in each case in a currency permitted under clause (a) above;

(e)    commercial paper rated at least P-2 by Moody's or at least A-2 by S&P and in each case maturing within 3 months after the date of creation thereof, and in each case in a currency permitted under clause (a) above;

(f)    marketable short-term money market and similar securities having a rating of at least P-2 or A-2 from either Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another Rating Agency) and in each case maturing within 3 months after the date of creation thereof and in a currency permitted under clause (a) above;

(g)    investment funds investing 95% of their assets in securities of the types described in clauses (a) through (f) above;

(h)    readily marketable direct obligations issued by any state, commonwealth or territory of the United States or any political subdivision or taxing authority thereof having a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P, or, in either case, an equivalent rating by any other Rating Agency with maturities of 3 months or less from the Closing Date;

(i)        Indebtedness or preferred stock issued by Persons with a rating of "A" or higher from S&P or "A2" or higher from Moody's with maturities of 3 months or less from the date of acquisition and in each case in a currency permitted under clause (a) above;

(j)        Investments with average maturities of 3 months or less from the date of acquisition in money market funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's and in each case in a currency permitted under clause (a) above; and

(k)        credit card receivables and debit card receivables so long as such are considered cash equivalents under GAAP and are so reflected on the Issuer's balance sheet.

Notwithstanding the foregoing, Cash Equivalents shall include amounts denominated in currencies other than those set forth in clause (a) above, provided that such amounts are converted into any currency listed in clause (a) as promptly as practicable and in any event within ten Business Days following the receipt of such amounts.

 "Casualty Event" means any event that gives rise to the receipt by any Loan Party or any Subsidiary thereof of any insurance proceeds or condemnation award in respect of any equipment, fixed assets or real property (including improvements thereon) to replace, restore or repair such equipment, fixed assets or real property.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980.

"CERCLIS" means the Comprehensive Environmental Response, Compensation and Liability Information System, and its successor, the Superfund Enterprise Management System, maintained by the U.S. Environmental Protection Agency.

"CFC" means a Foreign Subsidiary of the Borrower that is a controlled foreign corporation under Section 957 of the Code, and any direct or indirect Subsidiary of such a Foreign Subsidiary.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following:  (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

"Change of Control" means an event or series of events by which:

(a)     Permitted Holders, collectively, shall cease to be the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Exchange Act as in effect on the Closing Date) (free and clear of all Liens except those created under the Collateral Documents and Permitted Liens), either directly or indirectly, of equity securities in Roadhouse Holding representing more than 50% of the combined voting power of all of equity securities entitled to vote for members of the board of directors or equivalent governing body of Roadhouse Holding on a fully-diluted basis (and taking into account all such securities that the Permitted Holders have the right to acquire, whether such right is exercisable immediately or only after the passage of time); or

(b)     At any time, a majority of the members of the board of directors or other equivalent governing body of Holdings, Roadhouse Holding or the Borrower cease to be composed of individuals (i) who were members of that board or equivalent governing body on the first day of such period, (ii) whose election or nomination to that board or equivalent governing body was approved by individuals referred to in clause (i) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body or (iii) whose election or nomination to that board or other equivalent governing body was approved by individuals referred to in clauses (i) and (ii) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body (excluding, in the case of both clause (ii) and clause (iii), any individual whose initial nomination for, or assumption of office as, a member of that board or equivalent governing body occurs as a result of an actual or threatened solicitation of proxies or consents for the election or removal of one or more directors by any person or group other than a solicitation for the election of one or more directors by or on behalf of the board of directors); or

(c)     Roadhouse Holding shall cease, directly or indirectly, to own and control legally and beneficially all of the Equity Interests in the Borrower; or

(d)     a "change of control" or any comparable term under, and as defined in, any indenture or agreement governing any Pre-Petition Debt shall have occurred.

"Closing Date" means the first date all the conditions precedent in Section 4.01 are satisfied or waived in accordance with Section 11.01.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collateral" has the meaning given to such term in the Security Agreement.

"Collateral Documents" means, collectively, the Security Agreement, each Intellectual Property Security Agreement, the Mortgages, the collateral assignments, Security Agreement Supplements, security agreements, pledge agreements or other similar agreements delivered to the Administrative Agent pursuant to Sections 7.11 and 7.12 and each of the other agreements, instruments or documents that creates or purports to create a Lien in favor of the Administrative Agent for the benefit of the Secured Parties, each as the Administrative Agent may request.

"Committee" means the official committee of unsecured creditors retained in any Case whose retention is approved by the Bankruptcy Court pursuant to sections 327, 328 or 1103 of the Bankruptcy Code.

"Commitments" means, collectively, the Initial Commitments and the Delayed Draw Commitments. The aggregate principal amount of all Commitments on the Closing Date is $25,000,000.

"Committed Loan Notice" means a written notice of (a) a Borrowing, (b) a conversion of Loans from one Type to the other, or (c) a continuation of Eurodollar Rate Loans, pursuant to Section 2.02(a), which shall be substantially in the form of Exhibit A-1.

"Company IP Rights" means rights in Intellectual Property owned or purported to be owned by a Loan Party or its Subsidiaries.

"Compliance Certificate" means a certificate substantially in the form of Exhibit C.

"Consolidated" means, with respect to any Person, the accounts of such Person and its Subsidiaries consolidated in accordance with GAAP.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Control Agreement" means, with respect to any deposit account, any securities account, commodity account, securities entitlement or commodity contract, an agreement, in form and substance satisfactory to the Administrative Agent and the Required Lenders in their sole discretion, effective to grant "control" (as defined under the applicable UCC) over such account to the Administrative Agent for the benefit of the Secured Parties or otherwise to perfect the security interest of the Administrative Agent for the benefit of the Secured Parties in such account and to permit the exercise of collateral remedies with respect thereto.

"Corporate Chart" means a document in form reasonably acceptable to the Administrative Agent and setting forth, as of a date set forth therein, for each Person that is a Loan Party, that is subject to Section 7.09 or that is a Subsidiary or joint venture of any of them, (a) the full legal name of such Person, (b) the jurisdiction of organization and any organizational number and tax identification number of such Person, (c) the location of such Person's chief executive office (or, if applicable, sole place of business) and (d) the number of shares of each class of Stock of such Person authorized, the number outstanding and the number and percentage of such outstanding shares for each such class owned, directly or indirectly, by any Loan Party or any Subsidiary of any of them.

"Credit Extension" means a Borrowing.

"Debtor Relief Laws" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rear-

rangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default; provided that any Default that results solely from the taking of an action that would have been permitted but for the continuation of a previous Default will be deemed to be cured if such previous Default is cured prior to becoming an Event of Default.

"Default Rate" means (a) when used with respect to Obligations consisting of principal, an interest rate equal to (i) the Base Rate with respect to any Base Rate Loan, or Eurodollar Rate with respect to any Eurodollar Loan plus (ii) the Applicable Rate for such loan, plus (iii) 3% per annum, (b) when used with respect to Obligations other than principal, an interest rate equal to (i) the Base Rate, plus (ii) the Applicable Rate applicable to Base Rate Loans under the Facility, plus (iii) 3% per annum.

"Defaulting Lender" means any Lender that (a) has failed to fund any portion of the Loans required to be funded by it hereunder within two Business Days of the date required to be funded by it hereunder, (b) has otherwise failed to pay over to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within two Business Days of the date when due, unless the subject of a good faith dispute, (c) has notified the Borrower or the Administrative Agent or any Lender that it does not intend to comply with its funding obligations or has made a public statement to that effect with respect to its funding obligations, (d) has failed within three Business Days after request by the Administrative Agent, to confirm in a manner satisfactory to the Administrative Agent that it will comply with its funding obligations, or (e) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, (ii) had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or a custodian appointed for it, (iii) taken any action in furtherance of, or indicated its consent to, approval of, or acquiescence in any such proceeding or appointment, or (iv) become the subject of a Bail-In Action; provided that, for the avoidance of doubt, a Lender shall not be a defaulting lender solely by virtue of (i) the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority or (ii) in the case of a solvent Person, the precautionary appointment of an administrator, guardian, custodian or other similar official by a Governmental Authority under or based on the law of the country where such Person is subject to home jurisdiction supervision if applicable law requires that such appointment not be publicly disclosed so long as, in any such case, where such action does not result in or provide such Person with immunity from the jurisdiction of courts within the United States of America or from the enforcement of judgments or writs of attachment on its assets or permit such Person (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any of one or more clauses (a) through (e) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender upon delivery of written notice of such determination from the Administrative Agent to the Borrower and each Lender.

"Delayed Draw Commitment" means, with respect to each Lender, the several (and not joint or joint and several) commitment of such Lender to make Delayed Draw Loans hereunder as set forth in the "Delayed Draw Commitments" column on Schedule 2.01, or in the Assignment and Acceptance pursuant to which such Lender assumed its Delayed Draw Commitment, as applicable, as the same may be (a) reduced from time to time pursuant to Section 2.04 and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to Section 11.06.  The aggregate principal amount of all Delayed Draw Commitments on the Closing Date is $15,000,000.

"Delayed Draw Loan" has the meaning specified in Section 2.01(b).

"Delayed Draw Loan Funding Date" means the later of (a) the Final Order Entry Date and (b) the date that is forty (40) days after the Interim Order Entry Date.

"DIP Maturity Date" means the earliest of (a) the Effective Date, (b) the date on which a sale of all or substantially all of the Debtors' assets under section 363 of the Bankruptcy Code is consummated, (c) the date of termination in whole of the Commitments or acceleration of the Loans pursuant to Section 9.02 and (d) November 14, 2016.

"DIP Orders" means the Interim Order and the Final Order.

"Disbursement Date" has the meaning specified in Section 2.03(a).

"Disclosure Statement" has the meaning specified in Section 7.16(e).

"Disqualified Lenders" means any competitor of the Borrower or its Subsidiaries, which Person has been identified in writing to the Administrative Agent prior to the Closing Date as being a "Disqualified Lender," the identities of which will be made available to Lenders upon request.

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction) of any property by any Person (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"Disqualified Equity Interests" means any Equity Interest which, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable and the termination of the Commitments) (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise, (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part, (c) provides for the scheduled payments of dividends in cash, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests,

in each case, prior to the date that is ninety-one (91) days after the latest then existing DIP Maturity Date.

"Dollar" and "$" mean lawful money of the United States.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition and is subject to the supervision of an EEA Resolution Authority, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision of an EEA Resolution Authority with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Date" means the effective date of the Reorganization Plan.

"Eligible Assignee" means any Person that meets the requirements to be an assignee under Sections 11.06(b)(iii), (v) and (vi) (subject to such consents, if any, as may be required under Section 11.06(b)(iii)), and in no event shall include any Disqualified Lender or any Affiliate of any Loan Party (other than the Equity Investors).

"Environmental Laws" means any and all applicable Federal, state, local, international and foreign treaties, statutes, laws (including common law), codes, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions relating to pollution, the protection of the environment, the protection of natural resources (including threatened or endangered species), the Release of any Hazardous Materials into the environment, or the exposure of any person to Hazardous Materials, including those related to air emissions of Hazardous Materials, management and disposal of solid waste, and discharges of wastewater to public systems.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Borrower, any other Loan Party or any of their respective Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Environmental Permit" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"Equity Investors" means Kelso & Company, L.P. and any successor in interest thereto and any of its Affiliates other than any portfolio companies or any Loan Party.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with the Borrower within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by the Borrower or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by the Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in endangered or critical status under Section 305 of ERISA; (d) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Section 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (f) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrower or any ERISA Affiliate; (g) a prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan; or (h) any Loan Party, any Subsidiary thereof or any ERISA Affiliate engages in a transaction that could be subject to Section 4069 or 4212(c) of ERISA.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"Eurodollar Rate" means, for any Interest Period with respect to any Eurodollar Rate Loan:

(a)    the rate of interest per annum, expressed on the basis of a year of 360 days, determined by the Administrative Agent,  which is equal to the ICE Benchmark Administration Limited LIBOR Rate published by Bloomberg (or any successor thereto as may be selected by the Administrative Agent) with a term equivalent to such Interest Period, determined as of ap-

proximately 11:00 a.m. (London time) two (2) Business Days prior to the first day of such Interest Period, or

      (b)    if the rates referenced in the preceding subsection (a) are not available, the Administrative Agent shall request the principal London office of any three major reference banks in the London interbank market selected by the Administrative Agent to provide such bank's offered quotation (expressed as a percentage per annum) to prime banks in the London interbank market for deposits in U.S. dollars for a term equivalent to such Interest Period as of 11:00 am London time, on such date for the amounts for a comparable loan at the time of such calculation, and LIBOR shall be the arithmetic mean of such quotation.  In no event will the Eurodollar Rate be lower than 1.00% at any time.

      "Eurodollar Rate Loan" means a Loan that bears interest at a rate based on the Eurodollar Rate.

      "Event of Default" has the meaning specified in Section 9.01.

      "Exchange Act" means the Securities Exchange Act of 1934, as amended.

      "Excluded Subsidiary" means each (i) CFC and (ii) Transparent Subsidiary.

      "Excluded Taxes" means, with respect to the Administrative Agent, any Lender, or any other recipient of any payment to be made by or on account of any obligation of any Loan Party under any Loan Document, (a) Taxes imposed on or measured by its overall net income (however denominated), franchise Taxes imposed on it (in lieu of net income Taxes) and branch profits Taxes, in each case, imposed by the jurisdiction (or any political subdivision thereof) under the Laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable Lending Office is located, or as the result of any other connection between such recipient and such jurisdiction (other than any such connection arising solely from the execution or delivery of, receipt of payments under, receipt or perfection of a security interest under, enforcement of, becoming a party to, performing its obligations under or otherwise participating in the transactions contemplated in, or otherwise with respect to, the Loan Documents), (b) in the case of any Lender (other than an assignee pursuant to a request by the Borrower under Section 11.13), any U.S. federal withholding Tax that (i) is required to be imposed on amounts payable to such Lender pursuant to the Laws in force at the time such Lender becomes a party hereto (or designates a new Lending Office), except to the extent that such Lender (or its assignor, if any) was entitled, at the time of designation of a new Lending Office (or assignment), to receive additional amounts from the Borrower with respect to such withholding Tax pursuant to Section 3.01(a) or (ii) is attributable to such Lender's failure to comply with Section 3.01(e), and (c) any U.S. federal withholding Taxes imposed pursuant to FATCA.

      "Exit Facilities" means, collectively, the Exit First Lien Facility and the Exit Second Lien Facility.

      "Exit First Lien Facility" has the meaning specified in the RSA Term Sheet.

"Exit Second Lien Facility" means a second lien term loan facility to be entered into on the Effective Date, on terms materially consistent with the second lien exit financing term sheet attached to the RSA Term Sheet, and otherwise reasonably acceptable to the Debtors, the Required Supporting Noteholders and the Supporting Lenders.

"Facility" means the New Money Facility and the Roll Up Facility.

"FATCA" means Sections 1471 through 1474 of the Code as of the date of this Agreement, and any amended or successor version that is substantively comparable and not materially more onerous to comply with, and any current or future Treasury regulations or other official administrative guidance or interpretations thereof (including any Revenue Ruling, Revenue Procedure, Notice or similar guidance issued by the Internal Revenue Service) promulgated thereunder.

"FCPA" has the meaning specified in Section 5.19(c).

"Federal Funds Rate" means, for any day, the rate calculated by the New York Fed based on such day's federal funds transactions by depository institutions as determined in such manner as the New York Fed shall set forth on its public website from time to time and published on the next succeeding Business Day by the New York Fed as the federal funds effective rate; provided that if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day.

"Final Order" means a final order entered by the Bankruptcy Court in the Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures approved by the Bankruptcy Court, which order shall authorize the transactions contemplated by this Agreement and the use of cash collateral in accordance with the Budget, and shall otherwise be in form and substance satisfactory to the Administrative Agent, the Required Lenders, the Debtors, the Supporting Lenders, the Required Supporting Noteholders, and the Supporting Interest Holders in their respective sole discretion.

"Final Order Entry Date" means the date on which the Final Order is entered by the Bankruptcy Court.

"Flood Insurance Laws" means, collectively, (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statute thereto, (iii) the National Flood Insurance Reform Act of 1994 as now or hereafter in effect or any successor statute thereto and (iv) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto.

"Foreign Lender" means any Lender that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"Foreign Subsidiary" means each Subsidiary of the Borrower that is not organized under the Laws of the United States, any state thereof, or the District of Columbia.

"<u>FRB</u>" means the Board of Governors of the Federal Reserve System of the United States.

"<u>Fund</u>" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"<u>Funding Date</u>" has the meaning specified in <u>Section 2.02(b)</u>.

"<u>GAAP</u>" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"<u>Governmental Authority</u>" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"<u>Group Members</u>" means, collectively, the Loan Parties and their respective other Subsidiaries, if any (each such entity individually being a "Group Member").

"<u>Group Members' Accountants</u>" means Grant Thornton LLP, Deloitte & Touche LLP or other nationally-recognized independent registered certified public accountants reasonably acceptable to the Administrative Agent.

"<u>GSO</u>" means GSO Capital Partners LP and its Affiliates and Approved Funds, including GSO / Blackstone Debt Funds Management LLC.

"<u>GSO Entity</u>" means GSO or certain funds and accounts managed or sub-advised by GSO as the context may require.

"<u>Guarantee</u>" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness payable by another Person (the "<u>primary obligor</u>") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of

the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien); provided that the term "Guarantee" shall not include endorsements for collection or deposit, in either case in the ordinary course of business, or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or disposition or assets permitted under this Agreement (other than such obligations with respect to Indebtedness).  Except as provided in the definition of Indebtedness, the amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith.  The term "Guarantee" as a verb has a corresponding meaning.

"Guarantor Subsidiaries" means the Subsidiaries of the Borrower listed on Schedule 7.12 and each other Subsidiary of the Borrower that shall be required to execute and deliver a guaranty or guaranty supplement pursuant to Section 7.12; provided that in no event shall any CFC or Transparent Subsidiary be considered a Guarantor Subsidiary.

"Guarantors" means, collectively, Roadhouse Holding, Roadhouse Intermediate, Roadhouse Midco, Roadhouse Parent, Holdings and the Guarantor Subsidiaries.

"Guaranty" means, the Guaranty, dated as of the date hereof, made by the Guarantors in favor of the Secured Parties, substantially in the form of Exhibit E, together with each other guaranty and guaranty supplement delivered pursuant to Section 7.12.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, infectious or medical wastes and all other hazardous or toxic substances or wastes of any nature regulated pursuant to any Environmental Law.

"Holdings" means LRI Holdings, Inc., a Delaware corporation.

 "Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)     all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)     the maximum amount of all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c)     net obligations of such Person under any swap contract;

(d)       all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business and not past due for more than 90 days);

(e)       indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)       all Attributable Indebtedness in respect of Capitalized Leases of such Person;

(g)       all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interest in such Person or any other Person or any warrant, right or option to acquire such Equity Interest, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends;

(h)       all obligations in respect of Disqualified Equity Interests; and

(i)       all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person.  The amount of Indebtedness of any Person for the purposes of clause (e) (or any secured Guarantee thereof) shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the fair market value of the property encumbered thereby as determined by such Person in good faith.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Indemnitees" has the meaning specified in Section 11.04(b).

"Information" has the meaning specified in Section 11.07.

"Initial Commitment" means, with respect to each Lender, the several (and not joint or joint and several) commitment of such Lender to make Initial Loans hereunder as set forth in the "Initial Commitments" column on Schedule 2.01, or in the Assignment and Acceptance pursuant to which such Lender assumed its Commitment, as applicable, as the same may be (a) reduced from time to time pursuant to Section 2.04 and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to Section 11.06.  The aggregate principal amount of all Initial Commitments on the Closing Date is $10,000,000.

"Initial Loan" has the meaning specified in Section 2.01(b).

"Initial Roll Up Loans" has the meaning specified in Section 2.01(a).

"Intellectual Property" has the meaning specified in the Collateral Documents.

"Intellectual Property Security Agreements" means, collectively, the Copyright Security Agreement, the Trademark Security Agreement and the Patent Security Agreement (as each such term is defined in the Security Agreement).

"Interest Payment Date" means, (a) as to any Eurodollar Rate Loan, the last day of each Interest Period applicable to such Loan and the DIP Maturity Date; and (b) as to any Base Rate Loan, the last Business Day of each March, June, September and December and the DIP Maturity Date.

"Interest Period" means, as to each Eurodollar Rate Loan, the period commencing on the date such Eurodollar Rate Loan is disbursed or converted to or continued as a Eurodollar Rate Loan and ending on the date one month thereafter; provided that:

(a)     any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

(b)     any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(c)     no Interest Period shall extend beyond the DIP Maturity Date.

"Interim Order" means an interim order entered by the Bankruptcy Court (as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms hereof) in the form set forth as Exhibit J (as modified in a manner satisfactory to the Debtors, the Administrative Agent, the Required Lenders, the Supporting Lenders, the Required Supporting Noteholders and the Supporting Interest Holders in their respective sole discretion).

"Interim Order Entry Date" means the date on which the Interim Order is entered by the Bankruptcy Court.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or interest in, another Person, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person that constitute a business unit or all or a substantial part of the business of, such Person.  For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"IRS" means the United States Internal Revenue Service.

"Laws" means, collectively, all applicable international, foreign, Federal, state and local statutes, treaties, rules, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case having the force of law.

"Lender" has the meaning specified in the introductory paragraph hereto.

"Lending Office" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify in writing to the Borrower and the Administrative Agent.

"Lien" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing).

"Loans" means the loans made by the Lenders to the Borrower pursuant to Section 2.01 (including, for the avoidance of doubt, the Initial Loans, the Delayed Draw Loans and the Roll Up Loans), in each case, plus any PIK Interest capitalized and added to the principal amount thereof.

"Loan Documents" means, collectively, (a) this Agreement, (b) the Notes, if any, (c) the Guaranty, (d) the Collateral Documents, (e) the Agent Fee Letter and (f) any other document executed by or on behalf of any of the Loan Parties that is delivered to the Administrative Agent or any of the other Secured Parties in connection with the foregoing.

"Loan Parties" means, collectively, the Borrower and each Guarantor.

"Logan's Kansas" means Logan's Roadhouse of Kansas, Inc., a Kansas corporation.

"Logan's Texas" means Logan's Roadhouse of Texas, Inc., a Texas corporation.

"Marblegate" means Marblegate Asset Management, LLC and its Affiliates and Approved Funds.

"Marblegate Entity" means Marblegate or certain funds and accounts managed or sub-advised by Marblegate as the context may require.

"Material Adverse Effect" means a material adverse change in, or a material adverse effect upon, (a) the operations, business, assets or condition (financial or otherwise) of the Loan Parties and their Subsidiaries, taken as a whole, other than as customarily occurs as a result of events leading up to and following the commencement of a proceeding under chapter 11 of the

Bankruptcy Code and the commencement of the Cases, (b) the validity or enforceability of this Agreement or any other Loan Document or the rights or remedies of the Administrative Agent or any of the Lenders hereunder or thereunder or the ability of the Loan Parties to perform their respective material obligations hereunder or thereunder, (c) the Collateral or the attachment, perfection or priority of any Liens granted pursuant to any Loan Document in the Collateral, or (d) the Transactions.

"Monthly Operating Reports" has the meaning specified in Section 6.03.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Mortgages" means deeds of trust, trust deeds, deeds to secure debt and mortgages, each in a form satisfactory to the Administrative Agent.

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which the Borrower or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"Net Cash Proceeds" means:

(a)      with respect to any Disposition by any Loan Party or any of its Subsidiaries, or any Casualty Event, the excess, if any, of (i) the sum of cash and Cash Equivalents received by any Loan Party or Subsidiary thereof in connection with such transaction (including any cash or Cash Equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) over (ii) the sum of (A) the principal amount of any Indebtedness that is secured by the applicable asset and that is required to be repaid in connection with such transaction (other than Indebtedness under the Loan Documents), (B) the reasonable out-of-pocket cash fees and expenses (including attorney's fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, other customary expenses and brokerage, consulting and other customary fees) incurred by such Loan Party or such Subsidiary in connection with such transaction, (C) any Taxes paid or reasonably estimated to be payable by the Borrower to be payable with respect to such Disposition; provided that, if the amount of any estimated Taxes pursuant to subclause (C) exceeds the amount of Taxes actually required to be paid in cash in respect of such Disposition, the aggregate amount of such excess shall constitute Net Cash Proceeds and (D) any reserve for adjustment in respect of (x) the sale price of such asset or assets established in accordance with GAAP and (y) any liabilities associated with such asset or assets and retained by the Borrower or any Subsidiary after such sale or other disposition thereof, including pension and other post-employment benefit liabilities and liabilities related to environmental matters or with respect to any indemnification obligations associated with such transaction, it being understood that "Net Cash Proceeds" shall include (i) any cash or Cash Equivalents received upon the Disposition of any non-cash consideration by the Borrower or any Subsidiary in any such Disposition and (ii) upon the reversal (without the satisfaction of any applicable liabilities in cash in a corresponding amount) of any reserve described in subclause (D) above or if such liabilities have not been satisfied in cash and such reserve is not reversed within 365 days after such Disposition or Casualty Event, the amount of such reserve;

(b)    with respect to the incurrence or issuance of any Equity Interest or Indebtedness by the Borrower or any of its Subsidiaries, the excess of (i) the sum of the cash and Cash Equivalents received in connection with such transaction over (ii) the investment banking fees, underwriting discounts and commissions, costs and other reasonable and customary out-of-pocket fees and expenses, incurred by the Borrower or such Subsidiary in connection therewith.

"New Money Facility" has the meaning specified in Section 2.01(b).

"Note" means a promissory note of the Borrower, in substantially the form of Exhibit B, payable to the order of a Lender, evidencing the Indebtedness of the Borrower to such Lender resulting from the Loans made to the Borrower by such Lender or its predecessor(s) and "Notes" means all such notes.

"Notice of Request for Disbursement" means a written notice of request for disbursement of proceeds of the Initial Loans and Delayed Draw Loans on deposit in the Segregated Pre-Funding Account, pursuant to Section 2.03, substantially in the form of Exhibit A-2 or such other form as may be acceptable to the Administrative Agent and the Required Lenders.

"NPL" means the National Priorities List under CERCLA.

"Obligations" means all Loans, advances to, and debts, liabilities, obligations, covenants and duties of (including, without limitation, interest (including any PIK Interest), fees, expenses, indemnities and any prepayment premiums), any Loan Party arising under any Loan Document or otherwise with respect to any Loan, absolute or contingent, due or to become due, now existing or hereafter arising and including interest (including, without limitation, any PIK Interest) and fees that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding.

"OFAC" has the meaning specified in Section 5.19(a).

"Organization Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Other Taxes" means all present or future stamp or documentary Taxes or any other excise, property, intangible, mortgage recording or similar Taxes arising from any payment made hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document, except any such Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 11.13) that are imposed as a result of a present or former connection between the assignor or as-

signee and the jurisdiction imposing such Tax (other than connections arising from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, sold or assigned an interest in any Loan or Loan Document).

"Outstanding Amount" means the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Loans as the case may be, occurring on such date.

"PBGC" means the Pension Benefit Guaranty Corporation.

"Perfection Certificate" means that certain Perfection Certificate, dated on or after the date hereof, delivered by each Loan Party to the Administrative Agent pursuant to Section 4.01.

"Pension Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by the Borrower or any ERISA Affiliate or to which the Borrower or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer plan or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five plan years.

"Permitted Holder" means the Equity Investors, members of management of the Borrower or any direct or indirect parent of the Borrower, any other shareholders who are holders of Equity Interests of the Borrower (or any of its direct or indirect parent companies) on the Closing Date, and any group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act or any successor provision) of which any of the foregoing constitute the majority; provided that the voting power of the voting stock owned by the Equity Investors shall be greater than the voting power of the voting stock owned by such groups and/or members of management.

"Permitted Liens" has the meaning specified in Section 8.01, except where otherwise indicated.

"Permitted Refinancing" means, with respect to any Person, any modification (other than a release of such Person), refinancing, refunding, renewal or extension of any Indebtedness of such Person; provided that (a) the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, refunded, renewed or extended except by an amount equal to unpaid accrued interest and premium thereon plus other reasonable amounts paid, and fees and expenses reasonably incurred, in connection with such modification, refinancing, refunding, renewal or extension and by an amount equal to any existing commitments unutilized thereunder, (b) other than with respect to a Permitted Refinancing in respect of Indebtedness permitted pursuant to Section 8.03, such modification, refinancing, refunding, renewal or extension has a final maturity date equal to or later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being modified, refinanced, refunded, renewed or extended and (c) at the time thereof, no Event of Default shall have occurred and be continuing.

"Permitted Tax Distributions" means, for so long as any Group Member is a member of a combined, consolidated or unitary tax group of which it is not the parent, payments, dividends or distributions by such Group Member to its direct or indirect parent, as applicable, to the extent necessary to allow the payment by such direct or indirect parent of any consolidated, combined or unitary federal, state or local Taxes not payable directly by such Group Member and its Subsidiaries; provided that the aggregate amount of such payments, dividends or distributions shall not be greater than the aggregate amount of Taxes that would have been due and owing by such Group Member had the Group Member and its Subsidiaries filed a combined, consolidated, unitary or similar type return (without including any other persons other than such Group Member and its Subsidiaries).

"Permitted Variance" means (a) any positive Variance or (b) any negative Variance that, on a cumulative basis, does not exceed the greater of (i) solely for the first three Variance Reports, $4.5 million and (ii) the dollar amount resulting from multiplying the total operating receipts in the applicable Budget by six percent (6%) for the applicable week.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Petition Date" has the meaning specified in the recitals hereto.

"PIK Interest" has the meaning specified in Section 2.06(c).

"Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established by the Borrower or, with respect to any such plan that is subject to Section 412 of the Code or Section 302 or Title IV of ERISA, any ERISA Affiliate.

"Plan Milestones" has the meaning specified in Section 7.16.

"Platform" has the meaning specified in Section 7.01.

"Pledged Securities" has the meaning specified in the Security Agreement.

"Pre-Petition 2010 Indenture" means that certain Indenture, dated as of October 4, 2010, as amended or supplemented from time to time, by and among the Borrower, the Guarantors party thereto, the indenture trustee thereunder (the "Pre-Petition 2010 Indenture Trustee") and the collateral agent thereunder (the "Pre-Petition 2010 Collateral Agent").

"Pre-Petition 2010 Indenture Noteholders" means the holders of the notes under the 2010 Indenture.

"Pre-Petition 2015 Indenture" means that certain Indenture, dated as of October 15, 2015, as amended or supplemented from time to time, by and among the Borrower, the Guarantors party thereto, the indenture trustee thereunder (the "Pre-Petition 2015 Indenture Trustee") and the collateral agent thereunder (the "Pre-Petition 2015 Collateral Agent").

"Pre-Petition 2015 Indenture Noteholders" means the holders of the notes under the 2015 Indenture.

"Pre-Petition Debt" means, collectively, the Indebtedness of each Debtor outstanding and unpaid under the Pre-Petition First Lien Loan Documents and the Pre-Petition Indenture Documents.

"Pre-Petition Debt Documents" means, collectively, the Pre-Petition First Lien Loan Documents and the Pre-Petition Indenture Documents.

"Pre-Petition First Lien Agent" means JPMorgan Chase Bank, N.A., as administrative agent under the Pre-Petition First Lien Credit Agreement, and any successor in interest thereto.

"Pre-Petition First Lien Credit Agreement" means that certain Credit Agreement, dated as of October 4, 2010 (as amended by Amendment No. 1, dated as of September 4, 2012, as further amended by Amendment No. 2, dated as of April 26, 2013, as further amended by Amendment No. 3, dated as of January 24, 2014, as further amended by Amendment No. 4, dated as of December 19, 2014, as further amended by Amendment No. 5, dated as of May 28, 2015, Amendment No. 6, dated as of October 15, 2015, as further amended by Amendment No. 7, dated as of March 28, 2016, as further amended by Amendment No. 8 and Forbearance Agreement, dated as of June 30, 2016), by and among the Borrower, Holdings, the lenders from time to time party thereto and the Pre-Petition First Lien Agent.

"Pre-Petition First Lien Lenders" means the "Lenders" under (and as defined in) the Pre-Petition First Lien Credit Agreement.

"Pre-Petition First Lien Loan Documents" means the "Loan Documents" as defined in the Pre-Petition First Lien Credit Agreement.

"Pre-Petition First Lien Obligations" means the "Obligations" as defined in the Pre-Petition First Lien Credit Agreement.

"Pre-Petition First Lien Secured Parties" means, collectively, the Pre-Petition First Lien Agent and the Pre-Petition First Lien Lenders.

"Pre-Petition Indenture Documents" means, collectively, the Pre-Petition 2010 Indenture, the Pre-Petition 2015 Indenture, the related notes, and other guarantee, security or other relevant documentation executed in connection therewith.

"Pre-Petition Indenture Noteholders" means, collectively, the Pre-Petition 2010 Indenture Noteholders and the Pre-Petition 2015 Indenture Noteholders.

"Pre-Petition Indenture Notes" means, collectively, the notes issued under the Pre-Petition Indentures, which are the (a) 10.75% Senior Secured Notes due 2017 issued under the Pre-Petition 2010 Indenture and (b) the Series 2015-1 Senior Secured Zero Coupon Notes due October 2017 and the Series 2015-2 Senior Secured Notes Due October 2017, each issued under the Pre-Petition 2015 Indenture.

"Pre-Petition Indenture Secured Parties" means, collectively, the Pre-Petition Indenture Noteholders and the Pre-Petition Indenture Trustees.

"Pre-Petition Indenture Trustees" means, collectively, the Pre-Petition 2010 Trustee and the Pre-Petition 2015 Indenture Trustee.

"Pre-Petition Indentures" means, collectively, the Pre-Petition 2010 Indenture and the Pre-Petition 2015 Indenture.

"Pre-Petition Intercreditor Agreement" means that certain Intercreditor Agreement, dated as of October 4, 2010 (as amended by Amendment No. 1 to Intercreditor Agreement, dated as of October 15, 2015), by and among the Pre-Petition First Lien Agent, the Pre-Petition Indenture Trustees, the Borrower, Holdings, Logan's Texas and Logan's Kansas.

"Pre-Petition Intercreditor Agreement Waiver" means that certain Waiver to Intercreditor Agreement, dated as of August [__], 2016, by and among the Borrower, Holdings, Logan's Kansas, Logan's Texas, the Pre-Petition First Lien Agent, and each of the Pre-Petition Indenture Trustees.

"Pre-Petition Payment" means a payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any (i) Pre-Petition Debt, (ii) "critical vendor payments", (iii) trade payables (including, without limitation, in respect of reclamation claims) or (iv) other pre-petition claims against any Debtor.

"Primed Liens" has the meaning specified in Section 7.18(a)(iv).

"Priming Liens" has the meaning specified in Section 7.18(a)(iv).

"Pro Rata Share" means, with respect to each Lender at any time a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount of the Commitments (or Loans, as applicable) of such Lender under the Facility at such time and the denominator of which is the amount of the Aggregate Commitments (or aggregate Loans, as applicable) under the Facility at such time.

"Public Lender" has the meaning specified in Section 7.01(e).

"Qualified Equity Interests" means any Equity Interests that are not Disqualified Equity Interests.

"Register" has the meaning specified in Section 11.06(c).

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, members, principals, employees, agents, trustees, advisors and sub-advisors of such person and of such person's Affiliates, and with respect to a (a) GSO Entity, also includes current and prospective investors or funding sources of a GSO Entity, (b) Carl Marks Entity, also includes current and prospective investors or funding sources of a Carl Marks Entity and (c) Marblegate Entity, also includes current and prospective investors or funding sources of a Marblegate Entity.

"Release" means, with respect to any Hazardous Material, any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, depositing,

disposing, dispersing, or migrating into or through the environment or within any building, structure, facility or fixture (including the abandonment or discarding of any barrels, containers or other closed receptacles containing any Hazardous Material).

"Reorganization Plan" means a plan of reorganization in the Cases implementing the terms of the Restructuring in accordance with the Restructuring Support Agreement and otherwise in form and substance reasonably acceptable to the Administrative Agent, the Required Lenders, the Debtors, the Supporting Lenders, the Required Supporting Noteholders and the Supporting Interest Holders or that otherwise satisfies the Obligations in full in cash.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30 day notice period has been waived.

"Request for Credit Extension" means with respect to a Borrowing, conversion or continuation of a Loan, a Committed Loan Notice.

"Required Lenders" means Lenders having at such time in excess of 50% of the sum of the aggregate Commitments then outstanding as of such date plus the Total Outstandings as of such date, which, in the event that the Backstop Lenders are Lenders under the Facility, shall include (a) a majority in interest by commitment amount of the Lenders and (b) the funds or financing vehicles (or funds or accounts advised or sub-advised by such Person) who are Backstop Lenders and are affiliated with at least three of the following: (i) Carl Marks, (ii) Marblegate, (iii) GSO and (iv) Kelso & Company, L.P.; provided, that if any Lender described in the foregoing clause (b) subsequently transfers or otherwise disposes of some or all of its Loans prior to the Effective Date such that it holds less than [5]% of all outstanding Loans in the aggregate, such Lender shall be deemed removed from clause (b), and clause (b) shall be deemed revised to require consent from a majority in interest of the remaining Lenders described therein.

"Required Supporting Noteholders" means (1) a majority of holders in amount of the outstanding principal amount of the notes issued pursuant to the Pre-Petition Indentures and (2) including funds or financing vehicles (or funds or accounts advised or sub-advised by such Persons) that are Pre-Petition Indenture Noteholders and are affiliated with at least three of the following entities: Carl Marks, Marblegate, GSO and Kelso & Company, L.P.; provided, that if any Person described in this clause (2) subsequently transfers or otherwise disposes of some or all of its notes prior to the Effective Date such that it holds less than [5]% of all outstanding Pre-Petition Indenture Notes in the aggregate, such Person shall be deemed removed from clause (2) and clause (2) shall be deemed revised to require consent from a majority of the remaining Pre-Petition Indenture Noteholders described therein.

"Responsible Officer" means the chief executive officer, president, vice president, chief financial officer, treasurer, assistant treasurer, secretary, assistant secretary or controller of a Loan Party. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other Equity Interest of any Person or any of its Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such capital stock or other Equity Interest, or on account of any return of capital to any Person's stockholders, partners or members (or the equivalent of any thereof), or any option, warrant or other right to acquire any such dividend or other distribution or payment.

"Restructuring" has the meaning specified in the Restructuring Support Agreement.

"Restructuring Support Agreement" means that certain Restructuring Support Agreement, dated as of August [__], 2016, by and among the Debtors, the Pre-Petition First Lien Lenders, the Pre-Petition First Lien Agent, GSO or certain affiliates thereof party thereto, Kelso & Company, L.P. or certain affiliates thereof party thereto, Carl Marks or certain affiliates thereof party thereto, and Marblegate or certain affiliates thereof party thereto, in form and substance satisfactory to the Administrative Agent, the Required Lenders and the Unanimous DIP Lenders, as amended, supplemented, modified, extended, renewed, restated and/or replaced in accordance therewith, together with any schedules and exhibits thereto.

"Roadhouse Holding" means Roadhouse Holding Inc., a Delaware corporation.

"Roadhouse Intermediate" means Roadhouse Intermediate Inc., a Delaware corporation.

"Roadhouse Midco" means Roadhouse Midco Inc., a Delaware corporation.

"Roadhouse Parent" means Roadhouse Parent Inc., a Delaware corporation.

"Roadhouse Parent Entities" means Roadhouse Holding, Roadhouse Intermediate, Roadhouse Midco and Roadhouse Parent.

"Roll Up Facility" has the meaning specified in Section 2.01(a).

"Roll Up Loans" has the meaning specified in Section 2.01(a).

"RSA Term Sheet" means the term sheet attached as Exhibit A to the Restructuring Support Agreement.

"Sanctions" has the meaning specified in Section 5.19(a).

"Sanctioned Country" has the meaning specified in Section 5.19(a).

"SDN List" has the meaning specified in Section 5.19(a).

"S&P" means Standard & Poor's Financial Services LLC, a subsidiary of The McGraw-Hill Companies, Inc., and any successor thereto.

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Secured Parties" means, collectively, the Administrative Agent, each Lender, each other Indemnitee and each other holder of any Obligation of any Loan Party.

"Security Agreement" means that certain Debtor-In-Possession Security Agreement, dated as of the date hereof, by and among the Loan Parties and the Administrative Agent, substantially in the form of Exhibit F (together with each security agreement supplement delivered pursuant to Section 7.12, in each case as amended).

"Security Agreement Supplement" has the meaning specified in the Security Agreement.

"Segregated Pre-Funding Account" means a segregated deposit account maintained by the Administrative Agent for the benefit of the Lenders into which the proceeds of the Loans under the New Money Facility shall be deposited; provided, that, as of the Closing Date and until a new account maintained by the Administrative Agent for the benefit of the Lenders is established, "Segregated Pre-Funding Account" shall mean the omnibus account at the Administrative Agent into which the proceeds of the Loans under the New Money Facility shall be deposited temporarily until such time as the new account can be established.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person.  Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of Holdings.

"Supporting Interest Holders" means the holders of Equity Interests, directly or indirectly, in Holdings that are signatories to the Restructuring Support Agreement and remain bound by its terms.

"Supporting Lenders" means the Pre-Petition First Lien Lenders that are signatories to the Restructuring Support Agreement and remain bound by its terms.

"Tax Affiliate" means, (a) the Roadhouse Parent Entities, Holdings, Borrower and each of their Subsidiaries and (b) any Affiliate of the Roadhouse Parent Entities, Holdings or the Borrower with which the Roadhouse Parent Entities, Holdings, Borrower or any of their Subsidiaries files or is eligible to file consolidated, combined or unitary tax returns, but only if and to the extent that the Roadhouse Parent Entities, Holdings, Borrower or any of their Subsidiaries may be liable for the tax in question of such Affiliate pursuant to Treasury Regulation Section 1.1502-6 (or similar provision of state or local law).

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Total Outstandings" means the aggregate Outstanding Amount of all Loans.

"Transactions" means, collectively, (a) the execution, delivery and performance by the Loan Parties of the Loan Documents to which they are a party and the making of the Borrowings hereunder, (b) the entry into the Restructuring Support Agreement, (c) the restructuring transactions contemplated under the Reorganization Plan, (d) the entry of the DIP Orders and (e) the payment of the fees and expenses related to the foregoing.

"Transparent Subsidiary" means a Subsidiary of the Borrower that is treated as a disregarded entity or partnership for U.S. federal income Tax purposes and that has no material assets other than Equity Interests (held directly or indirectly through other Transparent Subsidiaries) in one or more CFCs.

"Type" means, with respect to a Loan, its character as a Base Rate Loan or a Eurodollar Rate Loan.

"UCC" means the Uniform Commercial Code as in effect in the State of New York; provided that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"Unanimous DIP Lenders" means, collectively, (a) any Carl Marks Entity or Lender hereunder that is affiliated with a Carl Marks Entity for so long as such Carl Marks Entity or Affiliate remains a Lender hereunder, (b) any Marblegate Entity or Lender hereunder that is affiliated with a Marblegate Entity for so long as such Marblegate Entity or Affiliate remains a Lender hereunder, (c) any GSO Entity or Lender hereunder that is affiliated with a GSO Entity for so long as such GSO Entity or Affiliate remains a Lender hereunder and (d) Kelso & Company, L.P. for so long as it remains a Lender hereunder and all Lenders hereunder who are affiliated with Kelso & Company, L.P.; provided, that if any Backstop Lender described in this definition subsequently transfers or otherwise disposes of some or all of its Loans prior to the Effective Date such that it holds less than [5]% of all outstanding Loans in the aggregate, such Backstop Lender shall be deemed removed from this definition, and this definition shall be deemed revised to require consent from each of the remaining Backstop Lenders described therein.

"Unfunded Pension Liability" means the excess of a Pension Plan's "benefit liabilities" (as defined in Section 4001(a)(16) of ERISA), over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to Section 412 of the Code for the applicable plan year.

"United States" and "U.S." mean the United States of America.

"Variance" has the meaning assigned to such term in the definition of "Variance Report".

"Variance Report" means a report certified by a Responsible Officer of the Borrower, in form reasonably satisfactory the Lenders, delivered in accordance with Section 6.01(d), showing (a) the actual cumulative receipts and disbursements as of the end of the week immediately preceding the week during which such Variance Report is delivered and (b) commencing with the second Thursday following the Petition Date, the variance, expressed as both a percentage and as a dollar amount, of such amounts for all applicable weeks since the Closing Date, on a rolling basis (and without giving effect to the making of any Loans or prepayments of any Loans), from the corresponding anticipated amount therefor set forth in the most recent Budget (each a "Variance").

"Weighted Average Life to Maturity" means, when applied to any Indebtedness at any date, the number of years obtained by dividing: (i) the sum of the products obtained by multiplying (a) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (b) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment by (ii) the then outstanding principal amount of such Indebtedness.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.02    Other Interpretive Provisions.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Preliminary Statements, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Preliminary Statements, Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to

refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)      In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including."

(c)      Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

Section 1.03   Accounting Terms.

(a)      Generally.   All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, applied in a manner consistent with that used in preparing the Audited Financial Statements, except as otherwise specifically prescribed herein.

(b)      Changes in GAAP.   If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrower or the Required Lenders shall so request, the Administrative Agent, the Lenders and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrower shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder together with a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP; provided further that such reconciliation shall be required to be provided only for the four fiscal quarters following such change or such longer period as may be reasonably requested by the Administrative Agent.

Section 1.04   Rounding.   Any financial ratios required to be maintained by the Borrower pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

Section 1.05   Times of Day.   Unless otherwise specified, all references herein to times of day shall be references to Eastern Time (daylight or standard, as applicable).

Section 1.06   Currency Equivalents Generally.   Any amount specified in this Agreement (other than in Articles II, IX and X) or any of the other Loan Documents to be in Dollars shall also include the equivalent of such amount in any currency other than Dollars, such equivalent amount thereof in the applicable currency to be determined by the Administrative Agent at such

time on the basis of the Spot Rate (as defined below) for the purchase of such currency with Dollars.  For purposes of this Section 1.06, the "Spot Rate" for a currency means the rate determined by the Administrative Agent to be the rate quoted by the Person acting in such capacity as the spot rate for the purchase by such Person of such currency with another currency through its principal foreign exchange trading office at approximately 11:00 a.m. on the date two Business Days prior to the date of such determination; provided that the Administrative Agent may obtain such spot rate from another financial institution designated by the Administrative Agent if the Person acting in such capacity does not have as of the date of determination a spot buying rate for any such currency.  Notwithstanding the foregoing, for purposes of determining compliance with Sections 8.01, 8.02 and 8.03 with respect to any amount of Indebtedness or Investment in a currency other than Dollars, no Default shall be deemed to have occurred solely as a result of changes in rates of exchange occurring after the time such Indebtedness or Investment is incurred; provided that, for the avoidance of doubt, the foregoing provisions of this Section 1.06 shall otherwise apply to such Sections, including with respect to determining whether any Indebtedness or Investment may be incurred at any time under such Sections.

ARTICLE II.
THE COMMITMENTS AND CREDIT EXTENSIONS

Section 2.01    The Facilities.

(a)    Roll Up Facility.

(i)    Upon entry of the Interim Order, each Lender who is a Pre-Petition Indenture Noteholder shall be deemed to have exchanged its Pre-Petition Indenture Notes in an aggregate principal amount equal to the sum of such Lender's Initial Commitment which has been actually disbursed to the Borrower pursuant to Section 2.03, for loans hereunder on a dollar for dollar basis (each such loan deemed made in exchange for such Pre-Petition Indenture Notes, an "Initial Roll Up Loan", and collectively, the "Initial Roll Up Loans"). Each Lender that is a Pre-Petition Indenture Noteholder as of the entry of the Interim Order shall be identified in a schedule delivered to the Administrative Agent on such date.

(ii)    So long as permitted by the Final Order, upon entry of the Final Order, each Lender who is a Pre-Petition Indenture Noteholder shall be deemed to have exchanged additional Pre-Petition Indenture Notes held by it in an aggregate principal amount equal to the amount of Initial Loans plus Delayed Draw Loans of such Lender hereunder which have been actually disbursed to the Borrower pursuant to Section 2.03, for loans hereunder so that the aggregate total of such loans received by such Lender under this Section 2.01(a)(i) and (ii) in exchange for such Lender's Pre-Petition Indenture Notes plus accrued and unpaid interest thereon result in an exchange on a 2:1 basis for every dollar of the New Money Facility under Section 2.01(b) actually disbursed to the Borrower pursuant to Section 2.03 (each such loan deemed made in exchange for such additional Pre-Petition Indenture Notes, an "Additional Roll Up Loan", and collectively, the "Additional Roll Up Loans", and the Additional Roll Up Loans together with the Initial Roll Up Loans, the "Roll Up Loans"). Notwithstanding anything herein or in any other Loan Document to the contrary, if the terms of the DIP Orders do not permit such ad-

ditional exchange, no additional Pre-Petition Indenture Notes shall be exchanged pursuant to this clause (ii) and no Additional Roll Up Loans shall be deemed to be outstanding hereunder.

(iii)    All such Pre-Petition Indenture Notes so exchanged shall be deemed repaid in full and no longer outstanding. The facility described in this Section 2.01(a) is referred to herein as the "Roll Up Facility".

(b)    New Money Facility.

(i)    Subject to the terms and conditions herein and in the DIP Orders and relying upon the representations and warranties herein set forth, each Lender agrees, severally and not jointly, to make (i) a single loan to the Borrower on the Interim Order Entry Date in an aggregate principal amount not to exceed its Initial Commitment (such loans, each an "Initial Loan" and collectively, the "Initial Loans") and (ii) a single loan on the Delayed Draw Loan Funding Date in an aggregate principal amount not to exceed its Delayed Draw Commitment (such loans, each a "Delayed Draw Loan" and collectively, the "Delayed Draw Loans"). Following the making of the Initial Loans, the Initial Commitment of such Lender shall terminate, and following the making of the Delayed Draw Loans, the Delayed Draw Commitment of such Lender shall terminate. Any remaining Initial Commitments or Delayed Draw Commitments shall automatically terminate on (1) the [second Business Day] following the entry of the Interim Order in the case of the Initial Loans and (2) the [second Business Day] following the Delayed Draw Loan Funding Date in the case of the Delayed Draw Loans.  Once funded, each Initial Loan and Delayed Draw Loan shall be a "Loan" for all purposes under this Agreement and the other Loan Documents.  Amounts paid or prepaid in respect of Loans may not be reborrowed. The facility provided for in this Section 2.01(b) shall be referred to herein as the "New Money Facility".

(ii)    All proceeds from the New Money Facility shall be deposited into the Segregated Pre-Funding Account and shall be disbursed to the Borrower in accordance with, subject to and to the extent provided in, Section 2.03. For the avoidance of doubt, it is understood and agreed that (A) the funds on deposit in the Segregated Pre-Funding Account shall not be assets of any of the Loan Parties, (B) the Loan Parties shall have no right, title or interest in amounts on deposit in the Segregated Pre-Funding Account other than to request a disbursement hereunder in accordance with the terms of this Agreement.

Section 2.02    Borrowings, Conversions and Continuations of Loans.

(a)    Each Borrowing or each conversion of Loans from one Type to the other, and each continuation of Eurodollar Rate Loans shall be made upon the Borrower's irrevocable written notice to the Administrative Agent.  Each such notice must be received by the Administrative Agent not later than 11:00 a.m. (i) three Business Days prior to the requested date of any Borrowing of, conversion to or continuation of Eurodollar Rate Loans or of any conversion of Eurodollar Rate Loans to Base Rate Loans, and (ii) one Business Day prior to the requested date of any Borrowing of Base Rate Loans.  Not later than 11:00 a.m., one Business Day before the requested date of such Borrowing, conversion or continuation, the Administrative Agent shall noti-

fy the Borrower in writing whether or not the requested Interest Period has been consented to by all the Lenders.  Each written notice contemplated by this Section 2.02(a) shall be made pursuant to a written Committed Loan Notice, appropriately completed and signed by a duly authorized officer of the Borrower.  Each Borrowing of, conversion to or continuation of Eurodollar Rate Loans shall be in a principal amount of $[100,000] or a whole multiple of $[50,000] in excess thereof.  Each Borrowing of or conversion to Base Rate Loans shall be in a principal amount of $[100,000] or a whole multiple of $[50,000] in excess thereof.  Each Committed Loan Notice shall specify (i) whether the Borrower is requesting a Borrowing or a conversion of Loans from one Type to the other, or a continuation of Eurodollar Rate Loans, (ii) the requested date of the Borrowing, conversion or continuation, as the case may be (which shall be a Business Day), (iii) the principal amount of Loans to be borrowed, converted or continued, (iv) the Type of Loans to be borrowed or to which existing Loans are to be converted, and (v) if applicable, the duration of the Interest Period with respect thereto.  If the Borrower fails to specify a Type of Loan in a Committed Loan Notice or if the Borrower fails to give a timely notice requesting a conversion or continuation, then the applicable Loans shall be made as, or converted to, Base Rate Loans.  If the Borrower requests a Borrowing of or continuation of Eurodollar Rate Loans but fails to specify an Interest Period, it will be deemed to have specified an Interest Period of one month. Any such automatic conversion to Base Rate Loans shall be effective as of the last day of the Interest Period then in effect with respect to the applicable Eurodollar Rate Loans.

(b)     Following receipt of a Committed Loan Notice, the Administrative Agent shall promptly notify each Lender of the amount of its Pro Rata Share under the applicable Loans, and if no timely notice of a conversion or continuation is provided by the Borrower, the Administrative Agent shall notify each Lender of the details of any automatic conversion to Base Rate Loans described in Section 2.02(a).  Each Lender shall make the amount of its Loan available to the Administrative Agent in immediately available funds at the Administrative Agent's Office not later than [2:00 p.m.] on the Business Day specified in the applicable Committed Loan Notice (each such date, a "Funding Date").  Upon satisfaction of the applicable conditions set forth in Section 4.02 (and, if such Borrowing is the initial Credit Extension, Section 4.01) and receipt of each Lender's Pro Rata Share of such Loans (other than the portion to be funded by a Defaulting Lender), the Administrative Agent shall make all funds so received available to the Borrower, subject to the DIP Orders and the Budget (including Permitted Variances), in like funds as received by the Administrative Agent, provided that such funds be deposited into the Segregated Pre-Funding Account and only disbursed in accordance with the terms of Section 2.03.

(c)     Except as otherwise provided herein, a Eurodollar Rate Loan may be continued or converted only on the last day of an Interest Period for such Eurodollar Rate Loan.  During the existence of a Default, no Loans may be requested as, converted to or continued as Eurodollar Rate Loans without the consent of the Required Lenders.

(d)     The Administrative Agent shall promptly notify the Borrower and the Lenders of the interest rate applicable to any Interest Period for Eurodollar Rate Loans upon determination of such interest rate.  At any time that Base Rate Loans are outstanding, the Administrative Agent shall notify the Borrower and the Lenders of any change in the prime rate used in determining the Base Rate promptly following such change.

(e)     After giving effect to all Borrowings, all conversions of Loans from one Type to the other, and all continuations of Loans as the same Type, there shall not be more than [two] Interest Periods in effect in respect of the Facility.

Section 2.03    Disbursements from Segregated Pre-Funding Account.

(a)     From and after the funding of the Initial Loans or the Delayed Draw Loans, the Borrower may request proceeds from such Loans on deposit in the Segregated Pre-Funding Account be disbursed from such account to the Borrower on a weekly basis in accordance with the Budget until the DIP Maturity Date (or more frequently as determined by the Required Lenders in their sole discretion). To request such disbursement, the Borrower shall deliver to the Administrative Agent and the Lenders a Notice of Request for Disbursement, which notice must be received by the Administrative Agent no later than 11:00 a.m. at least one Business Day prior to the date of the requested disbursement. Such Notice of Request for Disbursement shall specify:

(i)     the amount of the disbursement to be made, which shall be an amount not to exceed the least of (1) an amount, such that after making such disbursement, the cumulative amount of disbursements so made since the date of the first disbursement would not exceed the amount set forth in the Budget for such period, (2) the amount permitted in the DIP Orders and (3) the amount available in the Segregated Pre-Funding Account as of the date of the proposed disbursement (such date, the "Disbursement Date"); and

(ii)     the Disbursement Date, which shall be a Business Day.

(b)     Upon receipt of a Notice of Request for Disbursement, the Administrative Agent shall promptly notify each Lender of the amount of its Pro Rata Share of the Loans to be disbursed on such Disbursement Date.

(c)     Such disbursements shall be made available to the Borrower by wire transfer of such amount to the account as specified by the Borrower in the Notice of Request for Disbursement to the Administrative Agent, which such account shall be subject to a Control Agreement. The Borrower shall promptly direct and apply such amounts for the purposes set forth in the Budget (subject to Permitted Variances).

(d)     Notwithstanding anything herein to the contrary, (i) there shall not be more than one (1) disbursement in any calendar week unless otherwise agreed to by the Required Lenders in their sole discretion, (ii) no disbursement shall be issued during any week when the Budget does not provide for such a disbursement, unless otherwise consented to by the Required Lenders and (iii) all conditions precedent set forth in Section 4.03 shall have been fulfilled or waived by the Required Lenders and the Unanimous DIP Lenders before any such disbursement may be made.

Section 2.04    Prepayments.

(a)     Optional.  The Borrower may, upon three (3) Business Days prior written notice for a Eurodollar Rate Loan and upon one Business Day prior written notice for a Base Rate Loan, prepay the outstanding principal amount of any Loan in whole or in part at any time (to-

gether with any breakage costs that may be owing pursuant to Section 3.05 after giving effect to such prepayment); provided, however, that each partial prepayment that is not of the entire outstanding amount under the Facility shall be in a minimum amount of $[100,000] and increments of $[50,000] in excess thereof. Amounts so prepaid under this Section 2.04(a) may not be reborrowed.

(b)    Mandatory.

(i)    (A) if (x) any Loan Party or any Subsidiary thereof Disposes or proposes to Dispose of any property or assets (other than Net Cash Proceeds of sales or other dispositions of inventory in the ordinary course of business as permitted by Section 8.05(a), Section 8.05(b) and Section 8.05(c) (to the extent constituting a Disposition to a Loan Party)), (y) any Casualty Event occurs or (z) the Borrower or any Guarantor issues or proposes to issue any Equity Interest, the Borrower shall (1) promptly notify the Administrative Agent in writing of such proposed Disposition, Casualty Event or issuance of Equity Interest (in each case, including a description of such property or assets (if applicable) and the estimated amount of Net Cash Proceeds to be received by a Loan Party or any Subsidiary thereof in respect thereof and the expected date of prepayment) and (2) make a prepayment, in accordance with Section 2.04(b)(ii), of an aggregate principal amount of Loans equal to 100% of all such Net Cash Proceeds realized or received.

(ii)    On each occasion that the Borrower must make a prepayment of the Loans pursuant to Section 2.04(b)(i), the Borrower shall, within [five (5) Business Days] after the date of realization or receipt of such Net Cash Proceeds, make a prepayment, in accordance with Section 2.04(b)(v) below, of the principal amount of Loans in an amount equal to 100% of such Net Cash Proceeds realized or received.

(iii)    If any Loan Party or Subsidiary thereof incurs or issues any Indebtedness not expressly permitted to be incurred or issued pursuant to Section 8.03, the Borrower shall cause to be prepaid an aggregate principal amount of Loans equal to 100% of all Net Cash Proceeds received therefrom on the first Business Day following the date of receipt of such Net Cash Proceeds.

(iv)    Each prepayment of Loans pursuant to this Section 2.04(b) shall be applied in accordance with the provisions set forth in Section 9.03.

(v)    The Borrower shall notify the Administrative Agent in writing substantially in the form of Exhibit H of any mandatory prepayment of Loans required to be made pursuant to clauses (ii) and (iii) of this Section 2.04(b) at least one (1) Business Day prior to 1:00 p.m. on the date of such prepayment.  Each such notice shall specify the date of such prepayment and provide a reasonably detailed calculation of the amount of such prepayment.  The Administrative Agent will promptly notify each Lender of the contents of the Borrower's prepayment notice and of such Lender's Pro Rata Share of the prepayment.

(c)    Interest, Funding Losses, Etc.  All prepayments under this Section 2.04 shall be accompanied by all accrued and unpaid interest thereon, together with, in the case of any such

prepayment of a Eurodollar Rate Loan on a date other than the last day of an Interest Period therefor, any amounts owing in respect of such Eurodollar Rate Loan pursuant to Section 3.05.

Notwithstanding any of the other provisions of this Section 2.04, so long as no Default or Event of Default shall have occurred and be continuing, if any prepayment of Eurodollar Rate Loans is required to be made under this Section 2.04, prior to the last day of the Interest Period therefor, in lieu of making any payment pursuant to this Section 2.04 in respect of any such Eurodollar Rate Loan prior to the last day of the Interest Period therefor, the Borrower may, in its sole discretion, deposit with the Administrative Agent the amount of any such prepayment otherwise required to be made hereunder until the last day of such Interest Period, at which time the Administrative Agent shall be authorized (without any further action by or notice to or from the Borrower or any other Loan Party) to apply such amount to the prepayment of such Loans in accordance with this Section 2.04. Such deposit shall constitute cash collateral for the Eurodollar Rate Loans to be so prepaid, provided that the Borrower may at any time direct that such deposit be applied to make the applicable payment required pursuant to this Section 2.04.

Section 2.05   Repayment of Loans. On the DIP Maturity Date, (i) if the Reorganization Plan is not confirmed or if the Restructuring Support Agreement is terminated or otherwise not in full force and effect, then the Borrower shall repay the Loans, together with all other Obligations hereunder and under the other Loan Documents (other than contingent indemnification and expense reimbursement obligations for which no claim has been made), in full in cash and (ii) if both the Reorganization Plan is confirmed and the Restructuring Support Agreement remains in full force and effect, all outstanding principal, accrued and unpaid interest and all other Obligations hereunder (other than contingent indemnification and expense reimbursement obligations for which no claim has been made) shall be exchanged for an equivalent amount of principal of loans under the Exit Second Lien Facility and upon such full and complete exchange pursuant to this clause (ii), the Borrower's Obligations hereunder and under the other Loan Documents (other than contingent indemnification and expense reimbursement obligations for which no claim has been made) shall be deemed to have been satisfied in full; provided, that the Borrower shall repay any Obligations owing to the Administrative Agent (other than contingent indemnification and expense reimbursement obligations for which no claim has been made) in full in cash on the DIP Maturity Date regardless of whether the Restructuring Support Agreement is terminated or remains in full force and effect or the Reorganization Plan has been confirmed or not confirmed.

Section 2.06   Interest.

(a)    Subject to the provisions of Section 2.06(b), (i) each Eurodollar Rate Loan under the Facility shall bear interest (from the time of disbursement pursuant to Section 2.03) on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the Eurodollar Rate for such Interest Period plus the Applicable Rate for the Facility; and (ii) each Base Rate Loan under the Facility shall bear interest (from the time of disbursement pursuant to Section 2.03) on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Rate for the Facility.

(b)    (i) If the Borrower shall default in the payment of any principal of or interest on any Loan or any other amount due hereunder or under any other Loan Document, by acceleration or otherwise, or any Event of Default shall occur and be continuing, then, until such defaulted

amount shall have been paid in full or such Event of Default shall no longer exist, all Obligations shall bear interest (after as well as before judgment), payable on demand, at a fluctuating interest rate per annum at all times equal to the Default Rate.

(ii)    Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c)    Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.  Any interest payable hereunder shall automatically and without further action on the applicable Interest Payment Date be capitalized, compounded and added to the then unpaid principal amount of the Loans (the "PIK Interest") and shall thereafter be deemed to be a part of the principal amount of the Loans. All PIK Interest that has accrued shall be payable in cash on the DIP Maturity Date.  The Borrower shall not issue any additional promissory notes to represent the PIK Interest, and, in lieu thereof, the Administrative Agent shall keep a ledger of the amount of PIK Interest that has accrued, which ledger shall be presumed to be correct absent manifest error.

Section 2.07    Fees.

(a)    Unused Commitment Fee.  The Borrower agrees to pay to each Lender (other than a Defaulting Lender) a commitment fee on the actual daily amount by which (i) the Initial Commitments of such Lender exceeds its Pro Rata Share of the aggregate outstanding principal amount of the Initial Loans from the Closing Date to the Final Order Entry Date at a rate per annum equal to 0.5% per annum and (ii) the Commitments of such Lender exceeds its Pro Rata Share of the aggregate outstanding principal amount of the Initial Loans and the Delayed Draw Loans from and including the Final Order Entry Date through the DIP Maturity Date at a rate per annum equal to 0.5% per annum, in each case of this clause (i) and (ii), payable in arrears and in cash (x) on the last Business Day of each month, and (y) on the DIP Maturity Date.

(b)    Commitment Fee.  The Borrower shall pay on the Closing Date to each Lender party to this Agreement as a Lender on the Closing Date, as fee compensation for agreeing to fund such Lender's Commitments, a commitment fee in an amount equal to 2.0% of the stated principal amount of such Lender's Commitments. Such fee shall be in all respects fully earned, due and payable on the Closing Date and non-refundable and non-creditable thereafter and shall automatically and without further action be added to the outstanding amount of the Loans as of the Closing Date.

(c)    Backstop Commitment Fee.  The Borrower agrees to pay on each Funding Date to each Backstop Lender party to this Agreement as a Lender on such Funding Date, as fee compensation for the funding of the Commitments held by such Backstop Lender on the Closing Date, a fee in an amount equal to 3.0% of the stated principal amount of such Commitments funded on such date (in each case regardless of whether such Commitments are funded by such Backstop Lender, any assignee of such Backstop Lender, any Affiliate or Approved Fund of such Backstop Lender or assignee or any combination of the foregoing), payable in cash to such

Backstop Lender.  Such fee shall be in all respects fully earned, due and payable on such funding date and non-refundable and non-creditable thereafter.

(d)    <u>Administrative Agent Fees</u>.  The Borrower shall pay to the Administrative Agent such fees as have been agreed upon in writing as set forth in the Agent Fee Letter.

(e)    <u>Other Fees.</u>  The Borrower shall pay to the Lenders such fees as shall have been separately agreed upon in writing in the amounts and at the times so specified.  Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

Section 2.08    <u>Computation of Interest and Fees</u>.  All computations of interest for Base Rate Loans when the Base Rate is determined by the "prime rate" shall be made on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed.  All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a 365-day year).  Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid, <u>provided</u> that any Loan that is repaid on the same day on which it is made shall, subject to <u>Section 2.10(a)</u>, bear interest for one day.  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.[1]

Section 2.09    <u>Evidence of Debt</u>.  The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and by the Administrative Agent in the ordinary course of business.  The accounts or records maintained by the Administrative Agent and each Lender shall be conclusive absent manifest error of the amount of the Credit Extensions made by the Lenders to the Borrower and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.  Upon the request of any Lender made through the Administrative Agent, the Borrower shall execute and deliver to such Lender (through the Administrative Agent) a Note, which shall evidence such Lender's Loans in addition to such accounts or records.  Each Lender may attach schedules to its Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto.

Section 2.10    <u>Payments Generally; Administrative Agent's Clawback</u>.

(a)    <u>General</u>.  All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the Administrative Agent's Office in Dollars and in immediately available funds not later than 2:00

---

[1] NTD: TBD interest accrual.

p.m. on the date specified herein.  The Administrative Agent will promptly distribute to each Lender its Pro Rata Share in respect of the Facility (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office.  All payments received by the Administrative Agent after 2:00 p.m. may be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.  If any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected on computing interest or fees, as the case may be.

(b)     (i)   Reserved.

(ii)     Payments by Borrower; Presumptions by Administrative Agent.   Unless the Administrative Agent shall have received written notice from the Borrower prior to the time at which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders, as the case may be, the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the Lenders, as the case may be, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

A notice of the Administrative Agent to any Lender or the Borrower with respect to any amount owing under this subsection (b) shall be conclusive, absent manifest error.

(c)     Failure to Satisfy Conditions Precedent.   If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the Borrower by the Administrative Agent because the conditions to the applicable Credit Extension set forth in Article IV are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest from the Borrower or any other Person.

(d)     Obligations of Lenders Several.   The obligations of the Lenders hereunder to make Loans and to make payments pursuant to Section 11.04(c) are several and not joint.  The failure of any Lender to make any Loan or to make any payment under Section 11.04(c) on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan or to make its payment under Section 11.04(c).

(e)     Funding Source.   Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

(f)      Insufficient Funds.  If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (i) first, toward payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, toward payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

Section 2.11    Sharing of Payments by Lenders.  If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of (a) Obligations in respect of the Facilities due and payable to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations due and payable to such Lender at such time to (ii) the aggregate amount of the Obligations in respect of the Facilities due and payable to all Lenders hereunder and under the other Loan Documents at such time) of payments on account of the Obligations in respect of the Facilities due and payable to all Lenders hereunder and under the other Loan Documents at such time obtained by all the Lenders at such time or (b) Obligations in respect of any of the Facilities owing (but not due and payable) to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations owing (but not due and payable) to such Lender at such time to (ii) the aggregate amount of the Obligations in respect of the Facilities owing (but not due and payable) to all Lenders hereunder and under the other Loan Documents at such time) of payment on account of the Obligations in respect of the Facilities owing (but not due and payable) to all Lenders hereunder and under the other Loan Documents at such time obtained by all of the Lenders at such time then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact, and (b) make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of Obligations in respect of the Facilities then due and payable to the Lenders or owing (but not due and payable) to the Lenders, as the case may be, provided that: the provisions of this Section 2.11 shall not be construed to apply to (A) any payment made by the Borrower or Holdings pursuant to and in accordance with the express terms of this Agreement or (B) any payment obtained by a Lender as consideration for the assignment of any of its Loans to any assignee.

Each Loan Party consents to the foregoing.

Section 2.12    Defaulting Lenders.  Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the Commitments and Outstanding Amount of Loans of such Defaulting Lender shall not be included in determining whether all Lenders or the Required Lenders or the Unanimous DIP Lenders have taken or may take any action hereunder (including any consent to any amendment, waiver or other modification pursuant to Section 11.01); provided that any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender which affects such Defaulting Lender disproportionately when compared to the other affected Lenders, or increases or extends the Commitment of such Defaulting Lender, or extends the DIP Maturity Date beyond December 14, 2016 or reduces the

principal of the Loans of such Defaulting Lender, shall require the consent of such Defaulting Lender.

ARTICLE III.
TAXES, YIELD PROTECTION AND ILLEGALITY

Section 3.01    Taxes.

(a)    Payments Free of Taxes; Obligation to Withhold; Payments on Account of Taxes. (i)  Any and all payments by or on account of any obligation of any Loan Party hereunder or under any other Loan Document shall to the extent permitted by applicable Laws be made free and clear of and without reduction or withholding for any Taxes.

(ii)    If any applicable withholding agent shall be required by applicable Laws to withhold or deduct any Taxes from any payment, then (A) the applicable withholding agent shall withhold or make such deductions as are determined by the applicable withholding agent to be required, (B) the applicable withholding agent shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with applicable Laws, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the applicable Loan Party shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this Section 3.01) the Administrative Agent or Lender, as the case may be, receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(b)    Payment of Other Taxes by the Borrower.  Without limiting or duplicating the provisions of subsection (a) above, the Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable Laws.

(c)    Tax Indemnifications.  Without limiting or duplicating the provisions of subsection (a) or (b) above, the Borrower shall indemnify the Administrative Agent and each Lender, and shall make payment in respect thereof within 10 days after receipt of written demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 3.01) paid or payable by the Administrative Agent or such Lender, as the case may be, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of any such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)    Evidence of Payments.  As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority as provided in this Section 3.01, such Loan Party shall deliver to the Administrative Agent, the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return required by applicable

Laws to report such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)    Status of Lenders; Tax Documentation.  (i)  Each Lender shall deliver to the Borrower and to the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable Laws and such other reasonably requested information as will permit the Borrower or the Administrative Agent, as the case may be, to determine (A) whether or not payments made hereunder or under any other Loan Document are subject to withholding or deduction of any Taxes, (B) if applicable, the required rate of withholding or deduction, and (C) such Lender's entitlement to any available exemption from, or reduction of, applicable Taxes in respect of all payments to be made to such Lender by a Loan Party pursuant to this Agreement or otherwise to establish such Lender's status for withholding Tax purposes in the applicable jurisdiction.  Notwithstanding anything to the contrary in the preceding sentence, the completion, execution and submission of such documentation shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)    Without limiting the generality of the foregoing:

(A)    any Lender that is a "United States person" within the meaning of Section 7701(a)(30) of the Code shall deliver to the Borrower and the Administrative Agent, on or before the date on which it becomes a Lender under this Agreement (and from time to time thereafter upon the request of the Borrower or the Administrative Agent), two properly completed and duly executed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding; and

(B)    each Foreign Lender that is entitled under the Code or any applicable treaty to an exemption from or reduction of withholding Tax with respect to payments hereunder or under any other Loan Document shall deliver to the Borrower and the Administrative Agent, on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)    two properly completed and duly executed originals of IRS Form W-8BEN (or IRS Form W-8BEN-E, as applicable) claiming eligibility for the applicable benefits of an income tax treaty to which the United States is a party,

(2)    two properly completed and duly executed originals of IRS Form W-8ECI,

(3)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate, substantially in the form of Exhibit G, to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the

Code, or (C) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (any such certificate, a "U.S. Tax Compliance Certificate") and (y) two properly completed and duly executed originals of  IRS Form W-8BEN (or IRS Form W-8BEN-E, as applicable),

(4)     to the extent a Foreign Lender is not the beneficial owner, two properly completed and duly executed originals of IRS Form W-8IMY of the Foreign Lender, accompanied by IRS Form W-8ECI, IRS Form W-8BEN (or IRS Form W-8BEN-E, as applicable), a U.S. Tax Compliance Certificate, IRS Form W-9, and/or other certification documents from each beneficial owner that would be required under this Section 3.01(e) if such beneficial owner were a Lender, as applicable; provided that if the Foreign Lender is a partnership for U.S. federal income tax purposes and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit G on behalf of each such direct and indirect partner, or

(5)     properly completed, duly executed originals of any other form prescribed by applicable Laws as a basis for claiming exemption from or a reduction in United States Federal withholding Tax together with such supplementary documentation as may be prescribed by applicable Laws to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made.

(C)  if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable Laws (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (C), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so. Notwithstanding any other provision of this clause (e), a Lender shall not be required to deliver any form that such Lender is not legally eligible to deliver.

(f)     Treatment of Certain Refunds.  Unless required by applicable Laws, at no time shall the Administrative Agent have any obligation to file for or otherwise pursue on behalf of a Lender, or have any obligation to pay to any Lender, any refund of Taxes withheld or deducted

from funds paid for the account of such Lender.  If the Administrative Agent or any Lender receives a refund of any Indemnified Taxes as to which it has been indemnified by the Borrower or any other Loan Party, or with respect to which the Borrower or any other Loan Party has paid additional amounts pursuant to this Section 3.01, it shall pay to the Borrower an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 3.01 with respect to the Indemnified Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) incurred by the Administrative Agent or such Lender, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that the Borrower, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this subsection (f), in no event will the Administrative Agent or any Lender be required to pay any amount to the Borrower pursuant to this subsection (f) the payment of which would place the Administrative Agent or such Lender in a less favorable net after-Tax position than the Administrative Lender or such Lender would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This subsection (f) shall not be construed to require the Administrative Agent or any Lender to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to any Loan Party or any other Person.

(g)    Each party's obligations under this Section 3.01 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

Section 3.02   Illegality.  If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to make, maintain or fund Eurodollar Rate Loans, or to determine or charge interest rates based upon the Eurodollar Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, then, on notice thereof by such Lender to the Borrower through the Administrative Agent, any obligation of such Lender to make or continue Eurodollar Rate Loans or to convert Base Rate Loans to Eurodollar Rate Loans shall be suspended until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, the Borrower shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all Eurodollar Rate Loans of such Lender to Base Rate Loans, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Eurodollar Rate Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such Eurodollar Rate Loans.  Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted.

Section 3.03    <u>Inability to Determine Rates</u>.  If the Required Lenders determine that for any reason in connection with any request for a Eurodollar Rate Loan or a conversion to or continuation thereof that (a) Dollar deposits are not being offered to banks in the London interbank eurodollar market for the applicable amount and Interest Period of such Eurodollar Rate Loan, (b) adequate and reasonable means do not exist for determining the Eurodollar Rate for any requested Interest Period with respect to a proposed Eurodollar Rate Loan, or (c) the Eurodollar Rate for any requested Interest Period with respect to a proposed Eurodollar Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, the Administrative Agent will promptly so notify the Borrower and each Lender.  Thereafter, the obligation of the Lenders to make or maintain Eurodollar Rate Loans shall be suspended until the Administrative Agent (upon the instruction of the Required Lenders) revokes such notice.  Upon receipt of such notice, the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of Eurodollar Rate Loans or, failing that, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans in the amount specified therein.

Section 3.04    <u>Increased Costs; Reserves on Eurodollar Rate Loans</u>.

(a)    <u>Increased Costs Generally</u>.  If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any reserve requirement contemplated by <u>Section 3.04(e)</u>);

(ii)    subject any Lender to any Tax of any kind whatsoever with respect to this Agreement or any Eurodollar Rate Loan made by it (except for Indemnified Taxes covered by <u>Section 3.01</u>, or any Excluded Tax); or

(iii)    impose on any Lender or the London interbank market any other condition, cost or expense affecting this Agreement or Eurodollar Rate Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurodollar Rate Loan (or of maintaining its obligation to make any such Loan), or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount) then, within 15 days after Borrower's receipt of a written request from such Lender, including a reasonably detailed calculation of such increased costs or reduction, the Borrower will pay to such Lender, as the case may be, such additional amount or amounts as will compensate such Lender, as the case may be, for such additional costs incurred or reduction suffered.

(b)    <u>Capital Requirements</u>.  If any Lender determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital requirements or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender, to a level below that which such Lender or such Lender's holding

company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender, as the case may be, such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)    Certificates for Reimbursement.    A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, and a reasonably detailed calculation of such amounts, as specified in subsection (a) or (b) of this Section and delivered to the Borrower shall be conclusive absent manifest error.  The Borrower shall pay such Lender, as the case may be, the amount shown as due on any such certificate within 15 days after receipt thereof.

(d)    Delay in Requests.    Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of such Lender's right to demand such compensation, provided that the Borrower shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender, as the case may be, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

(e)    Reserves on Eurodollar Rate Loans.    The Borrower shall pay to each Lender, as long as such Lender shall be required to maintain reserves with respect to liabilities or assets consisting of or including Eurodollar funds or deposits (currently known as "Eurodollar liabilities"), additional interest on the unpaid principal amount of each Eurodollar Rate Loan equal to the actual costs of such reserves allocated to such Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive), which shall be due and payable on each date on which interest is payable on such Loan, provided the Borrower shall have received at least 10 days' prior notice (with a copy to the Administrative Agent) of such additional interest from such Lender.  If a Lender fails to give notice 10 days prior to the relevant Interest Payment Date, such additional interest shall be due and payable 10 days from receipt of such notice.

Section 3.05    Compensation for Losses.    Upon demand of any Lender (with a copy to the Administrative Agent) from time to time, the Borrower shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense incurred by it as a result of:

(a)    any continuation, conversion, payment or prepayment of any Loan other than a Base Rate Loan on a day other than the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(b)      any failure by the Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Loan other than a Base Rate Loan on the date or in the amount notified by the Borrower; or

(c)      any assignment of a Eurodollar Rate Loan on a day other than the last day of the Interest Period therefor as a result of a request by the Borrower pursuant to Section 11.13;

including any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained.  The Borrower shall also pay any customary administrative fees charged by such Lender in connection with the foregoing.

For purposes of calculating amounts payable by the Borrower to the Lenders under this Section 3.05, each Lender shall be deemed to have funded each Eurodollar Rate Loan made by it at the Eurodollar Rate for such Loan by a matching deposit or other borrowing in the London interbank eurodollar market for a comparable amount and for a comparable period, whether or not such Eurodollar Rate Loan was in fact so funded.

Section 3.06      Mitigation Obligations; Replacement of Lenders.

(a)      Designation of a Different Lending Office.  If any Lender requests compensation under Section 3.04, or the Borrower is required to pay Indemnified Taxes or any additional amount with respect to Indemnified Taxes to any Lender, or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender gives a notice pursuant to Section 3.02, then such Lender shall, as applicable, use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.04, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 3.02, as applicable, and (ii) in each case, would not subject such Lender, as the case may be, to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender, as the case may be.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)      Replacement of Lenders.  If any Lender requests compensation under Section 3.04, or if the Borrower is required to pay any Indemnified Taxes or pay any additional amount with respect to any Indemnified Taxes to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, the Borrower may replace such Lender in accordance with Section 11.13 and/or convert to a Base Rate Loan.

Section 3.07      Survival.  All of the Borrower's obligations under this Article III shall survive termination of the Aggregate Commitments, repayment of all other Obligations hereunder, and resignation of the Administrative Agent.

ARTICLE IV.
CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

Section 4.01    <u>Conditions of Initial Credit Extension</u>.  The effectiveness of this Agreement and the obligation of each Lender to make its Initial Loans on the Closing Date hereunder is subject to satisfaction (or waiver in accordance with <u>Section 11.01</u>) of the following conditions precedent:

(a)    The Administrative Agent's receipt of the following, each properly executed by a duly authorized officer of the signing Loan Party (if applicable) and each other party thereto, each dated the Closing Date (unless otherwise provided herein or, in the case of searches and certificates of governmental officials, a recent date before the Closing Date) and each in form and substance satisfactory to the Administrative Agent and the Required Lenders in their sole discretion:

(i)    this Agreement, the Guaranty, the Agent Fee Letter and each other Loan Document to be executed on the Closing Date, each duly executed by the appropriate parties;

(ii)    executed counterparts of the Pre-Petition Intercreditor Agreement Waiver and the Restructuring Support Agreement (including executed counterparts from the Pre-Petition First Lien Lenders);

(iii)    executed counterparts of the Security Agreement, together with:

(A)    except as permitted by <u>Section 7.15</u>, certificates, if any, representing the Pledged Securities referred to therein accompanied by undated stock powers executed in blank, or other arrangements (including the DIP Orders) sufficient to perfect the security interest of the Administrative Agent for the benefit of the Secured Parties in the securities evidenced by such certificates and to permit the exercise of collateral remedies with respect thereto, subject to the right of the Pre-Petition First Lien Secured Parties to exercise remedies after November 14, 2016 to the extent set forth in paragraph 23 of the Interim DIP Order,

(B)    Reserved,

(C)    except as permitted by <u>Section 7.15</u>, UCC, United States Patent and Trademark Office and United States Copyright Office, tax and judgment lien searches or equivalent reports or searches, each of a recent date listing all effective financing statements, lien notices or comparable documents that name any Loan Party as debtor and that are filed in those state and county jurisdictions in which any Loan Party is organized or maintains its principal place of business and such other searches that are required by the Perfection Certificate,

(D)    evidence of the completion of all other actions, recordings and filings of or with respect to the Security Agreement that the Administrative Agent may

deem necessary or desirable in order to perfect the Liens created thereby, except as permitted by Section 7.15 hereof, and

(E)    except as permitted by Section 7.15 hereof, each Control Agreement required by the Security Agreement to perfect security interests in the Cash Collateral Account, Deposit Accounts, Securities Accounts, or Commodities Accounts, duly executed by the appropriate parties;

(iv)    except as permitted by Section 7.15 hereof, the Intellectual Property Security Agreements, duly executed by each Loan Party, together with evidence that all action that the Administrative Agent may reasonably deem necessary or desirable in order to perfect the Liens created under each Intellectual Property Security Agreements has been taken;

(v)    (1) copies of the Organization Documents of each Loan Party certified as of a recent date by the appropriate governmental official, (2) signature and incumbency certificates of the officers of such Person executing the Loan Documents to which it is a party, (3) resolutions of the board of directors or similar governing body of each Loan Party approving and authorizing the execution, delivery and performance of this Agreement and the other Loan Documents to which it is a party or by which it or its assets may be bound, certified by its secretary or an assistant secretary or other comparable officer as being in full force and effect without modification or amendment, (4) a good standing certificate from the applicable Governmental Authority of each Loan Party's (A) jurisdiction of incorporation, organization or formation and (B) except as permitted by Section 7.15, jurisdiction in which it is qualified as a foreign corporation or other entity to do business where the failure to be in good standing could result in a Material Adverse Effect, in each case dated a recent date prior to the Closing Date, and (5) such other documents and certificates as the Administrative Agent or its counsel may reasonably request relating to the organization, existence and good standing of the Loan Parties, and the authorization of the Transactions;

(vi)    Reserved;

(vii)    evidence that all insurance required to be maintained pursuant to the Loan Documents has been obtained and is in effect, together with, subject to Section 7.15 the certificates of insurance and endorsements, naming the Administrative Agent, on behalf of the Lenders, as an additional insured or lender's loss payee, as the case may be, under all insurance policies maintained with respect to the assets and properties of the Loan Parties that constitutes Collateral;

(viii)    a certificate of a Responsible Officer of the Borrower as to the satisfaction of the conditions set forth in this Section 4.01 and in Section 4.03, except to the extent satisfaction of such conditions is subject to Section 7.15; and

(ix)    except as permitted by Section 7.15 hereof, a Perfection Certificate by, and in respect of, each Loan Party.

(b)        (i) All fees and other amounts required to be paid to the Administrative Agent and the Lenders on or prior to the Closing Date to the extent permitted by the terms of the DIP Orders shall have been paid, including reimbursement or payment of all reasonable and documented out-of-pocket costs, fees and expenses (including the reasonable and documented out-of-pocket costs, fees and expenses of outside counsel and financial advisors) incurred in connection with the Transactions and (ii) all fees and other amounts required to be paid to the Pre-Petition Indenture Trustees and the Pre-Petition Indenture Noteholders on or prior to the Closing Date to the extent permitted by the terms of the DIP Orders shall have been paid, including reimbursement or payment of all reasonable and documented out-of-pocket costs, fees and expenses (including the reasonable and documented out-of-pocket costs, fees and expenses of outside counsel and financial advisors) incurred in connection with the Transactions.

(c)        The Administrative Agent shall have received, prior to the Closing Date, all documentation and other information about the Borrower and the Guarantors that it reasonably determines is required by regulatory authorities under applicable "know your customer" and Anti-Money Laundering Laws, including without limitation the USA PATRIOT Act, including but not limited to the Borrower's form W-9.

(d)        The Administrative Agent and the Lenders shall have received on or prior to the Closing Date each of the following:

(i)        the Consolidated unaudited balance sheet of Holdings and its Subsidiaries as of the close of the last fiscal year and, to the extent such statements have been filed publically, each subsequent fiscal quarter and (y) the related Consolidated income statement for such fiscal year and, to the extent such statements have been filed publically, fiscal quarter, in each case setting forth in comparative form the figures for the corresponding periods in the prior fiscal year or fiscal quarter and in each case certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the Consolidated and consolidating financial position, results of operations and cash flow of Holdings and its Subsidiaries as at the dates indicated and for the periods indicated in accordance with GAAP (subject to the absence of footnote disclosure and normal year-end audit adjustments) and in each case otherwise reasonably satisfactory to the Administrative Agent and the Required Lenders; and

(ii)        such other material documents and material information as any Lender through the Administrative Agent may reasonably request.

(e)        Reserved.

(f)        The Petition Date shall have occurred, and the Administrative Agent and the Required Lenders shall be reasonably satisfied with the form and substance of the material pleadings and "first day orders" sought by the Borrower, which in any event shall not conflict with the terms of this Agreement and the Facility hereunder, the other Loan Documents and the Restructuring Support Agreement. Such first day orders shall have been entered on or prior to the Closing Date.

(g)    The Interim Order Entry Date shall have occurred not later than three (3) Business Days after the Petition Date.

(h)    The Administrative Agent and the Lenders shall have received, and the Administrative Agent, the Required Lenders and the Unanimous DIP Lenders shall be satisfied with, the Budget for the period of thirteen weeks commencing with the week during which the Petition Date occurred.

(i)    No trustee under chapter 7 or chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in any of the Cases.

(j)    The amount of the Loans made on the Closing Date shall not exceed the amount authorized by the Interim Order.

(k)    Each of the Interim Order and the Restructuring Support Agreement shall be in full force and effect, and the Interim Order shall not have been vacated or reversed, shall not be subject to a stay and shall not have been modified or amended in any respect without the prior written consent of the Required Lenders; *provided* that if the Interim Order is the subject of a pending appeal in any respect, neither the making of the Loans nor the performance by any Loan Party of any of its respective obligations under any of the Loan Documents shall be the subject of a presently effective stay pending appeal.

(l)    Upon entry of the Interim Order, the Administrative Agent shall have, for the benefit of the Lenders, valid and perfected first priority Liens on the Collateral, junior only to the liens of the Pre-Petition First Lien Secured Parties securing the Pre-Petition First Lien Obligations, the Adequate Protection Liens of the Pre-Petition First Lien Secured Parties, the Carve-Out and Permitted Liens (as defined in the Interim Order), and all filing and recording fees and taxes with respect to such Liens and security interests that are then due and payable shall have been duly paid.

(m)    The proposed Exit Facilities, on the terms included in the exit financing term sheets attached to the RSA Term Sheet, shall have backstop commitments and be satisfactory in all respects to the Administrative Agent, the Required Lenders and the Unanimous DIP Lenders.

Without limiting the generality of the provisions of the last paragraph of Section 10.03, for purposes of determining compliance with the conditions specified in this Section 4.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

Section 4.02    Conditions to Delayed Draw Borrowing.  The obligation of each Lender to make its Delayed Draw Loan is subject to the satisfaction or waiver in accordance with Section 11.01 of the following conditions precedent:

(a)     The Final Order and the Restructuring Support Agreement shall be in full force and effect, and the Final Order shall not have been vacated or reversed, shall not be subject to a stay, and shall not have been modified or amended in any material respect without the written consent of the Required Lenders; *provided* that if the Final Order is the subject of a pending appeal in any respect, neither the making of the Loans nor the performance by any Loan Party of any of its respective obligations under any of the Loan Documents shall be the subject of a presently effective stay pending appeal.

(b)     (i) All material "second day orders" and all related pleadings intended to be entered on or prior to the date of entry of the Final Order, including a final cash management order and any order authorizing adequate protection or establishing procedures for the administration of the Cases, shall have been entered by the Bankruptcy Court and (ii) all pleadings related to procedures for approval of significant transactions, including, without limitation, asset sale procedures, regardless of when filed or entered, shall be reasonably satisfactory in form and substance to the Administrative Agent and the Required Lenders.

(c)     The Borrower shall have paid all fees and reasonable and documented out-of-pocket expenses of the Lenders (including the reasonable and documented fees and expenses of outside counsel and financial advisors) accrued and payable on or prior to the date of such Borrowing.

(d)     The aggregate amount of the Loans made on or prior to such date shall not exceed the aggregate amount authorized by the Final Order.

(e)     The Final Order shall have been entered by the Bankruptcy Court in the Cases no later than thirty-five (35) calendar days after the Petition Date.

(f)     The Administrative Agent shall have received a certificate of a Responsible Officer as to the satisfaction of the conditions set forth in this <u>Section 4.02</u> and in <u>Section 4.03</u>, except to the extent satisfaction of such conditions is subject to <u>Section 7.15</u>.

Section 4.03    <u>Conditions to all Credit Extensions and Disbursements</u>.  The obligation of each Lender to honor any Request for Credit Extension (other than a Committed Loan Notice requesting only a conversion of Loans to the other Type, or a continuation of Eurodollar Rate Loans) or Notice of Request for Disbursement is subject to the following conditions precedent:

(a)     The representations and warranties contained in <u>Article V</u> or any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects on and as of the date of such Credit Extension or such Disbursement Date, as applicable, and, in each case, after giving effect thereto, except (i) to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct as of such earlier date, (ii) to the extent that such representations are qualified as to materiality, in which case they shall be true and correct in all respects and (iii) that for purposes of this <u>Section 4.03</u>, the representations and warranties contained in <u>Sections 5.05(a)</u> and <u>(b)</u> shall be deemed to refer to the most recent statements furnished pursuant to <u>Sections 6.01(b)</u> and <u>(a)</u>, respectively.

(b)     No Default or Event of Default shall exist, or would result from such proposed Credit Extension or disbursement, as applicable, or from the application of the proceeds thereof.

(c)     The Administrative Agent shall have received a Request for Credit Extension or a Notice of Request for Disbursement, as applicable, in accordance with the requirements hereof and within the time periods specified herein (or such shorter period of time as may be agreed to by the Administrative Agent in its sole discretion).

Each Borrowing shall be deemed to constitute a representation and warranty by the Borrower on the date of such Borrowing as to the matters specified in paragraphs (a) through (b) of this <u>Section 4.03</u>.

ARTICLE V.
REPRESENTATIONS AND WARRANTIES

Each of the Loan Parties, jointly and severally, represents and warrants to the Administrative Agent and the Lenders that:

Section 5.01    <u>Existence, Qualification and Power</u>.  Each Loan Party and each of its Subsidiaries (a) is duly organized or formed, validly existing and, as applicable, in good standing under the Laws of the jurisdiction of its incorporation or organization, (b) has all requisite power and authority to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party, (c) has all requisite governmental licenses, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and (ii) subject to the entry of the DIP Orders, execute, deliver and perform its obligations under the Loan Documents to which it is a party, and (d) is duly qualified and is licensed and, as applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except, in each case referred to in clause (c)(i) or (d), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

Section 5.02    <u>Authorization; No Contravention</u>.  The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is or is to be a party have been duly authorized by all necessary corporate or other organizational action, and do not and will not (a) contravene the terms of any of such Person's Organization Documents; (b) conflict with or result in any breach or contravention of, or the creation of any Lien under, or require any payment to be made under (i) any material Contractual Obligation to which such Person is a party or affecting such Person (other than, with respect to such conflicts, the Pre-Petition Debt Documents) or the properties of such Person or any of its Subsidiaries or (ii) any material order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or (c) violate any Law in any material respect.

Section 5.03    <u>Governmental Authorization; Other Consents</u>.  No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with (a) the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, (b) the grant by any Loan Party of the Liens granted by it pursuant to the Collateral

Documents, (c) subject to the entry of the DIP Orders, the perfection or maintenance of the Liens created under the Collateral Documents (including the priority thereof) or (d) the exercise by the Administrative Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents, except for (i) the authorizations, approvals, actions, notices and filings listed on Schedule 5.03, all of which have been duly obtained, taken, given or made and are in full force and effect (other than any consents necessary pursuant to the Pre-Petition Debt Documents) and (ii) those authorizations, approvals, actions, notices or filings, the failure of which to obtain or make could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.04   Binding Effect.   This Agreement has been, and each other Loan Document, when delivered hereunder, will have been, duly executed and delivered by each Loan Party that is party thereto.   Subject to the entry of the DIP Orders, this Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms, except as such enforceability may be limited by Debtor Relief Laws and by general principals of equity.

Section 5.05   Financial Statements.

(a)      The Audited Financial Statements (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; (ii) fairly present in all material respects the financial condition of Holdings and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; and (iii) show all material indebtedness and other liabilities, direct or contingent, of the Holdings and its Subsidiaries as of the date thereof, including liabilities for taxes, material commitments and Indebtedness to the extent required by GAAP.

(b)      The unaudited consolidated balance sheet of the Holdings and its Subsidiaries and the related consolidated statements of income or operations, shareholders' equity and cash flows for the most recent fiscal quarter delivered pursuant to Section 6.01(a) (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and (ii) fairly present in all material respects the financial condition of Holdings and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby, subject, in the case of clauses (i) and (ii), to the absence of footnotes and to normal year-end audit adjustments.

Section 5.06   Litigation.   Other than the Cases, there are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of any Loan Party, threatened, at law, in equity, in arbitration or before any Governmental Authority, by or against any Loan Party or any of its Subsidiaries or against any of their properties or revenues that (a) purport to affect or pertain to this Agreement, any other Loan Document, or (b) either individually or in the aggregate could reasonably be expected to have a Material Adverse Effect.

Section 5.07   No Material Adverse Effect.   Since December 31, 2015, there has been no Material Adverse Effect and there has been no circumstance, event or occurrence, and no fact is

known to any of the Loan Parties, in each case, that could reasonably be expected to result in a Material Adverse Effect.

Section 5.08    Ownership of Property; Liens; Investments.  Each Loan Party and each of its Subsidiaries has good record and marketable defensible title in fee simple to, or valid lease-hold interests in (except to the extent of an existing event of default under such leases as set forth on Schedule 5.08), or easements or other limited property interests in, all property necessary in the ordinary conduct of its business, free and clear of all Liens except for minor defects in title that do not individually or in the aggregate materially interfere with its ability to conduct its business or to utilize such assets for their intended purposes and Liens permitted under the Loan Documents (including the Permitted Liens) and except where the failure to have such title or other interest could not reasonably be expected to have, individually or in the aggregate, a Mate-rial Adverse Effect.  The property of each Loan Party and each of its Subsidiaries, taken as a whole, (i) is in good operating order, condition and repair (ordinary wear and tear excepted) and (ii) constitutes all the property which is required for the business and operations of each Loan Party and each of its Subsidiaries as presently conducted. None of the Loan Parties nor any Sub-sidiary thereof owns any real property.

Section 5.09    Environmental Compliance.

Except for any matters that, individually or in the aggregate, could not reasonably be ex-pected to have a Material Adverse Effect:

(a)    Each Loan Party and its Subsidiaries are and have been in compliance with all Environmental Laws, including possessing and complying with all Environmental Permits.

(b)    None of the real property currently owned, if any, leased or operated by any Loan Party or any of its Subsidiaries is listed or, to the knowledge of any Loan Party, proposed for list-ing on the NPL or on the CERCLIS or any analogous foreign, state or local list; to the knowledge of the Loan Parties, there are no and never have been any underground or above-ground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed on any property currently owned, leased or operated by any Loan Party or any of its Subsidiaries or, to the knowledge of any Loan Party, on any property formerly owned, leased or operated by any Loan Party or any of its Subsidiaries, in each case which could reasonably be expected to result in any Loan Party in-curring an Environmental Liability; to the knowledge of the Loan Parties, there is no asbestos or asbestos-containing material on any property currently owned, leased or operated by any Loan Party or any of its Subsidiaries that could reasonably be expected to result in any Loan Party in-curring an Environmental Liability; and there has been no Release of Hazardous Materials by any Loan Party or any of its Subsidiaries or, to the knowledge of any Loan Party, by any other Person at, on, under or migrating to or from any property currently or formerly owned, leased or operated by any Loan Party or any of its Subsidiaries in violation of Environmental Law or which could reasonably be expected to result in any Loan Party incurring an Environmental Lia-bility.

(c)    Neither any Loan Party nor any of its Subsidiaries is undertaking, and has not completed, either individually or together with other potentially responsible parties, any investi-

gation or assessment or remedial or response action relating to any actual or threatened Release of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any Governmental Authority or the requirements of any Environmental Law; and all Hazardous Materials generated, used, treated, handled or stored by any Loan Party or any of its Subsidiaries at, or transported to or from, any property currently or formerly owned, leased or operated by any Loan Party or any of its Subsidiaries have been disposed of in a manner not reasonably expected to result in any Loan Party or any of its Subsidiaries incurring an Environmental Liability.

(d)    No Loan Party nor any of its Subsidiaries: (i) has received notice (written or otherwise) of any Environmental Liability that is pending or unresolved; or (ii) has assumed by Contractual Obligation (including indemnity) or operation of Law any Environmental Liability of any other Person.

Section 5.10    Insurance.  The properties of the Loan Parties and their respective Subsidiaries are insured with financially sound and reputable insurance companies not Affiliates of the Borrower, in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the applicable Person operates.

Section 5.11    Taxes.  Each Loan Party and each Subsidiary thereof has timely filed all federal income Tax returns and reports and all other material Tax returns and reports required to be filed, and has paid all material Taxes (including any Taxes payable in the capacity of a withholding agent) levied or imposed upon it or its income, profits, properties or assets otherwise due and payable, except those which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP. There is no proposed Tax audit, Tax assessment, deficiency or other claim against any Loan Party or any Subsidiary thereof that, if made, individually or in the aggregate could reasonably be expected to have a Material Adverse Effect.  The charges, accruals and reserves on the books of the Loan Parties in respect of any Taxes are adequate.  Neither any Loan Party nor any Subsidiary thereof is party to any tax sharing agreement.

Section 5.12    ERISA Compliance.

(a)    Each Plan is in compliance in all respects with its terms and with the applicable provisions of ERISA, the Code and other Federal or state Laws, except to the extent that could not reasonably be expected to have a Material Adverse Effect.  Each Plan that is intended to qualify under Section 401(a) of the Code has received a favorable determination or opinion letter from the IRS or an application for such a letter is currently being processed by the IRS with respect thereto (or such Plan or the prototype sponsor in respect of such Plan has remaining a period of time under the Code or pronouncements of the Internal Revenue Service in which to apply for such a determination and make any amendments necessary to obtain a favorable determination or opinion, as applicable, as to the qualified status of such Plan) and, to the knowledge of the Borrower, nothing has occurred which would prevent, or cause the loss of, such qualification. The Borrower and each ERISA Affiliate have made all required contributions to each Plan subject to Section 412 of the Code or Section 302 of ERISA, and no application for a funding waiv-

er or an extension of any amortization period pursuant to Section 412 of the Code or Section 302 of ERISA has been made with respect to any Plan.

(b)    There are no pending or, to the knowledge of the Loan Parties, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that could reasonably be expected to have a Material Adverse Effect.

(c)    (i) No ERISA Event has occurred or is reasonably expected to occur; (ii) no Pension Plan has any Unfunded Pension Liability; (iii) neither the Loan Parties nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due and not delinquent under Section 4007 of ERISA); and (iv) neither the Loan Parties nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Section 4201 of ERISA with respect to a Multiemployer Plan, except, in each case, that could not reasonably be expected to have a Material Adverse Effect.

Section 5.13    Subsidiaries; Equity Interests; Loan Parties.    As of the Closing Date, no Loan Party has any Subsidiaries other than those specifically disclosed in Part (a) of Schedule 5.13 (none of which are Foreign Subsidiaries), and all of the outstanding Equity Interests in such Subsidiaries have been validly issued, are fully paid and non-assessable and are owned by a Loan Party in the amounts specified on Part (a) of Schedule 5.13 free and clear of all Liens except those created under the Collateral Documents and Permitted Liens.  No Loan Party has any equity investments in any other corporation or entity other than those specifically disclosed in Part (b) of Schedule 5.13.  Set forth on Part (c) of Schedule 5.13 is a complete and accurate list of all Loan Parties, showing as of the Closing Date (as to each Loan Party) the jurisdiction of its incorporation, the address of its principal place of business and its U.S. taxpayer identification number, if any, or in the case of any Guarantor Subsidiary that does not have a U.S. taxpayer identification number, any unique identification number issued to it by the jurisdiction of its incorporation.  The copy of the charter of each Loan Party and each amendment thereto provided pursuant to Section 4.01(a)(v) is a true and correct copy of each such document, each of which is valid and in full force and effect.

Section 5.14    Margin Regulations; Investment Company Act.

(a)    No Loan Party is engaged nor will engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock and no proceeds of any Borrowings will be used for any purpose that violates Regulation U or Regulation X of the FRB.

(b)    None of the Loan Parties, any Person Controlling any Loan Party, or any Subsidiary is or is required to be registered as an "investment company" under the Investment Company Act of 1940, as amended.

Section 5.15    Disclosure.    No report, financial statement, certificate or other written information furnished by or on behalf of any Loan Party or any Subsidiary thereof to the Adminis-

trative Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (in each case as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading; <u>provided</u> that, with respect to projected financial information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time; it being understood that such projections may vary from actual results and that such variances may be material.

Section 5.16    <u>Compliance with Laws</u>.  Except to the extent excused by the Bankruptcy Code, each Loan Party and each Subsidiary thereof is in compliance in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (b) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

Section 5.17    <u>Intellectual Property; Licenses, Etc.</u>  Each Loan Party and each of its Subsidiaries own, or possess the valid title to all of the Intellectual Property owned or purported to be owned by such Loan Party or Subsidiary, free and clear of all Liens (other than licenses granted in the ordinary course of business) except for Liens permitted under the Loan Documents (including Permitted Liens).  All Intellectual Property which any Loan Party or any Subsidiary thereof uses under license from third parties and which is material to its business operations is subject to license agreements that are valid and in full force and effect.  As of the Closing Date, <u>Schedule 5.17</u> sets forth a true, complete and accurate list of all Company IP Rights, which are registered or pending application for registration with applicable intellectual property registries worldwide.  The operation of the businesses of each Loan Party and each of its Subsidiaries, including technology, slogan or other advertising device, product, process, method, substance, part or other material now employed in connection therewith, or now contemplated to be employed, by any Loan Party or any of its Subsidiaries, does not infringe or otherwise violate any proprietary rights held by any other Person.  No claim or litigation alleging any of the foregoing, or disputing the ownership, validity or enforceability of any Company IP Rights, is pending or, threatened in writing.

Section 5.18    <u>Labor Matters</u>.  There are no collective bargaining agreements or Multiemployer Plans covering the employees of any Loan Party or any of its Subsidiaries as of the Closing Date and neither any Loan Party nor any Subsidiary thereof has suffered any strikes, walkouts, work stoppages or other material labor difficulty within the last five years.

Section 5.19    <u>Foreign Assets Control Regulations; Anti-Money Laundering; Anti-Corruption Practices; Anti-Terrorism Laws</u>.

(a)    Each Loan Party and each Subsidiary of each Loan Party is in compliance in all material respects with all U.S. economic sanctions laws, Executive Orders and implementing regulations ("<u>Sanctions</u>") as administered by the U.S. Treasury Department's Office of Foreign Assets Control ("<u>OFAC</u>") and the U.S. State Department.  No Loan Party and no Subsidiary of a

Loan Party (i) is a Person on the list of the Specially Designated Nationals and Blocked Persons (the "SDN List"), (ii) is a Person who is otherwise the target of U.S. economic sanctions laws such that a U.S. Person cannot deal or otherwise engage in business transactions with such person, (iii) is a Person organized or resident in a country or territory subject to comprehensive Sanctions (a "Sanctioned Country") or (iv) is owned or controlled by (including by virtue of such Person being a director or owning voting shares or interests), or acts, directly or indirectly, for or on behalf of, any Person on the SDN List or a government of a Sanctioned Country such that the entry into, or performance under, this Agreement or any other Loan Document would be prohibited by U.S. law.

(b)    Each Loan Party and each Subsidiary of each Loan Party is in compliance with all laws related to terrorism or money laundering including: (i) all applicable requirements of the Currency and Foreign Transactions Reporting Act of 1970 (31 U.S.C. 5311 et. seq., (the Bank Secrecy Act)), as amended by Title III of the USA Patriot Act, (ii) the Trading with the Enemy Act, (iii) Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 (66 Fed. Reg. 49079), any other enabling legislation, executive order or regulations issued pursuant or relating thereto and (iv) other applicable federal or state laws relating to "know your customer" or anti-money laundering rules and regulations. No action, suit or proceeding by or before any court or Governmental Authority with respect to compliance with such anti-money laundering laws is pending or threatened to the knowledge of each Loan Party and each Subsidiary of each Loan Party.

(c)    Each Loan Party and each Subsidiary of each Loan Party is in compliance in all material respects with all applicable anti-corruption laws, including the U.S. Foreign Corrupt Practices Act of 1977 ("FCPA") and the U.K. Bribery Act 2010 ("Anti-Corruption Laws"). None of the Loan Parties or any Subsidiary thereof, nor to the knowledge of the Loan Parties, any director, officer, agent, employee, or other person acting on behalf of such Loan Party or any Subsidiary thereof, has taken any action, directly or indirectly, that would result in a violation of applicable Anti-Corruption Laws. Each Loan Party and each Subsidiary has instituted and will continue to maintain policies and procedures designed to promote compliance with applicable Anti-Corruption Laws.

Section 5.20    No Defaults.  No Default or Event of Default has occurred and is continuing or would result from the consummation of the Transactions.

ARTICLE VI.
REPORTING COVENANTS

Each of the Loan Parties agrees with the Lenders and the Administrative Agent to each of the following, as long as any Obligation (other than contingent indemnification claims not then due and payable) or any Commitment remains outstanding:

Section 6.01    Financial Statements.  The Borrower shall deliver to the (x) Administrative Agent, for delivery to each Lender, and (y) Pre-Petition First Lien Agent, for delivery to each Pre-Petition First Lien Lender, each of the following:

(a)      Quarterly Reports.  As soon as available, and in any event within 45 days after the end of each of the first three fiscal quarters of each fiscal year  (or such later date that the Required Lenders may agree in their sole discretion), the Consolidated and consolidating unaudited balance sheet of Holdings and its Subsidiaries as of the close of such fiscal quarter and related Consolidated and consolidating statements of operations and cash flow for such fiscal quarter and that portion of the fiscal year ending as of the close of such fiscal quarter, setting forth in comparative form the figures for the corresponding period in the prior fiscal year, certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the Consolidated and consolidating financial position, results of operations and cash flow of Holdings and its Subsidiaries as at the dates indicated and for the periods indicated in accordance with GAAP (subject to the absence of footnote disclosure and normal year-end audit adjustments).

(b)      Annual Reports.  As soon as available, and in any event within 120 days after the end of each fiscal year (or such later date that the Required Lenders may agree in their sole discretion), the Consolidated and consolidating balance sheet of Holdings and its Subsidiaries as of the end of such year and related Consolidated and consolidating statements of operations, unitholders' equity and cash flow for such fiscal year, each prepared in accordance with GAAP, together with a certification (with respect to such Consolidated financial statements) by the Group Members' Accountants that (i) such Consolidated financial statements fairly present in all material respects the Consolidated financial position, results of operations and cash flow of Holdings and its Subsidiaries as at the dates indicated and for the periods indicated therein in accordance with GAAP without qualification as to the scope of the audit and (ii) in the course of the regular audit of the businesses of the Group Members, which audit was conducted in accordance with the standards of the United States' Public Company Accounting Oversight Board (or any successor entity), such Group Members' Accountants have obtained no knowledge that a Default in respect of any financial covenant contained in this Agreement is continuing or, if in the opinion of the Group Members' Accountants such a Default is continuing, a statement as to the nature thereof (which certification may be limited to the extent required by customary applicable auditing rules or guidelines acceptable to the Administrative Agent).

(c)      Monthly Reports.  As soon as available, and in any event within 30 days after the end of each fiscal month (other than the third fiscal month of each fiscal quarter), (i) the Consolidated and consolidating unaudited balance sheet of Holdings and its Subsidiaries as of the close of such fiscal month (and that portion of the fiscal year ending as of the close of such fiscal month) and (ii) the related Consolidated and consolidating income statement for such fiscal month (and that portion of the fiscal year ending as of the close of such fiscal month), in each case setting forth in comparative form the figures for the corresponding periods in the prior fiscal year and in each case certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the Consolidated and consolidating financial position and results of operations of Holdings and its Subsidiaries as at the dates indicated and for the periods indicated in accordance with GAAP (subject to the absence of footnote disclosure and normal year-end audit adjustments). Together with such monthly reports delivered pursuant to this clause, the Borrower shall deliver a certificate, in form and substance satisfactory to the Administrative Agent, by a Responsible Officer of the Borrower that (i) the Corporate Chart attached thereto (or the last Corporate Chart delivered pursuant to this clause (c)) is correct and complete as of the date of such monthly report, (ii) the Loan Parties have delivered all documents (including updated

schedules as to locations of Collateral and acquisition of Intellectual Property or real property) they are required to deliver pursuant to any Loan Document on or prior to the date of delivery of such monthly report and (iii) complete and correct copies of all documents modifying any term of any Organization Document of any Group Member or any Subsidiary or joint venture thereof on or prior to the date of delivery of such monthly report have been delivered to the Administrative Agent or are attached to such certificate.

(d)     <u>Variance Report</u>.

(i)     Commencing on the second Thursday after the Petition Date and no later than Thursday of each succeeding calendar week, and on any other date on which the Borrower may deliver the same to the Bankruptcy Court, a Variance Report as of the end of the immediately preceding calendar week, and

(ii)     commencing on the date of this Agreement and no later than Thursday of each week thereafter, and on any other date on which the Borrower may deliver the same to the Bankruptcy Court, a Budget setting forth on a weekly basis for the next thirteen weeks (commencing with the immediately succeeding calendar week) an updated budget for such period; *provided* that the Required Lenders, in their sole and absolute discretion, shall have the right to dispute any updates or amendments contained in any budget delivered pursuant to this clause (ii) by providing the Borrower specific notice thereof within five (5) Business Days after the delivery by the Borrower of such updates or amendments; *provided*, *further*, that, (x) to the extent the Required Lenders do not provide such dispute notice within such period of five (5) Business Days, the updates to or amendments of the Budget shall be deemed approved and consented to by the Required Lenders and shall be deemed to constitute the Budget upon the expiration of such period of five (5) Business Days, and (y) to the extent the Required Lenders do provide such dispute notice within such period of five (5) Business Days, then the Budget, without giving effect to such updates or amendments, shall continue to constitute the Budget until otherwise agreed to among the Loan Parties and the Required Lenders.

(e)     <u>Management Discussion and Analysis</u>.  Together with each delivery of the financial statements for each fiscal quarter or fiscal month required by clauses (a) or (c) above, a customary written management discussion and analysis (MD&A) of the financial condition and results of operations of the Group Members for the portion of the fiscal year then elapsed and discussing the reasons for any significant variations from (i) the previous fiscal quarter or fiscal month, as applicable for such period, (ii) the figures for the corresponding period in the previous fiscal year and (iii) to the extent forecasts and projections have been delivered pursuant to Section 6.01(g), the figures for the corresponding period in such forecasts and projections, including written qualitative discussion and analysis, in each case with detail satisfactory to the Administrative Agent.

(f)     <u>Corporate Chart and Other Collateral Updates</u>.  A certificate by a Responsible Officer of the Borrower that (i) the Corporate Chart attached thereto (or the last Corporate Chart delivered pursuant to this <u>clause (f)</u>) is correct and complete as of the date of the Variance Report most recently required to be delivered pursuant to <u>Section 6.01(d)</u>, (ii) the Loan Parties have delivered all documents (including updated schedules as to locations of Collateral and acquisition

of Intellectual Property or real property) they are required to deliver pursuant to any Loan Document on or prior to the date of the Variance Report most recently required to be delivered pursuant to Section 6.01(d) and (iii) complete and correct copies of all documents modifying any term of any Organization Document of any Group Member or any Subsidiary or joint venture thereof on or prior to the date of the Variance Report most recently required to be delivered pursuant to Section 6.01(d).

(g)    Additional Projections.  As soon as available and in any event not later than 45 days after the end of the [fiscal quarter ended September 30, 2016], (i) a revised annual business plan of the Group Members for the [2017 fiscal year] in form and substance acceptable to the Administrative Agent and the Required Lenders in their reasonable discretion and (ii) forecasts prepared by management of the Borrower for each fiscal quarter in such next succeeding fiscal year, including in such forecasts, (x) a projected year-end Consolidated and consolidating balance sheet, income statement and statement of cash flows, (y) a statement of all of the material assumptions on which such forecasts are based and (z) substantially the same type of financial information as that contained in financial projections provided by or on behalf of the Borrower to the Administrative Agent or the Pre-Petition First Lien Agent (in such capacities) prior to the Closing Date.

(h)    Bankruptcy Court Filings.  As soon as practicable in advance of filing with the Bankruptcy Court, (i) all proposed orders and pleadings related to the Facility, which orders and pleadings shall be in form and substance satisfactory to the Administrative Agent and the Required Lenders, (ii) any plan of reorganization or liquidation, and/or any disclosure statement related to such plan (which plan shall be a Reorganization Plan and with the disclosure statement shall comply with the requirements set forth herein), (iii) any motion and proposed form of order seeking to extend or otherwise modify the Debtors' exclusive periods set forth in section 1121 of the Bankruptcy Code, (iv) any motion seeking approval of any sale of the Debtors' assets in form and substance reasonably acceptable to the Administrative Agent and the Required Lenders and any proposed form of a bidding procedures order and sale order (each of which must be in form and substance satisfactory to the Administrative Agent and the Required Lenders) and (v) any motion and proposed form of order filed with the Bankruptcy Court relating to any management equity plan, incentive plan or severance plan, the assumption, rejection, modification or amendment of any employment agreement, or the assumption, rejection, modification or amendment of any material contract (each of which must be in form and substance satisfactory to the Administrative Agent and the Required Lenders).

(i)    Insurance.  Together with each delivery of any financial statement for any fiscal month pursuant to clause (c) above, each in form and substance satisfactory to the Administrative Agent and certified as complete and correct by a Responsible Officer of the Borrower, a summary of all material insurance coverage maintained as of the date thereof by any Group Member, together with such other related documents and information as the Administrative Agent may reasonably require; provided, that in lieu of such summary, a Responsible Officer of the Borrower may certify that there have been no changes since the Closing Date or the end of the previous fiscal month, as applicable.

(j)    Additional Reports. Such additional reports reasonably requested by the Administrative Agent or the Lenders, including with respect to litigation and contingent liabilities.

Section 6.02   Other Events.  The Loan Parties shall give the (x) Administrative Agent, for delivery to each Lender, and (y) Pre-Petition First Lien Agent, for delivery to each Pre-Petition First Lien Lender, notice of each of the following (which may be made by telephone if promptly confirmed in writing) promptly after any Responsible Officer of any Group Member knows: (a) any event (other than any event involving loss or damage to property) reasonably expected to result in a mandatory payment of the Obligations pursuant to Section 2.04, stating the material terms and conditions of such transaction and estimating the Net Cash Proceeds thereof, (b) the commencement of, or any material developments in, any action, investigation, suit, proceeding, audit, claim, demand, order or dispute with, by or before any Governmental Authority affecting any Group Member or any property of any Group Member that seeks injunctive or similar relief, (c) the acquisition of any material real property or the entering into of any material lease and (d) any event, occurrence or circumstance in which a material portion of the Collateral is damaged, destroyed or otherwise impaired or adversely affected.

Section 6.03   Copies of Notices and Reports.  The Loan Parties shall promptly deliver to the (x) Administrative Agent, for delivery to each Lender, and (y) Pre-Petition First Lien Agent, for delivery to each Pre-Petition First Lien Lender, copies of each of the following:  (a) all reports that any Loan Party transmits to its security holders generally, and (b) all documents that any Group Member files with, or otherwise provides to, the Securities and Exchange Commission, any securities exchange or any Governmental Authority exercising similar functions, any Governmental Authority exercising regulatory authority over the restaurant industry, the Bankruptcy Court (including, without limitation, any "Monthly Operating Reports") or any Committee.

Section 6.04   Taxes.  The Loan Parties shall give the (x) Administrative Agent, for delivery to each Lender, and (y) Pre-Petition First Lien Agent, for delivery to each Pre-Petition First Lien Lender, notice of each of the following (which may be made by telephone if promptly confirmed in writing) promptly after any Responsible Officer of any Group Member knows of it: (a) the creation, or filing with the IRS or any other Governmental Authority, of any Contractual Obligation or other document extending, or having the effect of extending, the period for assessment or collection of any Taxes with respect to any Tax Affiliate and (b) the creation of any Contractual Obligation of any Tax Affiliate, or the receipt of any request directed to any Tax Affiliate, to make any adjustment under Section 481(a) of the Code, by reason of a change in accounting method or otherwise, which, in either case, could reasonably be expected to have a Material Adverse Effect.

Section 6.05   Labor Matters.  The Loan Parties shall give the (x) Administrative Agent, for delivery to each Lender, and (y) Pre-Petition First Lien Agent, for delivery to each Pre-Petition First Lien Lender, notice of each of the following (which may be made by telephone if promptly confirmed in writing), promptly after, and in any event within 30 days after any Responsible Officer of any Group Member knows or has reason to know of it:  (a) the commencement of any material labor dispute to which any Group Member is or may become a party, including any class action litigation, strikes, lockouts or other disputes relating to any of such Person's restaurants, plants or other facilities and (b) the incurrence by any Group Member of any Worker Adjustment and Retraining Notification Act or related or similar liability incurred with respect to the closing of any plant or other facility of any such Person (other than, in the case of

this <u>clause (b)</u>, those that could not, in the aggregate, reasonably be expected to have a Material Adverse Effect).

Section 6.06    <u>Lender Calls</u>.  The Borrower, Holdings and their respective officers (including, the chief financial officer of the Borrower) and advisors (including any investment banker or financial advisor retained by any Debtor) shall make themselves available for conference calls to be held on a weekly basis with the Administrative Agent and/or the other Secured Parties or their representatives or advisors to discuss the Budget (and all updates and Variance Reports related thereto), or any other issues as may be reasonably requested by the Administrative Agent and/or the other Secured Parties, and such conference calls may be held without the participation of the Loan Parties or any other representative or advisor of the Loan Parties.

ARTICLE VII.
AFFIRMATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder (other than contingent indemnification obligations for which no claim has been made) shall remain unpaid or unsatisfied or shall remain outstanding, each Loan Party shall, and shall cause each of its Subsidiaries to:

Section 7.01    <u>Certificates; Other Information</u>.  Deliver to the Administrative Agent for delivery to each Lender:

(a)    concurrently with the delivery of the financial statements referred to in <u>Section 6.01(a), (b) and (c)</u> (commencing with the delivery of the financial statements for the fiscal quarter ended September 30, 2016), a duly completed Compliance Certificate signed by the chief executive officer, chief financial officer, treasurer or controller of the Borrower;

(b)    promptly, and in any event within five Business Days after receipt thereof by any Loan Party or any Subsidiary thereof, copies of each material notice or other material correspondence received from the SEC (or comparable agency in any applicable non-U.S. jurisdiction) concerning any investigation or possible investigation or other inquiry by such agency regarding financial or other operational results of any Loan Party or any Subsidiary thereof;

(c)    promptly after receipt thereof by any Loan Party or any Subsidiary thereof, copies of all notices, requests and other documents (including amendments, waivers and other modifications) so received under or pursuant to any instrument, indenture, loan or credit or similar agreement regarding or related to any breach or default by any party thereto, or any other event, in each case, that could reasonably be expected to materially impair the value of the interests or the rights of any Loan Party or otherwise reasonably be expected to have a Material Adverse Effect;

(d)    promptly after the assertion or occurrence thereof, notice of any action or proceeding against or of any noncompliance by any Loan Party or any of its Subsidiaries with any Environmental Law or Environmental Permit that could (i) reasonably be expected to have a Material Adverse Effect or (ii) cause any property owned or leased by any Loan Party to be subject

to any material restrictions on ownership, occupancy, use or transferability under any Environmental Law;

(e)    promptly, such additional information regarding the business, financial, legal or corporate affairs of any Loan Party or any Subsidiary thereof, or compliance with the terms of the Loan Documents, as the Administrative Agent or any Lender through the Administrative Agent may from time to time reasonably request.

Documents required to be delivered pursuant to Section 6.01(a) or (b) (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower posts such documents, or provides a link thereto on the Borrower's website on the Internet at the website address listed on Schedule 11.02; or (ii) on which such documents are posted on the Borrower's behalf on an Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); provided that:  (i) the Borrower shall deliver paper copies of such documents to the Administrative Agent or any Lender that requests the Borrower to deliver such paper copies until a written request to cease delivering paper copies is given by the Administrative Agent or such Lender and (ii) the Borrower shall notify the Administrative Agent and each Lender (by telecopier or electronic mail) of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents.  Notwithstanding anything contained herein, in every instance the Borrower shall be required to provide paper copies of the Compliance Certificates required by Section 7.01(a) to the Administrative Agent.  Except for such Compliance Certificates, the Administrative Agent shall have no obligation to request the delivery or to maintain copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Borrower with any such request for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

The Borrower hereby acknowledges that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on SmartRoom or another similar electronic system (the "Platform") and (b) certain of the Lenders (each, a "Public Lender") may have personnel who do not wish to receive material non-public information with respect to the Borrower or its Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities.  The Borrower hereby agrees that it will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (w) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any material non-public information (although it may be sensitive and proprietary), with respect to the Borrower or its securities for purposes of United States Federal and state securities laws (provided, however, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 11.07); (y) all Borrower Materials

marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information"; and (z) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information."  For purposes of this Agreement, public information shall not be deemed to include any information and documentation that is of a type that would be required under applicable securities laws to have been made publicly available if the Borrower were a public reporting company.

Section 7.02    Notices.  In addition to any other notice otherwise required under this Agreement or any of the other Loan Documents, promptly notify the Administrative Agent and each Lender in writing:

(a)    of the occurrence of any Default or Event of Default;

(b)    of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect, including the following to the extent they have resulted or could reasonably be expected to result in a Material Adverse Effect: (i) except as excused by the Bankruptcy Code, breach or non-performance of, or any default under, a Contractual Obligation of any Loan Party or any Subsidiary thereof; (ii) any dispute, litigation, investigation, proceeding or suspension between any Loan Party or any Subsidiary thereof and any Governmental Authority; or (iii) the commencement of, or any material development in, any litigation or proceeding affecting any Loan Party or any Subsidiary thereof, including pursuant to any applicable Environmental Laws; and

(c)    (i) of the occurrence of any ERISA Event; (ii) of the filing by any Loan Party of Schedule B (or such other schedule as contains actuarial information) to IRS Form 5500 in respect of a Plan with Unfunded Pension Liabilities (and shall provide a copy of such IRS Form 5500, including the Schedule B); or (iii) of (w) a material increase in Unfunded Pension Liabilities (taking into account only Plans with positive Unfunded Pension Liabilities) since the date the representations hereunder are deemed given, (x) the existence of potential withdrawal liability under Section 4201 of ERISA if any Loan Party or any Subsidiary thereof were to withdraw completely from any and all Multiemployer Plans, (y) the adoption of, or the commencement of contributions to, any Plan subject to Section 412 of the Code by any Loan Party, any Subsidiary thereof or any ERISA Affiliate, or (z) the adoption of any amendment to a Plan subject to Section 412 of the Code that results in a material increase in contribution obligations of any Loan Party, any Subsidiary thereof or any ERISA Affiliate.

Each notice pursuant to Section 7.02 shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth details of the occurrence referred to therein and stating what action the Loan Parties have taken and propose to take with respect thereto, to the extent such details and other information are known to the Loan Parties.  Each notice pursuant to Section 7.02(a) shall describe with particularity any and all provisions of this Agreement and any other Loan Document that have been breached.

Section 7.03    Payment of Taxes.  Pay and discharge all post-petition Taxes imposed upon it or upon its income or profits, or upon any properties or assets belonging to it, in each case on a timely basis, and all lawful claims which, if unpaid, may reasonably be expected to become

a Lien upon any properties or assets of any Loan Party or any Subsidiary thereof not otherwise permitted under this Agreement; provided that none of the Loan Parties or any of their respective Subsidiaries shall be required to pay any such Tax that is being contested in good faith by proper proceedings diligently conducted if it has maintained adequate reserves with respect thereto in accordance with GAAP or which could not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect.

Section 7.04    Preservation of Existence, Etc.    (a) Preserve, renew and maintain in full force and effect its legal existence and good standing under the Laws of the jurisdiction of its organization (except pursuant to a transaction expressly permitted by Section 8.04 or Section 8.05) and (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

Section 7.05    Maintenance of Properties.    (a) Maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted and (b) make all necessary repairs thereto and renewals and replacements thereof, except in each case where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

Section 7.06    Maintenance of Insurance.    Maintain with financially sound and reputable insurance companies not Affiliates of the Borrower, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts as are customarily carried under similar circumstances by such other Persons.  All such insurance shall name the Administrative Agent as an additional insured or lender's loss payee, as applicable.  If any portion of any Mortgaged Property is at any time located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a special flood hazard area with respect to which flood insurance has been made available under the National Flood Insurance Act of 1968 (as now or hereafter in effect or successor act thereto), then, to the extent required by the Flood Insurance Laws, the Borrower shall, or shall cause each Loan Party to, (i) maintain, or cause to be maintained, with a financially sound and reputable insurer, flood insurance in an amount reasonably satisfactory to the Administrative Agent and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (ii) deliver to the Administrative Agent evidence of such compliance in form and substance reasonably acceptable to the Administrative Agent.

Section 7.07    Compliance with Laws.    Except as excused by the Bankruptcy Code, comply in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted; or (b) the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

Section 7.08    Books and Records.    (a) Maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of such Loan Party or

such Subsidiary, as the case may be; and (b) maintain such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over such Loan Party or such Subsidiary, as the case may be.  In addition, each Group Member shall provide full and direct access during normal business hours and upon reasonable prior notice to information (including historical information) and personnel as the Administrative Agent may reasonably request from time to time, including regularly scheduled meetings among senior management, company advisors, and the Administrative Agent and such other consultants to the Administrative Agent and/or the Lenders as may be identified to the Borrower, shall be provided with reasonable access during normal business hours and upon reasonable prior notice to all information it shall reasonably request and to other internal meetings regarding strategic planning, cash and liquidity management, operation and restructuring activities, progress with respect to the Reorganization Plan and any other aspect of the Cases; provided, however, that the foregoing shall not require the Borrower to permit any access, disclose any privileged information or trade secret or violate any of its obligations with respect to confidentiality or violate applicable laws.  All access rights of the Administrative Agent or any other Lender under this Section 7.08 shall extend to any of their respective representatives, agents, counsel, advisors, accountants, appraisers, consultants, independent contractors or other designees.

Section 7.09    Inspection Rights.  Permit representatives and independent contractors of the Administrative Agent and each Lender to visit and inspect any of its properties and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants, all at the reasonable expense of the Borrower and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower; provided that, excluding any such visits and inspections during the continuation of an Event of Default, only the Administrative Agent on behalf of the Lenders may exercise rights of the Administrative Agent and the Lenders under this Section 7.09, and the Administrative Agent shall not exercise such rights more often than three (3) times during any calendar year absent the existence of an Event of Default, and only three (3) such visits shall be at the Borrower's expense; provided further that when an Event of Default exists, the Administrative Agent or any Lender (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice. The Administrative Agent and the Lenders shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants. Notwithstanding anything to the contrary in this Section 7.09, the Borrower shall not be required to disclose or permit the inspection or discussion of, any document, information or other matter (i) that constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by Law or any binding agreement or (iii) that is subject to attorney client or similar privilege or constitutes attorney work product.

Section 7.10    Use of Proceeds.  Use the proceeds of the Loans in accordance with the Budget (including, subject to Section 8.17, by reason of a Permitted Variance) to: (i) provide working capital to the Loan Parties that are Debtors in the Cases; (ii) fund interest, fees and other payments contemplated hereunder, including, without limitation, the Adequate Protection Payments; and (iii) fund costs of the administration of the Cases and the consummation of the Restructuring (including professional fees).

Section 7.11    Information Regarding Collateral.

(a)    Not effect any change (i) in any Loan Party's legal name, (ii) in the location of any Loan Party's chief executive office, (iii) in any Loan Party's identity or organizational structure, (iv) in any Loan Party's Federal Taxpayer Identification Number or organizational identification number, if any, or (v) in any Loan Party's jurisdiction of organization (in each case, including by merging with or into any other entity, reorganizing, dissolving, liquidating, reorganizing or organizing in any other jurisdiction), until (A) it shall have given the Administrative Agent not less than 30 days' prior written notice (in the form of an Officers' Certificate), or such lesser notice period agreed to by the Administrative Agent, of its intention so to do, clearly describing such change and providing such other information in connection therewith as the Administrative Agent may reasonably request and (B) it shall have taken all action reasonably satisfactory to the Administrative Agent to maintain the perfection and priority of the security interest of the Administrative Agent for the benefit of the Secured Parties in the Collateral, if applicable.  Each Loan Party agrees to promptly provide the Administrative Agent with certified Organizational Documents reflecting any of the changes described in the preceding sentence.  Each Loan Party also agrees to promptly notify the Administrative Agent of any change in the location of any office in which it maintains books or records relating to Collateral owned by it or any office or facility at which Collateral is located (including the establishment of any such new office or facility), other than changes in location to a Mortgaged Property or a leased property subject to a Landlord Access Agreement (as defined in the Security Agreement).

Section 7.12    Covenant to Guarantee Obligations and Give Security.

(a)    Upon the formation or acquisition of any new direct or indirect Subsidiary (other than an Excluded Subsidiary) by any Loan Party, then the Loan Parties shall, at the expense of the Loan Parties:

(i)    within 15 days after such formation or acquisition, cause such Subsidiary, to duly execute and deliver to the Administrative Agent a guaranty or guaranty supplement, in form and substance satisfactory to the Administrative Agent, guaranteeing the other Loan Parties' obligations under the Loan Documents,

(ii)    within 15 days after such formation or acquisition, furnish to the Administrative Agent a description of the real and personal properties of such Subsidiary, in detail reasonably satisfactory to the Administrative Agent,

(iii)    within 30 days after such formation or acquisition, cause such Subsidiary to duly execute and deliver to the Administrative Agent any Mortgages, Security Agreement Supplements, IP Security Agreements, each item required pursuant to the Mortgaged Property Requirement and other security and pledge agreements required by the Security Agreement, as specified by and in form and substance reasonably satisfactory to the Administrative Agent (including delivery of all Pledged Securities in and of such Subsidiary, and other instruments of the type specified in Section 4.01(a)(iii)), to grant a security interest in the assets of such Subsidiary constituting Collateral;

(iv)    within 30 days after such formation or acquisition, cause such Subsidiary to take whatever action (including the recording of Mortgages, the filing of Uniform Commercial Code financing statements, the giving of notices and the endorsement of notices on title documents) required hereunder or in the Security Agreement to vest in the Administrative Agent (or in any representative of the Administrative Agent designated by it), for the benefit of the Secured Parties, valid and subsisting Liens on the assets of such Subsidiary constituting Collateral, and

(v)    concurrently with the actions taken under clauses (iii) and (iv) above, deliver to the Administrative Agent, upon the request of the Administrative Agent or the Required Lenders in their sole discretion, a signed copy of a favorable opinion, addressed to the Administrative Agent and the other Secured Parties, of counsel for the Loan Parties acceptable to the Administrative Agent as to the matters contained in clauses (i), (iii) and (iv) above, and as to such other matters as the Administrative Agent may reasonably request.

(b)    Upon the acquisition of (i) any property with a value in excess of $[100,000] by any Loan Party, if such property, in the judgment of the Administrative Agent, shall not already be subject to a perfected first priority Lien and security interest in favor of the Administrative Agent for the benefit of the Secured Parties, then the Loan Parties shall, at the Loan Parties' expense:

(i)    within 5 days after such acquisition, furnish to the Administrative Agent a description of the property so acquired in detail satisfactory to the Administrative Agent,

(ii)    within 5 days after such acquisition, cause the applicable Loan Party to duly execute and deliver to the Administrative Agent, Security Agreement Supplements, IP Security Agreements and other security and pledge agreements required by the Security Agreement, as specified by and in form and substance reasonably satisfactory to the Administrative Agent, to grant a security interest in the assets of the applicable Loan Party constituting Collateral,

(iii)    within 10 days after such acquisition, cause the applicable Loan Party to take whatever action (including the filing of Uniform Commercial Code financing statements, the giving of notices and the endorsement of notices on title documents) required hereunder or in the Security Agreement to vest in the Administrative Agent (or in any representative of the Administrative Agent designated by it) for the benefit of the Secured Parties valid and subsisting Liens on the assets of such Loan Party constituting Collateral,

(iv)    concurrently with the actions taken under clauses (ii) and (iii) above, deliver to the Administrative Agent, upon the request of the Administrative Agent or the Required Lenders in their sole discretion, a signed copy of a favorable opinion, addressed to the Administrative Agent and the other Secured Parties, of counsel for the Loan Parties acceptable to the Administrative Agent as to the matters contained in clauses (ii) and (iii) above and as to such other matters as the Administrative Agent may reasonably request,

(c)    Reserved, and

(d)    At any time upon request of the Administrative Agent, promptly execute and deliver any and all further instruments and documents and take all such other action as the Administrative Agent may reasonably deem necessary or desirable in obtaining the full benefits of, or (as applicable) in perfecting and preserving the Liens of, such guaranties, deeds of trust, trust deeds, deeds to secure debt, mortgages, Security Agreement Supplements and other security and pledge agreements and supplements thereto.

(e)    Notwithstanding anything to the contrary herein, in no case shall a Loan Party be required to grant a security interest in any Equity Interests in a CFC or a Transparent Subsidiary, other than (i) 100% of the non-voting Equity Interests (if any) in a CFC or Transparent Subsidiary, as applicable, that is a first-tier Subsidiary of such Loan Party, and (ii) 65% of the voting Equity Interests in a CFC or Transparent Subsidiary, as applicable, that is a first-tier Subsidiary of such Loan Party, in each case to secure Obligations of such Loan Party.

(f)    Notwithstanding anything to the contrary herein, the Required Lenders may agree in their sole discretion to extend any of the time periods set forth in this Section 7.12.

Section 7.13    Compliance with Environmental Laws.  Except as required by the Bankruptcy Code or orders of the Bankruptcy Court, comply, and cause all its lessees and other Persons operating or occupying its properties to comply, with all applicable Environmental Laws and Environmental Permits, except where the failure to comply could not reasonably be expected to result in a Material Adverse Effect; obtain and renew all Environmental Permits necessary for its operations and properties, except whether the failure to obtain or renew could not reasonably be expected to result in a Material Adverse Effect; and conduct any investigation, study, sampling and testing, and undertake any cleanup, removal, remedial or other action necessary to remove and clean up Hazardous Materials from any of its properties, to the extent required of it by and in material compliance with Environmental Laws; provided, however, that neither the Borrower nor any of its Subsidiaries shall be required to undertake any such investigation, study, sampling, testing, cleanup, removal, remedial or other action to the extent that its obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained with respect to such circumstances in accordance with GAAP.

Section 7.14    Further Assurances.  Promptly upon request by the Administrative Agent, or any Lender through the Administrative Agent, (a) correct any material defect or error that may be discovered in any Loan Document or in the execution, acknowledgment, filing or recordation thereof, and (b) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Administrative Agent, or any Lender through the Administrative Agent, may reasonably require from time to time in order to (i) carry out more effectively the purposes of the Loan Documents, (ii) subject to any Loan Party's or any of its Subsidiaries' properties, assets, rights or interests to the Liens now or hereafter intended to be covered by any of the Collateral Documents, (iii) perfect and maintain the validity, effectiveness and priority of any Collateral Documents and any of the Liens intended to be created thereunder and (iv) assure, convey, grant, assign, transfer, preserve, protect and confirm more effectively unto the Secured Parties the rights granted or now or hereafter intended to be granted to the Secured Parties under any Loan Documents or under any other instrument executed in connection with any Loan Document to which any Loan Party or any of its Subsidiaries is or is to be a party, and cause each of its Subsidiaries to do so.

Section 7.15    Post-Closing Covenant.    To the extent any actions to create or perfect a security interest in Collateral to be provided hereunder or any other matters herein that are specifically subject to this Section 7.15 are not completed on or prior to the Closing Date notwithstanding the Borrower's use of best efforts to do so, the Borrower will complete each of such actions as soon as commercially reasonable but in no event later than Final Order Entry Date unless a later date is agreed to by the Required Lenders or the Administrative Agent at the direction of the Required Lenders; provided, that the Loan Parties shall deliver the Perfection Certificate to the Administrative Agent on or before the date that is within ten (10) days of the Closing Date.

Section 7.16    Compliance with Milestones.    Comply with the following relating to the Cases in accordance with the applicable timing referred to below (or such later dates as approved by the Required Lenders or the Administrative Agent by consent of the Required Lenders, other than any Plan Milestones set forth in clauses (g), (i) or (l) (and with respect to clause (l), only to the extent that the Effective Date were to be extended beyond December 14, 2016) below, which shall be subject to the approval of the Unanimous DIP Lenders as well), as well as certain other agreed milestones as may relate to the Cases (collectively, the "Plan Milestones" and each individually, a "Plan Milestone"):

(a)    Reserved;

(b)    on or before September 26, 2016, the Debtors must seek to obtain exit financing from third parties on terms similar to or better than the terms set forth in the Exit First Lien Facility;

(c)    Reserved;

(d)    the Debtors shall have commenced the respective Cases in the Bankruptcy Court no later than August 15, 2016;

(e)    each Debtor shall file the Reorganization Plan, and an accompanying disclosure statement (the "Disclosure Statement"), which shall be reasonably acceptable in form and substance to the Administrative Agent, the Required Lenders, the Debtors, the Supporting Lenders, the Required Supporting Noteholders, and the Supporting Interest Holders, in the Cases by no later than August 15, 2016;

(f)    the Debtors shall file a motion seeking approval of the Facility within one Business Day of the Petition Date;

(g)    the Interim Order shall be entered by the Bankruptcy Court in the Cases no later than three (3) Business Days after the Petition Date;

(h)    an order in form and substance acceptable to the Debtors, the Supporting Lenders, the Required Supporting Noteholders, and the Supporting Interest Holders, approving the assumption of the Restructuring Support Agreement shall be entered by the Bankruptcy Court in the Cases no later than thirty-five (35) calendar days after the Petition Date;

(i)      the Final Order shall be entered by the Bankruptcy Court in the Cases no later than thirty-five (35) calendar days after the Petition Date;

(j)      an order approving the Disclosure Statement, which shall be reasonably acceptable in form and substance to the Administrative Agent, the Required Lenders, the Debtors, the Supporting Lenders, the Required Supporting Noteholders, and the Supporting Interest Holders, shall be entered by the Bankruptcy Court in the Cases by no later than September 26, 2016;

(k)      an order confirming the Reorganization Plan, which shall be reasonably acceptable in form and substance to the Administrative Agent, the Required Lenders, the Debtors, the Supporting Lenders, the Required Supporting Noteholders, and the Supporting Interest Holders, shall be entered by the Bankruptcy Court in the applicable Cases by no later than November 7, 2016; and

(l)      the Effective Date shall occur by no later than November 14, 2016.

Section 7.17    <u>Opposition to Certain Motions</u>. Each Loan Party shall promptly and diligently oppose all motions filed by Persons in the Bankruptcy Court to lift the stay on any Collateral (other than motions filed by the Administrative Agent, the Pre-Petition Indenture Trustees, the Lenders, the Pre-Petition 2010 Indenture Noteholders and/or the Pre-Petition 2015 Indenture Noteholders relating to the Facility), all motions filed by Persons in the Bankruptcy Court to terminate the exclusive ability of the Debtors to file a plan of reorganization, and all other motions filed by Persons in the Bankruptcy Court that, if granted, could reasonably be expected to have a material adverse effect on the Administrative Agent or any Collateral.

Section 7.18    Priority and Liens.  At all times during the term hereof, ensure each of the following:

(a)      Upon entry of each DIP Order, the Borrower's and each other Debtor's Obligations hereunder and under each of the other Loan Documents shall, at all times:

(i)      pursuant to section 364(c)(1) of the Bankruptcy Code, constitute an allowed superpriority claim on a joint and several basis in the Case of such Loan Party;

(ii)      subject to the Carve-Out, pursuant to section 364(c)(2) of the Bankruptcy Code, be secured by first priority, valid, binding, continuing, enforceable and fully-perfected security interests in, and Liens upon, all Collateral that, on or as of the Petition Date, is not subject to valid, perfected and non-avoidable liens (excluding any Avoidance Actions (but including, following the entry of the Final Order, the proceeds therefrom));

(iii)      pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by valid, binding, continuing, enforceable and fully-perfected security interests in, and Liens upon, the Collateral (other than the property described in clause (ii) or (iv) of this <u>Section 7.18(a)</u>, as to which the liens and security interests in favor of the Administrative Agent will be as described in such clauses), whether existing on the Petition Date or thereafter acquired, that is subject to the liens of the Pre-Petition First Lien Secured Parties securing the Pre-Petition First Lien Obligations, the Adequate Protection Liens of the Pre-Petition

Secured Parties, the Carve-Out, or any Permitted Lien (as defined in the Interim Order) which security interests and liens in favor of the Administrative Agent, are junior to such valid, perfected, and non-avoidable liens; and

(iv)    pursuant to section 364(d)(1) of the Bankruptcy Code, be secured by valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interests in and Liens upon all Collateral that is subject to valid, perfected, and non-avoidable liens presently held for the benefit of the Pre-Petition Indenture Secured Parties (such priming liens, the "Priming Liens" and such primed liens of the Pre-Petition Indenture Noteholders, the "Primed Liens").  The Priming Liens shall be senior in all respects to the interests in such property of any of the Pre-Petition Indenture Secured Parties (including, without limitation, any and all forms of adequate protection granted to the foregoing), but shall be junior to the liens of the Pre-Petition First Lien Secured Parties securing the Pre-Petition First Lien Obligations, the Adequate Protection Liens of the Pre-Petition First Lien Secured Parties, the Carve-Out and the Permitted Liens (as defined in the Interim Order).  The Primed Liens shall be primed by and made subject and subordinate to the Priming Liens, but the Priming Liens shall not prime liens, if any, to which the Primed Liens are subordinate at the time of the commencement of the Cases.

(b)    The Secured Parties' Liens and superpriority claims as described in Section 7.18(a) shall have priority over any claims arising, upon entry of the Final Order, under sections 105 and 506(c) of the Bankruptcy Code, and shall be subject only to the liens of the Pre-Petition First Lien Lenders securing the Pre-Petition First Lien Obligations, the Adequate Protection Liens of the Pre-Petition First Lien Lenders, the Carve-Out, any other Permitted Liens (as defined in the Interim Order) and the payment of the Adequate Protection Claims of the Pre-Petition First Lien Lenders.  Except as set forth herein, no other claim having a priority superior to or pari passu with that granted to Secured Parties by the Interim Order and Final Order, whichever is then in effect, shall be granted or approved while any Obligations under this Agreement remain outstanding.

(c)    Except for the Carve-Out, no costs or expenses of administration shall be imposed against the Administrative Agent, the Lenders, any other Secured Party or any of the Collateral or, subject to entry of the Final Order, under sections 105 or 506(c) of the Bankruptcy Code, or otherwise, and each of the Loan Parties hereby waives for itself and on behalf of its estate in bankruptcy, any and all rights under sections 105 or, upon entry of the Final Order, 506(c) of the Bankruptcy Code, or otherwise, to assert or impose or seek to assert  or impose, any such costs or expenses of administration against Administrative Agent, the Lenders or any other Secured Party.

(d)    Except for the Carve-Out, the respective superpriority claims of the Secured Parties, the Pre-Petition First Lien Agent, the Pre-Petition First Lien Lenders, the Pre-Petition Indenture Trustees and the Pre-Petition Indenture Noteholders shall at all times be senior to the rights of such Loan Party, any chapter 11 trustee and, subject to section 726 of the Bankruptcy Code, any chapter 7 trustee, or any other creditor (including, without limitation, post-petition counterparties and other post-petition creditors) in the Cases or any subsequent proceedings under the Bankruptcy Code, including, without limitation, any chapter 7 cases (if any of such Loan Party's cases are converted to cases under chapter 7 of the Bankruptcy Code). Notwithstanding the fore-

going, the superpriority claims of the Secured Parties shall be junior to the Adequate Protection Claims of the Pre-Petition First Lien Lenders.

ARTICLE VIII.
NEGATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder (other than contingent indemnification obligations for which no claims has been made) shall remain unpaid or unsatisfied or shall remain outstanding, each Loan Party shall not, nor shall it permit any of its Subsidiaries to, directly or indirectly:

Section 8.01    Liens.   Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following (the "Permitted Liens"):

(a)      Liens securing the Obligations;

(b)      Liens which are Permitted Liens (as defined in the Interim DIP Order);

(c)      Adequate Protection Liens and Liens securing Indebtedness of the Loan Parties outstanding under the Pre-Petition First Lien Loan Documents or the Pre-Petition Indenture Documents as of the Closing Date or as otherwise provided under the DIP Orders; and

(d)      Liens for Taxes that are not overdue for a period of more than 30 days or that are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP.

Section 8.02    Investments.   Make any Investments, except:

(a)      Investments existing on the Petition Date and listed on Schedule 8.02(a);

(b)      Investments as provided in the Budget (including Permitted Variances) or the DIP Orders.

Section 8.03    Indebtedness.   Create, incur, assume or suffer to exist any Indebtedness, except

(a)      Indebtedness in respect of the (i) Obligations, (ii) Pre-Petition First Lien Obligations and (iii) obligations under the Pre-Petition Indenture Documents;

(b)      Indebtedness existing on the date hereof and listed on Schedule 8.03(b) and any permitted refinancing thereof allowed pursuant to Section 8.14;

(c)      Indebtedness in respect of swap contracts designed to hedge against interest rates, foreign exchange rates or commodities pricing risks incurred in the ordinary course of business and not for speculative purposes; and

(d)      Indebtedness as provided in the Budget (including Permitted Variances) or the DIP Orders.

The accrual of interest, the accretion of accreted value and the payment of interest in the form of additional Indebtedness shall not be deemed to be an incurrence of Indebtedness for purposes of this <u>Section 8.03</u>.

Section 8.04    <u>Fundamental Changes</u>.  Merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, except that, so long as no Default exists or would result therefrom:

(a)      any Subsidiary may merge with (i) the Borrower; <u>provided</u> that the Borrower shall be the continuing or surviving Person, or (ii) any one or more other Subsidiaries; <u>provided</u> that when any Subsidiary that is a Loan Party is merging with another Subsidiary, a Loan Party shall be the continuing or surviving Person;

(b)      the Borrower may change its legal form if it determines in good faith that such action is in the best interests of the Borrower and its Subsidiaries, and the Administrative Agent reasonably determines it is not disadvantageous to the Lenders or in conflict with the Restructuring Support Agreement; and

(c)      any Loan Party may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to the Borrower or to another Loan Party (other than Holdings or any Roadhouse Parent Entity).

Section 8.05    <u>Dispositions</u>.  Make any Disposition or enter into any agreement to make any Disposition, except:

(a)      Dispositions of obsolete, worn out or surplus property, whether now owned or hereafter acquired, in the ordinary course of business and Dispositions of property no longer used or useful in the conduct of the business of the Borrower and its Subsidiaries;

(b)      Dispositions of inventory, equipment and immaterial assets in the ordinary course of business;

(c)      Dispositions of property by any Subsidiary to the Borrower or to a wholly-owned Subsidiary; <u>provided</u> that if the transferor of such property is a Guarantor, the transferee thereof must either be the Borrower or a Guarantor;

(d)      Dispositions permitted by <u>Section 8.02</u>, <u>Section 8.04</u> and <u>Section 8.06</u> and Liens permitted by <u>Section 8.01</u>;

(e)      Dispositions in the ordinary course of business of Cash Equivalents;

(f)      leases, subleases, licenses or sublicenses, in each case in the ordinary course of business and which do not materially interfere with the business of the Borrower and its Subsidiaries, taken as a whole;

(g)      transfers of property subject to Casualty Events upon receipt of the Net Cash Proceeds of such Casualty Event;

(h)      Dispositions of Investments in joint ventures to the extent required by, or made pursuant to customary buy/sell arrangements between, the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

(i)      Dispositions of accounts receivable in the ordinary course of business in connection with the collection or compromise thereof;

(j)      The unwinding of any swap contract pursuant to its terms;

(k)      Dispositions in the ordinary course of business consisting of the abandonment of Company IP Rights which, in the reasonable good faith determination of the Borrower or any Subsidiary, are uneconomical, negligible, obsolete or otherwise not material in the conduct of its business; and

(l)      any surrender or waiver of contractual rights or the settlement, release or surrender of contractual rights or other litigation claims in the ordinary course of business.

To the extent any Collateral is disposed of as expressly permitted by this Section 8.05 to any Person other than to a Loan Party, such Collateral shall be sold free and clear of the Liens created by the Loan Documents and, if requested by the Administrative Agent, upon the certification by the Borrower that such Disposition is permitted by this Agreement, the Administrative Agent shall be authorized to take and shall take any actions deemed appropriate in order to effect the foregoing.

Section 8.06    Restricted Payments.  Declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except that:

(a)      each Subsidiary may make Restricted Payments to the Borrower, any Subsidiaries of the Borrower that are Guarantors and any other Person that owns a direct Equity Interest in such Subsidiary, ratably according to their respective holdings of the type of Equity Interest in respect of which such Restricted Payment is being made;

(b)      Permitted Tax Distributions may be made by any Group Member; and

(c)      to the extent constituting Restricted Payments, the Borrower and its Subsidiaries may enter into and consummate transactions expressly permitted by any provision of Section 8.02 or Section 8.04.

Section 8.07    Change in Nature of Business.  Engage in any material line of business different in any material respect from those lines of business conducted by the Borrower and its Subsidiaries on the date hereof or any business substantially related or incidental thereto.

Section 8.08    Transactions with Affiliates.  Except with the prior written consent of the Administrative Agent and Required Lenders, enter into any transaction of any kind with any Affiliate of the Borrower, whether or not in the ordinary course of business, other than:

(a)　　transactions between or among the Borrower or any Subsidiary that is a Guarantor or any entity that becomes a Subsidiary that becomes a Guarantor as a result of such transaction;

(b)　　loans and other transactions by and among the Borrower and/or one or more Subsidiaries to the extent otherwise permitted under this Article VIII;

(c)　　employment and severance arrangements between the Borrower or any of its Subsidiaries and their respective officers and employees in the ordinary course of business and transactions pursuant to stock option plans and employee benefit plans and arrangements; provided that such arrangements are limited to incentive plans approved by the Bankruptcy Court in accordance with the Restructuring Support Agreement;

(d)　　the payment of customary fees and reasonable out-of-pocket costs to, and indemnities provided on behalf of, directors, officers, employees and consultants of the Borrower and its Subsidiaries or any direct or indirect parent of the Borrower in the ordinary course of business to the extent attributable to the ownership or operation of the Borrower and its Subsidiaries; and

(e)　　transactions pursuant to the Restructuring Support Agreement or the Reorganization Plan.

Section 8.09　　Burdensome Agreements.　Enter into or permit to exist any Contractual Obligation (other than this Agreement or any other Loan Document or as required under the Bankruptcy Code) that limits the ability (i) of any Subsidiary (other than an Excluded Subsidiary) to make Restricted Payments to the Borrower or any Guarantor or to otherwise transfer property to invest in the Borrower or any Guarantor, (ii) of any Loan Party (other than the Borrower or an Excluded Subsidiary) to Guarantee the Indebtedness of the Borrower or (iii) of the Borrower, any other Loan Party or any Subsidiary thereof (other than an Excluded Subsidiary) to create, incur, assume or suffer to exist Liens on property of such Person for the benefit of the Secured Parties with respect to the Obligations; provided, however, that the foregoing shall not apply to:

(a)　　restrictions and conditions imposed by law or any Loan Document;

(b)　　restrictions and conditions existing on the Closing Date (including, without limitation, any restrictions or conditions pursuant to existing Indebtedness permitted under Section 8.03(a)) or to any extension, renewal, amendment, modification or replacement thereof, except to the extent any such amendment, modification or replacement expands the scope of any such restriction or condition;

(c)　　customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary or any assets pending such sale, provided that such restrictions and conditions apply only to the Subsidiary or assets that is or are to be sold and such sale is permitted hereunder;

(d)　　customary provisions in leases, licenses and other contracts restricting the assignment thereof;

(e)      restrictions imposed by any agreement relating to secured Indebtedness permitted by this Agreement to the extent such restriction applies only to the property securing such Indebtedness;

(f)      restrictions or conditions set forth in any agreement in effect at any time a Person becomes a Subsidiary (but not any modification or amendment expanding the scope of any such restriction or condition), provided that such agreement was not entered into in contemplation of such Person becoming a Subsidiary and the restriction or condition set forth in such agreement does not apply to the Borrower, any other Loan Party or any other Subsidiary;

(g)      restrictions or conditions in any Indebtedness permitted pursuant to Section 8.03 to the extent such restrictions or conditions are no more restrictive than the restrictions and conditions in the Loan Documents or, in the case of subordinated debt, are market terms at the time of issuance or, in the case of Indebtedness of any non-Guarantor, are imposed solely on such non-Guarantor and its Subsidiaries;

(h)      restrictions on cash or other deposits imposed by agreements entered into in the ordinary course of business;

(i)      encumbrances and restrictions under the Organization Documents of any joint ventures existing on the Closing Date; and

(j)      negative pledges incurred or provided in favor of any holder of Indebtedness permitted under Section 8.03 solely to the extent any such negative pledge relates to the property financed by or the subject of such Indebtedness.

Section 8.10    Use of Proceeds.

(a)      Use the proceeds of any Credit Extension, whether directly or indirectly, and whether immediately, incidentally or ultimately, to purchase or carry margin stock (within the meaning of Regulation U of the FRB) or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund indebtedness originally incurred for such purpose.

(b)      Use any portion of the Carve-Out, any proceeds of any Credit Extension, cash collateral or other Collateral or prepetition collateral proceeds, for the payment of the fees and expenses of any Person incurred in challenging, or in relation to (i) the challenge of the Liens or claims of any or all of the Administrative Agent or the Lenders, or the initiation or prosecution of any claim or cause of action against any or all of the Administrative Agent, the Lenders, the Pre-Petition First Lien Agent, any Pre-Petition Indenture Trustee, the Pre-Petition First Lien Lenders, and the Pre-Petition Indenture Noteholders, including any claim under chapter 5 of the Bankruptcy Code, (ii) the assertion of any claims or causes of actions (including any claims or causes of action under chapter 5 of the Bankruptcy Code) against any or all of the Pre-Petition First Lien Agent, the Pre-Petition Indenture Trustees, the Pre-Petition First Lien Lenders, and the Pre-Petition Indenture Noteholders, their respective advisors, agents and sub-agents, including formal discovery proceedings in anticipation thereof and (iii) the assertion of any claims or challenges relating to the allocation of value as between encumbered and unencumbered assets (if any). The foregoing notwithstanding, no more than $25,000 in the aggregate of the amounts set

forth in the Budget, the Carve-Out, any cash collateral, or proceeds of any Credit Extension, Collateral or prepetition collateral may be used by the Committee, or any representative of the estates, to investigate, but not prosecute (or prepare for the prosecution of) any challenge or motion seeking standing to prosecute a challenge, to, the claims and/or Liens of the Pre-Petition First Lien Agent, the Pre-Petition Indenture Trustees, the Pre-Petition First Lien Lenders and the Pre-Petition Indenture Noteholders; provided, however, that nothing in this Agreement, any other Loan Document or the DIP Orders shall vest or confer on the Committee, or any representative of the estates, standing or authority to pursue any cause of action belonging to the Debtors or their estates. In addition, neither the Carve-Out nor any proceeds of any Credit Extension, cash collateral, Collateral or prepetition collateral shall be used in connection with preventing, hindering or delaying the Lenders', the Administrative Agent's, the Pre-Petition First Lien Agent's, the Pre-Petition Indenture Trustees', the Pre-Petition First Lien Lenders' or the Pre-Petition Indenture Noteholders' enforcement or realization upon the Collateral once an Event of Default has occurred and is continuing under the Loan Documents, subject to the notice provisions in <u>Section 9.02</u> (and a comparable notice provision to be included in the Final Order with respect to the Pre-Petition First Lien Agent, the Pre-Petition Indenture Trustees, the Pre-Petition First Lien Lenders and the Pre-Petition Indenture Noteholders).

Section 8.11    <u>Capital Expenditures</u>.  Make or become legally obligated to make any Capital Expenditure, other than as set forth in the Budget (including Permitted Variances thereto).

Section 8.12    <u>Amendments of Organization Documents</u>.  Amend, supplement, waive or otherwise modify, or permit any amendment, supplement, waiver or other modification to, any of its Organization Documents in a manner adverse to the interests of the Lenders.

Section 8.13    <u>Accounting Changes</u>.  Make any change in (a) accounting policies or reporting practices, except as required by GAAP, or (b) fiscal year; <u>provided</u>, <u>however</u>, that the Borrower may, upon written notice to the Administrative Agent change its (x) accounting policies and/or reporting practices and/or (y) fiscal year, in each case as may be reasonably acceptable to the Administrative Agent and the Required Lenders, in which case the Borrower and the Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such change in fiscal year and/or accounting policies or reporting practices.

Section 8.14    <u>Prepayments, Etc. of Indebtedness</u>.  (i) Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner any Indebtedness (it being understood that payments of regularly scheduled interest and mandatory prepayments under Indebtedness expressly permitted to be incurred hereunder shall be permitted, subject in each case to the DIP Orders) except (a) the conversion of any such Indebtedness to Qualified Equity Interests of Holdings (or any direct or indirect parent thereof), and (b) refinancings and refundings of such Indebtedness in compliance with the Budget, or (ii) amend, modify or change in any manner any term or condition of any Indebtedness set forth in <u>Schedule 8.03(b)</u> in a manner materially adverse to the Administrative Agent or the Lenders without the consent of the Required Lenders, except for any refinancing, refunding, renewal or extension thereof contemplated by the Budget and permitted hereunder.

Section 8.15   <u>Holding Company</u>.  In the case of Holdings and any Roadhouse Parent Entity, engage in any business or activity other than (a) (i) in the case of Holdings, the ownership of all outstanding Equity Interests in the Borrower, (ii) in the case of Roadhouse Parent, the ownership of all outstanding Equity Interests in Holdings, (iii) in the case of Roadhouse Midco, the ownership of all outstanding Equity Interests in Roadhouse Parent, (iv) in the case of Roadhouse Intermediate, the ownership of all outstanding Equity Interests in Roadhouse Midco, and (v) in the case of Roadhouse Holding, the ownership of all outstanding Equity Interests in Roadhouse Intermediate, (b) maintaining its corporate existence, including general and corporate overhead, <u>provided</u> that Holdings or such Roadhouse Parent Entity may change its form of organization, so long as (A) it is organized under the laws of the United States of America, any State thereof or the District of Columbia and (B) its Guarantee of the Obligations and the Lien on or security interest in any Collateral held by it under the Loan Documents shall remain in effect to the same extent as immediately prior to such change, (c) activities required to comply with applicable laws, (d) participating in tax, accounting and other administrative activities as the parent of the consolidated group of companies, including the Loan Parties, (e) the receipt of Restricted Payments to the extent permitted by <u>Section 8.06</u> and the making of Restricted Payments to the extent permitted by <u>Section 8.06</u> (including, in each case, for the avoidance of doubt, Permitted Tax Distributions), (f) to the extent not otherwise covered by the other clauses of this <u>Section 8.15</u>, any of the activities of Holdings or such Roadhouse Parent Entity referred to in <u>Section 8.06</u>, (g) concurrently with any issuance of Qualified Equity Interests, the redemption, purchase or retirement of any Equity Interest of Roadhouse Holding using the proceeds of, or conversion or exchange of any equity Interests of Roadhouse Holding for, such Qualified Equity Interests, (h) compliance with its obligation under the Loan Documents, the execution and delivery of the Loan Documents to which it is a party and the performance of its obligations thereunder, (i) incurring guarantees of Indebtedness permitted to be incurred by the Borrower or any Guarantor Subsidiary hereunder, provided such guarantee shall be subordinated to the Obligations to the same extent as such other Indebtedness, and (j) activities incidental to the businesses or activities described in clauses (a) through (i) of this <u>Section 8.15</u>.

Section 8.16   <u>Bankruptcy Provisions</u>.  No Group Member shall: (a) seek or consummate a sale of assets under a plan of reorganization, Section 363(b) of the Bankruptcy Code or otherwise (other than the Reorganization Plan) without the consent of the Required Lenders and the Supporting Interest Holders; (b) except for the Carve-Out (subject to the applicable caps and the other limitations set forth herein and in the DIP Orders), incur administrative expense claims pari passu with or senior to the Obligations; (c) seek or consent to any modification, stay, vacation or amendment with respect to (i) "first day orders" entered by the Bankruptcy Court, (ii) the Final Order or (iii) the Loan Documents, except in each case as agreed to by the Administrative Agent and the Required Lenders in their sole discretion; (d) except as otherwise expressly permitted herein or in the DIP Orders, create any Lien that ranks senior to, or *pari passu* with, the Liens securing the Obligations; (e) make cash expenditures on account of claims incurred (i) by critical vendors prior to the Petition Date, (ii) by protected vendors under the Perishable Agricultural Commodities Act of 1930, as amended, prior to the Petition Date or (iii) pursuant to Section 503(b)(9) of the Bankruptcy Code, or pursuant to any "first day" orders entered by the Bankruptcy Court,  in each case except as agreed to by the Pre-Petition First Lien Agent, the Pre-Petition Indenture Trustees and the Required Lenders or as permitted by the Budget (including Permitted Variances thereto), (f) seek or consent to any order seeking authority to take any action prohibit-

ed by the Final Order or the other Loan Documents without the consent of the Required Lenders, the Pre-Petition First Lien Agent or the Pre-Petition Indenture Trustees or otherwise required by any Requirement of Law or (g) except as expressly consented to by the Required Lenders, seek, or consent to any order seeking, to settle any litigation related to employee or labor matters, including without limitation, wage and hour collective or class action litigation involving one or more Loan Parties.

Section 8.17   Compliance with Budget Covenants.  Permit any Variance to exist other than a Permitted Variance.

Section 8.18   Foreign Subsidiaries.  Form or otherwise acquire any Foreign Subsidiaries.

Section 8.19   Real Property. Own or acquire, or enter into any agreement to acquire, any real property unless appropriate collateral documents, in form and substance acceptable to the Required Lenders in all respects, are executed and delivered to the Administrative Agent to create a valid, continuing and perfected security interest in such real property in favor of the Administrative Agent for the benefit of the Secured Parties.

ARTICLE IX.
EVENTS OF DEFAULT AND REMEDIES

Section 9.01   Events of Default.  Any of the following shall constitute an Event of Default:

(a)      Non-Payment.  The Borrower or any other Loan Party fails to pay (i) any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or by acceleration thereof or otherwise, or (ii) pay any interest on any Loan or any fee or other amount (other than an amount referred to in the foregoing clause (i)) payable under this Agreement or under any other Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of five (5) or more Business Days; or

(b)      Specific Covenants.  Any Loan Party fails to perform or observe any term, covenant or agreement contained in any of Sections 7.02(a), 7.04(a) (solely with respect to the Borrower), 7.10, 7.12, 7.15, 7.16, 7.17, 7.18 or Article VIII; or

(c)      Other Defaults.  Any Loan Party fails to perform or observe any other term, covenant or agreement (not specified in Section 9.01(a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for 10 days; provided that an Event of Default under Article VI (other than under Sections 6.01(d) and Section 6.06) is subject to a grace period of 5 Business Days and an Event of Default under Sections 6.01(d) or 6.06 is subject to a grace period of 2 Business Days; or

(d)      Representations and Warranties.  Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Borrower or any other Loan Party herein, in any other Loan Document, or in any document delivered in connection herewith or

therewith shall be incorrect or misleading in any material respect when made or deemed made; or

(e)    <u>Judgments</u>.  There is entered against any Loan Party or any Subsidiary thereof a final judgment or order for the payment of money in an aggregate amount exceeding $[250,000] (to the extent not covered by independent third-party insurance as to which the insurer is rated at least "A" by A.M. Best Company, has been notified of the potential claim and does not dispute coverage), or any one or more non-monetary final judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and there is a period of 30 consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, is not in effect, or enforcement of such judgment is not subject to the automatic stay provided in the Bankruptcy Code; or

(f)    <u>ERISA</u>.  (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of any of the Loan Parties under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount in excess of $[250,000], (ii) any Loan Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount in excess of $[250,000], (iii) there is or arises an Unfunded Pension Liability (taking into account only Plans with positive Unfunded Pension Liability) of $[250,000] or more, or (iv) there is or arises any potential withdrawal liability under Section 4201 of ERISA, if any Loan Party, any Subsidiary thereof or any ERISA Affiliate were to withdraw completely from any and all Multiemployer Plan of $[250,000] or more; or

(g)    <u>Invalidity of Loan Documents and Collateral Documents</u>.  (i) Any Loan Document shall cease to be in full force and effect (other than pursuant to the terms hereof or thereof), or any Loan Party shall deny or disaffirm in writing the validity of any Loan Document or that it has any further liability under any such Loan Document (other than, in the case of a Guarantor Subsidiary, as a result of the discharge of a Guarantor Subsidiary in accordance with the terms of the Loan Documents) or otherwise attempt to invalidate or otherwise impair the Loans or of the validity or perfection of the liens granted thereunder or (ii) any material provision of any Collateral Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or as a result of acts or omissions by the Administrative Agent or any Lender or satisfaction in full of all the Obligations, ceases to be in full force and effect or ceases to create a valid and perfected first priority Lien (subject to Liens permitted by <u>Section 8.01</u>) on the Collateral to be covered thereby; or any Loan Party or any other Person contests in any manner the validity or enforceability of any material provision of any Collateral Document or of the validity or perfection of the liens granted thereunder; or any Loan Party denies that it has any or further liability or obligation under any provision of any Collateral Document, or purports to revoke, terminate or rescind any Collateral Document; or

(h)    <u>Change of Control</u>.  There occurs any Change of Control; or

(i)    <u>Bankruptcy Matters</u>.  The Bankruptcy Court shall enter an order authorizing, approving or granting (or the Debtors shall file a motion seeking such authorization, approval or grant of) (i) additional post-Petition Date financing not otherwise permitted herein, (ii) any liens

on the Collateral not otherwise permitted herein, (iii) dismissal of the Cases or conversion of any Case to one under Chapter 7 of the Bankruptcy Code, (iv) appointment of a Chapter 11 trustee in any of the Cases, (v) any other superpriority claim senior to or pari passu with superpriority claims of the Administrative Agent, the other Secured Parties, the Pre-Petition First Lien Agent, the Pre-Petition First Lien Lenders, the Pre-Petition Indenture Trustees or the Pre-Petition Indenture Noteholders, (vi) modification of the Facility (other than pursuant to Section 11.01) or the Final Order, (vii) any action materially adverse to the Administrative Agent, the other Secured Parties, the Pre-Petition First Lien Agent, the Pre-Petition First Lien Lenders, the Pre-Petition Indenture Trustees or the Pre-Petition Indenture Noteholders, or their rights and remedies with respect to or interest in the Collateral, (viii) appointment of an examiner having powers beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code in any of the Cases, (ix) relief from the automatic stay for the benefit of any creditor with a security interest in the Collateral without the consent of the Administrative Agent and the Required Lenders, or (x) termination of the use of cash collateral by the Loan Parties; or

(j)   <u>Prepetition Debts</u>.  Any Debtor shall make any Pre-Petition Payment or otherwise pay any claim accrued prior to the Petition Date without the prior written consent of the Administrative Agent and the Required Lenders in their sole discretion or other than as permitted by the Budget (and any Permitted Variances thereto); or

(k)   <u>Actions against Administrative Agent</u>.  Any Debtor shall commence any action against the Administrative Agent, any other Secured Parties, the Pre-Petition First Lien Agent, the Pre-Petition First Lien Lenders, the Pre-Petition Indenture Trustees or the Pre-Petition Indenture Noteholders, on behalf of itself or any of its affiliates, officers or employees; or

(l)   <u>Material Adverse Effect</u>. Any Material Adverse Effect shall have occurred; or

(m)   <u>Restructuring Support Agreement</u>.  The Restructuring Support Agreement (i) shall be terminated pursuant to its terms or shall otherwise cease to be in full force and effect (other than a Termination Event (as defined in the RSA) as a result of the occurrence of the Effective Date of the Reorganization Plan), or (ii) shall have been amended, supplemented or otherwise modified in any material manner that adversely affects the interests, rights or remedies of any of the Administrative Agent or the Lenders; or

(n)   <u>Plan Milestones</u>.  The failure of the Debtors to comply with any of the Plan Milestones, regardless of whether the Debtors used commercially reasonable efforts to comply with any such Plan Milestone; or

(o)   <u>506(c) Claims</u>.  A claim under Section 506(c) of the Bankruptcy Code or otherwise shall have been allowed against any of all of the Administrative Agent, the other Secured Parties or the Collateral, or against the Pre-Petition First Lien Agent, the Pre-Petition First Lien Lenders, the Pre-Petition Indenture Trustees or the Pre-Petition Indenture Noteholders or the collateral securing any Pre-Petition Debt; or

(p)   <u>Competing Plans</u>.  The filing by any Group Member of any plan of reorganization or related disclosure statement or any direct or indirect amendment, modification, waiver or other change to the Reorganization Plan or related disclosure statement, or the entry of an order con-

firming any such plan of reorganization or approving any such disclosure statement or approving any such amendment, modification, waiver or other change in each case to the extent that such filing is not the Reorganization Plan or treats the claims of the Administrative Agent, any of the Lenders, any of the Pre-Petition Indenture Trustees or any of the Pre-Petition Indenture Noteholders in any manner to which they do not consent in their respective sole discretion; or

(q)    Exclusivity.  The Bankruptcy Court shall enter an order that results in any termination or modification of the exclusivity periods set forth in Section 1121 of the Bankruptcy Code except as provided in the Final Order or any such exclusivity periods shall have expired; or

(r)    Bankruptcy Orders Not In Full Force and Effect.  The Interim Order (prior to entry of the Final Order) or the Final Order shall cease to be in full force and effect or shall have been reversed, modified, amended, stayed, vacated or subject to stay pending appeal, in the case of any modification or amendment, without the prior written consent of the Required Lenders; or

(s)    Compliance with DIP Orders.  The failure of any Loan Party to comply in any material respect with the Interim Order (prior to entry of the Final Order) or the Final Order; or

(t)    Asset Sales.  Any sale or other disposition of all or a material portion of the Collateral pursuant to sections 363 or 1129 of the Bankruptcy Code other than as permitted by the DIP Orders (or pursuant to a transaction expressly permitted herein); or

(u)    Administrative Expense or Priority Claims.  A claim against any Debtor arising prior to the Effective Date of a kind specified under or entitled to priority or superpriority pursuant to sections 364(c)(1), 503(b), 507(a), 507(b) or 1114(e)(2) of the Bankruptcy Code or otherwise shall have been allowed in excess of $50,000 against such Debtor as a result of litigation with employees or former employees of any Debtor (including, without limitation, wage and hour collective or class action litigation involving one or more Debtors); or

(v)    Schedule of Assumption/Rejection of Executory Contracts and Unexpired Leases.  The filing of any schedule of assumption, assumption and assignment, or rejection of executory contracts and unexpired leases in any of the Cases that materially adversely affects the interests, rights or remedies of the Administrative Agent or any Lender that is not reasonably satisfactory to the Administrative Agent and the Required Lenders; or

(w)    Challenge Under Interim Order.  If forty-five (45) days after the Committee or a party in interest obtains standing to assert a Challenge (as defined in the Interim Order) and such Challenge (as defined in the Interim Order) is not resolved.

Section 9.02    Remedies upon Event of Default.  During the continuance of an Event of Default:

(a)    (other than an event described in Section 9.01(i)(iii) above), subject to the DIP Orders, the Administrative Agent may (with the consent of the Required Lenders), and shall (at the request of the Required Lenders), by notice to the Borrower, take any or all of the following actions, at the same or different times, (i) terminate forthwith the Commitments and (ii) declare the Loans then outstanding to be forthwith due and payable in whole or in part, whereupon the

principal of the Loans so declared to be due and payable, together with accrued interest thereon and any unpaid accrued fees and all other Obligations of the Loan Parties accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Loan Parties, anything contained herein or in any other Loan Document to the contrary notwithstanding; and in any event described in Section 9.01(i)(iii) above, the Commitments shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon and any unpaid accrued fees and all other Obligations of the Loan Parties accrued hereunder and under any other Loan Document, shall automatically become due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Loan Parties, anything contained herein or in any other Loan Document to the contrary notwithstanding; and

(b)    after the Administrative Agent or the Required Lenders have given at least five (5) days' prior written notice (the "Notice Period") to the Loan Parties (during which period the Event of Default is not cured) as set forth below, the Required Lenders may direct the Administrative Agent, who shall be permitted without seeking relief from the automatic stay, to foreclose on all or any portion of the Collateral, collect accounts receivable and apply the proceeds thereof to the Obligations or otherwise exercise remedies against the Collateral as permitted by applicable Laws.  During the Notice Period, the Loan Parties shall be entitled to (i) contest the occurrence and/or continuance of any Event of Default and (ii) seek and obtain an emergency hearing before the Bankruptcy Court, with proper notice to the Administrative Agent, solely for the purpose of contesting whether an Event of Default has occurred and/or is continuing. In addition to the other remedies set forth in this Section 9.02, the Administrative Agent, at the direction of the Required Lenders, shall have the authority to credit bid all or a portion of the Obligations, whether pursuant to a sale under section 363 of the Bankruptcy Code, a plan pursuant to section 1129(b) of the Bankruptcy Code or otherwise; provided, that that such credit bid provides for the assumption of or payment in full in cash of the Pre-Petition First Lien Obligations.

Section 9.03    Application of Funds.  After the exercise of remedies provided for in Section 9.02 (or after the Loans have automatically become immediately due and payable), any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order, subject to the Carve-Out:

First, to the payment of interest, expense reimbursement and other obligations owed to the Pre-Petition First Lien Agent and the Pre-Petition First Lien Lenders in accordance with the DIP Orders;

Second, to the payment of the remaining Pre-Petition First Lien Obligations in accordance with the terms of the Pre-Petition First Lien Credit Agreement;

Third,  to the payment of all costs and expenses incurred by the Administrative Agent (in its capacity as such hereunder or under any other Loan Document) in connection with any collection, sale, foreclosure or realization or otherwise in connection with this Agreement, any other Loan Document or any of the Obligations, including all court costs and the fees and expenses of its agents and legal counsel, the repayment of all advances made by the Administrative Agent hereunder or under any other Loan Document on behalf of

any Loan Party, any other costs or expenses incurred in connection with the exercise of any right or remedy hereunder or under any other Loan Document, any amounts for which the Administrative Agent is entitled to indemnification, fees, or reimbursement of costs or expenses under the terms of any Loan Document, and any other Obligations owed to the Administrative Agent, in their respective capacities as such hereunder or under any other Loan Document;

Fourth, to the payment in full of all Obligations consisting of interest (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) on the Loans, (the amounts so applied to be distributed among the Lenders pro rata in accordance with the amounts of the Loans owed to them on the date of any such distribution);

Fifth, to the payment in full of all Obligations (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) consisting of unpaid principal amount of the Loans and any premium thereon or breakage or termination fees, costs or expenses related thereto (the amounts so applied to be distributed among the Lenders pro rata in accordance with the amounts of the Obligations owed to them on the date of any such distribution);

Sixth, to the payment in full of all other Obligations (the amounts so applied to be distributed among the Secured Parties pro rata in accordance with the amounts of the Obligations owed to them on the date of any such distribution);

Seventh, to the payment of any remaining obligations owed to the Pre-Petition Indenture Trustees and the Pre-Petition Indenture Noteholders under the Pre-Petition Indentures; and

Eighth, to the Borrower, its successors or assigns, or as a court of competent jurisdiction may otherwise direct.

The Administrative Agent shall have absolute discretion as to the time of application of any such proceeds, moneys, balances or amounts in accordance with this Agreement and the other Loan Documents.  Upon any sale of Collateral by the Administrative Agent (including pursuant to a power of sale granted by statute or under a judicial proceeding), the receipt of the Administrative Agent or of the officer making the sale shall be a sufficient discharge to the purchaser or purchasers of the Collateral so sold and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to the Administrative Agent or such officer or be answerable in any way for the misapplication thereof.

ARTICLE X.
ADMINISTRATIVE AGENT

Section 10.01  Appointment and Authority.

(a)      Each of the Lenders hereby irrevocably appoints Cortland Capital Market Services LLC to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  The provisions of this Article are solely for the benefit of the Administrative Agent, the Lenders, and neither the Borrower nor any other Loan Party shall have rights as a third party beneficiary of any of such provisions.

(b)      The Administrative Agent shall also act as the "collateral agent" under the Loan Documents, and each of the Lenders hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto.  In this connection, the Administrative Agent, as "collateral agent" and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to Section 10.05 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent), shall be entitled to the benefits of all provisions of this Article X and Article XI (including Section 11.04(c), as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto.

Section 10.02  Rights as a Lender.  The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

Section 10.03  Exculpatory Provisions.  The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, the Administrative Agent:

(a)      shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)      shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the

other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), <u>provided</u> that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable law; and

(c)     shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity.

The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in <u>Sections 11.01</u> and <u>9.02</u>) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final, non-appealable judgment.  The Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice describing such Default is given to the Administrative Agent by the Borrower or a Lender.

The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Collateral Documents, (v) the value or the sufficiency of any Collateral, or (v) the satisfaction of any condition set forth in <u>Article IV</u> or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

Section 10.04  <u>Reliance by Administrative Agent</u>.  The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan, that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan.  The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Section 10.05  <u>Delegation of Duties</u>.  The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent.  The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent. The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final, non-appealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

Section 10.06  <u>Resignation of Administrative Agent</u>.  The Administrative Agent may at any time give written notice of its resignation to the Lenders and the Borrower.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right, upon the consent of the Borrower, to appoint a successor, not to be unreasonably withheld (and not required during the continuance of an Event of Default) which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may on behalf of the Lenders, appoint a successor Administrative Agent meeting the qualifications set forth above; <u>provided</u> that if the Administrative Agent shall notify the Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (a) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders under any of the Loan Documents, the retiring Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (b) except for any indemnity payments owed to the retiring or resigning Administrative Agent, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Administrative Agent as provided for above in this <u>Section 10.06</u>.  Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent, and the retiring Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this <u>Section 10.06</u>).  The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the retiring Administrative Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article and <u>Section 11.04</u> shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent.

Section 10.07 <u>Non-Reliance on Administrative Agent and Other Lenders</u>.  Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

Section 10.08 <u>No Other Duties, Etc.</u>  Except as expressly set forth in this Agreement or any other Loan Document, the Administrative Agent shall not have any duties or responsibilities hereunder in its capacity as such.

Section 10.09 <u>Administrative Agent May File Proofs of Claim</u>.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise

(a)      to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under <u>Sections 2.07</u> and <u>11.04</u>) allowed in such judicial proceeding; and

(b)      to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, if the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under <u>Sections 2.07</u> and <u>11.04</u>.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender to authorize the Administrative Agent to vote in respect of the claim of any Lender or in any such proceeding.

Section 10.10 <u>Collateral and Guaranty Matters</u>. Each of the Lenders irrevocably authorize the Administrative Agent, at its option and in its discretion,

(a)    to release any Lien on any property granted to or held by the Administrative Agent under any Loan Document (i) upon termination of the Aggregate Commitments and payment in full in cash of all Obligations (other than contingent indemnification obligations for which no claim has been made), (ii) that is sold or to be sold as part of or in connection with any sale permitted hereunder or under any other Loan Document to a Person that is not a Loan Party, or (iii) if approved, authorized or ratified in writing in accordance with <u>Section 11.01</u>;

(b)    to release any Guarantor from its obligations under the Guaranty if such Person ceases to be a Subsidiary as a result of a transaction permitted hereunder; and

(c)    to subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted by <u>Section 8.01</u>.

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty pursuant to this <u>Section 10.10</u>. In each case as specified in this <u>Section 10.10</u>, the Administrative Agent will, at the Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Collateral Documents or to subordinate its interest in such item, or to release such Guarantor from its obligations under the Guaranty, in each case in accordance with the terms of the Loan Documents and this <u>Section 10.10</u>.

Section 10.11 <u>Withholding Tax.</u>  To the extent required by any applicable Laws, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax. Without limiting or expanding the provisions of <u>Section 3.01</u>, each Lender shall, and does hereby severally, indemnify the Administrative Agent against, and shall make payable in respect thereof within 10 days after demand therefor, (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so) and (ii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Administrative Agent under this <u>Section 10.11</u>. The agreements in this <u>Section 10.11</u> shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender and the repayment, satisfaction or discharge of all other Obligations.

ARTICLE XI.
MISCELLANEOUS

Section 11.01  <u>Amendments, Etc.</u>  No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Borrower or any other Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders and the Borrower or the applicable Loan Party, as the case may be, and acknowledged by the Administrative Agent, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; <u>provided</u>, <u>however</u>, that no such amendment, waiver or consent shall:

(a)    waive any condition set forth in <u>Section 4.01</u> without the written consent of each Lender;

(b)    without limiting the generality of clause (a) above, waive any condition set forth in <u>Section 4.03</u> as to any Credit Extension or Notice of Request for Disbursement without the written consent of each Unanimous DIP Lender;

(c)    increase the Commitment of any Lender (or reinstate any Commitment terminated pursuant to <u>Section 9.02</u>) without the written consent of each affected Lender and the Unanimous DIP Lenders;

(d)    postpone any date fixed by this Agreement or any other Loan Document for any payment of principal, interest, fees or other amounts due to the Lenders (or any of them) hereunder or under such other Loan Documents or extend the DIP Maturity Date beyond December 14, 2016, in each case without the written consent of the Unanimous DIP Lenders;

(e)    reduce the principal of, or the rate of interest specified herein on, any Loan or any fees or other amounts payable hereunder or under any other Loan Document, or change the manner of computation of such rate of interest or fee that would result in a reduction of any interest rate on any Loan or any fee payable hereunder without the written consent of each affected Lender entitled to such amount and the Unanimous DIP Lenders; <u>provided</u>, <u>however</u>, that only the consent of the Required Lenders and the Unanimous DIP Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Borrower to pay interest at the Default Rate;

(f)    change (i) <u>Section 2.11</u> or <u>Section 9.03</u> in a manner that would alter the pro rata sharing of payments required thereby without the written consent of each Lender or (ii) the order of application of any reduction in the Commitments or any prepayment of Loans from the application thereof set forth in the applicable provisions of <u>Section 2.04(b)</u> without the consent of each affected Lender or (iii) any provision of <u>Section 7.18</u> in a manner that would alter the Lien priority of the Facility without the written consent of the Unanimous DIP Lenders;

(g)    change any provision of this <u>Section 11.01</u> or the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder without the written consent of each Lender, other than any such change that

would only affect the Unanimous DIP Lenders in which case the written consent of the Unanimous DIP Lenders shall be required to make such change;

(h)    change the definition of "Unanimous DIP Lenders" without the written consent of each Unanimous DIP Lender;

(i)    release all or substantially all of the Collateral in any transaction or series of related transactions, without the written consent of each Lender;

(j)    release all or substantially all of the value of the Guaranty, without the written consent of each Lender, except to the extent the release of any Subsidiary from the Guaranty is permitted pursuant to Section 9.10 (in which case such release may be made by the Administrative Agent acting alone);

(k)    impose any greater restriction on the ability of any Lender under the Facility to assign any of its rights or obligations hereunder without the written consent of each affected Lender;

(l)    subordinate the Obligations or the Liens securing the Obligations without the written consent of the Unanimous DIP Lenders;

(m)    alter the adequate protection provided under the Facility without the written consent of the Unanimous DIP Lenders;

(n)    subject to clause (d) of this Section 11.01, alter any Event of Default in a manner adverse to the Lenders without the written consent of the Unanimous DIP Lenders; or

(o)    change the terms of the Facility in a manner that would materially adversely affect any of the rights or obligations of any Unanimous DIP Lender in a manner that is different or disproportionate in any respect from the effect on the rights or obligations (as applicable) of the Unanimous DIP Lenders generally, other than in proportion to the Unanimous DIP Lenders' respective amounts of the Loans, without the written consent of the Unanimous DIP Lenders;

provided, further, that no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, affect the rights or duties of the Administrative Agent under this Agreement or any other Loan Document.

Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder, except that the Commitment of such Lender may not be increased or extended without the consent of such Lender.

If any Lender does not consent to a proposed amendment, waiver, consent or release with respect to any Loan Document that requires the consent of each Lender or each adversely affected Lender and that has been approved by the Required Lenders or the majority of the Lenders whose consent is required therefor, the Borrower may replace such non-consenting Lender in accordance with Section 11.13; provided that such amendment, waiver, consent or release can be

effected as a result of the assignment contemplated by such Section (together with all other such assignments required by the Borrower to be made pursuant to this paragraph).

Section 11.02  Notices; Effectiveness; Electronic Communications.

(a)     Notices Generally.   Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier or electronic mail as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)     if to Holdings, the Borrower, or the other Loan Parties, to the address, telecopier number, electronic mail address or telephone number specified for such Person on Schedule 11.02;

(ii)     if to the Administrative Agent, to the address, telecopier number, electronic mail address or telephone number specified for such Person on Schedule 11.02; and

(iii)     if to any Lender, to the address, telecopier number, electronic mail address or telephone number specified on Schedule 11.02 or in the Assignment and Acceptance pursuant to which such Lender shall have become a party hereto or in its Administrative Questionnaire.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient).   Notices and other communications delivered through electronic communications to the extent provided in subsection (b) below shall be effective as provided in such subsection (b).

(b)     Electronic Communications.   Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, provided that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender, as applicable, has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.   The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice

or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)     The Platform.  THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE."  THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.  In no event shall the Administrative Agent or any of its Related Parties (collectively, the "Agent Parties") have any liability to Holdings, the Borrower, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's or the Administrative Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party; provided, however, that in no event shall any Agent Party have any liability to Holdings, the Borrower, any Lender, or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(d)     Change of Address, Etc.  Each of the Loan Parties and the Administrative Agent may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto.  Each Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the Borrower and the Administrative Agent.  In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.  Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States Federal and state securities Laws, to make reference to Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Borrower or its securities for purposes of United States Federal or state securities laws.

(e)     Reliance by Administrative Agent and Lenders.  The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices (including telephonic Committed Loan Notices) purportedly given by or on behalf of the Borrower even if (i) such notices were

not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Loan Parties shall indemnify the Administrative Agent, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of a Loan Party. All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

Section 11.03 <u>No Waiver; Cumulative Remedies; Enforcement</u>. No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with <u>Section 9.02</u> for the benefit of all the Lenders; <u>provided, however</u>, that the foregoing shall not prohibit (a) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent) hereunder and under the other Loan Documents, (b) any Lender from exercising setoff rights in accordance with <u>Section 11.08</u> (subject to the terms of <u>Section 2.11</u>), or (c) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law; and <u>provided, further</u>, that if at any time there is no Person acting as Administrative Agent hereunder and under the other Loan Documents, then (i) the Required Lenders shall have the rights otherwise ascribed to the Administrative Agent pursuant to <u>Section 9.02</u> and (ii) in addition to the matters set forth in clauses (b) and (c) of the preceding proviso and subject to <u>Section 2.11</u>, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

Section 11.04 <u>Expenses; Indemnity; Damage Waiver</u>.

(a) <u>Costs and Expenses</u>. The Loan Parties shall, subject to the terms of the DIP Orders, pay (i) all reasonable and documented out-of-pocket costs and expenses incurred by the Administrative Agent (including the reasonable fees, charges and disbursements of counsel for the Administrative Agent) and the Required Lenders and the Unanimous DIP Lenders (including the reasonable fees, charges and disbursements of counsel for the Required Lenders and the Unanimous DIP Lenders (including King & Spalding LLP, Debevoise & Plimpton LLP, Dechert LLP and Delaware Counsel for each)), in connection with the syndication of the credit facilities provided for herein, the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the

provisions hereof or thereof (whether or not the transactions contemplated thereby shall be consummated), (ii) all reasonable and documented out-of-pocket costs and expenses incurred by the Administrative Agent (including reasonable fees, charges and disbursements of counsel for the Administrative Agent) and any Required Lender and any Unanimous DIP Lender (including the fees, charges and disbursements of only one lead law firm, one local-counsel firm and any necessary specialists, one accounting firm, one financial advisory firm and one consultant retained for or on behalf of the Administrative Agent and the Lenders) in connection with the enforcement of its rights and interests under this Agreement and the other Loan Documents, including in connection with any workout, restructuring or waiver or similar matters in respect of such Obligations and Loan Documents and (iii) all reasonable and documented out-of-pocket costs and expenses incurred by the Administrative Agent (including reasonable fees, charges and disbursements of counsel for the Administrative Agent) and any Required Lender and any Unanimous DIP Lender (including the fees, charges and disbursements of only one lead law firm, one local-counsel firm and any necessary specialists, one accounting firm, one financial advisory firm and one consultant retained for or on behalf of the Administrative Agent and the Lenders).

(b)     <u>Indemnification by the Borrower</u>.  The Loan Parties shall indemnify the Administrative Agent (and any sub-agent thereof), each Lender, and each Related Party and Approved Fund of any of the foregoing Persons (each such Person being called an "<u>Indemnitee</u>") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities, obligations, settlement payments, actions, or causes of action and related costs and expenses (including the reasonable, documented and invoiced fees, charges and disbursements of one counsel for the Indemnitees taken as a whole and, if necessary, one firm of local counsel in each appropriate jurisdiction to the Indemnitees taken as a whole, and, in the case of a conflict of interest, one additional counsel to the affected Indemnitee taken as a whole; <u>provided</u>, that the foregoing shall not apply to the Administrative Agent and the Lenders, who shall each be entitled to select their respective counsel, and the Loan Parties agree to pay promptly the reasonable fees and expenses of such counsel), and shall indemnify and hold harmless each Indemnitee from all reasonable, documented and invoiced fees and time charges and disbursements for attorneys who may be employees of any Indemnitee, incurred by any Indemnitee or asserted against any Indemnitee by any third party or by the Borrower or any other Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, or, in the case of the Administrative Agent (and any sub-agent thereof) and its Related Parties only, the administration of this Agreement and the other Loan Documents, (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or Release of Hazardous Materials on or from any property owned or operated by the Borrower or any of its Subsidiaries, or any Environmental Liability related in any way to the Borrower or any of its Subsidiaries, (iv) the Cases or (v) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower or any other Loan Party or any of the Borrower's or such Loan Party's directors, shareholders or creditors, and regardless of whether any Indemnitee is a party thereto; <u>provided</u> that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (1) (x) are determined by a court of competent jurisdiction by final and nonap-

pealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or any of its officers or directors or (y) result from a claim brought by the Borrower or any other Loan Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if the Borrower or such Loan Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction or (2) relate to any proceeding solely between or among Indemnitees other than (A) claims against the Administrative Agent, Lenders or their Affiliates, in each case in their capacity or in fulfilling their role as the agent or arranger or any other similar role under the Loan Documents (including their role as a Lender), and (B) claims arising out of any act or omission on the part of the Equity Investors (in their capacities as holders of Equity Interests in Roadhouse Holding), the Borrower or their respective Subsidiaries.

(c)    _Reimbursement by Lenders_.  To the extent that the Borrower for any reason fails to indefeasibly pay any amount required under subsection (a) or (b) of this Section 11.04 to be paid by it to the Administrative Agent (or any sub-agent thereof), or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent), or such Related Party, as the case may be, such Lender's Pro Rata Share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, _provided_ that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent) in its capacity as such, or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent) in connection with such capacity.  The obligations of the Lenders under this subsection (c) are subject to the provisions of Section 2.10(d).

(d)    _Waiver of Consequential Damages, Etc_.  To the fullest extent permitted by applicable law, no Loan Party shall assert, and each Loan Party hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.  No Indemnitee referred to in subsection (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnitee as determined by a final and nonappealable judgment of a court of competent jurisdiction.

(e)    _Payments_.  All amounts due under this Section 11.04 shall be payable not later than ten Business Days after presentation of a reasonably detailed invoice therefor.

(f)    _Survival_.  The agreements in this Section 11.04 shall survive the resignation of the Administrative Agent, the replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations.

Section 11.05  <u>Payments Set Aside</u>.  To the extent that any payment by or on behalf of any Loan Party is made to the Administrative Agent or any Lender, or the Administrative Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent, <u>plus</u> interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect.  The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

Section 11.06  <u>Successors and Assigns</u>.

(a)    <u>Successors and Assigns Generally</u>.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that neither the Borrower nor any other Loan Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of <u>Section 11.06(b)</u> or (ii) by way of pledge or assignment of a security interest subject to the restrictions of <u>Section 11.06(d)</u> (and any other attempted assignment or transfer by any party hereto shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    <u>Assignments by Lenders</u>.  Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment(s) and the Loans at the time owing to it); <u>provided</u> that any such assignment shall be subject to the following conditions:

(i)    <u>Minimum Amounts</u>.

(A)    in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment under the Facility and the Loans at the time owing to it under the Facility or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)    in any case not described in subsection (b)(i)(A) of this <u>Section 11.06</u>, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the Commitment is not then in effect, the principal out-

standing balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent, shall not be less than $[1,000,000]; provided, however, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met;

(ii)    Proportionate Amounts.  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Commitment assigned, except that this clause (ii) shall not prohibit any Lender from assigning all or a portion of its rights and obligations among separate Facilities on a non-pro rata basis;

(iii)    Required Consents.  No consent shall be required for any assignment except to the extent required by subsection (b)(i)(B) of this Section 11.06 and, in addition:

(A)    the consent of the Borrower (such consent not to be unreasonably withheld, conditioned or delayed) shall be required unless (1) an Event of Default has occurred and is continuing at the time of such assignment or (2) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund; provided that the Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within ten (10) Business Days after having received notice thereof;

(B)    the consent of the Administrative Agent (such consent not to be unreasonably withheld, conditioned or delayed) shall be required for assignments in respect of (1) any Commitment (other than Commitments assigned to an Affiliate or an Approved Fund of such Lender) to a Person that is not a Lender with a Commitment in respect of the Facility, an Affiliate of any such Lender or an Approved Fund with respect to any such Lender or (2) any Loan to a Person that is not a Lender, an Affiliate of a Lender or an Approved Fund;

(iv)    Assignment and Assumption.  The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee in the amount of $[3,500]; provided, however, that (A) such processing and recordation fee shall not be payable in connection with any assignment by a Lender that was a Lender on the Closing Date or an Affiliate of any such Lender or a GSO Entity, Carl Marks Entity or Marblegate Entity and (B) the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment.  The assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire, including but not limited to all documentation and other information with respect to the assignee that is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act.

(v)   No Assignment to Borrower.  No such assignment shall be made to any Loan Party or Subsidiary thereof.

(vi)   No Assignment to Natural Persons.  No such assignment shall be made to a natural person.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to subsection (c) of this Section 11.06, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and to, the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05 and 11.04 with respect to facts and circumstances occurring prior to the effective date of such assignment.  Upon request, the Borrower (at its expense) shall execute and deliver a Note to the assignee Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be null and void.

(c)   Register.  The Administrative Agent, acting solely for this purpose as an agent of the Borrower, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower and any Lender (solely to the extent of the provisions related to such Lender), at any reasonable time and from time to time upon reasonable prior notice.

(d)   Certain Pledges.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under any Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, the European Central Bank or any other central bank or similar monetary authority in the organizational jurisdiction of such Lender; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

Section 11.07 Treatment of Certain Information; Confidentiality.  Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective Related Parties (if such person is (i) a GSO Entity, then it may make disclosures to any other GSO Entity and its Related Parties or its Approved Funds, (ii) a Carl Marks Entity, then it may make disclosures to any other Carl Marks Entity and its Related Parties or its Approved Funds and (iii) a Marblegate Entity, then it may make disclosures to any other Mar-

blegate Entity and its Related Parties or its Approved Funds) (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential, and it being further understood that the disclosing party shall be liable for any breaches of such confidentiality obligations by such disclosing party's current and prospective investors and funding sources to whom such disclosing party discloses Information), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it or any of its Affiliates (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this <u>Section 11.07</u>, to (i) any assignee or any prospective assignee of any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower and its obligations, (g) with the consent of the Borrower or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this <u>Section 11.07</u> or (ii) becomes available to the Administrative Agent and any Lender, or any of their respective Affiliates on a nonconfidential basis from a source other than the Borrower.

For purposes of this <u>Section 11.07</u>, "<u>Information</u>" means all information received from any Loan Party or any Subsidiary thereof relating to any Loan Party or any Subsidiary thereof or their respective businesses, other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by any Loan Party or any Subsidiary thereof, <u>provided</u> that, in the case of information received from a Loan Party or any such Subsidiary after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this <u>Section 11.07</u> shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Administrative Agent and the Lenders acknowledges that (a) the Information may include material non-public information concerning the Borrower or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Law, including United States Federal and state securities Laws.

Section 11.08  <u>Right of Setoff</u>.  If an Event of Default shall have occurred and be continuing each Lender and each of their respective Affiliates and Approved Funds is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of the Borrower or any other Loan Party against any and all of the obligations of the Borrower or such Loan Party now or hereafter existing under this Agreement or any other Loan Document to such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or any

other Loan Document and although such obligations of the Borrower or such Loan Party may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness.  The rights of each Lender and their respective Affiliates under this <u>Section 11.08</u> are in addition to other rights and remedies (including other rights of setoff) that such Lender or their respective Affiliates may have.  Each Lender agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application, <u>provided</u> that the failure to give such notice shall not affect the validity of such setoff and application.

Section 11.09  <u>Interest Rate Limitation</u>.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "<u>Maximum Rate</u>").  If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower.  In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

Section 11.10  <u>Counterparts; Integration; Effectiveness</u>.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in <u>Section 4.01</u>, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy or other electronic imaging means shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 11.11  <u>Survival of Representations and Warranties</u>.  All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by the Administrative Agent and each Lender, regardless of any investigation made by the Administrative Agent or any Lender or on their behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

Section 11.12  <u>Severability</u>.  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected

or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 11.13  Replacement of Lenders.  If any Lender requests compensation under Section 3.04, or if the Borrower is required to pay any Indemnified Taxes or is required to pay any additional amount with respect to Indemnified Taxes to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, if any Lender is a Defaulting Lender or if any other circumstance exists hereunder that gives the Borrower the right to replace a Lender as a party hereto, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 11.06), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), provided that:

(a)     the Borrower shall have paid to the Administrative Agent the assignment fee specified in Section 11.06(b);

(b)     such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 3.05) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

(c)     in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments thereafter; and

(d)     such assignment does not conflict with applicable Laws.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

Section 11.14  Governing Law; Jurisdiction; Etc.

(a)     GOVERNING LAW.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK AND THE BANKRUPTCY CODE.

(b)     SUBMISSION TO JURISDICTION.  THE BORROWER AND EACH OTHER LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT, OR IF THE BANKRUPTCY COURT DOES NOT HAVE OR DOES NOT EXER-

CISE JURISDICTION, THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH COURTS OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE ADMINISTRATIVE AGENT OR ANY LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST THE BORROWER OR ANY OTHER LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)    WAIVER OF VENUE.  THE BORROWER AND EACH OTHER LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURTS REFERRED TO IN PARAGRAPH (B) OF THIS SECTION 11.14.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURTS.

(d)    SERVICE OF PROCESS.  EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 11.02.  NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW

Section 11.15  Waiver of Jury Trial.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT

AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 11.15</u>.

Section 11.16   <u>No Advisory or Fiduciary Responsibility</u>.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each Loan Party acknowledges and agrees, and acknowledges its Affiliates' understanding, that:  (i) (A) the arranging and other services regarding this Agreement provided by the Administrative Agent are arm's-length commercial transactions between the Borrower, Holdings and their respective Affiliates, on the one hand, and the Administrative Agent, on the other hand, (B) each Loan Party has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) each Loan Party is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) the Administrative Agent and each Lender is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for any Loan Party or any of its Affiliates, or any other Person and (B) none of the Administrative Agent or the Lenders has any obligation to the Loan Parties or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Administrative Agent and the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Loan Parties and their respective Affiliates, and none of the Administrative Agent or the Lenders has any obligation to disclose any of such interests to the Loan Parties or any of their respective Affiliates.  To the fullest extent permitted by law, each of the Loan Parties hereby waives and releases any claims that it may have against the Administrative Agent the Lenders with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 11.17   <u>Electronic Execution of Assignments and Certain Other Documents</u>.  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption or in any amendment or other modification hereof (including waivers and consents) shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 11.18   <u>USA PATRIOT Act</u>.  Each Lender that is subject to the Act (as hereinafter defined) and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "<u>Act</u>"), it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify each Loan Party in accordance with the Act.  The Borrower

shall, promptly following a request by the Administrative Agent or any Lender, provide all documentation and other information that the Administrative Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" an anti-money laundering rules and regulations, including the Act.

Section 11.19  <u>Conflicts</u>.  In the event of any conflict between the terms and conditions of the Loan Documents and of the DIP Orders, the provisions of the DIP Orders shall govern and control.

Section 11.20  Acknowledgement and Consent to Bail-In of EEA Financial Institutions. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers and agrees and consents to, and acknowledges and agrees to be bound by:

(a)      the application of any Write-Down and Conversion Powers to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)      the effects of any Bail-In Action on any such liability, including, if applicable:

(i)      a reduction in full or in part or cancellation of any such liability;

(ii)      a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)      the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers.

*IN WITNESS WHEREOF,* the parties hereto have caused this Agreement to be duly executed as of the date first above written.

LOGAN'S ROADHOUSE, INC.


By: _____
     Name:
     Title:

LRI HOLDINGS, INC.


By: _____
     Name:
     Title:

LOGAN'S ROADHOUSE OF KANSAS, INC.


By: _____
     Name:
     Title:

LOGAN'S ROADHOUSE OF TEXAS, INC.


By: _____
     Name:
     Title:

ROADHOUSE PARENT INC.


By: _____
     Name:
     Title:

ROADHOUSE MIDCO INC.


By: _____
     Name:
     Title:

**[SIGNATURE PAGE TO DEBTOR-IN-POSSESSION CREDIT AGREEMENT]**

ROADHOUSE INTERMEDIATE INC.

By: _____
     Name:
     Title:

ROADHOUSE HOLDING INC.


By: _____
     Name:
     Title:

**[SIGNATURE PAGE TO DEBTOR-IN-POSSESSION CREDIT AGREEMENT]**

CORTLAND CAPITAL MARKET SERVICES
LLC,
as Administrative Agent


By: _____
    Name:
    Title:

**[SIGNATURE PAGE TO DEBTOR-IN-POSSESSION CREDIT AGREEMENT]**

MARBLEGATE SPECIAL OPPORTUNITIES
MASTER FUND, L.P., as a Lender

**EXHIBIT E**

**EXIT FIRST LIEN FINANCING TERM SHEET**

Logan's Roadhouse, Inc.
$29 million
<u>First Lien Exit Revolving Facility</u>
<u>Summary of Terms and Conditions</u>

This summary of terms and conditions (the "<u>Term Sheet</u>") and all annexes hereto describes the principal terms and conditions for the Exit Revolving Facility (as defined below) contemplated to be entered into upon consummation of the Plan, subject to the terms and conditions herein and in the Restructuring Support Agreement, by and among Roadhouse Holding, Inc., Kelso Investment Associates VIII, L.P., KEP VI, LLC, the Supporting Noteholders (as defined therein), JPMorgan Chase Bank, N.A., the Supporting Lenders (as defined therein), and any Joining Party (as defined therein) from time to time party thereto (the "<u>Restructuring Support Agreement</u>") and the Plan. Capitalized terms used but not defined shall have the meanings set forth in the Restructuring Support Agreement.

## 1. PARTIES

| | |
|---|---|
| Borrower: | Logan's Roadhouse, Inc., a Tennessee corporation, as reorganized pursuant to the Plan (the "<u>Borrower</u>"). |
| Guarantors: | LRI Holdings, Inc., a Delaware corporation ("<u>Holdings</u>"), as reorganized pursuant to the Plan, and each of the Borrower's direct and indirect, existing and future, domestic subsidiaries (the "<u>Guarantors</u>", in each case, as reorganized pursuant to the Plan; together with the Borrower, the "<u>Loan Parties</u>"). |
| Lead Arrangers and Bookrunners: | JPMorgan Chase Bank, N.A. ("<u>JPMorgan</u>") and Credit Suisse Securities (USA) LLC ("<u>CS Securities</u>"; together with JPMorgan in such capacity, the "<u>Senior Lead Arrangers</u>"). |
| Administrative Agent: | JPMorgan (in such capacity, the "<u>Administrative Agent</u>"). |
| Lenders: | The lenders under the Existing Facility (as defined below) (the "<u>Lenders</u>").<br><br>"<u>Existing Facility</u>" means that certain Credit Agreement dated as of October 4, 2010, between LRI Holdings, Inc. (as successor by merger to Roadhouse Merger, Inc.), Logan's Roadhouse, Inc. (as successor by merger to Roadhouse Financing, Inc.), JPMorgan, as Administrative Agent, and the other agents and lenders party thereto from time to time, and all exhibits, amendments, and supplements thereto. |

## 2. TYPE AND AMOUNT OF EXIT REVOLVING FACILITY

| | |
|---|---|
| Type and Amount: | A thirty month first lien exit revolving facility (the "<u>Exit Revolving Facility</u>"; the commitments thereunder, the "<u>Revolving Commitments</u>") in the amount of $29,000,000 (the loans thereunder, the "<u>Revolving Loans</u>"). |
| Availability and | |

| | |
|---|---|
| Maturity: | The Exit Revolving Facility shall be available on a revolving basis during the period commencing on the Closing Date and ending on the date that is thirty months after the Closing Date (the "<u>Revolving Termination Date</u>"), provided that Revolving Loans shall not exceed $23,899,525 (plus an additional amount that shall include commitment fees and PIK interest, which shall be set forth in a separate tranche which, for the avoidance of doubt, may not be reborrowed) at any time outstanding. The Revolving Commitments and the Revolving Loans will mature on the Revolving Termination Date. |
| Letters of Credit: | A portion of the Exit Revolving Facility not in excess of $12,000,000 shall be available for the issuance of letters of credit (the "<u>Letters of Credit</u>") by the Administrative Agent or other Lenders reasonably satisfactory to the Borrower (in such capacity, the "<u>Issuing Lender</u>"). No Letter of Credit shall have an expiration date after the earlier of (a) one year after the date of issuance unless consented to by the Issuing Lender and (b) five business days prior to the Revolving Termination Date, <u>provided</u> that any Letter of Credit with a one-year tenor may provide for the renewal thereof for additional one-year periods (which shall in no event extend beyond the date referred to in clause (b) above). Letters of Credit issued under the Existing Facility and outstanding on the Closing Date will be rolled over into the Exit Revolving Facility and shall be deemed to have been issued under the Exit Revolving Facility. |
| | Drawings under any Letter of Credit shall be reimbursed by the Borrower (whether with its own funds or with the proceeds of Revolving Loans) within one business day. To the extent that the Borrower does not so reimburse the Issuing Lender, the Lenders under the Exit Revolving Facility shall be irrevocably and unconditionally obligated to fund participations in the reimbursement obligations on a pro rata basis. |
| Use of Proceeds: | The proceeds of the Revolving Loans shall be used to repay (or deemed to repay) the outstanding principal amount under the Existing Facility, as contemplated by the Plan, and to finance the working capital needs and general corporate purposes of the Borrower and its subsidiaries. |

## 3. CERTAIN PAYMENT PROVISIONS

| | |
|---|---|
| Fees and Interest Rates: | As set forth on Annex I. |
| Optional Prepayments and Commitment Reductions: | Revolving Loans may be prepaid and Revolving Commitments may be reduced, in whole or in part without premium or penalty, at the option of the Borrower, in multiples of $1,000,000, or a whole multiple of $500,000 in excess thereof, upon not less than three-business days' prior notice to the Administrative Agent, |

subject to reimbursement of the Lenders' redeployment costs in the case of a prepayment of Eurodollar Loans (as defined in Annex I) prior to the last day of the relevant interest period. Any reduction shall reduce permanently the Revolving Commitments then in effect.

Mandatory Commitment Reductions/Prepayments:

The Revolving Commitments shall be permanently reduced upon the receipt by the Borrower or any of its subsidiaries of the net cash proceeds of any asset sale (including any casualty or condemnation event) in an amount equal to 75% of the net cash proceeds from any such asset sale in excess of $2,000,000 in the aggregate since the effective date of the Plan. In addition, all of such net cash proceeds shall be used to prepay outstanding Revolving Loans and, to the extent that, after giving effect to the prepayment of all outstanding Revolving Loans, the outstanding extensions of credit under the Exit Revolving Facility exceed the Revolving Commitments (as so reduced), the Borrower shall cash collateralize any outstanding Letters of Credit in any amount equal to such excess.

The Revolving Loans shall be prepaid and the Letters of Credit shall be cash collateralized or replaced (i) to the extent, for any other reason, such extensions of credit exceed the Revolving Commitments and (ii) with any amounts in excess of the Maximum Liquidity Amount.

4.  COLLATERAL

Collateral:

Subject to exclusions and limitations substantially the same as those applicable to the Existing Facility, the obligations of the Borrower and each Guarantor in respect of the Exit Revolving Facility and any swap agreements and cash management arrangements provided by any Lender (or any affiliate of a Lender) (collectively, the "Exit Revolving Facility Obligations") shall be secured by a perfected first priority security interest in all of its tangible and intangible assets (collectively, the "Collateral") (including, without limitation, U.S. intellectual property, real property, material leasehold interests and all of the capital stock of the Borrower and each of its direct and indirect subsidiaries (limited, in the case of foreign subsidiaries, to 66-⅔% of the capital stock of first tier foreign subsidiaries)), except for those assets as to which the Administrative Agent shall determine in its sole discretion that the cost of obtaining a security interest therein are excessive in relation to the value of the security to be afforded thereby.

All the above-described pledges, security interests and mortgages shall be created on reasonably satisfactory terms, pursuant to documentation substantially the same as that applicable to the Existing Facility, and none of the Collateral

3

shall be subject to any other pledges, security interests or mortgages, other than liens to secure the obligations under the Exit Second Lien Facility including exceptions consistent with those applicable to the Existing Facility.

Intercreditor Arrangements: An intercreditor agreement (the "Second Lien Intercreditor Agreement") shall document the second lien status of the collateral package for the Exit Second Lien Facility which shall provide, among other things, that (i) the Lenders under the Exit Revolving Facility and any other holders of a first lien on the Collateral (the "Senior Lienholders") will have a standstill on the ability of Lenders under the Exit Second Lien Facility (the "Second Lienholders") to exercise lien-related remedies, (ii) the Second Lienholders will not dispute the validity of the Senior Lienholders' claims or the Exit Revolving Facility Obligations, (iii) the Second Lienholders will not object to a "debtor-in-possession" financing, (iv) the Second Lienholders will not object to the Senior Lienholders' adequate protection, (v) the Second Lienholders will not engage in any credit bidding with regard to the Exit Second Lien Facility unless the Exit Revolving Facility is paid in full and in cash with the proceeds of such credit bid, (vi) the Second Lienholders may not support any plan that is inconsistent with the terms of the Second Lien Intercreditor Agreement, (vii) the Second Lienholders may not make any proposal regarding "debtor-in-possession" financing without the prior consent of the Senior Lienholders, provided, further, that any such "debtor-in-possession" financing proposed by the Second Lienholders must be subordinated to the Senior Lienholders and (viii) certain other customary bankruptcy-related protections satisfactory to the Lenders.

5.  CERTAIN CONDITIONS

Initial Conditions: The availability of the Exit Revolving Facility and each extension of credit under the Exit Revolving Facility on the Closing Date (if any) will be subject to usual and customary conditions precedent for facilities and transactions of this type including, but not limited to, the following:

(a) Each party thereto shall have executed and delivered the Revolving Credit Documentation (as defined below) and the Second Lien Intercreditor Agreement on terms consistent with, and containing only such representations, warranties, covenants and events of default expressly set forth in, this Term Sheet, and otherwise reasonably satisfactory to both the Loan Parties and the Lenders, and the Lenders shall have received:

i.   customary closing certificates and legal opinions for similar financings; and

4

    ii.    a certificate from the chief financial officer of Holdings, in the form attached hereto as Annex II, certifying that Holdings and its subsidiaries, on a consolidated basis after giving effect to the transactions contemplated hereby, are solvent.

(b) A final non-appealable order of the Bankruptcy Court in form and substance satisfactory to the Administrative Agent confirming the Plan, which shall not have been stayed, reversed, vacated, amended, supplemented or otherwise modified in any manner that could reasonably be expected to adversely affect the interests of the Administrative Agent, the Arranger or the Lenders (the "Confirmation Order") and authorizing Loan Parties and their subsidiaries to execute, deliver and perform under all documents contemplated hereunder and thereunder shall have been entered and shall have become a final order of the Bankruptcy Court.  The Plan and all transactions contemplated therein or in the Confirmation Order to occur on the effective date of the Plan shall have been (or concurrently with the Closing Date, shall be) substantially consummated in accordance with the terms thereof and in compliance with applicable law and Bankruptcy Court and regulatory approvals.

(c) The Borrower shall have received debtor-in-possession financing under a debtor-in-possession financing agreement, in the form of the DIP Credit Agreement attached as Exhibit D to the RSA Term Sheet, consisting of the New Money Facility (as defined in the DIP Credit Agreement) not less than $25,000,000 and the Roll Up Facility (as defined in the DIP Credit Agreement), and the proceeds of the New Money Facility shall have been contributed to the Borrower following any such approval of the DIP Financing by the Bankruptcy Court in an amount not less than $25,000,000.  In addition, claims under the DIP Financing shall have been (or concurrently with the Closing Date, shall be) converted to claims under the Exit Second Lien Facility, as set forth in the Plan.

(d) The Administrative Agent shall have received evidence reasonably satisfactory to it that the Loan Parties shall have aggregate Liquidity (as defined below) as of the Closing Date in an amount not less than $5,000,000 and there shall be no debt of the Borrower or any its Subsidiaries outstanding as of the Closing Date other than the Exit Revolving Facility, the Exit Second Lien Facility and as otherwise contemplated by the Plan, in each case, as certified to in writing by an authorized officer of each Loan Party and evidenced in a form and

509265-1544-15068-Active.20036354.11

substance reasonably satisfactory to the Administrative Agent.

(e)  The Restructuring Support Agreement shall be in full force and effect and no termination event shall have occurred thereunder.

(f)  The Lenders shall have received (a) audited consolidated balance sheets and related statements of income, stockholders' equity and cash flows of Holdings and its subsidiaries, for fiscal years ended 2013, 2014 and 2015 and (b) unaudited consolidated balance sheets and related statements of income, stockholders' equity and cash flows of Holdings and its subsidiaries, for each subsequent fiscal quarter ended at least 45 days before the Closing Date.

(g)  The Lenders shall have received a pro forma consolidated balance sheet and related pro forma consolidated statements of income, stockholders' equity and cash flows of the Loan Parties as of and for the twelve-month period ending on the Closing Date, prepared after giving effect to the consummation of the Plan and any other transactions contemplated thereby as if and other transactions had occurred as of such date (in the case of such balance sheet) or at the beginning of such period (in the case of such statements of income and cash flows).

(h)  The Administrative Agent shall have received, at least 5 days prior to the Closing Date, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act.

(i)  All fees and invoiced expenses due to the Senior Lead Arrangers and the Lenders shall have been paid.

(j)  All documents, certificates and instruments necessary to establish that the Administrative Agent under the Exit Revolving Facility will have a perfected first priority security interest (subject to liens permitted under the Revolving Credit Documentation) in the Collateral shall have been executed and delivered.

(k)  A Chief Restructuring Officer acceptable to the Lenders shall have been appointed.

(l)  All governmental and third party approvals necessary in connection with the consummation of the Plan, including

6

the Exit Revolving Facility and the continuing operations of the Loan Parties (including shareholder approvals, if any) shall have been obtained on satisfactory terms and shall be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose adverse conditions on the consummation of the Plan, including the entry into the Exit Revolving Facility.

(m) The absence of any action, suit, investigation or proceeding pending or threatened in any court or before any arbitrator or governmental authority that purports to materially and adversely affect the consummation of the Plan and any other transaction contemplated hereby, or that could have a material adverse effect on Loan Parties, taken as a whole, the consummation of the Plan and any other transaction contemplated hereby or on the ability of any Loan Party to perform its obligations under the Loan Documents.

(n) The Closing date shall have occurred on or prior to November 14, 2016.

On-Going Conditions:

After the Closing Date the making of each Revolving Loan or the issuance of a Letter of Credit shall be conditioned upon (a) the accuracy in all material respects (and in all respects if qualified by materiality) of all representations and warranties in the definitive documentation for the Exit Revolving Facility and (b) there being no default or event of default in existence at the time of, or after giving effect to the making of, such extension of credit (including, without limitation, under the financial covenants set forth below).

## 6. DOCUMENTATION

Revolving Credit Documentation:

The definitive documentation for the Exit Revolving Facility (the "Revolving Credit Documentation") shall contain those terms and conditions set forth herein and otherwise customary for facilities and transactions of this type as may be mutually agreed by the Senior Lead Arrangers and the Borrower.

Financial Covenants:

Limited to:

(a)     A minimum EBITDA measured on a trailing twelve month basis at the end of each fiscal month, at levels to be agreed and based on (i) for the period beginning on the Closing Date and ending on March 31, 2017, a 50% variance in EBITDA below the EBITDA levels set forth

in the Plan, (ii) for the period beginning on April 1, 2017 and ending on June 30, 2017, a 40% variance in EBITDA below the EBITDA levels set forth in the Plan, (iii) for the period beginning on September 1, 2017 and ending on December 31, 2017, a 30% variance in EBITDA below the EBITDA levels set forth in the Plan and (iv) thereafter, a 25% variance in EBITDA below the EBITDA levels set forth in the Plan. For the avoidance of doubt, this covenant shall be based on a consolidated EBITDA definition (which shall include certain adjustments) to be mutually agreed upon by the Loan Parties and the Lenders pursuant to definitive documentation.

(b) Maximum capital expenditures, measured on a trailing 12-month basis at the end of each fiscal month, at levels to be agreed and with a 15% variance in capital expenditures above the capital expenditure levels set forth in the Plan.

(c) Maximum liquidity (which shall include the undrawn available Revolving Commitments), measured on a trailing monthly basis at the end of each fiscal month (beginning with January 2018), shall be equal to or less than $23,000,000 (the "Maximum Liquidity Amount").

(d) Liquidity shall equal or be greater than, at the end of each fiscal month (i) for the period beginning on the Closing Date and ending on March 31, 2017, $5,000,000, (ii) for the period beginning on April 1, 2017 and ending on December 31, 2017, $6,000,000 and (iii) thereafter, $7,500,000.

**Representations and Warranties:** Customary for facilities and transactions of this type, and limited to the following:  Financial condition (including pro forma financial statements); no material adverse change; corporate existence; compliance with law; corporate power and authority; enforceability of Revolving Credit Documentation; no conflict with law or contractual obligations; no material litigation; no default; ownership of property; liens; possession under leases; insurance; location of real property and leased premises; intellectual property; taxes; Federal Reserve regulations; labor matters; ERISA; Investment Company Act; subsidiaries; use of proceeds; environmental matters; accuracy of disclosure; creation and perfection of security interests; solvency; and status of Exit Revolving Facility as senior debt.

**Affirmative Covenants:** Customary for facilities and transactions of this type, and limited to the following:  Delivery of financial statements, reports, accountants' letters, projections, officers' certificates and other information requested by the Lenders or provided to the Second

8

Lienholders (including, without limitation, weekly flash performance reports); payment of taxes and other obligations; continuation of business and maintenance of existence and material rights and privileges; compliance with laws and material contractual obligations; maintenance of property and insurance; maintenance of books and records; right of the Lenders to inspect property and books and records (including, without limitation, the availability of the Loan Parties for update calls at the Lenders' request); notices of defaults, litigation and other material events; compliance with environmental laws; ERISA; further assurances (including, without limitation, with respect to security interests in after-acquired property); use of commercially reasonable efforts to maintain public corporate family/corporate credit ratings; sanctions and anti-corruption laws; and maintenance of a Chief Restructuring Officer acceptable to the Lenders.

|                    |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                             |
|--------------------|-------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| Negative Covenants: | Customary for facilities and transactions of this type, and limited to the following:  Limitations on: indebtedness (including guarantee obligations); liens; mergers, consolidations, liquidations, dissolutions and other fundamental changes; changes in nature of business; sales of assets; dividends and other payments in respect of capital stock; capital expenditures; acquisitions, investments, loans and advances; payments and modifications of the obligations under the Exit Second Lien Facility, subordinated debt and other material debt instruments; transactions with affiliates; sale-leasebacks; changes in fiscal year; hedging arrangements; negative pledge clauses and clauses restricting subsidiary distributions; use of proceeds not violating sanctions and anti-corruption laws; and changes in lines of business. |
| Events of Default: | Customary for facilities and transactions of this type, and limited to the following:  Nonpayment of principal when due; nonpayment of interest, fees or other amounts after a grace period to be agreed upon; material inaccuracy of a representation or warranty when made; violation of a covenant (subject, in the case of certain affirmative covenants, to a grace period to be agreed upon); cross-default to material indebtedness; bankruptcy events; certain ERISA events; material judgments; actual or asserted invalidity of any guarantee, security document or subordination provisions or non-perfection of security interest; changes in the passive holding company status of Holdings; and a change of control. |
| Voting: | Amendments and waivers with respect to the Exit Revolving Facility Documentation shall require the approval of Lenders holding more than 50% of the aggregate amount of the Revolving Commitments (the "<u>Required Lenders</u>"), except that (a) the consent of each Lender directly affected thereby shall be required with respect to (i) reductions in the amount or |

9

extensions of the final maturity of any Revolving Loan, (ii) reductions in the rate of interest or any fee or extensions of any due date thereof and (iii) increases in the amount or extensions of the expiry date of any Lender's Revolving Commitment and (b) the consent of 100% of the Lenders shall be required with respect to (i) reductions of any of the voting percentages, (ii) releases of all or substantially all the collateral and (iii) releases of all or substantially all of the Guarantors. The Exit Revolving Facility Documentation shall contain customary provisions for replacing non-consenting Lenders in connection with amendments and waivers requiring the consent of all Lenders or of all Lenders directly affected thereby so long as the Required Lenders shall have consented thereto.

The Exit Revolving Facility Documentation shall contain customary provisions relating to "defaulting" Lenders (including provisions relating to providing cash collateral to support letters of credit, the suspension of voting rights, rights to receive certain fees, and termination or assignment of commitments or Revolving Loans of such Lenders).

|   |   |
|---|---|
| Assignments and Participations: | The Lenders shall be permitted to assign all or a portion of their Revolving Loans and Revolving Commitments with the consent, not to be unreasonably withheld, conditioned or delayed of (a) the Borrower, unless (i) the assignee is a Lender, an affiliate of a Lender or an approved fund; provided that the Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within ten (10) business days after having received written notice thereof; or (ii) an event of default has occurred and is continuing and (b) the Administrative Agent.  In the case of partial assignments (other than to another Lender, an affiliate of a Lender or an approved fund), the minimum assignment amount shall be $1,000,000, unless otherwise agreed by the Borrower and the Administrative Agent.  The Administrative Agent shall receive a processing and recordation fee of $3,500 in connection with all assignments.  The Lenders shall also be permitted to sell participations in their Revolving Loans.  Participants shall have the same benefits as the selling Lenders, in an amount not to exceed that available to the selling Lenders, with respect to yield protection and increased cost provisions subject to customary limitations.  Voting rights of participants shall be limited to those matters set forth in clause (a) under "Voting" with respect to which the affirmative vote of the Lender from which it purchased its participation would be required.  Pledges of Revolving Loans in accordance with applicable law shall be permitted without restriction. |
| Yield Protection: | The Revolving Credit Documentation shall contain customary provisions (a) protecting the Lenders against increased costs or loss of yield resulting from changes in reserve, tax, capital |

509265-1544-15068-Active.20036354.11

adequacy and other requirements of law and from the imposition of or changes in withholding or other taxes and (b) indemnifying the Lenders for "breakage costs" incurred in connection with, among other things, any prepayment of a Eurodollar Loan (as defined in Annex I) on a day other than the last day of an interest period with respect thereto.

**Expenses and Indemnification:**   The Borrower shall pay (a) all reasonable and documented out-of-pocket expenses of the Administrative Agent and the Lead Arrangers associated with the syndication of the Exit Revolving Facility and the preparation, execution, delivery and administration of the Revolving Credit Documentation and any amendment or waiver with respect thereto (including the reasonable fees, disbursements and other charges of counsel); (b) all documented out-of-pocket expenses of the Administrative Agent and the Lenders (including the fees, disbursements and other charges of counsel) in connection with the enforcement of the Revolving Credit Documentation; and (c) all reasonable and documented out-of-pocket expenses of the Lenders' outside counsel, local counsel and financial advisor, if necessary, in the discretion of the Lenders.

The Administrative Agent, the Lead Arrangers and the Lenders and their affiliates and their respective officers, directors, employees, advisors and agents (each, an "indemnified person" and such affiliates, directors, officers, employees, advisors, agents and other representatives of any such indemnified person are referred to herein as its "related parties") will have no liability for, and will be indemnified and held harmless against, any losses, claims, damages, liabilities or expenses (including the reasonable fees, disbursements and other charges of counsel) incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof, except to the extent they are found by a final, nonappealable judgment of a court of competent jurisdiction to arise from the bad faith, gross negligence, willful misconduct or material breach of the obligations of the relevant indemnified person (or its related parties) under the Revolving Credit Documentation.

**Governing Law and Forum:**   New York.

**Bail-In Provisions:**   The Exit Revolving Facility will contain customary EU bail-in provisions.

**Counsel to the Administrative Agent and the Lenders:**   Simpson Thacher & Bartlett LLP.

11

Annex I

## <u>INTEREST AND CERTAIN FEES</u>

Interest Rate Options:

The Borrower may elect that the Revolving Loans comprising each borrowing bear interest at a rate per annum equal to (a) the ABR plus the Applicable Margin or (b) the Eurodollar Rate plus the Applicable Margin.

As used herein:

"<u>ABR</u>" means the highest of (i) the rate of interest publicly announced by JPMorgan Chase Bank, N.A. as its prime rate in effect at its principal office in New York City (the "<u>Prime Rate</u>"), (ii) the federal funds effective or overnight rate from time to time plus 0.50% and (iii) the Eurodollar Rate applicable for an interest period of one month plus 1.00%

"<u>ABR Loans</u>" means Revolving Loans bearing interest based upon the ABR.

"<u>Applicable Margin</u>" means, (a) in the case of Eurodollar Loans, (i) during the period commencing on the Closing Date and ending on the date that is twelve months after the Closing Date: 8.00%; (ii) during the period commencing on the date that is thirteen months after the Closing Date and ending on the date that is eighteen months after the Closing Date: 11.00% and (iii) during the period commencing on the date that is nineteen months after the Closing Date and ending on the date that is thirty months after the Closing Date: 13.00%, and, (b) in the case of ABR Loans, (i) during the period commencing on the Closing Date and ending on the date that is twelve months after the Closing Date: 7.00%; (ii) during the period commencing on the date that is thirteen months after the Closing Date and ending on the date that is eighteen months after the Closing Date: 10.00% and (iii) during the period commencing on the date that is nineteen months after the Closing Date and ending on the date that is thirty months after the Closing Date: 12.00%, <u>provided that</u>, at the option of the Borrower, the Borrower may elect to pay a portion of such Applicable Margin in-kind by adding such portion to the principal amount of the Revolving Loans, which portion shall not exceed (i) 1.00% during the period commencing on the Closing Date and ending on the date that is twelve months after the Closing Date, (ii) 3.00% during the period commencing on the date that is thirteen months after the Closing Date and ending on the date that is eighteen months after the Closing Date and (iii) 2.00% thereafter.

"<u>Eurodollar Rate</u>" means the rate (adjusted for statutory reserve requirements for eurocurrency liabilities) for eurodollar deposits for a period equal to one, two, three or six months (as selected by

the Borrower) appearing on LIBOR01 Page published by Reuters (or an interpolated rate if the screen rate is not available), provided, however, that in no event shall the Eurodollar Rate be less than 1%.

"<u>Eurodollar Loans</u>" means Revolving Loans bearing interest based upon the Eurodollar Rate.

| | |
|---|---|
| Interest Payment Dates: | In the case of ABR Loans, quarterly in arrears. |

In the case of Eurodollar Loans, on the last day of each relevant interest period and, in the case of any interest period longer than three months, on each successive date three months after the first day of such interest period.

| | |
|---|---|
| Upfront Commitment Fee: | The Borrower shall pay an upfront commitment fee equal to 3.00% of the total amount of the Exit Revolving Facility (the "<u>Upfront Commitment Fee</u>"), which shall be capitalized on the Closing Date and added to the outstanding balance of Revolving Loans as of the Closing Date. |
| Undrawn Commitment Fee: | The Borrower shall pay a commitment fee calculated at a rate per annum equal to 0.75% on the average daily unused portion of the Exit Revolving Facility. |
| Letter of Credit Fees: | The Borrower shall pay a fee on all outstanding Letters of Credit at a per annum rate equal to the Applicable Margin then in effect with respect to Eurodollar Loans under the Exit Revolving Facility on the face amount of each such Letter of Credit. Such fee shall be shared ratably among the Lenders participating in the Exit Revolving Facility and shall be payable quarterly in arrears. |

A fronting fee equal to 0.25% of the face amount of each Letter of Credit shall be payable quarterly in arrears to the Issuing Lender for its own account. In addition, customary administrative, issuance, amendment, payment and negotiation charges shall be payable to the Issuing Lender for its own account.

| | |
|---|---|
| Default Rate: | At any time when the Borrower is in default in the payment of any amount under the Exit Revolving Facility, after giving effect to any applicable grace period, such overdue amounts shall bear interest at 2.00% per annum above the interest rate which would be payable at such time on an ABR Loan. |
| Rate and Fee Basis: | All per annum rates shall be calculated on the basis of a year of 360 days (or 365/366 days, in the case of ABR Loans, the interest rate payable on which is then based on the Prime Rate) for actual days elapsed. |

I-2

Annex II

## FORM OF SOLVENCY CERTIFICATE

[____], 2016

This Solvency Certificate is being executed and delivered pursuant to Section [___] of that certain [_____][1] (as amended, restated, amended and restated, extended, supplemented or otherwise modified in writing from time to time, the "Exit Revolving Facility"; the terms defined therein being used herein as therein defined).

I, [            ], the Chief Financial Officer of Holdings, in such capacity and not in an individual capacity, hereby certify that I am the Chief Financial Officer of Holdings and that I am generally familiar with the businesses and assets of Holdings and its Subsidiaries (taken as a whole) and am duly authorized to execute this Solvency Certificate on behalf of Holdings pursuant to the Exit Revolving Facility.

I further certify, in my capacity as Chief Financial Officer of Holdings, and not in my individual capacity, as of the date hereof and after giving effect to the Plan and the incurrence of the indebtedness and obligations being incurred in connection with the Exit Revolving Facility and the Plan, that, (i) the sum of the debt (including contingent liabilities) of Holdings, the Borrower and its subsidiaries, taken as a whole, does not exceed the present fair saleable value of the present assets of Holdings, the Borrower and its subsidiaries, taken as a whole; (ii) the capital of Holdings, the Borrower and its subsidiaries, taken as a whole, is not unreasonably small in relation to the business of Holdings, the Borrower or its subsidiaries, taken as a whole, contemplated as of the date hereof; and (iii) Holdings, Borrower and its subsidiaries, taken as a whole, do not intend to incur, or believe that they will incur, debts including current obligations beyond their ability to pay such debt as they mature in the ordinary course of business. For the purposes hereof, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standard No. 5).

*[Remainder of page intentionally left blank]*

---

[1]        Describe Exit Revolving Facility

IN WITNESS WHEREOF, I have executed this Solvency Certificate on the date first written above.

By:_____
Name: [_____]
Title: Chief Financial Officer

# EXHIBIT F

# GOVERNANCE TERM SHEET

**Logan's Roadhouse, Inc.**

**Corporate Governance Term Sheet**

**August 8, 2016**

**THE FOLLOWING TERM SHEET PRESENTS CERTAIN OF THE MATERIAL TERMS IN RESPECT OF THE CORPORATE GOVERNANCE OF ROADHOUSE HOLDINGS, INC. (OR SUCH OTHER ENTITY AS IS ESTABLISHED TO BE THE ULTIMATE HOLDING COMPANY FOR THE LOGAN'S ROADHOUSE BUSINESS) ("ULTIMATE PARENT").    THIS TERM SHEET IS BEING PROVIDED IN CONTEMPLATION OF A RELATED "PRINCIPAL TERMS OF PROPOSED RESTRUCTURING TRANSACTION" TO BE ATTACHED TO A RESTRUCTURING SUPPORT AGREEMENT (THE "RSA").    THE PROPOSED TERMS SET FORTH IN THIS TERM SHEET ARE INTENDED TO FACILITATE THE PREPARATION OF THE DEFINITIVE CONSTITUTIVE DOCUMENTATION OF ULTIMATE PARENT.    THIS TERM SHEET IS HIGHLY CONFIDENTIAL AND SHALL NOT BE DISCLOSED BY ANY RECIPIENT HEREOF TO ANY THIRD PARTY.**

The constitutive documents (e.g., Amended and Restated Certificate of Incorporation, By-laws and Stockholders' Agreement) of Ultimate Parent (the "Organizational Documents") would include the provisions set forth below.

| | |
|---|---|
| ***Board of Directors*** | Following the effective date of the Plan contemplated by the RSA (such date, the "Effective Date"), the day-to-day operations of Ultimate Parent shall be overseen by the Board of Directors of Ultimate Parent (the "Board"), including the authority to appoint the officers of Ultimate Parent, which shall initially be comprised of seven or more directors collectively holding up to twelve votes as follows: |
| | (i) two independent directors nominated by the Board and elected by a majority of the holders of Ultimate Parent's equity securities entitled to vote generally for the election of directors ("New Voting Securities"); |
| | (ii) the then-serving Chief Executive Officer of Ultimate Parent; |
| | (iii) for so long as Kelso & Company or its respective controlled investment affiliates (collectively, "Kelso") hold at least the Designating Threshold (as defined below) of the New Voting Securities issued to Kelso on the Effective Date, one director appointed by Kelso (the "Kelso Director"); |

(iv) for so long as GSO Capital Partners, LP or its controlled investment affiliates (collectively, "GSO" and together with Kelso, the "Lead Holders") hold at least the Designating Threshold of the New Voting Securities issued to GSO on the Effective Date, one director appointed by GSO (the "GSO Director" and together with the Kelso Director, the "Lead Directors");

(v) for so long as Marblegate Asset Management, LLC or its controlled investment affiliates (collectively, "MG") hold at least the Designating Threshold of the New Voting Securities issued to MG on the Effective Date, one director appointed by MG (the "MG Director");

(vi) for so long as Carl Marks Management Company, LLC or its controlled investment affiliates (collectively, "CM" and collectively with Kelso, GSO and MG for so long as they retain the right to designate a Designated Director, the "Designating Holders") hold at least the Designating Threshold of the New Voting Securities issued to CM on the Effective Date (the "CM Director" and collectively with the Kelso Director, the GSO Director and the MG Director, the "Designated Directors"); and

(vii) any Alternative Director (as defined below).

The "Designating Threshold" means an amount of New Voting Securities equal to 25% of the lesser of (a) the New Voting Securities to be issued to Kelso on the Effective Date and (b) the New Voting Securities to be issued to GSO on the Effective Date.

Each director shall be entitled to cast one vote on any matter before the Board, except that (a) (i) each Lead Director shall be entitled to cast three votes on any matter before the Board for so long as the Lead Holder that appointed such Lead Director holds an amount of New Voting Securities equal to at least the Three-Vote Threshold (as defined below) of the New Voting Securities issued to such Designating Holder on the Effective Date, (ii) each Lead Director shall be entitled to cast two votes on any matter before the Board for so long as the Lead Holder that appointed such Lead Director holds at least the Two-Vote Threshold (as defined below) but less than Three-Vote Threshold of the New Voting Securities issued to such Designating Holder on the Effective Date, and (iii) thereafter each Lead Director shall have the right to cast one vote on any matter before the Board, (b) the CM Director shall be entitled to cast two votes on any matter before the Board for so long as CM holds at least the Two-Vote Threshold of the New Voting Securities issued to CM on the Effective Date and thereafter the CM Director shall have

the right to cast one vote on any matter before the Board and (c) any Alternative Director shall be entitled to cast a number of votes as described below. Furthermore, anytime a Designating Holder transfers to one of the other Designating Holders (in one or more transactions) (x) an aggregate amount of New Voting Securities equal to or greater than the Designating Threshold, which causes a reduction in the number of votes entitled to be cast by the transferring Designating Holder's Designated Director from three votes to two votes, (y) an aggregate amount of New Voting Securities equal to or greater than (i) the Three-Vote Threshold minus the Two-Vote Threshold, in the case of the Lead Directors, and (ii) 100% of the New Voting Securities issued to CM on the Effective Date minus the Two-Vote Threshold, in the case of CM, which causes a reduction in the number of votes entitled to be cast by the transferring Designating Holder's Designated Director from two votes to one vote, or (z) an aggregate amount of New Voting Securities equal to or greater than the Designating Threshold, which causes the loss of the transferring Designating Holder's right to designate a director, the number of votes entitled to be cast on any matter before the Board by the Designated Director of the transferee Designating Holder will increase by one vote for each applicable transfer concurrently with the corresponding loss of a vote by the transferring Designating Holder's Designated Director. Such Designated Director of the transferee Designating Holder will continue to be entitled to cast any such additional vote or votes so long as the transferee Designating Holder holds such transferred New Voting Securities and is otherwise entitled to designate a director in accordance herewith.

The "Two-Vote Threshold" means an amount of New Voting Securities equal to 75% of the New Voting Securities to be issued to CM on the Effective Date. The "Three-Vote Threshold" means an amount of New Voting Securities equal to 75% of the lesser of (a) the New Voting Securities to be issued to Kelso on the Effective Date and (b) the New Voting Securities to be issued to GSO on the Effective Date.

Notwithstanding the foregoing, any time the GSO Director would otherwise be entitled to cast more than 25% of the total number of votes entitled to be cast on any matter before the Board, one or more (as determined by GSO) additional independent directors shall be appointed to the Board by the then-serving Chief Executive Officer of Ultimate Parent (each, an "Alternative Director"), which appointment(s) shall be subject in all respects to GSO's consent, and such Alternative Director(s) shall be entitled to collectively cast (in lieu of the GSO Director) the number of votes that reduces the

| | |
|---|---|
| | number of votes the GSO Director is entitled to cast to 25% or less of the total number of votes entitled to be cast. For the avoidance of doubt, any vote entitled to be cast by an Alternative Director will reduce the number of votes entitled to be cast by the GSO Director.

For each Designating Holder that loses its right to designate a director, the number of directors elected pursuant to clause (i) shall be increased by one; provided, that, to the extent another Designated Director receives the right to cast an additional vote in connection with such loss (as described above), the number of directors elected pursuant to clause (i) shall not be increased until such time as the applicable Designated Director is no longer entitled to cast such additional vote.

The Chairperson of the Board shall be appointed from among the members of the Board by a majority vote of the Designated Directors (together with any Alternative Directors). The Chairperson of the Board shall have the rights and duties customary for non-executive chairperson positions.

A quorum for meetings of the Board will require the attendance (telephonically or in person) of directors holding a majority of the votes of all the directors on the Board. Action to be taken by the Board shall require approval by a majority vote of the directors of the whole Board at a meeting at which quorum is present. Any two directors acting collectively (irrespective of voting power) shall have the right to call a special meeting of the Board.  The Board shall hold regular meetings no less than quarterly.

Each Designating Holder may remove and replace its Designated Director with or without cause by written notice to the Board.  A Designated Director may not otherwise be removed from the Board except for cause or as required by applicable law and, in such cases, the applicable Designating Holder may fill the vacancy created by such removal.

No Designating Holder may transfer its right to appoint a Designated Director to any third party (whether or not in connection with a sale or transfer of its New Voting Securities as contemplated below). |
| ***Observer Rights*** | Each Designating Holder shall be entitled to designate one person to observe the Board's actions and meetings (including the actions and meetings of committees of the Board), subject to exceptions for the preservation of attorney-client privilege and conflicts of interest, for so long as such Designating Holder retains its right to designate a |

| | |
|---|---|
| | director to the Board. Such observer may be required to execute a confidentiality agreement reasonably acceptable to Ultimate Parent prior to attending such meetings or receiving any written materials to be discussed at such meetings. Such observer shall not have any voting rights. |
| ***Voting*** | Each holder of New Voting Securities (such holder, an "<u>Equity Holder</u>") shall be entitled to one vote per share of New Voting Securities. |
| | A quorum for all Equity Holder meetings shall require the attendance (telephonically, in person or by proxy) of Equity Holders holding a majority of the New Voting Securities issued and outstanding. Action to be taken by Equity Holders at a meeting shall require approval by a majority or such other percentage of the New Voting Securities entitled to vote, as provided herein.  Any holder or group of holders of the New Voting Securities holding at least 25% of the New Voting Securities shall be entitled to call a special meeting of the Equity Holders. |
| ***Consent Rights/Protections*** | The following actions shall require the affirmative vote of the Equity Holders holding more than 67 of the New Voting Securities: |
| | (i)      any change in the size or classification of the Board; |
| | (ii)     any winding up, liquidation or dissolution of the business and operations of Ultimate Parent or any of its subsidiaries; |
| | (iii)    any recapitalization, reclassification or similar action with respect to the equity securities of Ultimate Parent or any of its subsidiaries (or securities exercisable for, convertible into or exchangeable for equity securities); |
| | (iv)    any issuance of any equity securities (or securities exercisable for, convertible into or exchangeable for equity securities) at less than fair market value as determined by the Board in good faith, other than Excluded Issuances (as defined below); |
| | (v)     any redemption of any equity securities; |
| | (vi)    transactions between Ultimate Parent or any of its subsidiaries, on the one hand, and, on the other hand, (A) any Equity Holder or affiliate of an Equity |

|  | Holder (other than (1) pursuant to the definitive documentation that provides for a loan to Ultimate Parent or any of its subsidiaries and (2) transactions among any of Ultimate Parent and any of its subsidiaries); or (B) any director or officer of Ultimate Parent or any of its subsidiaries or any of their respective affiliates (other than ordinary course employment and indemnification arrangements and the management incentive plan); |
|  | (vii)  engagement of Ultimate Parent or any of its subsidiaries in any unrelated line of business; |
|  | (viii)  any sale or other disposition of assets of Ultimate Parent or any of its subsidiaries with a value in excess of $40 million in one or a series of related transactions; |
|  | (ix)  any transaction that results in a change in control of Ultimate Parent other than a sale pursuant to Drag-Along Rights described below; |
|  | (x)  the establishment or entrance into any joint ventures, partnerships, alliances or similar arrangements in which Ultimate Parent and/or any of its subsidiaries invests (or commits to invest), or becomes liable for, an aggregate amount in excess of $10 million; and |
|  | (xi)  any initial public offering or any action to cause Ultimate Parent to become a public reporting company under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and the related rules and regulations thereunder. |
| ***Tag-Along Rights*** | If one or more Designating Holders (collectively, the "Transferring Equity Holders" and each a "Transferring Equity Holder") propose to sell or otherwise transfer in one or a series of related transactions shares of New Voting Securities representing more than 50% of the issued and outstanding New Voting Securities held by it to any purchaser (other than to any affiliate of a Transferring Equity Holder or any other Designating Holder), then the Transferring Equity Holders shall give written notice to Ultimate Parent and all of the other Designating Holders at least 15 business days prior to the closing of such sale or transfer, and each other Designating Holder (the "Tagging Equity Holders") shall have the right (but not the obligation) to include in such sale or transfer its pro rata portion |

| | |
|---|---|
| | of the New Voting Securities to be sold or transferred to the proposed purchaser on the same terms and conditions as the Transferring Equity Holder, including, without limitation, in exchange for a pro rata share of all consideration received by the Transferring Equity Holders in exchange for such New Voting Securities, except that such other Designating Holders shall not be required to make any representation, warranty or agreement in any documentation relating to such sale transfer that is less favorable than the representations, warranties or agreements agreed to by the Transferring Equity Holder. |
| ***Drag-Along Rights*** | If one or more Equity Holders (collectively, the "<u>Selling Equity Holders</u>" and each a "<u>Selling Equity Holder</u>") propose to sell or otherwise transfer in one or a series of related transactions shares of New Voting Securities representing more than 67% of all of the issued and outstanding New Voting Securities (including through a merger structure) or all or substantially all of the assets of Ultimate Parent to any purchaser (other than to an affiliate of a Selling Equity Holder) that proposes to purchase all (but not less than all) of the issued and outstanding New Voting Securities or all or substantially all of the assets of Ultimate Parent, the Selling Equity Holders may require the other Equity Holders (the "<u>Dragged-Along Equity Holders</u>") to include all of their shares of New Voting Securities in, if applicable, and otherwise cooperate and raise no objection to, such sale or transfer and on the same terms and conditions applicable to the Selling Equity Holders, except that the only representations to be made by the Dragged-Along Equity Holders in any documentation relating to such sale shall be those as are customarily made by selling security holders in a compelled sale, and any liability of a Dragged-Along Equity Holder shall be several and limited to an escrow. |
| ***Pre-emptive Rights*** | Until an initial public offering (if any) by Ultimate Parent occurs (an "<u>Initial Public Offering</u>"), if Ultimate Parent offers any equity securities (or securities exercisable for, convertible into or exchangeable for equity securities), except for any securities issued in connection with any Excluded Issuances, each Equity Holder who is an accredited investor and owns not less than 5% of New Voting Securities shall have a right of first refusal to purchase its *pro rata* portion of such interests on the most favorable price and the most favorable economic terms as such interests are offered to be sold. "<u>Excluded Issuances</u>" shall mean the issuance of equity securities (i) pursuant to or issued upon the exercise of incentive interests granted under any management incentive plan approved by the Board, (ii) in consideration for an acquisition transaction or other strategic investment, (iii) pursuant to conversion or exchange rights included |

| | |
|---|---|
| | in equity interests previously issued, (iv) in connection with an equity interests split, division or dividend and (v) in connection with a bona fide debt financing. |
| *Registration Rights* | *Demand Registration.*  At any time after an Initial Public Offering, Ultimate Parent shall register all Registrable Securities under the Securities Act of 1933, as amended (the "<u>Securities Act</u>") requested in writing to be registered by any holder of at least 7% of Registrable Securities (a "<u>Qualified Equity Holder</u>").  Kelso, GSO and any other Qualified Equity Holder will each be entitled to an aggregate of 2 demand registrations.  Exercise of demand rights will otherwise be subject to usual and customary limitations (e.g., blackout periods). |
| | "<u>Registrable Securities</u>" means all New Voting Securities held by Equity Holders, including any equity securities issued (a) in respect of the New Voting Securities (by way of conversion, exchange, split, dividend or otherwise) or (b) by a corporation formed for the purpose of effecting a public offering; provided that such securities shall cease to be Registrable Securities after (i) they have been sold to the public pursuant to a registration statement or (ii) may be sold to the public without registration or being subject to limitations pursuant to Rule 144. |
| | *Piggyback Registration.*  Each Equity Holder that owns at least 2% of the Registrable Securities shall have the right to include its Registrable Securities each time Ultimate Parent proposes for any reason to register any of its Registrable Shares under the Securities Act.  The rights to piggyback registration may be exercised an unlimited number of occasions.  The rights to piggyback registration will be subject to usual and customary exceptions and limitations (including, without limitation, as to exceptions, employee plan S-8 filings and acquisition transactions and, as to limitations, selection of underwriters, priority and cutbacks). |
| | *S-3 Registration.*  Following an Initial Public Offering, any Qualified Equity Holder may request that Ultimate Parent file a registration statement under the Securities Act on Form S-3 (or similar or successor form) covering Registrable Securities held by such Qualified Equity Holder if Ultimate Parent is a registrant qualified to use Form S-3 to register the Registrable Securities. Demands to register the Registrable Securities on Form S-3 will not be deemed to be demand requests (as described above) and any Qualified Equity Holder shall have the right to request an unlimited number of registrations on Form S-3. |

|  | *Registration Procedures*.  Ultimate Parent and its Equity Holders will enter into a registration rights agreement that will contain usual and customary provisions relating to the registration procedures to be followed by Ultimate Parent, termination of registration rights, as well as indemnification obligations. |
|---|---|
| ***Right of First Refusal*** | If a Designating Holder negotiates to sell or otherwise transfer (i) to any purchaser (other than any affiliate of such Designating Holder or any other Designating Holder), in one or a series of related transactions, shares of New Voting Securities (the "Offered Securities") representing more than 5% of the issued and outstanding New Voting Securities held by it or (ii) to another Designating Holder, a number of shares of New Voting Securities that will result in the Designated Director of the transferee Designating Holder being entitled to cast a majority or more of the votes of the Board (each of (i) and (ii) referred to as an "Offer"), then such Designating Holder shall give written notice (the "Offer Notice") of the Offer to Ultimate Parent and all of the other Designating Holders, and each other Designating Holder (the "Offerees") shall have the right (but not the obligation) to elect to purchase (within 5 business days after the Offer Notice) on a pro rata basis with any other participating Offeree, the offered New Voting Securities at the same price and on the terms as the Offer.  If any Offerees elect to exercise such right to purchase the Offered Securities, the parties shall use commercially reasonable efforts to consummate such transaction within 20 business days after the Offer Notice. |
| ***Information Rights*** | Ultimate Parent (for as long as it is not a public filer) will provide or cause to be provided the following information to each of (a) the Equity Holders holding 2% or more of the issued and outstanding New Voting Securities and (b) upon written request therefor, the Equity Holders holding less than 2% of the issued and outstanding New Voting Securities:

(i)      As soon as available but in any event within 120 days after the end of each fiscal year of LRI Holdings, Inc., Logan's Roadhouse, Inc. and their respective subsidiaries and affiliates (collectively, the "Company"), audited consolidated financial statements (including an income statement, balance sheet and statement of cash flows), setting forth in each case in comparative form the corresponding figures for the corresponding periods of the previous fiscal year, all in reasonable detail, together with a copy of the audit report of the Company's |

|  | independent public accountants, and |
|---|---|
|  | (ii)  As soon as available but in any event within 45 days after the end of each fiscal quarter of the Company, unaudited consolidated financial statements (including an income statement, balance sheet and statement of cash flows), all in reasonable detail. |
|  | Ultimate Parent will also provide or cause to be provided, upon request therefor, the following information to each Designating Holder: |
|  | (i)  Copy of the annual budget and Board adopted updates to such budget; |
|  | (ii)  Copies of all material notices from accountants, landlords, insurers and counterparties to material agreements; |
|  | (iii)  Copies of any filings or notices of any material actions, suits or proceedings by or before any arbitrator or governmental authority against or affecting the Company; and |
|  | (iv)  Such other information as such Equity Holder may reasonably request. |
| ***Amendments*** | None of the Organizational Documents may be amended without written consent of the Equity Holders holding at least 67% of the New Voting Securities issued and outstanding; provided, however, that no amendment to any of the Organizational Documents shall be effected that would eliminate or materially alter the right of the Designating Holders to appoint, remove or replace the Designated Directors without the written consent of the Designating Holders. |

## EXHIBIT B

### JOINDER

The undersigned ("***Transferee***") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of August 8, 2016 (the "***Agreement***"), by and among Roadhouse Holding Inc. and each of its direct and indirect subsidiaries that are party thereto (collectively, the "***Debtors***") and certain holders of claims against the Debtors signatory thereto, and agrees to be bound by the terms and conditions thereof, and shall be deemed a "***Joining Party***" under the terms of the Agreement.   The Transferee hereby makes the representations and warranties of the Supporting Parties (as defined in the Agreement) set forth in <u>Section 2</u> of the Agreement to the other Parties thereto.  This joinder shall be governed by, and construed in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflict of laws that would require the application of the law of any other jurisdiction.

Date Executed:  _____

**TRANSFEREE**

Name:  _____

By:  _____

Name:  _____

Title:  _____

Notice Party: _____

Address:  _____

_____

Telephone:  _____

Facsimile:  _____

Email:  _____

**CLAIMS**

$ _____

# **EXHIBIT D**

## **Financial Projections**

| Logan's Roadhouse, Inc.<br>($000's) | 2016<br>Jan-Jun | 2016<br>Jul-Dec | 2016<br>Total | 2017<br>Total | 2018<br>Total | 2019<br>Total |
|---|---|---|---|---|---|---|
| **Store Count [1]** | **230** | **213** | **213** | **213** | **213** | **213** |
| Gross Sales | 316,683 | 272,981 | 589,664 | 593,441 | 611,244 | 629,581 |
| Discounts | 14,281 | 14,252 | 28,533 | 28,878 | 29,744 | 30,637 |
| **Net Sales** | **302,402** | **258,729** | **561,131** | **564,563** | **581,500** | **598,945** |
| Food and Liquor Cost | 103,821 | 88,055 | 191,876 | 189,279 | 194,713 | 200,546 |
| *Percentage of Net Food Sales [2]* | *34.8%* | *34.6%* | *34.7%* | *34.1%* | *34.1%* | *34.1%* |
| Labor Cost | 94,131 | 81,072 | 175,203 | 169,784 | 173,814 | 177,491 |
| *Percentage of Net Sales* | *31.1%* | *31.3%* | *31.2%* | *30.1%* | *29.9%* | *29.6%* |
| **Gross Profit** | **104,451** | **89,602** | **194,053** | **205,499** | **212,973** | **220,907** |
| *Percentage of Net Sales* | *34.5%* | *34.6%* | *34.6%* | *36.4%* | *36.6%* | *36.9%* |
| Operating Expenses [3] | 36,085 | 31,327 | 67,412 | 64,544 | 66,539 | 68,477 |
| Repair & Maintenance | 6,143 | 5,588 | 11,731 | 11,808 | 12,184 | 12,550 |
| Occupancy Cost [4] | 28,095 | 26,201 | 54,297 | 51,337 | 52,039 | 53,181 |
| *Percentage of Net Sales* | *9.3%* | *10.1%* | *9.7%* | *9.1%* | *8.9%* | *8.9%* |
| General & Administrative [5] | 18,919 | 15,595 | 34,514 | 35,922 | 35,372 | 36,080 |
| *Percentage of Net Sales* | *6.3%* | *6.0%* | *6.2%* | *6.4%* | *6.1%* | *6.0%* |
| Advertising | 7,163 | 7,512 | 14,676 | 16,681 | 16,681 | 16,681 |
| *Percentage of Net Sales* | *2.4%* | *2.9%* | *2.6%* | *3.0%* | *2.9%* | *2.8%* |
| **EBITDA [6]** | **8,045** | **3,379** | **11,424** | **25,208** | **30,158** | **33,938** |
| *Adjustments to EBITDA:* | *4,585* | *850* | *5,435* | *512* | | |
| **Adjusted EBITDA** | **12,630** | **4,229** | **16,859** | **25,720** | **30,158** | **33,938** |

**Footnotes:**

(1): Reflects the closure of 17 units in August 2016.

(2): Reflects food cost as a percentage of net food sales.

(3): 2016 reflects store closure costs of approximately $850K.

(4): Reflects occupancy cost savings of $2.5MM in both 2017 & 2018.

(5): Reflects one-time nonrecurring outsourcing related costs.

**Logan's Roadhouse, Inc.**
Emergence Date Cash Analysis

| | | |
|---|---|---:|
| Cash Balance at Exit (1) | $ | 13,580 |
| Remaining New Money Facility Availability | | 4,927 |
| Refund of Utility Deposit (2) | | 750 |
| **Total Cash** | **$** | **19,257** |

| | | |
|---|---|---:|
| **Potential Closing Cost** | | |
| 503(b)(9) | $ | 580 |
| General Unsecured Claims Pool (3) | | 350 |
| Aggregate Cash-Out Payments (4) | | 1,830 |
| Cure Costs (leases) and Unpaid Administrative Rent | | 3,700 |
| Cure Costs (contracts) | | 1,500 |
| Accrued/Unpaid Professional Fees | | 3,600 |
| **Total Potential Closing Costs** | **$** | **11,560** |

| | | |
|---|---|---:|
| **Net Projected Cash** | **$** | **7,697** |

1. Reflects cash balance per the Debtors' most recent Budget, net of timing impact of rent payments.
2. Assumes the recoupment of remaining portion of the utility deposit
3. Assumes Class 6 accepts the Plan
4. Assumes Class 5 accepts the Plan

0

## **EXHIBIT E**

**Valuation Discussion**

## VALUATION ANALYSIS

### Estimated Enterprise and Implied Equity Valuation of the Reorganized Debtors

THE VALUATION INFORMATION CONTAINED HEREIN IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN. THIS VALUATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE INFORMATION AS REQUIRED BY SECTION 1125 OF THE BANKRUPTCY CODE[15] TO ENABLE THE HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF CLAIMS AGAINST THE DEBTORS.

Solely for purposes of the Plan and the Disclosure Statement, Jefferies LLC ("**Jefferies**"), as investment banker and financial advisor to the Debtors, has estimated the total enterprise value (the "**Total Enterprise Value**") and implied equity value (the "**Equity Value**") of the Reorganized Debtors on a going concern basis and pro forma for the transactions contemplated by the Plan.

In preparing the estimates set forth below, Jefferies has relied upon the accuracy, completeness, and fairness of financial and other information furnished by the Debtors. Jefferies did not attempt to independently audit or verify such information, nor did it perform an independent appraisal of the assets or liabilities of the Debtors or Reorganized Debtors.

The valuation information set forth in this section represents a valuation of the Reorganized Debtors based on the application of standard valuation techniques. The estimated values set forth in this section:

(a) do not purport to constitute an appraisal of the assets of the Debtors or Reorganized Debtors;

(b) do not constitute an opinion on the terms and provisions or fairness from a financial point of view to any person of the consideration to be received by such person under the Plan;

(c) do not constitute a recommendation to any Holder of Allowed Claims as to how such person should vote or otherwise act with respect to the Plan; and

(d) do not necessarily reflect the actual market value that might be realized through a sale or liquidation of the Debtors or Reorganized Debtors.

In estimating the Total Enterprise Value and implied Equity Value of the Reorganized Debtors, Jefferies consulted with the Debtors' Co-Chief Restructuring Officers and senior management team to discuss the Debtors' operations and future prospects, reviewed the Debtors'

---

[15] Unless otherwise defined herein, capitalized terms have the meaning ascribed to them in the *Debtors' Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code*, dated August 16, 2016 (the "**Plan**"), filed by Roadhouse Holding Inc. and its affiliated Debtors or the Disclosure Statement (as defined in the Plan).

historical financial information, and reviewed certain of the Debtors' internal financial and operating data, including the Debtors' financial projections for the Reorganized Debtors attached as **<u>Exhibit D</u>** to the Disclosure Statement (the "**Financial Projections**").

The estimated values set forth herein assume that the Reorganized Debtors will achieve the Financial Projections in all material respects.   Jefferies has relied on the Debtors' representation and warranty that the Financial Projections (a) have been prepared in good faith; (b) are based on fully disclosed assumptions, which, in light of the circumstances under which they were made, are reasonable; (c) reflect the Debtors' best currently available estimates; and (d) reflect the good faith judgments of the Debtors.   Jefferies does not offer an opinion as to the attainability of the Financial Projections.   As disclosed in the Disclosure Statement, the future results of the Reorganized Debtors are dependent upon various factors, many of which are beyond the control or knowledge of the Debtors and Jefferies, and consequently are inherently difficult to project.

This report contemplates facts and conditions known and existing as of September 9, 2016.   Events and conditions subsequent to this date, including updated projections, as well as other factors, could have a substantial effect upon the Total Enterprise Value and implied Equity Value.   Among other things, failure to consummate the Plan in a timely manner may have a materially negative effect on the Total Enterprise Value and implied Equity Value.   For purposes of this Valuation Analysis, Jefferies has assumed that no material changes that would affect value will occur between September 9, 2016 and the contemplated Effective Date of November 14, 2016.

The following is a summary of analyses performed by Jefferies to arrive at its recommended range of estimated Total Enterprise Value and implied Equity Value of the Reorganized Debtors.

1.  **Discounted Cash Flow Analysis**

The discounted cash flow analysis relates the value of an asset or business to the present value of expected future cash flows generated by that asset or business.   The discounted cash flow analysis discounts the expected future cash flows by a theoretical or observed discount rate, in this case determined by estimating the cost of equity and cost of debt for the subject company based upon analysis of similar publicly traded companies. This approach has two components: (i) calculating the present value of the projected unlevered after-tax free cash flows for a determined period and (ii) adding the present value of the terminal value of cash flows.   The terminal value represents the portion of enterprise value that lies beyond the time horizon of the available projections.

In performing the discounted cash flow analysis, Jefferies made assumptions for (i) the weighted average cost of capital (the "**Discount Rate**"), which is used to calculate the present value of future cash flows; and (ii) the terminal Adjusted EBITDA multiple, which was used to determine the terminal value of the Reorganized Debtors.   Jefferies used a range of Discount Rates for the Reorganized Debtors, which reflects a number of company and market-specific factors, and is calculated based on the cost of capital for companies that Jefferies deemed similar. In determining Adjusted EBITDA terminal multiples, Jefferies relied upon various analyses

including, among other things, the range of Adjusted EBITDA trading multiples of projected performance for the next calendar year of selected publicly traded companies that Jefferies deems to be similar to the Reorganized Debtors.

This approach relies on the Debtors' ability to project future cash flows with some degree of accuracy. Because the projections reflect significant assumptions made by the Debtors' management concerning anticipated results, the assumptions and judgments used in the projections may or may not prove correct and, therefore, no assurance can be provided that projected results are attainable or will be realized.

## 2. Comparable Companies Analysis

The comparable companies analysis estimates the value of a company based on a relative comparison with other publicly traded companies with similar operating and financial characteristics. Under this methodology, the enterprise value for each selected public company is determined by examining the trading prices for the equity securities of such company in the public markets and adding the outstanding net debt for such company. Such enterprise values are commonly expressed as multiples of various measures of financial and operating statistics, most commonly Adjusted EBITDA. The Total Enterprise Value is then calculated by applying these multiples to the Reorganized Debtors' projected financial metrics. The selection of public comparable companies for this purpose was based upon the business profile, scale, profitability and other characteristics of the comparable companies that were deemed relevant.

**Total Enterprise Value and Implied Equity Value**

As a result of the analysis described herein, Jefferies estimated the Total Enterprise Value of the Reorganized Debtors to be approximately $131 million to $157 million, with a mid-point of $144 million. Based on assumed pro forma net debt of $103 million (calculated assuming pro forma excess cash of $3.5 million from the "new money" loans under the Exit Second Lien Facility on the Effective Date), the Total Enterprise Value implies an Equity Value range of $28 to $54 million, with a midpoint of $41 million. Jefferies has been advised that the amount of excess cash at emergence could range from $3.5 million to $8.5 million depending on, among other things, the actual amount of the costs of administering the Chapter 11 Cases (including, without limitation, professional fees paid by the Debtors) and which executory contracts and unexpired leases the Debtors elect to assume and the corresponding cure amounts.

The estimate of Total Enterprise Value set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein depending on the results of the Debtors' and Reorganized Debtors' operations or changes in the financial markets. Additionally, these estimates of value represent the hypothetical enterprise value of the Reorganized Debtors as the continuing operator of their businesses and assets, and do not purport to reflect or constitute appraisals, liquidation values, or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein. Such estimates were developed solely for purposes of formulation and negotiation of the Plan and analysis of implied relative recoveries to creditors thereunder. The value of an operating business such as the Debtors' businesses is subject to uncertainties and contingencies that are difficult to predict

and will fluctuate with changes in factors affecting the financial condition and prospects of such businesses.

Jefferies' estimated valuation range of the Reorganized Debtors does not constitute a recommendation to any holder of Allowed Claims or Interests as to how such person should vote or otherwise act with respect to the Plan.  The estimated value of the Reorganized Debtors set forth herein does not constitute an opinion as to the fairness from a financial point of view to any person of the consideration to be received by such person under the Plan or of the terms and provisions of the Plan.  Because valuation estimates are inherently subject to uncertainties, none of the Debtors, Jefferies, or any other person assumes responsibility for their accuracy or any differences between the estimated valuation ranges herein and any actual outcome.

**<u>EXHIBIT F</u>**

**Liquidation Analysis**

# HYPOTHETICAL LIQUIDATION ANALYSIS

To assist the Court in making the findings required under section 1129(a)(7) of the Bankruptcy Code, the Debtors have prepared this hypothetical Liquidation Analysis. The Plan proposes distributions from the Debtors' estates on a consolidated basis, and this Liquidation Analysis has also been prepared on a consolidated basis. As such, proceeds realized from each Debtor are aggregated into a common distribution source. For purposes of distribution, each and every asserted Claim against and Equity Interest in any Debtor is entitled to a distribution from the aggregated proceeds. Any Claim against a Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors are deemed to have one right to a distribution from the aggregated proceeds.

The Liquidation Analysis presents both a "High" and "Low" range of estimated Liquidation Proceeds representing a range of management's assumptions and estimates relating to the proceeds to be received from the liquidation of the assets less the costs incurred during the liquidation. It is assumed that the Chapter 7 cases would be administered over a period of twelve months. The assumed date of the conversion to a hypothetical Chapter 7 Liquidation is approximately November 14, 2016 (the "**Conversion Date**"). It is assumed that a Chapter 7 trustee would be appointed for the Debtors (the "**Trustee**"), he or she would retain counsel and a financial advisor, and certain current corporate and field-based employees of the Debtors would be employed for a limited period to wind-down the Debtors' operations. The Liquidation Analysis further assumes that the Trustee does not possess the financial or operational resources to continue to operate the Debtors' restaurant locations for any period, including the extended period that would be required to conduct a going-concern sale process. As a result, the Liquidation Analysis assumes that the Trustee would immediately close company-operated locations and sell assets on an expedited basis. The Liquidation Analysis assumes, however, that the Trustee would undertake a 60 to 75 day marketing and auction process for the Debtors' leasehold interest and improvements on a non-operating basis ("**Store Sales**"), and the Liquidation Analysis reflects net proceeds form Store Sales that are exclusive of carrying costs for the stores after the Conversation Date, cure amounts, and transaction specific fees, costs and expenses. The Debtors' assumptions regarding the marketability and value of their leaseholds and improvements are based on the experience of the Debtors' management and real estate advisors. In an actual liquidation, it is possible that, due to purchaser-specific and macroeconomic factors, some of the leaseholds and improvements that the Debtors believe are valuable may not be sold. However, the Debtors believe that the values ascribed herein represent a reasonable estimate of what could be achieved from Store Sales conducted during a Chapter 7 liquidation.

In preparing the Liquidation Analysis, the Debtors estimated Allowed Claims based upon a review of their books and records through the date of this analysis. The Liquidation Analysis also includes estimates for Claims which could be asserted and Allowed in a chapter 7 liquidation, including Administrative Claims, employee-related obligations, wind-down costs (as detailed herein), the Trustee's fees, tax liabilities, and other Allowed Claims. To date, the Court has not estimated or otherwise fixed the total amount of Allowed Claims. For purposes of the Liquidation Analysis, the Debtors' have estimated the amount of Allowed Claims and provided ranges of projected recoveries based on certain assumptions. Therefore, the Debtors' estimates of Allowed Claims set forth in the Liquidation Analysis should not be relied upon for any

purpose other than considering the hypothetical distributions under a Chapter 7 liquidation. Nothing contained in the Liquidation Analysis is intended to be or constitutes a concession or admission by the Debtors. The actual amount of Allowed Claims in the Chapter 11 Cases could materially differ from the estimated amounts set forth in the liquidation analysis.

**Factors Considered in Valuing the Hypothetical Liquidation Proceeds**

Factors that could negatively impact the recoveries set forth in the Liquidation Analysis include: (i) turnover of key personnel; (ii) challenging economic conditions; (iii) delays in the liquidation process; (iv) possible difficulty in obtaining landlord consent to assume and assign leases to third party buyers; and (v) possible difficulty in finding willing buyers. Accordingly, these factors may limit the amount of the proceeds that are available to the Trustee through the liquidation of the Debtors' assets.

**Waterfall and Recovery Range**

The Liquidation Analysis assumes that the proceeds generated from the liquidation of all of the Debtors' assets, plus Cash estimated to be held by the Debtors on the Conversion Date, will be reasonably available to the Trustee and the Debtors' secured creditors will have consented to the use of cash collateral as set forth in the Liquidation Analysis and accompanying footnotes. After deducting the costs of liquidation, including, the Trustee's fees and expenses and other administrative expenses incurred in the liquidation, the Trustee would allocate net liquidation proceeds to holders of Claims and Interests in accordance with the priority scheme set forth in section 726 of the Bankruptcy Code. The Liquidation Analysis estimates high and low recovery percentages for Claims and Interests upon the Trustee's application of the liquidation proceeds.

The Debtors have worked with their advisors to estimate ranges of recoveries as provided in this Liquidation Analysis. These ranges are estimate and should not be relied upon by any party. The Debtors do not provide assurance of any recovery.

The statements in the Liquidation Analysis, including estimates of Allowed Claims, were prepared solely to assist the Court in making the findings required under section 1129(a)(7) of the Bankruptcy Code and they may not be used or relied upon for any other purpose.

THE DEBTORS BELIEVE THAT ANY ANALYSIS OF A HYPOTHETICAL LIQUIDATION IS NECESSARILY SPECULATIVE. THERE ARE A NUMBER OF ESTIMATES AND ASSUMPTIONS UNDERLYING THE LIQUIDATION ANALYSIS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT ECONOMIC, COMPETITIVE AND OPERATIONAL UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTORS OR A CHAPTER 7 TRUSTEE. NEITHER THE LIQUIDATION ANALYSIS, NOR THE FINANCIAL INFORMATION ON WHICH IT IS BASED, HAS BEEN EXAMINED OR REVIEWED BY INDEPENDENT ACCOUNTANTS IN ACCORDANCE WITH STANDARDS PROMULGATED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. THERE CAN BE NO ASSURANCE THAT ACTUAL RESULTS WILL NOT VARY MATERIALLY FROM THE HYPOTHETICAL RESULTS PRESENTED IN THE LIQUIDATION ANALYSIS.

Roadhouse Holding Inc. and Subsidiaries
Hypothical Liquidation Analysis
All Debtors Combined
($ in thousands)

| Gross Liquidation Proceeds | | | | | | |
|---|---|---|---|---|---|---|

| | | Estimated Recoveries | | | | See |
| | Estimated | Low | | High | | Attached |
| Asset Category | Value | Value | Rate | Value | Rate | Footnotes |
|---|---|---|---|---|---|---|
| Cash and Equivalents | $ 13,580 | $ 13,580 | 100% | $ 13,580 | 100% | 1 |
| Estimated Accrued and Unpaid Sales Tax | | (2,200) | | (1,800) | | 2 |
| Residual PACA Claims | | (750) | | (750) | | 3 |
| Net Cash and Equivalents | | 10,630 | | 11,030 | | |
| Receivables | 4,636 | 2,470 | 53% | 3,356 | 72% | 4 |
| Inventory | 13,553 | 136 | 1% | 498 | 4% | 5 |
| Prepaid and Other Current Assets | 4,633 | 171 | 4% | 574 | 12% | 6 |
| Property & Equipment, net | 162,119 | 1,750 | 1% | 4,821 | 3% | 7 |
| Goodwill | 93,988 | - | 0% | - | 0% | 8 |
| Tradename | 27,100 | - | 0% | 542 | 2% | 9 |
| Other Assets and Other Intangible Assets | 10,428 | - | 0% | - | 0% | 10 |
| Leasehold Interest | | 500 | | 1,250 | | 11 |
| Chapter 5 Actions and Other Litigation Recoveries | TBD | | | | | 12 |
| Gross Liquidation Proceeds | $ 319,609 | $ 15,656 | 5% | $ 22,071 | 7% | |

| Liquidation Costs and Reserve Claims | | | | | | |
|---|---|---|---|---|---|---|

| | | Range of Recovery | | |
| Recovery of Claims and Costs | | Low | High | |
|---|---|---|---|---|
| Operational Wind-Down Costs - Corp., Rest and Other Admin Claims | | 2,940 | 2,252 | 13 |
| Chapter 7 Trustee Fees Estimated @ 3% | | 470 | 662 | 14 |
| Chapter 7 Trustee Professionals | | 750 | 500 | |
| Total Liquidation Fees and Expenses | | 3,409 | 2,914 | |
| Net Liquidation Proceeds Available Before Professional Fee Carve out | | $ 12,997 | $ 19,907 | |
| Carve-Out for Chapter 11 Professionals | 1,747 | 1,747 | 1,747 | 15 |
| Net Liquidation Proceeds Available for Distribution | | $ 11,250 | $ 18,159 | 16 |

| Distribution of Proceeds | | | | | | |
|---|---|---|---|---|---|---|

| | | Low | | High | | |
|---|---|---|---|---|---|---|
| Revolving Facility Lender Claims | 29,146 | 11,250 | 39% | 18,159 | 62% | 17 |
| DIP Facilities Claims | 62,385 | | 0% | | 0% | 18 |
| Notes Claims | 360,481 | | 0% | | 0% | 19 |
| Chapter 11 Administrative Expenses | 16,750 | | 0% | | 0% | 20 |
| Priority Claims | 5,000 | | 0% | | 0% | 21 |
| General Unsecured Claims | 66,786 | | 0% | | 0% | 22 |
| Existing Equity Interests | | | 0% | | 0% | 23 |
| Total Recoveries | | $ 11,250 | | $ 18,159 | | |

The major assumptions utilized by the Debtors in creating the Liquidation Analysis are detailed below.

**Proceeds from Liquidation of Assets**

1    *Cash and Cash Equivalents*:   The amounts shown are the projected cash balances available to the Debtors as of the Conversion Date.   The estimated cash balances are based on projected cash flows through to the Conversion Date.   The cash balances are (i) prior to any wind-down costs required for the Liquidation, except as noted; (ii) exclude payment of any Professional Fees accrued but unpaid to that date; and (iii) do not include any "restricted cash" or cash in escrow accounts.

2    *Estimated Accrued and Unpaid Sales Tax:*  The Debtors estimate that accrued sales tax at the Conversion Date would be approximately $1.8 million to $2.2 million. The Debtors collect sales tax on customer sales and remit the proceeds to the respective taxing jurisdictions approximately one month after collection. These proceeds are in effect "Trust Fund" proceeds and would be remitted to the taxing jurisdictions prior to any other claim, including any Super-Priority claims being paid.

3    *PACA*:  Claims under the Perishable Agricultural Commodities Act ("**PACA**") payable at the time of conversion are approximately equivalent to the amount of such claims that existed at the Petition Date, which was approximately $750,000.  It is assumed that these claims will be recovered in full based on the protection afforded to vendors under PACA.

4    *Receivables*: Receivables were analyzed by the following major general ledger accounts:

   a    <u>Credit Card Receivables</u>: Represents receipts for meal purchases collected generally within one or two days from the actual sale.  Recovery is assumed at a range of 95% to 98%, after deductions for fees charge-backs and true-ups.

   b    <u>Rebates</u>: Represents rebates from food producers and food manufacturers. Recovery has been assumed at a range of 25% to 75%, since rebates are dependent on the producers or manufactures being paid by our food distributors. In the event of a Chapter 7 liquidation, distributors may not pay the suppliers for certain of the goods yielding the lower recovery rate on rebates.

   c    <u>Franchisee Fees</u>: The Debtors support two franchisees that operate approximately 26 restaurants. The Debtors bill the Franchisee's in arrears for marketing costs and other expenses based on a contractual formula.  The Debtors anticipate that the franchise relationships will terminate upon a conversion to Chapter 7, and collection of these receivables in a wind-down scenario could be offset by various counter-claims and defenses to payment as a result of that termination.

   d    <u>Other</u>:   Represents other various items ranging from payments in excess of deductibles for insurance claims, employee payroll withholding programs and various vendor claims.  Recoveries are projected at 5% to 90% depending on the type of receivable.

5   *Inventory*:  Inventory includes two primary categories:  Food and related items, liquor, beer and wine in the restaurants (34% of total) and smallwares, which include cooking and serving items such as pots, pans, utensils, flatware, plates, cups, and other small food handling equipment (66% of total).

    a   Food:   Due to its highly perishable nature, relatively small value in each restaurant, and wide geographic dispersion, food products would be sold to liquidators or donated to food banks with recoveries ranging between 1% and 5% of cost.

    b   Smallwares:  In a large-scale liquidation such as this, the value of the smallwares is estimated to range between $400 to $1,200 per restaurant or approximately 1% to 3% of the book value.

6   *Prepaid and Other Current Assets*:

    a   Prepaid Insurance:   Represents premiums for various insurance policies including property, general liability, auto, etc.  The prepaid items are assumed to be applied during the wind-down period with a recovery of only 10% to 25%, attributable to policies no longer needed as part of the liquidation or otherwise cancelled.

    b   Prepaid Advertising:  Represents deposits made to advertisers for marketing materials and events that will be halted as part of the liquidation process.  Recovery is estimated at between 0% and 10%, so long as such advertising could be stopped prior to their run dates and the prepaid amounts are not otherwise subject to forfeiture.

    c   Other:  Represents various corporate and store level deposits for goods and services paid for in advance.  Gross dollar amount prepaid are small with expected recoveries ranging between 10% and 67%.

7   *Property, Plant and Equipment:*  Property, Plant and Equipment was analyzed in the following major groups.  All recoveries are presented net of transaction specific costs, including commissions:

    a   Corporate and Store Furniture Fixture and Equipment:  Based on consultation with third party restaurant liquidation/disposal companies, the Debtors have estimated that in a wind-down scenario the recovery on restaurant furniture, fixture and equipment would range between $.50 to $1.00 per square foot, before marketing cost ranging from $5,000 to $7,500 per store.  Recoveries on Corporate Office furniture, fixture and equipment are estimated to be $250,000 to $500,000.  Under these assumptions the net recovery on furniture fixture and equipment would range from $250,000 to $1.1 million, 2% of original cost.

    b   Leasehold Improvements:  Represents leasehold improvements such as buildings, renovations and remodels at leased restaurants that will be closed upon liquidation.   The Debtors have assumed that 75% of the proceeds from Store Sales will be apportioned to leasehold improvements (buildings) on ground leases.

8       *Goodwill*: Goodwill with a book value of $93.9 million is assumed to have no value under in a Chapter 7 liquidation.

9       *Tradename*:  The tradename had been valued at $27.1 million on a going concern basis. The Debtors have estimated that there will be limited value for the tradename in a wind-down scenario, rather than a going-concern sale.  The value has been estimated to range from $0 to $542,000, 2% of book value.

10      *Other Intangibles and Other Assets:* Included in this category are deferred financing and transaction costs, franchise agreements, licenses and permits and CAM deposits.  These assets are deemed to have no value in a wind-down scenario given their lack of transferability and expected likelihood of recovery and collection.

11      *Leasehold Interests*:   The Company currently leases approximately 213 restaurant properties with rents both above and below prevailing market rates.  These leases would be assumed and assigned in the Store Sales.  The Debtors have allocated 25% of the expected proceeds from Store Sales to leasehold interests.

12      *Chapter 5 Actions and Other Litigation:*

        a       <u>Chapter 5 Actions</u>:   In a Chapter 7 liquidation, the Trustee would consider pursuing various potential avoidance actions under Chapter 5 of the Bankruptcy Code, including to recover preferential payments from creditors that were made by the Company during the 90 day period prior to the Petition Date.  The Debtors recently began the process of reviewing their payment records to determine the amount and number of potential preference action items that could be pursued, but have not yet formed a view of the likely value of these actions.   The Liquidation Analysis does not reflect any potential recoveries that might be realized by the Trustee's potential pursuit of any avoidance actions, as the Debtors believe that the amount of potential recoveries on such actions is highly speculative in light of, among other things, the various defenses that would likely be asserted.

        b       <u>Pending Lawsuits</u>:   The Debtors have several pending lawsuits against third parties but given a wind-down.  While the Debtors believe that their claims are meritorious in these actions, the Debtors have not included an estimate of recovery given the uncertainties inherent and litigation and the possibility that the Trustee may determine not to further pursue these actions.

**Liquidation Costs and Reserve Claims**

13      *Operational Wind-Down Costs*:  Operational wind-down costs are expected to range from approximately $2.2 million to $2.9 million over the course of an eight-week wind-down period.   To maximize recoveries on the Debtors' assets, minimize the amount of Claims, and generally ensure an orderly Chapter 7 liquidation, it is assumed that the Trustee will continue to employ a number of the Debtors' employees for a limited amount of time during the Chapter 7 liquidation process.  For purposes of this analysis, these individuals have been segregated into company-operated store personnel and corporate personnel.

The company-operated store personnel will primarily be responsible for the sale of inventory, furniture, fixtures, and equipment at the Debtors' restaurants as well as returning the leaseholds back to the landlord or transferring locations to buyers in the Store Sales. The corporate personnel will primarily be responsible for oversight of the store closure process, finalization of employee benefit matters, cash collections, payroll and tax reporting, accounts payable and other books and records, and responding to certain legal matters related to the wind-down.

The estimated time to complete the asset sales at the restaurants is three weeks and sale of the other assets are expected to take three to five weeks. All of these activities are assumed to take place concurrently.

Personnel-requirement assumptions include the following:

    a    Store-level managers will be needed during the Store Sales process and for turnover of the closed stores.

    b    Operations management will be required to oversee the store-closure process and sale of equipment and other store-level assets.

    c    Accounting, human resources and tax personnel will be required to oversee and manage the finalization of employee benefit matters, cash collections, payroll and tax reporting, accounts payable and other reporting and recordkeeping activities.

Other costs include closing down existing office space, or renting smaller space during the wind-down, utilities and other overhead for the corporate personnel during the wind-down process, rent and utilities for the company operated stores during the asset sale process and cure costs related to any assumed leases.

14    *Chapter 7 Trustees Fees*:  The Trustee's fees have been estimated to be 3% of moneys disbursed or turned over to parties in interest in accordance with section 326 of the Bankruptcy Code.  Costs for the Trustee's professionals are estimated at $500,000 to $750,000.

15    *Professional Fees*:  The Debtors estimate that Professional Fees will be consistent with the Budget (as defined in the DIP Loan Documents) and that approximately $1.7 million of Professional Fees provided for under the Carve-Out (as defined in the DIP Loan Documents) will have been incurred but will remain unpaid as of the Conversation Date.

16    *Unencumbered Assets; Payover*:  While certain assets were not the subject of the liens granted to holders of Revolving Facility Lender Claims and Notes Claims as of the Petition Date, under the DIP Loan Documents, the Debtors granted (i) liens on substantially all of their assets to the DIP Lenders (referred to as the "DIP Collateral"), and (ii) adequate protection liens in favor of the Revolving Facility Lenders and the Noteholders on the DIP Collateral. Additionally, Paragraph 11 of the Interim DIP Order requires the DIP Lenders, except in certain limited circumstances, to pay over all proceeds of DIP Collateral to the Revolving Facility Lenders until the Revolving Facility Lender Claims are satisfied (or cash collateralized in the case of letters of credit).  As a

result, the Liquidation Analysis assumes that the pay-over provisions of the Interim DIP Order are implemented.

**Distribution of Proceeds**

17    *Revolving Facility Lender Claims*:  On the Conversion Date, the Debtors estimate that there will be approximately $29.1 million outstanding under the Revolving Facility Loan Documents which includes a $5.1 million letter of credit facility.  Under the Plan, holders of Revolving Facility Lender Claims are projected to receive recoveries of 100%.

18    *DIP Facilities Claims*:   The New Money Facility (as defined in the DIP Loan Documents) provides for borrowing up to $25.0 million.  The Debtors anticipated that no more than $20.7 million will be outstanding under the New Money Facility as of the Conversion Date.  The DIP Loan Documents also provide for the Roll Up Facility, which provides for a "2 for 1" rollup of the Notes based on amounts advanced under the New Money Facility.  The amount of the DIP Facilities Claims is inclusive of all obligations under the New Money Facility and Roll Up Facility. There are insufficient proceeds for holders of DIP Facilities Claims to obtain any recovery in a Chapter 7 liquidation after taking into account the pay-over provisions discussed in Note 16.  Under the Plan, holders of DIP Facilities Claims are projected to receive recoveries of 100%.

19    *Notes Claims*:   On the Conversion Date, the Debtors estimate that there will be approximately $360.4 million in principal plus accrued interest and paid-in-kind interest outstanding under the Prepetition Second Lien Credit Agreement, which excludes approximately $41.4 million of Notes exchanged under the Roll Up Facility. There are insufficient proceeds for holders of Notes Claims to obtain any recovery in a Chapter 7 liquidation.  Under the Plan, holders of Notes Claims are projected to receive recoveries of approximately 11.6%.

20    *Chapter 11 Administrative Expenses*:   Chapter 11 Administrative Expenses of $16.7 million represent amounts incurred by the Debtors' in the Chapter 11 Cases through the Conversion Date that will remain unpaid (excluding Professional Fees).  Under the Plan, holders of Administrative Expense Claims are projected to receive recoveries of 100%.

21    *Priority Claims* - Priority Claims are Claims accorded priority in right of payment (under section 507(a) of the Bankruptcy Code) arising from the chapter 7 liquidation or the prior chapter 11 proceedings.  For purposes of this analysis, the Debtors have assumed Priority Claims arising from the Debtors' hypothetical chapter 7 cases to be zero, which includes the assumption that any unpaid personal property taxes would be paid from, and are excluded from the amount presented for, the proceeds of the sales of the Debtors' assets. Under the Plan, holders of Priority Claims are projected to receive recoveries of 100%.

22    *General Unsecured Claims*:  On the Conversion Date, the Debtors estimate that there will be approximately $66.8 million outstanding on account of General Unsecured Claims, excluding an intercompany note payable in the amount of approximately $125.5 million. This amount is comprised of $11.4 million on account of trade claims, $50 million on account of estimated rejection damages claims, and the remaining balance is on account

of other miscellaneous claims.  The Debtors have not included in this estimate claims arising from the successful prosecution of litigation against the Debtors.  Further, the Debtors have not included any deficiency claims held by the Revolving Facility Lenders (who are not being paid in full in either scenario under the Liquidation Analysis) or the Noteholders (who are not receiving any distribution on account of the Notes in either scenario under the Liquidation Analysis).  There are insufficient proceeds for holders of General Unsecured Claims to obtain any recovery in a Chapter 7 liquidation.  Under the Plan, holders of General Unsecured Claims are projected to receive recoveries of approximately 2.5% to 3.5%

23    *Existing Equity Interests:*  There are insufficient proceeds for holders of Existing Equity Interests to receive any distribution in a Chapter 7 liquidation.  Holders of Existing Equity Interests will receive no recovery under the Plan.

**<u>EXHIBIT G</u>**

**Confirmation Hearing Notice**

(TO BE PROVIDED ONCE DISCLOSURE STATEMENT ORDER ENTERED)

01:19130797.15